UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KEVIN O'BRIEN,

                Plaintiff,         19 CV 9767 (AKH)
           v.               19 CV 9795 (AKH)
                             19 CV 9849 (AKH)
PARETEUM CORP., et al.,

                Defendants.

------------------------------x
                             New York, N.Y.
                             January 8, 2020
                             11:45 a.m.

Before:

                HON. ALVIN K. HELLERSTEIN,

                             District Judge

                    APPEARANCES

HAGENS BERMAN SOBOL SHAPIRO LLP (NYC)
     Attorneys for Plaintiff Singh and Movants Lee and Soto
BY:  LUCAS GILMORE

BRAGAR, EAGEL & SQUIRE
     Attorneys for Niko Holding
BY:  LAWRENCE EAGEL
     SCOTT HOLLEMAN

KAHN SWICK & FOTI
     Attorneys for Pareteum Corp.
BY:  MICHAEL PALESTINA
     MELISSA HARRIS

WOLF POPPER
     Attorneys for Gateway Securities
BY:  ROBERT FINKEL

MCGUIRE WOODS
     Attorneys for Defendants
BY:  STEPHEN FORESTA

THE COURT:  This is Kevin O'Brien v. Pareteum Corporation, 19 CV 9767, 9795, 9849.  I have two motions before me.  One is the consolidation.  There is no opposition.  It's logical, and I grant it.

The second is for lead plaintiff to choose lead counsel.  Why don't you introduce yourself on the first bench.

MR. GILMORE:  Yes.  Lucas Gilmore of Hagens Berman for Plaintiff Singh and the movants, Dr. Lee and Dr. Soto.

MR. EAGEL:  Good morning, your Honor.  Lawrence Eagel, Bragar, Eagel & Squire.  And with me is Scott Holleman from Bragar, Eagel & Squire.  We are on behalf of Niko Holding Investments.

THE COURT:  That's the Ukrainian company.

MR. EAGEL:  It is, your Honor.

MR. PALESTINA:  Good morning, your Honor.  My name is Michael Palestina of Kahn Swick & Foti.  We are here on behalf Pareteum Shareholder Investor Group, which is the five-member group.  I have with me my colleague, Melissa Harris.

Your Honor, my pro hac vice is pending.  I just wanted to put that on the table.

THE COURT:  It's granted.

MR. PALESTINA:  Thank you.

THE COURT:  It's granted pending the formal order which will come to me eventually.

MR. FINKEL:  And Robert Finkel of Wolf Popper on behalf of Gateway Securities.

MR. FORESTA:  Good morning, your Honor.  Stephen Foresta from McGuire Woods representing the defendants in these matters.

THE COURT:  Do you have an interest in excluding any one of the three?

MR. FORESTA:  We have agreed that it would be in the best interests to consolidate the cases.  In terms of appointment of lead plaintiff and lead counsel, we don't have a dog in that fight.

THE COURT:  Okay.  Who wants to speak first?

MR. EAGEL:  Good morning, your Honor.  Lawrence Eagel of Bragar, Eagel & Squire on behalf of Niko Holding and Investment Limited.

As your Honor is aware, there are three competing motions for lead plaintiff.  There is the Niko Holding, our client.  There is also Ms. Lee and Mr. Soto.  There is also the investor group on my right.

As the Court is also aware, Niko Holding has the largest loss, and there is a presumption on behalf of the movant who has the largest loss.  I will address some of the questions --

THE COURT:  The losses are pretty close together.  Niko has $1.8 million, PSIG has $1.5 million, and the two

doctors have $1.2 million.  So it's pretty close.  There's a presumption.  But given the proximity of one to the other, it's not a major presumption.

MR. EAGEL:  Your Honor, the presumption we come in with -- we also have a company, a representative of the company.  Let me tell you I guess it's fair to say I think the presumption is -- I'd like to advocate for the fact that the presumption is important.  I think Congress, when it decided to have the entity or the movant with the largest loss, it was that movant had the greatest interest.

And I think that's relevant in terms of this particular dispute because there is one person and one entity that we're representing, which is Niko Holding Investments Limited.  It is not a group of people.  It is not several people.

THE COURT:  It's a holding company for various Ukrainian entities.

MR. EAGEL:  It's a Cyprus-organized company.  It is located in the Ukraine.  Again, we live in a -- the fact that it's a Ukraine company I guess everybody in the current political environment may think, oh, gee, it's a Ukraine company.

There is a lot of business done in the Ukraine.  This company, as far as we can tell -- we've vetted and spoken with -- I've spoken with Ivan Nikolaev, the person who

submitted the certification.

