**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PARETEUM SECURITIES LITIGATION | Case No. 1:19-cv-09767-AKH-GWG |

## CONSOLIDATED COMPLAINT

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | | PRELIMINARY STATEMENT…………………………………... | 1 |
| II. | | BASIS OF ALLEGATIONS…………………………………….. | 8 |
| III. | | JURISDICTION AND VENUE………………………………… | 9 |
| IV. | | PARTIES………………………………………………………... | 10 |
| | A. | LEAD PLAINTIFF……………………………………….. | 10 |
| | B. | CORPORATE DEFENDANT……………………………….. | 10 |
| | C. | THE FRAUD DEFENDANTS……………………………….. | 10 |
| | D. | THE IPASS ACQUISITION AND SECONDARY OFFERING DEFENDANTS… | 13 |
| | E. | RESPONSIBILITIES UNDER THE SECURITIES LAWS AND BASIS FOR LIABILITY…………………………………………………….. | 14 |
| V. | | FACTUAL BACKGROUND…………………………………….. | 18 |
| | A. | RELEVANT PARTIES AND NON-PARTIES………………………. | 18 |
| | | 1.   Defendant Turner…………………………………... | 18 |
| | | 2.   Defendant McCarthy………………………………... | 20 |
| | | 3.   Defendant Bozzo…………………………………….. | 21 |
| | | 4.   Defendant O'Donnell……………………………….. | 21 |
| | | 5.   Laura Thomas……………………………………….. | 22 |
| | | 6.   Stephen (a/k/a Steven) Hart………………………….. | 23 |
| | | 7.   Barry Honig…………………………………………. | 23 |
| | | 8.   Dawson Jones, Squar Milner, and Sichenzia………………… | 26 |
| | B. | TURNER TAKES OVER PARETEUM AND REASSEMBLES HIS CREW……………………………………………………... | 28 |
| | C. | PARETEUM'S BACKLOG AND OTHER INTERNAL METRICS FOR REVENUE GROWTH…………………………………………... | 30 |
| | D. | DEFENDANTS ARE AWARE OF MATERIAL WEAKNESS IN THE COMPANY'S INTERNAL CONTROLS & PROCEDURES AND FINANCIAL REPORTING…………………………………………………... | 32 |
| | E. | DEFENDANTS ADVANCE A FALSE HYPER-GROWTH NARRATIVE TO INVESTORS USING METRICS THEY CREATED AND KNEW WERE FALSE | 33 |
| | | 1.   The Scheme Begins………………………………............ | 36 |
| | | 2.   The Company Uses Its Artificially Inflated Stock as Currency in Two Acquisitions, Which It Uses to Buoy Its False Metrics with Real Customers, and Defendant Turner Cashes In…………………………………………………... | 41 |

|  |  | 3. | Honig's Associates Appear to Cash in While the Company Continues to Use Its Artificially Inflated Stock as Currency………………………………………………… | 48 |
|---|---|---|---|---|
|  |  | 4. | The Truth Begins to Trickle Out, but the Company Denies Everything………………………………………………… | 54 |
|  |  | 5. | The Company Denies Everything (Again) While Defendants Stop Pumping the Stock and Start Distancing Themselves from Their Self-Created Backlog Metric…………………….. | 63 |
|  |  | 6. | The House of Cards Begins to Fall as the Company Discloses It Is in Material and Repeated Breach of Its Credit Facility…………………………………………………….. | 66 |
|  |  | 7. | Before They Come Clean, Defendants Make One Last Money Grab ………………………………………………… | 70 |
|  |  | 8. | The Full Truth and The True Financial & Operational Condition of Pareteum Is Finally Revealed………………….. | 71 |
|  |  | 9. | Restatement Fallout and Post-Class Period Developments… | 74 |
| VI. | | | MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT THROUGHOUT THE CLASS PERIOD…………………………………………………………… | 75 |
|  | A. | | STATEMENTS AND OMISSIONS REGARDING THE COMPANY'S FALSE HYPER-GROWTH NARRATIVE, BACKLOG AND CONNECTIONS METRICS, AND REVENUE………………………………………… | 75 |
|  |  | 1. | December 2017 Statements…………………………………. | 77 |
|  |  | 2. | First Quarter 2018 Statements………………………………... | 79 |
|  |  | 3. | First Quarter 2018 Operating Results and Form 10-Q……... | 87 |
|  |  | 4. | Second Quarter 2018 Statements…………………………... | 92 |
|  |  | 5. | Second Quarter 2018 Operating Results and Form 10-Q...... | 96 |
|  |  | 6. | Third Quarter 2018 Statements…………………………….. | 100 |
|  |  | 7. | Third Quarter 2018 Operating Results and Form 10-Q……. | 109 |
|  |  | 8. | Fourth Quarter 2018 Statements…………………………. | 115 |
|  |  | 9. | Fourth Quarter 2018 and Full Year 2018 Operating Results, Investor Conference, and Form 10-K…………………………. | 123 |
|  |  | 10. | First Quarter 2019 Statements…………………………….. | 135 |
|  |  | 11. | First Quarter 2019 Operating Results and Form 10-Q……... | 143 |
|  |  | 12. | Second Quarter 2019 Statements………………………….. | 149 |
|  |  | 13. | Second Quarter 2019 Operating Results and Form 10-Q…... | 152 |
|  | B. | | FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS REGARDING THE COMPANY'S FINANCIAL CONTROLS AND | 156 |

| | | PROCEDURES AND FINANCIAL REPORTING AND COMPLIANCE WITH GAAP…………………………………………………… | |
|---|---|---|---|
| | C. | FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS REGARDING THE COMPANY'S BLOCKCHAIN CAPABILITIES………….. | 174 |
| | D. | FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS REGARDING SENIOR MANAGEMENT'S BACKGROUND………………… | 176 |
| | E. | FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS CONTAINED WITHIN AND/OR INCORPORATED INTO THE iPASS ACQUISITION AND SECONDARY OFFERING STATEMENTS AND PROSPECTUSES…………………………………………….. | 178 |
| | | 1.   The iPass Acquisition Statements and Prospectuses………… | 178 |
| | | 2.   The Secondary Offering Statements and Prospectuses…….. | 181 |
| VII. | | PARETEUM AND THE FRAUD DEFENDANTS ACTED WITH SCIENTER………………………………………………………. | 184 |
| | A. | THE FRAUD DEFENDANTS' CONCEALMENT OF THEIR RELATIONSHIPS EVIDENCE SCIENTER…………………………………………. | 185 |
| | B. | THE SCHEME EVIDENCES SCIENTER……………………………….. | 186 |
| | C. | THE FRAUD DEFENDANTS' COMPENSATION PLANS SUPPORT SCIENTER………………………………………………………….. | 188 |
| | D. | THE FRAUD DEFENDANTS' POSITIONS EVIDENCE SCIENTER…………. | 189 |
| | E. | THE CRITICAL NATURE OF THE BACKLOG, CONNECTIONS, AND REVENUE METRICS AND THE COMPANY'S FOCUS ON ITS FINANCIAL REPORTING SUPPORT SCIENTER………………………………………… | 189 |
| | F. | THE COMPANY'S BALLOONING ACCOUNTS RECEIVABLES SUPPORTS SCIENTER………………………………………………………….. | 190 |
| | G. | THE RESTATEMENT EVIDENCES SCIENTER………………………… | 190 |
| | H. | POST-CLASS PERIOD DEVELOPMENTS SUPPORT SCIENTER…………. | 191 |
| VIII. | | VIOLATIONS OF GAAP AND SEC REPORTING RULES………………. | 191 |
| IX. | | LOSS CAUSATION AND ECONOMIC HARM…………………………. | 195 |
| X. | | PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET…… | 198 |
| XI. | | NO SAFE HARBOR………………………………………………….. | 199 |
| XII. | | CLASS ACTION ALLEGATIONS…………………………………….. | 200 |

Lead Plaintiff, the Pareteum Shareholder Investor Group (defined below), through undersigned Lead Counsel, brings this federal securities class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of purchasers and/or acquirers of Pareteum Corporation ("Pareteum" or the "Company") securities between **December 14, 2017 and October 21, 2019,** inclusive (the "Class Period"), against Defendants (defined below) for violations of the Securities Act of 1933 (the "Securities Act") and/or the Securities Exchange Act of 1934 (the "Exchange Act").

## I.    PRELIMINARY STATEMENT

1.    Pareteum is a telecommunications software and services provider. Through its cloud communications platform software and services, Pareteum targets mobile service and telecommunications providers, primarily Mobile Virtual Network Operators (MVNO). MVNOs provides wireless communications to customers. However, because they do not actually own any network infrastructure, MVNOs rent bandwidth from large mobile network operators, such as AT&T (thus, the "virtual" in MVNO). Similarly, rather than develop their own software for operations and business support systems, MVNOs typically purchase those products from companies like Pareteum.

2.    As network capacity has gotten cheaper and wholesale rates for bandwidth have fallen, MVNOs have become increasingly easy to form, allowing anyone with a little bit of start-up capital to start their own cellphone company. Indeed, competition in the industry is fierce and starting an MVNO is an especially challenging and risky venture, particularly in light of the up-front costs of certifications and the rapid pace at which telecommunications technology becomes obsolete. As a result, many start-up MVNOs inevitably fail.

3.      Prior to November 2015, Pareteum was a declining international telecommunications software and services provider known as Elephant Talk Communications Corporation ("Elephant Talk"). That changed in November 2015, when Defendant Turner was appointed as Executive Chairman. As outlined below, Defendant Turner has a long history of leading failed businesses and misleading shareholders stretching as far back as 2001. He also has a history of doing so alongside Defendants McCarty and Bozzo, with whom he has worked at several other companies that ended in financial ruin.

4.      And, indeed, within a year of his appointment as Executive Chairman, Defendant Turner had ousted the Company's interim Chief Executive Officer and replaced him with Defendant Bozzo, who became Elephant Talk's Chief Executive Officer at the same time that the Company changed its name to Pareteum. Just over another year after that, Defendant McCarthy rejoined his compatriots as Pareteum's Senior Vice President of Corporate Development and, later, its President and Chief Operating Officer. In the interim, Defendant Turner also hired Defendant O'Donnell to serve as the Company's Chief Financial Officer. Like Defendants Turner, Bozzo, and McCarthy, Defendant O'Donnell likewise had a long history of leading failed businesses and misleading shareholders, most notably being sued for fraud by the investors of a company at which he had just previously served as Chief Financial Officer for "personally affect[ing] the fraudulent booking of revenues" that triggered a restatement erasing *92%* of the company's reported revenue over the relevant period. Notably, like here, the lawsuit alleged that the fraud was designed to "give the market the false notion that revenue growth was accelerating" and "artificially inflate [the company's] stock price…"

5.      In the interim – indeed *days before* the Class Period begins – entities related to Barry Honig purchased millions of shares of Pareteum stock – approximately 12.23% of the

Company's outstanding common stock in total. As outlined below, Mr. Honig is the accused "primary strategist" of several long-running securities frauds that the SEC has aptly described as "classic pump-and-dump schemes" and who has since been banned from investing in and financing publicly-traded, small cap companies. Notably, as concealed by the Company during the Class Period, Mr. Honig has connections with several Pareteum executives, including Defendants Turner and McCarthy. Mr. Honig also has extensive ties to several firms that ultimately provided services in furtherance of Defendants' fraud, including Pareteum's exclusive placement agent, its independent auditor, and its outside counsel (which also has the *same address* as Pareteum's supposed corporate office).

6.      As aptly noted by one of the analysts that first raised red flags regarding Pareteum, "[j]ust in isolation, we believe the mere presence of this collection of actors should send diligent investors running for hills." And, indeed, as this cast of characters found their way to Pareteum, the events giving rise to this fraud action soon unfolded. For example, as he began to assemble this team, Defendant Turner changed the way that Pareteum reported its revenue by focusing analysts and investors on fabricated metrics Pareteum called "Backlog" and "connections," which it represented demonstrated the Company's revenue growth. Assuring investors that these metrics were "key indicators" of revenue even though internally Defendants knew that they were not reliable throughout the Class Period, Defendants advanced a story of hyper-growth, using the Backlog and connections metrics as support for their false revenue growth story. During this time period, and based on this false information, the Company's stock

price soared from a low of just $0.72 per share to a trading high of $5.93 per share – *an 824% increase* in just a few months.[1]

7.      Defendants achieved this fraud through a classic pump-and-dump style barrage of false and misleading press releases that touted the Company's fake success and growth. As outlined below, during the Class Period, Defendants published *178 press releases – over 130 in 2018 alone.* In these statements, Defendants told investors that the Company was achieving "record" performance and revenues that grew from $4.113 million in the first quarter of 2018 to $34.1 million by the end of the second quarter of 2019 – an increase of 729%. Similarly, throughout the Class Period, in these statements, Defendants repeatedly and systematically highlighted the fabricated Backlog metric, which they said grew from $200 million at the end of the first quarter of 2018 to $1.27 billion by the end of the second quarter of 2019 – an increase of 535%. These statements were extremely important to investors, and the Company acknowledged that "[t]his metric has also been a very useful way to help stakeholders understand the magnitude of our opportunity and the commitments that we've secured from customers." In short, through these statements, and using metrics that they created and knew were unreliable, Pareteum and the Fraud Defendants (defined below) conditioned the market to believe in the growing demand for the Company's products and its success in signing customers to multi-year deals worth tens of millions of dollars in revenue for the Company. **It was all a lie.**

8.      As would be later reveled, the vast majority of the 178 press releases issued during the Class Period either announced false and/or misleading contract awards with customers

---

[1]      During the Class Period, the Company took advantage of the artificially inflated stock price to acquire three telecommunication service providers, pay off corporate debt, including debt acquired in these transactions during the Class Period, and advance the financial interest of its executives, whose employment agreements provided incentives and rewards for certain business milestones.

– many of whom either did not exist at all or who could never have supported the value of the contract stated – and/or touted the Company's purported growth and abilities, which also did not exist as represented. Examples of these purported customers include European and African companies with little to no capital or meaningful business activity, businesses with inactive websites that offered limited contact information, and businesses that were outright closed or dissolved. As expected, these revelations caused a significant decline in the price of the Company's stock price.

9.        These issues were first raised in June 2019, when two highly critical independent research reports related to Pareteum were published and revealed for the first time that (a) Defendants were engaged in a fraudulent scheme to inflate revenues and the Company's order Backlog, by fabricating clients and/or claiming that certain clients have the ability to generate tens of millions of dollars in revenue when they do not; (b) the Company had failed to disclose material facts about its officers, board members, significant investors and senior staff; and (c) that the Company was "completely uninvestible" and subject to "massive downside potential." Following this news, the Company's share price plummeted 41%.

10.       In response, the Company "categorically denied" the claims. Indeed, it attempted to further reassure investors and the market by providing "an early view of [the Company's] results on a one-time basis given the compelling quarter and in advance of several planned institutional investor meetings in July," announcing that "its positive preliminary results for the second quarter of 2019 will exceed current analysts' consensus [for revenue and Adjusted EBITDA]." Quietly, however, the Company's press release machine ground to a sudden halt: in June 2019, the Company published just two press releases; in July 2019, just four, and only one announced a new customer, but notably contained no information regarding the revenue from

this purported new customer or the now infamous Backlog metric.  Then, in a conference call on August 6, 2019, the Company announced that it would "retire" the Backlog metric – noting that it had ***served its purpose*** – and would replace it with operational metrics that "provide a more direct indication of our performance."

11.     These assurances could not stop the inevitable, however. Cash-strapped, on August 6, 2019, the Company announced that it had defaulted on its credit facility, essentially immediately after it was signed, and was forced to amend its credit agreement to get access to $2.5 million. This news caused the Company's stock to drop another 17%, from $2.81 per share on August 26, 2019 to $2.33 at the close of trading on August 27, 2019. Then, on September 20, 2019, the Company announced a dilutive $40 million offering of common stock and warrants based on false and misleading statements and omissions that immediately drove the price of the Company's stock to just above $1.50 per share, after closing at $1.84 per share on the prior trading day.

12.     Finally, on October 21, 2019 – despite *twice* "categorically denying" the analyst reports and barely one month after the Company sold $40 million worth of stock and warrants into the market – the full truth was finally revealed. On this date, Pareteum issued a release (the "Restatement") announcing that it would restate its previously issued consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019 and June 30, 2019; that "[i]nvestors should no longer rely upon the Company's previously released financial statements [and related press releases, earnings releases, and investor communications describing the Company's financial statements] for the time periods cited above"; that "certain revenues recognized during 2018 and 2019 should not have been recorded during that period[,] . . . [and that for] certain customer transactions, the Company may

have prematurely or inaccurately recognized revenue"; and that Pareteum "estimates the revenue impact for the full year 2018 to be a reduction of approximately $9 million. . . .[and] a reduction of approximately $24 million [for the first half of 2019]."

13.     The impact of the Restatement on the Company's reported financial statements and revenue growth is substantial. For example, for the 2018 fiscal year, the Company reported revenues of $32.4 million, of which the Company now expects to reduce by $9 million, or approximately *28 percent*. Similarly, for the first half of fiscal year 2019, the Company reported revenues of $23 million for the first quarter and $34.1 million for the second quarter for a total of $57.1 million, and the Company expects to reduce this by approximately $24 million, or *42 percent*.

14.     Following this announcement, shares of Pareteum tumbled in after-market trading, closing at $0.73 per share on October 21, 2019 and opening at $0.37 per share on October 22, 2019.   Just prior to and following the Restatement, the Company terminated Defendants Turner and McCarthy; it also replaced Defendant O'Donnell pending a review of his status with the Company.

15.     A restatement is an extraordinarily negative event for a public company. Under Generally Accepted Accounting Principles ("GAAP"), a "restatement" is a term of art used only where a company's previously issued financial statements were materially false as of the time of issuance and the misstatements were based on "facts that existed at the time the financial statements were prepared." In this case, Pareteum announced that it had "discovered internal control issues related to the accuracy and timing of the recognition of revenue" and could not estimate when the Restatement would be completed, could not "predict the aggregate amount of revenue that will ultimately be restated," and noted that "[u]ntil the full magnitude of these

7

transactions is analyzed and understood, the Company cannot provide forward guidance, and expects financial results for the second half and full year 2019 will be materially below current analysts' estimates." To date, the Company has not completed its Restatement and has not filed financial results for the remaining quarters of 2019, and thus is no longer in compliance with NASDAQ listing rules.

16.     Defendants' misconduct has destroyed hundreds of millions of dollars of Pareteum's market capitalization and investor equity. Based on the facts alleged in this Complaint, Lead Plaintiff asserts claims under (a) §§ 10(b) and 20(a) of the Exchange Act against Pareteum and the Fraud Defendants (defined below) and (c) §§11, 12, and 15 of the Securities Act against, as appropriate, Pareteum, the Controller Defendants (defined below), and the Company's exclusive placement agent and its independent auditor.

## II.     **BASIS OF ALLEGATIONS**

17.     Plaintiff has alleged the following based upon:

(a) Independent investigative analyst reports regarding Pareteum's executives, business, and customers – namely a June 7, 2019 report authored by Marcus Aurelius Value entitled, "TEUM: Where are the Customers?" (hereinafter, the "Aurelius Report"),[2] and (b) a June 25, 2019 report authored by Viceroy Research Group entitled, "Pareteum – the Wild West of Telecoms" (hereinafter, the "Viceroy Report");[3] and

(b) The independent investigation of Lead Counsel, which included a review of Securities and Exchange Commission ("SEC") filings, regulatory filings and reports, securities

---

[2]     *TEUM: Where Are The Customers?*, Marcus Aurelius Value (June 7, 2019), available at http://aureliusvalue.com/research/teum-where-are-the-customers (last visited February 20, 2020).
[3]     *Pareteum – The Wild West of Telecoms*, Viceroy Research Group (June 25, 2019), available at https://viceroyresearch.org/2019/06/26/pareteum-the-wild-west-of-telecoms/ (last visited February 20, 2020). Both the Aurelius Report and the Viceroy Report are attached hereto as Exhibits 1 and 2, respectively, and are expressly incorporated herein by reference.

analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, publicly available documents, and the report of an independent investigator retained by undersigned counsel.

18.     As outlined below, the Lead Plaintiff's independent investigation has confirmed, in substantial part, the majority of the allegations made in the Aurelius and Viceroy Reports. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## III.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5], and under §§11, 12, and 15 of the Securities Act.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Pareteum maintains its principal place of business in this District; its stock trades on the NASDAQ, which is located in this District; and many of the acts and practices complained of herein occurred in substantial part in this District.

22.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV.    PARTIES

### A.    LEAD PLAINTIFF

23.    Lead Plaintiff, the Pareteum Shareholder Investor Group, is comprised of five individual business professionals and investors, namely Messrs. Kevin Ivkovich, Stephen Jones, Keith Moore, Nicholas Steffey, and Robert E. Whitley, Jr., who as set forth in their attached certifications, incorporated herein by reference, acquired Pareteum securities at artificially inflated prices during the Class Period and were harmed when the true facts were revealed and the artificial inflation was removed from the price of the stock at the end of the Class Period.

### B.    CORPORATE DEFENDANT

24.    Defendant Pareteum Corporation is organized under the laws of the State of Delaware, and purports to maintain its principal place of business at 1185 Avenue of the Americas, 37th Floor, NY, NY. 10036.[4]   The Company was formerly known as Elephant Talk Communications Corp. and changed its name to Pareteum Corporation in November 2016. Throughout the Class Period, the Company's securities traded on the NYSE American under the ticker symbol "TEUM" until the market close on October 22, 2018, and then on October 23, 2018, the Company began trading on the NASDAQ exchange under the ticker symbol "TEUM."

### C.    THE FRAUD DEFENDANTS

25.    Defendant Robert H. "Hal" Turner ("Turner") was, during the Class Period, Executive Chairman of Pareteum's Board of Directors (at all times), Pareteum's Principal Executive Officer (until May 24, 2019), and then its Chief Executive Officer ("CEO") (effective

---

[4]    On September 6, 2017 Sichenzia Ross Ference Kesner LLP ("Sichenzia"), Pareteum's outside counsel, published a release announcing that it had relocated its headquarters to the ***full floor*** at 1185 Avenue of the Americas, 37th Floor, New York, NY 10036. It is unclear if Pareteum's operations are run out of its attorney's offices or if this is simply a mail-drop and service address, and no explanation has been provided by Pareteum. In its filings with the SEC, Pareteum notes that it "leases this space pursuant to a lease which continues month to month with a monthly rent of $7,550."

May 24, 2019).[5] Defendant Turner was terminated by the Company on November 25, 2019, in the wake of the Restatement. According to the Company's Schedule 14A filed with the SEC on June 6, 2019 (the "2019 Proxy Statement"), as of May 24, 2019, Defendant Turner beneficially owned 2,765,973 shares of the Company's common stock, which represented 2.5% of the Company's outstanding stock as of that date. For the fiscal year ended December 31, 2018, Defendant Turner received $5,281,843 in compensation from the Company, which included $321,255 in salary, a $600,000 bonus, $2,921,563 in bonus stock awards, and $1,439,055 in all other compensation. During the Class Period, Defendant Turner signed and/or certified the Company's Form 10-K and Form 10-Qs filed with the SEC and made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading, at that time.

26.     Defendant Edward "Ted" O'Donnell ("O'Donnell") was, during the Class Period, Pareteum's Chief Financial Officer ("CFO"). On November 5, 2019, the Company reported that Defendant O'Donnell would be replaced as CFO and that his "status with the Company is under review." During the Class Period, Defendant O'Donnell signed and/or certified the Company's Form 10-K and Form 10-Q filed with the SEC and made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading, at that time.

---

[5]     Effective May 24, 2019, the Company changed the titles of certain of its named executive officers "to better reflect their roles and responsibilities with the Company." No new employment agreements or arrangements were entered into between the Company and any of the named executive officers in connection with the title changes. *See* Pareteum Corp., Current Report (Form 8-K) (May 24, 2019).

27.   Defendant Victor Bozzo ("Bozzo") was, during the Class Period, Pareteum's CEO (until May 24, 2019), and then its Chief Commercial Officer (effective May 24, 2019).[6] During the Class Period, Defendant Bozzo signed the Company's Form 10-K filed with the SEC, and/or made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading, at that time.

28.   Defendant Denis McCarthy ("McCarthy") was, during the Class Period, Pareteum's President (until May 24, 2019), and then its Chief Operating Officer ("COO") (effective May 24, 2019).[7] Defendant McCarthy joined the Company on January 1, 2018 in the capacity as Senior Vice President of Corporate Development, and then became President of the Company on October 1, 2018.[8] In May 2019, Defendant McCarthy was named COO and resigned his position as President. ***According to a fourth quarter 2018 earnings call, it is Defendant McCarthy who maintained the Backlog calculation in a spreadsheet.*** Defendant McCarthy was terminated by the Company on October 9, 2019, just twelve days before the Company's October 21, 2019 restatement announcement.[9] During the Class Period, Defendant McCarthy assisted in the preparation of the Company's SEC filings, maintained the Company's Backlog spreadsheets and analysis, and/or made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading, at that time.

---

[6]   *Id.*
[7]   *Id.*
[8]   *Id.*
[9]   *See* Pareteum Corp., Current Report (Form 8-K) (October 15, 2019). Pursuant to the separation agreement between the Company and Defendant McCarthy, Defendant McCarthy agreed not to trade in the Company's securities through October 1, 2021, waived earned and unearned bonuses, and his vested and unvested stock options will lapse. *Id.*

29.     Defendant Rob Mumby ("Mumby") was, during the Class Period, Pareteum's Chief Revenue Officer and in charge of leading sales growth for Pareteum. Throughout the Class Period, Defendant Mumby was frequently quoted in press releases touting the Company's purported hyper-growth.

30.     Defendants Turner, O'Donnell, Bozzo, McCarthy, and Mumby are referred to herein as the "Fraud Defendants."

### D.     THE iPASS ACQUISITION AND SECONDARY OFFERING DEFENDANTS

31.     Defendant Robert Lippert ("Lippert") was a director of Pareteum as of the dates the Registration Statements for the iPass Acquisition and the Secondary Offering (as defined herein) were filed with the SEC. During the Class Period, Defendant Lippert signed and/or certified the Company's Form 10-K.

32.     Defendant Yves van Sante ("van Sante") was a director of Pareteum as of the dates the Registration Statements for the iPass Acquisition and the Secondary Offering were filed with the SEC.  During the Class Period, Defendant van Sante signed and/or certified the Company's Form 10-K.

33.     Defendant Luis Jimenez-Tunon ("Jimenez-Tunon") was a director of Pareteum as of the dates the Registration Statements for the iPass Acquisition and the Secondary Offering were filed with the SEC.  During the Class Period, Defendant Jimenez-Tunon signed and/or certified the Company's Form 10-K.

34.     Defendant Dawson James Securities Inc. ("Dawson James") is a full-service investment banking firm headquartered in Boca Raton, FL. Dawson James acted as Pareteum's exclusive placement agent and arranged for the sale of Pareteum securities offered in connection with the Company's September 20, 2019 Secondary Offering. Pursuant to the September 20,

13

2019 Prospectus Supplement, Dawson James "may be deemed to be an underwriter within the meaning of Section 2(a)(11) of the Securities Act."

35.     Defendant Squar Milner is a certified public accounting and financial advisory firm headquartered in Orange County, California. Defendant Squar Milner served as Pareteum's independent auditor for Pareteum's consolidated financial statements as of and for the year ended December 31, 2018 and 2017, included in Pareteum's FY2018 10-K and incorporated by reference into the Registration Statement for the Direct Offering, as defined herein.

36.     Defendants Turner, O'Donnell, Bozzo, Lippert, van Sante, and Jimenez-Tunon are referred to herein as the "Control Person Defendants."

### E.     RESPONSIBILITIES UNDER THE SECURITIES LAWS AND BASIS FOR LIABILITY

37.     Pareteum, the Fraud Defendants, the Control Person Defendants, Dawson James, and Squar Milner are referred to collectively herein as "Defendants."

38.     Because of the their positions, each of the Fraud Defendants had access to information about Pareteum's Backlog, connections, revenue, liabilities, and financial controls and procedures and the financial reporting thereon through access to internal corporate documents, conversations, and contact with other corporate officers and employees, attendance at meetings, and reports and other information provided to them. Each of the Fraud Defendants, by virtue of his or her high-level position, was directly involved in the day-to-day operations of Pareteum at the highest levels and was privy to confidential information concerning the Company and its business, operations and practices, including the accounting misstatements alleged herein. Because of the Fraud Defendants' positions of control and authority as officers and/or directors, they possessed the power and authority to control the contents of Pareteum's SEC filings, quarterly reports, press releases, presentations to investors, securities analysts,

money and portfolio managers and institutional investors (*i.e.*, the market), and other public statements of Pareteum outlined below.

39.    Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Fraud Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. Accordingly, each of the Fraud Defendants bears responsibility for the accuracy of the SEC filings, press releases, and other public statements detailed herein, and is liable for the false and misleading statements and omissions pleaded herein.

40.    During the Class Period, each of the Fraud Defendants substantially participated in, and had exclusive authority and control over, the content of the Company's false and/or misleading statements, financial statements, and how those results were communicated to investors. The Fraud Defendants also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of Pareteum's false financial statements, all of which made it necessary or inevitable that material misrepresentations and the false results of Defendants' scheme would be communicated to, and mislead, investors.

41.    The Fraud Defendants were obligated to refrain from falsifying Pareteum's books, records and accounts, and were prohibited from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business that operates or would operate as a fraud

upon any person. The Fraud Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Pareteum securities.

42.     Each of the Fraud Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Pareteum securities by disseminating materially false and/or misleading statements and/or concealing material adverse facts about Pareteum's financial condition. The Fraud Defendants' scheme:

(a)     Deceived the investing public regarding Pareteum's business, operations, management and the intrinsic value of Pareteum common stock;

(b)     Enabled defendants to artificially inflate the price of Pareteum shares;

(c)     Enabled Pareteum insiders to use millions of dollars in artificially inflated Company stock as currency to acquire revenues, and it enabled them to raise at least $50 million in capital necessary to fund operations, while in possession of material adverse non-public information about the Company; and

(d)     Caused Plaintiff and other members of the Class to purchase Pareteum common stock at artificially inflated prices.

43.     The Company's press releases and SEC filings were group-published documents, representing the collective actions of Company management. The Fraud Defendants directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Fraud Defendants were involved in drafting,

producing, reviewing, and/or disseminating the false and/or misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and/or misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

44.     The Fraud Defendants were able to and did control and monitor the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant time frame. Each Fraud Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Fraud Defendant is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

45.     Each of the Control Person Defendants owed a duty to the purchasers or acquirers of Pareteum stock in the iPass Acquisition and Secondary Offering, including the duty to make a reasonable and diligent investigation of the statements contained in the iPass Registration Statement and the Secondary Offering Registration Statement (as defined herein) at the time it became effective. This duty included performing an appropriate investigation to ensure that the statements contained therein were true, and that there were no omissions of material fact required to be stated in order to make the statements contained in the iPass Registration Statement not misleading.

## V.   **FACTUAL BACKGROUND**[10]

### A.   **RELEVANT PARTIES AND NON-PARTIES**

As outlined below, many of the relevant parties and non-parties to this matter have undisclosed preexisting relationships; undisclosed histories of fraudulent and/or criminal conduct, including undisclosed connections to Barry Honig ("Honig"), an accused serial pump and dump mastermind; and/or have worked together at companies that mysteriously lose virtually all of their shareholders' money shortly after their involvement.

#### 1.   **Defendant Turner**

46.     As noted above, during the Class Period, Defendant Turner served as Pareteum's Principal Executive Officer (and/or CEO) and Executive Chairman of the Board of Directors. As outlined below, after the Class Period ended and Defendants' fraud was revealed, Defendant Turner was terminated as Chairman and CEO of the Company.

47.     Defendant Turner has a long history of leading failed businesses and misleading shareholders stretching as far back as 2001. For example, as outlined in the Viceroy Report, Defendant Turner served as CEO of Davnet, an Australian-listed company that collapsed as a result of liquidity issues, as recounted in the book "Dot. Bomb Australia" by Kate Askew, which the Viceroy Report aptly quoted as stating:

> It turned out that Hal Turner, the American who took over at the helm of Davnet from Stephen Moignard in February 2001, had excellent money-dissipating skills. He did a great job of regularly racking up monthly expenses bills of $50,000.
>
> In hindsight, there was little doubt that when Turner had been in charge in 2000–01 there was much going on in the company—and in its financials. Davnet's asset position fell by $100 million to not much more than $21 million. At the same time, its cash reserves

---

[10]     Unless otherwise indicated, original source emphasis (bolding, underlines, and/or italics) has been removed, and all emphasis in this Complaint has been added by undersigned counsel.

shrank by $72 million, leaving about $11 million in the once-bursting company coffers. And Turner was anything if not generous. He parted company with Davnet after writing himself a $200,000 cheque for services rendered, and made sure to include a $16,000 expenses bill.

Turner's next stop was back in the USA. In February 2007 he was bought in to run a company called Catcher Holdings. By December, only 10 months later, Turner had again resigned. When Turner departed, the company had about $US100,000 to keep it going.

48.     According to the Viceroy Report, after Davnet, Defendant Turner served as a director of LastMile Communications, a UK telecommunications company from December 14, 2005 to June 6, 2006. The Company liquidated in 2007.

49.     Sometime around this time, Defendant Turner appears to have met Defendant McCarthy at a company called Catcher Holdings, Inc. ("Catcher Holdings"), where Defendant Turner served as CEO and Chairman of the Board (from February 2007 to December 2007) and Defendant McCarthy served as CFO (from December 2006 to January 2008). Defendant Turner left Catcher Holdings in December 2007, after only 10 months, following an acquisition. When he did, Defendant Turner purportedly left the company with only $100,000 to keep it going. Four months later, in April 2008, Catcher Holdings collapsed due to insufficient working capital. According to the Viceroy report, during Defendant Turner's brief tenure at Catcher Holdings, its stock price fell from $1.40 to $0.73 amid going concern issues. Catcher is now a worthless penny stock.

50.     Notably, while CEO and Chairman of Catcher Holdings, Defendant Turner made enthusiastic false statements about that company eerily similar to those he made regarding Pareteum. For example, he told investors that "Catcher is very much a transformational company and opportunity. . . . now we are transforming into true production and into the revenue stages

19

most importantly the growth stages" and "2007 will be a break out year for us." Defendant Turner further emphasized that Catcher Holdings was a sales company and that "there is a significant demand for the Catcher products," while further emphasizing the company's upside and confidence in exceeding sales and revenue guidance.

51.     After Catcher Holdings, Defendant Turner (and Defendant McCarthy) moved on to Pac-West Telecomm, Inc. ("Pac-West"), where he served as CEO from January 2008 to May 2011. It appears to be here that they met Defendant Bozzo, who served as Pac-West's Chief Sales and Marketing Officer and then its President and General Manager – Telastic Services from July 2010 to August 2011. Defendants Turner, McCarthy, and Bozzo all left in 2011. Pac-West filed for bankruptcy in 2013.

### 2.     Defendant McCarthy

52.     As noted above, during the Class Period, Defendant McCarthy served as Pareteum's COO and President. As outlined below, after the Class Period ended and Defendants' fraud was revealed, Defendant McCarthy was terminated as COO and President.

53.     Like Defendant Turner, Defendant McCarthy has a long history of leading failed businesses and misleading shareholders, and appears to be a part of Defendant Turner's preferred management crew.

54.     For example, as noted above, Defendant McCarthy served as CFO of Catcher Holdings from December 2006 to January 2008, during roughly the same tenure that Defendant Turner served as the company's CEO and Chairman. As also noted above, when both men left, they purportedly left the company with only $100,000 to keep it going and, four months later, it collapsed due to insufficient working capital.

55.     After Catcher Holdings, as again noted above, Defendant McCarthy (and Defendant Turner) moved on to Pac-West, where Defendant McCarthy served as CFO/COO from January 2008 to November 2010. It appears to be here that they met Defendant Bozzo, who served as the Pac-West's Chief Sales and Marketing Officer and then its President and General Manager – Telastic Services from July 2010 to August 2011. Defendants Turner, McCarthy, and Bozzo all left in 2011. Pac-West filed for bankruptcy in 2013.

### 3.     **Defendant Bozzo**

56.     As noted above, during the Class Period, Defendant Bozzo served as Pareteum's CEO and Chief Commercial Officer. Like Defendant McCarty, Defendant Bozzo appears to have become part of Defendant Turner's preferred management team.

57.     Specifically, as noted above, during Defendants Turner's and McCarthy's tenures as CEO and CFO/COO of Pac-West, respectively, Defendant Bozzo was hired as PacWest's Chief Sales and Marketing Officer and then its President and General Manager – Telastic Services, from July 2010 to August 2011. Defendants Turner, McCarthy, and Bozzo all left in 2011, just before Pac-West filed for bankruptcy in 2013.

### 4.     **Defendant O'Donnell**

58.     As noted above, during the Class Period, Defendant O'Donnell served as Pareteum's CFO. As outlined below, after the Class Period ended and Defendants' fraud was revealed, Defendant O'Donnell was replaced as CFO and his "status with the Company is under review."

59.     Like Defendant Turner, Defendant O'Donnell has a history of leading failed businesses and misleading shareholders. For example, from October 2003 to December 2010, Defendant O'Donnell served as CFO of Carlyle Capital Group, LLC, which, according to the

Viceroy Report, appeared to be mimicking the name of The Carlyle Group (a well-respected private equity fund) without any substantive connection thereto to make investments. Per the Viceroy Report, the Carlyle Capital Group, LLC has very little internet presence or mentions beyond, most notably, on Pareteum press releases.

60.     Perhaps most notably, from February 2013 to June 2015, Defendant O'Donnell served as CFO of AudioEye, Inc. ("AudioEye"). Shortly after he left AudioEye, in November 2015, Defendant O'Donnell was sued by AudioEye investors for fraud, after he allegedly "***personally affected the fraudulent booking of revenues***" ***that triggered a restatement erasing*** ***<u>92%</u> of the company's reported revenue over the relevant period***. The lawsuit alleged that the fraud was designed to "***give the market the false notion that revenue growth was accelerating***" and "artificially inflate AudioEye's stock price…" That litigation was settled in February 2017, one month after Defendant O'Donnell joined Pareteum.

61.     Next, from July 2015 to January 2016, Defendant O'Donnell served as CFO of Radbourne Property Group, which, according to the Viceroy Report, was charged with fraud. Per that Report, Defendant O'Donnell's responsibilities at Radbourne Property Group were "raising capital, external reporting, outlining capital structure and budgeting."

