**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - **X**
           :
IN RE PARETEUM SECURITIES       :
LITIGATION               :       Case No. 1:19-cv-09767-AKH-GWG
           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
           **X**

**MEMORANDUM OF LAW IN SUPPORT OF THE PARETEUM**
**DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED**
**COMPLAINT, OR IN THE ALTERNATIVE, TO STRIKE CERTAIN**
<u>**ALLEGATIONS IN THE CONSOLIDATED COMPLAINT**</u>

**MCGUIREWOODS LLP**

1251 Avenue of the Americas
20th Floor
New York, NY 10020
Telephone: (212) 548-2100
Facsimile: (212) 548-2150

*Counsel for the Pareteum Defendants*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF ALLEGED FACTS ........................................................................... 3

A.    THE REVENUE "BACKLOG" ........................................................................... 3

B.    CORRECTIVE INFORMATION AND ALLEGED MISSTATEMENTS ...................... 3

      1.    Corrective information concerning certain revenues recognized by Pareteum in 2018 and 2019.................................................................... 3

      2.    Allegations of the Statements' falsity .................................................. 6

      3.    Information contained in Pareteum press releases and SEC filings that PSIG omits from its Complaint.................................................. 8

      C.    PSIG's scienter allegations ................................................................... 9

D.    THE IPASS ACQUISITION AND SECONDARY OFFERING ................................. 11

      1.    The iPass Acquisition .......................................................................... 11

      2.    The Secondary Offering........................................................................ 12

ARGUMENT................................................................................................................... 13

I.    PSIG'S COMPLAINT SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(B)(6) FOR FAILURE TO STATE A CLAIM ............................................. 13

      A.    The Complaint fails to state a Section 10(b) claim............................................. 14

          1.    PSIG must allege specific reasons why the Statements were false when made and that Pareteum and the Fraud Defendants were aware of their falsity. .............................................................. 15

          2.    PSIG's Complaint lacks the particularity that Rule 9(b) and the PSLRA require.......................................................................... 16

              (a)    The Statements, asserted over 100 pages and in hundreds of paragraphs containing verbatim and block-quoted recitals from press releases, SEC filings, and registration statements, are classic "puzzle pleading." .................................. 16

              (b)    PSIG's reasons why the Statements were false do not pass Rule 9(b) or PSLRA muster........................................................ 18

          3.    PSIG's conclusory allegations of scienter do not meet the demanding Rule 9(b) and PSLRA standards. ......................................... 20

              (a)    None of the allegations are sufficient to support a strong inference of scienter.................................................................... 21

**TABLE OF CONTENTS**
(continued)

**Page**

(i)    The Fraud Defendants' alleged concealment of their relationships is not evidence of scienter or a material misstatement. ...................................................... 21

(ii)    Issuing press releases does not show scienter. ................. 23

(iii)    The Fraud Defendants' compensation plans do not evidence scienter. ............................................................ 24

(iv)    The Fraud Defendants' corporate positions do not establish scienter. ............................................................ 24

(v)    The Backlog, connections, and revenue metrics and the Company's focus on its financial reporting do not support scienter. ............................................................ 25

(vi)    The Company's accounts receivables do not support scienter. .............................................................. 26

(vii)    The Restatement does not evidence scienter. .................. 27

(viii)    Post-class period developments do not evidence scienter. .............................................................................. 27

(b)    The allegations collectively do not add up to scienter. ................. 28

(c)    PSIG improperly lumps the Fraud Defendants together for group scienter. ..................................................................................... 29

(d)    PSIG's Section 10(b) claim is impermissible "fraud by hindsight." .................................................................................... 30

4.    The Statements contain cautionary language and are thus protected by the PSLRA's safe harbor. .................................................................. 34

5.    Alleged GAAP and SOX violations do not support a Section 10(b) claim. ............................................................................................................. 38

6.    Statements regarding the Company's Blockchain capabilities are not actionable. ........................................................................................... 40

B.    PSIG has failed to state a Section 20(a) claim. ...................................................... 41

C.    PSIG has failed to state a Section 11, 12, or 15 Securities Act claim in connection with the iPass Registration Statement. ............................................. 41

1.    Basis of iPass Registration Statement alleged misstatements ................. 41

2.    PSIG cannot state a Section 11 claim. ..................................................... 42

3.    PSIG cannot state a Section 12 claim. ..................................................... 44

4.    Because there is no Section 11 or 12 liability, there is no Section 15 liability. .............................................................................................. 45

## TABLE OF CONTENTS
### (continued)

**Page**

D.      PSIG has failed to state a Section 11 or 15 Securities Act claim in connection with the Secondary Offering. ............................................................... 45

II.     THIS COURT SHOULD STRIKE PSIG'S ALLEGATIONS RELATING TO THE NON-PARTIES UNDER RULE 12(F) ...................................................... 46

A.      Allegations relevant to Motion to Strike............................................................. 47

B.      Legal standard. ................................................................................................... 48

C.      This Court should strike the scandalous and irrelevant allegations against Hart and Thomas................................................................................................. 48

1.      PSIG seizes on Hart's decade-old conviction to try to show the Pareteum Defendants' propensity for misconduct, which is improper. ................................................................................................ 48

2.      PSIG includes Thomas in the Complaint to try to show guilt-by-association................................................................................................ 49

D.      Allegations related to Honig are purely innuendo and inflammatory................. 50

E.      Purportedly material omissions involving Honig, and allegations of scienter concerning the same, do not save these impertinent allegations. ........... 52

CONCLUSION................................................................................................................... 53

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aceto Corp. Sec. Litig.*,
No. 2:18-CV-2425-ERK-AYS, 2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)........................25

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)................................................................................................24

*AmBase Corp. v. SDG Inc.*,
No. 3:00CV1694 (DJS), 2005 WL 1860260 (D. Conn. Aug. 3, 2005) ............................21, 22

*In re AmTrust Fin. Services, Inc. Sec. Litig.*,
No. 17-cv-1545-LAK, 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)................................38, 42

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)................................................................................35

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act
(ERISA) Litig.*,
No. 09 CIV. 5411 PKC, 2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012) .................................32

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019)................................................................................22

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)..........................................................................34, 36

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013)..................................................................................28

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)................................................................................29

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)................................................................................30

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ..................................................................................17, 18

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)................................................................................24

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008)..........................................................................27, 28

*City of Brockton Retirement Sys. v. Avon Prod., Inc.*,
  No. 11 Civ. 4665 (PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) .........................25, 27

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
  442 F. App'x 672 (3d Cir. 2011) ...............................................................................................28

*Crigger v. Fahnestock & Co., Inc.*,
  443 F.3d 230 (2d Cir. 2006)......................................................................................................22

*In re CRM Holdings, Ltd. Sec. Litig.*,
  No. 10 Civ. 975, 2012 WL 1646888 (S.D.N.Y. May 10, 2012)................................................30

*Das v. Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018).......................................................................................28

*Denny v. Barber*,
  576 F.2d 465 (2d Cir. 1978).......................................................................................................32

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  No. 16CIV3495 (AT) (BCM), 2017 WL 4049253 (S.D.N.Y. June 28, 2017) ........................17

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)........................................................................................27

*Erickson Beamon Ltd. v. CMG Worldwide, Inc.*,
  No. 12 CIV. 5105 NRB, 2014 WL 3950897 (S.D.N.Y. Aug. 13, 2014)...................................53

*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010).................................................................................31, 32

*In re Fannie Mae 2008 Sec. Litig.*,
  891 F. Supp. 2d 458 (S.D.N.Y. 2012)........................................................................................48

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018)........................................................................................35

*Frederick v. Mechel OAO*,
  475 F. App'x 353 (2d Cir. 2012) ...............................................................................................25

*Fries v. N. Oil & Gas, Inc.*,
  285 F. Supp. 3d 706 (S.D.N.Y. 2018)........................................................................................28

*In re Gaming Lottery Sec. Litig.*,
  No. 96 CIV. 5567 (RPP), 1998 WL 276177 (S.D.N.Y. May 29, 1998)....................................52

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y.2012).........................................................................................15

*Gotham Holdings, LP v. Health Grades, Inc.*,
   534 F. Supp. 2d 442 (S.D.N.Y. 2008)...............................................................44, 45

*IBEW Local 98 Pension Fund v. Cent. Vermont Pub. Serv. Corp.*,
   No. 11-CV-222, 2012 WL 12985689 (D. Vt. Aug. 23, 2012)...................................17

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017).....................................................................25

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*,
   32 F.3d 697 (2d Cir. 1994)......................................................................................30

*Kinra v. Chicago Bridge & Iron Co.*,
   No. 17 Civ. 4251 (LGS), 2018 WL 2371030 (S.D.N.Y. May 24, 2018)......................26, 27, 30

*Lasker v. New York State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996).........................................................................................35

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
   650 F.3d 167 (2d Cir. 2011).....................................................................................45

*Lipow v. Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015)......................................................................24

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976).....................................................................................51

*Lynch v. Southampton Animal Shelter Found. Inc.*,
   278 F.R.D. 55 (E.D.N.Y. 2011)................................................................49, 50, 51

*In re Manulife Fin. Cop. Sec. Litig.*,
   276 F.R.D. 87 (S.D.N.Y. 2001)...........................................................................30, 31

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009)................................................................................27, 39

*McIntire v. China MediaExpress Holdings, Inc.*,
   927 F. Supp. 2d 105 (S.D.N.Y. 2013).......................................................................41

*Medis Investor Group v. Medis Technologies, Ltd.*,
   586 F. Supp. 2d 136 (S.D.N.Y. 2008).......................................................................23

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010).......................................................................................42

*Morse v. Weingarten*,
   777 F. Supp. 312 (S.D.N.Y. 1991) ............................................................................48

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*,
    720 F. Supp. 2d 254 (S.D.N.Y. 2010)...............................................................................14, 46

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006).....................................................................................25

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)....................................................................................................38

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................................................40

*Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010)....................................................................................................15

*Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015).....................................................................................34

*Pollio v. MF Glob., Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009)................................................................................19, 20

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................13, 15, 16, 17, 42, 43

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)......................................................................................................26

*S.E.C. v. Aimsi Technologies, Inc.*,
    650 F. Supp. 2d 296 (S.D.N.Y. 2009).....................................................................................23

*S.E.C. v. Lee*,
    720 F. Supp. 2d 305 (S.D.N.Y. 2010).....................................................................................48

*In re Seadrill Ltd. Sec. Litig.*,
    No. 14 CIV. 9642 (LGS), 2016 WL 3461311 (S.D.N.Y. June 20, 2016) ..............................37

*Shahzad v. Meyers*,
    No. 95 CIV. 6196 (DAB), 1997 WL 47817 (S.D.N.Y. Feb. 6, 1997)...................48, 49, 50, 51

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010).................................................................................27, 34, 36, 39

*In re Stac Elecs. Secs. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ..................................................................................................43

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)................................................................................................32, 40

*Tabor v. Bodisen Biotech, Inc.*,
  579 F. Supp. 2d 438 (S.D.N.Y. 2008)................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................15, 16, 21, 40

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.*,
  No. 11 CIV. 2890 GBD, 2013 WL 2154220 (S.D.N.Y. Mar. 29, 2013)................................22

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
  723 F. App'x 20 (2d Cir. 2018) ......................................................................31

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
  No. 07 Civ. 3994 (LTS) (AJP), 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009).........................22

*Yung v. Lee*,
  432 F.3d 142 (2d Cir. 2005)..........................................................................44

*Zech Capital LLC v. Ernst & Young Hua Ming*,
  636 F. App'x 582 (2d Cir. 2016) ....................................................................32

**Statutes**

15 U.S.C. § 77k(a) ....................................................................................42

15 U.S.C. § 78u-4(b)(2)(A)..................................................................15, 21, 23

15 U.S.C. § 78u-5(i)(1) ..............................................................................34

**Rules**

Fed. R. Civ. P. 9(b) ..................................1, 13, 15, 16, 17, 18, 20, 32, 37, 42, 43, 46, 52

Fed R. Civ. P. 12(B)(6)...............................................................................13

Fed. R. Civ. P. 12(f).......................................................................2, 46, 48, 53

Rule 10b-5............................................................................................1, 15

**INTRODUCTION**

The Pareteum Defendants[1] respectfully submit this memorandum in support of their motion to dismiss the Consolidated Complaint filed by the Lead Plaintiff in this putative class action, the Pareteum Shareholder Investor Group ("PSIG"), or in the alternative, to strike certain allegations in the Complaint that relate to non-parties.  PSIG's 500-paragraph, heavily block-quoted Complaint is long on dubiously relevant history but short on the particularized allegations of misrepresentations and scienter needed to survive the exacting standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

The Rule 10b-5 cause of action (First Claim) fails for at least four reasons.  First, despite its bulk, the Complaint lacks particularity about which statements it alleges were false or misleading, expecting instead that the Pareteum Defendants and this Court will figure it out.  Such "puzzle pleading" is impermissible under the Exchange Act.  Second, PSIG has not linked the allegedly corrective information—a restatement of certain past revenues Pareteum incorrectly recognized in 2018 and 2019 ("Restatement")—to the misrepresentations it alleges, which concern the value of future revenues.  Those purported misstatements about future revenues do not "fit" the truth revealed by the Restatement.  Third, PSIG's scienter allegations do not pass muster under Rule 9(b) or the PSLRA as to all Pareteum Defendants, and there are certain specific Defendants as to whom these allegations are particularly deficient.  Fourth, the alleged misstatements themselves contained meaningful disclosures and cautionary language about the future revenues that PSIG claims were overstated, bringing them within the PSLRA's safe harbor.

