# EXHIBIT A

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**001-35360**
( *Commission file No.* )

# PARETEUM CORPORATION
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **DELAWARE** | **95-4557538** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**1185 Avenue of the Americas, New York, NY 10036**
**USA**
*(Address of principal executive offices) (Zip Code)*

**+ 1 (212) 984-1096**
*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common Stock, $0.00001 par value per share** | **NASDAQ** |
| *(Title of Class)* | *(Name of each exchange on which registered)* |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐     No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐     No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒     No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submit pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒     No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (17 CFR 229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐ | Smaller reporting company ☒ |
| | | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐     No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates as of June 30, 2018 was approximately $139 million based on the closing sale price of the Company's common stock on such date of $2.50 per share, as reported by the NYSE American LLC.

State the number of shares outstanding of each of the issuer's classes of common equity, as of the latest practicable date: As of March 18, 2019, there were 109,399,780 shares of common stock outstanding.

**Pareteum Corporation**

**Form 10-K**
**For the fiscal year ended December 31, 2018**

**TABLE OF CONTENTS**

<u>**Note on Forward-Looking Statements**</u>

| | | |
|---|---|---|
| PART I | | 4 |
| | | |
| Item 1. | Business Description. | 4 |
| Item 1A. | Risk Factors. | 10 |
| Item 1B. | Unresolved Staff Comments. | 18 |
| Item 2. | Description of Properties. | 18 |
| Item 3. | Legal Proceedings. | 19 |
| Item 4. | Mine Safety Disclosure. | 19 |
| | | |
| PART II | | 19 |
| | | |
| Item 5. | Market for Common Equity and Related Stockholder Matters. | 19 |
| Item 6. | Selected Financial Data. | 21 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk. | 31 |
| Item 8. | Financial Statements. | 32 |
| Item 9. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure. | 70 |
| Item 9A. | Controls and Procedures. | 70 |
| Item 9B. | Other Information. | 72 |
| | | |
| PART III | | 72 |
| | | |
| Item 10. | Directors, Executive Officers and Corporate Governance. | 72 |
| Item 11. | Executive Compensation. | 77 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 86 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence. | 87 |
| Item 14. | Principal Accountant Fees and Services. | 87 |
| | | |
| PART IV | | 88 |
| | | |
| Item 15. | Exhibits, Financial Statement Schedules. | 88 |

2

## FORWARD LOOKING STATEMENTS

This Report, including the documents incorporated by reference in this Report, includes forward-looking statements. We have based these forward-looking statements on our current expectations and projections about future events. Our actual results may differ materially from those discussed herein, or implied by, these forward-looking statements. Forward-looking statements are generally identified by words such as "believe," "expect," "anticipate," "intend," "estimate," "plan," "project," "should," "will," "would" and other similar expressions. In addition, any statements that refer to expectations or other characterizations of future events or circumstances are forward-looking statements. The statements that contain these or similar words should be read carefully because these statements discuss our future expectations, contain projections of our future results of operations or of our financial position, or state other "forward-looking" information. Pareteum Corporation believes that it is important to communicate our future expectations to our stockholders. However, there may be events in the future that we are not able to accurately predict or control. Forward-looking statements included in this Report or our other filings with the SEC include, but are not necessarily limited to, those relating to:

- risks and uncertainties associated with the integration of the assets and operations we have acquired and may acquire in the future;

- our possible inability to generate additional funds that will be necessary to expand our operations;

- our potential lack of revenue growth;

- our potential inability to maintain compliance with the listing standards of the Nasdaq ("the Exchange");

- our potential inability to continue as a going concern;

- our potential inability to add new products and services that will be necessary to generate increased sales;

- our potential lack of cash flows;

- our potential loss of key personnel;

- the availability of qualified personnel;

- international, national regional and local economic political changes;

- general economic and market conditions;

- increases in operating expenses associated with the growth of our operations;

- the possibility of telecommunications rate changes and technological changes;

- the potential for increased competition;

- failure to satisfy our obligations under our secured loan documents; and

- other unanticipated factors.

The foregoing does not represent an exhaustive list of risks. Please see "Risk Factors" for additional risks which could adversely impact our business and financial performance. Moreover, new risks emerge from time to time and it is not possible for our management to predict all risks, nor can we assess the impact of all risks on our business or the extent to which any risk, or combination of risks, may cause actual results to differ from those contained in any forward-looking statements. All forward-looking statements included in this Report are based on information available to us on the date of this Report. Except to the extent required by applicable laws or rules, we undertake no obligation to publicly update or revise any forward-looking statement, whether as a result of new information, future events or otherwise. All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements contained throughout this Report.

**AVAILABLE INFORMATION**

We maintain a corporate website with the address  www.pareteum.com . We intend to use our website as a regular means of disclosing material non-public information and for complying with disclosure obligations under Regulation FD promulgated by the Securities and Exchange Commission (the "SEC"). Such disclosures will be included on the website under the heading "News" and "Investors – Press Releases". Accordingly, investors should monitor such portions of the website, in addition to following the Company's press releases, SEC filings and public conference calls and the webcasts.

We are not incorporating information contained in the website by reference into this Annual Report on Form 10-K. We make available, free of charge, through the website, our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, and any amendments to these reports as soon as reasonably practicable after electronically filing such material with, or furnishing such material to, the SEC.

Materials filed with the SEC can be read and copies made at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1 800 SEC 0330 for further information about the Public Reference Room. The SEC also maintains a website,  www.sec.gov  containing the reports, proxy and other information filed with the SEC.

**PART I**

*In this Annual Report on Form 10-K, references to "Pareteum," the "Company," "we," "us" and "our" refer to Pareteum Corporation, a Delaware corporation.*

**Item 1. Business Description**

**Overview**

Pareteum Corporation (Nasdaq: TEUM) is a rapidly growing cloud software communications platform company with a mission - *to connect every person and every(thing)* ™.

Millions of people and devices are connected around the world using Pareteum's global cloud software communications platform, enhancing their mobile experience. Pareteum unleashes the power of applications and mobile services, bringing secure, ubiquitous, scalable, and seamlessly available voice, video, SMS/text messaging, and data services to our customers, making worldwide communications services easily and economically accessible to everyone. By harnessing the value of our cloud communications platform, Pareteum serves enterprises, communications service providers, early stage innovators, developers, Internet-of-Things ("IoT"), and telecommunications infrastructure providers Pareteum envisions a new mobile communications experience imagining what will be, and delivering now.

With estimates of up to 30 billion devices to be managed and connected the total available market is astoundingly large. Service Providers, Brand Marketing Companies, Enterprise and Internet of Things providers use Pareteum to energize their growth and profitability through cloud communication services and complete turnkey solutions featuring relevant content, applications, and connectivity worldwide. To achieve this, Pareteum has developed, and added through its acquisition of Artilium plc, public limited company registered in England and Wales ("Artilium") and iPass Inc., patent pending software platforms which are connected to 59 mobile networks in 80 counties using multiple different communications channels including mobile telephony, data, SMS, VOIP, OTT services – all over the world. Pareteum integrates all these disparate communications methods and services and brings them to life for customers and application developers, allowing communications to become value-added. This is a major strategic target for many industries, from legacy telecommunications providers to the disruptive technology and data enterprises of today and the future.

4

The vast majority of our platform is comprised of our self-developed software and intellectual property, which provides our customers with a great deal of flexibility in how they use our products now and in the future and allows us to be market driven in our future.  We have approximately 40 patents granted in relation to techniques and processes which support our cloud software and communications platform solutions.  Our platform services partners (technologies integrated into our cloud) include: HPE, IBM, Sonus, Oracle, Microsoft, NetNumber, Affirmed and other world class technology providers.

Pareteum is a mission focused company empowering every person and every "thing" to be globally connected – **ANY DEVICE, ANY NETWORK, ANYWHERE ™**. The Pareteum cloud communications platform targets large and growing sectors from IoT, Mobile Virtual Network Operators (MVNO), Smart Cities, and Application developer markets - each in need of mobile platforms, management and connectivity. These sectors need Communications-Platform-as-a-Service (CPaaS), which Pareteum delivers. Our solutions have received industry acclaim.

At Pareteum, our mission is to create an easily accessible open mobility system for the world. We believe that open software and interfaces for mobility and applications will create more innovation, economic freedom, and opportunity equality worldwide, just like the internet did for information.

**The Pareteum Ecosystem**

Our value proposition intersects with numerous applications and industries. It is our strong belief that no other company in the CPaaS market offers similarly broad value in such a comprehensive way. An easily accessible open mobility system for the world is difficult to get started because it requires a "network effect". The network effect is an observable condition that yields increased value to the "new easily accessible open mobility system for the world", and all users of the system as more users come on board. The essence of this point is that every communication – a transaction – requires both a sender and recipient who are willing to access and use the new system. We aim to provide the marketplace exchange on which these transactions take place, and will attract new users.

**Innovative Use Cases**

Many sectors, from traditional network operators to disruptive technology and data-driven companies have found many innovative use cases for our platforms. Beyond simply enabling communications between people and devices, the platforms of Pareteum enable:

- Smart homes, including smart appliances, smart energy meters, wearables etc.
- Connected cars
- Smart cities
- Smart logistics and supply chains
- Smart healthcare applications
- Smart defense

In addition to the foregoing, as a result of certain acquisitions completed in October 2018 and February 2019, the Company has acquired certain intellectual property portfolios, which it now manages through various wholly-owned direct and indirect subsidiaries (the "Acquired IP Rights"). The Company utilizes patent, copyright, trademark and trade secret laws in the United States, Europe, and elsewhere to protect the Acquired IP Rights.

**One TEUM!**

Having welcomed our TEUMates from Artilium and iPass into the group, we have immediately set about fully integrating our workforces, our technologies and our business processes to ensure that as the business grows the company's growth rate and momentum is maintained and accelerated. We call these parallel initiatives the One Teum!

**Business Model**

At Pareteum, our mission is to create an easily accessible open mobility system for the world. We believe that open software and interfaces for communications services will create more innovation, economic freedom, and opportunity equality worldwide, just like the internet did for information.

However, an easily accessible open mobility system for the world is challenging to scale because it requires a "network effect". The network effect is the principle that a service yields increased value as it grows. The essence of this point is that our business and our services will grow in value as we grow and scale. We aim to achieve that growth by providing the marketplace exchange on which these communications and transactions take place, and in doing so we attract new users and more customers.

To achieve our desired and rapid growth, we are using our managed services solutions as a launching pad from which to grow our Global Cloud Services Platform and Application Exchange & Developer Platform. This process is already well underway, including with our anchor customer Vodafone.

**Go-to-Market and Growth Strategy**

Pareteum is in fast-growth mode, which will be achieved through a combination of organic growth as well as targeted and accretive mergers & acquisitions, such as the recent acquisitions of Artilium and iPass, as well as others that will be identified from time to time.

Pareteum continues to win new long-term contractual business. We expect this pace to increase throughout 2019 and beyond. We see many new opportunities, including those that leverage our support of emerging technologies, which is at the heart of our identity management and payment systems integration plans.

Our focus is on selling and implementing new communications services and IoT opportunities as fast as possible, as the world of connected devices and people continues to rise on a daily basis.

We will measure our growth in the numbers of 'Connections' that we on-board to our platforms, be they SIM cards, handsets, devices, vehicles etc. As at December 31, 2018, we had approximately 4,609,000 connections, an increase of 252% over the end of the prior year.

Our go-to-market strategy uses a four-phase approach:

*Phase 1:*   We continue to attract new subscribers across all verticals to all our platforms through direct sales, existing channel partnerships and new initiatives such as referral programs.

*Phase 2:*   We will continue to on-board new communication services providers, multiplying our own growth, largely through business development and direct sales in each of our six defined sales regions (North America, Latin America, Europe, Middle East, Africa, and Asia-Pac).

*Phase 3:*   We will drive adoption through a twin approach. First, we will be on-boarding more Connections which are already active on our Managed Services and Global Cloud Platforms, as our initial user base. Second, we will be drawing in new customers and end-users to the Application Exchange & Developer Platform. These will be people with the greatest pain point, who are underserved by the current mobility networks and applications (including in developing markets).

*Phase 4:* At this stage, our strategic Application Exchange & Developer Platform customers will have their own go-to-market strategy, creating shared value, ranging from traditional consumer strategies to sophisticated B2B and B2B2C strategies, driving and expanding our ecosystem to new heights.

The phases described above are already being implemented, in parallel as far as possible, for the fastest most sustainable growth and this highlights our strategy for accelerating the world's shift to an open mobility and application network. When we're successful, it will accelerate the pace of innovation in the world, create more economic freedom, and provide better mobility services to billions of underserved people.

**Employees & Leadership Team**

As of December 31, 2018, the Company had 138 full-time employees worldwide.

Pareteum is led by its Executive Chairman and Principal Executive Officer, Robert H. Turner. He is supported by Victor Bozzo, Chief Executive Officer, and Denis McCarthy, President, working closely with Edward O'Donnell, Chief Financial Officer and Robert Mumby, Chief Revenue Officer.

The leadership team has many decades of combined experience in fast-growing telecoms, software and technology markets.

**Research & Development**

Pareteum's research and development function ensures that its communications platforms grow in line with customer needs and technological advancement, and remain resilient, reliable and secure. We have announced innovation in e-commerce, machine learning and predictive analytics, and mobile gaming all supported by our growing Pareteum application exchange and development community. Enabling our CPaaS with identity management, transaction settlements and payment solutions greatly expands the opportunity for our customers and revenue streams for the Company. Product development expenses for the year ended December 31, 2018 were $3,092,776 compared to $1,479,587 for the year ended December 31, 2017.

**Intellectual Property**

Pareteum relies on a combination of patents, copyright, trademark and trade secret laws in the United States, Europe and elsewhere. The Company protects its brand and reputation through the exploitation of a number of registered and unregistered trademarks and service marks. Pareteum has two granted patents for inventions embedded in its communications platforms, and with the addition of Artilium and iPass has a patent portfolio of some 40 granted patents.

Pareteum further protects its intellectual property rights by requiring all its employees and independent contractors involved in the development of intellectual property to assign those rights to the Company, to the greatest extent permitted by applicable law.

**Sales & Marketing**

Pareteum has begun to publish and market self-service capabilities which will allow new customers to deploy our system capabilities such as adding mobility to their online applications in a seamless way, quickly all through published API's from our community portals.

**Customers**

Pareteum manages a rigorous methodology from sale to revenue through its management of customer post-sale implementation and service delivery.

A team of customer advocates is assigned to each new contract and a multi-step process of handoff from sales to service is handled by this distinct team which is made up of experienced staff around the globe and supported by back office professionals throughout the United States, United Kingdom, Europe, Middle East, Africa and Latin, America.

The Company has a significant customer and the loss of this customer could have an adverse effect on our business, results of operations and financial conditions. For the year ended December 31, 2018, this significant customer accounted for approximately 40% of our revenue.

**Competitive Differentiation**

The CPaaS market is moving quickly. The Company believes that the key competitive differentiators in the near-term will be:

- Scale and international reach of connectivity
- Comprehensiveness of platform offerings
- Ease of deployment and implementation
- Scalability and reliability of service

Pareteum considers itself well placed to be judged on those criteria. The Company is confident that its network of global and international connectivity partners will enable it to access markets that currently are under-served and compete equally with larger competitors in mature markets. In addition, Pareteum is confident that few other players have the breadth of value-added services to complement the core connectivity platforms.

Nevertheless, some of our competitors have greater financial, technical and sales and marketing resources, as well as greater brand and market awareness, and consequently may be able to react more quickly to competitive pressures. As we execute on our growth strategies, and enter new markets, or disrupt markets and replace incumbents, we expect competition to become more intense.

One key tenet in our competitive strategy, however, is to actually lower the competitive barriers to market for new players (customers) to create new mobility and communications applications and businesses. We intend to disrupt existing markets and have the advantage of quick time-to-market for those newly enabled business models and opportunities. These include, for example:

- Uniquely tailored data services such as unlimited social media, messaging apps or streaming music services.
- Global roaming connectivity without local infrastructure: e.g. business executives using a multi-SIM worldwide phone.
- Creation of personal, branded, mobile services.
- One-stop shop for bundles of IoT and machine-to-machine ("M2M") services: through plug-ins to multiple vertical applications and specialized platforms.
  One-stop shop for current and next-gen GSM and Wi-Fi connectivity, deployed seamless through our CPaaS solutions.

**Regulatory**

Pareteum is subject to several U.S. federal and state and foreign laws and regulations that involve matters central to our business. These laws and regulations may involve privacy, data protection, intellectual property, telecommunications, trade and export sanctions or other subjects. Many of the laws and regulations to which we are subject are still evolving and may be tested or varied in courts and could be interpreted in ways that could harm our business. In addition, the application and interpretation of these laws and regulations often are uncertain, particularly in the new and rapidly evolving markets in which we operate. Because applicable international laws and regulations have continued to develop and evolve rapidly, it is possible that we or our products or our platform may not be, or may not have been, compliant with each such applicable law or regulation.

**Corporate Information**

Pareteum Corporation, a Delaware corporation, was originally formed in 2001 as Elephant Talk Communications Corp. as a result of a merger between Staruni Corporation (USA, 1962) and Elephant Talk Limited (Hong Kong, 1994).

In December 2011, the Company moved its listing from the OTCBB to the NYSE MKT (now known as the NYSE American) and its stock began trading at that time under the ticker symbol "ETAK".

Following approval at the Company's 2016 annual shareholder meeting, the Company was rebranded and formally renamed to Pareteum Corporation and on November 3, 2016, the Company started trading on the Exchange under the current ticker symbol "TEUM". On October 23, 2018, the company moved its listing to Nasdaq under its current ticker symbol "TEUM".

Pareteum currently has offices in North America, South America, Spain, Bahrain, Singapore, Indonesia, Germany, Belgium, United Kingdom, Russia, Netherlands and India.

Pareteum®, the Pareteum logo, the strapline "to connect every person and every(thing)™" and other trademarks or service marks of Pareteum, as well as those trademarks or service marks of the Artilium and iPass group companies, which appear in this Annual Report on Form 10-K are the property of Pareteum Corporation or its subsidiaries. Trade names, trademarks and service marks of other companies appearing in this Annual Report on Form 10-K are the property of their respective holders.

**Acquisitions**

*Acquisition of Artilium*

On October 1, 2018 the Company completed its previously announced acquisition of all of the outstanding shares of Artilium plc, a public limited company registered in England and Wales ("Artilium") effected by a court-sanctioned scheme of arrangement between Artilium and the Artilium shareholders, whereby each Artilium ordinary shareholder received 0.1016 new shares of the Company's common stock and 1.9 pence in cash (the "Artilium Acquisition"). In connection with the Artilium Acquisition, the Company issued an aggregate of 37,511,606 shares of the Company's common stock to Artilium shareholders. At which time, the Company cancelled 3,200,332 shares of common stock that were held by Aritilium pre-acquisition, for a net of 34,311,115 newly-issued shares of the Company's common stock. Following the Artilium Acquisition, Artilium operates as a wholly-owned subsidiary of the Company, and Artilium's direct subsidiaries operate as indirect subsidiaries of the Company, wholly-owned by Artilium. Artilium is a software development company active in the enterprise communications and core telecommunications markets delivering software solutions which layer over disparate fixed, mobile and IP networks to enable the deployment of converged communications services and applications.

*Acquisition of iPass*

On November 12, 2018, the Company entered into an Agreement and Plan of Merger (the "iPass Merger Agreement") by and among the Company, iPass Inc. ("iPass"), and TBR, Inc., a wholly-owned subsidiary of the Company ("TBR"). Pursuant to the iPass Merger Agreement, TBR commenced an exchange offer (the "iPass Offer") for all of the outstanding shares of iPass' common stock, par value $0.0001 per share, for 1.17 shares of the Company's common stock, together with cash in lieu of any fractional shares, without interest and less any applicable withholding taxes. The iPass offer and withdrawal rights expired at 5:00 p.m. New York City time on February 12, 2019, and promptly following such time TBR accepted for payment and promptly paid for all validly tendered iPass shares in accordance with the terms of the iPass Offer. In aggregate, the Company issued 9,867,041 shares of common stock to the iPass shareholders in March 2019. iPass is a leading provider of global mobile connectivity, offering simple, secure, always-on Wi-Fi access on any mobile device. Built on a SaaS platform, the iPass cloud-based service keeps its customers connected by providing unlimited Wi-Fi connectivity on unlimited devices. iPass is the world's largest Wi-Fi network, with more than 68 million hotspots globally, at airports, hotels, train stations, convention centers, outdoor venues, inflight on more than 20 leading airlines, and more.

**Item 1A.  Risk Factors**

*An investment in our common stock is subject to risks inherent in our business.  Before making an investment decision, you should carefully consider the risks and uncertainties described below together with all of the other information included in this report.  In addition to the risks and uncertainties described below, other risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially and adversely affect our business, financial condition and results of operations.  The value or market price of our common stock could decline due to any of these identified or other risks, and you could lose all of your investment.*

**Risks Related to Our Business**

*The current economic climate, especially in Europe, may have an adverse effect in the markets in which we operate.*

Much of our customers' business is consumer driven, and to the extent there is a decline in consumer spending, our customers could experience a reduction in the demand for their services and consequently affect the demand for our services and a decrease in our revenues, net income and an increase in bad debts arising from non-payment of our trade receivables. The potential adverse effects of an economic downturn include:

- reduced demand for services, resulting in increased price competition or deferrals of purchases, with lower revenues not fully compensated through reduced costs; risk of financial difficulties or failures among our suppliers;
- increased demand for customer finance, difficulties in collection of accounts receivable and increased risk of counterparty default;
- risk of impairment losses related to our intangible assets as a result of lower forecasted sales of certain products;
- increased difficulties in forecasting sales and financial results as well as increased volatility in our reported results; and
- end user demand could also be adversely affected by reduced consumer spending on technology, changed operator pricing, security breaches and trust issues.

*Uncertainties and risks associated with international markets could adversely impact our international operations.*

We have significant international operations in Europe, and to a lesser extent in the U.S., Middle East and elsewhere. There can be no assurance that we will be able to obtain the permits and operating licenses required for us to operate, obtain access to local transmission facilities on economically acceptable terms, or market services in international markets. In addition, operating in international markets generally involves additional risks, including unexpected changes in regulatory requirements, taxes, tariffs, customs, duties and other trade barriers, difficulties in staffing and managing foreign operations, problems in collecting accounts receivable, political risks, fluctuations in currency exchange rates, restrictions associated with the repatriation of funds, technology export and import restrictions, and seasonal reductions in business activity. Our ability to operate and grow our international operations successfully could be adversely impacted by these risks.

*We operate in a complex regulatory environment, and failure to comply with applicable laws and regulations could adversely affect our business.*

Our operations are subject to a broad range of complex and evolving laws and regulations. Because of our coverage in many countries, we must perform our services in compliance with the legal and regulatory requirements of multiple jurisdictions. Some of these laws and regulations may be difficult to ascertain or interpret and may change from time to time. Violation of such laws and regulations could subject us to fines and penalties, damage our reputation, constitute a breach of our client agreements, impair our ability to obtain and renew required licenses, and decrease our profitability or competitiveness. If any of these effects were to occur, our operating results and financial condition could be adversely affected.

10

***We may not be able to integrate new technologies and provide new services in a cost-efficient manner.***

The telecommunications industry is subject to rapid and significant changes in technology, frequent new service introductions and evolving industry standards. We cannot predict the effect of these changes on our competitive position, our profitability or the industry generally. Technological developments may reduce the competitiveness of our networks and our software solutions and require additional capital expenditures or the procurement of additional products that could be expensive and time consuming. In addition, new products and services arising out of technological developments may reduce the attractiveness of our services. If we fail to adapt successfully to technological advances or fail to obtain access to new technologies, we could lose customers and be limited in our ability to attract new customers and/or sell new services to our existing customers. In addition, delivery of new services in a cost-efficient manner depends upon many factors, and we may not generate anticipated revenue from such services.

***We may not be able to develop and successfully market our mobile telecommunications platform and services as planned.***

Pareteum operates in an exceptionally competitive environment where there is continuous innovation and new development. We are required to be a top performer in over a dozen highly specialized domains to effectively compete with our competitors. Ongoing investments are required to stay ahead of the competition. The sales process for our platform and the deployment process may be complicated and very slow. We are highly dependent on convincing mobile network operators ("MNOs") and mobile virtual network operators ("MVNOs") to believe that outsourcing their requirements to us is the best way to go. We are exposed to business risks associated with turnkey projects and the scalability of our service and support organization. Although our policy is to avoid or minimize risks, it cannot be ruled out that in certain cases events occur that may seriously impact us and our performance.

***Implementation and development of our software platform business depends on our ability to obtain adequate funding.***

Our software platforms require ongoing funding to continue the current development and operational plans. Failure to obtain adequate financing will substantially delay our development, slow down current operations, result in loss of customers and adversely impact our results of operations.

***Disruptions in our networks and infrastructure may result in customer dissatisfaction, customer loss or both, which could materially and adversely affect our reputation and business.***

Our systems are an integral part of our customers' business operations. It is critical for our customers, that our systems provide a continued and uninterrupted performance. Customers may be dissatisfied by any system failure that interrupts our ability to provide services to them. Sustained or repeated system failures would reduce the attractiveness of our services significantly and could result in decreased demand for our services.

We face the following risks to our networks, infrastructure and software applications:

- our territory can have significant weather events which physically damage access lines;
- power surges and outages, computer viruses or hacking, earthquakes, terrorism attacks, vandalism and software or hardware defects which are beyond our control; and
- unusual spikes in demand or capacity limitations in our or our suppliers' networks.

Disruptions may cause interruptions in service or reduced capacity for customers, either of which could cause us to lose customers and/or incur expenses, and thereby adversely affect our business, revenue and cash flow.

11

***Integration of acquisitions ultimately may not provide the benefits originally anticipated by management and may distract the attention of our personnel from the operation of our business.***

We strive to broaden our solutions offerings as well as to increase the number of subscribers hosted on our platforms, volume of voice and data that we carry over our existing global network in order to reduce transmission costs and other operating costs as a percentage of net revenue, improve margins, improve service quality and enhance our ability to introduce new products and services. Strategic acquisitions in desired markets play a part of our growth strategy, and we may pursue additional acquisitions in the future to further strengthen our strategic objectives. Acquisitions of businesses and customer lists involve operational risks, including the possibility that an acquisition may not ultimately provide the benefits originally anticipated by management. Moreover, we may not be successful in identifying attractive acquisition candidates, completing and financing additional acquisitions on favorable terms, or integrating the acquired business or assets into our own. There may be difficulty in integrating technologies and solutions, in migrating customer bases and in integrating the service offerings, distribution channels and networks gained through acquisitions with our own. Successful integration of operations and technologies requires the dedication of management and other personnel, which may distract their attention from the day-to-day business, the development or acquisition of new technologies, and the pursuit of other business acquisition opportunities. Therefore, successful integration may not occur in light of these factors.

***Our revenue, earnings and profitability are affected by the length of our sales cycle, and a longer sales cycle could adversely affect our results of operations and financial condition.***

12

Our business is directly affected by the length of our sales cycle and strategic mobile partnership cycles with MNOs and other large enterprises. Our software platforms, outsourced solutions and value-added communication services, are relatively complex and their purchase may involve a significant commitment of mostly human capital, with attendant delays frequently associated with the allocation of substantial human resources and procurement procedures within an organization. The purchase of these types of products typically also requires coordination and agreement across many departments within a potential customer. Delays associated with such timing factors could have a material adverse effect on our results of operations and financial condition. In periods of economic slowdown in the communications industry, which may recur in the current economic climate, our typical sales cycle may lengthen, which means that the average time between our initial contact with a prospective customer and the signing of a sales contract increases. The lengthening of our sales and strategic mobile partnership cycle could reduce growth in our revenue in the future.

*Because most of our business is conducted outside the U.S., fluctuations in foreign currency exchange rates versus the U.S. Dollar could adversely affect our results of operations.*

Currently most of our net revenue, expenses and capital expenditures are derived and incurred from sales and operations outside the U.S., whereas the reporting currency for our consolidated financial statements is the U.S. Dollar ("USD"). The local currency of each country is the functional currency for each of our respective entities operating in that country, where the Euro is the predominant currency. Considering the fact that most income and expenses are not subject to relevant exchange rate differences, it is only at a reporting level that the translation needs to be made to the reporting unit of USD. In the future, we expect to continue to derive a significant portion of our net revenue and incur a significant portion of our operating costs outside the U.S., and changes in exchange rates have had and may continue to have a significant, and potentially distorting effect (either negative or positive) on the reported results of operations, not necessarily being the result of operations in real terms. Our primary risk of loss regarding foreign currency exchange rate risk is caused by fluctuations in the following exchange rates: USD/Euro.

We historically have not engaged in hedging transactions since we primarily operate in same currency countries, currently being the Euro ("EUR"). However, the operations of affiliates and subsidiaries in non-US countries have been funded with investments and other advances denominated in foreign currencies and more recently in USD. Historically, such investments and advances have been long-term in nature, and we have accounted for any adjustments resulting from currency translation as a charge or credit to accumulate other comprehensive loss within the stockholders' deficit section of our consolidated balance sheets. Although we have not engaged in hedging so far, we continue to assess on a regular basis the possible need for hedging.

*We are substantially smaller than our major competitors, whose marketing and pricing decisions, and relative size advantage, could adversely affect our ability to attract and retain customers and are likely to continue to cause significant pricing pressures that could adversely affect our net revenues, results of operations and financial condition.*

Our services related to cloud-based communications software and information systems, outsourced solutions and value added communication services are subject to competitive pressure, and we expect competition to continue to increase. We compete with telecom solution providers, independent software and service providers and the in-house IT and network departments of communications companies as well as firms that provide IT services (including consulting, systems integration and managed services), software vendors that sell products for particular aspects of a total information system, software vendors that specialize in systems for particular communications services (such as Internet, land-line and mobile services, cable, satellite and service bureaus) and companies that offer software systems in combination with the sale of network equipment. Also, in this more fragmented market, larger players exist with associated advantages described earlier which we need to compete against.

We believe that our ability to compete depends on several factors, including:

- The development by others of software products that are competitive with our products and services,
- the price at which others offer competitive software and services,
- the ability to make use of the networks of mobile network operators,
- the technological changes of telecommunication operators affecting our ability to run services over their networks,
- the ability of competitors to deliver projects at a level of quality that rivals our own,
- the responsiveness of our competitors to customer needs, and
- the ability of our competitors to hire, retain and motivate key personnel.

A number of our competitors have long operating histories, large customer bases, substantial financial, technical, sales, marketing and other resources, and strong name recognition. Current and potential competitors have established, and may establish in the future, cooperative relationships among themselves or with third parties.

***Our positioning in the marketplace as a smaller provider places a significant strain on our resources, and if not managed effectively, could result in operational inefficiencies and other difficulties.***

Our positioning in the marketplace may place a significant strain on our management, operational and financial resources, and increase demand on our systems and controls. To manage this position effectively, we must continue to implement and improve our operational and financial systems and controls, invest in development & engineering, critical systems and network infrastructure to maintain or improve our service quality levels, purchase and utilize other systems and solutions, and train and manage our employee base. As we proceed with our development, operational difficulties could arise from additional demand placed on customer provisioning and support, billing and management information systems, product delivery and fulfillment, sales and marketing and administrative resources.

For instance, we may encounter delays or cost overruns or suffer other adverse consequences in implementing new systems when required. In addition, our operating and financial control systems and infrastructure could be inadequate to ensure timely and accurate financial reporting.

***We could suffer adverse tax and other financial consequences if U.S. or foreign taxing authorities do not agree with our interpretation of applicable tax laws.***

Our corporate structure is based, in part, on assumptions about the various tax laws, including withholding tax, and other relevant laws of applicable non-U.S. jurisdictions. Foreign taxing authorities may not agree with our interpretations or reach different conclusions. Our interpretations are not binding on any taxing authority and, if these foreign jurisdictions were to change or to modify the relevant laws, we could suffer adverse tax and other financial consequences or have the anticipated benefits of our corporate structure materially impaired.

***We must attract and retain skilled personnel. If we are unable to hire and retain technical, technical sales and operational employees, our business could be harmed.***

Our ability to manage our reorganization and growth will be particularly dependent on our ability to develop and retain an effective sales force and qualified technical and managerial personnel. We need software development specialists with in-depth knowledge of a blend of IT and telecommunications or with a blend of security and telecom. We intend to hire additional necessary employees, including software engineers, communication engineers, project managers, sales consultants, employees and operational employees, on a permanent basis. The competition for qualified technical sales, technical, and managerial personnel in the communications and software industry is intense in the markets where we operate, and we may not be able to hire and retain sufficient qualified personnel. In addition, we may not be able to maintain the quality of our operations, control our costs, maintain compliance with all applicable regulations, and expand our internal management, technical, information and accounting systems in order to support our desired growth, which could have an adverse impact on our operations. Volatility in the stock market and other factors could diminish our use, and the value, of our equity awards as incentives to employees, putting us at a competitive disadvantage or forcing us to use more cash compensation.

14

*If we are not able to use and protect our intellectual property domestically and internationally, it could have a material adverse effect on our business.*

Our ability to compete depends, in part, on our ability to use intellectual property internationally. We rely on a combination of patents, copyright, trade secrets and confidentiality, trademarks and licenses to protect our intellectual property. There is limited protection under patent law to protect the source codes we developed or acquired on our platform. The copyright and know-how protection may not be sufficient. Our granted patents and pending patent applications may be challenged. We are also subject to the risks of claims and litigation alleging infringement of the intellectual property rights of others. The telecommunications industry is subject to frequent litigation regarding patent and other intellectual property rights. We rely upon certain technology, including hardware and software, licensed from third parties. The technology licensed by us may not continue to provide competitive features and functionality. Licenses for technology currently used by us or other technology that we may seek to license in the future may not be available to us on commercially reasonable terms or at all.

*We are dependent on one significant customer for our businesses and the loss of this customer could have an adverse effect on our business, results of operations and financial condition.*

For the year ended December 31, 2018, we had one significant customer which accounted for 40% of our revenue. Although no other customer accounted for greater than 10% of our net sales during this period, other customers may account for more than 10% of our net sales in future periods. The loss, or reduction in services to, this significant customer or other discontinuation of their relationship with us for any reason, or if this significant customer reduces or postpones purchases that we expect to receive, it could have an adverse impact on our business, results of operations and financial condition.

*Our success depends on our continued investment in research and development, the level and effectiveness of which could reduce our profitability.*

We intend to continue to make investments in research and development and product development in seeking to sustain and improve our competitive position and meet our customers' needs. These investments currently include streamlining our suite of software functionalities, including modularization and improving scalability of our integrated solutions. To maintain our competitive position, we may need to increase our research and development investment, which could reduce our profitability and cash flows. In addition, we cannot assure you that we will achieve a return on these investments, nor can we assure you that these investments will improve our competitive position or meet our customers' needs.

*Product defects or software errors could adversely affect our business.*

Design defects or software errors may cause delays in product introductions and project implementations, damage customer satisfaction and may have a material adverse effect on our business, results of operations and financial condition. Our software systems are highly complex and may, from time to time, contain design defects or software errors that may be difficult to detect and correct. Because our products are generally used by our customers to perform critical business functions, design defects, software errors, misuse of our products, incorrect data from external sources or other potential problems within or outside of our control may arise during implementation or from the use of our products and may result in financial or other damages to our customers, for which we may be held responsible. Although we have license agreements with our customers that contain provisions designed to limit our exposure to potential claims and liabilities arising from customer problems, these provisions may not effectively protect us against such claims in all cases and in all jurisdictions. Our insurance coverage is not sufficient to protect against all possible liability for defects or software errors. In addition, as a result of business and other considerations, we may undertake to compensate our customers for damages caused to them arising from the use of our products, even if our liability is limited by a license or other agreement. Claims and liabilities arising from customer problems could also damage our reputation, adversely affecting our business, results of operations and the financial condition.

*Political risks, including changes to United States tariff and import/export regulations may have a negative effect on our business.*

There have been recent changes to United States trade policies, treaties and tariffs, including determinations made by the United States to reinstate or impose new sanctions levied by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") against certain nation states. The Company or its subsidiaries may engage in business with entities located in certain regions which may be impacted, directly or indirectly by such changes. If the Company is precluded as a result of changes to sanctions laws from doing business in certain jurisdictions or with certain entities, the loss of any related revenues could impact our business, results of operations and/or financial condition.

*We have outstanding debt secured by all of the assets of the Company, including our intellectual property, and failure by us to fulfill our obligations under the applicable loan transaction agreements may cause the repayment obligations to accelerate.*

In February 2019, we, and certain of our subsidiaries, entered into a credit agreement (the "Credit Agreement") with Post Road Administrative Finance, LLC and its affiliate Post Road Special Opportunity Fund I LLP (collectively, "Post Road"), pursuant to which Post Road will provide the Company with a secured loan of up to $50,000,000 (the "Loan") with an initial loan of $25,000,000 funded on February 26, 2019, and additional loans in increments of $5,000,000 as requested by the Company before the 18 month anniversary of the initial funding date: provided however that no additional loans shall be funded until the later of delivery of certain third party consents (the "Consents"). The Credit Agreement provides for all amounts due on February 26, 2022 and requires us to meet and maintain within specified levels and thresholds with respect to financial and operational covenants, including: requirements to maintain a minimum of $2,000,000 of unrestricted cash, certain maximum total leverage rations, a debt-to-asset ratio, maximum churn rate and adjusted EBITDA. The Credit Agreement further provides customary events of default and cure periods for certain specified events of default, and in the event of uncured default, the acceleration of the maturity date, an increase in the applicable interest rate with respect to amounts outstanding under the Loan and payment of additional fees. The Credit Agreement also provides for an increase in the interest rate upon failure to timely deliver Consents by May 31, 2019 or July 31, 2019, as applicable. There can be no assurance that we will be able to perform and timely repay the amounts outstanding under the Credit Agreement, and upon the occurrence of an event of default under the Credit Agreement, if we are not able to repay all outstanding amounts required, we would lose control over our assets, including our intellectual property, which would seriously harm our business and operations.

**Risks Related to Our Industry**

*Changes in the regulation of the telecommunications industry could adversely affect our business, revenue or cash flow.*

We operate in a heavily regulated industry. As a provider of communications technology, we are directly and indirectly subject to varying degrees of regulation in each of the jurisdictions in which we provide our services. Local laws and regulations, and the interpretation of such laws and regulations, differ significantly among the jurisdictions in which we operate. Enforcement and interpretations of these laws and regulations can be unpredictable and are often subject to the informal views of government officials. Certain European, foreign, federal, and state regulations and local franchise requirements have been, are currently, and may in the future be, the subject of judicial proceedings, legislative hearings and administrative proposals. Such proceedings may relate to, among other things, the rates we may charge for our local, network access and other services, the manner in which we offer and bundle our services, the terms and conditions of interconnection, unbundled network elements and resale rates, and could change the manner in which telecommunications companies operate. We cannot predict the outcome of these proceedings or the impact they will have on our business, revenue and cash flow.

There can be no assurance that future regulatory changes will not have a material adverse effect on us, or that regulators or third parties will not raise material issues regarding our compliance or noncompliance with applicable regulations, any of which could have a material adverse effect upon us. Potential future regulatory, judicial, legislative, and government policy changes in jurisdictions where we operate could have a material adverse effect on us. Domestic or international regulators or third parties may raise material issues regarding our compliance or noncompliance with applicable regulations, and therefore may have a material adverse impact on our competitive position, growth and financial performance.

*The market for communications services is highly competitive and fragmented, and we expect competition to continue to increase.*

We compete with independent software and service providers and with the in-house IT and network departments of communications companies. Our main competitors include firms that provide communications services and IT services (including consulting, systems integration and managed services), software vendors that sell products for particular aspects of a total information system, software vendors that specialize in systems for particular communications services (such as internet, wire line and wireless services, cable, satellite and service bureaus) and network equipment providers that offer software systems in combination with the sale of network equipment. We also compete with companies that provide digital commerce software and solutions.

*The telecommunications industry is rapidly changing, and if we are not able to adjust our strategy and resources effectively in the future to meet changing market conditions, we may not be able to compete effectively.*

The telecommunications industry is changing rapidly due to deregulation, privatization, consolidation, technological improvements, availability of alternative services such as mobile, broadband, DSL, Internet, VOIP, and wireless DSL through use of the fixed wireless spectrum, and the globalization of the world's economies. In addition, alternative services to traditional land-line services, such as mobile, broadband, Internet and VOIP services, have shown a competitive threat to our legacy land-line traffic business. If we do not continue to invest and exploit our contemplated plan of development of our communications information systems, outsourced solutions and value-added communication services to meet changing market conditions, or if we do not have adequate resources, we may not be able to compete effectively in providing technology solutions to our customers. The telecommunications industry is marked by the introduction of new product and service offerings and technological improvements. Achieving successful financial results will depend on our ability to anticipate, assess and adapt to rapid technological changes, and offer, on a timely and cost-effective basis, services including the bundling of multiple services into our technology platforms that meet evolving industry standards. If we do not anticipate, assess or adapt to such technological changes at a competitive price, maintain competitive services or obtain new technologies on a timely basis or on satisfactory terms, our financial results may be materially and adversely affected.

*If we are not able to operate a cost-effective network, we may not be able to grow our business successfully.*

Our long-term success depends on our ability to design, implement, operate, manage and maintain a reliable and cost-effective network. In addition, we rely on third parties to enable us to expand and manage our global network and to provide local, broadband Internet and mobile services.

**Risks Related to Our Capital Stock**

*We could issue additional common stock, which might dilute the book value of our capital stock.*

Our Board of Directors has authority, without action or vote of our stockholders, to issue all or a part of our authorized but unissued shares of common stock. Any such stock issuance could be made at a price that reflects a discount or a premium to the then-current trading price of our common stock. In addition, in order to raise future capital, we may need to issue securities that are convertible into or exchangeable for a significant amount of our common stock. These issuances, if any, would dilute your percentage ownership interest in the Company, thereby having the effect of reducing your influence on matters on which stockholders vote. You may incur additional dilution if holders of stock options, whether currently outstanding or subsequently granted, exercise their options, or if warrant holders exercise their warrants to purchase shares of our common stock. As a result, any such issuances or exercises would dilute your interest in the Company and the per share book value of the common stock that you owned, either of which could negatively affect the trading price of our common stock and the value of your investment.

17

***Shares eligible for future sale may adversely affect the market for our common stock.***

As of February 28, 2019, there are 6,788,122 options (including 2,167,000 granted in 2019) and 3,732,003 warrants to purchase shares of our common stock outstanding. All of the shares issuable from exercise have been registered and are freely traded. Options are exercisable at exercise prices between $1.00 and $67.50, the warrants are exercisable at exercise prices between $0.887 and $5.375. If and when these securities are exercised into shares of our common stock, the number of our shares of common stock outstanding will increase. Such increase in our outstanding shares, and any sales of such shares, could have a material adverse effect on the market for our common stock and the market price of our common stock.

In addition, from time to time, certain of our stockholders may be eligible to sell all or some of their shares of common stock by means of ordinary brokerage transactions in the open market pursuant to Rule 144, promulgated under the Securities Act of 1933, as amended (the "Securities Act"), subject to certain limitations. In general, pursuant to Rule 144, after satisfying a six month holding period: (i) affiliated stockholders (or stockholders whose shares are aggregated) may, under certain circumstances, sell within any three month period a number of securities which does not exceed the greater of 1% of the then outstanding shares of common stock or the average weekly trading volume of the class during the four calendar weeks prior to such sale and (ii) non-affiliated stockholders may sell without such limitations, provided that we are current in our public reporting obligations. Rule 144 also permits the sale of securities by non-affiliates that have satisfied a one year holding period without any limitation or restriction. Any substantial sale of our common stock pursuant to Rule 144 or pursuant to any resale prospectus may have a material adverse effect on the market price of our securities.

***We have no dividend history and have no intention to pay dividends in the foreseeable future.***

We have never paid dividends on or in connection with our common stock and do not intend to pay any dividends to common stockholders for the foreseeable future.

**Item 1B.  Unresolved Staff Comments**

None.

**Item 2.  Description of Properties**

We do not own any properties, but lease office space in the various countries for our shared service centers and lease data center locations for housing our equipment, applications and network interconnections to our customers and telecommunication network providers.

Our office in the United States is located at 1185 Avenue of the Americas, 37 <sup>th</sup> Floor, New York, NY 10036. We lease this space pursuant to a lease which continues month to month with a monthly rent of $7,550. Our Pareteum office in The Netherlands is located at Hornweg 7, 1432 GD Aalsmeer, The Netherlands, wherefore the contract is automatically renewed every 6 months. The monthly fee for this contract is 348 EUR. The Artilium Dutch office is located at Soesterberg, Laan Blussé van oud Alblas 2a. We lease 500 square meters with a monthly rent of 5,119 EUR until 31 December 2020. Our Artilium Belgian offices are located at Bruges, Vaartdijkstraat 19. We lease this 580 square meters with a monthly rent of 10,397 EUR. The contract continues month by month and can be terminated with a 6-month notice. The main office is located at Rotselaar, Wingepark 5b. We lease 269 square meters with a monthly rent of 3,333 EUR until August 2025. The contract can be terminated every 3-year period with a 6-month notice. We rent a shop in Lommel, Michiel Jansplein 28, of 50 square meters with a monthly rent of 846 EUR. The contract can be terminated every 3-year period (first period ending 31 Dec 2019) with a 6-month notice. The Indonesian office for Artilium is located at the JDC Building 1st floor, Jalang Imam Bonjol 154-160, Semarang. We rent 33 square meters with a monthly rent of 708 EUR which continues year by year with a 1-month notice. The German office for Artilium is located at Lubeck, Maria-Goeppert Street 7. We lease 155 square meters with a monthly rent of 3,869 EUR. The contract continues month by month and can be terminated with a 9-month notice. In Spain we currently rent office space for Pareteum at Paratge Bujonis, 17220 Sant Feliu de Guixols, (Girona) Spain, at a monthly rent of 3,267 EUR. This contract continues on a month to month basis. In addition, the Company rents office space at Av. Dr. Severo Ochoa 36, 28100 Alcobendas, (Madrid) Spain. This contract also continues on a month to month basis for 2,040 EUR per month. The Company rents office space in Lehmedeh, Bahrain for 370 BHD per month. The contract is valid until December 2019. iPass currently leases approximately 25,000 square feet of space for iPass's headquarters in Redwood Shores, California. iPass signed a lease renewal effective May 1, 2015, that expires in 2020. iPass also leases sales and support offices abroad in EMEA and Asia Pacific.

18

We also rent space for our telecom switches, servers and IT platforms at data centers ("co-locations") at an aggregate monthly rent of $49,179. The various co-location spaces include: Amsterdam, Madrid, Barcelona, Oostkamp, Tongeren and other locations where our telecommunications equipment is located.

We believe the facilities currently under rent are adequate for our present activities and those additional facilities are available on competitive market terms to provide for such future expansion of our operations as may be warranted.

**Item 3.   Legal Proceedings**

We are involved in various claims and lawsuits incidental to our business.  In the opinion of management, the ultimate resolution of such claims and lawsuits will not have a material effect on our financial position, liquidity, or results of operations.

**Item 4.  Mine Safety Disclosures**

Not applicable.

**Part II**

**Item 5.   Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities**

Since December 5, 2011, our common stock was listed for quotation on the Exchange under the symbol "ETAK." As of November 1, 2016, our common stock began trading under the symbol "TEUM" on the Exchange.  The following table sets forth the high and low closing prices per share for each quarterly period from March 31, 2017 through December 31, 2018 as quoted on the Exchange and published by www.nasdaq.com . These quotations reflect prices between dealers and do not include retail mark-ups, mark-downs or commissions and may not reasonably represent actual transactions.

| | Common Stock | | | |
| --- | --- | --- | --- | --- |
| **Quarter Ended** | **High** | | **Low** | |
| December 31, 2018 | $ | 2.9600 | $ | 1.4700 |
| September 30, 2018 | $ | 3.0700 | $ | 2.3100 |
| June 30, 2018 | $ | 2.9700 | $ | 2.1500 |
| March 31, 2018 | $ | 3.3500 | $ | 1.6800 |
| | | | | |
| December 31, 2017 | $ | 2.8000 | $ | 0.6901 |
| September 30, 2017 | $ | 1.5200 | $ | 0.5200 |
| June 30, 2017 | $ | 0.8901 | $ | 0.5280 |
| March 31, 2017 | $ | 3.7100 | $ | 0.8600 |

As of February 28, 2019, we had approximately 14,753 recorded holders of our common stock.

**Dividends**

We have not declared any cash dividends since inception and do not anticipate paying any dividends in the foreseeable future. The payment of dividends is within the discretion of our Board of Directors and will depend on our earnings, capital requirements, financial condition, and other relevant factors. There are no restrictions that currently limit our ability to pay dividends on our common stock other than those generally imposed by applicable state law.

**EQUITY COMPENSATION PLAN INFORMATION**

**Securities Authorized for Issuance under Equity Compensation Plans**

| Plan Category | | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise prices of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under the equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | | | | |
| | **2008 Plan (1):** | 203,266 | $ 10.74 | 921,910 |
| | **2017 Plan (2):** | 3,417,856 | $ 1.00 | 1,530,049 |
| | **2018 Plan (3):** | 1,000,000 | $ - | 6,000,000 |
| Equity compensation plans not approved by security holders | | - | $ - | - |
| **Total** | | **4,621,122** | | **8,451,959** |

(1)  2008 Pareteum Corp. Long-Term Incentive Compensation Plan (the "2008 Plan"). Form S-8 filed July 11, 2008. The stockholders approved the increase of the total number of shares of authorized to be issued under the 2008 Plan from 200,000 to 920,000, during 2013 the stockholders approved an increase from 920,000 to 1,840,000 and during 2014 an increase of the total number of shares available under the 2008 Plan from 1,840,000 to 2,240,000.

(2)  2017 Pareteum Corp. Long-Term Incentive Compensation Plan (the "2017 Plan"). The shareholders approved 6,500,000 shares to be issued under the 2017 Plan, of which 3,500,000 were registered under a Form S-8 filed June 14, 2017 for a number of 3,500,000 shares and 3,000,000 shares were registered under a Form S-8 filed April 13, 2018.

(3)  2018 Pareteum Corp. Long-Term Incentive Compensation Plan (the "2018 Plan"). Form S-8 filed October 10, 2018. The shareholders approved 8,000,000 common shares to be issued under the 2018 Plan, of which 8,000,000 were registered under the S-8. During 2018 1,000,000 common shares have been issued at zero cost to the executive. As is shown in the table above an additional 1,000,000 common shares are scheduled to be issued as of December 31, 2018, leaving a balance of 6,000,000 remaining as available to be issued.

**Recent Sales of Unregistered Securities**

Other than as set forth below or as previously disclosed in our filings with the Securities and Exchange Commission, we did not sell any equity securities during the year ended December 31, 2018 in transactions that were not registered under the Securities Act. The issuance of such securities were made in transactions exempt from registration under Section 4(a)(2) of the Securities Act and/or Rule 506 promulgated thereunder.

During the Company's first fiscal quarter of 2018 ending March 31, 2018, the Company issued 47,937 unregistered shares of common stock in connection with the receipt of certain financial services, and 30,000 unregistered shares of common stock in connection with the receipt of certain investor relations services.

During the Company's second fiscal quarter of 2018 ending June 30, 2018, the Company issued 13,400 unregistered shares of common stock in connection with the receipt of certain consulting services, and 45,000 unregistered shares of common stock in connection with the receipt of certain investor relations services.

During the Company's third fiscal quarter of 2018 ending September 30, 2018, the Company issued 31,250 unregistered shares of common stock in connection with the receipt of certain advisory services.

During the Company's fourth fiscal quarter of 2018 ending December 31, 2018, the Company issued 39,750 unregistered shares of common stock in connection with a certain settlement arrangement.

**Item 6.  Selected Financial Data**

We are a "smaller reporting company" as defined by Regulation S-K and as such, are not required to provide the information contained in this item pursuant to Regulation S-K.

**Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following Management's Discussion and Analysis of Financial Condition and Results of Operations should be read in conjunction with our consolidated financial statements and related notes that appear elsewhere in this Annual Report on Form 10-K. In addition to historical consolidated financial statements, the following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. See "Risk Factors" in Part I, Item 1A of this Form 10-K.*

**Business overview**

Pareteum Corporation (Nasdaq: TEUM) is a rapidly growing cloud software communications platform company with a mission - *to connect every person and every(thing)* ™.

Millions of people and devices are connected around the world using Pareteum's global cloud software communications platform, enhancing their mobile experience. Pareteum unleashes the power of applications and mobile services, bringing secure, ubiquitous, scalable, and seamlessly available voice, video, SMS/text messaging, and data services to our customers, making worldwide communications services easily and economically accessible to everyone. By harnessing the value of our cloud communications platform, Pareteum serves enterprises, communications service providers, early stage innovators, developers, IoT, and telecommunications infrastructure providers Pareteum envisions a new mobile communications experience imagining what will be and delivering now.

With estimates of up to 30 billion devices to be managed and connected the total available market is astoundingly large. Service Providers, Brand Marketing Companies, Enterprise and Internet of Things providers use Pareteum to energize their growth and profitability through cloud communication services and complete turnkey solutions featuring relevant content, applications, and connectivity worldwide. To achieve this, Pareteum has developed, and added through its acquisition of Artilium and iPass, patent pending software platforms which are connected to 59 mobile networks in 80 counties using multiple different communications channels including mobile telephony, data, SMS, VOIP, OTT services – all over the world. Pareteum integrates all these disparate communications methods and services and brings them to life for customers and application developers, allowing communications to become value-added. This is a major strategic target for many industries, from legacy telecommunications providers to the disruptive technology and data enterprises of today and the future.

The vast majority of our platform is comprised of our self-developed software and intellectual property, which provides our customers with a great deal of flexibility in how they use our products now and in the future and allows us to be market driven in our future. We have approximately 40 patents granted in relation to techniques and processes which support our cloud software and communications platform solutions.  Our platform services partners (technologies integrated into our cloud) include: HPE, IBM, Sonus, Oracle, Microsoft, NetNumber, Affirmed and other world class As of October 1, 2018, the Company now includes Artilium plc, which operates as a wholly-owned subsidiary of the Company. Artilium is a software development company active in the enterprise communications and core telecommunications markets delivering software solutions which layer over disparate fixed, mobile and IP networks to enable the deployment of converged communication services and application technology providers. As of February 26, 2019, the Company now includes iPass Inc., which operates as a wholly-owned subsidiary of the Company. iPass is a cloud-based service provider of global mobile connectivity, offering Wi-Fi access on any mobile device through its SaaS platform.

Pareteum is a mission focused company empowering every person and every "thing" to be globally connected – **ANY DEVICE, ANY NETWORK, ANYWHERE** ™. The Pareteum cloud communications platform targets large and growing sectors from IoT (Internet of Things), Mobile Virtual Network Operators (MVNO), Smart Cities, and Application developer markets - each in need of mobile platforms, management and connectivity. These sectors need Communications-Platform-as-a-Service (CPaaS), which Pareteum delivers. Our solutions have received industry acclaim.

At Pareteum, our mission is to create an easily accessible open mobility system for the world. We believe that open software and interfaces for mobility and applications will create more innovation, economic freedom, and opportunity equality worldwide, just like the internet did for information.

**Results of Operations**

Although the majority of our cost base is carried out in Euros, we report our financial statements in U.S. dollars ("USD"). The conversion of Euros and USD leads to period-to-period fluctuations in our reported USD results arising from changes in the exchange rate between the USD and the Euro. Generally, when the USD strengthens relative to the Euro, it has an unfavorable impact on our reported revenue and income and a favorable impact on our reported expenses. Conversely, when the USD weakens relative to the Euro, it produces a favorable impact on our reported revenue and income, and an unfavorable impact on our reported expenses. The above fluctuations in the USD/Euro exchange rate therefore result in currency translation effects (not to be confused with real currency exchange effects), which impact our reported USD results and may make it difficult to determine actual increases and decreases in our revenue and expenses which are attributable to our actual operating activities. We carry out our business activities primarily in Euros, and we do not currently engage in hedging activities.

The following table shows the USD equivalent of the major currencies for the years ended December 31, 2018 and 2017:

|  | USD equivalent | |
| --- | --- | --- |
|  | **2018** | **2017** |
| Euro | 1.14460 | 1.19986 |
| British Pound | 1.27369 | 1.35029 |

*Comparison of Years Ended December 31, 2018 and 2017*

*Revenue*

Revenue for the year ended December 31, 2018 was $32,435,736, an increase of 18,888,229 or 139%, compared to $13,547,507 for the year ended December 31, 2017. This increase was mainly due to the Company's focus on growing the mobile bundled services portion of the business which accounted for $11,380,870 of revenue for the full year of 2018, which is 35% of the total revenue for the year. Additionally, the Q4-2018 revenues from our newly acquired subsidiary Artilium contributed $5,171,680 of revenues.

In 2018, total billings were $33,120,530 of which $32,192,750 was recognized as revenue with the remainder of $927,780 deferred over the remaining contract period in accordance with ASC 606.

*Cost of Revenues*

Cost of revenues includes origination, termination, network and billing charges from telecommunications operators, costs of telecommunications service providers, network costs, data center costs, facility cost of hosting network and equipment and cost in providing resale arrangements with long distance service providers, cost of leasing transmission facilities, international gateway switches for voice, data transmission services, and the cost of professional services of staff directly related to the generation of revenues, consisting primarily of employee-related costs associated with these services, including share-based compensation and the cost of subcontractors. Cost of revenues excludes depreciation and amortization.

Cost of revenues for the twelve-month period ended December 31, 2018 was $10,329,646, an increase of $6,646,037 or 180%, compared to $3,683,609 for the twelve-month period ended December 31, 2017, this mainly due to the 139% increase in revenue and lower gross margin on revenue generated by Artilium.

*Product Development*

Product development costs consist primarily of salaries and related expenses, including share-based expenses, of employees involved in the development of the Company's services, which are expensed as incurred. Costs such as database architecture, and Pareteum BOSS & IN platform development and testing are included in this function.

Costs incurred during the application development stage of internal-use software projects, such as those used in the Company's operations, are capitalized in accordance with the accounting guidance for costs of computer software developed for internal use. Capitalized costs are amortized on a straight-line basis. When assigning useful lives to internal-use software, the Company considers the effects of obsolescence, competition, technology, and other economic factors. During the twelve-month period ended December 31, 2018 and 2017, the Company capitalized $1,258,085 and $696,401, respectively. The Artilium acquisition had no material effect on the 2018 capitalized software cost.

Product development expenses for the twelve months ended December 31, 2018 and 2017 were $3,092,776 and $1,479,587, an increase of $1,613,189 or 109%, because of increased development on new products and newly acquired customers as well as acquisition of Artilium.

*Sales and Marketing*

Sales and marketing expenses consist primarily of salaries and related expenses, including share-based expenses, for our sales and marketing staff, including commissions, payments to partners and marketing programs. Marketing programs consist of advertising, events, corporate communications and brand building.

Sales and marketing expenses for the twelve months ended December 31, 2018 and 2017 were $3,161,234 and $1,575,069, respectively, an increase of $1,586,165 or 101%. The increase is due to additions to the sales force as well as the inclusion of the Artilium sales and marketing expenses.

*General and Administrative*

General and administrative expenses are our largest cost and consist primarily of salaries and related expenses, including share-based compensation, for non-employee directors, finance and accounting, legal and human resources personnel, legal costs, professional fees and other corporate expenses.

General and administrative expenses for the twelve months ended December 31, 2018 and 2017 were $17,808,912 and $10,097,027, respectively, an increase of $7,711,885 or 76%.

23

General and administrative expenses increased by $7,711,885 primarily due to increased non-cash compensation, the increase of staff following the increase of revenues and the addition in Q4-2018 of Artilium, which added an additional $2,024,932 of general and administrative expenses, which the Company will actively look to decrease through identified synergies as a result of the acquisition.

### *Restructuring and Acquisition Costs*

Restructuring charges for the twelve months ended December 31, 2018 and 2017 were $213,605 and $966,292, a decrease of $752,687 or 78%. The Acquisitions costs for the twelve months ended December 31, 2018 were $7,045,226, There were no acquisition costs in 2017.The restructuring plan, which commenced in the fourth quarter of 2015, was designed to align actual expenses and investments with current revenues and continued after the acquisition of Artilium.

### *Share-based Compensation*

Share-based compensation is comprised of:

- the expensing of the options granted under the 2017 Plan to staff and management;
- the expensing of the shares issued under the 2017 Plan to the directors and executive officers in lieu of cash compensation;
- the expensing of (restricted) shares issued for consultancy services; and
- the expensing of share awards granted under the 2008, 2017 and 2018 Plan to executive officers.

For the years ended December 31, 2018 and 2017, we recognized share-based compensation expense of $6,582,286 and $4,289,033, respectively, an increase of $2,293,253 or 54%.

In the following table we show the allocation of share-based compensation according to functions in the Consolidated Statement of Comprehensive Loss:

| | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Cost of revenue (excluding depreciation and amortization) | $ | 74,958 | $ | 70,025 |
| Product Development | | 156,585 | | 74,148 |
| Sales and Marketing | | 531,360 | | 207,735 |
| General and Administrative | | 5,793,479 | | 3,937,125 |
| Restructuring | | 25,904 | | - |
| Total | $ | 6,582,286 | $ | 4,289,033 |

### *Depreciation and Amortization*

Depreciation and amortization expenses for the year ended December 31, 2018 was $5,427,029, an increase of $893,920 or 20%, compared to $4,533,109 for the same period in 2017. The increase is due to a full year of depreciation on the assets capitalized in 2017 and incremental depreciation on capitalized assets and intangible assets for 2018.

*Interest Income and Expense*

Interest income for the twelve-month periods ended December 31, 2018 and 2017 was $184,511 and $172,253, respectively, an increase of $12,258 or 7%. Interest income consists of interest received on bank balances and interest charged to customers for extended payment terms.

Interest expense for the twelve-month periods ended December 31, 2018 and 2017, was $308,742 and $1,654,418, respectively, a decrease of $1,345,676 or 81%, as a result of the conversion of debt during 2018 into equity after renegotiating the terms of the convertible note.

*Interest Expense Related to Debt Discount and Conversion Feature*

For the twelve-month periods ended December 31, 2018 and 2017, interest expenses related to debt discount and conversion feature were $184,308 and $3,408,735, respectively, a decrease of $3,224,427 or 95%.

The decrease in the twelve-month periods ended December 31, 2018 compared to 2017 was mainly caused by the accelerated amortization as a result of the repayment of the senior secured debt in 2017.

*Changes in Fair Value of Derivative Liabilities*

*Change in Fair Value of Conversion Feature and Warrant Liability*

On December 18, 2015, the Company consummated a closing and on March 14, 2016, the Company consummated the last of twelve closings of its private placement offering of units ("Units") to "accredited investors" (defined in Rule 501(a) of the Securities Act) as part of a "best efforts" private placement offering of up to $4,200,000 consisting of up to 140 Units, each Unit consisting of: (i) one 9% unsecured subordinated convertible promissory note in the principal amount of $30,000 (each a "Note" and collectively the "Notes"), which is convertible into shares (the "Note Shares") of common stock of the Company at the option of the holder at a conversion price of $7.50 per share, subject to certain exceptions; and (ii) a five-year warrant (each a "Warrant" and collectively, the "Warrants"). The Notes contains elements which require liability accounting for the conversion feature. During the second quarter of 2017, the Company negotiated with the Note holders to eliminate any condition responsible for the need of derivative accounting. This resulted in the calculation of the fair value as per the agreement date of the elimination of such feature and the subsequent accounting for the allocation of the remaining liability value towards extinguishment of debt and change in fair value of the conversion feature. Such renegotiations did not include the "Saffelberg Note."

During the third quarter of 2018 we renegotiated and settled the remaining "Saffelberg Note", the settlement resulted in the elimination of the derivative liability on the note and resulted in a combined revaluation gain of $1,283,914 for 2018, compared to a gain of $794,691 in 2017.

In the year ended December 31, 2017, the Company realized a gain on the extinguishment of debt of $163,835 as a result of the removal of the derivative liability that was associated with the senior secured debt. The amount was included in the consolidated statement of cash flows in the non-cash financing activities from amendments to fair market value adjustments to warrants liabilities and convertible feature liability.

The senior secured debt for which carried the derivative liability was completely paid in December of 2017. The company carried no senior secured debt and had no derivative liabilities for the full year ended December 31, 2018.

*Other Income and (expense), net*

Other income and (expense), net is income generated from non-operating activities and for the twelve-month period ended December 31, 2018 was $577,538 compared to $705,140 for the twelve-month period ended December 31, 2017. As to both 2018 and 2017, the majority is caused by the realized exchange rate gains.

*Amortization of Deferred Finance Costs*

For the twelve-month period ended December 31, 2018, there was an amount of $28,711 as amortization of deferred finance costs, compared to a $341,354 for period ended December 31, 2017, a decrease of $312,643. The $341,354 in 2017 was the result of the accelerated amortization after voluntary conversion of 9% Unsecured Convertible notes.

*Provision for Income Taxes*

Income tax benefit for the twelve-month periods ended December 31, 2018 was a benefit of $(143,840), compared to a provision for income taxes of $107,205 for the same period in 2017. This change was due to the deferred tax liability included in the Artilium acquisition.

*Net Loss*

Net loss for the twelve months' period ended December 31, 2018, was $12,974,650, an increase in loss of $511,671 or 4%, compared to the loss of $12,462,979 for the same period in 2017.

*Other Comprehensive Income (Loss)*

We record foreign currency translation gains and losses as part of other comprehensive income (loss), which amounted to a gain as of December 31, 2018 of $5,911, compared to a loss of $1,219,782 for the year ended December 31, 2017, an improvement of $1,225,693. The 2017 effect was is primarily attributable to the translation effect resulting on fixed assets held by our subsidiaries.

**Liquidity and Capital Resources**

As reflected in the accompanying consolidated financial statements, the Company reported net losses of $12,974,650 and $12,462,979 for the years ended 2018 and 2017, respectively, and had an accumulated deficit of $312,625,383 as of December 31, 2018 and $299,543,213 as of December 31, 2017.

The cash balance including restricted cash and cash of the Company at December 31, 2018 was $6,482,364. The incremental equity raised during the fourth quarter provided vital liquidity in the short term.

In February 2019, the Company, and certain of our subsidiaries, entered into a credit agreement with Post Road, pursuant to which Post Road will provide the Company with a secured loan of up to $50,000,000 with an initial loan of $25,000,000 funded on February 26, 2019.

**Operating Activities**

The net cash used in operating activities of $7,661,739 for the year ended December 31, 2018 compared to net cash used in operating activities of $2,616,160 in 2017 increased by $5,045,579. Operating activities decreased primarily as a result of an increase in the add back of several items such as the amortization of deferred financing costs, stock-based compensation, depreciation and amortization and change in fair value of warrant liability.

|  | 2018 | 2017 |
|---|---|---|
| Net loss | $ (12,974,650) | $ (12,462,979) |
| Adjustments to reconcile net loss to net cash used in operating activities: | 11,789,185 | 12,564,439 |
|  | (1,185,465) | 101,460 |
| Changes in operating assets and liabilities: | (6,476,274) | (2,717,620) |
| Net cash (used in) operating activities | $ (7,661,739) | $ (2,616,160) |

**Investing Activities**

Net cash used in investing activities for year ended December 31, 2018 was $11,956,478 an increase of $11,234,655 or 1,586%, compared to $721,823 net cash used in investing activities in 2017. This increase is a result of the acquisition of Artilium this year, capitalized software which amounted to $3,403,071, which includes $2,000,000 in software licenses.

**Financing Activities**

Net cash provided by financing activities for the year ended December 31, 2018 was $12,304,660, compared to net cash provided by financing activities of $15,859,090 for the year ended December 31, 2017. Financing activities decreased as a result of paying off all senior secured debt and equity raises in 2017.

26

As a result of the above activities, we had a cash, cash equivalents and restricted cash of $6,482,364 as of December 31, 2018 compared to $13,737,675 as of December 31, 2017, a net decrease in cash, cash equivalents and restricted cash of $7,255,311.

**Off-Balance Sheet Arrangements**

We do not have any off-balance sheet arrangements that have or are reasonably likely to have either a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors, nor we have any relationships with unconsolidated organizations or financial partnerships, such as structured finance or special purpose entities that would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Application of Critical Accounting Policies and Estimates**

*Revenue Recognition and Net billings in excess of revenues*

Revenue represents amounts earned for (non-software) arrangements consisting of hosting subscriptions for mobile and security solutions. We also offer customer support and professional services related to implementing and supporting our suite of applications. Revenues generally are recognized net of any taxes collected from customers and subsequently remitted to governmental authorities.

In May 2014, the FASB issued Accounting Standards Update No. 2014-09 (Topic 606) "Revenue from Contracts with Customers." Topic 606 supersedes the revenue recognition requirements in Topic 605 "Revenue Recognition" (Topic 605), and requires entities to recognize revenue when control of the promised goods or services is transferred to customers at an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. We adopted Topic 606 as of January 1, 2018 using the modified retrospective transition method.

**Adoption of ASC Topic 606, "Revenue from Contracts with Customers"**

On January 1, 2018, we adopted Topic 606 using the modified retrospective method applied to those contracts which were not completed as of January 1, 2018. Results for reporting periods beginning after January 1, 2018 are presented under Topic 606.

We recorded a net increase to opening retained earnings of $107,520 as of January 1, 2018 due to the cumulative impact of adopting Topic 606, with the impact primarily related to our installation revenues that were previously deferred for which the performance obligation was determined to be complete as of the date of adoption.

**Monthly Service Revenues**

The Company's performance obligations in a monthly Software as a Service (SaaS) and service offerings are simultaneously received and consumed by the customer and therefore, are recognized over time. For recognition purposes, we do not unbundle such services into separate performance obligations. The Company typically bills its customer at the end of each month, with payment to be received shortly thereafter. The fees charged may include a combination of fixed and variable charges with the variable charges tied to the number of subscribers or some other measure of volume. Although the consideration may be variable, the volumes are estimable at the time of billing, with "true-up" adjustments occurring in the subsequent month. Such amounts have not been historically significant.

**Installation and Software Development Revenues**

The Company's other revenues consist generally of installation and development projects.

Installation represents the activities necessary for a customer to obtain access and connectivity to the Company's monthly SaaS and service offerings. While installation may require separate phases, it represents one promise within the context of the contract.

Development consists of programming and other services to add new, additional or customized functionality to a customer's existing service offerings. Each development activity is typically its own performance obligation.

Revenue is recognized over time if the installation and development activities create an asset that has no alternative use for which the Company is entitled to receive payment for performance completed to date. If not, then revenue is not recognized until the applicable performance obligation is satisfied.

**Arrangements with Multiple Performance Obligations**

The Company's contracts with customers may include multiple performance obligations. For such arrangements, the Company allocates revenue to each performance obligation based on its relative standalone selling price. The Company generally determines standalone selling prices based on the prices charged to customers.

**Net Billings in Excess of Revenues**

The Company records net billings in excess of revenues when payments are made in advance of our performance, including amounts which are refundable. Net billings in excess of revenues was $927,780 as of December 31, 2018, an increase of $684,794, as compared to $242,986 for December 31, 2017.

Payment terms vary by the type and location of our customer and the products or services offered. The term between invoicing and when payment is due is not significant. For certain products or services and customer types, payment is required before the products or services are delivered to the customer.

**Contract Assets**

Given the nature of the Company's services and contracts, it has no contract assets.

Beginning in 2013, when our business was transitions form the landline business to the mobile and security solutions business, the Company entered multiple element arrangements which are accounted in accordance with ASC 605 "Revenue Recognition-Multiple Element Arrangements" for revenue recorded prior to the adoption of ASC Topic 606 "Revenue for Customers with Contracts".

The elements in a multiple element arrangement are identified and are separated into separate units of accounting when both of the following criteria are met: The delivered item or items have value to the customer on a stand-alone basis, meaning the delivered item or items have value on a standalone basis if it sold separately by any vendor or the customer could resell the delivered item or items on a stand-alone basis. And if the arrangement includes a general right of return related to the delivered item, delivery or performance of the undelivered item or items are considered probably and substantially in the control of the Company. Total consideration of a multiple-element arrangement is then allocated using the relative selling price method using the hierarchy prescribed in ASC 605. In accordance with that hierarchy if fair value of the vendor specific objective evidence (VSOE) or, third-party evidence (TPE) does not exist for the element, then the best estimated selling price (BESP) is used.

Since the Company has neither VSOE nor TPE, the Company determines BESP for all deliverables in their hosting arrangements. In determining the BESP, the Company considers multiple factors which include, and are not limited to, the following: (i) gross margin objectives and internal costs for services; (ii) pricing practices, market conditions; (iii) competitive landscape; and (iv) growth strategy.

Accordingly, management's judgment is applied regarding, among other aspects, conformance with acceptance criteria and if delivery of services has occurred and the degree of completion.

In the paragraphs below, we explain the revenue recognition policy for each element.

For the mobile solutions services the Company recognizes revenues from customers accessing our cloud-based application suite in two different service offerings, namely managed services and bundled services.

For managed services, revenues are recognized for network administration services provided to end users on behalf of Mobile Network Operators (MNO) and virtual Mobile Network Operators (MVNO's). Managed service revenues are recognized monthly based on an average number of end-users managed and calculated on a pre-determined service fee per user. For bundled services, the Company provides both network administration as well as mobile airtime management services. Revenues for bundled services are recognized monthly based on an average number of end-users managed and mobile air time and calculated based on a pre-determined service fee. Technical services that meet the criteria to be separated as a separate unit of accounting are recognized as the services are performed. Otherwise they are deferred and recognized over the contract term. Our arrangements with customers do not provide the customer with the right to take possession of the software supporting the cloud-based application service at any time.

Telecommunication revenues were recognized when delivery occurred based on a pre-determined rate and number of user minutes and number of calls that the Company has managed in a given month.

Professional services and other revenue include fees from consultation services to support the business process mapping, configuration, data migration, integration and training. Amounts that have been invoiced are recorded in accounts receivable and in net billings in excess of revenues or revenue, depending on whether the revenue recognition criteria have been met. Revenue for professional and consulting services in connection with an implementation or implantation of a new customer that is deemed not to have stand-alone value is recognized over the contractual period commencing when the subscription service is made available to the customer. Revenue from other professional services that provide added value such as new features or enhancements to the platform that are deemed to have standalone value to the customer or are sold separately from the original hosting arrangement, are deferred and revenue recognition occurs when the feature is activated.

The Company used revenue recognition standards for ASC 605 for the year ended December 31, 2017 and adopted the revenue recognition standards for ASC 606 beginning on January 1, 2018 using the modified retrospective transition method and applied these standards for the full year ended December 31, 2018.

*Cost of service and Operating Expenses*

Cost of service includes origination, termination, network and billing charges from telecommunications operators, costs of telecommunications service providers, network costs, data center costs, facility cost of hosting network and equipment and cost in providing resale arrangements with long distance service providers, cost of leasing transmission facilities, international gateway switches for voice, data transmission services, and the cost of professional services of staff directly related to the generation of revenues, consisting primarily of employee-related costs associated with these services, including share-based expenses and the cost of subcontractors. Cost of service excludes depreciation and amortization.

*Share-based Compensation*

The Company follows the provisions of ASC 718 "Compensation-Stock Compensation", using the prospective approach. As a result, we recognize share-based compensation expense for only those awards that are granted subsequent to December 31, 2005 and any previously existing awards that are subject to variable accounting, including certain share options that were exercised with convertible notes in 2003, until the awards are exercised, forfeited, or contractually expire in accordance with the prospective method and the transition rules of ASC 718. Under ASC 718, share-based awards granted after December 31, 2005, are recorded at fair value as of the grant date and recognized as expense over the employee's requisite service period (the vesting period, generally three years), which the Company amortizes on a straight-line basis.

28

For both the long-term contractors and advisory board members, we recognize the guidance for share-based compensation awards to non-employees in accordance with ASC 505-50 "Equity-Based Payments to Non-Employees" ("ASC 505-50"). Under ASC 505-50, we determine the fair value of the options or share-based compensation awards granted as either the fair value of the consideration received or the fair value of the equity instruments issued, whichever is more reliably measurable.

Share-based compensation (cash and non-cash) related to equity plans for employees and non-employee directors are included within our cost of revenues and operating expenses.

*Business Combinations*

We generally recognize the identifiable assets acquired, the liabilities assumed, and any non-controlling interests in an acquirer at their fair values as of the date of acquisition, under the purchase method of accounting. We measure goodwill as the excess of consideration transferred, which we also measure at fair value, over the net of the acquisition date fair values of the identifiable assets acquired and liabilities assumed. The acquisition method of accounting requires us to exercise judgment and make significant estimates and assumptions regarding the fair values of the elements of a business combination as of the date of acquisition, including the fair values of identifiable intangible assets, deferred tax asset valuation allowances, liabilities related to uncertain tax positions, and contingencies. This method also requires us to refine these estimates over a one-year measurement period to reflect new information obtained about facts and circumstances that existed as of the acquisition date that, if known, would have affected the measurement of the amounts recognized as of that date. If we are required to retroactively adjust provisional amounts that we have recorded for the fair value of assets and liabilities in connection with acquisitions, these adjustments could materially decrease our operating income and net income and result in lower asset values on our balance sheet.

Significant estimates and assumptions that we must make in estimating the fair value of acquired technology, customer lists, and other identifiable intangible assets include future cash flows that we expect to generate from the acquired assets. If the subsequent actual results and updated projections of the underlying business activity change compared with the assumptions and projections used to develop these values, we could record impairment charges. In addition, we have estimated the economic lives of certain acquired assets and these lives are used to calculate depreciation and amortization expense. If our estimates of the economic lives change, depreciation or amortization expenses could be accelerated or slowed.

*Intangible Assets and Impairment of Long Lived Assets*

In accordance with ASC 350, intangible assets are carried at cost less accumulated amortization and impairment charges. Intangible assets are amortized on a straight-line basis over the expected useful lives of the assets, between three and ten years. Other intangible assets are reviewed for impairment in accordance with ASC 350, on an annual basis, or whenever events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable. Measurement of any impairment loss for long-lived assets and identifiable intangible assets that management expects to hold and use is based on the amount of the carrying value that exceeds the fair value of the asset. This is a critical accounting policy because of the judgement and estimates involved.

**Impact of Accounting Pronouncements**

In June 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2016-13, "Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments," ("ASU 2016-13") which requires measurement and recognition of expected versus incurred credit losses for financial assets held. ASU 2016-13 is effective for the Company's annual and interim reporting periods beginning January 1, 2020, with early adoption permitted on January 1, 2019. The Company is currently evaluating the impact of this ASU on its consolidated financial statements; however at the current time the Company has not determined what impact the adoption will have on its consolidated financial statements, financial condition or results of operations.

In March 2016, the FASB issued ASU No. 2016-09, "Compensation-Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting" ("ASU 2016-09"). The updated guidance changes how companies account for certain aspects of share-based payment awards to employees, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. The update to the standard was effective for the Company's annual and interim reporting periods beginning January 1, 2017. The Company has evaluated the impact of ASU 2016-09 on its consolidated financial statements and has determined that the impact of adopting of ASU 2016-09 did not have a material effect on its consolidated financial statements, financial condition or results of operations.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)* . This update outlines a new, single comprehensive model for entities to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. This new revenue recognition model provides a five-step analysis in determining when and how revenue is recognized. The new model will require revenue recognition to depict the transfer of promised goods or services to customers in an amount that reflects the consideration a company expects to receive in exchange for those goods or services. In August 2015, the FASB issued ASU No. 2015-14, *Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date* , which deferred the effective date of ASU 2014-09 by one year. ASU 2014-09 is now effective for fiscal periods beginning after December 15, 2017, including interim periods within that reporting period. Early adoption is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. We adopted Topic 606 as of January 1, 2018 using the modified retrospective transition method.  This update requires expanded disclosures relating to the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. Additionally, qualitative and quantitative disclosures are required for customer contracts, significant judgments and changes in judgments, and assets recognized from the costs to obtain or fulfill a contract.

In February 2016, the FASB issued ASU No. 2016-02, "Leases (Topic 842)," (ASU 2016-02), which together with subsequent amendments, modified lessee accounting guidance under Topic 840. This ASU requires the Company to recognize on the balance sheet the assets and liabilities for the rights and obligations created by leases with terms of more than twelve months. This ASU also requires disclosures enabling the users of financial statements to understand the amount, timing and uncertainty of cash flows arising from leases. This new standard will become effective for annual periods beginning after December 15, 2018 (including interim reporting periods within those periods). Early adoption is permitted as of the beginning of an interim or annual reporting period. The Company will adopt the new standard in the first quarter of its fiscal year 2019 using the optional transition method allowed by ASU 2018-11. The Company will elect not to reassess whether any expired or existing contracts are or contain leases, not to reassess the lease classification for any expired or existing leases, not to reassess initial direct costs for any existing leases, and not to separate non-lease components from lease components and instead account for each separate lease component and the non-lease components associated with that lease component as a single lease component for new or modified leases. The Company does not expect the adoption of this standard to a material effect on its financial statements for existing leases as of January 1, 2019. However, as a result of the iPass acquisition, the Company expects to record a Right of Use asset and related liability for the existing iPass leases subject to ASU 2016-02.

In January 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2016-01, "Financial Instruments – Overall (Subtopic 825-10)." ASU 2016-01 enhances the reporting model for financial instruments to provide users of financial statements with more decision-useful information by addressing certain aspects of recognition, measurement, presentation, and disclosure of financial instruments. The amendments simplify certain requirements and also reduce diversity in current practice for other requirements. ASU 2016-01 is effective for public companies' fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. Except for the early application guidance specifically allowed in ASU 2016-01, early adoption is not permitted. The Company has determined that there was no material effect as a result of the adoption of ASU 2016-01 on our consolidated financial statements.

In November 2016, the FASB issued Accounting Standards Update 2016-18, "Statement of Cash Flows - Restricted Cash a consensus of the FASB Emerging Issues Task Force." This standard requires restricted cash and cash equivalents to be included with cash and cash equivalents on the statement of cash flows under the retrospective transition approach. The guidance will become effective for fiscal years beginning after December 15, 2017 and interim periods within those fiscal years. Early adoption is permitted. The Company has retrospectively adopted this standard and the effects of the adoption including restricted cash and cash equivalents with cash and cash equivalents are reflected on the statement of the cash flows.

**Item 7A.  Quantitative and Qualitative Disclosures about Market Risk**

We are a "smaller reporting company" as defined by regulation S-K and as such, are not required to provide the information contained in this item pursuant to regulation S-K.

31

**Item 8.  Financial Statements and Supplementary Data**

**Pareteum Corporation**
**AND SUBSIDIARIES**

CONSOLIDATED FINANCIAL STATEMENTS

TABLE OF CONTENTS

| | PAGE |
|---|---|
| REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 33 |
| CONSOLIDATED BALANCE SHEETS AS OF DECEMBER 31, 2018 AND 2017 | 34 |
| CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS FOR THE YEARS ENDED DECEMBER 31, 2018 AND 2017 | 35 |
| CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT) FOR THE YEARS ENDED DECEMBER 31, 2018 AND 2017 | 36 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS FOR THE YEARS ENDED DECEMBER 31, 2018 AND 2017 | 37 |
| NOTES TO CONSOLIDATED FINANCIAL STATEMENTS | 38 |

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Pareteum Corporation

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Pareteum Corporation and its subsidiaries (the Company) as of December 31, 2018 and 2017, the related consolidated statements of comprehensive loss, changes in stockholders' equity (deficit) and cash flows for the years then ended, and the related notes to the consolidated financial statements (collectively, the financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (Untied States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Our report dated March 18, 2019 expressed an opinion that the Company had not maintained effective internal control over financial reporting as of December 31, 2018 based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Squar Milner, LLP

We have served as the Company's auditor since 2014.

Los Angeles, California
March 18, 2019

**Pareteum Corporation and Subsidiaries**

CONSOLIDATED BALANCE SHEETS
AS OF DECEMBER 31, 2018 AND 2017

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 6,051,709 | $ 13,537,899 |
| Restricted cash | 430,655 | 199,776 |
| Accounts receivable, net of an allowance for doubtful accounts of $1,021,179 at December 31, 2018 and $90,173 at December 31, 2017 | 15,361,594 | 2,058,284 |
| Prepaid expenses and other current assets | 2,083,950 | 900,369 |
| Total current assets | 23,927,908 | 16,696,328 |
| **NON-CURRENT ASSETS** | | |
| **OTHER ASSETS** | 45,336 | 91,267 |
| **NOTE RECEIVABLE** | 1,082,436 | 594,520 |
| **PROPERTY AND EQUIPMENT, NET** | 4,553,250 | 4,713,710 |
| **LONG TERM INVESTMENT** | - | 3,230,208 |
| **INTANGIBLE ASSETS, NET** | 39,658,325 | - |
| **GOODWILL** | 91,773,911 | - |
| **TOTAL ASSETS** | $ 161,041,166 | $ 25,326,033 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable and customer deposits | $ 10,337,629 | $ 1,978,726 |
| Net billings in excess of revenues | 927,780 | 242,986 |
| Accrued expenses and other payables | 7,952,380 | 5,250,130 |
| Promissory Note | 681,220 | - |
| 9% Unsecured subordinate convertible promissory note (current portion net of debt discount and debt issuance) | 106,967 | 66,000 |
| Total current liabilities | 20,005,976 | 7,537,842 |
| **LONG TERM LIABILITIES** | | |
| Derivative liabilities | - | 1,597,647 |
| Other long term liabilities | 212,703 | 151,163 |
| Unsecured convertible promissory note (net of debt discount and debt issuance) | - | 617,848 |
| Deferred tax liabilities | 8,415,825 | - |
| Related party loan | 341,998 | - |
| Total long term liabilities | 8,970,526 | 2,366,658 |
| Total liabilities | 28,976,502 | 9,904,500 |
| Commitments and Contingencies (See Notes) | | |
| **STOCKHOLDERS' EQUITY** | | |
| Preferred Stock $0.00001 par value, 50,000,000 shares authorized, 0 issued and outstanding as of December 31, 2018 and 0 issued and outstanding as of December 31, 2017 | - | - |
| Common Stock $0.00001 par value, 500,000,000 shares authorized, 97,852,911 issued and outstanding as of December 31, 2018 and 46,617,093 shares issued and outstanding as of December 31, 2017 | 450,990,827 | 321,271,437 |
| Accumulated other comprehensive loss | (6,300,780) | (6,306,691) |
| Accumulated deficit | (312,625,383) | (299,543,213) |
| Pareteum Corporation stockholders' equity | 132,064,664 | 15,421,533 |

NON-CONTROLLING INTEREST                                                                                              -

| | | |
|---|---|---|
| Total stockholders' equity | 132,064,664 | 15,421,533 |
| | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 161,041,166 | $ 25,326,033 |

The accompanying notes are an integral part of these consolidated financial statements

34

**Pareteum Corporation and Subsidiaries**

CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS
FOR THE YEARS ENDED DECEMBER 31, 2018 AND 2017

|  | 2018 | 2017 |
|---|---|---|
| REVENUES | $ 32,435,736 | $ 13,547,507 |
|  |  |  |
| COST AND OPERATING EXPENSES |  |  |
| Cost of revenues (excluding depreciation and amortization) | 10,329,646 | 3,683,609 |
| Product development | 3,092,776 | 1,479,587 |
| Sales and marketing | 3,161,234 | 1,575,069 |
| General and administrative | 17,808,912 | 10,097,027 |
| Restructuring and acquisition costs | 7,258,831 | 966,292 |
| Depreciation and amortization | 5,427,029 | 4,533,109 |
| Total cost and operating expenses | 47,078,428 | 22,334,693 |
|  |  |  |
| LOSS FROM OPERATIONS | (14,642,692) | (8,787,186) |
|  |  |  |
| OTHER INCOME (EXPENSE) |  |  |
| Interest income | 184,511 | 172,253 |
| Interest expense | (308,742) | (1,654,418) |
| Interest expense related to debt discount and conversion feature | (184,308) | (3,408,735) |
| Changes in derivative liabilities | 1,283,914 | 794,691 |
| Gain on extinguishment of debt | - | 163,835 |
| Other income and (expense), net | 577,538 | 705,140 |
| Amortization of deferred financing costs | (28,711) | (341,354) |
| Total other income (expense) | 1,524,202 | (3,568,588) |
|  |  |  |
| LOSS BEFORE (BENEFIT) PROVISION FOR INCOME TAXES | (13,118,490) | (12,355,774) |
| Income tax (benefit) provision | (143,840) | 107,205 |
| NET LOSS | (12,974,650) | (12,462,979) |
|  |  |  |
| OTHER COMPREHENSIVE LOSS |  |  |
| Foreign currency translation income (loss) | 5,911 | (1,219,782) |
| COMPREHENSIVE LOSS | $ (12,968,739) | $ (13,682,761) |
|  |  |  |
| Net loss per common share and equivalents – basic | $ (.20) | $ (.76) |
|  |  |  |
| Net loss per common share and equivalents – diluted | $ (.20) | $ (.76) |
|  |  |  |
| Weighted average shares outstanding during the period – basic | 64,548,533 | 16,338,156 |
|  |  |  |
| Weighted average shares outstanding during the period – diluted | 64,548,533 | 16,338,156 |

The accompanying notes are an integral part of these consolidated financial statements.

35

**Pareteum Corporation and Subsidiaries**

CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)

| Description | Preferred Stock Shares | Preferred Stock Amount | Common Stock Shares | Common Stock Amount | Other comprehensive loss | Accumulated Deficit | Total stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| Balance - December 31, 2016 | 249 | $ 2,143,196 | 8,376,267 | $ 280,653,362 | $ (5,086,902) | $ (287,080,234) | $ (9,370,578) |
| | | | | | | | |
| Preferred Stock (Issuance) | 4,034 | 3,691,110 | - | - | - | - | 3,691,110 |
| Preferred Stock (Conversions) | (4,283) | (6,181,110) | 5,836,020 | 6,181,110 | - | - | - |
| Shares issued for warrant exercises | - | - | 4,865,743 | 5,049,905 | - | - | 5,049,905 |
| Shares issued for Equity Fundraises | - | - | 21,420,379 | 21,202,239 | - | - | 21,202,239 |
| Shares issued/exchanges for Strategic Partnership | - | - | 3,200,332 | 3,230,208 | - | - | 3,230,208 |
| Shares issued for board and management compensation | - | - | 17,631 | 49,146 | - | - | 49,146 |
| Shares issued for Settlement of Debt & Services | - | - | 804,193 | 784,054 | - | - | 784,054 |
| Shares issued for Conversion of Notes | - | - | 243,564 | 630,366 | - | - | 630,366 |
| Warrants issued attributable to loan amendments | - | - | - | 2,530,605 | - | - | 2,530,605 |
| Stock awards issued to Management | - | - | 1,527,880 | 1,470,540 | - | - | 1,470,540 |
| Stock awards issued to Staff | - | - | 68,393 | 102,134 | - | - | 102,134 |
| Shares issued to consultants | - | - | 248,396 | 299,501 | - | - | 299,501 |
| Shares to be issued | - | - | - | 463,716 | - | - | 463,716 |
| Amortization of Stock Options expense | - | - | - | 1,318,020 | - | - | 1,318,020 |
| Expenses attributable to share issuances (fundraise & warrant exercises & note conversions & preferred share conversions) | - | 346,804 | - | (3,267,682) | - | - | (2,920,878) |
| Warrants issued attributable to share issuances | - | - | - | 162,689 | - | - | 162,689 |
| Warrants issued/repriced as part of IR management services | - | - | - | 462,320 | - | - | 462,320 |
| Movements on Non-Corporate Equity Accounts | - | - | - | (50,796) | - | - | (50,796) |
| Other comprehensive loss due to foreign exchange rate translation net of tax | - | - | - | - | (1,219,782) | - | (1,219,782) |
| Net Loss | - | - | - | - | - | (12,462,979) | (12,462,979) |
| Net reverse stock split rounding and share cancellations | - | - | 8,295 | - | (7) | - | (7) |
| Balance - December 31, 2017 | - | - | 46,617,093 | 321,271,437 | (6,306,691) | (299,543,213) | 15,421,533 |
| | | | | | | | |
| ASC 606 transition adjustment | - | - | - | - | - | (107,520) | (107,520) |
| Shares issued for Acquisition | - | - | 34,311,115 | 109,304,601 | - | - | 109,304,601 |
| Shares issued for warrant exercises | - | - | 11,111,780 | 6,114,863 | - | - | 6,114,863 |
| Shares issued for Equity Fundraises | - | - | 2,440,000 | 6,100,002 | - | - | 6,100,002 |
| Expenses attributable to share issuances (fundraise & warrant exercises & note conversions & preferred share conversions) | | | 13,400 | (700,817) | | | (700,817) |
| Shares issued for board and management compensation | - | - | 389,416 | 902,715 | - | - | 902,715 |
| Shares issued for Settlement of Debt | - | - | 375,857 | 650,807 | - | - | 650,807 |
| Shares issued for Conversion of Notes | - | - | 410,205 | 1,314,243 | - | - | 1,314,243 |
| Stock awards issued to Management | - | - | 1,890,272 | 4,265,819 | - | - | 4,265,819 |
| Shares issued to consultants | - | - | 234,553 | 374,306 | - | - | 374,306 |
| Shares issued for Exercised Stock Options | | | 59,220 | 59,220 | | | 59,220 |
| Amortization of Stock Options expense | - | - | - | 1,677,483 | - | - | 1,677,483 |
| Warrants issued/repriced as part of IR management services | - | - | - | - | - | - | - |
| Movement on non-corporate equity accounts | - | - | - | (343,852) | - | - | (343,852) |
| Other comprehensive loss due to foreign exchange rate translation net of tax | - | - | - | - | 5,911 | - | 5,911 |
| Net Loss | - | - | - | - | - | (12,974,650) | (12,974,650) |
| Balance - December 31, 2018 | - | $ - | 97,852,911 | $ 450,990,827 | $ (6,300,780) | $ (312,625,383) | $ 132,064,664 |

**Pareteum Corporation and Subsidiaries**

CONSOLIDATED STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED DECEMBER 31, 2018 AND 2017

| | | 2018 | | 2017 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| Net loss | $ | (12,974,650) | $ | (12,462,979) |
| **Adjustments to reconcile net loss to net cash (used in) operating activities:** | | | | |
| Depreciation and amortization | | 5,427,029 | | 4,533,109 |
| Provision for doubtful accounts | | - | | 2,845 |
| Stock based compensation | | 6,582,286 | | 4,289,033 |
| Change in fair value of warrant liability | | (1,283,914) | | (794,691) |
| Amortization of deferred financing costs | | 28,711 | | 341,354 |
| Interest expense relating to debt discount and conversion feature | | 184,308 | | 3,408,735 |
| Shares issued for services | | 1,075,983 | | 784,054 |
| Deferred Tax | | (225,218) | | - |
| **Changes in operating assets and liabilities:** | | | | |
| (Increase) in accounts receivable | | (13,239,269) | | (1,446,459) |
| (Increase) decrease in prepaid expenses, deposits and other assets | | (1,169,435) | | 640,478 |
| Decrease (increase) in accounts payable and customer deposits | | 5,110,007 | | (349,039) |
| Decrease (increase) in net billings in excess of revenues | | 677,191 | | (830,114) |
| Decrease (increase) in accrued expenses and other payables | | 2,145,232 | | (732,486) |
| **Net cash (used in) operating activities** | | (7,661,739) | | (2,616,160) |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| Purchases of property, equipment and software development | | (4,124,894) | | (721,823) |
| Acquisition of Artilium plc, net of cash acquired | | (7,331,584) | | - |
| Purchase of note | | (500,000) | | - |
| **Net cash (used in) investing activities** | | (11,956,478) | | (721,823) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | |
| Increase in short term loans | | 812,586 | | - |
| Exercise of warrants & options | | 6,174,083 | | 5,049,905 |
| Equity and debt issuance costs paid | | - | | (227,584) |
| Repayment on loans (Equitalia) | | (81,194) | | - |
| Gross proceeds from public offering | | 6,100,002 | | 21,202,239 |
| Financing related fees | | (700,817) | | - |
| Reclassify accrued interest to principal (Saffelberg Advance) | | - | | (83,634) |
| Principal repayment to senior secured lender | | - | | (10,081,836) |
| **Net cash provided by financing activities** | | 12,304,660 | | 15,859,090 |
| | | | | |
| **EFFECT OF EXCHANGE RATES ON CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | 58,246 | | (278,639) |
| **NET INCREASE IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | (7,255,311) | | 12,242,468 |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH, BEGINNING OF THE PERIOD** | | 13,737,675 | | 1,495,207 |
| | | | | |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH, END OF THE PERIOD** | $ | 6,482,364 | $ | 13,737,675 |
| | | | | |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:** | | | | |
| | | | | |
| Cash received during the period for interest | $ | 202,262 | $ | 129,390 |
| Cash (paid) during the period for interest | $ | (120,530) | $ | (1,494,527) |
| Cash (paid) during the period for income taxes | $ | (34,314) | $ | (2,359) |
| **NON-CASH INVESTING ACTIVITIES:** | | | | |
| Shares issued to Artilium and Artilium shareholders | $ | 109,304,601 | $ | 3,230,208 |
| **NON-CASH FINANCING ACTIVITIES:** | | | | |
| Conversion of notes, including converted accumulated interest | $ | 1,314,243 | $ | 630,366 |
| Conversion of 9% unsecured convertible note | $ | 678,372 | $ | - |
| Shares issued for settlement of debt | $ | 650,807 | $ | 784,054 |
| Conversion of preferred shares | $ | - | $ | 6,181,110 |
| Amendments and fair market value adjustments to warrants liabilities and convertible feature liability | $ | 313,860 | $ | 2,668,183 |

The accompanying notes are an integral part of these consolidated financial statements.

**Note 1. Business and Summary of Significant Accounting Policies**

**Description of Business**

Pareteum has developed a **Communications Cloud Services Platform** , providing (i) Mobility, (ii) Messaging and (iii) Security services and applications, with a Single-Sign-On, API and software development suite.

Pareteum has developed a Communications Cloud Services Platform, providing (i) Mobility, (ii) Messaging and (iii) Security services and applications, with a Single-Sign-On, API and software development suite. The Pareteum platform hosts integrated IT/Back Office and Core Network functionality for mobile network operators, and for enterprises implement and leverage mobile communications solutions on a fully outsourced SaaS, PaaS and/or IaaS basis: made available either as an on-premise solution or as a fully hosted service in the Cloud depending on the needs of our customers. Pareteum also delivers an Operational Support System ("OSS") for channel partners, with Application Program Interfaces ("APIs") for integration with third party systems, workflows for complex application orchestration, customer support with branded portals and plug-ins for a multitude of other applications. These features facilitate and improve the ability of our channel partners to provide support and to drive sales. As of October 1, 2018, the Company now includes Artilium plc, which operates as a wholly-owned subsidiary of the Company. Artilium is a software development company active in the enterprise communications and core telecommunications markets delivering software solutions which layer over disparate fixed, mobile and IP networks to enable the deployment of converged communication services and applications.  As of February 26, 2019, the Company now includes iPass Inc., which operates as a wholly-owned subsidiary of the Company. iPass is a cloud-based service provider of global mobile connectivity, offering Wi-Fi access on any mobile device through its SaaS platform.

**Liquidity**

As reflected in the accompanying consolidated financial statements, the Company reported net loss of $12,974,650 and $12,462,979 for the years ended 2018 and 2017, respectively, and had an accumulated deficit of $312,625,383 as of December 31, 2018. The cash balance including restricted cash of the Company at December 31, 2018 was $6,482,364.

Management has evaluated the Company's Going Concern risk as the Company continues to operate on an annual basis at a loss for the past several years and has also been operating cash flow negative during those years.

During 2018, Pareteum raised over $6.1 million primarily through the sale of common stock equivalents and an additional $6.1 million cash exercise or exchange of warrants.

As of December 31, 2018, and currently Pareteum has no Senior Secured Debt, having paid off the Senior Secured Loan balance of $7.64 million during Q4 2017. The repayment of the debt freed up over $100,000 of interest and fees that were paid each month to the senior secure lender in addition to the debt service. The Company did not enter any debt or line of credit arrangements in 2018. A credit facility of up to $50 million was secured on February 26, 2019 and $25 million of debt proceeds was received by the company of which $11 million was used to pay off the Fortress debt from the iPass acquisition, which closed on February 12, 2019. Professional fees related to this transaction were $1.7 million, leaving the Company with $12.3 million in cash from the initial $25 million is debt proceeds.

**Equity or Debt Financing**

On December 31, 2018, we had $6,482,364 in cash and restricted cash. Based on our current expectations with respect to our revenue and expenses, we expect that our current level of cash and cash equivalents should be sufficient to meet our liquidity needs for the next twelve months. If our revenues do not grow as expected and if we are not able to manage expenses sufficiently, we may be required to obtain additional equity or debt financing. Although we have previously been able to attract financing as needed, such financing may not continue to be available at all, or if available, on reasonable terms as required. Further, the terms of such financing may be dilutive to existing shareholders or otherwise on terms not favorable to us or existing shareholders. If we are unable to secure additional financing, as circumstances require, or do not succeed in meeting our sales objectives, we may be required to change or significantly reduce our operations or ultimately may not be able to continue our operations.

**Dawson James Public Offering**

On May 9, 2018, we entered into a securities purchase agreement with select accredited investors relating to a registered direct offering, issuance and sale of an aggregate of 2,440,000 shares of our common stock at a purchase price of $2.50 per share for gross proceeds before deducting estimated offering expenses of $6,100,002. The shares were issued pursuant to a Registration Statement on Form S-3 filed with the Securities and Exchange Commission on September 9, 2016, as amended October 21, 2016 and November 10, 2016 and declared effective November 14, 2016. Dawson James Securities, Inc. (the "Placement Agent") acted as placement agent on a best-efforts basis in connection with the offering, pursuant to a placement agency agreement that was entered into on May 9, 2018. We also agreed to pay the Placement Agent a commission, to reimburse the Placement Agent's out-of-pocket expenses, to issue the Placement Agent, in a private transaction, a warrant to purchase 122,000 shares of common stock at an exercise price equal to 125% of the offering price per share, and to indemnify the Placement Agent against certain liabilities.

**Artilium Acquisition**

On October 1, 2018 we completed our previously announced Artilium Acquisition. In connection with the Artilium Acquisition, the Company issued an aggregate of 37,511,447 shares of the Company's common stock to Artilium shareholders. At which time, the Company cancelled 3,200,332 shares of common stock that were held by Aritilium pre-acquisition, for a net of 34,311,115 newly-issued shares of the Company's common stock. Following the Artilium Acquisition, Artilium operates as a wholly-owned subsidiary of the Company, and Artilium's direct subsidiaries operate as indirect subsidiaries of the Company, wholly-owned by Artilium. Artilium is a software development company active in the enterprise communications and core telecommunications markets delivering software solutions which layer over disparate fixed, mobile and IP networks to enable the deployment of converged communications services and applications.

**iPass Acquisition**

On November 12, 2018, we entered into the iPass Merger Agreement by and among iPass, and TBR. Pursuant to the iPass Merger Agreement, TBR commenced the iPass Offer for all of the outstanding shares of iPass' common stock, par value $0.0001 per share, for 1.17 shares of the Company's common stock, together with cash in lieu of any fractional shares, without interest and less any applicable withholding taxes. The iPass offer and withdrawal rights expired at 5:00 p.m. New York City time on February 12, 2019, and promptly following such time TBR accepted for payment and promptly paid for all validly tendered iPass shares in accordance with the terms of the iPass Offer. In aggregate, the Company issued 9,867,041 shares of common stock to the iPass shareholders in March 2019. iPass is a leading provider of global mobile connectivity, offering simple, secure, always-on Wi-Fi access on any mobile device. Built on a software-as-a-service ("SaaS") platform, the iPass cloud-based service keeps its customers connected by providing unlimited Wi-Fi connectivity on unlimited devices. iPass is the world's largest Wi-Fi network, with more than 68 million hotspots globally, at airports, hotels, train stations, convention centers, outdoor venues, inflight on more than 20 leading airlines, and more.

<u>**Principles of Consolidation**</u>

The accompanying consolidated financial statements include the accounts of Pareteum and its subsidiaries and have been prepared in accordance with accounting principles generally accepted in the United States ("US GAAP"). All intercompany transactions and account balances have been eliminated in consolidation. The Company's subsidiaries are:

• its wholly owned subsidiary Pareteum North America Corp. with its wholly owned subsidiary, Pareteum UK Ltd.;

• its wholly owned subsidiary Pareteum Asia PTE. Ltd.;

• its wholly owned subsidiary TBR Inc. (special purpose vehicle for iPass acquisition);

• its wholly-owned subsidiary Pareteum Europe B.V. (fka Elephant Talk Europe Holding B.V.) and its wholly owned subsidiaries, Elephant Talk Mobile Services B.V., Elephant Talk PRS Netherlands BV, Elephant Talk Deutschland GmbH (dormant), Elephant Talk Middle East & Africa (Holding) W.L.L., Elephant Talk Luxembourg SA (dormant), Guangzhou Elephant Talk Information Technology Limited (dormant), Elephant Talk Communications Italy S.R.L. (dormant), Elephant Talk Business Services W.L.L., Elephant Talk Middle East & Africa (Holding) Jordan L.L.C. (dormant).;

• its wholly owned Elephant Talk Communications Holding AG and its wholly owned subsidiaries Pareteum Spain SLU and ETC Carrier Services GmbH.;

• Pareteum Europe B.V. majority-owned subsidiaries Elephant Talk Bahrain W.L.L. (99%), ET de Mexico S.A.P.I. de C.V. (99.998%), ET-UTS NV; (51%) and LLC Pareteum (Russia) (50%) Elephant Talk;

• Elephant Talk Telecomunicação do Brasil LTDA, is owned 90% by Pareteum Europe B.V. and 10% by Elephant Talk Communication Holding AG;

• its wholly-owned subsidiary Elephant Talk Limited ("ETL") and its wholly owned ET Guangdong Ltd. and its majority owned (50.54%) subsidiary Elephant Talk Middle East & Africa FZ-LLC.;

• Asesores Profesionales ETAK S. de RL. de C.V. is owned 99% by Pareteum Europe B.V.; and

• its wholly owned subsidiary Artilium Group Ltd. and its wholly owned subsidiaries, Artilium NV, Speak UP BVBA, Ello Mobile BVBA, Artilium UK Ltd., Comsys Telecom & Media BV, Portalis BV, Comsys Connect GmbH, United Telecom N.V., Talking Sense BVBA, Wbase Comm. V, Artilium Trustee Company Limited, Comsys Connect BV, Livecom International BV, Comsys Connect AG and United Telecom BV.

## Foreign Currency Translation

The functional currency is Euros for the Company's wholly-owned subsidiary Pareteum Europe B.V. and its subsidiaries. The financial statements of the Company were translated to USD using period-end exchange rates as to assets and liabilities and average exchange rates as to revenues and expenses, and capital accounts were translated at their historical exchange rates when the capital transaction occurred. In accordance with ASC 830, Foreign Currency Matters, net gains and losses resulting from translation of foreign currency financial statements are included in the statement of changes in stockholders' equity as other comprehensive income (loss). Foreign currency transaction gains and losses are included in the consolidated statements of comprehensive loss, under the line item 'other income and (expense), net'.

## Use of Estimates

The preparation of the accompanying consolidated financial statements conforms with accounting principles generally accepted in the U.S. and requires management to make certain estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities and intangible assets acquired in our acquisition of Artilium. Significant estimates include the bad debt allowance, revenue recognition, impairment of long-lived assets, valuation of financial instruments, useful lives of long-lived assets and share-based compensation. Actual results may differ from these estimates under different assumptions or conditions.

## Cash and Cash Equivalents

The Company considers all highly liquid investments with original maturities of three months or less at the time of purchase to be cash equivalents. The Company has full access to the whole balance of cash and cash equivalents on a daily basis without any delay. As of December 31, 2018, the Company had no cash equivalents.

## Restricted Cash

Restricted cash as of December 31, 2018 and 2017 was $430,655 and $199,776 respectively and consists of cash deposited in blocked accounts as bank guarantees for corporate credit cards and a portion of the 2018 balance relates to a Letter of Credit issued to a vendor.

## Accounts Receivables, net

The Company's customer base consists of a geographically dispersed customer base. The Company maintains an allowance for potential credit losses on accounts receivable. The Company makes ongoing assumptions relating to the collectability of our accounts receivable. The accounts receivable amounts presented on our consolidated balance sheets include reserves for accounts that might not be collected. In determining the amount of these reserves, the Company considers its historical level of credit losses. The Company also makes judgments about the creditworthiness of significant customers based on ongoing credit evaluations, and the Company assesses current economic trends that might impact the level of credit losses in the future. The Company's reserves have generally been adequate to cover its actual credit losses. However, since the Company cannot reliably predict future changes in the financial stability of its customers, it cannot guarantee that its reserves will continue to be adequate. If actual credit losses are significantly greater than the reserves, the Company would increase its general and administrative expenses and increase its reported net losses. Conversely, if actual credit losses are significantly less than our reserve, this would eventually decrease the Company's general and administrative expenses and decrease its reported net losses. Allowances are recorded primarily on a specific identification basis. See Note 2 of the Financial Statements for more information.

**Leasing Arrangements**

At the inception of a lease covering equipment or real estate, the lease agreement is evaluated under the criteria of *ASC 840, Leases.* Leases meeting one of the four key criteria are accounted for as capital leases and all others are treated as operating leases. Under a capital lease, the discounted value of future lease payments becomes the basis for recognizing an asset and a borrowing, and lease payments are allocated between debt reduction and interest. For operating leases, payments are recorded as rent expense. Criteria for a capital lease include (i) transfer of ownership during the lease term; (ii) existence of a bargain purchase option under terms that make it likely to be exercised; (iii) a lease term equal to 75 percent or more of the economic life of the leased equipment; and (iv) minimum lease payments that equal or exceed 90 percent of the fair value of the property. Subsequent to initial recognition, the asset is accounted for in accordance with the accounting policy applicable to that type of asset. The assets are amortized as per our accounting policy for property & equipment, and intangibles, as applicable.

**Revenue Recognition and Net billings in Excess of Revenues**

Revenue primarily represents amounts earned for our mobile and security solutions. Our mobile and security solutions are hosted software where the customer does not take possession of the software and are therefore accounted for as subscriptions. We also offer customer support and professional services related to implementing and supporting our suite of applications. Revenues generally are recognized net of any taxes collected from customers and subsequently remitted to governmental authorities.

The Company enters into arrangements that include various combinations of hosting subscriptions and services, where elements are delivered over different periods of time. Such arrangements are accounted for in accordance with ASC 605 "Revenue Recognition-Multiple Element Arrangements" for revenue recorded prior to the adoption of ASC Topic 606, "Revenue from Contracts with Customers" as discussed below. Revenue recognition for multiple-element arrangements requires judgment to determine if multiple elements exist, whether elements can be accounted for as separate units of accounting, and if so, the fair value for each of the elements.

The elements in a multiple element arrangement are identified and are separated into separate units of accounting at the inception of the arrangement and revenue is recognized as each element is delivered. Delivered item or items are considered a separate unit of accounting when both of the following criteria are met: (i) the delivered item or items have value to the customer on a stand-alone basis, meaning the delivered item or items have value on a standalone basis if it sold separately by any vendor or the customer could resell the delivered item or items on a stand-alone basis, and (ii) if the arrangement includes a general right of return related to the delivered item, delivery or performance of the undelivered item or items are considered probably and substantially in the control of the Company. Total consideration of a multiple-element arrangement is allocated to the separate units of accounting at the inception of the arrangement based on the relative selling price method using the hierarchy prescribed in ASC 605. In accordance with that hierarchy if vendor specific objective evidence (VSOE) of fair value or, third-party evidence (TPE) does not exist for the element, then the best estimated selling price (BESP) is used. Since the Company does not have VSOE or TPE, the Company uses BESP to allocate consideration for all units of accounting in our hosting arrangements. In determining the BESP, the Company considers multiple factors which include, but are not limited to the following: (i) gross margin objectives and internal costs for services; (ii) pricing practices and market conditions; (iii) competitive landscape; and (iv) growth strategy.

41

In the paragraphs below we explain the revenue recognition policy for each element.

For the mobile solutions services the Company recognizes revenues from customers accessing our cloud-based application suite in two different service offerings, namely managed services and bundled services.

For managed services, revenues are recognized for network administration services provided to end users on behalf of Mobile Network Operators (MNO) and virtual Mobile Network Operators (MVNO's). Managed service revenues are recognized monthly based on an average number of end-users managed and calculated on a pre-determined service fee per user. For bundled services, the Company provides both network administration as well as mobile airtime management services. Revenues for bundled services are recognized monthly based on an average number of end-users managed and mobile air time, calculated based on a pre-determined service fee. Technical services that meet the criteria to be separated as a separate unit of accounting are recognized as the services are performed. Services that do not meet the criteria to be accounted for as a separate unit of accounting are deferred and recognized ratably over the estimated customer relationship. Our arrangements with customers do not provide the customer with the right to take possession of the software supporting the cloud-based application service at any time.

Telecommunication revenues are recognized when delivery occurs based on a pre-determined rate and number of user minutes and calls that the Company has managed in a given month.

Professional services and other revenue include fees from consultation services to support the business process mapping, configuration, data migration, integration and training. Amounts that have been invoiced are recorded in accounts receivable and in net billings in excess of revenues or revenue, depending on whether the revenue recognition criteria have been met. Revenue for professional and consulting services in connection with an implementation or implantation of a new customer that is deemed not to have stand-alone value is recognized over the estimated customer relationship commencing when the subscription service is made available to the customer. Revenue from other professional services that provide added value such as new features or enhancements to the platform that are deemed to have standalone value to the customer are recognized when the feature is activated.

**Adoption of ASC Topic 606, "Revenue from Contracts with Customers"**

On January 1, 2018, we adopted Topic 606 using the modified retrospective method applied to those contracts which were not completed as of January 1, 2018. Results for reporting periods beginning after January 1, 2018 are presented under Topic 606, while prior period amounts are not adjusted and continue to be reported in accordance with our historic accounting under Topic 605.

We recorded a net increase to opening accumulated deficit of $107,520 as of January 1, 2018 due to the cumulative impact of adopting Topic 606, with the impact primarily related to our installation revenues that were previously deferred for which the performance obligation was determined to be complete as of the date of adoption. The impact to revenues to be recognized for the nine months ended September 30, 2018 was a decrease of $107,520 as a result of applying Topic 606, relating to the aforementioned installation revenues and an increase to the accumulated deficit.

**Revenue Recognition**

Our revenues represent amounts earned for our mobile and security solutions. Our solutions take many forms but our revenue generally consists of fixed and/or variable charges for services delivered monthly under a combined services and SaaS model. We also offer discrete (one-time) services for implementation and for development of specific functionality to properly service our customers.

The following table presents our revenues disaggregated by revenue source:

| | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2018** | | **2017** [1] | |
| Monthly Service | $ | 28,467,985 | $ | 12,540,377 |
| Installation and Software Development | | 3,967,751 | | 1,007,130 |
| Total revenues | $ | 32,435,736 | $ | 13,547,507 |

(1) As noted above, prior period amounts have not been adjusted under the modified retrospective method.

Monthly services revenues are recognized at a point in time and amounted to $28,467,985 and $12,540,377 for the years ended December 31, 2018 and 2017, respectively. Installation and software development revenues are recognized over time and amounted to $3,967,751 and $1,007,130 for years ended December 31, 2018 and 2017, respectively.

The following table presents our revenues disaggregated by geography, based on the billing addresses of our customers

|  | Years Ended December 31, | | |
|  | 2018 | | 2017 [1] |
|---|---|---|---|
| Europe | $ | 24,600,456 | $ | 12,428,942 |
| Other geographic areas | | 7,835,280 | | 1,118,565 |
| Total revenues | $ | 32,435,736 | $ | 13,547,507 |

(1)  As noted above, prior period amounts have not been adjusted under the modified retrospective method.

**Monthly Service Revenues**

The Company's performance obligations in a monthly Software as a Service (SaaS) and service offerings are simultaneously received and consumed by the customer and therefore, are recognized over time. For recognition purposes, we do not unbundle such services into separate performance obligations. The Company typically bills its customer at the end of each month, with payment to be received shortly thereafter. The fees charged may include a combination of fixed and variable charges with the variable charges tied to the number of subscribers or some other measure of volume. Although the consideration may be variable, the volumes are estimable at the time of billing, with "true-up" adjustments occurring in the subsequent month. Such amounts have not been historically significant.

**Installation and Software Development Revenues**

The Company's other revenues consist generally of installation and development projects.

Installation represents the activities necessary for a customer to obtain access and connectivity to the Company's monthly SaaS and service offerings. While installation may require separate phases, it represents one promise within the context of the contract.

Development consists of programming and other services to add new, additional or customized functionality to a customer's existing service offerings. Each development activity is typically its own performance obligation.

Revenue is recognized over time if the installation and development activities create an asset that has no alternative use for which the Company is entitled to receive payment for performance completed to date. If not, then revenue is not recognized until the applicable performance obligation is satisfied.

**Arrangements with Multiple Performance Obligations**

The Company's contracts with customers may include multiple performance obligations. For such arrangements, the Company allocates revenue to each performance obligation based on its relative standalone selling price. The Company generally determines standalone selling prices based on the prices charged to customers.

**Net Billings in Excess of Revenues**

The Company records net billings in excess of revenues when payments are made in advance of our performance, including amounts which are refundable. Net billings in excess of revenues was $927,780 as of December 31, 2018, an increase of $684,794, as compared to $242,986 for December 31, 2017.

Payment terms vary by the type and location of our customer and the products or services offered. The term between invoicing and when payment is due is not significant. For certain products or services and customer types, payment is required before the products or services are delivered to the customer.

**Contract Assets**

Given the nature of the Company's services and contracts, it has no contract assets.

**Cost of Revenues and Operating Expenses**

*Cost of Revenues*

Cost of revenues includes origination, termination, network and billing charges from telecommunications operators, costs of telecommunications service providers, network costs, data center costs, facility cost of hosting network and equipment and cost in providing resale arrangements with long distance service providers, cost of leasing transmission facilities, international gateway switches for voice, data transmission services, and the cost of professional services of staff directly related to the generation of revenues, consisting primarily of employee-related costs associated with these services, including share-based expenses and the cost of subcontractors. Cost of revenues excludes depreciation and amortization.

**Reporting Segments**

ASC 280, Segment Reporting ("ASC 280"), defines operating segments as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing performances. The business operates as one single segment and discrete financial information is based on the whole, not segregated; and is used by the chief decision maker accordingly.

**Financial Instruments**

The carrying values of cash and cash equivalents, restricted cash, accounts receivable, accounts payable, notes receivable, promissory notes (payable) and customer deposits approximate their fair values based on their short-term nature. The recorded values of long-term debt approximate their fair values, as interest approximates market rates. The Company's conversion feature, a derivative instrument, is recognized in the balance sheet at its fair values with changes in fair market value reported in earnings.

**Fair Value Measurements**

In accordance with ASC 820, Fair Value Measurement ("ASC 820"), the Company defines fair value as the price that would be received from selling an asset or paid to transfer a liability (i.e., the exit price) in an orderly transaction between market participants at the measurement date. ASC 820 establishes a fair value hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available.

Observable inputs are those that market participants would use in pricing the asset or liability based on market data obtained from sources independent of the Company. Unobservable inputs reflect the Company's assumptions about the inputs that market participants would use in pricing the asset or liability developed based on the best information available in the circumstances.

The fair value hierarchy is categorized into three levels based on the inputs as follows:

*Level 1* – Quoted prices are available in active markets for identical assets or liabilities as of the reported date.

*Level 2* – Pricing inputs are other than quoted prices in active markets, which are either directly or indirectly observable as of the reported date. The nature of these financial instruments includes cash instruments for which quoted prices are available but are traded less frequently, derivative instruments whose fair values have been derived using a model where inputs to the model are directly observable in the market and instruments that are fair valued using other financial instruments, the parameters of which can be directly observed.

*Level 3* – Instruments that have little to no pricing observability as of the reported date. These financial instruments are measured using management's best estimate of fair value, where the inputs into the determination of fair value require significant management judgment or estimation.

The degree of judgment exercised by the Company in determining fair value is greatest for securities categorized in Level 3. In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, for disclosure purposes, the level in the fair value hierarchy within which the fair value measurement falls in its entirety is determined by the lowest level input that is significant to the fair value measurement.

The Company has the following asset groups that are valued at fair value categorized within Level 3: Goodwill and intangibles (non-recurring measurements) for the impairment test. Below are discussions of the main assumptions used for the recurring measurements.

The Company used the Monte Carlo valuation model to determine the value of the outstanding warrants and conversion feature from the "Offering". Since the Monte Carlo valuation model requires special software and expertise to model the assumption to be used, the Company hired a third party valuation expert. Because tradenames, customer relationships and the technology acquired as part of the acquisition of Artilium required expertise to model the assumptions to be used, the Company hired a third party valuation expert.

***Recurring Measurement - Warrant Derivative Liabilities and Conversion Feature Derivative (see also Note 11 and 16)***

*Number of Outstanding Warrants and/or Convertible Notes*

The number of outstanding warrants and/or convertible notes is adjusted every re-measurement date after deducting the exercise or conversion of any outstanding warrants convertible notes during the previous reporting period.

*Stock Price at Valuation Date*

The closing stock price at re-measurement date being the last available closing price of the reporting period taken from www.nasdaq.com.

*Exercise Price*

The exercise price is fixed and determined under the terms of the financing facility it was issued.

*Remaining Term*

The remaining term is calculated by using the estimated life of the outstanding principal liability at the moment of re-measurement.

*Expected Volatility*

Management estimates expected cumulative volatility giving consideration to the expected life of the note and/or warrants and calculated the annual volatility by using the continuously compounded return calculated by using the share closing prices of an equal number of days prior to the maturity date of the note (reference period). The annual volatility is used to determine the (cumulative) volatility of the Company´s common stock.

Liquidity Event

We estimate the expected liquidity event considering the average expectation of the timing of fundraises and the need for those funds offset against scheduled repayment dates and the costs and/or savings of the future steps in re-modelling the organization.

*Risk-Free Interest Rate*

Management estimates the risk-free interest rate using the "Daily Treasury Yield Curve Rates" from the US Treasury Department with a term equal to the reported rate or derived by using both spread in intermediate term and rates, up to the expected maturity date of the derivative involved.

*Expected Dividend Yield*

Management estimates the expected dividend yield by giving consideration to the Company´s current dividend policies as well as those anticipated in the future considering the Company´s current plans and projections. Management currently does not believe that it is in the best interest of the Company to pay dividends at this time.

**Share-based Compensation**

The Company follows the provisions of ASC 718, Compensation-Stock Compensation, ("ASC 718"). Under ASC 718, share-based awards are recorded at fair value as of the grant date and recognized as expense with an adjustment for forfeiture over the employee's requisite service period (the vesting period, generally up to three years). The share-based compensation cost based on the grant date fair value is amortized over the period in which the related services are received.

To determine the value of our stock options at grant date under our employee stock option plan, the Company uses the Black-Scholes option-pricing model. The use of this model requires the Company to make many subjective assumptions. The following addresses each of these assumptions and describes our methodology for determining each assumption:

*Expected Life*

The expected life represents the period that the stock option awards are expected to be outstanding. The Company uses the simplified method for estimating the expected life of the option, by taking the average between time to vesting and the contract life of the award.

*Expected Volatility*

The Company estimates expected cumulative volatility giving consideration to the expected life of the option of the respective award, and the calculated annual volatility by using the continuously compounded return calculated by using the share closing prices of an equal number of days prior to the grant-date (reference period). The annual volatility is used to determine the (cumulative) volatility of its common stock.

*Forfeiture rate*

The Company is using the aggregate forfeiture rate. The aggregate forfeiture rate is the ratio of pre-vesting forfeitures over the awards granted (pre-vesting forfeitures/grants). The forfeiture discount (additional loss) is released into the profit and loss in the same period as the option vesting-date. The forfeiture rate is actualized every reporting period and due to the firm reorganization, the forfeiture rate has been set to zero to reflect the current expectation of the number of employees that leave the Company.

*Risk-Free Interest Rate*

The Company estimates the risk-free interest rate using the "Daily Treasury Yield Curve Rates" from the U.S. Treasury Department with a term equal to the reported rate or derived by using both spread in intermediate term and rates, to the expected life of the award.

*Expected Dividend Yield*

The Company estimates the expected dividend yield by giving consideration to our current dividend policies as well as those anticipated in the future considering our current plans and projections.

**Income Taxes**

Current tax is based on the income or loss from ordinary activities adjusted for items that are non-assessable or disallowable for income tax purpose and is calculated using tax rates that have been enacted or substantively enacted at the balance sheet date. Deferred tax assets are recognized for the expected future tax benefit to be derived from tax losses and tax credit carry-forwards. Establishment of a valuation allowance is provided when it is more likely than not that deferred taxes will be realized.

In the ordinary course of a global business, there are many transactions and calculations where the ultimate tax outcome is uncertain. Some of these uncertainties arise as a consequence of revenue sharing and reimbursement arrangements among related entities, the process of identifying items of revenue and expenses that qualify for preferential tax treatment and segregation of foreign and domestic income and expense to avoid double taxation.

The Company files federal income tax returns in the U.S., various U.S. state jurisdictions and various foreign jurisdictions. The Company's income tax returns are open to examination by federal, state and foreign tax authorities, generally for 3 years but can be extended to 6 years under certain circumstances. In other jurisdictions the period for examinations depend on local legislation. The Company's policy is to record estimated interest and penalties on unrecognized tax benefits as part of its income tax provision.

**Comprehensive Income (Loss)**

For the years ended December 31, 2018 and 2017, the Company's comprehensive loss consisted of net losses and foreign currency translation adjustments.

**Business Combinations**

The acquisition method of accounting for business combinations as per ASC 805, Business Combinations ("ASC 805"), requires us to use significant estimates and assumptions, including fair value estimates, as of the business combination date and to refine those estimates as necessary during the measurement period (defined as the period, not to exceed one year, in which the Company may adjust the provisional amounts recognized for a business combination).

Under the acquisition method of accounting, the identifiable assets acquired, the liabilities assumed, and any non-controlling interests acquired in the acquisition are recognized as of the closing date for purposes of determining fair value. The Company measures goodwill as of the acquisition date as the excess of consideration transferred, over the net of the acquisition date fair value of the identifiable assets acquired and liabilities assumed. Costs that the Company incurs to complete the business combination such as investment banking, legal and other professional fees are not considered part of consideration and the Company charges them to general and administrative expense as they are incurred.

During the measurement period, the Company adjusts the provisional amounts recognized at the acquisition date to reflect new information obtained about facts and circumstances that existed as of the acquisition date that, if known, would have affected the measurement of the amounts recognized as of that date. Measurement period adjustments are reflected retrospectively in all periods being presented in the financial statements.

**Goodwill**

The Company records goodwill when the fair value of consideration transferred in a business combination exceeds the fair value of the identifiable assets acquired and liabilities assumed. Goodwill and other intangible assets that have indefinite useful lives are not amortized, but the Company tests them for impairment annually during its fourth fiscal quarter and whenever an event or change in circumstances indicates that the carrying value of the asset is impaired.

The authoritative guidance for the goodwill impairment model includes a two-step process. First, it requires a comparison of the carrying value of the reporting unit to its fair value. If the fair value is determined to be less than the carrying value, a second step is performed. In the second step, the Company compares the implied fair value of goodwill to its carrying value in the reporting unit. The shortfall of the fair value below carrying value, if any, would represent the amount of goodwill impairment charge. We are using the criteria in ASU no. 2011-08 Intangibles – Goodwill and Other (Topic 350): Testing Goodwill for Impairment, which permits the Company to make a qualitative assessment of whether it is more likely than not than not that a reporting unit's fair value is less than the carrying amount before applying the two-step goodwill impairment test. If the Company concludes that it is not more likely than not that the fair value of a reporting unit is less that its carrying amount, it would not need to perform the two-step impairment test for that reporting unit.

The Company tests goodwill for impairment in the fourth quarter of each year, or sooner should there be an indicator of impairment as per *ASC 350, Intangibles – Goodwill and Other.* The Company periodically analyzes whether any such indicators of impairment exist. Such indicators include a sustained, significant decline in the Company's stock price and market capitalization, a decline in the Company's expected future cash flows, a significant adverse change in legal factors or in the business climate, unanticipated competition, and/or slower growth rate, among others. In the Company's case, the indicator is the continuing losses.

47

**Long-Lived Assets and Intangible Assets**

In accordance with ASC 350, Intangibles – Goodwill and Other ("ASC 350"), intangible assets are carried at cost less accumulated amortization and impairment charges. Intangible assets are amortized on a straight-line basis over the expected useful lives of the assets, between three and ten years. Other indefinite life intangible assets are reviewed for impairment in accordance with ASC 350, on an annual basis, or whenever events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable. Measurement of any impairment loss for long-lived assets and amortizing intangible assets that management expects to hold and use is tested for impairment when amounts may not be recoverable. Impairment is measured based on the amount of the carrying value that exceeds the fair value of the asset.

**Property and Equipment, Internal Use Software and Third Party Software**

Property and equipment are initially recorded at cost. Additions and improvements are capitalized, while expenditures that do not enhance the assets or extend the useful life are charged to operating expenses as incurred. Included in property and equipment are certain costs related to the development of the Company's internally developed software technology platform.

The Company has adopted the provisions of ASC 350-40, Accounting for the Costs of Computer Software developed or obtained for internal use, and therefore the costs incurred in the preliminary stages of development are expensed as incurred. The Company capitalizes all costs related to software developed or obtained for internal use when management commits to funding the project; the preliminary project stage is completed and when technological feasibility is established. Software developed for internal use has generally been used to deliver hosted services to the Company's customers. Technological feasibility is considered to have occurred upon completion of a detailed program design that has been confirmed by documenting the product specifications, or to the extent that a detailed program design is not pursued, upon completion of a working model that has been confirmed by testing to be consistent with the product design. Once a new functionality or improvement is released for operational use, the asset is moved from the property and equipment category "construction in progress" ("CIP") to a property and equipment asset subject to depreciation in accordance with the principle described in the previous sentence. In addition, account management also records equipment acquired from third parties, until it is ready for use. Capitalization of costs ceases when the project is substantially complete and ready for its intended use. Depreciation is applied using the straight-line method over the estimated useful lives of the assets once the assets are placed in service.

Management evaluates the useful lives of these assets on an annual basis and tests for impairment whenever events or changes in circumstances occur that could impact the recoverability of these assets. In 2018 and 2017, the Company did not record an impairment.

**Recent Accounting Pronouncements**

In June 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2016-13, "Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments," ("ASU 2016-13") which requires measurement and recognition of expected versus incurred credit losses for financial assets held. ASU 2016-13 is effective for the Company's annual and interim reporting periods beginning January 1, 2020, with early adoption permitted on January 1, 2019. The Company is currently evaluating the impact of this ASU on its consolidated financial statements; however at the current time the Company has not determined what impact the adoption will have on its consolidated financial statements, financial condition or results of operations.

48

In March 2016, the FASB issued ASU No. 2016-09, "Compensation-Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting" ("ASU 2016-09"). The updated guidance changes how companies account for certain aspects of share-based payment awards to employees, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. The update to the standard was effective for the Company's annual and interim reporting periods beginning January 1, 2017. The Company has evaluated the impact of ASU 2016-09 on its consolidated financial statements and has determined that the impact of adopting of ASU 2016-09 did not have a material effect on its consolidated financial statements, financial condition or results of operations.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)* . This update outlines a new, single comprehensive model for entities to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. This new revenue recognition model provides a five-step analysis in determining when and how revenue is recognized. The new model will require revenue recognition to depict the transfer of promised goods or services to customers in an amount that reflects the consideration a company expects to receive in exchange for those goods or services. In August 2015, the FASB issued ASU No. 2015-14, *Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date* , which deferred the effective date of ASU 2014-09 by one year. ASU 2014-09 is now effective for fiscal periods beginning after December 15, 2017, including interim periods within that reporting period. Early adoption is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. We adopted Topic 606 as of January 1, 2018 using the modified retrospective transition method.  This update requires expanded disclosures relating to the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. Additionally, qualitative and quantitative disclosures are required for customer contracts, significant judgments and changes in judgments, and assets recognized from the costs to obtain or fulfill a contract.

In February 2016, the FASB issued ASU No. 2016-02, "Leases (Topic 842)," (ASU 2016-02), which together with subsequent amendments, modified lessee accounting guidance under Topic 840. This ASU requires the Company to recognize on the balance sheet the assets and liabilities for the rights and obligations created by leases with terms of more than twelve months. This ASU also requires disclosures enabling the users of financial statements to understand the amount, timing and uncertainty of cash flows arising from leases. This new standard will become effective for annual periods beginning after December 15, 2018 (including interim reporting periods within those periods). Early adoption is permitted as of the beginning of an interim or annual reporting period. The Company will adopt the new standard in the first quarter of its fiscal year 2019 using the optional transition method allowed by ASU 2018-11. The Company will elect not to reassess whether any expired or existing contracts are or contain leases, not to reassess the lease classification for any expired or existing leases, not to reassess initial direct costs for any existing leases, and not to separate non-lease components from lease components and instead account for each separate lease component and the non-lease components associated with that lease component as a single lease component for new or modified leases. The Company does not expect the adoption of this standard to have a material effect on its financial statements for existing leases as of January 1, 2019. However, as a result of the iPass acquisition, the Company expects to record a Right of Use asset and related liability for the existing iPass leases subject to ASU 2016-02.

In January 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2016-01, "Financial Instruments – Overall (Subtopic 825-10)." ASU 2016-01 enhances the reporting model for financial instruments to provide users of financial statements with more decision-useful information by addressing certain aspects of recognition, measurement, presentation, and disclosure of financial instruments. The amendments simplify certain requirements and also reduce diversity in current practice for other requirements. ASU 2016-01 is effective for public companies' fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. Except for the early application guidance specifically allowed in ASU 2016-01, early adoption is not permitted. The Company has determined that there was no material effect as a result of the adoption of ASU 2016-01 on our consolidated financial statements.

In November 2016, the FASB issued Accounting Standards Update 2016-18, "Statement of Cash Flows - Restricted Cash a consensus of the FASB Emerging Issues Task Force." This standard requires restricted cash and cash equivalents to be included with cash and cash equivalents on the statement of cash flows under the retrospective transition approach. The guidance became effective for fiscal years beginning after December 15, 2017 and interim periods within those fiscal years. Early adoption is permitted. The Company has retrospectively adopted this standard and the effects of the adoption are reflected on the accompanying statement of the cash flows.

### Note 2. Allowance for Doubtful Accounts

Accounts receivable are presented on the balance sheet net of estimated uncollectible amounts. The Company records an allowance for estimated uncollectible accounts in an amount approximating anticipated losses. Individual uncollectible accounts are written off against the allowance when collection of the individual accounts appears doubtful.  The Company recorded an allowance for doubtful accounts of $1,021,179 and $90,173 as of December 31, 2018 and 2017, respectively.

### Note 3. Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets amounted to $2,083,950 as of December 31, 2018, compared with $900,369 as of December 31, 2017. Prepaid expenses and other current assets consisted primarily of prepaid insurance, other prepaid operating expenses, prepaid taxes and prepaid Value Added Tax ("VAT").  As of December 31, 2018, $424,167 of the prepaid expenses was related to VAT. On December 31, 2017, prepaid VAT represented $324,092.

### Note 4. Other Assets

Other assets at December 31, 2018 and December 31, 2017 are long-term in nature and consist of long-term deposits to various telecom carriers and loans amounting to $45,336 and $91,267, respectively. The deposits are refundable at the termination of the business relationship with the carriers. The primary decrease in other assets was related to the closing of certain entities that were dissolved or are in the process of being dissolved.

### Note 5. Note Receivable

The third quarter 2016 sale of ValidSoft for the price of $3,000,000 was completed and the Company received $2,000,000 in cash and a $1,000,000 promissory note. The Principal amount of $1,000,000 together with all interest must be paid by on or before September 30, 2018 bearing interest of 5% per annum. During 2017 we accrued $21,639 for interest, credited $375,594 for Company liabilities assumed by ValidSoft and credited $51,525 as a partial repayment on the principal which results in a remaining outstanding principal amount of $594,520. On July 22, 2018, an agreement was made to extend the maturity date of the note to September 30, 2019. At December 31, 2018 we accrued $4,780 for interest which results in a remaining outstanding principal amount of $576,769.

On November 26, 2018, the Company executed a senior secured promissory note from Yonder Media Mobile (an unrelated entity), with interest accruing at a simple rate of 6% per annum with a maturity date of May 26, 2020. The principal amount is $500,000 and accumulated interest for 2018 was $5,667 which results in a remaining outstanding amount of $505,667. All principal and interest are due on the maturity date.

The total notes receivable held by the Company as of December 31, 2018 and 2017 was $1,082,436 and $594,520, respectively, and is included in the accompanying consolidated balance sheet.

**Note 6.  Property and Equipment**

Property and equipment at December 31, 2018 and December 31, 2017 consisted of:

| | Average Estimated Useful Lives | December 31, 2018 | December 31, 2017 |
|---|---|---|---|
| Furniture and fixtures | 5 | $          139,857 | $          139,857 |
| Computer, communication and network equipment | 3 - 10 | 17,520,435 | 17,020,421 |
| Software | 5 | 4,716,816 | 2,899,794 |
| Automobiles | 5 | 10,744 | 10,744 |
| Software development | 1 | 1,656,739 | 398,654 |
| Total property and equipment | | 24,044,591 | 20,469,470 |
| | | | |
| Less: accumulated depreciation and amortization | | (19,491,341) | (15,755,760) |
| Total property and equipment, net | | $       4,553,250 | $       4,713,710 |

Computers, communications and network equipment includes the capitalization of our systems engineering and software programming activities. Typically, these investments pertain to the Company's:

- Intelligent Network (IN) platform;
- CRM provisioning Software;
- Mediation, Rating & Pricing engine;
- ValidSoft security software applications;
- Operations and business support software; and
- Network management tools.

The total amount of product development costs (internal use software costs) that are capitalized in Property and Equipment during the years ended December 31, 2018 and 2017 was $1,258,085 and $696,401, respectively.

During the years ended December 31, 2018 and December 31, 2017, the Company amortized $900,723 and $896,039 of software development, respectively.

**Note 7. Long Term Investments**

As of December 31, 2018 the Company no longer holds any long term investments. The long term investment held by the Company as of the year ended December 31, 2017 of $3,230,208 was Artilium common shares, which the Company now owns 100% of and our investment in our subsidiary is eliminated upon consolidation.

**Note 8. Net Billings in Excess of Revenues**

Because the Company recognizes revenue upon performance of services, net billings in excess of revenues represents amounts received from the customers for which either delivery has not occurred or against future sales of services. As of December 31, 2018, the balance of net billings in excess of revenues was $927,780. For the corresponding period in 2017, the net billings in excess of revenues balance was $242,986.

**Note 9. Accrued Expenses**

As of December 31, 2018 and December 31, 2017, the accrued expenses were comprised of the following:

51

| Accrued expenses and other payables | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Accrued selling, general and administrative expenses | $ 2,396,941 | $ 3,463,800 |
| Accrued restructuring & acquisition related costs | 1,885,194 | - |
| Accrued cost of service | 1,070,099 | 413,942 |
| Accrued taxes (including VAT) | 2,283,999 | 877,366 |
| Accrued interest payable | 67,613 | 96,801 |
| Other accrued expenses | 248,534 | 398,221 |
| | $ 7,952,380 | $ 5,250,130 |

Accrued taxes include income taxes payable as of December 31, 2018 amounting to $93,883. See Note 21 of the Financial Statements for more information.

Accrued Selling, General and Administrative expenses include social security premiums, personnel related costs such as payroll taxes, provision for holiday allowance, accruals for marketing and sales expenses, and office related expenses.

**Note 10. Promissory Notes and Unsecured Convertible Promissory Notes**

*Promissory Note*
The Promissory Notes of $681,220 are 4 bank notes secured through by Artilium with varying maturity dates ranging between 6 and 18 months with an average interest rate of 2%. The notes are not convertible and are not included in any of the tables in the remainder of note 10.

*9% Unsecured Convertible Promissory Note*
The Unsecured Convertible Promissory Notes is split into a long term part and a short term part, for this year ending only the short term part exists.

| Breakdown of the Unsecured Convertible Promissory Notes (net of debt discounts) | Outstanding December 31, 2018 | Long Term to Short Term re-allocation | Regular Amortizations (during 2018) | Conversions (during 2018) including accelerated amortization | Outstanding December 31, 2017 |
|---|---|---|---|---|---|
| *9% Unsecured Convertible Note (Private Offering Q4-2015 – Q1-2016)* | $ - | $ 40,967 | $ (59,340) | $ 56,348 | $ (37,975) |
| *9% Unsecured Convertible Note (Saffelberg)* | - | - | (42,151) | 622,024 | (579,873) |
| *Total Long Term* | - | 40,967 | (101,491) | 678,372 | (617,848) |
| | | | | | |
| *9% Unsecured Convertible Note (Private Offering Q4-2015 – Q1-2016)* | (106,967) | (40,967) | - | - | (66,000) |
| *Total Short Term* | (106,967) | (40,967) | - | - | (66,000) |
| | | | | | |
| **Total Unsecured Convertible Promissory Notes** | $ (106,967) | $ - | $ (101,491) | $ 678,372 | $ (683,848) |

On December 18, 2015, the Company consummated a closing and on March 14, 2016, the Company consummated the last of twelve closings of its private placement offering of units ("Units") to "accredited investors" (as defined in Rule 501(a) of the Securities Act as part of a "best efforts" private placement offering of up to $4,200,000 consisting of up to 140 Units, each Unit consisting of: (i) one 9% unsecured subordinated Note in the principal amount of $30,000, which is convertible into the Note Shares of common stock of the Company at the option of the holder at a conversion price of $7.50 per share, subject to certain exceptions; and (ii) a five-year Warrant to purchase one hundred thousand (4,000) shares of common stock (the "Warrant Shares") at an exercise price of $11.25 per share, subject to certain exceptions.

The Units were offered and sold pursuant to an exemption from registration under Section 4(2) and Regulation D of the Securities Act. During 2016 and 2015, the Company sold an aggregate of $3,548,000 principal amount of Notes and delivered Warrants to purchase an aggregate of 473,067 shares of common stock.

The Warrants entitle the holders to purchase shares of common stock reserved for issuance thereunder for a period of five years from the date of issuance and contain certain anti-dilution rights on terms specified in the Warrants. The Note Shares and Warrant Shares will be subject to full ratchet anti-dilution protection for the first 24 months following the issuance date and weighted average anti-dilution protection for the 12 months period after the first 24 months following the issuance date. In December 2016, the Company and the holders agreed upon modification of the Warrants to redeem the above anti-dilution protection and offered an exercise price adjustment to $3.75 and 10% bonus warrants in return.

The Company filed a Registration Statement on Form S-3 registering the Note Shares and Warrant Shares which became effective November 14, 2016.

In connection with the offering, the Company retained a registered FINRA broker dealer (the "Placement Agent") to act as the placement agent. For acting as the placement agent, we agreed to pay the Placement Agent, subject to certain exceptions: (i) a cash fee equal to seven percent (7%) of the aggregate gross proceeds raised by the Placement Agent in the offering, (ii) a non-accountable expense allowance of up to one percent (1%) of the aggregate gross proceeds raised by the Placement Agent in the offering, and (iii) at the final closing one five-year warrant to purchase such number of shares equal to 7% of the shares underlying the Notes sold in this offering at an exercise price of $7.50 and one five-year warrant to purchase such number of shares equal to 7% of the shares underlying the

Warrants sold in this offering at an exercise price of $11.25. The total number of warrants earned by the Placement Agent were 33,115 warrants with an exercise price of $11.25 and 33,115 warrants with an exercise price of $7.50.

The aggregate number of Units sold during the offering period in 2016 resulted in gross proceeds of $3,458,000 and a net proceed of $3,039,932. The Company used the net proceeds from the offering primarily for working capital.

The value of the Warrants and the conversion feature to the investors and the Placement Agent cash fees and warrants have been capitalized and off set against the liability for the Notes. By doing this the Company followed ASU 2015-03 guidelines to also offset the debt issuance costs against the liability of the convertible notes. This resulted in a total initial debt discount of $2,395,290 and $467,568 of financing costs incurred in connection with the offering. The debt discount and debt issuance costs are being amortized over the term of the Notes using the effective interest method.

52

**Breakdown of the 9% Unsecured Subordinated Convertible Promissory Note**
**(Maturing December 2018 through March 21, 2019)**

| | December 31, 2018 | Regular Amortizations (during 2018) | Conversions (during 2018) including accelerated amortization | Outstanding December 31, 2017 |
|---|---|---|---|---|
| **Convertible Note Principal Amount** | | | | |
| Principal Amount | $ (105,000) | $ - | $ 60,000 | $ (165,000) |
| 10% Early Repayment | (10,500) | - | 6,000 | (16,500) |
| | | | | |
| **Debt Discounts & Financing Costs** | | | | |
| Investor Warrants | 1,719 | (26,104) | (5,149) | 32,972 |
| Conversion Feature value | 1,237 | (6,912) | (1,412) | 9,561 |
| 7% Agent Warrants | 534 | (3,027) | (609) | 4,170 |
| Financing Costs | 5,043 | (23,297) | (2,482) | 30,822 |
| | $ (106,967) | $ (59,340) | $ 56,348 | $ (103,975) |

**Breakdown of the 9% Saffelberg Note (Unsecured Convertible)**
**(Maturing August 18, 2019)**

| | December 31, 2018 | Regular Amortizations (during 2018) | Conversions (during 2018) including accelerated amortization | Outstanding December 31, 2017 |
|---|---|---|---|---|
| **Convertible Note Principal Amount** | | | | |
| Principal Amount (Long Term) | $ - | $ - | $ 723,900 | $ (723,900) |
| **Debt Discounts & Financing Costs** | | | | |
| Investor Warrants | - | (30,154) | (73,900) | 104,054 |
| Conversion Feature value | - | (11,996) | (27,977) | 39,973 |
| | $ - | $ (42,150) | $ 622,023 | $ (579,873) |

On June 29, 2018, the Company entered into an agreement with Saffelberg agreeing to (i) pay the balance and interest of the September 7, 2017 repayment agreement, (ii) convert at $2.37 per share on July 11, 2018 the August 18, 2016 $723,900 convertible note and accrued interest into 387,913 common shares, (iii) adjust the strike price of the 96,250 warrants to a fixed amount of $2.37 on June 29, 2018 and (iv) register converted 387,913 common shares, the 96,250 warrant and other shares held by Saffelberg in the next registration statement.

**Breakdown of the conversion rights for outstanding convertible notes:**

| Number of underlying shares for Conversion of outstanding unsecured convertible notes | Outstanding December 31, 2018 | Agreement Amendments / Interest effects | Exercises / Conversions / Expirations | Outstanding December 31, 2017 |
|---|---|---|---|---|
| 9% Convertible Note - Investors | 39,500 | 763 | (22,292) | 61,029 |
| 9% Convertible Note - Other Investor | - | (472,030) | (387,913) | 859,943 |
| **Outstanding Conversion Features** | **39,500** | **(471,267)** | **(410,205)** | **920,972** |

**Note 11. Warrant and Conversion Feature Liabilities**

In the past the Company used equity instruments to improve the yield of the Notes (Investors). During 2018 all of the outstanding derivative liabilities have either been renegotiated or extinguished by other reasons.

Currently, the Company has identified the following movements during 2018 for the number of rights owned by the holders for the following groups.

| Number of underlying shares for Liability Warrants & Conversion Features | Outstanding December 31, 2018 | Agreement Amendments / Interest effects | Exercises/ Conversions / Expirations | Outstanding December 31, 2017 |
|---|---|---|---|---|
| 9% Convertible Note - Other Investor | $ - | (472,030) | (387,913) | $ 859,943 |
| **Outstanding Liability Conversion Features** | **-** | **(472,030)** | **(387,913)** | **859,943** |
| | | | | |
| Other 9% Convertible Note Warrants | - | (96,520) | - | 96,520 |
| **Outstanding Liability Warrants** | **-** | **(96,520)** | **-** | **96,520** |
| | | | | |
| **Total** | **$ -** | **(568,550)** | **(387,913)** | **$ 956,463** |

The Company has identified the following fair market value for such derivative liabilities of outstanding rights owned by the holders for the following groups.

| Fair Market Value Liability Warrants & Conversion Features | FMV as of December 31, 2018 | Agreement Amendments/ Conversions/ FX effect | Mark to market adjustment Ytd-2018 | FMV as Of December 31, 2017 |
|---|---|---|---|---|
| 9% Convertible Note - Other Investor | $ - | $ (1,706,484) | $ 279,581 | $ 1,426,903 |
| **FMV Conversion Feature Liability** | **-** | **(1,706,484)** | **279,581** | **1,426,903** |
| | | | | |
| Other 9% Convertible Note Warrants | - | (204,896) | 34,152 | 170,744 |
| **FMV Warrant Liabilities** | **-** | **(204,896)** | **34,152** | **170,744** |
| | | | | |
| **Total** | **$ -** | **$ (1,911,380)** | **$ 313,733** | **$ 1,597,647** |

54

On June 29, 2018, the Company amended the Saffelberg Investments N.V. ("Saffelberg") convertible note dated August 18, 2016 with principal of $723,900 and amended the August 18, 2016 Warrant. These amendments removed the elements that generated the derivative liabilities and related expense from the convertible note and warrant.

**Note 12. Obligations under Capital Leases**

The Company had a financing arrangement with one of its vendors to acquire equipment and licenses. This trade arrangement matured in January 2017.

**Note 13. Other long-term payable**

As of December 31, 2018, the other long-term liabilities amounted to $212,703 compared to $151,163 as of December 31, 2017, respectively.

**Note 14. Related Party Loan**

As of December 31, 2018, there remains an outstanding loan to Comsys, a fully owned subsidiary of Artilium BV, from Comsystems (a company owned by Gerard Dorenbos). Prior to the acquisition by Pareteum, Gerard Dorenbos was a shareholder of Artilium PLC, with approximately 15% of the total shares of Artilium PLC, and a board member of Artilium PLC.

The loan has a maturity date of December 31, 2021. The total amount outstanding balance as of December 31, 2018 was $341,998 which carries an 8% interest rate and is reflected as a related party loan in the accompanying consolidated balance sheet. All principal and interest are due on the maturity date.

**Note 15. Fair Value Measurements**

In case the Company needs to account for derivative liabilities, the Company uses the Monte Carlo valuation model and the Black-Scholes model to determine the value of the outstanding warrants and conversion feature, in these situations, the Company hires a third party valuation expert to prepare such calculations.

The following table summarizes fair value measurements by level at December 31, 2017 for financial assets and liabilities measured at fair value on a recurring basis:

| | December 31, 2017 | | | |
|---|---|---|---|---|
| | **Level 1** | **Level 2** | **Level 3** | **Total** |
| **Derivative Liabilities** | | | | |
| Conversion feature | $        - | $        - | $   1,426,903 | $   1,426,903 |
| Warrant Liabilities | - | - | 170,744 | 170,744 |
| Total Derivatives Liabilities | $        - | $        - | $   1,597,647 | $   1,597,647 |

The Company has classified the historical outstanding warrants into level 3 due to the fact that some inputs are not published and not easily comparable to industry peers.

The Company determines the "Fair Market Value" using a Monte Carlo or Black-Scholes model by using the following assumptions:

*Number of outstanding warrants*

The number of outstanding exercise rights is adjusted every re-measurement date after deducting the number of exercised rights during the previous reporting period.

55

*Stock price at valuation date*

The closing stock price at re-measurement date being the last available closing price of the reporting period taken from www.nasdaq.com.

*Exercise Price*

The exercise price is fixed and determined in the warrant agreement.

*Remaining Term*

The remaining term is calculated by using the contractual expiration date of the warrant agreement at the moment of re-measurement. The remaining term for a warrant exercise using the exchange condition is fixed in the warrant agreement at five years.

*Expected Volatility*

We estimate expected cumulative volatility giving consideration to the expected life of the note and calculated the annual volatility by using the continuously compounded return calculated by using the share closing prices of an equal number of days prior to the maturity date of the note (reference period). The annual volatility is used to determine the (cumulative) volatility of our common stock (= annual volatility x SQRT (expected life).

*Liquidity Event*

We estimate the expected liquidity event giving consideration to the expectation of sale of assets held for sale and the current substantial reorganization.

*Risk-Free Interest Rate*

We estimate the risk-free interest rate using the "Daily Treasury Yield Curve Rates" from the U.S. Treasury Department with a term equal to the reported rate or derived by using both spread in intermediate term and rates, up to the maturity date of the note.

*Expected Dividend Yield*

We estimate the expected dividend yield by giving consideration to our current dividend policies as well as those anticipated in the future considering our current plans and projections.

**Note 16. Stockholders' Equity**

**(A) Common Stock**

The Company is presently authorized to issue 500,000,000 shares of common stock. The Company had 97,852,911 shares of common stock issued and outstanding as of December 31, 2018, an increase of 51,235,818 shares from December 31, 2017, the increase has mainly been caused by the issuance of shares relating to the acquisition of Artilium (34,311,115), warrant exercises (11,111,780), equity fund raises (2,453,400), non-cash compensation for board and management (2,279,668), note conversions (410,205), settlement of debt (375,857), consultants (234,553) and option exercises by staff (59,220).

**(B) Preferred Stock**

The Company's Certificate of Incorporation authorizes the issuance of 50,000,000 shares of Preferred Stock, $0.00001 par value per share. No shares of preferred stock are outstanding as of December 31, 2018 and 2017. Under the Company's Certificate of Incorporation, the Board of Directors has the power, without further action by the holders of the common stock, subject to the rules of the Exchange, to designate the relative rights and preferences of the preferred stock, and issue preferred stock in such one or more series as designated by the Board of Directors. The designation of rights and preferences could include preferences as to liquidation, redemption and conversion rights, voting rights, dividends or other preferences, any of which may be dilutive of the interest of the holders of the common stock or the preferred stock of any other series. The issuance of preferred stock may have the effect of delaying or preventing a change in control of the Company without further stockholder action and may adversely affect the rights and powers, including voting rights, of the holders of common stock. In certain circumstances, the issuance of preferred stock could depress the market price of the common stock.

**(C) Warrants**

Throughout the years, the Company has issued warrants with varying terms and conditions related to multiple financing rounds, acquisitions and other transactions. Often these warrants could be classified as equity instead of a derivative. As of December 31, 2018, -0- warrants have been classified as derivative warrants with a total fair market value of $0 compared to 96,520 warrants outstanding as per December 31, 2017 (see note 12) with a total fair market value of $170,744.

The table below summarizes the warrants outstanding as of December 31, 2018 and as of December 31, 2017:

| Warrants: | Number of Warrants |
|---|---|
| **Outstanding as of January 1, 2017** | 2,204,586 |
| Issued | 25,696,801 |
| Exercised | (7,362,786) |
| Expirations | (2,402,769) |
| **Outstanding as of December 31, 2017** | 18,135,832 |
| Issued | 196,750 |
| Exercised | (14,463,097) |
| Expirations | (80,003) |
| **Outstanding as of December 31, 2018** | 3,789,482 |

| Outstanding Warrants | Exercise/ Conversion price(s) (range) | Expiring | December 31, 2018 | December 31, 2017 |
|---|---|---|---|---|
| Equity Warrants – Fundraising | $1.05 - $5.375 | 2019 - 2023 | 3,789,482 | 18,039,312 |
| Liability Warrants – Fundraising | $ 0.8418 | 2019 | - | 96,520 |
| | | | 3,789,482 | 18,135,832 |

**_Warrants - Issued_**

On May 9, 2018, Pareteum Corporation, entered into a securities purchase agreement (the "Purchase Agreement") with select accredited investors relating to a registered direct offering, issuance and sale (the "Offering") of an aggregate of 2,440,000 shares (the "Shares") of the Company's common stock, $0.00001 par value per share (the "Common Stock"), at a purchase price of $2.50 per share for total gross proceeds of $6,100,002, with related financing fees totaling $700,817.

Dawson James Securities, Inc. (the "Placement Agent") acted as placement agent on a best-efforts basis in connection with the Offering, pursuant to a placement agency agreement (the "Placement Agreement") that was entered into on May 9, 2018. We agreed to issue the Placement Agent, in a private transaction, a warrant to purchase 196,750 shares of Common Stock at an exercise price ($3.125) equal to 125% of the offering price per share.

57

On October 10, 2017, Pareteum Corporation closed on a public offering of common stock for gross proceeds of $1,569,750. The offering was a shelf takedown off of our registration statement on Form S-3 and was conducted pursuant to a placement agency agreement (the "Agreement") entered into between us and Dawson James Securities, Inc., the placement agent on a best-efforts basis with respect to the offering (the "Placement Agent"), that was entered into on October 5, 2017. The Company sold 1,495,000 shares of common stock in the offering at a purchase price of $1.05 per share.

Dawson James Securities, Inc. (the "Placement Agent") received as compensation for services rendered issued a warrant to purchase 74,750 shares of Common Stock at the one five-year warrant to purchase such number of Shares equal to 5.0% of the Shares sold in this Offering at an exercise price of $1.3125 (125% of the price per Share).

*Warrants - Exercised*

During 2018 several warrant holders decided to exercise, some of the exercises have been made "cashless" as per the conditions stipulated in the agreement in certain situations. In total 14,463,097 warrants were exercised, 8,826,567 of them were exercised cashless resulting in no cash collection by the Company and 5,636,530 warrants were exercised at an average exercise price of $1.0847, resulting in a cash of $6,114,083 during 2018.

*Warrants – Expirations*

During 2018 80,003 warrants expired, of which 80,000 were not exercised by the holder as the exercise price was higher than the actual share price on the stock market another 3 warrants were eliminated due to roundings as a result of the reversed-stock-split

**Note 17.  Non-controlling Interest**

As of December 31, 2018 and 2017, the Company had non-controlling interests in its subsidiaries of zero dollars for both periods.

**Note 18. Basic and diluted net loss per share**

Net loss per share is calculated in accordance with ASC 260, Earnings per Share ("ASC 260"). Basic net loss per share is based upon the weighted average number of common shares outstanding. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase Common Stock at the average market price during the period. The Company uses the 'if converted' method for its senior secured convertible notes. Weighted average number of shares used to compute basic and diluted loss per share is the same since the effect of dilutive securities is anti-dilutive.

The diluted share base for fiscal 2018 and 2017 excludes incremental shares related to convertible debt, warrants to purchase Common Stock, stock-based compensation shares waiting to be issued and employee awards and or stock options as follows:

| Dilutive Securities | 2018 | 2017 |
|---|---|---|
| Convertible Notes | 39,500 | 920,972 |
| Warrants | 3,789,482 | 18,135,832 |
| Shares "Pending to be issued" | 484,185 | 620,056 |
| Time Conditioned Share Awards | 1,480,557 | 1,518,055 |
| Employee Stock Options | 3,663,812 | 3,028,184 |
| | 9,457,536 | 24,223,099 |

Dilutive securities were excluded due to their anti-dilutive effect on the loss per share recorded in each of the years presented. Except for shares pending to be issued due to compensation in lieu of cash and a certain warrant exercise, no additional securities were outstanding that could potentially dilute basic earnings per share.

**Note 19. Employee Benefit Plan**

**2008 Long-Term Incentive Compensation Plan**

In 2008, the Company adopted the 2008 Plan. The 2008 Plan initially authorized total awards of up to 200,000 shares of Common Stock, in the form of incentive and non-qualified stock options, stock appreciation rights, performance units, restricted stock awards and performance bonuses. The amount of Common Stock underlying the awards to be granted remained the same after the 1-for-25 reverse stock-split that was effectuated on June 11, 2008.

On September 14, 2011, the stockholders approved an increase in the shares available under the 2008 Plan from 200,000 to 920,000 shares of Common Stock.

On December 17, 2013, the Company's stockholders approved the amendment and restatement of the 2008 Plan, which increased the number of authorized shares by 920,000 to 1,840,000 shares of Common Stock.

On September 12, 2014, the Company's stockholders approved another amendment and restatement of the 2008 Plan, which increased the number of authorized shares by 400,000 to 2,240,000 shares of Common Stock.

During 2018, 42,400 shares were issued under the 2008 Plan, all of them being non-cash compensation and or bonus granted to staff, management and board members for services during 2018, no shares were issued under the plan as a result of employee option exercises.

During 2018, the board decided to revoke the outstanding options of 786,697, the staff involved was compensated with awards from the 2018 plan, another 138,246 options expired (post-vesting) and 175 options were forfeited (pre-vesting).

The current 2008 Plan is considered dormant and in principle only exists of historically granted options which are mostly far out of the money as per December 31, 2018 and will have little chance in being exercised, the outstanding number of options is 203,266 at an average exercise price of $10.74 ranging between $3.705 and $62.50.

**Reconciliation of registered and available shares and/or options as of December 31, 2018:**

| | Full Year 2018 | Total |
|---|---:|---:|
| Registered 2008 | - | 200,000 |
| Registered 2011 | - | 720,000 |
| Approved increase 2013 | - | 920,000 |
| Approved increase 2014 | - | 400,000 |
| *Total Approved under this plan* | | 2,240,000 |
| *Shares (issued to):* | | |
| Consultants | - | 326,140 |
| Directors, Officers and staff | 42,400 | 693,400 |
| Options exercised | - | 95,284 |
| *Options (movements):* | | |
| Revoked/Expired and Outstanding | (925,118) | (203,266) |
| **Available for grant at December 31, 2018:** | | 921,910 |

**Common Stock options related to the 2008 Long-Term Incentive Compensation Plan consisted of the following as of the years ended December 31, 2018 and 2017:**

| Options: | Number of Options | | Weighted Average Exercise Price | Initial Fair Market Value (Outstanding Options) |
|---|---|---|---|---|
| Outstanding as of December 31, 2016 | 1,040,211 | $ | 13.35 | $ 8,836,640 |
| Granted in 2017 | 213,700 | | 2.10 | 293,720 |
| Forfeitures (Pre-vesting) | 15,024 | | 3.72 | (55,232) |
| Expirations (Post-vesting) | (140,551) | | 27.65 | (2,220,933) |
| Outstanding as of December 31, 2017 | 1,128,384 | | 9.40 | 6,854,195 |
| Revoked (cancelled) in 2018 | (786,697) | | 6.33 | (3,494,552) |
| Forfeitures (Pre-vesting) | (175) | | 3.07 | (353) |
| Expirations (Post-vesting) | (138,246) | | 25.60 | (1,996,852) |
| Outstanding as of December 31, 2018 | 203,266 | $ | 10.74 | $ 1,362,438 |

At December 31, 2018, the unrecognized expense portion of share-based awards granted to employees under the 2008 Plan was $0.

**2017 Long-Term Incentive Compensation Plan**

On April 13, 2018, the Company filed an S-8 to register the remaining 3,000,000 shares of common stock of the 2017 Long Term Incentive Compensation Plan which was previously ratified by our stockholders on September 12, 2017 at our annual meeting. This incentive plan provides for awards of up to 6,500,000 shares of common stock, in the form of options, restricted stock awards, stock appreciation rights ("SAR's"), performance units and performance bonuses to eligible employees and the grant of nonqualified stock options, restricted stock awards, SAR's and performance units to consultants and eligible directors.

During 2018, 1,141,172 shares of common stock were issued to directors, officers and staff, 387,130 shares of common stock were issued to consultants for services provided and 59,220 were issued to staff for exercising options, furthermore 494,452 shares of common stock are currently reserved for time conditioned share awards for management (227,784) and board members (266,668) and 3,460,546 options were granted and are reserved for management, board members and staff.

| Reconciliation of registered and available shares and/or options as of December 31, 2018: | | **Total** |
|---|---|---|
| Approved by the Shareholders | | **6,500,000** |
| | | |
| Registered 2017 (S-8 dated June 14, 2017) | | **3,500,000** |
| Registered 2018 (S-8 dated April 13, 2018) | | **3,000,000** |

| *Shares (issued to):* | Movement 2018 | |
|---|---|---|
| Consultants | 387,130 | 507,281 |
| Directors, Officers and staff | 1,141,172 | 2,573,116 |
| Options exercised | 59,220 | 59,220 |
| *Total Shares issued in 2018:* | | **3,139,617** |
| | | |
| **Available for issuance at December 31, 2018 (under the S-8 registration statements)** | | **3,360,383** |
| | | |
| *Outstanding rights (movements):* | | |
| Options | 1,560,746 | 3,460,546 |
| Time Conditioned Share Awards | (1,023,604) | 494,452 |
| **Available for grant at December 31, 2018: (approved by shareholders)** | | **(594,615)** |

The Company plans on filing an additional S-8 registration statement for issuances that have been approved by shareholders, but still require registration.

**Common Stock options related to the 2017 Long-Term Incentive Compensation Plan consisted of the following as of the years ended December 31, 2018:**

| Options: | Number of Options | Weighted Average Exercise Price | | Initial Fair Market Value (Outstanding Options) | |
|---|---|---|---|---|---|
| **Outstanding as of December 31, 2016** | - | $ | - | $ | - |
| Granted in 2017 | 1,971,800 | | 1.00 | | 1,092,507 |
| Forfeitures (Pre-vesting) | (72,000) | | 1.00 | | (39,681) |
| **Outstanding as of December 31, 2017** | 1,899,800 | | 1.00 | | 1,052,826 |
| Granted in 2018 | 1,999,685 | | 2.51 | | 3,356,202 |
| Exercised (with delivery of shares) | (59,220) | | 1.00 | | (59,220) |
| Forfeitures (Pre-vesting) | (374,663) | | 1.59 | | (792,724) |
| Expirations (Post-vesting) | (5,056) | | 1.00 | | (5,056) |
| **Outstanding as of December 31, 2018** | 3,460,546 | $ | 1.81 | $ | 3,552,028 |

The options awarded in 2018 had a weighted average exercise price of $2.51. The initial fair market value at grant date of these options had an aggregate value of $3,356,202.

61

**Following is a summary of the status and assumptions used of options outstanding as of the years ended December 31, 2018, and 2017:**

| | Twelve months period ending | |
| --- | --- | --- |
| | December 31, 2018 | December 31, 2017 |
| **Option Grants** | | |
| During the year | 1,999,685 | 1,971,800 |
| Weighted Average Annual Volatility | 130% | 93% |
| Weighted Average Cumulative Volatility | 216% | 156% |
| Weighted Average Contractual Life of grants (Years) | 4.07 | 3.99 |
| Weighted Average Expected Life of grants (Years) | 2.79 | 2.84 |
| Weighted Average Risk Free Interest Rate | 2.6928% | 1.4906% |
| Dividend yield | 0.0000% | 0.0000% |
| Weighted Average Fair Value at Grant-date | $ 1.678 | $ 0.553 |
| | | |
| **Options Outstanding** | | |
| Total Options Outstanding | 3,460,546 | 1,899,800 |
| Weighted Average Remaining Contractual Life (Years) | 2.98 | 3.51 |
| Weighted Average Remaining Expected Life (Years) | 1.84 | 2.35 |
| Weighted Average Exercise Price | $ 1.81 | $ 1.00 |
| Aggregate Intrinsic Value (all options) | $ (401,021) | $ 2,032,786 |
| Aggregate Intrinsic Value (only in-the-money options) | $ 1,723,086 | $ 2,032,786 |
| | | |
| **Options Exercisable** | | |
| Total Options Exercisable | 841,053 | - |
| Weighted Average Exercise Price | $ 1.00 | $ - |
| Weighted Average Remaining Contractual Life (Years) | 2.24 | - |
| Aggregate Intrinsic Value (all options) | $ 580,327 | $ - |
| Aggregate Intrinsic Value (only in-the-money options) | $ 580,327 | $ - |
| | | |
| **Unvested Options** | | |
| Total Unvested Options | 2,619,493 | 1,899,800 |
| Weighted Average Exercise Price | $ 2.06 | $ 1.00 |
| Forfeiture rate used for this period ending | 11.247% | 3.651% |
| | | |
| **Options expected to vest** | | |
| Number of options expected to vest corrected by forfeiture | 2,324,885 | 1,830,429 |
| Unrecognized stock-based compensation expense | $ 2,448,790 | $ 866,889 |
| Weighting Average remaining contract life (Years) | 2.86 | 3.38 |
| | | |
| **Exercises** | | |
| Total shares delivered/issued | 59,220 | - |
| Weighted Average Exercise Price | $ 1.00 | $ - |
| Intrinsic Value of Options Exercised | $ 101,084 | $ - |

At December 31, 2018, the unrecognized expense portion of the share based option awards granted to management, directors and employees under the 2017 Plan was approximately $2,448,790 adjusted for cancellations, forfeitures and returns during the preceding period.

**2018 Long-Term Incentive Compensation Plan**

On October 10, 2018, the Company filed an S-8 to register the remaining 8,000,000 shares of common stock of the 2018 Long Term Incentive Compensation Plan which was previously ratified by our stockholders on September 12, 2017 at our annual meeting. This incentive plan provides for awards of up to 8,000,000 shares of common stock, in the form of options, restricted stock awards, stock appreciation rights ("SAR's"), performance units and performance bonuses to eligible employees and the grant of nonqualified stock options, restricted stock awards, SAR's and performance units to consultants and eligible directors.

During 2018, 1,000,000 shares of common stock were issued to a certain officer under the 2018 Plan. This is included in the accompanying consolidated statement of changes in stockholders' equity (deficit) under stock awards issued to management.

| Reconciliation of registered and available shares and/or options as of December 31, 2018: | | Total |
|---|---|---|
| Approved by the Shareholders | | **8,000,000** |
| Registered 2018 (S-8 dated October 10, 2018) | | **8,000,000** |

| *Shares (issued to):* | Movement 2018 | |
|---|---|---|
| Consultants | - | - |
| Directors, Officers and staff | 1,000,000 | 1,000,000 |
| Options exercised | - | - |
| *Total Shares issued:* | | 1,000,000 |
| | | |
| **Available for issuance at December 31, 2018 (under the S-8 registration statement)** | | **7,000,000** |
| | | |
| *Outstanding rights (movements):* | | |
| Options | - | - |
| Time Conditioned Share Awards | 1,000,000 | 1,000,000 |
| **Available for grant at December 31, 2018:** | | **6,000,000** |

The outstanding Time Conditioned Share Awards will be expensed at the fair market value on the date of delivery to the respective beneficiaries. The current award will vest pro-rata during the 12 months of 2019.

*Share-Based Compensation Expense*

The Company recorded for the year ended December 31, 2018, $6,582,286 of share-based compensation, of which $89,200 relate to the 2008 Plan, $3,909,539 to the 2017 Plan, $1,980,000 relate to the 2018 Plan and $603,547 relates to the expensing of shares issued as restricted securities as defined in Rule 144 of the Securities Act and not issued under the 2008 Plan or 2017 Plan. For the comparable period in 2017 the expensing was in total $1,845,520 for shares issued under the 2008 Plan, $2,006,173 to the 2017 Plan and $437,340 for expensing of the issuance of restricted shares under the Rule 144 of the Securities Act. In case of grant of options, the Company utilized the Black-Scholes valuation model for estimating the fair value of the stock-options at grant and subsequent expensing until the moment of vesting.

**Share-based Compensation Expense**

| Stock-Based Compensation Expense | Twelve months ended December 31, 2018 | | Twelve months ended December 31, 2017 | |
|---|---|---|---|---|
| Consultancy services | $ | 422,307 | $ | 674,553 |
| Directors and Officers (shares and options) | | 5,360,160 | | 3,070,520 |
| Employees (shares and options) | | 799,819 | | 543,960 |
| **Total** | $ | 6,582,286 | $ | 4,289,033 |

**Note 20.  Income taxes**

For financial statement purposes, loss before the income tax (benefit) provision is generated by the following;

| | 2018 | | 2017 | |
|---|---|---|---|---|
| Domestic | $ | (25,371,790) | $ | (11,993,500) |
| Foreign | | 12,253,300 | | (362,274) |
| Total loss before income tax provision | $ | (13,118,490) | $ | (12,355,774) |

63

The Company files income tax returns in the U.S. federal jurisdiction and various state and foreign jurisdictions. The applicable statutory tax rates vary from none (zero) to 34%. However, because the Company and its subsidiaries have incurred annual corporate income tax losses since their inception, management has determined that it is more likely than not that the Company will not realize the benefits of its US and foreign net deferred tax assets. Therefore in all jurisdictions where the Company has a net deferred tax asset, the Company has recorded a full valuation allowance to reduce the net carrying amount of the deferred tax assets to zero. The Company's 2018 income tax benefit of $0.1 million relates to $0.2 million of benefit associated with the net losses in certain foreign jurisdictions offset by current taxes of $0.1 in other foreign jurisdictions with taxable income.

The Tax Cuts and Jobs Act, or the Act, was enacted on December 22, 2017, which reduced the U.S. federal corporate tax rate from 35% to 21%, among other changes. Effective in 2018, the Company is subject to global intangible low tax income ("GILTI") which is a tax on foreign income in excess of a deemed return on tangible assets of foreign corporations. Due to the complexity of the GILTI tax rules, companies are allowed to make an accounting policy choice of either (1) treating taxes due on future US inclusions in taxable income related to GILTI as a current-period expense incurred or (2) factoring such amounts into a company's measurement of deferred taxes. The Company is electing to treat taxes due on future US inclusions in taxable income related to GILTI as a current-period expense when incurred and, therefore, there is no impact to the deferred tax rate in 2018.

Income tax (benefit) expense for each year is summarized as follows:

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Current: | | |
| Federal | $ - | $ - |
| State | - | - |
| Foreign | 81,378 | 107,205 |
|  | 81,378 | 107,205 |
| Deferred: | | |
| Federal | - | - |
| State | - | - |
| Foreign | (225,218) | - |
|  | (225,218) | |
|  | | |
| Income tax (benefit) expense | $ (143,840) | $ 107,205 |

The following is a reconciliation of the provision for income taxes at the US federal statutory rate (21%) and (34%) to the foreign income tax rate for the years ended:

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Tax expense at statutory rate federal | 21% | 34% |
| Foreign income tax rate difference | - | (3)% |
| GILTI | (9)% | - |
| Change in valuation allowance | (11)% | (32)% |
| Income tax (benefit)/ expense | 1% | (1)% |

64

The tax effects of temporary differences that gave rise to significant portions of deferred tax assets and liabilities at December 31, are as follows:

|  | 2018 | 2017 |
|---|---|---|
| Deferred tax attributable to: | | |
| Net operating losses | $ 34,196,356 | $ 35,524,856 |
| | | |
| Less: valuation allowance | (31,432,246) | (35,524,856) |
| Total deferred tax assets | 2,717,110 | - |
| | | |
| Deferred tax liabilities attributable to: | | |
| Intangibles assets | (10,009,309) | - |
| Deferred revenue | (1,123,626) | - |
| Total deferred tax liabilities | (11,132,935) | - |
| Net deferred tax liabilities | $ (8,415,825) | $ - |

As of October 1, 2018 the company acquired Artilium PLC, as a result of the purchase price allocation the company recorded a net deferred tax liability of $8.6 million for basis difference on acquired intangible assets and tax attributes from the business combination.

As of December 31, 2018, and 2017, the Company had net operating losses carryforwards of approximately $145 million and $109 million, respectively. Any net deferred tax assets in a jurisdiction have been offset by a full valuation allowance in both 2018 and 2017 due to the uncertainty of realizing any tax benefit for such losses. Releases of the valuation allowances in the future, if any, will be recognized through earnings.

As of December 31, 2018, and 2017, the Company's US based subsidiaries had net federal and state operating loss carryforwards of approximately $72 million and $57 million, respectively. Federal and state net operating loss carry forwards in the US started to expire in 2018. At December 31, 2018, the net operating loss carryforwards for foreign countries amounts to approximately $73 million. Losses in material foreign jurisdictions will expire in 2018 and forward.

Section 382 of the Internal Revenue Code limits the use of net operating loss and tax credit carry forwards in certain situations where changes occur in the stock ownership of a company. In the event the Company has a change in ownership, utilization of the carry forward could be limited.

In the ordinary course of business, the Company is subject to tax examinations in the jurisdictions in which it files tax returns. The Company's statute of limitations for assessment is three years for federal and three to four years for state purposes. The federal net operating loss carry forwards remain open for adjustment until the net operating losses are fully utilized. The Company's statute of limitations is four to six years in the major foreign jurisdictions in which the Company files.

The Company files income tax returns in the US federal jurisdiction and various state and foreign jurisdictions. As of December 31, 2018, and 2017, the Company accrued a liability of $0 and $246,370, respectively, for an uncertain tax position, including interest and penalties.

## Note 21.  Commitments and Contingencies

**Ellenoff Grossman & Schole LLP, claimed legal fees.**

On May 5, 2017, the Company's former legal counsel, Ellenoff Grossman & Schole LLP, commenced litigation proceedings in New York alleging breach of contract and claiming $817,822 in unpaid legal fees for January 2015 through November 2016. On June 29, 2017, the parties entered into a settlement agreement for the full $817,822 with agreed-upon monthly installment payments through August 31, 2019. As of December 31, 2018, this transaction is reflected in the financial statements.

The Company is involved in various claims and lawsuits incidental to our business.  In the opinion of management, the ultimate resolution of such claims and lawsuits will not have a material effect on our financial position, liquidity, or results of operations.

**telSPACE -vs- Elephant Talk et al.**

Claimant commenced arbitration on or about September 7, 2016 by the filing of a statement of claim. Claimant asserted claims arising out of Software Licensing Agreements ("Licensing Agreements") entered into by Claimant and mCash Holdings LLC (together, "Licensors"), on the one hand, and Telnicity, on the other, which Telnicity subsequently assigned to the Company. Pursuant to the Licensing Agreements, the Company obtained the license to use certain intellectual property in exchange for monthly payments to the Licensors. Claimant alleged that the Company failed to make monthly payments from on or about November 2015, causing the Licensors to terminate the Licensing Agreements, and continued using Licensors' intellectual property after such termination. Based on these allegations, Claimant asserted claims for breach of contract, misappropriation of trade secret, and copyright infringement. Claimant seeks unspecified damages, specific performance, prejudgment interest, attorneys' fees, and costs.

On October 31, 2016, the Company filed a statement of answer denying Claimant's claims. On January 5, 2017, the arbitration panel scheduled the hearing for April 13, 2017. The Parties have conducted limited discovery, which concluded on February 28, 2017. On March 10, 2017, Claimant requested leave to move for a default judgment against the Company for failing to advance the AAA administrative fees, and for sanctions based on alleged spoliation of evidence. On March 15, 2017, the Arbitration Chair denied Claimant's request for leave to move for default and granted Claimant's request for leave to move for sanctions.

After a two-day arbitration hearing in Seattle, WA, the Arbitration tribunal, on or about June 9, 2017, issued an award for the benefit of Claimant in the amount of $510,916, inclusive of AAA tribunal and administrative fees (the "Award"). On or about July 25, 2017, the parties entered into a forbearance agreement, pursuant

to which Claimant agreed to forbear from commencing any confirmation or enforcement proceedings and from taking any collection efforts or discovery related to the Award in exchange for the Company's agreement to pay the Award in agreed-upon installment payments.

All remaining payment obligations to telSPACE were settled by the Company in the year ended December 31, 2018 and is reflected in the financial statements. These expenses are included in the consolidated statement of comprehensive loss under restructuring and acquisition costs, as it is a restructuring event.

65

**Severance and Change of Control**

*Robert H. Turner* - The employment agreement with Mr. Turner is for an indefinite term. Under the terms of the employment agreement, Mr. Turner is entitled to severance if Mr. Turner's employment with the Company is terminated by the Company without "cause" or by Mr. Turner for "good reason" (as such terms are defined in the Employment Agreement) the Company will pay Mr. Turner, 12 months' salary at the rate of his salary as of such termination, together with payment of the average earned bonuses (regular and extraordinary) since November 1, 2015.

*Victor Bozzo* – The employment agreement with Mr. Bozzo is for an indefinite term. Under the terms of the employment agreement, Mr. Bozzo is entitled to a severance if he is terminated by the Company without "cause" or by Mr. Bozzo for "good reason" the Company will pay Mr. Bozzo 12 months' salary at the rate of his salary as of such termination.

*Edward O'Donnell* – The employment agreement with Mr. O'Donnell is for an indefinite term. Under the terms of the employment agreement, Mr. O'Donnell is entitled to a severance if he is terminated by the Company, then, subject to a mutual release, the Company will pay Mr. O'Donnell's base salary for an additional 270 days after termination in accordance with customary payroll practices.

**Note 22. Geographic Information**

**Year ended December 31, 2018**

| | Europe | Other foreign countries | Total |
|---|---|---|---|
| Revenues from unaffiliated customers | $ 24,600,456 | $ 7,835,280 | $ 32,435,736 |
| Identifiable assets | $ 154,236,839 | $ 6,804,327 | $ 161,041,166 |

**Year ended December 31, 2017**

| | Europe | Other foreign countries | Total |
|---|---|---|---|
| Revenues from unaffiliated customers | $ 12,428,942 | $ 1,118,565 | $ 13,547,507 |
| Identifiable assets | $ 7,214,217 | $ 18,111,816 | $ 25,326,033 |

**Note 23. Concentrations**

Financial instruments that potentially subject us to concentrations of credit risk consist of accounts receivable and unbilled receivables. Those customers that comprised 10% or more of our revenue, accounts receivable and unbilled receivables are summarized as follows:

For the year ended December 31, 2018, the Company had one customer that accounted for 40% of total revenue. For the year ended December 31, 2017, the Company had two customers that accounted for 96.9% of total revenue.

As of December 31, 2018, the Company had two customers that accounted for 47.3% and 47.2% respectively of accounts receivable and unbilled revenue. As of December 31, 2017, the Company had two customers that accounted for 49.7% and 23.9% of accounts receivable and unbilled revenue.

**Note 24. Business Combinations**

*Acquisition of Artilium plc.*   Artilium plc ("Artilium") is an innovative software development company active in the enterprise communications and core telecommunication markets delivering software solutions which layer over disparate fixed, mobile and IP networks to enable the deployment of converged communication services and applications.

66

On 7 June 2018, the Artilium Board and the Pareteum Board announced that they had reached agreement regarding the terms of a recommended share and cash offer by Pareteum to acquire the issued and to be issued ordinary share capital of Artilium not already owned by Pareteum. Under the terms of the acquisition, which have been further detailed today in an announcement issued under Rule 2.7 of the UK Takeover Code, each Artilium shareholder will be entitled to receive 0.1016 Pareteum shares and 1.9 pence in cash per Artilium share upon completion of the transaction. The acquisition values each Artilium share at 19.55 pence and the entire issued and to be issued ordinary share capital of Artilium at approximately $104.7 million (or £78.0 million), based on Pareteum's closing share price of $2.33 on June 6, 2018 and the exchange rate of US$1.3413: £1.

On September 13, 2018, shareholders of Pareteum approved proposed acquisition of the entire issued and to be issued ordinary shares of Artilium.

On October 1, 2018, The Pareteum completed the acquisition of all of the outstanding shares of Artilium. In connection with the acquisition the Company issued an aggregate of 37,511,606 common shares of the Company's stock. The Company issued 4,107,714 common shares to certain Artilium officers also previously had issued 3,200,332 shares to Artilium, that was cancelled at the time of the acquisition. The Company also paid 6,248,184 pounds or $8,142,009 in cash.

The allocation of the purchase price was as follows (in thousands):

| | |
|---|---:|
| **Purchase consideration:** | |
| Cash consideration | $ 8,142 |
| Seller notes | 112,535 |
| Purchase price allocation | 120,677 |
| | |
| **Purchase price allocation:** | |
| Assets: | |
| Current and long term assets | 4,726 |
| Intangible assets | 40,800 |
| Total assets | 45,526 |
| Liabilities: | |
| Current and long-term liabilities | 7,982 |
| Deferred tax liabilities | 8,641 |
| Total liabilities | 16,623 |
| Estimated fair value of net assets acquired | 28,903 |
| Goodwill | $ 91,774 |

The year ended December 31, 2018 consolidated financial statements included Artilium and its subsidiaries from the closing date of October 1, 2018 acquisition date through December 31, 2018.

The allocation of the purchase price for Artilium's intangible assets were as follows (in thousands):

| | Estimated Fair Value | Useful Life (Years) |
|---|---:|---:|
| Technology | $ 20,600 | 6 |
| Customer relationships | 16,800 | 18 |
| Tradename | 3,400 | 5 |
| Intangible assets | $ 40,800 | |

## Note 25. Related Party Transactions

During 2018 and 2017, the Company retained Robert Turner of InTown Legal Services, who is the son of Robert H. Turner, Executive Chairman of the Board. InTown Legal Services has a $5,000 per month minimum retainer with the Company and was paid $155,112 in 2018 and $66,114 in 2017. The agreement between the Company and InTown Legal Services is an at will agreement.

As of December 31, 2018, there remains a still outstanding loan to Comsys, a fully owned subsidiary of Artilium BV, from Comsystems (a company owned by Gerard Dorenbos). Prior to the acquisition by Pareteum, Gerard Dorenbos was a shareholder of Artilium PLC, with approximately 15% of the total shares of Artilium PLC, and a board member of Artilium PLC.

The loan has a maturity date of December 31, 2021. The total amount outstanding balance as of December 31, 2018 was $341,998 which carries an 8% interest rate and is reflected as a related party loan in the accompanying consolidated balance sheet. All principal and interest are due on the maturity date.

**Note 26. Subsequent Events**

**iPass Acquisition**

On February 12, 2019, Pareteum Corporation entered into the Consent with iPass SPV, and Fortress. Also, on February 12, 2019 the Company entered into the Joinder to Security Agreement, the Joinder to Guarantee and the Pledge Agreement, each for the benefit of or with Fortress, guaranteeing the Loan and granting a first-priority security interest in all of the assets of the Company to Fortress.

Pursuant to the Consent, Fortress consented to the consummation of the Merger Agreement by and among the Company, iPass and Purchaser, a wholly owned subsidiary of the Company. The Company paid Fortress a cash fee of $150,000 and issued to Fortress warrants to purchase an aggregate of 325,000 shares of common stock.

The Fortress loan to iPass bears an annual interest at a stated rate of 11.0% plus the greater of the following i) Federal Funds Rate plus 0.5%, ii) the Prime Rate, iii) the sum of the LIBOR in effect plus 1.0%, or iv) 2.0%. During the first 18 months following the closing date, payments under the Loan are interest-only, with iPass able to elect that up to 5.5% of the accrued interest to be paid in-kind by capitalizing and adding such interest to the unpaid principal amount. The Loan provides that beginning in November 2019, iPass shall make thirty monthly principal payments, plus any accrued and unpaid interest, and upon completion will fully payoff the Loan under the terms of the Agreement. At the end of the term or upon earlier prepayment by iPass, iPass will pay a fee equal to 5.0% of the principal of the term loan. After the closing of the iPass acquisition on February 12, 2019 and upon securing the $25,000,000 loan from Post Road Group on February 26, 2019, the Company paid the $11,000,000 outstanding remaining balance on the Fortress loan to iPass.

The foregoing summary does not purport to be complete, and is qualified in its entirety by the Consent, the Joinder to Security Agreement, the Joinder to Guarantee and the Pledge Agreement, each of which are filed as Exhibits 10.1, 10.2, 10.3 and 10.4, respectively, to the Current Report on Form 8-K filed with the Securities and Exchange Commission as of February 13, 2019, and incorporated herein by reference and by the Loan and Security Agreement by and among iPass, SPV and Fortress filed (with certain portions subject to confidential treatment) with iPass's Quarterly Report on Form 10-Q for the period ended June 30, 2018.

On November 12, 2018, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") by and among the Company, Purchaser, and iPass. Pursuant to the Merger Agreement, Purchaser commenced the Offer for the "iPass Shares for the "Transaction Consideration, upon the terms and subject to the conditions set forth in the Prospectus/Offer to Exchange dated December 4, 2018 (together with any amendments and supplements thereto, the "Offer to Exchange"), and the related Letter of Transmittal. The Offer and withdrawal rights expired at 5:00 p.m. New York City time on February 12, 2019, and promptly following such time Purchaser accepted for payment and promptly paid for all validly tendered iPass Shares in accordance with the terms of the Offer.

On February 12, 2019, following acceptance and payment for the validly tendered iPass Shares and pursuant to the terms and conditions of the Merger Agreement, the Company completed its acquisition of iPass from the stockholders of iPass when Purchaser merged with and into iPass, with iPass surviving as a wholly owned subsidiary of the Company (the "Merger"). The Merger was governed by Section 251(h) of the Delaware General Corporation Law, as amended (the "DGCL") with no stockholder vote required to consummate the Merger. At the effective time of the Merger, each iPass Share outstanding was converted into the right to receive the Transaction Consideration. The iPass Shares will no longer be listed on the Nasdaq Capital Market.

68

The aggregate consideration paid to stockholders of iPass by the Company to acquire iPass was 9.865 million shares of the Company's common stock.

**Post Road Group Debt Facility**

On February 26, 2019, Pareteum Corporation and certain of its subsidiaries entered into a credit agreement (the "Credit Agreement") with Post Road Administrative Finance, LLC and its affiliate Post Road Special Opportunity Fund I LLP (collectively, "Post Road"). Pursuant to the Credit Agreement, Post Road will provide the Company with a secured loan of up to $50,000,000 (the "Loan"), with an initial loan of $25,000,000 funded on February 26, 2019, and additional loans in increments of $5,000,000 as requested by the Company before the 18 month anniversary of the initial funding date. No additional loan shall be funded until the later of delivery of certain third party consents (the "Consents"), the filing of Pareteum's Quarterly Report on Form 10-Q for the first quarter of 2019, or June 1, 2019. All amounts owed under the Credit Agreement shall be due on February 26, 2022.

The unpaid principal amount of the Loan shall bear interest from the relevant funding dates at a rate per year of 8.5% plus Libor in effect from time to time, provided however, that upon an event of default or if certain of the Consents are not delivered prior to May 1, 2019 or June 1, 2019, as applicable, the unpaid principal amount of the Loan shall bear interest from the relevant funding dates at a rate per year of 11.5% plus Libor in effect from time to time until the Consents are delivered. The interest shall be due and payable monthly in cash in arrears, provided, however, that the Company may elect to pay any or all of the interest in the form of PIK interest due and payable at maturity at a maximum percentage per year equal to (a) through and including the first anniversary of the initial funding date, 3%, (b) after the first anniversary of the initial funding date through and including the second anniversary of the initial funding date, 2%, and (c) after the second anniversary of the initial funding date, 1%.

Permitted use of proceeds for the initial $25,000,000 of the Loan include approximately $11,000,000 for payment in full of outstanding secured debt owed to Fortress Credit Corp. (together with its affiliates, "Fortress") incurred in connection with the Company's previously disclosed acquisition of iPass Inc. ("iPass") on February 12, 2019, as well as remaining amounts for permitted acquisitions and investments, for general working capital purposes and to pay approximately $885,000 in transaction fees related to the Loan. Proceeds from additional Loans, if any, are to be used for permitted acquisitions and to fund growth capital expenditures and other growth initiatives.

The Loan is subject to prepayment upon the receipt of proceeds outside the ordinary course of business in excess of $1,000,000 and the Company must pay a commitment fee of 1% per year for an unfunded commitment. The initial $25,000,000 loan is reduced by an original issue discount of (i) 0.75% of $25,000,000 and (ii) 1.25% of $50,000,000, and any additional loans will be reduced by an original issue discount of 0.75% of the funded amounts.

The Company's obligations under the Credit Agreement are secured by a first-priority security interest in all of the assets of the Company, and guaranteed by certain subsidiaries of the Company. The Credit Agreement contains customary representations, warranties and indemnification provisions. The Credit Agreement also contains affirmative and negative covenants with respect to operation of the business and properties of the Company as well as financial performance, including requirements to maintain a minimum of $2,000,000 of unrestricted cash, certain maximum total leverage ratios, a debt to asset ratio, maximum churn rate and minimum adjusted EBITDA. The Credit Agreement further provides customary events of default and cure periods for certain specified events of default, and in the event of uncured default, the acceleration of the maturity date, an increase in the applicable interest rate with respect to amounts outstanding under the Loan and payment of additional fees.

The foregoing summary is qualified in its entirety by the Credit Agreement filed (with certain portions subject to confidential treatment) with this "2018 Annual Report", together with the Security Agreement, Trademark Security Agreement, the Patent Security Agreement, Copyright Security Agreement and other agreements that will be filed with the 2018 Annual Report.

On February 26, 2019, concurrently with entering into the Credit Agreement, the existing loan and security agreement by and among iPass, iPass IP LLC and Fortress (the "Existing iPass Loan") terminated. Credit facilities under the Existing iPass Loan included a term loan A facility and a term loan B facility maturing on February 27, 2019. The foregoing summary of the Existing iPass Loan does not purport to be complete and is subject to, and qualified in its entirety by, the full text of the Existing iPass Loan filed (with certain portions subject to confidential treatment) with iPass's Quarterly Report on Form 10-Q for the period ended June 30, 2018 and the full text of the Consent and Amendment No. 1 to Credit Agreement dated February 12, 2019 filed with the Company's Current Report on Form 8-K filed on February 13, 2019.

On February 26, 2019, pursuant to the terms of the Credit Agreement, the Company issued to Post Road 425,000 shares of common stock and will issue an additional 200,000 shares of common stock upon the next subsequent funding, if any, under the Loan.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

      (a)  **Disclosure Controls and Procedures.**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including our interim chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosures. Our management, with the participation of our principal executive officer and chief financial officer (our principal financial officer), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 131-15(e) and 15d-15(e)) as of December 31, 2018. Based on that evaluation, our management concluded that because of material weaknesses in its internal control over financial reporting, as further described below, our disclosure controls and procedures were not effective as of December 31, 2018.

      (b)  **Management's Annual Report on Internal Control over Financial Reporting.**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Our internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of published financial statements in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of our financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Internal control over financial reporting may not prevent or detect misstatements due to its inherent limitations.  Management's projections of any evaluation of the effectiveness of internal control over financial reporting as to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2018 and in making this assessment used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 Framework) in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Based on the foregoing evaluation, our management has identified the following deficiencies that constitute material weaknesses in the Company's internal controls over financial reporting:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.

Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

The material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results. Based on these material weaknesses, the Company's management concluded that at December 31, 2018, the Company's internal control over financial reporting was not effective.

Squar Milner LLP, the Company's independent registered public accounting firm, expressed an unqualified opinion for the audit of our consolidated financial statements as of and for the year ended December 31, 2018 and has issued an adverse audit report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2018, which appears below.

**Remediation**

Management has been implementing and continues to implement measures designed to ensure that control deficiencies contributing to the material weakness are remediated, such that these controls are designed, implemented and operating effectively.

The remediation actions to the Company's internal controls over financial reporting include a thorough review and documentation of all processes involved in our financial reporting to ensure that there is segregation of duties, access security and documented review processes in place that happen at appropriate intervals throughout the year that covers all elements of the Company's financial reporting. This includes, but is not limited to, testing samples and documenting that testing has occurred with the results of the findings being reported to senior management and that they occur at appropriate intervals and continuously making improvements to our processes as necessary.

To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) will continue to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) will institute sample testing of changes made in our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhance our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors.

We believe that these actions will remediate the material weakness. The weakness will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. We expect that the remediation of this material weakness will be completed prior to the end of fiscal 2019.

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Pareteum Corporation

**Opinion on the Internal Control Over Financial Reporting**

We have audited Pareteum Corporation's and its subsidiaries (the Company) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. In our opinion, because of the effect of the material weaknesses described below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 ("COSO").

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2018 and 2017 and the related consolidated statements of comprehensive loss, shareholders' equity and cash flows for the years then ended and our report dated March 18, 2019 expressed an unqualified opinion.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in internal control have been identified as material weaknesses over the Company's control environment and monitoring pursuant to the COSO framework:

> Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment and ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and this report does not affect our report dated March 18, 2019.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

\s\ Squar Milner LLP

Los Angeles, California
March 18, 2019

### (c)  Changes in Internal Control Over Financial Reporting

There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

None.

## PART III

**Item 10. Directors, Executive Officers and Corporate Governance**

*Directors & Executive Officers*

Set forth below are the Company's Directors and key Executive Officers as of December 31, 2018, together with an overview of their professional experience and expertise.

| Name | Age | Position(s) Held | Director Since |
|---|---|---|---|
| Robert H. Turner | 68 | Executive Chairman of the Board | 2015 |
| Yves van Sante (1) (2) (3) | 58 | Director | 2014 |
| Luis Jimenez-Tuñon (1) (2) (3) | 39 | Director | 2017 |
| Robert Lippert (1) (2) (3) | 55 | Director | 2018 |
| Victor Bozzo | 50 | Chief Executive Officer | N/A |
| Edward O'Donnell | 53 | Chief Financial Officer | N/A |
| Denis McCarthy | 44 | President | N/A |

(1)     Currently a member of the Audit and Finance Committee.
(2)     Currently a member of the Nominating and Corporate Governance Committee.
(3)     Currently a member of the Compensation Committee.

**Robert H. Turner** was appointed Executive Chairman of the Board on November 16, 2015. Mr. Turner has 40 years' experience, cultivating and growing "all stage" global software, telecom and tech companies. He emphasizes strategy, sales, organizational leadership, and fundamental financial results and leads with a culture that passionately serves the needs of valued constituents, while sustaining growth. Mr. Turner launched his career at AT&T, where he rose to serve at the highest ranks in a broad spectrum of international, start-up, and corporate firms, including (selected highlights): NeoNova Network Services, Inc.; Pac West; Telecom, Inc.; Panterra Networks; PTT Telecom Netherlands, US Inc. (now KPN); and BellSouth Communications, Inc. (now AT&T). Mr. Turner is also an advisory board member of The Capital Angels, affiliated with SC Angel Network. Mr. Turner earned a Bachelor of Science degree and a Master of Business Administration from the University of South Carolina, where he was presented with a Distinguished Alumni award in 2010. Mr. Turner is Guest Lecturer in the Darla Moore School of Business Professional MBA program.

**Yves van Sante** was appointed a director on June 1, 2014. From July 2011 to May 2014, Mr. van Sante was a board observer for our Company, following his service on our Board of Directors from October 2006 to July 2011. Mr van Sante (1960) studied Marketing, Communication and Commercial Management. He started his career in 1982 as an advisor at United Brokers and became sales manager for Brinkers International, the market leader in refining oil for the food industry, a year later. From 1987 until 1993 he served as Sales and Marketing manager Central Europe at 3C Communications in Luxemburg, where he launched Credit Card Telephony across Europe. Following this position, he became a business unit manager Public Telephony at Belgacom, the Belgium incumbent, where he managed a department of 650 employees and a € 40 million business. In 1994, together with Steven van der Velden, Yves van Sante co-founded InTouch Telecom. As its managing director he was responsible for business development, sales and marketing. In 1999, when achieving a turnover of € 25 million and having grown to 125 staff, InTouch was sold to GTS, a pan European Telecom operator. Mr. van Sante became vice-president Business Services with GTS in London, where he consolidated acquisitions and turned the voice Telco around into an IP operator. In 2000 he became Managing Director of Eport, a call center owned by the Port of Ostend. After six months Eport was sold to the Dutch call-center Call-IT, and Mr. van Sante became advisor to its Management Board. In 2002 he founded Q.A.T. Investments. Concurrently, he has held various Management and Board functions in companies in the QAT portfolio. Mr. van Sante is a member of De Warande and member of the Board of Directors of Festival of Flanders.

**Luis Jimenez-Tuñon** was appointed a Director of Pareteum Corporation on March 1, 2017. Mr. Jimenez-Tuñon is a distinguished telecommunications industry leader, and a highly accomplished senior executive with +15 years of success in telecommunications, mobile, technology, satellite, IoT and banking industries. In his executive career, he held leadership positions at Eutelsat EPA:ETL (Worldwide Executive Vice President); Red Queen Ventures (CEO); Vodafone Enabler Spain (CEO); Vodafone LON:VOD (Senior Vice President; previously VP Strategy; and before Executive for New Business); and INSA (Deputy Commercial Director), among others. He grew companies and teams from $0 to + $300m annual revenue consistently exceeding financial, commercial and operational goals across global B2B and B2C markets.

Mr. Jimenez-Tuñon served as CEO of Pareteum's largest customer, Vodafone Enabler S.L. ("Vodafone Enabler") from July 2011 to December 2016. As Chief executive of Vodafone Enabler, he pioneered the Company's innovative business model and powered the launch of Vodafone Spain's second brand Lowi.es which was awarded best Spanish MVNO in 2015 and 2016. As a start-up born within the Group in 2011, and under his leadership, Vodafone enabler boosted its revenue, profit and operational performance, and achieved internationalization. In addition to his role at Vodafone Enabler, during a decade at Vodafone, Mr. Jimenez-Tuñon also held leadership positions at Vodafone Spain where he was responsible for business development and strategy of the group's Mobile Virtual Network Operators (MVNOs), enablers, roaming services, international carriers and wholesale fixed broadband business lines, growing business to hundreds of millions of euros in yearly revenue.

Since November 2017, and as Group's Worldwide Executive Vice President of Eutelsat – one of the leading satellite operators in the world with around 1.5 billion euro in yearly revenue, Mr. Jimenez-Tuñon reports to its Group's Deputy CEO and leads its worldwide data business comprising satellite IoT, Corporate, Telecom and new data solutions; fixed data services, wholesale and NGO & humanitarian affairs. On the entrepreneurial front, Mr. Jimenez-Tuñon founded Red Queen Ventures (www.redqueen-ventures.com), a global high-tech advisory and Investment Company focused on early-stage technology, telecom, satellite and aerospace companies in hubs like Madrid, London, New York, Miami, Palo Alto and Los Angeles CA.

Mr. Jimenez-Tuñon earned an Executive MBA from EOI Business School, a Master's Degree in Satellite Communications from Polytechnic University of Madrid, and a M.S. in Telecommunications Engineering from the University of Zaragoza in cooperation with the Technical University of Denmark. He also completed the prestigious Executive Management Program (SEP) from the Graduate School of Business at Stanford University in California, of which he is lifetime alumni. Mr Jimenez-Tuñon has served on boards and advisory councils, has won numerous awards and recognitions, and has participated as speaker in many business events and round tables.

**Robert Lippert** was appointed a director on November 16 , 2018. Dr. Lippert is a financial economist who has held corporate, consulting and academic positions in the areas of finance and strategy. He has more than two decades of business experience around the world. Dr. Lippert is also the coauthor of The New CFOs: How Finance Teams and Their Leaders Can Revolutionize Modern Business coauthored with Liz Mellon, David C. Nagel and Nigel Slack. He has been on the faculty of Emory University, Georgia State University, Rutgers University and the University of South Carolina. He has won numerous teaching awards, published extensively, taught and consulted in 50 plus countries and been Key Note Speaker at numerous events across five continents. He currently designs and delivers a variety of Executive Education courses for DukeCE, Emory, UCLA, UNC-Chapel Hill, and University of Pennsylvania Wharton School of Business. Among others, clients have included: AbbVie, Alcatel, Bank of America/Merrill Lynch, BCBS, CenturyLink, ComcastNBCU, CVS, Enterprise Ireland, Farmers Insurance, HP, Home Depot, IBM, KPMG, Owens Corning, PWC, Samsung, U.S. Navy, UPS and Verizon. In addition to being a faculty member, his work in executive development, consulting, and executive coaching, Dr. Lippert was interim CFO and Vice President of Strategic Planning for the Seibels Bruce Group, a publicly traded holding company, which specialized in insurance-related activities. His primary duties in these capacities were to manage the acquisition, integration and divestiture of existing businesses; oversee the formulation and implementation of the corporate strategic plan; manage the business planning and budgeting process; co-manage a multi-million-dollar investment portfolio; and interact with Wall Street analysts, investment bankers and investors in the financial community. Dr. Lippert earned his Ph.D. in Finance from the University of South Carolina and a BSBA from Xavier University.

**Victor Bozzo**  was appointed Chief Executive Officer on November 1, 2016. Mr. Bozzo served as Senior Vice President, Worldwide Sales and Marketing for Telarix Inc., a market leader in interconnect solutions for service providers. Under Mr. Bozzo's sales and marketing leadership, sales increased significantly, and the company received numerous market leadership accolades, ultimately leading to a highly successful exit for investors. Prior to joining Telarix, Mr. Bozzo served as President and General Manager of Pac-West's Emerging Technologies division after selling Pac-West his startup, Factor Communications, an innovative portfolio of cloud-based communications services. He was also responsible for significant revenue and customer growth and investor returns at exTone Communications, ITXC Corporation, and Voxware.

**Edward O'Donnell** was appointed Chief Financial Officer on January 9, 2017. Mr. O'Donnell has over 23 years of experience in investment banking, advertising, private equity, investment, venture capital, technology, internet and other new media businesses. Prior to joining the Company, Mr. O'Donnell served as the Chief Financial Officer of Ameri Holdings, Inc. (OTC: AMRH) from January 2016 through December 2016. Mr. O'Donnell has served as the Chief Operating Officer of Radbourne Property Group, Inc., an innovative operator of family entertainment centers, where his primary responsibilities included raising capital, external reporting, outlining capital structure and budgeting. From February 2013 until April 2015, Mr. O'Donnell served as chief financial officer of AudioEye, Inc. (OTC: AEYE) From December 2010 until January 2013, Mr. O'Donnell served as Vice President of Finance for Augme Technologies, Inc. (Previously OTC: AUGT), which provides strategic services and mobile marketing technology to leading consumer and healthcare brands. From January 2007 until November 2010, Mr. O'Donnell served as Chief Financial Officer of Carlyle Capital Group LLC, a venture capital and private equity firm. Previously, Mr. O'Donnell also served as Senior Vice President of Finance & Investor Relations of ACTV, Inc. (previously NASDAQ: IATV), where he developed the investor relations department before the company was purchased by OpenTV, a subsidiary of Liberty Media. Mr. O'Donnell is a Certified Public Accountant in New York and a member of NYSSCPAs and AICPA. Mr. O'Donnell earned a B.S, degree in Accountancy from Villanova University in 1991 and an M.B.A. from Columbia Business School in 2003. We believe that Mr. O'Donnell's extensive education and background in accounting and finance makes him qualified to serve as our Chief Financial Officer.

74

**Denis McCarthy** was appointed President on October 1, 2018 and joined Pareteum January 1, 2018 as SVP of Corporate Development. From 2014 through 2017, Mr. McCarthy was Senior Vice President of Operations and Finance at Mosaic Networx Inc., which delivers cloud-based data and telephony services to enterprises, where he handled all aspects of finance, systems integration, human resources and strategic relationships including merger and acquisition activity. From 2011 through 2013, Mr. McCarthy was Senior Vice President of Finance with United Brands Product Design. Prior to that, Mr. McCarthy was CFO of AP Telecom, a global sales channel manager for Undersea Cable Installations. He was CFO and COO of Pac-West Telecomm, a provider of next generation VoIP solutions for enterprise and communications services providers, which includes Telastic, a division of PacWest that developed cutting edge cloud-based telephony, billing and support systems. Mr. McCarthy began his career and spent nearly ten years in public accounting, providing assurance and advisory services in the high technology and software industry, including telecommunications and bio-tech companies both at Arthur Andersen and RSM. He holds a Bachelor of Science in Business Administration and a Master of Science in Administration from Bryant University.

None of our directors or executive officers has been involved in any legal proceeding enumerated in Regulation S-K Item 401 within the time periods described in that regulation.

## CORPORATE GOVERNANCE

### Board Committees

Our Board of Directors has established three standing committees: (1) Audit and Finance, (2) Nominating and Corporate Governance, and (3) Compensation.

All committees operate under a charter that has been approved by the Board of Directors and which is available on our website, www.pareteum.com.

### Audit and Finance Committee

Our Board of Directors has an Audit and Finance Committee, abbreviated to Audit Committee, composed of Messrs. van Sante (member since February 18, 2016) and Jimenez-Tuñon (member since March 1, 2017) and Mr. Lippert (Chairman since November 16, 2018). Ms. Thomas (member since July 25, 2017), resigned from the Board and the Audit Committee as Chairwoman effective November 16, 2018. Mr. Lippert serves as the Audit and Finance Committee financial expert. The Audit and Finance Committee met four times during 2018 and acted by unanimous written consent four times in 2018. Each of the then-current members was present at all of the Audit and Finance Committee meetings held during 2018.

The Audit Committee oversees our corporate accounting, financial reporting practices and the audits of financial statements. For this purpose, the Audit and Finance Committee has a charter (which is reviewed annually) and performs several functions. The Audit and Finance Committee:

- evaluates the independence and performance of, and assesses the qualifications of, our independent auditor, and engages such independent auditor;

- approves the plan and fees for the annual audit, quarterly reviews, tax and other audit-related services, and approves in advance any non-audit service to be provided by the independent auditor;

- reviews and approves related-party transactions;

- monitors the independence of the independent auditor and the rotation of partners of the independent auditor on our engagement team as required by law;

- reviews the financial statements to be included in our Annual Report on Form 10-K and Quarterly Reports on Form 10-Q and reviews with management and the independent auditors the results of the annual audit and reviews of our quarterly financial statements;

- oversees all aspects our systems of internal accounting control and corporate governance functions on behalf of the Board of Directors; and

- provides oversight assistance in connection with legal, ethical and risk management compliance programs established by management and the Board of Directors, including Sarbanes-Oxley implementation, and makes recommendations to the Board of Directors regarding corporate governance issues and policy decisions.

*Nominating and Corporate Governance Committee*

Our Board of Directors has a Nominating and Corporate Governance Committee, abbreviated to Nominating Committee, presently composed of Messrs. van Sante (Chairman and member since December 16, 2015) and Jimenez-Tuñon (member since March 1, 2017) and Mr. Lippert (member since November 16, 2018). Ms. Thomas (member since July 25, 2017) resigned from the Board and the Nominating Committee effective November 16, 2018. The Nominating and Corporate Governance Committee did not convene a meeting in 2018, but acted by unanimous written consent one time in 2018. Each of the then-committee members was present at all of the Compensation Committee meetings held during 2018.

The Nominating Committee is charged with the responsibility of reviewing our corporate governance policies and with presenting new potential director-nominees to the Board of Directors for consideration. The Nominating Committee has a charter which is reviewed annually. All members of the Nominating Committee are independent directors as defined by the rules of the Exchange. The Nominating Committee will consider director nominees recommended by stockholders. To recommend a nominee, please write to the Nominating and Corporate Governance Committee, c/o the Company Secretary, Pareteum Corporation, 1185 Avenue of the Americas, 37 th Floor, New York, NY 10036. The Nominating Committee will assess all director nominees using the same criteria it applies generally, described in this Form 10-K under the heading "Director and Officer Qualifications." During 2017, we did not pay any fees to any third parties to assist in the identification of nominees.

*Compensation Committee*

Our Board of Directors also has a Compensation Committee composed of Mr. Jimenez-Tuñon (Chairman, since July 25, 2017), Mr. van Sante and Mr. Lippert (member since November 16, 2018). Ms. Thomas (member since July 25, 2017) resigned from the Compensation Committee effective November 16, 2018. The Compensation Committee reviews or recommends the compensation arrangements for our management and employees and also assists the Board of Directors in reviewing and approving matters such as Company benefit and insurance plans. The Compensation Committee did not meet during 2018 but acted by unanimous written consent four times in 2018.

The Compensation Committee has the authority to directly engage, at the Company's expense, any compensation consultants or other advisers as it deems necessary to carry out its responsibilities in determining the amount and form of employee, executive and director compensation. In 2018, the Compensation Committee did not engage any such compensation consultants or advisers.

*Director and Officer Qualifications*

We have not formally established any specific, minimum qualifications that must be met by each of our officers or directors or specific qualities or skills that are necessary for one or more of our officers or members of the Board of Directors to possess. However, our Nominating Committee generally evaluates and recommends candidates with a focus on the following qualities: educational background, diversity of professional experience, knowledge of our industry and business, integrity, professional reputation, independence, wisdom and ability to represent the best interests of our stockholders and other stakeholders.

Our Board of Directors and officers are composed of a diverse group of leaders. In their prior positions they have gained experience in core management skills, such as strategic and financial planning, public company financial reporting, compliance, risk management and leadership development. Most of our officers and directors also have experience serving on boards of directors and board committees of other public companies or private companies, and have an understanding of corporate governance practices and trends, which provides an understanding of different business processes, challenges and strategies.

### Attendance at Board, Committee and Stockholder Meetings

Our Board of Directors met in person and telephonically 9 times during 2018 and also approved Board resolutions or acted by unanimous written consent 24 times. Each of the then-members of our Board of Directors was present at 75% or more of the Board of Directors meetings held in 2018.

We have encouraged, but do not require, that all of our directors be in attendance at our annual shareholder meeting either in person or by remote communication. In 2018, Mr. Turner, via teleconference, attended the annual stockholder meeting.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act requires that our directors and executive officers and persons who beneficially own more than 10% of our common stock (referred to herein as the "reporting persons") file with the SEC various reports as to their ownership of and activities relating to our common stock. Such reporting persons are required by the SEC regulations to furnish us with copies of all Section 16(a) reports they file. Based solely upon a review of copies of Section 16(a) reports and representations received by us from reporting persons, and without conducting any independent investigation of our own, in 2017, there was one (1) untimely filing of a Form 3, 4 and/or 5: Edward O'Donnell (Form 4).

### Code of Conduct

We have adopted a code of conduct that outlines the principles, policies and laws that govern our activities and establishes guidelines for conduct in the workplace. The code of conduct applies to all employees, as well as each member of our Board of Directors. All employees are required to read the code of conduct and affirm in writing their acceptance of the code. Our code of conduct is posted on our website, www.pareteum.com. We intend to satisfy any disclosure requirement under Item 5.05 of Form 8-K regarding an amendment to, or waiver from, a provision of our code of conduct by posting such information on our website, www.pareteum.com. A copy of our code of conduct is also available in print, without charge, upon written request to Pareteum Corporation, 1185 Avenue of the Americas, 37 th Floor, New York, NY 10036, Attn: Corporate Secretary.

## Item 11. Executive Compensation

### SUMMARY COMPENSATION TABLE

| Name and principal position | Year | Salary ($)(1) | Bonus ($) | Bonus Stock Awards (in $) | Bonus Stock Awards (in shares) | Option Awards ($)(2) | Option Awards (in options) | Stock Awards ($)(1) | Stock Awards (in shares) | All Other Compensation ($) | Total ($) | Total Number of shares | Total Number of options |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Robert H. Turner * (Executive Chairman) | 2018 $ | 321,225(a) | $ 600,000(f) $ | 2,921,563 | 1,375,000(i) $ | - | - $ | | $ | 1,439,055(o) | $5,281,843 | 1,375,000 | - |
| | 2017 $ | 326,044 | $ 300,000 $ | 1,605,965 | 1,196,436 | $265,520 | 100,000 $ | | $ | | $2,497,529 | 1,196,436 | 100,000 |
| Victor Bozzo (Chief Executive Officer) | 2018 $ | 293,162(b) | $ 325,000(g) $ | 687,788 | 306,943(j) | $460,064 | 500,000(l) $ | | $ | 395,521(p) | $2,161,536 | 306,943 | 500,000 |
| | 2017 $ | 307,063 | $ 83,500 $ | 352,513 | 330,555 $ | - | - $ | | $ | | $ 743,076 | 330,555 | - |
| Alex Korff (General Counsel, Secretary & Compliance Officer) | 2018 $ | 134,319(c) | $ - $ | 304,581 | 208,329(k) $ | - | - $ | | $ | - | $ 438,900 | 208,329 | - |
| | 2017 $ | 208,164 | | $ | 224,249 | 108,333 | $ 24,389 | 20,000 $ | | $ | | $ 456,802 | 108,333 | 20,000 |
| Edward O'Donnell (Chief Financial Officer) | 2018 $ | 212,197(d) | $ 60,000(h) $ | - | - | $151,397 | 100,000(m) $ | | $ | 14,354(q) | $ 437,948 | - | 100,000 |
| | 2017 $ | 209,388 | $ | $ | 2,915 | 1,000 | $220,201 | 290,000 $ | | $ | | $ 432,504 | 1,000 | 290,000 |
| Denis McCarthy (President) | 2018 $ | 198,509(e) | $ - $ | - | - | $138,021 | 150,000(n) $ | | $ | 17,662(q) | $ 354,192 | - | 150,000 |
| | 2017 $ | - | $ - $ | - | - | $ - | - $ | | $ | | $ - | - | - |

**Notes:**

   (i)   Mr. Turner was appointed on November 16, 2015.

   (ii)  Mr. Bozzo was appointed on November 1, 2016.

   (iii) Mr. Korff was appointed on April, 1, 2016. Effective December 1, 2017, Mr. Korff transitioned from General Counsel to Company Secretary.

   (iv) Mr. O'Donnell was appointed January 8, 2017, compensation to be received in 2017 was pro-rated.

   (v)  Mr. McCarthy was appointed January 1, 2018, increase of salary implemented as per October 1, 2018.


(a) These amounts have been agreed in USD and amounts to an annual amount of USD 300,000. The total salary in 2018 amounts to $321,225 which includes the employer part of the social securities.

(b) These amounts have been agreed in USD and amounts to an annual amount of USD 275,000. The total salary in 2018 amounts to $293,162 which includes the employer part of the social securities and staff allowances.

(c) These amounts have been agreed in GBP. The amount for 2018 has been agreed upon GBP 100,000. The average exchange rate is $1.3432 in 2018. These averages are the average of the 4 exchange rates used during the respective year by using the exchange rate of the first working day of each quarter.

(d) These amounts have been agreed in USD and amounts to an annual amount of USD 200,000. The total salary in 2018 amounts to $212,197 which includes the employer part of the social securities.

(e) These amounts have been agreed in USD and started with an annual amount of USD 175,000, which was increased as of Q4-2018 to an annual amount of $225,000. The total salary in 2018 amounts to $198,509 which includes the employer part of the social securities.

(x) These amounts have been agreed in EUR and amounts to an annual amount of EUR 240,000. The 2018 salary only represent 3 months, the officer uses a consultancy construction for his compensation and is paid by one of the subsidiaries. Options are granted by Headquarter office and the award value represent the expensing during 2018 for the Black-Scholes value during the time until vesting of the award.

(f) 2017 Bonus granted for an amount of $600,000 which was equally paid through the twelve months of 2018.

(g) 2017 Bonus granted for an amount of $325,000 which was equally paid through the twelve months of 2018.

(h) 2017 Bonus granted for an amount of $60,000 which was equally paid through the twelve months of 2018.

(i) Comprised of 375,000 shares being the remainder of a 1,500,000 Restricted Stock Award granted November 17, 2017 and 1,000,000 shares being part of the 2017 Performance Equity Grant (granted September 29, 2018 totaling 2,000,000 shares), as of December 2018, 1,000,000 shares will be vesting and delivered during 2019.

(j)   Comprised of 306,943 shares being the remainder of a 850,000 Restricted Stock Award granted November 17, 2017. As of December 2018, 236,113 shares will be vesting and delivered during 2019.

(k)   Comprised of 200,000 shares being the remainder of a 200,000 Restricted Stock Award granted November 17, 2017 and an accidental excess delivery of 8,329 shares which are in a process to be returned.

(l)   500,000 options granted May 10, 2018 with a Black-Scholes value of $935,921, options have an exercise price of $2.49 and will start vesting at February 5, 2019 for 1/3 and will be followed by 24 equal subsequent monthly vestings.

(m)  100,000 options granted May 10, 2018 with a Black-Scholes value of $187,184, options have an exercise price of $2.49 and will start vesting at February 5, 2019 for 1/3 and will be followed by 24 equal subsequent monthly vestings.

(n)   Comprised of two options agreements totaling to 150,000 options granted May 10, 2018 with a Black-Scholes value of $280,776, options have an exercise price of $2.49 and will start vesting at February 5, 2019 for 1/3 and will be followed by 24 equal subsequent monthly vestings.

(o)   Result of an agreement between Mr. Turner and the company that the company will pay for the taxes levied on the stock-based compensation granted

(p)   Comprised of an amount of $370,786 as a result of an agreement between Mr. Bozzo and the company that the company will pay for the taxes levied on the stock-based compensation granted and an amount of $24,736 for Other Staff Allowances.

(q)   Relating to Other Staff Allowances.

**Narrative Disclosure to Summary Compensation Table**

*Employment Agreements*

We currently have the following agreements with our named executive officers:

*Robert H. Turner, Executive Chairman* – We entered into a letter of employment, effective as of November 17, 2015, with Mr. Turner, to serve as Executive Chairman of the Company. Mr. Turner is paid a base compensation of USD $300,000 gross per year. Mr. Turner receives no fees (cash or stock) for serving on our Board of Directors. Mr. Turner has a number of granted options set at 2,500,000 carrying a 7 years exercise period after granting; the options would vest in four equal annual installments, following the joining date. Mr. Turner is eligible to a performance related bonus, depending on business performance by the Group performance. Such bonus shall be based solely upon your achievement of Board-approved and mutually agreed upon performance targets. For 2016 the on-target bonus percentage is set at 100% against the Base salary paid in that year, capped at 200% maximum on cash payment; performance over and above 200% is paid in equity at the then-current value of the Company.

Additionally, on November 18, 2016, the Company entered into a new employment agreement with Mr. Turner. The employment agreement modifies and supplements the terms of the prior employment letter between the Company and Mr. Turner dated November 2015 by providing for the following additional terms: (i) one-time bonuses of USD $300,000 for achieving previously determined business and restructuring goals established by the Board and an extraordinary bonus of USD $300,000 for Mr. Turner's efforts on behalf of the Company during late 2015 and 2016 and to be paid as set forth in the employment agreement; (ii) restricted common stock grants of 2,000,000 shares of the Company's common stock; (iii) options to purchase up to 7,500,000 shares of the Company's stock, which options shall vest over a period of three (3) calendar years, with 1,875,000 shares vesting immediately, and the remaining 5,625,000 shares vesting in 3 equal installments of 1,875,000 each, on the first, second and third anniversary of the option grant. The exercise price of the options is $.14 per share; and (iv) other customary allowances, bonuses, reimbursements and vacation pay. The employment agreement also provides that if Mr. Turner's employment with the Company is terminated by the Company without "cause" or by Mr. Turner for "good reason" (as such terms are defined in the employment agreement) the Company will pay Mr. Turner, 12 months' salary at the rate of his salary as of such termination, together with payment of the average earned bonuses (regular and extraordinary) since November 1, 2015.

*Victor Bozzo, Chief Executive Officer* – We entered into an employment agreement, effective as of November 1, 2016, with Mr. Bozzo, to server as Chief Executive Officer of the Company. Mr. Bozzo is paid a base compensation of USD $275,000 gross per year. Mr. Bozzo received a signing bonus of USD $50,000 gross and has a total number of restricted common stock grants of shares with the equivalent value of USD $10,000. Additionally, Mr. Bozzo received a restricted grant with the equivalent value of USD $15,000 within a reasonable time following the 6-month anniversary of the effective date and USD $50,000 within the first calendar year anniversary date, with each of these grants being subject to certain conditions set forth in the employment agreement. Additionally, Mr. Bozzo is entitled to purchase options up to 3,000,000 shares of the Company's common stock, of which options to purchase 750,000 shares of common stock will vest immediately, and the remaining 2,250,000 shares shall vest in 3 installments of 750,000 each annually on the first, second and third anniversary of the option grant. The exercise price of the options is $.1749 per share. Mr. Bozzo also received other customary allowances, bonuses, reimbursements and vacation pay. The employment agreement also provides that if Mr. Bozzo's employment with the Company is terminated by the Company without "cause" or by Mr. Bozzo for "good reason" the Company will pay Mr. Bozzo 12 months' salary at the rate of his salary as of such termination. Mr. Bozzo is also subject to customary non-competition, non-solicitation and confidentiality requirements during and after the term of his employment.

*Denis McCarthy, President* – Mr. McCarthy joined the Company as of January 1, 2018 in the capacity of SVP of Corporate Development. We then entered an employment agreement as of October 1, 2018, with Mr. McCarthy, to serve as President of the Company, for the purpose of expanding Mr. McCarthy's responsibilities with the Company during his continued term of employment. Mr. McCarthy is paid a base compensation of USD $225,000 gross per year. Mr. McCarthy is eligible to receive an annual bonus of up to 100% of the amount of his gross base salary, subject to the achievement of certain business-plan targets. Mr. McCarthy is also entitled to other customary allowances, bonuses, reimbursements for certain expenses and vacation pay. The agreement is an "at-will" agreement, and also provides that if Mr. McCarthy is terminated by the Company, then, subject to a mutual release, the Company will pay to Mr. McCarthy his base salary for an additional 12 months after termination in accordance with customary payroll practices. Mr. McCarthy is subject to the Company's customary confidentiality requirements consummate with his position during and after his term of employment.

*Edward O'Donnell, Chief Financial Officer* – The Company entered into an employment agreement, effective as of January 9, 2017 with Mr. O'Donnell, to perform as Chief Financial Officer of the Company. Mr. O'Donnell is paid a base compensation of USD $200,000 gross and is entitled to an annual bonus of up to USD $75,000 gross. Additionally, Mr. O'Donnell received a signing bonus of 1,000 restricted common shares, and options to purchase up to 250,000 shares of the Company's stock, subject to the Company's employee stock option plan including restrictions and vesting schedule. Mr. O'Donnell is also entitled to other customary allowances, bonuses, reimbursements and vacation pay. The employment agreement between the Company and Mr. O'Donnell is an "at will" agreement, which also provides that if Mr. O'Donnell's employment with the Company is terminated by the Company, then, subject to a mutual release, the Company will pay Mr. O'Donnell's base salary for an additional 270 days after termination in accordance with customary payroll practices. Mr. O'Donnell is also subject to customary confidentiality requirements during and after the term of his employment.

*Alexander Korff, Former General Counsel and Chief Compliance Officer* – Effective February 2017, Mr. Korff was engaged as an employee of the Company under an employment agreement for a total of GBP £120,000 (USD $149,383) gross per annum. Additionally, Mr. Korff received options to purchase up to 500,000 shares of the Company's stock, subject to the Company's employee stock option plan including restrictions and vesting schedule. Additionally, Mr. Korff will also be eligible for a bonus of up to fifty percent (50%) of his base salary above, where any such bonus is subject to the Company's achievement of its business plan targets. Mr. Korff is also entitled to other customary allowances, bonuses, reimbursements and vacation pay. Effective December 1, 2017, Mr. Korff resigned from his position as General Counsel and Chief Compliance Officer.

80

**Severance and Change of Control**

The named executive officers (and certain former executive officers) have individual severance terms as described below. In addition, outstanding equity awards made to our named executive officers under the 2008 Plan and 2017 Plan are subject to acceleration of any unvested portion of such awards upon a change of control unless the terms of a particular award state otherwise.

Other than as set out below, none of the agreements with named executives include any provisions for severance benefits or other payments upon a change of control regardless of whether a named executive officer's employment is terminated by him with or without good reason, or whether the named executive officer is terminated by the Company with or without cause.

*Robert H. Turner* - The employment agreement with Mr. Turner is for an indefinite term. Under the terms of the employment agreement, Mr. Turner is entitled to severance if Mr. Turner's employment with the Company is terminated by the Company without "cause" or by Mr. Turner for "good reason" (as such terms are defined in the employment agreement) the Company will pay Mr. Turner, 12 months' salary at the rate of his salary as of such termination, together with payment of the average earned bonuses (regular and extraordinary) since November 1, 2015.

*Victor Bozzo* – The employment agreement with Mr. Bozzo is for an indefinite term. Under the terms of the employment agreement, Mr. Bozzo is entitled to a severance if he is terminated by the Company without "cause" or by Mr. Bozzo for "good reason" the Company will pay Mr. Bozzo 12 months' salary at the rate of his salary as of such termination.

*Denis McCarthy* – The employment agreement with Mr. McCarthy is for an indefinite term. Under the terms of the employment agreement, Mr. McCarthy is entitled to a severance if he is terminated by the Company without "cause" or by Mr. McCarthy for "good reason" the Company will pay to Mr. McCarthy 12 months' salary at the rate of his salary as of such termination.

*Edward O'Donnell* – The employment agreement with Mr. O'Donnell is for an indefinite term. Under the terms of the employment agreement, Mr. O'Donnell is entitled to a severance if he is terminated by the Company, then, subject to a mutual release, the Company will pay Mr. O'Donnell's base salary for an additional 270 days after termination in accordance with customary payroll practices.

*Alexander Korff* – The employment agreement entered on February 1, 2017 with Mr. Korff was for an indefinite term. Under the terms of the employment agreement, Mr. Korff was entitled to a severance if he is terminated by the Company, then, subject to a mutual release, the Company would pay Mr. Korff's base salary for an additional 180 days after termination in accordance with customary payroll practices. Effective December 1, 2017, Mr. Korff resigned from his position as General Counsel and Chief Compliance Officer.

## GRANT OF PLAN-BASED AWARDS

| Name and principle position | Grant date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of shares of Stocks or Units (#) | All Other Stock Option Awards: Number of Securities Underlying Options # | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards ($)(1) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | | |
| Robert H. Turner *(Executive Chairman)* | 17-Nov-17 | | | | | | | 375,000 | | | $ 992,188 |
| | 29-Sep-18 | | | | 1,000,000 | | | 1,000,000 | | | $ 1,980,000 |
| | 29-Sep-18 | | | | | | | | | | $ 1,690,000 |
| Victor Bozzo *(CEO & Chief Executive Officer)* | 17-Nov-17 | | | | | | | 306,943 | | | $ 736,663 |
| | 17-Nov-17 | | | | 259,724 | | | | | | $ 438,934 |
| | 10-May-18 | | | | | | | | 500,000 | $ 2.49 | $ 935,921 |
| Alex Korff *(General Counsel, Secretary & Compliance Officer)* | 17-Nov-17 | | | | | | | 208,329 | | | $ 540,823 |
| Edward O'Donnell *(Chief Financial Officer)* | 8-Jan-17 | | | | | | | | 250,000 | $ 1.0000 | $ 121,806 |
| | 10-May-18 | | | | | | | | 100,000 | $ 2.4900 | $ 187,184 |
| Denis McCarthy | 10-May-18 | | | | | | | | 50,000 | $ 2.4900 | $ 93,592 |
| | 10-May-18 | | | | | | | | 100,000 | $ 2.4900 | $ 187,184 |
| Bart Weijermars *(CEO EMEA)* | 17-Oct-18 | | | | | | | | 138,655 | $ 3.0400 | $ 189,344 |

The Company issued the compensation shares to the above executive officers from the shares authorized under its 2017 Plan and 2018 Plan.

**OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END**

The following table discloses information regarding outstanding equity awards granted or accrued as of December 31, 2018 for each of our named executive officers.

| | Outstanding Equity Awards | | | | | |
| | Option Awards | | | | Stock Awards | |
| Name | Number of Securities Underlying Unexercised (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock that have not Vested (#) | Market Value of Shares or Units of Stock that have not Vested ($) |
|---|---|---|---|---|---|---|
| Robert H. Turner *(Executive Chairman)* | | | | | 1,000,000(a) $ | 1,690,000 |
| Victor Bozzo *(CEO & Chief Executive Officer)* | | 500,000(1) $ | 2.4900 | 5-Feb-22 | 236,113(b) $ | 399,031 |
| Alex Korff *(General Counsel, Secretary & Compliance Officer)* | | | | | | |
| Edward O'Donnell | 159,717(2) | | $ 1.0000 | 7-Jan-20 | | |
| *(Chief Financial Officer)* | | 90,283(2) | $ 1.0000 | 7-Jan-20 | | |
| | | 100,000(1) | $ 2.4900 | 5-Feb-22 | | |
| Denis McCarthy | | 50,000(1) | $ 2.4900 | 5-Feb-22 | | |
| | | 100,000(1) | $ 2.4900 | 5-Feb-22 | | |

(a)  Unvested Time Conditioned Restricted Stock Award granted September 29, 2018. The total number of Restricted Stock Awarded was 2,000,000 shares of which 1,000,000 have actually been issued and 1,000,000 remained unvested as per December 31, 2018, The remaining 1,000,000 are scheduled to vest equally over the 12 months of 2019.

(b)  Unvested Time Conditioned Restricted Stock Award granted November 17, 2017. The total number of Restricted Stock Awarded was 850,000 shares of which 613,887 have actually been issued and 236,113 remained unvested as per December 31, 2018

1    The stock options vested on the grant date May 10, 2018 and will start vesting February 5, 2019 for 1/3 and will be followed by 24 equal monthly vestings, expiration date will be February 5, 2022.

2    The stock options were granted on January 9, 2017, start vesting January 7, 2018 for 1/3 and will have 24 subsequent equally monthly vestings, expiration date will be January 7, 2020

82

**OPTION EXERCISES AND STOCK VESTED**

The following table represents stock options that have been exercised and restricted stock awards that have vested as of December 31, 2018.

| Name | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#)(a) | Value Realized on Vesting ($) |
| Robert H. Turner | 0 | $ - | 1,375,000 | $ 2,986,250.00 |
| Vic Bozzo | 0 | $ - | 306,943 | 736,663.20 |
| Alex Korff | 0 | $ - | 208,329 | 542,906.27 |
| Edward O'Donnell | 0 | $ - | 0 | - |
| Denis McCarty | 0 | $ - | 0 | - |
| Laura Thomas | 0 | $ - | 0 | - |
| | | | 1,890,272 | $ 4,265,819 |

Our named executive officers did not participate in, or otherwise receive any benefits under, a nonqualified deferred compensation plan during 2018.

(a) The awards have been granted in 2017 and 2018 and vested during 2017 and 2018, however, some of the shares vested in 2017 were only issued and delivered early 2018. The corresponding share-based compensation expenses have been accounted for in the year of vesting with an fair market value adjustment at the delivery date of the shares of common stock.

*Director Compensation*

The basic compensation for serving as a non-executive director is USD $80,000 per year, with an additional USD $10,000 for non-executive directors serving in one committee and USD $20,000 paid to non-executive directors who serve on more committees of our Board of Directors, USD $30,000 for serving as chairman of the Audit Committee and USD $5,000 for serving as a chairman of the other committees. Generally, during a non-executive director's first year of service, a minimum of 50% of such director's compensation is paid through the issuance of common stock with the remaining portion paid in cash. In subsequent years of service, a non-executive director gets to elect the method and proportion of payment. Compensation was paid per quarter in arrears, whereby the conversion of cash in shares was done at the average closing share price of the Company of the 10 days prior to the end of the respective quarter discounted by 25%. This is in line with our policy to stimulate as much as possible conversion into shares to preserve our cash position.

83

The following table represents compensation earned or paid in 2018 to our non-executive directors.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Yves van Sante (2) | $ 129,851 | $ 237,865 | $ - | $ - | $ (42,767) | $ - | $ 324,949 |
| Laura Thomas (3) | 181,054 | 47,002 | 31,941 | - | (48,048) | - | 211,948 |
| Luis Jimenez Tuñon (4) | 40,000 | 437,758 | - | - | (97,749) | - | 380,009 |
| Robert Lippert (5) | - | - | - | - | 19,899 | - | 19,899 |

(1) The amounts included in these columns are the aggregate fair values of the awards granted by the Company to the directors in the fiscal year in lieu of cash fees or other awards, valued in accordance with FASB ASC Topic 718 for the fiscal year ended December 31, 2018. Pursuant to SEC rules, the amounts in these columns exclude the impact of estimated forfeitures related to service-based vesting conditions. The share prices used for the 2018 calculations in this table are the share prices of the last 10 trading days of the quarter covering the compensation related period. Compensation to the directors can be elected by the directors, at the beginning of the quarter, either in cash or in shares. When directors opt for payment in shares there is a 25% discount on the 'purchase' price. The amounts however are shown at fair market value at the date of delivery. In principle non-executive officer directors might earn up to approximately 33% more than the standard director fees if they have elected to receive 100% compensation in shares.

(2) Mr. van Sante earned a cash directorship fees of $129,851 which includes deferred board fee payable as per December 31, 2017. During 2018 Mr. van Sante earned EUR 25,000 outside the normal board fee arrangement and furthermore Mr. van Sante was compensated $26,042 for directorships activities for Pareteum subsidiaries. During 2018 a fair market value of $237,865 in shares of common stock were issued to Mr van Sante for shares which were awarded in 2017 and vested during 2018 66,666 shares and an award of 40,000 shares. Mr. van Sante did not elect to have his directorship fees paid in shares for 2018. Currently $49,459 of his fees is still unpaid. The number of shares pending to be issued as per December 31, 2018 for non-cash compensation in lieu of cash for services prior to 2018 is 133,052 which have a fair market value of $294,512 and are expected to be issued in the first quarter of 2019.

(3) Ms. Thomas earned cash directorship fees of $181,054 in 2018, of which $7,113 was paid as a deferred part of her 2017 cash compensation.

(4) Mr. Tuñon elected to have all regular board fees to be paid in shares at the terms described above. During 2018 Mr. Tuñon earned $40,000 outside his normal board fee arrangement for special projects. During 2018 a total fair market value of $437,758 in shares were issued to Mr. Tuñon which were awarded in 2017 and vested during 2018 (66,666 shares) and 101,436 shares with an fair market value of $289,093 were delivered. As per December 31, 2018, the number of shares pending to be issued as per December 31, 2018 for non-cash compensation in lieu of cash for services prior to 2018 is 84,179 which have an fair market value of $142,263 and are expected to be issued in the first quarter of 2019. Another 16,668 shares of common stock which have vesting in 2018 as part of a time conditioned award which have a fair market value of $28,169.

84

(5) Mr. Lippert joined our Board of Directors in November 2018 and didn't receive cash directorship fees in 2018, however, an amount of $8,125 is currently being booked as deferred cash fees and is expected to be paid in early 2019, another $11,774 being the fair market value as per December 31, 2018 for 6,967 shares is being accounted for and shares are expected to be delivered early 2019.

**EQUITY COMPENSATION PLAN INFORMATION**

**Securities Authorized for Issuance under Equity Compensation Plans**

| Plan Category | | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | | Weighted-average exercise prices of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under the equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|---|---|
| Equity compensation plans approved by security holders | **2008 Plan (1):** | 203,266 | $ | 10.74 | 921,910 |
| | **2017 Plan (2):** | 3,417,856 | $ | 1.00 | 1,530,049 |
| | **2018 Plan (3):** | 1,000,000 | $ | - | 6,000,000 |
| Equity compensation plans not approved by security holders | | - | | - | - |
| **Total** | | **4,621,122** | | | **8,451,959** |

(1) 2008 Pareteum Corp. Long-Term Incentive Compensation Plan (the "2008 Plan"). Form S-8 filed July 11, 2008. On September 14, 2011 the stockholders approved the increase of the total number of shares of authorized to be issued under the 2008 Plan from 200,000 to 920,000, on December 17, 2013 the stockholders approved an increase from 920,000 to 1,840,000 and on September 12, 2014 an increase of the total number of shares available under the 2008 Plan from 1,840,000 to 2,240,000.

(2) 2017 Pareteum Corp. Long-Term Incentive Compensation Plan (the "2017 Plan"). On September 12, 2017 the shareholders approved 6,500,000 shares to be issued under the 2017 Plan, of which 3,500,000 were registered under a Form S-8 filed June 14, 2017 for a number of 3,500,000 shares and 3,000,000 shares were registered under a Form S-8 filed April 13, 2018.

85

(3) 2018 Pareteum Corp. Long-Term Incentive Compensation Plan (the "2018 Plan"). Form S-8 filed October 10, 2018. The shareholders approved 8,000,000 shares to be issued under the 2018 Plan, of which 8,000,000 were registered under the S-8. During 2018 1,000,000 have been issued.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

### BENEFICIAL OWNERSHIP OF PRINCIPAL STOCKHOLDERS, OFFICERS AND DIRECTORS

The following table sets forth, based on 109,399,780 shares of our Common Stock outstanding as of March 18, 2019, certain information as to the stock ownership of each person known by us to own beneficially five percent or more of our outstanding Common Stock, of each of the named executive officers and directors, and of all the named executive officers and directors as a group. In computing the outstanding shares of Common Stock, we have excluded all shares of Common Stock subject to options, warrants or other securities that are not currently exercisable or exercisable within 60 days and are therefore not deemed to be outstanding and beneficially owned by the person holding the options, warrants or other securities for the purpose of computing the number of shares beneficially owned and the percentage ownership of that person. Unless otherwise indicated, the address for each person listed below is c/o Pareteum Corporation, at 1185 Avenue of the Americas, 37 th Floor, New York, NY 10036.

| Name of Beneficial Holder | Number of Shares of Common Stock Owned(A) | Percent of Class as of March 18, 2019 |
|---|---|---|
| **5% or More Holders (none reported)** | | |
| | | |
| **Officers & Directors** | | |
| Yves Van Sante | 286,285(2) | 0.3% |
| Robert H. Turner | 2,765,973(4) | 2.5% |
| Luis Jimenez-Tuñon | 280,056(5) | 0.3% |
| Robert Lippert | 16,967(1) | 0.0% |
| Victor Bozzo | 803,757(6) | 0.7% |
| Denis McCarthy | -(3) | |
| Edward O'Donnell | 228,697(7) | 0.2% |
| All Officers and Directors as a Group **(7 Persons)** | 4,381,735(2)-(7) | 4.0% |

(A) Calculated in accordance with Rule 13d-(3)(d)(1) under the Securities Exchange Act of 1934.

(1) Issued options have not yet vested.
(2) Excludes 133,333 shares of common stock pursuant to a restricted stock award which does not vest within 60 days of March 18, 2019.
(3) Issued options have not yet vested.
(4) Includes stock received and purchased through March 18, 2019.
(5) Excludes 105,558 shares of common stock pursuant to a restricted stock award which does not vest within 60 days of March 18, 2019.
(6) Includes 194,445 shares of common stock issuable upon exercise of options vested or to be vested within 60 days of March 18, 2019.
(7) Includes (i) 36,111 shares of common stock issuable upon exercise of options vested or to be vested within 60 days of March 18, 2019, at an exercise price of $2.37, and (ii) 180,549 shares of common stock issuable upon exercise of options vested or to be vested within 60 days of March 18, 2019, at an exercise price of $1.00.

**Item 13. Certain Relationships, and Related Transactions, and Director Independence**

*Transactions with Related Persons*

Management of the Company is not aware of a material interest, direct or indirect, of any director or officer of the Company, any other informed person of the Company, or any associate or affiliate of any such person, in any transaction since the commencement of the Company's most recently completed fiscal year or in any proposed transaction which has materially affected or would materially affect the Company or any of its subsidiaries, except for:

During 2017 and 2018, the Company retained Robert Turner of InTown Legal Services, who is the son of Robert H. Turner, Executive Chairman of the Board. InTown Legal Services has a $5,000 per month minimum retainer with the Company and was paid $66,114 in 2017 and $133,194 in 2018. The agreement between the Company and InTown Legal Services is an at will agreement.

In the event of any future transactions between us and our officers, directors or five percent stockholders, and respective affiliates will be on terms no less favorable than could be obtained from unaffiliated third parties and will be approved by our independent directors.

*Procedures for Approval of Related Party Transactions*

Related party transactions are subject to the advance review and approval of the Audit and Finance Committee and/or the full Board of Directors, with advice from the Chief Compliance Officer as well as outside counsel. In its review, the Audit Committee and/or Board is provided with full disclosure of the parties involved in the transaction and considers the relationships amongst the parties and members of our Board of Directors and executive officers.

*Independence Standards for Directors*

There are no arrangements between our directors and any other person pursuant to which our directors were nominated or elected for their positions.

Three of our current directors, Yves van Sante, Luis Jimenez-Tuñon and Robert Lippert are not related to each other and are "independent" under Section 803 of the Exchange rules. Each of Messrs. van Sante and Jimenez-Tuñon and Lippert serve on the Audit and Finance Committee, the Compensation Committee and the Nominating and Corporate Governance Committee. The Executive Chairman is not independent.

In addition, Mr. van Sante and Mr. Jimenez-Tuñon and Mr. Lippert qualify as "independent" under the standards established by the SEC for members of audit committees. The Board of Directors has determined that Mr. Lippert is an "audit committee financial expert" as defined in Item 407(d)(5)(ii) of Regulation S-K. Stockholders should understand that this designation is a disclosure requirement of the SEC related to Mr. Lippert' experience and understanding with respect to certain accounting and auditing matters. The designation does not impose upon Mr. Lippert any duties, obligations or liability that are greater than those generally imposed on him as a member of the Audit Committee and the Board of Directors, and his designation as an audit committee financial expert pursuant to this SEC requirement does not affect the duties, obligations or liability of any other member of the Audit Committee or the Board of Directors. Our Board of Directors also determined that Mr. Lippert has sufficient knowledge in reading and understanding financial statements to serve on the Audit Committee.

**Item 14. Principal Accountant Fees and Services**

The following table sets forth the aggregate fees billed by Squar Milner LLP ("Squar Milner"), our independent registered accounting firm for the fiscal years ended December 31, 2018 and December 31, 2017. These fees are categorized as audit fees, audit-related fees, tax fees, and all other fees. The nature of the services provided in each category is described in the table below.

|  | 2018 | 2017 |
| --- | ---: | ---: |
| Audit fees | $ 350,000 | $ 240,000 |
| Audit-related fees | - | - |
| Tax fees | 28,000 | 28,000 |
| All other fees | - | $ 60,000 |
| Total Fees | $ 378,000 | $ 328,000 |

87

Audit fees. Consist of fees billed for professional services rendered for the audit of the consolidated financial statements and review of the quarterly interim consolidated financial statements. These fees also include the review of registration statements and the delivery of consents in connection with registration statements.

Tax fees. Consists of fees paid to Squar Milner related to the filings of Federal and State returns during the years ended December 31, 2018 and 2017.

All other fees. Consists of fees related to letters to underwriters in connection with certain registration statements for the years ended December 31, 2018 and 2017.

The Audit Committee of our Board of Directors has established its pre-approval policies and procedures, pursuant to which the Audit Committee approved the foregoing audit and audit-related services provided by Squar Milner in 2017 and 2016 consistent with the Audit Committee's responsibility for engaging our independent auditors. The Audit Committee also considered whether the non-audit services rendered by our independent registered public accounting firm are compatible with an auditor maintaining independence. The Audit Committee has determined that the rendering of such services is compatible with Squar Milner maintaining its independence.

## PART IV

**Item 15. Exhibits, Financial Statement Schedules**

The following exhibits are filed with this Report.

| Number | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger between Pareteum Communication Corporation a Delaware Corporation and Pareteum Communications, Inc., a California Corporation (incorporated by reference to Appendix A to Pareteum Corporation's Definitive Proxy Statement filed dated July 26, 2011). |
| 2.2 | Rule 2.7 Announcement dated June 7, 2018 (incorporated by reference to Exhibit 2.1 to Pareteum Corporation's current report on Form 8-K dated June 7, 2018). |

88

| 2.3 | Co-operation Agreement, dated June 7, 2018 (incorporated by reference to Exhibit 2.2 to Pareteum Corporation's current report on Form 8-K dated June 7, 2018). |
|---|---|
| 2.4 | Sale and Purchase Agreement, dated March 17, 2010, by and among Pareteum Corporation and the stockholders of ValidSoft Limited other than Enterprise Ireland (incorporated by reference to Exhibit 2.1 to Pareteum Corporation's current report on Form 8-K dated March 23, 2010). |
| 2.5 | Agreement and Plan of Merger by and among iPass Inc., TBR, Inc. and Pareteum Corporation dated November 12, 2018 (incorporated by reference to Pareteum Corporation's current report on Form 8-k dated November 13, 2018). |
| 3.1 | Certificate of Merger (incorporated by reference to Exhibit 3.2 to Pareteum Corporation's current report on Form 8-K dated October 4, 2011). |
| 3.2 | Certificate of Incorporation of Pareteum Communication Corporation, a Delaware Corporation (incorporated by reference to Exhibit 3.2 to Pareteum Corporation's annual report on Form 10-K for the fiscal year ended December 31, 2013). |
| 3.3 | By-Laws (incorporated by reference to Appendix C of Pareteum Corporation's Definitive Proxy Statement on Schedule 14A dated July 26, 2011). |
| 3.4 | Certificate of Amendment to Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Pareteum Corporation's current report on Form 8-K dated August 29, 2016). |
| 3.5 | Certificate of Designation of Preferences, Rights and Limitations of Series A Preferred Stock as corrected (incorporated by reference to Exhibit 3.1 to Pareteum Corporation's current report on Form 8-K dated September 9, 2016). |
| 3.6 | Certificate of Designation of Preferences, Rights and Limitations of Series A-1 Preferred Stock (incorporated by reference to Exhibit 3.1 to Pareteum Corporation's current report on Form 8-K dated November 3, 2016). |
| 3.7 | Certificate of Amendment to Certificate of Incorporation (incorporated by reference to Exhibit 3.2 to Pareteum Corporation's current report on Form 8-K dated November 3, 2016). |
| 3.8 | Certificate of Amendment to Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Pareteum Corporation's current report on Form 8-K dated February 27, 2017). |
| 3.9 | Certificate of Designations, Preferences and Rights of Series B Convertible Preferred Stock (incorporated by reference to Exhibit 3.1 to Pareteum Corporation's current report on Form 8-K dated November 8, 2017). |
| 4.1 | Form of Warrant, dated November 17, 2014, issued to Corbin Mezzanine Fund I, L.P. (incorporated by reference to Exhibit 4.1 to Pareteum Corporation's current report on Form 8-K filed on November 21, 2014). |
| 4.2 | Form of Conversion Letter Agreement, dated November 17, 2014, issued to Saffelberg Investments NV (incorporated by reference to Exhibit 4.2 to Pareteum Corporation's current report on Form 8-K filed on November 21, 2014). |
| 4.3 | Form of Warrant, dated November 17, 2014, issued to Saffelberg Investments NV (incorporated by reference to Exhibit 4.3 to Pareteum Corporation's current report on Form 8-K filed on November 21, 2014). |
| 4.4 | Form of Warrant, dated July 9, 2015, issued to Corbin Mezzanine Fund I, L.P (incorporated by reference to Exhibit 4.1 to Pareteum Corporation's current report on Form 8-K filed on July 14, 2014). |

| | |
|---|---|
| 4.5 | Form of Warrant, dated July 9, 2015, issued to Corbin Mezzanine Fund I, L.P (incorporated by reference to Exhibit 4.2 to Pareteum Corporation's current report on Form 8-K filed on July 14, 2014). |
| 4.6 | Form of Warrant issued in the 9% Unsecured Subordinated Convertible Promissory Note Financing (incorporated by reference to Exhibit 4.1 to Pareteum Corporation's current report on Form 8-K filed on December 24, 2015). |
| 4.7 | Corbin Warrant, dated December 27, 2016 issued to Corbin Mezzanine Fund I, L.P to purchase 27,051,627 shares of Common Stock (incorporated by reference to Exhibit 4.1 to Pareteum Corporation's current report on Form 8-K filed on December 29, 2016). |
| 4.8 | ACM Warrant, dated December 27, 2016 issued to ACM Carry-I LLC to purchase 4,773,817 shares of Common Stock (incorporated by reference to Exhibit 4.2 to Pareteum Corporation's current report on Form 8-K filed on December 29, 2016). |
| 4.9 | Amendment No. 1 to Corbin Warrant, dated March 31, 2017 (incorporated by reference to Exhibit 4.1 to Pareteum Corporation's current report on Form 8-K filed on April 6, 2017). |
| 4.10 | Amendment No. 1 to ACM Warrant, dated March 31, 2017 (incorporated by reference to Exhibit 4.2 to Pareteum Corporation's current report on Form 8-K filed on April 6, 2017). |
| 4.11 | Form of New Warrant (incorporated by reference to Exhibit 4.1 to Pareteum Corporation's current report on Form 8-K filed on July 17, 2017). |
| 4.12 | Form of Warrant (incorporated by reference to Exhibit 4.1 to Pareteum Corporation's current report on Form 8-K filed on December 1, 2017). |
| 4.13 | Form of Warrant (incorporated by reference to Exhibit 4.1 to Pareteum Corporation's current report on Form 8-K filed on February 13, 2019 |
| 10.1 | Contract between Vodafone Enabler Espana, S.L. and Pareteum Europe Holding, B.V., dated November 1, 2013 (incorporated by reference to Exhibit 10.11 to Pareteum Corporation's annual report on Form 10-K for the fiscal year ended December 31, 2013). |
| 10.2 | Credit Agreement, dated as of November 17, 2014, by and among Pareteum Europe Holding B.V., as the Borrower, Pareteum Corporation, as the Parent and Guarantor, the other Subsidiaries of the Parent, from time to time party hereto as Guarantors, the Lenders from time to time party hereto and Atalaya Administrative LLC, as Administrative Agent and Collateral Agent (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K filed on November 21, 2014). |
| 10.3 | Security Agreement, dated as of November 17, 2014, by and among Pareteum Europe Holding B.V., Pareteum Corporation, the other Grantors from time to time party hereto, and Atalaya Administrative LLC, as Collateral Agent (incorporated by reference to Exhibit 10.2 to Pareteum Corporation's current report on Form 8-K filed on November 21, 2014). |
| 10.4 | First Amendment to Credit Agreement, dated as of July 9, 2015, by and among Pareteum Europe Holding B.V., as the Borrower, Pareteum Corporation, as the Parent and Guarantor, the other Subsidiaries of the Parent, from time to time party hereto as Guarantors, the Lenders from time to time party hereto and Atalaya Administrative LLC, as Administrative Agent and Collateral Agent (incorporated by reference to Exhibit 10.1 to t Pareteum Corporation's current report on Form 8-K filed on July 14, 2015). |
| 10.5 | Trademark Security Agreement, dated as of November 17, 2014, between Pareteum Europe Holding B.V. and Atalaya Administrative LLC (incorporated by reference to Exhibit 10.3 to Pareteum Corporation's current report on Form 8-K filed on November 21, 2014). |
| 10.6 | Release and Settlement Agreement, dated as of June 12, 2015, by and between Pareteum de Mexico, S.A.P.I. de C.V., Pareteum Europe Holding BV, and Pareteum Corporation, and Iusacell, S.A., de C.V. (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K filed on June 16, 2015). |
| 10.7 | Severance Agreement, dated as of November 16, 2015, between Pareteum Corporation and Steven van der Velden (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K filed on November 17, 2015). |

| 10.8 | Form of Subscription Agreement issued in the 9% Unsecured Subordinated Convertible Promissory Note Financing (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K filed on December 24, 2015). |
| 10.9 | Form of 9% Unsecured Subordinated Convertible Promissory Note issued in the 9% Unsecured Subordinated Convertible Promissory Note Financing (incorporated by reference to Exhibit 10.2 to Pareteum Corporation's current report on Form 8-K filed on December 24, 2015). |
| 10.10 | Amended and Restated Pareteum Corporation 2008 Long-Term Incentive Compensation Plan (incorporated by reference to Annex A to t Pareteum Corporation's definitive proxy statement on Schedule 14 A filed on November 21, 2013). |
| 10.11 | Amendment No. 2 to the Amended and Restated Pareteum Corporation 2008 Long-Term Incentive Compensation Plan (incorporated by reference to Annex A to Pareteum Corporation's definitive proxy statement on Schedule 14 A filed on August 11, 2014). |
| 10.12 | Subscription Agreement (incorporated by reference to Exhibit 3.1 to Pareteum Corporation's current report on Form 8-K dated September 9, 2016). |
| 10.13 | Form of Share Purchase Agreement dated September 30, 2016 (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated October 6, 2016). |
| 10.14 | Promissory Note dated September 30, 2016 (incorporated by reference to Exhibit 10.2 to Pareteum Corporation's current report on Form 8-K dated October 6, 2016). |
| 10.15 | License Agreement dated September 30, 2016 (incorporated by reference to Exhibit 10.3 to Pareteum Corporation's current report on Form 8-K dated October 6, 2016). |
| 10.16 | Subscription Agreement (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated November 3, 2016). |
| 10.17 | Letter Agreement (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated December 21, 2016). |
| 10.18 | Amended and Restated Credit Agreement, dated as of December 27, 2016, by and among Elephant Talk Europe Holding B.V., as the Borrower, Pareteum Corporation, as the Parent and Guarantor, the other Subsidiaries of the Parent, from time to time party hereto as Guarantors, the Lenders from time to time party hereto and Atalaya Administrative LLC, as Administrative Agent and Collateral Agent (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated December 29, 2016). |
| 10.19 | Reaffirmation Agreement, dated as of December 27, 2016, by and among Elephant Talk Europe Holding B.V., as the Borrower, Pareteum Corporation, as the Parent and Guarantor Pareteum North America Corp., from time to time party hereto as Guarantors and Atalaya Administrative LLC, as Administrative Agent and Collateral Agent (incorporated by reference to Exhibit 10.2 to Pareteum Corporation's current report on Form 8-K dated December 29, 2016). |
| 10.20 | Letter Agreement, dated as of March 6, 2017, by and among Elephant Talk Europe Holding B.V., as the Borrower, Pareteum Corporation, as the Parent and Guarantor, the other Subsidiaries of the Parent, from time to time party hereto as Guarantors, the Lenders from time to time party hereto and Atalaya Administrative LLC, as Administrative Agent and Collateral Agent (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated March 7, 2017). |
| 10.21 | Agreement, dated March 30, 2017 (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated March 31, 2017). |
| 10.22 | Amendment, dated March 31, 2017 (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated April 6, 2017). |
| 10.23 | Form of Warrant Exercise Agreement (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated July 17, 2017). |
| 10.24 | Pareteum Corporation 2017 Long-Term Incentive Compensation Plan (incorporated by reference to Appendix A to Pareteum Corporation's definitive proxy statement on Schedule 14 A filed on July 27, 2017). |
| 10.25 | Placement Agency Agreement, dated October 5, 2017, between Pareteum Corporation and Dawson James Securities, Inc. (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated October 5, 2017). |

| 10.26 | Form of Share Exchange Agreement (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated October 16, 2017). |
| 10.27 | Form of Strategic Alliance Agreement (incorporated by reference to Exhibit 10.2 to Pareteum Corporation's current report on Form 8-K dated October 16, 2017). |
| 10.28 | Form of Purchase Agreement (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated December 1, 2017). |
| 10.29 | Form of Placement Agreement (incorporated by reference to Exhibit 10.2 to Pareteum Corporation's current report on Form 8-K dated December 1, 2017). |
| 10.30 | Form of Purchase Agreement (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated May 9, 2018). |
| 10.31 | Form of Placement Agreement (incorporated by reference to Exhibit 10.2 to Pareteum Corporation's current report on Form 8-K dated May 9, 2018). |
| 10.32 | Management Services Agreement (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated June 7, 2018). |
| 10.33 | Amendment dated June 7, 2018 to Management Services Agreement (incorporated by reference to Exhibit 10.2 to Pareteum Corporation's current report on Form 8-K dated June 7, 2018). |
| 10.34 | Consent and Amendment No. 1 to Credit Agreement by and among iPass Inc., iPass IP LLC, Fortress Credit Corp., FIP UST LP and DBD Credit Funding LLC (incorporated by reference to Exhibit 10.1 to Pareteum Corporation's current report on Form 8-K dated February 13, 2019). |
| 10.35 | Joinder to Security Agreement by Pareteum Corporation (incorporated by reference to Exhibit 10.2 to Pareteum Corporation's current report on Form 8-K dated February 13, 2019). |
| 10.36 | Joinder to Guarantee by Pareteum Corporation (incorporated by reference to Exhibit 10.3 to Pareteum Corporation's current report on Form 8-K dated February 13, 2019). |
| 10.37 | Joinder to Pledge Agreement by Pareteum Corporation (incorporated by reference to Exhibit 10.4 to Pareteum Corporation's current report on Form 8-K dated February 13, 2019). |
| 10.38*** | Credit Agreement between Pareteum Corporation and certain subsidiaries of Pareteum Corporation, Post Road Administrative Finance, LLC and Post Road Special Opportunity Fund I LLP |
| 10.39*** | Security Agreement between Pareteum Corporation and certain subsidiaries of Pareteum Corporation, Post Road Administrative Finance, LLC and Post Road Special Opportunity Fund I LLP |
| 10.40*** | Patent Security Agreement between Pareteum Corporation and certain subsidiaries of Pareteum Corporation, Post Road Administrative Finance, LLC and Post Road Special Opportunity Fund I LLP |
| 10.41*** | Trademark Security Agreement between Pareteum Corporation and certain subsidiaries of Pareteum Corporation, Post Road Administrative Finance, LLC and Post Road Special Opportunity Fund I LLP |
| 21.1 | Subsidiaries |
| 23.1* | Consent of Squar Milner, LLP |
| 31.1 | Certification of the Company's Principal Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. (*) |
| 31.2 | Certification of the Company's Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. (*) |
| 32.1 | Certification of the Company's Principal Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. (*) |
| 32.2 | Certification of the Company's Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. (*) |

| 101.INS | XBRL Instance Document. (*) |
| 101.SCH | XBRL Taxonomy Extension Schema Document. (*) |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. (*) |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. (*) |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. (*) |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. (*) |

\*      Filed Herewith
\*\*     Employee Compensation Plan
\*\*\*    Confidential Treatment has been requested for certain portions of this Exhibit

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Pareteum Corporation**

By:      /s/ Robert H. Turner
Name:   Robert H. Turner
Title:    Executive Chairman
         (Principal Executive Officer)

Date:    March 18, 2019

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Person | Capacity | Date |
| --- | --- | --- |
| /s/ Robert H. Turner<br>Robert H. Turner | Executive Chairman<br>(Principal Executive Officer) | March 18, 2019 |
| /s/ Victor Bozzo<br>Victor Bozzo | Chief Executive Officer | March 18, 2019 |
| /s/ Edward O'Donnell<br>Edward O'Donnell | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | March 18, 2019 |
| /s/ Yves van Sante<br>Yves van Sante | Director | March 18, 2019 |
| /s/ Luis Jimenez-Tuñon<br>Luis Jimenez-Tuñon | Director | March 18, 2019 |
| /s/ Robert Lippert | Director | March 18, 2019 |

93

**Exhibit 10.38**

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

*Execution Version*

**CREDIT AGREEMENT**

by and among

**PARETEUM CORPORATION** ,
as the Borrower,

the Subsidiaries of the Borrower
from time to time party hereto as Guarantors,

the Lenders
from time to time party hereto

and

**POST ROAD ADMINISTRATIVE LLC** ,
as Administrative Agent and Collateral Agent

Dated as of February 26, 2019

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| ARTICLE I | DEFINITIONS | | 1 |
| | SECTION 1.01 | Defined Terms | 1 |
| | SECTION 1.02 | Other Interpretive Provisions | 38 |
| | SECTION 1.03 | Accounting Terms and Principles | 39 |
| | SECTION 1.04 | Rounding | 39 |
| | SECTION 1.05 | References to Agreements, Laws, etc | 40 |
| | SECTION 1.06 | Times of Day | 40 |
| | SECTION 1.07 | Timing of Payment of Performance | 40 |
| | SECTION 1.08 | Corporate Terminology | 40 |
| | SECTION 1.09 | Currency Matters | 40 |
| ARTICLE II | AMOUNT AND TERMS OF LOANS | | 40 |
| | SECTION 2.01 | Loan | 40 |
| | SECTION 2.02 | Change of Lending Office | 41 |
| | SECTION 2.03 | Lender Branches | 41 |
| | SECTION 2.04 | Reserved | 41 |
| | SECTION 2.05 | Disbursement of Funds | 41 |
| | SECTION 2.06 | Payment of Loans; Evidence of Debt | 42 |
| | SECTION 2.07 | Funding Requests | 43 |
| | SECTION 2.08 | [Reserved] | 43 |
| | SECTION 2.09 | Interest | 43 |
| | SECTION 2.10 | Increased Costs, Illegality, etc | 44 |
| | SECTION 2.11 | Compensation | 46 |
| | SECTION 2.12 | Defaulting Lender | 46 |
| ARTICLE III | FEES AND COMMITMENT TERMINATIONS | | 48 |
| | SECTION 3.01 | Fees | 48 |
| | SECTION 3.02 | Mandatory Reduction of Commitments | 48 |
| ARTICLE IV | PAYMENTS | | 49 |
| | SECTION 4.01 | Voluntary Prepayments | 49 |
| | SECTION 4.02 | Mandatory Prepayments | 49 |
| | SECTION 4.03 | Payment of Obligations; Method and Place of Payment | 51 |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| SECTION 4.04 | Taxes | 52 |
| SECTION 4.05 | Computations of Interest and Fees | 57 |
| ARTICLE V | CONDITIONS PRECEDENT TO LOANS | 57 |
| SECTION 5.01 | Closing Date Loan | 57 |
| SECTION 5.02 | Loans Made after Closing Date | 63 |
| ARTICLE VI | GUARANTEE | 65 |
| SECTION 6.01 | Guarantee | 65 |
| SECTION 6.02 | Right of Contribution | 66 |
| SECTION 6.03 | No Subrogation | 66 |
| SECTION 6.04 | Modification of the Guarantor Obligations | 67 |
| SECTION 6.05 | Guarantee Absolute and Unconditional | 67 |
| SECTION 6.06 | Reinstatement | 68 |
| SECTION 6.07 | Payments | 68 |
| SECTION 6.08 | Taxes | 68 |
| SECTION 6.09 | Limitation on Guarantee by German Guarantors | 68 |
| ARTICLE VII | REPRESENTATIONS, WARRANTIES AND AGREEMENTS | 74 |
| SECTION 7.01 | Status | 74 |
| SECTION 7.02 | Power and Authority | 74 |
| SECTION 7.03 | No Violation. | 74 |
| SECTION 7.04 | Litigation, Labor Controversies, etc | 75 |
| SECTION 7.05 | Use of Proceeds; Regulations U and X | 75 |
| SECTION 7.06 | Approvals, Consents, etc | 75 |
| SECTION 7.07 | Investment Company Act | 75 |
| SECTION 7.08 | Accuracy of Information | 75 |
| SECTION 7.09 | Financial Condition; Financial Statements | 76 |
| SECTION 7.10 | Tax Returns and Payments | 76 |
| SECTION 7.11 | Compliance with ERISA | 77 |
| SECTION 7.12 | Subsidiaries | 78 |
| SECTION 7.13 | Intellectual Property; Licenses, etc | 78 |
| SECTION 7.14 | Environmental Warranties | 79 |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**TABLE OF CONTENTS**
(continued)

| | | | Page |
|---|---|---|---|
| SECTION 7.15 | Ownership of Properties | | 80 |
| SECTION 7.16 | No Default | | 80 |
| SECTION 7.17 | Solvency | | 80 |
| SECTION 7.18 | Locations of Offices, Records and Collateral | | 80 |
| SECTION 7.19 | Compliance with Laws and Permits; Authorizations | | 81 |
| SECTION 7.20 | No Material Adverse Effect | | 81 |
| SECTION 7.21 | Contractual or Other Restrictions | | 82 |
| SECTION 7.22 | Collective Bargaining Agreements | | 82 |
| SECTION 7.23 | Insurance | | 82 |
| SECTION 7.24 | Evidence of Other Indebtedness | | 82 |
| SECTION 7.25 | Deposit Accounts and Securities Accounts | | 82 |
| SECTION 7.26 | Absence of any Undisclosed Liabilities | | 83 |
| SECTION 7.27 | Material Customers | | 83 |
| SECTION 7.28 | Material Contracts | | 83 |
| SECTION 7.29 | Anti-Terrorism Laws | | 83 |
| SECTION 7.30 | Reserved | | 84 |
| SECTION 7.31 | Privacy and Data Security | | 84 |
| SECTION 7.32 | Lender Shares | | 84 |
| SECTION 7.33 | EEA Financial Institutions | | 84 |
| SECTION 7.34 | Dutch Fiscal Unity | | 84 |
| ARTICLE VIII | AFFIRMATIVE COVENANTS | | 85 |
| SECTION 8.01 | Financial Information, Reports, Notices and Information | | 85 |
| SECTION 8.02 | Books, Records and Inspections | | 89 |
| SECTION 8.03 | Maintenance of Insurance | | 89 |
| SECTION 8.04 | Payment of Taxes | | 90 |
| SECTION 8.05 | Maintenance of Existence; Compliance with Laws, etc | | 90 |
| SECTION 8.06 | Environmental Compliance | | 90 |
| SECTION 8.07 | ERISA | | 92 |
| SECTION 8.08 | Maintenance of Properties | | 93 |
| SECTION 8.09 | End of Fiscal Years; Fiscal Quarters | | 93 |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**TABLE OF CONTENTS**
(continued)

|  |  |  | Page |
|---|---|---|---|
| SECTION 8.10 | Additional Guarantors and Grantors | | 93 |
| SECTION 8.11 | Pledges of Additional Stock. | | 94 |
| SECTION 8.12 | Use of Proceeds | | 94 |
| SECTION 8.13 | Further Assurances | | 94 |
| SECTION 8.14 | Collateral Access Agreements | | 95 |
| SECTION 8.15 | Bank Accounts | | 95 |
| SECTION 8.16 | Annual Lender Meeting | | 96 |
| SECTION 8.17 | Post-Closing Covenants | | 96 |
| SECTION 8.18 | Centre of Main Interest | | 96 |
| SECTION 8.19 | Parallel Debt | | 97 |
| SECTION 8.20 | Legends; Rule 144 | | 98 |
| SECTION 8.21 | Reserved | | 98 |
| SECTION 8.22 | Sanctions; Anti-Corruption Laws | | 98 |
| SECTION 8.23 | Board Observation Rights | | 99 |
| SECTION 8.24 | Privacy and Data Security | | 99 |
| SECTION 8.25 | Dutch Fiscal Unity | | 99 |
| SECTION 8.26 | Additional Lender Shares | | 99 |
| ARTICLE IX | NEGATIVE COVENANTS | | 100 |
| SECTION 9.01 | Limitation on Indebtedness | | 100 |
| SECTION 9.02 | Limitation on Liens | | 101 |
| SECTION 9.03 | Consolidation, Merger, etc | | 103 |
| SECTION 9.04 | Permitted Dispositions | | 103 |
| SECTION 9.05 | Investments | | 105 |
| SECTION 9.06 | Restricted Payments | | 106 |
| SECTION 9.07 | Prepayments and Modification of Certain Agreements | | 107 |
| SECTION 9.08 | Sale and Leaseback | | 107 |
| SECTION 9.09 | Transactions with Affiliates | | 107 |
| SECTION 9.10 | Restrictive Agreements, etc | | 108 |
| SECTION 9.11 | Hedging Agreements | | 108 |
| SECTION 9.12 | Changes in Business and Fiscal Year | | 108 |

iv

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**TABLE OF CONTENTS**

(continued)

|  |  | Page |
|---|---|---|
| SECTION 9.13 | Financial Covenants | 109 |
| SECTION 9.14 | Operations of Borrower | 110 |
| SECTION 9.15 | Dutch Fiscal Unity | 110 |
| ARTICLE X | EVENTS OF DEFAULT | 110 |
| SECTION 10.01 | Listing of Events of Default | 110 |
| SECTION 10.02 | Remedies Upon Event of Default | 113 |
| ARTICLE XI | THE AGENTS | 114 |
| SECTION 11.01 | Appointment | 114 |
| SECTION 11.02 | Delegation of Duties | 114 |
| SECTION 11.03 | Exculpatory Provisions | 115 |
| SECTION 11.04 | Reliance by Agents | 115 |
| SECTION 11.05 | Notice of Default | 115 |
| SECTION 11.06 | Non Reliance on Agents and Other Lenders | 116 |
| SECTION 11.07 | Indemnification | 116 |
| SECTION 11.08 | Agent in Its Individual Capacity | 117 |
| SECTION 11.09 | Successor Agents | 117 |
| SECTION 11.10 | Agents Generally | 117 |
| SECTION 11.11 | Restrictions on Actions by Secured Parties; Sharing of Payments; Specified Hedging Agreement | 118 |
| SECTION 11.12 | Agency for Perfection | 119 |
| SECTION 11.13 | Administration of German Collateral | 119 |
| ARTICLE XII | MISCELLANEOUS | 120 |
| SECTION 12.01 | Amendments and Waivers | 120 |
| SECTION 12.02 | Notices and Other Communications; Facsimile Copies | 121 |
| SECTION 12.03 | No Waiver; Cumulative Remedies | 122 |
| SECTION 12.04 | Survival of Representations and Warranties | 122 |
| SECTION 12.05 | Payment of Expenses and Taxes; Indemnification | 123 |
| SECTION 12.06 | Successors and Assigns; Participations and Assignments; Replacement of Lender | 124 |
| SECTION 12.07 | Pledge of Loans | 127 |
| SECTION 12.08 | Adjustments; Set-off | 127 |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| SECTION 12.09 | Counterparts | 128 |
| SECTION 12.10 | Severability | 128 |
| SECTION 12.11 | Integration | 128 |
| SECTION 12.12 | Representation of Subsidiaries | 129 |
| SECTION 12.13 | GOVERNING LAW | 129 |
| SECTION 12.14 | Submission to Jurisdiction; Waivers | 129 |
| SECTION 12.15 | Acknowledgments | 130 |
| SECTION 12.16 | WAIVERS OF JURY TRIAL | 130 |
| SECTION 12.17 | Confidentiality | 130 |
| SECTION 12.18 | Press Releases, etc | 133 |
| SECTION 12.19 | Releases of Guarantees and Liens | 133 |
| SECTION 12.20 | USA Patriot Act | 133 |
| SECTION 12.21 | No Fiduciary Duty | 134 |
| SECTION 12.22 | Authorized Officers | 134 |
| SECTION 12.23 | Judgment Currency | 134 |
| SECTION 12.24 | Subordination of Intercompany Indebtedness | 135 |
| SECTION 12.25 | Public Lenders; Trading Restrictions | 135 |
| SECTION 12.26 | Original Issue Discount | 136 |
| SECTION 12.27 | Tax Treatment | 136 |
| SECTION 12.28 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 136 |
| SECTION 12.29 | Dutch Fiscal Unity | 137 |
| SECTION 12.30 | Accredited Investor Status | 137 |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SCHEDULES

| | |
|---|---|
| Schedule 1.01 | Commitments |
| Schedule 1.01-A | Severance and Other Restructuring Expenses |
| Schedule 7.04 | Litigation |
| Schedule 7.10 | Tax Liens |
| Schedule 7.12 | Subsidiaries |
| Schedule 7.13 | Intellectual Property |
| Schedule 7.14 | Environmental Matters |
| Schedule 7.15 | Real Property |
| Schedule 7.18 | Principal Place of Business/Chief Executive Office |
| Schedule 7.21 | Contractual or Other Restrictions |
| Schedule 7.22 | Collective Bargaining Agreements |
| Schedule 7.23 | Insurance |
| Schedule 7.24 | Existing Indebtedness |
| Schedule 7.25 | Deposit Accounts and Securities Accounts |
| Schedule 7.27 | Material Customers |
| Schedule 7.28 | Material Contracts |
| Schedule 8.17 | Post-Closing Covenants |
| Schedule 9.02 | Liens |
| Schedule 9.05 | Investments |
| Schedule 9.09 | Transactions with Affiliates |
| Schedule 9.12 | Description of Business |
| Schedule 12.02 | Addresses for Notices |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Compliance Certificate |
| Exhibit C | Form of Note |
| Exhibit D | Form of Funding Request |
| Exhibit E | Form of PIK Election Notice |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

## CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** , dated as of February 26, 2019, is among **PARETEUM CORPORATION** , a Delaware corporation (the " *Borrower* "), any Subsidiaries of Borrower party hereto that are Guarantors or become Guarantors hereunder pursuant to Section 8.10 or Section 8.17 below, the lenders from time to time party hereto (each a " *Lender* " and, collectively, the " *Lenders* "), **POST ROAD ADMINISTRATIVE LLC** , a Delaware limited liability company (" *Post Road* "), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " *Administrative Agent* ") and Post Road, as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the " *Collateral Agent* ", and together with the Administrative Agent, collectively, the " *Agents* " and each an " *Agent* ").

## RECITALS

**WHEREAS** , Borrower has requested that the Lenders extend to Borrower certain Loans and Commitments to make Loans in the aggregate principal amount of $50,000,000 commencing on the Closing Date; and

**WHEREAS** , the Lenders have agreed to provide the Loans subject to the terms and conditions contained in this Agreement.

## AGREEMENT

**NOW, THEREFORE** , in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## ARTICLE I
### Definitions

SECTION 1.01    Defined Terms . As used herein, the following terms shall have the meanings specified in this Section 1.01 unless the context otherwise requires:

" *Additional Issuance Date* " shall mean the earliest to occur of: (a) December 31, 2019; (b) any Funding Date; and (c) the Termination Date.

" *Additional Lender Shares* " shall mean 200,000 shares of Borrower Common Stock.

" *Adjusted EBITDA* " shall mean, for a specified period, an amount determined for the Consolidated Companies equal to:

    (a)      Consolidated Net Income, plus

    (b)      to the extent reducing Consolidated Net Income, the sum of, without duplication, amounts for:

        (i)      Consolidated Interest Expense,

[\*\*\*] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(ii)    Taxes paid in cash by the Consolidated Companies (provided that, if there is a Tax refund received in such period, the amount thereof shall be deducted from Consolidated Net Income for purposes of calculating Adjusted EBITDA),

(iii)    total depreciation expense,

(iv)    total amortization expense,

(v)    fees, charges and expenses incurred in connection with the consummation of the Transactions on or prior to the Closing Date,

(vi)    fees, charges and expenses (other than restructuring expenses) incurred in connection with the consummation of any Permitted Acquisition in an aggregate amount not to exceed $250,000 in any fiscal year,

(vii)    non-cash charges reducing Consolidated Net Income (excluding any such non-cash item to the extent that it represents an accrual or reserve for potential cash items in any future period or amortization of a prepaid cash item that was paid in a prior period) including non-cash compensation expense in respect of stock option plans,

(viii)    the amount of any severance and other restructuring expenses, in each case, to the extent (A) set forth on Schedule 1.01-A (or as may be subsequently incorporated into such Schedule as agreed to in writing by the Administrative Agent in its sole discretion following delivery of a certificate from an Authorized Officer of the Borrower certifying the amount and purpose of such expense), (B) deducted in such period in computing Consolidated Net Income, and (C) actually paid in cash during such period,

(ix)    such other amounts, to the extent consistent with Regulation S-X of the Securities Act, as agreed to in writing by the Administrative Agent in its reasonable discretion following delivery of a certificate from an Authorized Officer of the Borrower certifying the rationale for the inclusion of such amount, and

(c)    minus , to the extent increasing Consolidated Net Income, the sum of, without duplication, amounts for:

(i)    other non-cash gains increasing Consolidated Net Income for such period (excluding any such non-cash item to the extent it represents the reversal of an accrual or reserve for potential cash item in any prior period),

(ii)    any income or gains from disposal of disposed, abandoned, transferred, closed or discontinued operations, and

(iii)    to the extent not deducted in determining such Consolidated Net Income, all cash payments during such period on account of reserves and other non-cash charges added to Consolidated Net Income after the Closing Date pursuant to clause (b)(vii).

2

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Administrative Agent*** " shall have the meaning set forth in the preamble to this Agreement.

" ***Administrative Questionnaire*** " shall mean a questionnaire completed by each Lender, in a form approved by the Administrative Agent, in which such Lender, among other things, (a) designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Credit Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with such Lender's compliance procedures and Applicable Laws, including federal and state securities laws and (b) designates an address, facsimile number, electronic mail address and/or telephone number for notices and communications with such Lender.

" ***Affiliate*** " shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; or with respect to any German Credit Party its direct or indirect shareholder(s) or any entity affiliated to such shareholder ( *verbundenes Unternehmen* ) within the meaning of section 15 of the German Stock Corporation Act ( *Aktiengesetz* ).

" ***Agents*** " shall have the meaning set forth in the preamble to this Agreement.

" ***Agreement*** " shall mean this Credit Agreement, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

" ***Aggregate Commitment*** " shall mean $50,000,000.

" ***Applicable Laws*** " shall mean, as to any Person, any law (including common law), statute, regulation, ordinance, rule, order, policy, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority or determination of an arbitrator, in each case applicable to or binding on such Person or any of its property, products, business, assets or operations or to which such Person or any of its property, products, business, securities, assets or operations is subject.

" ***Applicable Margin*** " shall mean (a) during the continuation of the [***]Cure Period or the [***]Cure Period, a percentage per annum equal to eleven and one-half percent (11.50%); and (b) at all times not described in the foregoing clause (a), a percentage per annum equal to eight and one-half percent (8.50%).

" ***Application Event*** " shall have the meaning set forth in Section 4.02(d).

" ***Approved Fund*** " shall mean any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender or (d) Post Road Capital Management, LLC.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

"*Artilium Belgium*" shall mean Artilium NV, a Belgian company with its registered office at Vaartdijkstraat 19, 8200 Brugge, Belgium, registration number 0468.433.091 (Commercial court of Gent, division Brugge).

"*Artilium Netherlands*" shall mean Artilium B.V., a *besloten vennootschap met beperkte aansprakelijkheid* organized under the laws of the Netherlands.

"*Artilium UK*" shall mean Artilium Group Limited, a private limited liability company formed under the laws of England and Wales.

"*Assignment and Acceptance*" shall mean an assignment and acceptance substantially in the form of Exhibit A or such other form approved by the Administrative Agent.

"*Attributable Indebtedness*" shall mean, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear as a liability on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"*Auditors*" shall have the meaning set forth in Section 6.09(c)(iii) .

"*Auditors Determination*" shall have the meaning set forth in Section 6.09(c)(iii) .

"*Authorized Officer*" shall mean, with respect to any Credit Party, the chairman of the board of directors, the president, the chief financial officer, the chief operating officer, the secretary, with respect to the Netherlands Subsidiaries, a managing director ( *directeur* or *bestuurder* ) the treasurer or any other senior officer of such Credit Party, with respect to Interactive, a managing director ( *Geschäftsführer* ) or a procurist ( *Prokurist* ), but, in any event, with respect to financial matters, the chief financial officer of such Credit Party or such other senior officer of such Credit Party designated as such by the applicable Credit Party in writing.

"*Bail-In Action*" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"*Base Rate*" shall mean, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day or (b) the Federal Funds Rate in effect on such day plus 1/2 of 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Rate, respectively.

"*Belgian Guarantor*" shall mean each direct or indirect Subsidiary of Borrower (other than any Immaterial Subsidiary) organized under the laws of Belgium that becomes a Guarantor pursuant to the terms of this Agreement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

"**Belgian Security Documents**" shall mean (i) the Business Pledge Agreement dated as of the Closing Date between Artilium Belgium and United Telecom, as pledgors, and the Collateral Agent, as pledgee, (ii) the Share Pledge Agreement dated as of the Closing Date between Artilium UK, as pledgor, and the Collateral Agent, as pledgee, as the same may be amended, restated, supplemented or otherwise modified from time to time, and each other instrument or document executed and delivered pursuant to Sections 8.10 , 8.11, 8.13 or 8.17 or pursuant to any of the Security Documents to guarantee or secure any of the Obligations governed by Belgian law.

"**Benefited Lender**" shall have the meaning set forth in Section 12.08 .

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Board of Directors**" shall mean the board of directors, board of managers or other equivalent governing body of a Person; provided , that , with respect to each Netherlands Subsidiary, such term shall mean such Subsidiary's managing board ( *directie* or *bestuur* ) and with respect to Interactive, such term shall mean such Subsidiary's managing board ( *Geschäftsführung* ).

"**Borrower**" shall have the meaning set forth in the preamble to this Agreement.

"**Borrower Common Stock**" shall mean the common stock, par value $0.00001 per share, of Borrower.

"**Borrower Materials**" shall have the meaning set forth in Section 12.25 .

"**Budget**" shall have the meaning set forth in Section 8.01(e) .

"**Business Day**" shall mean (a) any day excluding Saturday, Sunday and any day that shall be in the City of New York a legal holiday or a day on which banking institutions are authorized by law or other governmental actions to close, and (b) any day that is also a day for trading by and between banks in Dollar deposits in the interbank Eurodollar market.

"**Capital Impairment**" shall have the meaning set forth in Section 6.09(b) .

"**Capital Stock**" shall mean any and all shares, interests, participations, units or other equivalents (however designated) of capital stock of a corporation, membership interests in a limited liability company, partnership interests of a limited partnership, any and all equivalent ownership interests in a Person and any and all warrants, rights or options to purchase any of the foregoing.

"**Capitalized Lease Obligations**" shall mean, as applied to any Person, all obligations under Capitalized Leases of such Person or any of its Subsidiaries, in each case taken at the amount thereof accounted for as liabilities on the balance sheet (excluding the footnotes thereto) of such Person in accordance with GAAP.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *Capitalized Leases* " shall mean, as applied to any Person, all leases of property that have been or should be, in accordance with GAAP, recorded as capitalized leases on the balance sheet of such Person or any of its Subsidiaries, on a consolidated basis; provided , that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability on the balance sheet (excluding the footnotes thereto) of such Person in accordance with GAAP.

" *Cash Equivalents* " shall mean:

     (a)     any direct obligation of (or unconditional guarantee by) the United States (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States) maturing not more than one year after the date of acquisition thereof;

     (b)     commercial paper maturing not more than one year from the date of issue and issued by (i) a corporation (other than an Affiliate of any Credit Party) organized under the laws of any state of the United States or of the District of Columbia and, at the time of acquisition thereof, rated A 1 or higher by S&P or P 1 or higher by Moody's, or carrying an equivalent rating by a nationally recognized rating agency if at any time neither S&P or Moody's shall be rating such obligations, or (ii) any Lender (or its holding company);

     (c)     any certificate of deposit, time deposit or bankers acceptance, maturing not more than one year after its date of issuance, which is issued by either: (i) a bank organized under the laws of the United States (or any state thereof) which has, at the time of acquisition thereof, (A) a credit rating of A-2 or higher from Moody's or A or higher from S&P and (B) a combined capital and surplus greater than $500,000,000, or (ii) a Lender;

     (d)     any repurchase agreement having a term of thirty (30) days or less entered into with any Lender or any commercial banking institution satisfying, at the time of acquisition thereof, the criteria set forth in clause (c)(i) which (i) is secured by a fully perfected security interest in any obligation of the type described in clause (a), and (ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder; and

     (e)     mutual funds investing primarily in assets described in clauses (a) through (d) of this definition.

" *Cash Interest* " shall mean all interest due and payable hereunder that is not Paid in Kind Interest.

" *Casualty Event* " shall mean the damage, destruction or condemnation, as the case may be, of property of any Person or any of its Subsidiaries.

" *CERCLA* " shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

"  **Change in Law** " shall mean (a) the adoption of any law, rule, regulation or treaty after the date of this Agreement, (b) any change in any law, rule, regulation or treaty or in the interpretation, implementation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.09 , by any lending office of such Lender or by such Lender's parent, if any) with any request, rule, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives issued thereunder or in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the day enacted, adopted, issued or implemented.

"  **Change of Control** " shall mean an event or series of events by which: (a) any Guarantor (or any Subsidiary that is required to become a Guarantor pursuant to Section 8.10 ) shall cease to be 100% owned, beneficially and of record, by either the Borrower or another Guarantor, in each case, on a fully-diluted basis, free and clear of all Liens (other than Permitted Liens), (b) any "person" or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act) has become the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a Person shall be deemed to have "beneficial ownership" of all securities that any such Person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), by way of merger, consolidation or otherwise, of 35% or more of the Capital Stock of Borrower on a fully diluted basis (the " **Merger Transaction** ") and the individuals constituting the Board of Directors of each Credit Party as of the Closing Date cease to constitute a majority of the Board of Directors of each Credit Party at any time after the Merger Transaction, (c) during any period of twelve consecutive calendar months, individuals who at the beginning of such period constituted the Board of Directors of Borrower, together with any new members of such Board of Directors whose elections by such Board of Directors or whose nominations for election by the stockholders of Borrower were approved by a vote of a majority of the members of such Board of Directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved (excluding any individual whose initial nomination for, or assumption of office as, a member of such Board of Directors occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any Person or group other than a solicitation for the election of one or more directors by or on behalf of the Board of Directors), cease for any reason to hold a majority of the voting rights of the members of the Board of Directors of Borrower, still in offices set forth above or (d) a "change of control" or any term of similar effect under any Material Contract of the type referred to in clause (i) of the definition thereof or any other document executed in connection therewith shall have occurred in respect of any Credit Party or Subsidiary thereof.

"  **Churn Rate** " shall mean, for any period, the ratio, expressed as a percentage, of (a) (i) RMR attributed to any customer contracts that were cancelled during such period, minus (ii) RMR attributed to any new customer contracts that were entered into during such period by existing customers, divided by (b) the RMR at the beginning of such period.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *[***]* " shall mean [***], together with its affiliates.

" *[***] Agreement* " shall mean the [***] Agreement dated [***] between Borrower, Pareteum Europe and [***] pursuant to which [***], as amended, extended, renewed, replaced, restated or otherwise modified from time to time.

" *[***] Consent and Acknowledgment* " shall mean the consent and acknowledgment among [***], Borrower, Pareteum Europe and the Collateral Agent dated on or about the date hereof (or such later date permitted by Section 8.17 ) pursuant to which (a) Pareteum Europe shall join the [***] Agreement as a "[***]" thereunder; (b) [***] shall consent to the grant by the Credit Parties to Collateral Agent of a security interest in [***]; and (b) [***] shall agree to remit all payments and other amounts payable by [***] under the [***] Agreement to the Pareteum Europe Capital One Account until such time as such Consent and Acknowledgement is terminated in accordance with its terms.

" *[***] Cure Period* " shall mean the period (a) commencing on May 1, 2019 (unless the [***]Consent and Acknowledgement has been delivered in accordance with Section 8.17 prior to such date) and (b) continuing until such date that the [***] Consent and Acknowledgement has been delivered in accordance with Section 8.17 , as confirmed by the Administrative Agent in writing.

" *Claims* " shall have the meaning set forth in the definition of Environmental Claims.

" *Closing Date* " shall mean February 26, 2019.

" *Closing Date Lender Shares* " shall mean 425,000 shares of Borrower Common Stock.

" *Code* " shall mean the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated and rulings issued thereunder.

" *Collateral* " shall mean any assets of any Credit Party or other assets upon which the Collateral Agent has been, or has purportedly been, granted a Lien in connection with this Agreement.

" *Collateral Access Agreements* " shall mean a collateral access agreement in form and substance reasonably satisfactory to the Collateral Agent between Collateral Agent and any lessor, warehouseman, processor, bailee, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Credit Party's books and records or assets located outside of Germany.

" *Collateral Agent* " shall have the meaning set forth in the preamble to this Agreement.

" *Collateral Assignee* " shall have the meaning set forth in Section 12.06(c) of this Agreement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Collections*** " shall mean all cash, checks, credit card slips or receipts, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds) of the Credit Parties.

" ***Commitment*** " shall mean the obligation of the Lenders to make the Loans hereunder, in each case in the Dollar amounts set forth beside such Lender's name under the applicable heading on Schedule 1.01 attached hereto or in the Assignment and Acceptance pursuant to which such Lender became a Lender under this Agreement, as such amounts may be changed from time to time pursuant to the terms of this Agreement. On the Closing Date, the total of the Commitments for all Lenders shall be $50,000,000 as set forth on Schedule 1.01 .

" ***Commitment Percentage*** " shall mean, as to any Lender, the Commitment Percentage (if any) set forth below such Lender's name in Schedule 1.01 hereof (or, in the case of any Lender that became party to this Agreement after the Closing Date pursuant to Section 12.06(b) or (c) hereof, the Commitment Percentage (if any) of such Lender as set forth in the applicable Assignment and Acceptance), as the same may be adjusted upon any assignment by or to such Lender pursuant to Section 12.06(b) or (c) hereof.

" ***Commodity Exchange Act*** " means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

" ***Communications*** " means, collectively, any notice, demand, communication, information, document or other material that any Credit Party provides to the Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to Section 12.25, including through the Platform.

" ***Compliance Certificate*** " shall mean a certificate duly completed and executed by an Authorized Officer of the Borrower substantially in the form of Exhibit B , together with such changes thereto or departures therefrom as the Administrative Agent may from time to time reasonably request or approve for the purpose of monitoring the Credit Parties' compliance with the financial covenants contained herein or certain other calculations, or as otherwise agreed to by the Administrative Agent.

" ***Confidential Information*** " shall have the meaning set forth in Section 12.17 .

" ***Connection Income Taxes*** " shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

" ***Consolidated Capital Expenditures*** " shall mean, for any specified period, the sum of, without duplication, all expenditures made, directly or indirectly, by the Consolidated Companies during such period, determined on a consolidated basis in accordance with GAAP, that are or should be reflected as additions to property, plant or equipment or similar items reflected in the consolidated statement of cash flows and balance sheet of the Consolidated Companies, or have a useful life of more than one year.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *Consolidated Companies* " shall mean Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.

" *Consolidated Interest Expense* " shall mean, for the Consolidated Companies, the sum of: (a) all interest in respect of Indebtedness (including, without limitation, the interest component of any payments in respect of Capitalized Lease Obligations) accrued or capitalized during such period (whether or not actually paid during such period), less interest income during such period, plus (b) the net amount payable (or minus the net amount receivable) in respect of Hedging Obligations relating to interest during such period (whether or not actually paid or received during such period).

" *Consolidated Net Income* " shall mean, for any specified period, the consolidated net income (or deficit) of the Consolidated Companies determined in accordance with GAAP, after eliminating therefrom all extraordinary nonrecurring items of income or loss; provided that there shall be excluded (without duplication) (i) the consolidated net income (or deficit) of any Person in which any Person (other than any of the Consolidated Companies) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid in cash to any of the Consolidated Companies by such Person during such specified period, (ii) the income (or loss) of any Person accrued prior to the date it becomes a consolidated Subsidiary of any of the Consolidated Companies or is merged into or consolidated with any of the Consolidated Companies or such Person's assets are acquired by any of the Consolidated Companies, (iii) the income of any consolidated Subsidiary of any of the Consolidated Companies to the extent that the declaration or payment of dividends or other distributions by that consolidated Subsidiary of that income is not at the time permitted by operation of the terms of any Contractual Obligation or Applicable Law applicable to that consolidated Subsidiary, (iv) any gain attributable to the write-up of any asset and any loss attributable to the write-down of any asset; (v) any net gain from the collection of the proceeds of life insurance policies; (vi) any net gain or loss arising from the acquisition of any securities, or the extinguishment, under GAAP, of any Indebtedness, of any of the Consolidated Companies, (vii) in the case of a successor to any consolidated Subsidiary of any of the Consolidated Companies by consolidation or merger or as a transferee of its assets, any earnings of such successor prior to such consolidation, merger or transfer of asset (unless such successor was a consolidated Subsidiary of any of the Consolidated Companies prior to such consolidation, merger or transfer), (viii) any deferred credit representing the excess of equity in any consolidated Subsidiary of any of the Consolidated Companies at the date of acquisition of such consolidated Subsidiary over the cost to the Consolidated Companies of the investment in such Subsidiary, (ix) the cumulative effect of any change in GAAP during such period, and (x) any non-cash FASB ASC 815 income (or loss) related to hedging activities.

" *Consolidated Revenue* " shall mean, for any specified period, the revenue of the Consolidated Companies calculated and recognized in accordance with GAAP.

" *Consolidated Revenue Testing Period* " shall mean the period (a) commencing on the date, if any, that the Borrower delivers a Compliance Certificate to the Administrative Agent in accordance with Section 8.01(d) hereunder that reflects a failure by the Credit Parties to comply with the covenant set forth in Section 9.13(d) ; and (b) continuing until the date that the Borrower delivers a Compliance Certificate to the Administrative Agent in accordance with Section 8.01(d) hereunder that evidences compliance with the covenant set forth in Section 9.13(d) .

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" **Consolidated Total Debt** " shall mean, as of any date of determination, the outstanding principal amount of all Funded Debt.

" **Contingent Liability** " shall mean, for any Person, any agreement, undertaking or arrangement by which such Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Stock of any other Person. The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

" **Contractual Obligation** " shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound other than the Obligations.

" **Control** " means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise; provided that, for purposes of this definition, any Person which owns directly or indirectly 5% or more of the equity interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 5% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person. Notwithstanding anything to the contrary set forth herein, neither Agent nor any Lender shall be deemed to be an Affiliate of any Credit Party solely by virtue of complying with the terms and provisions of, or exercising its rights under, this Agreement and the other Credit Documents. The terms " **Controlling** " and " **Controlled** " have meanings correlative thereto.

" **Control Agreement** " shall mean a pledge, collateral assignment, control agreement or bank consent letter, in form and substance reasonably satisfactory to the Collateral Agent, executed and delivered by the applicable Credit Party, the Collateral Agent, and the applicable securities intermediary or bank, which agreement is sufficient to give the Collateral Agent "control" over (or otherwise perfect Collateral Agent's Lien in, to the extent "control" is not applicable under the laws of any applicable jurisdiction) each of such Credit Party's securities accounts, deposit accounts or investment property, as the case may be, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" **Copyright Security Agreements** " shall mean any and all copyright security agreements entered into by a Credit Party in favor of Collateral Agent (as required by the Agreement or any other Credit Document), in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" **Corresponding Obligations** " means all Obligations as they may exist from time to time, other than the Parallel Debts.

11

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

"*Credit Documents*" shall mean (a) this Agreement, the Security Documents, any Notes, any subordination or intercreditor agreements in favor of any Agent with respect to this Agreement, and (b) any other document, instrument, certificate or agreement executed by any Credit Party, or by the Borrower on behalf of the Credit Parties, or any of them, and delivered to any Agent or Lender in connection with any of the foregoing or the Obligations, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"*Credit Parties*" shall mean, collectively, the Borrower and the Guarantors, and "*Credit Party*" shall mean any of the Credit Parties, individually.

"*Current Assets to Debt Ratio*" shall mean, as of any date, the ratio of: (a) (i) unrestricted cash and Cash Equivalents of the Consolidated Companies as of such date; *plus* (ii) accounts receivable owing to the Consolidated Companies as of such date so long as such accounts receivable have not been (x) outstanding more than 60 days after the original due date therefor or (y) otherwise written off the books of the Borrower or designated as uncollectible by the Borrower in its reasonable discretion; to (b) Consolidated Total Debt of the Consolidated Companies outstanding as of such date.

"*Default*" shall mean any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"*Defaulting Lender*" shall mean any Lender that: (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Commitment, (ii) pay over to either Agent or any Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including a particular Default or Event of Default, if any) has not been satisfied; (b) has notified Borrower or the Administrative Agent in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including a particular Default or Event of Default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit; (c) has failed, within two (2) Business Days after request by the Administrative Agent, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's receipt of such certification in form and substance satisfactory to the Administrative Agent or (d) has become the subject of an Insolvency Event.

"*Default Rate*" shall mean a rate per annum equal to the applicable rate described in Section 2.09(a) plus three percent (3.00%) per annum.

"*Designated Jurisdiction*" means any country or territory to the extent that such country or territory is the subject of any Sanction.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *[***] Acquisition* " shall mean that certain acquisition by the Borrower of one hundred percent (100%) of the Capital Stock of [***].

" *Disposition* " shall mean, with respect to any Person, any sale, transfer, lease, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of such Person's or their respective Subsidiaries' assets (including Capital Stock of Subsidiaries) to any other Person in a single transaction or series of transactions.

" *Disqualified Capital Stock* " shall mean any Capital Stock that, by its terms (or by the terms of any security or other Capital Stock into which it is convertible or for which it is exchangeable) or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Qualified Capital Stock or in connection with a transaction that would constitute an Event of Default under Section 10.01(k) hereof after the Secured Parties are paid in full), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Capital Stock or in connection with a transaction that would constitute an Event of Default under Section 10.01(k) hereof after the Secured Parties are paid in full), in whole or in part, (c) provides for the scheduled payment of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Capital Stock that would constitute Disqualified Capital Stock, in each case, prior to the date that is one hundred and eighty (180) days after the latest Maturity Date; provided , that if such Capital Stock is issued pursuant to a plan for the benefit of employees of Borrower or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

" *Dollars* " and " *$* " shall mean dollars in lawful currency of the United States of America.

" *Domestic Subsidiary* " shall mean each Subsidiary of a Credit Party that is a U.S. Person.

" *Dutch Credit Party* " shall mean a Credit Party that is resident in the Netherlands for tax purposes and includes any Credit Party carrying on a business through a permanent establishment or deemed permanent establishment that is taxable in the Netherlands.

" *EEA Financial Institution* " means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

" *EEA Member Country* " means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

" *EEA Resolution Authority* " means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

13

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

"*EMU*" shall mean the economic and monetary union as contemplated in the Treaty on European Union.

"*Environmental Claims*" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than internal reports prepared by the Credit Parties (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings relating to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law ("*Claims*"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the Release or threatened Release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to the exposure to Hazardous Materials) or the environment.

"*Environmental Law*" shall mean any applicable federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment or human health or safety (to the extent relating to exposure to Hazardous Materials).

"*Equivalent Amount*" shall mean, on any date of determination, with respect to obligations or valuations denominated in one currency (the "first currency"), the amount of another currency (the "second currency") which would result from the conversion of the relevant amount of the first currency into the second currency at the 12:00 noon rate quoted by Bloomberg on www.bloomberg.com/markets/currencies/fxc.html (Page BOFC or such other Page as may replace such Page for the purpose of displaying such exchange rates) on such date or, if such date is not a Business Day, on the Business Day immediately preceding such date of determination, or such other rate as may have been agreed to in writing between Borrower and the Administrative Agent.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder. Section references to ERISA are to ERISA as in effect at the date of this Agreement and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"*ERISA Affiliate*" shall mean each Person (as defined in Section 3(9) of ERISA), as to which any Credit Party or any Subsidiary of any Credit Party, is, or within the last six (6) years was, treated as a "single employer" (i) within the meaning of Section 414(b), (c) of the Code (and sections 414(m) and (o) of the Code for purposes of provisions relating to section 412 of the Code and section 302 of ERISA) or (ii) as a result of any Credit Party or any Subsidiary of any Credit Party being or having been a general partner of such Person.

"*EST*" shall mean eastern standard time or eastern daylight time, as applicable.

14

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *EU Bail-In Legislation Schedule* " means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

" *euro* " and "€" shall mean the single currency of participating member states of the EMU.

" *Eurodollar Rate* " shall mean, with respect to any Loan, a rate per annum determined by the Administrative Agent on the Closing Date and thereafter on the last day of each third Interest Period (which shall be a Business Day) for the next succeeding three Interest Periods (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the greater of (A) 1.00%, and (B) the product of (i) the rate of interest which is identified and normally published by Bloomberg Professional Service LIBOR screen page (or such other page as may replace such page on that service for the purpose of displaying such rates or such other service as may be nominated by the ICE Benchmark Administration for the purpose of displaying London interbank offered rates for Eurodollar Rates) as the offered rate for loans in United States dollars for a three-month interest period for Eurodollar Rates as of 11:00 a.m. (London time), on the second full Business Day next preceding the first day of such Interest Period (unless such date is not a Business Day, in which event the next succeeding Business Day will be used); and (ii) the Statutory Reserve Rate. If Bloomberg Professional Service no longer reports the Eurodollar Rate or the Administrative Agent determines in good faith that the rate so reported no longer accurately reflects the rate available to the Administrative Agent in the London Interbank Market or if such index no longer exists or accurately reflects the rate available to the Administrative Agent in the London Interbank Market, the Administrative Agent may select a replacement index or replacement page, as the case may be, that reasonably reflects such rate.

" *Event of Default* " shall have the meaning set forth in Article X .

" *Exchange Act* " means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

" *Excluded Accounts* " means any deposit account (a) that is used solely to fund payroll or employee benefits, so long as such account is a zero balance account or (b) that contains, at all times, less than $100,000 for any one account and $350,000 in the aggregate for all such accounts.

" *Excluded Issuances* " shall mean (a) the issuance of equity securities (other than Disqualified Capital Stock) by Borrower to members of the management, employees or directors of any Credit Party and (b) the issuance of equity securities of Borrower (other than Disqualified Capital Stock) upon the exercise of any warrants issued by the Borrower on or prior to the Closing Date.

" *Excluded Hedging Obligation* " means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

15

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *Excluded Taxes* " shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 12.06 ) or (ii) such Lender changes its lending office (other than pursuant to Section 2.02 ), except in each case to the extent that, pursuant to Section 4.04 , amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 4.04(f) ; and (d) any U.S. federal withholding Taxes imposed under FATCA.

" *Exit Fee* " shall mean an exit fee in an amount sufficient to increase the Minimum Return to 1.20:1.00; provided, that, such Exit Fee shall only be due and payable to the extent the Minimum Return shall be less than 1.20:1.00 after repayment in full of the Obligations (other than such Obligations that constitute the Exit Fee).

" *Extraordinary Receipts* " shall mean any cash received by or paid to or for the account of any Consolidated Company not in the ordinary course of business, including, without limitation: (a) proceeds of judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action to the extent not used to pay any corresponding cause of action or to reimburse a Consolidated Company for amounts previously expended, (b) indemnification payments received by any Consolidated Company to the extent not used or anticipated to be used to pay any corresponding liability or reimburse such Consolidated Company for the payment of any such liability, (c) any purchase price adjustment (other than a working capital adjustment) received in connection with any purchase agreements, (d) tax refunds, (e) pension plan reversions and (f) any payment, fee or other amount received by any Consolidated Company in respect of any amendment, termination or non-renewal of any Material Contract. In no event shall proceeds of business interruption insurance be deemed to be Extraordinary Receipts.

" *FATCA* " shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury Regulations thereunder or official interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above), and any intergovernmental agreements (together with any Laws implementing such agreements) implementing the foregoing.

16

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Federal Funds Rate*** " shall mean, for any day, a fluctuating interest rate per annum equal to: (a) the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next succeeding Business Day) by the Federal Reserve Bank of New York; or (b) if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

" ***Fees*** " shall mean all amounts payable pursuant to, or referred to in, Section 3.01 .

" ***Financial Performance Covenants*** " shall mean the covenants set forth in Section 9.13 (other than clause (f) thereof).

" ***Foreign Lender*** " shall mean a Lender that is resident or organized under the laws of a jurisdiction other than that in which Borrower is resident for tax purposes.

" ***Foreign Subsidiary*** " shall mean each Subsidiary of a Credit Party that is not a Domestic Subsidiary.

" ***Fortress Debt Documents*** " shall mean that certain Credit Agreement dated as of June 14, 2018 by and among iPass, iPass IP Sub, Borrower and Fortress Credit Corp., a Delaware corporation, as amended, restated, supplemented or otherwise modified from time to time, together with any other document, instrument, certificate or agreement executed from time to time in connection therewith.

" ***Fortress Debt Repayment*** " shall mean that certain transaction pursuant to which the Borrower shall repay 100% of the outstanding principal balance of the Indebtedness evidenced by the Fortress Debt Documents and any accrued and unpaid interest thereon.

" ***Funded Debt*** " shall mean, as of any date of determination, all then outstanding Indebtedness of the Consolidated Companies, of the type described in clauses (a), (b), (d) and (f) of the defined term "Indebtedness" (other than letters of credit or similar instruments which are cash collateralized in an aggregate amount not to exceed $100,000).

" ***Funding Date*** " shall mean the date of funding of each Loan, other than the Closing Date.

" ***Funding Request*** " means a written request by the Borrower for the funding of each Loan, which shall be in the form of Exhibit D attached hereto.

" ***GAAP*** " shall mean generally accepted accounting principles in the United States of America set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), including the FASB Accounting Standards Codification™, which are applicable to the circumstances as of the date of determination, subject to Section 1.03 .

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *GDPR* " shall mean the European Union General Data Protection Regulation, Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 and, with respect to the Netherlands Subsidiaries only, the Dutch GDPR Implementation Act ( *Uitvoeringswet Algemene verordening gegevensbescherming* ) and, with respect to Interactive only, the German Data Protection Act ( *Bundesdatenschutzgesetz* ) and, with respect to the Belgian Guarantors only, the Belgian GDPR Implementation Act ( *Wet betreffende de bescherming van natuurlijke personen met betrekking tot de verwerking van persoonsgegevens/Loi relative à la protection des personnes physiques à l'égard des traitements de données à caractère personnel* ).

" *German Collateral* " shall mean any Collateral assumed or accepted by or through the Collateral Agent or the Secured Parties, as the case may be, pursuant to any German Security Document and held or administered by the Collateral Agent on behalf of or in trust for the Secured Parties under this Agreement or the other Credit Documents and includes any addition, replacement or substitutions thereof

" *German Collateral Party* " shall mean each Credit Party which agrees to provide security expressed to be governed by German law, including but not limited to the security provided under the German Security Documents.

" *German Credit Party* " shall mean, collectively, each Credit Party or Subsidiary thereof that for the purposes of the Insolvency Regulation maintains its centre of interest in Germany.

" *German Guarantor* " means Interactive and each other Guarantor which is incorporated under the laws of the Federal Republic of Germany.

" *German Insolvency Code* " shall mean the German insolvency code ( *Insolvenzordnung* ).

" *German Insolvency Event* " shall mean:

(a)     a German Relevant Entity is unable or admits its inability to pay its debts as they fall due or is deemed to or declared to be unable to pay its debts under applicable law, suspends or threatens to suspend making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness, including a stoppage of payment situation ( *Zahlungsunfähigkeit* ), a status of over-indebtedness ( *Überschuldung* ) or actual insolvency proceedings;

(b)     a moratorium is declared in respect of any indebtedness of a German Relevant Entity;

*(c)*     (i) such German Relevant Entity is otherwise in a situation to file for insolvency because of any of the reasons set out in Sections 17 to 19 of the German Insolvency Code and (ii) a petition for insolvency proceedings in respect of its assets *(Antrag auf Eröffnungeines Insolvenzverfahrens)* has been filed based on Sections 17 to 19 of the German Insolvency Code ( *Insolvenzordnung* ) or actions are taken pursuant to section 21 German Insolvency Code ( *Insolvenzordnung* ) by a competent court; or

18

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(d)     any procedure or step analogous to the foregoing taken in any jurisdiction in respect of a German Relevant Entity;

provided that, this definition shall not apply to any insolvency petition which is frivolous or vexatious and is discharged, stayed or dismissed within 60 days of notice thereof to any German Relevant Entity becoming aware of the same; provided that each Credit Party hereby expressly authorizes each Secured Party to appear in any court conducting any such case or proceeding during such 60-day period to preserve, protect and defend their rights under the Credit Documents.

" *German Relevant Entity* " shall mean each Person, including without limitation any Lender, any Credit Party and any Subsidiary thereof, capable of becoming subject of insolvency proceedings under the German Insolvency Code ( *Insolvenzordnung* ).

" *German Security Documents* " shall mean (i) the Share Pledge Agreement dated as of the Closing Date between Artilium UK, as pledgor, Interactive, as company and the German Security Trustee as pledgee and German security agent and the Lenders as pledgees, (ii) [reserved], (iii) the Global Assignment Agreement dated as of the Closing Date between Interactive, as assignor and the German Security Trustee, as assignee and German security agent, (vi) the Account Pledge Agreement dated as of the Closing Date between Interactive, as pledgor, the German Security Trustee, as pledgee and German security agent and the Lenders, as pledgees, (v) the IP Rights Transfer and Assignment Agreement dated as of the Closing Date between Interactive, as security provider and the German Security Trustee, as security trustee and German security agent, as the same may be amended, restated, supplemented or otherwise modified from time to time, and each other instrument or document executed and delivered pursuant to Sections 8.10 , 8.11, 8.13 or 8.17 or pursuant to any of the Security Documents to guarantee or secure any of the Obligations governed by German law.

" *German Security Trustee* " has the meaning assigned to such term in Section 11.13 .

" *Governmental Authority* " shall mean the government of the United States, any foreign country or any multinational or supranational authority, or any state, commonwealth, protectorate or political subdivision thereof, and any entity, body or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, the PBGC and other administrative bodies, self- regulatory organizations including registered national stock exchanges, or quasi-governmental entities established to perform the functions of any such agency or authority.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Guarantee Obligations*** " shall mean, as to any Person, any Contingent Liability of such Person or other obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the " *primary obligor* ") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; <u>provided</u> that the term " ***Guarantee Obligations*** " shall not include endorsements of instruments for deposit or collection in the ordinary course of business and consistent with past practice or customary and reasonable indemnity obligations in effect on the Closing Date, entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith and reasonable business judgment.

" ***Guarantor Obligations*** " shall have the meaning set forth in Section 6.01(a) .

" ***Guarantors*** " shall mean (a) Pareteum Europe, (b) Pareteum North America, (c) iPass, (d) iPass IP Sub, (e) Artilium UK, (f) Artilium Netherlands, (g) Artilium Belgium, (h) Interactive, (i) United Telecom, (j) each other direct or indirect Subsidiary of Borrower (other than any Immaterial Subsidiary), and (k) any other Person that provides a guarantee for the payment and performance of the Obligations pursuant to an agreement reasonably acceptable to the Administrative Agent after the Closing Date pursuant to Section 8.10 .

" ***Guaranty*** " means the guaranty set forth in Section 6.01 and any other guaranty agreement, in form and substance satisfactory to Administrative Agent, pursuant to which a Subsidiary or any other Person guarantees payment and performance of all Obligations of the Borrower and of the other Guarantors.

" ***Hazardous Materials*** " shall mean (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "waste", "recycled materials", "sludge", "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law; and (c) any other chemical, waste, recycled material, material or substance, which is prohibited, limited or regulated by any Environmental Law.

" ***Hedging Agreement*** " shall mean (a) any and all agreements or documents not entered into for speculative purposes that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging exposure to fluctuations in interest or exchange rates, loan, credit exchange, security, or currency valuations or commodity prices, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a " ***Master Agreement*** "), including any such obligations or liabilities under any Master Agreement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

"  *Hedging Obligations*  " shall mean, with respect to any Person, the obligations of such Person under Hedging Agreements.

"  *Historical Financial Statements*  " shall mean (a) the audited consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 2016 and the related consolidated statements of income and cash flows of the Borrower and its Subsidiaries for the fiscal year then ended; (b) the audited consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 2017 and the related consolidated statements of income and cash flows of the Borrower and its Subsidiaries for the fiscal year then ended; and (c) the reviewed consolidated balance sheets of the Borrower and its Subsidiaries as of the last day of the nine-month period ended September 30, 2018, together with the related consolidated statements of income and cash flows for such period.

"  *Immaterial Subsidiary*  " means, as of any date, any Subsidiary of Borrower that (a) individually has total assets not exceeding 5% of consolidated total assets of Borrower and its Subsidiaries as of such date and (ii) has total revenues for the most recent 12-month period not exceeding 5% of consolidated total revenues of Borrower and its Subsidiaries for the same period; and (b) taken together with all other Immaterial Subsidiaries of Borrower, (i) has total assets not exceeding 10% of consolidated total assets of Borrower and its Subsidiaries as of such date and (ii) has total revenues for the most recent 12-month period not exceeding 10% of consolidated total revenues of Borrower and its Subsidiaries for the same period.

"  *Indebtedness*  " shall mean, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)        all indebtedness of such Person for borrowed money and all indebtedness of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)        the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)        net Hedging Obligations of such Person;

(d)        all obligations of such Person to pay the deferred purchase price of property or services, but excluding trade accounts payable in the ordinary course of business (which are not overdue for a period of more than ninety (90) days past the applicable due date thereof;

21

Case 1:19-cv-09767-AKH    Document 143-3    Filed 04/24/20    Page 136 of 366

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person with respect to the redemption, repayment or other repurchase or payment in respect of any Disqualified Capital Stock; and

(h)    all Guarantee Obligations of such Person in respect of any of the foregoing;

provided , that Indebtedness shall not include (i) prepaid or deferred revenue arising in the ordinary course of business on customary terms, (ii) purchase price holdbacks arising in the ordinary course of business and on customary terms in respect of a portion of the purchase price of an asset to satisfy warranties or other unperformed obligations of the seller of such asset, (iii) endorsements of checks or drafts arising in the ordinary course of business and consistent with past practice, and (iv) preferred Capital Stock to the extent not constituting Disqualified Capital Stock.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or another entity not disregarded for tax purposes) in which such Person is a general partner or a joint venture (whether partner or member), except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of any net Hedging Obligations on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) above shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith and reasonable business judgment.

" *Indemnified Liabilities* " shall have the meaning set forth in Section 12.05 .

" *Indemnified Taxes* " shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

" *Insolvency Event* " shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy, insolvency or examinership proceeding (including any proceeding under Title 11 of the United States Code), regulatory restrictions or Netherlands Insolvency Event, (b) has had a receiver, examiner, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it or has called a meeting of its creditors, (c) admits in writing its inability, or be generally unable, to pay its debts as they become due or cease material operations of its present business, (d) with respect to a Lender, such Lender is unable to perform hereunder due to the application of Applicable Law, (e) with respect to a German Relevant Entity, a German Insolvency Event occurs in respect of such German Relevant Entity or (f) in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Authority or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

22

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

"  *Insolvency Regulation*  " shall mean the Council Regulation (EC) No. 848/2015 of 20 May 2015 on Insolvency Proceedings.

"  *Interactive*  " shall mean interactive digital media GmbH, a limited liability company ( *Gesellschaft mit beschränkter Haftung, GmbH* ), incorporated under the laws of the Federal Republic of Germany, with registered seat in Lübeck, registered under file no. HRB 9738 HL with the Commercial Register ( *Handelsregister* ) located with the local court ( *Amtsgericht* ) of Lübeck.

"  *Interest Payment Date*  " shall have the meaning set forth in Section 2.09(b) .

"  *Interest Period*  " shall mean, with respect to any Loan, an interest period commencing (a) with respect to the first Interest Period for such Loan (i) initially on the Closing Date (with respect to those Loans funded on the Closing Date) and ending on the next succeeding Interest Payment Date, or (ii) initially on the Funding Date for such Loan (with respect to those Loans funded after the Closing Date, if any) and ending on the next succeeding Interest Payment Date; and (b) thereafter on each Interest Payment Date and ending on the next succeeding Interest Payment Date.

"  *Investment*  " shall mean, relative to any Person, (a) any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such first Person of any bonds, notes, debentures or other debt securities of any such other Person; (b) the incurrence of Contingent Liabilities for the benefit of any other Person; and (c) acquisition of any Capital Stock or other investment held by such Person in any other Person. The amount of any Investment at any time shall be the original principal or capital amount thereof less all returns of principal or equity thereon made on or before such time and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"  *iPass*  " shall mean iPass Inc., a Delaware corporation.

"  *iPass Acquisition*  " shall mean that certain acquisition by the Borrower of the Capital Stock of iPass pursuant to that certain Agreement and Plan of Merger dated November 12, 2018 by and among the Borrower, TBR and iPass.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *iPass IP Sub* " shall mean iPass IP LLC, a Delaware limited liability company.

" *iPass-TBR Merger* " shall mean the merger of TBR with and into iPass pursuant to Section 251(h) of the Delaware General Corporate Law.

" *IP Rights* " shall have the meaning set forth in Section 7.13 .

" *IRS* " shall mean the United States Internal Revenue Service.

" *Key Contract* " shall mean the **[***]** Agreement.

" *Lender* " shall have the meaning set forth in the preamble to this Agreement.

" *Lender Shares* " shall mean, collectively, the Closing Date Lender Shares and the Additional Lender Shares.

" *Lien* " shall mean any mortgage, pledge, security interest, hypothecation, assignment for collateral purposes, lien (statutory or other) or similar encumbrance, and any easement, right-of- way, license, restriction (including zoning restrictions), defect, exception or irregularity in title or similar charge or encumbrance (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof); provided that in no event shall an operating lease entered into in the ordinary course of business and on customary terms or any precautionary UCC filings made pursuant thereto by an applicable lessor or lessee, be deemed to be a Lien.

" *Liquidity* " shall mean the sum, for the Credit Parties, of unrestricted cash and Cash Equivalents, in each case, which is held in deposit accounts which are subject to Control Agreements.

" *Loan* " shall have the meaning set forth in Section 2.01 .

" *Management Notification* " shall have the meaning set forth in Section 6.09(c)(ii) .

" *Master Agreement* " shall have the meaning set forth in the definition of the term "Hedging Agreement".

" *Material Adverse Effect* " shall mean a material adverse effect on (a) the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise), results of operations or performance of (i) the Borrower, (ii) the Credit Parties taken as a whole or (iii) the Borrower and its Subsidiaries taken as a whole, (b) the validity or enforceability of this Agreement or any of the other Credit Documents (it being agreed that documents described in clause (b) of the definition of "Credit Documents" shall be taken as a whole), (c) the ability of any Credit Party to perform its obligations under any Credit Document (it being agreed that documents described in clause (b) of the definition of "Credit Documents" shall be taken as a whole) to which it is a party, (d) the rights or remedies of the Secured Parties or the Lenders hereunder or thereunder, (e) the priority of any Liens granted to Collateral Agent in or to any Collateral (other than as a result of voluntary and intentional discharge of the Lien by the Collateral Agent), or (f) the rights or benefits of any Credit Party under the **[***]** Agreement.

24

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

"*Material Contracts*" shall mean and include: (i) any agreement evidencing, securing or pertaining to any Funded Debt, or any guaranty thereof, in a principal amount exceeding $500,000, (ii) any real property lease where annual rent exceeds $500,000, (iii) any operating lease where annual rentals exceed $500,000, (iv) the [***] Agreement, (v) any other agreement with any Material Customer which involves aggregate consideration payable to or by such Material Customer of $500,000 or more, (vi) any agreement (other than the agreements set forth in the foregoing clauses (i) through (v)) which involves aggregate consideration payable to or by such Person or such Subsidiary of $500,000 or more and (vii) any other agreement the termination of which (without contemporaneous replacement of substantially equivalent value) could reasonably be expected to have a Material Adverse Effect.

"*Material Customer*" shall have the meaning set forth in Section 7.27 .

"*Maturity Date*" shall mean February 26, 2022.

"*Minimum Return*" shall mean the ratio equal to (a) the aggregate amount, without duplication, of all principal, interest, fees and other amounts paid in cash by the Credit Parties to the Lenders hereunder; *divided* by (b) the aggregate amount of Loans disbursed by the Lenders hereunder net of any original issue discount; provided , however , the foregoing clause (a) shall not include any fees paid directly to the Administrative Agent for its own account including, without limitation, those fees paid pursuant to Section 3.01(a) hereunder; and provided , further , that (i) the amount of any Paid in Kind Interest elected to be paid by the Borrower in accordance with the terms hereunder (x) shall be added to the amount described in the foregoing clause (a) on the date such election is made (but no further addition to clause (a) shall be made at such time that the Borrower repays the capitalized principal amount relating to such Paid in Kind Interest), and (y) shall not be included for purposes of clause (b) hereunder; and (ii) any Capital Stock received by the Lenders in connection with the equity grants contemplated by Sections 5.01(r) and 5.02(g) shall not be included for purposes of clause (b) hereunder.

"*Moody's* " shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"*Mortgage* " shall mean each mortgage, deed of trust, or deed to secure debt, trust deed or other security document granted by any applicable Credit Party to the Collateral Agent for the benefit of the Secured Parties in respect of any Real Property owned or leased by such Credit Party, in such form as agreed between such Credit Party and the Collateral Agent.

"*Multiemployer Plan* " shall mean any multiemployer plan, as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) any Credit Party, any Subsidiary of any Credit Party or any ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which any Credit Party, any Subsidiary of any Credit Party or any ERISA Affiliate contributed to or had an obligation to contribute to such plan.

25

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *Net Assets (Belgian)* " ( *actif net/netto actief* ) has the meaning given to it in article 617 of the Belgian Companies Code, and, in the event of a dispute on the amount thereof, a certificate of such amount from the statutory auditors of such Belgian Guarantor (or, if none, an independent form of accountants of international reputation) shall be conclusive, save in the case of manifest error.

" *Net Assets (German)* " shall have the meaning set forth in Section 6.09(c)(i) .

" *Net Casualty Proceeds* " shall mean, with respect to any Casualty Event, the amount of any insurance proceeds or condemnation awards received by any Credit Party or any of its Subsidiaries in connection with such Casualty Event (net of (i) the amount of any reserves to be maintained in connection with the Casualty Event, to the extent such reserve is maintained in accordance with GAAP, and (ii) all reasonable and customary collection expenses thereof (including, without limitation, any legal or other professional fees) (except with respect to any expenses paid to an Affiliate of such Person)), but excluding any proceeds or awards required to be paid to a creditor (other than the Lenders) which holds a Lien permitted by Section 9.02(c) on the property which is the subject of such Casualty Event, and less any Taxes payable by such Person on account of such insurance proceeds or condemnation award, actually paid, assessed or estimated by such Person (in good faith) to be payable within the next 12 months in cash in connection with such Casualty Event, in each case to the extent, but only to the extent, that the amounts are properly attributable to such transaction; provided that if, after the expiration of such 12-month period, the amount of such estimated or assessed Taxes, if any, exceeded the Taxes actually paid in cash in respect of proceeds from such Casualty Event, the aggregate amount of such excess shall constitute Net Casualty Proceeds under Section 4.02(a)(iii) and be immediately applied to the prepayment of the Obligations pursuant to Section 4.02(c).

" *Net Debt Proceeds* " shall mean, with respect to the sale or issuance by any Credit Party or any of its Subsidiaries of any Indebtedness (other than Indebtedness permitted by Section 9.01), the excess of: (a) the gross cash proceeds received by the issuer of such Indebtedness from such sale or issuance, over (b) all reasonable and customary underwriting commissions and legal, investment banking, underwriting, brokerage, accounting and other professional fees, sales commissions and disbursements and all other reasonable fees, expenses and charges, in each case actually incurred and paid in connection with such sale or issuance other than such amounts that have been paid to any Affiliate of such Person.

" *Net Disposition Proceeds* " shall mean, with respect to any Disposition by any Credit Party or any of its Subsidiaries, the excess of: (a) the gross cash proceeds received by such Person from such Disposition, over (b) the sum of: (i) all reasonable and customary legal, investment banking, underwriting, brokerage and accounting and other professional fees, sales commissions and disbursements and all other reasonable fees, expenses and charges, in each case actually incurred and paid in connection with such Disposition other than such amounts that have been paid to any Affiliate of such Person, (ii) all Taxes payable by such Person on account of proceeds from such Disposition, actually paid, assessed or estimated by such Person (in good faith) to be payable in cash within the next 12 months in connection with such proceeds, in each case to the extent, but only to the extent, that the amounts so are properly attributable to such transaction, and (iii) the amount of any reserves to be maintained in connection with such Disposition, to the extent such reserve is maintained in accordance with GAAP; provided that if, after the expiration of the 12-month period referred to in clause (b)(ii) above, the amount of estimated or assessed Taxes, if any, pursuant to clause (b)(ii) above exceeded the Taxes actually paid in cash in respect of proceeds from such Disposition, the aggregate amount of such excess shall constitute Net Disposition Proceeds under Section 4.02(a)(ii) and be immediately applied to the prepayment of the Obligations pursuant to Section 4.02(c) .

26

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Net Equity Proceeds*** " shall mean, with respect to the sale, issuance or exercise after the Closing Date by any Credit Party or any of its Subsidiaries of any Capital Stock or any capital contribution by any Person to any such Credit Party or Subsidiary, the excess of: (a) the gross cash proceeds received by such Credit Party or Subsidiary from such sale, issuance or exercise, over (b) all reasonable and customary underwriting commissions and legal, investment banking, brokerage, accounting and other professional fees, sales commissions and disbursements actually incurred and paid in connection with such sale or issuance other than such amounts with have been paid to any Affiliate of such Person.

" ***Netherlands Insolvency Event*** " means, with respect to any Netherlands Subsidiary, any bankruptcy ( *faillissement* ), suspension of payments ( *surseance van betaling* ), provisional suspension of payments ( *voorlopige surseance van betaling* ), administration ( *onderbewindstelling* ), dissolution ( *ontbinding)* , filing of a notice under Section 36 of the Tax Collection Act of the Netherlands ( *Invorderingswet 1990* ) or Section 60 of the Social Insurance Financing Act of the Netherlands ( *Wet Financiering Sociale Verzekeringen* ) in conjunction with Section 36 of the Tax Collection Act of the Netherlands ( *Invorderingswet 1990* ) and any other event whereby the relevant company is limited in the right to dispose of its assets.

" ***Netherlands Security Documents*** " shall mean (i) the Netherlands Pledge Agreement between the Netherlands Subsidiaries as pledgors and the Collateral Agent as pledgee and (ii) the deed of pledge over shares in the capital of each Netherlands Subsidiary between the Borrower, Pareteum Europe and Artilium UK as respective pledgors and the Collateral Agent as pledgee, in each case, dated as of the Closing Date, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" ***Netherlands Subsidiaries*** " shall mean, collectively, Pareteum Europe, Elephant Talk Mobile Services B.V., Elephant Talk Communications Premium Rate Services Netherlands B.V. and Artilium Netherlands, and

" ***Netherlands Subsidiary*** " shall mean any of the Netherlands Subsidiaries, individually.

" ***Non-Defaulting Lender*** " shall mean, at any time, any Lender holding a Commitment which is not a Defaulting Lender.

" ***Note*** " shall mean a promissory note (or amended and restated promissory note) substantially in the form of Exhibit C .

" ***Notice of Control*** " shall have the meaning set forth in Section 8.15(b) .

" ***Obligations*** " shall mean (a) with respect to the Borrower, all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrower arising under or in connection with any Credit Document, including all original issue discount, fees and premiums payable under any Credit Document, the principal of and interest (including interest accruing during the pendency of any proceeding of the type described in Section 10.01(i) , whether or not allowed in such proceeding) on the Loans, all indemnification obligations and all obligations to pay or reimburse any Secured Party for paying any costs or expenses under any Credit Document, or (b) with respect to each Credit Party other than the Borrower, all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of such Credit Party arising under or in connection with any Credit Document, all indemnification obligations and all obligations to pay or reimburse any Secured Party for paying any costs or expenses under any Credit Document.

27

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Organization Documents*** " shall mean, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); and (c) with respect to a Netherlands Subsidiary, the deed of incorporation ( *akte van oprichting* ), the articles of association ( *statuten* ) currently in force, an up to date shareholders register ( *aandeelhoudersregister* ) and any regulations and/or rules ( *reglementen en/of andere regels* ) adopted by any of such Netherlands Subsidiary's corporate bodies and (d) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and, if applicable, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

" ***Other Connection Taxes*** " shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

" ***Other Taxes*** " shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 12.06 ).

" ***Paid in Kind Interest*** " shall mean interest payable in kind at a maximum percentage per annum equal to (a) through and including the first anniversary of the Closing Date, three percent (3.00%); (b) after the first anniversary of the Closing Date through and including the second anniversary of the Closing Date, two percent (2.00%); and (c) after the second anniversary of the Closing Date, one percent (1.00%).

" ***Parallel Debt*** " shall have the meaning set forth in Section 8.19 .

28

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Pareteum Europe*** " shall mean Pareteum Europe B.V., a *besloten vennootschap met beperkte aansprakelijkheid* organized under the laws of the Netherlands.

" ***Pareteum Europe Capital One Account*** " shall mean that certain deposit account of Pareteum Europe maintained with Capital One, National Association having an account number ending in 6026.

" ***Pareteum North America*** " shall mean Pareteum North America Corp., a Delaware corporation.

" ***Participant*** " shall have the meaning set forth in Section 12.06(b)(i) .

" ***Participant Register*** " shall have the meaning set forth in Section 12.06(b)(iii) .

" ***Patent Security Agreements*** " shall mean any patent security agreements entered into by a Credit Party in favor of Collateral Agent (as required by the Agreement or any other Credit Document), in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" ***Patriot Act*** " shall have the meaning set forth in Section 12.19 .

" ***PBGC*** " shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

" ***Permits*** " shall mean, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or operations or to which such Person or any of its property or operations is subject.

" ***Permitted Acquisition*** " shall mean an acquisition by any Credit Party of all of the Capital Stock of any Person or all or substantially all of the assets of any Person (or a division thereof) that satisfies each of the following conditions:

(i)       immediately before and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing;

(ii)      such acquisition and all transactions related thereto shall be consummated in accordance with all Applicable Laws in all material respects;

(iii)     if such acquisition involves the purchase of Capital Stock, no less than one hundred percent (100%) thereof on a fully-diluted basis shall be acquired, directly or indirectly, less the amount of any rollover shares for equity owners or management of the Persons acquired, and the Person acquired shall be located or organized in the United States, the Netherlands, Belgium, Germany or England;

(iv)      the Borrower shall have furnished to the Administrative Agent a certificate of the chief financial officer of the Borrower, demonstrating on a pro forma basis that, after giving effect to such acquisition, the Credit Parties are in compliance with the Financial Performance Covenants (and, during the continuation of a Consolidated Revenue Testing Period, the covenant set forth in Section 9.13(f) hereof);

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

     (v)     (A) with the exception of the **[***]** Acquisition, the purchase price for each such acquisition shall not exceed $250,000 and, when aggregated with the purchase price of all other acquisitions consummated after the Closing Date, shall not exceed $1,000,000; and (B) the purchase price for the **[***]** Acquisition shall not exceed **[***]** (in each case of the foregoing clauses (A) and (B), which such purchase price shall include any and all Indebtedness assumed and any and all contingent liabilities, including any purchase price obligations, seller notes or earn-outs, incurred in connection with all acquisitions, the amount of which shall be determined in accordance with GAAP, but excluding the amount of any roll-over equity or equity issued to sellers);

     (vi)     such acquisition is of a business or entity which is engaged in the business activities described on Schedule 9.12 and business activities incidental or reasonably related thereto;

     (vii)     all or substantially all of the assets acquired in connection with any acquisition shall be located within the United States or the Netherlands and shall be held by a Credit Party after giving effect to such acquisition;

     (viii)     the Borrower shall have (A) notified the Administrative Agent of such proposed Acquisition at least thirty (30) days prior to the consummation thereof, (B) furnished to the Administrative Agent at least fifteen (15) days prior to the consummation thereof (1) an executed term sheet and/or letter of intent (setting forth in reasonable detail the terms and conditions of such acquisition) and at the request of the Administrative Agent, furnish the Administrative Agent with such other information and documents that the Administrative Agent may reasonably request, including, without limitation, drafts of the respective agreements, documents or instruments pursuant to which such acquisition is to be consummated (including, without limitation, any related management, non-compete, employment, option or other material agreements), any schedules to such agreements, documents or instruments and all other material ancillary agreements, instruments and documents to be executed or delivered in connection therewith (with executed counterparts of such documents to be furnished promptly when available) and (2) pro forma financial statements of Borrower and its Subsidiaries after giving effect to the consummation of such acquisition; (C) furnished to the Administrative Agent at least five (5) Business Days prior to the consummation thereof (or such shorter period as may be agreed to by the Administrative Agent), drafts of the purchase documents and related schedules and exhibits and (D) furnished to the Administrative Agent prior to the consummation thereof, executed copies of such purchase documents and related schedules and exhibits thereto, each in form and substance reasonably acceptable to the Administrative Agent.

     (ix)     Borrower and its Subsidiaries (including any new Subsidiary) shall execute and deliver the agreements, instruments and other documents required by Sections 8.10 and 8.11 ; and

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(x)     Borrower shall have delivered a certification to the Administrative Agent that all conditions contained in the definition of Permitted Acquisition have been satisfied or will be satisfied as of the consummation of the applicable Permitted Acquisition.

" ***Permitted Liens*** " shall have the meaning set forth in <u>Section 9.02</u> .

" ***Person*** " shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

**"PIK Election Notice"** means a written request by the Borrower in the form of <u>Exhibit E</u> attached hereto.

" ***Plan*** " shall mean any Multiemployer Plan or any "employee benefit plan," as defined in Section 3 of ERISA subject to Title IV of ERISA, Section 412 of the Code or Sections 302 or 303 of ERISA, sponsored, maintained or contributed to by any Credit Party, Subsidiary of a Credit Party or any ERISA Affiliate (or to which any Credit Party, Subsidiary of a Credit Party or any ERISA Affiliate has or may have an obligation to contribute or to make payments), and each such plan for the five-year period immediately following the latest date on which any Credit Party, Subsidiary of a Credit Party or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Sections 4069 or 4212(c) of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

" ***Post Road*** " shall have the meaning set forth in the preamble to this Agreement.

" ***Prime Rate*** " shall mean the prime rate as published by The Wall Street Journal for such day. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer; each change in the Prime Rate shall be effective from and including the date such change is identified and published as being effective.

" ***Public Lender*** " shall have the meaning set forth in <u>Section 12.25</u> .

" ***Qualified Capital Stock*** " shall mean any Capital Stock that is not Disqualified Capital Stock.

" ***Real Property*** " shall mean, with respect to any Person, all right, title and interest of such Person (including, without limitation, any leasehold estate) in and to a parcel of real property owned, leased or operated by such Person together with, in each case, all improvements and appurtenant fixtures, equipment, personal property, easements and other property and rights incidental to the ownership, lease or operation thereof.

" ***Recipient*** " shall mean (a) the Administrative Agent and (b) any Lender.

**"Refinancing Indebtedness** " shall mean refinancings, renewals, or extensions of Indebtedness so long as:

(a)     such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, other than by the amount of premiums and compounded interest paid thereon and the reasonable and customary fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto,

31

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)      such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity (measured as of the refinancing, renewal, or extension) of the Indebtedness so refinanced, renewed, or extended,

(c)      if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lenders as those that were applicable to the refinanced, renewed, or extended Indebtedness, and

(d)      the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

" *Register* " shall have the meaning set forth in Section 12.06(a)(iv) .

" *Regulation D* " shall mean Regulation D of the Board as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

" *Regulation U* " shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

" *Regulation X* " shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

" *Related Parties* " shall mean, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, advisors of such Person and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

" *Release* " shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing, disposing, emanating or migrating of Hazardous Materials in the environment.

" *Replacement Lender* " shall have the meaning set forth in Section 2.12(f) .

" *Reportable Event* " shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30 day notice period is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Required Lenders*** " shall mean, at any time when there is more than one Lender which is not a Defaulting Lender, at least two Lenders which are not Defaulting Lenders having Loans and unused Commitments representing at least 51% of the sum of the aggregate Loans and unused Commitments at such time, or at any time when there is only one Lender which is not a Defaulting Lender, such Lender.

" ***Restricted Payment*** " shall mean, with respect to any Person, (a) the declaration or payment of any dividend on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any class of Capital Stock of such Person or any warrants or options to purchase any such Capital Stock, whether now or hereafter outstanding, or the making of any other distribution in respect thereof, either directly or indirectly, whether in cash or property, (b) any payment of a management fee (or other fee of a similar nature) by such Person to any holder of its Capital Stock or any Affiliate thereof and (c) the payment or prepayment of principal of, or premium or interest on any Indebtedness subordinate to the Obligations.

" ***RMR*** " shall mean, for any month, the aggregate amount equal to the contracted monthly recurring revenues of the Consolidated Companies during such month.

" ***S&P*** " shall mean Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

" ***Sanction(s)*** " means any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, the Netherlands, Her Majesty's Treasury ("HMT") or other relevant sanctions authority.

" ***SEC*** " means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

" ***Secured Parties*** " shall mean, collectively, (a) the Lenders, (b) the Agents, (c) the beneficiaries of each indemnification obligation undertaken by any Credit Party under the Credit Documents, (d) any successors, indorsees, transferees and assigns of each of the foregoing to the extent any such transfer or assign is permitted by the terms of this Agreement and (e) any other holder of any Secured Obligation (as defined in any applicable Security Document).

" ***Securities Act*** " shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

" ***Security Documents*** " shall mean, collectively, the U.S. Security Agreement, the Collateral Access Agreements, the Control Agreements, the Patent Security Agreements, the Trademark Security Agreements, the Copyright Security Agreements, the [***]Consent and Acknowledgment, the [***]Consent and Acknowledgment, each Mortgage, the UK Security Documents, the Netherlands Security Documents, the German Security Documents, the Belgian Security Documents and each other instrument or document executed and delivered pursuant to Sections 8.10 , 8.11, 8.13 or 8.17 or pursuant to any of the Security Documents to guarantee or secure any of the Obligations.

33

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *Servicer* " shall mean Cortland Capital Market Services LLC, any of its affiliates, or any successor to such Person.

" *Solvency Certificate* " shall mean a solvency certificate, duly executed and delivered by the chief financial officer of the Borrower to Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent.

" *Solvent* " shall mean, with respect to any Person, at any date, that (a) the sum of such Person's debt (including Contingent Liabilities) does not exceed the present fair saleable value of such Person's present assets (which, for this purpose, shall include, without limitation, rights of contribution in respect of obligations for which such Person has provided a guarantee), (b) such Person's capital is not unreasonably small in relation to its business as contemplated on such date, (c) such Person has not incurred and does not intend to incur debts including current obligations beyond its ability to generally pay such debts as they become due (whether at maturity or otherwise), and (d) such Person is "solvent" within the meaning given that term and similar terms under Applicable Laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any Contingent Liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

" *Statutory Reserve Rate* " shall mean, for any day as applied to any Loan, a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages that are in effect on that day (including any marginal, special, emergency or supplemental reserves), expressed as a decimal, as prescribed by the Board and to which the Administrative Agent is subject, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D). Such reserve percentages shall include those imposed pursuant to such Regulation D. Loans shall be deemed to constitute Eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

" *Subsidiary* " of any Person shall mean and include (a) any corporation more than 50% of whose Voting Stock having by the terms thereof power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any partnership, limited liability company, association, joint venture or other entity in which such Person directly or indirectly through one or more Subsidiaries has more than (i) a 50% equity interest measured by either vote or value at the time or (ii) a 50% general partnership interest at the time. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *Swap Obligation* " means with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

" *Swap Termination Value* " shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

" *Taxes* " or " *taxes* " shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

" *TBR* " shall mean TBR, Inc., a Delaware corporation.

" *Termination Date* " shall mean the date on which the Loans and the other Obligations (other than Unasserted Contingent Obligations) shall have been paid in full in cash in accordance with the terms of this Agreement.

" *Total Credit Exposure* " shall mean, as of any date of determination (a) with respect to each Lender, (i) prior to the termination of the Commitments, the sum of such Lender's Commitment plus the outstanding principal amount of such Lender's Loans (including, for the avoidance of doubt, any accrued and unpaid Paid in Kind Interest) or (ii) upon the termination of the Commitments, the outstanding principal amount of such Lender's Loans (including, for the avoidance of doubt, any accrued and unpaid Paid in Kind Interest) and (b) with respect to all Lenders, (i) prior to the termination of the Commitments, the sum of all of the Lenders' Commitments plus the aggregate outstanding principal amount of all Loans (including, for the avoidance of doubt, any accrued and unpaid Paid in Kind Interest) and (ii) upon the termination of the Commitments, the aggregate outstanding principal amount of all Loans (including, for the avoidance of doubt, any accrued and unpaid Paid in Kind Interest).

" *Total Leverage Ratio* " shall mean, as of any date, the ratio of (a) Consolidated Total Debt of the Consolidated Companies outstanding as of such date, to (b) Adjusted EBITDA of the Consolidated Companies for the period of four consecutive fiscal quarters of Borrower most recently ended on or prior to such date; provided that for the purposes of computation of the foregoing ratio for the period of twelve consecutive months ending: (A) June 30, 2018, Adjusted EBITDA shall equal Adjusted EBITDA for the fiscal quarter ending on such date multiplied by four (4); (B) September 30, 2018, Adjusted EBITDA shall equal Adjusted EBITDA for the two fiscal quarters ending on such date multiplied by two (2) and (C) December 31, 2018, Adjusted EBITDA shall equal Adjusted EBITDA for the three fiscal quarters ending on such date multiplied by four-thirds (4/3).

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Trademark Security Agreements*** " shall mean the Trademark Security Agreements made in favor of Collateral Agent and Lenders by each applicable Credit Party and any trademark security agreement entered into after the Closing Date (as required by the Agreement or any other Credit Document), in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" ***Transactions*** " shall mean the funding of the Loans pursuant hereto and the use of the proceeds thereof and all other transactions contemplated by or described in the Credit Documents.

" ***Transferred Receivables*** " shall mean **[***]** .

" ***Treasury Regulations*** " means the United States Treasury regulations promulgated under the Code.

" ***U.S.*** " and " ***United States*** " shall mean the United States of America.

" ***U.S. Credit Parties*** " shall mean, collectively, Borrower, Pareteum North America and any other Guarantor that is a Domestic Subsidiary and " ***U.S. Credit Party*** " shall mean any of the U.S. Credit Parties, individually.

" ***U.S. Person*** " shall mean any person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

" ***U.S. Security Agreement*** " shall mean that certain Security Agreement dated as of the Closing Date, by and among the U.S. Credit Parties, Borrower and the Collateral Agent for the benefit of the Secured Parties, as amended, restated, supplemented or otherwise modified from time to time.

" ***U.S. Tax Compliance Certificate*** " has the meaning specified in Section 4.04(f).

" ***UCC*** " shall mean the Uniform Commercial Code as from time to time in effect in the State of New York and any other applicable jurisdiction.

" ***UK Debenture*** " shall mean the English law Debenture dated as of the Closing Date between Artilium UK and the Collateral Agent, as may be amended, restated or otherwise modified from time to time.

" ***UK Security Documents*** " shall mean, collectively, the UK Debenture and the UK Share Charge.

" ***UK Share Charge*** " shall mean, the English law Share Charge dated as of the Closing Date between the Borrower and Artilium UK, as may be amended, restated or otherwise modified from time to time.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Unasserted Contingent Obligations*** " shall mean, at any time, Obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment or indemnification (whether oral or written) has been made.

" ***Unfunded Current Liability*** " shall mean, with respect to any Plan the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

" ***United Telecom*** " shall mean United Telecom NV, a Belgian company with its registered office at Wingepark 5B, 3110 Rotselaar, Belgium, registration number 0446.133.484 (Commercial court of Leuven).

" ***United Telecom Disposition*** " shall mean the Disposition by Artilium UK of United Telecom and its Subsidiaries.

" ***VAT*** " means: value added tax within the meaning of Council Directive 2006/112/EC of 28 November 2006 on the common system of value added tax or any legislation in a Member State implementing such Council Directive and any other tax of a similar nature.

" ***[***]*** " shall mean [***].

" ***[***] Agreement*** " shall mean the [***], together with all annexes, exhibits, schedules and supplements thereto, as the same may be amended, extended, renewed, replaced, restated or otherwise modified from time to time in accordance with the terms of this Agreement.

" ***[***]Consent and Acknowledgment*** " shall mean the consent and acknowledgment among [***], Pareteum Europe and the Collateral Agent dated on or about the date hereof (or such later date permitted by Section 8.17 ) pursuant to which [***]shall consent to the grant by Pareteum Europe to Collateral Agent of a security interest in all of Pareteum Europe's rights under the [***]Agreement as security for the Obligations.

" ***[***] Cure Period*** " shall mean the period (a) commencing on June 1, 2019 (unless the [***] Consent and Acknowledgement has been delivered in accordance with Section 8.17 prior to such date) and (b) continuing until such date that the [***] Consent and Acknowledgement has been delivered in accordance with Section 8.17 , as confirmed by the Administrative Agent in writing.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Voting Stock*** " shall mean, with respect to any Person, shares of such Person's Capital Stock having the right to vote for the election of directors (or Persons acting in a comparable capacity) of such Person under ordinary circumstances.

" ***Withholding Agent*** " shall mean any Credit Party and Administrative Agent.

" ***Write-Down and Conversion Powers*** " means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write- down and conversion powers are described in the EU Bail-In Legislation Schedule.

" ***Yonder Investment*** " shall mean that certain purchase by the Borrower of a convertible promissory note in the aggregate principal amount of $2,000,000 issued by Yonder Media Mobile, Inc. pursuant to that certain Convertible Note Purchase Agreement dated as of November 26, 2018.

SECTION 1.02    Other Interpretive Provisions . With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(g)    Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(h)    All references in any Credit Document to the consent of or approval by any Agent or Lender shall be deemed to mean the consent of or approval by such Agent or Lender in its sole discretion, except as otherwise expressly provided in the applicable Credit Document.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(i)     Any reference herein to a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, Credit Party, joint venture or any other like term shall also constitute such a Person or entity).

SECTION 1.03     Accounting Terms and Principles . All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Historical Financial Statements, except as otherwise specifically prescribed herein. No change in the accounting principles used in the preparation of any financial statement hereafter adopted by Borrower or any of its Subsidiaries shall be given effect for purposes of measuring compliance with any provision of Article IX , including Section 9.13 , or otherwise in this Agreement unless the Borrower, the Administrative Agent and the Required Lenders agree in writing to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article IX shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value". A breach of a financial covenant contained in Article IX shall be deemed to have occurred as of any date of determination by the Administrative Agent or as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to any Agent. Anything in this Agreement to the contrary notwithstanding, any obligation of a Person under a lease (whether existing as of the Closing Date or entered into after the Closing Date) that is not (or would not be) required to be classified and accounted for as a capital lease on the balance sheet of such Person under GAAP as in effect on the Closing Date shall not be treated as a Capital Lease solely as a result of (x) the adoption of any changes in, or (y) changes in the application of, GAAP after the Closing Date.

SECTION 1.04     Rounding . Any financial ratios required to be maintained or complied with by the Credit Parties pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

39

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 1.05    References to Agreements, Laws, etc . Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including this Agreement and each of the other Credit Documents) and other Contractual Obligations shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document; and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

SECTION 1.06    Times of Day . Unless otherwise specified, all references herein to times of day shall be references to EST.

SECTION 1.07    Timing of Payment of Performance . When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day. All payments required hereunder shall be paid in immediately available funds unless otherwise expressly provided herein.

SECTION 1.08    Corporate Terminology . Any reference to officers, shareholders, stock, shares, directors, boards of directors, corporate authority, articles of incorporation, bylaws or any other such references to matters relating to a corporation made herein or in any other Credit Document with respect to a Person that is not a corporation shall mean and be references to the comparable terms used with respect to such Person.

SECTION 1.09    Currency Matters . Principal, interest, fees and all other amounts payable under this Agreement and the other Credit Documents to the Agents and the Lenders shall be payable in Dollars. Unless stated otherwise, all calculations, comparisons, measurements or determinations under this Agreement shall be made in Dollars. For the purpose of such calculations, comparisons, measurements or determinations, amounts or proceeds denominated in other currencies shall be converted to the Equivalent Amount in Dollars on the date of calculation, comparison, measurement or determination. In particular, without limitation, for purposes of valuations or computations under Article II, Article III, Article IV, Article VII, Article VIII, Article IX and Article X, unless expressly provided otherwise, where a reference is made to a dollar amount, the amount is to be considered as the amount in Dollars and, therefore, each other currency shall be converted into the Equivalent Amount thereof in Dollars.

**ARTICLE II**
**Amount and Terms of Loans**

SECTION 2.01    Loan . Subject to and upon the terms and conditions herein set forth, each Lender having a Commitment shall, on the Closing Date and on each Funding Date thereafter, severally (and not jointly), make a term loan to the Borrower (each such loan, a " *Loan* ") which Loan (a) when aggregated with each other Loan made hereunder, shall be in an amount not to exceed the Aggregate Commitment and (b) for each Lender, when aggregated with each other Loan made by such Lender hereunder, shall be in an amount not to exceed, for each Lender, such Lender's Commitment. Each Loan may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

40

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 2.02    Change of Lending Office . Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Sections 2.10(a) (ii) , 2.10(f) or 4.04(b) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided, that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section. Nothing in this Section 2.02 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 2.10 or 4.04(b) . The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

SECTION 2.03    Lender Branches . Each Lender may at its option, make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make any Loan; provided that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (ii) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of such Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it, and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.09 shall apply).

SECTION 2.04    Reserved .

SECTION 2.05    Disbursement of Funds .

(a)    If all the conditions set forth in Section 5.01 to the effectiveness of this Agreement are met prior to 3:00 p.m. EST on the Closing Date, then, each Lender will make available its *pro rata* portion of the Loans to be made on the Closing Date in the manner provided below no later than 3:00 p.m. EST on the Closing Date.

(b)    Each Lender shall make available all amounts it is to fund to Borrower in immediately available funds to the Administrative Agent, and, following receipt of all requested funds in an account designated by the Administrative Agent, the Administrative Agent will remit such amounts, in immediately available funds and in Dollars to Borrower, by remitting the same to such Persons and such accounts as may be designated by Borrower to the Administrative Agent in writing. The failure of any Lender to make available the amounts it is to fund to Borrower hereunder or to make a payment required to be made by it under any Credit Document shall not relieve any other Lender of its obligations under any Credit Document, but no Lender shall be responsible for the failure of any other Lender to make any payment required to be made by such other Lender under any Credit Document.

(c)    Nothing in this Section 2.05 shall be deemed to relieve any Lender from its obligation to fulfill its commitments and obligations hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments and obligations hereunder)

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 2.06    Payment of Loans; Evidence of Debt .

(a)      The Borrower agrees to pay to the Administrative Agent, for the benefit of the Lenders, all outstanding principal and interest due on the Loans on the Maturity Date or upon such earlier date on which the Obligations are accelerated pursuant to the terms of this Agreement.

(b)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office of such Lender from time to time, including the amounts of principal and interest payable and paid to such lending office of such Lender from time to time under this Agreement. To the extent there is any conflict between the Lenders' records maintained herein or the Register, the Register controls.

(c)      The Borrower agrees that from time to time on and after the Closing Date, upon the reasonable request by any Lender, at the Borrower's own expense, the Borrower will execute and deliver to such Lender a Note, evidencing the Loans made by, and payable to such Lender or registered assigns in a maximum principal amount equal to such Lender's applicable Commitment. The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall conclusively indicate, absent manifest error, inter alia , the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to, the Loans evidenced thereby. Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the Register, be conclusive and binding on each Credit Party absent manifest error; provided that the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Credit Party. The Administrative Agent shall maintain the Register pursuant to Section 12.06(a)(iv) , and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent from the Borrower and each Lender's share thereof.

(d)      The entries made in the Register and accounts and subaccounts maintained pursuant to paragraphs (b) and (c) of this Section 2.06 shall, to the extent permitted by Applicable Law, be conclusive evidence (absent manifest error) of the existence and amounts of the obligations of the Borrower therein recorded; provided that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

42

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 2.07     Funding Requests . The Borrower shall provide not less than seven (7) Business Days prior written notice of any request for Loans, which such Funding Request shall be in the form attached hereto as Exhibit D setting forth, among other things, (A) the proposed Funding Date, (B) the aggregate principal amount of such requested Loans, and (C) the wire instructions for Borrower's account where funds should be sent. Following receipt of a Funding Request, the Administrative Agent shall notify the Lenders of their pro rata share of such Loan.

SECTION 2.08     [Reserved] .

SECTION 2.09     Interest .

(a)     The unpaid principal amount of the Loans shall bear interest from the Closing Date or the relevant Funding Date at a rate per annum that shall at all times be the Applicable Margin plus the Eurodollar Rate in effect from time to time. Interest on the Loans shall accrue from and including the Closing Date or the relevant Funding Date to but excluding the date of any repayment in full thereof

(b)     On the first Business Day of each calendar month (each such date an " *Interest Payment Date* "), Cash Interest shall be due and payable monthly in cash in arrears, *provided* , *however* , that the Borrower may, by delivering a written PIK Election Notice to the Administrative Agent at least three (3) Business Days prior to the last day of an applicable Interest Period, elect instead to pay a portion of the Cash Interest due at the end of any Interest Period (but not, for the avoidance of doubt, in respect of any prior Interest Period) in the form of Paid in Kind Interest (in the maximum amount set forth in the definition thereof) in lieu of a payment in cash, in which case such Paid in Kind Interest shall accrue and be added to the outstanding principal balance of the Loans on a monthly basis in arrears, *provided* , *further* , that the Borrower may not elect to pay Paid in Kind Interest upon the occurrence and during the continuance of an Event of Default.

(c)     From and after the occurrence and during the continuance of any Default or Event of Default, upon notice by the Administrative Agent or the Collateral Agent to the Borrower, the Borrower shall pay interest on the principal amount of all Loans and all other unpaid Obligations, to the extent permitted by Applicable Law, at the Default Rate, which Default Rate shall accrue from the date of such Default or Event of Default, as applicable (regardless of the date of notice of the imposition of the Default Rate), until waived in writing and shall be payable on demand and in cash.

(d)     All computations of interest hereunder shall be made in accordance with Section 4.05 .

(e)      The Administrative Agent, upon determining the interest rate for any Borrowing of Loans, shall promptly notify the Borrower and the relevant Lenders thereof. Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 2.10    Increased Costs, Illegality, etc .

(a)    In the event that (x) in the case of clause (i) below, the Administrative Agent or (y) in the case of clause (ii) below, any Lender, in each case, shall have reasonably determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto):

(i)    on any date for determining the Eurodollar Rate for any Interest Period that (A) deposits in the principal amounts of the Loans comprising any Loan are not generally available in the relevant market or (B) adequate and reasonable means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of Eurodollar Rate; or

(ii)    at any time, after the later of the Closing Date and the date such entity became a Lender hereunder, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to the Loans , including as a result of any Tax (other than any (x) Indemnified Taxes, (y) Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" or (z) Connection Income Taxes) because of (A) any change since the date hereof in any Applicable Law (or in the interpretation or administration thereof and including the introduction of any new Applicable Law), such as, for example, without limitation, a change in official reserve requirements (but excluding changes in the rate of tax on the overall net income of such Lender), and/or (B) other circumstances affecting the interbank Eurodollar market or the position of such Lender in such market,

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice (if by telephone, confirmed in writing) to the Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (A) in the case of clause (i) above, the Loans at the Eurodollar Rate shall no longer be available and interest thereafter shall accrue at a rate equal to the Base Rate plus 8.0% per annum (provided, that in lieu of the foregoing rate change, Borrower and Administrative Agent may agree upon a different method of calculating interest with the result being that Borrower's cost are not increased) until such time as the Administrative Agent notifies the Borrower, the Collateral Agent and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), at which time interest with respect to the Loans shall revert to the rate applicable hereunder without regard to this clause (A), and (B) in the case of clause (ii) above, the Borrower shall pay to such Lender, within ten (10) days after receipt of written demand therefor such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its reasonable discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding upon all parties hereto).

44

(b)     If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(i) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(i) have not arisen but either (x) any applicable interest rate specified herein is no longer a widely recognized benchmark rate for newly originated loans in the syndicated loan market in the United States or (y) the applicable supervisor or administrator (if any) of any applicable interest rate specified herein or any Governmental Authority having, or purporting to have, jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which any applicable interest rate specified herein shall no longer be used for determining interest rates for loans in the syndicated loan market in the United States, then the Administrative Agent shall establish an alternate rate of interest to the Eurodollar Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and the Administrative Agent and the Borrower shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but, for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin). Notwithstanding anything to the contrary in Section 12.01 , such amendment shall become effective without any further action or consent of any other party to this Agreement.

(c)     If, after the later of the date hereof and the date such entity becomes a Lender hereunder, the adoption of any Applicable Law regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by a Lender or its parent with any request or directive made or adopted after such date regarding capital adequacy (whether or not having the force of law) of any such authority, association, central bank or comparable agency, has the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration such Lender's or its parent's policies with respect to capital adequacy), then within ten (10) days after receipt of written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any such Applicable Law as in effect on the date hereof. Each Lender (on its own behalf), upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c) , will, as promptly as practicable upon ascertaining knowledge thereof, give written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts. Without limiting Section 2.10(e) below, the failure to give any such notice with respect to a particular event shall not release or diminish any of the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) for amounts accrued or incurred after the date of such notice with respect to such event. Notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, orders, requests, guidelines or directives in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, in each case, are deemed to have been adopted and to have taken effect after the Closing Date.

45

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(d)     In the event that any change in market conditions or any Change in Law shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain its portion of the Loans at the Eurodollar Rate or to continue such maintaining, or to determine or charge interest rates at the Eurodollar Rate, such Lender shall give notice of such changed circumstances to Administrative Agent and Borrower and Administrative Agent shall promptly transmit such notice to each other Lender and in the case of the portion of the Loans at the Eurodollar Rate of such Lender that is outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such portion of the Loans, interest upon the portion of the Loans of such Lender thereafter shall accrue at a rate equal to the Base Rate plus 8.0% per annum ( provided that in lieu of the foregoing rate change, Borrower and such Lender may agree upon a different method of calculating interest) until such time as such Lender notifies Borrower and the Administrative Agent that the circumstances giving rise to such notice by such Borrower no longer exist (which notice such Lender agrees to promptly give at such time when such circumstances no longer exist), at which time interest with respect to the Loans of such Lender shall revert to the rate applicable hereunder without regard to this Section 2.10(d) .

(e)     This Section 2.10 shall not apply to Taxes to the extent duplicative of Section 4.03(b). In addition, this Section 2.10 shall not apply to any demand made after the 180th day following the requesting Lender's knowledge that it would be entitled to any such amounts.

SECTION 2.11     Compensation . If (a) any payment of principal of a Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Loan as a result of a payment pursuant to Sections 2.05 , 2.09 , 4.01 or 4.02 , as a result of acceleration of the maturity of the Loans pursuant to Article X or for any other reason, or (b) any prepayment of principal of a Loan is not made as a result of a withdrawn notice of prepayment pursuant to Sections 4.01 or 4.02 , the Borrower shall, after receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses (including, without limitation, any Eurodollar Rate related breakage costs) that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue, failure to prepay, reduction or failure to reduce, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund or maintain such Loan

SECTION 2.12     Defaulting Lender .

(a)     Notwithstanding anything to the contrary contained herein, in the event any Lender is a Defaulting Lender, all rights and obligations hereunder of such Defaulting Lender and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.12 so long as such Lender is a Defaulting Lender.

46

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)     (i)     Except as otherwise expressly provided for in this Section 2.12 , Loans shall be made pro rata from Lenders holding Commitments which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Loans required to be advanced by any Lender shall be increased as a result of any Lender being a Defaulting Lender. Amounts received in respect of principal of any type of Loans shall be applied to reduce such type of Loans of each Lender (other than any Defaulting Lender) holding a Commitment in accordance with their Commitment Percentages; provided, that, the Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments received by the Administrative Agent for Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees). Amounts payable to a Defaulting Lender shall instead be paid to or retained by the Administrative Agent. The Administrative Agent may hold and, in its discretion, re-lend to a Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender.

(ii)     Fees pursuant to Section 3.01 hereof shall cease to accrue in favor of such Defaulting Lender.

(c)     A Defaulting Lender shall not be entitled to give instructions to the Administrative Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement or the other Credit Documents, and all amendments, waivers and other modifications of this Agreement or the other Credit may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall not be deemed to be a Lender, to have any outstanding Loans or a Commitment Percentage; provided, that this clause (c) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification described in clauses (i) or (iii) of Section 12.01 .

(d)     Other than as expressly set forth in this Section 2.12 , the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agents) and the other parties hereto shall remain unchanged. Nothing in this Section 2.12 shall be deemed to release any Defaulting Lender from its obligations under this Agreement or the other Credit Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, any Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)     In the event that the Administrative Agent and Borrower agree in writing that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Administrative Agent will so notify the parties hereto.

(f)     If any Lender is a Defaulting Lender, Borrower may, within ninety (90) days of such Lender becoming a Defaulting Lender, by notice in writing to the Administrative Agent and such Defaulting Lender (i) request the Defaulting Lender to cooperate with Borrower in obtaining a replacement Lender satisfactory to the Administrative Agent and Borrower (the " *Replacement Lender* "); (ii) request the Non- Defaulting Lenders to acquire and assume all of the Defaulting Lender's Loans and its Commitment Percentage as provided herein, but none of such Lenders shall be under any obligation to do so; or (iii) propose a Replacement Lender subject to approval by the Administrative Agent in its good faith business judgment. If any satisfactory Replacement Lender shall be obtained, and/or if any one or more of the Non- Defaulting Lenders shall agree to acquire and assume all of the Defaulting Lender's or the other Credit Loans and its Commitment Percentage, then such Defaulting Lender shall assign, in accordance with Section 12.01 hereof, all of its Loans and its Commitment Percentage and other rights and obligations under this Agreement and the other Credit Documents to such Replacement Lender or Non- Defaulting Lenders, as the case may be, in exchange for payment of the principal amount so assigned and all interest and fees accrued on the amount so assigned, plus all other Obligations then due and payable to the Defaulting Lender.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

## ARTICLE III
## Fees and Commitment Terminations

SECTION 3.01   Fees .

(a)     The Borrower shall pay to the Administrative Agent for its own account an annual, non-proratable administration fee in the amount of $80,000, which fee shall be payable in quarterly installments of $20,000, the first such installment to be paid on the Closing Date and, thereafter, on the first Business Day of each April, July, October and January of each year, commencing on April 1, 2019, until such time as the Obligations have been repaid in full.

(b)     The Borrower shall pay to the Administrative Agent, for the account of each Lender holding an unfunded Commitment, an unused fee equal to one percent (1%) per annum of such unfunded Commitment on the first Business Day of each calendar month from and after the Closing Date until such time as the Obligations have been repaid in full.

(c)     Upon repayment in full of the Obligations (not including that portion of the Obligations constituting the Exit Fee), the Borrower agrees to pay to the Administrative Agent, for the account of each Lender that holds a Loan on the date of such repayment, the Exit Fee, whether such payment is made before or after an Event of Default or an acceleration of all or any part of the Obligations, and all such Exit Fees shall be characterized as additional interest for all purposes hereunder.

(d)     In connection with the Loans funded on the Closing Date and on each Funding Date thereafter, Borrower agrees that the funded amount of such Loans to be remitted to Borrower shall be reduced by an original issue discount of (i) with respect to the Loans funded on the Closing Date, (x) three-quarters of one percent (0.75%) of the stated principal amount of such Loans and (y) one and one-quarter percent (1.25%) of the stated principal amount of the Commitment (regardless of whether such Commitment is funded or unfunded as of the Closing Date), and (ii) with respect to the Loans funded on each Funding Date thereafter, three-quarters of one percent (0.75%) of the stated principal amount of such Loan (collectively, the " *OID* "), which OID shall be fully earned and retained by the Administrative Agent, for the benefit of the Lenders, provided , that, notwithstanding such deduction from the funded amount of the Loans, Borrower remains liable to pay (i) the full principal amount of such Loans (inclusive of such OID), without giving effect to such deduction, which shall be due and payable in full, if not earlier in accordance with this Agreement, on the Maturity Date and (ii) accrued interest on the full outstanding principal amount of such Loans (inclusive of such OID), without giving effect to such deduction.

SECTION 3.02   Mandatory Reduction of Commitments . The Commitment shall be permanently reduced by the amount of each Loan made on the Closing Date and on each Funding Date thereafter.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

# ARTICLE IV
## Payments

SECTION 4.01    Voluntary Prepayments . The Borrower shall have the right to prepay the outstanding remaining balance of the Loans in whole or in part on the following terms and conditions: (i) the Borrower shall give the Administrative Agent written notice of (A) its intent to make such prepayment and (B) the amount of such prepayment, no later than 1:00 p.m. EST five (5)      Business Days prior thereto, and shall promptly be transmitted by the Administrative Agent to each of the relevant Lenders, as the case may be; (ii) prepayment of Loans pursuant to this Section 4.01 on any day other than the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of Section 2.10 ; (iii) each such prepayment shall be in an amount at least equal to $1,000,000, or, if less, the entire principal amount then outstanding; and (iv) such prepayment shall be accompanied by a payment of the Exit Fee, if applicable.

SECTION 4.02    Mandatory Prepayments .

    (a)    Types of Mandatory Prepayments .

    (i)    Within one (1) Business Day of the receipt by any Credit Party or any of its Subsidiaries of any proceeds from the incurrence of any Indebtedness by any Credit Party or any of its Subsidiaries (other than Indebtedness permitted under Section 9.01 ), the Borrower shall prepay the Loans in an amount equal to one hundred percent (100%) of such Net Debt Proceeds, to be applied as set forth in Section 4.02(c) . Nothing in this Section 4.02(a)(i) shall be construed to permit or waive any Default or Event of Default arising from any incurrence of Indebtedness not permitted under the terms of this Agreement.

    (ii)    Within one (1) Business Day of the receipt by any Credit Party or any of its Subsidiaries of any Net Disposition Proceeds from any Disposition (other than any Disposition permitted under Section 9.04(d) , Section 9.04(h) or Section 9.04(n )) the Borrower shall prepay the Loans in an amount equal to one hundred percent (100%) of the Net Disposition Proceeds from such Disposition, to be applied as set forth in Section 4.02(c) . Nothing in this Section 4.02(a)(ii) shall be construed to permit or waive any Default or Event of Default arising from any Disposition not permitted under the terms of this Agreement.

    (iii)    Within three (3) Business Days of the receipt by any Credit Party or any of its Subsidiaries of any Net Casualty Proceeds from any Casualty Event, the Borrower shall prepay the Loans in an amount equal to one hundred percent (100%) of such Net Casualty Proceeds, to be applied as set forth in Section 4.02(c) ; provided that the Borrower may, at its option by notice in writing to the Administrative Agent no later than thirty (30) days following the occurrence of the Casualty Event resulting in such Net Casualty Proceeds, apply such Net Casualty Proceeds to the rebuilding or replacement of such damaged, destroyed or condemned assets or property so long as such Net Casualty Proceeds are in fact used to commence the rebuilding or replacement of the damaged, destroyed or condemned assets or property within ninety (90) days following the receipt of such Net Casualty Proceeds, with the amount of Net Casualty Proceeds unused after such period to be applied as set forth in Section 4.02(c) . Nothing in this Section 4.02(a)(iii) shall be construed to permit or waive any Default or Event of Default arising from, directly or indirectly, any Casualty Event.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(iv)    Within one (1) Business Day of the receipt by any Credit Party or any of its Subsidiaries of any Net Equity Proceeds from the issuance of any Capital Stock (other than Excluded Issuances) that results in Net Equity Proceeds exceeding $2,000,000 in the aggregate during the term of this Agreement (the " *Equity Sweep Amount* "), the Borrower shall prepay the Loans in an amount equal to one hundred percent (100%) of such Net Equity Proceeds, to be applied as set forth in Section 4.02(c) ; provided , that , if a Default or Event of Default shall have occurred and be continuing at the time such proceeds are received, the Equity Sweep Amount shall be deemed to equal $0. Nothing in this Section 4.02(a)(iv) shall be construed to permit or waive any Default or Event of Default arising, directly or indirectly, from any such issuance of Capital Stock.

(v)    Within three (3) Business Days of the receipt by any Credit Party or any of its Subsidiaries of any proceeds from any Extraordinary Receipts in an amount exceeding $1,000,000 (the " *Extraordinary Receipts Sweep Amount* "), the Borrower shall prepay the Loans in an amount equal to one hundred percent (100%) of such Extraordinary Receipts, to be applied as set forth in Section 4.02(c) ; provided , that , if a Default or Event of Default shall have occurred and be continuing at the time such proceeds are received, the Extraordinary Receipts Sweep Amount shall be deemed to equal $0. Nothing in this Section 4.02(a)(v) shall be construed to permit or waive any Default or Event of Default arising, directly or indirectly, from any event or circumstance giving rise to any Extraordinary Receipts.

(vi)    Immediately upon any acceleration of the Maturity Date of any Loans pursuant to Section 10.02 , the Borrower shall repay all the Loans, unless only a portion of all the Loans is so accelerated (in which case the portion so accelerated shall be repaid).

(b)    Notice and Option to Decline Prepayment . The Borrower shall provide the Administrative Agent with at least three (3) Business Days prior written notice, by 12:00 EST, of any prepayments under Section 4.02(a) . Notwithstanding anything to the contrary herein, any mandatory prepayment pursuant to Section 4.02(a) may be declined in whole or in part by any Lender without prejudice to such Lender's rights hereunder to accept or decline any future payments in respect of any mandatory prepayment, provided such Lender provides written notice to the Administrative Agent of its intent to decline any prepayment, which such notice must be received by 2:00 p.m. EST one (1) Business Day prior to the projected prepayment date. Any Lender that does not provide notice by that time shall be deemed to have accepted the prepayment. If a Lender chooses not to accept payment in respect of a mandatory prepayment, in whole or in part, the other Lenders that accept such mandatory prepayment shall have the option to share such proceeds on a pro rata basis (and if declined by all Lenders, such declined proceeds shall be retained by the Borrower).

(c)    Application of Payments . With respect to each prepayment of the Loans required by Section 4.02(a) , the amounts prepaid shall be applied, so long as no Application Event shall have occurred and be continuing, first to pay any fees and expenses of the Agents and the Lenders under the Credit Documents until paid in full (other than the Exit Fee), second to any accrued and unpaid interest on the Loans until paid in full, third to the outstanding principal on the Loan until the Loans are paid in full and thereafter to the Exit Fee; provided that Borrower shall pay any amounts, if any, required to be paid pursuant to Section 2.10 with respect to prepayments of Loans made on any date other than the last day of the applicable Interest Period.

50

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(d)        Application of Collateral Proceeds . Notwithstanding anything to the contrary in Section 4.01 or this Section 4.02 , all proceeds of Collateral received by the Collateral Agent or any other Person pursuant to the exercise of remedies against the Collateral, and all payments received upon and after the acceleration of any of the Obligations (an " *Application Event* ") shall be applied as follows (subject to adjustments pursuant to any agreements entered into among the Lenders):

(i)        first , to pay any costs and expenses of the Agents (in their respective capacity as Agent) and fees then due to the Agents (in their respective capacity as Agent) under the Credit Documents, including any indemnities then due to any Agents (in their respective capacity as Agent) under the Credit Documents, until paid in full,

(ii)        second , to pay any fees and premiums then due to the Agents (in their respective capacity as Agent) under the Credit Documents until paid in full,

(iii)        third , ratably to pay any costs, expense reimbursements, fees (other than the Exit Fee) or premiums of Lenders and indemnities then due to any of the Lenders under the Credit Documents until paid in full,

(iv)        fourth , ratably to pay interest due in respect of the outstanding Loans until paid in full (other than any Paid in Kind Interest which has been added to the principal amount of Loans),

(v)        fifth , ratably to pay the outstanding principal balance of the Loans in the inverse order of maturity until the Loans are paid in full,

(vi)        sixth , to pay any other Obligations,

(vii)        seventh , to pay the Exit Fee, if applicable; and

(viii)        eighth , to Borrower or such other Person entitled thereto under Applicable Law.

SECTION 4.03    Payment of Obligations; Method and Place of Payment .

(a)        The obligations of each Credit Party hereunder and under each other Credit Document are not subject to counterclaim, set-off, rights of rescission, or any other defense. Subject to Section 4.03(b) , and except as otherwise specifically provided herein, all payments under any Credit Document shall be made by the Borrower, without set-off, rights of rescission, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Secured Parties entitled thereto, not later than 12:00 p.m. EST on the date when due and shall be made in immediately available funds in Dollars to the Administrative Agent. The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 12:00 p.m. EST, on such day) like funds relating to the payment of principal or interest or Fees ratably to the Secured Parties entitled thereto.

51

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)      For purposes of computing interest or fees, any payments under this Agreement that are made later than 12:00 p.m. EST, may, in the Administrative Agent's discretion, be deemed to have been made on the next succeeding Business Day. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall continue to accrue during such extension at the applicable rate in effect immediately prior to such extension.

(c)      The Borrower shall make each payment under any Credit Document by wire transfer to such deposit account as the Administrative Agent shall notify the Borrower in writing from time to time within a reasonable time prior to such payment.

SECTION 4.04    Taxes .

(a)      Any and all payments by or on account of any obligation of any Credit Party under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law. If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 4.04 ) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      The Credit Parties shall timely pay, and shall authorize the Administrative Agent to pay in their name, to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes. Within 30 days after the date of any payment of Taxes or Other Taxes by any Credit Party, the Credit Parties shall furnish to Agent, at its address referred to in Section 12.02 , the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to the Administrative Agent.

(c)      The Credit Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 4.04 ) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(d)        Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.06(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 4.04(d) .

(e)        As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 4.04 , such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)        Status of Lenders .

(i)        Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to Borrower and the Administrative Agent, at the time or times reasonably requested by Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrower or the Administrative Agent as will enable Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 4.04(f)(ii)(A) , (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)       Without limiting the generality of the foregoing,

(A)        any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

53

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code in customary form consistent with the Model Credit Agreement Provisions of the Loan Syndications and Trading Association (a " *U.S. Tax Compliance Certificate* ") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

54

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(D)      if a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)      If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 4.04 (including by the payment of additional amounts pursuant to this Section 4.04 ), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 4.04 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 4.04(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 4.04(g) , in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 4.04(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person

(h)      (i) All amounts set out or expressed to be payable under a Credit Document by any party to any Lender or Agent which (in whole or in part) constitute the consideration for a supply or supplies for VAT purposes are deemed to be exclusive of any VAT which is chargeable on such supply or supplies, and accordingly, subject to clause (ii) below, if VAT is or becomes chargeable on any supply made by any Lender or Agent to any party under a Credit Document and such Lender or Agent is required to account to the relevant tax authority for the VAT, that party shall pay to the Lender or Agent, as the case may be, (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of such VAT.

55

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(ii)    If VAT is or becomes chargeable on any supply made by any Lender or Agent (the " *Supplier* ") to any other Lender or Agent (the " *Receiver* ") under a Credit Document, and any party other than the Receiver (the " *Relevant Party* ") is required by the terms of a Credit Document to pay an amount equal to the consideration for such supply to the Supplier (rather than being required to reimburse the Receiver in respect of that consideration),

(A)    (where the Supplier is the person required to account to the relevant tax authority for the VAT), the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of VAT; the Receiver must (where this subsection (ii)(A) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Receiver receives from the relevant tax authority which the Receiver reasonably determines relates to the VAT chargeable on that supply; and

(B)    (where the Receiver is the person required to account to the relevant tax authority for the VAT), the Relevant Party must promptly, following demand from the Receiver, pay to the Receiver an amount equal to the VAT chargeable on that supply but only to the extent that the Receiver reasonably determines that is is not entitled to credit or repayment from the relevant Tax authority in respect of that VAT.

(iii)    Where a Credit Document require any party to reimburse or indemnify a Lender or Agent for any cost or expense, the party shall reimburse or indemnify (as the case may be) the Lender or Agent for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that the Lender or Agent determines that it is entitled to credit or repayment in respect of such VAT from the relevant Tax authority.

(iv)    Any reference in this Section 4.04(h) to any party shall, at any time when such party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to a person under the grouping rules as defined in the EC Council Directive 2006/112 or any notional legislation implementing that Directive.

(v)    In relation to any supply made by a Lender or Agent to any party under a Credit Document, if reasonably requested by such Lender or Agent, that party must promptly provide such Lender or Agent with details of that party's VAT registration and such other information as is reasonably requested in connection with such Lender's or Agent's, as the case may be, VAT reporting requirements in relation to such supply.

(i)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 4.04 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and the Administrative Agent in writing of its legal inability to do so.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(j)      Each party's obligations under this Section 4.04 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all obligations under any Credit Document.

SECTION 4.05    Computations of Interest and Fees . All interest and fees shall be computed on the basis of the actual number of days occurring during the period for which such interest or fee is payable over a year comprised of 360 days. Payments due on a day that is not a Business Day shall (except as otherwise required by) be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

**ARTICLE V**
**Conditions Precedent to Loans**

SECTION 5.01    Closing Date Loan . The obligation of each Lender to make the Loans on the Closing Date as provided for hereunder is subject to the fulfillment, to the satisfaction of the Agents and each Lender, of each of the following conditions precedent on or before the Closing Date, unless any such condition is waived in accordance with Section 12.01 :

(a)      Credit Documents . The Administrative Agent shall have received the following documents, duly executed by an Authorized Officer of each applicable Credit Party and each other relevant party:

(i)      this Agreement;

(ii)      the Notes;

(iii)      the Security Documents; and

(iv)      each other Credit Document.

(b)      Collateral .

(i)      All Capital Stock of each Credit Party (other than Borrower) shall have been pledged pursuant to the Security Documents and the Collateral Agent shall have received all certificates, if any, representing such securities pledged under the Security Documents, accompanied by instruments of transfer and undated stock powers endorsed in blank.

(ii)      All Indebtedness owed to any of the Credit Parties (other than any Indebtedness of another Credit Party) which, in the aggregate, exceeds $50,000 that is evidenced by one or more promissory notes shall have been pledged pursuant to the Security Documents, and the Collateral Agent shall have received original executed versions of all such promissory notes, together with instruments of transfer with respect thereto endorsed in blank.

57

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(iii)    The Collateral Agent shall have received the results of a search of the UCC filings (or equivalent filings), in addition to tax Lien, judgment Lien, bankruptcy and litigation searches made with respect to each Credit Party, together with copies of the financing statements and other filings (or similar documents) disclosed by such searches, and accompanied by evidence satisfactory to the Collateral Agent that the Liens indicated in any such financing statement and other filings (or similar document) are Permitted Liens or have been released or will be released substantially simultaneously with the making of the Loans hereunder.

(iv)    The Collateral Agent shall have received evidence, in form and substance satisfactory to the Collateral Agent, that appropriate UCC (or equivalent) financing statements (including fixture filings) have been duly filed in such office or offices as may be necessary or, in the opinion of Collateral Agent, desirable, to perfect the Collateral Agent's Liens in and to the Collateral and certified searches reflecting the filing of all such financing statements.

(c)    Legal Opinions . The Administrative Agent shall have received executed legal opinion of (i) Sichenzia Ross Ference LLP, U.S. counsel to the Credit Parties; (ii) CMS Netherlands, Dutch counsel to the Credit Parties; (iii) CMS Cameron McKenna Nabarro Olswang LLP, English counsel to the Credit Parties; (iv) [reserved]; (vi) CMS DeBacker, Belgian counsel to the Credit Parties; Bird & Bird LLP, English counsel to the Agent in respect of enforceability and (vii) such other local counsel opinions as the Administrative Agent shall reasonably request, which opinions shall be addressed to the Administrative Agent and the Lenders and shall be in form and substance reasonably satisfactory to the Administrative Agent.

(d)    Secretary's Certificates . The Administrative Agent shall have received a certificate for each Credit Party, dated the Closing Date, duly executed and delivered by such Credit Party's secretary or assistant secretary, managing director ( *directeur* or *bestuurder* ), managing directors ( *Geschäftsführer* ), managing member or general partner, as applicable, as to:

(i)    resolutions of each such Person's board of managers/directors (or other managing body, in the case of a Person that is not a corporation, or shareholders in case of Interactive) then in full force and effect expressly and specifically authorizing, to the extent relevant, all aspects of the Credit Documents applicable to such Person and the execution, delivery and performance of each Credit Document, in each case, to be executed by such Person;

(ii)    if applicable and with respect to the Netherlands Subsidiaries only, resolution of each such Netherlands Subsidiary's general meeting of shareholders then in full force and effect expressly and specifically authorizing, to the extent relevant, all aspects of the Credit Documents applicable to such Netherlands Subsidiary and the execution, delivery and performance of each Credit Document, in each case, to be executed by such Netherlands Subsidiary, including the execution of the deed of pledge over shares in the capital of such Netherlands Subsidiary;

(iii)    if applicable and with respect to the Netherlands Subsidiaries only, a copy of the unconditional and positive advice of the works council of each Netherlands Subsidiary;

58

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(iv)    the incumbency and signatures of its Authorized Officers and any other of its officers, managing member or general partner, as applicable, authorized to act with respect to each Credit Document to be executed by such Person and a list of all officers and directors of the Credit Parties;

(v)    each such Person's Organization Documents, as amended, modified or supplemented as of Closing Date, certified by the appropriate officer or official body of the jurisdiction of organization of such Person; and

(vi)    with respect to Interactive only, Interactive's shareholder list, excerpt from the commercial register and other organizational documents applicable to it as well as assurances in relation to the following facts in form and substance satisfactory to the Administrative Agent:

(A)    no Insolvency Event occurred as of the date of signing the German Security Documents

(B)    the centre of interest of Interactive is in Germany (for the purposes of the Insolvency Regulation); and

(C)    no supervisory board ( *Aufsichtsrat* ) for the Interactive exists;

which certificates shall provide that each Secured Party may conclusively rely thereon until it shall have received a further certificate of the secretary, assistant secretary, managing director ( *directeur* or *bestuurder* ), managing director ( *Geschäftsführer* ), managing member or general partner, as applicable, of any such Person canceling or amending the prior certificate of such Person as provided in Section 8.01(k) .

(e)    Other Documents and Certificates . The Administrative Agent shall have received originals of the following documents and certificates, each of which shall be dated the Closing Date and duly executed by an Authorized Officer of each applicable Credit Party, in form and substance reasonably satisfactory to the Administrative Agent:

(i)    a certificate of an Authorized Officer of the Borrower, certifying as to such items as reasonably requested by the Collateral Agent, including without limitation:

(A)    the receipt of all required approvals and consents of all Governmental Authorities and other third parties, if applicable, with respect to the consummation of the Transactions and the operation of the Credit Parties' business, each of which shall be attached thereto and certified as being true, complete and correct copies thereof;

(B)    both before and after giving effect to Transactions, including the borrowing of the Loans on the Closing Date, (A) no Default or Event of Default shall have occurred, (B) no default or event of default under any Material Contract by Borrower or its Subsidiaries shall have occurred and (C) each Material Contract remains in full force and effect and no Credit Party or Subsidiary has received any notice of termination or non-renewal from the other party thereto; and

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(C)     the representations and warranties set forth in Article VII are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof);

(ii)     a Perfection Certificate of each Credit Party;

(iii)     (A) certificates of good standing (or the local equivalent thereof, if applicable) with respect to each Credit Party, each dated within a recent date prior to the Closing Date, such certificates to be issued by the appropriate officer or official body of the jurisdiction of organization of such Credit Party, which certificate shall indicate that such Credit Party is in good standing in such jurisdiction, and (B) certificates of good standing (or the local equivalent thereof, if applicable) with respect to each Credit Party, each dated within a recent date prior to the Closing Date, such certificates to be issued by the appropriate officer of the jurisdictions where such Credit Party is qualified to do business as a foreign entity, which certificate shall indicate that such Credit Party is in good standing in such jurisdictions;

(iv)     a certificate detailing the planned distribution of proceeds from the Loans and a funds flow memorandum detailing the sources and uses of the Transactions; and

(v)     an executed Funding Request delivered in accordance with Section 2.07 .

(f)     Solvency . The Administrative Agent shall be reasonably satisfied, based on financial statements (actual and pro forma), projections and other evidence provided by Credit Parties, or requested by the Administrative Agent, that Borrower and its Subsidiaries (on a consolidated basis), after incurring the Loans, will be Solvent and the Administrative Agent shall have received and shall be reasonably satisfied with a Solvency Certificate of an Authorized Officer of the Borrower, on behalf of the Credit Parties, confirming the Solvency of the Credit Parties and their Subsidiaries (on a consolidated basis) after giving effect to the Transactions.

(g)     Financial Information . The Administrative Agent shall have received a certificate in form and substance satisfactory to it, dated the Closing Date and properly executed by an Authorized Officer of the Borrower and the Borrower, attaching the following documents and reports (each in form and substance reasonably satisfactory to the Collateral Agent):

(i)     the Historical Financial Statements; and

(ii)     the financial projections of the Consolidated Companies for each fiscal year of the Consolidated Companies during the period from the Closing Date through the Maturity Date along with a pro forma balance sheet of the Consolidated Companies giving effect to the Transactions (including actual results for the twelve months prior to the Closing Date).

The documents and reports delivered pursuant to clause (i) above shall be certified by such Authorized Officer to be true, complete and correct in all material respects as of the Closing Date and the documents and reports delivered pursuant to clause (ii) above shall be certified in a manner consistent with the representations and warranties set forth in Section 7.08 .

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(h)      The Collateral Agent shall have received a certificate of insurance, together with the endorsements thereto, (or with respect to insurance policies governed by German law, the respective insurance certificate or confirmation ( *Sicherungsschein/-bestätigung* ) naming the Collateral Agent as an additional insured on behalf of the Lenders and loss payee as to casualty insurance, in each case, as to the insurance required by Section 8.03 , in form and substance reasonably satisfactory to Administrative Agent.

(i)      Payment of Outstanding Indebtedness . (a) On the Closing Date, the Credit Parties and each of their respective Subsidiaries shall have no outstanding Indebtedness other than the Loans hereunder and the Indebtedness (if any) listed on Schedule 7.24 or otherwise permitted by Section 9.01 , and the Administrative Agent shall have received copies of all documentation and instruments evidencing the discharge of all Indebtedness paid off in connection with the Transactions and the transactions contemplated by this Agreement, and (b) all Liens (other than Permitted Liens) securing payment of any such Indebtedness shall have been released and the Administrative Agent shall have received pay-off letters, all form UCC-3 termination statements, all releases or terminations of intellectual property security agreements and other instruments as may be reasonably requested by Administrative Agent in connection therewith.

(j)      Material Adverse Effect . The Administrative Agent shall have determined that, both immediately before and immediately after giving effect to the Transactions, except as disclosed in the Borrower's Form 10-K filed with the SEC for the fiscal year ending December 31, 2017 and the Borrower's Form 10-Q filed with the SEC for each of the fiscal quarters ending March 30, 2018, June 30, 2018 and September 30, 2018 and any Form 8-K filed by the Borrower with the SEC since September 30, 2018 though the Business Day prior to the Closing Date, no Material Adverse Effect has occurred since December 31, 2017.

(k)      Fees and Expenses . Each of Post Road, the Agents and each Lender shall have received, for its own respective account, (i) all fees and expenses due and payable to such Person hereunder, and (ii) the reasonable and documented fees, costs and expenses due and payable to such Person pursuant Sections 3.01 and 12.05 (including the reasonable fees, disbursements and other charges of counsel) for which invoices have been presented prior to the Closing Date.

(l)      Patriot Act Compliance and Reference Checks . The Administrative Agent shall have received completed reference checks with respect to each Credit Party's senior management, and any required Patriot Act compliance, the results of which are satisfactory to Administrative Agent in its sole discretion which shall include, for the avoidance of doubt, a duly executed IRS Form W-9 and W-8 BENE.

(m)      Due Diligence . The Administrative Agent shall have completed and be reasonably satisfied its business, legal, and collateral due diligence on Borrower and its Subsidiaries, including (i) corporate, capital and legal structure of Borrower and its Subsidiaries; (ii)      securities, labor, insurance, tax, litigation and environmental matters; (iii) review of all third party reports; and (iv) an independent quality of earnings report, third party accounting review, and the results of Borrower's pipeline and backlog.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(n)     Material Contracts . The Administrative Agent shall have received copies of each Material Contract (if written), and the results of the Administrative Agent's review thereof shall be reasonably satisfactory to Administrative Agent.

(o)     No Default, Representations and Warranties and No Injunctions .

(i)     No Default or Event of Default shall have occurred and be continuing;

(ii)     all representations and warranties made by each Credit Party contained herein or in the other Credit Documents shall be true and correct, in each case, with the same effect as though such representations and warranties had been made on and as of the Closing Date (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all respects as of such earlier date); and

(iii)     no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the Transactions shall have been issued and remain in force by any Governmental Authority against any Credit Party, any Agent or any Lender.

(p)     No Adverse Actions . There shall be no order or injunction or pending litigation in which there is a reasonable possibility of a decision that could reasonably be expected to have a Material Adverse Effect on the Borrower or Pareteum Europe and its Subsidiaries, taken as a whole, and no pending litigation seeking to prohibit, enjoin or prevent any of the Transactions.

(q)     Loan Amount . The aggregate principal amount of Loans funded on the Closing Date shall be $25,000,000.

(r)     Closing Date Lender Shares . The Borrower shall have issued the Closing Date Lender Shares, and the Administrative Agent shall have received an executed irrevocable instruction letter to the Borrower's transfer agent, in form and substance acceptable to the Administrative Agent, providing for the issuance of the Closing Date Lender Shares, in each case to the Lenders, with each Lender being issued a number of Closing Date Lender Shares proportionate to the aggregate principal amount of the Loans funded by each such Lender on the Closing Date as a percentage of the principal amount of all Loans funded by all Lenders on the Closing Date, with such adjustments to reflect rounding or other adjustments as the Administrative Agent may agree.

(s)     Closing Date Transactions . The following transactions shall have been consummated (or shall be consummated substantially concurrently with the initial borrowings hereunder on the Closing Date) and the Administrative Agent shall have received definitive documentation, in form and substance acceptable to the Administrative Agent, evidencing such transactions:

(i)     the iPass Acquisition

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(ii)    the iPass-TBR Merger; and

(iii)    the Fortress Debt Repayment.

SECTION 5.02    Loans Made after Closing Date . The obligation of each Lender to make the Loans on each Funding Date as provided for hereunder is subject to the fulfillment, to the satisfaction of the Agents and each Lender, of each of the following conditions precedent on or before such Funding Date, unless any such condition is waived in accordance with Section 12.01:

(a)    Funding Date and Loan Amounts . Each Funding Date shall occur on or before the eighteen (18) month anniversary of the Closing Date; provided , however , that no Funding Date shall occur until the latest to occur of: (i) delivery of the [***] Consent and Acknowledgement to the Administrative Agent in accordance with Section 8.17 ; (ii) the filing of the Borrower's Form 10-Q with the SEC for the fiscal quarter ending March 30, 2019; or (iii) June 1, 2019. The aggregate principal amount of Loans made on each Funding Date (i) shall be no less than $5,000,000; and (ii) shall, when aggregated with the original principal amount of all other Loans funded hereunder (without giving effect to any Paid in Kind Interest), not be more than the Aggregate Commitment. Notwithstanding anything set forth herein to the contrary, no Funding Date shall occur within thirty (30) days of any other Funding Date.

(b)    Documents and Certificates . The Administrative Agent shall have received originals of the following documents and certificates, each of which shall be dated as of the applicable Funding Date and duly executed by an Authorized Officer of each applicable Credit Party, in form and substance reasonably satisfactory to the Administrative Agent:

(i)    an executed Funding Request delivered in accordance with Section 2.07 ;

(ii)    a certificate of an Authorized Officer of Borrower, certifying as to such items as reasonably requested by the Collateral Agent, including without limitation:

(A)    both before and after giving effect to the borrowing of the Loans on such Funding Date, no Default or Event of Default shall have occurred;

(B)    the representations and warranties set forth in Article VII are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof); and

(C)    evidence that, after giving pro forma effect to the requested Loan, the Credit Parties shall be in compliance with the Financial Performance Covenants (and, during the continuation of a Consolidated Revenue Testing Period, the covenant set forth in Section 9.13(f) hereof);

(iii)    a certificate detailing the planned distribution of proceeds from the Loans and a funds flow memorandum detailing the sources and uses of the Transactions, each of which shall be acceptable to the Administrative Agent.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c)     Solvency . The Administrative Agent shall be reasonably satisfied, based on financial statements (actual and pro forma), projections and other evidence provided by Credit Parties, or requested by the Administrative Agent, that Borrower and its Subsidiaries (on a consolidated basis), after incurring the Loans, will be Solvent and the Administrative Agent shall have received and shall be reasonably satisfied with a Solvency Certificate of an Authorized Officer of Borrower, on behalf of the Credit Parties, confirming the Solvency of the Credit Parties and their Subsidiaries (on a consolidated basis) after giving effect to the Transactions.

(d)     Material Adverse Effect . The Administrative Agent shall have determined that, both immediately before and immediately after giving effect to the Transactions, except as disclosed in the Borrower's Form 10-K filed with the SEC for the fiscal year ending December 31, 2017 and the Borrower's Form 10-Q filed with the SEC for each of the fiscal quarters ending March 30, 2018, June 30, 2018 and September 30, 2018 and any Form 8-K filed by the Borrower with the SEC since September 30, 2018 though the Business Day prior to the Closing Date, no Material Adverse Effect has occurred since December 31, 2017.

(e)     Fees and Expenses . Each of the Agents and Lenders shall have received, for its own respective account, (i) all fees and expenses due and payable to such Person hereunder, and (ii) the reasonable and documented fees, costs and expenses due and payable to such Person pursuant Sections 3.01 and 12.05 (including the reasonable fees, disbursements and other charges of counsel) for which invoices have been presented prior to the Closing Date.

(f)     No Default, Representations and Warranties and No Injunctions .

(i)     No Default or Event of Default shall have occurred and be continuing;

(ii)     all representations and warranties made by each Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), in each case, with the same effect as though such representations and warranties had been made on and as of the Funding Date (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof));

(iii)     no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the Transactions shall have been issued and remain in force by any Governmental Authority against any Credit Party, any Agent or any Lender; and

(iv)     there shall be no order or injunction or pending litigation in which there is a reasonable possibility of a decision that could reasonably be expected to have a Material Adverse Effect on Borrower and its Subsidiaries, taken as a whole, and no pending litigation seeking to prohibit, enjoin or prevent the making of such Loan or the use of the proceeds thereof

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(g)     Additional Lender Shares . The Borrower shall have issued the Additional Lender Shares in accordance with Section 8.26 .

## ARTICLE VI
## Guarantee

SECTION 6.01    Guarantee . (a) To induce the Lenders to make the Loans and each other Secured Party to make credit available to or for the benefit of one or more Credit Parties, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably, guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Credit Document, of all the Obligations of the Borrower and of the other Guarantors whether existing on the date hereof or hereinafter incurred or created (the " *Guarantor Obligations* ", which in no event shall include any Excluded Hedging Obligations). The Guarantor Obligations shall include, without limitation, interest accruing at the then applicable rate provided herein after the maturity thereof and interest accruing at the then applicable rate provided herein after the commencement of any Insolvency Event relating to the Borrower or any other Credit Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with this Agreement or any other Credit Document, in each case whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including all fees and disbursements of counsel to the Agents or to the other Secured Parties that are required to be paid by the Borrower pursuant to the terms of any of the foregoing agreements) and all obligations and liabilities of such Guarantor that arise or may arise under or in connection with this Agreement or any other Credit Document to which such Guarantor is a party, in each case whether on account of guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including all fees and disbursements of counsel to the Secured Parties that are required to be paid by such Guarantor pursuant to the terms of any such Credit Document). Each Guarantor's guarantee hereunder constitutes a guarantee of payment and not of collection.

(b)    Any term or provision of this Agreement or any other Credit Document to the contrary notwithstanding, the maximum aggregate amount for which any Guarantor shall be liable under this Guarantee shall not exceed the maximum amount for which such Guarantor can be liable without rendering the obligations of such Guarantor under this Agreement or any other Credit Document, as it relates to such Guarantor, subject to avoidance under Applicable Laws relating to fraudulent conveyance or fraudulent transfer (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and Section 548 of title 11 of the United States Code or any applicable provisions of comparable Applicable Laws) (collectively, the " *Fraudulent Transfer Laws* "). Any analysis of the provisions of this Article VI for purposes of the Fraudulent Transfer Laws shall take into account the right of contribution established in Section 6.02 and, for purposes of such analysis, give effect to any discharge of intercompany debt as a result of any payment made under this Article VI.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c)       Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing this Guarantee or affecting the rights and remedies of any Secured Party hereunder.

(d)       This Guarantee shall remain in full force and effect until the Termination Date occurs, notwithstanding that from time to time during the term of this Agreement no Guarantor Obligations may be outstanding.

(e)       No payment made by the Borrower, any of the Guarantors, any other guarantor or any other Person or received or collected by any Secured Party from the Borrower, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder, and each Guarantor shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable for the Obligations up to the maximum liability of such Guarantor hereunder until the Termination Date occurs.

SECTION 6.02      Right of Contribution . Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 6.03. The provisions of this Section 6.02 shall in no respect limit the obligations and liabilities of any Guarantor to the Secured Parties, and each Guarantor shall remain liable to the Secured Parties for the full amount guaranteed by such Guarantor hereunder.

SECTION 6.03      No Subrogation . Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by any Secured Party, no Guarantor shall be entitled to be subrogated to any of the rights of any Secured Party against the Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by any Secured Party for the payment of the Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any other Guarantor in respect of payments made by such Guarantor under this Guarantee, until the Termination Date occurs. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time prior to the Termination Date, such amount shall be held by such Guarantor for the benefit of Secured Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Collateral Agent in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Collateral Agent, if required), to be applied against the Obligations, whether matured or unmatured, as the Collateral Agent may determine in accordance with Section 4.02(d) of this Agreement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 6.04    Modification of the Guarantor Obligations . Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Guarantor Obligations made by any Secured Party may be rescinded by such Secured Party and any of the Guarantor Obligations continued, and the Guarantor Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by any Secured Party, and this Agreement and the other Credit Documents, and any other documents executed and delivered in connection therewith may be amended, amended and restated, supplemented or otherwise modified or terminated, in whole or in part, as the Agents (or the Required Lenders or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by any Secured Party for the payment of the Guarantor Obligations may be sold, exchanged, waived, surrendered or released. No Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Guarantor Obligations or for this Agreement or any other Credit Document or any property subject thereto.

SECTION 6.05    Guarantee Absolute and Unconditional . Each Guarantor waives to the fullest extent permitted by Applicable Law any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by any Secured Party upon this Agreement or acceptance of the guarantee contained in this Article VI. The Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon this Article VI and all dealings between the Borrower and any of the Guarantors, on the one hand, and the Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon this Article VI. Each Guarantor, to the fullest extent permitted by Applicable Law, waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or any of the Guarantors with respect to the Obligations. Each Guarantor waives, to the fullest extent permitted by law, any right such Guarantor may now have or hereafter acquire to revoke, rescind, terminate or limit (except as expressly provided herein) the guarantee set forth in this Article VI or any of its obligations hereunder. Each Guarantor understands and agrees, to the fullest extent permitted by Applicable Law, that the guarantee set forth in this Article VI shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of this Agreement or any other Credit Document, any of the Guarantor Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by any Secured Party, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrower or any other Person against any Secured Party, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Borrower or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower with respect to any Obligations, or of such Guarantor under this guarantee, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, any Secured Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrower, any other Guarantor or any other Person or against any collateral security or guarantee for the Guarantor Obligations or any right of offset with respect thereto, and any failure by any Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of any Secured Party against any Guarantor. For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

67

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 6.06    Reinstatement . The guarantee set forth in this Article VI shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Guarantor Obligations is rescinded or must otherwise be restored or returned by any Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

SECTION 6.07    Payments . Each Guarantor hereby guarantees that payments hereunder will be paid to the Administrative Agent without set-off or counterclaim in Dollars in accordance with Section 4.03(c).

SECTION 6.08    Taxes . Each payment of the Guarantor Obligations will be made by each Guarantor subject to the same provisions as are set forth in Section 4.04 hereof.

SECTION 6.09    Limitation on Guarantee by German Guarantors .

(a)    Scope .

(i)    To the extent a German Guarantor guarantees the obligations or liabilities (including guarantees, letters of credit or similar instruments)of an affiliated company ( *verbundenes Unternehmen* ) within the meaning of section 15 of the German Stock Corporation Act ( *Aktiengesetz* ) (other than such German Guarantor's direct or indirect subsidiaries ( *Tochtergesellschaften* ) or of a direct or indirect minority shareholder of the German Guarantor within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* )), demanding payment under a Guaranty or the enforcement of a Guaranty in respect of such German Guarantor shall be limited as set out below.

(ii)    The restrictions set out in this Section 6.09 shall not apply to a German Guarantor to the extent that:

(A)    the Guaranty granted by such German Guarantor guarantees indebtedness of itself or any of its direct or indirect subsidiaries ( *Tochtergesellschaft* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* );

(B)    such German Guarantor secures any indebtedness under any documentation evidencing the Obligations in respect of (1) loans to the extent they are on- lent or otherwise passed on (directly or indirectly) to such German Guarantor or its subsidiaries ( *Tochtergesellschaften* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* ) or (2) bank guarantees or letters of credit ( *Avale* ) that are issued for the financial benefit of any of the creditors of such German Guarantor or its subsidiaries ( *Tochtergesellschaften* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* ) or any other benefit granted under documentation evidencing the Obligations, in each case, to the extent that any such on-lending or otherwise passing on or bank guarantees or letters of credit are still outstanding at the time of the enforcement of the Guaranty; for the avoidance of doubt, nothing in this Section 6.09(a)(ii) shall have the effect that such on-lent amounts may be enforced multiple times (no double dip); such indebtedness shall also be disregarded for the purpose of calculating the Net Assets (German) pursuant to Section 6.09(c) ;

68

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(C)     such German Guarantor does, at the time of payment under the Guaranty, hold a fully recoverable indemnity claim or claim for refund ( *vollwertiger Gegenleistungs- oder Rückgewähranspruch* ) against the relevant shareholder or against the affiliate whose obligations are secured by the relevant Guaranty; or

(D)     such German Guarantor as dominated company has entered into a profit transfer and/or domination agreement ( *Gewinnabführungs- und/oder Beherrschungsvertrag* ) according to section 291 of the German Stock Corporation Act ( *Aktiengesetz* ) (either directly or via a chain of profit transfer and/or domination agreements) with (i) an obligor whose obligations are guaranteed by a Guaranty as dominating company, provided that such German Guarantor is a subsidiary ( *Tochtergesellschaft* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* ) of such obligor, or (ii) a (direct or indirect) holding company as dominating company ( *beherrschendes Unternehmen* ), of both that German Guarantor and an obligor whose obligations are guaranteed by a Guaranty, provided that such German Guarantor is an affiliated company of such obligor, in each case to the extent the existence of such profit transfer and/or domination agreement ( *Gewinnabführungs- und/oder Beherrschungsvertrag* ) leads to the inapplicability of § 30 (1) sentence 1 of the German Limited Liabilities Company Act ( *GmbHG* ) and section 57 paragraph 1 of the German Stock Corporation Act ( *Aktiengesetz* ).

Section 6.09(a)(ii)(D) above shall not apply if such German Guarantor provides a final judgment ( *rechtskräftiges Urteil* ) of a Higher Regional Court ( *Oberlandesgericht* ) or a judgment of the Federal Court of Justice ( *Bundesgerichtshof* ) setting out that the mere existence of a profit transfer and/or domination agreement is no reason not to apply section 30 paragraph 1 of the German Limited Liabilities Companies Act ( *Gesetz betreffend die Gesellschaften mit beschränkter Haftung* ) ( *GmbHG* ) or section 57 paragraph 1 of the German Stock Corporation Act ( *Aktiengesetz* ) or at least as long relevant proceedings to get such a judgement are pending at a Higher Regional Court ( *Oberlandesgericht* ) or the Federal Court of Justice ( *Bundesgerichtshof* ).

(E)     if and to the extent such restrictions are at the time of enforcement of the Guaranty not required to prevent personal liability of the relevant German Guarantor's managing directors due to a breach of §§ 30 and 31 of the German Limited Liabilities Company Act ( *GmbHG* ) or other obligations to observe or act imposed by a Higher Regional Court ( *Oberlandesgericht* ) or the Federal Court of Justice ( *Bundesgerichtshof* ) or under § 826 German Civil Code ( *Bürgerliches Gesetzbuch* ).

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(iii)     Subject to paragraph (iv) below, all references in this Section 6.09 as to whether demanding payment under or enforcing of a Guaranty granted by a German Guarantor would lead to a Capital Impairment (as defined below) shall be construed as references to the time of such German Guarantor executing such Guaranty and granting such Guaranty provided that if after the date of this Agreement jurisprudence of the German Federal Court of Justice ( *Bundesgerichtshof* ) comes into force which holds that the relevant time for making the determination whether or not the granting of a guarantee, surety ( *Bürgschaft* ) or similar payment obligations pursuant to which a GmbH or a German stock corporation ( *Aktiengesellschaft* ) secures indebtedness of its direct or indirect shareholder(s) or of a subsidiary ( *Tochtergesellschaft* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* ) of such shareholder(s) has caused a violation of section 30 of the German Limited Liabilities Company Act ( *GmbHG* ) or section 57 of the German Stock Corporation Act ( *Aktiengesetz* ), respectively, is not the date of demanding payment under, or enforcement of, such guarantee, surety or similar payment obligations, but the date of granting the relevant guarantee, surety or similar payment obligation.

(iv)     If paragraph (iii) above is applicable, the determinations and calculations in the Management Determination and the Auditor's Determination (each as defined below) shall set out whether or not a Capital Impairment has occurred as a result of a German Guarantor executing a Guaranty and granting such Guaranty.

(b)     Capital Impairment . The parties to this Agreement agree that if the enforcement of any Guaranty would cause the amount of a German Guarantor's Net Assets (German), as calculated pursuant to of Section 6.09(c)(i) , to fall below the amount of its registered share capital ( *Stammkapital* ) ( *Begründung einer Unterbilanz* ) (or increase an existing shortage of its registered share capital ( *Vertiefung einer Unterbilanz* )) in violation of section 30 paragraph 1 of the German Limited Liabilities Company Act ( *GmbHG* ), (such event is hereinafter referred to as a " **Capital Impairment** "), then Administrative Agent and/or the Beneficiaries may demand payment under such Guaranty from such German Guarantor only to the extent such Capital Impairment would not occur and and the German Guarantor shall, have a defense ( *Einrede* ) against any claim under the Guaranty if and to the extent such Capital Impairment would occur.

(c)     Net Assets (German).

(i)     The calculation of net assets ( *Reinvermögen* ) of the German Guarantor (the " **Net Assets (German)** ") shall be determined in accordance with the principle of orderly bookkeeping ( *Grundsätze ordnungsmäßiger Buchführung* ) applicable from time to time in Germany applying the same accounting principles ( *Bilanzierungsgrundsätze* ) which have been consistently applied by the relevant German Guarantor in preparing its unconsolidated balance sheets ( *Jahresabschluss* ) (section 42 German Limited Liabilities Company Act ( *GmbHG* ), sections 242, 264 of the German Commercial Code ( *Handelsgesetzbuch* )) in the previous years and the calculation shall be determined on the basis of the balance sheet items listed in sections 266 para. 2 A, B, C, D and E of the German Commercial Code ( *HGB* ) less all liabilities listed in section 266 para. 3 B, C, D and E of the German Commercial Code ( *HGB* ), save that the following balance sheet items shall be adjusted as follows:

(A)     the amount of any increase from capital reserves in the registered share capital of such German Guarantor ( *Kapitalerhöhung aus Gesellschaftsmitteln* ), which was carried out after the date of execution of this Agreement by such German Guarantor, shall be deducted from the amount of the registered share capital of such German Guarantor if it is expressly prohibited under the Credit Documents and has been carried out without the prior written consent of the Administrative Agent;

70

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(B)      the amount of non-distributable assets according to § 253 (6) of the German Commercial Code ( *Handelsgesetzbuch* ) shall not be included in the calculation of Net Assets (German),

(C)      the amount of non-distributable assets according to § 268 (8) of the German Commercial Code ( *Handelsgesetzbuch* ) shall not be included in the calculation of Net Assets (German);

(D)      the amount of non-distributable assets according to § 272 (5) of the German Commercial Code ( *Handelsgesetzbuch* ) shall not be included in the calculation of Net Assets (German);

(E)      loans or other liabilities incurred by the relevant German Guarantor in willful or grossly negligent violation of the Credit Documents shall not be taken into account as liabilities

(F)       as far as the registered share capital is not paid in full and no demand for a payment of outstanding amounts ( *nicht eingeforderte Beträge* ) has been made, the amount not yet paid in shall be deducted from the amount of the registered share capital of such German Guarantor;

(G)      loans provided to such German Guarantor by a member of the group shall be disregarded, if and to the extent that such loans are subordinated or become subordinated in the insolvency of such German Guarantor pursuant to section 39 paragraph 1 no. 5 or section 39 paragraph 2 of the German Insolvency Code ( *Insolvenzordnung* ), in each case including obligations under guarantees for obligations which are so subordinated;

(H)      any funds borrowed or provided to the Borrower under any documentation evidencing the Obligations which have been or are passed on to such German Guarantor and have not yet been repaid at the time when the demand under such Guaranty is made, shall not be taken into account as liabilities; and

(I)       financial liabilities incurred by such German Guarantor in breach of provisions of any documentation evidencing the Obligations shall not be taken into account as liabilities.

(ii)      Each German Guarantor will notify Administrative Agent in writing in reasonable detail within fifteen (15) Business Days after Administrative Agent notified such German Guarantor of its intention to demand payment under a Guarantee whether and to what extent a Capital Impairment would occur if a payment under such Guarantee was made (the " *Management Notification* "). Such Management Notification shall comprise an up-to-date balance sheet of such German Guarantor and a detailed calculation, based on the provisions of this deed, of the amount of the Net Assets (German) of such German Guarantor (taking into account the adjustments set out above). Such German Guarantor shall fulfil its obligations under such Guaranty within five (5) Business Days of providing the Management Notification in an amount which pursuant to the Management Notification would not result in a Capital Impairment (irrespective of whether or not Administrative Agent agrees with the Management Notification).

71

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(iii)    If Administrative Agent disagrees with the calculation in the Management Notification, such German Guarantor will, upon written request by Administrative Agent, which may be issued within 20 Business Days of the receipt of the Management Notification, provide an auditors' determination by a firm of recognized international auditors (the " *Auditors* ") within 45 Business Days upon such request by Administrative Agent (the " *Auditors' Determination* "). Such Auditors' Determination shall set out:

(A)    an up-to-date balance sheet of such German Guarantor;

(B)    a detailed calculation of the amount of Net Assets (German) of such German Guarantor taking into account the adjustments set out in paragraph (A) above, and

(C)    the extent of the Capital Impairment taking into account the anticipated payment.

The results of the Auditors' Determination are, save for manifest errors, binding on all parties. Such German Guarantor shall fulfill its obligations under such Guaranty within five (5) Business Days of providing the Auditor's Determination in an amount which pursuant to the Auditor's Determination would not result in a Capital Impairment.

(iv)    If a German Guarantor does not provide the Management Notification or the Auditors' Determination within the time frame set out above, demanding payment under a Guaranty shall not be limited by this Section 6.09, and Section 6.09(b) shall not be applicable in that regard. In particular, Administrative Agent shall not be obliged to make available to any German Guarantor any proceeds realized.

(d)    Mitigation . If the Management Notification or the Auditors' Determination shows that a Capital Impairment would occur upon payment under a Guaranty, the relevant German Guarantor shall realize all of its assets that are shown in the balance sheet with a book value ( *Buchwert* ) that is significantly lower than the market value of the assets to the extent this is necessary to fulfil its obligations under any documents evidencing the Obligations to the extent legally permitted in a situation where it does not have sufficient liquidity to fulfil its liabilities to its creditors if the relevant asset is not necessary for the German Guarantor's business ( *nicht betriebsnotwendig* ). If the relevant assets are necessary for such German Guarantor's business ( *betriebsnotwendig* ), it will use its best efforts to realize the higher market value by sale-and-lease-back or similar measures (if legally permitted).

(e)    Improvement of Financial Condition . If Administrative Agent ascertains that the financial condition of a German Guarantor as set out in an Auditors' Determination has improved (in particular, if such German Guarantor has taken any action in accordance with the mitigation provisions set out in Section **Error! Reference source not found.** (d), Administrative Agent may, at such German Guarantor's cost and expense, arrange for the preparation of an updated balance sheet of such German Guarantor by applying the same principles that were used for the preparation of the Auditors' Determination by the auditors who prepared the Auditors' Determination in order for such auditors to determine whether (and, if so, to what extent) the Capital Impairment has been cured as a result of the improvement of the financial condition of such German Guarantor. Administrative Agent may consequently demand payment under such Guaranty to the extent that the auditors determine that the Capital Impairment has been cured.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(f)     <u>No waiver</u> . This <u>Section</u> **Error! Reference source not found.** shall not affect the enforceability (other than as specifically set out herein), legality or validity of any Guaranty and Administrative Agent is entitled to claim in court that making payments under such Guaranty by the relevant German Guarantor does not fall within the scope of section 30 of the German Limited Liabilities Company Act ( *GmbHG* ). No reduction of the amount enforceable under any Guaranty pursuant to this <u>Section</u> **Error! Reference source not found.** will prejudice the right of Administrative Agent to continue to enforce such Guaranty (subject always to the operation of the limitations set out above at the time of such enforcement) until full satisfaction of the claims guaranteed. Administrative Agent's rights to any remedies it may have against a German Guarantor shall not be limited if it is ascertained in court by a final non-appealable ( *rechtskräftig* ) court order that the limitations contained in this <u>Section</u> **Error! Reference source not found.** are not necessary to avoid that the managing directors of the German Guarantor become personally liable pursuant to section 43 paragraph 3 of the German Limited Liabilities Company Act ( *GmbHG* ). The agreement of Administrative Agent to abstain from demanding any or part of the payment under any Guaranty in accordance with the provisions above shall not constitute a waiver ( *Verzicht* ) of any right granted under this Agreement or any other document evidencing the Obligations to Administrative Agent.

(g)     <u>No violation</u> . To the extent that a Guaranty was enforced in violation of this <u>Section</u> **Error! Reference source not found.** , Administrative Agent being the recipient of such excess proceeds shall be under an obligation to repay such excess amount to the relevant German Guarantor provided that such German Guarantor presents within 20 Business Days after the date of such enforcement to Administrative Agent a determination by the Auditors confirming that the enforcement of such German Guarantor's liabilities has caused a Capital Impairment.

SECTION 6.10     <u>Belgian Guarantor</u> . The obligations and liabilities of a Belgian Guarantor under the Credit Documents, and under Article VI ( *Guarantee* ) in particular, shall be limited at any time to the highest of:

(a)     90% of the Net Assets (Belgian) of such Belgian Guarantor calculated on the basis of its most recent published annual financial statements available at the Closing Date; and

(b)     90% of the Net Assets (Belgian) of such Belgian Guarantor calculated on the basis of its most recent published annual financial statements available at the date on which a demand is made on such Belgian Guarantor under this Agreement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

## ARTICLE VII
### Representations, Warranties and Agreements

In order to induce the Lenders to enter into this Agreement and continue the Loans as provided for herein, the Credit Parties make the following representations and warranties to, and agreements with, the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans:

SECTION 7.01    Status . Each Credit Party (a) is a duly organized or formed and validly existing corporation or other registered entity in good standing under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact the business in which it is engaged and (b) has duly qualified and is authorized to do business and is in good standing in all jurisdictions where it does business or owns assets, except, in the case of this clause (b), where the failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect.

SECTION 7.02    Power and Authority . Each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party. Each Credit Party has duly executed and delivered the Credit Documents to which it is a party and such Credit Documents constitute the legal, valid and binding obligation of such Credit Party enforceable against each Credit Party that is a party thereto in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, moratorium, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

SECTION 7.03    No Violation . None of (a) the execution, delivery and performance by any Credit Party of the Credit Documents to which it is a party and compliance with the terms and provisions thereof, (b) the consummation of the Transactions, or (c) the consummation of the other transactions contemplated hereby or thereby on the relevant dates therefor, including the issuance of the Lender Shares, will (i) contravene any applicable provision of any material Applicable Law of any Governmental Authority, (ii) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of any Credit Party (other than Liens created under the Credit Documents) pursuant to, (A) the terms of the [***] Agreement or the [***] Agreement (subject to receipt of the [***] Consent and Acknowledgment and the [***] Consent and Acknowledgment, respectively), (B) the terms of any material indenture, loan agreement, lease agreement, mortgage or deed of trust, or (C) any Material Contract (other than those referred to in the foregoing clauses (A) or (B)), in the case of any of clauses (A), (B) and (C) to which any Credit Party is a party or by which it or any of its property or assets is bound or (iii) violate any provision of the Organization Documents or Permit of any Credit Party, except with respect to any conflict, breach or contravention or default (but not creation of Liens) referred to in clauses (ii)(B) or (ii)(C), to the extent that such conflict, breach, contravention or default could not reasonably be expected to have a Material Adverse Effect.

74

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 7.04    Litigation, Labor Controversies, etc . There is no pending or, to the knowledge of any Credit Party, threatened, litigation, action, proceeding or labor controversy (including without limitation, strikes, lockouts or slowdowns against the Credit Parties or any of their respective Subsidiaries pending or, to the knowledge of any Credit Party, threatened) (a) except as disclosed in Schedule 7.04 , none of which could reasonably be expected to have a Material Adverse Effect, (b) which purports to affect the legality, validity or enforceability of any Credit Document or the Transactions or (c) relating to any Indebtedness or purported Indebtedness of any Credit Party or any Subsidiary. There is no outstanding judgment rendered by any court or tribunal against any Credit Party or any Subsidiary.

SECTION 7.05    Use of Proceeds; Regulations U and X . The proceeds of the Loans are intended to be and shall be used solely for the purposes set forth in and permitted by Section 8.12 . No Credit Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Loans will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with Regulation U or Regulation X.

SECTION 7.06    Approvals, Consents, etc . No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person, and no consent or approval under any contract or instrument (other than (a) those that have been duly obtained or made and which are in full force and effect, or if not obtained or made, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, (b) the filing of UCC financing statements and other equivalent filings for foreign jurisdictions, (c) the filings or other actions necessary to perfect Liens under the Credit Documents and (d) any notice filings relating to the issuance of the Lender Shares, as the case may be, under the Securities Act) is required for the consummation of the Transactions or the due execution, delivery or performance by any Credit Party of any Credit Document to which it is a party, or for the due execution, delivery or performance of the Credit Documents, in each case by any of the Credit Parties party thereto. There does not exist any judgment, order, injunction or other restraint issued or filed with respect to the transactions contemplated by the Credit Documents, the consummation of the Transactions, the making of the Loans or the performance by the Credit Parties or any of their respective Subsidiaries of their Obligations under the Credit Documents. Without limiting the foregoing, Borrower is not required to obtain stockholder approval of this Agreement or the transactions contemplated hereby, including without limitation the issuance of the Lender Shares, pursuant to the rules of The Nasdaq Stock Exchange applicable to listed companies.

SECTION 7.07    Investment Company Act . No Credit Party is, or will be after giving effect to the Transactions and the transactions contemplated under the Credit Documents, an "investment company" or a company "controlled" by a Person required to be registered as an "investment company", within the meaning of the Investment Company Act of 1940.

SECTION 7.08    Accuracy of Information .

(a)    None of the factual information and data (taken as a whole) at any time furnished by any Credit Party, any of their respective Subsidiaries or any of their respective authorized representatives in writing to any Agent or any Lender (including all information contained in the Credit Documents) for purposes of or in connection with this Agreement or any of the Transactions contains any untrue statement of a material fact or omits to state any material fact necessary to make such information and data (taken as a whole) not materially misleading, in each case, at the time such information was provided in light of the circumstances under which such information or data was furnished; provided that, to the extent any such information was based upon or constitutes a forecast or projection, the Credit Parties represent only that the Credit Parties acted in good faith and utilized assumptions believed to be reasonable at the time made and due care in the preparation of such information, it being understood that forecast and projections are subject to uncertainties and contingencies and no assurance can be given that any forecast or projection will be realized.

75

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)       The budget and pro forma financial information provided to the Administrative Agent were prepared in good faith based upon assumptions believed by the Credit Parties to be reasonable at the time made, it being recognized by the Administrative Agent and the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

SECTION 7.09    Financial Condition; Financial Statements . The Historical Financial Statements present fairly in all material respects the financial position and results of operations of Borrower and its Subsidiaries at the respective dates of such information and for the respective periods covered thereby, subject in the case of unaudited financial information, to changes resulting from normal year end audit adjustments and to the absence of footnotes. The Historical Financial Statements and all of the balance sheets, all statements of income and of cash flow and all other financial information furnished pursuant to Section 8.01 have been and will for all periods following the Closing Date be prepared in accordance with GAAP consistently applied. All of the financial information to be furnished pursuant to Section 8.01 will present fairly in all material respects the financial position and results of operations of Borrower and its Subsidiaries at the respective dates of such information and for the respective periods covered thereby, subject in the case of unaudited financial information, to changes resulting from normal year end audit adjustments and to the absence of footnotes. None of the Credit Parties or any of their respective Subsidiaries has any Indebtedness or other material obligations or liabilities, direct or contingent that, either individually or in the aggregate, has had or could reasonably be expected to have, a Material Adverse Effect.

SECTION 7.10    Tax Returns and Payments . Each Credit Party and its Subsidiaries has timely filed or caused to be timely filed all material Tax returns and reports required to have been filed (and all such Tax returns are true complete and correct in all material respects) and has paid or caused to be paid all material Taxes required to have been paid by it that are due and payable, except Taxes (or any requirement to file Tax returns with respect thereto) that are being contested in good faith by appropriate proceedings and for which the Credit Party or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP. Except as set forth on Schedule 7.10 , there are no material proposed or pending tax assessments, deficiencies, audits or other proceedings. None of the Credit Parties nor any of their Subsidiaries has ever "participated" in a "reportable transaction" within the meaning of Section 1.6011-4 of the Treasury Regulations. None of the Credit Parties nor any of their Subsidiaries is a party to any tax sharing or similar agreement. No Tax Lien has been filed and no material claim is being asserted, with respect to any such Tax, fee, or other charge.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 7.11     Compliance with ERISA . Each Plan (and each related trust, insurance contract or fund) is in compliance with its terms and with ERISA, the Code and all Applicable Laws; no Reportable Event has occurred (or is reasonably expected to occur) with respect to any Plan; each Plan (and each related trust, if any) that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service for all required amendments regarding its qualification thereunder that considers the law changes incorporated in the Plan sponsor's most recently expired remedial amendment cycle determined under the provisions of Rev. Proc. 2007-44, and nothing has occurred subsequent to the issuance of such determination letter which would prevent, or cause the loss of, such qualification; no Plan is insolvent or in reorganization or in endangered or critical status within the meaning of Section 432 of the Code or Section 4241 or 4245 of Title IV of ERISA (or is reasonably expected to be insolvent or in reorganization), and no written notice of any such insolvency or reorganization has been given to any of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate; no Plan is, or is reasonably expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); no Plan (other than a Multiemployer Plan) has failed to satisfy the minimum funding standard of Section 412 of the Code or Section 302 of ERISA (whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA), or is reasonably expected to do so, and no Plan has applied for or received a waiver of the minimum funding standard or an extension of any amortization period within the meaning of Section 412 of the Code or Section 302, 303 or 304 of ERISA; no failure to make any required installment under Section 430(j) of the Code with respect to any Plan or to make any required contribution to a Multiemployer Plan when due has occurred; none of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate has incurred (or is reasonably expected to incur) any liability to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 436(f), 4971, 4975 or 4980 of the Code or has been notified in writing that it will incur any liability under any of the foregoing Sections with respect to any Plan; no proceedings have been instituted (or are reasonably expected to be instituted) to terminate or to reorganize any Plan or to appoint a trustee to administer any Plan, and no written notice of any such proceedings has been given to any of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate; no Lien imposed under the Code or ERISA on the assets of any of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate exists (or is reasonably expected to exist) nor have the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate been notified in writing that such a Lien will be imposed on the assets of any of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate on account of any Plan; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, expected or threatened; there has been no violation of the applicable requirements of Section 404 or 405 of ERISA or the exclusive benefit rule under Section 401(a) of the Code by any fiduciary or disqualified person with respect to any Plan for which any of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate may be directly or indirectly liable; and none of the Credit Parties, any of their respective Subsidiaries nor any ERISA Affiliate has filed, or is considering filing, an application under the United States Internal Revenue Service Employee Plans Compliance Resolution System or the Department of Labor's Voluntary Fiduciary Correction Program with respect to any Plan, except to the extent that a breach of any of the representations, warranties or agreements in this Section 7.11 could not result, individually or in the aggregate, in an amount of liability that would be reasonably expected to have a Material Adverse Effect. No Plan (other than a Multiemployer Plan) has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 7.11 , be reasonably expected to have a Material Adverse Effect. No employee welfare benefit plan within the meaning of §3(1) or §3(2)(B) of ERISA of any Credit Party or any of their respective Subsidiaries, provides benefit coverage subsequent to termination of employment except as required by Title I, Part 6 of ERISA or applicable state insurance laws. No liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA has been, or is reasonably expected to be, incurred, except as could not reasonably be expected to have a Material Adverse Effect. With respect to any Plan that is a Multiemployer Plan, the representations and warranties in this Section 7.11 , other than any made with respect to (a) liability under Section 4201 or 4204 of ERISA or (b) liability for termination or reorganization of such Plans under ERISA, are made to the best knowledge of the Credit Parties.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 7.12     Subsidiaries . None of the Credit Parties has any Subsidiaries other than the Subsidiaries listed on Schedule 7.12 . Schedule 7.12 describes the direct and indirect ownership interest of each of the Credit Parties in each Subsidiary. The Borrower has no Subsidiaries other than (x) Immaterial Subsidiaries and (y) those Subsidiaries party hereto as Credit Parties. Each Subsidiary identified by the Borrower as an "Immaterial Subsidiary" qualifies as such under the criteria therefor set forth in such definition.

SECTION 7.13     Intellectual Property; Licenses, etc . Each Credit Party and each of its Subsidiaries owns, or possesses the right to use, all of the trademarks, service marks, trade names, Internet domain names, copyrights and copyrightable works, patents, inventions, trade secrets, know-how, proprietary computer software, franchises, intellectual property licenses and other intellectual property rights, including all registrations and applications to register any of the foregoing and all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof (collectively, the " *IP Rights* ") that are reasonably necessary for the operation of their respective businesses. The conduct and operations of the businesses of each Credit Party and each of its Subsidiaries do not infringe, misappropriate, dilute, or otherwise violate in any material respect any intellectual property owned by any other Person, no other Person has challenged in writing or questioned any right, title or interest of any Credit Party or any of its Subsidiaries in any IP Rights of such Credit Party or Subsidiary, and no Credit Party or Subsidiary thereof has received a written challenge from any other Person contesting the use of any IP Rights owned by such Credit Party or Subsidiary or the validity or enforceability of such IP Rights. Except as specifically set forth on Schedule 7.04 , no claim or litigation regarding any of the foregoing is pending or, to the knowledge of such Credit Party threatened. Schedule 7.13 is a complete and accurate list of (i) all IP Rights registered or pending registration with the United States Copyright Office or the United States Patent and Trademark Office and owned by each Credit Party and each of its Subsidiaries as of the Closing Date and (ii) all material license agreements or similar arrangements granting IP Rights of another Person to any Credit Party or any of its Subsidiaries, other than software license agreement for "off-the-shelf" or "click-through" agreements. As of the Closing Date, none of the IP Rights owned by any Credit Party or any of its Subsidiaries is subject to any licensing agreement, other than (i) non-exclusive licenses granted to customers in the ordinary business, or (ii) except as set forth on Schedule 7.13 .

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 7.14    Environmental Warranties .

(a)    Except as set forth in Schedule 7.14 :

(i)    The Credit Parties, their Subsidiaries and their respective businesses, operations and Real Property are and have at all times during the Credit Parties' or their Subsidiaries' ownership, lease or operation thereof been in material compliance with, and the Credit Parties and their Subsidiaries have no material liability under, any applicable Environmental Law.

(ii)    The Credit Parties and their Subsidiaries have obtained all material permits, licenses, certificates or authorizations required under Environmental Law (" *Environmental Permits* ") and necessary for the conduct of their businesses and operations, and the ownership, operation and use of their Real Property. The Credit Parties and their Subsidiaries are in material compliance with the terms and conditions of such Environmental Permits, and all such Environmental Permits are valid and in good standing.

(iii)    There has been no Release or threatened Release or any handling, management, generation, treatment, storage or disposal of Hazardous Materials in, on, at, under, to, or from any Real Property presently or, to the knowledge of any Credit Party, formerly owned, leased or operated by any of the Credit Parties, their Subsidiaries or their respective predecessors in interest that has resulted in, or is reasonably expected to result in, material liability or obligations by any of the Credit Parties under Environmental Law or result in a material Environmental Claim.

(iv)    There is no material Environmental Claim pending or, to the knowledge of the Credit Parties, threatened against any of the Credit Parties or their Subsidiaries, or relating to the Real Property currently or formerly owned, leased or operated by any of the Credit Parties or their Subsidiaries or relating to the operations of the Credit Parties or their Subsidiaries, and, to the knowledge of the Credit Parties, there are no actions, activities, circumstances, conditions, events or incidents that are reasonably likely to form the basis of a material Environmental Claim.

(v)    No person with an indemnity, contribution or other obligation to any of the Credit Parties or their Subsidiaries relating to compliance with or liability under Environmental Law is in default with respect to any such indemnity, contribution or other obligation.

(vi)    No Real Property owned, leased or operated by the Credit Parties or their Subsidiaries and, to the knowledge of the Credit Parties, no Real Property or facility formerly owned, leased or operated by any of the Credit Parties or any of their predecessors in interest is (i) listed or proposed for listing on the National Priorities List as defined in and promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any governmental or regulatory authority that indicates that any Credit Party or Subsidiary has or may have an obligation to undertake investigatory or remediation obligations under applicable Environmental Laws.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(vii) No Lien has been recorded or, to the knowledge of any Credit Party, threatened under any Environmental Law with respect to any Real Property of the Credit Parties or their Subsidiaries.

(b)     None of the matters, individually or in the aggregate, disclosed in Schedule 7.14 could reasonably be expected to have a Material Adverse Effect.

(c)     The Credit Parties and their Subsidiaries have made available to the Administrative Agent all material reports, assessments, audits, studies and investigations in the possession, custody or control of the Credit Parties and their Subsidiaries concerning Environmental Claims or compliance with or liability or obligation under Environmental Law, including those concerning the condition of the Real Property or the existence of Hazardous Materials at Real Property or facilities formerly owned, operated, leased or used by any of the Credit Parties, their Subsidiaries or their predecessors-in-interest.

SECTION 7.15     Ownership of Properties . Set forth on Schedule 7.15 is a list of all of the Real Property owned or leased by any of the Credit Parties or their respective Subsidiaries as of the Closing Date, indicating in each case whether the respective property is owned or leased, the identity of the owner or lessor and the location of the respective property. Each Credit Party owns (a) in the case of owned Real Property, good and valid fee simple title to such Real Property, (b) in the case of owned personal property, good and valid title to such personal property, and (c) in the case of leased Real Property or material personal property, valid and enforceable (except as may be limited by bankruptcy, insolvency, moratorium, fraudulent conveyance or other laws applicable to creditors' rights generally and by generally applicable equitable principles, whether considered in an action at law or in equity) leasehold interests (as the case may be) in such leased property, in each case, free and clear in each case of all Liens or claims, except for Permitted Liens.

SECTION 7.16     No Default . None of the Credit Parties or any of their respective Subsidiaries (a) is in default under or with respect to the [***] Agreement or the [***] Agreement or (b) is in default under or with respect to, or a party to, any Contractual Obligation (other than any such Contractual Obligation referred to in the foregoing clause (a) or in respect of Indebtedness) that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. On the Closing Date, after giving effect to the Transactions, none of the Credit Parties or any of their respective Subsidiaries is in default under or with respect to any Contractual Obligation in respect of Indebtedness or purported Indebtedness.

SECTION 7.17     Solvency . On the Closing Date after giving effect to the Transactions and the other transactions related thereto, Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

SECTION 7.18     Locations of Offices, Records and Collateral . The address of the principal place of business and chief executive office of each Credit Party is, and the books and records of each Credit Party and all of its Chattel Paper and records of Receivables are maintained exclusively in the possession of such Credit Party at, the address of such Credit Party specified in Schedule 7.18 (or, after the Closing Date, in the case of any Credit Parties party to the U.S. Security Agreement, at such other address permitted by Section 5.3(a)(i) of the U.S. Security Agreement). There is no location at which a Credit Party maintains any Collateral having a value in excess of $100,000 for any such location other than the locations specified for it in Schedule 7.15 (or, after the Closing Date, in the case of any Credit Parties party to the U.S. Security Agreement, at such other address permitted by Section 5.3(d) of the U.S. Security Agreement). Except as otherwise agreed by the Administrative Agent, each leased location of a Credit Party that is the headquarters of any Credit Party, where books and records of any Credit Party are maintained or where Collateral having value in excess of $100,000 is located, shall be subject to a Collateral Access Agreement to be provided by the landlord of such leased location in favor of the Collateral Agent.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 7.19     Compliance with Laws and Permits; Authorizations .

(a)     Each Credit Party and each of its Subsidiaries (a) is in material compliance with all Applicable Laws and Permits and (b) has all requisite governmental licenses, Permits, authorizations, consents and approvals to operate its business as currently conducted, except in such instances in which (x) such requirement of Applicable Laws, Permits, government licenses, authorizations or approvals are being contested in good faith by appropriate proceedings diligently conducted or (y) the failure to have or comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. No Credit Party has received any written notice that is outstanding or unresolved to the effect that its operations are not in material compliance with any Environmental Law or Permit or are the subject of any investigation by any Governmental Authority evaluating whether any cleanup or other action is needed to respond to a Release or impose further controls on any existing discharge of Hazardous Materials to the environment.

(b)     No Credit Party, nor any Subsidiary, nor, to the knowledge of the Credit Parties and their Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction; provided that no representation shall be made by any German Credit Party to the extent it would violate section 7 of the German Foreign Trade Ordinance ( *Außenwirtschaftsverordnung* ), any provision of Council Regulation (EC) 2271/1996 or any similar applicable anti-boycott law or regulation binding on that German Credit Party.

(c)     The Credit Parties and their Subsidiaries have conducted their business in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other jurisdictions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

SECTION 7.20     No Material Adverse Effect . Since December 31, 2017, except as disclosed in the Borrower's Form 10-K filed with the SEC for the fiscal year ending December 31, 2017 and the Borrower's Form 10-Q filed with the SEC for each of the fiscal quarters ending March 30, 2018, June 30, 2018 and September 30, 2018 and any Form 8-K filed by the Borrower with the SEC since September 30, 2018, both immediately before and immediately after giving effect to the Transactions, (a) there has been no Material Adverse Effect, and (b) there has been no circumstance, event or occurrence, and no fact is known to the Credit Parties that could reasonably be expected to result in a Material Adverse Effect.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 7.21    Contractual or Other Restrictions . Other than the Credit Documents, as set forth in Schedule 7.21 and to the extent permitted by Section 9.10 , no Credit Party or any of its Subsidiaries is a party to any agreement or arrangement or subject to any Applicable Law that limits its ability to pay dividends to, or otherwise make Investments in or other payments to any Credit Party, that limits its ability to grant Liens in favor of the Collateral Agent or that otherwise limits its ability to perform the terms of the Credit Documents..

SECTION 7.22    Collective Bargaining Agreements . Set forth on Schedule 7.22 is a list and description (including dates of termination) of all collective bargaining or similar agreements between or applicable to any Credit Party or any of its Subsidiaries and any union, labor organization or other bargaining agent in respect of the employees of any Credit Party or any of its Subsidiaries.

SECTION 7.23    Insurance . The properties of each Credit Party are insured with financially sound and reputable insurance companies not Affiliates of any Credit Party against loss and damage in such amounts, with such deductibles and covering such risks as are customarily carried by Persons of comparable size and of established reputation engaged in the same or similar businesses and owning similar properties in the general locations where such Credit Party operates, in each case as described on Schedule 7.23 . As of the Closing Date, all premiums with respect thereto that are due and payable have been duly paid and no Credit Party has received or is aware of any notice of violation or cancellation thereof and each Credit Party has complied in all material respects with the requirements of such policy.

SECTION 7.24    Evidence of Other Indebtedness . Schedule 7.24 is a complete and correct list of each credit agreement, loan agreement, indenture, purchase agreement, guarantee, letter of credit or other arrangement providing for or otherwise relating to any Indebtedness or any extension of credit (or commitment for any extension of credit) to, any Credit Party or Subsidiary outstanding on the Closing Date which will remain outstanding after the Closing Date (other than this Agreement and the other Credit Documents), in each case, in excess of $100,000 and the aggregate principal or face amount outstanding or that may become outstanding under each such arrangement as of the Closing Date is correctly described in Schedule 7.24 . The aggregate principal amount of all Indebtedness of (and all commitments for extensions of credit to) the Credit Parties and their Subsidiaries which is not disclosed on Schedule 7.24 by reason of the disclosure threshold set forth in the immediately preceding sentence does not exceed $250,000.

SECTION 7.25    Deposit Accounts and Securities Accounts . Set forth in Schedule 7.25 is a list as of the Closing Date of all of the deposit accounts and securities accounts of each Credit Party, including, with respect to each bank or securities intermediary at which such accounts are maintained by such Credit Party (a) the name and location of such Person and (b) the account numbers of the deposit accounts or securities accounts maintained with such Person. The Credit Parties have delivered a proposed draft of the [***] Consent and Acknowledgment to [***] , and upon execution thereof, [***] shall have been instructed to remit any payments owing to the Credit Parties in connection with the [***] Agreement solely to the Pareteum Europe Capital One Account. The Credit Parties have instructed [***] to remit any payments owing to the Credit Parties in connection with the [***] Agreement solely to the Pareteum Europe Capital One Account.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 7.26    Absence of any Undisclosed Liabilities . There are no material liabilities of any Credit Party of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in any such liabilities, other than those liabilities provided for or disclosed in the Historical Financial Statements.

SECTION 7.27    Material Customers . Schedule 7.27 sets forth the twelve (12) largest customers that are engaged in a service contract with the Borrower and its Subsidiaries for each of the fiscal year ended December 31, 2018 and for the fiscal year to date (" *Material Customers* "). Except as set forth on Schedule 7.27 , (i) all Material Customers continue to be customers of the Borrower or any Subsidiary thereof, as the case may be, and none of such Material Customers has reduced materially its business with the Borrower or any of its Subsidiaries, as the case may be, from the levels achieved during the year ended December 31, 2018 or during the fiscal year to date, and neither the Borrower nor any of its Subsidiaries has any knowledge that such reduction will occur provided, however, that Administrative Agent and the Lenders acknowledge and agree that the representation contained in this clause (i) is qualified in its entirety by the fact that the Credit Parties' business and the business of its Material Customers are cyclical and subject to market events and, as such, the level of a Material Customer's business with the Credit Parties vary in the ordinary course of business; (ii) no Material Customer has terminated its relationship with the Borrower or any Subsidiary thereof, as the case may be, or, to the knowledge of the Borrower or such Subsidiary, has threatened in writing to do so; (iii) neither the Borrower nor any Subsidiary thereof is involved in any material claim, dispute or controversy with any Material Customer and (iv) neither the Borrower nor any Subsidiary thereof is involved in any claim, dispute or controversy with any of its other customers that could reasonably be expected to have a Material Adverse Effect.

SECTION 7.28    Material Contracts . Schedule 7.28 , as updated from time to time pursuant to Section 8.01(g)(viii) , sets forth all Material Contracts of the Credit Parties. As of the Closing Date, all Material Contracts are in full force and effect and no defaults currently exist thereunder.

SECTION 7.29    Anti-Terrorism Laws . No Credit Party or any Subsidiary is in violation of any Law relating to terrorism or money laundering (" *Anti-Terrorism Laws* "), including the Patriot Act and Executive Order No. 13224 on Terrorism Financing, effective September 24, 2001 (the " *Executive Order* "). No Credit Party, Subsidiary or agent acting or benefiting in any capacity in connection with the Loans is (a) a Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order, (b) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order, (c) a Person with whom any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order, or (e) a Person that is named as a "specially designated national and blocked person" on the most current list published by the United States Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list. No Credit Party or Subsidiary or, to the Credit Parties' knowledge, other agents acting or benefiting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in the preceding sentence, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in any property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Anti-Terrorism Laws.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 7.30    Reserved .

SECTION 7.31    Privacy and Data Security . The Credit Parties and their Subsidiaries are in compliance with all applicable United States and international privacy and data security laws and regulations including, without limitation, GDPR.

SECTION 7.32    Lender Shares .

(a)    The Borrower has reserved out of its duly authorized capital stock the maximum number of shares of Borrower Common Stock issuable as Lender Shares under the terms of this Agreement. All of the Lender Shares, when issued to the Lenders at the Closing Date or the Additional Issuance Date, as the case may be, in accordance with the terms of this Agreement, will be duly authorized and validly issued, fully paid and nonassessable, and will be issued free of preemptive rights. At the Closing Date and the Additional Issuance Date, the Borrower shall issue, sell, convey and deliver to the Lenders the Closing Date Lender Shares and the Additional Lender Shares, as the case may be, free and clear of any Liens (other than restrictions on transfer arising under applicable securities laws).

(b)    The offer, sale and issuance of the Lender Shares in accordance with the terms of this Agreement will be exempt from the registration requirements of the Securities Act, and will have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws.

(c)    The Borrower is not, and has never been, an issuer identified in Rule 144(i)(1) promulgated under the Securities Act.

SECTION 7.33    EEA Financial Institutions . No Credit Party is an EEA Financial Institution.

SECTION 7.34    Dutch Fiscal Unity . As of the Closing Date, any fiscal unity ( *fiscale eenheid* ) for Dutch corporate income tax ( *vennootschapsbelasting* ) or Dutch VAT ( *omzetbelasting* ) purposes in which a Credit Party is included, if any, shall consist of Dutch Credit Parties only. Each of the Dutch Credit Parties is resident for tax purposes only in its jurisdiction of incorporation.

84

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

# ARTICLE VIII
## Affirmative Covenants

The Credit Parties hereby covenant and agree that on the Closing Date and thereafter, until the Loans, together with interest, Fees and all other Obligations incurred hereunder (other than Unasserted Contingent Obligations) are paid in full in accordance with the terms of this Agreement:

SECTION 8.01     Financial Information, Reports, Notices and Information . The Credit Parties will furnish the Administrative Agent and each Lender copies of the following financial statements, reports, notices and information:

(a)     Monthly Financial Statements . As soon as available and in any event within thirty (30) days after the end of each month, unaudited (i) consolidated balance sheets of Borrower and its Subsidiaries as of the end of such month, and (ii) consolidated statements of income and cash flow of Borrower and its Subsidiaries as of the end of such month, in each case, including in comparative form (both in Dollar and percentage terms) the figures for the corresponding month in the preceding fiscal year of Borrower and in the then-current Budget for such fiscal year, if applicable, and year-to-date portion of, the immediately preceding fiscal year of Borrower.

(b)     Quarterly Financial Statements . As soon as available and in any event within forty-five (45) days after the end of each fiscal quarter of Borrower, (i) unaudited (A) consolidated balance sheets of Borrower and its Subsidiaries as of the end of such fiscal quarter, and (B) consolidated statements of income and cash flow of Borrower and its Subsidiaries for such fiscal quarter, in each case, and for the period commencing at the end of the previous fiscal year of Borrower and ending with the end of such fiscal quarter, including (in each of clause (A) and (B) (if applicable)), in comparative form (both in Dollar and percentage terms) the figures for the corresponding fiscal quarter in, and year-to-date portion of, the immediately preceding fiscal year of Borrower and in the then-current Budget for such fiscal year, certified as complete and correct in all material respects by an Authorized Officer of Borrower, subject to normal year- end adjustments and the absence of footnotes pursuant to the audit required under Section 8.01(c) ( provided that such year-end adjustments and footnotes shall not be materially adverse, individually or in the aggregate, to any Agent or any Lender), and (ii) a management discussion and analysis (with reasonable detail and specificity) of the results of operations for the fiscal periods reported, including, in comparative form the figures for the corresponding fiscal quarter in, and year-to-date portion of, the immediately preceding fiscal year of Borrower, and period commencing at the end of the previous fiscal year of Borrower and ending with the end of such fiscal quarter.

(c)     Annual Financial Statements . As soon as available and in any event within ninety (90) days after the end of each fiscal year of Borrower, copies of the consolidated balance sheets of Borrower and its Subsidiaries, and the related consolidated statements of income and cash flows of Borrower and its Subsidiaries for such fiscal year, setting forth in comparative form (both in Dollar and percentage terms) the figures for the immediately preceding fiscal year and in the then-current Budget for such fiscal year, such consolidated statements audited and certified without qualification, or exception as to the scope of such audit, by an independent public accounting firm reasonably acceptable to the Administrative Agent, together with a management discussion and analysis (with reasonable detail and specificity) of the results of operations for the fiscal periods reported.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(d)　　Compliance Certificates . Concurrently with the delivery of the financial information pursuant to clauses (a), (b) and (c) above, a Compliance Certificate, executed by an Authorized Officer of the Borrower, (A) certifying that such financial information presents fairly in all material respects the financial condition, results of operations and cash flows of Borrower and its Subsidiaries in accordance with GAAP at the respective dates of such information and for the respective periods covered thereby, subject in the case of unaudited financial information, to changes resulting from normal year-end audit adjustments and to the absence of footnotes, (B) showing compliance with the Financial Performance Covenants (and, during the continuance of a Consolidated Revenue Testing Period, demonstrating compliance with Section 9.13(f) ), and stating that no Default or Event of Default has occurred and is continuing (or, if a Default or an Event of Default has occurred, specifying the details of such Default or Event of Default and the actions taken or to be taken with respect thereto) and containing the applicable certifications set forth in Section 7.09 with respect thereto, (C) in the case of each Compliance Certificate delivered concurrently with the financial information pursuant to clause (c) above, specifying any change in the identity of the Subsidiaries as at the end of such fiscal year from the Subsidiaries provided to the Lenders on the Closing Date or the most recent fiscal year, as the case may be, and (D) in the case of each Compliance Certificate delivered concurrently with the financial information pursuant to clause (c) above, including (x) an updated Schedule 7.15 and Schedule 7.25 of this Agreement (if applicable) and (y) a written supplement substantially in the form of Schedules 1-5, as applicable, to the Security Agreement with respect to any additional assets and property acquired by any Credit Party after the date hereof, all in reasonable detail.

(e)　　Budget . No later than thirty (30) days after the commencement of each fiscal year of Borrower, the forecasted financial projections for the then current fiscal year (on a month-by-month basis), in each case (including projections for Consolidated Capital Expenditures, a projected consolidated income statement and balance sheet of Borrower and its Subsidiaries on a month-by-month basis as of the end of the then current fiscal year, the related consolidated statements of projected cash flow and projected changes in financial position and a description of the underlying assumptions applicable thereto), in each case, as customarily prepared by management of the Credit Parties for their internal use consistent in scope with the financial statements provided pursuant to Section 8.01(c) , setting forth the principal assumptions on which such projections are based (such projections, together with the projections delivered as of the Closing Date pursuant to Section 5.07(b) , collectively, the " **Budget** ").

(f)　　Defaults; Litigation . As soon as possible and in any event within five (5) Business Days after an Authorized Officer of any Credit Party or any of their respective Subsidiaries obtains knowledge thereof, notice from an Authorized Officer of the Borrower of (i) the occurrence of any event that constitutes a Default or an Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the applicable Credit Parties propose to take with respect thereto (provided, that if the Credit Parties require more time to determine what action to take with respect thereto, they shall be permitted up to five (5) additional Business Days to furnish a description of their proposed action to the Administrative Agent), and (ii) (A) the occurrence of any material adverse development with respect to any litigation, action, proceeding or labor controversy described in Schedule 7.04 or (B) the commencement of any litigation, action, proceeding or labor controversy of the type and the materiality described in Section 7.04 , and to the extent the Administrative Agent requests, copies of all documentation related thereto.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(g)    Notices . The Credit Parties shall provide the Administrative Agent with a written notice promptly (and in no event later than five (5) Business Days after an Authorized Officer of any Credit Party becoming aware of) of the following:

(i)    any pending or threatened (in writing) litigation, action, proceeding or other controversy which purports to affect the legality, validity or enforceability of any Credit Document, or any other document or instrument referred to in Section 9.07 , which notice shall be signed by an Authorized Officer of the Borrower and shall specify the nature thereof, and what actions the applicable Credit Parties propose to take with respect thereto, together with copies of all relevant documentation;

(ii)    the commencement of, or any material development in, any litigation, investigation (formal or informal), document request or proceeding affecting any Credit Party or any Subsidiary thereof, in which (A) the amount of damages claimed is $1,000,000 (or its equivalent in another currency or currencies) or more, (B) injunctive or similar relief is or may be sought and which, if adversely determined, could reasonably be expected to have a Material Adverse Effect, (C) the relief sought is or may be an injunction or other stay of the performance of this Agreement or any other Credit Document or (D) the SEC is involved;

(iii)    notice of any pending or threatened labor dispute, strike, walkout, or union organizing activity with respect to any employees of a Credit Party;

(iv)    notice of (i) any material default by any Credit Party or Subsidiary under any Material Contract or any other agreement with any Material Customer or (ii) any termination or non-renewal of any Material Contract or any other agreement with any Material Customer or the receipt by any Credit Party or Subsidiary of any notice from the other party to any Material Contract or Material Customer of such party's intent to terminate or not renew such Material Contract or other agreement;

(v)    notice of the discharge or withdrawal or resignation by Credit Parties' independent accountants;

(vi)    copies of all amendments, consent letters, waivers or modifications to a Credit Party's Organization Documents (to the extent permitted hereunder), or by such Credit Party to any such Person;

(vii)    all significant written final reports submitted to the Credit Parties by its accountants in connection with each annual, interim or special audit or review of any type of the financial statements or related internal control systems, including any final comment letters delivered to management and all responses thereto; and

(viii)    notice of entering into any Material Contract following the Closing Date.

87

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(h)      Credit Documents . As soon as possible and in any event within five (5) Business Days after any Credit Party obtains knowledge of the occurrence of a breach or default or notice of termination by any party under, or material amendment entered into by any party to, any Credit Document or any other document or instrument referred to in Section 9.07 , a statement of an Authorized Officer of the Borrower setting forth details of such breach or default or notice of termination and the actions taken or to be taken with respect thereto and, if applicable, a copy of such amendment.

(i)      Management Letters . Promptly upon, and in any event within five (5) Business Days after, receipt thereof, copies of all "management letters" submitted to any Credit Party by the independent public accountants referred to in Section 8.01(c) in connection with each audit made by such accountants.

(j)      Bankruptcy, etc. Immediately upon becoming aware thereof, notice (whether involuntary or voluntary) of the bankruptcy, insolvency, reorganization of any Credit Party, or the appointment of any trustee in connection with or anticipation of any such occurrence, or the taking of any step by any Person in furtherance of any such action or occurrence, including the occurrence of a Netherlands Insolvency Event or German Insolvency Event.

(k)      Corporate Information . Promptly upon, and in any event within five (5) Business Days after, becoming aware of any additional corporate or limited liability company information of the type delivered pursuant to Section 5.01(d) , or of any change to such information delivered on or prior to the Closing Date or pursuant to this Section 8.01 or otherwise under the Credit Documents, a certificate, certified to the extent of any change from a prior certification, from the secretary, assistant secretary, managing director ( *directeur* or *bestuurder* ), managing director ( *Geschäftsführer* ), managing member or general partner of such Credit Party notifying the Administrative Agent of such information or change and attaching thereto any relevant documentation in connection therewith.

(l)      Valuation Report . Contemporaneously with the delivery of the financial statements required by Section 8.01(b) , a report setting forth the current market valuation of the Loans in form and detail reasonably acceptable to the Administrative Agent and Required Lenders from a third party valuation agent acceptable to the Administrative Agent and Required Lenders (the cost of which, up to a maximum amount of $20,000 during any fiscal year of Borrower, shall be paid by the Borrower).

(m)      Other Information . With reasonable promptness, such other information (financial or otherwise) as any Agent on its own behalf or on behalf of any Lender may reasonably request in writing from time to time.

Notwithstanding the foregoing, the obligations of the Credit Parties in paragraphs (b) and (c) of this Section 8.01 shall be deemed to be satisfied with respect to any financial statements of the Borrower upon the filing by the Borrower of the Borrower's Form 10-Q or 10-K, as applicable, with the SEC and the posting thereof on the SEC's website within the time periods specified in such paragraphs (or, in the event that the SEC has granted to the Borrower an extension of the deadline for filing of the Borrower's 10-Q or 10-K, as applicable, with the SEC, within the time period specified by the SEC for such extension, but in no event later than (x) five calendar days after the time period specified in paragraph (b) of this Section 8.01 , in the case of the quarterly financial statements required by such paragraph (b), and (y) fifteen calendar days after the time period specified in paragraph (c) of this Section 8.01 , in the case of the annual financial statements required by such paragraph (c)).

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 8.02    Books, Records and Inspections . The Credit Parties will, and will cause each of their respective Subsidiaries to, maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP (subject to normal year-end adjustments pursuant to the audit required under Section 8.01(c) ( provided that such year-end adjustments shall not be materially adverse, individually or in the aggregate, to any Agent or any Lender)) consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Credit Parties or such Subsidiary, as the case may be. The Credit Parties will, and will cause each of their respective Subsidiaries to, permit the Administrative Agent and its representatives and independent contractors to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Credit Parties; provided that such visits or inspections shall be at reasonable times during normal business hours, upon reasonable advance notice to the Credit Parties, but not more often than two (2) times per year (except that none of the limitations in this proviso shall apply if an Event of Default then exists). Any information obtained by the Administrative Agent pursuant to this Section 8.02 may be shared with the Collateral Agent or any Lender upon the request of such Secured Party. The Administrative Agent shall give the Credit Parties the opportunity to participate in any discussions with the Credit Parties' independent public accountants.

SECTION 8.03    Maintenance of Insurance . The Credit Parties will, and will cause each of their respective Subsidiaries to, at all times maintain in full force and effect, with insurance companies that the Credit Parties believe (in their reasonable business judgment) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance in at least such amounts and against at least such risks (and with such risk retentions) as are usually insured against in the same general area by companies engaged in businesses similar to those engaged in by the Credit Parties; and will furnish to the Collateral Agent for further delivery to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the insurance so carried, including (i) endorsements to (A) all "All Risk" policies naming the Collateral Agent, on behalf of the Secured Parties, as loss payee (or with respect to insurance policies governed by German law, the respective insurance certificate or confirmation ( *Sicherungsschein/-bestätigung* ) and (B) all general liability and other liability policies naming the Collateral Agent, on behalf of the Secured Parties, as additional insured (or with respect to insurance policies governed by German law, the respective insurance certificate or confirmation ( *Sicherungsschein/-bestätigung* ) and (ii) legends providing that no cancellation, material reduction in amount or material change in insurance coverage thereof shall be effective until at least thirty (30) days (ten (10) days with respect to failure to pay premium) after receipt by the Collateral Agent of written notice thereof (or with respect to insurance policies governed by German law, legends providing that any cancellation, material reduction in amount or material change in insurance coverage thereof shall require an advance notice in text form by the insurer to the Collateral Agent as set forth in the insurance certificate or confirmation ( *Sicherungsschein/-bestätigung* ).

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 8.04    Payment of Taxes . The Credit Parties will timely pay and discharge, and will cause each of their respective Subsidiaries to timely pay and discharge, all Taxes, assessments and governmental charges or levies imposed upon them or upon their income or profits, or upon any properties belonging to it (including, without limitation, any such amounts described on Schedule 7.10 ), prior to the date on which such Tax, assessment or governmental charge is due, and all lawful claims that, if unpaid, could reasonably be expected to become a Lien having priority over the Collateral Agent's Liens (other than Permitted Liens) or an otherwise material Lien upon any properties of the Credit Parties or any of their respective Subsidiaries; provided that none of the Credit Parties or any of their respective Subsidiaries shall be required to pay any such Tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings that stays execution and as to which such Credit Party has maintained adequate reserves with respect thereto in accordance with GAAP.

SECTION 8.05    Maintenance of Existence; Compliance with Laws, etc . Each Credit Party will, and will cause its Subsidiaries to, (a) preserve and maintain in full force and effect its organizational existence (except in a transaction permitted by Section 9.03 ), (b) preserve and maintain its good standing under the laws of its state or jurisdiction of incorporation, organization or formation, and each state or other jurisdiction where such Person is qualified, or is required to be so qualified, to do business as a foreign entity, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect, and (c) comply in all material respects with all Applicable Laws, rules, regulations and orders, including without limitation compliance with safety regulations applicable to the Borrower or any of its Subsidiaries.

SECTION 8.06    Environmental Compliance .

(a)    Each Credit Party will, and will cause its Subsidiaries to, comply in all material respects with all Environmental Laws and Environmental Permits applicable to their business, operations and Real Property; obtain and maintain in full force and effect all material Environmental Permits applicable to its business, operations and Real Property; and conduct all response, investigation, remediation, cleanup or monitoring activity required by any governmental or regulatory authority or any applicable Environmental Laws, and in accordance with, the requirements of any governmental or regulatory authority and applicable Environmental Laws.

(b)    Each Credit Party will, and will cause its Subsidiaries to, do or cause to be done all things required by Environmental Laws to prevent any Release of Hazardous Materials in, on, at, under, to or from any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries except in full compliance with applicable Environmental Laws or an Environmental Permit, and ensure that there shall be no Hazardous Materials in, on, at, under or from any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries except those that are present, used, stored, handled and managed in material compliance with applicable Environmental Laws.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c)     Each Credit Party will, and will cause its Subsidiaries to, undertake all actions, including response, investigation, remediation, cleanup or monitoring actions, necessary, at the sole cost and expense of the Credit Parties, (i) to address any Release of Hazardous Materials in, on, at, under, to or from any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries as required pursuant to Environmental Law or the requirements of any governmental or regulatory authority; (ii) to address as may be required by Environmental Law any environmental conditions relating to any Credit Party, Subsidiary, or their respective business or operations or to any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries pursuant to any reasonable written request of the Administrative Agent and, except for information and documents to the extent covered by attorney client privilege or attorney work product doctrine, share with the Administrative Agent all data, information and reports generated or prepared in connection therewith; (iii) to keep any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries free and clear of all Liens and other encumbrances pursuant to any Environmental Law, whether due to any act or omission of any Credit Party, Subsidiary or any other person; and (iv) to promptly notify the Administrative Agent in writing of: (1) any material Release or threatened Release of Hazardous Materials in, on, at, under, to, or from any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries, except those that are pursuant to and in compliance with the terms and conditions of an Environmental Permit, (2) any material non- compliance with, or violation of, any Environmental Law applicable to any Credit Party or Subsidiary, any Credit Party's or Subsidiary's business and any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries, (3) any Lien pursuant to Environmental Law imposed on any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries, (4) any response, investigation, remediation, cleanup or monitoring activity at any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries required to be undertaken pursuant to Environmental Law, and (5) any notice or other communication received by any Company from any person or governmental or regulatory authority relating to any material Environmental Claim or material liability or potential liability of any Credit Party or Subsidiary pursuant to any Environmental Law.

(d)     If a Default caused by reason of a breach of Section 7.14 or this Section 8.06 shall have occurred and is not reasonably curable within 10 days or shall be continuing for more than thirty (30) days without the Credit Parties commencing activities reasonably likely to cure such Default, the Credit Parties shall, at the written request of the Administrative Agent, (i) provide to the Administrative Agent within forty-five (45) days after such request, at the expense of the Credit Parties, an environmental assessment report regarding the matters which are the subject of such Default, including, where appropriate, any soil and/or groundwater sampling, prepared by a nationally recognized environmental consulting firm reasonably acceptable to the Administrative Agent and in the form and substance reasonably acceptable to the Administrative Agent and evaluating the presence or absence of Hazardous Materials and the estimated cost of any compliance or response action to address such Default and findings; (ii) promptly undertake all actions required by applicable Environmental Law to address any non-compliance with or violation of Environmental Law; (iii) promptly undertake all response actions required by Environmental Laws to address any recognized environmental conditions identified in the environmental assessment report to the reasonable satisfaction of the Administrative Agent; and (iv) permit the Administrative Agent and its representatives to have access to all Real Property and all facilities owned, leased or operated by any of the Credit Parties and their Subsidiaries which are the subject of such Default for the purpose of conducting such environmental audits and testing as is reasonably necessary, including subsurface sampling of soil and groundwater, the cost for which shall be payable by the Credit Parties.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 8.07    ERISA .

(a)       As soon as possible and, in any event, within ten (10) days after any Credit Party, any of its Subsidiaries or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following events, the Borrower will deliver to the Agents and each Lender a certificate of an Authorized Officer of the Borrower setting forth the full details as to such occurrence and the action, if any, that such Credit Party, such Subsidiary or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by such Credit Party, such Subsidiary, such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto: (i) the institution of any steps by any Person to terminate any Plan; (ii) the failure to make a required contribution to any Plan if such failure is sufficient to give rise to a Lien under Sections 303(k) or 4068 of ERISA or under Section 430(k) of the Code; (iii) the taking of any action with respect to a Plan which could result in the requirement that any Credit Party furnish a bond or other security to the PBGC or such Plan; (iv) the occurrence of any event with respect to any Plan which could result in the incurrence by any Credit Party of any material liability, fine or penalty, notice thereof and copies of all documentation relating thereto; (v) that a Reportable Event has occurred (except to the extent that the Borrower has previously delivered to the Agents and Lenders a certificate and notices (if any) concerning such event pursuant to the next clause hereof); (vi) that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; (vii) that a failure to satisfy the minimum funding standard within the meaning of Section 430 of the Code or Section 303 of ERISA (whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA) has occurred (or is reasonably likely to occur) or an application may be or has been made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412, 430 or 431 of the Code or Section 302, 303 or 304 of ERISA with respect to a Plan; (viii) that a Plan having any material Unfunded Current Liability has been or is to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA (including the giving of written notice thereof); (ix) that a Plan has an Unfunded Current Liability that has or will result in a Lien under ERISA or the Code; (x) that proceedings may be or have been instituted to terminate a Plan having an Unfunded Current Liability (including the giving of written notice thereof); (xi) that a proceeding may be or has been instituted against a Credit Party, a Subsidiary thereof or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; (xii) that the PBGC has notified any Credit Party, any Subsidiary thereof or any ERISA Affiliate of its intention to appoint a trustee to administer any Plan; (xiii) that any Credit Party, any Subsidiary thereof or any ERISA Affiliate has failed to make a required installment or other payment pursuant to Section 412 of the Code with respect to a Plan; (xiv) that any Credit Party, any Subsidiary thereof or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 436(f), 4971, 4975 or 4980 of the Code; or (xv) that any Credit Party, any Subsidiary thereof or any ERISA Affiliate may be directly or indirectly liable for a violation of the applicable requirements of Section 404 or 405 of ERISA or the exclusive benefit rule under Section 401(a) of the Code by any fiduciary or disqualified person with respect to any Plan; and

92

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)     Promptly following any request therefor, copies of any documents described in Section 101(k) of ERISA that any Credit Party, any of its Subsidiaries or any ERISA Affiliate may request with respect to any Plan, any notices described in Section 101(l) of ERISA that any Credit Party, any of its Subsidiaries or any ERISA Affiliate may request with respect to any Plan and any information that any Credit Party, any of its Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan in connection with Section 4221(e) of ERISA; provided, that if any Credit Party, any of its Subsidiaries or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Plan, the applicable Credit Party, the applicable Subsidiary(ies) or the ERISA Affiliate(s) shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

SECTION 8.08     Maintenance of Properties . Each Credit Party will, and will cause its Subsidiaries to, maintain, preserve, protect and keep its properties and assets in good repair, working order and condition (ordinary wear and tear excepted and subject to casualty, condemnation and dispositions permitted pursuant to Section 9.04 ), and make necessary repairs, renewals and replacements thereto and will maintain and renew as necessary all licenses, Permits and other clearances necessary to use and occupy such properties and assets, in each case so that the business carried on by such Person may be properly conducted at all times, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 8.09     End of Fiscal Years; Fiscal Quarters . The Credit Parties will, for financial reporting purposes, cause (a) each of their, and each of their Subsidiaries' fiscal years to end on December 31 of each year and (b) each of their, and each of their Subsidiaries', fiscal quarters to end on dates consistent with such fiscal year-end and Borrower's past practice.

SECTION 8.10     Additional Guarantors and Grantors . Subject to any applicable limitations set forth in the Security Documents, the Credit Parties will upon the formation or acquisition thereof (including by division of any existing limited liability company pursuant to a "plan of division" under the Delaware Limited Liability Company Act) (a) promptly cause any direct or indirect Subsidiary formed or otherwise purchased or acquired after the Closing Date to execute (i) a joinder to this Agreement pursuant to which such Subsidiary shall become a party to this Agreement as an additional Guarantor hereunder or another guarantee in form and substance satisfactory to the Administrative Agent and (ii) a supplement to the Security Agreement in the form of Annex I to the Security Agreement or another Security Document in form and substance satisfactory to Collateral Agent and (b) deliver or cause such Subsidiary to deliver such opinions, resolutions, certificates and other documents with respect to such Subsidiary as are consistent with those delivered by the Credit Parties on the Closing Date under Article V ; provided , that, no Immaterial Subsidiary shall be required to become a Guarantor hereunder.

93

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 8.11    Pledges of Additional Stock . Subject to any applicable limitations set forth in the Security Documents, the Credit Parties will promptly pledge to Collateral Agent for the benefit of the Secured Parties, (i) all the Capital Stock of each Subsidiary formed or otherwise purchased or acquired after the Closing Date and directly held by a Credit Party and (ii) any promissory notes executed after the Closing Date evidencing Indebtedness owing to any Credit Party in an amount of $100,000 or more (as to any individual evidence of Indebtedness) received by the Credit Parties.

SECTION 8.12    Use of Proceeds . The proceeds of the Loans funded on the Closing Date shall be used (i) to make the Fortress Debt Repayment, (ii) to pay the purchase price owing in connection with Permitted Acquisitions, if any, (iii) to make the Yonder Investment to the extent permitted hereunder, (iv) for general working capital purposes, and (v) to pay the transaction fees, costs and expenses incurred directly in connection with the Transactions. The remaining Loans to be funded on other Funding Dates (if any) shall be used (i) to pay the purchase price owing in connection with Permitted Acquisitions, if any, and (ii) to fund growth capital expenditures and other growth initiatives, in each case, in accordance with the terms hereunder.

SECTION 8.13    Further Assurances .

(a)    The Credit Parties will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), which may be required under any Applicable Law, or which the Collateral Agent may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by any Credit Document, all at the sole cost and expense of the Borrower. If, on any date after the Closing Date, a Subsidiary of Borrower that was classified as an "Immaterial Subsidiary" prior to such date no longer qualifies as such under the criteria therefor set forth in such definition, the Borrower shall promptly cause such Subsidiary to become a Guarantor hereunder and the Borrower and such Subsidiary shall comply with the related requirements set forth in this Agreement, including Sections 8.10 and 8.11 hereunder.

(b)    Subject to any applicable limitations set forth in any applicable Security Document, if any Credit Party acquires a fee simple interest in Real Property with a fair market value in excess of $1,000,000, the Borrower will notify the Collateral Agent and the Lenders thereof and will cause such assets to be subjected to a Lien securing the applicable Obligations and will take, and cause the other Credit Parties to take, such actions as shall be necessary or reasonably requested by the Collateral Agent to grant and/or perfect such Liens consistent with the applicable requirements of the Security Documents, including actions described in Section 8.13(a) , all at the sole cost and expense of the Borrower; provided that in the case of leasehold interests, no Mortgage shall be required except to the extent requested by the Administrative Agent in its reasonable discretion. Any Mortgage delivered to the Collateral Agent in accordance with the preceding sentence shall be accompanied by (A) a policy or policies (or unconditional binding commitment thereof) of title insurance issued by a nationally recognized title insurance company insuring the Lien of the Mortgage as a valid Lien (with the priority described therein) on the Real Property described therein, free of any other Liens except as expressly permitted by Section 9.02 , together with such endorsements and reinsurance as the Collateral Agent may reasonably request, (B) a current A.L.T.A. survey of such Real Property, satisfactory in form and substance to Collateral Agent and the title insurance company issuing the title policies (or unconditional binding commitments thereof) referenced in (A) above, which is prepared by a licensed surveyor satisfactory to Collateral Agent, (C) a flood zone determination issued by a national certification agency to Collateral Agent indicating the flood zone for each Real Property, together with evidence that the mortgagee under the Mortgage carries flood insurance reasonably satisfactory to Collateral Agent if such Real Property is located in a special flood hazard area, and (D) if requested by the Collateral Agent, an opinion of local counsel to the applicable Credit Party(ies) in form and substance reasonably satisfactory to the Collateral Agent.

94

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c)    Notwithstanding anything herein to the contrary, if the Collateral Agent determines that the cost of creating or perfecting any Lien on any property is excessive in relation to the practical benefits afforded to the Lenders thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents.

(d)    The Credit Parties shall promptly notify the Administrative Agent if the fair value of the moveable assets owned by any German Credit Party exceeds the aggregate amount of $100,000.

SECTION 8.14    Collateral Access Agreements . The Credit Parties shall use commercially reasonable efforts to obtain a Collateral Access Agreement for any leased location of the Credit Parties at the request of the Collateral Agent to the extent required by the U.S. Security Agreement.

SECTION 8.15    Bank Accounts .

(a)    On the Closing Date, the Credit Parties shall have established and delivered to Collateral Agent a Control Agreement with respect to each of their respective securities accounts, deposit accounts and investment property, each of which is set forth on Schedule 7.25 , other than those accounts which are Excluded Accounts. The Credit Parties shall not allow any Collections to be deposited to any accounts other than those listed on Schedule 7.25 which are subject to a Control Agreement; provided that so long as no Event of Default has occurred and is continuing, the Credit Parties may establish new deposit accounts, commodities accounts or securities accounts so long as, prior to or concurrently with the time such account is established: (i) the Credit Parties have delivered to the Agents an amended Schedule 7.25 including such account and (ii) the Credit Parties have delivered to Collateral Agent a Control Agreement with respect to such account to the extent such account is not an Excluded Account.

(b)    Each Control Agreement shall provide, among other things, that (i) upon notice (a " *Notice of Control* ") from the Collateral Agent, the bank, securities intermediary or other financial institution party thereto will comply with instructions of the Collateral Agent directing the disposition of funds without further consent by the applicable Credit Party; provided that the Collateral Agent agrees not to issue a Notice of Control unless an Event of Default has occurred and is then continuing, and (ii) the bank, securities intermediary or other financial institution party thereto has no rights of setoff or recoupment or any other claim against the account subject thereto, other than for payment of its service fees and other charges directly related to the administration of such account and for returned checks or other items of payment. In the event Collateral Agent issues a Notice of Control under any Control Agreement, all Collections or other amounts subject to such Control Agreement shall be transferred as directed by the Collateral Agent and used to pay the Obligations in the manner set forth in Section 4.02(d) .

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c)        If, notwithstanding the provisions of this Section 8.15 , after the occurrence and during the continuance of an Event of Default, the Credit Parties receive or otherwise have dominion over or control of any Collections or other amounts, the Credit Parties shall hold such Collections and amounts in trust for the Collateral Agent and shall not commingle such Collections with any other funds of any Credit Party or other Person or deposit such Collections in any account other than those accounts set forth on Schedule 7.25 which are subject to a Control Agreement.

(d)        Within five (5) Business Days after written request by Administrative Agent, the Credit Parties shall provide the Collateral Agent with copies of all monthly (or other, periodic) bank (or other financial intermediary) statements of account with respect to all securities accounts, deposit accounts and investment property of the Credit Parties.

(e)        The Credit Parties shall cause all amounts paid by [***] and [***] in connection with the [***] Agreement and the [***] Agreement to be remitted to the Pareteum Europe Capital One Account; provided , that, if such amounts are remitted to an account other than the Pareteum Europe Capital One Account, the Credit Parties shall transfer such amounts to the Pareteum Europe Capital One Account no later than the Business Day immediately following such initial deposit.

SECTION 8.16        Annual Lender Meeting . Borrower will, and will cause each of its Subsidiaries to, upon the request by the Required Lenders, participate in a meeting of the Lenders, so long as no Event of Default or Default under Section 10.01(i) shall have occurred and be continuing, once each year, and otherwise as frequently as may be required by the Administrative Agent, during each fiscal year, to be held via teleconference or in person at least once per year, at a time selected by the Administrative Agent and reasonably acceptable to the Lenders and the Borrower. The purpose of this meeting shall be to present the Credit Parties' previous fiscal years' financial results and to present the Credit Parties' Budget for the current fiscal year.

SECTION 8.17        Post-Closing Covenants . The Credit Parties shall comply with the requirements set forth on Schedule 8.17 in accordance with the terms thereof.

SECTION 8.18        Centre of Main Interest . Each Netherlands Subsidiary shall maintain its center of interest in the Netherlands, each Belgian Guarantor Subsidiary shall maintain its center of interest in Belgium and Interactive shall maintain its center of interest in Germany for the purposes of the Insolvency Regulation.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 8.19    <u>Parallel Debt</u> .

(a)    Each Credit Party hereby irrevocably and unconditionally undertakes to pay to the Collateral Agent an amount equal to the aggregate amount due in respect of the Corresponding Obligations as they may exist from time to time. The payment undertaking of each of the Credit Parties under this <u>Section 8.19(a)</u> is to be referred to as a " ***Parallel Debt*** ".

(b)    The Parallel Debts of each of the Credit Parties will be payable in the currency or currencies of the Corresponding Obligations and will become due and payable as and when and to the extent one or more of the Corresponding Obligations become due and payable. An Event of Default in respect of the Corresponding Obligations shall constitute a default ( *verzuim* ) within the meaning of section 3:248 of the Netherlands Civil Code and a default ( *Verzug* ) within the meaning of section 286 of the German Civil Code ( *Bürgerliches Gesetzbuch* ) with respect to the Parallel Debts without any notice being required.

(c)    Each of the parties to this Agreement hereby acknowledges that:

(i)    each Parallel Debt constitutes an undertaking, obligation and liability to the Collateral Agent which is separate and independent from, and without prejudice to, the Corresponding Obligations; and

(ii)    each Parallel Debt represents the Collateral Agent's own separate and independent claim to receive payment of the Parallel Debt,

it being understood, in each case, that pursuant to this Section 8.19(c) the amount which may become payable by each of the Credit Parties as a Parallel Debt shall never exceed the total of the amounts which are payable under or in connection with the Corresponding Obligations.

(d)    The Collateral Agent hereby confirms and accepts that to the extent the Collateral Agent irrevocably receives any amount in payment of a Parallel Debt, the Collateral Agent shall distribute that amount among the Secured Parties that are creditors of the relevant Corresponding Obligations in accordance with <u>Section 4.02(d)</u> of this Agreement. Upon irrevocable receipt by the Collateral Agent of any amount in payment of a Parallel Debt (a " ***Received Amount*** "), the Corresponding Obligations shall be reduced, if necessary pro rata in respect of the Collateral Agent and each Secured Party individually, by amounts totaling an amount (a " ***Deductible Amount*** ") equal to the Received Amount in the manner as if the Deductible Amount were received by the Collateral Agent and the Secured Parties as a payment of the Corresponding Obligations owed by the relevant Credit Party on the date of receipt by the Collateral Agent of the Received Amount.

(e)    For the purpose of this Section 8.19 the Collateral Agent acts in its own name and on behalf of itself and not as agent or representative of any other Secured Party.

(f)    Without limiting or affecting the Collateral Agent´s rights against the Credit Parties (whether under this <u>Section 8.19</u> or under any other provision of the Credit Documents), the Credit Parties acknowledge that (i) nothing in this <u>Section 8.19</u> shall impose any obligation on the Collateral Agent to advance any sum to any Credit Party or otherwise under any Credit Document and (ii) for the purpose of any vote taken under any Credit Document, the Collateral Agent shall not be regarded as having any participation or Commitment.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 8.20    Legends; Rule 144 .

(a)    Upon the request of any holder of Lender Shares, the Company shall remove any restrictive legends under the Securities Act on the certificates or analogous restrictions on book-entry positions, and shall issue or cause to be issued a certificate (or book entry position) without such legend or any other legend to the holder of the applicable Lender Shares, or issue or cause to be issued to such holder by electronic delivery at the applicable balance account at The Depository Trust Company, if (i) such shares are registered for resale under the Securities Act and such holder is selling pursuant to the effective registration statement registering such shares for resale, or (ii) such shares are sold or are eligible to be sold in compliance with Rule 144 under the Securities Act without restriction. Any fees or expenses (with respect to the Borrower's transfer agent, outside counsel or otherwise) associated with the removal of such legend shall be borne by the Borrower.

(b)    With a view toward making available to the holders of Lender Shares the benefits of Rule 144 promulgated under the Securities Act and any other rule or regulation of the SEC that may at any time permit a holder thereof to sell securities to the public without registration, the Borrower shall (i) use commercially reasonable efforts to make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act; (ii) use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required of the Borrower under the Securities Exchange Act of 1934, as amended, at any time when the Borrower is subject to such reporting requirements; and (iii) furnish to any holder thereof, promptly upon request, a written statement by the Borrower as to its compliance with the reporting requirements of Rule 144 under the Securities Act and of the Securities Exchange Act of 1934, as amended, a copy of the most recent annual or quarterly report of the Borrower, and such other reports and documents so filed or furnished by the Borrower as such holder may reasonably request in connection with the sale of Lender Shares without registration (in each case to the extent not readily publicly available).

SECTION 8.21    Reserved .

SECTION 8.22    Sanctions; Anti-Corruption Laws .

(a)    No Credit Party shall (or shall permit any Subsidiary to) directly or indirectly, use any Loan or the proceeds of any Loan, or lend, contribute or otherwise make available such Loan or the proceeds of any Loan to any Person, to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as Lender or otherwise) of Sanctions; provided that no undertaking shall be made by any German Credit Party to the extent it would violate section 7 of the German Foreign Trade Ordinance ( *Außenwirtschaftsverordnung* ), any provision of Council Regulation (EC) 2271/1996 or any similar applicable anti-boycott law or regulation binding on that German Credit Party.

(b)    No Credit Party shall (or shall permit any Subsidiary to) directly or indirectly, use any Loan or the proceeds of any Loan for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other jurisdictions.

[\*\*\*] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 8.23    <u>Board Observation Rights</u> . The Borrower shall allow one (1) representative designated by the Administrative Agent (the " <u>Board Representative</u> ") to attend in an observer capacity any annual or quarterly meetings of the Board of Directors or any similar governing body of Borrower. Borrower shall (i) give the Board Representative notice of all such annual and quarterly meetings, at the same time as furnished to the attendees, directors, officers or stockholders, as applicable, of Borrower, (ii) provide to the Board Representative all notices, documents and information furnished to the attendees, directors, officers or stockholders, as applicable, of Borrower, whether at or in anticipation of a meeting, at the same time furnished to such directors, officers, or stockholders, as applicable; <u>provided</u> , that, with respect to monthly meetings of the Board of Directors, the Borrower shall only be required pursuant to this clause (ii) to deliver to the Board Representative the monthly information packet provided to the Board of Directors in connection with such monthly meeting, (iii) provide the Board Representative copies of the minutes of all such annual and quarterly meetings at the time such minutes are furnished to the attendees of such meeting (if any) and (iv) reimburse the Board Representative for all reasonable expenses and all reasonable out of pocket expenses related to the foregoing for the Board Representative. The Board Representative shall be free during the period prior to the meeting to contact the directors or officers, as applicable, of Borrower and its Subsidiaries and discuss the pending actions to be taken. Notwithstanding the foregoing, the Board Representative may be excused by the Borrower's Board of Directors from attending any portion of a board meeting and certain materials may be withheld or redacted from distribution under this <u>Section 8.19</u> to the extent that (i) such attendance or disclosure would jeopardize the Borrower's ability to assert the attorney-client privilege with respect to matters discussed or disclosed, or (ii) matters discussed or disclosed relate to a matter involving a conflict of interest with the Administrative Agent or its Board Representative, in each case as determined by the Borrower's Board of Directors in good faith. As of the Closing Date, the Board Representative will be Michael Bogdan, <u>provided</u> , however, that the Administrative Agent shall be entitled to designate a different representative to serve as Board Representative from time to time in its reasonable discretion.

SECTION 8.24    <u>Privacy and Data Security</u> . The Credit Parties and their Subsidiaries shall, at all times, remain in compliance with all United States and international privacy and data security laws and regulations including, without limitation, GDPR.

SECTION 8.25    <u>Dutch Fiscal Unity</u> . Any fiscal unity ( *fiscale eenheid* ) for Dutch corporate income tax ( *vennootschapsbelasting* ) purposes in which a Credit Party is included, if any, shall consist of Dutch Credit Parties only, unless with the prior written consent of the Administrative Agent.

SECTION 8.26    <u>Additional Lender Shares</u> . On the Additional Issuance Date, the Borrower shall issue the Additional Lender Shares and deliver, or cause to be delivered, to the Administrative Agent on such Additional Issuance Date, an executed irrevocable instruction letter to the Borrower's transfer agent, in form and substance acceptable to the Administrative Agent, providing for the issuance of the Additional Lender Shares, in each case to the Lenders, with each Lender being issued a number of Additional Lender Shares proportionate to the aggregate principal amount of Commitments held by each such Lender on the Additional Issuance Date as a percentage of the Commitments held by all Lenders on the Additional Issuance Date, with such adjustments to reflect rounding or other adjustments as the Administrative Agent may agree.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**ARTICLE IX**
**Negative Covenants**

The Credit Parties hereby covenant and agree that until the Loans, together with interest, Fees and all other Obligations incurred hereunder (other than Unasserted Contingent Obligations) are paid in full in accordance with the terms of this Agreement:

SECTION 9.01    Limitation on Indebtedness . Each Credit Party will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee, suffer to exist or otherwise become directly or indirectly liable, contingently or otherwise with respect to any Indebtedness, except for:

(a)    Indebtedness in respect of the Obligations;

(b)    Indebtedness existing as of the Closing Date which is identified on Schedule 7.24 and which is not otherwise permitted by this Section 9.01 , and any Refinancing Indebtedness in respect of such Indebtedness;

(c)    unsecured Indebtedness incurred by the Borrower or any other Credit Party that is (i) incurred in the ordinary course of business of such Credit Party and its Subsidiaries in respect of open accounts extended by suppliers on normal trade terms in connection with purchases of goods and services which are not overdue for a period of more than ninety (90) days or, if overdue for more than ninety (90) days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of such Credit Party and (ii) in respect of performance, surety or appeal bonds provided in the ordinary course of business and consistent with past practice, but excluding (in each case) Indebtedness incurred through the borrowing of money or Contingent Liabilities in respect thereof;

(d)    Indebtedness incurred by the Borrower or any other Credit Party (i) evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of equipment of such Credit Party and its Subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of such Credit Party and its Subsidiaries ( provided that such Indebtedness is incurred within ninety (90) days of the acquisition of such property), and (ii) constituting Capitalized Lease Obligations; provided that the principal amount of such Indebtedness under clauses (i) and
(ii) shall not exceed $2,000,000 in the aggregate at any one time outstanding;

(e)    Guarantee Obligations of any Credit Party in respect of Indebtedness otherwise permitted hereunder of the Borrower or any Subsidiary of the Borrower which is a Credit Party;

(f)    non-recourse Indebtedness incurred by the Borrower or any Credit Party to finance the payment of insurance premiums;

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(g)    intercompany Indebtedness (i) between any Credit Parties, (ii) or by any Credit Party owing to any Subsidiary that is not a Credit Party, so long as such Indebtedness is subject to a subordination agreement (or evidenced by a note which includes subordination terms) in form and substance satisfactory to Collateral Agent, (B) between any Subsidiaries that are not Credit Parties, and (iii) by any Subsidiary that is not a Credit Party owing to any Credit Party in an aggregate amount not to exceed, when combined with the aggregate amount of Investments made pursuant to Section 9.05(d)(i) , $100,000;

(h)    the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(i)    Indebtedness in respect of netting services, overdraft protection and otherwise in connection with deposit accounts or similar accounts incurred in the ordinary course of business;

(j)    Indebtedness owed to any Person providing worker's compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Borrower or any Subsidiary incurred in connection with such Person providing such benefits or insurance pursuant to customary reimbursement or indemnification obligations to such Person;

(k)    Indebtedness in respect of surety bonds, performance bonds and similar instruments issued in an aggregate amount not to exceed (i) $250,000 in respect of each such surety bond, performance bond and similar instrument or (ii) $1,000,000 in respect of all such surety bonds, performance bonds and similar instruments in the aggregate;

(l)    Indebtedness relating to judgments, including appeal bonds, or awards not constituting an Event of Default under Section 10.01(g) ;

(m)    Indebtedness representing letters of credit for the account of any Credit Party intended to provide security for payment obligations in the ordinary course of business; and

(n)    other unsecured Indebtedness of the Borrower or any other Credit Party in an aggregate amount at any time outstanding not to exceed $500,000.

SECTION 9.02    Limitation on Liens . Each Credit Party will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of any such Person (including its Capital Stock), whether now owned or hereafter acquired, except for the following (collectively, the " *Permitted Liens* "):

(a)    Liens securing payment of the Obligations;

(b)    Liens existing as of the Closing Date and disclosed in Schedule 9.02 securing Indebtedness permitted under Section 9.01(b) , and Refinancing Indebtedness in respect of such Indebtedness; provided that no such Lien shall encumber any additional property and the amount of Indebtedness secured by such Lien shall not be increased or its term extended from that existing on the Closing Date (as such Indebtedness may be permanently reduced subsequent to the Closing Date) except to the extent permitted by Section 9.01(b) ;

101

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c)      Liens securing Indebtedness of the type permitted under Section 9.01(d) ; provided that (i) such Lien is granted within ninety (90) days after such Indebtedness is incurred,
(ii) the Indebtedness secured thereby does not exceed the lesser of the cost and the fair market value of the applicable property, improvements or equipment at the time of such acquisition (or construction) and (iii) such Lien secures only the assets that are the subject of the Indebtedness referred to in such clause and the proceeds thereof;

(d)      Liens arising by operation of law in favor of carriers, warehousemen, mechanics, materialmen and landlords incurred in the ordinary course of business for amounts not yet overdue or being diligently contested in good faith by appropriate proceedings that stay execution of such Lien and for which adequate reserves in accordance with GAAP shall have been established on its books;

(e)      Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business or to secure obligations on surety, appeal or performance bonds; with respect to Interactive this shall include security created or subsisting in order to comply with the requirements of Section 8a of the German Partial Retirement Act ( *Altersteilzeitgesetz* ) and of Section 7e of the German Social Security Code IV ( *Sozialgesetzbuch IV* );

(f)      judgment Liens which do not otherwise result in an Event of Default under Section 10.01(g) ;

(g)      easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other similar encumbrances not interfering in any material respect with the value or use of the property to which such Lien is attached;

(h)      Liens for Taxes, assessments or other governmental charges or levies not yet due and payable, or that are being diligently contested in good faith by appropriate proceedings that stays execution and for which adequate reserves in accordance with GAAP shall have been established on its books;

(i)      Liens arising in the ordinary course of business by virtue of any contractual, statutory or common law provision relating to banker's Liens, rights of set-off or similar rights and remedies covering deposit or securities accounts (including funds or other assets credited thereto) or other funds maintained with a depository institution or securities intermediary, so long as the applicable provisions of Section 8.15 have been complied with, in respect of such deposit accounts;

(j)      any interest or title of a lessor, licensor or sublessor under any lease, license or sublease (and precautionary UCC filings with respect thereto) entered into by any such Credit Party or Subsidiary in the ordinary course of its business and covering only the assets so leased, licensed or subleased;

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(k)        Liens solely on any cash earnest money deposits made by such Person in connection with any letter of intent or purchase agreement permitted hereunder;

(l)        Liens of sellers of goods to such Person arising under Article II of the Uniform Commercial Code or similar provisions of Applicable Law in the ordinary course of business, covering only the goods sold or securing only the unpaid purchase price of such goods and related expenses to the extent such Indebtedness is permitted hereunder;

(m)        Liens on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto to the extent such financing is permitted under Section 9.01(h) ;

(n)        Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits so long as the applicable provisions of Section 8.15 have been complied with;

(o)        deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds, letters of credit and other obligations of a like nature, in each case in the ordinary course of business; and

(p)        other Liens with respect to which the aggregate amount of the obligations secured thereby does not exceed $100,000.

Notwithstanding anything to the contrary set forth in this Section 9.02, in no event shall any Credit Party create, incur, assume or suffer to exist any Lien (other than Liens in favor of the Collateral Agent pursuant to the Credit Documents) upon the rights of any Credit Party or Subsidiary under any Material Contract (including without limitation, the [***] Agreement) or any accounts receivable, Collections or proceeds arising thereunder or with respect thereto.

SECTION 9.03    Consolidation, Merger, etc . Each Credit Party will not, and will not permit any of its Subsidiaries, to liquidate or dissolve, consolidate with, or merge into or with, any other Person or purchase or otherwise acquire all or substantially all of the assets of any Person (or any division thereof); provided that (a) any Credit Party (other than the Borrower) or Subsidiary of any Credit Party may liquidate or dissolve voluntarily into, and may merge with and into, the Borrower (so long as the Borrower is the surviving entity), (b) any Guarantor may liquidate or dissolve voluntarily into, and may merge with and into any other Guarantor organized under the laws of the same jurisdiction, (c) the assets or Capital Stock of any Credit Party may be purchased or otherwise acquired by the Borrower, (d) the assets or Capital Stock of any Guarantor may be purchased or otherwise acquired by any Credit Party, and (e) the assets of any Subsidiary that is not a Credit Party may be purchased or otherwise acquired by any Credit Party.

SECTION 9.04    Permitted Dispositions . Each Credit Party will not, and will not permit any of its Subsidiaries, to make a Disposition, or enter into any agreement to make a Disposition, of such Credit Party's or such other Person's assets (including accounts receivable and Capital Stock of Subsidiaries) to any Person in one transaction or a series of related transactions unless such Disposition:

103

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

      (a)    is in the ordinary course of its business and is of obsolete, surplus or worn out property or property no longer used in its business; or

      (b)    is made as a consequence of any loss, damage, distribution or other casualty or any condemnation or taking of such assets by eminent domain proceedings, provided, that the proceeds thereof are applied in accordance with this Agreement; or

      (c)    is for fair market value and the following conditions are met:

           (i)    with the exception of the United Telecom Disposition, the aggregate amount of Dispositions during any fiscal year shall not exceed **[***]** and the amount of any single Disposition shall not exceed **[***]** ;

           (ii)    immediately prior to and immediately after giving effect to such Disposition, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

           (iii)    the Borrower applies any Net Disposition Proceeds arising therefrom pursuant to Section 4.02(a)(ii) ; and

           (iv)    no less than **[***]** percent ([***]%) of the consideration received for such sale, transfer, lease, contribution or conveyance is received in cash;

      (d)    is a sale of Inventory in the ordinary course of business;

      (e)    is a sale or disposition of equipment to the extent that such equipment is exchanged for credit against the purchase price of similar replacement equipment, or the proceeds of such Dispositions are reasonably promptly applied to the purchase price of similar replacement equipment, all in the ordinary course of business in accordance with Section 4.02(a)(ii) ;

      (f)    is an abandonment, failure to renew, or other disposition in the ordinary course of business of any intellectual property that is not material to the conduct of the business of any Credit Party or any Subsidiary of such Credit Party;

      (g)    is otherwise permitted by Section 9.03, Section 9.05(d) or Section 9.05(h);

      (h)    is by (i) any Credit Party or Subsidiary thereof to the Borrower, (ii) any Subsidiary of a Credit Party (other than the Borrower) to any Credit Party, (iii) any Credit Party (other than the Borrower) to another Credit Party, or (iv) by any Subsidiary that is not a Credit Party to any other Subsidiary that is not a Credit Party;

      (i)    consists of the granting of Permitted Liens;

      (j)    consists of a Disposition of cash or Cash Equivalents;

      (k)    is a sale or discount of accounts receivable arising in the ordinary course of business in connection with the collection thereof;

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(l)      consists of the leasing (pursuant to leases entered into in the ordinary course of business) or licensing of real or personal property in the ordinary course of business;

(m)      is a disposition of Real Property to a Governmental Authority that results from a condemnation; provided, that the proceeds thereof are applied in accordance with this Agreement; or

(n)      is a disposition of Transferred Receivables for cash by Borrower or Pareteum Europe to **[***]** pursuant to the **[***]** Agreement consistent with past practice, provided, that all payments and other amounts payable by **[***]** in respect of each such disposition are remitted directly by **[***]** to the Pareteum Europe Capital One Account in accordance with the **[***]** Consent and Acknowledgment.

Notwithstanding anything to the contrary set forth in this Section 9.04 , in no event shall any Credit Party sell, transfer, assign or otherwise dispose of (other than in connection with (i) the grant of a Lien in favor of the Collateral Agent pursuant to the Credit Documents, (ii) the sale of Transferred Receivables in accordance with Section 9.04(n) or (iii) the United Telecom Disposition in accordance with Section 9.04(c) ) any of its rights under or in respect of any Material Contract (including without limitation, the **[***]** Agreement) or any accounts receivable, Collections or proceeds arising thereunder or with respect thereto. The Collateral Agent and the Lenders hereby agree that the security interest of the Collateral Agent in a Transferred Receivable proposed to be sold by Borrower or Pareteum Europe to [***]under the [***]Agreement shall be deemed to be automatically released upon [***]committing to purchase such Transferred Receivable in accordance with the terms of the [***]Agreement.

SECTION 9.05     Investments . Each Credit Party will not, and will not permit any of its Subsidiaries to, purchase, make, incur, assume or permit to exist any Investment in any other Person, except:

(a)      Investments existing on the Closing Date and identified in Schedule 9.05 ;

(b)      Investments in cash and Cash Equivalents;

(c)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)      Investments by way of contributions to capital or purchases of Capital Stock (i) by any Credit Party in any of its Subsidiaries that are Credit Parties or by any Subsidiary that is not a Credit Party in any Credit Party; provided that such Credit Party or such Subsidiary shall be required to comply with Section 9.01(g)(i) in the event such Investment constitutes Indebtedness of the party making such Investment, (ii) by any Credit Party in any Subsidiary that is not a Credit Party in an aggregate amount at any time not to exceed, when combined with the aggregate principal amount of Indebtedness incurred pursuant to Section 9.01(g)(iii) , $100,000, and (iii) by any Subsidiary that is not a Credit Party in another Subsidiary that is not a Credit Party;

[\*\*\*] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(e)      Investments constituting (i) accounts receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business;

(f)      Investments consisting of any deferred portion of the sales price received by any Credit Party in connection with any Disposition permitted under Section 9.04 ;

(g)      other Investments made by the Credit Parties in an aggregate principal amount at any time not to exceed $500,000;

(h)      intercompany Indebtedness permitted pursuant to Section 9.01(i) ;

(i)      the maintenance of deposit accounts in the ordinary course of business so long as the applicable provisions of Section 8.15 have been complied with in respect of such deposit accounts;

(j)      Guarantee Obligations to the extent permitted by Section 9.01(e) ;

(k)      loans and advances to officers, directors and employees of any Credit Party for reasonable and customary business related travel expenses, entertainment expenses, moving expenses and similar expenses, in each case incurred in the ordinary course of business, in an aggregate principal amount at any time not to exceed $100,000;

(l)      Investments consisting of loans made in lieu of Restricted Payments which are otherwise permitted under Section 9.06 ;

(m)      Permitted Acquisitions; and

(n)      Deposits, prepayments and other credits to suppliers and deposits in connection with lease obligations, taxes, insurance and similar items, in each case made in the ordinary course of business and securing contractual obligations of a Credit Party, in each case to the extent constituting a Permitted Lien; and

(o)      the Yonder Investment; provided , that, for the avoidance of doubt, the Borrower shall take such actions with respect to the promissory note evidencing such Yonder Investment as required by the Security Agreement within the time frames set forth therein.

provided that no Investment otherwise permitted under clauses (d)(ii), (f), (g), (k) or (o) shall be permitted to be made if any Default or Event of Default has occurred and is continuing or would result therefrom.

SECTION 9.06    Restricted Payments . Each Credit Party will not, and will not permit any of its Subsidiaries, to make any Restricted Payment, or make any deposit for any Restricted Payment, other than:

(a)      Restricted Payments by any Subsidiary of a Credit Party to (i) its direct parent, so long as such parent is a Credit Party and a direct or indirect wholly-owned subsidiary of the Borrower or (ii) the Borrower; and

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)        Restricted Payments by any Credit Party or any of its Subsidiaries to pay dividends with respect to its Capital Stock payable solely in additional shares of such Capital Stock (other than Disqualified Capital Stock).

SECTION 9.07    Prepayments and Modification of Certain Agreements . Each Credit Party will not, and will not permit any of its Subsidiaries to:

(a)        Except as expressly permitted by Section 9.06 , make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time under the subordination terms and conditions applicable thereto.

(b)        Consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in (i) any Organization Documents, in each case, other than any amendment, supplement, waiver, termination, modification or forbearance (A) that is not materially adverse to the Secured Parties and (B) notice of which was received by the Administrative Agent at least ten (10) Business Days' (or such shorter period as the Administrative Agent may permit in its sole discretion) prior to its effectiveness, (ii) any document, agreement or instrument evidencing or governing any Indebtedness that has been subordinated to the Obligations in right of payment or any Liens that have been subordinated in priority to the Liens of the Administrative Agent unless such amendment, supplement, waiver or other modification is permitted under the terms of the subordination agreement applicable thereto, or (iii) the [***] Agreement, any Material Contract or any other agreement with any Material Customer, in each case, other than any amendment, supplement, waiver or modification (A) that is not adverse to the Secured Parties and (B) notice of which was received by the Administrative Agent at least ten (10) Business Days' (or such shorter period as the Administrative Agent may permit in its sole discretion) prior to its effectiveness.

SECTION 9.08    Sale and Leaseback . Each Credit Party will not, and will not permit any of its Subsidiaries, directly or indirectly, to enter into any agreement or arrangement providing for the sale or transfer by it of any property (now owned or hereafter acquired) to a Person and the subsequent lease or rental of such property or other similar property from such Person.

SECTION 9.09    Transactions with Affiliates . Except as set forth on Schedule 9.09 , each Credit Party will not, and will not permit any of its Subsidiaries, to enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any Affiliate (other than arrangements, transactions or contracts solely among the Credit Parties) except (a) on fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than it could obtain in an arm's-length transaction with a Person that is not an Affiliate, (b) any transaction expressly permitted under Section 9.01(g) , Section 9.03 , Section 9.05(d) , Section 9.05(h) , Section 9.05(j) , Section 9.05(k) or Section 9.06 , (c) so long as it has been approved by the Borrower's or its applicable Subsidiary's Board of Directors in accordance with Applicable Law, (i) customary fees to, and indemnifications of, non-officer directors of the Credit Parties and their respective Subsidiaries pursuant to Section 9.06(a) or (ii) the payment of reasonable and customary compensation and indemnification arrangements and benefit plans for officers and employees of the Credit Parties and their respective Subsidiaries in the ordinary course of business, and (d) transactions among Subsidiaries that are not Credit Parties in the ordinary course of business.

107

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 9.10    Restrictive Agreements, etc . Each Credit Party will not, and will not permit any of its Subsidiaries, to enter into any agreement (other than a Credit Document) prohibiting:

(a)    the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

(b)    the ability of such Person to amend or otherwise modify any Credit Document; or

(c)    the ability of such Person to make any payments, directly or indirectly, to the Borrower, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to customary restrictions of the type described in clause (a) above (which do not prohibit the Credit Parties from complying with or performing the terms of this Agreement and the other Credit Documents) which are contained in any agreement, (i)    governing any Indebtedness permitted by Section 9.01(d) as to the transfer of assets financed with the proceeds of such Indebtedness, (ii) for the creation or assumption of any Lien on the sublet or assignment of any leasehold interest of any Credit Party or any of its Subsidiaries entered into in the ordinary course of business, (iii) for the assignment of any contract or licensed intellectual property entered into by any Credit Party or any of its Subsidiaries in the ordinary course of business or (iv) for the transfer of any asset pending the close of the sale of such asset pursuant to a Disposition permitted under this Agreement.

SECTION 9.11    Hedging Agreements . Each Credit Party will not, and will not permit any of its Subsidiaries to, enter into any Hedging Agreement, except (a) Hedging Agreements entered into to hedge or mitigate risks to which such Credit Party or such Subsidiary has actual exposure (other than those in respect of Capital Stock) and (b) Hedging Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of such Credit Party or such Subsidiary.

SECTION 9.12    Changes in Business and Fiscal Year . Each Credit Party will not, and will not permit any of its Subsidiaries to:

(a)    engage in any business activity other than such business activities described on Schedule 9.12 and business activities incidental or reasonably related thereto; or

(b)    modify or change its fiscal year or its method of accounting (other than (i) as may be required to conform to GAAP, or (ii) to the extent consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed)).

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 9.13    Financial Covenants . The Credit Parties will not permit:

(a)    Liquidity . Liquidity of the Credit Parties to be less than $2,000,000 at any time.

(b)    Maximum Total Leverage Ratio . The Total Leverage Ratio, as of the last day of each fiscal quarter, to be greater than the amount set forth below opposite such fiscal quarter:

| Fiscal Quarter Ending | Total Leverage Ratio |
|---|---|
| March 31, 2019 | [***]:1.00 |
| June 30, 2019 | [***]:1.00 |
| September 31, 2019 and each fiscal quarter thereafter | [***]:100 |

(c)    Minimum Current Assets to Debt Ratio . The Current Assets to Debt Ratio, as of the last day of each fiscal quarter, to be less than **[***]** to 1.00.

(d)    Maximum Churn Rate . (A) the Churn Rate, as of the last day of each fiscal quarter, to be greater than **[***]** percent ([***]%); provided , however , that, the Borrower's failure to comply with such maximum Churn Rate covenant during any fiscal quarter ending on or before December 31, 2019 shall not constitute a Default or Event of Default hereunder so long as the Borrower maintains compliance with Section 9.13(f) hereunder.

(e)    Minimum Adjusted EBITDA . The Adjusted EBITDA, as of the last day of each fiscal quarter, to be less than the amount set forth below opposite such fiscal quarter:

| Fiscal Quarter Ending | Adjusted EBITDA |
|---|---|
| March 31, 2019 | $[***] |
| June 30, 2019 | $[***] |
| September 31, 2019 | $[***] |
| December 31, 2019 | $[***] |
| March 31, 2020 | $[***] |
| June 30, 2020 | $[***] |
| September 31, 2020 | $[***] |
| December 31, 2020 | $[***] |
| March 31, 2021 | $[***] |
| June 30, 2021 | $[***] |
| September 31, 2021 | $[***] |
| December 31, 2021 | $[***] |

(f)    Minimum Consolidated Revenue . The Consolidated Revenue, during the continuance of a Consolidated Revenue Testing Period, as of the last day of each fiscal quarter set forth below, to be less than the amount set forth below opposite such fiscal quarter, commencing with the fiscal quarter immediately preceding the commencement of such Consolidated Revenue Testing Period:
**[***]**

109

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

| Fiscal Quarter Ending | Consolidated Revenue |
|---|---|
| March 31, 2019 | $[***] |
| June 30, 2019 | $[***] |
| September 31, 2019 | $[***] |
| December 31, 2019 | $[***] |

SECTION 9.14    Reserved .

SECTION 9.15    Dutch Fiscal Unity . The Dutch Credit Parties shall not change their residence for tax purposes unless with the prior written consent of the Administrative Agent.

**ARTICLE X**
**Events of Default**

SECTION 10.01    Listing of Events of Default . Each of the following events or occurrences described in this Section 10.01 shall constitute an " *Event of Default* ":

(a)    Non-Payment of Obligations . The Borrower shall default in the payment of:

(i) any principal of any Loan when such amount is due; or

(ii) any interest on any Loan and such default shall continue unremedied for a period of two (2) Business Days after such amount is due; or

(iii)    any fee described in Article III or any other monetary Obligation, and such default shall continue unremedied for a period of three (3) Business Days after such amount is due.

(b)    Breach of Representations or Warranties . Any representation or warranty by any Credit Party made or deemed to be made in any Credit Document (including any certificates delivered pursuant to Article V ), is or shall be incorrect when made or deemed to have been made.

(c)    Non-Performance of Certain Covenants and Obligations . Any Credit Party shall default in the due performance or observance of any of its obligations under Section 8.01, Section 8.02, Section 8.03, Section 8.04, Section 8.05 (solely with respect to such Credit Party's existence in its jurisdiction of organization), Section 8.10, Section 8.11, Section 8.12, Section 8.13, Section 8.15, Section 8.17, Section 8.18, Section 8.20 or Section 8.23 or Article IX, or any Credit Party shall default in the due performance or observance of its obligations under any covenant applicable to it under any Security Document (subject to any grace or cure period specified in such Security Document).

(d)    Non-Performance of Other Covenants and Obligations . Any Credit Party shall default in the due performance or observance of any of its obligations under Section 8.05 (solely with respect to such Credit Party's maintenance of good standing in its jurisdiction of organization), Section 8.06 , Section 8.07 or Section 8.16 , and such default shall continue unremedied for a period of ten (10) days after the occurrence thereof.

110

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(e)    Non-Performance of Other Covenants and Obligations . Any Credit Party shall default in the due performance and observance of any obligation contained in any Credit Document executed by it (other than as specified in Sections 10.01(a) , 10.01(b) . 10.01(c), or 10.01(d) ), and such default shall continue unremedied for a period of twenty (20) days after the occurrence thereof.

(f)    Default on Other Indebtedness . (i) a default shall occur in the payment of any amount when due (subject to any applicable grace period), whether by acceleration or otherwise, of any principal or stated amount of, or interest or fees on, any Indebtedness (other than the Obligations) of any Credit Party or Subsidiary of any Credit Party having a principal or stated amount, individually or in the aggregate, in excess of $500,000, or a default shall occur in the performance or observance of any obligation or condition with respect to any such Indebtedness if the effect of such default is to accelerate the maturity of such Indebtedness or to permit the holder or holders of such Indebtedness, or any trustee or agent for such holders, to cause or declare such Indebtedness to become immediately due and payable, or (ii) any Indebtedness of any Credit Party or Subsidiary of any Credit Party having a principal or stated amount, individually or in the aggregate, in excess of $500,000 shall otherwise be required to be prepaid, redeemed, purchased or defeased, or require an offer to purchase or defease such Indebtedness to be made, prior to its expressed maturity).

(g)    Judgments; Fines . Any judgment, order for the payment of money, fines, settlements or enforcement penalties (including, without limitation, as a result of any action described in Section 8.01(g)(ii)(D) ), in an amount individually or in the aggregate in excess of $500,000 (exclusive of any amounts covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) shall be rendered against any Credit Party or any of its Subsidiaries and such judgment, order, fine, settlement or penalty shall not have been vacated or discharged or stayed or bonded pending appeal within thirty (30) days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

(h)    Plans . Any of the following events shall occur with respect to any Plan:

(i)    the institution of any steps by any Credit Party, any Subsidiary of a Credit Party, any ERISA Affiliate or any other Person to terminate or partially terminate a Plan if, as a result of such termination or partial termination, any Credit Party or Subsidiary of any Credit Party could be required to make a contribution to such Plan, or could reasonably be expected to incur a liability or obligation to such Plan, in excess of $500,000 in the aggregate;

(ii)    there is or arises any potential withdrawal liability under Section 4201 of ERISA, if any Credit Party, any Subsidiary of a Credit Party or any ERISA Affiliate were to completely or partially withdraw from one or more Multiemployer Plans, in excess of $350,000, in the aggregate; or

(iii)    a contribution failure occurs with respect to any Plan sufficient to give rise to a Lien under Sections 303(k) or 4068 of ERISA or Section 430(k) of the Code.

111

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(i)        Bankruptcy, Insolvency, etc . Any Credit Party or any of its Subsidiaries shall:

(i)        become insolvent or generally fail to pay, or admit in writing its inability or unwillingness generally to pay, its debts as they become due;

(ii)        apply for, consent to, or acquiesce in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the assets or other property of any such Person, or make a general assignment for the benefit of creditors;

(iii)        in the absence of such application, consent or acquiesce to or permit or suffer to exist, the appointment of a trustee, receiver, sequestrator or other custodian for a substantial part of the property of any thereof, and such trustee, receiver, sequestrator or other custodian shall not be discharged within sixty (60) days; provided that each Credit Party hereby expressly authorizes each Secured Party to appear in any court conducting any relevant proceeding during such 60-day period to preserve, protect and defend their rights under the Credit Documents;

(iv)        permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect thereof, and, if any such case or proceeding is not commenced by such Person, such case or proceeding shall be consented to or acquiesced in by such Person, or shall result in the entry of an order for relief or shall remain for sixty (60) days undismissed; provided that each Credit Party hereby expressly authorizes each Secured Party to appear in any court conducting any such case or proceeding during such 60-day period to preserve, protect and defend their rights under the Credit Documents; or

(v)        take any action authorizing, or in furtherance of, any of the foregoing.

(j)        Foreign Insolvency Event . A Netherlands Insolvency Event or a German Insolvency Event in relation to a Credit Party shall occur.

(k)        Impairment of Security, etc . Any Credit Document or any Lien granted thereunder shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Credit Party party thereto with respect to Collateral in an aggregate amount in excess of $100,000, or any Credit Party or any other Person shall, directly or indirectly, contest or limit in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any Credit Document, any Lien securing any Obligation shall, in whole or in part, cease to be a perfected Lien with respect to Collateral in an aggregate amount in excess of $100,000 (other than as a result of voluntary and intentional discharge of the Lien by the Collateral Agent).

(l)        Change of Control . Any Change of Control shall occur.

(m)        Hedging Agreement . Any Credit Party or any of its Subsidiaries shall (i) default in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment due on early termination of, any Hedging Agreement, in each case beyond the period of grace, if any, provided in such Hedging Agreement, or (ii) defaults in the observance or performance of any other agreement or condition relating to any such Hedging Agreement, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, after the giving of notice if required or the elapse of any grace period, a liquidation, acceleration or early termination of such Hedging Agreement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(n)     Restraint of Operations; Loss of Assets . If any Credit Party or any Subsidiary of a Credit Party is enjoined, restrained, or in any way prevented by court order or other Governmental Authority from continuing to conduct all or any material part of its business affairs or if any material portion of any Credit Party's or any of its Subsidiaries' assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and the same is not discharged before the earlier of 30 days after the date it first arises or 5 days prior to the date on which such property or asset is subject to forfeiture by such Credit Party or the applicable Subsidiary.

(o)     Termination of Key Contract . (i) Any Credit Party or Subsidiary shall default in the performance of any of its obligations under any Key Contract and such default shall entitle the other party to such Key Contract to terminate such Key Contract or withhold or reduce the amount of any payment payable to any Credit Party or Subsidiary thereunder or (ii) any Key Contract is terminated or the other party to any Key Contract notifies any Credit Party or Subsidiary that it intends to terminate or not renew such Key Contract.

(p)     Material Adverse Effect . Any Material Adverse Effect shall occur.

SECTION 10.02 Remedies Upon Event of Default . If any Event of Default under Section 10.01(i) shall occur for any reason, whether voluntary or involuntary, all of the outstanding principal amount of the Loans and other Obligations, together with the Exit Fee, shall automatically be due and payable and any commitments shall be terminated, in each case, without further notice, demand or presentment. If any Event of Default (other than any Event of Default under Section 10.01(i) ) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent may, and upon the direction of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable and any commitment shall be terminated, whereupon the full unpaid amount of such Loans and other Obligations that shall be so declared due and payable shall be and become immediately due and payable, together with any Exit Fee, in each case, without further notice, demand or presentment. The Lenders and the Collateral Agent shall have all other rights and remedies available at law or in equity or pursuant to any Credit Documents.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

## ARTICLE XI
## The Agents

SECTION 11.01    Appointment . Each Lender (and, if applicable, each other Secured Party) hereby appoints Post Road as its Collateral Agent under and for purposes of each Credit Document, and hereby authorizes the Collateral Agent to act on behalf of such Lender (or if applicable, each other Secured Party) under each Credit Document, other than under the Netherlands Security Documents, and, in the absence of other written instructions from the Lenders pursuant to the terms of the Credit Documents received from time to time by the Collateral Agent, to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Collateral Agent by the terms hereof and thereof, together with such powers as may be incidental thereto. Each Lender (and, if applicable, each other Secured Party) hereby appoints Post Road as its Administrative Agent under and for purposes of each Credit Document and hereby authorizes the Administrative Agent to act on behalf of such Lender (or, if applicable, each other Secured Party) under each Credit Document and, in the absence of other written instructions from the Lenders pursuant to the terms of the Credit Documents received from time to time by the Administrative Agent, to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto. Each Lender (and, if applicable, each other Secured Party) hereby irrevocably designates and appoints each Agent as the agent of such Lender. Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender or other Secured Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against any Agent. Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Security Agreement or any other Security Documents, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Agents, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Agents, and (ii) in the event of a foreclosure by any of the Agents on any of the Collateral pursuant to a public or private sale or other disposition, any Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and each Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations (including Obligations owed to any other Secured Party) as a credit on account of the purchase price for any Collateral payable by such Agent at such sale or other disposition.

SECTION 11.02    Delegation of Duties . Each Agent may execute any of its duties under this Agreement and the other Credit Documents by or through agents (including, without limitation, the Servicer) or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care.

114

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 11.03     Exculpatory Provisions . Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Credit Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence, bad faith or willful misconduct) or (b) responsible in any manner to any of the Lenders or any other Secured Party for any recitals, statements, representations or warranties made by any Credit Party or any officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document or for any failure of any Credit Party or other Person to perform its obligations hereunder or thereunder. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party.

SECTION 11.04     Reliance by Agents . Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Credit Parties), independent accountants and other experts selected by such Agent. The Agents may deem and treat the payee of any note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Agents. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all or other requisite Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans and all other Secured Parties.

SECTION 11.05     Notice of Default . The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder, except with respect to any Default or Event of Default in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders unless the Administrative Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Collateral Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that an Agent receives such a notice, such Agent shall give notice thereof to the other Agent and the Lenders. Each Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided that unless and until each Agent shall have received such directions, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as such Agent shall deem advisable in the best interests of the Secured Parties.

115

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 11.06    <u>Non Reliance on Agents and Other Lenders</u> . Each Lender (and, if applicable, each other Secured Party) expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Credit Party or any Affiliate of a Credit Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender or any other Secured Party. Each Lender (and, if applicable, each other Secured Party) represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender or any other Secured Party, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Credit Parties and their Affiliates and made its own decision to make its Loans hereunder. Each Lender (and, if applicable, each other Secured Party) also represents that it will, independently and without reliance upon any Agent or any other Lender or any other Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Credit Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent hereunder, the Agents shall not have any duty or responsibility to provide any Lender or any other Secured Party with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Credit Party or any Affiliate of a Credit Party that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

SECTION 11.07    <u>Indemnification</u> . The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective Total Credit Exposure in effect on the date on which indemnification is sought under this <u>Section 11.07</u> (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Total Credit Exposure immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Credit Documents, or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; <u>provided</u> that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence, bad faith or willful misconduct. The agreements in this <u>Section 11.07</u> shall survive the payment of the Loans and all other amounts payable hereunder.

116

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 11.08    Agent in Its Individual Capacity . Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Credit Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender", "Lenders", "Secured Party" and "Secured Parties" shall include each Agent in its individual capacity.

SECTION 11.09    Successor Agents .

(a)    Either Agent may resign as Agent upon twenty (20) days' notice to the Lenders, such other Agent and the Borrower. If either Agent shall resign as such Agent in its applicable capacity under this Agreement and the other Credit Documents, then the Required Lenders shall appoint a successor agent, which successor agent shall (unless an Event of Default shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of such Agent in its applicable capacity, and the term "Administrative Agent" or "Collateral Agent", as the case may be, shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Agent in its applicable capacity shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Loans. If no applicable successor agent has accepted appointment as such Agent in its applicable capacity by the date that is twenty (20) days following such retiring Agent's notice of resignation, such retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall assume and perform all of the duties of such Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Agent's resignation as the Administrative Agent or the Collateral Agent, as applicable, the provisions of this Article XI shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Credit Documents.

(b)    For purposes of any Belgian Security Document, Netherlands Security Document and any German Security Document or any other right of pledge governed by the laws of Belgium, of the Netherlands or of Germany, any resignation by the Collateral Agent is not effective with respect to its rights under the Parallel Debts until all rights and obligations under the Parallel Debts have been assigned and assumed to the successor agent. The Collateral Agent will reasonably cooperate in transferring its rights and obligations under the Parallel Debts to any such successor agent and will reasonably cooperate in transferring all rights under any Belgian Security Document, Netherlands Security Document and any German Security Document or any Security Document governed by the laws of Belgium, the Netherlands or of Germany (as the case may be) to such successor agent.

SECTION 11.10    Agents Generally . Except as expressly set forth herein, no Agent shall have any duties or responsibilities hereunder in its capacity as such.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 11.11    Restrictions on Actions by Secured Parties; Sharing of Payments; Specified Hedging Agreement .

(a)    Each of the Lenders agrees that it shall not, without the express written consent of the Collateral Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Collateral Agent, set off against the Obligations, any amounts owing by such Lender to any Credit Party or any of their respective Subsidiaries or any deposit accounts of any Credit Party or any of their respective Subsidiaries now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Collateral Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Credit Document against any Credit Party or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)    Subject to Section 12.08(a) , if, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from the Agents pursuant to the terms of this Agreement, or (ii) payments from the Agents in excess of such Lender's pro rata share of all such distributions by Agents, such Lender promptly shall (A) turn the same over to the Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Collateral Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their pro rata shares; provided that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

(c)    The benefit of the provisions of the Credit Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not an Agent or a Lender as long as, by accepting such benefits, such Secured Party agrees, as among the Agents and all other Secured Parties, that such Secured Party is bound by (and, if requested by any Agent, shall confirm such agreement in a writing in form and substance acceptable to the such Agent) this Article XI , including Sections 11.11(a) and (b) , and the decisions and actions of the Agents and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) to the same extent a Lender is bound; provided that, notwithstanding the foregoing, (i) except as set forth specifically herein, each Agent and each Lender shall be entitled to act in its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (ii) except as specifically set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Credit Document.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 11.12    Agency for Perfection . Collateral Agent hereby appoints each other Secured Party as its agent and as sub-agent for the other Secured Parties (and each Secured Party hereby accepts such appointment) for the purpose of perfecting all Liens with respect to the Collateral, including with respect to assets which, in accordance with Article VIII or Article IX , as applicable, of the Uniform Commercial Code of any applicable state can be perfected only by possession or control. Should any Secured Party obtain possession or control of any such Collateral, such Secured Party shall notify Collateral Agent thereof, and, promptly upon Collateral Agent's request therefor shall deliver possession or control of such Collateral to Collateral Agent and take such other actions as agent or sub-agent in accordance with the Collateral Agent's instructions to the extent, and only to the extent, so authorized or directed by the Collateral Agent. In addition, to the extent required under the laws of any jurisdiction other than the U.S., each of the Secured Parties hereby grants to the Collateral Agent any required powers of attorney to execute any Collateral Document governed by the laws of such jurisdiction on such Secured Party's behalf. Any Secured Party granting any power of attorney or otherwise authorising the Collateral Agent under this Agreement hereby exempts the Collateral Agent from any restrictions of double-representation and self-dealing under any applicable law, including, but not limited to, § 181 of the German Civil Code ( *Bürgerliches Gesetzbuch* ) to the extent legally possible. A Secured Party which cannot grant such exemption shall notify the Collateral Agent accordingly.

SECTION 11.13    Administration of German Collateral .

(a)    The Collateral Agent will (i) hold and administer (a) the Parallel Debt provided by any German Collateral Party and secured by any German Collateral and (b) any German Collateral which is security assigned or otherwise transferred ( *Sicherungsabtretung* ) to it under a non-accessory security right ( *nicht akzessorische Sicherheit* ) and, as German law trustee ( *Treuhänder* ) (the Collateral Agent in such capacity referred to as the " **German Security Trustee** ") for the benefit of the Secured Parties; and (ii) administer any German Collateral which is pledged ( *Verpfändung* ) or otherwise transferred to any or each Secured Party under an accessory security right ( *akzessorische Sicherheit* ).

(b)    Each Secured Party authorizes the German Security Trustee (whether or not by or through employees or agents): (i) to exercise such rights, remedies, powers and discretions as are specifically delegated to or conferred upon the German Security Trustee by the German Security Documents and this Agreement together which such powers and discretions as are reasonably incidental thereto; (ii) to take such action on its behalf as may, from time to time, be authorized under or in accordance with the German Security Documents and this Agreement; and (iii) to execute for and on its behalf any and all German Security Documents which create non-accessory ( *nicht akzessorisch* ) German Collateral.

(c)    The German Security Trustee may delegate its power by way of granting a sub-power of attorney.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(d)    The German Security Trustee may take such action (including, without limitation, the exercise of all rights, discretions or powers and the granting of consents or releases or the engagement of a notary for execution of any documents required in notarial form) or, as the case may be, refrain from taking such action under or pursuant to the German Security Documents at its own discretion.

(e)    Unless the German Security Trustee has been so directed, the German Security Trustee will not take any action under the German Security Documents provided that it may (but is not obliged to) take such action as permitted under the German Security Documents as it reasonably considers necessary or appropriate to protect the interests of the Secured Parties under the German Security Documents.

(f)    Each Lender agrees that no Secured Party (other than the German Security Trustee) shall, in relation to a Germany Collateral, have the right individually to seek to realize upon the security granted by any German Security Document, it being understood and agreed that such rights and remedies may be exercised solely by the German Security Trustee for the benefit of the relevant Secured Parties upon the terms of the German Security Documents. In the event that any (future) German Collateral is hereafter to be pledged by any Person as security for the Obligations, the German Security Trustee is hereby authorized, and hereby granted a power of attorney, to execute and deliver on behalf of the Secured Parties any Credit Documents necessary or appropriate to grant and perfect a Lien on such (future) German Collateral in favor of the German Security Trustee on behalf of the Secured Parties.

## ARTICLE XII
## Miscellaneous

SECTION 12.01    Amendments and Waivers . Neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 12.01 . The Required Lenders may (with notice to the Administrative Agent), or, with the consent of the Required Lenders, the Administrative Agent may, from time to time, (a) enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or the Credit Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; provided that no such waiver, amendment, supplement or modification shall directly or indirectly:

(i)    (A) reduce or forgive any portion of any Loan or extend the final scheduled maturity date of any Loan or reduce the stated interest rate ( provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the "default rate" or amend Section 2.09(c) ), (B) reduce or forgive any portion or extend the date for the payment, of any interest or fee payable hereunder (other than as a result of (x) waiving the applicability of any post-default increase in interest rates and (y) a waiver or amendment of any mandatory prepayment of Loans in an amount, for purposes of this clause (y) only, of up to $1,000,000 (in each case of the foregoing (x) and (y) which shall not constitute an extension, forgiveness or postponement of any date for payment of principal, interest or fees)), or (C)    amend or modify any provisions of Section 4.02(d) or any other provision that provides for the pro rata nature of disbursements by or payments to Lenders, in each case without the written consent of each Lender adversely affected thereby;

120

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(ii)     amend, modify or waive any provision of this Section 12.01 or reduce the percentages specified in the definitions of the term "Required Lenders" or consent to the assignment or transfer by any Credit Party of its rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to Section 9.03 ), in each case without the written consent of each Lender adversely affected thereby;

(iii)     increase the aggregate amount of any Commitment of any Lender or impose any additional financial, tax or reporting obligations of any Lender (other than additional reporting obligations that are needed in connection with Applicable Law), in each case without the written consent of such Lender;

(iv)     amend, modify or waive any provision of Article XI without the written consent of the then-current Collateral Agent and Administrative Agent;

(v)     release any of the Guarantors under Article VI hereof (except as expressly permitted by such Article VI), or release any Liens in favor of the Collateral Agent or any Lender on all or any portion of the Collateral under the Security Documents having a value in excess of $1,000,000 (except as expressly permitted in Section 12.19 ), in each case without the prior written consent of each Lender;

(vi)     permit any payment of principal, interest (other than post-default interest), dividends or fees due or payable to be payable in kind or payable in money (or a currency) other than as set forth herein without the written consent of each Lender;

(vii)     change any of the provisions of Section 11.07 or Section 12.05 , in each case without the written consent of each Lender adversely affected thereby; or

(viii)     directly or indirectly subordinate the interests or any right of recovery of any Lender, including but not limited to (a) by permitting the issuance of senior debt (except as expressly permitted hereunder) or (b) by taking any action affecting the liquidation preference of such Lender or any other rights of the Lender in liquidation or bankruptcy proceedings, in each case without the prior written consent of each Lender adversely affected thereby; provided , that, the foregoing shall not apply to the extent such subordination or other effect on the liquidation preference or recovery of such Lender occurs in connection with the issuance of a debtor-in-possession financing arranged in favor of any Credit Party.

SECTION 12.02     Notices and Other Communications; Facsimile Copies .

(a)     General . Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(i)     if to the Credit Parties or the Agents, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 12.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(ii)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower and the Agents.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three (3) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 12.02(c) ), when delivered; provided that notices and other communications to the Agents pursuant to Article II shall not be effective until actually received by such Person.

(b)     Effectiveness of Facsimile Documents and Signatures . Credit Documents may be transmitted and/or signed by facsimile or other electronic communication. The effectiveness of any such documents and signatures shall have the same force and effect as manually signed originals and shall be binding on all Credit Parties, the Agents and the Lenders.

(c)     Reliance by Agents and Lenders . The Agents and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of any Credit Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. All telephonic notices to either Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.

SECTION 12.03     No Waiver; Cumulative Remedies . No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

SECTION 12.04     Survival of Representations and Warranties . All representations and warranties made hereunder and in the other Credit Documents shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 12.05     Payment of Expenses and Taxes; Indemnification . The Borrower agrees, (a) to pay or reimburse the Agents for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with due diligence in respect of the transactions contemplated by this Agreement, the development, preparation and execution of, and any amendment, supplement, or modification to, this Agreement and the other Credit Documents, including in connection with an initial syndication, and any other documents prepared in connection herewith or therewith, and the consummation, monitoring, oversight and administration (for the avoidance of doubt, whether performed directly by the Agents or by the Servicer) of the transactions contemplated hereby and thereby, including the reasonable fees, disbursements and other charges of counsel to the Agents; (b) to pay or reimburse each Lender and the Agents for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Credit Documents and any such other documents, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, and including the reasonable fees, disbursements and other charges of counsel to each Lender and of counsel to the Agents, (c) to pay, indemnify, and hold harmless each Lender and the Agents from any and all Other Taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Credit Documents and any such other documents, (d) to pay or reimburse Collateral Agent for all reasonable fees, costs and expenses incurred in exercising its rights under Section 8.16 and (e) to pay, indemnify and hold harmless each Lender and the Agents and their respective Related Parties from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, and reasonable and documented (to the extent available) reasonable out-of-pocket costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented (to the extent available) fees, disbursements and other charges of counsel, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Credit Documents and any such other documents, including any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law or any actual or alleged presence of Hazardous Materials applicable to the operations of each Credit Party, any of their respective Subsidiaries or any of their Real Property (all the foregoing in this clause (e), collectively, the *" Indemnified Liabilities "* ); provided that the Credit Parties shall not have any obligation hereunder to the Agents or any Lender nor any of their Related Parties with respect to Indemnified Liabilities arising from the gross negligence or willful misconduct of the party to be indemnified as determined by a final and non-appealable decision of a court of competent jurisdiction. The agreements in this Section 12.05 shall survive repayment of the Loans and all other amounts payable hereunder and termination of this Agreement. To the fullest extent permitted by Applicable Law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against any Lender, any Agent and their respective Related Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loans or the use of the proceeds thereof. No Lender, no Agent nor any of their respective Related Parties shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

123

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 12.06    Successors and Assigns; Participations and Assignments; Replacement of Lender .

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) except as set forth in Section 9.03 , no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by any Credit Party without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.06 . Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 12.06 ) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement. Notwithstanding anything to the contrary herein, (a) any Lender shall be permitted to pledge or grant a security interest in all or any portion of such Lender's rights hereunder including, but not limited to, any Loans (without the consent of, or notice to or any other action by, any other party hereto) to secure the obligations of such Lender or any of its Affiliates to any Person providing any loan, letter of credit or other extension of credit to or for the account of such Lender or any of its Affiliates and any agent, trustee or representative of such Person and (b) the Agents shall be permitted to pledge or grant a security interest in all or any portion of their respective rights hereunder or under the other Credit Documents, including, but not limited to, rights to payment (without the consent of, or notice to or any other action by, any other party hereto), to secure the obligations of such Agent or any of its Affiliates to any Person providing any loan, letter of credit or other extension of credit to or for the account of such Agent or any of its Affiliates and any agent, trustee or representative of such Person.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments or the Loans at the time owing to it) with the prior written consent (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed) of the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund and the withholding of consent by the Administrative Agent to an assignment to any Affiliate of Borrower shall be deemed to be not unreasonable;

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $ 1,000,000, unless the Administrative Agent otherwise consents, which consent, in each case, shall not be unreasonably withheld or delayed; provided , however , that contemporaneous assignments to a single assignee made by Affiliated Lenders or related Approved Funds and contemporaneous assignments by a single assignor to Affiliated Lenders or related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirement stated above;

124

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement as to the Loans so assigned; provided that this paragraph shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect its Loans;

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500; provided that only one such fee shall be payable in connection with simultaneous assignments to two or more Approved Funds;

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and requested know-your-customer documentation; and

(E) unless consented to by the Required Lenders, no assignment may be made to a Credit Party or an Affiliate of a Credit Party.

(iii)      Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 12.06 , from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.09 , 2.10 , 4.03(b) and 12.05 ). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.06 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 12.06 .

(iv)      The Administrative Agent, acting for this purpose on behalf of the Borrower (but not as an agent, fiduciary or for any other purposes), shall maintain a copy of each Assignment and Acceptance delivered to it and a register in the United States for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the " *Register* "). Further, the Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive absent manifest error, and the Credit Parties, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register, as in effect at the close of business on the preceding Business Day, shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and know-your-customer documentation (unless the assignee shall already be a Lender hereunder) and any written consent to such assignment required by paragraph (b)(i) of this Section 12.06 , the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless and until it has been recorded in the Register as provided in this paragraph.

(c)     (i) Any Lender may, without the consent of the Borrower or the Agents, sell participations to one or more banks or other entities (each, a " *Participant* ") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (D) no such Participant may be a Credit Party or an Affiliate of a Credit Party. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clause (i) of the first proviso to Section 12.01 . Subject to paragraph (c)(ii) of this Section 12.06 , the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.09 , 2.10 and 4.04(a) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 12.06 . To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08(a) as though it were a Lender; provided that such Participant agrees to be subject to Section 12.08(a) as though it were a Lender.

(ii)     A Participant shall not be entitled to receive any greater payment under Sections 2.09, 2.10 or 4.04(a) than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, (A) unless the sale of the participation to such Participant is made with the Borrower's prior written consent, and (B) except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 4.03(b) that are greater than the applicable Lender unless the Borrower are notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 4.04(a) and Section 4.04(c) as though it were a Lender.

126

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain at one of its offices in the United States a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the " *Participant Register* "). The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement. No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Nothing herein is intended to prevent, impair, limit or otherwise restrict the ability of a Lender to collaterally assign or pledge all or any portion of its interests in the Loans and the other rights and benefits under the Credit Documents to an unaffiliated third party lender of such Lender (each such Person, a " *Collateral Assignee* "); provided that unless and until Borrower receives notification from a Collateral Assignee of such assignment directing payments to be made to such Collateral Assignee, any payment made by Borrower for the benefit of such Lender in accordance with the terms of the Credit Documents shall satisfy Borrower's obligations thereunder to the extent of such payment. Any such Collateral Assignee, upon foreclosure of its security interests in the Loans pursuant to the terms of such assignment and in accordance with Applicable Law, shall succeed to all the interests of or shall be deemed to be a Lender, with all the rights and benefits afforded thereby, and such transfer shall not be deemed to be a transfer for purposes of and otherwise subject to the provisions of this Section 12.06 . Notwithstanding the foregoing, Lender shall remain responsible for all obligations and liabilities arising hereunder or under any other Credit Document, and, except as otherwise expressly set forth in any applicable pledge or assignment, nothing herein is intended or shall be construed to impose any obligations upon or constitute an assumption by a Collateral Assignee thereof.

SECTION 12.07    Pledge of Loans . The Credit Parties hereby acknowledge that the Lenders and their Affiliates may pledge the Loans as collateral security for loans to the Lenders or their Affiliates. The Credit Parties shall, to the extent commercially reasonable, cooperate with the Lenders and their Affiliates to effect such pledges at the sole cost and expense of such Lender. Notwithstanding the foregoing, no pledge shall release the Lender party thereto from any of its obligations hereunder.

SECTION 12.08    Adjustments; Set-off .

(a)    If any Lender (a " *Benefited Lender* ") shall at any time receive any payment of all or part of its Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 10.01(i) , or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided that if all or any portion of such excess payment or benefits is thereafter recovered from such benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The foregoing provisions of this Section 12.08 shall not apply to payments made and applied in accordance with the terms of this Agreement and the other Credit Documents.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)        After the occurrence and during the continuance of an Event of Default, to the extent consented to by Administrative Agent, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower or any other Credit Party, any such notice being expressly waived by the Credit Parties to the extent permitted by Applicable Law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final, but excluding, subject to the limitations set forth in Section 8.15(a) , deposit accounts used solely to fund payroll or employee benefits, or deposit accounts that consist of cash collateral subject to Permitted Liens), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower, as the case may be. Each Lender agrees promptly to notify the Borrower and the Agents after any such set-off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

SECTION 12.09    Counterparts . This Agreement and the other Credit Documents may be executed by one or more of the parties thereto on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Any signature page delivered by telecopy machine or transmitted electronically in Portable Document Format (".pdf") shall be valid and binding to the same extent as an original signature page. Any party who delivers such a signature page agrees to later deliver an original counterpart to any party who requests it. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower, the Collateral Agent and the Administrative Agent.

SECTION 12.10    Severability . Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 12.11    Integration . This Agreement and the other Credit Documents represent the agreement of the Credit Parties, the Agents and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by any party hereto or thereto relative to the subject matter hereof not expressly set forth or referred to herein or in the other Credit Documents.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 12.12     Representation of Subsidiaries .

(a)     If any Netherlands Subsidiary is represented by an attorney in connection with the signing and/or execution of this Agreement (including by way of accession to this Agreement) or any other agreement, deed or document referred to in or made pursuant to this Agreement, it is hereby expressly acknowledged and accepted by the other parties to such document that the existence and extent of the attorney's authority and the effects of the attorney's exercise or purported exercise of his or her authority shall be governed by the laws of the Netherlands.

(b)     If Interactive is represented by an attorney in connection with the signing and/or execution of this Agreement (including by way of accession to this Agreement) or any other agreement, deed or document referred to in or made pursuant to this Agreement, it is hereby expressly acknowledged and accepted by the other parties to such document that the existence and extent of the attorney's authority and the effects of the attorney's exercise or purported exercise of his or her authority shall be governed by the laws of the Germany.

SECTION 12.13 GOVERNING LAW . THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS (UNLESS EXPRESSLY PROVIDED OTHERWISE THEREIN) AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO CONFLICTS OF LAW PROVISIONS WHICH WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

SECTION 12.14     Submission to Jurisdiction; Waivers . Each party hereto hereby irrevocably and unconditionally:

(a)     submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Credit Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by Applicable Laws, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Laws. Nothing in this Agreement or any other Credit Document or otherwise shall affect any right that the Administrative Agent, the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Credit Document against any Credit Party or its properties in the courts of any jurisdiction in connection with the exercise of any rights under any Security Document or the enforcement of any judgment;

129

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)        consents that any such action or proceeding shall be brought in such courts, and agrees not to plead or claim and waives, to the fullest extent permitted by Applicable Laws, any objection that it may now or hereafter have to the venue of any such action or proceeding arising out of or relating to this Agreement or any other Credit Document in any court referred to in Section 12.13(a) . Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court;

(c)        agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the applicable party at its respective address set forth in Schedule 12.02 or on Schedule 1.01 or at such other address of which the Agents shall have been notified pursuant thereto. Nothing in this Agreement or any other Credit Document will affect the right of any party to this Agreement to serve process in any other manner permitted by Applicable Law;

(d)        waives, to the maximum extent not prohibited by law, all rights of rescission, setoff, counterclaims, and other defenses in connection with the repayment of the Obligations; and

(e)        waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 12.13 any special, exemplary, punitive or consequential damages.

SECTION 12.15    Acknowledgments . Each Credit Party hereby acknowledges that:

(a)        it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)        neither the Agents nor any Lender has any fiduciary relationship with or duty to the Credit Parties arising out of or in connection with this Agreement or any of the other Credit Documents, and the relationship between any Agent and Lenders, on one hand, and the Credit Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)        no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Credit Parties and the Lenders.

SECTION 12.16    WAIVERS OF JURY TRIAL . THE CREDIT PARTIES, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 12.17    Confidentiality . Each Agent and Lender shall hold all non-public information relating to any Credit Party or any Subsidiary of any Credit Party obtained pursuant to the requirements of this Agreement or in connection with such Lender's evaluation of whether to become a Lender hereunder (" *Confidential Information* ") confidential in accordance with its customary procedure for handling confidential information of this nature and (in the case of a Lender that is a bank) in accordance with safe and sound banking practices; provided that Confidential Information may be disclosed by any Agent or Lender:

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(a)    as required or requested by any governmental or regulatory agency or representative thereof;

(b)    pursuant to legal or regulatory process;

(c)    in connection with the enforcement of any rights or exercise of any remedies by such Agent or Lender under this Agreement or any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document;

(d)    to such Agent's or Lender's attorneys, professional advisors, accountants, independent auditors or Affiliates,

(e)    in connection with:

    (i)    the establishment of any special purpose funding vehicle with respect to the Loans,

    (ii)    any pledge permitted under Section 12.08 ;

    (iii)    any prospective assignment of, or participation in, its rights and obligations pursuant to Section 12.06 , to prospective assignees or Participants, as the case may be (it being understood that each such Persons will be informed of the confidential nature of such information and instructed to keep such information confidential on the same terms as this Section 12.16 );

    (iv)    any Hedging Agreement entered into or proposed to be entered into in connection with the Loans made hereunder, to actual or proposed direct or indirect contractual counterparties (it being understood that each such Persons will be informed of the confidential nature of such information and instructed to keep such information confidential on the same terms as this Section 12.16 ); and

    (v)    any actual or proposed credit facility for loans, letters of credit or other extensions of credit to or for the account of such Agent or Lender or any of its Affiliates, to any Person providing or proposing to provide such loan, letter of credit or other extension of credit or any agent, trustee or representative of such Person (it being understood that each such Persons will be informed of the confidential nature of such information and instructed to keep such information confidential on the same terms as this Section 12.16 ); or

(f)    to any rating agency;

(g)    with the consent of the Borrower;

131

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(h)    to the extent required, or to the extent counsel to the Agents or to any Lender reasonably determines is required to be disclosed in connection with any public filing by Agents or such Lender;

(i)    in connection with the Promotional Rights (as defined below);

provided that in the case of clause (e) hereof, the Person to whom Confidential Information is so disclosed is advised of and has been directed to comply with the provisions of this Section 12.16 .

Notwithstanding the foregoing, Agents and each Lender shall have the right to publicize, for general marketing and related promotional purposes, their relationship to Borrower and the fact that they have extended the Loan to Borrower (the " *Promotional Rights* ") and, in connection therewith, Borrower hereby grants to each Agent and each Lender a royalty free, non-exclusive limited license to use Borrower's name, trade name, trademarks, logos, trade dress and other identifying intellectual property, now existing or hereafter acquired, in any literature, advertisements, websites, promotional or other marketing materials now or hereafter used by such Agent or Lender.

Notwithstanding the foregoing, no Agent or Lender shall have any obligation to keep information confidential if such information: (i) is or becomes public from a source other than an Agent or a Lender, or one of an Agent's or a Lender's Affiliates, consultants or legal or financial advisors in breach of this Agreement, (ii) is, was or becomes known on a non-confidential basis (to the best of such Agent's or Lender's knowledge after reasonable inquiry) to or discovered by an Agent or Lender, Lenders or any of their Affiliates, consultants or legal or financial advisors independently from communications by or on behalf of any Credit Party, or (iii) is independently developed by an Agent without use of such confidential information, provided that, the source of such information was not known to be bound by a confidentiality agreement with (or subject to any other contractual, legal or fiduciary obligation of confidentiality to) the relevant Credit Party.

EACH LENDER ACKNOWLEDGES THAT CONFIDENTIAL INFORMATION (AS DEFINED IN THIS SECTION 12.16 ) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

ALL INFORMATION, INCLUDING WAIVERS AND AMENDMENTS, FURNISHED BY THE CREDIT PARTIES OR ANY AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE CREDIT PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE CREDIT PARTIES AND THE AGENTS THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 12.18    Press Releases, etc . Each Credit Party will not, and will not permit any of its respective Subsidiaries, directly or indirectly, to publish any press release or other similar public disclosure or announcements (including any marketing materials) regarding this Agreement, the other Credit Documents, or any of the Transactions, without the consent of the Administrative Agent, which consent shall not be unreasonably withheld.

SECTION 12.19    Releases of Guarantees and Liens . (a) Notwithstanding anything to the contrary contained herein or in any other Credit Document, the Collateral Agent is hereby irrevocably authorized by each Secured Party (without requirement of notice to or consent of any Secured Party except as expressly required by Section 12.01 ) to take any action requested by the Borrower having the effect of releasing any Liens on Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction expressly permitted by any Credit Document or that has been consented to in accordance with Section 12.01 or (ii) under the circumstances described in paragraph (b) below.

(b)    At such time as (i) the Loans and the other Obligations (other than Unasserted Contingent Obligations) shall have been paid in full and (ii) the Commitments have been terminated, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent and each Credit Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(c)    Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property, or to release any guarantee obligations pursuant to this Section 12.18 . In each case as specified in this Section 12.18 , the Collateral Agent will (and each Lender irrevocably authorizes the Collateral Agent to), at the Borrower's expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral or guarantee obligation from the assignment and security interest granted under the Security Documents, in each case in accordance with the terms of the Credit Documents and this Section 12.18 .

SECTION 12.20    USA Patriot Act . Each Lender hereby notifies each Credit Party that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the " *Patriot Act* "), it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act. Each Credit Party agrees to provide all such information to the Lenders upon request by any Agent at any time, whether with respect to any Person who is a Credit Party on the Closing Date or who becomes a Credit Party thereafter.

133

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 12.21    <u>No Fiduciary Duty</u> . Each Credit Party, on behalf of itself and its Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Credit Parties, their respective Subsidiaries and Affiliates, on the one hand, and the Agents, the Lenders and their respective Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Agents the Lenders or their respective Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

SECTION 12.22    <u>Authorized Officers</u> . The execution of any certificate requirement hereunder by an Authorized Officer shall be considered to have been done solely in such Authorized Officer's capacity as an officer of the applicable Credit Party (and not individually). Notwithstanding anything to the contrary set forth herein, the Secured Parties shall be entitled to rely and act on any certificate, notice or other document delivered by or on behalf of any Person purporting to be an Authorized Officer of a Credit Party and shall have no duty to inquire as to the actual incumbency or authority of such Person

SECTION 12.23    <u>Judgment Currency</u> .

(a)    The obligations of the Credit Parties hereunder and under the other Credit Documents to make payments in a specified currency (the "***Obligation Currency*** ") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by a Secured Party of the full amount of the Obligation Currency expressed to be payable to it under this Agreement or another Credit Document. If, for the purpose of obtaining or enforcing judgment against any Credit Party in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "***Judgment Currency*** ") an amount due in the Obligation Currency, the conversion shall be made, at the rate of exchange (as quoted by the Administrative Agent or if the Administrative Agent does not quote a rate of exchange on such currency, by a known dealer in such currency designated by the Administrative Agent) determined, in each case, as of the Business Day immediately preceding the date on which the judgment is given (such Business Day being hereinafter referred to as the "***Judgment Currency Conversion Date*** ").

(b)    If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due, the Borrower covenants and agrees to pay, or cause to be paid, or remit, or cause to be remitted, such additional amounts, if any (but in any event not a lesser amount), as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial award at the rate of exchange prevailing on the Judgment Currency Conversion Date.

(c)    For purposes of determining any rate of exchange or currency equivalent for this <u>Section 12.23</u> , such amounts shall include any premium and costs payable in connection with the purchase of the Obligation Currency.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 12.24    Subordination of Intercompany Indebtedness . The Credit Parties hereby agree that all present and future Indebtedness of any Credit Party to any other Credit Party (" *Intercompany Indebtedness* ") shall be subordinate and junior in right of payment and priority to the Obligations, and each Credit Party agrees not to make, demand, accept or receive any payment in respect of any present or future Intercompany Indebtedness, including any payment received through the exercise of any right of setoff, counterclaim or cross claim, or any collateral therefor, unless and until such time as the Obligations shall have been indefeasibly paid in full; provided that, so long as no Default or Event of Default shall have occurred and be continuing and no Default or Event of Default shall be caused thereby and such Indebtedness is expressly permitted hereunder, the Credit Parties may make and receive such payments in respect of Intercompany Indebtedness as shall be customary in the ordinary course of the Credit Parties' business. Without in any way limiting the foregoing, in the event of any Insolvency Event, or any receivership, liquidation, reorganization, dissolution or other similar proceedings relative to any Credit Party or to its businesses, properties or assets, the Lenders shall be entitled to receive payment in full of all of the Obligations before any Credit Party shall be entitled to receive any payment in respect of any present or future Intercompany Indebtedness.

SECTION 12.25    Public Lenders; Trading Restrictions .

(a)        Each Credit Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications available to the Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the " *Platform* "). The Platform is provided "as is" and "as available." The Borrower hereby acknowledges that (a) the Administrative Agent may, but shall not be obligated to, make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the " *Borrower Materials* ") by posting the Borrower Materials on the Platform and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a " *Public Lender* "). The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in Section 12.17); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be deemed to have been marked "PUBLIC", unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Credit Documents, (2) notification of changes in the terms of the credit facility hereunder and (3) any financial statements and compliance certificates delivered by the Borrower pursuant to Section 8.01(a), (b), (c) or (d) hereof.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)    Borrower shall ensure that at all times the members of its Board of Directors are provided with or have access to the Borrower Materials. At the request of any Lender at any time, Borrower shall confirm to such Lender whether or not at such time the members of the Board of Directors of Borrower are restricted from trading in shares of Borrower Common Stock pursuant to any corporate insider trading or similar policy applicable to such Persons (but without, in the event that the trading window applicable to such Persons is not open or such Persons are otherwise restricted from trading in shares of Borrower Common Stock, disclosing the specific reason or reasons for such determination, it being understood that such limitation will not affect the Administrative Agent's right to receive any Borrower Information under any other provisions of this Agreement).

SECTION 12.26    Original Issue Discount . THE LOANS HAVE BEEN ISSUED WITH AN ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF SUCH ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY OF THESE LOANS MAY BE OBTAINED BY WRITING TO BORROWER. ANY NOTES ISSUED HEREUNDER SHALL CONTAIN A SIMILAR LEGEND.

SECTION 12.27    Tax Treatment . Borrower and Lenders agree that the Loans are indebtedness of Borrower for U.S. federal income Tax purposes. Each party to this Agreement agrees not to take any Tax position inconsistent with such Tax characterization and shall not report the transactions arising under this Agreement in any manner other than the issuance of debt obligations on all applicable Tax returns unless otherwise required by a final determination within the meaning of Section 1313(a) of the Code (or a similar final determination under applicable state or local Law).

SECTION 12.28    Acknowledgement and Consent to Bail-In of EEA Financial Institutions . Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

SECTION 12.29    Dutch Fiscal Unity . If, at any time, a Dutch Credit Party is a member of a fiscal unity ( *fiscale eenheid* ) for Dutch corporate income tax ( *vennootschapsbelasting* ) purposes, and such fiscal unity is, in respect of that Dutch Credit Party, terminated ( *verbroken* ) or disrupted ( *beëindigd* ) as a result of or in connection with the Administrative Agent enforcing its rights under any Security Document, such Dutch Credit Party shall, at the request of the Administrative Agent and together with the parent company ( *moedermaatschappij* ) or deemed parent company ( *aangewezen moedermaatschappij* ) of that fiscal unity, for no consideration and as soon as reasonably practicable lodge a request with the relevant Governmental Authority to allocate and surrender any tax losses within the meaning of Article 20 of the Dutch Corporate Income Tax Act ( *Wet op de vennootschapsbelasting 1969* ) to the Dutch Credit Party leaving that fiscal unity, to the extent such ax losses are attributable ( *toerekenbaar* ) to the Dutch Loan Party leaving that fiscal unity within the meaning of Article 15af of the Dutch Corporate Income Tax Act ( *Wet op de vennootschapsbelasting 1969* ).

SECTION 12.30    Accredited Investor Status . Each Lender represents as of the Closing Date and as of the Additional Issuance Date that:

(a)     such Lender is an "accredited investor" as such term is defined in Rule 501(a) promulgated under the Securities Act whose knowledge and experience in financial and business matters are such that such Lender is capable of evaluating the merits and risks of its investment in the Borrower Common Stock;

(b)     such Lender's financial situation is such that it can afford to bear the economic risk of holding the Borrower Common Stock for an indefinite period of time;

(c)     such Lender can afford to suffer complete loss of its investment in the Borrower Common Stock;

(d)     the Borrower has made available to such Lender all documents and information that such Lender has requested relating to an investment in the Borrower Common Stock; and

(e)     such Lender has had adequate opportunity to ask questions of, and receive answers from, the Borrower as well as the Borrower's officers, employees, agents and other representatives concerning the Borrower's business, operations, financial condition, assets, liabilities and all other matters relevant to such Lender's investment in the Borrower Common Stock.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK - SIGNATURE PAGES FOLLOW]

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

BORROWER :

**PARETEUM CORPORATION**

By:       /s/ Robert H. Turner
Name:   Robert H. Turner
Title:     Executive Chairman & Principal Executive Officer

[ *Signatures continued on following page* ]

Signature Page to Credit Agreement

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

GUARANTORS:

**PARETEUM EUROPE B.V.**

By:      / s / Yves van Sante
Name:   Yves van Sante
Title:    Director

**PARETEUM NORTH AMERICA CORP.**

By:      / s / Robert H. Turner
Name:   Robert H. Turner
Title:    Director

**ARTILIUM N**

**UNITED TELECOM NV**

By:      / s / Bart Weijermar
Name:   Bart Weijermar
Title:    as permanent representative of Artilium (UK) LTD, director

By:      /s/ Bart Weijermar
Name:   Bart Weijermar
Title:    as permanent representative of Artilium (UK) LTD, director

**ARTILIUM B.V.**

By:      /s/ Bart Weijermar
Name:   Bart Weijermar
Title:    as permanent representative of Artilium (UK) LTD, director

[ *Signatures continued on following page]*

Signature Page to Credit Agreement

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**INTERACTIVE DIGITAL MEDIA GMBH**

By:    /s/ Andreas Felke
Name:   Andreas Felke
Title:    Director

**ARTILIUM GROUP LIMITED**

By:    /s/ Alexander Korff
Name:   Alexander Korff
Title:    Director

**iPASS INC.**

By:    /s/ Robert H. Turner
Name:   Robert H. Turner
Title:    Director

**iPASS IP LLC**

By:    /s/ Denis McCarthy
Name:   Denis McCarthy
Title:    Director/CEO

[ *Signatures continued on following page* ]

Signature Page to Credit Agreement

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

ADMINISTRATNE AGENT AND COLLATERAL AGENT:

By:     /s/ Michael Bogdan
Name:   Michael Bogdan
Title:   Authorized Signatory

[ *Signatures continued on following page]*

Signature Page to Credit Agreement

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

LENDERS

POST ROAD SPECIAL OPPORTUNITY FUND I LP

By:    /s/ Michael E. Bogdan
Name:    Michael E. Bogdan
Title:    Authorized Signatory

[ *Signatures continued on following page]*

Signature Page to Credit Agreement

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**SCHEDULE 1.01**

Commitments.

| Lender | Commitment | Pro Rata Portion |
|---|---|---|
| **POST ROAD SPECIAL OPPORTUNITY FUND I LP** | $ 50,000,000 | 100.0% |
| **Total** | **$ 50,000,000** | **100.0%** |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Schedule 1.01-A**
**iPass Acquisition - Detailed List of Synergies**

| Line Item | Full Synergies by YE 2019 |
|---|---|
| Reduction in Vender Costs (COGS) | $ 5,500,000 |
| LinkedIn Recruiting | 50,000 |
| Bank Fees | 50,000 |
| Tax Consultants | 100,000 |
| Audit Fees | 500,000 |
| Legal Fees | 2,000,000 |
| Investor Relations/NASDAQ Fees | 350,000 |
| D&O Insurance | 400,000 |
| Director Fees | 275,000 |
| PR for UK Products | 25,000 |
| Consulting/IT Licenses | 1,400,000 |
| Net Savings of California HQ | 500,000 |
| Stock Admin | 75,000 |
| Singapore Office Lease | 60,000 |
| Headcount Reduction | 8,000,000 |
| **Total** | **$ 19,285,000** |

SCHEDULE 7.04
LITIGATION

*Jordan Rosenblatt v. iPass Inc., et al., Case No. 1:18-cv-03004 (the "Rosenblatt Action"):*
As disclosed in Amendment No. 3 to a registration statement on Form S-4 (the "Registration Statement"), filed with the Securities and Exchange Commission as of January 15, 2019, in connection with the tender offer (the "Offer") by Pareteum Corporation (the "Company") through TBR, Inc., the Company's wholly- owned subsidiary formed solely for the purpose of the transaction described in the Registration Statement, for all issued, to be issued and outstanding shares of iPass Inc. ("iPass"), on December 18, 2018, the Rosenblatt Action was brought against iPass, the five members of the iPass board of directors, the Company and TBR, Inc. The complaint alleged the Schedule 14d-9 filed in connection with the offer failed to disclose certain material information regarding the proposed transaction including certain financial projections and certain inputs underlying the valuation analysis performed by Raymond James, which rendered the Schedule 14D-9 materially false and misleading. iPass, who is addressing this claim, believes such claim is without merit. For more information, please review the section titled "iPass Legal Proceedings" in the Registration Statement.

*Darrell Boswell v. iPass Inc., et al., Case No. 3:18-cv-7486 (the "Boswell Action"):*
As disclosed in the Registration Statement in connection with the Offer, on December 12, 2018, the Boswell Action is brought against iPass and the five members of the iPass board and alleges that the Schedule 14D-9 failed to disclose material information regarding the proposed transaction including certain financial projections, the valuation of Pareteum and the merger consideration, and certain inputs underlying the valuation analyses performed by Raymond James & Associates, which rendered the Schedule 14D-9 materially false or misleading. iPass, who is addressing this claim, believes such claim is without merit. For more information, please review the section titled "iPass Legal Proceedings" in the Registration Statement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

***Stephen Brown v. Elephant Talk North America Corporation and Elephant Talk Communications Corp., Case No. 5:18-cv-00902-R in the Western District of Oklahoma (the "Brown Action")***

A former consultant, Steve Brown ("Brown") brought a lawsuit against the Company claiming five (5) years' unpaid consulting fees in an amount equal to $780,000. The Company is investigating whether some or all of his claims are time-barred and/or frivolous. The Company's position is that Brown was dismissed for cause in 2013/14, and intends to defend itself in this matter vigorously. The Company does not presently have advice pertaining to the likelihood of success of some or all elements of Brown's claim.

***BT vs United Telecom NV***
***Second Chamber of the Ondernemingsrechtbank of Leuven, A.R. nr. A/16/01790***

BT is claiming 400K by means of back billing over the period of the last 5 years but is not providing evidence since the case was presented to Court 2 years ago. As we paid the due invoices and have a counterclaim of an equal amount for bad performance of services by BT, we assume that BT will not insist on further payment of the contested invoices.

***Francine Mills v. iPass Inc.; Darin Vickery ; Case #18CIV05729 in Superior Court of California, County of San Mateo:***

Suit by former employee filed in San Mateo County (California) Superior Court in October 2018, alleging unfair employment practices and other related claims. Insurance carrier has been informed. Litigation defense counsel has been retained. Mediation set for summer 2019.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

***Markus Boehm v. iPass Deutschland GmbH; Case #4 CA 44/18 in the Arbeitsgericht Hamburg (Hamburg Labor Court)***
Suit by former employee filed in German labor court in February 2018 seeking payment of commissions. Insurance carrier has been informed. Litigation defense counsel has been retained. No trial date is set, but continuing settlement negotiations are pending.

***China Mobile International Ltd (represented by Morrison Foerster Hong Kong); Demand letter for alleged indebtedness and threatened litigation***
China Mobile International Limited ("CMI") sent a letter dated November 12, 2018, demanding purportedly outstanding payments of $1.9 million by November 30, 2018. CMI claims the iPass has unpaid invoices related to the use of CMI's network in China. iPass believes it does not owe CMI anything because iPass does not have an agreement with CMI with commercial terms. iPass does have a commercial agreement with New Bridge and has been paying New Bridge each month for many years for facilitating iPass' usage of CMI's network. iPass believes New Bridge owes CMI money, but CMI incorrectly asserts that New Bridge is a subsidiary of iPass. A representative of iPass has met with New Bridge and CMI to work out this dispute. At this time, iPass does not believe it owes CMI any money.

Litigation counsel has been engaged to defend against this claim. Counsel has reached out to CMI and are currently in negotiation.

SCHEDULE 7.10
TAX LIENS

The following represent uncertain tax positions regarding Pareteum Europe B.V..

[***]

SCHEDULE 7.12
SUBSIDIARIES

| Parent | Subsidiary | Nature of Ownership | Percentage of Ownership |
|---|---|---|---|
| Pareteum Corporation | Pareteum North America Corp. | Common Shares | 100% |
| Pareteum Corporation | Pareteum Europe B.V. | Ordinary Shares | 100% |
| Pareteum Corporation | Elephant Talk Limited – Hong Kong | Ordinary Shares | 100% |
| Pareteum Corporation | Pareteum ASIA PTE Ltd. | Ordinary Shares | 100% |
| Pareteum Corporation | iPass Inc. | Ordinary Shares | 100% |
| Pareteum Corporation | Artilium Group Limited | Common Shares | 100% |
| Pareteum Europe B.V. | Pareteum Spain S.L. | Ordinary Shares | 100% |
| Pareteum Europe B.V. | Elephant Talk Communications Premium Rate Services Netherlands B.V. | Ordinary Shares | 100% |
| Pareteum Europe B.V. | Elephant Talk Communications Italy S.R.L. | Ordinary Shares | 100% |
| Pareteum Europe B.V. | Elephant Talk Business Services W.L.L. | Ordinary Shares | 100% |
| Pareteum Europe B.V. | Elephant Talk Mobile Services B.V. | Ordinary Shares | 100% |
| Pareteum Europe B.V. | Elephant Talk Guangshzou IT LTD | Ordinary Shares | 100% |
| Pareteum Europe B.V. | Elephant Talk Deutschland GmbH | Ordinary Shares | 100% |
| Pareteum Europe B.V. | Elephant Talk Communications Luxembourg SA | Ordinary Shares | 100% |
| Pareteum Europe B.V. | Elephant Talk De Mexico S.A.P.I DE C.V. | Common Shares | 99.98% |
| Pareteum Europe B.V. | Asesores Profesionales ETAK S. de RL. de C.V. | Common Shares | 99% |
| Pareteum North America Corp. | Pareteum UK Limited | Ordinary Shares | 100% |
| Artilium Group Limited | Artilium UK Limited | Ordinary Shares | 100% |
| Artilium Group Limited | Artilium NV | Ordinary Shares | 100% |
| Artilium Group Limited | United Telecom NV | Ordinary Shares | 100% |
| Artilium Group Limited | Artilium B.V. | Ordinary Shares | 100% |
| Artilium Group Limited | interactive digital media GmbH | Ordinary Shares | 100% |
| Artilium Group Limited | Artilium Trustee Company Limited | Ordinary Shares | 100% |
| Artilium Group Limited | Ello Mobile BVBA | Ordinary Shares | 100% |
| iPass Inc. | iPass IP LLC | Membership Interests | 100% |
| iPass Inc. | iPass Holdings PTY LTD | Ordinary Shares | 100% |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

| Parent | Subsidiary | Nature of Ownership | Percentage of Ownership |
|---|---|---|---|
| iPass Inc. | iPass France SAS | Ordinary Shares | 100% |
| iPass Inc. | iPass Japan Kabushiki Kaisha | Ordinary Shares | 100% |
| iPass Inc. | iPass Deutschland GmbH | Ordinary Shares | 100% |
| iPass Inc. | iPass Asia Pte LTD. | Ordinary Shares | 100% |
| iPass Inc. | iPass (U.K.) Limited | Ordinary Shares | 100% |

SCHEDULE 7.13
INTELLECTUAL PROPERTY

[***]

SCHEDULE 7.14
ENVIRONMENTAL MATTERS

None.

SCHEDULE 7.15
REAL PROPERTY

**Real Property Owned**

None.

**Real Property Leased**

| Leasing Party | Location of Leased Property |
|---|---|
| Pareteum Corporation | The United States: 1185 Avenue of the Americas, 37th floor, New York, NY 10036, USA |
| Pareteum Europe B.V. | The Netherlands – Aalsmeer: Hornweg 7, Aalsmeer, 1432 GD |
| Artilium B.V. | The Netherlands – Soesterberg: Laan Blussé van Oud Alblas 2a, 3769 AT Soesterberg |
| Artilium NV | Belgium – Brugge: Vaartdijkstraat 19, 8200 Brugge, Belgium |
| United Telecom NV | Belgium – Rotselaar: Wingepark 5B, bus 302, 3110 Rotselaar, Belgium |
| interactive digital media GmbH | Germany: Maria-Goeppert-Straße 7, 23562 Lübeck, Germany |
| Artilium B.V. | Indonesia: Address: IB Building Lantai 3, JL. Imam Bonjol No. 163, 50132, Semarang, Jawa Tengah |
| iPass Inc. | The United States: 3800 Bridge Parkway, Redwood Shores, CA 94065, USA |
| iPass Inc. | The United States: Digital Realty Trust, 2820 North Western Parkway, Santa Clara, CA 95050 |
| iPass Inc. | The United States: Quality Technology Services. 1033 Jefferson Street, North West, Atlanta, GA, 30318. |

**Real Property Locations Holding Collateral in Excess of $100,000**

None.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SCHEDULE 7.18
PRINCIPAL PLACE OF BUSINESS/CHIEF EXECUTIVE OFFICE

| Name of Credit Party | Chief Executive Office |
| --- | --- |
| Pareteum Corporation Pareteum Europe B.V. Pareteum North America Corp. | c/o Pareteum, 1185 Avenue of the Americas, New York, USA |
| Artilium NV | c/o Artilium, Vaartdijkstraat 19, 8200 Brugge, Belgium |
| United Telecom NV | c/o Artilium, Vaartdijkstraat 19, 8200 Brugge, Belgium |
| Artilium B.V. | c/o Artilium, Vaartdijkstraat 19, 8200 Brugge, Belgium |
| interactive digital media GmbH | Maria-Goeppert-Strasse 7, 23562, Lübeck, Germany |
| Artilium Group Limited | c/o Artilium, Vaartdijkstraat 19, 8200 Brugge, Belgium |
| iPass Inc. | 3800 Bridge Parkway, Redwood Shores, CA 94065 |
| iPass IP LLC | 3800 Bridge Parkway, Redwood Shores, CA 94065 |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SCHEDULE 7.21
CONTRACTUAL OR OTHER RESTRICTIONS

None.

SCHEDULE 7.22
COLLECTIVE BARGAINING AGREEMENTS

None.

SCHEDULE 7.23
INSURANCE

[***]

SCHEDULE 7.24
EXISTING INDEBTEDNESS

None.

SCHEDULE 7.25
DEPOSIT ACCOUNTS AND SECURITIES ACCOUNTS

[***]

SCHEDULE 7.27
MATERIAL CUSTOMERS

[***]

SCHEDULE 7.28
MATERIAL CONTRACTS

**Pareteum Corporation and Subsidiaries (other than Artilium Group Limited)**

Promissory Note dated September 30, 2016, in the amount of $1,000,000.00, made by each of VSFT Holdings, Inc., ValidSoft UK Limited, and ValidSoft Limited, as Obligors, payable to Pareteum Corporation (f/k/a Elephant Talk Communications Corp.), as Holder.

Contract dated November 1, 2013 between Vodafone Enabler Espana, S.L. and Pareteum Europe Holding, B.V.

Supplier Agreement dated January 8, 2018 between Pareteum Corporation and Citibank, N.A.

Note Purchase Agreement dated November 26, 2018 between Pareteum Corporation and Yonder Media Mobile Inc.

First Amendment to Convertible Note Purchase Agreement dated February 11, 2019 between Pareteum Corporation and Yonder Media Mobile Inc.

**Artilium Group Limited and Subsidiaries**

License Agreement between Artilium NV and Telenet Group BVBA (01.01.2017)

License Agreement between Artilium NV and Begacom NV (28.12.2008)

License Agreement between Artilium NV and Lycamobile NV (23.03.2017)

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Service Agreement between United Telecom NV and Billi BVBA (12.01.16)

Service Agreement between United Telecom NV and Lmobishop BV (08.01.2016)

Service Agreement between United Telecom NV and Premier Telecom SPRL (19.09.2005)

Service Agreement between Artilium B.V. and Livecom International BV (was a member of Comsys group now Artilium B.V.) - Philips Electronics Nederland BV (prolongated 01.01.2018)

Service Agreement between Comsys Telecom Media BV ( now Artilium B.V.) - I-New Unified Mobile Solution AG (15.03.2016)

Service Agreement between interactive digital media GmbH and Google Ireland Limited (12.12.2016)

Service Agreement between interactive digital media GmbH and Bofrost Dienstleistungs GmbH Co KG (2014)

Service Agreement between interactive digital media GmbH and MS Inovations SA (France) (2014)

**iPass Inc. and Subsidiaries**

Common Stock Purchase Warrant with Drawbridge Special Opportunities Fund LP, dated June 14, 2018

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Common Stock Purchase Warrant with FIP UB Investments LP, dated June 14, 2018

**Schedule 8.17**

<u>Post-Closing Covenants</u>

As soon as practicable, but in any event:

1. within five (5) Business Days of the Closing Date, the Credit Parties shall furnish, or cause to be furnished, to each Lender a stock certificate evidencing such Lender's Closing Date Lender Shares;

2. by July 31, 2019, the Credit Parties shall furnish to the Administrative Agent the [***] Consent and Acknowledgment, in form and substance reasonably acceptable to the Administrative Agent;

3. within twenty (20) days of the Closing Date, the Credit Parties shall deliver, or cause to be delivered, to the Administrative Agent, certificates of insurance (on ACORD form 28 with respect to property insurance and ACORD form 25 with respect to liability insurance or, with respect to any Foreign Subsidiary, such evidence of insurance customary in such Foreign Subsidiary's jurisdiction of formation) from the Credit Parties' insurance carriers naming the Administrative Agent as additional insured and/or loss payee, as applicable, as required by the Credit Agreement and the other Credit Documents, together with endorsements from the Credit Parties' insurance carriers (or, with respect to any Foreign Subsidiary, any similar instrument customary in such Foreign Subsidiary's jurisdiction of formation) naming the Administrative Agent as additional insured and/or loss payee, as applicable, consistent with such certificates and, in each case, in form and substance reasonably satisfactory to the Administrative Agent;

4. within thirty (30) days of the Closing Date, the Credit Parties shall deliver, or cause to be delivered, to the Administrative Agent, (i) a duly executed Share Pledge Agreement, in form and substance acceptable to the Administrative Agent, by and among Artilium UK, as pledgor, Interactive, as company, the German Security Trustee as pledgee and German security agent and the Lenders as pledgees; (ii) an executed opinion letter from CMS Hasche Sigle Partnerschaft von Rechtsanwälten und Steuerberatern mbB, German counsel to the Credit Parties; (iii) an executed opinion letter from Bird & Bird LLP, German counsel to the Administrative Agent in respect of enforceability; and (iv) an updated certificate in substantially the form described in Section 5.01(d)(vi) of the Credit Agreement, in each case, in form and substance acceptable to the Administrative Agent; <u>provided</u>, that, the documents described in the foregoing clauses (i) through (iv) shall all be dated as of the same date and delivered to the Administrative Agent on such date.

5. by May 31, 2019, the Credit Parties shall furnish to the Administrative Agent the [***] Consent and Acknowledgment, in form and substance reasonably acceptable to the Administrative Agent;

6. within ten (10) days of the Closing Date, the Credit Parties shall deliver, or cause to be delivered, to the Administrative Agent, the "wet ink" original Promissory Note dated as of September 30, 2016 executed and delivered by each of VSFT Holdings, Inc., ValidSoft UK Limited and ValidSoft Limited in favor of the Borrower, together with an undated note power covering such promissory note duly executed in blank by the Borrower and otherwise in form and substance satisfactory to Collateral Agent;

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

7.  within ten (10) days of the Closing Date, the Credit Parties shall deliver, or cause to be delivered, to the Administrative Agent, a Collateral Access Agreement, in form and substance reasonably satisfactory to the Administrative Agent, with respect to the real property leased by iPass located at 3800 Bridge Parkway, Redwood City, California; and

8.  within (2) two Business Days of the Closing Date, the Credit Parties shall deliver, or cause to be delivered, to the Administrative Agent a Control Agreement with respect to the deposit accounts of each of Pareteum Corporation and Pareteum North America Corp. located at Silicon Valley Bank, in each case, in form and substance acceptable to the Administrative Agent.

---

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SCHEDULE 9.02 LIENS

None.

SCHEDULE 9.05
INVESTMENTS

ValidSoft UK Limited
That certain Promissory Note dated September 30, 2016, in the amount of $1,000,000.00, made by each of VSFT Holdings, Inc., ValidSoft UK Limited, and ValidSoft Limited, as Obligors, payable to Pareteum Corporation (f/k/a Elephant Talk Communications Corp.), as Holder.

Yonder Media Mobile Inc.
$5,000,000 Convertible Note Purchase Agreement (the "NPA") dated as of November 26, 2018 by and among Yonder Media Mobile, Inc. ("Yonder") and Pareteum Corporation ("Pareteum") and First Amendment to the NPA dated as of February 11, 2019 (the "Amendment"). Pursuant to the NPA, there are three convertible promissory notes executed by Yonder in favor of Pareteum, one dated November 26, 2018 in the amount of $500,000, a second dated January 7, 2019 in the amount of $500,000 and a third dated February 12, 2019 in the amount of $200,000.

UTS Joint venture (dormant): ET-UTS NV was incorporated in Curacao, the Netherlands Antilles, on April 9, 2008 as a 51% subsidiary of Elephant Talk Caribbean B.V. with the remaining 49% owned by our joint venture partner UTS N.V. The purpose of ET-UTS NV was to design, install, maintain and exploit WIFI and WIMAX networks in the Caribbean area and Surinam, however the project was never launched and the entity is being wound down SCHEDULE 9.09 TRANSACTIONS WITH AFFILIATES

None.

SCHEDULE 9.12
DESCRIPTION OF BUSINESS

Pareteum Corporation ("Pareteum") is a leading global provider of mobile communications technology platforms and high-value services that increase revenues and reduce costs for its customers globally with a SaaS business model and a diverse customer base that ranges from small tech companies to some of the largest mobile networks in the world. Pareteum provides mobile networking software and services solutions, including a managed services platform, global mobile cloud platform services and application exchange developer's platform services.

Organizations use Pareteum to energize their growth and profitability through cloud communication services and complete turnkey solutions featuring relevant content, applications, and connectivity worldwide. Pareteum's platform services partners (technologies integrated into Pareteum's cloud) include: HPE, IBM, Sonus, Oracle, Microsoft, and other world class technology providers. All of the relevant customer acquired value is derived from Pareteum's award winning software, developed and enhanced over many years. By harnessing the value of communications, Pareteum serves enterprise, retail and IoT customers. Pareteum currently has offices in New York, Sao Paulo, Madrid, Barcelona, Bahrain and the Netherlands. On October 1, 2018, Pareteum completed the acquisition of all of the outstanding shares of Artilium plc, a public limited company registered in England and Wales ("Artilium"), at which time Artilium became a wholly-owned subsidiary of Pareteum.

iPass Inc. ("iPass") is a leading provider of global mobile connectivity, offering simple, secure, always-on Wi-Fi access on any mobile device. Built on a software-as-a-service ("SaaS") platform, the iPass cloud-based service keeps its customers connected by providing unlimited Wi-Fi connectivity on unlimited devices. iPass is the world's largest Wi-Fi network, with more than 68 million hotspots globally, at airports, hotels, train stations, convention centers, outdoor venues, inflight on more than 20 leading airlines, and more. Using patented technology, the iPass SmartConnect™ platform takes the guesswork out of Wi-Fi, automatically connecting customers to the best hotspot for their needs. Customers simply download the iPass application ("app") to experience UNLIMITED, EVERYWHERE and INVISIBLE Wi-Fi.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SCHEDULE 12.02

Addresses for Notices.

1185 Avenue of the Americas, 37th Floor
New York, NY 10036
Attention: Hal Turner
Email: hal.turner@pareteum.com

with a copy to :
Sichenzia Ross Ference LLP
1185 Avenue of the Americas, 37th Floor
New York, New York 10036
Attention: Darrin Ocasio, Esq.
Fax: (212) 930-9725
Email: dmocasio@srf.law

If to Administrative Agent or Collateral Agent :
c/o Post Road Group
2 Landmark Square, Suite 207
Stamford, CT 06901
Attention: Michael Bogdan
Email: mbogdan@postroadgroup.com

with copies to :
Locke Lord LLP
111 Huntington Avenue
Boston, MA 02199
Attention: George Ticknor, Esq.
Fax: (617) 227-4420
Email: George.ticknor@lockelord.com

If to any Lender :

At its address or facsimile number set forth in its Administrative Questionnaire.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXHIBIT A**

FORM OF ASSIGNMENT AND ACCEPTANCE

Reference is made to the Credit Agreement dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " *Credit Agreement* "), by and among PARETEUM CORPORATION, a Delaware corporation (the " *Borrower* "), any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 or Section 8.17       of the Credit Agreement (the " *Guarantors* ", and, together with Borrower, the " *Credit Parties* "), the lenders from time to time party thereto (each, a " *Lender* ", and collectively, the " *Lenders* "), POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company (" *Post Road* "), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " *Administrative Agent* ") and as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the " *Collateral Agent* " and together with the Administrative Agent, collectively, the " *Agents* " and each an " *Agent* ").

Unless otherwise defined herein, capitalized terms used herein and defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement.

The Assignor identified on Schedule l hereto (the " *Assignor* ") and the Assignee identified on Schedule l hereto (the " *Assignee* ") agree as follows:

1.        The Assignor hereby irrevocably sells and assigns to the Assignee without recourse to the Assignor, and the Assignee hereby irrevocably purchases and assumes from the Assignor without recourse to the Assignor, as of the Effective Date (as defined below), the interest described in Schedule 1 hereto (the " *Assigned Interest* ") in and to the Assignor's rights and obligations under the Credit Agreement with respect to the Loans made pursuant to the Credit Agreement as set forth on Schedule 1 hereto (the " *Assigned Loans* "), in a principal amount as set forth on Schedule 1 hereto.

2.        The Assignor (a) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or with respect to the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any other Credit Document or any other instrument or document furnished pursuant thereto, other than that the Assignor has not created any adverse claim upon the interest being assigned by it hereunder and that such interest is free and clear of any such adverse claim; (b) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower, any of its Subsidiaries or any other Credit Party or the performance or observance by the Borrower, any of its Subsidiaries or any other Credit Party of any of their respective obligations under the Credit Agreement or any other Credit Document or any other instrument or document furnished pursuant hereto or thereto; and (c) attaches any promissory notes held by it evidencing the Assigned Loans (" *Notes* "); and (i) requests that the Administrative Agent, upon request by the Assignee, exchange the attached Note(s) for a new Note or Notes payable to the Assignee and (ii) if the Assignor has retained any interest in the Loans under the Credit Agreement, requests that the Administrative Agent exchange the attached Note(s) for a new Note or Notes payable to the Assignor, in each case in amounts which reflect the assignment being made hereby (and after giving effect to any other assignments which have become effective on the Effective Date).

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

3.      The Assignee (a) represents and warrants that it is legally authorized to enter into this Assignment and Acceptance; (b) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements delivered pursuant to Section 8.01 thereof or referred to in Section 7.09 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (c) agrees that it will, independently and without reliance upon the Assignor, any Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement, the other Credit Documents or any other instrument or document furnished pursuant hereto or thereto; (d) appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Credit Agreement, the other Credit Documents or any other instrument or document furnished pursuant hereto or thereto as are delegated to such Agent by the terms thereof, together with such powers as are incidental thereto; and (e) agrees that it will be bound by the provisions of the Credit Agreement and will perform in accordance with its terms all the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender including, if it is organized under the laws of a jurisdiction outside the United States, its obligation pursuant to Section 4.04 of the Credit Agreement.

4.      The effective date of this Assignment and Acceptance shall be the Effective Date of Assignment described in Schedule 1 hereto (the " *Effective Date* "). Following the execution of this Assignment and Acceptance, it will be delivered to the Administrative Agent for acceptance by it and recording by the Administrative Agent pursuant to the Credit Agreement, effective as of the Effective Date (which shall not, unless otherwise agreed to by the Administrative Agent, be earlier than five (5) Business Days after the date of such acceptance and recording by the Administrative Agent).

5.      Upon such acceptance and recording, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to the Effective Date and to the Assignee for amounts which have accrued subsequent to the Effective Date.

6.      From and after the Effective Date, (a) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and under the other Credit Documents and shall be bound by the provisions thereof and (b) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement.

7.      This Assignment and Acceptance shall be governed by and construed in accordance with the laws of the State of New York, without reference to conflicts of law provisions which would result in the application of the laws of any other jurisdiction.

*[Signature page follows]*

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed as of the date first above written by their respective duly authorized officers.

[Name of Assignor]                                              [Name of Assignee]

By: _____                    By: _____
Name:                                                              Name:
Title                                                                Title

[ *Signature Page to Assignment and Acceptance* ]

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Schedule 1
to Assignment and Acceptance

Name of Assignor: _____

Name of Assignee: _____

Effective Date of Assignment: _____

| Credit Facility Assigned | Principal Amount Assigned |
|---|---|
| Loan | $_____ |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[Acknowledged][Accepted and Consented to] ⊥:                    [Consented To:

POST ROAD ADMINISTRATIVE LLC,                                   PARETEUM CORPORATION] 2
as Administrative Agent                                         as Borrower

By: _____                                    By: _____
Name:                                                           Name:
Title:                                                          Title:

_____

1 To the extent required under Section 12.06 of the Credit Agreement.

2 To the extent required under Section 12.06 of the Credit Agreement.

[ *Signature Page to Assignment and Acceptance* ]

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXHIBIT B**

FORM OF COMPLIANCE CERTIFICATE

_____, 20 ___

This compliance certificate (this " *Certificate* ") is delivered pursuant to Section 8.01(d) of the Credit Agreement dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " *Credit Agreement* "), by and among PARETEUM CORPORATION, a Delaware corporation (the " *Borrower* "), any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 or Section 8.17 of the Credit Agreement (the " *Guarantors* ", and, together with Borrower, the " *Credit Parties* "), the lenders from time to time party thereto (each, a " *Lender* ", and collectively, the " *Lenders* "), POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company (" *Post Road* "), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " *Administrative Agent* ") and as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the " *Collateral Agent* " and together with the Administrative Agent, collectively, the " *Agents* " and each an " *Agent* "). Unless otherwise defined herein, capitalized terms used herein and in the Attachments hereto shall have the meanings provided in the Credit Agreement.

The undersigned hereby certifies that he or she is an Authorized Officer of the Borrower, and further certifies, on behalf of the Credit Parties, that: (i) the financial information delivered with this Certificate in accordance with Section 8.01[(a)]/[(b)]/[(c)] of the Credit Agreement presents fairly in all material respects the financial condition, results of operations and cash flows of Borrower and its Subsidiaries in accordance with GAAP at the respective dates of such information and for the respective periods covered thereby, subject in the case of unaudited financial information, to changes resulting from normal year-end audit adjustments and to the absence of footnotes; (ii) as of the date hereof [a Consolidated Revenue Testing Period is not in effect] [a Consolidated Revenue Testing Period is in effect, and set forth on Attachment 6 hereto is a calculation of the Consolidated Revenue of the Credit Parties]; and (iii) as of the date hereof [no Default or Event of Default has occurred and is continuing] [a Default/an Event of Default has occurred and set forth on Attachment 9 are the details specifying such Default or Event of Default and the action taken or to be taken with respect thereto]. The undersigned hereby further certifies, on behalf of the Credit Parties, that as of , 20 (the " *Computation Date* "):

(1)      Liquidity of the Credit Parties on the Computation Date was $ , as computed on Attachment 1 hereto. Liquidity as of such Computation Date must be greater than or equal to $2,000,000, pursuant to Section 9.13(a) of the Credit Agreement.

(2)      The Total Leverage Ratio, as of the last day of the fiscal quarter ended on the Computation Date was to 1.00, as detailed on Attachment 2 hereto. The Total Leverage Ratio as of such date must not exceed the amount set forth below opposite such fiscal quarter, pursuant to Section 9.13(b) of the Credit Agreement.

(3)

| Fiscal Quarter Ending | Total Leverage Ratio |
|---|---|
| March 31, 2019 | [***]:1.00 |
| June 30, 2019 | [***]:1.00 |
| September 31, 2019 and each fiscal quarter thereafter | [***]:100 |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(4)     The Current Assets to Debt Ratio, as of the last day of the fiscal quarter ended on the Computation Date was to 1.00, as computed on Attachment 3 hereto. The Current Assets to Debt Ratio as of such date must not be less than **[***]** to 1.00 pursuant, to Section 9.13(c) of the Credit Agreement.

(5)     The Churn Rate, as of the last day of the fiscal quarter ended on the Computation Date was _____ %, as computed on Attachment 4 hereto. The Churn Rate as of such date must not be greater than [***] percent ([***]%), pursuant to Section 9.13(d) of the Credit Agreement. [1]

(6)     Adjusted EBITDA, as of the last day of the fiscal quarter ended on the Computation Date was $ , as computed on Attachment 5 hereto. Adjusted EBITDA as of such date must not be less than the amount set forth below opposite such fiscal quarter, pursuant to Section 9.13(e) of the Credit Agreement.

| Fiscal Quarter Ending | Adjusted EBITDA |
|---|---|
| March 31, 2019 | $[***] |
| June 30, 2019 | $[***] |
| September 31, 2019 | $[***] |
| December 31, 2019 | $[***] |
| March 31, 2020 | $[***] |
| June 30, 2020 | $[***] |
| September 31, 2020 | $[***] |
| December 31, 2020 | $[***] |
| March 31, 2021 | $[***] |
| June 30, 2021 | $[***] |
| September 31, 2021 | $[***] |
| December 31, 2021 | $[***] |

(7)     [Consolidated Revenue, as of the last day of the fiscal quarter ended on the Computation Date, was $ , as computed on Attachment 6 hereto. Consolidated Revenue as of such date must not be less than the amount set forth below opposite such fiscal quarter, pursuant to Section 9.13(f) of the Credit Agreement.] [2]

| Fiscal Quarter Ending | Consolidated Revenue |
|---|---|
| March 31, 2019 | $[***] |
| June 30, 2019 | $[***] |
| September 31, 2019 | $[***] |
| December 31, 2019 | $[***] |

---

[1] Provided , however , that, the Borrower's failure to comply with such maximum Churn Rate covenant during any fiscal quarter ending on or before December 31, 2019 shall not constitute a Default or Event of Default hereunder so long as the Borrower maintains compliance with Section 9.13(f) of the Credit Agreement.

[2] To be delivered only upon the occurrence of a Consolidated Revenue Testing Period, as defined in the Credit Agreement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(8)    [ Attachment 7 hereto contains the changes as of the Computation Date, if any, in the identity of the Subsidiaries from those provided to the Lenders as of the Closing Date or the prior fiscal period, as the case may be. [3] ]

(9)    [ Attachment 8 hereto contains (x) an updated Schedule 7.15 and Schedule 7.25 of the Credit Agreement (if applicable) and (y) a written supplement substantially in the form of Schedules 1-5, as applicable, to the Security Agreement with respect to any additional assets and property acquired by any Credit Party after the Closing Date or the previous Computation Date (as the case may be), all in reasonable detail. [4] ]

(10)    The aggregate amount on deposit in Excluded Accounts (other than Excluded Accounts that are zero-balance accounts used solely to fund payroll or employee benefits) was $ as of the Computation Date. Such aggregate amount must be less than $350,000 pursuant to the Credit Agreement.

*[Remainder of page intentionally left blank; signature page follows]*

---

[3] To be delivered only with annual financial reports.

[4] To be delivered only with annual financial reports.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

The foregoing information is true, complete and correct as of the date first stated above.

BORROWER :

**PARETEUM CORPORATION**
a Delaware corporation

By: _____

Name:

Title:    Authorized Officer

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Attachment 1
(to _/_/_
Compliance Certificate)

LIQUIDITY

As of _____, 20 ___(the " ***Computation Date*** ")

" ***Liquidity*** " shall mean the sum, for the Credit Parties, of:

| | |
|---|---|
| unrestricted cash  ($ )  and  Cash  Equivalents ($ ), in each case, which is held in deposit accounts which are subject to Control Agreements ............. | $ |
| Minimum Required Liquidity | $2,000,000 [5] |
| In compliance? | Yes/No |

[5] Liquidity . Pursuant to Section 9.13(a) of the Credit Agreement, the Credit Parties will not permit Liquidity of the Credit Parties to be less than $2,000,000 at any time.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Attachment 2
(to _/_/_
Compliance Certificate)

TOTAL LEVERAGE RATIO

As of the last day of the fiscal quarter ended on _____, 20 ___(the " *Computation Date* ")

" *Total Leverage Ratio* " shall mean, as of any date, the ratio of:

(a)   Consolidated Total Debt : an amount determined for the Consolidated Companies as of the Computation Date, equal to the outstanding principal amount of all Funded Debt (as defined in the Credit Agreement)   $ _____

divided by

(b)   Adjusted EBITDA : an amount determined for the Consolidated Companies for the period of four consecutive fiscal quarters of Borrower most recently ended on or prior to the Computation Date (as calculated in Attachment 5 below). [6]   $ _____

(C)   TOTAL LEVERAGE RATIO ((a) ÷ (b)): The Total Leverage Ratio as of the Computation Date is:   _____to 1

The Maximum Total Leverage Ratio is required to be not greater than:   [***] [***] to 1.00 [7]

In compliance?   Yes/No

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

---

6 Provided that for the purposes of computation of the Total Leverage Ratio for the period of twelve consecutive months ending: (A) June 30, 2018, Adjusted EBITDA shall equal Adjusted EBITDA for the fiscal quarter ending on such date multiplied by four (4); (B) September 30, 2018, Adjusted EBITDA shall equal Adjusted EBITDA for the two fiscal quarters ending on such date multiplied by two (2) and (C) December 31, 2018, Adjusted EBITDA shall equal Adjusted EBITDA for the three fiscal quarters ending on such date multiplied by four-thirds (4/3).

7 Maximum Total Leverage Ratio . Pursuant to Section 9.13(b) of the Credit Agreement, the Credit Parties will not permit the Total Leverage Ratio, as of the last day of each fiscal quarter, to be greater than the amount set forth below opposite such fiscal quarter:

| Fiscal Quarter Ending | Total Leverage Ratio |
|---|---|
| March 31, 2019 | [***] :1.00 |
| June 30, 2019 | [***] :1.00 |
| September 31, 2019 and each fiscal quarter thereafter | [***] :100 |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Attachment 3
(to _/_/_
Compliance Certificate)

## CURRENT ASSETS TO DEBT RATIO

As of the last day of the fiscal quarter ended on _____, 20 ___ (the " *Computation Date* ")

" *Current Assets to Debt Ratio* " shall mean, as of any date, the ratio of:

(a)(i)   unrestricted cash and Cash Equivalents of the Consolidated Companies as of the Computation Date;   $ _____

plus

(a)(ii)   accounts receivable owing to the Consolidated Companies as of the Computation Date so long as such accounts receivable have not been (x) outstanding more than 60 days after the original due date therefor or (y) otherwise written off the books of the Borrower or designated as uncollectible by the Borrower in its reasonable discretion.   $ _____

**Subtotal (a)** : (a)(i) plus (a)(ii)   $ _____

divided by :

(b)   Consolidated Total Debt : an amount determined for the Consolidated Companies as of the Computation Date, equal to the outstanding principal amount of all Funded Debt (as defined in the Credit Agreement)   $ _____

CURRENT ASSETS TO DEBT RATIO ((Subtotal (a)) ÷ (b)): The Current Assets to Debt Ratio as of the Computation Date is:   _____ to 1

The Minimum Current Assets to Debt Ratio is required to be greater than or equal to:   [***] to 1.00 §

In compliance?   Yes/No

---

§ Minimum Current Assets to Debt Ratio . Pursuant to Section 9.13(c) of the Credit Agreement, the Credit Parties will not permit the Current Assets to Debt Ratio, as of the last day of each fiscal quarter, to be less than [***] to 1.00.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Attachment 4
(to _/_/_
Compliance Certificate)

CHURN RATE

As of the last day of the fiscal quarter ended on _____, 20 ___ (the " *Computation Date* ")

" *Churn Rate* " shall mean, for any period, the ratio, expressed as a percentage, of:

| | | |
|---|---|---|
| (a)(i) | RMR (as defined in the Credit Agreement) attributed to any customer contracts that were cancelled during such period; minus | $ _____ |
| (a)(ii) | RMR attributed to any new customer contracts that were entered into during such period by existing customers | $ _____ |
| | **Subtotal (a)** : (a)(i) minus (a)(ii) | $ _____ |
| | divided by | |
| (b) | RMR at the beginning of such period | $ _____ |
| (C) | CHURN RATE (Subtotal (a) ÷ (b)) (expressed as a percentage): The Churn Rate as of the Computation Date is: | _____% |
| | The Maximum Churn Rate is required to be less than or equal to: | [***] % 9 |
| | In compliance? | Yes/No |

---

9 Maximum Churn Rate . Pursuant to Section 9.13(d) of the Credit Agreement, the Credit Parties will not permit the Churn Rate, as of the last day of each fiscal quarter, to be greater than [***] percent ([***]%); provided , however , that, the Borrower's failure to comply with such maximum Churn Rate covenant during any fiscal quarter ending on or before December 31, 2019 shall not constitute a Default or Event of Default hereunder so long as the Borrower maintains compliance with Section 9.13(f) of the Credit Agreement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Attachment 5
(to _/_/_
Compliance Certificate)

ADJUSTED EBITDA

As of _____, 20 _(the " *Computation Date* ")
for the four fiscal quarters ending on the
Computation Date (the " *Computation Period* ")

" *Adjusted EBITDA* " shall mean, for a specified period, an amount determined for the Consolidated Companies equal to:

(a)   **Consolidated Net Income**                                                                      $ _____

(b)   plus , to the extent reducing Consolidated Net Income, the sum of, without duplication, amounts for:

   (i)       Consolidated Interest Expense;                                                             $ _____

   (ii)      Taxes paid in cash by the Consolidated Companies (provided that, if there is a Tax refund received in    $ _____
   such period, the amount thereof shall be deducted from Consolidated Net Income for purposes of calculating
   Adjusted EBITDA);

   (iii)     total depreciation expense;                                                                $ _____

   (iv)      total amortization expense;                                                                $ _____

   (v)      fees, charges and expenses incurred in connection with the consummation of the Transactions on or    $ _____
   prior to the Closing Date;

   (vi)      fees, charges and expenses (other than restructuring expenses) incurred in connection with the    $ _____
   consummation of any Permitted Acquisition in an aggregate amount not to exceed $250,000 in any fiscal year;

   (vii)     non-cash charges reducing Consolidated Net Income (excluding any such non-cash item to the extent    $ _____
   that it represents an accrual or reserve for potential cash items in any future period or amortization of a prepaid
   cash item that was paid in a prior period) including non-cash compensation expense in respect of stock option
   plans;

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(viii)    the amount of any severance and other restructuring expenses, in each case, to the extent (A) set forth on Schedule 1.01-A (or as may be subsequently incorporated into such Schedule as agreed to in writing by the Administrative Agent in its sole discretion following delivery of a certificate from an Authorized Officer of the Borrower certifying the amount and purpose of such expense), (B) deducted in such period in computing Consolidated Net Income, and (C) actually paid in cash during such period; and    $ _____

(ix)    such other amounts as agreed to in writing by the Administrative Agent in its sole discretion following delivery of a certificate from an Authorized Officer of the Borrower certifying the rationale for the inclusion of such amount.

**Subtotal (b)** : sum of (b)(i) through (b)(ix)    $ _____

(c)    minus , to the extent increasing Consolidated Net Income, the sum of, without duplication, amounts for:

(i)    other non-cash gains increasing Consolidated Net Income for such period (excluding any such non-cash item to the extent it represents the reversal of an accrual or reserve for potential cash item in any prior period);    $ _____

(ii)    any income or gains from disposal of disposed, abandoned, transferred, closed or discontinued operations; and    $ _____

(iii)    to the extent not deducted in determining such Consolidated Net Income, all cash payments during such period on account of reserves and other non-cash charges added to Consolidated Net Income after the Closing Date pursuant to clause (b)(vii).

**Subtotal (c)** : sum of (c)(i) through (c)(iii)    $ _____

Adjusted EBITDA: Consolidated Net Income plus Subtotal (b) minus Subtotal (c)    $ _____

Minimum Adjusted EBITDA: Adjusted EBITDA is required to be greater than or equal to:    $ _____ [10]

---

[10] Minimum Adjusted EBITDA . Pursuant to Section 9.13(e) of the Credit Agreement, the Credit Parties will not permit Adjusted EBITDA, as of the last day of each fiscal quarter, to be less than the amount set forth below opposite such fiscal quarter:

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

In compliance?                                                                                          Yes/No

| Fiscal Quarter Ending | Adjusted EBITDA |
|---|---|
| March 31, 2019 | $[***] |
| June 30, 2019 | $[***] |
| September 31, 2019 | $[***] |
| December 31, 2019 | $[***] |
| March 31, 2020 | $[***] |
| June 30, 2020 | $[***] |
| September 31, 2020 | $[***] |
| December 31, 2020 | $[***] |
| March 31, 2021 | $[***] |
| June 30, 2021 | $[***] |
| September 31, 2021 | $[***] |
| December 31, 2021 | $[***] |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Attachment 6
(to _/_/_
Compliance Certificate)

CONSOLIDATED REVENUE

[ *Borrower to complete if applicable* ]

As of the last day of the fiscal quarter ended on _____, 20 ___(the " ***Computation Date*** ")

" ***Consolidated Revenue*** " shall mean, for any specified period:

the revenue of the Consolidated Companies calculated and recognized in accordance with GAAP  $ _____

Minimum Consolidated Revenue: Consolidated Revenue is required to be greater than or equal to:  $ ___[11]___

In compliance?  Yes/No

---

[11] Minimum Consolidated Revenue . Pursuant to Section 9.13(f) of the Credit Agreement, during the continuance of a Consolidated Revenue Testing Period, the Credit Parties will not permit Consolidated Revenue, as of the last day of each fiscal quarter, to be less than the amount set forth below opposite such fiscal quarter:

| Fiscal Quarter Ending | Consolidated Revenue |
|---|---|
| March 31, 2019 | $[***] |
| June 30, 2019 | $[***] |
| September 31, 2019 | $[***] |
| December 31, 2019 | $[***] |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Attachment 7
(to _/_/_
Compliance Certificate)

<u>CHANGES IN IDENTITY OF THE SUBSIDIARIES</u>

[ *Borrower to complete if applicable* ]

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Attachment 8
(to _/_/_
Compliance Certificate)

UPDATES/SUPPLEMENTS TO CERTAIN SCHEDULES

[ *Borrower to complete if applicable* ]

(i) An updated Schedule 7.15 and Schedule 7.25 of the Credit Agreement (if applicable); and

(ii) A written supplement substantially in the form of Schedules 1-5, as applicable, to the Security Agreement with respect to any additional assets and property acquired by any Credit Party after the Closing Date on the previous Computation Date (as the case may be), all in reasonable detail.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[Attachment 9
(to _/_/_
Compliance Certificate)

<u>DETAILS SPECIFYING DEFAULT OR EVENT OF DEFAULT
AND THE ACTION TAKEN OR TO BE TAKEN WITH RESPECT THERETO]</u> [12]

[Borrower to list any existing Defaults or Events of Default, specifying the nature and period of existence of each, and the actions Borrower has taken, is undertaking and proposes to take in respect thereof. If no Defaults and no Events of Default are then in existence, such schedule should read "None".]

---

[12] This attachment is to be used if a Default or Event of Default is occurring or continuing during the time that the Compliance Certificate is completed.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXHIBIT C**

FORM OF NOTE

[$ _____]                                                                                    [ _____], 20[_]

FOR VALUE RECEIVED, the undersigned (the " ***Borrower*** "), hereby unconditionally promises to pay to [ _____ ], a [ _____ ] [ _____ ], or its registered assigns (the " ***Holder*** "), in lawful money of the United States and in immediately available funds, the principal amount of (a) [ _____ ] DOLLARS ($[ _____ ]), or, if less, (b) the unpaid principal amount of the Loan of the Holder outstanding under the Credit Agreement referred to below. The principal amount of this Note (as amended, restated, supplemented or otherwise modified, this " ***Note*** ") shall be paid in the amounts and on the dates specified in the Credit Agreement to the account designated by the Administrative Agent. The Borrower further agrees to pay interest in like money to the account designated by the Administrative Agent on the unpaid principal amount hereof from time to time outstanding at the rates and on the dates specified in the Credit Agreement.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The Holder is authorized to endorse on the schedules annexed hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof the date, and amount of the Loan and the date and amount of each payment or prepayment of principal with respect thereto. Each such endorsement shall constitute <u>prima facie</u> evidence, absent manifest error, of the accuracy of the information endorsed. The failure to make any such endorsement or any error in any such endorsement shall not affect the obligations of the Borrower in respect of the Loan.

This Note (a) is one of the promissory notes referred to in the Credit Agreement, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " ***Credit Agreement*** "), by and among the Borrower, any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 or Section 8.17 of the Credit Agreement, the Lenders from time to time party thereto, Post Road Administrative LLC, a Delaware limited liability company, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " ***Administrative Agent*** ") and as collateral agent for the Secured Parties, (b) is subject to the provisions of the Credit Agreement, and (c) is subject to optional and mandatory prepayment in whole or in part as provided in the Credit Agreement. This Note is secured and guaranteed as provided in the Credit Documents. Reference is hereby made to the Credit Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and the guarantees, the terms and conditions upon which the security interests and each guarantee were granted and the rights of the Holder in respect thereof.

Upon the occurrence and continuance of any one or more of the Events of Default, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Credit Agreement.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE CREDIT AGREEMENT, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AND IN ACCORDANCE WITH THE REGISTRATION AND OTHER PROVISIONS OF SECTION 12.06 OF THE CREDIT AGREEMENT.**

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO CONFLICTS OF LAW PROVISIONS WHICH WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.**

**THE BORROWER AND THE HOLDER (BY ACCEPTANCE OF THIS NOTE) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

*[Signature page follows]*

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

IN WITNESS WHEREOF, the undersigned has caused this Note to be executed by its duly authorized officer as of the day and year first above written.

**PARETEUM CORPORATION**

By:
Name:
Title:

[Signature Page to Note]

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Schedule A to Note

LOAN AND REPAYMENTS OF LOAN

| Date | Amount of Loan | Amount of Principal of Loan Repaid | Unpaid Principal Balance of Loan | Notation Made By |
|------|----------------|-------------------------------------|----------------------------------|------------------|
|      |                |                                     |                                  |                  |
|      |                |                                     |                                  |                  |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXHIBIT D**

FORM OF FUNDING REQUEST

[Date of Funding Request]

Post Road Administrative LLC
      as Administrative Agent for the Lenders party to the
      Credit Agreement referred to below
c/o Post Road Group
2 Landmark Square, Suite 207
Stamford, CT 06901
Attention: Michael Bogdan

Ladies and Gentlemen:

The undersigned, PARETEUM CORPORATION, a Delaware corporation (the " **Borrower** "), refers to the Credit Agreement dated as of February 26, 2019 (as amended, supplemented or otherwise modified from time to time, the " **Credit Agreement** "; capitalized terms used and not otherwise defined herein shall have the same meanings as specified therefor in the Credit Agreement) among the Borrower, any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 or Section 8.17 of the Credit Agreement (the " **Guarantors** ", and, together with Borrower, the " **Credit Parties** "), the Lenders from time to time party thereto, and Post Road Administrative LLC, as Administrative Agent for the Lenders thereunder, and as Collateral Agent for the Secured Parties, hereby gives you notice, irrevocably, pursuant to Section 2.07 of the Credit Agreement, that the undersigned hereby requests a Loan under the Credit Agreement and, in connection therewith, sets forth below the information relating to such Loan (the *"Proposed Borrowing"* ) as required by of the Credit Agreement:

(a)      The aggregate principal amount of the Proposed Borrowing is requested to be $ ;

(b)      The proposed Funding Date is requested to be , 20 ;

(c)      The Interest Period is requested to be [three (3) months];

(d)      The proceeds of the Proposed Borrowing are to be distributed as set forth on Annex A attached hereto.

The undersigned hereby certifies that the following statements are true and correct on and as of the date of this Funding Request and will be true and correct on and as of the Funding Date of the Proposed Borrowing:

(i)      The conditions precedent to such Proposed Borrowing as set forth in Section [5.01/5.02] of the Credit Agreement have been satisfied;

(ii)      No Default or Event of Default has occurred and is continuing;

(iii)      All representations and warranties made by each Credit Party contained in the Credit Agreement or in the other Credit Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), in each case, with the same effect as though such representations and warranties had been made on and as of the Funding Date (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties are true and correct in all material respects as of such earlier date (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof));

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(iv)     No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the Transactions has been issued and remain in force by any Governmental Authority against any Credit Party, any Agent or any Lender;

(v)     There is no order or injunction or pending litigation in which there is a reasonable possibility of a decision that could reasonably be expected to have a Material Adverse Effect on Borrower and its Subsidiaries, taken as a whole, and no pending litigation seeking to prohibit, enjoin or prevent the making of such Loan or the use of the proceeds thereof.

(vi)     The principal amount of the Proposed Borrowing when aggregated with the original principal amount of all other Loans funded hereunder (without giving effect to any Paid in Kind Interest), is not more than the Aggregate Commitment.

Very truly yours,

**PARETEUM CORPORATION**

By:
     Name:
     Title:

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXHIBIT E**

FORM OF PIK ELECTION NOTICE

**[Letterhead of Borrower]**

_____, 20 __

Post Road Administrative LLC
  as Administrative Agent for the Lenders party to the
  Credit Agreement referred to below
c/o Post Road Group
2 Landmark Square, Suite 207
Stamford, CT 06901
Attention: Michael Bogdan

   Reference is made to that certain Credit Agreement dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " *Credit Agreement* "), by and among PARETEUM CORPORATION, a Delaware corporation (the " *Borrower* "), any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 or Section 8.17 of the Credit Agreement (the " *Guarantors* ", and, together with Borrower, the " *Credit Parties* "), the lenders from time to time party thereto (each, a " *Lender* ", and collectively, the " *Lenders* "), POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company (" *Post Road* "), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " *Administrative Agent* ") and as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the " *Collateral Agent* " and together with the Administrative Agent, collectively, the " *Agents* " and each an " *Agent* "). Capitalized terms used in this notice, unless otherwise defined herein, shall have the meanings ascribed to them in the Credit Agreement.

   The undersigned, the [President] [Chief Financial Officer] [Vice President of Finance] of the Borrower, gives this notice to Administrative Agent in accordance with the requirements of Section 2.09(b) of the Credit Agreement.

   1.  On [ _____ ] [3] , the Company is required to make a payment of Cash Interest in respect of the Loans for the Interest Period that commenced on [ _____ ] and ended on [ _____ ] (the " **Applicable Interest Period** ") in an aggregate amount totaling $ _____ (the " **Applicable Cash Rate Interest Amount** ").

   2.  In accordance with the provisions of Section 2.09(b) of the Credit Agreement, the Borrower is making an election to pay Paid in Kind Interest (a " **PIK Election** ") with respect to $ _____ [4] of the Applicable Cash Rate Interest Amount (the " **PIK Interest Amount** ") and, accordingly, in lieu of making a payment of Cash Interest for the entire Applicable Cash Rate Interest Amount, that portion of the Applicable Cash Rate Interest Amount constituting the PIK Interest Amount will be paid in kind in the form of Paid in Kind Interest.

---

   [3] Date must be no earlier than three (3) Business Days prior to the date this Notice is delivered to the Administrative Agent.

   [4] Amount can be no greater than a percentage per annum equal to (a) through and including the first anniversary of the Closing Date, three percent (3.00%); (b) after the first anniversary of the Closing Date through and including the second anniversary of the Closing Date, two percent (2.00%); and (c) after the second anniversary of the Closing Date, one percent (1.00%).

[\*\*\*] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

3.      I hereby certify that the PIK Election which the Borrower is making for the Applicable Interest Period fully complies with the provisions of Section 2.09(b) of the Credit Agreement.

4.      The Borrower hereby requests that on the last day of the Applicable Interest Period, the Administrative Agent make an entry in its records (a) to reflect the PIK Election which the Borrower is making for the Applicable Interest Period and (b) to add the entire PIK Interest Amount to the outstanding principal balance of the Notes.

_____

as **[President] [Chief Financial Officer] [Vice President of Finance] of Pareteum Corporation**

**Exhibit 10.39**

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXECUTION COPY**

---

### SECURITY AGREEMENT

by and among

**PARETEUM CORPORATION** ,

the other Grantors from time to time party hereto,
and

**POST ROAD ADMINISTRATIVE LLC** ,
as Collateral Agent

Dated as of February 26, 2019

---

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Table of Contents

|  |  |  | **Page** |
|---|---|---|---|
| SECTION 1 | DEFINED TERMS |  | 1 |
| 1.1 | Definitions |  | 1 |
| 1.2 | Other Definitional Provisions. |  | 6 |
| SECTION 2. | [RESERVED] |  | 7 |
| SECTION 3. | GRANT OF SECURITY INTEREST |  | 7 |
| 3.1 | General. |  | 7 |
| 3.2 | Recourse to Security |  | 8 |
| 3.3 | Special Provisions Relating to Inventory |  | 8 |
| SECTION 4. | REPRESENTATIONS AND WARRANTIES |  | 8 |
| 4.1 | Representations in Credit Agreement |  | 8 |
| 4.2 | Title; No Other Liens. |  | 8 |
| 4.3 | Perfected Priority Liens. |  | 9 |
| 4.4 | Perfection Certificate; Jurisdiction of Organization; Chief Executive Office |  | 9 |
| 4.5 | Farm Products. |  | 9 |
| 4.6 | Investment Property; Pledged Stock. |  | 9 |
| 4.7 | Receivables. |  | 10 |
| 4.8 | Contracts. |  | 10 |
| 4.9 | Intellectual Property |  | 10 |
| 4.10 | Commercial Tort Claims |  | 11 |
| SECTION 5. | COVENANTS |  | 11 |
| 5.1 | Delivery of Instruments and Chattel Paper |  | 11 |
| 5.2 | Maintenance of Perfected Security Interest; Further Documentation. |  | 12 |
| 5.3 | Changes in Locations, Name, etc |  | 12 |
| 5.4 | Investment Property; Pledged Stock. |  | 13 |
| 5.5 | Receivables. |  | 14 |
| 5.6 | Intellectual Property |  | 14 |
| 5.7 | Intellectual Property Filing |  | 15 |
| 5.8 | Commercial Tort Claims |  | 15 |
| 5.9 | Collateral in the Possession of a Bailee |  | 16 |
| 5.10 | Electronic Chattel Paper |  | 16 |
| 5.11 | Letter-of-Credit Rights. |  | 16 |
| 5.12 | Further Assurances; Pledge of Instruments. |  | 17 |
| SECTION 6. | REMEDIAL PROVISIONS |  | 17 |
| 6.1 | Certain Matters Relating to Receivables. |  | 17 |
| 6.2 | Communications with Obligors; Grantors Remain Liable |  | 18 |
| 6.3 | Pledged Stock. |  | 18 |
| 6.4 | Proceeds to be Turned Over to Collateral Agent |  | 19 |
| 6.5 | Application of Proceeds. |  | 19 |
| 6.6 | UCC and Other Remedies. |  | 19 |
| 6.7 | Sales of Pledged Stock. |  | 20 |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Table of Contents
(continued)

**Page**

| | | | |
|---|---|---|---|
| 6.8 | IP Licenses. | | 20 |
| 6.9 | Waiver; Deficiency | | 21 |
| 6.10 | Consent to Receivership. | | 21 |
| 6.11 | Limitation on Remedies by German Subsidiaries. | | 21 |
| SECTION 7. | THE COLLATERAL AGENT | | 26 |
| 7.1 | Collateral Agent's Appointment as Attorney-in-Fact, etc. | | 26 |
| 7.2 | Duty of Collateral Agent | | 28 |
| 7.3 | Financing Statements. | | 28 |
| 7.4 | Authority of Collateral Agent | | 28 |
| 7.5 | Collateral Matters. | | 29 |
| SECTION 8. | MISCELLANEOUS | | 29 |
| 8.1 | Amendments in Writing | | 29 |
| 8.2 | Notices. | | 29 |
| 8.3 | No Waiver by Course of Conduct; Cumulative Remedies. | | 29 |
| 8.4 | Successors and Assigns. | | 29 |
| 8.5 | Set-Off | | 29 |
| 8.6 | Counterparts. | | 30 |
| 8.7 | Severability | | 30 |
| 8.8 | Section Headings. | | 30 |
| 8.9 | Integration. | | 30 |
| 8.10 | **GOVERNING LAW** | | 30 |
| 8.11 | **SUBMISSION TO JURISDICTION; WAIVERS** . **EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY** | | 30 |
| 8.12 | Acknowledgements | | 31 |
| 8.13 | Additional Grantors. | | 31 |
| 8.14 | Releases of Liens. | | 32 |
| 8.15 | Belgian Security Documents | | 32 |
| 8.16 | German Security Documents. | | 32 |
| 8.17 | Netherlands Security Documents. | | 33 |
| 8.18 | UK Security Documents. | | 33 |
| 8.19 | Subordination. | | 33 |
| 8.20 | Marshaling | | 33 |
| 8.21 | References to Schedules. | | 33 |

ANNEXES

Annex I          -          Form of Assumption Agreement
Annex II         -          Form of Intellectual Property Security Agreement

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**SECURITY AGREEMENT**

This SECURITY AGREEMENT dated as of February 26, 2019, made by each of the grantors signatory hereto (together with any other entity that becomes a party hereto as provided herein, the " *Grantors* "), in favor of POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company (" *Post Road* ") as collateral agent (in such capacity, together with its successors and assigns in such capacity, the " *Collateral Agent* ") acting pursuant to this Agreement for the benefit of the Secured Parties.

WITNESSETH:

WHEREAS, pursuant to the Credit Agreement dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " *Credit Agreement* "), by and among PARETEUM CORPORATION, a Delaware corporation (the " *Borrower* "), any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 of the Credit Agreement (collectively, the " *Guarantors* ", and, together with Borrower, the " *Credit Parties* "), the lenders from time to time party thereto (the " *Lenders* "), Post Road, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " *Administrative Agent* ") and the Collateral Agent (together with the Administrative Agent, collectively, the " *Agents* " and each an " *Agent* "), the Lenders have severally agreed to make the Loans to the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, each Grantor (other than the Borrower) has agreed to guarantee the payment and performance of the Borrower's obligations and liabilities under the Credit Agreement and the other Credit Documents as more fully set forth therein;

WHEREAS, the Borrower is a member of an affiliated group of companies that includes each of the other Grantors;

WHEREAS, the Borrower and the other Grantors are engaged in related businesses, and each Grantor will derive substantial direct and indirect benefit from the making of the Loans and other financial accommodations under the Credit Agreement; and

WHEREAS, it is a condition precedent to the obligation of the Secured Parties to make the Loans and other financial accommodations to the Borrower under the Credit Agreement, that the Grantors shall have executed and delivered this Agreement to the Collateral Agent for the benefit of the Secured Parties;

NOW, THEREFORE, in consideration of the premises and to induce the Agents and the Lenders to enter into the Credit Agreement and to induce the Secured Parties to make the Loans and other financial accommodations to the Borrower thereunder, each Grantor hereby agrees with the Collateral Agent, for the benefit of the Secured Parties, as follows:

SECTION 1.      DEFINED TERMS

1.1      Definitions .

(a)      Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement, and the following terms which are defined in the UCC are used herein as so defined: Account, Certificated Security, Chattel Paper, Commercial Tort Claim, control, Contract, Document, Farm Product, General Intangible, Goods, Instrument, Inventory, Letter-of-Credit Right, Securities Account, Securities Entitlement, Uncertificated Security and Supporting Obligation. To the extent applicable, all other terms used herein without definition which are not defined in the Credit Agreement shall have the definitions given therefor in the UCC.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)    The following terms shall have the following meanings:

" *Agreement* " shall mean this Security Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

" *Artilium UK* " shall mean Artilium Group Limited, a private limited liability company formed under the laws of England and Wales.

" *Auditors* shall have the meaning set forth in <u>Section 6.11(e).</u>

" *Auditors' Determination* "shall have the meaning set forth in <u>Section 6.11(e).</u>

" *Belgian Security Documents* " shall mean (i) the pledges over business granted by the Belgian Subsidiaries as pledgors to the Collateral Agent as pledgee and (ii) the pledges over shares in the capital of Artilium NV and United Telecom NV by Artilium UK as pledgor, and the Collateral Agent as pledgee, in each case, dated as of the Closing Date, as the same may be amended, restated, supplemented or otherwise modified from time to time, and each other instrument or document executed and delivered pursuant to Sections 8.10, 8.11, 8.13 or 8.17 of the Credit Agreement or pursuant to any of the Security Documents to guarantee or secure any of the Obligations governed by Belgian law.

" *Belgian Subsidiaries* " shall mean, collectively, Artilium NV and United Telecom NV and any other Subsidiary required to become a party hereto which is formed under the laws of Belgium, and " *Belgian Subsidiary* " shall mean any of the Belgian Subsidiaries, individually.

" *Capital Impairment* " shall have the meaning set forth in <u>Section 6.11(d).</u>

" *Collateral* " shall have the meaning set forth in <u>Section 3 </u>.

" *Collateral Account* " shall mean any Deposit Account that is (x) subject to a Control Agreement established pursuant to <u>Section 8.15 </u>of the Credit Agreement or (y) established by the Collateral Agent as provided in <u>Sections 6.1 </u>or <u>6.4 </u>of this Agreement.

" *Collections* " shall mean all cash, checks, credit card slips or receipts, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of the Credit Parties, including, without limitation, the proceeds of all Accounts.

" *Copyrights* " shall mean (a) all copyrights, rights, titles and interests in and to published and unpublished works of authorship, including all software (whether or not considered to be a "good" rather than an intangible, and including the source code version thereof), and all copyrights in any original or derivative works of authorship, whether registered or unregistered and whether published or unpublished (including those listed in <u>Schedule 4 </u>, if any), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or any other office throughout the world, (b) the right to obtain all renewals thereof and (c) all income, royalties, and proceeds at any time due or payable or asserted under or with respect to any of the foregoing, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, violation or other impairment thereof.

2

[\*\*\*] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *Copyright Licenses* " shall mean any written agreement naming any Grantor as licensor or licensee (including those listed in Schedule 4 , if any), other than software license agreements for "off-the-shelf", "shrink-wrap" or "click-through" agreements granting any right under any Copyright, including the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

" *Deposit Account* " shall have the meaning set forth in the UCC and, in any event, include any demand, time, savings, passbook or like account maintained with a depositary institution (other than Excluded Property).

" *Equipment* " means: (a) any "equipment", as such term is defined in Section 9- 102(a)(33) of the UCC; (b) all machinery, equipment, furnishings, Fixtures, and Vehicles; and (c) any and all additions, substitutions, and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment, and accessories installed thereon or affixed thereto (in each case, regardless of whether characterized as equipment under the UCC).

" *Excluded Property* " shall mean property that, but for any one or more of clauses (w)-(z) of the last paragraph of Section 3.1 , would constitute Collateral.

" *German Enforcement* " shall have the meaning set forth in Section 6.11 (a).

" *German Subsidiary* " shall mean, collectively, interactive digital media GmbH and any other Subsidiary required to become a party hereto which has a registered office in the Federal Republic of Germany, and " *German Subsidiary* " shall mean any of the German Subsidiaries, individually.

" *German Security Documents* " shall mean shall mean (i) the Share Pledge Agreement dated as of the Closing Date between Artilium UK, as pledgor, Interactive, as company and the German Security Trustee as pledgee and collateral agent and the Lenders as pledgees, (ii) the Security Transfer Agreement dated as of the Closing Date between Interactive, as transferor and the German Security Trustee as transferee and collateral agent, (iii) the Global Assignment Agreement dated as of the Closing Date between Interactive, as assignor and the German Security Trustee, as assignee and collateral agent, (vi) the Account Pledge Agreement dated as of the Closing Date between Interactive, as pledgor, the German Security Trustee, as pledgee and collateral agent and the Lenders, as pledgees, (v) the IP Rights Transfer and Assignment Agreement dated as of the Closing Date between Interactive, as security provider and the German Security Trustee, as security trustee and collateral agent, as the same may be amended, restated, supplemented or otherwise modified from time to time, and each other instrument or document executed and delivered pursuant to Sections 8.10, 8.11, 8.13 or 8.17 of the Credit Agreement or pursuant to any of the Security Documents to guarantee or secure any of the Obligations governed by German law.

" *Intellectual Property* " shall mean, collectively, all rights, priorities and privileges relating to intellectual property, including all Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks, Trademark Licenses, Internet Domain Names, Trade Secrets and Trade Secret Licenses.

" *Intercompany Note* " shall mean any promissory note evidencing loans made by any Obligor to any Grantor.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" *Internet Domain Names* " shall mean all rights, title and interests arising under any law in or relating to Internet domain names.

" *Investment Property* " shall mean, collectively, (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Stock.

" *IP License* " means all agreements, whether written or oral, granting any right, title or interest in any Intellectual Property, including all Copyright Licenses, Patent Licenses, and Trademark Licenses.

" *Issuers* " shall mean, collectively, each issuer of any Investment Property which does not constitute Excluded Property.

" *Material Intellectual Property* " shall have the meaning set forth in Section 5.6 .

" *Net Assets* " shall have the meaning set forth in Section 6.11(e).

" *Netherlands Security Documents* " shall mean (i) the Netherlands Pledge Agreement between the Netherlands Subsidiaries as pledgors and the Collateral Agent as pledgee and (ii) the deed of pledge over shares in the capital of each Netherlands Subsidiary between the Borrower, Pareteum Europe and Artilium UK as respective pledgors and the Collateral Agent as pledgee, in each case, dated as of the Closing Date, as the same may be amended, restated, supplemented or otherwise modified from time to time and each other instrument or document executed and delivered pursuant to Sections 8.10, 8.11, 8.13 or 8.17 of the Credit Agreement or pursuant to any of the Security Documents to guarantee or secure any of the Obligations governed by the laws of the Netherlands.

" *Netherlands Subsidiary* " shall mean, collectively, Pareteum Europe BV and Artilium BV, and any other Subsidiary required to become a party hereto which has a registered office in The Netherlands, and " *Netherlands Subsidiary* " shall mean any of the Netherlands Subsidiaries, individually.

" *Obligors* " shall mean, collectively, the Grantors and any other Person that becomes obligated to any Secured Party with respect to any of the Secured Obligations.

" *Patents* " shall mean (a) all letters patent of the United States, any political subdivision thereof or any other jurisdiction throughout the world and all reissues and extensions thereof, including any of the foregoing referred to in Schedule 4 (if any), (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, including any of the foregoing referred to in Schedule 4 (if any), (c)    all rights to obtain any reissues or extensions of the foregoing and (d) all income, royalties, and proceeds at any time due or payable or asserted under or with respect to any of the foregoing including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, violation or other impairment thereof.

" *Patent License* " shall mean all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use, sell, offer for sale or import any invention covered in whole or in part by a Patent, including any of the foregoing referred to in Schedule 4 (if any).

4

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

"*Pledged*", when used in conjunction with any type of asset, shall mean, at any time, an asset of such type that is included or required to be included (or that creates rights that are included or required to be included) in the Collateral at such time pursuant to the terms of this Agreement.

"*Pledged Notes*" shall mean all promissory notes listed on Schedule 1, all Intercompany Notes at any time issued to any Grantor and all other promissory notes issued to or held by any Grantor (other than promissory notes issued in connection with extensions of trade credit by any Grantor in the ordinary course of business).

"*Pledged Stock*" shall mean the shares of Capital Stock listed on Schedule 1, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect.

"*Proceeds*" shall mean all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"*Receivable*" shall mean any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including any Account).

"*Secured Obligations*" shall mean (a) in the case of the Borrower, the "Obligations" as defined in the Credit Agreement and (b) in the case of the Guarantors, the "Guarantor Obligations" as defined in the Credit Agreement and any and all other obligations (whether absolute or contingent, matured or unmatured) of the Obligors arising under or in connection with any Credit Document.

"*Securities Act*" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Trademarks*" shall mean (a) all trademarks, trade names, fictitious business names, service marks, logos, trade dress and other source or business identifiers (whether registered or unregistered), and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any jurisdiction throughout the world or any political subdivision thereof, or otherwise, and all common-law rights related thereto, including any of the foregoing referred to in Schedule 4 (if any), (b) the right to obtain all renewals thereof and (c) all income, royalties, and proceeds at any time due or payable or asserted under or with respect to any of the foregoing, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, violation or other impairment thereof.

"*Trademark License*" shall mean any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, including any of the foregoing referred to in Schedule 4 (if any).

5

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

" ***Trade Secrets*** " means anything that would constitute a trade secret under Applicable Law and information that derives independent economic value (actual or potential) from not being generally known to and not being readily ascertainable by proper means by a person able to obtain economic value from its use or disclosure, and all other inventions (whether patentable or not), industrial designs, discoveries, improvements, ideas, designs, models, formulae, patterns, compilations, databases, data collections, drawings, blueprints, mask works, devices, methods, techniques, processes, know-how, confidential information, proprietary information, customer lists, software, and technical information.

" ***Trade Secrets License*** " shall mean any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trade Secrets, including any of the foregoing referred to in Schedule 4 (if any).

" ***UK Debenture*** " shall mean the English law Debenture dated as of the Closing Date between Artilium UK and the Collateral Agent, as may be amended, restated or otherwise modified from time to time.

" ***UK Security Documents*** " shall mean, collectively, the UK Debenture and the UK Share Charge, as the same may be amended, restated, supplemented or otherwise modified from time to time, and each other instrument or document executed and delivered pursuant to Sections 8.10, 8.11, 8.13 or 8.17 of the Credit Agreement or pursuant to any of the Security Documents to guarantee or secure any of the Obligations governed by the laws of England and Wales.

" ***UK Share Charge*** " shall mean, the English law Share Charge dated as of the Closing Date between the Borrower and Artilium UK, as may be amended, restated or otherwise modified from time to time.

" ***UK Subsidiary*** " shall mean, collectively, Artilium UK and any other Subsidiary required to become a party hereto which is formed under the laws of England and Wales, and " ***UK Subsidiary*** " shall mean any of the UK Subsidiaries, individually.

" ***Vehicles*** " means all present and future automobiles, trucks, truck tractors, trailers, semi-trailers, or other motor vehicles or rolling stock, now owned or hereafter acquired by Grantors.

1.2      Other Definitional Provisions .

(a)      The words "hereof", "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Schedule references are to this Agreement unless otherwise specified.

(b)      The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SECTION 2.       [Reserved]

SECTION 3.       GRANT OF SECURITY INTEREST

3.1       <u>General</u> . Each Grantor hereby pledges and collaterally assigns to the Collateral Agent, and hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a security interest in all of its personal property and other assets, whether now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest, including all of the following property, wherever located (collectively, the " **Collateral** "), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Secured Obligations:

(a)       all Accounts, Receivables and Collections;

(b)       all Chattel Paper;

(c)       all Contracts;

(d)       all Deposit Accounts;

(e)       all Documents;

(f)       all Equipment;

(g)       all Vehicles;

(h)       all General Intangibles;

(i)       all Instruments;

(j)       all Intellectual Property;

(k)       all Inventory;

(l)       all Investment Property;

(m)       all Letter-of-Credit Rights;

(n)       all Goods and other property not otherwise described above;

(o)       all books and records pertaining to the Collateral;

(p)       all Commercial Tort Claims listed on <u>Schedule 5</u> or described in any notice sent pursuant to <u>Section 5.8</u> ; and

(q)       to the extent not otherwise included, all Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

Notwithstanding the foregoing, "Collateral" shall not include the following: (w) any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office (but only until such statement is accepted by the United States Patent and Trademark Office); (x) any rights or interests in any lease, license, contract, or agreement, as such or the assets subject thereto if under the terms of such lease, license, contract, or agreement, or Applicable Law with respect thereto, the valid grant of a Lien therein or in such assets to Collateral Agent is prohibited and such prohibition has not been or is not waived or the consent of the other party to such lease, license, contract, or agreement has not been or is not otherwise obtained or under Applicable Law such prohibition cannot be waived; (y) deposit accounts that are used solely to fund payroll or employee benefits, so long as such deposit account is a zero balance account; and (z) any asset with respect to which the Collateral Agent shall have determined in its sole discretion in consultation with the applicable Grantor (and written notice of such determination to such Grantor) that the cost of obtaining a security interest in such asset is excessive in relation to the value of the security to be afforded thereby; <u>provided</u> , <u>however,</u> the exclusion in clause (w) above shall in no way be construed (i) to apply if any such prohibition would be rendered ineffective under the UCC (including <u>Sections 9-406, 9-407</u> and <u>9-408</u> thereof) or other Applicable Law (including the United States bankruptcy code) or principles of equity, (ii) so as to limit, impair or otherwise affect Collateral Agent's unconditional continuing Liens upon any rights or interests of any Grantor in or to the Proceeds thereof (including proceeds from the sale, license, lease or other disposition thereof), including monies due or to become due under any such lease, license, contract, or agreement (including any Accounts or other Receivables), or (iii) to apply at such time as the condition causing such prohibition shall be remedied and, to the extent severable, "Collateral" shall include any portion of such lease, license, contract, agreement or assets subject thereto that does not result in such prohibition.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

3.2    <u>Recourse to Security</u> . Recourse to security shall not be required for any Obligation hereunder and each Grantor hereby waives, to the extent such waiver is not prohibited by Applicable Law, any requirement that the Collateral Agent or the Secured Parties exhaust any right or take any action against any of the Collateral before proceeding to enforce the Obligations against such Grantor.

3.3    <u>Special Provisions Relating to Inventory</u> .

(a)    <u>All Inventory</u> . The security interest in the Inventory granted to the Collateral Agent hereunder shall continue through all steps of manufacture and sale and attach without further act to raw materials, work in process, finished goods, returned goods, documents of title and warehouse receipts, and to proceeds resulting from the sale or other disposition of such Inventory.

(b)    <u>Inventory Records</u> . Each Grantor shall maintain, in the ordinary course of business, full, accurate and complete records of its Inventory describing the kind, type and quantity of such Inventory and the Grantor's cost therefor, withdrawals therefrom and additions thereto, including a perpetual inventory for raw materials, work in process and finished goods.

SECTION 4.    REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into the Credit Agreement and to induce the Secured Parties to make the Loans and other financial accommodations to the Borrower thereunder, each Grantor hereby represents and warrants to each Secured Party that:

4.1    <u>Representations in Credit Agreement</u> . All representations and warranties set forth in the Credit Agreement that relate to or are contemplated to be made by any Grantor are hereby incorporated herein by reference, are true and correct as of the date on which such representations and warranties are made or deemed made pursuant to the Credit Agreement, and each Secured Party shall be entitled to rely on each of them as if they were fully set forth herein.

4.2    <u>Title; No Other Liens</u> . No financing statement or other public notice or record of a Lien with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Collateral Agent, for the benefit of the Secured Parties, pursuant to this Agreement or as are expressly permitted by the terms of the Credit Agreement.

8

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

4.3     <u>Perfected Priority Liens</u> . Except with respect to intellectual property registered with an agency or governmental office or authority other than the United States Patent and Trademark Office, the United States Copyright Office or any similar agency in any political subdivision of the United States, the security interests granted pursuant to this Agreement upon completion of the filings and other actions specified on <u>Schedule 2</u> (which, in the case of all filings and other documents referred to on said Schedule, have been delivered to the Collateral Agent in completed and duly executed form) will constitute valid first priority perfected security interests in all of the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, as collateral security for the Secured Obligations, enforceable in accordance with the terms hereof against all creditors of each Grantor and any Persons purporting to purchase any Collateral from any Grantor and are prior to all other Liens on the Collateral, except for, (i) Liens permitted by <u>Section 9.02(a)</u> of the Credit Agreement and (ii) solely with respect to Collateral that does not constitute Pledged Stock, rights under Material Contracts or proceeds arising thereunder or with respect thereto, Permitted Liens which, pursuant to the terms of the Credit Agreement, are permitted to have priority over Collateral Agent's Liens thereon as collateral security for the Secured Obligations.

4.4     <u>Perfection Certificate; Jurisdiction of Organization; Chief Executive Office</u> . Each of the Grantors has previously delivered (or is concurrently delivering with this Agreement) to the Collateral Agent a Perfection Certificate signed by such Grantor. Each of the Grantors represents and warrants to the Secured Parties as follows: (a) such Grantor's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (b) such Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate, (c) the Perfection Certificate accurately sets forth such Grantor's organizational identification number or accurately states that such Grantor has none, (d) the Perfection Certificate accurately sets forth such Grantor's place of business or, if more than one, its chief executive office, as well as such Grantor's mailing address, if different, (e) all other information set forth on the Perfection Certificate pertaining to such Grantor is accurate and complete, and (f) there has been no change in any of such information since the date on which the Perfection Certificate was signed by such Grantor.

4.5     <u>Farm Products</u> . None of the Collateral constitutes, or is the Proceeds of, Farm Products.

4.6     <u>Investment Property; Pledged Stock</u> .

(a)     Schedule 3 sets forth all the issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by each Grantor. The shares of Pledged Stock pledged by each Grantor hereunder constitute all the issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor.

(b)     All the shares of the Pledged Stock issued by any Issuer have been duly and validly issued and are fully paid and nonassessable to the extent such concepts are applicable to such Pledged Stock.

(c)     Each of the Pledged Notes issued by any Grantor or Subsidiary of any Grantor constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

(d)     Each Grantor is the record and beneficial owner of, and has good and valid title to, the Investment Property (other than Excluded Property) pledged by it hereunder, prior to all other Liens on such Collateral except, (i) Liens permitted by <u>Section 9.02(a)</u> of the Credit Agreement and (ii) other than in the case of Pledged Stock, Permitted Liens which, pursuant to the terms of the Credit Agreement, are expressly permitted to have priority over Collateral Agent's Liens thereon to secure the Secured Obligations.

9

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(e)       No Grantor is or will become a party to or otherwise bound by any agreement (except the Credit Documents), including any limited partnership agreement or limited liability company operating agreement, which restricts the right of the Collateral Agent to foreclose upon any such Pledged Stock. None of such Pledged Stock is subject to any option, right of first refusal, call, purchase or similar right of any Person.

(f)       None of the Pledged Stock is represented by certificates or is a security governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

4.7       Receivables .

(a)       No amount payable to such Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the Collateral Agent to the extent required by Section 5.1.

(b)       The amounts represented by a Grantor to the Secured Parties from time to time as owing to such Grantor in respect of the Receivables will, to the best of Grantors' actual knowledge, at such times be accurate in all material respects.

4.8       Contracts . No amount payable to a Grantor under or in connection with any Contract is evidenced by any Instrument or Chattel Paper which has not been delivered to the Collateral Agent to the extent required by Section 5.1.

4.9       Intellectual Property .

(a)       Schedule 4 lists all items of (i) Intellectual Property which are registered in the United States Patent and Trademark Office, the United States Copyright Office, the applicable registrar of Internet Domain Names, or any similar office or agency in any political subdivision of the United States or any similar office or agency in any other country or any political subdivision thereof and (ii) all applications for such registered Intellectual Property that are owned by each Grantor, including for each of the foregoing items (1) the owner, (2) the title, (3) the jurisdiction in which the item has been registered or for which an application for registration has been filed, and (4) as applicable, the registration number and registration date or the application number and filing date.

(b)       All Intellectual Property of each Grantor described on Schedule 4 as updated when required by Section 8.01(d) of the Credit Agreement is valid, subsisting, unexpired and enforceable, has not been abandoned and, to the best of the Grantors' actual knowledge, as used in the business of the Borrower and each other Grantor, does not infringe the intellectual property rights of any other Person in any material respect.

(c)       Except as set forth in Schedule 4 , as updated when required by Section 8.01(d) of the Credit Agreement, none of the Intellectual Property (other than Excluded Property) is the subject of any licensing or franchise agreement pursuant to which a Grantor is the licensor or franchisor.

(d)       None of the products or services used in the business of any Grantor or any Subsidiary thereof uses any software or freeware licensed in a manner which imposes any requirement that such software or freeware, or any of the products or services of any such Grantor or such Subsidiary, or derivatives of such software, freeware or products or services, or software, products or services using, linked with, incorporating, distributed with, based on, or derived from such software or freeware or products or services, be (i) made available or distributed in source code form, (ii) licensed for the purpose of making derivative works, (iii) licensed under terms that allow reverse engineering, reverse assembly or disassembly of any kind, or (iv) made redistributable at no charge.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(e)    No holding, decision or judgment has been rendered by any Governmental Authority which would, in any respect, limit, cancel or question the validity of, or a Grantor's rights in, any Material Intellectual Property.

(f)    No action, suit, claim, demand, order or proceeding is pending, or, to the knowledge of any Grantor, threatened, (i) seeking to limit, cancel or question the validity of any Material Intellectual Property, or any Grantor's ownership interest therein (other than office actions issued in the ordinary course of prosecution of any pending applications for patents or applications for registration of other Intellectual Property), or (ii) which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

(g)    To each Grantor's actual knowledge, no Person has been or is infringing, misappropriating, or diluting any Intellectual Property owned by any Grantor.

(h)    Each Grantor, and to each Grantor's actual knowledge each other party thereto, is not in material breach or default of any material IP License and no breach or default of any material IP License shall be caused by the consummation of the transactions contemplated by any Credit Document.

4.10    Commercial Tort Claims .

(a)    No Grantor has rights in any Commercial Tort Claim for an amount in excess of $100,000 with respect to any one claim or in excess of $250,000 for all such claims, except as set forth on Schedule 5 .

(b)    Upon the granting to Collateral Agent of a security interest in any Commercial Tort Claim pursuant to Section 5.8 , such security interest will constitute a valid perfected security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, as Collateral for the Secured Obligations, enforceable in accordance with the terms hereof against all creditors of each Grantor and any Persons purporting to purchase such Collateral from any Grantor, which security interest shall be prior to all other Liens on such Collateral except for Permitted Liens, which, pursuant to the terms of the Credit Agreement, are expressly permitted to have priority over Collateral Agent's Liens thereon.

SECTION 5.    COVENANTS

Each Grantor covenants and agrees with the Secured Parties that, from and after the date of this Agreement until the Termination Date:

5.1    Delivery of Instruments and Chattel Paper . Without limiting Section 5.4 , if any amount in excess of [***] in any one instance or [***] in the aggregate for all such Collateral, payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Chattel Paper, such Instrument or Chattel Paper shall, within five (5) Business Days of such Collateral arising, being acquired or being so evidenced, be delivered to the Collateral Agent, together with such endorsements, notations and applicable transfer instruments with respect thereto as the Collateral Agent may reasonably request, duly endorsed in a manner satisfactory to the Collateral Agent, to be held for the benefit of the Secured Parties, as Collateral under this Agreement.

11

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

5.2     Maintenance of Perfected Security Interest; Further Documentation .

(a)     Each Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 4.3 and shall defend such security interest against the claims and demands of all Persons whomsoever.

(b)     Except as specifically waived by this Agreement or any other Credit Document, at any time and from time to time, upon the written request of the Collateral Agent, and at the sole expense of such Grantor, such Grantor will promptly, and in any event within five (5) Business Days, duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Collateral Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including (i) the filing of any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby, and (ii) without limitation of Section 5.5(c), in the case of Investment Property, Deposit Accounts, Securities Entitlements, Letter of Credit Rights (in each case, other than Excluded Property) and any other relevant Collateral, taking any actions necessary to enable the Collateral Agent to obtain "control" (within the meaning of the UCC) with respect thereto. For the avoidance of doubt, the Grantors' obligations to provide any such further documents with respect to Intellectual Property shall be governed by Sections 5.6(g) and 5.7.

5.3     Changes in Locations, Name, etc .

(a)     Such Grantor will not, without at least fifteen (15) Business Days prior written notice to Collateral Agent:

(i)     change its legal name or the location of its chief executive office or sole place of business from that referred to in Section 4.4 ; or

(ii)     except as permitted by Section 9.03 of the Credit Agreement, change its jurisdiction of organization, type of organization, identity or corporate structure.

(b)     To the extent entered into by a Grantor, such Grantor shall promptly provide the Collateral Agent with certified organizational documents reflecting any of the changes described in the preceding clause (a)(ii) of this Section.

(c)     No Grantor shall effect any change referred to in the preceding clause (a)(ii) of this Section unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected Lien on all the Collateral.

(d)     Each of the Grantors will keep all Equipment and Inventory (other than Inventory in transit to or from any such location) at the locations reflected in Section 2 of the Perfection Certificate or, upon not less than fifteen (15) Business Days' prior written notice to Collateral Agent accompanied by an updated Section 2 of the Perfection Certificate, to any such new locations within the continental United States of America (so long as such Grantor shall have provided Collateral Agent with such other information and documentation in connection therewith as the Collateral Agent may request and shall have taken all actions necessary or advisable to maintain the continuous validity, perfection and the same or better priority of the Collateral Agent's security interest in the relevant Equipment and Inventory intended to be granted and agreed to hereby, or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder and under the other Credit Documents, with respect to such Equipment and Inventory (provided, that in the case of any leased location or warehouse or other third party-controlled location, if the aggregate value of Equipment and Inventory at any such location exceeds [***] such grantors shall have used commercially reasonable efforts to obtain an executed Collateral Access Agreement with respect to such location)

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(e)     With respect to any real property leased by a Grantor as of the Closing Date or at any time thereafter, if such leased real property serves as the chief executive office of such Grantor, then the Grantors shall cause a Collateral Access Agreement or other Security Document requested by the Collateral Agent with respect to such leased real property, in form and substance acceptable to the Collateral Agent, to be promptly delivered to the Collateral Agent and in any event no later than thirty

(30) days following Collateral Agent's request therefor.

5.4     Investment Property; Pledged Stock .

(a)     If such Grantor shall become entitled to receive or shall receive any certificate in respect of any Pledged Stock (including any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization of such Pledged Stock), option or rights in respect of any Pledged Stock, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Stock, or otherwise in respect thereof, such Grantor shall accept the same as the agent of the Secured Parties, hold the same for the benefit of the Secured Parties and, within five (5) Business Days of such receipt, deliver the same forthwith to the Collateral Agent in the exact form received, duly endorsed by such Grantor to the Collateral Agent, if required, together with an undated stock transfer power covering such certificate duly executed in blank by such Grantor and otherwise in form and substance satisfactory to Collateral Agent, to be held by the Collateral Agent as additional Collateral under this Agreement. Any property distributed (other than cash or distributed property which constitutes Excluded Property) on or in respect of the Investment Property shall be delivered to the Collateral Agent within five (5) Business Days of its receipt, to be held by it as additional Collateral under this Agreement.

(b)     In the case of each Grantor which is an Issuer, such Issuer agrees that (i) it will be bound by the terms of this Agreement relating to the Investment Property issued by it which constitutes Collateral and will comply with such terms insofar as such terms are applicable to it and (ii) the terms of Sections 6.3(b) and 6.7 shall apply to it, *mutatis mutandis* , with respect to all actions that may be required of it pursuant to Section 6.3(b) with respect to such Investment Property issued by it.

(c)     Unless an Event of Default shall have occurred and be continuing and the payment of any such dividend or distribution is prohibited by Section 9.06 of the Credit Agreement, each Grantor shall be permitted to receive dividends and other distributions in respect of the Pledged Stock and all payments made in respect of the Pledged Notes, in each case, to the extent permitted by the Credit Agreement. Subject to the provisions of Section 6.3 , each Grantor shall be permitted to exercise all voting and corporate rights with respect to the Investment Property (other than Excluded Property); provided , that no vote shall be cast or corporate or other organizational right exercised or other action taken which would be inconsistent with or result in any violation of any provision of the Credit Agreement, this Agreement or any other Credit Document.

(d)     No Issuer will certificate any Pledged Stock after the Closing Date without the prior written consent of the Collateral Agent or opt into Article 8 of the Uniform Commercial Code without the prior written consent of the Required Lenders.

13

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

5.5    Receivables . Other than in the ordinary course of business or otherwise as a result of the exercise of reasonable business judgment, such Grantor will not (a) grant any extension of the time of payment of any Receivable, (b) compromise or settle any Receivable for less than the full amount thereof, (c)    release, wholly or partially, any Person liable for the payment of any Receivable, (d) allow any credit or discount whatsoever on any Receivable, or (e) amend, supplement or modify any Receivable in any manner that could adversely affect the value thereof; provided , that none of such actions may be taken by such Grantor upon the occurrence and continuation of an Event of Default. The Collateral Agent hereby authorizes each Grantor to collect such Grantor's Receivables, subject to the limitations set forth in this Agreement or other Credit Documents, and the Collateral Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default.

5.6    Intellectual Property . With respect to each item of Intellectual Property that is material to the conduct of any Grantor's business (collectively, " Material Intellectual Property "), except as permitted by Section 9.04(f) of the Credit Agreement and provided that clause (g) shall apply to all Intellectual Property referenced in such clause (g):

(a)    With respect to each such Trademark, such Grantor (either itself or through licensees) will (i) continue to use each such Trademark on each and every trademarked class of goods applicable to its then current lines of products and services as reflected in its current sales materials in order to maintain such Trademark in full force and effect, free from any claim of abandonment for non- use, (ii) maintain the quality of products and services offered under each such Trademark, (iii) use each such Trademark with the appropriate notice of registration and all other notices and legends required by Applicable Laws, (iv) not use any mark which is confusingly similar or a colorable imitation of any such Trademark unless the Collateral Agent, for the benefit of the Secured Parties, shall obtain a perfected security interest in such mark pursuant to this Agreement, and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way.

(b)    Such Grantor (either itself or through licensees) will not do any act, or omit to do any act, whereby any such Patent may become forfeited, abandoned or dedicated to the public (other than at the end of its applicable statutory term).

(c)    Such Grantor (either itself or through licensees) (i) will employ each such Copyright, and (ii) will not (and will not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any such Copyright may become invalidated or otherwise impaired. Such Grantor will not (either itself or through licensees) do any act whereby any such Copyright may fall into the public domain (other than at the end of its applicable statutory term).

(d)    Such Grantor (either itself or through licensees) will not do any act that knowingly infringes the intellectual property rights of any other Person.

(e)    Such Grantor will take all reasonable and necessary steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of such Intellectual Property, including filing of applications for renewal, affidavits of use and affidavits of incontestability.

(f)    Such Grantor shall take the actions reasonably necessary to protect the confidentiality of such Intellectual Property and its rights therein, including (a) protecting the secrecy and confidentiality of its confidential information and Trade Secrets, (b) taking actions reasonably necessary to ensure that no Trade Secret falls or has fallen into the public domain, and (c) protecting the secrecy and confidentiality of the source code of all computer software programs and applications of which it is the owner or licensee by having and enforcing a policy requiring any licensees (or sublicensees) of such source code to enter into license agreements with appropriate use and non-disclosure restrictions.

14

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(g)    Such Grantor shall execute and deliver to the Collateral Agent in form and substance reasonably acceptable to the Collateral Agent and suitable for (i) filing in the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any political subdivision of the United States, or any similar office or agency in any other country or any political subdivision thereof, the short-form intellectual property security agreements in the form attached hereto as Annex II, as modified as reasonably required for each such jurisdiction, for all Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks and Trademark Licenses of such Grantor and

(ii) to the extent requested by the Collateral Agent, recording with the appropriate Internet Domain Name registrar, a duly executed form of assignment for all Internet Domain Names of such Grantor (together with appropriate supporting documentation as may be requested by the Collateral Agent)

(h)    Such Grantor will take the actions reasonably necessary to ensure that ownership of all Material Intellectual Property used in the business of such Grantor, other than "off-the-shelf" software or software licensed under a "shrink-wrap" or "click-through" agreement, is assigned in writing to such Grantor by its employees, officers, founders, contractors or any other Person, as applicable.

5.7    Intellectual Property Filing . If such Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, such Grantor shall report such filing to the Collateral Agent as required by Section 8.01(d) of the Credit Agreement; provided , that, upon receipt from the United States Patent and Trademark Office, the United States Copyright Office, or any similar office or agency in any other country or any political subdivision thereof, of notice of registration of any Intellectual Property, such Grantor shall promptly (but in no event later than five (5) Business Days following such receipt) notify Collateral Agent of such registration by delivering, or causing to be delivered to Collateral Agent, via overnight courier, electronic mail or telefacsimile at the addresses designated in the Credit Agreement, documentation sufficient for Collateral Agent to perfect Collateral Agent's Liens on such Intellectual Property. Upon the request of the Collateral Agent, such Grantor shall execute and deliver, within five (5) Business Days of such request (or such later date as Collateral Agent may agree in its sole discretion), in recordable form, any and all agreements, instruments, documents, and papers as the Collateral Agent may request to evidence the Collateral Agent's Lien on any registered Copyright, Patent, Trademark or other Intellectual Property or application therefor and the goodwill and general intangibles of such Grantor relating thereto or represented thereby.

5.8    Commercial Tort Claims . If such Grantor shall obtain an interest in any Commercial Tort Claim for an amount in excess of [***] for any one such claim or in excess of [***] in the aggregate for all such claims, such Grantor shall promptly (and in any event within five (5) Business Days after obtaining such Commercial Tort Claim) notify the Collateral Agent in writing, and upon the request of the Collateral Agent, promptly (and in any event within five (5) Business Days after such request) amend Schedule 5 , authorizing the Collateral Agent to do such acts or things deemed necessary or desirable by the Collateral Agent to give the Collateral Agent a first priority (subject only to Permitted Liens which, pursuant to the terms of the Credit Agreement, are expressly permitted to have priority over Collateral Agent's Liens thereon) perfected security interest in any such Commercial Tort Claim. Without limiting the foregoing, such Grantor agrees that the notice described in the first sentence of this Section 5.8 shall constitute the grant to Collateral Agent by such Grantor of a first priority (subject only to Permitted Liens which, pursuant to the terms of the Credit Agreement, are expressly permitted to have priority over Collateral Agent's Liens thereon) security interest in the Commercial Tort Claim described therein.

15

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

5.9     <u>Collateral in the Possession of a Bailee</u>. If any Collateral having a book value in excess of **[***]** for any one bailee is now or at any time hereafter, in the possession of a bailee, such Grantor shall promptly, but in any event within five (5) Business Days, notify the Collateral Agent thereof and, at the Collateral Agent's request and option, shall use commercially reasonable efforts to promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to the Collateral Agent, that the bailee holds such Collateral for the benefit of the Collateral Agent and such bailee's agreement to comply, without further consent of such Grantor, at any time with instructions of the Collateral Agent as to such Collateral. The Collateral Agent agrees with the Grantors that the Collateral Agent shall not give any such instructions unless an Event of Default has occurred and is continuing.

5.10     <u>Electronic Chattel Paper</u>. If any Grantor, now or at any time hereafter, holds or acquires an interest in any electronic chattel paper, any electronic document or any "transferable record", as that term is defined in <u>Section 201</u> of the federal Electronic Signatures in Global and National Commerce Act, or in <u>Section 16</u> of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction having a value of **[***]** or more in any one instance or **[***]** or more in the aggregate for all such assets, such Grantor shall promptly (and in any event within five (5) Business Days after obtaining any such asset) notify the Collateral Agent thereof and, at the request and option of the Collateral Agent, shall promptly take such action as the Collateral Agent may request to vest in the Collateral Agent control, under <u>Section 9-105</u> of the UCC or the Uniform Commercial Code of any other relevant jurisdiction, of such electronic chattel paper, control, under <u>Section 7-106</u> of the UCC or the Uniform Commercial Code of any other relevant jurisdiction, of such electronic document or control, under <u>Section 201</u> of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record. The Collateral Agent agrees with each Grantor that the Collateral Agent will arrange, pursuant to procedures satisfactory to the Collateral Agent and so long as such procedures will not result in the Collateral Agent's loss of control, for such Grantor to make alterations to the electronic chattel paper, electronic document or transferable record permitted under UCC <u>Section 9-105</u>, UCC <u>Section 7-106</u>, or, as the case may be, <u>Section 201</u> of the federal Electronic Signatures in Global and National Commerce Act or <u>Section 16</u> of the Uniform Electronic Transactions Act for a party in control to make without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by such Grantor with respect to such electronic chattel paper, electronic document or transferable record. The provisions of this <u>Section 5.10</u> relating to electronic documents and "control" under UCC <u>Section 7-106</u> apply in the event that the 2003 revisions to Article 7, with amendments to Article 9, of the Uniform Commercial Code, in substantially the form approved by the American Law Institute and the National Conference of Commissioners on Uniform State Laws, are now or hereafter adopted and become effective in New York or in any other relevant jurisdiction.

5.11     <u>Letter-of-Credit Rights</u>. If any Grantor is, now or at any time hereafter, a beneficiary under a letter of credit having a face amount of **[***]** or more in any one instance or **[***]** or more for all such letters of credit, such Grantor shall promptly, but in any event within five (5) Business Days, notify the Collateral Agent thereof and, at the request of the Collateral Agent, such Grantor shall, promptly pursuant to an agreement in form and substance satisfactory to the Collateral Agent, either (a) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Collateral Agent of the proceeds of the letter of credit, or (b) arrange for the Collateral Agent to become the transferee beneficiary of the letter of credit, with the Collateral Agent agreeing, in each case, that the proceeds of the letter of credit are to be applied as provided in the Credit Agreement.

16

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

5.12    Further Assurances; Pledge of Instruments . At the sole expense of such Grantor, such Grantor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as the Collateral Agent may reasonably request to obtain the full benefits of this Agreement and of the rights and powers herein granted, which shall in any case include, but shall not be limited to: (a) using commercially reasonable efforts if required by the Collateral Agent to secure all consents and approvals necessary or appropriate for the grant of a security interest to the Collateral Agent in any lease, license, contract or agreement held by such Grantor or in which such Grantor has any right or interest (or with respect to which such Grantor has any right or interest in the assets subject to such lease, license, contract or agreement) not heretofore assigned, (b) authorizing the filing of and delivering and causing to be filed any financing or continuation statements under the UCC with respect to the security interests granted hereby, (c) filing or reasonably cooperating with the Collateral Agent in filing any forms or other documents required to be recorded with the United States Patent and Trademark Office, the United States Copyright Office, or if reasonably requested by the Collateral Agent, any actions, filings, recordings or registrations in any foreign jurisdiction or under any international treaty, required to secure or protect the Collateral Agent's interest in such Grantor's Collateral, (d) to the extent required by Section 5.1 or 5.4 , at the Collateral Agent's reasonable request, transferring such Grantor's Collateral to the Collateral Agent's possession (if a security interest in such Collateral can be perfected by possession), (e) at the Collateral Agent's request, placing the interest of the Collateral Agent as lienholder on the certificate of title (or similar evidence of ownership) of any vehicle, watercraft or other Equipment constituting Collateral owned by such Grantor which is covered by a certificate of title (or similar evidence of ownership) and (f) upon the Collateral Agent's request, executing and delivering or causing to be delivered written notice to insurers of the Collateral Agent's security interest in, or claim in or under, any policy of insurance (including unearned premiums). Such Grantor also hereby authorizes the Collateral Agent to file any such financing or continuation statement without the signature of such Grantor.

SECTION 6.        REMEDIAL PROVISIONS

6.1    Certain Matters Relating to Receivables . (a) After the occurrence and during the continuance of an Event of Default, (i) the Collateral Agent shall have the right to make test verifications of the Receivables in any manner and through any medium that it considers advisable, and each Grantor shall furnish all such assistance and information as the Collateral Agent may reasonably require, and shall reimburse the Collateral Agent for any and all expenses incurred by the Collateral Agent (subject to Section 12.05 of the Credit Agreement), in connection with such test verifications, and (ii) upon the Collateral Agent's reasonable request (but no more often than two (2) times per year prior to the occurrence and continuance of an Event of Default) and at the expense of the relevant Grantor, such Grantor shall promptly cause independent public accountants or others reasonably satisfactory to the Collateral Agent to furnish to the Collateral Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables.

(b)    If required by the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, any payments of Receivables, when collected by any Grantor, (i)        shall be forthwith (and, in any event, within one (1) Business Day) deposited by such Grantor in the exact form received, duly endorsed by such Grantor to the Collateral Agent if required, in a Collateral Account maintained under the sole dominion and control of the Collateral Agent, subject to withdrawal by the Collateral Agent for the account of the Secured Parties only as provided in Section 6.4 , and (ii)        until so turned over, shall be held by such Grantor for the benefit of the Secured Parties, segregated from other funds of such Grantor. Each such deposit of Proceeds of Receivables shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c)    At the Collateral Agent's request after the occurrence and during the continuance of an Event of Default, each Grantor shall promptly deliver to the Collateral Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including all original orders, invoices and shipping receipts.

17

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

6.2    Communications with Obligors; Grantors Remain Liable .

(a)    The Collateral Agent may in its own name or in the name of others at any time after the occurrence and during the continuance of an Event of Default, communicate with obligors under the Receivables and parties to the Contracts to verify with them to the Collateral Agent's satisfaction the existence, amount and terms of any Receivables or Contracts.

(b)    Upon the request of the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall promptly notify obligors on the Receivables and parties to the Contracts that the Receivables and the Contracts have been assigned to the Collateral Agent for the benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Collateral Agent.

(c)    Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Receivables and Contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. No Secured Party shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) or Contract by reason of or arising out of this Agreement (or any other Credit Document) or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto) or Contract, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times. From and after the occurrence and during the continuation of an Event of Default and following the notice thereof by the Collateral Agent, the Collateral Agent shall have the exclusive authority to enforce all Contracts included within the Collateral and no Grantor shall take any action under any Contract, including amending, waiving, extending, terminating or cancelling any such Contract, or taking any action in furtherance thereof, without the prior written consent of the Collateral Agent in each instance.

6.3    Pledged Stock .

(a)    If an Event of Default shall have occurred and be continuing, (i) the Collateral Agent shall have the right to receive any and all dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Secured Obligations in the order set forth in Section 4.02(d) of the Credit Agreement, (ii) any or all of the Investment Property (other than Excluded Property) may be registered in the name of the Collateral Agent or its nominee, and (iii) the Collateral Agent or its nominee shall have (except to the extent specifically waived in each instance by the Collateral Agent) the exclusive right to exercise (1) all voting, corporate and other rights pertaining to such Investment Property (other than Excluded Property) at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (2) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property (other than Excluded Property) as if it were the absolute owner thereof (including the right to exchange, at its discretion, any and all of the Investment Property (other than Excluded Property) upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property (other than Excluded Property), and in connection therewith, the right to deposit and deliver any and all of the Investment Property (other than Excluded Property) with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

18

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b)        Each Grantor hereby authorizes and instructs each Issuer of any Investment Property (other than Excluded Property) to comply with any instruction regarding Collateral Agent's rights under the preceding clause (a) received by it from the Collateral Agent in writing that states that an Event of Default has occurred and is continuing, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying and shall have no duty or right to inquire as to the Collateral Agent's authority to give such instruction, including the payment of any dividends or other payments with respect to such Investment Property directly to the Collateral Agent.

6.4        Proceeds to be Turned Over to Collateral Agent . In addition to the rights of the Secured Parties specified in Section 6.1 with respect to payments of Receivables, if an Event of Default shall have occurred and be continuing and the Collateral Agent shall so notify the Grantor in question in writing, all Collections thereon shall be held by such Grantor for benefit of the Secured Parties, segregated from other funds of such Grantor, and shall, forthwith (and in any event within one (1) Business Day) upon receipt by such Grantor, be turned over to the Collateral Agent in the exact form received by such Grantor (duly endorsed by such Grantor to the Collateral Agent, if required). All Proceeds received by the Collateral Agent hereunder shall be held by the Collateral Agent in a Collateral Account maintained under its sole dominion and control. All Proceeds, while held by the Collateral Agent in a Collateral Account (or by such Grantor for the benefit of the Secured Parties), shall continue to be held as Collateral under this Agreement and shall not constitute payment thereof until applied as provided in Section 6.5 .

6.5        Application of Proceeds . If an Event of Default shall have occurred and be continuing, at the Collateral Agent's election, the Collateral Agent may, at any such time, apply all or any part of the Proceeds of Collateral, whether or not held in any Collateral Account, in payment of the Secured Obligations in the order set forth in Section 4.02(d) of the Credit Agreement.

6.6        UCC and Other Remedies . If an Event of Default shall have occurred and be continuing, the Collateral Agent, on behalf of the Secured Parties, may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any of the Secured Obligations, all rights and remedies of a secured party under the UCC or any other Applicable Law. Without limiting the generality of the foregoing and except for the defenses set forth in Section 6.11 , the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except as specifically provided in this Agreement or the other Credit Documents) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such commercially reasonable terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit, or for future delivery, without assumption of any credit risk. Any Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released. Each Grantor further agrees, at the Collateral Agent's request, to assemble the Collateral, or any part thereof, and make it available to the Collateral Agent at places that the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere. The Collateral Agent shall apply the proceeds of any action taken by it pursuant to this Section 6.6 , after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Parties hereunder, including reasonable and documented attorneys' fees and disbursements, to the payment in whole or in part of the Secured Obligations in accordance with Section 6.5 , and only after such application and after the payment by the Collateral Agent of any other amount required by any provision of law, including Section 9-615(a)(3) of the UCC, need the Collateral Agent account for the surplus, if any, to any Grantor. Each Grantor hereby acknowledges that the Secured Obligations arose out of a commercial transaction, and agrees that if an Event of Default shall have occurred and be continuing, Collateral Agent shall have the right to an immediate writ of possession without notice of a hearing. Collateral Agent shall have the right to the appointment of a receiver for the properties and assets of each Grantor, and each Grantor hereby consents to such rights and such appointment and hereby waives any objection such Grantor may have thereto or the right to have a bond or other security posted by Collateral Agent. To the extent permitted by Applicable Law, each Grantor waives all claims, damages and demands it may acquire against any Secured Party arising out of the exercise by them of any rights granted to the Secured Parties hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition. Without limiting the foregoing, the Collateral Agent shall have, in its sole and absolute discretion at any time if an Event of Default has occurred and is continuing, the right to take physical possession of such Inventory and to maintain it on the premises of the Borrower, in a public warehouse, or at such other place as the Collateral Agent may deem appropriate.

19

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

6.7      Sales of Pledged Stock . (a) Each Grantor recognizes that the Collateral Agent may be unable to effect a public sale of any or all the Pledged Stock, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that selling Collateral in a private sale as opposed to a public sale shall not be deemed to make such sale other than in a commercially reasonable manner. The Collateral Agent shall be under no obligation to delay a sale of any of the Pledged Stock for the period of time necessary to permit the Issuer thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so.

(b) Each Grantor agrees to use its commercially reasonable efforts to promptly do or cause to be done all such other acts as may be necessary or advisable to make such sale or sales of all or any portion of the Pledged Stock pursuant to this Section 6.7 valid and binding and in compliance with any and all other Applicable Laws.

6.8      IP Licenses . For the purpose of enabling the Collateral Agent to exercise rights and remedies (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, convey, transfer or grant options to purchase any Collateral) at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to Collateral Agent, for the benefit of the Secured Parties, (i) an irrevocable, nonexclusive, worldwide license (exercisable without payment of royalty or other compensation to such Grantor), subject, in the case of registered Trademarks, to the Collateral Agent maintaining, or causing to be maintained, the quality of the respective goods and services associated with the use of the registered Trademarks at substantially the same level maintained by the Grantor immediately prior to the Event of Default, including in such license the right to sublicense, use and practice any Intellectual Property now owned or hereafter acquired by such Grantor and access to all media in which any of the licensed items may be recorded or stored and to all software and programs used for the compilation or printout thereof.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

6.9     Waiver; Deficiency . Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Secured Obligations and the reasonable and documented fees and disbursements of any attorneys employed by any Secured Party to collect such deficiency.

6.10     Consent to Receivership . Without limiting the generality of the foregoing or limiting in any way the rights of Administrative Agent or Collateral Agent under the Security Documents or otherwise under applicable law, at any time after the occurrence, and during the continuance, of an Event of Default, Administrative Agent or Collateral Agent shall be entitled to apply for and have a receiver or receiver and manager appointed under state or federal law of the United States by a court of competent jurisdiction in any action taken by Administrative Agent and/or Collateral Agent to enforce their rights and remedies hereunder and under the Credit Documents in order to manage, protect, preserve, sell and otherwise dispose of all or any portion of the Collateral and continue the operation of the business of the Grantors, and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership, including the compensation of the receiver, and to the payment of the Obligations as aforesaid until a sale or other disposition of such Collateral shall be finally made and consummated. Each Grantor hereby irrevocably consents to and waives any right to object to or otherwise contest the appointment of a receiver as provided above. Each Grantor (i) grants such waiver and consent knowingly and voluntarily after having discussed the implications thereof with counsel; (ii) acknowledges that the uncontested right to have a receiver appointed for the foregoing purposes is considered essential by Administrative Agent and Collateral Agent in connection with the enforcement of their rights and remedies hereunder and under the Security Documents, and the availability of such appointment as a remedy under the foregoing circumstances was a material factor in inducing the Secured Parties to make the Loans to Borrower; and (iii) agrees to enter into any and all stipulations in any legal actions and agreements or other instruments in connection with the foregoing and to cooperate fully with Administrative Agent and Collateral Agent in connection with the assumption and exercise of control by the receiver over all or any portion of the Collateral.

6.11     Limitation on Remedies by German Subsidiaries .

(a)     Scope . To the extent a German Subsidiary guarantees the indebtedness of an affiliated company ( *verbundenes Unternehmen* ) within the meaning of section 15 of the German Stock Corporation Act ( *Aktiengesetz* ) (other than such German Subsidiary's direct or indirect subsidiaries ( *Tochtergesellschaften* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* ), the enforcement of any rights and remedies provided for herein or otherwise available to the Collateral Agent and/or a secured party at law or in equity in respect of such German Subsidiary and the Collateral provided by it (" **German Enforcement** ") shall be limited as set out below. The restrictions set out in this Section **Error! Reference source not found.** shall not apply to a German Subsidiary to the extent that:

(i)     the Collateral granted by such German Subsidiary secures indebtedness of itself or any of its direct or indirect subsidiaries ( *Tochtergesellschaften* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* );

21

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(ii)        such German Subsidiary secures any indebtedness under any documentation evidencing the Secured Obligations in respect of (1) loans to the extent they are on-lent or otherwise passed on (directly or indirectly) to such German Subsidiary or its subsidiaries ( *Tochtergesellschaften* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* ) or (2) bank guarantees or letters of credit that are issued for the financial benefit of any of the creditors of such German Subsidiary or its subsidiaries ( *Tochtergesellschaften* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* ) or any other benefit granted under documentation evidencing the Secured Obligations, in each case, to the extent that any such on-lending or otherwise passing on or bank guarantees or letters of credit are still outstanding at the time of the German Enforcement; for the avoidance of doubt, nothing in this paragraph **Error! Reference source not found. Error! Reference source not found.** of Section **Error! Reference source not found.** shall have the effect that such on-lent amounts may be enforced multiple times (no double dip); such indebtedness shall also be disregarded for the purpose of calculating the Net Assets pursuant to paragraph (e) of this Section **Error! Reference source not found.** ( *Error! Reference source not found.* );

(iii)        such German Subsidiary does, at the time of the German Enforcement, hold a fully recoverable indemnity claim or claim for refund ( *vollwertiger Gegenleistungs- oder Rückgewähranspruch* ) against the relevant shareholder or against the affiliate whose Obligations are secured by the Collateral; or

(iv)        such German Subsidiary as dominated company has entered into a profit transfer and/or domination agreement ( *Gewinnabführungs- und/oder Beherrschungsvertrag* ) according to section 291 of the German Stock Corporation Act ( *Aktiengesetz* ) (either directly or via a chain of profit transfer and/or domination agreements) with (i) an obligor whose obligations are secured by Collateral as dominating company, provided that such German Subsidiary is a subsidiary ( *Tochtergesellschaft* ) within the meaning of sections 271, 290 of the German Commercial Code ( *HGB* ) of such obligor, or (ii) a (direct or indirect) holding company as dominating company ( *beherrschendes Unternehmen* ), of both that German Subsidiary and an obligor whose obligations are secured by a Collateral, provided that such German Subsidiary is an affiliated company of such obligor, in each case to the extent the existence of such profit transfer and/or domination agreement ( *Gewinnabführungs- und oder Beherrschungsvertrag* ) leads to the inapplicability of § 30 (1) sentence 1 of the German Limited Liabilities Company Act ( *GmbHG* ).

(v)        if and to the extent such restrictions are at the time of the German Enforcement not required to prevent personal liability of the relevant German Subsidiary's managing directors due to a breach of §§ 30 and 31 of the German Limited Liabilities Company Act ( *GmbHG* ) or under § 826 German Civil Code ( *Bürgerliches Gesetzbuch* ).

Paragraph (iv) above shall not apply if such German Subsidiary provides a final judgment ( *rechtskräftiges Urteil* ) of a Higher Regional Court ( *Oberlandesgericht* ) or a judgment of the Federal Court of Justice ( *Bundesgerichtshof* ) setting out that the mere existence of a profit transfer and/or domination agreement is no reason not to apply section 30 paragraph 1 of the German Limited Liabilities Companies Act ( *Gesetz betreffend die Gesellschaften mit beschränkter Haftung* ) ( *GmbHG* ).

(b)        Subject to the following sub-section (c) below, all references in this Section **Error! Reference source not found.** ( *Error! Reference source not found.* ) as to enforcing any rights and remedies provided for herein or otherwise available to the Collateral Agent and/or a secured party at law or in equity in respect of such German Subsidiary and the Collateral provided by it would lead to a Capital Impairment (as defined below) shall be construed as references to the time of such German Subsidiary executing the relevant agreement and granting the Collateral provided that if after the date of this Agreement jurisprudence of the German Federal Court of Justice ( *Bundesgerichtshof* ) comes into force which holds that the relevant time for making the determination whether or not the granting of a guarantee, surety ( *Bürgschaft* ) or similar payment obligations pursuant to which a GmbH or a German stock corporation ( *Aktiengesellschaft* ) secures indebtedness of its direct or indirect shareholder(s) or of a subsidiary of such shareholder(s) has caused a violation of section 30 of the GmbHG or section 57 of the German Stock Corporation Act ( *Aktiengesetz* ), respectively, is not the date of demanding payment under, or enforcement of, such guarantee, surety or similar payment obligations, but the date of granting the relevant guarantee, surety or similar payment obligation.

22

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c)        If the preceding sub-section is applicable, the determinations and calculations in the Management Determination and the Auditor's Determination (each as defined below) shall set out whether or not a Capital Impairment has occurred as a result of a German Subsidiary executing this Agreement and granting the Collateral provided that for the purposes of such determinations and calculations:

(i)        the higher of the Net Assets (as defined below) of such German Subsidiary calculated on the date of execution of, or accession to, this Agreement by such German Subsidiary and the date of demanding payment under the Collateral shall be taken into account; and

(ii)        it shall be assumed that the Secured Obligations were due and payable at the time of execution of, or accession to, this Agreement by such German Subsidiary.

(d)        Capital Impairment . The parties to this Agreement agree that if the German Enforcement would cause the amount of a German Subsidiary's Net Assets, as calculated pursuant to of Section **Error! Reference source not found.** (e), to fall below the amount of its registered share capital ( *Stammkapital* ) ( *Begründung einer Unterbilanz* ) (or increase an existing shortage of its registered share capital ( *Vertiefung einer Unterbilanz* ) in violation of section 30 paragraph 1 of the German Limited Liabilities Company Act ( *GmbHG* ), (such event is hereinafter referred to as a " **Capital Impairment** "), then the Collateral Agent may enforce against the German Subsidiary under this Agreement only to the extent such Capital Impairment would not occur and the German Subsidiary shall have a defense ( *Einrede* ) against any German Enforcement if and to the extent such Capital Impairment would occur.

(e)        Net Assets . The calculation of net assets ( *Reinvermögen* ) of the German Subsidiary (the " **Net Assets** ") shall be determined in accordance with the principle of orderly bookkeeping ( *Grundsätze ordnungsmäßiger Buchführung* ) applicable from time to time in Germany applying the same accounting principles ( *Bilanzierungsgrundsätze* ) which have been consistently applied by the relevant German Subsidiary in preparing its unconsolidated balance sheets ( *Jahresabschluss* ) (section 42 German Limited Liabilities Company Act ( *GmbHG* ), sections 242, 264 of the German Commercial Code ( *Handelsgesetzbuch* )) in the previous years, save that the following balance sheet items shall be adjusted as follows:

(i)        the amount of any increase from capital reserves in the registered share capital of such German Subsidiary ( *Kapitalerhöhung aus Gesellschaftsmitteln* ), which was carried out after the date of execution of, or accession to, this Agreement by such German Subsidiary, shall be deducted from the amount of the registered share capital of such German Subsidiary if it is expressly prohibited under the Credit Documents (as defined in the Credit Agreement) and has been carried out without the prior written consent of the Administrative Agent under the Credit Agreement;

(ii)        the amount of non-distributable assets according to § 253 (6) of the German Commercial Code ( *Handelsgesetzbuch* ) shall not be included in the calculation of Net Assets;

23

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(iii)    the amount of non-distributable assets according to § 268 (8) of the German Commercial Code ( *Handelsgesetzbuch* ) shall not be included in the calculation of Net Assets;

(iv)    the amount of non-distributable assets according to § 272 (5) of the German Commercial Code ( *Handelsgesetzbuch* ) shall not be included in the calculation of Net Assets;

(v)    loans or other liabilities incurred by the relevant German Guarantor in wilful or grossly negligent violation of the Credit Documents shall not be taken into account as liabilities

(vi)    as far as the registered share capital is not paid in full and no demand for a payment of outstanding amounts ( *nicht eingeforderte Beträge* ) has been made, the amount not yet paid in shall be deducted from the amount of the registered share capital of such German Subsidiary;

(vii)    loans provided to such German Subsidiary by a member of the group shall be disregarded, if and to the extent that such loans are subordinated or are considered subordinated in the insolvency of such German Subsidiary pursuant to section 39 paragraph 1 no. 5 or section 39 paragraph 2 of the German Insolvency Code ( *Insolvenzordnung* ), in each case including obligations under guarantees for obligations which are so subordinated;

(viii)    any funds borrowed or provided to the Borrower under any documentation evidencing the Secured Obligations which have been or are passed on to such German Subsidiary and have not yet been repaid at the time when the demand or German Enforcement under this Agreement is made, shall not be taken into account as liabilities; and

(ix)    financial liabilities incurred by such German Subsidiary in breach of provisions of any documentation evidencing the Secured Obligations shall not be taken into account as liabilities.

Each German Subsidiary will notify the Collateral Agent in writing in reasonable detail within 10 Business Days after the Collateral Agent notified such German Subsidiary of its intention to (1) demand payment under this Agreement or (2) execute a German Enforcement, whether and to what extent a Capital Impairment would occur if a payment under this Agreement or execution of such German Enforcement was made (the " *Management Notification* "). Such Management Notification shall comprise an up-to-date balance sheet of such German Subsidiary and a detailed calculation, based on the provisions of this Agreement, of the amount of the Net Assets of such German Subsidiary (taking into account the adjustments set out above). Such German Subsidiary shall fulfil its obligations under this Agreement within 3 Business Days of providing the Management Notification in an amount which pursuant to the Management Notification would not result in a Capital Impairment (irrespective of whether or not the Collateral Agent agrees with the Management Notification).

If the Collateral Agent disagrees with the calculation in the Management Notification, such German Subsidiary will, upon written request by the Collateral Agent, which may be issued within 20 Business Days of the receipt of the Management Notification, provide an auditors' determination by a firm of recognized international auditors (the " *Auditors* ") within 45 Business Days upon such request by the Collateral Agent (the " *Auditors' Determination* "). Such Auditors' Determination shall set out:

24

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

    (i)     an up-to-date balance sheet of such German Subsidiary;

    (ii)     a detailed calculation of the amount of Net Assets of such German Subsidiary taking into account the adjustments set out in paragraph a. above, and

    (iii)     the extent of the Capital Impairment taking into account the anticipated payment.

The results of the Auditors' Determination are, save for manifest errors, binding on all parties. Such German Subsidiary shall fulfil its obligations under this Agreement within 3 Business Days of providing the Auditor's Determination in an amount which pursuant to the Auditor's Determination would not result in a Capital Impairment.

If a German Subsidiary does not provide the Management Notification or the Auditors' Determination within the time frame set out above, demanding payment under this Agreement or executing a German Enforcement shall not be limited by this Section **Error! Reference source not found.** , and Section **Error! Reference source not found. (d)** shall not be applicable in that regard. In particular the Collateral Agent shall not be obliged to make available to any German Subsidiary any proceeds realized.

    (f)     <u>Mitigation</u> . If the Management Notification or the Auditors' Determination shows that a Capital Impairment would occur upon payment under this Agreement or execution of a German Enforcement, the relevant German Subsidiary shall realize all of its assets that are shown in the balance sheet with a book value ( *Buchwert* ) that is significantly lower than the market value of the assets to the extent this is necessary to fulfil its obligations under any documents evidencing the Secured Obligations to the extent legally permitted in a situation where it does not have sufficient liquidity to fulfil its liabilities to its creditors if the relevant asset is not necessary for the German Subsidiary's business ( *nicht betriebsnotwendig* ). If the relevant assets are necessary for such German Subsidiary's business ( *betriebsnotwendig* ), it will use its best efforts to realize the higher market value by sale-and- lease-back or similar measures.

    (g)     <u>Improvement of Financial Condition</u> . If the Collateral Agent ascertains that the financial condition of a German Subsidiary as set out in an Auditors' Determination has improved (in particular, if such German Subsidiary has taken any action in accordance with the mitigation provisions set out in <u>Section **Error! Reference source not found.** (f)</u> , the Collateral Agent may, at such German Subsidiary's cost and expense, arrange for the preparation of an updated balance sheet of such German Subsidiary by applying the same principles that were used for the preparation of the Auditors' Determination by the auditors who prepared the Auditors' Determination in order for such auditors to determine whether (and, if so, to what extent) the Capital Impairment has been cured as a result of the improvement of the financial condition of such German Subsidiary. The Collateral Agent may consequently demand payment under this Agreement or execute a German Enforcement to the extent that the auditors determine that the Capital Impairment has been cured.

    (h)     <u>No waiver</u> . This Section **Error! Reference source not found.** shall not affect the enforceability (other than as specifically set out herein), legality or validity of this Agreement and the Collateral granted thereunder and the Collateral Agent is entitled to claim in court that making payments under this Agreement by the relevant German Subsidiary and/or execution of a German Enforcement does not fall within the scope of section 30 of the GmbHG. No reduction of the amount enforceable under this Agreement pursuant to this Section **Error! Reference source not found.** will prejudice the right of the Collateral Agent to continue to enforce this Agreement (subject always to the operation of the limitations set out above at the time of such enforcement) until full satisfaction of the claims guaranteed. The Collateral Agent's rights to any remedies it may have against a German Subsidiary shall not be limited if it is ascertained in court by a final non-appealable ( *rechtskräftig* ) court order that section 30 of the GmbHG did not apply. The agreement of the Collateral Agent to abstain from demanding any or part of the payment under this Agreement or executing a German Enforcement in accordance with the provisions above shall not constitute a waiver ( *Verzicht* ) of any right granted under this Agreement or any other document evidencing the Secured Obligations to the Collateral Agent.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(i)        No violation . To the extent that this Agreement was enforced in violation of this Section **Error! Reference source not found.** , the Collateral Agent being the recipient of such excess proceeds shall be under an obligation to repay such excess amount to the relevant German Subsidiary provided that such German Subsidiary presents within 20 Business Days after the date of such enforcement to the Collateral Agent a determination by the Auditors confirming that the enforcement of such German Subsidiary's liabilities has caused a Capital Impairment.

SECTION 7.        THE COLLATERAL AGENT

7.1        Collateral Agent's Appointment as Attorney-in-Fact, etc .

(a)        Each Grantor hereby irrevocably appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to or further assent by such Grantor, to do any or all of the following, in each case at the Collateral Agent's sole option:

(i)        in the name of such Grantor or its own name, or otherwise, take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Receivable or Contract or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Receivable or Contract or with respect to any other Collateral whenever payable;

(ii)        in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Collateral Agent may reasonably request to evidence the Secured Parties' security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii)        pay or discharge taxes and Liens levied or placed on or threatened against any of the Collateral, effect any repairs to any of the Collateral and obtain any insurance called for by the terms of the Credit Agreement or any other Credit Document and pay all or any part of the premiums therefor and the costs thereof, which amounts shall constitute Secured Obligations;

(iv)        execute, in connection with any sale provided for in Sections 6.6 or 6.7 , any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral, or any part thereof;

26

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(v)        (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; (7) assign any Copyright, Patent or Trademark (along with the goodwill of the business to which any such Copyright, Patent or Trademark pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine; (8) perform any obligations of any Grantor under any Contract; and (9) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Secured Parties' security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do; and

(vi)        take all actions and execute all documents in respect of Contracts and Pledged Stock contemplated by Sections 6.2 and 6.3 .

Anything in this Agreement to the contrary notwithstanding, the Collateral Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 7.1 unless an Event of Default shall have occurred and be continuing and it has provided any notices required by the terms of this Agreement and the Credit Agreement.

(b)        If any Grantor fails to perform or comply with any of its agreements contained herein or in any other Credit Document, the Collateral Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(c)        The expenses of the Collateral Agent incurred in connection with actions undertaken as provided in this Section 7.1 , together with interest thereon at a rate per annum equal to the highest interest rate applicable to the Loans under the Credit Agreement, from the date of payment by the Collateral Agent to the date reimbursed by the relevant Grantor in cash, shall be payable by such Grantor to the Collateral Agent on demand.

(d)        Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

27

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(e)     Each Grantor grants to the Collateral Agent an IRREVOCABLE PROXY, to vote all or any part of the Pledged Stock from time to time following the occurrence and during the continuance of an Event of Default, in each case in any manner the Collateral Agent deems advisable in its sole discretion for or against any or all matters submitted, or which may be submitted, to a vote of shareholders (including holders of any Investment Property issued by any Issuer), partners or members, as the case may be, and to exercise all other rights, powers, privileges and remedies to which any such shareholders (including holders of any Investment Property issued any Issuer), partners or members would be entitled (including, without limitation, giving or withholding written consents of holders of Investment Property issued by any Issuer, calling special meetings of the holders of the Investment Property issued by any Issuer and voting at such meetings). The irrevocable proxy granted hereby shall be effective automatically upon the occurrence of an Event of Default without the necessity that any action (including, without limitation, that any transfer of any of the Pledged Stock be recorded on the books and records of the relevant Credit Party) be taken by any Person (including the relevant Credit Party of any Pledged Stock or any officer or agent thereof), shall be coupled with an interest and shall be irrevocable, shall survive the bankruptcy, dissolution or winding up of any relevant Grantor, and shall terminate only on the Termination Date.

7.2     Duty of Collateral Agent . The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account. No Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on the Secured Parties hereunder are solely to protect the Secured Parties' interests in the Collateral and shall not impose any duty upon any Secured Party to exercise any such powers. The Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

7.3     Financing Statements . Pursuant to any Applicable Law, each Grantor authorizes the Collateral Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral, without the signature of such Grantor, in such form (if no signature is required) and in such offices as the Collateral Agent determines appropriate to perfect the security interests of the Collateral Agent under this Agreement. Each Grantor authorizes the Collateral Agent to use the collateral description "all personal property", "all assets" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC or the Uniform Commercial Code of any other applicable state, in any such financing statements.

7.4     Authority of Collateral Agent . Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Secured Parties, be governed by the Credit Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and the Grantors, the Collateral Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

28

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

7.5     Collateral Matters . As between the Collateral Agent and the Secured Parties, except as otherwise set forth herein, any action or exercise of powers by the Collateral Agent provided under the Credit Documents, together with such other powers as are reasonably incidental thereto, shall be deemed authorized by and binding upon all of the Secured Parties. At any time and without notice to or consent from any Secured Party, the Collateral Agent may take any action necessary or advisable to perfect and maintain the perfection of the Liens upon the Collateral.

SECTION 8.      MISCELLANEOUS

8.1     Amendments in Writing . None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 12.01 of the Credit Agreement.

8.2     Notices . All notices, requests and demands to or upon the Collateral Agent or any Grantor hereunder shall be effected in the manner provided for in Section 12.02 of the Credit Agreement.

8.3     No Waiver by Course of Conduct; Cumulative Remedies . No Secured Party shall by any act (except by a written instrument pursuant to Section 8.1 ), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by any Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which such Secured Party would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

8.4     Successors and Assigns . This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Collateral Agent and the other Secured Parties and their permitted successors and assigns; provided , that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Collateral Agent.

8.5     Set-Off . Each Grantor hereby irrevocably authorizes the Agents and each Secured Party at any time and from time to time after the occurrence and during the continuance of an Event of Default, upon any amount becoming due and payable by such Grantor hereunder or under any other Credit Document (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Secured Party to or for the credit or the account of such Grantor, or any part thereof in such amounts as such Agent or such Secured Party may elect, against and on account of the obligations and liabilities of such Grantor to such Agent or such Secured Party hereunder and claims of every nature and description of such Agent or such Secured Party against such Grantor, in any currency, whether arising hereunder, under the Credit Agreement, any other Credit Document or otherwise, as such Agent or such Secured Party may elect, whether or not any Secured Party has made any demand for payment and although such obligations, liabilities and claims may be contingent or unmatured. Each Secured Party, or Collateral Agent on their behalf, shall notify such Grantor promptly of any such set-off and the application made by such Secured Party of the proceeds thereof; provided , that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Secured Party under this Section 8.5 are in addition to other rights and remedies (including other rights of set-off) that such Secured Party may have and are subject to any applicable limitations set forth in the Credit Agreement.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

8.6     Counterparts . This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

8.7     Severability . Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.8     Section Headings . The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

8.9     Integration . This Agreement and the other Credit Documents represent the entire agreement of the Grantors and the Secured Parties with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by any party hereto relative to the subject matter hereof and thereof not expressly set forth or referred to herein or in the other Credit Documents.

**8.10     GOVERNING LAW . THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

**8.11     SUBMISSION TO JURISDICTION; WAIVERS . EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY:**

**(a)     SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY APPLICABLE LAWS, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR OTHERWISE SHALL AFFECT ANY RIGHT THAT THE COLLATERAL AGENT, THE ADMINISTRATIVE AGENT OR ANY LENDER OR OTHER SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK TO THE EXTENT THE LAWS OF SUCH OTHER JURISDICTION GOVERN THE PERFECTION OF THE SECURITY INTEREST IN, OR THEIR REMEDIES WITH RESPECT TO, ANY COLLATERAL;**

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**(b)  CONSENTS THAT ANY SUCH ACTION OR PROCEEDING SHALL BE BROUGHT IN SUCH COURTS, AND AGREES NOT TO PLEAD OR CLAIM AND WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN SECTION 8.11(A) . EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT;**

**(c)  CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY CREDIT DOCUMENT, IN THE MANNER PROVIDED IN SECTION 12.13(c) OF THE CREDIT AGREEMENT. NOTHING IN THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAWS;**

**(d)  WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; AND**

**(e)  WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION 8.11 ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.**

8.12  Acknowledgements . Each party hereto hereby acknowledges that:

(a)  it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents to which it is a party, and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof;

(b)  no Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Credit Documents, and the relationship between the Grantors, on the one hand, and the Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)  no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantors and the Secured Parties.

8.13  Additional Grantors . Each Subsidiary of any Credit Party that is required to become a party to this Agreement pursuant to Section 8.10 of the Credit Agreement shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement in the form of Annex I hereto.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

8.14    Releases of Liens .

(a)    Notwithstanding anything to the contrary contained herein or in any other Credit Document, the Collateral Agent is hereby irrevocably authorized by each Secured Party (without requirement of notice to or consent of any Secured Party except as expressly required by Section 12.01 of the Credit Agreement) to take any action requested by the Grantor having the effect of releasing any Collateral (i) to the extent necessary to permit consummation of any transaction expressly permitted by the Credit Documents or that has been consented to in accordance with Section 12.01 of the Credit Agreement, or (ii) under the circumstances described in paragraph (b) below.

(b)    On the Termination Date, the Collateral shall be released from the Liens created by this Agreement and the other Security Documents, and this Agreement and the other Security Documents and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent and each Credit Party under this Agreement and the other Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(c)    Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property pursuant to this Section 8.14 . In each case as specified in this Section 8.14 , the Collateral Agent will (and each Lender irrevocably authorizes the Collateral Agent to), at the Credit Parties' expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under this Agreement and the other Security Documents, in each case in accordance with the terms of the Credit Documents and this Section 8.14 .

8.15    Belgian Security Documents . Notwithstanding any provision of this Agreement to the contrary (i) the pledge of shares in the capital of Artilium NV and United Telecom NV by Artilium Group Limited as pledgor, as well as the pledge over business by the Belgian Subsidiaries as pledgors, in each case, in favor of the Collateral Agent as pledgee, shall be governed by the Belgian Security Documents and not by this Agreement, and (ii) if in connection with the grant of a security interest in the Collateral or exercise of remedies by the Collateral Agent under this Agreement or the Belgian Security Documents, a court of competent jurisdiction in the United States or Belgium, as applicable, determines that the grant of a security interest in all or any part of the Collateral or any exercise of remedies by the Collateral Agent is governed by the Belgian Security Documents, then such Belgian Security Documents (and not this Agreement) shall control and supersede this Agreement, in each case, solely with respect to the grant of security interest in such Collateral or any exercise of remedies by the Collateral Agent with respect to such Collateral.

8.16    German Security Documents . Notwithstanding any provision of this Agreement to the contrary (i) the pledge of shares in the capital of (x) [interactive digital media GmbH] by [Artilium Group Limited] as [pledgor] in favor of the German Security Trustee as [pledgee and collateral agent] and the Lenders as [pledgees] shall be governed by the German Security Documents and not by this Agreement and (ii) if in connection with the grant of a security interest in the Collateral or exercise of remedies by the Collateral Agent under this Agreement or by the German Security Trustee under the German Security Documents, a court of competent jurisdiction in the United States or Germany, as applicable, determines that the grant of a security interest in all or any part of the Collateral or any exercise of remedies by the Collateral Agent or the German Security Trustee is governed by the German Security Documents, then such German Security Documents (and not this Agreement) shall control and supersede this Agreement, in each case, solely with respect to the grant of security interest in such Collateral or any exercise of remedies by the Collateral Agent or the German Security Trustee with respect to such Collateral.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

8.17    <u>Netherlands Security Documents</u>. Notwithstanding any provision of this Agreement to the contrary (i) the pledge of shares in the capital of (x) Pareteum Europe by the Borrower as pledgor and (y) Artilium BV by Artilium UK as pledgor, in each case, in favor of the Collateral Agent as pledgee, shall be governed by the Netherlands Security Documents and not by this Agreement and (ii) if in connection with the grant of a security interest in the Collateral or exercise of remedies by the Collateral Agent under this Agreement or the Netherlands Security Documents, a court of competent jurisdiction in the United States or the Netherlands, as applicable, determines that the grant of a security interest in all or any part of the Collateral or any exercise of remedies by the Collateral Agent is governed by the Netherlands Security Documents, then such Netherlands Security Documents (and not this Agreement) shall control and supersede this Agreement, in each case, solely with respect to the grant of security interest in such Collateral or any exercise of remedies by the Collateral Agent with respect to such Collateral.

8.18    <u>UK Security Documents</u>. Notwithstanding any provision of this Agreement to the contrary (i) the pledge of shares in the capital of Artilium Group UK by Pareteum Corporation as pledgor in favor of the Collateral Agent as pledgee and collateral agent and the Lenders as pledgees shall be governed by the UK Security Documents and not by this Agreement and (ii) if in connection with the grant of a security interest in the Collateral or exercise of remedies by the Collateral Agent under this Agreement or by the Collateral Agent under the UK Security Documents, a court of competent jurisdiction in the United States or England, as applicable, determines that the grant of a security interest in all or any part of the Collateral or any exercise of remedies by the Collateral Agent is governed by the UK Security Documents, then such UK Security Documents (and not this Agreement) shall control and supersede this Agreement, in each case, solely with respect to the grant of security interest in such Collateral or any exercise of remedies by the Collateral Agent with respect to such Collateral.

8.19    <u>Subordination</u>. Notwithstanding any provision of this Agreement to the contrary, and except as otherwise provided by Applicable Law, all rights of the Grantors to indemnity, contribution or subrogation under Applicable Law or otherwise shall be fully subordinated to the payment in full in cash of the Secured Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted). No failure on the part of the Borrower or any other Grantor to make the payments required under Applicable Law or otherwise shall in any respect limit the obligations and liabilities of any Grantor with respect to its obligations hereunder, and each Grantor shall remain liable for the full amount of the obligations of such Grantor hereunder. Each Grantor hereby agrees that all Indebtedness owed to it by any other Grantor shall be fully subordinated to the payment in full in cash of the Secured Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted).

8.20    <u>Marshaling</u>. Neither the Agents nor any other Secured Party shall be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the rights and remedies of the Secured Parties hereunder and of the Secured Parties in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.

8.21    <u>References to Schedules</u>. References herein to Schedules to this Agreement are to such Schedules as updated when required by Section 8.01(d) of the Credit Agreement.

*[Signature Page Follows.]*

33

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

IN WITNESS WHEREOF, each of the undersigned has caused this Security Agreement to be duly executed and delivered as of the date first above written.

GRANTORS :

**PARETEUM CORPORATION**

By:      /s/ Robert H. Turner
Name:   Robert H. Turner
Title:     Executive Chairman & Principal Executive Officer

**PARETEUM NORTH AMERICA CORP.**

By:      /s/ Robert H. Turner
Name:   Robert H. Turner
Title:     Director

**iPASS INC.**

By:      /s/ Robert H. Turner
Name:   Robert H. Turner
Title:     Director

**iPASS IP LLC**

By:      /s/ Denis McCarthy
Name:   Denis McCarthy
Title:     Director/CEO

[ *Signatures continued on following page* ]

(Security Agreement)

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

ACCEPTED :

**POST ROAD ADMINISTRATIVE LLC,**
as Collateral Agent

By:     /s/ Michael Bogdan
Name:  Michael Bogdan
Title:    Authorized Signatory

(Security Agreement)

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**SCHEDULES TO SECURITY AGREEMENT**

Schedule 1

DESCRIPTION OF INVESTMENT PROPERTY

**Pledged Stock:**

| Name of Grantor | Name of Pledged Company | Class of Interests | Percentage of Class Owned | Percentage of Class Pledged | Certificate No. |
|---|---|---|---|---|---|
| Pareteum Corporation | Pareteum North America Corp. | Common Shares | 100% | 100% | N/A |
| Pareteum Corporation | Pareteum Europe B.V. | Ordinary Shares | 100% | 100% | N/A |
| Pareteum Corporation | Artilium Group Limited | Ordinary Shares | 100% | 100% | N/A |
| Pareteum Corporation | Elephant Talk Limited - Hong Kong | Ordinary Shares | 100% | 100% | N/A |
| Pareteum Corporation | Pareteum ASIA PTE. Ltd. | Ordinary Shares | 100% | 100% | N/A |
| Pareteum Corporation | iPass Inc. | Common Shares | 100% | 100% | N/A |
| Pareteum North America Corp. | Pareteum UK Limited | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass IP LLC | Membership Interests | 100% | 100% | C-1 |
|  |  |  |  |  | C-2 |
|  |  |  |  |  | C-3 |
| iPass Inc. | iPass Holdings PTY LTD | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass France SAS | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass Japan Kabushiki Kaisha | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass Deutschland GmbH | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass Asia Pte. LTD. | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass (U.K.) Limited | Ordinary Shares | 100% | 100% | N/A |

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Pledged Notes:**

<u>ValidSoft UK Limited</u> :

That certain Promissory Note dated September 30, 2016, in the amount of $1,000,000.00, made by each of VSFT Holdings, Inc., ValidSoft UK Limited, and ValidSoft Limited, as Obligors, payable to Pareteum Corporation (f/k/a Elephant Talk Communications Corp.), as Holder.

<u>Yonder Media Mobile Inc.</u> :

$5,000,000 Convertible Note Purchase Agreement (the "NPA") dated as of November 26, 2018 by and among Yonder Media Mobile, Inc. ("Yonder") and Pareteum Corporation ("Pareteum") and First Amendment to the NPA dated as of February 11, 2019 (the "Amendment"). Pursuant to the NPA, there are three convertible promissory notes executed by Yonder in favor of Pareteum, one dated November 26, 2018 in the amount of $500,000, a second dated January 7, 2019 in the amount of $500,000 and a third dated February 12, 2019 in the amount of $200,000.

<u>UTS Joint venture (dormant):</u> ET-UTS NV was incorporated in Curacao, the Netherlands Antilles, on April 9, 2008 as a 51% subsidiary of Elephant Talk Caribbean B.V. with the remaining 49% owned by our joint venture partner UTS N.V. The purpose of ET-UTS NV was to design, install, maintain and exploit WIFI and WIMAX networks in the Caribbean area and Surinam, however the project was never launched and the entity is being wound down.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Schedule 2

FILINGS AND OTHER ACTIONS
REQUIRED TO PERFECT SECURITY INTERESTS

UCC Filings

| Grantor | Jurisdictions |
| --- | --- |
| Pareteum Corporation | Delaware |
| Pareteum North America Corp. | Delaware |
| iPass Inc. | Delaware |
| iPass IP LLC | Delaware |

Intellectual Property Filings

Recordation of the Patent Security Agreement with the USPTO.
Recordation of the Trademark Security Agreement with the USPTO.

Actions with respect to Pledged Stock

Delivery of original certificates evidencing Pledged Stock to Collateral Agent, together with an undated stock transfer power covering such Pledged Stock duly executed in blank by each respective Grantor, as applicable.

Other Actions

Delivery of original Pledged Notes to Collateral Agent, together with an undated note power covering such Pledged Notes duly executed in blank by each respective Grantor.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Schedule 3

CAPITAL STOCK

| Name of Grantor | Issuer of Capital Stock | Class of Interests | Percentage of Class Owned | Percentage of Class Pledged | Certificate No. |
|---|---|---|---|---|---|
| Pareteum Corporation | Pareteum North America Corp. | Common Shares | 100% | 100% | N/A |
| Pareteum Corporation | Pareteum Europe B.V. | Ordinary Shares | 100% | 100% | N/A |
| Pareteum Corporation | Artilium Group Limited | Ordinary Shares | 100% | 100% | N/A |
| Pareteum Corporation | Elephant Talk Limited - Hong Kong | Ordinary Shares | 100% | 100% | N/A |
| Pareteum Corporation | Pareteum ASIA PTE. Ltd. | Ordinary Shares | 100% | 100% | N/A |
| Pareteum Corporation | iPass Inc. | Common Shares | 100% | 100% | N/A |
| Pareteum North America Corp. | Pareteum UK Limited | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | | Membership Interests | 100% | 100% | C-1 |
| | iPass IP LLC | | | | C-2 |
| | | | | | C-3 |
| iPass Inc. | iPass Holdings PTY LTD | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass France SAS | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass Japan Kabushiki Kaisha | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass Deutschland GmbH | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass Asia Pte. LTD. | Ordinary Shares | 100% | 100% | N/A |
| iPass Inc. | iPass (U.K.) Limited | Ordinary Shares | 100% | 100% | N/A |

[\*\*\*] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

<u>Schedule 4</u>

INTELLECTUAL PROPERTY

    I.        Copyrights and Copyright Licenses:

[\*\*\*]

    II.       Patents and Patent Licenses:

[\*\*\*]

    III.     Trademarks and Trademark Licenses:

[\*\*\*]

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

IV.       Trade Secret Licenses:

[***]

V.       Internet Domain Names:

[***]

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Schedule 5

COMMERCIAL TORT CLAIMS

None

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Annex I
to
Security Agreement

ASSUMPTION AGREEMENT (this " *Assumption Agreement* "), dated as of _____, 20 ____ , made by _____ , a _____ (the " *Additional Grantor* "), in favor of POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company (" *Post Road* "), as collateral agent (in such capacity, together with its successors and assigns in such capacity, the " *Collateral Agent* ") acting pursuant to this Assumption Agreement for the benefit of the Secured Parties. All capitalized terms not defined herein shall have the meaning ascribed to them in the Security Agreement.

WITNESSETH :

WHEREAS, PARETEUM CORPORATION, a Delaware corporation (the " *Borrower* "), any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 of the Credit Agreement (collectively, the " *Guarantors* ", and, together with Borrower, the " *Credit Parties* "), the Lenders from time to time party thereto (the " *Lenders* "), Post Road, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " *Administrative Agent* ") and the Collateral Agent for the Lenders, have entered into a Credit Agreement, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " *Credit Agreement* ");

WHEREAS, in connection with the Credit Agreement, the Credit Parties (other than the Additional Grantor) have entered into the Security Agreement dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " *Security Agreement* ") in favor of the Collateral Agent, for the benefit of the Secured Parties;

WHEREAS, the Credit Agreement requires the Additional Grantor to become a party to the Security Agreement; and

WHEREAS, the Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Security Agreement;

NOW, THEREFORE, IT IS AGREED:

Security Agreement . By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 8.13 of the Security Agreement, hereby becomes a party to the Security Agreement as a Grantor thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby grants, pledges, collaterally assigns and transfers to the Collateral Agent, and hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a security interest in all of its personal property and other assets, wherever located, whether now owned or at any time hereafter acquired by such Grantor therein or in which such Grantor therein now has or at any time in the future may acquire any right, title or interest, including the Collateral, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Secured Obligations, and (b) expressly assumes all obligations and liabilities of a Grantor thereunder. The information set forth in Annex 1-A hereto is hereby added to the information set forth in Schedule[s] [ ] [3] to the Security Agreement. The Additional Grantor hereby represents and warrants that, with respect to the Additional Grantor, each of the representations and warranties contained in Section 4 of the Security Agreement is true and correct on and as the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

---

[3] Refer to each Schedule which needs to be supplemented.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Governing Law . This assumption agreement shall be governed by, and construed and interpreted in accordance with, the law of the state of New York without reference to conflicts of law provisions. In addition, the provisions of Sections 8.6, 8.7, 8.8 and 8.12 of the Security Agreement are incorporated herein by reference, *mutatis mutandis* .

No Novation or Release . Nothing in this Assumption Agreement shall be construed to release any other Grantor at any time party to the Security Agreement from its obligations and liabilities thereunder or otherwise affect any of such other Grantor's obligations or liabilities under any Credit Document.

[ *Remainder of page intentionally left blank* ].

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR],

By:
Name:
Title:

ACKNOWLEDGED :

POST ROAD ADMINISTRATIVE LLC,
as Collateral Agent

By:
Name:
Title:

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Annex 1-A

[INSERT INFORMATION TO BE ADDED TO THE APPLICABLE SECURITY AGREEMENT SCHEDULES]

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Annex II
to
Security Agreement

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT**

THIS [COPYRIGHT] [PATENT] [TRADEMARK] SECURITY AGREEMENT, dated as of _____, 20 ___, is made by each of the entities listed on the signature pages hereof (each a " *Grantor* " and, collectively, the " *Grantors* "), in favor of POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company (" *Post Road* "), as collateral agent (in such capacity, together with its successors and assigns in such capacity, the " *Collateral Agent* ") for the Lenders and the other Secured Parties.

WITNESSETH:

WHEREAS, PARETEUM CORPORATION, a Delaware corporation (the " *Borrower* "), any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 of the Credit Agreement (collectively, the " *Guarantors* ", and, together with Borrower, the " *Credit Parties* "), the Lenders from time to time party thereto (the " *Lenders* "), Post Road, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " *Administrative Agent* ") and the Collateral Agent for the Lenders, have entered into a Credit Agreement, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " *Credit Agreement* ");

WHEREAS, all of the Grantors are party to a Security Agreement of even date herewith in favor of the Collateral Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the " *Security Agreement* "), pursuant to which the Grantors are required to execute and deliver this [Copyright] [Patent] [Trademark] Security Agreement;

NOW, THEREFORE, in consideration of the premises and to induce the Lenders and the Collateral Agent to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the Collateral Agent as follows:

Section 1. Defined Terms . Capitalized terms used herein without definition are used as defined in the Security Agreement.

Section 2. Grant of Security Interest in [Copyright] [Trademark] [Patent] Collateral . Each Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations of such Grantor, hereby mortgages and pledges to the Collateral Agent for the benefit of the Secured Parties, and grants to the Collateral Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the following Collateral of such Grantor (the *"[Copyright] [Patent] [Trademark] Collateral* "):

(a)        [all of its Copyrights and all Copyright Licenses providing for the grant by or to such Grantor of any right under any Copyright, including those referred to on Schedule 1 hereto;

(b)        all renewals, reversions and extensions of the foregoing; and

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c)     all income, royalties, proceeds and liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof.]

or

(a)     [all of its Patents and all Patent Licenses providing for the grant by or to such Grantor of any right under any Patent, including those referred to on Schedule 1 hereto;

(b)     all reissues, reexaminations, continuations, continuations-in-part, divisionals, and extensions of the foregoing; and

(c)     all income, royalties, proceeds and liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, violation or other impairment thereof.]

or

(a)     [all of its Trademarks and all Trademark Licenses providing for the grant by or to such Grantor of any right under any Trademark, including those referred to on Schedule 1 hereto;

(b)     all renewals and extensions of the foregoing;

(c)     all goodwill of the business connected with the use of, and symbolized by, each such Trademark; and

(d)     all income, royalties, proceeds and Liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof. Notwithstanding the foregoing, there shall be no security interest or Lien on any Trademark application that is filed on an "intent-to-use" basis (until such time as a statement of use is filed with respect to such application and duly accepted by the United States Patent and Trademark Office).]

Section 3. <u>Security Agreement</u> . The security interest granted pursuant to this [Copyright] [Patent] [Trademark] Security Agreement is granted in conjunction with the security interest granted to the Collateral Agent pursuant to the Security Agreement and each Grantor hereby acknowledges and agrees that the rights and remedies of the Collateral Agent with respect to the security interest in the [Copyright] [Patent] [Trademark] Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. In the event that any provision of this [Copyright] [Patent] [Trademark] Security Agreement conflicts with any provision of the Security Agreement, the Security Agreement shall govern.

Section 4. <u>Grantor Remains Liable</u> . Each Grantor hereby agrees that, anything herein to the contrary notwithstanding, such Grantor shall assume full and complete responsibility for the prosecution, defense, enforcement or any other necessary or desirable actions in connection with their [Copyrights] [Patents] [Trademarks] subject to a security interest hereunder.

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Section 5. <u>Counterparts</u> . This [Copyright] [Patent] [Trademark] Security Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.

Section 6. <u>Governing Law</u>  . **THIS [COPYRIGHT] [PATENT] [TRADEMARK] SECURITY AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CONFLICTS OF LAW PROVISIONS (OTHER THAN <u>SECTION 5-1401</u> OF THE NEW YORK GENERAL OBLIGATIONS LAW).** In addition, the provisions of <u>Section 8.6, 8.7, 8.8</u> and <u>8.12</u> of the Security Agreement are incorporated herein by reference, mutatis mutandis.

[SIGNATURE PAGES FOLLOW]

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

IN WITNESS WHEREOF, each Grantor has caused this [Copyright] [Patent] [Trademark] Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

[GRANTOR], as Grantor

By: _____
Name: _____
Title: _____

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SCHEDULE I

TO

[COPYRIGHT] [PATENT] [TRADEMARK] SECURITY AGREEMENT

1.      REGISTERED [COPYRIGHTS] [PATENTS] [TRADEMARKS]

[Include Registration Number and Date]

2.      [COPYRIGHT] [PATENT] [TRADEMARK] APPLICATIONS

[Include Application Number and Date]

3.      [COPYRIGHT] [PATENT] [TRADEMARK] LICENSES

[Include complete legal description of agreement (name of agreement, parties and date)]

**Exhibit 10.40**

[ ***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXECUTION VERSION**

**PATENT SECURITY AGREEMENT**

THIS PATENT SECURITY AGREEMENT, dated as of February 26, 2019, is made by each of the entities listed on the signature pages hereof (each a " *Grantor* " and, collectively, the " *Grantors* "), in favor of POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company (" *Post Road* "), as collateral agent (in such capacity, together with its successors and assigns in such capacity, the " *Collateral Agent* ") for the Lenders and the other Secured Parties.

WITNESSETH:

WHEREAS, PARETEUM CORPORATION, a Delaware corporation (the " *Borrower* "), any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 or Section 8.17 of the Credit Agreement (collectively, the " *Guarantors* ", and, together with Borrower, the " *Credit Parties* "), the Lenders from time to time party thereto (the " *Lenders* "), Post Road, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " *Administrative Agent* ") and the Collateral Agent for the Lenders, have entered into a Credit Agreement, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " *Credit Agreement* ");

WHEREAS, all of the Grantors are party to a Security Agreement of even date herewith in favor of the Collateral Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the " *Security Agreement* "), pursuant to which the Grantors are required to execute and deliver this Patent Security Agreement;

NOW, THEREFORE, in consideration of the promises and to induce the Lenders and the Collateral Agent to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the Collateral Agent as follows:

Section 1. Defined Terms . Capitalized terms used herein without definition are used as defined in the Security Agreement.

Section 2. Grant of Security Interest in Patent Collateral . Each Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations of such Grantor, hereby mortgages and pledges to the Collateral Agent for the benefit of the Secured Parties, and grants to the Collateral Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the following Collateral of such Grantor (the *"Patent Collateral* "):

(a)  all of its Patents and all Patent Licenses providing for the grant by or to such Grantor of any right under any Patent, including those referred to on Schedule 1 hereto;

(b)  all reissues, reexaminations, continuations, continuations-in-part, divisionals, and extensions of the foregoing; and

(c)  all income, royalties, proceeds and liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, violation or other impairment thereof.

[ ***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXECUTION VERSION**

Section 3. <u>Security Agreement</u> . The security interest granted pursuant to this Patent Security Agreement is granted in conjunction with the security interest granted to the Collateral Agent pursuant to the Security Agreement and each Grantor hereby acknowledges and agrees that the rights and remedies of the Collateral Agent with respect to the security interest in the Patent Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. In the event that any provision of this Patent Security Agreement conflicts with any provision of the Security Agreement, the Security Agreement shall govern.

Section 4. <u>Grantor Remains Liable</u> . Each Grantor hereby agrees that, anything herein to the contrary notwithstanding, such Grantor shall assume full and complete responsibility for the prosecution, defense, enforcement or any other necessary or desirable actions in connection with such Grantor's Patents subject to a security interest hereunder.

Section 5. <u>Counterparts</u> . This Patent Security Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.

Section 6. <u>Governing Law</u> . **THIS PATENT SECURITY AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CONFLICTS OF LAW PROVISIONS (OTHER THAN <u>SECTION 5-1401</u> OF THE NEW YORK GENERAL OBLIGATIONS LAW).** In addition, the provisions of <u>Section 8.6, 8.7, 8.8</u> and <u>8.12</u> of the Security Agreement are incorporated herein by reference, *mutatis mutandis* .

[SIGNATURE PAGES FOLLOW]

[ ***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

IN WITNESS WHEREOF, the Grantor has caused this Patent Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

GRANTOR :

**iPASS IP LLC**

By:      /s/ Denis McCarthy
Name:   Denis McCarthy
Title:    Director/CEO

[ \*\*\*] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

[Patent Security Agreement – Signature Page]

[ ***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

SCHEDULE I

TO

PATENT SECURITY AGREEMENT

**[***]**

**Exhibit 10.41**

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

## TRADEMARK SECURITY AGREEMENT

THIS TRADEMARK SECURITY AGREEMENT, dated as of February 26, 2019, is made by each of the entities listed on the signature pages hereof (each a " *Grantor* " and, collectively, the " *Grantors* "), in favor of POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company (" *Post Road* "), as collateral agent (in such capacity, together with its successors and assigns in such capacity, the " *Collateral Agent* ") for the Lenders and the other Secured Parties.

WITNESSETH:

WHEREAS, PARETEUM CORPORATION, a Delaware corporation (the " *Borrower* "), any Subsidiaries of Borrower that are Guarantors or become Guarantors pursuant to Section 8.10 or Section 8.17 of the Credit Agreement (collectively, the " *Guarantors* ", and, together with Borrower, the " *Credit Parties* "), the Lenders from time to time party thereto (the " *Lenders* "), Post Road, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the " *Administrative Agent* ") and the Collateral Agent for the Lenders, have entered into a Credit Agreement, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the " *Credit Agreement* ");

WHEREAS, all of the Grantors are party to a Security Agreement of even date herewith in favor of the Collateral Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the " *Security Agreement* "), pursuant to which the Grantors are required to execute and deliver this Trademark Security Agreement;

NOW, THEREFORE, in consideration of the promises and to induce the Lenders and the Collateral Agent to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the Collateral Agent as follows:

Section 1. Defined Terms . Capitalized terms used herein without definition are used as defined in the Security Agreement.

Section 2. Grant of Security Interest in Trademark Collateral . Each Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations of such Grantor, hereby mortgages and pledges to the Collateral Agent for the benefit of the Secured Parties, and grants to the Collateral Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the following Collateral of such Grantor (the **"Trademark Collateral** "):

(a)    all of its Trademarks and all Trademark Licenses providing for the grant by or to such Grantor of any right under any Trademark, including those referred to on Schedule 1 hereto;

(b)    all renewals and extensions of the foregoing;

(c)    all goodwill of the business connected with the use of, and symbolized by, each such Trademark; and

(d)    all income, royalties, proceeds and Liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof. Notwithstanding the foregoing, there shall be no security interest or Lien on any Trademark application that is filed on an "intent-to-use" basis (until such time as a statement of use is filed with respect to such application and duly accepted by the United States Patent and Trademark Office).

[***] = Certain confidential information contained in this document, marked by brackets, is filed with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Section 3. Security Agreement . The security interest granted pursuant to this Trademark Security Agreement is granted in conjunction with the security interest granted to the Collateral Agent pursuant to the Security Agreement and each Grantor hereby acknowledges and agrees that the rights and remedies of the Collateral Agent with respect to the security interest in the Trademark Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. In the event that any provision of this Trademark Security Agreement conflicts with any provision of the Security Agreement, the Security Agreement shall govern.

Section 4. Grantor Remains Liable . Each Grantor hereby agrees that, anything herein to the contrary notwithstanding, such Grantor shall assume full and complete responsibility for the prosecution, defense, enforcement or any other necessary or desirable actions in connection with such Grantor's Trademarks subject to a security interest hereunder.

Section 5. Counterparts . This Trademark Security Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.

Section 6. Governing Law . **THIS TRADEMARK SECURITY AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).** In addition, the provisions of Section 8.6, 8.7, 8.8 and 8.12 of the Security Agreement are incorporated herein by reference, *mutatis mutandis* .

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each Grantor has caused this Trademark Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

GRANTORS :

**PARETEUM CORPORATION**

By:      /s/ Robert H. Turner
Name:   Robert H. Turner
Tile:    Executive Chairman & Principal Executive Officer

**iPASS IP LLC**

By:      /s/ Denis McCarthy
Name:   Denis McCarthy
Tile:    Director/CEO

[Trademark Security Agreement – Signature Page]

SCHEDULE I

TO

TRADEMARK SECURITY AGREEMENT

[***]

**Exhibit 21.1**

**SUBSIDIARIES OF THE REGISTRANT**

The following is a list of subsidiaries of Pareteum Corporation, omitting subsidiaries which, considered in the aggregate as a single subsidiary, would not constitute a significant subsidiary as of March 18, 2019:

Pareteum Europe B.V., The Netherlands
Pareteum North America Corp., Delaware
Artilium Group Limited, England
iPass Inc., Delaware
iPass IP LLC, Delaware

**EXHIBIT 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in Registration Statements on Form S-3 (Nos. 333-180977, 333-181320, 333-181738 and 333-213575) and Form S-8 (Nos. 333-135971, 333-152276, 333-177205 and 333-218715) of Pareteum Corporation and Subsidiaries of our report dated March 18, 2019 relating to our audit of the consolidated financial statements (which report expresses an unqualified opinion, which appears in this Annual Report on Form 10-K of Pareteum Corporation and Subsidiaries for the year ended December 31, 2018.

/s/ Squar Milner, LLP

Los Angeles, California
March 18, 2019

**EXHIBIT 31.1**

CERTIFICATION

I, Robert H. Turner, certify that:

1.   I have reviewed this annual report on Form 10-K of Pareteum Corporation for the year ended December 31, 2018;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this interim report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

March 18, 2019

/s/ Robert H. Turner
Robert H. Turner
Executive Chairman
(Principal Executive Officer)

**EXHIBIT 31.2**

CERTIFICATION

I, Edward O'Donnell, certify that:

1.  I have reviewed this annual report on Form 10-K of Pareteum Corporation for the year ended December 31, 2018;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this interim report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

March 18, 2019

*/s/ Edward O'Donnell*

Edward O'Donnell
Chief Financial Officer
(Principal Financial and Accounting Officer)

**EXHIBIT 32.1**

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Pareteum Corporation (the "Company") on Form 10-K for the fiscal year ended December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert H. Turner, Executive Chairman of the Company, certify, pursuant to 18 U.S.C. section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(2)      The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

March 18, 2019

*/s/ Robert H. Turner*
Robert H. Turner
Executive Chairman
(Principal Executive Officer)

**EXHIBIT 32.2**

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Pareteum Corporation (the "Company") on Form 10-K for the fiscal year ended December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Edward O'Donnell, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

March 18, 2019                                              */s/ Edward O'Donnell*
                                                            Edward O'Donnell
                                                            Chief Financial Officer
                                                            (Principal Financial and Accounting Officer)