There's nothing nefarious about the company. The company has a website. If you look on Google, the fourth website has Niko Group. The allegations concerning Niko regarding this money laundering -- there is no validity to it whatsoever.

It is really the republication of one particular article concerning events that occurred in 2008, nothing about which we understand -- and we've been told they know nothing about that and it didn't exist.

Mr. Nikolaev would come in and testify to that, but I think that the Court shouldn't indulge in speculation as to -- it's essentially one article that got republished five times.

THE COURT: How would you run the case?

MR. EAGEL: Excuse me?

THE COURT: How would you run the case?

MR. EAGEL: I would run the case by first we'd be filing a consolidated or amended complaint. Once we file the amended complaint, we would expect an anticipated motion to dismiss.

We'd respond to the motion to dismiss. We might enlist the aid of other counsel -- we've spoken with Wolf Popper and another firm -- if we needed more resources. Once we overcame the motion to dismiss, we'd push forward with discovery.

THE COURT:  What are the resources that your firm would put on the case?

MR. EAGEL:  I think the plan would be to put three or four lawyers on the case.  We would have Mr. Holleman and myself.  We have counsel Melissa Fortunato.  We have Marian Passmore.  We have Brandon Walker.

We have sufficient resources depending upon this particular case.  David Stone.  I think In this particular case, we would start with myself and Mr. Holleman.  I think we would also have Ms. Passmore who has done some of the work on the papers.

THE COURT:  Who would be in charge of the case?

MR. EAGEL:  I would be in charge of the case, your Honor.  We would litigate the case aggressively.  We'd litigate it responsibly.  And I think our client is interested -- this company lost a lot of money.

He's here.  I guess this whole idea about this sort of money laundering, the first thing he said, would I come here and submit an affidavit and try to be lead plaintiff?  The fact is it's just not true.  And I think that his interest is large. I think there is no issue regarding work.

We also have worked with and have been contacted by his Israeli lawyer, Mordechai Mintzer, your Honor.  He would also be involved to the extent we need help with Israel and help with the Ukraine company.

K29OBR9

THE COURT:  Where are these depositions to be held?  How many people in different places?

MR. EAGEL:  I think the depositions would largely be held here in New York.  Our client would come here to New York and would be available to be deposed in New York.

I think the defendants -- most of them reside in New York or at least are located in New York.  We're here in New York.  So we would conduct the depositions mostly in New York.

THE COURT:  So what's the need for the Israeli lawyer?

MR. EAGEL:  The need for the Israeli lawyer is the Israeli lawyer -- he has the relationship with Niko Holdings.  He's been their long-time counsel.

THE COURT:  Has he forwarded the case to you?

MR. EAGEL:  He is the person we've been in contact with.  He was our initial contact in connection with this particular matter.  Yes.

THE COURT:  This is Mordechai Mintzer?

MR. EAGEL:  Yes.

THE COURT:  You were chosen by Mr. Mintzer to represent Niko?

MR. EAGEL:  I think we were chosen with Mr. Mintzer with Ivan's knowledge, consent, and agreement.  We've spoken with him.  I've spoken with him.  So the answer is with both their consent.

THE COURT:  Thank you.

MR. EAGEL:  I can just respond -- I'd like the opportunity --

THE COURT:  Why don't you let them say, and then you'll respond.

MR. EAGEL:  Thank you, your Honor.

MR. PALESTINA:  Good morning, your Honor.  Michael Palestina on behalf of the Pareteum Investor Group.  We have the second largest loss.  I think it would make logical sense to go in that order.

Your Honor, Niko simply cannot lead this litigation. They potentially likely engaged in insider trading narrowly missing hundreds of thousands of dollars in losses by selling 70 percent of their holdings, 300,000 shares, literally hours before this company disclosed its restatement.

Even if you put that to the side, at the very least, Niko engaged in --

THE COURT:  What would you draw from that?

MR. PALESTINA:  Your Honor, if they engaged in insider trading, the basic presumption of reliance disappears into the night and defendants win a class certification.  We doom this case from the beginning if Niko engaged in insider trading. And even if Niko didn't engage in insider trading, although I would say that the facts suggest they did, at the very least --

THE COURT:  The fact that they've sold so many shares

would indicate a problem with reliance.

MR. PALESTINA:  Excuse me, your Honor?

THE COURT:  It would indicate a problem with reliance.

MR. PALESTINA:  It certainly would, your Honor, especially if they knew the restatement was coming, which, again, 70 percent of their shares on the eve of the restatement -- there is nothing short of implausibility and suspicion there, your Honor.

THE COURT:  Is the $1.8 million that they lost a computation from the balance they still hold?