### 5.     <u>Laura Thomas</u>

62.     Laura Thomas ("Thomas") served on Pareteum's Board from July 2017 until November 2018, when she joined management as the head of Corporate Development and Investor Relations, a position that she held until November 2019, when she replaced Defendant O'Donnell as interim CFO. Previously, Thomas was the CFO of Towerstream Corporation, in which Honig purportedly owned a substantial equity position.

### 6.   Stephen (a/k/a Steven) Hart

63.   Sometime in 2018, Stephen (a/k/a Steven) ("Hart") either joined the Company in the role of an investor relations representative or began working with the Company in that capacity, as evidenced by his inclusion as one of Pareteum's "Investor Relations Contacts" on Pareteum press releases issued during 2018 and at least until March 5, 2019. Mr. Hart is identified as a representative of an entity called Hayden IR, with what appears to be a New York City-based cell phone contact number (area code 917).

64.   Notably, Hart was sentenced to prison in August 2015 for obstruction of justice and perjury following charges by the SEC for "repeated violations of the federal securities laws from 2007 to 2011" in connection with "two distinct trading schemes that resulted in $831,071 in ill-gotten gains" involving matched trading and insider trading. As of 2019, Hart was added to the list of "Prohibited Service Providers" for OTC Markets.

### 7.   Barry Honig

65.   Honig is the accused mastermind of several long-running pump-and-dump securities fraud schemes. In September 2018, an action was brought against Honig by the SEC in the Southern District of New York for his role as the leader of what the SEC called a "classic pump-and-dump" securities fraud ring dating back to 2013 that generated more than $27 million from unlawful stock sales. According to reports, the SEC's amended complaint stated that "Honig was the primary strategist, calling upon other Defendants to, among other things, acquire or sell stock, arrange for the issuance of shares, negotiate transactions, and/or engage in promotional activity" in the $27 million scheme. In connection with the charges, the SEC issued the following release:

> The Securities and Exchange Commission today charged a group of *ten individuals and ten associated entities* for their participation **in long-running**

*fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock.*

According to the SEC's complaint, *from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes.* Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes. *Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume. According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors.*

On June 10, 2019, Honig entered into a consent judgment with the SEC, pursuant to which he agreed to be banned from the business of investing in and financing publicly-traded, small cap companies.[11] A parallel criminal investigation into Honig was also apparently being conducted by the U.S. Attorney's Office for the Northern District of California.

66.     Investigating Honig is notably difficult, and something of a small cottage industry has arisen around it, with multiple sources contributing to articles and research. One investigative journalist, Teri Buhl, has delved deeper than most, though, and written numerous reports on Honig and his schemes. In one, she notes that the SEC accused Honig of hiding over 90% ownership in a fund that was listed in SEC filings as being owned by someone else.[12] In another, and as outlined further below, she notes Honig's connections with Pareteum's outside counsel in connection with Honig's apparent secret funding of the underwriting for a public

---

[11]     The settlement was approved by U.S. District Court Judge Ramos on July 10, 2019. *SEC v. Barry C. Honig, et al.*, No. 18-civ-08175 (S.D.N.Y., filed Sept. 7, 2018).

[12]     Teri Buhl, "Barry Honig Secret Profit Taking of Short Selling Publication TheStreetSweeper.org?, available at http://www.teribuhl.com/2019/10/08/barry-honig-secret-profit-taking-of-short-selling-publication-thestreetsweeper-org-opk-mgti/ (last visited February 23, 2020).

offering in a company in which he was a lead investor.[13] According to Ms. Buhl, after the offering, "[t]he stock had two quick run ups and cliff nose drops since the IPO which could be seen as a pump and dump."

67.     As concealed by the Company, but later revealed in the Aurelius Report, Honig has connections with several Pareteum executives. Defendants Turner and McCarthy were CEO/Chairman of the Board and CFO, respectively, at Catcher Holdings, in which a company controlled by Honig owned an interest; as noted above, Catcher Holdings later collapsed due to insufficient working capital and ceased operations just four months after Defendant Turner left. Further, while serving as the chair of Pareteum's Audit Committee, Laura Thomas (currently Pareteum's interim CFO) was also the CFO of TowerStream, an entity in which Honig owned a substantial stake. In addition, upon information and belief, one of the defendants in the SEC proceeding against Honig who allegedly took part in Honig's schemes was a stock promoter named John Ford – who also apparently appeared as a "private investor" in at least one Pareteum conference call in 2017.

68.     Honig also has undisclosed ties to Iroquois Capital Management, LLC ("Iroquois") and IntraCoastal Capital, LLC ("IntraCoastal"), who regularly invest alongside him. According to the Aurelius Report, Iroquois and/or IntraCoastal have collectively invested in a total of 34 publicly traded companies that were also owned by Honig, most of which have either declined more than 75% from their peak value or are now virtually worthless. Iroquois also reportedly received an SEC subpoena as part of the investigation into Honig's pump-and-dump scheme. According to Ms. Buhl, through this subpoena:

---

[13]     Teri Buhl, "Barry Honig Secretly funded Underwriting in his Laidlaw & Co. Deals," available at http://www.teribuhl.com/2019/09/25/barry-honig-secretly-funded-underwriting-in-his-laidlaw-co-deals-trpx/ (last visited February 23, 2020).

The government was looking for communications from Iroquois and one of the companies named for being a pump and dump called MGT Capital. I was first to report on the contents of the SEC subpoena, which was *fishing for information to prove this group was trading as undisclosed affiliates and influencing public company CEO's to get false press release published to drive up the price of a stock*.[14]

As outlined below, during the Class Period, Iroquois and IntraCoastal owned or controlled as much as 13.2% of Pareteum's outstanding shares. As also outlined below, both appear to have conveniently cashed in their stakes before the Company's stock price plummeted as Defendants' fraud was revealed.

### 8.   Dawson Jones, Squar Milner, and Sichenzia

69.     As outlined below, Honig also has undisclosed ties to several firms that provided services in furtherance of Defendants' fraud, including Dawson James, Defendant Squar Milner, and Sichenzia.

70.     As noted above, Dawson James acted as Pareteum's exclusive placement agent and arranged for the sale of Pareteum securities offered in connection with the Company's September 20, 2019 direct public offering. Dawson James also acted as placement agent for several Honig-related entities and has been engaged by at least thirteen different companies (in addition to Pareteum) in which Honig and/or entities affiliated with Honig had ownership interests. According to the Aurelius Report, most of these companies have declined more than 75% from their peak value and/or are now virtually worthless. Dawson James has also issued multiple favorable research reports on Pareteum.

---

[14]     Teri Buhl, "Iroquois' Richard Abbe Quits XpresSpa While COmpant Battles Fraud Lawsuit," available at https://www.teribuhl.com/2019/01/24/iroquois-richard-abbe-quits-xpresspa-while-company-battles-fraud-lawsuit/ (last visited February 23, 2020).

71.     As noted above, Defendant Squar Milner served as Pareteum's independent auditor for Pareteum's consolidated financial statements as of and for the years ended December 31, 2017 and 2018, included in Pareteum's FY2018 10-K, which was incorporated by reference into the Registration Statement for the Secondary Offering and which was included in the documents covered by the Restatement. According to the Aurelius Report, Defendant Squar Milner has also audited at least one company owned by Honig – True Drinks Holdings – which is now virtually worthless.

72.     What is more, in 2017, the Public Company Accounting Oversight Board uncovered significant deficiencies in Defendant Squar Milner's auditing practices with respect to three issuer audits, finding, *inter alia*, that Defendant Squar Milner had failed to perform sufficient procedures to test its (unidentified) client's valuation of revenue and the effectiveness of its controls.  Defendant Squar Milner did not dispute these findings in its response to the audit report.

73.     Finally, Sichenzia, Pareteum's outside counsel, has assisted Pareteum with issuing tens of millions in shares, warrants, and convertible preferred securities in a series of complex private placements, according to the Aurelius Report. Sichenzia is also Honig's longtime securities law firm and has served as the securities law firm of record for at least 22 companies that Honig and/or John Stetson, an alleged member of Honig's pump-and-dump ring, have invested in since 2009, according to the Aurelius Report.

74.     Notably, Sichenzia and Honig are currently being sued in separate lawsuits by MabVax Therapeutics, a company in which Honig was a large investor and member of a controlling shareholder group, for their alleged role in a pump-and-dump scheme that ultimately

left that company bankrupt. This investor group contained many of the same characters as those involved in the SEC action against Honig noted above.

75.     Oddly, the relationship between Pareteum and Sichenzia appears to be so close that they share office space: the address that Pareteum lists on its website as its "USA headquarters" is the identical address for Sichenzia's main office.

**B.     TURNER TAKES OVER PARETEUM AND REASSEMBLES HIS CREW**

76.     Pareteum was formerly known as Elephant Talk, a penny stock that had declining revenues. On November 17, 2015, Elephant Talk announced the appointment of Defendant Turner as Executive Chairman and Tim Payne, the company's then-current president, as interim CEO. Purportedly, they were to be responsible for jointly managing and growing Elephant Talk's global operations. One month later, Mr. Payne was no longer interim-CEO.

77.     Instead, on October 31, 2016, Elephant Talk announced that it was changing its name to "Pareteum" and appointing Defendant Bozzo – Defendant Turner's accomplice from Pac-West – CEO. The press release announced these actions as "the end of a successful 12-month restructuring effort for the Company."

78.     Next, on January 12, 2017, Pareteum announced the appointment of Defendant O'Donnell as its CFO. Thereafter, acting on prior shareholder approval, Pareteum effectuated a 1-for-25 reverse stock split. Defendant Turner noted that the reverse stock split was intended to "[ensure] compliance with NYSE MKT minimum bid listing requirements," while Defendant Bozzo added that the stock split "[would] demonstrate to the market, potential customers and employees, that we have substantially completed our restructuring program and have built a business that can support long-term growth on a stable, solid foundation."

79.     By December 2017, Honig's related entities appear to have gotten involved. Specifically, on December 7, 2017, Iroquois filed a form 13G with the SEC disclosing that it and related persons now owned 3,575,573 shares of Pareteum common stock, which represented, at the time, approximately 8.33% of the Company's outstanding common stock. Further evidencing their ongoing coordination, also on December 11, 2017, Intracoastal likewise filed a form 13G with the SEC disclosing that it and related persons now owned 2,550,573 shares of Pareteum common stock, which represented, at the time, approximately 5.9% of the Company's outstanding common stock.[15] Pursuant to SEC rules, these forms are required to be filed within ten days of the filer acquiring 5% or more of an issuer's stock. 17 CFR § 240.13d-1(a). Based on the "date of event which requires filing of this statement," which was December 1, 2017, it appears that both Iroquois and IntraCoastal acquired their stock by way of a private placement of 7,151,146 shares and warrants to purchase an additional 7,151,146 shares (to undisclosed investors) that took place on that date. The shares sold in that placement were sold at a purchase price of just $0.92 per share and the warrants, which were exercisable within six months, had an exercise price of $1.09 per share.

80.     Then on February 21, 2018, the Company announced the appointment of Defendant McCarthy – Defendant Turner's accomplice from Catcher Holdings and Defendants Turner's and Bozzo's accomplice from Pac-West – as its Senior Vice President of Corporate Development. Later, on October 1, 2018, he would become the Company's President and, on May 24, 2019, the Company's COO.

---

[15]     On February 13, 2018, IntraCoastal amended its 13G to report that it now beneficially owned 36,239 shares of Pareteum common stock, which excluded 3,575,573 shares issuable upon exercise of "Intracoastal Warrant 1," but that, assuming the warrants were exercised, it could be deemed the beneficial owner of 3,611,812 shares of Pareteum common stock.

81.     Finally, as noted above, to round out the same cast of characters as past Honig-related schemes, after Defendant Turner joined the Company and during the Class Period, Pareteum regularly employed Dawson James as its exclusive placement agent, which arranged for the sale of Pareteum securities; Defendant Squar Milner as its independent auditor for the statements implicated in the Restatement; and Sichenzia as outside counsel.

82.     Indeed, just before the Class Period began, on September 22, 2017, Dawson James began issuing favorable analyst reports and research on Pareteum, wherein it noted that the Company had accelerated its new contract activity and was adding to its Backlog and issued a "Buy" rating. And, on December 11, 2017, Dawson James published a report in which it commented on the Company's Q3/2017 results, highlighted the Company's purported contract awards and growing Backlog, concluded by increasing its revenue forecast for the Company, and noted that, "[w]ith a new, experienced management team, growing revenues and backlog stressing recurring revenue and higher-margin contracts, an improved balance sheet and successful cost-reduction program, investors have much to like about Pareteum both near-term and over the long run." Throughout the Class Period, Dawson James issued no less than eight such favorable reports, always maintaining its "Buy" rating. Notably, in some, Dawson James claimed that it "does not make a market in the securities of the subject company."

## C.     PARETEUM'S BACKLOG AND OTHER INTERNAL METRICS FOR REVENUE GROWTH

83.     As he began to assemble his team, Defendant Turner changed the way that Pareteum reported its revenue. Specifically, beginning in or about 2016 and continuing throughout the Class Period, Pareteum focused analysts and investors on its so-called, self-created "Backlog" metric, which it represented demonstrated the Company's current contracts so that investors could understand the "magnitude of our opportunity" as a Company.

84.    Defendant Turner described the Company's use of the Backlog metric as follows:

This key performance indicator is directly correlated to our financial and operating results and reflects the traction our services and solutions are gaining in the marketplace.

He also described the Backlog as follows:

We've discussed our 36-month contractual revenue backlog, which is simply ***the value of new sales orders intake and the revenue under contract*** or simply called backlog and we -- as we've discussed this so which it is as a non-GAAP indicative number. *We began using this metric in 2016* to provide a view of the magnitude, sales growth and its conversion to billable revenues. This has been especially important as we transform the company and needed a barometer that looked beyond the methodical building up of monthly recurring revenue. . .

. . . ***This metric has also been a very useful way to help stakeholders understand the magnitude of our opportunity*** and the commitments that we've secured from customers, particularly as we started to transform the company in 2016.

85.    In addition to this self-defined, non-GAAP metric, throughout the Class Period, the Company also frequently used another self-created metric – "connections" – which it represented measured its successes and growth. Defendant Turner described "connections" as the Company's "term representing devices, subscribers, and their variable usage" and noted that "connections" are a lead indicator of revenue.

86.    As outlined below in greater depth, the Company itself emphasized the importance of its Backlog and connections metrics, frequently reporting them and touting the growth they demonstrated in press releases and filings with the SEC.

87.    What is more, as outlined below, the Company conditioned the market and investors to believe that it could convert its Backlog into revenue and that deployment of its services would gradually drive connections, which would generate increasing monthly recurring revenues. The Company stated that a typical 3-year contract would generate 85% of the contract value in monthly recurring revenues, driven by "connections," and typically recognized in years

31

2 and 3, thus setting the bar low for operating results in the short term while encouraging investors to trust the Backlog and Company's self–aggrandizing customer wins, despite knowing (as outlined below) that many of the Company's purported customers were incapable of generating the revenues promised.

### D.   DEFENDANTS ARE AWARE OF MATERIAL WEAKNESS IN THE COMPANY'S INTERNAL CONTROLS & PROCEDURES AND FINANCIAL REPORTING

88.   During the Class Period, the Company and its executives were aware that these metrics were unreliable. Specifically, on March 18, 2019, Pareteum filed with the SEC its Form 10-K Annual Report for the year ended December 31, 2018 (the "FY2018 Form 10-K"). Therein, the Company disclosed that, throughout 2018, there existed at Pareteum "material weaknesses in its internal control over financial reporting, [such that its] disclosure controls and procedures were not effective as of December 31, 2018."  More specifically, as outlined in greater depth below (*supra* ¶¶359-364), the FY2018 Form 10-K disclosed that management had identified deficiencies that constituted material weaknesses in the Company's internal controls over financial reporting, including inadequate and ineffective management assessment of internal controls over financial reporting and ineffective design, implementation and monitoring of information technology general controls. However, as also noted below, Defendants also represented that, *despite* knowing that its metrics were not reliable, the Company went out of its way to assure investors that the opposite was true and that, *despite* the material weaknesses that management had discovered, investors could still rely on those metrics because the identified "material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results," and the Company had already begun remediation measures. The Company even specifically highlighted that Defendant Squar Milner had provided it an unqualified opinion and, despite reporting the prior deficiency that

purported to affect 2018, but not necessarily 2019 (although shareholders would later learn that it affected both), the Company stated that there had been *no changes in internal controls over financial reporting*.

89.     As a result, the material weaknesses inherent in the Company's internal controls and procedures that existed throughout the Class Period actually served to cause investors to rely *more heavily* upon Defendants to ensure that the Company's financial statements were true, accurate, and reliable, and that the controls and procedures that did exist were at least minimally adequate to assure transparency and reliability. In fact, Defendants *encouraged* this reliance throughout the Class Period. For example, in the Company's first quarter 2019 Form 10-Q, filed on May 10, 2019, Defendants stated that, *"[i]n light of the material weakness described [in the Company's SEC filings], we performed **additional** analysis and other post-closing procedures to **ensure** our financial statements are prepared in accordance with generally accepted accounting principles."* And, during the Company's August 6, 2019 earnings call, Defendant McCarthy assured investors that, during the first quarter of 2019, Pareteum had "engaged RSM to bolster our internal audit function and improve our internal control processes. They will partner with us, and Defendant Squar Milner are guiding us as we enter the next chapter of our development and expected substantial growth."

### E.     DEFENDANTS ADVANCE A FALSE HYPER-GROWTH NARRATIVE TO INVESTORS USING METRICS THEY CREATED AND KNEW WERE FALSE

90.     Having reassembled his crew and primed investors to focus on and believe in the Company's self-created Backlog and connections metrics, but aware that these metrics were unreliable, throughout the Class Period, Defendants advanced a story of hyper-growth, using the Backlog and connections metrics as support for their false revenue growth story. During this time period, and based on this false information, the Company's stock price soared from a low of

33

just $0.72 per share on December 14, 2017 (the closing price on the first day of the Class Period and the lowest the stock would trade until the end of the Class Period, when the truth was finally revealed) to a trading high of $5.93 per share (on March 18, 2019, in the middle of the Class Period, before the truth was revealed) – *an 824% increase in stock price* in just a few months. Indeed, as outlined by the below chart, the artificial inflation built into the Company's Class Period stock price is obvious, as the beginning of the Class Period (before Pareteum and the Fraud Defendants began their fraudulent scheme) and the end of the Class Period (when the truth was finally revealed) bookend an otherwise meteoric rise and fall in the Company's stock price:



91.     Pareteum and the Fraud Defendants achieved this fraud through a classic pump-and-dump style barrage of false and misleading press releases that touted the Company's fake success and growth. As outlined below, during the Class Period, Defendants published *178 press releases – over 130 in 2018 alone –* almost all of which either announced false and/or misleading contract awards with customers – many of whom either did not exist at all or who could never have supported the value of the contract stated – and/or falsely touted the Company's purported growth and abilities:

| Date Range | Releases |
|---|---|
| December 14, 2017 – January 2018 | 5 |
| January 2018 | 14 |
| February 2018 | 16 |
| March 2018 | 15 |
| April 2018 | 13 |
| May 2018 | 15 |
| June 2018 | 7 |
| July 2018 | 11 |
| August 2018 | 10 |
| September 2018 | 7 |
| October 2018 | 13 |
| November 2018 | 8 |
| December 2018 | 2 |
| January 2019 | 2 |
| February 2019 | 8 |
| March 2019 | 7 |
| April 2019 | 4 |
| May 2019 | 6 |
| June 2019 | 2 |
| July 2019 | 4 |
| August 2019 | 4 |
| September 2019 | 4 |
| October 2019 (until restatement) | 1 |
| **TOTAL** | **178** |

In these press releases and other public filings with the SEC, the Company systematically touted its allegedly always-growing Backlog and connections and corresponding significant revenue growth. The Company's promotional campaign consistently presented the Company as a "rapidly growing Cloud Communications Platform" poised for success, using topical buzzwords like "Blockchain," "cryptocurrency," "Internet of Things" ("IoT"), "smart cities," and "advanced analytics." Through these releases and statements, and using metrics that they created and knew were unreliable, Pareteum and the Fraud Defendants conditioned the market to believe in the growing demand for the Company's products and its success in signing customers to multi-year deals worth tens of millions of dollars in revenue for the Company. **It was all a lie.**

### 1.    **The Scheme Begins**

92.    Throughout most of the Class Period, Defendants' scheme was facilitated through a lack of transparency regarding the Company's purported customer wins. Specifically, throughout most of the Class Period, Defendants virtually never disclosed the identity of their purported customers and contracts, explaining to investors that the non-disclosure was "customary in highly competitive growth markets" and due to "competitive reasons." Only later in 2018, as the scheme reached its nadir, were the Fraud Defendants bold enough to provide the identities of the Company's alleged new customers. And, as outlined below, when those identities were subjected to analysis, they crumbled.

93.    The Class Period begins with Defendants priming the market to believe their fraud by publishing a series of communications to investors and the market in which they stated that the Company's "*restructuring and repositioning in 2016 has led to solid growth in 2017*, and has defined our innovation in both services and market positioning, establishing a *strong outlook for our success in 2018 and beyond.*" Similarly, the Company told investors and the

market that it had eliminated senior secured debt, which "substantially improve[d] cashflow," a key element of the corporate turnaround and growth story. Defendant Turner assured investors that the Company was now focused on a "continued sales surge" and that it expected to "deliver maximum value for [its] equity investors." In a power point presentation, the Company began noting its increasing Backlog and stated that its "[p]ath to profitability is accelerated via *high margins* on subscribers and [that] *the magic of monthly recurring revenue* will drive *sustainable returns*."

94.     Following these statements, Pareteum's shares traded as high as $1.96 per share and closed at $1.65 per share on December 19, 2017, a significant increase from its closing price of $0.72 per share on December 14, 2017, with higher trade volume on December 18, 2017 and December 19, 2017, as indicated in the following chart:



95.     With the market primed, Defendants commenced their barrage of press releases touting customer wins and ballooning contract and Backlog values. For example, in January 2018 alone, the Company issued 14 press releases – one every other day. *Infra* §VI.A.2. During this period, on January 8, 2018, the Company described its Backlog metric as a "key

performance indicator [that[ is ***directly correlated*** to our financial and operating result." The Company ended the month by publishing a release on January 31, 2018, that announced that, in January 2018, it added $15,200,000 to its Backlog, which represented a 400% increase from a year earlier and a 10% month over month increase. Defendant Turner told investors that "Pareteum's performance is highlighted by the growth of our 36-month contractual revenue backlog, currently standing over $162,000,000."

96.     Defendant Turner made similar statements in a February 12, 2018 letter to shareholders, in which he which he primed the market to believe in Pareteum's non-stop growth:

> The TEUM[16] of Pareteum Corporation continues to be hard at work, globally. We have had a *fast start to 2018 with excellent results in January . . . .*
>
> * * *
>
> *We have a very big and bright 2018 planned.* So far this year, in January alone, our TEUM signed $20.4 million of new contracts, spanning the globe, from Brazil to Africa to Europe. $15.2 million was additive to ***our now record high $162 million 36-month contractual revenue backlog,*** as two of the awarded contracts are 5-year agreements. I am extremely proud of our TEUM's accomplishments as *we have accelerated the growth of our backlog from $60 million at June 30, 2017 to $162 million as of January 31, 2018.* ***We expect the pace to accelerate during the year*** and that our reported results will reflect the hard work that has gone into the turnaround of our company.
>
> * * *
>
> *Pareteum continues to win new long-term contractual business at an* ***unprecedented*** *pace,* ***<u>as evidenced by our 36-month contractual revenue backlog</u>****. We expect this pace to increase throughout the year*. . . .

97.     Just as the Fraud Defendants planned, the Company's stock price rose as a result of this letter. Indeed, on February 12, 2018, the Company issued a press release announcing that

---

[16]     The Company often refers to its employees as the "TEUM," a play on words for the word "team."

its stock price had risen as a result of this letter: "Pareteum . . . is up 4.8% premarket following on a letter from its chairman outlining its start to 2018."

98.     In total, the Company issued sixteen press releases in February 2018 – again, one every other day, in which it continually and repeatedly highlighted supposed contract wins and Backlog additions. *Infra* §VI.A.2. In the month's final release, published on February 28, 2018, the Company announced that it had secured a "$10 Million Contract from Established Carrier to Launch Global MVNO," further adding to the Backlog. Defendant Bozzo called the contract "a major milestone for continued growth." On February 28, 2018, Pareteum's common stock traded as high as $2.34 per share on volume of 5.12 million shares, up from the prior day's close of $2.00 per share and 647.9k share volume.

99.     In March 2018, the Company published another fifteen press releases, most of which touted supposed contract wins and Backlog additions. *Infra* §VI.A.2. Of note, in a March 21, 2018 press release, it announced that it added $10 million to its Backlog via a $15 million contract with an Africa-based MVNO. Defendant Bozzo noted that "[t]his part of the world represents *high growth* in connections as the digital economy takes over." On March 21, 2018, Pareteum's stock traded as high as $3.35 per share with 11.08 million share trading volume, up from the prior day's close of $2.85 per share.

100.    In April 2018, the Company published thirteen press releases, most of which touted supposed contract wins and Backlog additions. *Infra* §VI.A.4. On April 2, 2018, to condition the market to further trust Pareteum's false statements, the Company issued a press release notifying the public that its audited financial statements for the year ended December 31, 2017, which were included with its 10-K filed on March 30, 2018 with the SEC, did **not** contain a going concern qualification paragraph in the audit opinion from its independent registered

public accounting firm (Squar Milner). Defendant Turner stated that the "achievement *marks another milestone in our successful turnaround* as . . . we are fully capitalized for our growth plan as we continue to seek new business and ***convert our current revenue backlog to revenue***. *Confidence in our business model and execution on our financial model* . . . sets the tone for Pareteum to continue to excel in 2018."

101.    To further bouy investors' false confidence in Pareteum's financial reporting, on April 5, 2018, the Company published a press release in which it quoted Defendant Turner as stating: "***We remain ahead of our targeted 36-month Contractual Revenue Backlog conversion.***" Then, on April 9, 2018, to capitalize on this false confidence, the Company previewed its as-of-yet unfinalized first quarter of 2018 results by publishing a press release announcing expected first quarter revenue of $4.1 million, "a 47% Increase over [First Quarter] 2017." The release quoted Defendant Turner as saying: "This momentum is ***a result of our success in converting our contract revenue backlog into connections which generates revenues***."

102.    On April 16, 2018, Defendant Turner again sought to assure investors that the Company could convert its Backlog to actual revenue in an Update Letter to shareholders, in which he noted the Company's "rapid start" to 2018 and highlighted that the Company's *Backlog was at "$200 million, with expectations for continued, and[] even accelerated growth[.]"* The Update Letter reiterated the Company's 2018 first quarter results, and further provided that the Company *"[has] excellent visibility into our business operations and <u>revenue recognition</u>."*

103.    On April 18, 2018, IntraCoastal filed an amendment to its 13G, in which it disclosed that it could be deemed to be the beneficial holder of 3,575,573 shares of Pareteum common stock, or 6.6% of the Company's outstanding stock.

104.    In May 2018, the Company published another fifteen press releases, most of which again touted supposed contract wins and Backlog additions. *Infra* §VI.A.4. On May 7, 2018, the Company published a press release announcing its actual, supposedly "record" results for the first quarter of 2018, reporting "[r]evenues of $4.113 Million, up 47% Year-Over-Year," and noting that the Backlog had reached $200 million following a $53 million quarter and that "connections, a lead indicator of revenue, increased 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017." This release claimed that the Company's Backlog revenue conversion had purportedly reached ***103%***. Defendant Turner stated that the Company "remains *laser focused on converting backlog to revenue*." And, ***"[b]ased on our 36-month contractual revenue backlog of $200 million***, as of March 31, 2018, and 2,200,000 connections," the Company raised its 2018 outlook to *at least* 60% over 2017, up from the previous provided guidance of 50%.

### 2.    The Company Uses Its Artificially Inflated Stock as Currency in Two Acquisitions, Which It Uses to Buoy Its False Metrics with Real Customers, and Defendant Turner Cashes In

105.    Taking advantage of its artificially inflated stock price, which by now was trading around $2.50 per share, on May, 9 2018, the Company entered into a securities purchase agreement with select investors, pursuant to which the Company issued and sold an aggregate 2,440,000 shares at a purchase price of $2.50 per share. The gross proceeds of this offering were approximately $6,100,000, which the Company stated would be used for working capital and general corporate purposes.

106.    At the same time, Defendant Turner took advantage of the increased stock price and an upcoming (as-of-yet unannounced acquisition) to dramatically increase his compensation. Specifically, on June 6, 2018 (in a press release) and on June 13, 2018 (in an 8-K filed with the

SEC), the Company announced that it had *amended* Defendant Turner's existing employment agreement to (a) extend his employment contract for three years, through at least November 18, 2021, and (b) provide that his "*restricted stock awards [and Option Shares] shall become vested and exercisable with respect to 100% of the Restricted Stock Award [and Option Shares] in the event of a 'Change of Control or Triggering Event.'"* A "Change of Control or Triggering Event" was defined as, *inter alia*, "immediately . . . upon the Company tendering a binding offer to merge, or acquire all of substantially all of the assets or a controlling portion . . . of the equity of another company(ies)."

107.    On the next day, June 7, 2018, the Company announced an agreement to acquire Artilium PLC ("Artilium"), a strategic partner since October 2017, in a $104.7 million stock and cash transaction.[17] The Company touted that the acquisition would add approximately $65 million to its Backlog.

108.    As a result of this transaction (as demonstrated by a June 11, 2018 Form 4 and October 10, 2018 Form S-8 filed with the SEC), it appears that **Defendant Turner acquired 1,500,000 shares of Company stock pursuant to his recently amended employment agreement, thereby personally profiting from Pareteum's artificially inflated stock price.**[18]

109.    The Company also benefited from the artificially inflated stock price.  On June 12, 2018, the Company published a press release announcing that it would be joining the Russell Microcap Index effective June 25, 2018. Defendant Turner commented: "This marks a significant milestone in the history of Pareteum and we are pleased that our shareholders and

---

[17]    Prior to this transaction, Pareteum owned approximately 27,695,177 shares of Artilium, representing approximately 7.8% of the company.

[18]    An October 25, 2018 Form 4 suggests that Defendant Turner may have sold 1,000,000 of the shares he received as a result of the Artilium acquisition in the 16 days following the October 10, 2018 Form S-8, although it is unclear.

institutions will see the benefit of the results of our hard work over these last years.  We believe our inclusion will raise awareness across the investment community."

110.    In the meantime, the Company and the Fraud Defendants continued to prime the market to believe in the Company's false hyper-growth story and fabricated metrics. For example, on May 9 and 11, 2018, respectively, in yet more press releases announcing yet more supposed contract wins, Defendant Turner was quoted as saying that Pareteum "*will continue in its **growth trajectory**, translating into **additional revenue** for [the] Company*" and that "*Pareteum is in a trajectory of **relentless forward motion . . . TEUM is on fire**.*"

111.    In total, in June and July 2018, the Company issued eighteen press releases, most of which again touted supposed contract wins and Backlog additions.  *Infra* §§VI.A.4, IV.A.6.

112.    On June 28, 2018, the Company published a press release announcing that the Company had secured *$55 million in 13 new contracts during the second quarter of 2018*, ***growing its Backlog to $255 million,*** a supposed increase of 74% from the 2017 year-end balance of $147 million and an increase of 27.5% during the second quarter of 2018 alone. And, on July 10, 2018, the Company again previewed its expected second quarter of 2018 results in a press release. Therein, the Company and the Fraud Defendants again primed the market to believe the false hyper-growth narrative, to trust the Company's fabricated Backlog and connections metrics, and to believe that these metrics translated into revenue:

> ***Connections, which are a lead indicator of revenue***, rose . . . providing management the confidence to ***increase its projected 2018 revenue outlook to a substantial 80% annual revenue growth over 2017's year-end totals***.

Defendant Turner was quoted as saying:

> ***[We] surged into 2018 with strong first quarter results, demonstrated by the acceleration in revenues and connections. This momentum has continued into the second quarter, at an accelerating rate, because of rapid conversions of our***

*36 Month Contractual Revenue Backlog.* We see this translating into our best quarter, ever. *We anticipate continued improvement in our results . . . .*

113.    On August 6, 2018, the Company again announced "record" results for the second quarter of 2018, noting that revenues increased by 85% year over year, the Company *increased Backlog by $55 million through 13 contracts*, and that it ended the second quarter of 2018 with *2,713,600 Connections, an increase of 225%* over the end of the second quarter of 2017 and 23% higher than the first quarter of 2018. Defendant Turner noted that the quarter "marks the achievement of materially significant milestones for Pareteum *as it continues to evolve into a high-growth . . . company*." He again identified the Backlog and connections metrics as "[k]ey performance indicators" and told investors that Pareteum "remains laser focused on converting backlog to revenue." Again "[b]ased on our 36-month contractual revenue backlog of $276 million," the Company raised its 2018 outlook to expect 2018 revenue growth greater than 80% over 2017, up from the previous provided guidance of 70%."

114.    Meanwhile, in total, in August and September 2018, the Company issued another seventeen press releases, most of which again touted supposed contract wins and Backlog additions.  *Infra* §VI.A.6. For example, on August 2, 2018, the Company published a press release announcing that *it reached the $300 million Backlog "milestone" and that it had added $46 million to the Backlog with ten new customers in the prior 36 days*. Defendant Turner commented: "Our momentum will not stop here . . . . We are on a *torrid sales pace and we are On Fire with relentless forward motion* and passion . . . ." And, in another "Update Letter" on September 13, 2018, Defendant Turner again told investors that the Company's metrics were "lead indicators of revenue," that, based on the Company's supposed "visibility into Q3 and Q4 operating performance, we remain very bullish in our outlook," that the Company's "revenue and connections (our proxy for connected devices and their usage) will soon also be updated,"

*and that, "to date we exceeded 100% of our plan for converting revenue and connections from backlog."*

115.    Then, on September 17, 2018, ***for the apparent first time***, in a press release announcing $50 million in purported new contracts during the last two weeks of August *alone,* the Company identified (some or all) of the alleged customers and contracts added. As outlined below in considerable depth, most of the companies identified in this release were (and remain) incapable of generating *the $50 million* in revenues claimed by the Company – some of them, comically incapable of doing so. *Infra* ¶270.

116.    In total, in October and November 2018, the Company issued another ten press releases, most of which again touted supposed contract wins and Backlog additions. *Infra* §§VI.A.6, VI.A.8.

117.    On or about October 1, 2018, the Company completed its previously announced cash and stock acquisition of Artilium. Pursuant thereto, and using its artificially inflated stock (then valued at $3.00 per share) as currency, the Company issued approximately 37.5 million new shares of common stock, with approximately 33.4 million shares (or $100.2 million in stock) going to former Artilium shareholders.

118.    On October 2, 2018, the Company published a press release announcing $15 million in supposed new contracts, this time again identifying the companies and contracts. As again outlined below in considerable depth, the companies identified in this release were (and remain) incapable of generating *the $15 million* in revenues claimed by the Company. *Infra* ¶283.

119.    On October 5, 2018, the Company again previewed its expected third quarter of 2018 results in a press release.  In so doing, it again described its fabricated metrics as "leading

indictor[s] of revenue" and described its Backlog, connections, and revenues as all accelerating as the Company "surge[d]" through 2018.

120.    Then, on October 8, 2018, the Company identified another supposed big contract win – this time, a 3-year, *$50 million contract* with One Development. But, as again outlined below in considerable depth, One Development was (and remains) incapable of generating *the $50 million* in revenues claimed by the Company. *Infra* ¶285. Indeed, as again outlined below, One Development reported no revenue of any kind in 2018, and its purported $50 million contract with the Company would have made that contract *several orders of magnitude larger* than that of Pareteum's single largest customer. And, on October 17 and 23, 2018, the Company published press releases announcing almost $20 million in new contracts with several customers. Again, though, as outlined below, these customers were (and remain) incapable of generating such revenues. *Infra* ¶¶287, 289.

121.    Based on false contracts and customers like this, on October 24, 2018, in the lead up to the quarterly results release, Pareteum published a press release announcing that it ***had grown its Backlog to $500 million***, which it stated represented "a 1,150% increase year over year since 2016." On November 7, 2018, the Company formally announced "record" results for the third quarter of 2018. In so doing, it again conditioned the market to continue to believe the hyper-growth narrative and the reliability of the Company's fabricated metrics by again describing those metrics as "key performance indicators," stating that the Backlog conversion rate was 100%, stating that the end of the quarter marked "*our continued evolution into a high-growth . . . company*," and raising the Company's guidance based on the Backlog to *greater than 100% revenue growth for 2018 over 2017, up from the previous provided guidance of 85%.*"

122.     Then, on November 12, 2018, the Company announced that it had entered into an agreement to acquire iPass Inc. ("iPass") in a stock-based acquisition valued at approximately $30 million (hereinafter, the "iPass Acquisition"). The Company represented that the iPass Acquisition would achieve more than $15 million in annual cost synergies, with more than $12 million expected to be realized during the first full quarter of operations. The Company also estimated approximately $2.0 million of GAAP earnings accretion and $5 million of non-GAAP earnings accretion in the first full year after closing the transaction.

123.     Pursuant to the terms of the merger agreement, and through the iPass Registration Statement (defined below), Pareteum commenced a tender offer, offering 1.17 shares of Pareteum common stock in exchange for each share of iPass common stock tendered. The tender offer was effectuated and competed, and the acquisition closed, on February 12, 2019. In connection with the acquisition, Pareteum issued 9.865 million shares of common stock to iPass shareholders and 705,000 shares were granted to employees. As part of the acquisition, the Company also entered into an Consent and Amendment to Credit Agreement and Joinder to Security Agreement with iPass' lender, Fortress Credit Corp. ("Fortress Credit"), pursuant to which Pareteum (a) guaranteed iPass' indebtedness to Fortress and (b) paid Fortress a cash fee of $150,000 and *issued Fortress warrants to purchase 325,000 Pareteum shares at $2.78 per share*.

124.     In total, from December 2018 to February 2019, the Company issued 10 press releases, with most again touting supposed contract wins and Backlog additions. *Infra* §VI.A.8, VI.A.10.