---

[1] Pareteum Defendants include Pareteum Corporation and the following current or former officers and directors of Pareteum: Robert H. "Hal" Turner; Edward "Ted" O'Donnell; Victor Bozzo; Denis McCarthy; Rob Mumby; Robert Lippert; Yves van Sante; and Luis Jimenez-Tunon.

PSIG's remaining six causes of action—violation of Section 20(a) of the Exchange Act (Second Claim), violation of Sections 11, 12, and 15 of the Securities Act in the iPass Acquisition (Third, Fourth, and Fifth Claims), and violation of Sections 11 and 15 of the Securities Act in the Secondary Offering (Sixth and Seventh Claims)—fare no better.  Besides the specific grounds for dismissal set forward below, those claims all fail because they depend on the same inadequate allegations of misrepresentations that doom its Section 10(b) claim.

All seven causes of action arise out of allegedly false or misleading statements or omissions falling into several categories.  The bulk of the asserted false or misleading statements concern Pareteum's "false hyper-growth narrative, backlog and connections metrics, and revenue." (Compl. ¶¶ 185-350.)  PSIG also identifies purportedly "false and/or misleading statements and/or omissions regarding the Company's financial controls and procedures and financial reporting and compliance with GAAP."  (*Id.* ¶¶ 351-77.)  The Complaint asserts that statements related to Pareteum's "Blockchain Capabilities" and "senior management background" are false and misleading.  (*Id.* ¶¶ 378-84.)  Finally, PSIG identifies false or misleading statements or omissions made in connection with Pareteum's iPass acquisition and the Secondary Offering Statements and Prospectuses.  (*Id.* ¶¶ 385-404.)  As set forward below, this Court should dismiss the claims grounded in these statements.

Additionally, this Court should strike paragraphs in the Complaint concerning Non-Parties Stephen Hart, Laura Thomas, and Barry Honig (the "Non-Party" or "Non-Parties").  PSIG's allegations related to these individuals are scandalous and impertinent under Fed. R. Civ. P. 12(f), because their sole purpose is to impugn the Pareteum Defendants' conduct through reference to the Non-Parties' "prior bad acts"—in some cases over a decade old—in the securities arena.  Such prejudicial, inadmissible allegations should be struck.

2

## STATEMENT OF ALLEGED FACTS

### A.    The Revenue "Backlog"

Almost every alleged misstatement or omission identified by PSIG relates to Pareteum's use of the Backlog metric in press releases and other disclosures. The "Backlog" describes a forward-looking, 36-month projection of contractual revenue Pareteum expected to receive under its customer agreements. (*Id.* ¶ 84.) Pareteum management would also use the number of "connections" the Company made over a given period as an indicator of revenue, where that term represented "devices, subscribers, and their variable usage." (*Id.* ¶ 85.)

PSIG alleges that between late 2017 and mid-2019, Pareteum issued press releases announcing that it was signing new contracts with customers for wireless communications services. (*See*, *e.g.*, *id.* ¶ 98.) These new deals increased Pareteum's Backlog and connections, and similarly increased revenue earned by Pareteum in comparison to years past. (*See*, *e.g.*, *id.* ¶ 101.) Broadly stated, PSIG claims that Pareteum's positive press releases and related Securities and Exchange Commission filings "artificially inflated Pareteum's stock price" and "presented a misleading image of Pareteum's business and growth prospects" to investors like PSIG and its constituent members. (*Id.* ¶¶ 430-31.)

### B.    Corrective information and alleged misstatements

#### 1.    Corrective information concerning certain revenues recognized by Pareteum in 2018 and 2019

Events in 2019 allegedly revealed flaws in Pareteum's revenue recognition controls, leading to an October 21, 2019 decision by the Company to restate its SEC filings for 2018 and 2019 (the "Restatement"). October 21, 2019 is the close of the proposed class period and date on which PSIG asserts that Pareteum's purported fraud was fully revealed to the market. (*Id.* ¶¶ 172, 440.)

3

The first of these events was Pareteum's acknowledgment in its FY2018 Form 10-K—filed on March 18, 2019, over six months before October 21, 2019—that "there existed at Pareteum 'material weaknesses in its internal control over financial reporting, [such that its] disclosure controls and procedures were not effective as of December 31, 2018.'"  (*Id.* ¶ 88.) Pareteum stated in that same filing that "[t]he material weaknesses did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results."  (April 24, 2020 Decl. of Stephen G. Foresta, submitted herewith ("Foresta Decl."), Ex. A, FY2018 10-K at 78.)  It also highlighted its remediation efforts in this respect. (*Id.* at 77-78.)

Next, in June 2019, two websites published articles (the "Aurelius Report" and the "Viceroy Report") questioning Pareteum's ability to convert the Backlog into revenue.  (Compl. ¶¶ 142-56.)  PSIG takes much of the content from these reports and includes it in the Complaint, sometimes inflating the articles' limited conclusions and reporting it as fact.  (*Compare id.* ¶ 144 (Aurelius Report identified "a *variety* of purportedly valuable customers that *appear* wholly incapable of paying [Pareteum]") (emphasis added) *with id.* ¶¶ 448 (in Section 10(b) cause of action, alleging in blanket fashion that *all* press releases identifying new contracts were false); *compare* ¶¶ 146-47 (Aurelius Report "outlined how . . . Pareteum had surrounded itself with veterans from failed stock promotions") *with id.* ¶ 382 (asserting that unspecified Defendants made false or misleading statements or omissions regarding background of senior Pareteum management).)

Last, and as the driving event behind PSIG's lawsuit, Pareteum announced on October 21, 2019, that it "would restate its previously issued consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019 and June 30, 2019" because "certain revenues recognized during 2018 and 2019 should not have been

4

recorded during that period . . . and that for certain customer transactions, the Company may have prematurely or inaccurately recognized revenue." (*Id.* ¶¶ 5, 7, 12, 447, 452.) That announcement allegedly revealed the truth to the market that *all* of Pareteum's statements regarding future contract revenue and business prospects were false. (*Id.*) PSIG asserts that the Restatement would result in a $9 million reduction in revenue for 2018 (a 28% decrease) and a $24 million reduction for the first half of 2019 (a 42% decrease). (*Id.* ¶¶ 12-13.) As a result, PSIG alleges, "shares of Pareteum tumbled in after-market trading, closing at $0.73 per share on October 21, 2019 and opening at $0.37 per share on October 22, 2019." (*Id.* ¶ 14.)

PSIG appears to assert that the Restatement announcement revealed the falsity of the following:

- 101[2] press releases issued between December 2017 and August 2019 about Pareteum's revenues, connections, and Backlog (*id.* ¶¶ 185-350);

- Six filings with the Securities and Exchange Commission, all filed between May 2018 and August 2019, about Pareteum's revenues, connections, Backlog, financial controls, and GAAP reporting compliance (*id.* ¶¶ 221, 250, 279, 305, 334, 346, 356-59, 364, 373, 375-76);

- Three press releases issued between December 2017 and February 2018 relating to Pareteum's Blockchain Capabilities (*id.* ¶¶ 378-81);

- A 2018 Form 10-K filing with the SEC about the background of "Pareteum's senior management and some of its former Board members" (*id.* ¶ 382-84);

- The iPass Registration Statement (*id.* ¶¶ 385-92); and

- The Secondary Offering Registration Statement (*id.* ¶¶ 394-401) (all 112 communications are collectively the "Statements").

---

[2] PSIG never states how many press releases they allege were misleading, leaving that task to Defendants and this Court. PSIG often cites the 178 press releases issued during the class period. (*See* Compl. ¶¶ 8, 91.) When accounting for typographical errors, the true number of purportedly false or misleading press releases is 101. As highlighted below, PSIG has failed to assert facts showing that even *one* of these press releases was false.

5

PSIG sometimes identifies the specific individual who made a particular statement.  (*See id.* ¶ 225.)  It attributes other statements to "the Company."  (*See id.* ¶ 226.)

### 2.    Allegations of the Statements' falsity

PSIG repeats in cookie-cutter fashion the same purported facts showing the falsity of Pareteum's press releases, SEC filings, and registration statements.  PSIG asserts that these Statements were false for these reasons—without offering a key to decode which reasons are relevant to the falsity of which Statements:

| Reasons why Statements were false when made | Citation | Citation elsewhere[3] |
|---|---|---|
| "[I]t was not true that the Company's purported success was the result of hyper-demand for Pareteum's unique products or exceptional service, or the Company's competent management; but, in fact, throughout the Class Period, Defendants had propped up the Company's results by manipulating Pareteum's accounting for revenues, income, and the important Backlog and connections metrics" | ¶ 187(a) | |
| "Defendants had materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results, as the Company ultimately admitted in the Restatement" | ¶ 187(b) | ¶¶ 192, 216, 222, 245, 251, 272, 280, 296, 306, 326, 335, 342, 356-57, 364, 371, 373, 375 |
| "[A]s described in depth in the [June 2019 website articles] . . . multiple purported customers and contracts on which the Company based many of its statements regarding its hyper-growth, Backlog, connections, and revenue were either non-existent or non-operational, embellished, related parties, and/or incapable of generating the revenues touted by the Company; what is more, in light of the fact that the vast majority of the customers disclosed in the 176 press releases throughout the Class Period were not identified, there is a reasonable basis to conclude that Defendants have materially misrepresented the existence and/or capabilities of many more alleged customer and contracts [sic]" | ¶ 187(c) | |
| "[I]t was also not true that Pareteum contained even the most minimally adequate systems of internal operational | ¶ 187(d) | |

---

[3] This refers to paragraphs of the Complaint that incorporate previous paragraphs as support for the allegation that the particular Statements at issue were false or misleading when made and that the speaker knew those statements were false or misleading at the time.

| | | |
|---|---|---|
| or financial controls necessary to assure that Pareteum's reported financial statements were true, accurate, and/or reliable, as the Company ultimately admitted in the Restatement" | | |
| "[I]t also was not true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules, as the Company again ultimately admitted in the Restatement" | ¶ 187(e) | |
| "As a result of the aforementioned adverse conditions, which Pareteum and the Fraud Defendants failed to disclose, throughout the Class Period, Pareteum and the Fraud Defendants lacked any reasonable basis to claim that Pareteum was operating according to plan, or that Pareteum could achieve the guidance sponsored and/or endorsed by Defendants" | ¶ 187(f) | |
| The Statements "were based on the Company's faulty Backlog and connections metrics which—as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports . . . were artificially inflated and unreliable," or substantially similar | ¶ 192 | ¶¶ 216(a), 222(a), 245(a), 251(a), 272(a), 280(a), 296(a), 306(a), 326(a), 335(a), 342(b), 348(a) |
| The Statements "were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made" | ¶ 192 | |
| "[B]ecause the Backlog was artificially inflated and unreliable—as subsequently revealed by the Restatement" and the Aurelius and Viceroy Reports, "the Backlog . . . was not" something a Defendant represented it to be or "did not" provide something a Defendant said it would | ¶ 216(b) | ¶¶ 222(b), 245(b), 251(b), 272(b), 280(b), 296(b), 306(b), 326(b), 335(b), 342(c), 348(b) |

These generalized allegations purport to reveal that certain Defendants knew their statements were false when made because later-in-time events like the Aurelius and Viceroy Reports and the Restatement supposedly proved that to be so. But PSIG says nothing about their knowledge of the falsity of the statements when they were made. PSIG also alleges that the "Fraud Defendants" as a group knew when they made the statements that they could not convert the Backlog to actual revenue at a 100% rate. PSIG alleges no facts supporting that knowledge.

Similarly, PSIG does not allege with particularity which of the many press releases claimed to contain a misstatement ultimately was connected to the expected $9 million

restatement for 2018 and $24 million restatement for the first half of 2019. In total, the expected revenue announced in those releases exceeds $500 million.

### 3. Information contained in Pareteum press releases and SEC filings that PSIG omits from its Complaint

Despite apparently reviewing 178 press releases from Pareteum between December 2017 and August 2019, PSIG fails to note that *every* press release alleged to contain a misstatement was accompanied by cautionary language. That language stated that the information in those releases included forward-looking statements regarding revenue generation and were not guarantees of future performance. (*See, e.g.*, Foresta Decl., Ex. B at 3.) In particular, the releases informed potential investors that:

> **Forward Looking Statements:**
> Certain statements contained herein constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements may include, without limitation, statements with respect to Pareteum's plans and objectives, projections, expectations and intentions. These forward-looking statements are based on current expectations, estimates and projections about Pareteum's industry, management's beliefs and certain assumptions made by management. Readers are cautioned that any such forward-looking statements are not guarantees of future performance and are subject to certain risks, uncertainties and assumptions that are difficult to predict. Because such statements involve risks and uncertainties, the actual results and performance of Pareteum may differ materially from the results expressed or implied by such forward-looking statements. Given these uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements. Unless otherwise required by law, Pareteum also disclaims any obligation to update its view of any such risks or uncertainties or to announce publicly the result of any revisions to the forward-looking statements made here. Additional information concerning certain risks and uncertainties that could cause actual results to differ materially from those projected or suggested in Pareteum's filings with the Securities and Exchange Commission, copies of which are available from the SEC or may be obtained upon request from Pareteum Corporation.