MR. PALESTINA:  That's my understanding, your Honor. Perhaps they simply weren't able to dump it all in time.  It was almost 4 and 8 percent of the company's trading volume on those days.  It's hard to sell that much stock in one day, quite frankly.

Frankly, your Honor, even if that wasn't insider trading, at the very least, Niko engaged in trading at a volume that renders it atypical with the rest of the class.  That volume of trading altered the price of the stock on those days. It changed the market.  That's an atypicality and an adequacy defense on itself.

They also erred in reporting their losses that are not recoverable under *Dura* which is not that big of a deal but suggests a sloppiness not becoming of a classwide fiduciary.

More than anything, though, your Honor, Niko has a

questionable likely criminal past connected to recent Ukrainian fraud. I understand that counsel says it didn't happen, but counsel' representations aren't evidence.

THE COURT: How do you know it did happen?

MR. PALESTINA: Sorry, your Honor?

THE COURT: How do you know it did happen?

MR. PALESTINA: We don't, your Honor. But the fact of the matter is defendants are certainly going to spend a lot of time looking into it, and that's going to derail this litigation and unnecessarily distract this Court, spending weeks and months investing Niko and whether or not it's a fraudulent entity.

25 percent of the smuggled funds in the Magnitsky case allegedly went through its account. Whether or not that's true isn't going to matter to defendants. They're going to make this case about Niko, not about the wrongdoing at Pareteum.

Niko had to change its name, your Honor, as a result of whatever happened in Ukraine with the Magnitsky case. It submitted, in addition to all these things, no doubt as a result, literally no information about itself, despite being an apparent Cyprus maildrop company with two of its three directors seemingly just for-hire Cyprus directors.

Perhaps most important of all, although we don't spend that much time on it, it may not have standing to bring the very claims at issue in this litigation since it claims to

engage in investment management and disclosed no assignments.

These are unique issues that make it ineligible. That's just what we know from the public record, your Honor.

THE COURT:  Tell me about your situation.

MR. PALESTINA:  Our situation is fairly straightforward, your Honor.  If Niko loses the presumption and you go to the next biggest loser, which is what the PLSRA mandates, the Pareteum Shareholders Investor Group has the next biggest loss.  They obviously are prima facie adequate and typical.  They didn't engage in insider trading.

THE COURT:  What makes them a group?

MR. PALESTINA:  Easy, your Honor.  This one is quite simple.  These are five guys who met each other in investment forums, talked extensively about this long before this litigation.

They had a pre-existing relationship.  The idea that they didn't have a pre-existing relationship is patently false. The joint declaration that they submitted --

THE COURT:  Did they buy stocks together?

MR. PALESTINA:  When you say "together," do you mean in the same account?  No.  They bought stocks individually, having spoken to each other about those stocks, having conferred.

THE COURT:  So some bought, and some didn't buy?

MR. PALESTINA:  No, your Honor.  All five members

bought.

THE COURT:  How about other stock aside from Pareteum?

MR. PALESTINA:  I don't know the answer to that, your Honor.  I do know that they commonly speak to each other.  They've met in person.  They speak on the phone.  They email.

These aren't five guys who met just in a chatroom and their total relationship is in a chatroom.  They know each other.  They are five professionals.  One is a lawyer.  They have 84 years of investing experience between the five of them.

THE COURT:  How did they come to you?

MR. PALESTINA:  They came to us as a group.  One of the members reached out and said he was doing due diligence on lawyers on behalf of his friends in this group, and they spoke to us.  They hired us as a group.  They understood that they would be moving as a group.

THE COURT:  And you've tendered some documents that show that one of the members has executive authority to bind the group.

MR. PALESTINA:  That is correct, your Honor.  I want to address that specifically because, quite inexplicably to me, that was thrown against the group as somehow being a negative.

First of all, multiple courts prefer that, and that's been happening for years.  It's not as if the other four members of the group have said that they are renouncing their ability to make a decision.

They've agreed to collectively litigate this case. They've assigned someone to make an executive decision in two instances:  One, if they can't agree; and two, if the exigences of litigation require a decision quickly.

Your Honor, another group here, the married couple, also constitute technically a group.  Yes, they're related. They haven't explained to us what's going to happen if they disagree how to settle this case.

I would respectfully say, as a newly married man, disagreements come up in marriages sometimes.  We at least have a system in place to address that if it ever happens.

THE COURT:  Who makes the decisions in your marriage?

MR. PALESTINA:  Absolutely not me.

But, your Honor, that's good management.  That's not something that should be thrown at this group.  Courts have routinely praised making decisions like that and having an executive manager.