125.     In a February 13, 2019 press release announcing the closing of the iPass Acquisition, Defendant Turner peddled the acquisition to the market:

> We're delighted to announce the completion of our acquisition of iPass. *We will now accelerate as one company* with combined software products and services,

the expansion of addressable markets and the resulting executive and operating talent. Our integration with iPass *immediately grows our installed Connections base*, adding marquee brands to our portfolio of customers, and it also materially enhances our software portfolio of services, and adds global access to the world's largest Wi-Fi network."

126.    Over the next week, the Company published three press releases touting its $615 million Backlog, several multi-year agreements, a supposed "sales surge [that] yield[ed] $15 million in new contracts in the final two weeks of the year,"  and "revenue generation mode delivering immediate value." According to Defendant Turner, this sales surge was a sign that the Company was "rapidly growing," "starting 2019 stronger than ever," and "in the business of . . . operating profitably." Defendant Mumby also stated that the Company's "strong position at the end of 2018 is exceeded by *further strong growth* into 2019 and indicates the scale of opportunities open to Pareteum . . . . *Pareteum is experiencing great success*. . . . [W]e're confident *we will continue accelerating our growth*."

### 3.    Honig's Associates Appear to Cash in While the Company Continues to Use Its Artificially Inflated Stock as Currency

127.    On February 8 and 14, 2019, IntraCoastal and Iroquois, respectively, reported that they had *liquidated 100% of their Pareteum holdings*. Although it is unclear precisely when they sold their stock,[19] between January 31, 2019 and February 14, 2019, Pareteum stock closed between $2.50 per share and $3.19 per share, such that any sale in these ranges would represent a 272% to 347% rate of return for these Honig-associated entities.

---

[19]    Pursuant to SEC rules, an amendment is generally required to be filed promptly after "any  material increase or decrease in the percentage of the" stock class beneficially owned, and any "disposition of beneficial ownership of securities in an  amount equal to one percent or more of the class of securities" is deemed "material." 17 C.F.R. § 210.13d-2. However, under certain circumstances, any such amendment can also be delayed until 45 days after the end of the calendar year. *Id.* In light of the fact that both amendments listed December 31, 2018 as the "date of event which requires filing of this statement," and both were filed with 45 days of the end of the previous calendar year, it is impossible to determine when exactly they sold their stock, be it in late 2018 or early 2019.

128.    With share prices trading almost 25% higher since the announcement of the closing of the iPass Acquisition, the Company took advantage of the artificial inflation in its stock price to secure a credit facility – which it then used as feedback to further support its false growth narrative. Specifically, on February 26, 2019, the Company issued a press release announcing that it had secured an additional $50 million credit facility from Post Road Group (hereinafter the "Credit Facility"). Approximately $11 million of the initial draw was to be used to repay debt from Fortress Credit, which had been assumed by the Company in the iPass Acquisition.[20]

129.    This press release quoted Defendant Turner as stating:

> *During 2018, we showed our ability to convert our contractual revenue backlog into tangible results.* This financing gives us a new currency with which to support our *aggressive market consolidation* through accretive acquisitions and *organic growth strategy* and improves leverage in the business to respect the value that management places on equity. ***The facility will allow us to continue on our current growth trajectory in 2019 and the future.***

The press release further provided:

> The credit facility was led by Post Road Group and is a milestone transaction for Pareteum's mission to connect every person and every(thing)™. The credit facility provides financing secured through Pareteum's existing recurring revenue streams from its software as a service platform, as well as its growing intellectual property portfolio. ***The transaction enables Pareteum to continue to demonstrate its ability to grow revenues on an organic as well as inorganic basis, globally.***

130.    This press release also quoted Michael Bogdan, Managing Partner of Post Road Group, as stating: "The strength of Pareteum's combined capabilities after its recent acquisitions creates a company with significant scale and international presence to drive further consolidation

---

[20]    Additional terms of the Credit Facility were only disclosed in Pareteum's Form 8-K filed on February 26, 2019.  Among other things, these terms and conditions included: (i) obtaining the consents of certain third-parties prior to any additional loans beyond the initial $25 million; (ii) specified levels with respect to operational and financial covenants; and (iii) requirement to maintain a minimum of $2 million of unrestricted cash, maximum leverage ratios, churn rate and adjusted EBITDA.

in this industry." Little did Mr. Bogdan know — but as he would soon discover — Pareteum was in default on the terms of this Credit Facility from the moment it was signed, and within less than a month's time would not even continue to make interest payments, much less secure the consent agreements necessary before the Company could access half of the $50 million. While Mr. Bogdan was quoted as stating that "[w]e are excited to become Pareteum's capital partners," this excitement would turn into frustration.

131. In March 2019, the Company published another seven press releases. *I Infra* §VI.A.2. On March 7, 2019, in anticipation of the Company's Fourth Quarter and Full Year 2018 Earnings Call, Defendant Turner published a Chairman's Letter to Shareholders, in which he "affirmed *our clear mandate to **hyper-accelerate growth** in accretive ways, be it through our continued stellar sales growth, or, through additional successful strategic alliances*." He further assured investors that the Company had "ambitious plans for continued growth and profitability" and that shareholders "[would] also see many new customers enter our client rosters."

132. Defendant Turner used the March 7, 2019 letter to further condition investors to believe that the Company was "maintain[ing] [its] *laser focus on growth* . . . [and] was well positioned now to drive *dramatic increases in our scale* and become the recognized market leader through the value we create for our customers and shareholders." Defendant Turner also stated:

> As you have heard me say many times, "we are all in sales!" We are driving hard, everyday to acquire new customers, upsell our existing customers and aggressively convert our [Backlog].

133. On March 12, 2019, the Company announced its results for the fourth quarter of 2018 and the full 2018 fiscal year, for the period ended December 31, 2018. Once again, Defendants reported "record" results, purporting to have *achieved over 139% year-over-year*

revenue growth and 256% year-over-year revenue growth for the fourth quarter. Moreover, Defendants represented that **the Company's Backlog had "quadrupled" to $615 million** and that connections had increased 252% to 4,609,000 for the full year 2018 and grew 59% sequentially in the fourth quarter of 2018. **The Company also forecast wildly-accelerating growth in the range of 225 – 260% year-over-year in its 2019 full year guidance.** Defendants also reported that an "initial draw" of $25 million of the Credit Facility would be used "to repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions."

134.    Later on March 12, 2019, Defendants hosted an earnings call with analysts and investors, during which Defendant Turner conditioned the market to believe that Pareteum was poised to deliver "dramatic revenue growth" by focusing investors and the market on Pareteum's false metrics:

> Pareteum delivered excellent results in 2018 as well as in the fourth quarter of 2018. *Pareteum's prospects are now the very best, more than ever before in our history.* **There is a clear path ahead for _dramatic revenue growth_ and this is fueled by the growth of our 36 Month Contractual Revenue Backlog and its conversion of that backlog into billing customers.**

135.    During the same March 12, 2019, earnings call, Defendant McCarthy (identified in the transcript as "Pareteum President"), also stated, in part, that:

> We generated $14.3 million of revenue in the fourth quarter and our gross margins were 63%, in line with expectations post the Artilium acquisition.
>
> * * *
>
> **Our key performance indicators continue to exceed plans**. *Connections . . . have grown over 4-point -- to over 4.6 million at the end of the fourth quarter. 36 Month Contractual Revenue Backlog converted into live production incremental monthly revenue was at 97% of scheduled conversion for the fourth quarter while we're **maintaining an average over 100% for the year**.*
>
> * * *

Finally, as we mentioned during our last call, *we are decidedly a growth company*. . . .

136.   Following these purported results, shares of the Company jumped from a close of $3.10 per share on March 12, 2019 to a high of $5.15 per share before closing at $4.79 per share on March 13, 2019, on trading volume of 23.85 million shares. On March 19, 2019, shares of Pareteum traded at a Class Period high of $5.93 per share.

137.   The Company capped off the month of March announcing a contract with a "streaming media brand" worth "in excess of $50 million," which purportedly provided the Company with its "very first $100 million new [Backlog] sales month." On April 4, 2019, Pareteum issued another press release, purporting to announce "$100 million in New Sales Agreements During March." Defendants Turner and Mumby again used the Company's press release to condition the market to believe in the false hyper-growth narrative. And, on May 15, 2019, Defendants published a press release that purported to announce $70 million in New Sales Agreements in April in connection with the closing of at least 20 new sales transactions. *Again, even a single $50 million would have been several orders of magnitude larger than that of Pareteum's single largest customer at the time – to say nothing of two.*

138.   Thought April and May 2019, the Company published ten press releases. *Infra* §VI.A.4.   On May 7, 2019, Pareteum and the Fraud Defendants published a press release announcing purported results for the first quarter of 2019, in which they stated that total revenue of $23 million was a *460% increase* compared to the first quarter 2018. Moreover, they stated that **Backlog had reached $938 million** *while Connections increased 441% to 12,012,000 for the first quarter of 2019, and grew 161% sequentially in the first quarter of 2019.*

139.   Commenting on these first quarter results, Defendant Turner called Pareteum "fast-growing" and *raised its 2019 full year guidance and growth expectations,* further

conditioning the market to expect revenues between *$115 million and $125 million for the full year of 2019 and revenue growth in the range of 255% to 285% year-over-year.* During a May 7, 2019 earnings call, Defendant Turner called Pareteum a "growth company" and concluded: "*We're on plan financially and we're well above our expectations and sales results.*" He further admitted regarding the Backlog: "***the most important phase for Pareteum is to convert these contracts to billable revenues***." ***Then he assured investors that the Company was converting its Backlog into billable revenues at 101% and converting connections at 122%,*** *alleging that the Company has "over retained and outperformed what had been expected."*

140.    On May 8, 2019, the Company announced in a press release that, led by Defendant McCarthy, it had acquired Devicescape, a San-Francisco-based provider, which "strengthen[ed] Pareteum's intellectual property portfolio considerably, with the addition of 33 patents globally" and which would be "fully accretive from day one." This press release did not provide any details regarding the terms of the acquisition, but in the earnings call the previous day, May 7, 2019, investors learned that it was a cash and stock-based transaction of approximately $2 million in cash and "slightly under" $2 million in Company stock.

141.    Defendants' campaign had the desired effect. By repeatedly touting its rapidly growing Backlog, which would purportedly balloon to ***over $1 billion*** by August 2019, and its purported revenue growth, the Company gained the attention of the market.  On May 29, 2019, Defendant Turner, along with Company employees, investors, and purported customers, celebrated with the ceremonial NASDAQ bell-ringing, which Defendant Turner characterized as "a tremendous honor and a great opportunity to thank everyone who has supported us and helped us transform into a fast-growing and profitable SaaS and communications service provider."

### 4.   The Truth Begins to Trickle Out, but the Company Denies Everything

142.   On June 7, 2019, Defendants got caught red handed and unaware. On this day, the Aurelias Report – the first of two *highly* critical independent research reports related to Pareteum – was published. The Aurelius Report, which is attached hereto as Exhibit 1 and expressly incorporated herein by reference, revealed, for the first time, that:

(a) Pareteum and the Fraud Defendants were engaged in a fraudulent scheme to inflate revenues and the Company's Backlog by fabricating clients and/or claiming that certain clients had the ability to generate tens of millions of dollars in revenue when they plainly did not;

(b) Pareteum and the Fraud Defendants had failed to disclose material facts about its officers, board members, significant investors, and senior staff; and

(c) The Company was "completely uninvestible" and subject to "massive downside potential."

143.   Regarding the Company's Backlog metric and the fabricated clients and contracts that supported it, the Aurelius Report, stated, in part, the following:

> TEUM's public claims simply don't hold up to investigative scrutiny. For example, TEUM touted a contract with the South Africa based "Eyethu Mobile Network" as part of a group of deals, purportedly worth $50 million in aggregate, that TEUM says it signed in the last two weeks of August 2018. . . . *Our investigators went to visit Eyethu/EMN's headquarters but discovered only a dilapidated shack and crumbling structures near a rural African village . . .*
>
> Documents and detailed forensic evidence presented throughout this report shows that *Eyethu is only the tip of the iceberg of small or defunct entities across the world that TEUM claims to have signed valuable contracts with*.

144.   The Aurelius Report further concluded that Pareteum's "Purported $900 Million Backlog Appears Significantly Exaggerated or Fictitious," supporting this conclusion with significant evidence:

The foundation of the Pareteum growth story is built on the company's supposedly large and fast-growing 36-month backlog, which management now says exceeds $900 million. *But our investigation identified a variety of purportedly valuable customers that appear wholly incapable of paying TEUM anywhere near the large contractual values that TEUM has touted.* Examples include:

- A nearly-worthless penny-stock managed by a former AudioEye executive named alongside TEUM's CFO in the fraud suit.

- African entities that show no signs of meaningful business activity.

- Contracts with crypto-companies including one that recently settled with the SEC and "agreed to return funds to harmed investors."

- Closed or dissolved businesses.

- Websites that are inactive or offer limited contact information.

- Businesses that don't answer the phones or report having minimal employees.

- European entities with tiny amounts of capital or revenue.

- Featured customers located in apartment buildings.

- Millions in loans to an entity bleeding cash.

- A purported $50 million contract with an entity in Thailand that reports having zero 2018 revenue, years of losses, and involvement with a crypto-coin that has lost 97% of its peak value.

*We also found irregularities and embellishments involving a significant portion of the "notable partners and customers" that TEUM highlighted in a graphic at its recent analyst day*, suggesting TEUM struggles to find enough legitimate new customers to even fill a simple slide.

145.    The Aurelius Report further concluded that Pareteum's "Backlog Conversion and Receivables Signal Serious Potential Accounting Problems," supporting this allegation with more significant evidence:

*The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the stock price.* Bulls have taken comfort in management's assurances that TEUM's backlog has

converted to revenue at over 100% of contractual rates thus far. *But we find TEUM's backlog conversion rate highly problematic considering that our research has flagged so many small or defunct customers.* If exaggerated contractual values are now being recognized as revenue, then we believe TEUM will face serious accounting problems. *TEUM's receivables have already begun to balloon after growing at sequential rates far faster than revenues in each of the last four quarters.* TEUM's small California auditor, which was specifically cited by the PCAOB for audit deficiencies related to revenue, gives us no comfort.

* * *

**The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the company's stock price. Is it possible that this exact kind of scheme is now occurring at TEUM?**

Bulls have taken comfort in management's assurances that backlog has converted to revenue at over 100% of contractual rates thus far.  Backlog turning into actual revenue, the thinking seems to go, is a sign that TEUM's new contract wins must be high quality in nature. Conversely, we find TEUM's backlog conversion rate highly problematic considering that *our research has flagged customers that are small, defunct, or seem unlikely to be able to pay TEUM anywhere near the large contractual values that TEUM has touted*. If these kinds of exaggerated contracts are now being recognized as revenue, as management's commentary indicates, then we believe TEUM will face serious accounting problems.

This is exactly why we're troubled that *TEUM's receivables have grown at sequential rates far faster than revenues in each of the last four quarters*. For example, revenues grew 64% to $23M in Q1 2019 from $14M in Q4 2018 but receivables ballooned 86% to $28M from $15M over the same period.  This is puzzling because TEUM's own SEC filings state that "the company typically bills its customers at the end of each month, with payment to be received shortly thereafter", which we believe should naturally result in relatively minimal receivables. But TEUM's Days Sales Outstanding has reached 110 days as compared 39 days of Twilio (TWLO), a company that promoters like to compare TEUM to, suggesting that TEUM's customers may already be falling behind on their bills.

*TEUM's small California auditor, Squar Milner, gives us no additional comfort. Squar has audited at least one company owned by Barry Honig*, True Drinks Holdings (TRUU), an equity that is now virtually worthless. More importantly, **the Public Company Accounting Oversight Board ("PCAOB") uncovered significant deficiencies in its most recent inspection of Squar in 2017**.  The PCAOB stated in its report that "in other words, in these audits, the auditor [Squar] issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material

misstatement." The PCAOB even identified two significant deficiencies in a Squar audit specifically related to the valuation of revenue . . .

146.    The Aurelius Report also disclosed, for the first time, that Pareteum's management and executive teams have ties to each other and to previous alleged frauds and failures:

TEUM Has Surrounded Itself with Veterans from Failed Stock Promotions

*We discovered a network of actors behind TEUM whose mere presence should send diligent investors running for hills.* TEUM has paid promoters, used a placement agent, and attracted large investors that are *veterans of numerous previous stock promotions Honig was an investor in, many of which have since declined to near worthlessness.* We discovered that TEUM's relationship with Honig's longtime securities law firm, Sichenzia Ross, is so close that the address that TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's main office.  TEUM has issued tens of millions in shares, warrants, and convertible preferred securities in a series of complex private placements with the assistance of Sichenzia, who is being sued by a former client for allegedly helping create "ownership blockers" for Honig's group as part of an alleged pump and dump scheme that left that company bankrupt and unable to even validate its number of shares outstanding….

* * *

TEUM's Management Team Has Extensive Ties to Previous Alleged Frauds and Failures

TEUM's biographies of Turner and Chief Operating Officer, Denis McCarthy, fail to disclose their respective roles as CEO and CFO of Catcher Holdings, a now worthless stock that was owned by a group that included an entity controlled by Barry Honig, who was charged by the SEC last October with fraud for allegedly masterminding a series of pump and dump schemes. On May 22nd, CNBC reported there is a parallel criminal investigation into Honig's alleged pump and dump ring being conducted by the U.S. Attorney's Office of San Francisco.

* * *

We also learned that TEUM's CFO, Edward "Ted" O'Donnell, was sued by Audioeye investors for fraud after he allegedly "personally affected the fraudulent booking of revenues" that triggered a restatement erasing 92% of the company's reported revenue over the relevant period. The lawsuit alleged that the fraud was designed to "give the market the false notion that revenue growth was accelerating" and "artificially inflate AudioEye's stock price" (O'Donnell denied the allegations and the lawsuit appears to have been settled). O'Donnell resigned from AudioEye in March 2015 and joined TEUM in January 2017.

* * *

While Chairing TEUM's Audit Committee, Laura Thomas was also the CFO of TowerStream, a nearly worthless equity owned by Honig. Thomas moved from the TEUM Board to an executive role at TEUM in December 2018 and resigned from TowerStream in January 2018.

TEUM's longtime investor relations representative was Stephan Hart (aka Steven or Stephen Hart) who disappeared from TEUM press releases earlier this year after being added to the list of prohibited service providers by OTC markets. Hart was representing TEUM even though he was sentenced to prison in August 2015 for obstruction of justice and perjury following charges by the SEC for "illegal trading schemes" in December 2012.

147.    The Aurelius Report further outlined how that Pareteum had surrounded itself

with veterans from failed stock promotions:

> *While Honig is not named as a TEUM investor, we uncovered a series of relationships that make it hard for us to rule out the possibility that his invisible hand could be at work.* At absolute minimum, it's clear to us that TEUM is backed by a seasoned crowd of veterans from dubious stock promotions:
>
> - TEUM is represented by Sichenzia Ross, the securities law firm of record for at least 22 companies that Honig and/or John Stetson, an alleged member of the pump and dump ring, have invested in since 2009. Bizarrely, the relationship between TEUM and Sichenzia is so close that the address *TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's Main Office*. A 2017 Sichenzia press release states that Sichenzia has a long-term lease for the entire 37th floor that Pareteum currently lists as its address.
>
>     * * *
>
> - TEUM uses the same placement agent as Mabvax [Theraputics[21]] did, a Boca Raton broker named Dawson James Securities that also now issues favorable research reports on TEUM. According to our analysis, *Dawson James has been engaged by 13 different companies that have been owned by Honig, most of which have declined more than 75% from their peak value and/or are now virtually worthless.*

---

[21]    The Aurelius Report identifies Mabvax Therapeutics as a "worthless penny stock that the SEC says was the scene of a Honig-led pump and dump." As noted above, Honig and Sichenzia are currently being sued by Mabvax Therapeutics for their role in the scheme.

- While we are unable to identify all of TEUM's private placement investors, *two firms that have regularly invested alongside Honig, Iroquois Capital and IntraCoastal Capital, owned or controlled 13.2% of TEUM's outstanding shares as of March 2018*, according to an SEC filing. By our count, *Iroquois and/or Intracoastal have collectively invested in a total of 34 publicly traded companies that were also owned by Honig, most of which have either declined more than 75% from their peak value or are now virtually worthless.* A February 2019 SEC filing reported that Iroquois Capital has already dumped their entire TEUM stake. We note that Iroquois reportedly received an SEC subpoena as part of the investigation into Honig's alleged pump and dump ring but was not named in the SEC complaint or been accused of wrongdoing.

- TEUM has paid stock promoters from Red Chip companies, which has previously touted numerous now worthless companies backed by Honig. . . .

148.    Based on the foregoing, the Aurelius Report concluded that, **"[j]ust in isolation, we believe the mere presence of this collection of actors should send diligent investors running for hills"** (emphasis in original). If that was not clear enough, the Aurelius Report concluded as it began, by stating: "**[i]n our opinion TEUM's stock is completely uninvestible . . . [with] massive downside potential**" (emphasis in original).

149.    These June 7, 2019 representations – that Pareteum had materially misrepresented its financial and operational condition, the true value of its Backlog, the connections between management and prior failed dubious stock promotion schemes, and the Company's results of operations – caused shares of Pareteum stock to fall precipitously.  As evidence of this, that day, shares of the Company collapsed almost 45%, from a close of about $3.50 per share on June 6, 2019, to an intra-day low of just over $2.00 per share – on very high single-day trading volume of over 26 million shares traded.

150.    According to a June 10, 2019 report published by Insider Monkey and entitled, "Pareteum Corporation (TEUM) Responds to Short Seller Aurelius Value's Accusations," Defendant Turner responded to the Aurelius Report with a *categorical denial*:

Dear Fellow Pareteum Shareholders,

I want to take a moment to thank all of you for your support as we drive Pareteum forward.

In recent days our share price has been negatively impacted by a coordinated attack by short sellers. We fully understand that short selling is legal and it is an important part of the capital markets. That said, certain short sellers have used questionable tactics, including leveraging the media to misrepresent facts and make anonymous spurious claims against the company and its officers.

Every one of us at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company. *We categorically deny the allegations put forth. We do not intend to legitimize those reports by delving in to them.*

*Pareteum has experienced tremendous growth, and we continue to grow in a healthy and measurable way.*  We are confident in our strategy and mission – to connect every person and every(thing)™. Today millions of people and devices around the world are connected using Pareteum's Global Cloud Communications Platform, enhancing their mobile experience. Every day more people and devices are being added to our platform.

We will not be distracted.  We continue to focus on operating our business and generating strong financial results.  We believe executing on this plan will ultimately create significant value for long term shareholders.

We will report our Q2 results in early August, and look forward to speaking with you then.

Again, I want to thank all of our shareholders for their continued support.

Sincerely,

Hal Turner

Chairman and Chief Executive Officer[22]

---

[22]    According to the Viceroy Report, after the release of the Aurelius Report, Pareteum apparently retracted and modified slide decks, specifically their customer lists.

151.    On June 26, 2019, the Viceroy Report – the second *highly* critical independent research report related to Pareteum – was published. This report, which is attached hereto as Exhibit 2 and expressly incorporated herein by reference, substantially agreed with and – importantly, *independently* – corroborated the findings of the Aurelius Report. It also revealed new details.[23] Viceroy stated:

> Recently Pareteum has been subject to criticism from other short sellers. Given the discourse, Viceroy believe it is prudent that we also share our findings.
>
> • Further to recent research reports, Pareteum has a history of promotional press releases of customer wins. ***A deeper investigation into these customers show much larger number are insignificant, and the companies behind them appear in no way capable of fulfilling the contract values advertised by Pareteum.***
>
> • *Two of Pareteum's customer wins appear to be undisclosed related parties tied to Pareteum consultant Dinesh "Danny" Patel.*
>
> • *One of Pareteum's announced customer wins is a company under a historic investigation and charged with significant VAT evasion fraud.* Information on this is easily available, leading us to believe that Pareteum was aware of the company's issues while announcing the customer win.
>
> * * *
>
> • *Several entities on the pareteum.cloud domain are small companies or have no web presence whatsoever,* leading us to believe that they are Pareteum customers who are unable to pay or have no operations.
>
> * * *
>
> • *Pareteum's management has a history of dishonest reporting.* Notably, CFO Ted O'Donnell who was sued by former employer AudioEye for fabricating US$8.1m worth of revenue over 3 quarters which was found to

---

[23]    As one market analyst noted, "[s]hares of Pareteum lost 24% of value on June 7 after a short call by Aurelius Value. To that, Viceroy says 'Kudos to Aurelius Value for beating us to the punch. We identify further non-existent contracts, undisclosed related parties, and an apparent breach of Iran sanctions.'" *See* Jason Aycock, *Pareteum -18.7% as Viceroy piles on short reporting*, SEEKING ALPHA (June 26, 2019, 3:01 PM), available at https://seekingalpha.com/news/3474049-pareteum-minus-18_7-percent-viceroy-piles-short-reporting (last visited February 20, 2020).

have no supporting documentation. This was an overstatement of revenues in the period of more than 3,000%.

- *Pareteum's rapid-fire announcement of customer wins mirrors its announcements regarding cryptocurrency in 2017*, which were put to an abrupt halt when a response to an SEC letter revealed TEUM had made no revenue, nor planned to do so, from cryptocurrency.

152.   Based on the foregoing inflation of the Company's Backlog by Defendants, the Viceroy Report concluded that a breakdown of Pareteum's revenues, cash flows, and receivables shows ***the majority of its revenue*** from sources other than Vodafone[24] and acquired businesses iPass and Artilium ***appears to be uncollectable.*** Accordingly, Viceroy concluded that, ***"total revenue is overstated by 42%"*** – corroborating its findings regarding Pareteum's customers.

153.   The Viceroy Report also stated that "Pareteum's 36-month contractual [Backlog] measurement [was] <u>not</u> an accurate predictor of future profits" and that an analysis of the Company's Backlog and management comments demonstrates that ***Pareteum "should have reported 73.10% more revenue in Q1 2019.*** " According to the Viceroy Report, ***"[m]anagement appears to be inflating this [Backlog] figure to hype up the share price and reassure investors."***

154.   In addition to the foregoing, the Viceroy Report also disclosed that "Pareteum appear[ed] to be *in breach of US sanctions against Iran* through its provision of services to Iranian MVNO Amin SMC,: which "appears to be chaired by Hamid Reza Amirinia, an individual suspected of breaching sanctions . . . to launder money for [the Iranian government]."

155.   The Viceroy Report also described Pareteum as "terminally unprofitable" and its ***hyper-growth as facially "suspicious":***

---

[24]     According to the Viceroy Report, Vodafone Enabler S.L., an MVNO operating on Vodafone Spain's network, is Pareteum's "largest historical customer."

After our investigation *we believe this growth story is completely broken and **may not have ever existed at all***. Investors should take a look at the damage inflicted on Catcher Holdings, Davnet and AudioEye as a sign of things to come if management is investigated or held accountable for its actions.

We advise investors to call for a fully independent investigation of management, in particular: Hal Turner and Ted O'Donnell and for an investigation of the Company's revenue recognition practices and internal controls.

156.    On June 26, 2019, in the wake of the Viceroy Report, shares of Pareteum declined another 19%. The chart below evidences the sudden and dramatic decline in the price of Pareteum shares following the publication of the Aurelius and Viceroy Reports:



5.    **The Company Denies Everything (Again) While Defendants Stop Pumping the Stock and Start Distancing Themselves from Their Self-Created Backlog Metric**

157.    On June 27, 2019, in a statement that appears to no longer be available on the Company's website, Pareteum responded to both Reports with continued denials:

We are aware of increased trading in Pareteum Corporation stock and that certain short sellers have used questionable tactics including leveraging the media to misrepresent facts and make anonymous spurious claims against the company and its officers. Despite coordinated attacks designed only for the financial gain of these short sellers, we remain a dynamic and growing company that stands by the

quality of the information reported in our most recent earnings announcements, including the guidance provided for 2019.

***Pareteum Corporation categorically denies all allegations put forth in the short seller reports.*** Without giving credence to the reports in detail, we do state the allegations that Pareteum has breached U.S. sanctions against Iran are false. While Pareteum does not publicly comment on business relationships with its customers, it is committed to compliance with all applicable laws, including U.S. sanctions against countries such as Iran. We note that certain activities in Iran have been or are authorized under OFAC General License H and/or General License D-1, and that there are longstanding U.S. policies supporting communications and Internet freedom in Iran. In view of the evolving regulatory environment in Iran, Pareteum frequently and carefully reviews its business dealings there and has engaged with the U.S. Office of Foreign Assets Control to tailor its activities and maintain strict compliance.

Everyone at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company. We look forward to sharing additional information about our growth and success in future earnings releases. We invite investors and media following our activity to sign up for email alerts regarding any pubic statements and future earnings announcement dates by visiting our investor relations website . . . .

158.    Then, in a transparent effort to restore investor confidence, on July 1, 2019, Pareteum pre-announced results for the second quarter of 2019, the period ended June 30, 2019, that would purportedly "exceed current analysts' consensus of $26.2 million for revenue and $4.1 million for Adjusted EBITDA."

159.    As pointed out by one market commentator, while shares initially traded up 15% in pre-market, Pareteum stock finished the trading session "basically unchanged" as investors realized that "the vague pre-announcement lacked important information required to reinforce investor confidence."  This commentator further noted that, "[w]hile better than expected top and bottom line numbers are attractive, they are actually worth very little if accounts receivable have continued to balloon, further negatively impacting cash flows" as they had during the first quarter of 2019 when Pareteum reported adjusted EBITDA of $5.2 million on $23.0 million in revenues, but ***free cash flow was actually negative by $5.5 million*** even when adjusting for $2.7

million in additional loans made to Yonder Media Mobile, Inc. ("Yonder").[25] In reaction to the Company's July 1, 2019 pre-announcement of second quarter results, the same market commentator stated that, "[f]rankly speaking, Q2 cash flows should be improved meaningfully particularly given management's statements regarding the recent iPass acquisition on the Q1/2019 conference call." This commentator summarized the case against Pareteum as follows:

1. Contract backlog seems to be overstated by a material amount, threatening future growth expectations.

2. Accounts receivable balances are ballooning, raising questions on the collectability of billings and the company's ability to achieve its target of positive cash flow for FY2019 and beyond.[26]

160.    Indeed, perhaps sensing that the wheels were falling off, the Company's press releases came to a sudden halt. In June 2019, the Company published just two press releases; in July 2019, just four, and only one announced a new customer. ***Notably, this release contained no information regarding the revenue from this purported new customer or the now infamous Backlog metric.***

161.    Moreover, on the Company's August 6, 2018 earnings call, *Defendant Turner went out of his way to defend the use of the Backlog metric,* ***which had now reached over $1.27***

---

[25]    As outlined in the Viceroy Report, Pareteum made a $3.7 million loan to Yonder, an early stage MVNO operated by serial failure entrepreneur Adam Kidron, who had previously burned through at least $100 million in his prior enterprises (including $33 million in one where he never released a product) and who had already cratered the Yonder brand with a music streaming service that collapsed in 2017. On July 19, 2019, Yonder filed suit against Pareteum alleging that the Company breached several agreements with Yonder and fraudulently misappropriated Yonder's confidential information for its own products and services.

[26]    Henrik Alex, *Pareteum's Q2 Upside Preannouncement Not Suited To Restore Investor Confidence*, SEEKING ALPHA (July 3, 2019, 9:10 AM), available at https://seekingalpha.com/article/4273291-pareteums-q2-upside-preannouncement-suited-restore-investor-confidence (last visited February 20, 2020).

*billion*, *but then announced that* **the Company would replace the Backlog metric with something else**:

> However, new sales order 36-month **backlog metric will now be replaced as an external metric**. **It has served its purpose** and now provides us significant internal transparency into new sales orders and their conversion into billable revenues. We can now see clearly the strength in our revenues and their expected growth, *therefore it is our reported quarterly results and the annual guidance provided, which are the strongest indicators of our expected growth and continued financial successes in the coming periods*. We will, therefore, formerly retire backlog as a key performance indicator and no longer report it after Q3 of this year.

### 6. The House of Cards Begins to Fall as the Company Discloses It Is in Material and Repeated Breach of Its Credit Facility

162. As noted above, on February 26, 2019, the Company announced that it had secured a $50 million Credit Facility from Post Road Group. On August 23, 2019, the Company revealed that it had been in default of that agreement essentially *since it was signed*. Specifically, on this date, the Company filed with the SEC a "Waiver and First Amendment to Credit Agreement" (the "Waiver"), which it had executed with Post Road Group in order to obtain a waiver of its default and a small amount of additional cash. The Waiver contained a list of *at least eleven* breaches and conditions that Pareteum had failed to satisfy under its February 2019 Credit Facility, including:

> 1. To comply with the requirements set forth in the definition of "Permitted Acquisition" in connection with the consummation of the DeviceScape Acquisition as required by clause (m) of Section 9.05 of the Credit Agreement.

> 2. **To timely make the interest payment owed to the Administrative Agent for the Period that ended on or about March 31, 2019**, as required by Section 2.09(b) of the Credit Agreement.

> 3. *To timely deliver (i) the financial reporting information for the fiscal month ending February 28, 2019* as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

4.      *To timely deliver (i) the financial reporting information for the fiscal month ending March 31, 2019* as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

5.      *To timely deliver (i) the financial reporting information for the fiscal quarter ending March 31, 2019* as required by Section 8.01(b) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

6.      *To timely deliver (i) the financial reporting information for the fiscal month ending April 30, 2019* as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

7.  *To timely deliver (i) the financial reporting information for the fiscal month ending May 31, 2019* as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

8.      *To timely deliver (i) the financial reporting information for the fiscal month ending June 30, 2019* as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

9.      To timely deliver the . . . Consent and Acknowledgment as required by Section 8.17 of the Credit Agreement.

10.     To timely deliver the . . . Consent and Acknowledgment as required by Section 8.17 of the Credit Agreement.

11.     To comply with Sections 8.10 and 8.11 of the Credit Agreement in connection with the formation of its wholly-owned subsidiary DeviceScape Holdings, Inc., a Delaware corporation, and its acquisition of certain assets from DeviceScape Software, Inc., a California corporation, on or about April 22, 2019.

163.    As a condition to obtaining $2,500,000 in additional financing and the Waiver, Pareteum was forced to issue 750,000 additional shares of common stock, which were still trading at artificially high prices, to Post Road Group, thereby further diluting existing shareholders. Similarly, apparently strapped for cash, on August 23, 2019, the Company filed a prospectus supplement announcing that it was selling up to 1,311,439 shares of common stock in

settlement of balances owed to providers of investment banking services and software development services.

164.    These belated disclosures had a further and immediate negative impact on the price of Pareteum shares, causing the stock to fall from just under $3.00 per share on August 23, 2019, to just above $2.00 per share on the next trading day, August 26, 2019.

165.    Defendant Turner attempted to soften the blow (and continued to mislead investors), issuing a press release wherein he unbelievably continued to push the false growth narrative:

> We are pleased to conclude this Amendment, which puts the company on a firm footing for ***our ambitious growth strategies that will continue to be executed this quarter and beyond***. The additional flexibility afforded by this Amendment ensures we are able to be as agile and responsive in our corporate development activities as we are for our customers.

166.    The following day, August 27, 2019, a report was published on the *Seeking Alpha* investor information website, entitled "*Pareteum - Caught In A Cash Crunch After Violating Debt Covenants.*"[27]  This report stated:

> Shares of controversial emerging Communications Platform as a Service ("CPaaS") provider Pareteum Corporation have remained under pressure in recent weeks after the company's Q2/2019 results on August 6 revealed two major issues:
>
> - ***Accounts receivable ballooned an eye-catching 57% quarter-over-quarter,*** even outpacing the 48% sequential revenue increase. ***Over the past six months, accounts receivable have almost tripled from $15.4 million at year end 2018 to $45.1 million at the end of Q2.***
>
> - *Free cash flow for the quarter was negative $8 million*, leaving the company with just $3.4 million in unrestricted cash at the end of Q2, *dangerously close to the $2 million minimum liquidity covenant defined in its up to $50 million*

---

[27]    Henrik Alex, *Pareteum – Caught In A Cash Crunch After Violating Debt Covenants*, SEEKING ALPHA (August 27, 2019, 7:34 AM), available at https://seekingalpha.com/article/4288112-pareteum-caught-cash-crunch-violating-debt-covenants (last visited February 22, 2020).

*senior secured credit facility* with Post Road Group, a Connecticut-based junior private investment firm. For the first half of FY2019, Pareteum used $16.7 million in operating and investing activities.

**On the conference call, management actually pointed to accounts receivable to increase even further during Q3** with collections starting to come through in Q4.

167.   Astutely, this August 27, 2019 *Seeking Alpha* report stated that a highly dilutive secondary offering was going to be required to enable Pareteum to raise money as a result of its impaired financial and operational condition:

Personally, I do neither expect the company to return to covenant compliance in due time nor the accounts receivable issue starting to resolve itself by next quarter. *Accordingly, investors might have to prepare for a large, secondary offering in the not too distant future.*

Should the company not start to collect on its accounts receivable in due time, Pareteum will likely lose its ability to access the capital markets with bankruptcy being the ultimate outcome in this case.

Given the recent, negative developments and the company's increasingly uncertain outlook, investors should continue to avoid the shares or sell existing positions.

168.   The August 27, 2019 *Seeking Alpha* Report concluded that, "[b]ottom line:"

Frankly speaking, *things are really starting to look ugly for Pareteum.* The company has been in breach of debt covenants basically right from the closing date of the credit agreement with Post Road Group in February and seems now caught in a severe cash crunch.

* * *

As of this point, it seems that the skeptics have been right on Pareteum as the company is obviously experiencing a cash crunch with *the lender only reluctantly providing additional liquidity to keep the company afloat for now.*

Should Pareteum again fail to comply with the covenants and obligations under the amended credit agreement, *Post Road Group might very well chose to issue a notice of default, requiring the company to repay the almost $28 million currently outstanding under the facility within short notice.*

### 7.    Before They Come Clean, Defendants Make One Last Money Grab

169.    On September 20, 2019, the August 27, 2019 *Seeking Alpha* Report's prophecy of a large dilutive offering with "sweeteners" to entice otherwise non-existent buyers became a reality.  That day, Pareteum published a press release announcing a dilutive $40 million offering of common stock and warrants that immediately drove the price of the Company's stock to just above $1.50 per share, after closing at $1.84 per share on the prior trading day (hereinafter, the "Secondary Offering"). The Secondary Offering was effected through registration statements and prospectuses (defined below as the "Secondary Offering Registration Statement"), and the placement agent of this registered direct public offering was Defendant Dawson James.[28]

170.    This $40 million offering consisted of:

- 18,852,273 Common Stock Units, consisting of one share of Pareteum's common stock together with one Series A Purchase Warrant to purchase one share of Pareteum's common stock and one Series B Purchase Warrant to purchase one-half share of Pareteum's common stock.