The public knew that expected contract revenue was "based on current expectations, estimates, and projections" and was "cautioned that any such forward-looking statements are not guarantees of future performance and are subject to certain risks, uncertainties and assumptions that are difficult to predict," just like the performance of any other contract. (*Id.*) "Because such statements involve risks and uncertainties, the actual results and performance of Pareteum may differ materially from the results expressed or implied by such forward-looking statements." (*Id.*) Thus, "readers are cautioned not to place undue reliance on such forward-looking statements." (*Id.*) Pareteum's SEC filings contained similar cautionary language about the Company's forward-looking statements. (*See* Foresta Decl., Ex. C, Q1 2018 10-Q at 15.)

8

Moreover—and similarly absent in PSIG's hundreds of paragraphs about Pareteum's press releases—the statements also informed the public about what Pareteum meant when it referenced Backlog:

> **Contractual Revenue Backlog Definition:**
> Contractual revenue backlog is measured on a forward looking 36 month snapshot view monthly, and, is generated by each of the Company's Managed Services, Global Mobility Cloud, and Application Exchange & Developer's Platform customers. The Pareteum multi-year Software-as-a-Service agreements include service establishment and implementation fees, guaranteed minimum monthly recurring fees, as well as contractually scheduled subscribers, in some cases including subscriber usage, during the term of the agreement, and, their resulting monthly recurring revenue. There can be no assurances that we reach the total revenue backlog. The revenue backlog assumes timing of revenue recognition that may vary from actual results.

(Foresta Decl., Ex. B at 3.)  The Company stated that its Software-as-a-Service agreements "include service establishment and implementation fees, guaranteed minimum monthly recurring fees, as well as contractually scheduled subscribers, in some cases including subscriber usage, during the term of the agreement, and, their resulting monthly recurring revenue." (*Id.*)  And potential investors knew that "there [were] no assurances that we reach the total revenue backlog" and that "[t]he revenue backlog assumes timing of revenue recognition that may vary from actual results." (*Id.*)

C.      **PSIG's scienter allegations**

In support of its first and second causes of action, PSIG alleges that Pareteum and the Fraud Defendants acted with scienter.  PSIG offers these eight circumstances to try to carry that burden.

*The Fraud Defendants' alleged concealment of their relationships.*  PSIG alleges through reference to a publicly available internet report that "many of the relevant parties and non-parties to this matter . . . have undisclosed preexisting relationships; undisclosed histories of fraudulent and/or criminal conduct . . . and/or have worked together at companies that mysterious lose virtually all of their shareholders' money shortly after their involvement." (Compl. ¶¶ 408, 409.)  PSIG alleges that the Fraud Defendants were purportedly aware of the

9

fact that their mere work together "should send diligent investors running for the hills . . . . [which] evidences scienter." (*Id.* ¶ 409.)

The "pump and dump" scheme. PSIG doubles down on its use of the press releases, alleging simultaneously that they are false statements supporting liability and their collective existence—purportedly proof of a "pump and dump" plan by the Fraud Defendants—"lead to the reasonable conclusion that Pareteum and the Fraud Defendants acted with scienter of their wrongdoing." (*Id.* ¶ 413.) PSIG identifies no event, other than innuendo relating to non-party Barry Honig[4] and the statements themselves, showing knowledge on behalf of any individually named Fraud Defendant that the statements in the press releases were false when made.

The Fraud Defendants' compensation plans. PSIG asserts that "the Fraud Defendants were incentivized to artificially inflate the Company's stock price and to use that artificially inflated stock as currency to make acquisitions in order to enrich themselves." (*Id.* ¶ 414.)

The Fraud Defendants' senior positions. PSIG notes that "[t]he Fraud Defendants were all high-level corporate insiders" and "many" signed the SEC filings. (*Id.* ¶ 415.) They "issued releases and spoke about the Company's Backlog, connections, Backlog conversion rate, and revenue." (*Id.*) As a group, PSIG alleges that the Fraud Defendants "had access to the information necessary to discern the falsity of the statements alleged herein and a responsibility to do so." (*Id.*) "These positions give rise to an inference of scienter on their part." (*Id.*)

The Backlog, connections, and revenue metrics and the Company's focus on its financial reporting. The Complaint alleges that the Backlog and connections metrics were "core operations" of Pareteum and that the Company placed "importance" on them. (*Id.* ¶¶ 416, 418.) That "and the fact that the Company and the Fraud Defendants" as a group "continued to rely on

---

[4] Honig and two other individuals are the subject of the Pareteum Defendants' Motion to Strike.

10

their [earlier] statements even after being confronted with evidence of their falsity likewise support scienter." (*Id.* ¶ 418.)

*The Company's increasing accounts receivables.* More evidence of scienter, PSIG alleges, is that Pareteum and the Fraud Defendants generally "asserted throughout the Class Period that the Backlog was converting to revenue at or above 100%." (*Id.* ¶ 419.) PSIG does not point out in this paragraph the dates on which the "100% conversion" statements were made,[5] or who made them. But PSIG alleges that Pareteum's accounts receivable increased to over $45 million by the end of Q2 2019—up from $1.9 million in Q1 2018—so "[p]lainly, the Backlog was not converting as represented." (*Id.*) Thus, PSIG reasons, statements about the conversion rate were (1) false and (2) themselves evidenced scienter. (*Id.*)

*The Restatement.* PSIG asserts that the Restatement shows scienter because "[a]ccounting manipulations involving premature revenue recognition are especially indicative of conscious misbehavior . . . [as they] suggest a conscious decision to improperly recognize revenue." (*Id.* ¶ 421.) There are no more facts supporting this circular statement beyond Pareteum's announced plan to issue a Restatement after earlier identifying material weaknesses in its reporting. (*Id.*)

*Post-class period developments.* "[T]he fallout from the revelation of this [allegedly] stunning fraud supports scienter" because Pareteum replaced its CEO, CFO, and COO in October and November 2019, PSIG contends. (*Id.* ¶ 422.)

**D.    The iPass Acquisition and Secondary Offering**

**1.    The iPass Acquisition**

---

[5] According to the Complaint, these statements were made four times: on September 13, 2018 (Compl. ¶¶ 114, 268), November 7, 2018 (*id.* ¶¶ 121, 276), March 12, 2019 (*id.* ¶¶ 135, 299, 304 (highlighting statements that only concern 2018 results)), and May 7, 2019 (*id.* ¶ 332 and highlighting statements that only concern 2018 results).

PSIG alleges that on November 12, 2018, Pareteum announced that it entered into an agreement to acquire iPass in a $30 million stock-based acquisition. (*Id.* ¶ 122.) Pareteum's tender offer closed on February 12, 2019. (*Id.* ¶ 123.) In connection with the acquisition, Pareteum filed a Form S-4 Registration Statement and Schedule TO Tender Offer Statement, amending these documents on several occasions. (*Id.* ¶ 385.) The Company also filed a 424(b)(3) Prospectus "relating to the iPass Offering," according to PSIG (all documents collectively referred to as the "iPass Registration Statement"). (*Id.* ¶ 386.)

PSIG asserts that the iPass materials filed with the SEC contained statements that Pareteum's historical revenues for the nine months ended September 30, 2018 were $18,123,484, "which is the same revenues the Company reported in its 3Q:2018 Form 10-Q." (*Id.* ¶ 387.) This statement was allegedly false and misleading for the same reasons the Company's 2018 10-Q for Q3 was misleading. (*Id.* ¶ 388.) Further, because the iPass Registration Statement incorporated Pareteum's 2018 quarterly filings, those incorporated filings were allegedly false and misleading for the same reasons PSIG stated earlier in the Complaint (and as Defendants have outlined above). (*Id.* ¶¶ 177, 389.) Defendants Turner, O'Donnell, Bozzo, Lippert, van Sante, and Jimenez-Tunon (referred to in the Complaint as "the Control Person Defendants") signed the iPass Registration Statement. (*Id.* ¶ 392.)

## 2. The Secondary Offering

PSIG alleges that on September 20, 2019, Pareteum announced a $40 million offering of common stock and warrants (the "Secondary Offering"). (*Id.* ¶ 169.) The offering price was $1.76 per share and 1.5 purchase warrants, or $1.75 per pre-funded warrant and 1.5 purchase warrants. (*Id.* ¶ 395.) The Secondary Offering Registration Statement incorporated by reference Pareteum's 2018 10-K and 2019 10-Q for the second quarter. (*Id.* ¶ 396.) PSIG asserts that, "[a]s described in more detail above in ¶¶ 297-308, 343-350, and 359-375, these incorporated

documents were each materially false and misleading" because Pareteum later "announced that it would restate previously issued financial statements" for 2018.  (*Id.* ¶ 397.)  PSIG alleges that it purchased Pareteum shares pursuant to the Secondary Offering (*id.* ¶ 404), but this is not readily apparent in the certifications accompanying the Complaint.

## ARGUMENT

**I.     PSIG'S COMPLAINT SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(B)(6) FOR FAILURE TO STATE A CLAIM**

The Complaint fails to state a claim under either the Exchange Act or the Securities Act. PSIG's Exchange Act First and Second Claims fail for several independent reasons.  First, the Complaint is a classic "puzzle pleading" containing hundreds of paragraphs with excessive block-quotes, unexplained emphasis added, and formulaic recitals of allegedly false statements. Second, PSIG has not sufficiently explained for each Statement why it was misleading when made in view of the information communicated in the Restatement.  Third, PSIG has not adequately alleged scienter.  Fourth, the Statements contain cautionary language and are thus protected by the PSLRA's safe harbor.

The Third and Fourth Claims are also subject to dismissal.  These claims concern alleged violations of the Securities Act in the iPass Acquisition.  PSIG's Section 11 claim (Third Claim) as to Pareteum and the Control Person Defendants is subject to Fed. R. Civ. P. Rule 9(b)'s heightened pleading standard under *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004), since this cause of action (despite PSIG's attempt to state otherwise) sounds in fraud.  And because PSIG has directly linked the purported falsity of the iPass Registration Statement to Pareteum's SEC filings—the same filings that allegedly create Exchange Act liability—its Section 11 claim meets the same fate as the First Claim.  The Fourth Claim, against Pareteum, is subject to dismissal because PSIG has failed to plead an essential element of a Section 12 claim: that Pareteum had an obligation to issue the 424(b)(3) Prospectus at issue.  Nor are there any facts

13

showing that the alleged omissions or misrepresentations at issue relate to the 424(b)(3) Prospectus, an essential element of a Section 12 claim. *Id.* And, without a primary violation, PSIG cannot maintain its Section 15 cause of action in the Fifth Claim against the Control Person Defendants.

PSIG similarly cannot state a Section 11 (Sixth Claim) or Section 15 (Seventh Claim) claim related to the Secondary Offering because these claims are also subject to a heightened pleading standard and thus fall with the First Claim. Furthermore, PSIG has not adequately shown that it acquired any shares of Pareteum under the Secondary Offering. While PSIG asserts it did so in Paragraph 404 of the Complaint, its certifications do not clearly show any purchase of Pareteum shares under the Secondary Offering at the alleged offering price. Without any injury from this sale, PSIG lacks standing to pursue these claims. *See New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 265-66 (S.D.N.Y. 2010), *on reconsideration sub nom. New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 5093 HB, 2013 WL 1809767 (S.D.N.Y. Apr. 30, 2013).

### A.    The Complaint fails to state a Section 10(b) claim.

The Complaint alleges that five categories of statements were false or misleading: (1) statements concerning growth, Backlog, connections, and revenue (Compl. 75); (2) statements about Pareteum's financial controls and GAAP compliance (*id.* 156); (3) statements about the Company's Blockchain capabilities (*id.* 174); (4) statements regarding senior management's background (*id.* 176); and (5) statements related to the iPass Acquisition and Secondary Offering (*id.* 178).

PSIG's Section 10(b) claim fails for these reasons:

1. The Complaint is a "puzzle pleading," leaving Pareteum and this Court to wade through hundreds of paragraphs and dozens of block-quoted recitals from press releases, SEC filings, and registration statements to determine what PSIG alleges was false or misleading;

14

2.  PSIG fails to allege facts sufficient to show that the Statements were false when made;

3.  PSIG has not adequately alleged scienter; and

4.  The Statements contain cautionary language and are thus protected by the PSLRA's safe harbor.

### 1.   PSIG must allege specific reasons why the Statements were false when made and that Pareteum and the Fraud Defendants were aware of their falsity.

To state a claim for violating Section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010).

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards." *In re Gen. Elec. Co. Sec. Litig.,* 857 F. Supp. 2d 367, 383 (S.D.N.Y.2012). "First, the complaint must satisfy Rule 9(b), which requires that it "'state with particularity the circumstances constituting fraud.'" *Id*. "Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)." *Id.*

Under Rule 9(b), a securities fraud complaint based on misstatements or material omissions must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170.