We went back and looked, and even this Court has approved a group, previously unrelated, in the past, investors that had much less management in their declaration, your Honor.

There are a couple of other things that have been thrown at the PSIG that are, quite frankly, easily dismissed, if your Honor would like me to go through them.

If not, I'm happy to hold them until after, if they get thrown at us later.

THE COURT:  Hold them.

MR. GILMORE:  On behalf of the doctors, Lucas Gilmore.

Unfortunately, your Honor, there are some misstatements of law.  The presumption in terms of losses -- that only comes into effect if there's a prima facia showing of typicality inadequacy.  I would submit from the Niko movant, we haven't received that.

We have a certification that simply says that it's a Cyprus holding company for unknown Ukrainian entities.  We have no idea how many entities, how many shell companies are behind it, who the real party in interest is.

We also have a certification from a managing director that doesn't establish that he has any kind of personal knowledge for the investment or any type of the decision.  So we don't know at this point who is going to be testifying for Niko.

And the managing director, with all respect to counsel -- that is not the client.  It's Niko who is a holding company which is a shell company.  I think counsel has gone over all of the rest of the problems with Niko, their trading.

One thing I also wanted to correct is that in terms of establishing the merit of the allegations of whether Niko or its stakeholders were involved in an international money laundering scheme, that doesn't need to be proved at this stage.

THE COURT:  That argument has been made.

MR. GILMORE:  Okay.  On to the group.  There were misstatements of law as to the group.  In terms of a pre-existing relationship, it has to be a meaningful pre-existing relationship.

THE COURT:  About whom are you speaking now?

MR. GILMORE:  About PSIG.

THE COURT:  Go ahead.

MR. GILMORE:  Courts are dubious as to groups because they believe it's lawyer driven to aggregate the highest loss, and that's what we believe occurred here.  There is no pre-existing relationship.  All you hear is that they basically participated in chatrooms.

There are cases where you have institutional holders who belong to the same professional organizations.  That has been found to be not a meaningful pre-existing relationship.

Second, there is no real meaningful work that's been done by the group, which is another factor under *Varghese*.  All you see in the declaration is a statement that they did purported due diligence on a firm and selected that firm.

Plans for cooperation -- it's entirely vague and conclusory.  There are commitments to have a channel of communication, but there is no real set-out plan as to how they are going to operate with these five different individuals.

When you say five individuals, in reality, it's really

seven because one of the individuals purportedly received an assignment from yet two other individuals who aren't before this case.  So you're really going to have seven different individual investors, and it becomes unwieldy.

And then lastly, while counsel has represented that they came to counsel as a group, that's not in the declaration. That's not before the Court.  That's counsel's representation. And it appears from all the most plausible inference is that this was an orchestrated group to obtain the largest amount.

In contrast, I submit to the Court that our clients are the only ones who are typical and adequate.  They're respected doctors.  The only question regarding their --

THE COURT:  They're married?

MR. GILMORE:  They are.

THE COURT:  How long?

MR. GILMORE:  I don't know that for a fact, but they've been since medical school in the 90's at Boston University.  They have a substantial financial interest, and they're committed.

The only issue that was raised with their application had to do with a fund.  We submitted last night a declaration from Mr. Lee who said that that fund belongs to him; that he nicknamed that fund after his daughter for family financial planning purposes.

So I would submit, your Honor, we are the only lead

plaintiff applicant before the Court that has made a showing of typicality and adequacy.  Thank you.

THE COURT:  Mr. Eagel.

MR. EAGEL:  Yes.  I would like to have the opportunity to respond.  I will try to do it in order.

THE COURT:  Right now.

MR. EAGEL:  I will try to do it in order.  First, insider trading.

THE COURT:  Tell me about your setup.  That's what I'm interested in.  It's a Cyprus holding company.

MR. EAGEL:  Correct.

THE COURT:  Does it publish its information in any way, or is it all private?

MR. EAGEL:  It's a private company, but it's audited, as I understand it, by Ernst & Young now and used to be audited by Grant Thornton.  It has audited financial statements.

If your Honor looked at, as I'm sure each one of our adversaries can do, on Google, there is a fourth category that says Niko Group.  It identifies the business they're in.

THE COURT:  What is the business?

MR. EAGEL:  Primarily, it's an automobile-selling -- an import and selling business.

THE COURT:  It imports cars to Cyprus or the Ukraine?

MR. EAGEL:  It does to the Ukraine.  I think it is throughout Europe.  It is not just Ukraine.  It is throughout

Europe.  It's a fairly large company engaged in a number of different businesses.

THE COURT:  Incorporation in Cyprus is interesting.