- 3,875,000 Pre-Funded Units, consisting of one pre-funded warrant to purchase one share of Pareteum's common stock together with one Series A Purchase Warrant to purchase one share of the Pareteum's common stock and one Series B Purchase Warrant to purchase one-half share of Pareteum's common stock.

---

[28]    The shares of common stock and accompanying purchase warrants were sold together at a combined public offering price of $1.76 per unit, and the pre-funded warrants and accompanying purchase warrants were sold at a public offering price of $1.75 per unit with an exercise price of $0.01 per unit. The pre-funded warrants were immediately exercisable and could be exercised at any time until all of the pre-funded warrants were exercised in full. The Series A Purchase Warrants were exercisable six months after issuance, had an exercise price of $2.25 per share, and were exercisable for 5 years. The Series B Purchase Warrants were exercisable 6 months after issuance, had an exercise price of $1.84 each, and were exercisable for 18 months. On Friday, September 20, 2019, the Company's stock opened at $1.57 per share, traded between $1.51 per share and $1.68 per share, and closed the day trading at $1.67 per share, on volume of 13.86 million shares.  That week, the Company's stock traded on average daily trade volume of 3.92 million shares, exclusive of September 20, 2019's trading.

171.   On October 15, 2019 – six days before the Restatement – the Company unbelievably continued to describe itself as a "rapidly growing cloud communications platform company" in a release in which it also announced that it had retained Heidrick & Struggles, a provider of executive search and leadership advisory services, to assist with assessing the board of directors and key leadership positions "as Pareteum prepares diversity and succession plans to support the Company's planned growth and expansion of markets and services."

### 8.    The Full Truth and The True Financial & Operational Condition of Pareteum Is Finally Revealed

172.   Finally, on October 21, 2019 – despite *twice* "categorically denying" the Aurelius and Viceroy Reports and barely one month after the Company sold $40 million worth of stock and warrants into the market – the Aurelius and Viceroy Reports were vindicated and the full truth was finally revealed. On this date, Pareteum issued a release, entitled, "Pareteum to Restate Previously Issued Financial Statements" (hereinafter, the "Restatement Release"). Therein:

(a)    Pareteum announced "that the Company will restate its previously issued consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019 and June 30, 2019."

(b)    It advised that "[i]nvestors should no longer rely upon the Company's previously released financial statements [and related press releases, earnings releases, and investor communications describing the Company's financial statements] for the time periods cited above."

(c)    *It explained that "certain revenues recognized during 2018 and 2019 should not have been recorded during that period[,] . . . [and that] certain customer transactions, the Company may have prematurely or inaccurately recognized revenue."*

71

(d)     And it disclosed that Pareteum "*estimates the revenue impact for the full year 2018 to be a reduction of approximately $9 million. . . .[and] a reduction of approximately $24 million [for the first half of 2019].*"

173.    The relevant text of the Restatement Release is as follows:

NEW YORK, October 21, 2019 /PRNewswire/ -- Pareteum Corporation (Nasdaq: TEUM) today announced that *the Company will restate its previously issued consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019 and June 30, 2019.* This decision was approved by the Company's Board of Directors upon the recommendation of the Company's Audit Committee, and after consultation with management and the Company's independent registered public accounting firm.

*Investors should no longer rely upon the Company's previously released financial statements for the time periods cited above.* Similarly, related press releases, earnings releases, and investor communications describing the Company's financial statements for these periods should no longer be relied upon.

The decision to restate these financial statements is based on the Company's conclusion that ***certain revenues recognized during 2018 and 2019 should not have been recorded during that period.*** **For certain customer transactions, the Company may have prematurely or inaccurately recognized revenue.** These restatements should not impact historical cash or cash equivalents based upon the current review. *At the present time, the restatements are expected to impact* **Revenue**, *Cost of Service, Operating Income, Net Loss,* **Accounts Receivable** *and other Balance Sheet line items.* While the Company's analysis is still underway, ***the Company currently estimates the revenue impact for the full year 2018 to be a reduction of approximately $9 million. For the first half of 2019, the Company currently estimates the revenue impact to be a reduction of approximately $24 million.***

*At this time, the Company has not fully completed its review and the expected financial impact of the restatement described above is preliminary and subject to change.* The Company cannot predict the aggregate amount of revenue that will ultimately be restated, whether additional periods beyond those referenced above will be affected, and the final outcome or timing of the Company's filing of restated financial statements for the affected annual and quarterly periods. *Until the full magnitude of these transactions is analyzed and understood, the Company cannot provide forward guidance, and expects financial results for the second half and full year 2019 will be materially below current analysts' estimates.*

Pareteum has achieved a significant business transformation over the last few years, including the completion and integration of two large acquisitions, Artilium

and iPass. ***The Company recently discovered internal control issues related to the accuracy and timing of the recognition of revenue.*** The Company is undertaking a financial review and is taking proactive steps to improve the oversight and controls associated with customer transactions. This restatement does not impact day-to-day operations and the Company continues to be encouraged by the positive customer interest in Pareteum's global cloud communications platform and its other products and services. Today's announcement reiterates Pareteum's commitment to best practices and upholding the highest standards of financial reporting. The Company recognizes the seriousness of the restatement and will continue to evaluate and implement a broad range of measures and controls to ensure that Pareteum has a strong foundation of processes, procedures, systems and talent in order to capitalize on future global growth opportunities.

Pareteum cannot at this time estimate when the restatement will be completed. The Company will continue to diligently pursue completion of the restatement and intends to make its upcoming 2019 quarterly filings as soon as reasonably practical.

174.    Notably, the $9,000,000 reduction in revenue estimated for the full year of 2018 represented a ___**28% reduction**___ from the year's reported revenue of $32,435,736; and the $24,000,000 reduction in revenue estimated for the first half of 2019 represented a ___**42% reduction**___ from the reported revenue for the first half of 2019 of $57,188,309.

175.    Following this announcement, shares of Pareteum tumbled in after-market trading, closing at $0.73 per share on October 21, 2019 and opening at $0.37 per share on October 22, 2019.

176.    As this delinquent disclosure makes clear, by improperly characterizing the Company's revenue growth, Backlog, connections, sales, customers, and capabilities, and undeniably improperly recognizing revenues throughout the Class Period, Defendants presented a misleading image of Pareteum's business and growth prospects.  This, in turn caused and maintained the artificial inflation in the Company's stock during the Class Period – until the truth was finally and fully revealed to investors via the Restatement Release.

177.    Indeed, as the market learned, the Company's revenues had been repeatedly misstated in the Company's quarterly reports and other filings with the SEC – which were incorporated by reference in the prospectuses and registration statements disseminated to investors during the Class Period in connection with the iPass Acquisition and the Secondary Offering – and the Company's purported customers, Backlog, and connections, upon which Defendants urged the market to rely, were similarly exaggerated, while material information was withheld from the investing public.

178.    As this adverse information became known to investors, the prior artificial inflation was removed from the Company's share price, and shareholders were damaged as a result of this dramatic decline. Indeed, the timing and magnitude of the Company's stock price decline negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic, or industry factors, but rather are directly related to Defendants' misrepresentations, omissions, and violations of the securities laws.

### 9.    Restatement Fallout and Post-Class Period Developments

179.    The fallout from the revelation of this stunning fraud was swift and decisive.

180.    Just twelve days before the Restatement release, on October 9, 2019, Defendant McCarthy, the Company's COO who was deeply involved with the Company's self-created Backlog metric, was terminated. His termination was disclosed on October 16, 2019.

181.    On November 5, 2019, the Company reported that Defendant O'Donnell would be replaced as CFO and that his "status with the Company is under review."

182.    On November 15, 2019, the Company announced that it had received a notice from the Nasdaq stating that, because it had not filed its quarterly report for the third quarter of 2019m, the Company was no longer in compliance with Nasdaq listing rules.

183.    And, on November 25, 2019, the Company announced that Defendant Turner had been terminated as Chairman and CEO of the Company.

184.    After stabilizing in the immediate aftermath of the Restatement release, and without the artificial inflation created by the Fraud Defendants' consistently false statements that pumped the Company's stock price up, the Company's stock price has consistently traded in the $0.65 to $0.85 per share range over the last two months – not coincidentally, ***exactly where it traded before the Class Period began***, as noted above in ¶90.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT THROUGHOUT THE CLASS PERIOD

### A.    STATEMENTS AND OMISSIONS REGARDING THE COMPANY'S FALSE HYPER-GROWTH NARRATIVE, BACKLOG AND CONNECTIONS METRICS, AND REVENUE

185.    Plaintiff hereby realleges and incorporates the allegations set forth above as if fully set forth herein.

186.    As summarized above and outlined below in ¶¶185-350 in statement-by-statement detail, throughout the Class Period, the Fraud Defendants made statements regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue in the Company's press releases, publications, and/or filings with the SEC.

187.    The statements made by the Fraud Defendants during the Class Period regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue and contained in the Company's press releases,

publications, and/or filings with the SEC, were each materially false and/or misleading when made and/or omitted material information necessary to make the statements made not materially false and/or misleading, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the following reasons, among others, outlined below:

(a)     At all times during the Class Period, it was not true that the Company's purported success was the result of hyper-demand for Pareteum's unique products or exceptional service, or the Company's competent management; but, in fact, throughout the Class Period, Defendants had propped up the Company's results by manipulating Pareteum's accounting for revenues, income, and the important Backlog and connections metrics;

(b)     At all times during the Class Period, unbeknownst to investors, Defendants had materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results, as the Company ultimately admitted in the Restatement;

(c)     At all relevant times during the Class Period, and as described in depth in the Viceroy and Aurelius Reports and confirmed, in substantial part, by Lead Plaintiff's independent investigation, and as outlined below in depth, multiple purported customers and contracts on which the Company based many of its statements regarding its hyper-growth, Backlog, connections, and revenue were either non-existent or non-operational, embellished, related parties, and/or incapable of generating the revenues touted by the Company; what is more, in light of the fact that the vast majority of the customers disclosed in the 176 press releases throughout the Class Period were not identified, there is a reasonable basis to conclude

that Defendants have materially misrepresented the existence and/or capabilities of many more alleged customer and contracts;

(d)     At all relevant times during the Class Period, it was also not true that Pareteum contained even the most minimally adequate systems of internal operational or financial controls necessary to assure that Pareteum's reported financial statements were true, accurate, and/or reliable, as the Company ultimately admitted in the Restatement;

(e)     As a result of the foregoing, throughout the Class Period it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules, as the Company again ultimately admitted in the Restatement; and

(f)     As a result of the aforementioned adverse conditions, which Pareteum and the Fraud Defendants failed to disclose, throughout the Class Period, Pareteum and the Fraud Defendants lacked any reasonable basis to claim that Pareteum was operating according to plan, or that Pareteum could achieve the guidance sponsored and/or endorsed by Defendants.

### 1.     December 2017 Statements

188.     On December 14, 2017, the first day of the Class Period, the Company published a Shareholder Update Letter which stated, in part, that "[the Company's] restructuring and repositioning in 2016 has led to *solid growth* in 2017, and has defined our innovation in both services and market positioning, establishing a *strong outlook for our success in 2018 and beyond,*" and further thanked investors for their patience. This shareholder letter further provided that "*2017 Accomplishments Expected to Create Continued Growth and Market Innovations in 2018*" and that "*36 Month Contractual Revenue Backlog Grows to $129 Million at November 30, 2017*" (italics in original).

189.    On December 19, 2017, the Company published a press release announcing that, on December 18, 2017, it had eliminated senior secured debt and "substantially improve[d] cashflow." This press release quoted Defendant Turner, in part:

> Our successful Debt repayment is one of the key elements of the corporate turnaround at Pareteum which began in Q4 2015. This debt financing package, originally implemented by the Company's former management, was no longer optimized for the exciting value-generating and *growth stage* of our business plans. We thank the Lenders for their support during the challenging restructure period. We also look forward to focusing on the *continued sales surge* by making investments in the business which *we expect to deliver maximum value for our equity investors*.

190.    On December 19, 2017, the Company also published a PowerPoint presentation, in which it stated that the Company had added over $13 million in new 36 month contractual revenue Backlog and highlighted that the Company's **"[p]ath to profitability** is accelerated via **high margins** on subscribers and **the magic of monthly recurring revenue** will drive **sustainable returns**" (emphasis in original).

191.    On December 20, 2017, the Company published a press release announcing a three-year, $4 million contract with a "European global provider" of telecommunications services and that, in December 2017 alone, *the Company added over $13 million to its Backlog*. Defendant Turner was quoted, in part, as follows:

> The big deal in December, foreshadowed during our Q3 earnings call, ended up as three transactions, each of which demonstrates the value seen by our customers in our solutions, which is why they continue to increase services orders with us. Most importantly, we segue from a highly successful 2017 into 2018, ***expected to be a year of increasing growth***, knowing that we are recognized within our industry and markets for services innovation.

192.    The statements made by these Defendants outlined above in ¶¶188-191 and contained in the Company's December 2017 press releases, publications, and/or filings with the SEC regarding the Company's false hyper-growth narrative, its self-created Backlog and

connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and because, when these statements were made, there was no factual basis for the Company's representations regarding its Backlog value or that it expected "continued" and "increasing" "growth" and a "path to profitability" via "high margins" due to the "magic of monthly recurring income" and "sustainable returns" because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made.

## 2.    First Quarter 2018 Statements

193.    On January 2, 2018, the Company published a press release announcing service deployment of a $3 million contract to its first India-based customer, which commenced revenue generation in the first quarter of 2018.  Defendant Bozzo was quoted as stating:

> This was a significant win for us in one of the largest growth areas in the world and to begin generating revenue from this new customer so quickly proves the power of our cloud model. Continuing to streamline the efficiency of our cloud deployments to get to revenue faster is one of our largest priorities as we kick off 2018 . . . .

194.    On January 3, 2018, the Company published a press release announcing that it ended 2017 with *a "record" $147 million in Backlog*.  Defendant Bozzo noted that "[t]he technology innovations and product enhancements [the Company] made this year allow [it] to enter 2018 *poised to make another quantum leap forward* in [the Company's] business."

Similarly, Defendant Turner was quoted, in part, noting that "[t]hese contracts establish Pareteum as one of the *fastest growing* Cloud Communications companies in the world."

195.    On January 4, 2018, the Company published a press release announcing a three-year contract with an unidentified "social media application service provider" that would add $1 million to the Company's Backlog.

196.    On January 5, 2018, the Company published a press release announcing that it activated service to one of its unidentified new customers, which would generate planned revenue in the first quarter of 2018, ahead of schedule.

197.    On January 8, 2018, the Company published a press release announcing that it expects its 2017 fourth quarter revenues would exceed analysts' expectations. Defendant Turner stated, in part: "Our TEUM ended the 2017 year with a very strong fourth quarter as demonstrated by the *acceleration in our 36-month Contractual Revenue Backlog. **This key performance indicator is <u>directly correlated</u> to our financial and operating results** and reflects the traction our services and solutions are gaining in the marketplace.*"

198.    On January 10, 2018, the Company published a press release announcing a three-year, $5.4 million contract with an unidentified, "established," and "significant" "Cross Border European and African Mobile Operator." Defendant Bozzo represented that the contract "represents the continued expansion to all corners of the Globe where there is a need for new offerings, applications, settlement services and access to a superior cloud platform. We look forward to deploying these services and *generating revenue* in the first half of 2018."

199.    On January 17, 2018, the Company published a press release announcing a five-year, $3 million contract with an unidentified South American provider, which it stated would add over 300,000 connections in multiple countries at full deployment.

200.    On January 19, 2018, the Company published a press release announcing the deployment of a $1 million agreement that it stated would begin revenue generation in the first quarter of 2018.

201.    On January 24, 2018, the Company published a press release announcing a contract with an unidentified "established" Brazilian MVNO that it stated added $1 million to its Backlog, for which it represented that services were expected to be deployed in the second quarter of 2018.

202.    On January 26, 2018, the Company published a press release announcing that its wholly-owned subsidiary, Pareteum Europe, was awarded a 5-year, €8.7 million Euro contract with an unidentified new customer.

203.    On January 31, 2018, the Company published a month-end summary press release, in which announced that it "Continues Momentum via Highly Successful January 2018" **by adding $15,200,000 to its Backlog**.  This press release provided, in part:

> [D]uring the month of January 2018, the Company signed contracts scheduled to add $15,200,000 to its 36-month contractual revenue backlog. The current contractual revenue backlog represents a 400% increase from a year earlier and a *10% month over month increase to the $147,000,000 36-month contractual revenue backlog announced previously on January 3, 2018*.

> Pareteum's current cash balance is $15.6 million on January 31, 2018, reflecting having fully paid our senior secured loan, in the amount of $8.1 million, and, continuing the improved operations of the business. Increases in cash balances over prior periods are a result of net equity raised, warrant exercises and continued operational efficiencies. The improved strength of our balance sheet provides the foundation for *Pareteum's focus on accelerated growth in 2018 and beyond*.

> *Contracts executed in January 2018 that have meaningfully contributed to Pareteum's* **accelerating growth, as measured by our 36-month contractual revenue backlog**, are:

> •      $1,000,000 contract from Social Media Provider to Enable Smartphone Services, announced January 4, 2018

- $5,400,000 contract from Pan European Mobile Operator with African Subscribers, announced January 10, 2018

- $3,000,000 contract from South America Data Network Provider to Add Mobility, announced January 17, 2018

- $1,000,000 contract from Brazil Mobile Service Provider, announced January 24, 2018

- $10,000,000 contract awarded to Pareteum Europe for MSP deployment to EMEA customer, announced January 26, 2018.

204.    In this January 31, 2018 press release, Defendant Turner focused on the Backlog metric, stating that "*Pareteum's performance is highlighted by the growth of our 36-month contractual revenue backlog, currently standing over $162,000,000*, which represents a *Compound Annual Growth Rate* (CAGR), measured from the end of 2016's fourth quarter through 2017 *of 400%*! . . ."

205.    On February 2, 2018, the Company published a press release announcing a 3-year, $1 million contract with an unidentified, "established Russian [MVNO]," which was expected to go live before the second half of the year and generate $1 million in Backlog.

206.    On February 12, 2018, Defendant Turner issued a letter to shareholders, which stated, in part:

The TEUM of Pareteum Corporation continues to be hard at work, globally. We have had a *fast start to 2018 with excellent results in January* through the collective group initiatives of:

- Rob Mumby + his key sales executives and sales support TEUM;

- Ali Davachi + his key operations, technical support and service delivery TEUM;

- Denis McCarthy + his key corporate development TEUM;

- Ted O'Donnell + his accounting and finance TEUM

- And, as always, Vic Bozzo and his indomitable leadership, especially in the sales arena, to make things happen;

I am happy to report that our executive team, with its key leadership management team, is continuing to produce results. *We have a very big and bright 2018 planned.* So far this year, ***in January alone, our TEUM signed $20.4 million of new contracts***, spanning the globe, from Brazil to Africa to Europe. $15.2 million was additive to ***our now record high $162 million 36-month contractual revenue backlog***, as two of the awarded contracts are 5-year agreements. I am extremely proud of our TEUM's accomplishments as we have *accelerated the growth of our backlog from $60 million at June 30, 2017 to $162 million as of January 31, 2018*. We expect the pace to accelerate during the year and that our reported results will reflect the hard work that has gone into the turnaround of our company.

* * *

We are proud to be debt-free with substantial cash to operate and grow our business. We are putting these dollars to work throughout 2018 (and beyond) in a manner that we believe will yield the maximum shareholder value to TEUM through:

- Profitable Sales growth

- Product and services development, with a detailed build or buy analysis applied

***Pareteum continues to win new long-term contractual business at an unprecedented pace, as evidenced by our 36-month contractual revenue backlog. We expect this pace to increase throughout the year*** . . . .

207. Included with the February 12, 2018 letter to shareholders was a link to a presentation that included the following graphic regarding the Company's Backlog as of January 31, 2018:



208.    On February 14, 2018, the Company published a press release announcing a 3-year, $1.5 million contract for an unidentified "Connected Home and Office Project in the United Kingdom" that would add to the Backlog.

209.    On February 23, 2018, the Company published a press release announcing a contract with an online retail marketplace company in Asia that would add $1.4 million to its Backlog based on the initial schedule of connections and active users.

210.    On February 28, 2018, the Company published a press release announcing that it secured a "$10 Million Contract from [an unidentified] Established Carrier to Launch Global MVNO," which would purportedly add to its Backlog. Defendant Bozzo was quoted as saying that "[t]his contract is a major milestone for continued growth. Being awarded this contract demonstrates that the technology and strategy of Pareteum's turn-key solution for launching mobile network operators is being widely adopted across the globe."

211.    On March 8, 2018, the Company published a press release announcing a five-year, $4.5 million contract with an unidentified service provider that was "a joint venture

between a long established social entrepreneur organization and a social capital business focused locally in Mexico, that operates worldwide with a mission aimed at bringing financial inclusion to the most remote and economically disadvantaged regions of the globe." According to the Company, this contract added $2.7 million to the Backlog.

212.    On March 15, 2018, the Company published a press release announcing that it signed a three-year, $1.5 million contract with an unidentified California telecommunications company.  Defendant Bozzo commented: "[w]e are encouraged by the sales results as our market value is exemplified by the continuous flow of new customer [sic] coming aboard."

213.    On March 19, 2018, the Company published a press release announcing a 3-year contract with an unidentified, established global MVNO that would purportedly add $2.4 million to the Backlog.

214.    On March 21, 2018, the Company published a press release announcing that it added $10 million to its Backlog via a contract with an unidentified Africa-based MVNO. Defendant Bozzo stated: "Pareteum's MSP Platform is a perfect fit for the contract with our newest global client. This part of the world represents high growth in connections as the digital economy takes over. We are pleased with Rob Mumby and his team as they continue to add customers to our platform."

215.    On March 23, 2018, the Company published a press release announcing that an unidentified established MVNO added $1.5 million to a contract the MVNO previously signed with the Company in September 2017.  Defendant Bozzo commented, "[w]hen fully ramped, we expect this new customer to be servicing hundreds of thousands of recurring subscribers a month, *representing $1,500,000 in addition to the previously announced revenue for our growing [B]acklog* over the 5-year duration of the contract."

216.     The statements made by these Defendants outlined above in ¶¶193-215 and contained in the Company's first quarter of 2018 press releases, publications, and/or filings with the SEC regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)     When these statements were made, there was no factual basis for the Company's representations regarding its Backlog value, that it was experiencing a "quantum leap forward," "accelerating growth," or a "continuous flow of new customer[s] coming aboard," and that it was winning new business "at an unprecedented pace, as evidenced by [the Backlog]" and that Defendants "expect[ed] this pace to increase throughout the year" because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(b)     In reality, because the Backlog was artificially inflated and unreliable – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) –  the Backlog, as a matter of fact, was not "directly correlated" to [Pareteum's] financial and operating results.

### 3.   First Quarter 2018 Operating Results and Form 10-Q

217.   On April 9, 2018, the Company previewed its expected first quarter of 2018 results in a press release entitled: "[First Quarter] 2018 Revenue Expected At $4.1 Million, a 47% Increase over [First Quarter] 2017."   The press release stated that "the Company expects to report revenues of at least $4.1 million, which represents 47% growth for the first quarter ended March 31, 2018," and quoted Defendant Turner as stating:

> Our TEUM ended the 2017 year with a very strong fourth quarter as demonstrated by the acceleration in revenues. This momentum led to a robust first quarter of 2018 with continued year-over-year growth expected throughout the year. This momentum is a result of our *success in converting our contract revenue backlog into connections which generates revenues.*

218.   On May 7, 2018, the Company published a press release announcing "record" results for the first quarter 2018, for the period ending March 31, 2018.   Therein, the Company reported "Revenues of $4.113 Million, up 47% Year-Over-Year," included the following chart, and noted the following "Key Business Highlights for First Quarter 2018":

| ($000's) | Sequential Quarterly Key Metrics | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Q1 2017 | | Q2 2017 | | Q3 2017 | | Q4 2017 | | Q1 2018 | |
| REVENUE | 2,795 | | 3,239 | | 3,499 | | 4,015 | | 4,113 | |
| YEAR-OVER-YEAR REVENUE GROWTH | (479) | (15%) | (28) | (1%) | 328 | 10% | 870 | 28% | 1,318 | 47% |
| GROSS MARGIN | 1,953 | 70% | 2,293 | 71% | 2,707 | 77% | 2,910 | 73% | 2,918 | 71% |
| ADJUSTED EBITDA | (198) | | 463 | | 603 | | 708 | | 283 | |
| EBITDA | (1,146) | | (301) | | (35) | | (2,733) | | (869) | |
| CASH BALANCE | 1,409 | | 742 | | 700 | | 13,538 | | 15,759 | |
| 36 MONTH CONTRACTUAL REVENUE BACKLOG | 44,000 | | 60,000 | | 94,000 | | 147,000 | | 200,000 | |

- Awarded 14 contracts aggregating to $60 million in total contract value, which added $53 million to 36-month contractual revenue backlog

- Increased 36-month contractual revenue backlog from $147 million at 12/31/17 to $200 million

- ***Backlog revenue conversion at 103%***

- Ended Q1 2018 with 2,200,000 ***connections, a lead indicator of revenue***, increased 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017, with an additional conversion increase

of 70% versus the expected in the 36-month contract backlog for connections

219.    This May 7, 2018 press release quoted Defendant Turner as saying:

This quarter represents a **_record quarterly revenue milestone_** since we executed our turnaround and transformed the business in 2016. I am also extremely pleased and proud to report that we generated positive operating cash flow in the first quarter, a full quarter earlier than expected. First quarter revenue would have been $4.22 million, but we instituted Accounting Standard for Revenue Recognition (606) for our SaaS business model and did not recognize $107,000 of deferred revenue in the first quarter. All of our profitability metrics improved dramatically; Adjusted EBITDA, EBITDA, operating loss and cash flow from operations. **_Key performance indicators of connections, backlog conversion, connection values,_** revenue per employee and churn *continue to all move in the right direction and give us confidence in our overall strategy and business execution*. We also invested in product development and sales and marketing during the quarter, as we prepare to scale our business for *expected growth and profitability*. **_Our TEUM remains laser focused on converting backlog to revenue_**, servicing our clients, selling into new geographical markets and creating shareholder value . . . .

220.    This May 7, 2018 press release further provided that, **_"[b]ased on our 36-month contractual revenue backlog of $200 million_**, as of March 31, 2018, and 2,200,000 connections, **_we are raising our 2018 outlook_**. The Company now expects 2018 revenue growth of at least 60% over 2017, *up from the previous provided guidance of 50%*."

221.    On May 11, 2018, Pareteum filed with the SEC a Form 10-Q quarterly report for the first quarter ended March 31, 2018 (hereinafter, the "1Q:2018 Form 10-Q"), which was signed and certified by Defendants Turner and O'Donnell and made substantially similar materially false and misleading statements concerning Pareteum's revenues and customer growth as outlined above. Specifically, therein, the Company reported revenue of $4,112,570, cost of service of $1,194,523, a net loss of ($2,134,101), accounts receivable of $1,954,495, and numerous other balance sheet line items.

222.    The statements made by these Defendants outlined above in ¶¶217-221 and contained in the Company's April 9, 2018 1Q2018 preview, its May 7, 2018 1Q2018 earning

release, and its May 7, 2018 1Q:2018 Form 10-Q regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)     When these statements were made, there was no factual basis for the Company's representations regarding its Backlog value, that it was experiencing "record" results, that its Backlog conversion rate was 103%, that its Backlog and connection metrics were "key performance indicators" or "lead initiators of revenue," or that its guidance should be 10% higher because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(b)     In reality, because the Backlog was artificially inflated and unreliable – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) –  the Backlog, as a matter of fact, was not a reliable indicator of the Company's financial and operating results.

(c)     When these statements were made, there was no factual basis for the Company's representations regarding its revenue, cost of service, operating income, net loss, accounts receivable, and numerous other balance sheet line items, because, as the Company admitted in its Restatement, for the full year ended December 31, 2018 and the interim periods

ended March 31, 2019 and June 30, 2019, certain revenues recognized during this period should not have been recorded during that period, the Company prematurely or inaccurately recognized revenues during that period, those errors were expected to impact revenue, cost of service, operating income, net loss, accounts receivable, and numerous other balance sheet line items, and investors should therefore no longer rely on these financial statements.

223.    The 1Q:2018 Form 10-Q also made the following statements regarding the Company's Revenue Recognition:

**Adoption of ASC Topic 606, Revenue from Contracts with Customers**

On January 1, 2018, we adopted Topic 606 using the modified retrospective method applied to those contracts which were not completed as of January 1, 2018. Results for reporting periods beginning after January 1, 2018 are presented under Topic 606, while prior period amounts are not adjusted and continue to be reported in accordance with our historic accounting under Topic 605.

\* \* \*

**Revenue Recognition**

Our revenues represent amounts earned for our mobile and security solutions. Our solutions take many forms but our revenue generally consists of fixed and/or variable charges for services delivered monthly under a combined services and SaaS model. We also offer discrete (one-time) services for implementation and for development of specific functionality to properly service our customers.

The following table presents our revenues disaggregated by revenue source:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | **2018** | **2017** [1] |
| Monthly Service | $ 3,291,882 | $ 2,637,827 |
| Installation and Software Development | 820,688 | 157,116 |
| Total revenues | $ 4,112,570 | $ 2,794,943 |

(1) As noted above, prior period amounts have not been adjusted under the modified retrospective method.

Monthly services revenues are recognized at a point in time and amounted to $3,291,882 for the period ended March 31, 2018. Installation and software

development revenues are recognized over time and amounted to $820,688 for the period ended March 31, 2018.

* * *

**Monthly Service Revenues**

The Company's performance obligations in a monthly SaaS and service offerings are simultaneously received and consumed by the customer and therefore, are recognized over time. For recognition purposes, we do not unbundle such services into separate performance obligations as their pattern of transfer does not differ. The Company typically bills its customer at the end of each month, with payment to be received shortly thereafter. The fees charged may include a combination of fixed and variable charges with the variable charges tied to the number of subscribers or some other measure of volume. Although the consideration may be variable, the volumes are easily estimable at the time of billing, with "true-up" adjustments occurring in the subsequent month. As such adjustments have not historically been material, no amounts of variable consideration are subject to constraint.

**Installation and Software Development Revenues**

The Company's other revenues consist generally of installation and development projects.

Installation represents the activities necessary for a customer to obtain access and connectivity to the Company's monthly SaaS and service offerings. While installation may require separate phases, it represents one promise within the context of the contract.

Development consists of programming and other services to add new, additional or customized functionality to a customer's existing service offerings. Each development activity is typically its own performance obligation.

Revenue is recognized over time if the installation and development activities create an asset that has no alternative use for which the Company is entitled to receive payment for performance completed to date. If not, then revenue is not recognized until the applicable performance obligation is satisfied.

**Arrangements with Multiple Performance Obligations**

The Company's contracts with customers may include multiple performance obligations. For such arrangements, the Company allocates revenue to each performance obligation based on its relative standalone selling price. The Company generally determines standalone selling prices based on the prices charged to customers.

(Bolding in original.)

224.    This statement was likewise materially false and misleading when made, and were

known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for

the reasons outlined in ¶¶173 and 222(c).

### 4.    Second Quarter 2018 Statements

225.    On April 2, 2018, the Company issued a press release notifying the public that its

audited financial statements for the year ended December 31, 2017, which were included with its

10-K filed on March 30, 2018, with the SEC did **not** contain a going concern qualification

paragraph in the audit opinion from its independent registered public accounting firm. Regarding

this, Defendant Turner was quoted as stating:

> This achievement *marks another milestone in our successful turnaround* as we
> have *significantly improved our balance sheet* by increasing our cash and
> eliminating all senior secured debt. With our current balance of $15 million of
> cash, we are ***fully capitalized for our growth plan as we continue to seek new***
> ***business and convert our current revenue backlog to revenue***. *Confidence in our*
> *business model and execution on our financial model*, such as the removal of the
> going concern opinion, sets the tone for Pareteum to continue to excel in 2018.

226.    On April 3, 2018, the Company published a press release announcing a 3-year,

$3.1 million contract with an unidentified South Asian communications service provider.

227.    On April 5, 2018, the Company published a press release announcing service

deployments to customers that were included in the Backlog and would purportedly begin

producing monthly recurring revenues. Defendant Turner commented:

> We are a mission driven business and we hear positive feedback from our
> Shareholders, thanking us for our 'transparency.' Our ambition is to deliver a
> single solution to make it simple for our customers to grow and integrate the latest
> technologies without having to think about building them. ***We remain ahead of***
> ***our targeted 36-month Contractual Revenue Backlog conversion.*** Pareteum is
> expecting positive EBITDA from continuing operations for the full year.

228.     On April 12, 2018, the Company published a press release announcing a 3-year, $1 million contract with an unidentified rural service provider in the United States.

229.     On April 16, 2018, Defendant Turner issued an Update Letter to shareholders, in which he noted the Company's "rapid start" to 2018 and highlighted that the Company's *Backlog was at "$200 million, with expectations for continued, and[] even accelerated growth[.]"* The Update Letter reiterated the Company's 2018 first quarter results, and further provided that the Company, with its Software-as-a-Service business model, ***"[has] excellent visibility into our business operations and <u>revenue recognition</u>."***

230.     On April 18, 2018, the Company published a press release announcing a 3-year, $10 million contract to provide services to an unidentified MVNO provider in the Indian Subcontinent. Defendant Bozzo commented, "[t]his part of the world represents high growth in connections as the digital economy takes over. We are pleased with Rob Mumby and his team as they continue to add customers to our platform."

231.     On April 26, 2018, the Company published a press release announcing a 3-year, $2.5 million contract with an unidentified emerging North American MVNO.

232.     On April 30, 2018, the Company published a press release announcing a 3-year, $6 million contract with an unidentified established service provider in Asia and the Indian Subcontinent.

233.     On May 1, 2018, the Company published a press release announcing an additional $1 million contract with an unidentified existing India-based customer that would purportedly result in an aggregate 3-year, $4 million contract for the Company. Defendant Bozzo commented: "Our sales and delivery teams are hard at work to bring all of our potential subscribers live and while that is happening our product and cloud group is working to keep up

with the growing demand for more connectivity and additional services to be delivered through the channel."  Similarly, Defendant Turner commented: "The growth of our customers, and the resulting growth of Pareteum, is attributable to delivery on 'promises made.'"

234.    On May 4, 2018, the Company published a press release announcing that it had deployed services to a rural United States service provider and that revenue generation from ongoing monthly fees and usage-related fees for the connections would be recognized during the second quarter of 2018. Defendant Bozzo commented: "Pareteum's streamlining of efficient cloud deployments remains one of the pillars of 2018, as we rapidly convert executed contracts to live deployments.  This marks another great win for the Pareteum books."

235.    On May 8, 2018, the Company published a press release announcing a 3-year, $4 million contract with an unidentified diversified client in Asia.

236.    On May 9, 2018, the Company published a press release announcing a 3-year, $5 million contract with an unidentified India-based telecommunications company. Defendant Turner commented: *"Our award-winning technology . . . will continue in its **growth trajectory**, translating into **additional revenue** for [the] Company."*

237.    On May 11, 2018, the Company published a press release announcing the deployment of a 3-year, $1.5 million February 2018 service contract with an unidentified established provider in the United Kingdom.  Defendant Turner commented: *"Pareteum is in a trajectory of **relentless forward motion . . . TEUM is on fire**."*

238.    On May 16, 2018, the Company published a press release announcing the addition of $2 million to an existing 3-year contract with an unidentified U.S. wireless internet service provider.

239.    On May 17, 2018, the Company published a press release announcing a 3-year, $3 million contract with an unidentified established security services provider in the United Kingdom.

240.    On May 21, 2018, the Company published a press release announcing a 3-year, $8 million contract with an unidentified established MVNO in the United States, which contract would purportedly "add $8 million in revenue beginning end of 2018."

241.    On June 7, 2018, the Company published a press release announcing that the acquisition of Artilium would add over $65 million to the Company's ongoing Backlog.

242.    On June 11, 2018, the Company published a press release announcing a 3-year, $6 million contract with an unidentified established MVNO.

243.    On June 27, 2018, the Company issued a press release announcing a 3-year, $3.5 million contract with an unidentified established global MVNO enterprise.

244.    On June 28, 2018, the Company published a press release announcing that the Company had secured ***$55 million in 13 new contracts during the second quarter of 2018***, ***growing its Backlog to $255 million,*** *an increase of 74% from the 2017 year-end balance of $147 million and an increase of 27.5% during the second quarter of 2018 alone.*

245.    The statements made by these Defendants outlined above in ¶¶225-244 and contained in the Company's second quarter of 2018 press releases, publications, and/or filings with the SEC regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)     When these statements were made, there was no factual basis for the Company's representations regarding its greater than $255 million Backlog value, that it was "fully capitalized for [its] growth plan," that it had reasonable "expectations for continued, and[] even accelerated growth," that it was on a "growth trajectory" that would "translat[e] into additional revenue," that it "remain[ed] ahead of [its] targeted 36-month [Backlog] conversion," or that it "[had] excellent visibility into our business operations and revenue recognition," because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(b)     In reality, because the Backlog was artificially inflated and unreliable – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) –  the Backlog, as a matter of fact, did not provide "excellent visibility into our business operations and revenue recognition."

**5.     Second Quarter 2018 Operating Results and Form 10-Q**

246.    On July 10, 2018, the Company previewed its expected second quarter of 2018 results in a press release, in which it announced that:

> [T]he Company expects to report revenues of at least $5.75 million which represents approximately 78% growth for the second quarter ended June 30, 2018, as compared to a year ago. The second quarter's expected 2018 revenues will represent an approximate 40% sequential growth over the first quarter of 2018, demonstrating the strong growth in connections that was previously reported in the first quarter of 2018.
>
> ***Connections, which are a lead indicator of revenue***, rose to approximately 2,713,600 as of June 30, 2018, representing a 22.5% quarter over quarter growth

in 2018. The year over year increase, from the end of the second quarter 2017 to the end of the second quarter 2018, was a significant 225%, providing management the confidence to ***increase its projected 2018 revenue outlook to a substantial 80% annual revenue growth over 2017's year-end totals***.