Under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter.  15 U.S.C. § 78u-4(b)(2)(A). Scienter is a defendant's alleged intention "to deceive, manipulate, or defraud." *Tellabs, Inc. v.*

15

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id*. at 314.  Like Rule 9(b), the PSLRA also requires that a complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," which compels a plaintiff to "state with particularity the specific facts in support of [a plaintiff's] belief that [defendant's] statements were false when made."  *Rombach*, 355 F.3d at 172 (quotations and citations omitted).

> **2.     PSIG's Complaint lacks the particularity that Rule 9(b) and the PSLRA require.**
>
> **(a)     The Statements, asserted over 100 pages and in hundreds of paragraphs containing verbatim and block-quoted recitals from press releases, SEC filings, and registration statements, are classic "puzzle pleading."**

The Complaint is unclear about what PSIG claims are misstatements, as it often block quotes entire press releases and large parts of SEC filings, among other documents.  (Compl. ¶¶ 189, 191, 193, 203, 206, 217, 218-19, 223, 225, 227, 246, 248, 263, 268, 274, 276-77, 297-300, 302-04, 307 (over 5 pages of block quotes from SEC filing), 309-15, 317, 319, 321, 327-28, 330-33, 337, 339-40, 343-45, 349, 352-55, 359, 361-63, 367-68, 370, 372, 374, 379, 383, 395.)

Additionally, sometimes PSIG sets off quoted language in bold (*id.* ¶ 297), sometimes italics (*id.* ¶ 229), sometimes underline (*id.* ¶ 263), sometimes all three (*id.* ¶ 229), sometimes just bold and italics (*id.* ¶ 194), and sometimes nothing (*id.* ¶ 193).  Beyond stating that these modifications are added emphasis not in the originals (*id.* at 18 n.10), PSIG never mentions the significance of such language.  This is no trivial concern, because PSIG appears to maintain that *every* part of each statement in Section VI of the Complaint was misleading.  (*Compare id.* ¶ 268 (quoting a press release as saying that shareholders "approv[ed] of the Artilium acquisition,"

16

which in fact is true) *with id.* ¶¶ 186-87 (asserting in blanket fashion that statements quoted in ¶¶ 185-350 were false and misleading).)  PSIG has left Defendants and this Court to untangle the mess.

Dismissal for lack of particularity is the appropriate response to PSIG's "puzzle pleading."  In *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012), the Second Circuit affirmed this Court's dismissal of a Section 10(b) claim in part because the plaintiff's allegations fell short of the PSLRA's particularity threshold.  The Second Circuit explained that "the 280-page complaint consists in large part of large block quotations with italicized text, followed by a passage that reads '[t]he statements referenced in [the preceding paragraphs] were each materially false and misleading when made for the reasons set forth in ¶ 256'" and other facts "contained throughout" the Complaint.  *Id.*  This type of pleading "basically [left] the District Court to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter."  *Id.* at 38.  But "asking the Court to assess the truth of facts in light of 'the factual detail contained throughout this Complaint,' . . . *does* not comport with our exhortation that plaintiffs 'must demonstrate with specificity why and how' each statement is materially false or misleading."  *Id.* (quoting *Rombach*, 355 F.3d at 174).

This Court and fellow district courts in this Circuit scrupulously enforce Rule 9(b) and the PSLRA's specificity requirements when confronted with shotgun pleadings like this one.  *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16CIV3495 (AT) (BCM), 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017) ("On the contrary, the complaint employs the same conclusory formula (quoted above when describing Plaintiffs' allegations) four separate times in the complaint to cover all of the allegedly material misrepresentations . . . . This manner of

17

pleading was squarely rejected by the Second Circuit in *Bahash*"), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft,* 729 F. App'x 55 (2d Cir. 2018); *IBEW Local 98 Pension Fund v. Cent. Vermont Pub. Serv. Corp.*, No. 11-CV-222, 2012 WL 12985689, at *8 (D. Vt. Aug. 23, 2012) ("[plaintiffs] . . . claim that *all* of the quoted statements are misleading even though many of the statements merely recite uncontested facts. Not only does such a claim lack a good faith basis, it leaves the court with no ability to discern which statements Plaintiffs actually challenge as misleading. On this basis alone, dismissal is appropriate."); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452–53 (S.D.N.Y. 2008) (dismissing complaint and explaining that "Plaintiffs['] use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements [of the PSLRA]").

Besides the many block-quoted passages above, PSIG relies on a formulaic recital of Statements and the reasons they are false.  The formula is: recite or block quote press release or SEC filing; include italics, bold, underline, or some combination of emphasis for unclear reasons; identify speaker; and conclude with the allegation that all Statements referenced earlier in the section are false and misleading for reasons stated in Paragraphs 187, 192, or 216(b) (or some minor variation of the foregoing).  (Compl. ¶¶ 185-404.)  That approach merits dismissal under *Bahash* and decisions from this circuit.  And beyond just the First Claim, all of PSIG's causes of action depend on these non-particularized "misstatements" identified in the Complaint. Because PSIG's Section 10(b) claim violates the puzzle pleading rule, so does the entire action.

### (b)    PSIG's reasons why the Statements were false do not pass Rule 9(b) or PSLRA muster.

PSIG alleges that the October 21, 2019 Restatement announcement revealed the falsity of 101 press releases, six SEC filings, and two Registration Statements that predated that announcement.  (Compl. ¶¶ 187, 192, 216, 222, 245, 251, 272, 280, 296, 306, 326, 335, 342,

18

348, 356-58, 364, 373, 375, 388-91, 397-98.)  The Restatement, PSIG asserts, showed that "*certain revenues* recognized during 2018 and 2019 should not have been recorded during that period," and that the Restatement impact "for the full year 2018 [was] a reduction of approximately $9 million . . . [and] a reduction of approximately $24 million [for the first half of 2019]."  (*Id.* ¶ 12 (emphasis added).)

PSIG identifies no statement in which Pareteum announced it was recognizing revenue of $9 million in 2018 and $24 million in the first half of 2019 that it knew should not have been recognized.  PSIG instead spends hundreds of paragraphs faulting 101 press releases and six SEC filings addressing *future expected revenues* as quantified by the Backlog and connections metrics.  But PSIG has offered no sufficient reason why these statements are false, *see Pollio v. MF Glob., Ltd.*, 608 F. Supp. 2d 564, 569-70 (S.D.N.Y. 2009), and the Restatement did not reveal the falsity of the Statements.

Even assuming PSIG can bridge the chasm between recognized revenues (which Pareteum said required revision) and expected revenues (which PSIG says were false), the purported revelation of the financial fraud ($33 million total) was orders of magnitude less than the value of contracts announced in the 101 press releases (over $500 million).  (*See* Foresta Decl., Ex. D (chart showing total value of contracts alleged in Complaint).)  PSIG has unambiguously alleged that the Restatement proved the falsity of the 101 press releases. (Compl. ¶¶ 7-8, 12.)  Indeed, in copy-and-paste fashion following each subsection on press releases and SEC filings, PSIG asserts that these statements were false because, with minor variations, they "were based on the Company's faulty Backlog and connections metrics, which— as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports . . . were artificially inflated and unreliable," or substantially similar.  (*Id.* ¶¶ 192, 216(a), 222(a), 245(a), 251(a), 272(a), 280(a), 296(a), 306(a), 326(a), 335(a), 342(b), 348(a).)

19

The Restatement did not reveal that *any revenue* announced in the press releases was artificially inflated—it only shows that Pareteum did not correctly recognize revenue received in 2018 and the first half of 2019. Nor do the internet articles and Restatement show the falsity of every press release and SEC filing. PSIG's blanket fraud allegations are too much.

For example, PSIG alleges that "On June 7, 2018, the Company published a press release announcing that the acquisition of Artilium would add over $65 million to the Company's ongoing Backlog." (Compl. ¶ 241.) Assuming Pareteum booked at least $9 million of the revenue expected to be earned from customers as a result of this acquisition in 2018 and $24 million in the first half of 2019, the projected earnings represented in this one statement would account for the Restatement. The Pareteum Defendants do not concede that the $65 million addition to the Backlog was partly false, but if it were, then that one press release would account for the "full truth" purportedly revealed by the Restatement. Put differently, PSIG has offered no sufficient reason why—in light of the small correction relative to total revenue—the Statements were all false. *See Pollio*, 608 F. Supp. 2d at 570 (dismissing complaint for failure to state with particularity "in what respects the statements at issue were false").

### 3.    PSIG's conclusory allegations of scienter do not meet the demanding Rule 9(b) and PSLRA standards.

PSIG's scienter allegations fail for multiple reasons. First, the Complaint includes eight facts or circumstances purportedly showing scienter. (Compl. ¶¶ 405-22.) None of these are sufficient, standing alone or considered together, to show any intent to defraud. Additionally, and as to the Fraud Defendants, PSIG pleads scienter on a group-wide basis—not with particularity as to any individual Fraud Defendant, as they must. Furthermore, setting these arguments aside, the Complaint shows that PSIG's scienter allegations rest on future events that purportedly rendered earlier statements inaccurate. That boils down to the oft-rejected theory of

20

"fraud by hindsight." In sum, PSIG's conclusory allegations of scienter do not meet the demanding Rule 9(b) and PSLRA standards.

**(a)    None of the allegations are sufficient to support a strong inference of scienter.**

None of the asserted bases for scienter meet the requirement with respect to every Statement that PSIG "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," which is Pareteum and the Fraud Defendants' intention "to deceive, manipulate, or defraud." *See* 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 313. "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

**(i)    The Fraud Defendants' alleged concealment of their relationships is not evidence of scienter or a material misstatement.**

PSIG alleges that "relevant parties and non-parties" to this matter had "undisclosed preexisting relationships" with businesses that failed to achieve success. (Compl. ¶¶ 408-09.) Concealment of these relationships allegedly constituted a material omission and "evidences scienter." (*Id.* ¶¶ 382-84, 409.) This argument fails for several reasons.

First, preexisting relationships and prior business ventures are not material information. *AmBase Corp. v. SDG Inc.*, No. 3:00CV1694 (DJS), 2005 WL 1860260, at *24-25 (D. Conn. Aug. 3, 2005) (finding no duty to disclose insider trading charges in fraud case). Second, for proof that unspecified relationships involving some, but not all, Fraud Defendants were concealed, PSIG cites *publicly available internet reports* "revealing" these facts. (*Id.* ¶¶ 146-48,

383, 409; Doc. 98-1 at 6, 24.)  One of those purportedly concealed facts, as cited in the internet reports, was that the law firm used by non-party Honig and Pareteum shared an office address. (Doc. 98-1 at 6.)  Another allegedly concealed fact was a lawsuit naming Fraud Defendant O'Donnell.  (*Id.* at 8.)  In reality, each of these facts was available to anyone with an internet connection and thus nothing was "concealed."  So even if this information was material, PSIG fails to allege that they could not "ferret out the reliability or truth" of the situation using the same "ordinary intelligence" demonstrated by the authors of the internet articles.  *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006).

Moreover, "the absence of disclosures regarding facts and allegations regarding [a defendant's] past business relationships [does] not, as a matter of law, render [a company's] statements misleading."  *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 252 (S.D.N.Y. 2019) (citing *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07 Civ. 3994 (LTS) (AJP), 2009 WL 464934, at *6-8 (S.D.N.Y. Feb. 25, 2009)).  General positive statements about an individual's professional history and management abilities "are at most non-actionable puffery."  *Id.*; *see In re Xinhua*, 2009 WL 464934, at *6-8 (finding that failure to disclose malfeasance by corporate officers or that officers profited from related-party transactions did not render brief biographical sketches and general positive characterizations of a company's management team materially misleading); *see also Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, No. 11 CIV. 2890 GBD, 2013 WL 2154220, at *2 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' citation to a number of lawsuits and government investigations involving the RALI Defendants also provides no evidence of scienter" and dismissing Exchange Act claim).

Accordingly, the omission of preexisting relationships and prior business ventures/outcomes is not grounds for Section 10(b) liability (*see* Compl. ¶¶ 382-84), nor does it support anything close to a "strong inference" of scienter (*id.* ¶¶ 408-09).

**(ii)    Issuing press releases does not show scienter.**

PSIG alleges simultaneously that the press releases are false statements supporting liability and their collective existence—purportedly proof of a "pump and dump" plan by the Fraud Defendants—"lead to the reasonable conclusion that Pareteum and the Fraud Defendants acted with scienter of their wrongdoing." (*Id.* ¶ 413.)  At the outset, PSIG wrongly states that the "barrage of false and misleading press releases that touted the Company's fake success and growth" was a "pump and dump" scheme. (*Id.* ¶ 410.)  Such schemes require a defendant to actually sell—hence the "dump"—their stock after pumping it up. *See S.E.C. v. Aimsi Technologies, Inc.*, 650 F. Supp. 2d 296, 299 (S.D.N.Y. 2009).  There is no allegation here that the Fraud Defendants sold their stock as part of such a plan.  Instead, PSIG relies on innuendo relating to non-party Honig and his purported connections to Pareteum and the Fraud Defendants to show scienter. (Compl. ¶ 127.)  PSIG cannot even identify when Honig's associated entities sold their Pareteum stock. (*Id.*)  By its own pleading, there was no scheme.