Why would a Ukrainian company, a Ukrainian business, want to establish itself as a holding company in Cyprus?

MR. EAGEL:  My understanding, your Honor, is because Cyprus has very favorable tax laws which invariably they're not the only Ukrainian company that incorporates in Cyprus.  Your Honor, there are other Ukrainian companies that incorporate in Cyprus I believe to take advantage of favorable tax laws.

THE COURT:  And a certain missing accountability as well.

MR. EAGEL:  Well, I don't think that's accurate, Judge.  I respect your Honor.  I've spoken --

THE COURT:  I'm not an expert, but that's why Cyprus is in the news, because it is a place where people have holding companies.  It's hard to find out what's going on in Cyprus.

MR. EAGEL:  Your Honor, I don't think it's as hard in this case to find out what's going on with Niko Holdings.

THE COURT:  Who are the beneficiaries in the Ukraine?

MR. EAGEL:  I believe that the beneficiaries are -- I think the largest shareholder and I believe the controlling shareholder is Mr. Nikolaychuk.  He's the controlling individual.  He's also the managing director of this company.

I believe he owns 100 percent.  Again, he is going to be the one making the decision.

THE COURT:  So it's one person having a company with the holding company in Cyprus.

MR. EAGEL:  I believe so, your Honor.  It's incorporated in Cyprus, but the businesses are there.

THE COURT:  But just to recite that creates so many opportunities for discovery on the part of the defendants that would complicate your case and question typicality.

MR. EAGEL:  Your Honor, I think in fact there is no more typical plaintiff, representative plaintiff, than Niko Holding.

I think the fact that it's a Ukrainian company -- we now live in a world that's multinational.  There are emails. There is phone.  There is internet.  The fact that there are people located throughout the world -- there are many cases --

THE COURT:  Tell me about the sales of the shares.

MR. EAGEL:  The sales of the shares -- what your Honor needs to do is to really critically examine what the charges are.

THE COURT:  I'm asking about the sales of the shares.

MR. EAGEL:  I'm going to tell you, but I think it's important --

THE COURT:  Then tell me.

MR. EAGEL:  On October 16, your Honor, there was a

disclosure -- the chief executive officer was fired.  The disclosure was on October 15 that he was fired.

So in the complaint that was filed -- this is the complaint that was filed by counsel to my left.  It says: "Further, on October" -- and he's a COO, I'm sorry.  Chief opposite operating officer.

In the complaint, it alleges:  "Further, on October 16, *Seeking Alpha* reported that the company had surprisingly terminated COO Denis McCarthy without providing further details.  According to the report, McCarthy had been deeply involved with Pareteum self-introduced 36-month backlog.  The news brought the company's stock down another 25 percent from $1.13 per share on October 16 to .83 cents at the close of trading on October 17."

The trades that our client did after that was announced certainly don't give rise to the belief there was any insider trading.  It's true on October 21, they announced they were going to restate.

THE COURT:  What's the class period?

MR. EAGEL:  The class period is from -- I think it's December 2017 through October 21.  The class period ends on October 21.

THE COURT:  So you have to explain a large number of shares that took place where the class period began.

MR. EAGEL:  You're saying -- it's not --

THE COURT:  Before the class period ended.

MR. EAGEL:  Right.  I'm explaining that they sold the shares --

THE COURT:  The allegation is that everybody who bought during that class period was defrauded.

MR. EAGEL:  That's correct, your Honor.

THE COURT:  Because of the misrepresentation that they overvalued the stock.

MR. EAGEL:  That's correct.

THE COURT:  And you have a large number of sales within that period shortly before its end.

MR. EAGEL:  Shortly before its end, your Honor. That's correct.

THE COURT:  That's really fertile ground for depositions also.  We have two areas, Mr. Eagel.  You have two areas where your client is uniquely susceptible to extended discovery that others are not subjected to.  That makes it, as one of your colleagues argued, somewhat of a diversion, increasing expense, raising risk.

MR. EAGEL:  Your Honor, I respectfully don't see -- I think those questions can be answered pretty quickly in a deposition and addressed.

THE COURT:  No.  Not quickly.  They'll be discovery in the Ukraine.  There will be all kinds of requests for production.  There will be charges that the production was not

adequate. There will be some difficulty with different laws. There might be some issue in terms of jury prejudice in this area that might not be dispelled in a voir dire.

I think, Mr. Eagel, that your client, which enjoys a presumption because it is the largest loser -- that presumption is overcome by the issues I posed. So I hold that your client will not be lead counsel.