In connection with this press release, Defendant Turner was quoted as saying:

> ***[We] surged into 2018 with strong first quarter results, demonstrated by the acceleration in revenues and connections. This momentum has continued into the second quarter, at an accelerating rate, because of rapid conversions of our 36 Month Contractual Revenue Backlog.*** We see this translating into our best quarter, ever. *We anticipate continued improvement in our results* and execution of our long-term strategies, aimed at open mobility and open applications, globally delivered as part of excellent customer experiences in every engagement.

247. On August 6, 2018, Pareteum published a press release yet again announcing "record" results for the second quarter 2018, for the period ending June 30, 2018. Therein the Company reported "Revenues of $4.113 Million, up 47% Year-Over-Year," included the following chart, and noted the following "Key Business Highlights for First Quarter 2018":

248. Second Quarter 2018 Results":

Key Financial Highlights for Second Quarter 2018 Year over Year:

- Revenues increased by 85% to $6 million

- Net Income of $1.7 million versus net loss of ($1.3 million) in the second quarter of 2017

\* \* \*

Key Business Highlights for Second Quarter 2018:

- Awarded ***13 contracts aggregating to $55 million in total contract value, which added $55 million to 36-month Contractual Revenue Backlog***

- ***Increased 36-month Contractual Revenue Backlog from $200 million at end of the first quarter of 2018 to $276 million***; includes $21 million incremental from existing contracts

- ***Contractual Revenue Backlog conversion rate at 106%***

- Ended the second quarter of 2018 with 2,713,600 Connections, an increase of 225% over the end of the second quarter of 2017 and 23% higher than the first quarter of 2018

This August 6, 2018 press release quoted Defendant Turner as saying:

The quarter ended June 30, 2018, marks the achievement of materially significant milestones for Pareteum *as it continues to evolve into a high-growth*, software-based, enabling cloud services company. Our results include attainment of positive Net Income and positive EBITDA for the first time in Company history. Surpassing $6 million in revenues in the second quarter demonstrates *the efficiency of our employees in converting our Contract Revenue Backlog into revenue*. Today we operate with our Global Enablement Cloud, fueled by the award winning, and, customer affirmed, software applications, solutions and application programming interfaces (APIs). It is this combination that is making our services and software the developer community's first choice for connectivity and communications. We generated positive EBITDA and Net Income, validating the efficient scalability of our business. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. *Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values,* revenue-per-employee and churn *continue to all move in the right direction and give us confidence in our overall strategy and business execution*. Our TEUM remains *laser focused on converting backlog to revenue*, servicing our clients, selling into new geographical markets and creating shareholder value[.]

249. This August 6, 2018 press release further provided that, *"[b]ased on our 36-month contractual revenue backlog of $276 million*, as of as of June 30, 2018, and 2,713,600 connections, *we have raised our 2018 outlook*. The Company now expects 2018 revenue growth *greater than 80% over 2017, up from the previous provided guidance of 70%* . . . . As we convert Contractual Revenue Backlog to Connections, our revenue will increase and for every incremental dollar of revenue, we expect contribution to our bottom line. Our target gross margins are in the range of 70- 75%.

250. On August 13, 2018, Pareteum filed with the SEC a Form 10-Q quarterly report for the second quarter ended June 30, 2018 (hereinafter, the "2Q:2018 Form 10-Q"), which was signed and certified by Defendants Turner and O'Donnell and made substantially similar materially false and misleading statements concerning Pareteum's revenues and customer growth

as outlined above. Specifically, therein, the Company reported revenue of $6,003,180, cost of service of $1,779,882, a net income of $1,656,464, accounts receivable of $3,852,866, and numerous other balance sheet line items.

251.   The statements made by these Defendants outlined above in ¶¶246-250 and contained in the Company's July 10, 2018 2Q2018 preview, its August 6, 2018 2Q2018 earning release, and its August 6, 2018 2Q:2018 Form 10-Q regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)   When these statements were made, there was no factual basis for the Company's representations regarding its Backlog value, that it was experiencing "record" results, that its Backlog conversion rate was 106%, that its Backlog and connection metrics were "lead initiators of revenue," that its guidance should be 10% higher, or that the Company "surged into 2018 . . . demonstrated by the acceleration in revenues and connection," that "this momentum has continued into the second quarter, at an accelerating rate, because of rapid conversion of our [Backlog]," or that the Company was a "high-growth" Company because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

99

(b)    In reality, because the Backlog was artificially inflated and unreliable – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) –  the Backlog, as a matter of fact, was not a "lead indicator" of the Company's expedited revenue or financial and operating results;

(c)    When these statements were made, there was no factual basis for the Company's representations regarding its revenue, cost of service, operating income, net income, accounts receivable, and numerous other balance sheet line items, because, as the Company admitted in its Restatement, for the full year ended December 31, 2018 and the interim periods ended March 31, 2019 and June 30, 2019, certain revenues recognized during this period should not have been recorded during that period, the Company prematurely or inaccurately recognized revenues during that period, those errors were expected to impact revenue, cost of service, operating income, net loss, accounts receivable, and numerous other balance sheet line items, and investors should therefore no longer rely on these financial statements.

252.    The 2Q:2018 Form 10-Q also made statements regarding the Company's Revenue Recognition that were substantially identical to those outlined above in ¶223, except that Defendants updated the chart purporting to break down the Company's revenues disaggregated by source for the current quarter. These statements were likewise materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶173 and 251(c).

**6.    Third Quarter 2018 Statements**

253.    On July 11, 2018, the Company published a press release announcing a $6 million contract with an unidentified established telecommunications provider in Asia.

254.     On July 16, 2018, the Company published a press release announcing a 3-year, $4 million contract with an unidentified service provider operating in the Asia-Pacific region.

255.     On July 18, 2018, the Company published a press release announcing a $10 million contract with an unidentified established Asian mobile and cryptocurrency enterprise.

256.     On July 19, 2018, the Company published a press release announcing a 3-year, $2 million contract with an unidentified rural U.S. provider of wireless internet services.

257.     On July 24, 2018, the Company published a press release announcing a 3-year, $5 million contract with an unidentified Singapore based services provider. Defendant Turner commented: "It is from TEUM's efforts, expended daily, that we are reaping business results, and proving points of our company's attractiveness, both to current and prospective customers and investors."

258.     On July 25, 2018, the Company published a press release announcing a 5-year, $3 million contract with an unidentified North African services provider.

259.     On July 26, 2018, the Company published a press release announcing a new 3-year, $3.5 million contract with an unidentified existing Brazilian customer.

260.     On July 31, 2018, the Company published a press release announcing a 3-year, $5.5 million contract with an unidentified "established e-commerce solution company based in the U.K."

261.     On August 1, 2018, the Company published a press release announcing a 3-year, $3 million contract with an unidentified U.S. based service provider.

262.     On August 2, 2018, the Company published a press release announcing a 3-year, $4 million contract with an unidentified entity providing services in Europe, the Middle East, and Africa.

263.    Also on August 2, 2018, the Company published a press release announcing that

*it reached the $300 million Backlog "milestone" and that the Company had added $46 million to*

*the Backlog with ten new customers in the prior 36 days*. Per the press release: "Achieving this

tremendous milestone represent[ed] a 393% increase from a year earlier, when in July 2017, [the

Company's Backlog] was $61 million." Defendant Turner commented:

> The evidence is clear in the number of new contracts being signed and the rate at
> which customers are subscribing to our software services. This latest triumph
> delivers on what we said we would do, and the results show it. We are a force to
> be reckoned with. <u>Our momentum will not stop here</u>: our vision to provide
> connectivity for *Any Device, Any Network, Anywhere*™, continues to disrupt the
> industry. **<u>We are on a torrid sales pace and we are On Fire with relentless
> forward motion and passion</u>** for customers and meeting their global service
> needs."

(Bolding and italics in original; underlining added.)

264.    On August 7, 2018, the Company published a press release announcing a 3-year,

$8 million contract with an unidentified U.S. mobile marketing technology company.

265.    On August 9, 2018, the Company published a press release announcing a 3-year,

$4 million contract with an unidentified "leading Eastern European-based Enterprise company."

266.    On August 14, 2018, the Company published a press release announcing a 3-year,

$3.5 million contract with an unidentified British multinational conglomerate group. The press

release provided that, "[u]nder the terms of the contract, service deployment is expected by the

end of September 2018, and 2018 revenue contribution from this agreement is expected at

approximately $125,000. The balance of the backlog is expected to be recognized over the

ensuing 33 months from January 1, 2019, and, may exceed the backlog balance on this one

contract based upon more connections (subscribers) being activated."

267.    On August 16, 2018, the Company issued a press release announcing a 3-year, $4

million contract with an unidentified Asian mobile operator.  The release provided that, "[u]nder

the terms of the contract, initial service deployment is expected by the end of November 2018, and, 2018 revenue contribution is approximately $100,000. The balance of the remaining 35-month contractual revenue backlog is expected to be recognized over the remainder of the contract, beginning January 1, 2019."

268.    On September 13, 2018, the Company published a press release that included an "Update Letter" from Defendant Turner. Therein, Defendant Turner highlighted the purported synergies of the proposed Artilium transaction as follows:

> Your overwhelming approval of the Artilium acquisition means expanding the successful strategic alliance we have enjoyed with Artilium since October 2017, through the full integration of our two companies. The resulting fully-integrated business, will be accretive from a financial perspective, will strengthen our establishment of expanded-scale service delivery, and will *enhance our ability to sell to larger accounts globally and continue to convert our substantial growing [Backlog]*.

Defendant Turner further highlighted the Company's purported successes during the second quarter of 2018:

> In looking at the balance of the year ahead, we can take a moment to *recap the strong results achieved so far this year*, and as reported through Q2:
>
> • ***Revenues of $6 million, up 85% Year-Over-Year***
>
> • Net Income of $1,656,338 or EPS of $0.03 per Share (versus net loss of ($1.3 million) in the second quarter of 2017)
>
> • Adjusted EBITDA improved by over $834K, or 180%, to $1.3 million
>
> • EBITDA of $597,263 (improved by over $898K, or 298%, to $597,263)
>
> • ***Connections, a Lead Indicator of Revenue, Increased 225% over the Second Quarter of 2017 and 23% Increase Over the First Quarter of 2018***
>
> • ***Raised 2018 Outlook to > 80% Revenue Growth***
>
> • Operating Cash Flow Net of Restructuring and Acquisition Related Expenditures of $565K for the six months ended June 30, 2018

• Dollar based net expansion rate of 161% for contracts added since 2017

Defendant Turner continued:

> **Based upon our stellar Q2 results and our visibility into Q3 and Q4 operating performance, we remain very bullish in our outlook**. For the financial year ending 31 December 2018:
>
> • *We stand firmly by our formal guidance of over 80% revenue growth for 2018,* and we plan to issue an updated outlook statement following completion of the Artilium acquisition on October 1, 2018;
>
> * * *
>
> • **Our 36MCRB of revenue and connections (our proxy for connected devices and their usage) will soon also be updated and we note that to date <u>we exceeded 100% of our plan for converting revenue and connections from backlog</u>**.

269.     On September 17, 2018, the Company published a press release announcing that it had secured **$50 million in new contracts during the last two weeks of August, and that its Backlog totaled $375 million as of August 31, 2018. <u>For the apparent first time, in this press release, the Company identified (some or all of) the alleged customers and contracts added – namely, ACN Europe, Wing Tel Communications, Secure Watch, and Eyethu Mobile Network.</u>**

270.     In addition to the reasons set forth below in ¶272 regarding the statements made during the third quarter of 2018, the statements made by these Defendants in the September 17, 2018 release in particular were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the following additional reasons:

(a)     As reported by both the Viceroy and Aurelius Report, most of the companies identified in this release were (and remain) incapable of generating *the $50 million* in revenues claimed by the Company.

(b)     Specifically, as outlined in Viceroy and Aurelius Reports, Eyethu Mobile Network appears to have been non-operational. Its website was not functional, and investigators found no activity or indications of operations at its registered address; rather, they discovered only a dilapidated shack and crumbling structures near a rural African village.



(c)     What is more, as noted in the Viceroy Report and confirmed by Lead Plaintiff's investigation, Eyethu appears to have been launched by an unemployed South African individual with no history in the industry:



(d)    Undersigned counsel's investigation has confirmed that Eyethu's website remains non-operational:



And the company's Twitter account, opened in June 2018, provides that Eyethu was supposed to launch in 2019 – but it never did:



(e)     Similarly, according to the Viceroy Report, Secure Watch is a small 1-2 employee operation that appears to sell security systems and whose website appears to be a mere quote generator.[29] The website also displays the following image:



(f)     As reported by the Viceroy Report, and confirmed through undersigned counsel's investigation, this company was founded by Brandon Clyde of Idaho in 2010, originally as Infiniti Security, LLC, and rebranded as Secure Watch sometime in late 2017.  The company has again been rebranded and currently operates as Link Mobile in Meridian, ID offering cellular service plans and home security:

---

[29]     The link provided in the Company's September 17, 2018 press release directs to the following website: https://www.mysecurewatch.com/i-want-a-free-quote17981756 (last visited February 21, 2020).



(g)     Likewise, Wing Tel was launched in 2017 in New York and provides cellular phone services ranging in price from $12/month to $55/month.

271.    On September 24, 2018, the Company published a press release announcing a five-year, $38 million contract with an undisclosed Asian provider.

272.    The statements made by these Defendants outlined above in ¶¶253-271 and contained in the Company's third quarter of 2018 press releases, publications, and/or filings with the SEC regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)     When these statements were made, there was no factual basis for the Company's representations regarding its $375 million Backlog value, that it achieved revenues

of $6 million, that its "momentum will not stop here," that it was on a torrid sales pace and . . . On Fire with relentless forward motion and passion," that it had "visibility into Q3 and Q4 operating performance," that it could reliably "convert our substantial growing [Backlog]," that it had "exceeded 100% of our plan for converting revenue and connections from backlog," and that it was raising its 2018 outlook to greater than 80% revenue growth because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(b)     In reality, because the Backlog was artificially inflated and unreliable – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) –  the Backlog, as a matter of fact, did not provide reliable visibility into the Company's business operations and revenue recognition.

### 7.    Third Quarter 2018 Operating Results and Form 10-Q

273.    On October 5, 2018, the Company again previewed its expected third quarter of 2018 results in a press release, in which it announced that it expected "a minimum of $8 million in third quarter revenues," which would "represent an approximate 129% growth for the third quarter ended September 30, 2018, as compared to a year ago . . . [and] an approximate 33% sequential growth over the second quarter of 2018, demonstrating the continuing strong increase in connections previously reported in the second quarter of 2018."

274.    The Company further stated that its "customer connections, *a leading indicator of revenue*, are expected to exceed 2.9 million, as of September 30, 2018; this reflects the *ever-growing, robust demand for Pareteum's Global Software Defined Cloud platform services*." Defendant Turner was quoted as stating:

> *Pareteum continues to surge through 2018*, with our expectation of superior financial and operating results for the third quarter. *Our acceleration in revenues and connections proves it, and there's more to come.* We are focused on *forward momentum*, and it is happening as we move into the fourth quarter. Why? Because our existing customers are buying more from us and we are signing on new ones. This sales performance, coupled with *our daily-accelerating 36-Month Contractual Revenue Backlog conversion*, provides a favorable outlook for our business, even before we complete the operational integration of our newly-acquired Artilium, which is also performing well. We are in a good place for our company.

275.    On October 24, 2018, in the lead up to the quarterly results release, Pareteum published a press release announcing that it *had grown its Backlog to $500 million*, which "include[d] the backlog incorporated with Pareteum's recent acquisition of Artilium and exclude[d] certain monthly recurring revenue streams deriving from that acquisition for which long-term contracts are not in place." The press release noted that this Backlog milestone represented "*a 1,150% increase year over year since 2016*: at year end 2016, Pareteum announced $40 million 36MCRB; at year end 2017, the company announced $147 million; and now, ten months into this year, Pareteum has reached $500 million in 36MCRB." The Company further noted that "[d]uring the same period, Pareteum's quarterly booked revenue increased by 260%."

276.    On November 7, 2018, Pareteum published a press release yet again announcing "record" results for the third quarter 2018, for the period ending September 30, 2018. Therein the Company reported:

- ***Revenues of $8 Million, up 129% Year-Over-Year***

- Adjusted EBITDA of $1.8 Million

- Non-GAAP EPS of $0.01

- ***Raised 2018 Outlook to 100% Revenue Growth***

- Dollar-Based Net Expansion Rate of 147%

* * *

| ($000's) | Sequential Quarterly Key Metrics | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q3 2017 | | Q4 2017 | | Q1 2018 | | Q2 2018 | | Q3 2018 | |
| REVENUE | 3,499 | | 4,015 | | 4,113 | | 6,003 | | 8,008 | |
| YEAR-OVER-YEAR REVENUE GROWTH) | 328 | 10% | 870 | 28% | 1,318 | 47% | 2,764 | 85% | 4,509 | 129% |
| GROSS MARGIN | 2,707 | 77% | 2,910 | 72% | 2,918 | 71% | 4,223 | 70% | 5,879 | 73% |
| ADJUSTED EBITDA | 603 | | 708 | | 283 | | 1,297 | | 1,782 | |
| EBITDA | (35) | | (2,733) | | (869) | | 597 | | (5,851) | |
| CASH BALANCE | 700 | | 13,538 | | 15,759 | | 19,205 | | 18,865 | |
| 36 MONTH CONTRACTUAL REVENUE BACKLOG | 94,000 | | 147,000 | | 200,000 | | 276,000 | | 403,000 | |
| CONNECTIONS | 1,277 | | 1,310 | | 2,220 | | 2,714 | | 2,903 | |

Key Financial Highlights for Third Quarter 2018 Year over Year:

- Revenues increased by 129% to $8 million

- Adjusted EBITDA improved by over $1.2 million, or 195%, to $1.8 million

- Non-GAAP Earnings Per Common Share improved to $0.01 for Q3 2018, compared to ($0.12) for Q3 2017

- Increase in total assets from $10 million to $35 million

- Cash balance of $18.9 million

- Dollar-based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 147% in the third quarter of 2018 versus the third quarter of 2017

Key Business Highlights for Third Quarter 2018:

- ***Awarded 19 contracts aggregating to $403 million in total contract value, which added $127 million to 36-month Contractual Revenue Backlog***

- *Increased 36-Month Contractual Revenue Backlog from $276 million at end of the second quarter of 2018 to $403 million; includes $72 million incremental from existing contracts*

- *Contractual Revenue Backlog conversion rate at 100%*

- *Ended the third quarter of 2018 with 2,903,000 Connections, an increase of 127% over the end of the third quarter of 2017 and 7% higher than the second quarter of 2018*

277.   This November 7, 2018 press release quoted Defendant Turner as stating:

The quarter ended September 30, 2018, marks *our continued evolution into a high-growth*, software-based, enabling cloud services company. Surpassing $8 million in revenues in the third quarter demonstrates *the efficiency of our employees in converting our Contract Revenue Backlog into revenue*. Our results include growth in adjusted EBITDA, which reflects the scalability of our recurring revenue SaaS business model. Subsequent to the end of the third quarter, we closed the Artilium acquisition and have been busy integrating and streamlining the businesses and eliminating redundant expenses. **We are continuing to grow our revenues**, clearly seen in our results as we are driving financial performance and cash to the bottom line. **Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values**, revenue-per-employee and churn *continue to all move in the right direction and give us confidence in our overall strategy and business execution*. Our TEUM remains *laser focused on converting backlog to revenue*, servicing our clients, selling into new geographical markets and creating shareholder value.

278.   This November 7, 2018 press release further provided that, **"[b]ased on our 36-month contractual revenue backlog of $403 million**, as of as of September 30, 2018, and 3,000,000 connections, **we have raised our 2018 outlook**. The Company now expects 2018 revenue growth **greater than 100% over 2017, up from the previous provided guidance of 85%**. Also, with its current cost structures, Pareteum expects positive adjusted EBITDA and cash from continuing operations for the full year 2018. As we convert Contractual Revenue Backlog to Connections, our revenue will increase and for every incremental dollar of revenue, we expect contribution to our bottom line. Our target gross margins are in the range of 70-75%."

279.     On November 14, 2018, Pareteum filed with the SEC a Form 10-Q quarterly report for the third quarter ended September 30, 2018 (hereinafter, the "3Q:2018 Form 10-Q"), which was signed and certified by Defendants Turner and O'Donnell and made substantially similar materially false and misleading statements concerning Pareteum's revenues and customer growth as outlined above. Specifically, therein, the Company reported revenue of $8,007,734, cost of service of $2,128,683, a net loss of $(7,020,406), accounts receivable of $7,200,014, and numerous other balance sheet line items.

280.     The statements made by these Defendants outlined above in ¶¶273-279 and contained in the Company's October 5 and October 24 3Q2018 previews, its November 7, 2018 3Q2018 earning release, and its November 7, 2018 3Q:2018 Form 10-Q regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)     When these statements were made, there was no factual basis for the Company's representations regarding its greater than $500 million Backlog value, that that value had increased 1,150% year over year, that it was experiencing "record" results, that its Backlog conversion rate was 100%, that its Backlog and connection metrics were "key performance indicators" or "lead initiators of revenue," that its guidance should be 15% higher, that the Company was experiencing "ever-growing, robust demand" for its products, that the "acceleration in revenues and connections proves it," that it was experiencing "daily-accelerating [Backlog] conversion," or that it was "continuing to grow our revenues" because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as

subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(b)     In reality, because the Backlog was artificially inflated and unreliable – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) –  the Backlog, as a matter of fact, was not a reliable indicator of the Company's revenue or financial and operating results;

(c)     When these statements were made, there was no factual basis for the Company's representations regarding its revenue, cost of service, operating income, net income, accounts receivable, and numerous other balance sheet line items, because, as the Company admitted in its Restatement, for the full year ended December 31, 2018 and the interim periods ended March 31, 2019 and June 30, 2019, certain revenues recognized during this period should not have been recorded during that period, the Company prematurely or inaccurately recognized revenues during that period, those errors were expected to impact revenue, cost of service, operating income, net loss, accounts receivable, and numerous other balance sheet line items, and investors should therefore no longer rely on these financial statements.

281.    The 3Q:2018 Form 10-Q also made statements regarding the Company's Revenue Recognition that were substantially identical to those outlined above in ¶223, except that they updated the chart purporting to break down the Company's revenues disaggregated by source for the current quarter. These statements were likewise materially false and misleading when made,

and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶173 and ¶280(c).

### 8.   Fourth Quarter 2018 Statements

282.    On October 2, 2018, the Company published a press release announcing that it added $15 million in new contracts, this time identifying the companies and contracts as being with Parallax Health Sciences in the United States, oneCentral in the Netherlands, and Naledi in South Africa.

283.    In addition to the reasons set forth below in ¶296 regarding the statements made during the fourth quarter of 2018, the statements made by these Defendants in the October 2, 2018 release in particular were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the following additional reasons:

(a)     As reported by both the Viceroy and Aurelius Report, the companies identified in this release were (and remain) incapable of generating *the $15 million* in revenues claimed by the Company.

(b)     Specifically, according to the Viceroy and Aurelius Reports, Naledi is not operational. Investigators found no activity or indications of operations at Naledi's registered address and its website is not functional. Lead Plaintiff's investigation has confirmed that the Naledi website is not functional; that Naledi was formed in May 2018 with only "1000" in share capital by a Zimbabwe national who has no LinkedIn profile and no Google results; and that its listed address does not return any results on Google Maps (although a small building that appears identical to the one identified in the Aurelius Report does appear to exist).

(c)     Similarly, the Aurelius Report noted, and Lead Plaintiff's investigation has confirmed, that Parallax Health Sciences is a "nearly-worthless penny-stock" with only $11,739 in revenue for the year ended December 31, 2018 and whose recent 10-K noted that a "substantial doubt about the company's ability to continue as a going concern."  Notably, the Aurelius and Viceroy Reports also noted, and Lead Plaintiff's investigation has again confirmed, that two of Parallax Science's officers allegedly perpetrated the AudioEye fraud with Defendant O'Donnell, which suggests that this alleged contract may have been fabricated by O'Donnell's past co-defendants.

(d)     Finally, the Viceroy Report uncovered that oneCentral only generated $5.5 million in sales in 2018 and lists only nine employees on its corporate website and on LinkedIn. According to the Aurelius Report, and as confirmed by Lead Plaintiff's investigation, the company listed only ∋662,000 in equity and seven employees on its balance sheet at the end of 2018.

284.    In addition to the October 5, 2018 press release previewing the Company's third quarter of 2018 results outlined above, three days later, on October 8, 2018, the Company published a press release announcing a 3-year, $50 million contract with One Development, "Thailand's first mobile virtual network aggregator and enabler, and leader in the country's growing [MVNO] market." Pareteum would purportedly "power One Development's ability to offer a turnkey solution to the over 50 companies that have obtained a mobile virtual network operator license in Thailand."

285.    In addition to the reasons set forth below in ¶296 regarding the statements made during the fourth quarter of 2018, the statements made by these Defendants in the October 8, 2018 release in particular were each materially false and misleading when made, and were

known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the following additional reasons:

(a)    As reported by both the Viceroy and Aurelius Reports, One Development was (and remains) incapable of generating *the $50 million* in revenues claimed by the Company.

(b)    Specifically, according to the Viceroy and Aurelius Reports, One Development was only awarded its license in July 2018, has just seven employees listed on LinkedIn, had no meaningful business in the four years since its incorporation, and ***reported no revenue in 2018***.

(c)    Lead Plaintiff's independent investigation has confirmed that One Development's listed address, which could not be found on Google Maps, and phone number, which was not answered and did not direct to a voicemail or recording, do not support an operation capable of generating $50 million in revenue. Indeed, this would make One Development's contract several orders of magnitude larger than that of Pareteum's single largest customer, Vodafone Enabler S.L. (an MVNO operating on Vodafone Spain's network).

(d)    To put the size of the alleged $50 million One Development contract in perspective, Vodafone Enabler S.L. appears to have generated approximately 12.5% of Pareteum's revenues during the six months ended June 30, 2019, amounting to approximately $7.15 million based on the Company's reported revenue of $57.2 million for the six months ended June 30, 2019. According to Vodafone's corporate website, as of June 30, 2019, Vodafone Group had approximately ***640 million*** mobile customers, 21 million fixed broadband customers and 14 million TV customers, including all of the customers in Vodafone's joint ventures and associates.

(e)     By contrast, One Development's Facebook page has just 65 followers and the company has only 621 followers on Twitter. The "company" also only has five press releases on its website, one of which dates back to 2015. One of the remaining five appears to have announced a partnership with a cryptocurrency app for which the underlying crypt coin has lost more than 97% of its value and was valued at just $0.0044 when the Aurelius Report was published. The other three relate to its alleged contract with Pareteum and a license that was awarded to One development.

(f)     What is more, Lead Plaintiff's independent investigation revealed that One Development had total assets of just 9.3 million Baht (approximately $297,790.00) and reported a net loss in 2018:

**Statement of Financial Position of THE ONE DEVELOPMENT (THAILAND) COMPANY LIMITED**

For the year 2016 – 2018

| Unit : Baht | 2016 | | 2017 | | 2018 | |
|---|---|---|---|---|---|---|
| | Amount | %Change | Amount | %Change | Amount | %Change |
| Accounts Receivable | N/A | N/A | N/A | N/A | N/A | N/A |
| Inventories | N/A | N/A | N/A | N/A | N/A | N/A |
| Total Current Assets | 9,434,344.78 | -0.34 | 370,048.15 | -96.07 | 548,518.83 | 48.22 |
| Property, Plant and Equipment | N/A | N/A | N/A | N/A | N/A | N/A |
| Total Non-current Assets | N/A | N/A | 9,025,678.00 | N/A | 8,807,153.00 | -2.42 |
| **Total Assets** | **9,434,344.78** | **-0.34** | **9,395,726.15** | **-0.40** | **9,355,671.83** | **-0.42** |
| Total Current Liabilities | 14,500.00 | -65.47 | 35,000.00 | 141.37 | 50,500.00 | 44.28 |
| Total Non-current Liabilities | N/A | N/A | N/A | N/A | N/A | N/A |
| Total Liabilities | 14,500.00 | -65.47 | 35,000.00 | 141.37 | 50,500.00 | 44.28 |
| Equity | 9,419,844.78 | -0.05 | 9,360,726.15 | -0.62 | 9,305,171.83 | -0.59 |
| **Total Liabilities and Equity** | **9,434,344.78** | **-0.34** | **9,395,726.15** | **-0.40** | **9,355,671.83** | **-0.42** |



(g)     In addition, One Development's founder, Allan Rasmussen, wrote an article in 2017 about Thailand's MVNO market, in which he noted that, although Thailand's National Broadcasting and Telecommunications Commission had issued 50 MVNO licenses since MVNOs were introduced in Thailand in 2010, many of those licenses were awarded before the MVNO had obtained any agreements with a host operator and *many MVNOs never launched*.[30] Presciently, Mr. Rasmussen also appears to be the "managing director" of another company, Yozzo, that likewise had no apparent revenue in 2018.

286.    On October 17, 2018, the Company published a press release announcing $8 million in new contracts with four new customers, including monogoto and Nextelle.

287.    In addition to the reasons set forth below in ¶296 regarding the statements made during the fourth quarter of 2018, the statements made by these Defendants in the November 17, 2018 release in particular were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time,

---

[30]     Available  at  http://www.yozzo.com/news-and-information/mvno-mobile-operator-s/50-mvno-licenses-issued-in-thailand (last visited February 21, 2020).

because, according to the Viceroy Report, both monogoto and Nextelle maintain little online presence and appear to be small scale enterprises incapable of generating the revenues claimed by the Company: monogoto lists only eight employees and its website does not have any way to order online or by phone and has no payment mechanism, and reviews of Nextelle apparently report that it is a scam.

288.    On October 23, 2018, the Company published a press release announcing 3-year contracts with five new brands which would add $11 million in new business.  Among the five new brands were Global Connect and Moby.

289.    In addition to the reasons set forth below in ¶296 regarding the statements made during the fourth quarter of 2018, the statements made by these Defendants in the October 23, 2018 release in particular were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the following additional reasons:

(a)    As reported by the Aurelius Report, Global Connect maintains a dubious online presence and appears to be a small scale enterprise incapable of generating the $11 million in revenues claimed by the Company.

(b)    For example, according to the Aurelius Report, records for "Global Connect Communications Limited" indicate that it is a company registered in Derby, England that lists only £74,881 in "current asset[s]" as of April 30, 2018. Lead Plaintiff's independent investigation has confirmed that, according to Global Connect's corporate registration records, the company listed only £74,881 in "current asset[s]" as of April 30, 2018, and further disclosed that the average number of employees during the year was just two. Ironically, when the authors of the Aurelius Report visited the Global Connect website, the counter embedded at the bottom

of the page reportedly showed less than 500 visitors; when Lead Plaintiff's investigator did the same, it showed only two. Moreover, this company appears to have two corporate registration numbers, and the filings under the other registration number links to a company called "Global Connect Solutions Limited" which reported zero assets as of July 31, 2018 and net losses of £1,855 for the year.

(c)     The Viceroy Report further noted that Global Connect and another purported Pareteum customer, SJ Global, appear to be connected to an individual identified as a Pareteum consultant and concluded that Pareteum may have been creating related party contracts to inflate its sales wins.

(d)     The Viceroy Report further found that the link for Moby in Paretuem's press release redirected to a company called Hawaiian MVNO Mobi, Inc., and that Moby's manta.com profile lists a website that redirects to the website of an electronics wholesaler headquartered in an electronics store in Long Island City, New York.

290.    On October 25, 2018, the Company published a press release announcing a three-year $4 million contract with "an Asia, Pacific and Australasia-based global communications carrier."

291.    On October 30, 2018, the Company announced that it initiated services for 11 previously announced customers, and that these contracts "contributed to Pareteum's expected $8 million in revenues and 2.9 million connections for the third quarter 2018." Defendant Mumby emphasized, "[t]his announcement . . . means we are achieving our sales mission and bringing value to the people and institutions that have invested in us. *We recently announced $500 million in 36-month contractually committed revenue, and today's news confirms we are converting to revenue and connecting more companies and people, as scheduled and planned."*

292.    On November 27, 2018, the Company published a press release announcing that it deployed services in November 2018 for eight previously awarded contracts that represented $38.7 million of the $500 million in Backlog, and thus contributed to revenue recognition.

293.    On November 29, 2018, the Company published a press release announcing it added 11 new 3-year agreements in November 2018 totaling $76 million in Backlog.

294.    On December 11, 2018, the Company published a press release announcing service deployment for four previously awarded contracts that represented $21.5 million of Backlog and that would contribute to the Company's revenue recognition.

295.    On December 13, 2018, the Company published a press release announcing it had added 5 new 3-year contracts totaling $24 million in Backlog.  The customers, all unidentified, included an Ecuador-based MVNO, a Latin-American telecommunications company, a European telecommunications company, an international start-up company, and a US MVNO.

296.    The statements made by these Defendants outlined above in ¶¶282-295 and contained in the Company's fourth quarter of 2018 press releases, publications, and/or filings with the SEC regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)    When these statements were made, there was no factual basis for the Company's representations regarding its $500 million Backlog value or that it was "converting to revenue and connecting . . . as scheduled and planned" because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently

revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(b)     In reality, because the Backlog was artificially inflated and unreliable – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) –  the Backlog, as a matter of fact, did not provide reliable visibility into the Company's business operations and revenue recognition.

### 9.     Fourth Quarter 2018 and Full Year 2018 Operating Results, Investor Conference, and Form 10-K

297.    In anticipation of the Company's March 12, 2019 Fourth Quarter and Full Year 2018 Earnings Call, on March 7, 2019, Defendant Turner published a Chairman's Letter to Shareholders, in which he stated, in part:

**Dear Fellow Shareholders,**

In September 2018 I wrote a THANK YOU to you for your demonstrable support of Pareteum as you approved the Artilium acquisition. At that time, it was clear that you provided your support to us which in turn affirmed *our clear mandate to **hyper-accelerate growth** in accretive ways, be it through our continued stellar sales growth, or, through additional successful strategic alliances* which is how we began our Artilium acquisition. We certainly expect to continue our market disruption, using our software to fuel our ambitions, business plans and strategies.

* * *

Looking forward, we are a company with ***ambitious plans for continued growth*** and profitability. On our upcoming earnings call, scheduled for March 12, 2019, you will hear about our 2018 successes that have laid a strong foundation as we set even more challenging 2019 goals. *Our growth will continue* from our current customers who continue to buy more from us. We will also see many new customers enter our client rosters, and because of our iPass acquisition, we have opened completely new market

123

segments in the enterprise sector. We fully expect to be the market leader in cloud based communications software as a service, as we execute on our business plan.

298.     Defendant Turner used the March 7, 2019 letter to condition investors to continue

to believe the false hyper-growth narrative that Defendants had been pushing:

> **We have been updating you on our progress through our recent press releases, which we will continue to do. As <u>we maintain our laser focus on growth</u>** . . .

> **We are well positioned now to drive dramatic increases in our scale** and become the recognized market leader through the value we create for our customers and shareholders. We expect to continue to attract long-term institutional investors who believe in our proven ability to execute our plans and scale the company. Additionally, you will have read that *we have improved our capital gain plans by the addition of a $50 million debt facility*, initially being used to fully repay iPass' approximately $11 million debt on better terms, and which puts us in a position to act immediately when accretive opportunities, that further improve Pareteum, are identified. We also believe that leveraging our business in this way demonstrates management's confidence in our business and equity value.

> As you have heard me say many times, *"we are all in sales!" We are driving hard, everyday to acquire new customers, upsell our existing customers and aggressively convert our 36MCRB.*

299.     On March 12, 2019, Defendants published a press release that purported to

announce the Company's results for the fourth quarter of 2018 and full 2018 fiscal year, for the

period ended December 31, 2018.  Therein, the Company reported:

Q4 Revenue Growth of 256% and FY 139%
Q4 Adjusted EBITDA of $2.34M and FY $6.4M
Q4 Non-GAAP EPS of $0.02 cents and FY $0.09 cents
Net Dollar-Based Expansion Rate of 214% Year-Over-Year
Announces 2019 Guidance – Projecting 225-260% Year-Over-Year Revenue
Growth

* * *

FOURTH QUARTER 2018 FINANCIAL RESULTS:
(Unless otherwise noted, all comparisons are made to the fourth quarter of 2017)

- *Total revenues increased 256% to $14.3 million*

124

- In December of 2018 our Global Software Defined Cloud (GSDC) revenue was 51% of our total revenue, with 35% in Managed Services (MSP) revenues, and Super API of 14%
- Adjusted EBITDA increased 82% to $2.34 million
- Non-GAAP EPS of $0.02 cents
- Artilium financials are fully consolidated and accretive in Pareteum's fourth quarter results

FULL YEAR 2018 FINANCIAL RESULTS:
(Unless otherwise noted, all comparisons are made to full year of 2017)

- ***Revenues increased 139% to $32.4 million***
- Adjusted EBITDA improved 199% year-over-year to $6.4 million
- Non-GAAP EPS of $0.09 cents compared to $0.05 cents for year ending 2017
- We ended the year with a $6.1 million cash balance and no secured debt

KEY 2018 OPERATIONAL METRICS:

- ***36-month Contractual Revenue Backlog quadrupled to $615 million*** for the full year 2018, up from $147 million in 2017 with a conversion rate to revenue of 100%
- ***Connections increased 252%*** to 4,609,000 for the full year 2018, and grew 59% sequentially in the fourth quarter of 2018
- Fourth quarter average annualized revenue per employee of $415,000, an improvement of 78% year-over-year

| ($000's) | Sequential Quarterly Key Metrics | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Q4 2017 | | Q1 2018 | | Q2 2018 | | Q3 2018 | | Q4 2018 | |
| REVENUE | 4,015 | | 4,113 | | 6,003 | | 8,008 | | 14,312 | |
| YEAR-OVER-YEAR REVENUE GROWTH | 870 | 28% | 1,318 | 47% | 2,764 | 85% | 4,509 | 129% | 10,297 | 256% |
| GROSS MARGIN | 2,910 | 73% | 2,918 | 71% | 4,223 | 70% | 5,879 | 73% | 9,085 | 63% |
| ADJUSTED EBITDA | 1,283 | | 283 | | 1,297 | | 1,782 | | 2,339 | |
| EBITDA | (2,733) | | (869) | | 597 | | (5,851) | | (3,093) | |
| CASH BALANCE | 13,538 | | 15,759 | | 19,205 | | 18,865 | | 6,052 | |
| 36 MONTH CONTRACTUAL REVENUE BACKLOG | 147,000 | | 200,000 | | 276,000 | | 403,000 | | 615,000 | |
| CONNECTIONS | 1,310 | | 2,220 | | 2,714 | | 2,903 | | 4,609 | |

300.    This press release quoted Defendant Turner as stating:

*2018 was a record year for Pareteum, achieving over 139% year-over-year revenue growth* driven by the effectiveness of our cloud-based platform, innovative product solutions, employee talent and leading customers. *In fourth quarter of 2018, we reported 256% year-over-year revenue growth,* which included the first full quarter of our accretive Artilium acquisition.  We are extremely pleased with Pareteum's significant results in 2018 which are attributed

to our TEUM's laser focus on sales expansion and operational improvements. Looking ahead to 2019, we are very excited about the tremendous opportunities for Pareteum given the strong industry dynamics; *our visibility into future revenue from our 36 Month Contractual Revenue Backlog*; and, the augmented talent, product, services, network expansion and productivity improvements implicit from our strategic acquisitions.