What remains is the fact that Pareteum issued press releases with cautionary statements about its expected future revenue and service capabilities, and the importance of continuing to build on these accomplishments.  This does not show scienter. *See Medis Investor Group v. Medis Technologies, Ltd.*, 586 F. Supp. 2d 136, 143-44 (S.D.N.Y. 2008) ("Plaintiff fails to explain why [defendant] had an obligation to say something more" in press release at issue and rejecting scienter allegations).  And most importantly, PSIG itself pleads that these events "lead to the reasonable conclusion" that scienter exists. (*Id.* ¶ 413.)  But that is not close to the PSLRA's mandate that there be a "strong inference" of scienter. *See* 15 U.S.C. § 78u-4(b)(2)(A).  There is no sufficiently-pled allegation of scienter here.

23

       **(iii)**    **The Fraud Defendants' compensation plans do not evidence scienter.**

PSIG tries to find scienter in allegations that "the Fraud Defendants were incentivized to artificially inflate the Company's stock price and to use that artificially inflated stock as currency to make acquisitions in order to enrich themselves." (*Id.* ¶ 414.)  But the types of plans highlighted in the Complaint—common stock awards and options—"are typical of nearly every corporation." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004). "If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).  Accordingly, executive compensation based on stock value "does not give rise to a strong inference of scienter," especially where stock options are granted in lieu of compensation and are exercisable only *after* Pareteum suffered an allegedly significant drop in stock price. *Id.*; (*see* Compl. ¶ 414 (options for Control Person Defendants Jimenez-Tunon, Lippert, and Van Sante in lieu of compensation; options for Fraud Defendants Bozzo, O'Donnell, McCarthy exercisable 1/1/2020, after Restatement announcement).

       **(iv)**    **The Fraud Defendants' corporate positions do not establish scienter.**

PSIG tries to demonstrate scienter by pointing to the Fraud Defendants' status as "high-level corporate insiders" and the fact that "many" signed the SEC filings. (*Id.* ¶ 415.)  PSIG alleges that the Fraud Defendants "had access to the information necessary to discern the falsity of the statements alleged herein and a responsibility to do so." (*Id.*)

"To establish an inference of scienter, Plaintiff must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions." *See Lipow v. Net1 UEPS Techs., Inc.*,

24

131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.,* 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (holding that generalized allegations that the individual defendants "knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the company" are insufficient to establish scienter). Indeed, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *City of Brockton Retirement Sys. v. Avon Prod., Inc.,* No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at \*19 (S.D.N.Y. Sept. 29, 2014). The same allegations are similarly inadequate here, and there is no strong inference of scienter.

> **(v)     The Backlog, connections, and revenue metrics and the Company's focus on its financial reporting do not support scienter.**

The Complaint alleges that the Backlog and connections metrics were "core operations" of Pareteum and that the Company placed "importance" on them. (Compl. ¶¶ 416, 418.) That "and the fact that the Company and the Fraud Defendants" as a group "continued to rely on their [earlier] statements even after being confronted with evidence of their falsity" allegedly support scienter. (*Id.* ¶ 418.)

PSIG's "core operations" scienter theory "has been cast into doubt by the Second Circuit following the enactment of the PSLRA." *In re Aceto Corp. Sec. Litig.*, No. 2:18-CV-2425-ERK-AYS, 2019 WL 3606745, at \*10 (E.D.N.Y. Aug. 6, 2019) (citing *Frederick v. Mechel OAO*, 475 F. App'x 353, 356-57 (2d Cir. 2012)). "Where, as here, [p]laintiff's other scienter allegations . . . are not persuasive," this Court has "decline[d] to find that [p]laintiff's reliance on the core operations theory yields the cogent and compelling inference required." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 624 (S.D.N.Y. 2017). Because PSIG's other scienter allegations fall short of showing scienter, its "core operations" (Compl. ¶ 416) scienter theory fails too.

25

        **(vi)**       **The Company's accounts receivables do not support scienter.**

PSIG alleges that Pareteum and the Fraud Defendants "asserted throughout the Class Period that the Backlog was converting to revenue at or above 100%." (*Id.* ¶ 419.) PSIG also asserts that Pareteum's accounts receivable increased from $1.9 million in Q1 2018 to over $45 million by Q2 2019. (*Id.*) Thus, "the Backlog was not converting as represented" and statements about the conversion rate show fraudulent intent, PSIG's logic goes. (*Id.* ¶ 419.)

PSIG has failed to account for the fact that 2018 accounts receivable could rise (owing to a customer not paying on a contract that was signed before 2018) while Backlog conversion for the same year could be 100% (owing to customers on deals announced in 2018 paying at least what they agreed to pay, and perhaps more, owing to specific provisions in their contract for payments on top of the announced amount). This defeats a strong inference of scienter. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111 (2d Cir. 2009) ("[A]n inference of scienter [must be] at least as compelling as any opposing inference of nonfraudulent and nonreckless intent").

PSIG has also not alleged which Backlog-related revenues did not convert at the rate claimed in the statements (which were only made about 2018 revenues). Thus, PSIG has made no showing that the statements about Backlog conversion were even false, much less that these representations give rise to a "strong inference" that Defendant Turner, Defendant Pareteum, and Defendant McCarthy intended to deceive the public.[6]

---

[6] Because no Fraud Defendant other than Turner and McCarthy made these statements, PSIG's scienter allegations on this point are ineffective for the remaining Fraud Defendants. *See Kinra v. Chicago Bridge & Iron Co.*, No. 17 Civ. 4251 (LGS), 2018 WL 2371030, at *6 (S.D.N.Y. May 24, 2018) ("Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading.").

**(vii)    The Restatement does not evidence scienter.**

PSIG asserts that the Restatement shows scienter because "[a]ccounting manipulations involving premature revenue recognition are especially indicative of conscious misbehavior . . . [as they] suggest a conscious decision to improperly recognize revenue." (*Id.* ¶ 421.)  But "it is well settled that mere fact of a restatement of earnings does not support a strong, or even weak, inference of scienter."  *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472–73 (S.D.N.Y. 2008).  And the fact that Pareteum identified and disclosed to investors in March 2019 that there were "material weakness in its internal control over financial reporting," but that at that time did not believe there were any errors in its financial results (Compl. ¶ 88), shows that Pareteum "was [not] trying to hide anything from its investors."  *Slayton v. Am. Express Co.,* 604 F.3d 758, 777 (2d Cir. 2010); *see also Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,* 576 F.3d 172, 187 (4th Cir. 2009) ("Later disclosures that timely raised questions about the reliability of financial information . . . lend weight to an inference that contemporaneous financial statements were made in good faith.").  Furthermore, "'[d]efendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises.'" *City of Brockton Ret. Sys.*, 2014 WL 4832321, at *24 (quoting *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008)).  The fact of Restatement, then, does not lead to a "strong inference" of scienter.

**(viii)    Post-class period developments do not evidence scienter.**

PSIG asserts that Pareteum's replacement of its CEO, CFO and COO in the fall of 2019 shows that *someone* acted with scienter, although PSIG does not say who. (Compl. ¶ 422.)  That omission is grounds to reject this theory, because scienter must be pleaded specifically as to each defendant. *See Kinra*, 2018 WL 2371030, at *6.  Additionally, termination of an executive "do[es] not give rise to a cogent inference of scienter," because it says "nothing of [an individual

27

defendant's] state of mind." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018). And as to Pareteum, there is no supporting allegation that the terminations showed Pareteum's awareness of any alleged fraud. *Id.*; *see also Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 722 (S.D.N.Y. 2018) ("[W]hen Reger received a Wells Notice from the SEC, Northern Oil terminated him, which undermines scienter.").

### (b)       The allegations collectively do not add up to scienter.

PSIG's individually faulty scienter grounds cannot overcome the PSLRA's "strong inference" requirement in combination. When considering whether specific scienter allegations are greater than the sum of their parts, "it does not take much to explain that zero plus zero equals zero." *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011) (affirming dismissal of Section 10(b) claims for inadequately pleading scienter, and rejecting argument that individually insufficient grounds for scienter raised a "strong inference" of scienter when combined). This Court has followed the same basic math in the securities context. *See Shaw Grp.*, 540 F. Supp. 2d at 475 ("So none of the matters cited by plaintiffs admits an inference of fraud. Plaintiffs argue, however, that zero plus zero plus zero plus zero plus zero adds up to something. In this, [their] arithmetic is as faulty as Shaw Group's was."); *see also Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013) (dismissing Section 10(b) claim on similar grounds). Accordingly, even when combined, PSIG's grounds for scienter are insufficient to raise the strong inference required to sustain its claims.

28

### (c) PSIG improperly lumps the Fraud Defendants together for group scienter.

PSIG alleges that Defendants Turner, O'Donnell, Bozzo, McCarthy, and Mumby made certain false statements. (*See* Compl. ¶¶ 185-404.)[7] In the eight stated grounds allegedly showing scienter, PSIG identifies only seven facts particular to one of the Fraud Defendants: Defendant Turner's hiring of other certain Defendants, denial of the internet reports, and eventual termination (*id.* ¶¶ 408, 411, 422); Defendant McCarthy's purported "deep[] involve[ment] in the Backlog metric" and eventual termination (*id.* ¶¶ 415, 422); Defendant Mumby's status as Chief Revenue Officer (*id.* ¶ 415); and Defendant O'Donnell's replacement as CFO (*id.* ¶ 422). PSIG's remaining paragraphs lump everyone together.

At the outset, the scant particularized allegations against Defendants Turner, McCarthy, Mumby, and O'Donnell cannot raise a "strong inference" of scienter as to any one of these individuals. As to O'Donnell, for example, the only specific scienter allegation is that he was replaced as CFO. PSIG makes similar assertions about Defendant Turner and McCarthy. But this is not enough to survive a motion to dismiss. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 92 (S.D.N.Y. 2017) ("Nor do [executive A's] replacement as the Group Management Committee member responsible for oversight of [defendant] and his departure . . . shortly after the dam's collapse, and [executive B's] resignation . . . nearly a year after the collapse, strongly indicate that the Individual Defendants acted with scienter"). And PSIG has nothing at all to say about Defendant Bozzo.

Instead, PSIG tries the "group pleading" approach to scienter. That doctrine, to the extent it still exists, "merely gives plaintiffs the benefit of a presumption that certain kinds of

---

[7] Defendant Turner is alleged to have made over 50 statements; Defendant O'Donnell over 10 (all through signatures on SEC filings); Defendant Bozzo possibly 15; Defendant McCarthy just 2 (Compl. ¶¶ 304, 333); and Defendant Mumby, possibly 6.

statements were made by certain kinds of defendants." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005). It "has no effect on the PSLRA's *scienter* requirement." *Id.* (emphasis in original). The group pleading doctrine "does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made." *Id.* "Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading." *Kinra*, 2018 WL 2371030, at *6; *see also In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (explaining that scienter "cannot be satisfied by group pleading" because complaint must allege each individual defendant's fraudulent intent).

PSIG has failed to adequately plead that each Fraud Defendant acted with scienter when he made the allegedly false statements identified in the Complaint. This Court should thus dismiss those individuals from this case. At the very least, this Court should make clear that the Fraud Defendants may be liable only for those statements they made.

> **(d)     PSIG's Section 10(b) claim is impermissible "fraud by hindsight."**

PSIG asserts no non-conclusory fact at or before the time of the Statements to show that the makers of those Statements knew they were false or misleading when made. *In re Manulife Fin. Cop. Sec. Litig.*, 276 F.R.D. 87, 99 (S.D.N.Y. 2001) (dismissing Section 10(b) claim as to certain statements because plaintiff "fail[ed] to include any explanation about why the[] statements were misleading when made"). The Second Circuit has long rejected that tactic as "fraud by hindsight." *Id.* (citing *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 703 (2d Cir. 1994)).