MR. EAGEL: Okay, your Honor. I don't know if it pays for me to answer some of the other questions. I will tell you that --

THE COURT: I'm just talking about those two main ones.

If you want to answer the other ones, you may. I'm relying on the two main ones that I spoke about which you did answer.

MR. EAGEL: Okay, your Honor. I think in terms of the certification and in terms of discovery -- I think I've heard your Honor's ruling. So I'll take a seat. Thank you, your Honor.

THE COURT: All right. Who is speaking next?

MR. PALESTINA: Michael Palestina, your Honor, on behalf of the Pareteum Investor Group.

With the removal of Niko, your Honor, the three-step process requires that the Court next look at the Pareteum Investor Group, not compare it but look at the Pareteum

Investor Group.

The Pareteum Investor Group obviously prima facia satisfies typicality and adequacy.

THE COURT:  They're not really a group.  They're a conglomerate.  There is no legal entity involved.

MR. PALESTINA:  There absolutely does not need to be a legal entity involved, your Honor.  We sent the opposition filed by the lead Soto group to our clients.  And last night, one of them popped up and was quite offended by the idea that we put them together.  They came to us.

THE COURT:  I'm accepting that.  I'm accepting that.

MR. PALESTINA:  They lost a lot of money.

THE COURT:  I'm accepting that.

MR. PALESTINA:  And they know each other, your Honor.  They invested together in connection with this stock.  They talked about this stock.

THE COURT:  They made individual decisions.

MR. PALESTINA:  They made decisions, your Honor, perhaps on an individual size.

THE COURT:  They may have discussed different considerations, but each one made an individual decision testing reliance.

MR. PALESTINA:  That would certainly not test reliance, your Honor.  Reliance is satisfied simply by relying on the price of the stock in the market.  They spoke with each

other and made decisions to buy together.  They may have bought different amounts.

THE COURT:  I'm not sure that the efficient market will continue to have its strength based on the criticisms that have been made about it.

MR. PALESTINA:  It's interesting that you mention that, your Honor.  You asked how our firm would staff this. Our firm is one firm.  They approached us as one firm.

We'll be one firm.  We don't need any help.  We don't need to hire anyone else.  And we were in the Halliburton case where the efficient market was tested, your Honor.

We took it to the Supreme Court, your Honor, and we won.  We do believe that will maintain.  But even if it doesn't, that they discussed the Pareteum stock with each other doesn't in any way change reliance.

They all relied on the same public information.  They knew each other, discussed this stock, and decided to buy it and sell it at times together.

THE COURT:  Were there any sales during the class period?

MR. PALESTINA:  I'm sorry, your Honor?

THE COURT:  Were there any sales during the class period?

MR. PALESTINA:  Yes.  They had some sales during the class period, but that's not at all disqualifying in any way.

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

I believe the lead Soto group did as well.  I believe everyone did, quite frankly.

They certainly weren't on the day before the restatement happened though, your Honor.  So they certainly weren't subject to insider trading.  These are five professionals.  They're not in a multimillion dollar corporation that may have done business in the Ukraine.

THE COURT:  What's the pattern of the selling?  Selling and then buying again?

MR. PALESTINA:  No, your Honor.  As far as my knowledge -- we do not have any in-and-out sales to my knowledge.  We do not.  They bought, and then they sold, end of story.  I believe they sold as the stock started to tank, as it started to drop precipitously, before the restatement came out and the class period ended.

THE COURT:  So what's the difference between you and Niko.

MR. PALESTINA:  That we didn't sell 70 percent of our stock on the day the restatement came out, your Honor.  That suggests you might have known something.  We sold because the stock was simply dropping.  There is absolutely no assailing any of these individual members' sales.

THE COURT:  Do they all sell at the same time?

MR. PALESTINA:  I believe most of the guys sold towards the end of the class period, your Honor, as the stock

began to drop.  I can check, and we can of course highlight that in a reply, if we'll be filing one.  As I understand it --

THE COURT:  I'm making a decision today.  There will be no replies.

MR. PALESTINA:  Your Honor, I'd like to turn to the idea that they didn't know each other just briefly.  They did.

THE COURT:  I didn't say they didn't know each other.

MR. PALESTINA:  And multiple groups throughout this country have been appointed --

THE COURT:  I didn't say they didn't know each other.  I'm saying that there is no evidence that they functioned as a group.  They made individual decisions which may have been informed by discussions in chatrooms with other members who wish to be considered a group and with others.

MR. PALESTINA:  There is evidence that they functioned as a group, your Honor.  They came into this litigation as a group.  They came to us as a group with one purpose in mind, to recover the losses that they experienced together.

These gentlemen were investing together.  They may have had their own accounts, but they were really part of an investment club is really what you would call it.