301.   In a section entitled "Recent Business Highlights," Defendants noted that the Company had "closed a $50M credit facility with Post Road Group in February 2019" and that an "initial draw" of $25 million of the $50 million Credit Facility would be used, to "repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions."

302.   Finally, regarding 2019 Full Year Guidance, the March 12, 2019 press release forecast ***wildly-accelerating growth in the range of 225 – 260% year-over-year***, as follows:

*We expect revenue to be between $105 million and $115 million for the full year of 2019.* Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.

We are expecting ***2019 revenue growth in the range of 225% to 260% year-over-year****, outpacing the market growth rate fivefold to be updated quarterly.*

303.   Later on March 12, 2019, Defendants hosted an earnings call with analysts and investors, during which they reiterated many of the same materially false and misleading statements as had been made previously in press releases and SEC filings. In addition, Defendant Turner stated, in part, that:

Pareteum delivered excellent results in 2018 as well as in the fourth quarter of 2018. *Pareteum's prospects are now the very best, more than ever before in our history. There is **a clear path ahead for dramatic revenue growth and this is fueled by the growth of our 36 Month Contractual Revenue Backlog and its conversion of that backlog** into billing customers.* Artilium, which we acquired in October of 2018, has performed extraordinarily well. Bart, I want to thank you and all of our new Artilium teammates for that. Artilium was accretive to earnings and revenue just as we said that it would be. Well done, Bart and team.

Since our acquisition of iPass closed just a few weeks ago, many good things have happened. We've got newly -- new high experienced teammates joining with their extremely solid business acumen, their operating muscle, and importantly, we see that our new teammates are highly energized by the significantly expanded prospects that come with their being part of Pareteum.

\* \* \*

For the remainder of 2019, we have *a current robust pipeline of another 29 prospective sales transaction*s, and that's what's been identified just through mid-March. *Pareteum's potential addition to our 36-month contractual revenue from these identified customers in our pipeline is currently $166 million.*

304.   In addition to the foregoing, during the same March 12, 2019, earnings call,

Defendant McCarthy (identified in the transcript as Pareteum President), also stated, in part, that:

*We generated $14.3 million of revenue in the fourth quarter* and our gross margins were 63%, in line with expectations post the Artilium acquisition.

\* \* \*

***Our key performance indicators continue to exceed plans. Connections***, which is our term for subscribers, devices and their connectivity usage, have grown over 4-point -- to over 4.6 million at the end of the fourth quarter. ***36 Month Contractual Revenue Backlog converted into live production incremental monthly revenue was at 97% of scheduled conversion for the fourth quarter while we're maintaining an average over 100% for the year.***

\* \* \*

Finally, as we mentioned during our last call, ***we are decidedly a growth company*** . . . .

305.   Finally, on March 18, 2019, Pareteum filed with the SEC Form 10-K Annual

Report for the year ended December 31, 2018 (previously defined as the "FY2018 Form 10-K"),

which was signed by Defendants Turner, Bozzo, O'Donnell, van Sante, Jimenez-Tunon, and

Lippert, certified by Defendants Turner and O'Donnell, and made substantially similar

materially false and misleading statements concerning Pareteum's revenues and customer growth

as outlined above. Specifically, therein, the Company reported, for the full year ended December

31, 2018, revenue of $32,435,736, cost of revenues (formerly called "cost of service") of

$10,329,646, a net loss of $(12,974,650), accounts receivable of $15,361,594, and numerous other balance sheet line items.

306.   The statements made by these Defendants outlined above in ¶¶297-305 and contained in the Company's March 7, 2019 Chairman's Letter and March 12, 2019 press release, earnings call, and FY2018 10-K regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)   When these statements were made, there was no factual basis for the Company's representations regarding its purported $615 million Backlog value, that it was experiencing "record" results, that its Backlog conversion rate was "over 100% for the year," that its Backlog and connection metrics "provided it with "visibility into future revenue," that its guidance should be in the range of 225 – 260% year-over-year, or that it had a "a clear path ahead for dramatic revenue growth . . . fueled by the growth of our [Backlog] and its conversion" because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(b)   In reality, because the Backlog was artificially inflated and unreliable, as revealed in the Restatement release and outlined in considerable detail above (¶¶270, 283, 285,

287, 289), the Backlog was not a "lead indicator" of the Company's revenue or financial and operating results and did not provide it with "visibility into future revenue";

(c)     When these statements were made, there was no factual basis for the Company's representations regarding its quarterly or annual revenue because, as the Company admitted in its Restatement, for the full year ended December 31, 2018 and the interim periods ended March 31, 2019 and June 30, 2019, certain revenues recognized during this period should not have been recorded during that period, the Company prematurely or inaccurately recognized revenues during that period, those errors were expected to impact revenue, cost of service, operating income, net loss, accounts receivable, and numerous other balance sheet line items, and investors should therefore no longer rely on these financial statements; and

(d)     When these statements were made, the Company was about to or had already defaulted on the terms of this Credit Facility in that it had failed to make even its intimal interest payments, failed to fulfill its reporting obligations, and was unable to obtain and timely deliver the consents required, as detailed in ¶¶162-163 above, such that it could not access any additional funds.

307.    The FY2018 Form 10-K also made the following statements regarding the Company's Revenue Recognition:

Revenue Recognition and Net billings in excess of revenues

Revenue represents amounts earned for (non-software) arrangements consisting of hosting subscriptions for mobile and security solutions. We also offer customer support and professional services related to implementing and supporting our suite of applications. Revenues generally are recognized net of any taxes collected from customers and subsequently remitted to governmental authorities.

In May 2014, the FASB issued Accounting Standards Update No. 2014-09 (Topic 606) "Revenue from Contracts with Customers." Topic 606 supersedes the revenue recognition requirements in Topic 605 "Revenue Recognition" (Topic 605), and requires entities to recognize revenue when control of the promised

goods or services is transferred to customers at an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. ***We adopted Topic 606 as of January 1, 2018 using the modified retrospective transition method.***

* * *

Monthly Service Revenues

The Company's performance obligations in a monthly Software as a Service (SaaS) and service offerings are simultaneously received and consumed by the customer and therefore, are recognized over time. For recognition purposes, we do not unbundle such services into separate performance obligations. The Company typically bills its customer at the end of each month, with payment to be received shortly thereafter. The fees charged may include a combination of fixed and variable charges with the variable charges tied to the number of subscribers or some other measure of volume. Although the consideration may be variable, the volumes are estimable at the time of billing, with "true-up" adjustments occurring in the subsequent month. Such amounts have not been historically significant.

Installation and Software Development Revenues

The Company's other revenues consist generally of installation and development projects.

Installation represents the activities necessary for a customer to obtain access and connectivity to the Company's monthly SaaS and service offerings. While installation may require separate phases, it represents one promise within the context of the contract.

Development consists of programming and other services to add new, additional or customized functionality to a customer's existing service offerings. Each development activity is typically its own performance obligation.

Revenue is recognized over time if the installation and development activities create an asset that has no alternative use for which the Company is entitled to receive payment for performance completed to date. If not, then revenue is not recognized until the applicable performance obligation is satisfied.

Arrangements with Multiple Performance Obligations

The Company's contracts with customers may include multiple performance obligations. For such arrangements, the Company allocates revenue to each performance obligation based on its relative standalone selling price. The Company generally determines standalone selling prices based on the prices charged to customers.

130

\* \* \*

Contract Assets

Given the nature of the Company's services and contracts, it has no contract assets.

Beginning in 2013, when our business was transitions form the landline business to the mobile and security solutions business, the Company entered multiple element arrangements which are accounted in accordance with ASC 605 "Revenue Recognition-Multiple Element Arrangements" for revenue recorded prior to the adoption of ASC Topic 606 "Revenue for Customers with Contracts".

The elements in a multiple element arrangement are identified and are separated into separate units of accounting when both of the following criteria are met: The delivered item or items have value to the customer on a stand-alone basis, meaning the delivered item or items have value on a standalone basis if it sold separately by any vendor or the customer could resell the delivered item or items on a stand-alone basis. And if the arrangement includes a general right of return related to the delivered item, delivery or performance of the undelivered item or items are considered probably and substantially in the control of the Company. Total consideration of a multiple-element arrangement is then allocated using the relative selling price method using the hierarchy prescribed in ASC 605. In accordance with that hierarchy if fair value of the vendor specific objective evidence (VSOE) or, third-party evidence (TPE) does not exist for the element, then the best estimated selling price (BESP) is used.

Since the Company has neither VSOE nor TPE, the Company determines BESP for all deliverables in their hosting arrangements. In determining the BESP, the Company considers multiple factors which include, and are not limited to, the following: (i) gross margin objectives and internal costs for services; (ii) pricing practices, market conditions; (iii) competitive landscape; and (iv) growth strategy.

Accordingly, management's judgment is applied regarding, among other aspects, conformance with acceptance criteria and if delivery of services has occurred and the degree of completion.

In the paragraphs below, we explain the revenue recognition policy for each element.

For the mobile solutions services the Company recognizes revenues from customers accessing our cloud-based application suite in two different service offerings, namely managed services and bundled services.

For managed services, revenues are recognized for network administration services provided to end users on behalf of Mobile Network Operators (MNO) and virtual Mobile Network Operators (MVNO's). Managed service revenues are recognized monthly based on an average number of end-users managed and calculated on a pre-determined service fee per user. For bundled services, the Company provides both network administration as well as mobile airtime management services. Revenues for bundled services are recognized monthly based on an average number of end-users managed and mobile air time and calculated based on a pre-determined service fee. Technical services that meet the criteria to be separated as a separate unit of accounting are recognized as the services are performed. Otherwise they are deferred and recognized over the contract term. Our arrangements with customers do not provide the customer with the right to take possession of the software supporting the cloud-based application service at any time.

Telecommunication revenues were recognized when delivery occurred based on a pre-determined rate and number of user minutes and number of calls that the Company has managed in a given month.

Professional services and other revenue include fees from consultation services to support the business process mapping, configuration, data migration, integration and training. Amounts that have been invoiced are recorded in accounts receivable and in net billings in excess of revenues or revenue, depending on whether the revenue recognition criteria have been met. Revenue for professional and consulting services in connection with an implementation or implantation of a new customer that is deemed not to have stand-alone value is recognized over the contractual period commencing when the subscription service is made available to the customer. Revenue from other professional services that provide added value such as new features or enhancements to the platform that are deemed to have standalone value to the customer or are sold separately from the original hosting arrangement, are deferred and revenue recognition occurs when the feature is activated.

The Company used revenue recognition standards for ASC 605 for the year ended December 31, 2017 and adopted the revenue recognition standards for ASC 606 beginning on January 1, 2018 using the modified retrospective transition method and applied these standards for the full year ended December 31, 2018.

* * *

Adoption of ASC Topic 606, "Revenue from Contracts with Customers"

**On January 1, 2018, we adopted Topic 606 using the modified retrospective method applied to those contracts which were not completed as of January 1, 2018. Results for reporting periods beginning after January 1, 2018 are presented under Topic 606**, while prior period amounts are not adjusted and

continue to be reported in accordance with our historic accounting under Topic 605.

* * *

Revenue Recognition

Our revenues represent amounts earned for our mobile and security solutions. Our solutions take many forms but our revenue generally consists of fixed and/or variable charges for services delivered monthly under a combined services and SaaS model. We also offer discrete (one-time) services for implementation and for development of specific functionality to properly service our customers.

The following table presents our revenues disaggregated by revenue source:

(1) As noted above, prior period amounts have not been adjusted under the modified retrospective method.

Monthly services revenues are recognized at a point in time and amounted to $28,467,985 and $12,540,377 for the years ended December 31, 2018 and 2017, respectively. Installation and software development revenues are recognized over time and amounted to $3,967,751 and $1,007,130 for years ended December 31, 2018 and 2017, respectively.

* * *

Monthly Service Revenues

The Company's performance obligations in a monthly Software as a Service (SaaS) and service offerings are simultaneously received and consumed by the customer and therefore, are recognized over time. For recognition purposes, we do not unbundle such services into separate performance obligations. The Company typically bills its customer at the end of each month, with payment to be received shortly thereafter. The fees charged may include a combination of fixed and variable charges with the variable charges tied to the number of subscribers or some other measure of volume. Although the consideration may be variable, the volumes are estimable at the time of billing, with "true-up" adjustments occurring in the subsequent month. Such amounts have not been historically significant.

Installation and Software Development Revenues

The Company's other revenues consist generally of installation and development projects.

Installation represents the activities necessary for a customer to obtain access and connectivity to the Company's monthly SaaS and service offerings. While installation may require separate phases, it represents one promise within the context of the contract.

Development consists of programming and other services to add new, additional or customized functionality to a customer's existing service offerings. Each development activity is typically its own performance obligation.

Revenue is recognized over time if the installation and development activities create an asset that has no alternative use for which the Company is entitled to receive payment for performance completed to date. If not, then revenue is not recognized until the applicable performance obligation is satisfied.

Arrangements with Multiple Performance Obligations

The Company's contracts with customers may include multiple performance obligations. For such arrangements, the Company allocates revenue to each performance obligation based on its relative standalone selling price. The Company generally determines standalone selling prices based on the prices charged to customers.

Net Billings in Excess of Revenues

The Company records net billings in excess of revenues when payments are made in advance of our performance, including amounts which are refundable. Net billings in excess of revenues was $927,780 as of December 31, 2018, an increase of $684,794, as compared to $242,986 for December 31, 2017.

Payment terms vary by the type and location of our customer and the products or services offered. The term between invoicing and when payment is due is not significant. For certain products or services and customer types, payment is required before the products or services are delivered to the customer.

Contract Assets

Given the nature of the Company's services and contracts, it has no contract assets.

308.    These statements were likewise materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶173 and ¶306(c).

### 10.   **First Quarter 2019 Statements**

309.   On February 14, 2019, the Company published a press release announcing that Pareteum grew "FY2018 36 Month Contract Revenue Backlog to $615M," and that "sales surge yields $15 million in new contracts in the final two weeks of the year." This press release further stated:

> [Pareteum,] *a rapidly growing* global cloud software communications platform company with a mission to connect "every person and every(thing)", today announced that it closed FY2018 with six new three-year agreements with new and existing customers, worth a total of $15 million. Combined with previously announced contracts, *Pareteum's 36-month contractual revenue backlog now totals $615 million.* In addition, eight agreements that were announced in November and early December have been launched into production.

310.   This press release quoted Defendant Turner as stating:

> As demonstrated with our new clients, *Pareteum is starting 2019 stronger than ever,* growing and satisfying our customers' needs, innovating at a relentless pace ahead of others. We are in the business of inspiring and growing towards the future, *operating profitably*, and recognizing and believing that 'we are all in sales'.

This press release also quoted Defendant Mumby, Pareteum's Chief Revenue Officer, as stating:

> Our strong position at the end of 2018 is exceeded by *further strong growth into 2019 and indicates the scale of opportunities open to Pareteum*. We continue to have a strong focus on sales and our service delivery as we launched eight customers in December. We have never been better positioned to empower businesses with the latest connectivity and cloud platform mobility solutions.

311.   On February 15, 2019, Pareteum published a press release that purported to announce that "Sales Momentum [had brought] $49 million in 36 Month Contract Revenue Backlog." This press release further stated:

> [Pareteum,] *a rapidly growing* global cloud software communications platform company with a mission to connect "every person and every(thing)", today announced that it closed twelve agreements in January including new customers as well as upselling to our existing customers.

312.   This press release again quoted Defendant Turner as stating:

135

We love our customers, whether they are simply buying more from us or are new customer relationships deriving value from the significant savings and new revenues we help them generate. These new January agreements reinforce how easy it is to do business with [Pareteum] and is yet another step in our mission to connect every person and "every(thing)" through open mobility and applications everywhere."

This release also quoted Defendant Mumby, Pareteum Chief Revenue Officer as stating:

*Pareteum is experiencing great success* with developers and enterprises for our cloud software solutions[.] . . .With the addition of these new agreements, ***we're confident we will continue accelerating our growth*** as the market's first choice for cloud software communications solutions, expanding our ever growing reach, empowering businesses worldwide.

313.   On February 20, 2019, Pareteum published another press release that purported to announce it had launched "Six Customer Agreements into Production in January."  This press release quoted Defendants Bozzo and Turner as stating:

We continue to move signed customers from our contract backlog into production and revenue generation mode, delivering immediate value," said Bozzo . . . .

Turner comments, "*We are rapidly bringing our customers into service production*, enabling them to realize their business plans, creating unique mobility and application software solutions. The ability to quickly accomplish all this, without heavy infrastructure or software development cost, keeps our customers coming back for more.

314.   On March 5, 2019, Pareteum issued another press release purporting to announce big contract wins, *with at least 20 new customers amounting to $30 million in that one month*.

This press release quoted Defendants Bozzo and Turner, as stating:

Turner commented: "These new customers have chosen Pareteum because we solve real problems and add immediate value to their operations. This is our "Power of ONE TEUM" – by bringing together Pareteum, Artilium, and iPass, we are delivering innovative, easy to use products and services that are the leading edge of this industry. This is how we "reimagine communications" everyday. It is our customers, who have been with us for years and continue to buy more services from us, coupled with our newest relationships, who have benefited most from TEUM's growing market momentum and have contributed to our ever expanding service reputation for quality and dependability."

Bozzo . . . , added: "***Our plan*** to establish Pareteum as the leader in communications services ***is progressing well***. We are very pleased with the traction over the last month and the growing list of customers who are choosing to partner with Pareteum to deliver innovative communications services."

315.    On March 15, 2019, Pareteum issued another press release again purporting to announce big contract wins.  The press release claimed the Company had acquired 10 new customers amounting to $17 million in the first half of that month.  This press release again quoted Defendants Turner and Mumby:

> Chief Revenue Officer Rob Mumby added, "We are seeing a fantastic response to our enhanced and expanded offering across all sectors. I am confident we will continue to gain traction with our market-leading cloud services as we move towards the next quarter."

> Turner, commented, "These new customer wins reflect our deep understanding of the challenges faced by a diverse range of dynamic, market-leading organizations, and the great response our solutions represent to those challenges. *Our momentum continues to grow* in the wake of our acquisitions of Artilium and iPass, and our One TEUM strategy is delivering rich rewards."

316.    On March 28, 2019, Pareteum again purported to announce big contract wins, this time announcing a purported $50 million Global Expansion Contract with an unidentified Streaming Media Brand.  This press release stated that "[t]he initial phase of the contract is valued in excess of $50 million, which is incremental to Pareteum's 36-month contractual revenue backlog."

317.    The March 28, 2019 press release again quoted Defendants Bozzo (identified as the Company's CEO) and Turner (Executive Chairman), as follows:

> "This is a showcase significant strategic win for Pareteum which further proves the value of our recent acquisitions in driving cross- and up-sell opportunities within our addressable markets and rapidly growing customer base," said Bozzo. . . .

> [Turner] commented, "This latest partnership provides another great example of how Pareteum empowers brands to interact with customers to deliver targeted, locally relevant services and experiences, on a global basis. With our Global

137

Smart Network, and Global Software Experience Platform, our brand partners can provide rich digital services from anywhere, to anywhere. Geographical boundaries no longer matter."

318.   On April 2, 2019, the Company published a press release announcing a 3-year, $22 million contract with a new customer who was building a global blockchain-based Wi-Fi sharing community.

319.   On April 4, 2019, Pareteum issued another press release, this time purporting to announce *$100 million in New Sales Agreements During March*.   Defendants Turner and Mumby again used the Company's press release to condition the market to believe in the false hyper-growth narrative:

Turner, commented, "We have developed, built, and delivered software services for a wide range of customers and we are rapidly moving into new markets and territories with 'communications reimagined' services. This record performance, *our very first $100 million new 36MCRB sales month*, reflects the strong value customers derive as they continue to buy our services. All Pareteum TEUMATES have had a hand in the performance and I congratulate each of our colleagues."

Pareteum's Chief Revenue Officer, Rob Mumby, added, "We continue to win great new customers while positioning ourselves to become increasingly strategic to existing customers with our highly flexible cloud communications services."

320.   On April 9, 2019, the Company published a press release announcing the deployment of services for seven new customers during March 2019, and that the Company's Backlog grew to $938 million.

321.   On May 15, 2019, Defendants published a press release that purported to announce $70 million in New Sales Agreements in April in connection with the closing of at least 20 new sales transactions.   This press release quoted Defendants Turner and Mumby, as follows:

"*We continue to drive growth through our sales efforts* as our addressable markets expand and our cloud-based SaaS products and solutions are able to deliver new

requirements in an increasingly connected world," said [Defendant] Turner. . . . "At Pareteum, we believe we are 'all in sales' and we are pleased with another strong monthly performance."

"Each new customer represents an opportunity to build a unique and strategic relationship and facilitates cross-sell and up-sell of our expanding suite of global cloud software capabilities," added Rob Mumby.

322.    On May 28, 2019, the Company hosted an invitation only, RSVP-required Investor Day wherein it "provide[d] updates on the Company's vision, new product offerings and growth strategies," which also included "select Pareteum partners and customers."  There, the Company gave a presentation that contained many of the same false and misleading statements regarding the Company's sales, revenues, and purported growth as described herein.  Moreover, the presentation included the following slide:



323.    In addition to the reasons set forth below in ¶326 regarding the statements made during the first half of 2019, the statements made by these Defendants in the May 28, 2019 investor presentation in particular were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that

time, because the purported customer logos included with the presentation were replete with double counting and related and/or non-existent customers. For example, according to the Viceroy Report, the Company included the logos for both Vodaphone and Lowi.es, which is simply Vodaphone's Spanish telecom business. What is more, the Company included the logos *of its own subsidiaries* and the logo of a company that dissolved in 2017. Lead Plaintiff's independent investigation has confirmed these findings, including that *bliep, Ello Mobile, SpeakUp, and United Telecome, companies whose logos are included above, are actually *subsidiaries of Pareteum* as a result of its acquisition of Artilium in 2018 and are described as such in various filings with the SEC. That investigation also confirmed that three logos in the slide above belong to one company, Belgacom, which acquired Scarlet in 2008, and then rebranded as Proximus in 2015. Likewise, SOL Mobile was dissolved as of August 8, 2017, years before this slide was created; Pronto Telecom (the satellite dish logo) does not appear to have a phone number and appears to be run out of an apartment; Bellingham's website no longer works, its phone number is no longer in service, its LinkedIn page lists only one employee, and it likewise appears to be run out of an apartment; and Apeiron's website also no longer works and its phone number is also no longer active.

324.    The May 28, 2019 investor presentation also hosted a "customer panel," in which it identified the following "customers":



325.    As is apparent, the slide misleadingly identified Defendant Jimenez-Tunon – a member of the Board – as a "customer." And, while, the Presentation did elsewhere identify Defendant Jimenez-Tunon as a then-current director of the Company, the presentation entirely failed to disclose (despite providing a more in-depth biography) that Ali Davachi, another supposed "customer," was also affiliated with the Company, having been appointed Chief Technology Officer and Chief Operating Officer in December 2017 and who was, according to filings with the SEC, being compensated in Company shares for "software development services":

141



326.    The statements made by these Defendants outlined above in ¶¶309-325 and contained in the Company's first quarter of 2019 press releases, publications, and/or filings with the SEC regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)     When these statements were made, there was no factual basis for the Company's representations regarding its Backlog value, that it was "rapidly growing," that it was "experiencing great success," that it was "confident [it would] continue accelerating [its] growth," that it had an "ever growing reach," that its plan . . . [wa]s progressing well," or that its "momentum continues to grow" because   (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement

and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(b)     In reality, because the Backlog was artificially inflated and unreliable – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) –  the Backlog, as a matter of fact, did not provide reliable visibility into the Company's business operations and revenue recognition.

## 11.     First Quarter 2019 Operating Results and Form 10-Q

327.     On May 7, 2019, Pareteum published a press release announcing its purported results for the first quarter of 2019, for the period ended March 31, 2019.  Therein, the Company reported:

> Q1 Revenue of $23 Million Drives Growth of 460% Year-over-Year
> Q1 Adjusted EBITDA of $5.2 Million
> Net Dollar-Based Expansion Rate of 144% Year-over-Year
> Increases Full Year 2019 Guidance – Projecting 255-285% Year-over-Year
> Revenue Growth
>
> * * *
>
> FIRST QUARTER 2019 FINANCIAL RESULTS:
> (Unless otherwise noted, all comparisons are made to the first quarter of 2018)
>
> - ***Total revenues increased 460% to $23 million Adjusted EBITDA increased 1,723% to $5.2 million***
> - Non-GAAP EPS of $0.02 cents
> - Artilium and iPass financials are consolidated and accretive in Pareteum's first quarter results
> - Net Dollar-based expansion rate represented 144% growth
> - Increase in total assets from $27.2 million at March 31, 2018 to $236.9 million at March 31, 2019
> - Cash balance of $10.7 million
>
> - KEY FIRST QUARTER OF 2019 OPERATIONAL METRICS:

- ***36-Month Contractual Revenue Backlog increased to $938 million*** for the first quarter of 2019, up from $200 million in the first quarter of 2018 with a conversion rate to revenue of 101%
- ***Connections increased 441% to 12,012,000 for the first quarter of 2019***, and grew 161% sequentially in the first quarter of 2019
- First quarter average annualized revenue per employee of $390,000, an increase of 55% year over year

| | Sequential Quarterly Key Metrics | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ($000's) | Q1 2019 | | Q4 2018 | | Q3 2018 | | Q2 2018 | | Q1 2018 |
| REVENUE | 23,040 | | 14,312 | | 8,008 | | 6,003 | | 4,113 |
| YEAR-OVER-YEAR REVENUE GROWTH | 18,927 | 460% | 10,297 | 256% | 4,509 | 129% | 2,764 | 85% | 1,318 | 47% |
| GROSS MARGIN | 12,972 | 56% | 9,085 | 63% | 5,879 | 73% | 4,223 | 70% | 2,918 | 71% |
| ADJUSTED EBITDA | 5,156 | | 2,339 | | 1,782 | | 1,297 | | 283 |
| EBITDA | (2,485) | | (3,093) | | (5,851) | | 597 | | (869) |
| CASH BALANCE | 10,699 | | 6,052 | | 18,865 | | 19,205 | | 15,759 |
| 36 MONTH CONTRACTUAL REVENUE BACKLOG | 938,000 | | 615,000 | | 403,000 | | 276,000 | | 200,000 |
| CONNECTIONS | 12,012 | | 4,609 | | 2,903 | | 2,714 | | 2,220 |

328.    In addition to the foregoing, the May 7, 2019 press release also quoted Defendant Turner as stating:

> We are very pleased with our strong first quarter results, delivering ***460% revenue growth in Q1 2019 compared to Q1 2018***. Pareteum's core business, pre-acquisitions, has grown 33% over the prior quarter," commented Turner. "We are proud of the significant business transformation we have achieved over the past few years. *Pareteum is a fast-growing and profitable* SaaS and communications service provider. *Our software and platform solutions are unique in the market*, our global TEUM is executing, *we are well positioned to capture the large market opportunity,* and we are committed to our mission to connect every person and every(thing)™.

329.    In a section entitled "Recent Business Highlights," Defendants again noted that the Company had "closed a $50M credit facility with Post Road Group in February 2019" and that that an "initial draw" of $25 million of the $50 million Credit Facility would be used to "repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions."

330.    This press release purported to provide and update the Company's 2019 Full year Guidance, raising purported growth expectations – now as high as ***285% year-over-year*** – as follows:

> ***We expect revenue to be between $115 million and $125 million for the full year of 2019***. Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.

> We are expecting ***2019 revenue growth in the range of 255% to 285% year-over-year***, outpacing the market growth rate fivefold to be updated quarterly.

331.    Later on May 7, 2019, Defendants hosted an earnings call with analysts and investors during which they reiterated many of the same materially false and misleading statements regarding the Company's revenue growth and customer base as they had made previously in press releases and SEC filings. In this regard, Defendant Turner used this opportunity to condition the market to believe, in part, in the Company's remarkable performance and hyper-growth:

> Now to our business at hand. *Pareteum is performing extremely well.* Without taking too much of Denis's thunder from his results review coming shortly. *We reported a 460% Q1 2019 over Q1 2018 revenue increase*, more from Denis on that shortly. However we are on target with our products delivered, those being developed, our markets served and those that we will expand to. Our customers who are onboarding now even more efficiently and our people, matching the very best resources to address every opportunity we have. In every sense, this Company has reimagined the future of communications and we're delivering on it today.

> Our mission of connecting every person and everything is also on track. ***We're on plan financially and we're well above our expectations and sales results.*** We're raising the quality of customer experiences everyday and we're raising our results and performance expectations with operational transparency. ***As a growth Company***, we're expanding in a financially responsible manner.

332.    During the May 7, 2019 earnings call, regarding the Company's Backlog metric, Defendant Turner further stated:

To complete the 36-month contract revenue backlog topic, ***the most important phase for Pareteum is to convert these contracts to billable revenues***. This means new sales orders placed into live production, based upon their contracted schedules for service, invoices rendered, being billed and revenues collected. *Our backlog conversion metrics show this story and we're doing very well in this regard.*

I'd like to share a couple of details with you. From the inception of tracking the services deployed during the period of January the 1st, 2017 through March the 31st of 2019, that's a 27-month period, *we converted revenues in the backlog as they were scheduled at 101%. We converted connections which is our word for subscribers at 122%.* This means that taking each contract and comparing what was contractually scheduled by the customers. In both the revenue and connections, we ***we've over retained and outperformed what had been expected***. We're very pleased with this growth performance. But I must tell you we're even more pleased with what I'm about to say to you.

333.    During the May 7, 2019 earnings call, Defendant McCarthy (identified in the call transcript as the Company's President), also stated:

> "We have achieved organic growth of 32% over the prior-quarter from the combined Pareteum and our Artilium business . . .
>
> * * *
>
> As discussed on our year-end call, *we established a new $50 million credit facility* with Post Road Group and retired the more expensive debts acquired in the iPass acquisition. *The facility also provides us with significant available liquidity going forward should we need it.*
>
> *While we currently have no plans for the additional capital to operate our business, it gives us additional security and flexibility.* I want to reinforce Hal's comments about the remarkable transformation that Pareteum has achieved, along with this rapid growth and transformation, ***we have experienced some challenges including those related to our internal controls***, primarily as a result of M&A integration.

334.    On May 10, 2019, Pareteum filed with the SEC a Form 10-Q quarterly report for the first quarter ended March 31, 2019 (hereinafter, the "1Q:2019 Form 10-Q"), which was signed and certified by Defendants Turner and O'Donnell and made substantially similar materially false and misleading statements concerning Pareteum's revenues and customer growth

146

as outlined above. Specifically, therein, the Company reported revenue of $23,039,913, cost of service of $10,068,283, a net loss of $(5,778,515), accounts receivable of $28,644,699, and numerous other balance sheet line items.

335.    The statements made by these Defendants outlined above in ¶¶327-334 and contained in the Company's May 7, 2019 1Q2019 earning release and earnings call and its May 10, 2019 1Q:2019 Form 10-Q regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)    When these statements were made, there was no factual basis for the Company's representations regarding its $938 million Backlog value, that it had experienced "460% revenue growth," that it had "retained and outperformed what had been expected," that it was "on plan financially and . . . well above our expectations and sales results," and that it "expect[ed] revenue to be between $115 million and $125 million for the full year of 2019" because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(b)    In reality, because the Backlog was artificially inflated and unreliable, as revealed in the Restatement and outlined in considerable detail above (¶¶270, 283, 285, 287,

289), the Backlog was not a reliable indicator of the Company's revenue or financial and operating results;

(c)     When these statements were made, there was no factual basis for the Company's representations regarding its revenue, cost of service, operating income, net income, accounts receivable, and numerous other balance sheet line items, because, as the Company admitted in its Restatement, for the full year ended December 31, 2018 and the interim periods ended March 31, 2019 and June 30, 2019, certain revenues recognized during this period should not have been recorded during that period, the Company prematurely or inaccurately recognized revenues during that period, those errors were expected to impact revenue, cost of service, operating income, net loss, accounts receivable, and numerous other balance sheet line items, and investors should therefore no longer rely on these financial statements; and

(d)     When these statements were made, the Company was about to or had already defaulted on the terms of this Credit Facility in that it had failed to make even its intimal interest payments, failed to fulfill its reporting obligations, and was unable to obtain and timely deliver the consents required, as detailed in ¶¶162-163 above, such that it could not access any additional funds.

336.    The 1Q:2019 Form 10-Q also made statements regarding the Company's Revenue Recognition that were substantially identical to those outlined above in ¶_, except that they updated the chart purporting to break down the Company's revenues disaggregated by source for the current quarter. These statements were likewise materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶173 and 335(c).

### 12.  <u>Second Quarter 2019 Statements</u>

337.     According to a June 10, 2019 report published by Insider Monkey and entitled,

"Pareteum Corporation (TEUM) Responds to Short Seller Aurelius Value's Accusations,"

Defendant Turner responded to the Aurelius Report with a ***categorical denial***:

> Dear Fellow Pareteum Shareholders,
>
> I want to take a moment to thank all of you for your support as we drive Pareteum forward.
>
> In recent days our share price has been negatively impacted by a coordinated attack by short sellers. We fully understand that short selling is legal and it is an important part of the capital markets. That said, certain short sellers have used questionable tactics, including leveraging the media to misrepresent facts and make anonymous spurious claims against the company and its officers.
>
> Every one of us at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company. ***We categorically deny the allegations put forth. We do not intend to legitimize those reports by delving in to them.***
>
> ***Pareteum has experienced tremendous growth, and we continue to grow in a healthy and measurable way.*** We are confident in our strategy and mission – to connect every person and every(thing)™. Today millions of people and devices around the world are connected using Pareteum's Global Cloud Communications Platform, enhancing their mobile experience. Every day more people and devices are being added to our platform.
>
> We will not be distracted.  We continue to focus on operating our business and generating strong financial results.  We believe executing on this plan will ultimately create significant value for long term shareholders.
>
> We will report our Q2 results in early August, and look forward to speaking with you then.
>
> Again, I want to thank all of our shareholders for their continued support.
>
> Sincerely,
>
> Hal Turner

Chairman and Chief Executive Officer[31]

338.    Thereafter, on July 1, 2019, Pareteum attempted to further reassure investors and the market by publishing a press release that purported to provide "an early view of [the Company's] results on a one-time basis given the compelling quarter and in advance of several planned institutional investor meetings in July," announcing that "its positive preliminary results for the second quarter of 2019 will exceed current analysts' consensus of $26.2 million for revenue and $4.1 million for Adjusted EBITDA."

339.    During the Company's August 6, 2018 earnings call, Defendant Turner went out of his way to defend the use of the Backlog metric, then announced that the Company would replace the Backlog metric with something else, but then continued to insist that Pareteum "expected growth":

> However, new sales order 36-month **backlog metric will now be replaced as an external metric**. **It has served its purpose** and now provides us significant internal transparency into new sales orders and their conversion into billable revenues. We can now see clearly the strength in our revenues and their expected growth, *therefore it is our reported quarterly results and the annual guidance provided, which are the strongest indicators of* **our expected growth and continued financial successes** *in the coming periods*. We will, therefore, formerly retire backlog as a key performance indicator and no longer report it after Q3 of this year.

340.    On August 26, 2019, in another press release, Defendant Turner continued to push the false growth narrative:

> We are pleased to conclude this Amendment, which puts the company on a firm footing for **our ambitious growth strategies that will continue to be executed this quarter and beyond**. The additional flexibility afforded by this Amendment ensures we are able to be as agile and responsive in our corporate development activities as we are for our customers.

---

[31]    According to the Viceroy report, after the release of the Aurelius Report, Pareteum apparently retracted and modified slide decks, specifically their customer lists.

341.    And, on October 15, 2019 – six days before the Restatement – the Company continued to describe itself as a "rapidly growing cloud communications platform company."

342.    The statements made by these Defendants outlined above in ¶¶337-341 and contained in the Company's second quarter of 2019 statements regarding the Company's false hyper-growth narrative and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and for the following additional reasons:

(a)    When these statements were made, there was no factual basis for the Company's representations that it "categorically denied" the allegations in the Aurelius and Viceroy Reports because the allegations in those Reports were, in large part, verifiably accurate, it had not undertaken in investigation into those allegations, and it and the Fraud Defendants knew that those allegations were true;

(b)    When these statements were made, there was no factual basis for the Company's representations that it has "experienced tremendous growth," that it "expected growth and continued financial success," or that it expected to "continue to grow in a healthy and measurable way" because (i) these statements were based on the Company's faulty connections metrics, which were artificially inflated and unreliable, (ii) these statements appear to have also still been based on the Company's faulty Backlog metric, which, while now unreported, the Company was purportedly still using for "internal transparency," and which was artificially inflated and unreliable, and (iii) these statements were based on the ability to convert the contracts that made up the Backlog metric to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made; and

(c)     In reality, because the Backlog was artificially inflated and unreliable, as revealed in the Restatement and outlined in considerable detail above (¶¶270, 283, 285, 287, 289), the Backlog was not a reliable "internal" indicator of the Company's revenue or financial and operating results.