In *In re Manulife*, the plaintiffs claimed that individual defendants made false and misleading statements about risk management strategies employed by Manulife in annual reports, press releases, and analyst calls, none of which came after November 2008. *Id.* The

plaintiffs then alleged that the truth was revealed between November 2008 and March 2009. *Id.* at 95. Concluding that the alleged misstatements were not actionable, this Court explained that plaintiffs "fail[ed] to include any explanation about why these statements were misleading when made." *Id.* at 99. The only proof that the statements in question were false were the disclosures between November 2008 and March 2009—"fraud by hindsight." *Id.*

More recently, the Second Circuit affirmed this court's dismissal of a Section 10(b) claim for pleading fraud by hindsight. *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 723 F. App'x 20, 22 (2d Cir. 2018). The plaintiffs in that action alleged the defendant misrepresented the adequacy of staffing in its loan service departments. *Id.* The Second Circuit held that these assertions were fraud by hindsight because "Plaintiffs plead no facts demonstrating that the Company did not actually believe that it could achieve increased labor productivity with the increased loan volume at the time it made the positive statements, nor do they identify any contemporaneous facts that would have rendered such a belief unfounded." *Id.*

Similarly, in *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 409 (S.D.N.Y. 2010), this Court considered whether scienter was supported where Fannie Mae allegedly misstated the value of its Deferred Tax Allowances ("DTAs") by not reporting a reduction in this figure on its 2007 10-K. Plaintiff contended it was more likely than not that Fannie Mae would not realize the full value of its DTAs, as shown by the fact that Fannie Mae did reduce its DTA value on its 2008 Q3 10-Q. *Id.* But this Court held that these allegations were insufficient to show scienter because they amounted to fraud by hindsight. *Id.* Specifically, "[t]he fact that a financial item is accounted for differently, or in a later period, does not support an inference that

31

a previously filed financial statement was fraudulent. This is an allegation of fraud by hindsight, which is insufficient to withstand a motion to dismiss." *Id.* [8]

PSIG does not make any allegation meeting Rule 9(b) or the PSLRA that the Pareteum Defendants did not actually believe the truth of the Statements made when they made them.  In fact, the reasons offered by PSIG confirm the opposite: in six of the nine explanations for why the Statements were false or misleading, PSIG explicitly anchors its allegations to the June 2019 website reports and the Restatement:

- Compl. ¶ 187(b)—"Defendants had materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results, *as the Company ultimately admitted in the Restatement*") (emphasis added);

- Compl. ¶ 187(c) (referencing June 2019 website articles);

- Compl. ¶ 187(d) ("as the Company ultimately admitted in the Restatement");

- Compl. ¶ 187(e) ("as the Company again ultimately admitted in the Restatement");

- Compl. ¶ 192 (alleging that the Statements "were based on the Company's faulty Backlog and connections metrics which—*as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports* . . . were artificially inflated and unreliable"); and

---

[8] These decisions are just three examples of the many cases where this Court and the Second Circuit have rightly rejected attempts by plaintiffs to make after-the-fact allegations of scienter in the absence of any then-present proof of a statement's falsity.  *See Zech Capital LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582, 585 (2d Cir. 2016), *as amended* (Jan. 28, 2016) (dismissing allegations related to misstatements about auditing procedures because the plaintiff could not "establish scienter through hindsight evaluations of a defendant's conduct"); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (dismissing Section 10(b) claim as fraud by hindsight and rejecting plaintiff's argument that "[m]anagement's optimism that is shown only after the fact to be have been unwarranted" was strong circumstantial evidence of recklessness sufficient to show scienter); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (affirming dismissal of complaint because it alleged "fraud by hindsight" and did not state "with the required particularity" that, when defendants issued statement, they had "perceptions or were reckless in not having [perceptions]" about specific transactions); *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, No. 09 CIV. 5411 PKC, 2012 WL 1353523, at *4–6 (S.D.N.Y. Apr. 12, 2012) (dismissing Section 10(b) claim for statements related to litigation exposure where plaintiff rested allegations on "events [that] occurred in the months and years following the allegedly misleading statements").

- Compl. ¶ 216(b) ("as subsequently revealed by the Restatement").

In these paragraphs and those in which PSIG has incorporated the allegations (*see* chart, *supra* p. 6-7), PSIG relies entirely on future events supposedly proving that Pareteum and the Fraud Defendants knew their statements were false or misleading when made. Take paragraph 228, for example: "On April 12, 2018, the Company published a press release announcing a 3-year, $1 million contract with an unidentified rural service provider in the United States." PSIG uses the Restatement and two internet reports—events that occurred over a year later—as support for their claim that Pareteum knew this statement was false when made. (Compl. ¶ 245.)

None of the three remaining alleged reasons why the Statements were false when made alter this conclusion. Paragraph 187(a) is duplicative of other reasons, stating in conclusory fashion that it was "not true" that Pareteum's success was the result of hyper-demand for its services, but instead owed to all "Defendants" apparently "propp[ing] up the Company's results by manipulating Pareteum's accounting for revenues, income and the important Backlog and connections metrics"—the same conclusion PSIG claims was revealed by the Restatement. (*See* Compl. ¶ 187(c)). Paragraph 187(f) merely summarizes prior allegations relating to the Restatement and internet articles: "As a result of the [reasons statement in subparagraphs (a)-(e)], which Pareteum and the Fraud Defendants failed to disclose . . . Pareteum and the Fraud Defendants lacked any reasonable basis to claim that Pareteum was operating according to plan."

Finally, PSIG's assertion in paragraph 192—that the Statements "were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made"—is faulty as well. PSIG has not asserted any facts to show that the Fraud Defendants actually *based* their statements on the ability to convert the Backlog at or near 100%. On the contrary, Pareteum and the Fraud Defendants never did so. The very first press release and alleged misstatement cited

33

by PSIG, on December 14, 2017 (*id.* ¶ 188), and which PSIG did not quote in its Complaint, states that "there can be no assurances that we reach the total revenue backlog.  The revenue backlog assumes timing of revenue recognition that may vary from actual results."  (Foresta Decl., Ex. B at 3.)  So while it is true that Pareteum and the Fraud Defendants knew they may not reach 100% Backlog conversion, that same proof demonstrates that the Statements were *not* "based on the ability to convert the Backlog to actual revenue at or near 100%."  PSIG thus alleges nothing more than fraud by hindsight.

> **4.      The Statements contain cautionary language and are thus protected by the PSLRA's safe harbor.**

Under the PSLRA's safe-harbor provision, a defendant is not liable if (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," (2) the forward-looking statement is "immaterial," or (3) "the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading."  *Slayton*, 604 F.3d at 766.  Forward-looking statements include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," "*a statement of future economic performance*, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission," and any statement of the underlying assumptions for those forward-looking statements."  15 U.S.C. § 78u-5(i)(1) (emphasis added).  "A statement that 'projects results in the future' is 'plainly forward-looking.'"  *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018) (quoting *Slayton*, 604 F.3d at 769).

The Pareteum Defendants have prepared the chart attached as Exhibit D to indicate which of the 101 press releases contained forward-looking cautionary language that the Court can consider when ruling on this motion to dismiss.  *See Pehlivanian v. China Gerui Advanced*

34

*Materials Group, Ltd.*, 153 F. Supp. 3d 628, 643 (S.D.N.Y. 2015) (considering full content of press releases in securities case where those were at issue and attached to motion to dismiss). As that exhibit and the included press releases themselves show, *every* press release alleged to contain a false and misleading statement (many of them related to Backlog and contract announcements) contained forward-looking language.

Concerning the March 23, 2018 press release, for example, PSIG states that Pareteum announced that it added $1.5 million to a September 2017 contract, and quotes Defendant Bozzo saying that "we expect this new customer to be servicing hundreds of thousands of recurring subscribers a month, representing $1,500,000 in addition to the previously announced revenue for our growing Backlog over the 5-year duration of the contract."[9] (Compl. ¶ 215.) The accompanying cautionary language made clear (in relevant part) that "statements with respect to Pareteum's. . . expectations [are] based on current expectations, estimates and projections . . . . Readers are cautioned that any such forward-looking statements are not guarantees of future performance and are subject to certain assumptions that are difficult to predict." (Foresta Decl., Ex. B at 102.) For this reason, "readers are cautioned not to place undue influence on such forward-looking statements." (*Id.*)

Moreover, this same press release—and 54 others—also contained language defining the Backlog for the investing public and explained how Pareteum's "multi-year Software-as-a-

---

[9] Statements like this, with "we expect" and similar language, are also non-actionable statements of opinion. *See Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 58 (2d Cir. 1996) (Statements "regarding future earnings, sales goals and [] desire to achieve continued prosperity were just the sort of predictive statements of opinion and belief that courts have found immaterial."); *accord In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) ("Statements that express expectations about the future rather than presently existing, objective facts are [] statements of opinion.") (internal quotation marks omitted); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 227 (S.D.N.Y. 2018) (finding that the statements "we still expect . . . high single-digit growth;" "[we are] on the right track;" and "operationally . . . things [are] moving along exactly in line with what we thought" are opinion statements related to future earnings).

Service agreements include service establishment and implementation fees, guaranteed minimum monthly recurring fees, as well as contractually scheduled subscribers . . . and, their resulting monthly recurring revenue." (*Id.*) Pareteum also told the public that "*[t]here can be no assurances that we reach the total revenue [B]acklog. The revenue [B]acklog assumes timing of revenue recognition that may vary from actual results*." (*Id.* (emphasis added).) This language accompanied press releases where Pareteum made statements regarding the Backlog. (*See, e.g.*, *id.* at 8, 11, 14, 23, 26.)

"[U]se of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement." *In re Barrick Gold*, 341 F. Supp. 3d at 375 (quoting *Slayton*, 604 F.3d at 769). Thus, the Statements are not "of present or historical fact," as PSIG contends. (Compl. ¶ 439.)

The Complaint also states—without any citation—that "many of the specific statements pleaded herein were not identified as 'forward looking statements' when made," and that, if those statements were characterized as forward-looking, "there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements." (*Id.*) That is inaccurate, as the March 23, 2018 exemplar shows: investors knew in particular that the contract structure of customer deals may not lead Pareteum to realize total revenue Backlog, and that "[t]he revenue Backlog assumes timing of revenue recognition that may vary from actual results." (Foresta Decl., Ex. B at 102.) Pareteum's SEC filings also contained similar, well-identified forward-looking statements. (Foresta Decl., Ex. C at 15, 63, 118, 160, 193.)

Finally, PSIG states that the unidentified "speaker knew that the particular forward-looking statement was false." (Compl. ¶ 439.) Even assuming a blanket accusation of knowledge of unidentified individuals meets PSIG's burden here (it does not, because of the particularity requirements of Rule 9(b) and the PSLRA), PSIG has not shown falsity for the reasons in Section I.A.3. above.

This Court has applied the PSLRA safe harbor to forward-looking statements concerning projected revenue before. *See In re Seadrill Ltd. Sec. Litig.*, No. 14 CIV. 9642 (LGS), 2016 WL 3461311, at *9 (S.D.N.Y. June 20, 2016). Plaintiffs in *In re Seadrill* brought Section 10(b) claims alleging that Seadrill made misstatements relating to its "solid contract backlog[10] of US$6.3 Bn" and that a particular contract added "$4.1 billion [to the] backlog." *Id.* at *4. Applying the PSLRA safe harbor to these statements, this Court explained that "[s]tatements about projected revenues from the newly signed . . . contracts . . . are forward looking statements that fall within the PSLRA's safe harbor in one or more ways." *Id.* They contained cautionary language, expressly qualified the expected revenues as just that, and identified risks related to non-realization of the backlog revenue announced. *Id.* Thus, the statements "about the backlog are therefore protected by the PSLRA safe harbor." *Id.* And protection under a separate prong of the PSLRA safe harbor was also appropriate because "[t]he statements themselves were objectively true in describing" the contracts "as well as the amount of backlog . . . represented." *Id.*

The same result is appropriate here. The Statements contained cautionary language. The majority of the Statements not only contained specific information about the forward-looking nature of the facts stated therein, but also included a detailed explanation of how Pareteum

---

[10] "Backlog" in *In re Seadrill* represented "[f]uture expected revenues based on signed contracts," like here. 2016 WL 3461311, at *1.

defined Backlog, what fees and revenue were included in contracts contributing to the Backlog, whether Pareteum would ever reach the total Backlog, and why revenue recognition in the Backlog would vary from actual results.  (Foresta Decl., Ex. B at 3.)  This extra step, while not necessary to bring every alleged misstatement within the PSLRA safe harbor, goes squarely to PSIG's central complaint in this case: that Pareteum made false or misleading statements about future revenues.  Appropriate forward-looking language, however, accompanied all of those Statements.  For this reason, PSIG has not stated a Section 10(b) claim.

### 5. Alleged GAAP and SOX violations do not support a Section 10(b) claim.

PSIG also cannot maintain a Section 10(b) claim based on GAAP noncompliance and violations of SOX certification requirements.  (Compl. ¶¶ 351-77.)

"[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citations omitted).  Additionally, "SOX certifications contain an important qualification that the certifying officer's statements are true based on his or her knowledge."  *See In re AmTrust Fin. Services, Inc. Sec. Litig.*, No. 17-cv-1545-LAK, 2019 WL 4257110, at *24 (S.D.N.Y. Sept. 9, 2019).  Here too a plaintiff "must allege sufficiently that defendants knew that the financial statements were inaccurate."  *Id.*

PSIG has not stated facts sufficient to give rise to fraudulent intent.  *See* Section I.A.3. This is particularly true for the alleged misstatements alleged in paragraphs 351-58, which concern Pareteum's 1Q, 2Q, and 3Q 2018 10-Q filings.  PSIG has identified no facts contemporaneous with these filings demonstrating scienter.

Pareteum's 2018 10-K filing identified a material weakness in internal control over financial reporting (Compl. ¶ 359) and those weaknesses did not result in misstatements in or

38

changes to prior financial reporting (*id.* ¶ 360). Instead, the weaknesses were limited to "ineffective management assessment of internal control over financial reporting" and "ineffective . . . monitoring of information technology general controls pertaining to the Company's change management process" (*id.* ¶ 359). The Pareteum Defendants later engaged in remediation efforts. (*Id.* ¶ 361.) PSIG states summarily that "the statements made by these Defendants outlined above in ¶¶ 359-363 and contained in the Company's FY2018 Form 10-K regarding the Company's Financial Controls and Procedures and Financial Reporting were likewise each materially false and misleading when made." (*Id.* ¶ 364.)

Once again, PSIG has failed to provide particularity as to what exactly it claims was a misstatement. As pled, PSIG alleges that the identification of a material weakness was itself a misstatement. (*Compare id.* (asserting that ¶¶ 359-363 contained misstatements) *with id.* ¶ 359 (identifying material weakness).)