THE COURT:  Were they an investment club?

MR. PALESTINA:  I don't know that it has a formal name, your Honor.  But they were a bunch of guys who knew each other and who invested together.  They came to us as a group.

THE COURT:  Do they live in the same city?

MR. PALESTINA:  They do not, your Honor.  They do know each other.  They have met each other.  They speak on the phone.

THE COURT:  How do they know each other?

MR. PALESTINA:  Through this investment, your Honor.  Through this investment.

THE COURT:  So they've made many other investments also?

MR. PALESTINA:  I don't know that they've made other investments since this investment.

THE COURT:  Before this investment, they made other investments?

MR. PALESTINA:  I do not know that, your Honor.

THE COURT:  We can assume that.

MR. PALESTINA:  I don't know.  I think they met each other in connection with making this investment.

THE COURT:  So is there any parallelism between the investment of one to the investment of another?

MR. PALESTINA:  I don't know that there is or is not, your Honor.  We did not ask them about their other investments, quite frankly, in this.  But they invested together.  They came to us together.  They hired us together.

They have not been cobbled together as a lawyer-driven group.  And that is what the PLSRA seeks to stop, lawyer-driven

groups. The PLSRA, your Honor, specifically allows groups to move. What it does not allow is lawyer-driven groups to move, and these men are not a lawyer-driven group.

They meet all of the requirements of typicality and adequacy, and they meet all of the factors for a cohesive group. Just because they don't literally have a limited partnership together does not mean that they are not a group.

I would like to say, very briefly, your Honor, that Lee/Soto argues that the assignment makes the group too large. That is absolute nonsense. Assignments are a literal transfer of rights. The assignees are gone. They have no power, no say, nothing. They have assigned their rights.

And most important, your Honor, even if you remove the losses attributable to the assignees -- and this is absolutely critical -- if you remove the losses attributable to the assignees, the Pareteum Investor Group is still larger than the Lee Soto Group. It still has the larger loss.

THE COURT: Say that again.

MR. PALESTINA: Even if you remove the assignments, the losses attributable to the assignees --

THE COURT: Why would you want to do that?

MR. PALESTINA: Because the Lee Soto Group is arguing that the assignments made the group too large. That's nonsense, your Honor.

THE COURT: Why is that a handicap?

MR. PALESTINA:  It's not a handicap, your Honor.

THE COURT:  Why are you concerned about it?

MR. PALESTINA:  Because my opposing counsel raised it, and I wanted to make sure that your Honor was aware that even without them, even without them, they are still a larger loser than the Lee Soto Group.

THE COURT:  You have examined some others that stand to show a certain degree of --

MR. PALESTINA:  Coordination and organization, your Honor.  That's correct.  The assignees are the brother and a long friend, the executive director of this group.  That is why they're in here, so that the poor man's brother didn't also have to be a member of this and spend all of his time.  That's why they're in here.

THE COURT:  Last word from the doctors.

MR. GILMORE:  Yes.  A couple of things.  The assignee assignment.  That's not true.  With the benefit comes the burden.  That gentleman now stands in the shoes of those two investors.

So any defense that the defendants have as against those two investors apply equally with the assignee.  So we are going to have seven investors before the Court.

THE COURT:  Just a minute.

It seems to me that the first paragraph of the assignment is broad enough to confer to powers to run the case

regarding those shares.

MR. PALESTINA:  It is, your Honor.  Frankly, this assigned language --

THE COURT:  It doesn't specifically say that there is a right to settle and a right to give releases, which is common in assignments of this nature.

MR. PALESTINA:  Your Honor, this assignment language is taken from past cases, specifically, I believe in the SDNY.  This is language that's been approved by multiple courts.

To the extent there is even an iota of doubt, the intent of the assignment is that the assignee has absolutely no authority to do anything in the case and the assignor is the person who stands in his shoes entirely.

THE COURT:  The other way.

MR. PALESTINA:  Excuse me.  Again, your Honor, I would point out that even if you strip the assignees out --

THE COURT:  I got the point.

Go ahead.

MR. GILMORE:  Just to that point, it's been misleading because that's only if you're aggregating all of the various different investors here.

THE COURT:  Well, I understand that.  But the fact that there is an assignment shows a certain congealment of the group that is an argument in its favor.

MR. GILMORE:  Understood, your Honor.  With respect to

their statements about knowing each other, that's not the test. There would have to be a meaningful pre-existing relationship. The way courts have looked at that is whether there's a familial or business relationship.