### 13.     Second Quarter 2019 Operating Results and Form 10-Q

343.     On August 6, 2019, Pareteum published a press release announcing its purported results for the second quarter of 2019, for the period ended June 30, 2019.   Therein, the Company reported:

*Q2 Revenue of $34 Million Drives Growth of 469% Year-over-Year*

Q2 Adjusted EBITDA of $6.1 Million

Net Dollar-Based Expansion Rate of 151% Year-over-Year

*Increases Full-Year Revenue Guidance – Projecting 270-301% Year-over-Year Revenue Growth*

\* \* \*

SECOND-QUARTER 2019 FINANCIAL RESULTS YEAR-OVER-YEAR:

- ***Total revenue increased 469% to $34.1 million***
- Income from Operations totaled $159,000
- EBITDA increased 466% to $3.4 million
- Adjusted EBITDA increased 369% to $6.1 million
- Non-GAAP EPS of $0.03 (Non-GAAP EPS of $0.05 for the 6 months ending June 30, 2019)
- Net Dollar-based expansion rate represented 151% growth
- Increase in total assets from $33.1 million at June 30, 2018 to $246.9 million at June 30, 2019

\* \* \*

KEY SECOND-QUARTER OPERATIONAL METRICS:

- ***Connections increased 380% to 13,030,000 for the second quarter of 2019, and grew 108.5% sequentially for the first half of 2019***

152

- Second-quarter average annualized revenue per employee of $583,000, an increase of 55% year-over-year

| ($000's) | Q2 2019 | | Q1 2019 | | Q4 2018 | | Q3 2018 | | Q2 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Sequential Quarterly Key Metrics | | | | | |
| REVENUE | 34,148 | | 23,040 | | 14,312 | | 8,008 | | 6,003 | |
| YEAR-OVER-YEAR REVENUE GROWTH | 28,145 | 469% | 18,927 | 460% | 10,297 | 256% | 4,509 | 129% | 2,764 | 85% |
| GROSS MARGIN | 18,812 | 55% | 12,972 | 56% | 9,085 | 63% | 5,879 | 73% | 4,223 | 70% |
| ADJUSTED EBITDA | 6,081 | | 5,156 | | 2,339 | | 1,782 | | 1,297 | |
| EBITDA | 3,384 | | (2,485) | | (3,093) | | (5,851) | | 597 | |
| CONNECTIONS | 13,030 | | 12,012 | | 4,609 | | 2,903 | | 2,714 | |

344.    In addition to the foregoing, the August 6, 2019 press release also quoted Defendant Turner as stating:

> Pareteum achieved several significant milestones in the second quarter: *We grew revenue 48% from the previous quarter*, delivered EBITDA positive results two full quarters ahead of analyst expectations and our annualized revenue run rate eclipsed $136 million," commented Turner. "*We are in the early innings of a remarkable growth story.* We have added numerous customers to our platform in 2019, and *these customers, as well as those in our deployment pipeline, will be the drivers of our* **continued growth**. *We are only at the beginning* of our mission to connect every person and every(thing)™.

345.    This press release also purported to raise the Company's 2019 Full year Guidance:

> We expect revenue to be between $120 million and $130 million for the full year of 2019, an increase from the previous forecast of between $115 million and $125 million. Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs, will be positive for the year.

> We expect 2019 revenue growth in the range of 270% to 301% year-over-year, outpacing the market growth rate by fivefold, and to be updated quarterly.

346.    On August 9, 2019, Pareteum filed with the SEC a Form 10-Q quarterly report for the second quarter ended June 30, 2019 (hereinafter, the "2Q:2019 Form 10-Q"), which was

signed and certified by Defendants Turner and O'Donnell and made substantially similar materially false and misleading statements concerning Pareteum's revenues and customer growth as outlined above. Specifically, therein, the Company reported revenue of $34,148,396, cost of service of $15,293,244, a net loss of $(515,809), accounts receivable of $45,061,236, and numerous other balance sheet line items.

347.    Notably, having now been caught red-handed by the Aurelius and Viceroy Reports, the word "Backlog" was nowhere to be found in the Company's August 6, 2019 2Q2019 earnings release or its August 9, 2019 2Q:2019 Form 10-Q.

348.    The statements made by these Defendants outlined above in ¶¶343-347 and contained in the Company's August 6, 2019 2Q2019 earnings release and its August 9, 2019 2Q:2019 Form 10-Q regarding the Company's false hyper-growth narrative, its self-created connections metric, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶181 above and for the following additional reasons:

(a)    When these statements were made, there was no factual basis for the Company's representations that it had experienced "469% Year-over-Year growth," that it had grown "48% from the previous quarter," that it was "in the early innings of a remarkable growth story," or that it was "only at the beginning" of "continued growth" because (i) these statements were based on the Company's faulty connections metrics, which were artificially inflated and unreliable, (ii) these statements appear to have also still been based on the Company's faulty Backlog metric, which, while now unreported, the Company was purportedly still using for "internal transparency," and which was artificially inflated and unreliable, and (iii) these

statements were based on the ability to convert the contracts that made up the Backlog metric to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made;

(b)    In reality, because the Backlog was artificially inflated and unreliable, as revealed in the Restatement and outlined in considerable detail above (¶¶270, 283, 285, 287, 289), the Backlog was not a reliable "internal" indicator of the Company's revenue or financial and operating results; and

(c)    When these statements were made, there was no factual basis for the Company's representations regarding its revenue, cost of service, operating income, net income, accounts receivable, and numerous other balance sheet line items, because, as the Company admitted in its Restatement, for the full year ended December 31, 2018 and the interim periods ended March 31, 2019 and June 30, 2019, certain revenues recognized during this period should not have been recorded during that period, the Company prematurely or inaccurately recognized revenues during that period, those errors were expected to impact revenue, cost of service, operating income, net loss, accounts receivable, and numerous other balance sheet line items, and investors should therefore no longer rely on these financial statements.

349.    Moreover, on the Company's August 6, 2018 earnings call, *Defendant Turner went out of his way to defend the use of the Backlog metric, **which had now reached over $1.27 billion**, but then announced that **the Company would replace the Backlog metric with something else**:*

> However, new sales order 36-month ***backlog metric will now be replaced as an external metric***. ***It has served its purpose*** and ***now provides us significant internal transparency*** into new sales orders and their conversion into billable revenues. We can now see clearly the strength in our revenues and their expected growth, *therefore it is our reported quarterly results and the annual guidance provided, which are the strongest indicators of our expected growth and*

*continued financial successes in the coming periods*. We will, therefore, formerly retire backlog as a key performance indicator and no longer report it after Q3 of this year.

350.    The 2Q:2019 Form 10-Q also made statements regarding the Company's Revenue Recognition that were substantially identical to those outlined above in ¶223, except that they updated the chart purporting to break down the Company's revenues disaggregated by source for the current quarter. These statements were likewise materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶173 and 348(c).

**B.    FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS REGARDING THE COMPANY'S FINANCIAL CONTROLS AND PROCEDURES AND FINANCIAL REPORTING AND COMPLIANCE WITH GAAP**

351.    As outlined above, ¶¶37-45, Defendants had a responsibility to establish and maintain adequate internal control over financial reporting, which responsibility they failed to fulfill at all relevant times. Rather, at all relevant times, Defendants knew that Pareteum's controls were materially deficient and allowed the Company's financial statements to be materially false and/or misleading. Nonetheless, Defendants insisted that they had taken measures to ensure that the financial statements were properly prepared and accurate.

352.    For example, in the 1Q:2018 Form 10-Q, the Company purported to report its "Basis of Presentation of Interim Periods" as follows:

> *The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information* and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three months ended March 31, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

353.    In the 1Q:2018 Form 10-Q, Defendants made the following statements regarding

the Company's Controls and Procedures:

Critical Accounting Policies and Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles, or GAAP, requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of net revenue and expenses in the reporting period. ***We regularly evaluate our estimates and assumptions related to revenue recognition . . . .***

* * *

Item 4. Controls and Procedures

Evaluation of Disclosure Controls and Procedures

*As of March 31, 2018, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial and Accounting Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based on the evaluation, **the Company's Principal Executive Officer and Principal Accounting Officer have concluded that the Company's disclosure controls and procedures are effective** to ensure that information required to be disclosed by the Company in the reports it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.*

354.    In addition to the foregoing, the Company's 1Q:2018 Form 10-Q contained

certifications, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (hereinafter, "SOX"),

signed by Defendants Turner and O'Donnell that purported to attest to the accuracy and completeness of Pareteum's financial and operational results and which stated:

*1.      I have reviewed this quarterly report on Form 10-Q of Pareteum Corporation.;*

2.      Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.      Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition***, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are *responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of a quarterly report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

355.   In addition to the foregoing, the Company's 1Q:2018 Form 10-Q also contained certifications, pursuant to section 906 of SOX (hereinafter "SOX"), signed by Defendants Turner and O'Donnell, that further purported to attest to the accuracy and completeness of Pareteum's financial and operational results:

(1)     The Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (the "Form 10-Q") of the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Form 10-Q fairly presents, in all materials respects, the financial condition and results of operations of the Company.

356.   These statements made by these Defendants outlined above in ¶¶352-355 and contained in the Company's 1Q:2018 Form 10-Q regarding the Company's Financial Controls and Procedures and Financial Reporting were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶187 and 222 above.

357.   Like the 1Q:2018 Form 10-Q, the 2Q:2018 Form 10-Q contained substantially the same statements as outlined above in ¶¶352-353 regarding the Company's Financial Controls and Procedures and Financial Reporting. What is more, in addition to signing the 2Q:2018 Form

10-Q, Defendants Turner and O'Donnell also signed SOX Certifications in connection with the 2Q:2018 Form 10-Q substantially similar to those outlined above in ¶¶354-355. These statements made by these Defendants contained in the Company's 2Q:2018 Form 10-Q regarding the Company's Financial Controls and Procedures and Financial Reporting were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶187 and 251above.

358.    Like the 1Q:2018 Form 10-Q, and the 2Q:2018 Form 10-Q, the 3Q:2018 Form 10-0Q likewise contained substantially the same statements as outlined above in ¶¶352-353 regarding the Company's Financial Controls and Procedures and Financial Reporting. What is more, in addition to signing the 3Q:2018 Form 10-Q, Defendants Turner and O'Donnell also signed SOX Certifications in connection with the 3Q:2018 Form 10-Q substantially similar to those outlined above in ¶¶354-355. These statements made by these Defendants contained in the Company's 3Q:2018 Form 10-Q regarding the Company's Financial Controls and Procedures and Financial Reporting were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶1817 and 280 above.

359.    As noted above, on March 18, 2019, Pareteum filed the FY2018 Form 10-K. Therein, the Company disclosed that, throughout much of the early Class Period, there existed at Pareteum "material weaknesses in its internal control over financial reporting, [such that its] disclosure controls and procedures were not effective as of December 31, 2018." Specifically, regarding the purported adequacy of the Company's Controls and Procedures, the FY2018 Form 10-K provided, in relevant part,

(a) Disclosure Controls and Procedures.

*We maintain disclosure controls and procedures* that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, *including our interim chief executive officer and chief financial officer*, as appropriate, to allow timely decisions regarding required disclosures. Our management, *with the participation of our principal executive officer and chief financial officer (our principal financial officer),* has evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 131-15(e) and 15d-15(e)) as of December 31, 2018. *Based on that evaluation, our management concluded that because of material weaknesses in its internal control over financial reporting, as further described below, our disclosure controls and procedures were not effective as of December 31, 2018.*

(b) Management's Annual Report on Internal Control over Financial Reporting.

*Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f).* Our internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of published financial statements in accordance with generally accepted accounting principles and includes those policies and procedures that:

· pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;

· provide reasonable assurance that transactions are recorded as necessary to permit preparation of our financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

· provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Internal control over financial reporting may not prevent or detect misstatements due to its inherent limitations. Management's projections of any evaluation of the effectiveness of internal control over financial reporting as to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

161

*Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2018* and in making this assessment used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 Framework) in accordance with the standards of the Public Company Accounting Oversight Board (United States). ***Based on the foregoing evaluation, our management has identified the following deficiencies that constitute material weaknesses in the Company's internal controls over financial reporting:***

***Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.***

***Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.***

***<u>The material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results.</u>*** Based on these material weaknesses, the Company's management concluded that at December 31, 2018, the Company's internal control over financial reporting was not effective.

***Squar Milner LLP, the Company's independent registered public accounting firm, expressed an unqualified opinion*** for the audit of our consolidated financial statements as of and for the year ended December 31, 2018 and has issued an adverse audit report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2018, which appears below.

360.    Despite knowing that its financial reporting was not reliable, the Company went out of its way to assure investors that the opposite was true and that, *despite* the material weaknesses that management had discovered, investors could still rely on those metrics. Specifically, as noted above, the Company represented in the FY2018 Form 10-K that the identified "***material weakness did <u>not</u> result in any identified misstatements to the financial statements, and there were no changes to previously released financial results***."

361.    The FY2018 Form 10-K also purported to report that Pareteum's management had *already* been implementing and continued to implement "measures designed to ensure that control deficiencies contributing to the material weakness [were] remediated, such that these

controls [were] designed, implemented and operating effectively." As evidence of this, Defendants represented that their actions would foreseeably "remediate the material weakness," and that such remediation was foreseeably expected to be completed prior to the end of fiscal 2019:

Remediation

**Management has been implementing and continues to implement measures designed to ensure that control deficiencies contributing to the material weakness are remediated**, such that these controls are designed, implemented and operating effectively.

**The remediation actions to the Company's internal controls over financial reporting include a thorough review and documentation of all processes involved in our financial reporting** to ensure that there is segregation of duties, access security and documented review processes in place that happen at appropriate intervals throughout the year that covers all elements of the Company's financial reporting. This includes, but is not limited to, testing samples and documenting that testing has occurred with the results of the findings being reported to senior management and that they occur at appropriate intervals and continuously making improvements to our processes as necessary.

To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) will continue to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) will institute sample testing of changes made in our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhance our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors.

**We believe that these actions will remediate the material weakness.** The weakness will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. We expect that the remediation of this material weakness will be completed prior to the end of fiscal 2019.

362.    What is more, on the following page of the FY2018 Form 10-K, the Company highlighted that Defendant Squar Milner, the Company's purported independent registered public accounting firm, had provided it an unqualified opinion:

### Report of Independent Registered Public Accounting Firm

To the Shareholders and the Board of Directors of Pareteum Corporation

### Opinion on the Internal Control Over Financial Reporting

We have audited Pareteum Corporation's and its subsidiaries (the Company) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. *In our opinion, because of the effect of the material weaknesses described below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018*, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 ("COSO").

\* \* \*

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in internal control have been identified as material weaknesses over the Company's control environment and monitoring pursuant to the COSO framework:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment and ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

*These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and **this report does not affect our report dated March 18, 2019.***

### Basis for Opinion

\* \* \*

We conducted our audit in accordance with the standards of the PCAOB. . . .We believe that our audit provides a reasonable basis for our opinion.

\* \* \*

> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

> \s\ Squar Milner LLP
> Los Angeles, California
> March 18, 2019

(bolding in original).

363.   Despite reporting the prior deficiency that purported to affect 2018, but not necessarily 2019, the FY2018 Form 10-K also reported that there had been ***no changes in internal control over financial reporting***:

> There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

364.   Despite these representations, as outlined above, statements regarding the Company's hyper-growth, Backlog, and connections metrics, and revenue made by Defendants and contained in the Company's FY2018 Form 10-K were each materially false and misleading when made, and were know by Defendants to be false at that time or were recklessly disregarded as such thereby, at that time. Accordingly, the statements made by these Defendants outlined above in ¶¶359-363 and contained in the Company's FY2018 Form 10-K regarding the Company's Financial Controls and Procedures and Financial Reporting were likewise each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶187 and 306 above. Even worse, while these material weaknesses existed within the Company, investors were encouraged to rely on the Defendants false assurances that the Company had compensated for these deficiencies and the financial statements were fairly presented. Indeed, the Defendants

knowingly allowed the Company to issue materially false and/or misleading statements because the Company's Controls and Procedures were materially weak.

365.    Moreover, while Defendant Squar Milner's report highlighted the potential risks of material misstatements in and/or regarding the reliability of the Company's financial statements, the Company's almost 10 full pages of purported "Risk Factors" (hereinafter, the "Risk Disclosures") contained in the FY2018 Form 10-K did little or nothing to alert investors to the additional risks of investing in a Company that lacks sufficient controls and procedures, or the impact this was having on Pareteum at that time, including the impact on Defendants' inability to secure necessary agreements to enable Pareteum to utilize half of its $50 million Credit Facility, or the true financial and operational condition of certain new customers.

366.    In fact, the purported Risk Disclosures contained in the FY2018 Form 10-K were completely ineffective and were designed to obfuscate the material risks of investing in Pareteum at that time, rather than disclose them as required.  These purported Risk Disclosures generally fell into one of three categories: (i) irrelevant, general statements that had nothing to do with Pareteum and that would generally apply to any company, in any business, located anywhere; (ii) obtuse and inadequate statements that were not effective to disclose the actual material adverse conditions then impacting the Company, and which disguised these negative conditions as possible contingencies that might or might not impact Pareteum at some point in the unknown future; and (iii) simply missing disclosures, such as the risk of investing in a company with no, or inadequate controls and procedures.

367.    Below are the first dozen purported business specific Risk Disclosures, in the order provided by Defendants within the FY2018 Form 10-K (presumably reported in order of

importance), and each one is an example of a general disclosure that is not specific to Pareteum and that could apply to almost any business, doing anything, anywhere as follows:

> The *current economic climate, especially in Europe*, may have an adverse effect in the markets in which we operate.

> Uncertainties and *risks associated with international markets* could adversely impact our international operations.

> We operate in a *complex regulatory environment*, and failure to comply with applicable laws and regulations could adversely affect our business.

> We may not be able to *integrate new technologies and provide new* services in a cost-efficient manner.

> We may not be able to *develop and successfully market* our mobile telecommunications platform and services as planned.

> Implementation and development of our software platform business depends on our *ability to obtain adequate funding*.

> *Disruptions in our networks and infrastructure* may result in customer dissatisfaction, customer loss or both, which could materially and adversely affect our reputation and business.

> *Integration of acquisitions ultimately may not provide the benefits originally anticipated* by management and may distract the attention of our personnel from the operation of our business.

> Our revenue, earnings and profitability are affected by the length of our sales cycle, and a *longer sales cycle could adversely affect our results* of operations and financial condition.

> Because most of our business is conducted outside the U.S., *fluctuations in foreign currency exchange rates* versus the U.S. Dollar could adversely affect our results of operations.

> *We are substantially smaller than our major competitors*, whose marketing and pricing decisions, and relative size advantage, could adversely affect our ability to attract and retain customers and are likely to continue to cause significant pricing pressures that could adversely affect our net revenues, results of operations and financial condition.

Our positioning in the marketplace as a smaller provider places a significant strain on our resources, and if not managed effectively, could result in operational inefficiencies and other difficulties.

368.    An example of the second type of ineffective and inadequate Risk Disclosure, identified above, where then current material adverse conditions impacting the Company are portrayed as mere contingencies which may or may not impact the Company, was also contained in the FY2018 Form 10-K. As evidence of this, Pareteum's last purported business specific Risk Disclosure stated the following, regarding the Credit Facility:

We have outstanding debt secured by all of the assets of the Company, including our intellectual property, and failure by us to fulfill our obligations under the applicable loan transaction agreements may cause the repayment obligations to accelerate.

In February 2019, we, and certain of our subsidiaries, entered into a credit agreement (the "Credit Agreement") with Post Road Administrative Finance, LLC and its affiliate Post Road Special Opportunity Fund I LLP (collectively, "Post Road"), pursuant to which Post Road will provide the Company with a secured loan of up to $50,000,000 (the "Loan") with an initial loan of $25,000,000 funded on February 26, 2019, and additional loans in increments of $5,000,000 as requested by the Company before the 18 month anniversary of the initial funding date: *provided however that no additional loans shall be funded until the later of delivery of certain third party consents (the "Consents").* The Credit Agreement provides for all amounts due on February 26, 2022 and requires us to meet and maintain within specified levels and thresholds with respect to financial and operational covenants, including: *requirements to maintain a minimum of $2,000,000 of unrestricted cash, certain maximum total leverage rations, a debt-to-asset ratio, maximum churn rate and adjusted EBITDA.* The Credit Agreement further provides customary events of default and cure periods for certain specified events of default, and in the event of uncured default, the acceleration of the maturity date, an increase in the applicable interest rate with respect to amounts outstanding under the Loan and payment of additional fees. The Credit Agreement also provides for an increase in the interest rate upon failure to timely deliver Consents by May 31, 2019 or July 31, 2019, as applicable. *There can be no assurance that we will be able to perform and timely repay the amounts outstanding under the Credit Agreement, and upon the occurrence of an event of default under the Credit Agreement, if we are not able to repay all outstanding amounts required, we would lose control over our assets, including our intellectual property, which would seriously harm our business and operations.*

369.    In addition to being false and materially misleading, this purported Risk Disclosure failed to report that, at that time, Defendants had **_already_** failed to make timely payments under the Credit Facility, they were unable to obtain the signatures necessary to obtain the second 50% of the Credit Facility amount, and they were also in technical breach of the Credit Facility Covenants by failing to provide timely interim financial reports to the lender. *See* ¶¶162-163.

370.    The Company's other Risk Disclosures, related to Pareteum's industry participation and capital stock, were even more general and vague, lacking any specific relation to the Company at the time. These Risk Disclosures included, in part, the following:

*Changes in the regulation of the telecommunications industry* could adversely affect our business, revenue or cash flow.

The market for communications services is highly competitive and fragmented, and we expect *competition to continue to increase*.

The *telecommunications industry is rapidly changing*, and if we are not able to adjust our strategy and resources effectively in the future to meet changing market conditions, we may not be able to compete effectively.

If we are not able to operate a cost-effective network, *we may not be able to grow* our business successfully.

*We could issue additional common stock*, which might dilute the book value of our capital stock.

*Shares eligible for future sale* may adversely affect the market for our common stock.

*We have no dividend history* and have no intention to pay dividends in the foreseeable future.

371.    Like the Quarterly Reports outlined above, in addition to signing the FY2018 Form 10-K, Defendants Turner and O'Donnell also signed SOX Certifications in connection with the FY2018 Form 10-K substantially similar to those outlined above in ¶¶354-355. These

statements were likewise materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶187 and 306 above.

372.    Like the 2018 Form 10-Qs, the 1Q:2019 Form 10-Q likewise contained substantially the same statements as outlined above in ¶¶352-353 regarding the Company's Financial Controls and Procedures and Financial Reporting, updating them merely to revise Item 4. Controls and Procedures to acknowledge the material weaknesses that continued to persist and to assure investors that those material weaknesses had not affected the reported information and outline the remedial steps the Company had taken:

Item 4. Controls and Procedures

Evaluation of Disclosure Controls and Procedures

As of March 31, 2019, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial and Accounting Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. *Based on the evaluation, the Company's Principal Executive Officer and Principal Accounting Officer have concluded that, due a previously reported material weakness in our internal control over financial reporting described below, the Company's disclosure controls and procedures were not effective as March 31, 2019.* ***In light of the material weakness described below, we performed additional analysis and other post-closing procedures to ensure our financial statements are prepared in accordance with generally accepted accounting principles.***

Changes in Internal Control Over Financial Reporting

We previously identified and disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018, a material weakness related to:

· Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process; and

170

· Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.

To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) has continued to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) instituted sample testing of changes made in our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhanced our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors. Management believes this material weakness has been remediated, as of March 31, 2019, pending further testing. .

*We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of March 31, 2019, these efforts are ongoing.*

We are committed to **maintaining a strong internal control environment** and believe that these remediation actions will represent significant improvements in our controls. However, the identified material weakness in internal control over financial reporting will not be considered remediated until controls have been designed and/or controls are in operation for a sufficient period of time for our management to conclude that the material weaknesses have been remediated. Additional remediation measures may be required, which may require additional implementation time. We will continue to assess the effectiveness of our remediation efforts in connection with our evaluations of internal control over financial reporting.

373.    The 1Q:2019 Form 10-Q did nothing to update or enhance the Risk Disclosures previously provided in Pareteum's FY2018 Form 10-K filed on March 18, 2019. Instead, the 1Q:2019 Form 10-Q "Item 1A. Risk Factors" simply referred investors back to the FY2018 Form 10-K. Finally, in addition to signing the 1Q:2019 Form 10-Q, Defendants Turner and O'Donnell also signed SOX Certifications in connection with the 1Q:2019 Form 10-Q substantially similar to those outlined above in ¶¶354-355. These statements made by these Defendants contained in the Company's 1Q:2019 Form 10-Q regarding the Company's Financial Controls and Procedures and Financial Reporting were each materially false and misleading

when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶187 and 355 above.

374. Finally, like the 1Q:2019 Form 10-Q, the 2Q:2019 Form 10-Q contained substantially the same statements as outlined above in ¶¶352-353 regarding the Company's Financial Controls and Procedures and Financial Reporting, updating them merely to revise Item 4. Controls and Procedures to again acknowledge the material weaknesses that continued to persist and to assure investors that those material weaknesses had not affected the reported information and outline the further remedial steps the Company had taken:

Item 4. Controls and Procedures

Evaluation of Disclosure Controls and Procedures

As of June 30, 2019, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer [Defendant Turner] and Principal Financial and Accounting Officer [Defendant O'Donnell], of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. *Based on the evaluation, the Company's Principal Executive Officer and Principal Accounting Officer have concluded that the Company's disclosure controls and procedures were not effective as of June 30, 2019.* **In light of the previously issued material weakness described below, the Company has performed additional analysis and other remediation efforts, described below, to ensure the financial statements are prepared in accordance with GAAP.**

Changes in Internal Control Over Financial Reporting

We previously identified and disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018, a material weakness related to:

· Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process; and

· Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.

To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) has continued to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) instituted monitoring controls and sample testing needs to be completed on our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhanced our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors. Management believes the Company has taken significant steps towards the remediation of the identified material weaknesses, as of June 30, 2019.

375.   In addition to signing the 2Q:2019 Form 10-Q, Defendants Turner and O'Donnell also signed SOX Certifications in connection with the 2Q:2019 Form 10-Q substantially similar to those outlined above in ¶¶354-355. These statements made by these Defendants contained in the Company's 2Q:2019 Form 10-Q regarding the Company's Financial Controls and Procedures and Financial Reporting were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶¶187 and 348 above.

376.   In sum, despite Defendants' repeated representations regarding the Company's Financial Controls and Procedures and Financial Reporting, as outlined above, multiple statements contained in Pareteum's 1Q:2018 Form 10-Q, 2Q:2018 Form 10-Q, 3Q:2018 Form 10-Q, FY2018 Form 10-K, 1Q:2019 Form 10-Q, and 2Q:2019 Form 10-Q were materially false and/or misleading when made, and/or omitted material facts necessary to make such statements true, accurate and reliable, in light of circumstances that existed at that time, and were known by Defendants to be false at that time, or were recklessly disregarded as such. Even worse, while these material weaknesses existed within Pareteum, investors were told not to worry because

Defendants had ensured that at each reporting period Pareteum had compensated for these deficiencies, providing investors with a false assurance that the Financial Statements were fairly presented, when they were not.

377.    The Company's poor internal control environment was designed to enable Defendants to purposely and knowingly misstate and inflate Pareteum's Backlog, connections, and revenue to play into their false hyper-growth narrative. Accordingly, Defendants not only failed to maintain a sound internal control environment, but knowingly allowed Pareteum to issue materially false and/or misleading financial statements because its internal control environment was materially weak. During the relevant time period, Defendants have done virtually nothing to correct or implement adequate internal controls over Pareteum's financial reporting, compliance with laws and regulations, and the preparation of financial statements in accordance with accepted accounting principles, and therefore had no reasonable basis to state that Pareteum's Financial Statements were fairly presented.

### C. FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS REGARDING THE COMPANY'S BLOCKCHAIN CAPABILITIES

378.    On December 26, 2017, the Company published a press release announcing that it completed development enabling it to support Blockchain technology, which would purportedly allow its customers the ability to process crypto-currencies.  The press release quoted Defendant Turner as stating: "We envision a time in the not too distant future when Pareteum could create its own currency payments and settlements among the millions of subscribers on its platform globally." Following this announcement, the Company's stock price nearly doubled, trading as high as $3.15 per share after opening the day at $1.38 per share, and closing at $2.80 per share on trading volume of approximately 42 million shares.

379.     On January 22, 2018, the Company published a press release announcing that the Company had expanded its partnership with AirFox by adding AirFox's Blockchain and AirToken platform to the Company's product. The press release quoted Defendant Turner as stating:

> Pareteum and AirFox form a highly complementary technology partnership. These new converged services, centered on the security offered via Blockchain and Pareteum's open source developed award winning software services for communication service providers, extend TEUM's s abilities for person to person mobile payments, that are trusted. *We see new markets, faster services adoption and deeper market penetration occurring*, as well as our inevitable march toward cloud based self-services, utilizing our insights gleaned from data analytics, for everything. ***This bodes well for our partners AirFox and for Pareteum, in fundamental revenue growth and profitability***.

380.     Similarly, on February 6, 2018, the Company published a press release announcing that the Company "Publish[ed] Blockchain White Paper Defining Opportunities in the Mobile Market," which explored how the Company's products support blockchain enablement and its importance in the market. The press release noted that "TEUM Blockchain (TBC) will revolutionize how our customers leverage Blockchain technology." Defendant Turner was quoted as stating: "In conjunction with our partner, AirFox, Pareteum's cloud platform will also service its customers by capturing new revenue streams in the telecommunications and IoT markets. Our cloud-based solution will enable the deployment of Blockchain services, delivered for our customers anywhere in the world."

381.     These statements made by these Defendants regarding the Company's supposed Blockchain Capabilities were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, because in reality and as disclosed in a letter to the SEC just ten months later, the Company had "no plans to create our own digital currency and [had] no plans to act as a verification service for digital

currency," and "[t]hough [the Company] continue[d] to maintain a professional relationship with AirFox . . . *[the Company had] not and [did] not plan in the near future to generate any revenue from [its] relationship with AirFox."* Indeed, there is no way it could have, since, in November 2018, Airfox *settled charges with the SEC* related to registration violations involving its sale of "AirTokens," pursuant to which it "agreed to return funds to harmed investors."

### D.   FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS REGARDING SENIOR MANAGEMENT'S BACKGROUND

382.   As outlined above, many of the relevant parties and non-parties to this matter – including most of Pareteum's senior management and some of its former Board members – have undisclosed preexisting relationships; undisclosed histories of fraudulent and/or criminal conduct, including undisclosed connections to Honig; and/or have worked together at companies that mysteriously lose virtually all of their shareholders' money shortly after their involvement.

383.   Although the Viceroy Report aptly noted that "the mere presence of this collection of actors should send diligent investors running for hills," at no time during the Class Period did Pareteum disclose this information. Rather, the FY2018 Form 10-K describes the relevant parties as follows:

> Robert H. Turner was appointed Executive Chairman of the Board on November 16, 2015. Mr. Turner has 40 years' experience, cultivating and growing "all stage" global software, telecom and tech companies. He emphasizes strategy, sales, organizational leadership, and fundamental financial results and leads with a culture that passionately serves the needs of valued constituents, while sustaining growth. Mr. Turner launched his career at AT&T, where he rose to serve at the highest ranks in a broad spectrum of international, start-up, and corporate firms, including (selected highlights): NeoNova Network Services, Inc.; Pac West; Telecom, Inc.; Panterra Networks; PTT Telecom Netherlands, US Inc. (now KPN); and BellSouth Communications, Inc. (now AT&T). Mr. Turner is also an advisory board member of The Capital Angels, affiliated with SC Angel Network. Mr. Turner earned a Bachelor of Science degree and a Master of Business Administration from the University of South Carolina, where he was

presented with a Distinguished Alumni award in 2010. Mr. Turner is Guest Lecturer in the Darla Moore School of Business Professional MBA program.

\* \* \*

Victor Bozzo was appointed Chief Executive Officer on November 1, 2016. Mr. Bozzo served as Senior Vice President, Worldwide Sales and Marketing for Telarix Inc., a market leader in interconnect solutions for service providers. Under Mr. Bozzo's sales and marketing leadership, sales increased significantly, and the company received numerous market leadership accolades, ultimately leading to a highly successful exit for investors. Prior to joining Telarix, Mr. Bozzo served as President and General Manager of Pac-West's Emerging Technologies division after selling Pac-West his startup, Factor Communications, an innovative portfolio of cloud-based communications services. He was also responsible for significant revenue and customer growth and investor returns at exTone Communications, ITXC Corporation, and Voxware.

Edward O'Donnell was appointed Chief Financial Officer on January 9, 2017. Mr. O'Donnell has over 23 years of experience in investment banking, advertising, private equity, investment, venture capital, technology, internet and other new media businesses. Prior to joining the Company, Mr. O'Donnell served as the Chief Financial Officer of Ameri Holdings, Inc. (OTC: AMRH) from January 2016 through December 2016. Mr. O'Donnell has served as the Chief Operating Officer of Radbourne Property Group, Inc., an innovative operator of family entertainment centers, where his primary responsibilities included raising capital, external reporting, outlining capital structure and budgeting. From February 2013 until April 2015, Mr. O'Donnell served as chief financial officer of AudioEye, Inc. (OTC: AEYE) From December 2010 until January 2013, Mr. O'Donnell served as Vice President of Finance for Augme Technologies, Inc. (Previously OTC: AUGT), which provides strategic services and mobile marketing technology to leading consumer and healthcare brands. From January 2007 until November 2010, Mr. O'Donnell served as Chief Financial Officer of Carlyle Capital Group LLC, a venture capital and private equity firm. Previously, Mr. O'Donnell also served as Senior Vice President of Finance & Investor Relations of ACTV, Inc. (previously NASDAQ: IATV), where he developed the investor relations department before the company was purchased by OpenTV, a subsidiary of Liberty Media. Mr. O'Donnell is a Certified Public Accountant in New York and a member of NYSSCPAs and AICPA. Mr. O'Donnell earned a B.S, degree in Accountancy from Villanova University in 1991 and an M.B.A. from Columbia Business School in 2003. We believe that Mr. O'Donnell's extensive education and background in accounting and finance makes him qualified to serve as our Chief Financial Officer.

Denis McCarthy was appointed President on October 1, 2018 and joined Pareteum January 1, 2018 as SVP of Corporate Development. From 2014 through 2017, Mr. McCarthy was Senior Vice President of Operations and Finance at

Mosaic Networx Inc., which delivers cloud-based data and telephony services to enterprises, where he handled all aspects of finance, systems integration, human resources and strategic relationships including merger and acquisition activity. From 2011 through 2013, Mr. McCarthy was Senior Vice President of Finance with United Brands Product Design. Prior to that, Mr. McCarthy was CFO of AP Telecom, a global sales channel manager for Undersea Cable Installations. He was CFO and COO of Pac-West Telecomm, a provider of next generation VoIP solutions for enterprise and communications services providers, which includes Telastic, a division of PacWest that developed cutting edge cloud-based telephony, billing and support systems. Mr. McCarthy began his career and spent nearly ten years in public accounting, providing assurance and advisory services in the high technology and software industry, including telecommunications and bio-tech companies both at Arthur Andersen and RSM. He holds a Bachelor of Science in Business Administration and a Master of Science in Administration from Bryant University.

384.    These statements made by these Defendants contained in the Company's FY2018 Form 10-K regarding senior management's background were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, because they failed to disclose all material information outlined in in ¶¶ 46-75 above.

E.    **FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS CONTAINED WITHIN AND/OR INCORPORATED INTO THE IPASS ACQUISITION AND SECONDARY OFFERING STATEMENTS AND PROSPECTUSES**

1.    **The iPass Acquisition Statements and Prospectuses**

385.    In connection with the iPass Acquisition, on or about December 3, 2018, the Company filed with the SEC on Form S-4 a Registration Statement relating to the iPass Acquisition and concurrently filed a Schedule TO Tender Offer Statement. Thereafter, the Company filed several amendments to the December 4, 2018 Registration Statement, which amendments were filed on December 21, 2018, January 14, 2019, and January 15, 2019, and similarly amended and supplemented the Schedule TO Tender Offer Statement on December 10,

2018, December 21, 2018, January 4, 2019, and January 14, 2019, January 15, 2019, and February 13, 2019.

386.    On February 4, 2019, the Company filed a 424(b)(3) Prospectus relating to the iPass Offering (collectively, the December 3, 2018 Registration Statement, the Schedule TO Tender Offer Statement, and the February 4, 2019 Prospectus, and all amendments thereto filed with the SEC are referred to herein as the "iPass Registration Statement.").

387.    The iPass Registration Statement provided financial statements, entitled "Unaudited Pro Forma Condensed Combined Statement of Comprehensive Loss for the Nine Months Ended September 30, 2018," which contained statements relating to Pareteum's "Historical Revenues" of $18,123,484, which is the same revenues the Company reported in its 3Q:2018 Form 10-Q.

388.    As described in detail above, these statements regarding Pareteum's 2018 revenues were false and/or misleading, and the iPass Registration Statement omitted material information to make these statements not false and misleading to investors. *Infra* §VI.A, VI.B. Most notably, on October 21, 2019 the Company announced that it would restate previously issued financial statements and investors should no longer rely upon certain financial statements for 2018. The iPass Registration Statement further failed to provide adequate risk disclosures and *did not* disclose that the Company had significantly overstated revenues during the relevant period by systematically recognizing revenue it did not have.

389.    Moreover, the iPass Registration Statement incorporated by reference various corporate filings of Pareteum, including, *inter alia*, the Company's 1Q:2018 Form 10-Q, 2Q:2018 Form 10-Q, and 3Q:2018 Form 10-Q. As described above in ¶¶217-224, 246-252, 273-281, and 352-358, *supra*, these incorporated filings were each materially false and misleading

179

and/or omitted material facts necessary to make these statements not false and misleading. Specifically, these incorporated documents disclosed certain financial results of operations for the Company, namely quarterly revenues for the applicable reporting periods.

390.    The iPass Registration Statement also incorporated by reference the following corporate filings and or exhibits:

(a)    Current Report on Form 8-K filed with the SEC on September 13, 2018. This filing itself incorporated as an exhibit a September 13, 2018 Chairman's Update Letter detailing the Company's progress, wherein Defendant Turner recapped and touted the Company's "strong results" as reported for the second quarter of 2018, including the Company's purported increasing revenues, and further reiterating the Company's "formal guidance of over 80% revenue growth for 2018."