Setting this aside, Pareteum's identification in March 2019 of a material weakness does not trigger scienter. *See Slayton,* 604 F.3d at 777 (finding that scienter was not sufficiently pled where the "facts [did] not support an inference that [defendant] was trying to hide anything from its investors. Rather, they suggest[ed] that [defendant] . . . was endeavoring in good faith to ascertain and disclose" accounting issues); *see also Matrix Capital Mgmt. Fund,* 576 F.3d at 187 ("Later disclosures that timely raised questions about the reliability of financial information . . . lend weight to an inference that contemporaneous financial statements were made in good faith."). Accordingly, PSIG cannot maintain a Section 10(b) claim in connection with Pareteum's 2018 10-K, and 1Q 2019 and 2Q 2019 10-Qs. (*See* Compl. ¶ 374 (alleging that 1Q 2019 10-Q form disclosed existing material weaknesses in reporting).)

39

**6.      Statements regarding the Company's Blockchain capabilities are not actionable.**

PSIG asserts that on December 26, 2017, Defendant Turner stated that Pareteum "could" create its own currency "in the not too distant future." (*Id.* ¶ 378.) The next month, the Company announced that it had expanded its partnership with AirFox, and as a result, Pareteum envisioned "new markets, faster services adoption and deeper market penetration occurring" in the coming months and years. (*Id.* ¶ 379.) Specifically, AirFox brought an application to Pareteum that could enable individuals using Pareteum services to make "person to person mobile payments." (*Id.*) These statements were allegedly false at the time because "as disclosed in a letter to the SEC just ten months later, the Company had 'no plans to create our own digital currency . . . and did not plan in the near future to generate any revenue from its relationship with AirFox.'" (*Id.* ¶ 381.)

The statements regarding Pareteum's Blockchain capabilities are not actionable. First, PSIG has failed to show Defendant Turner or Pareteum did not sincerely believe that it might expand its revenue streams through partnership with AirFox. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015). Second, in citing a letter "ten months later" to show falsity at the time these statements were made, PSIG has again pled itself into fraud by hindsight. *Stevelman*, 174 F.3d at 85 ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud."). Third, PSIG discounts the impact of the November 2018 AirFox settlement with the SEC on the December 2018 announcement by Pareteum that, at that time, it did not plan to generate revenue from its relationship with AirFox. The inference of scienter PSIG asks this Court to draw is not "cogent and at least as compelling as any opposing inference one could draw from the facts alleged"—that Pareteum did not want to further pursue this relationship given AirFox's regulatory issues. *Tellabs*, 551 U.S. at 323-24.

40

**B.      PSIG has failed to state a Section 20(a) claim.**

"Liability for § 20(a) violations is derivative of liability for § 10(b) violations." *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 121 (S.D.N.Y. 2013).  To establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the targeted defendant"; and (3) that the "controlling person was in some meaningful sense a culpable participant in the controlled person's fraud." *Id.* (internal quotation marks omitted).  The heightened pleading standards of the PSLRA apply with respect to the third prong of a § 20(a) claim.  *Id.*

There are two reasons to dismiss the Second Claim.  First, PSIG has not stated a Section 10(b) claim; accordingly, the Control Person Defendants are not liable under Section 20(a).  Second, PSIG has failed to plead scienter as to the Control Person Defendants.  Indeed, the only scienter accusations levied by PSIG are against Pareteum and the Fraud Defendants.  (Compl. ¶ 406 ("As alleged herein, Pareteum and the Fraud Defendants acted with scienter").)  While it is true that Defendants Turner, O'Donnell, and Bozzo are also "Fraud Defendants," there are no particularized culpable participation allegations of scienter against any individual Control Person Defendant (like Defendants Lippert, van Sante, and Jimenez-Tunon).  This Court should therefore dismiss PSIG's Section 20(a) claim.  At a minimum, this cause of action should be dismissed as to Defendants Lippert, van Sante, and Jimenez-Tunon.

**C.      PSIG has failed to state a Section 11, 12, or 15 Securities Act claim in connection with the iPass Registration Statement.**

**1.      Basis of iPass Registration Statement alleged misstatements.**

PSIG alleges that, in connection with its acquisition of iPass, Pareteum filed a Registration Statement on December 3, 2018.  (Compl. ¶ 385.)  On February 4, 2019, it filed a 424(b)(3) Prospectus relating to the iPass offering.  (*Id.* ¶ 386.)  The documents Pareteum filed with the SEC in connection with this acquisition, listing historical revenues of $18,123,484,

41

"which is the same revenues the Company reported in its 3Q:2018 Form 10-Q," are those that PSIG asserts the Restatement demonstrates are false. (*Id.* ¶¶ 387-88.) Additionally, because the iPass Registration Statement incorporated earlier 2018 10-Q filings and investor presentations, the iPass Registration Statement contained false or misleading statements for the same reasons PSIG says it "described above," that is, as shown by the Restatement. (*Id.* ¶¶ 389-90.) PSIG uses similar language in the Third Claim itself. (*Id.* ¶ 464 ("The iPass Registration Statement was false and misleading for the reasons set forth above. The iPass Registration Statement also incorporated by reference SEC filings (outlined above) that contained false and misleading statements and/or omitted material facts necessary to make these statements not false and misleading, for the reasons set forth above.").)

### 2. PSIG cannot state a Section 11 claim.

Section 11 liability requires an allegation that a plaintiff (1) purchased a registered security; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).

"When the same course of conduct supports both a claim of fraud under the Exchange Act and a claim under Section 11 or 12(a)(2) of the Securities Act, the latter claim must satisfy the requirements of Rule 9(b) . . . . *Mere disavowal of any allegations that would make Rule 9(b) applicable will not suffice.*" *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *11 (emphasis added); *see also Rombach*, 355 F.3d at 172.

In support of its Section 11 claim, PSIG attempts to disavow its reliance on fraud and related allegations. (Compl. ¶ 462.) This about-face is unpersuasive because "the wording and

42

imputations of the complaint are classically associated with fraud," in that the Complaint asserts

"that the Registration statement was inaccurate and misleading, that it contained untrue

statements of material facts, and that materially false and misleading written statements were

issued." *Rombach*, 355 F.3d at 172 (applying Rule 9(b) and PSLRA to Section 11 claim). The

language in the *Rombach* complaint that failed to ward off Rule 9(b) and the PSLRA is almost

verbatim the language used by PSIG here.

PSIG's Complaint asserts that the iPass Registration Statement was "false and misleading

for the reasons set forth above," and that the incorporated SEC filings "contained false and

misleading statements and/or omitted material facts . . . for the reasons set forth above." (Compl.

¶ 464; *see also id.* ¶¶ 388, 391.) All of the "reasons set forth above" relate to fraud, not

negligence. (*See id.* ¶¶ 405-407 (alleging in blanket fashion that Pareteum and Fraud Defendants

acted with scienter with respect to every preceding Statement, including for those Statements

made in SEC filings that were incorporated into iPass Registration Statement and iPass

Registration Statement itself).)

Furthermore, "'the gravamen of the complaint'"—consisting of hundreds of pages

alleging false and misleading statements—"'is plainly fraud and no effort is made to show any

other basis for the claims levied'" at the iPass Registration Statement. *Rombach*, 355 F.3d at 172

(quoting *In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399, 1405 n. 2 (9th Cir. 1996)).

Because PSIG's Section 11 claim against Pareteum and the Control Person Defendants is

subject to the heightened pleading standards under Rule 9(b) and the PSLRA, and because PSIG

cannot meet that burden for reasons stated in Section I.A., *supra*, this Court should dismiss the

Third Claim too.[11]

---

[11] Once again, at a minimum, Defendants Lippert, van Sante, and Jimenez-Tunon should be dismissed because PSIG failed to plead scienter specifically as to these individuals.

### 3.    PSIG cannot state a Section 12 claim.

The Fourth Claim, against Pareteum, is likewise premised on fraud and is therefore subject to the same heightened standard as the Third Claim.  So it should be dismissed for the same reason.  Further, "[l]iability under § 12(a)(2) attaches only if [a defendant] was under an obligation to distribute a prospectus in selling its shares." *Gotham Holdings, LP v. Health Grades, Inc.*, 534 F. Supp. 2d 442, 445 (S.D.N.Y. 2008) (citations omitted).  "[A] Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction . . . . [T]here is no 'obligation' to distribute a document that describes a public offering to a private purchaser." *Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005).  "As in *Yung*, the fact that [a] prospectus was included in the sales offering documents made available to purchasers is irrelevant . . . . Plaintiffs have not alleged that [the defendant] was under any obligation to issue a prospectus for the sales at issue." *Gotham Holdings*, 534 F. Supp. 2d at 445.  In such a case, a defendant's stock "sales do not qualify for liability under § 12(a)(2) of the Securities Act." *Id.*

While it has alleged that Pareteum filed a 424(b)(3) Prospectus relating to the iPass offering,  PSIG has not asserted that Pareteum was under any obligation to do so. *See id.*  "The fact that [a] prospectus was included in the sales offering . . . is irrelevant." *Id.*  Indeed, given that only iPass stockholders could participate in the transaction, it is unclear from the Complaint whether this was truly a public offering giving rise to Section 12 liability.  (Compl. ¶¶ 122-23.)

Additionally, PSIG's Section 12(a)(2) claim also fails because the misrepresentations alleged in connection with this cause of action were "not contained in the prospectus or in oral statements about the prospectus." *Gotham Holdings*, 534 F. Supp. 2d at 444.  Indeed, the Complaint has nothing to say about the content of the 424(b)(3) Prospectus—only that the SEC filings incorporated into the iPass Registration Statement were false and misleading.  (Compl. ¶¶

44

387-90.) "[A]n essential element of the § 12(a)(2) claim is that the omissions or misrepresentations being sued upon are either contained in or related directly to a prospectus." *Gotham Holdings*, 534 F. Supp. 2d at 444. PSIG has made no such showing here.

### 4. Because there is no Section 11 or 12 liability, there is no Section 15 liability.

A plaintiff must plead a primary violation of the Securities Act to state a Section 15 claim. *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 185-86 (2d Cir. 2011). Because PSIG has not made out a Section 11 or 12 cause of action in connection with the iPass Acquisition, it cannot state a Section 15 claim against the Control Person Defendants. *Id.*

### D. PSIG has failed to state a Section 11 or 15 Securities Act claim in connection with the Secondary Offering.

PSIG's Section 11 (Sixth Claim) and Section 15 (Seventh Claim) causes of action relating to the Secondary Offering follow much the same formula as the iPass Acquisition claims. PSIG alleges that Pareteum closed the Secondary Offering on September 20, 2019. (Compl. ¶ 394.) According to the September 20, 2019 Supplemental Prospectus, the Secondary Offering had a $1.76 per share offering price for 1.5 purchase warrants, or $1.75 per pre-funded warrant and 1.5 purchase warrants. (*Id.* ¶ 395.) That Supplemental Prospectus incorporated by reference Pareteum's FY2018 Form 10-K and 2019 Q2 10-Q. (*Id.* ¶ 396.) PSIG then references portions of the Complaint detailing the allegedly false and misleading statements within these filings and asserts that "these incorporated documents were each materially false and misleading and/or omitted material facts necessary to make these statements not false and misleading." (*Id.* ¶ 397 (cross referencing paragraphs 297-308, 343-350, and 359-375); *see also id.* ¶¶ 488, 490.) Although PSIG says it is not relying on fraud (*id.* ¶¶ 486, 500), it did not except paragraphs 297-308, 343-350, and 359-375 (or Pareteum's SEC filings generally) from its scienter allegations (*id.* ¶¶ 405-07).

45

Because the gravamen of PSIG's Complaint is one of fraud, Rule 9(b) and the PSLRA apply to the Sixth and Seventh Claims. Those claims fail for the same reason as every other count, since they are predicated on the same alleged misstatements. Concerning Defendants Lippert, van Sante, and Jimenez-Tunon specifically, PSIG does not even bother to set forward any particularized scienter allegations, further supporting their dismissal.

The Secondary Offering claims should be dismissed for the additional reason that PSIG has not shown that it has standing. While it alleges that it "purchased Pareteum shares pursuant or otherwise traceable to the Secondary Offering Registration Statement" (*id.* ¶ 404), a review of the certifications attached to the Complaint does not reveal this to be the case. (*Compare* Doc. 98-3 at 14 (detailing participation in iPass tender).) Thus, the Sixth and Seventh Claims are subject to dismissal for this independent reason. *See New Jersey Carpenters Vacation Fund*, 720 F. Supp. 2d at 266 ("I concur with these reasoned and common-sense opinions that Plaintiffs need to show an injury connected to the offerings they challenge as misleading, and therefore Plaintiffs' claims with regard to offerings they did not purchase are dismissed for lack of standing"), *on reconsideration sub nom. New Jersey Carpenters Health Fund*, 2013 WL 1809767.

## II.    THIS COURT SHOULD STRIKE PSIG'S ALLEGATIONS RELATING TO THE NON-PARTIES UNDER RULE 12(F)

PSIG alleges that the Non-Parties were associated with some of the Fraud Defendants or Pareteum. PSIG does not allege that the Non-Parties made any material misstatements or omissions, or had any particular knowledge that any named Defendant did so. Instead, the Non-Parties were allegedly involved in unrelated "bad acts" that PSIG uses to build an innuendo-based case that the Fraud Defendants and Pareteum must have committed securities fraud. PSIG's "guilt-by-association" allegations concerning the Non-Parties are scandalous and impertinent, and this Court should strike these allegations from the Complaint.