There is nothing before the Court that they've ever been in business together.  All you have is a very, very vague statement filled with conjecture saying that:  "The undersigned met through common investing websites.  And as part of our respective investments in TEUM, we have regularly conversed with one another via various investing websites, telephonically, electronically, and/or in person," no dates. No specific reference.

The investors themselves are strewn out all across the country.  One is in Michigan, another is in Missouri, another in Texas, another in North Carolina, another in Florida, all with varying different degrees of damages, none even close to the doctors.

And then, again, you have the issue of now adding on two additional investors through the assignment because the defendants will have defenses against those two investors that will apply equally to Mr. Steffey, the executive who has been given full control, which calls into question what is the point of the other investors at all.

THE COURT:  I've reread their collective declaration, and even though they are of different cities and even though

there has been in the past no organization to which they all belonged, nevertheless, they've come together for the purpose of litigating the cause of their losses and appointed one of them with executive decision-making powers in connection with this litigation.

I think it suffices. And I think it provides a status, having more individuals, more shares, a larger loss, and the greatest strength to the litigation. So I appoint this group as lead plaintiff and with it the counsel that the group has chosen as lead counsel.

Having said this, I'd like to see an amendment in paragraph 8 so that Mr. Steffey is given the right to act for the group in connection with settlements, the giving of releases and discharges, and the conduct of the litigation.

MR. PALESTINA: That won't be a problem at all, your Honor.

THE COURT: Tell me: Was it you who said that you were thinking of vetting Israeli counsel?

MR. PALESTINA: No. We do not need any other counsel.

THE COURT: You are sufficiently staffed?

MR. PALESTINA: We are 100 percent sufficiently staffed. Yes.

THE COURT: Okay. Whether you use other counsel is up to you. But if you do, I want to make a warning that I look askance at duplications.

MR. PALESTINA:  That is not a problem, your Honor.

THE COURT:  I also look critically at committee decisions on how to prosecute the case because they generally result in a doling out of activities that tends to add to the expense.

MR. PALESTINA:  At this juncture, your Honor, we have no intention of.  We have new York offices and New York lawyers.  We have no intention of adding any other counsel.

THE COURT:  So you're appointed.  Now tell me what schedule I should set.

MR. PALESTINA:  Well, your Honor, I have one more wrinkle.  I don't know if defense counsel is aware of it yet. I think your Honor probably saw that the Eastern District of New York case has been dismissed.  We called Mr. Rosen and asked him what he was doing.

THE COURT:  Sorry.  Say that again.

MR. PALESTINA:  The case pending in the Eastern District has been dismissed.  I don't know if you saw that hit the docket.  We did file a notice.

THE COURT:  If you did, I didn't notice it.

What about it?

MR. PALESTINA:  That's done, but there's a new wrinkle, and I don't even know if defense counsel is aware of it.  Yesterday we learned that the day before yesterday, someone who doesn't do securities law we think filed a random

case in Alabama federal court.

We read it.  We called them.  We asked them what they were doing.  It's after the MLP deadline.  They didn't know. They didn't understand.

THE COURT:  I don't really care.

MR. PALESTINA:  Then we'll take care of it.

THE COURT:  I don't really care about what's filed in other places.

MR. PALESTINA:  Done.

THE COURT:  If there is abuse in terms of discovery, I am sure defense counsel will let me know, and I can issue whatever protective orders are necessary and appropriate.

MR. FINKEL:  Thank you, your Honor.

THE COURT:  How do you want to conduct the case?  What do you want to do?

MR. PALESTINA:  I would look for 45 or 60 days.

THE COURT:  I'd like to have a stipulation from both of you regulating the time for filing the amended complaint and making motions, if any, with respect to that.

MR. PALESTINA:  No problem.

MR. FINKEL:  We can do that, your Honor.

THE COURT:  I take it you will be making motions.

MR. FINKEL:  I expect we will, your Honor.

THE COURT:  I want dates.  I want the case moved.  So 45 is better than 60.  Similarly, 45 days to file a motion.

Thirty is actually enough because I believe that Mr. Palestina knows now what he wants to do.

So 45 days to file a consolidated amended complaint. Thirty-five days thereafter to file a motion to dismiss, followed by 20 and 10.  That would complete the motion.  Give me a stipulation accordingly.

MR. PALESTINA:  Yes, your Honor.  Thank you.

THE COURT:  You might as well have your stipulation for a protective order in place as well.  So do that.  Follow my rules, individual rules of practice.

Is there anything else I need to do today?

MR. PALESTINA:  No, your Honor.

MR. EAGEL:  Thank you, your Honor.

MR. FINKEL:  Thank you, your Honor.

THE COURT:  Thank you, all.

(Adjourned)