(b)    Current Report on Form 8-K filed with the SEC on July 27, 2018. This document provided investors with certain Pro Forma financial statements relating to the Company's 2018 acquisition of Artilium; included therein were statements relating to the Company's 2018 first quarter revenues.

(c)    Current Report on Form 8-K filed with the SEC on June 8, 2018. This filing included as an exhibit an Investor Presentation dated June 8, 2018 relating to the Company's acquisition of Artilium; included therein were statements relating to the Company's purported 2018 first quarter revenues, sales wins, and the accretive effect to the Company's Backlog.

(d)    Investor Presentations dated November 13, 2018, December 10, 2018, and December 20, 2018, attached as exhibits to the Company's Schedule TO Tender Offer Statement and amendments thereto.   These presentations included false and or misleading statements

regarding the Company's 2018 revenues, purported sales wins, and statements related to the Company's Backlog metric.

391.    As described above, these statements were false and or misleading and the filings failed to include material information that would make these statements not false and/or misleading.

392.    Defendants Turner, O'Donnell, Bozzo, Van Sante, Lippert, and Jimenez-Tunon signed the iPass Registration Statement.  Pursuant to 15 U.S.C. § 77k(a)(1-2), these Defendants are strictly liable to Plaintiff for the misstatements and omissions in the iPass Registration Statement. None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the iPass Registration Statement were true and without omissions of any material facts and were not misleading.

393.    Lead Plaintiff received iPass shares pursuant or otherwise traceable to the iPass Registration Statement and has sustained damages as the value of Pareteum securities has declined substantially due to the Defendants' conduct and/or violations of the securities laws as alleged herein.

## 2.    The Secondary Offering Statements and Prospectuses

394.    On September 20, 2019, the Company closed the Secondary Offering, a $40 million direct public offering of common stock and warrants, which was registered for sale under its November 30, 2018 Amended Registration Statement on Form S-3, its December 18, 2018 Prospectus, and its September 20, 2019 Supplemental Prospectus (collectively, the "Secondary Offering Registration Statement"). In its SEC filings, press releases and transaction documents, the Company represented that the primary purpose of the capital raised in the Secondary Offering was the repayment of outstanding indebtedness to Post Road Group.

395.    Pursuant to the September 20, 2019 Supplemental Prospectus, the September 2019 offering consisted of:

> 18,852,273 shares of our common stock, pre-funded warrants to purchase 3,875,000 and warrants to purchase 34,090,910 shares of common stock. 11,363,637 of the purchase warrants will be exercisable for a period of eighteen months commencing six months from the issuance date at an exercise price of $1.84, and 22,727,273 of the purchase warrants will be exercisable for a period of five years commencing six months from the issuance date at an exercise price of $2.25. The pre-funded warrants will be immediately exercisable at an exercise price of $0.01 per share and may be exercised at any time until all of the pre-funded warrants are exercised in full. One five-year purchase warrant, and 0.5 of an eighteen-month purchase warrant, will be issued for every one share of common stock or pre-funded warrant purchased in this offering.

The offering price was: $1.76 per share and 1.5 purchase warrants, or $1.75 per pre-funded warrant and 1.5 purchase warrants (hereinafter, the "Offering Price").

396.    The Supplemental Prospectus to the Secondary Offering Registration Statement incorporated by reference the Company's FY2018 Form 10-K and "[its] financial statements and related notes thereto" and the Company's 2Q:2019 Form 10-Q and "[its] financial statements and related notes thereto."

397.    As described in more detail above in ¶¶297-308, 343-350, and 359-375, these incorporated documents were each materially false and misleading and/or omitted material facts necessary to make these statements not false and misleading. Specifically, these incorporated documents disclosed certain financial results of operations for the Company, namely annual and/or quarterly revenues for the applicable reporting periods. Most notably, on October 21, 2019 the Company announced that it would restate previously issued financial statements and investors should no longer rely upon certain financial statements for 2018. The Secondary Offering Registration Statement, and the financial statements incorporated therein, further failed to provide adequate risk disclosures and *did not* disclose that the Company had significantly

overstated revenues during the relevant period by systematically recognizing revenue it did not have.

398.    In addition to the false and misleading statements and/or non-disclosures contained in the documents incorporated by reference, as described above, the September 20, 2019 Supplemental Prospectus did nothing to adequately update the Risk Disclosures provided in the Company's FY2018 Form 10-K. While the Company emphasized its "growth mode" and abilities "to win new long-term contractual business" that would "increase throughout 2019 and beyond," the Company failed to disclose that many of the Company's purported customers and contract wins were not currently operational and/or capable of generating the contractual revenues and that the Company lacked any meaningful internal accounting controls.

399.    Between September 20, 2019 and the date of this filing, the Company's share price has not reached the Offering Price.

400.    As registrant and issuer of stock sold in the Secondary Offering, Pareteum is strictly liable to Plaintiff for the misstatements and omissions in the Registration Statement. The Control Person Defendants are liable pursuant to 15 U.S.C. § 77k(a)(1-2; 4-5)

401.    None of the Control Person Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Secondary Offering Registration Statement were true and without omissions of any material facts and were not misleading.

402.    Moreover, Defendants Dawson James, as underwriter, and Squar Milner, as auditor, owed a duty to investors to independently verify and investigate the Company's representations contained in the Secondary Offering Registration Statement, and breached said duty to investigate despite red flags regarding the Company's purported "long-term contractual

business," hyper-revenue growth, and/or the reliability of its financial statements. Indeed, throughout the Class Period, Defendant Dawson James provided extensive equity research on the Company and the telecommunications industry to the public, frequently commenting on the Company's purported revenues and growing Backlog, and Defendant Squar Milner serves as the Company's auditor, and thus both should have been aware of the red flags that had been publicly disclosed by other analysts and market commentators three months before the Secondary Offering.

403.    By reason of the conduct alleged herein, Pareteum, the Control Person Defendants, Dawson James, and Squar Milner violated and/or controlled a person who violated Section 11 of the Securities Act.

404.    Lead Plaintiff purchased Pareteum shares pursuant or otherwise traceable to the Secondary Offering Registration Statement and has sustained damages as the value of Pareteum securities has declined substantially due to the Defendants' conduct and/or violations of the securities laws as alleged herein.

## VII.    PARETEUM AND THE FRAUD DEFENDANTS ACTED WITH SCIENTER

405.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

406.    As alleged herein, Pareteum and the Fraud Defendants acted with scienter in that each of those Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in

detail, the Fraud Defendants, by virtue of their receipt of information reflecting the true facts regarding Pareteum, their control over, and/or receipt and/or modification of Pareteum's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Pareteum, participated in the fraudulent scheme alleged herein.

407.    Pareteum and the Fraud Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company in order to: (i) deceive the investing public regarding Pareteum's business, operations, management and the intrinsic value of Pareteum common stock; (ii) enable defendants to artificially inflate the price of Pareteum shares; (iii) enable Pareteum insiders to use millions of dollars of Company stock as currency to acquire revenues, and millions more to raise capital necessary to fund operations, while in possession of material adverse non-public information about the Company; and (iv) cause Lead Plaintiffs and other members of the Class to purchase Pareteum common stock at artificially inflated prices.

### A.    THE FRAUD DEFENDANTS' CONCEALMENT OF THEIR RELATIONSHIPS EVIDENCE SCIENTER

408.    As outlined above, many of the relevant parties and non-parties to this matter – including most of Pareteum's senior management and some of its former Board members – have undisclosed preexisting relationships; undisclosed histories of fraudulent and/or criminal conduct, including undisclosed connections to Honig; and/or have worked together at companies that mysteriously lose virtually all of their shareholders' money shortly after their involvement. What is more, almost immediately after taking over Pareteum in November 2015, Defendant Turner immediately started reassembling this same cast of characters as his senior management team – Defendant Bozzo in October 2016, Defendant O'Donnell in January 2017, the Honig-

related entities by December 2017, and Defendant McCarthy by February 2018. Finally, during the Class Period, Pareteum regularly employed Defendant Dawson James, Defendant Squar Milner, and Sichenzia.

409.    As the Viceroy Report aptly noted, "the mere presence of this collection of actors should send diligent investors running for hills." No doubt aware of this fact, Pareteum and the Fraud Defendants concealed this information and their extensive past relationships from the market. This active and knowing concealment evidences scienter.

**B.    THE SCHEME EVIDENCES SCIENTER**

410.    Having concealed their extensive past relationships, beginning in 2016, the Fraud Defendants created the Backlog and connections metrics and started conditioning the market to believe these false metrics so they could sell a false narrative of hyper-growth and revenue. Not coincidentally, beginning in December 2017, just after the Honig-related entities became involved, Pareteum and the Fraud Defendants began issuing a classic pump-and-dump style barrage of false and misleading press releases that touted the Company's fake success and growth – *178 during the Class Period, over 130 in 2018 alone*. The sheer volume of these press releases is telling. So too is the fact that they ended nearly contemporaneously with the publication of the Aurelius and Viceroy Reports, when the Fraud Defendants were caught red handed.

411.    But that is not all. Even after the Aurelius and Viceroy Reports were published, Pareteum and the Fraud Defendants continued to maintain that their statements were true and that the investors and the market could rely on them. Indeed, Defendant Turner "categorically denied" everything in the reports. However, barely a month after their publication, Pareteum and

the Fraud Defendants discontinued use of the infamous Backlog metric that they had used to effectuate their fraud, noting that it had ***"served its purpose."***

412. Indeed, it had. By that time, the Company's stock had reached a Class Period high of $5.93 per share – ***an 824% increase in stock price*** in just a few months – the Honig-related entities (Iroquois and IntraCoastal) had cashed out just before the fraud was revealed and when the Company's stock was trading at artificially high prices, and (as outlined below) the Fraud Defendants had made millions in compensation based on the Company's artificially inflated stock price. Not long after that, the other shoe fell, when it was revealed that the Company had defaulted on its Credit Facility before the ink was even dry on its papers. Nonetheless, in one last money grab, Pareteum and the Fraud Defendants – with the assistance of the Board, Defendant Dawson Jones, and Defendant Squar Milner – orchestrated a $40 million Secondary Offering, in full knowledge that the representations made therein were false. Sure enough, *one month* after they accepted $40 million of Class members' money when they were well aware that their financial reporting contained material weaknesses, Pareteum and the Fraud Defendants announced that they would have to restate every major financial report they had made in 2018 and 2019.

413. These facts – and especially the Fraud Defendants' concealment of their extensive past relationships, their sudden pivot away from the Backlog metric when they were caught, and their ultimate Restatement of financials that they had certified as correct just one month earlier – lead to the reasonable conclusion that Pareteum and the Fraud Defendants acted with scienter of their wrongdoing.

## C.   THE FRAUD DEFENDANTS' COMPENSATION PLANS SUPPORT SCIENTER

414.   Throughout the Class Period, the Company had in place a Long-Term Incentive Compensation Plan, pursuant to which the Company would grant equity and equity-linked awards to officers, directors, consultants, and others upon the achievement of performance targets based upon certain operational, financial, or performance criteria, which included *inter alia*, acquisition-related activity, stock price appreciation, and relative stock price performance. As outlined below, the Fraud Defendants were incentivized to artificially inflate the Company's stock price and to use that artificially inflated stock as currency to make acquisitions in order to enrich themselves:

| Recipient (Title) | Date of Award | Type | Number of Securities/ Derivative Securities Acquired | Conversion/ Exercise Price | Date Exercisable | Pursuant to |
|---|---|---|---|---|---|---|
| Vic Bozzo (CEO) | 5/15/18 | Options | 500,000 | $2.37 | 2/5/2019 (1) | Long-Term Incentive Plan |
| Edward O'Donnell (CFO) | 5/15/18 | Options | 100,000 | $2.37 | 2/5/2019 (1) | Long-Term Incentive Plan |
| Yves Van Sante (Director) | 10/25/18 | Common Stock | 40,000 (4) | | | |
| Robert Turner | 10/25/18 | Common Stock | 2,000,000(5) | | | Long-Term Incentive Plan |
| Vic Bozzo (CEO) | 1/2/19 | Options | 150,000 | $1.72 | 1/1/2020(6) | Long-Term Incentive Plan |
| Edward O'Donnell (CFO) | 1/2/19 | Options | 80,000 | $1.72 | 1/1/2020(6) | Long-Term Incentive Plan |
| Luis Jimenez-Tunon (Director) | 1/2/19 | Common Stock | 125,000 | | | Long-Term Incentive Plan |
| Luis Jimenez-Tunon (Director) | 1/2/19 | Common Stock | 84,179 | | | Compensation for Board Fees in lieu of cash |
| Denis McCarthy (President) | 1/2/19 | Options | 400,000 | $1.72 | 1/1/2020(6) | Long-Term Incentive Plan |
| Robert Lippert (Director) | 1/2/19 | Common Stock | 6,967 | | | Compensation for Board Fees in lieu of cash |
| Robert Lippert (Director) | 1/2/19 | Options | 100,000 | $1.72 | 1/1/2020(6) | |
| Yves Van Sante (Director) | 1/2/19 | Options | 150,000 | $1.72 | 1/1/2020(6) | Long-Term Incentive Plan |
| Yves Van Sante (Director) | 1/2/19 | Common Stock | 133,052 | | | Compensation for Board Fees in lieu of cash |
| | TOTAL SECURITIES ISSUED DURING CLASS PERIOD | | 3,869,198 | | | |
| | | | | | | |
| 2017 Awards with Vesting Terms Amended During the Class Period | | | | | | |
| Robert Turner | 11/22/16 | Option | 300,000 | $3.50 | 11/18/16 (2) | Long-Term Incentive Plan |
| Robert Turner | 11/21/17 | Common Stock | 1,500,000 (3) | | | |

(1) One-third shall vest 2/5/19 and 2/3 shall vest in 24 equal monthly installments

(2) The options (the "Options") were issued pursuant to the Company's Amended and Restated 2008 Long-Term Incentive Compensation Plan and shall vest and become exercisable over a period of three (3) years, with 1/4 vesting immediately, and the remaining shares vesting in three equal yearly installments. On June 6, 2018, the Issuer and Reporting Person entered into an amendment to that certain employment agreement between the parties pursuant to which the vesting terms of the Options were amended to provide further that the Options shall become fully vested and exercisable on the first trading day of the calendar quarter following a "Change of Control or Triggering Event." On June 7, 2018, a "Change of Control or Triggering Event" occurred when the Issuer tendered a binding offer to merge, or acquire all or substantially all of the assets or a controlling portion (which may be less than 50%) of the equity of another company.

(3) Represents a restricted stock award (the "Restricted Stock Award") under the Pareteum Corp. 2017 Long-Term Incentive Compensation Plan, of which two-thirds shall vest on the date of grant and one-third shall vest in 12 equal monthly installments over a one year period, beginning on the one month anniversary of the date of grant. On June 6, 2018, the Issuer and Reporting Person entered into an amendment to that certain employment agreement between the parties pursuant to which the vesting terms of the Restricted Stock Award were amended to provide further that the Restricted Stock Award shall become fully vested and exercisable on the first trading day of the calendar quarter following a "Change of Control or Triggering Event." On June 7, 2018, a "Change of Control or Triggering Event" occurred when the Issuer tendered a binding offer to merge, or acquire all or substantially all of the assets or a controlling portion (which may be less than 50%) of the equity of another company.

(4) Represents a one-time restricted stock award (the "One-Time Restricted Stock Award") under the Pareteum Corporation 2018 Long-Term Incentive Compensation Plan, of which 100% shall vest on the date of grant.

(5) Represents a stock award of 2,000,000 shares under the 2018 Long-Term Incentive Compensation Plan (the " Stock Award"), of which half shall vest on the date of grant and the remaining half shall vest in 12 equal monthly installments over a one year period, beginning January, 2019.

(6) Option is granted pursuant to the Pareteum Corp. 2018 Long-Term Incentive Compensation Plan, of which one-third shall vest on January 1, 2020 and two-thirds shall vest in 24 equal monthly installments over a two year period thereafter (the "January Option Grant").

### D.      THE FRAUD DEFENDANTS' POSITIONS EVIDENCE SCIENTER

415.    The Fraud Defendants were all high-level corporate insiders. Many signed the Company's SEC filings. They also regularly – indeed, at times, almost every other day – issued releases and spoke about the Company's Backlog, connections, Backlog conversion rate, and revenue. Defendant McCarthy, the Company's COO, was deeply involved in the Backlog metric, and Defendant Mumby was the Company's Chief Revenue Officer. They plainly had access to the information necessary to discern the falsity of the statements alleged herein and a responsibility to do so. These positions give rise to an inference of scienter on their part.

### E.      THE CRITICAL NATURE OF THE BACKLOG, CONNECTIONS, AND REVENUE METRICS AND THE COMPANY'S FOCUS ON ITS FINANCIAL REPORTING SUPPORT SCIENTER

416.    As outlined above, Pareteum and the Fraud Defendants repeatedly described the Backlog and connections metrics as "critical" and that they provided the Company with "*excellent visibility into our business operations and <u>revenue recognition.</u>*" The Backlog and connections metrics and the Company's revenue were plainly core operations of Pareteum.

417.    This is all the more true here, where Pareteum and the Fraud Defendants repeatedly asserted that, due to the material weaknesses identified in Pareteum's financial reporting, they had "performed *additional analysis* and other post-closing procedures to ensure our financial statements are prepared in accordance with generally accepted accounting principles," and they "categorically denied" the Aurelius and Viceroy Reports *after* those reports pointed out the very basis for the Restatement.

418.    The core nature of these metrics, the importance the Company and the Fraud Defendants placed on them, the nature of their positions with the Company, and the fact that the

Company and the Fraud Defendants continued to rely on their statements even after being confronted with evidence of their falsity likewise support scienter.

**F.   THE COMPANY'S BALLOONING ACCOUNTS RECEIVABLES SUPPORTS SCIENTER**

419.   As outlined above, the Company and the Fraud Defendants asserted throughout the Class Period that the Backlog was converting to revenue at or above 100%. However, as also outlined above, throughout the Class Period, the Company's accounts receivable ballooned – from just $1,954,495 for the first quarter of 2018 (ended March 31, 2018) to $45,061,236 by the end of the second quarter of 2019 (ended June 30, 2019). Plainly, the Backlog was not converting as represented, and the 2,300% increase in the Company's accounts receivable proves that the Company and the Fraud Defendants were aware of this fact.

420.   What is more, as outlined in the Aurelius Report, the account receivables also grew faster than the Company's purported revenue. Likewise, throughout the Class Period, while the Company's Backlog purportedly grew to over $1 billion, and the Company purportedly recognized "record" revenues each quarter, the Company continued to report net losses. For example, for the full year 2018, the Company reported a net loss of $(12,974,650) and accounts receivable of $15,361,594. These facts and the Aurelius' Report analysis further support scienter.

**G.   THE RESTATEMENT EVIDENCES SCIENTER**

421.   Accounting manipulations involving premature revenue recognition are especially indicative of conscious misbehavior, because such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue. The announced Restatement of the Company's "previously issued consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019 and June 30, 2019" and expected reductions of $9 million  (or approximately **28 percent**) of the

Company's full year 2018 revenues and $24 million (or **42 percent**) of its first half 2019 revenues itself thus evidences scienter. This is all the more true here, where Pareteum and the Fraud Defendants repeatedly asserted that, due to the material weaknesses identified in Pareteum's financial reporting, they had "performed *additional analysis* and other post-closing procedures to ensure our financial statements are prepared in accordance with generally accepted accounting principles," and they "categorically denied" the Aurelius and Viceroy Reports *after* those reports pointed out the very basis for the Restatement. For these reasons, the concealed GAAP violations and the lack of internal controls, as well as the forthcoming Restatement, support an inference of scienter.

### H.   POST-CLASS PERIOD DEVELOPMENTS SUPPORT SCIENTER

422.   Finally, the fallout from the revelation of this stunning fraud supports scienter. As noted above, just twelve days before the Restatement, Defendant McCarthy, the Company's COO who was deeply involved with the Company's self-created Backlog metric, was terminated. On November 5, 2019, the Company reported that Defendant O'Donnell would be replaced as CFO and that his "status with the Company is under review." And, on November 25, 2019, the Company announced that Defendant Turner had been terminated as Chairman and CEO of the Company. The swift and suspiciously-timed termination of the majority of senior management further supports a finding of scienter.

## VIII.   VIOLATIONS OF GAAP AND SEC REPORTING RULES

423.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false

and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

424.   As noted above, Defendants represented in each of Pareteum's periodic reports filed with the SEC on Forms 10-K and 10-Q that the financial statements therein conformed with GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP. SEC Rule 13a-13 requires issuers to file quarterly reports. SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

425.   In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided.  Instructions to Item 303 require that this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant
> reasonably expects will have a material favorable or unfavorable impact on net

sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . .

426.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28.  Paragraph 17 of this authoritative pronouncement states that:

The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

427.    The Company's financial statements contained in the quarterly 2018 reports, full-year 2018 reports, and quarterly 2019 reports filed with the SEC on Form 10-K and Form 10-Q for the periods throughout the Class Period, were presented in a manner that violated the principle of fair financial reporting and the following GAAP provisions, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

428.    In addition, during the Class Period, Defendants violated SEC disclosure rules:

(a)     by failing to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. § 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)      by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).

429.    Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein. Had the true financial position and results of operations of the Company been disclosed during the Class Period, the Company's common stock would have traded at prices well below that which it did.

## IX.    LOSS CAUSATION AND ECONOMIC HARM

430.    As detailed herein, during the Class Period, Defendants deceived the market through a course of conduct that artificially inflated Pareteum's stock price and operated as a fraud or deceit on Class Period purchasers of Pareteum's stock by misrepresenting, among other things, the Company's key metrics and revenue, and, thus, the Company's financial results. Over a period of approximately twenty-three months, Defendants improperly inflated the Company's financial results. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of Pareteum declined precipitously – evidence that the prior artificial inflation in the price of Pareteum's shares was eradicated.  As a result of their purchases of Pareteum stock during the Class Period, Lead

Plaintiff and other members of the Class suffered economic losses – *i.e.*, damages under the federal securities laws.

431. By improperly characterizing the Company's financial results and misrepresenting its prospects, Defendants presented a misleading image of Pareteum's business and growth prospects. During the Class Period, Defendants repeatedly emphasized the ability of the Company to engage in hyper-inflated market growth while at the same time maintaining rational economic discipline and vetting prospective clients so as to reasonably assure that the hundreds of millions of dollars in Backlog revenue was reasonably assured of being collected, and was not just foreseeably unlikely to be collected revenues from incapable counter-parties. These claims caused and maintained the artificial inflation in Pareteum's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

432. Defendants' false and materially misleading statements had the intended effect of causing Pareteum's shares to trade at artificially inflated levels throughout the Class Period – reaching a Class Period high of $5.93 per share in mid-March 2019.

433. In June 2019, however, as investors began to learn the truth about the Company, and after the Aurelius Report and Viceroy Reports were published and investors learned that Defendants had failed to report the Company's true financial and operational results, shares of Pareteum fell, but only avoided totally collapsing because of the Company's denials. However, on October 22, 2019, Pareteum shares finally collapsed, reaching a 52-week low after the Company was forced to issue the Restatement disclosing that certain revenues for 2018 and 2019 should not have been recorded. These belated disclosures had an immediate, adverse impact on the price of Pareteum shares.

434.    These belated revelations also evidenced Defendants' prior falsification of Pareteum's business prospects due to Defendants' false statements.  As investors and the market ultimately learned, the Company's prior business prospects and purported Backlog had been inflated and overstated, as were the Company's results of operations. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Pareteum's share price, and investors were damaged as a result of the associated decline in the Company's share price.

435.    As a direct result of investors beginning to learn the truth about the Company on June 7, 2019 and on June 26, 2019, Pareteum's stock price fell approximately 50%, from a close of $4.00 per share to approximately $2.00 per share -- on very high trading volume of over 50 million shares traded. Thereafter, on October 22, 2019, shares fully collapsed, closing at $0.2992 per share with trade volume of over 31.8 million shares. The dramatic decline in the price of Company shares immediately following Defendants' October 21, 2019 belated disclosure is evidenced, in part, by the chart below:



These dramatic declines eradicated the artificial inflation of Pareteum's share price and caused real economic loss to investors who purchased this stock during the Class Period.

436. The decline in Pareteum's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of Pareteum's stock price decline negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct. During the same period in which Pareteum's share price fell as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged. The economic loss (*i.e.*, damages) suffered by Lead Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Pareteum's stock and the subsequent significant decline in the value of the Company's shares when Defendants' prior misstatements and other fraudulent conduct were revealed.

## X.     **PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET**

437. At all relevant times, the market for Pareteum's common stock was an efficient market for the following reasons, among others:

(a) Pareteum's stock met the requirements for listing, and was listed and actively traded on the NYSE and then the Nasdaq national market exchanges, both highly efficient and automated markets;

(b) As a regulated issuer, Pareteum filed periodic public reports with the SEC and the NYSE/Nasdaq;

(c) Pareteum regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other media;

(d)     Pareteum was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace; and

(e)     Unexpected material news about Pareteum was reflected and incorporated into its stock price during the Class Period.

438.    As a result of the foregoing, the market for Pareteum securities promptly digested current information regarding Pareteum from all publicly available sources and reflected such information in Pareteum stock price. Under these circumstances, all purchasers of Pareteum common stock during the Class Period suffered similar injury through their purchase of Pareteum common stock at artificially inflated prices and a presumption of reliance applies.

## XI.   <u>NO SAFE HARBOR</u>

439.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements or omissions pleaded in this complaint because they are not forward looking statements; rather, they are statements of present or historical fact. Further, many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent any such statements could be characterized as forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that any statements were identified as "forward-looking statements," which they were not, Defendants are liable for those

false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Pareteum who knew that those statements were false when made.

## XII.   CLASS ACTION ALLEGATIONS

440.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Pareteum between **December 14, 2017 and October 21, 2019,** inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are the Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

441.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Pareteum securities were actively traded on the NYSE American until the market closed on October 22, 2018, and thereafter, beginning on October 23, 2018, the Company's securities were traded on the Nasdaq.  As of August 8, 2019, there were 111,903,762 shares of Company common stock issued and outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pareteum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

442.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

443.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

444.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by certain Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pareteum; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

445.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**FIRST CLAIM**

**Violation of Section 10(b) of**
**the Exchange Act and Rule 10b-5**
**Promulgated Thereunder**
**Against Pareteum and the Fraud Defendants**

446.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

447.    During the Class Period, Pareteum and the Fraud Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Pareteum's business, operations, management and the intrinsic value of Pareteum common stock; (ii) enable Pareteum and the Fraud Defendants to artificially inflate the price of Pareteum shares; (iii) enable Pareteum insiders to use millions of dollars of Company stock as currency to acquire revenues and to raise millions more in capital necessary to fund operations, while in possession of material adverse non-public information about the Company; and (iv) caused Lead Plaintiff and other members of the Class to purchase Pareteum common stock at artificially inflated prices.

448.    Pareteum and the Fraud Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Pareteum's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Pareteum and the Fraud Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

449.    Pareteum and the Fraud Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and prospects of Pareteum as specified herein.

450.    Pareteum and the Fraud Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Pareteum's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Pareteum and its business operations and prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Pareteum common stock during the Class Period.

451.    Each of Pareteum and the Fraud Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Fraud Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Fraud Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Fraud Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and

information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Fraud Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

452.    Pareteum and the Fraud Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Pareteum's operating condition and business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Pareteum and the Fraud Defendants' overstatements and misstatements of the Company's business, operations, and earnings throughout the Class Period, Pareteum and the Fraud Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

453.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Pareteum common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Pareteum's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Pareteum and the Fraud Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Pareteum and the Fraud Defendants but not disclosed in public statements by Pareteum and the Fraud Defendants

during the Class Period, Lead Plaintiff and the other members of the Class acquired Pareteum common stock during the Class Period at artificially high prices and were damaged.

454. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Pareteum was experiencing, which were not disclosed by Pareteum and the Fraud Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Pareteum common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

455. By virtue of the foregoing, Pareteum and the Fraud Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

456. As a direct and proximate result of Pareteum and the Fraud Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Control Person Defendants

457. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

458. The Control Person Defendants acted as controlling persons of Pareteum within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

459.    In particular, each of the Control Person Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

460.    As set forth above, Pareteum and the Fraud Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Control Person Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## THIRD CLAIM

### Violation of Section 11 of the Securities Act
### Against Pareteum and the Control Person Defendants

461.    Lead Plaintiff realleges and incorporates each and every allegation of this Complaint as if fully set forth herein, except as noted below.

462.     This count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

463.     This count is asserted against Pareteum and the Control Person Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum securities in the iPass Acquisition pursuant or traceable to the iPass Registration Statement and the SEC filings incorporated therein by reference.

464.     The iPass Registration Statement was false and misleading for the reasons set forth above. The iPass Registration Statement also incorporated by reference SEC filings (outlined above) that contained false and misleading statements and/or omitted material facts necessary to make these statements not false and misleading, for the reasons set forth above.

465.     Lead Plaintiff purchased or otherwise acquired Pareteum stock in the iPass Acquisition issued pursuant to or traceable to the iPass Registration Statement, which contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading, for the reasons set forth above.

466.     Pareteum was the offeror and registrant for the iPass Acquisition. As such, Pareteum is strictly liable for the materially false and misleading statements and omissions of material act in the iPass Registration Statement.

467.     The Control Person Defendants were executive officers and/or directors of the Company responsible for the contents and dissemination of the iPass Registration Statement. Each of the Control Person Defendants was an officer and/or director of Pareteum at the time the iPass Registration Statement became effective as to the iPass Acquisition. Each of the Control

Person Defendants signed the iPass Registration Statement, in their capacities as officers and/or directors of Pareteum, and caused and participated in the issuance of the iPass Registration Statement. By reasons of the conduct alleged herein, each of the Control Person Defendants violated Section 11 of the Securities Act.

468.    Pareteum and the Control Person Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the iPass Registration Statement were true, were without omissions of any material facts, and were not misleading. Accordingly, Pareteum and the Control Person Defendants acted negligently and are therefore liable to Lead Plaintiff and members of the Class who purchased or otherwise acquired the securities sold pursuant or traceable to the materially false and misleading iPass Registration Statement.

469.    Lead Plaintiff and all members of the Class who purchased or otherwise acquired Parateum securities sold in or traceable to the iPass Acquisition did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

470.    The value of the securities sold pursuant or traceable to the iPass Acquisition has declined substantially due to Pareteum and the Control Person Defendants' violations of Section 11 of the Securities Act and, therefore, Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum shares pursuant or otherwise traceable to the iPass Registration Statement have suffered damages as a result.

471.    By reason of the foregoing, Pareteum and the Control Person Defendants are liable for violations of Section 11 of the Securities Act to Lead Plaintiff and all members of the Class.

## FOURTH CLAIM

### Violation of Section 12 of
### the Securities Act Against Pareteum

472.    Lead Plaintiff realleges and incorporates each and every allegation of this Complaint as if fully set forth herein, except as noted below.

473.    This count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

474.    This Count is asserted against Pareteum for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

475.    Pareteum was a seller, offeror, and/or solicitor of sales of the securities issued in the iPass Acquisition pursuant to the iPass Registration Statement and directly solicited the purchase or acquisition of securities by Lead Plaintiff by means of the iPass Registration Statement, motivated at least in part by the desire to serve their own financial interests.

476.    The iPass Registration Statement contained untrue statements of material fact and failed to disclose material facts, as set forth herein.  Lead Plaintiff purchased or otherwise acquired Pareteum stock in the iPass Acquisition, pursuant to or traceable to the materially false and misleading iPass Registration Statement.

477.    Lead Plaintiff did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the iPass Registration Statement when they purchased or otherwise acquired the stock.

478.    The value of the Pareteum stock issued in connection with the iPass Acquisition has declined substantially subsequent to the iPass Acquisition and Lead Plaintiff and the other members of the Class have sustained damages as a result.

479.    By reason of the foregoing, Pareteum is liable for violations of Section 12(a)(2) of the Securities Act to Lead Plaintiff and all members of the Class.

## FIFTH CLAIM

### Violation of Section 15 of The Securities Act
### Against the Control Person Defendants

480.    Lead Plaintiff realleges and incorporates each and every allegation of this Complaint as if fully set forth herein, except as noted below.

481.    This count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

482.    This Count is asserted against the Control Person Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Pareteum securities pursuant or traceable to the iPass Registration Statement and were damaged thereby.

483.    At all relevant times, the Control Person Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. Each of the Control Person Defendants served as an executive officer and/or director of Pareteum prior to and/or at the time of the iPass Acquisition. The Control Person Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Pareteum's business affairs. As officers and/or directors of a publicly owned company, the Control Person Defendants had a duty to disseminate accurate and

truthful information with respect to Pareteum's financial condition and results of operations. Because of their positions of control and authority as officers and/or directors of Pareteum, the Control Person Defendants were able to, and did, control the contents of the iPass Registration Statement, which contained materially untrue financial information.

484.   By reason of the aforementioned conduct, each of the Control Person Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Lead Plaintiff and the other members of the Class. As a direct and proximate result of the conduct of the Control Person Defendants, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Pareteum securities in the iPass Acquisition.

## SIXTH CLAIM

### Violation of Section 11 of the Securities Act
### Against Pareteum, the Control Person Defendants, Dawson James, and Squar Milner

485.   Lead Plaintiff realleges and incorporates each and every allegation of this Complaint as if fully set forth herein, except as noted below.

486.   This count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

487.   This count is asserted against Pareteum, the Control Person Defendants, Dawson James, and Squar Milner for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum securities in the Secondary Offering.

488.   The Secondary Offering Registration Statement was false and misleading for the reasons set forth above. The Secondary Offering Registration Statement also incorporated by reference SEC filings (outlined above) that contained false and misleading statements and/or

omitted material facts necessary to make these statements not false and misleading, for the reasons set forth above.

489.   Lead Plaintiff purchased or otherwise acquired Pareteum stock in the Secondary Offering pursuant to or traceable to the Secondary Offering Registration Statement.

490.   The Secondary Offering Registration Statement contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading, for the reasons set forth above.

491.   Pareteum was the offeror and registrant for the Secondary Offering. As such, Pareteum is strictly liable for the materially false and misleading statements and omissions of material act in the Secondary Offering Registration Statement.

492.   The Control Person Defendants were executive officers and/or directors of the Company responsible for the contents and dissemination of the Secondary Offering Registration Statement. Each of the Control Person Defendants was an officer and/or director of Pareteum at the time the Secondary Offering Registration Statement became effective as to the Secondary Offering. Each of the Control Person Defendants signed the Secondary Offering Registration Statement in their capacities as officers and/or directors of Pareteum, and caused and participated in the issuance of the Secondary Offering Registration Statement. By reasons of the conduct alleged herein, each of these Defendants violated Section 11 of the Securities Act.

493.   Pareteum and the Control Person Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Secondary Offering Registration Statement were true, were without omissions of any material facts, and were not misleading. Accordingly, Pareteum and the Control Person Defendants acted negligently and are therefore liable to Plaintiffs and members of the Class who purchased or

otherwise acquired the securities sold pursuant or traceable to the materially false and misleading Secondary Offering Registration Statement.

494.     Defendant Squar Milner was the auditor for Pareteum's consolidated financial statements as of and for the year ended December 31, 2018, included in Pareteum's FY2018 10-K and incorporated by reference into the Secondary Offering Documents. Defendant Squar Milner falsely certified that Pareteum's financial statements fairly presented the Company's financial position as of December 31, 2018 and December 31, 2017 and were prepared in accordance with GAAP, and falsely represented that it conducted its audits or reviews in accordance with PCAOB standards.

495.     Dawson James was the underwriter for the Secondary Offering. Dawson James owed to the purchasers of securities in the Secondary Offering the duty to make a reasonable and diligent investigation of the statements contained in the Secondary Offering Registration Statement at the time the Secondary Offering became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue or misleading.  Dawson James acted negligently by failing to ensure that the statements made in the Secondary Offering Registration Statement were not false or misleading or contained omissions of material fact and is liable to Lead Plaintiff and members of the Class who purchased or otherwise acquired Pareteum securities sold pursuant or traceable to the Secondary Offering.

496.     Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum securities sold in or traceable to the Secondary Offering did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and

omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

497.    The value of the securities sold pursuant or traceable to the Secondary Offering has declined substantially due to the violations of Section 11 of the Securities Act and, therefore, Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum shares pursuant or otherwise traceable to the Secondary Offering have suffered damages as a result.

498.    By reason of the foregoing, Pareteum, the Control Person Defendants, Dawson James, and Squar Milner are liable for violations of Section 11 of the Securities Act to Lead Plaintiff and all members of the Class.

## SEVENTH CLAIM

### Violation of Section 15 of the Securities Act
### Against the Control Person Defendants

499.    Lead Plaintiff realleges and incorporates each and every allegation of this Complaint as if fully set forth herein, except as noted below.

500.    This count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

501.    This Count is asserted against the Control Person Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Pareteum securities pursuant or traceable to the Secondary Offering Registration Statement and were damaged thereby.

502.    At all relevant times, the Control Person Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. Each of the Individual

Control Person Defendants served as an executive officer and/or director of Pareteum prior to and/or at the time of the Secondary Offering. The Control Person Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Pareteum's business affairs. As officers and/or directors of a publicly owned company, the Control Person Defendants had a duty to disseminate accurate and truthful information with respect to Pareteum's financial condition and results of operations. Because of their positions of control and authority as officers and/or directors of Pareteum, the Control Person Defendants were able to, and did, control the contents of the Secondary Offering Registration Statement, which contained materially untrue financial information.

503.    By reason of the aforementioned conduct, each of the Control Person Defendants are liable under Section 15 of the Securities Act, jointly and severally, to Lead Plaintiff and the other members of the Class. As a direct and proximate result of the conduct of the Control Person Defendants, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Pareteum securities in the Secondary Offering.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 26, 2020                    Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Melinda A. Nicholson*
LEWIS S. KAHN
MELINDA A. NICHOLSON (MN-6251)
MICHAEL J. PALESTINA (admitted PHV)
MELISSA HARRIS (MH-3553)
1100 Poydras Street – Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: Lewis.Kahn@ksfcounsel.com
Email: Melinda.Nicholson@ksfcounsel.com
Email: Michael.Palestina@ksfcounsel.com
Email: Melissa.Harris@ksfcounsel.com

-and-

J. RYAN LOPATKA
**KAHN SWICK & FOTI, LLC**
250 Park Ave., Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: j.lopatka@ksfcounsel.com


***Lead Counsel for Lead Plaintiff Pareteum Shareholder Investor Group***