46

### A.    Allegations relevant to Motion to Strike.

Non-Party Hart was a Pareteum investor relations representative.  (Compl. ¶ 63.)  He was also listed as one of Pareteum's "Investor Relations Contacts" on press releases issued during 2018 and through March 5, 2019.  (*Id.*)  PSIG alleges that "Hart was sentenced to prison in August 2015 for obstruction of justice and perjury following charges by the SEC for 'repeated violations of the federal securities laws from 2007 to 2011.'"  (*Id.* ¶¶ 64, 146.)  PSIG learned this information from an internet report.  (*Id.* ¶ 146.)  According to the Complaint, Hart was involved in "two distinct trading schemes that resulted in $831,071 in ill-gotten gains involving matched trading and insider trading."  (*Id.* ¶ 64 (quotations omitted).)  As of 2019, Hart was on the list of "Prohibited Service Providers" for OTC Markets.  (*Id.*)  PSIG references him eight times in the 500-plus paragraph Complaint.

Non-Party Thomas "served on Pareteum's Board from July 2017 until November 2018, when she joined management as the head of Corporate Development and Investor Relations." (*Id.* ¶ 62.)  She left that position in November 2019 to replace Defendant O'Donnell as interim CFO.  (*Id.*)  Thomas used to be the CFO of TowerStream Corporation.  (*Id.*)  She resigned from this company in January 2018.  (*Id.* ¶ 146.)  Honig "purportedly owned a substantial equity position" in this company.  (*Id.* ¶ 62.)  PSIG references Thomas six times in the 500-plus paragraph Complaint.

The Complaint alleges that Honig is the "accused mastermind of several long-running pump-and-dump securities fraud schemes."  (*Id.* ¶ 65.)  Honig has "connections" with a firm that also does work for Pareteum, Sichenzia Ross.  (*Id.* ¶ 66.)  He likewise owned an interest in a company where Defendants Turner and McCarthy were executives.  (*Id.* ¶ 67.)  PSIG asserts that Honig has "undisclosed ties" to Iroquois Capital Management, LLC ("Iroquois") and IntraCoastal Capital, LLC ("IntraCoastal").  (*Id.* ¶ 68.)  Both entities owned 13.2% of

outstanding Pareteum shares on March 30, 2018.  (*Id.* ¶ 68; Doc. 98-1 at 22.)  PSIG alleges that

"both [entities] appear to have conveniently cashed in their stakes before the Company's stock

price plummeted as Defendants' fraud was revealed."  (Compl. ¶ 68.)  As the internet reports

underlying the Complaint state, Iroquois "was not named in the SEC complaint [involving

Honig] or been accused of wrongdoing."  (Doc. 98-1 at 22.)

### B.    Legal standard.

Fed. R. Civ. P. 12(f) permits a district court to strike from a pleading "any redundant,

immaterial, impertinent, or scandalous matter."  "'To prevail on a motion to strike, a party must

demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the

allegations have no bearing on the issues in the case; and (3) that to permit the allegations to

stand would result in prejudice to the movant.'"  *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp.

2d 458, 471 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013) (quoting *S.E.C. v. Lee*, 720

F. Supp. 2d 305, 340–341 (S.D.N.Y. 2010)).  "Materials will also be stricken if they 'serve no

purpose except to inflame the reader.'"  *Shahzad v. Meyers*, No. 95 CIV. 6196 (DAB), 1997 WL

47817, at *13 (S.D.N.Y. Feb. 6, 1997) (quoting *Morse v. Weingarten,* 777 F. Supp. 312, 319

(S.D.N.Y. 1991)).

### C.    This Court should strike the scandalous and irrelevant allegations against Hart and Thomas.

#### 1.    PSIG seizes on Hart's decade-old conviction to try to show the Pareteum Defendants' propensity for misconduct, which is improper.

Allegations about Hart and Thomas have zero relevance to the allegations in the

Complaint.  In a lawsuit consisting of over 200 pages, 500 paragraphs, and tens of thousands of

words, PSIG mentions Hart and Thomas fourteen times combined.

"Sometime in 2018" Hart allegedly joined Pareteum in an undefined role, according to

the Complaint.  (Compl. ¶ 63.)  PSIG alleges that three years before that, "Hart was sentenced to

48

prison" for violating "securities laws from 2007 to 2011." (*Id.* ¶ 64.) Later, the Complaint reveals that PSIG is simply parroting internet reports about Hart to imply his guilt by association with Pareteum. (*Id.* ¶ 146.) Put differently, PSIG suggests that because Hart was guilty of a securities violation committed ten years before the alleged class period here, his employment at Pareteum must be evidence that it too was committing securities fraud.

That innuendo "serve[s] no purpose except to inflame the reader." *Shahzad*, 1997 WL 47817, at *13 (quotations and citation omitted). PSIG uses this allegation "to show a propensity for misconduct, which is inadmissible." *Lynch v. Southampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 68 (E.D.N.Y. 2011). And the Complaint reveals that Hart has no real connection to the case—he is not a party, is not alleged to have made a statement that was false or misleading, and is not alleged to have had any knowledge that the Company's statements were false or misleading. Instead, because he was an "Investor Relations Contact" on certain unidentified Pareteum press releases in 2018 and early 2019, and because he was sentenced to prison for securities violations over a decade ago, PSIG hopes the reader will conclude that Pareteum is now liable for securities fraud. That implication is not only irrelevant and inadmissible, but its continued inclusion as part of the pleadings prejudices the Pareteum Defendants through PSIG's improper "guilt-by-association" theory of liability in this regard. *See id.* Accordingly, this Court should strike the references to Hart in paragraphs 63, 64, and 146.

### 2. PSIG includes Thomas in the Complaint to try to show guilt-by-association.

The Complaint references Thomas six times to cast the aspersion that "[w]hile Chairing TEUM's Audit Committee . . . Thomas was also the CFO of TowerStream." (Compl. ¶ 146.) According to PSIG, TowerStream was "a nearly worthless equity owned by Honig." (*Id.*; *see also id.* ¶¶ 62, 67.) Thomas resigned from TowerStream in January 2018, one month after PSIG asserts the class period should begin. (*Id.* at 5, ¶ 146.)

49

The Complaint's references to Thomas serve no legitimate purpose. The only reason to mention Thomas is her connection to TowerStream. In turn, this entity was owned by Honig. Because Thomas was on Pareteum's board while also serving as CFO of TowerStream, PSIG implies that she must be "in" on the alleged pump-and-dump scheme allegedly perpetrated by someone else in the past and Pareteum in the present.

But PSIG never asserts Thomas made a false statement or had knowledge that the Company did the same. Nor is Thomas a named party. And the overlap with Honig's company during the class period was just one month. (*Id.* ¶ 146.) Her inclusion "serves absolutely no purpose in this action other than to inflame the reader." *Shahzad*, 1997 WL 47817, at *14 (quotation and citation omitted). And, like with Hart, PSIG aims "to show a propensity for misconduct" through her executive position with a company allegedly owned by the "pump-and-dump mastermind" Honig. *Lynch*, 278 F.R.D. at 68. This purpose "is inadmissible." *Id.* Permitting Thomas's continued inclusion in the Complaint prejudices the Pareteum Defendants by insinuating she links another person's alleged bad deeds to Pareteum, with no allegations to support that insinuation. This Court should exclude the references to Thomas in Paragraphs 62, 67, and 146 from the Complaint.

### D.    Allegations related to Honig are purely innuendo and inflammatory.

The Complaint also tries to impugn Pareteum and the Fraud Defendants' conduct by referencing Honig. (Compl. ¶¶ 65-66.) Those connections are gossamer-thin: Honig and Pareteum apparently share a law firm, Sichenzia Ross; Honig owned an interest in a company where Defendants Turner and McCarthy were executives; and Honig has "undisclosed ties" to Iroquois and IntraCoastal. (*Id.* ¶¶ 66-68.) Like the other two Non-Parties, Honig is not a named party. If PSIG had information Honig was at all relevant to the alleged wrongs, he would be named too.

PSIG has not offered any compelling allegation why its ignorance about the first two connections were material to its decision to buy Pareteum stock on hundreds of occasions.  As to Iroquois and IntraCoastal, these entities owned a combined 13.2% of outstanding Pareteum shares on March 30, 2018.  (Doc. 98-1 at 22.)  The documents attached to the Complaint also reveal that Iroquois "was not named in the SEC complaint [involving Honig] or been accused of wrongdoing," (Doc. 98-1 at 22), which the Complaint fails to make clear.  And there are no allegations that IntraCoastal did anything improper in simply owning Pareteum stock.

Indeed, allegations concerning Honig and related entities have little to do with the violations asserted in the Complaint.  Setting forward prejudicial allegations through repeated references to unrelated complaints, alleged schemes, and a consent judgment against Honig (Compl. ¶¶ 65, 74, 81) appears to be the actual purpose of these assertions, much the same way PSIG seeks to sway the reader by referencing Hart's guilt for acts committed over a decade ago.  Referring to an action unrelated to this case is grounds to strike those allegations.  *See Shahzad*, 1997 WL 47817, at \*14.  PSIG's allegations here are also more of the same "prior bad acts" pleading that is inadmissible and prejudicial.  *See Lynch*, 278 F.R.D. at 68.  Finally, the Second Circuit has affirmed a district court's striking of allegations about a consent judgment between a federal agency and a private individual that does not result from an actual adjudication of the issues.  *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

Most revealing of all is that the reports themselves hedged significantly on Honig's connection to Pareteum.  The best the internet reports offer was that Honig's ties "ma[de] it hard for us to rule out the possibility that his invisible hand could be at work."  (Doc. 98-1 at 20.)  So it was "hard to rule out" a "possibility" that Honig "could" be using an unseen or unknowable method to do something—it is not clear what—relating to the alleged misstatements.  Where there is no evidence to support allegations in a complaint, it is proper to strike those portions of

51

the suit. *In re Gaming Lottery Sec. Litig.*, No. 96 CIV. 5567 (RPP), 1998 WL 276177, at \*9 (S.D.N.Y. May 29, 1998). This Court should strike the portions of paragraphs 62, 65-69, 71, 73-74, 79, 81, 127, 145-47, 382, 408, 410, and 412, footnotes 11-13 and 21, and Section V.A., that concern Honig and/or Iroquois and IntraCoastal.

**E.      Purportedly material omissions involving Honig, and allegations of scienter concerning the same, do not save these impertinent allegations.**

55  Hart and Thomas are never mentioned in PSIG's allegations of false statements and scienter, bolstering the immateriality of paragraphs 62, 63, 64, 67, and 146 of the Complaint. PSIG does allege that Pareteum's 2018 10-K materially omitted information about "undisclosed connections to Honig," which also purportedly evidences scienter. (*Id.* ¶¶ 382, 408.) PSIG similarly alleges that "just after the Honig-related entities became involved" Pareteum began its "pump-and-dump" scheme, and that Iroquois and IntraCoastal "cashed out just before the fraud was revealed." (*Id.* ¶¶ 410, 412.)

The Pareteum Defendants incorporate their Motion to Dismiss arguments addressing why the alleged background omissions are not actionable or evidence of scienter, along with arguments demonstrating why the purported "scheme" was not evidence of scienter. *See* Section I.A.3.(a).(i-ii). Additionally, nowhere in its misstatement or omission section does PSIG disclose what it believes Pareteum's 2018 10-K should have said, beyond a blanket call-back to the "material information outlined in in [sic] ¶¶ 46-75 above." (*Id.* ¶ 384.) While the Non-Parties are identified in those paragraphs, for the reasons stated above, these references should be struck. There is no particular identification of a material misstatement or omission about these individuals, nor are the generalized scienter allegations enough to meet the high bar set by Rule 9(b) and the PSLRA. And regarding Iroquois and IntraCoastal, the Complaint shows that they did not "cash[] out just before the fraud was revealed" in October 2019; they sold around December 2018. (*Id.* ¶¶ 12, 127 n.19.) Cloaking a dubious accusation in scienter garb is not

52

enough to dodge Rule 12(f).  *See Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12 CIV.

5105 NRB, 2014 WL 3950897, at *6 (S.D.N.Y. Aug. 13, 2014) (striking affirmative defense that

was demonstrably false under facts of case).

## CONCLUSION

For the reasons set forth above, the Court should grant the Pareteum Defendants' motion

to dismiss the Consolidated Complaint or, in the alternative to strike certain allegations in the

Consolidated Complaint.

Dated: New York, New York
       April 24, 2020

**MCGUIREWOODS LLP**

 */s/ Stephen G. Foresta*
Stephen G. Foresta
Jeffrey J. Chapman
McGuireWoods LLP
1251 Avenue of the Americas
20th Floor
New York, NY 10020
Telephone: (212) 548-7060
Facsimile: (212) 715-6277
Email: sforesta@mcguirewoods.com
        jchapman@mcguirewoods.com

*Counsel for the Pareteum Defendants*

To:    All counsel of record (Via ECF)