**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PARETEUM SECURITIES LITIGATION** | **Case No. 1:19-cv-09767-AKH-GWG** |

**LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO THE MOTIONS TO DISMISS
THE CONSOLIDATED COMPLAINT FILED BY ALL DEFENDANTS AND THE
MOTION TO STRIKE FILED BY PARETEUM AND THE FRAUD DEFENDANTS**

**TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................... 1

II.   RELEVANT FACTUAL BACKGROUND.............................................................. 4

    A.    RELEVANT PARTIES .................................................................................... 4

    B.    THE PARTIES' PRE-EXISTING TIES WITH EACH OTHER AND NON-PARTIES ...................................... 4

        1.    Turner, McCarthy, Bozzo, and O'Donnell ........................................... 4

        2.    Barry Honig ............................................................................................. 5

        3.    Honig's Ties to Pareteum and Regular Accessories ........................... 6

        4.    Stephen Hart............................................................................................ 7

    C.    TURNER TAKES OVER PARETEUM AND REASSEMBLES THE CREW .................................................. 8

    D.    TURNER FABRICATES NEW METRICS FOR REVENUE GROWTH ...................................................... 9

    E.    PARETEUM AND THE FRAUD DEFENDANTS KNOW THESE METRICS ARE UNRELIABLE ........................ 9

    F.    PARETEUM AND THE FRAUD DEFENDANTS ADVANCE A FALSE HYPER-GROWTH NARRATIVE USING METRICS THEY CREATED AND KNEW WERE FALSE ................................................................. 10

        1.    The Scheme Begins................................................................................10

        2.    Pareteum and the Fraud Defendants Use Artificially Inflated Stock as Currency in Two Acquisitions, Which They Then Use to Buoy Their False Metrics with Real Customers, and Turner Cashes In................................................................12

        3.    Honig's Associates Cash in While Pareteum and the Fraud Defendants Continue to Use Artificially Inflated Stock as Currency ..................................................16

        4.    As the Truth Begins to Trickle Out, Pareteum and the Fraud Defendants Deny Everything................................................................................18

        5.    Pareteum and the Fraud Defendants Deny Everything (Again) While They Stop Pumping the Stock and Distance Themselves from Their Own Backlog Metric .........21

        6.    The House of Cards Begins to Fall.......................................................22

        7.    The Fraud Defendants Make One Last Money Grab ..........................23

        8.    The Full Truth Is Finally Revealed .....................................................23

        9.    Restatement Release Fallout and Post-Class Period Developments............................24

III.   LAW AND ARGUMENT.................................................................................... 24

    A.    LEGAL STANDARD..................................................................................... 25

    B.    PLAINTIFF ADEQUATELY ALLEGES SECTION 10(B) AND 20(A) CLAIMS AGAINST PARETEUM AND THE FRAUD DEFENDANTS ....................................................................................... 26

        1.    Plaintiff Adequately Alleges False and Misleading Statements .......................................27

      a.    Statements Regarding Revenue, Backlog, Connections, and Growth...............................28

        i.    Statements Regarding Revenue.......................................................29

        ii.    Statements Regarding Backlog and Its Conversion ...............................................31

        ◊    Statements Regarding Backlog.........................................................31

        ◊    Statements Regarding Backlog Conversion.........................................35

        ◊    Counterarguments Regarding Backlog ..............................................37

iii.    Statements Regarding Connections ................................................................ 39
iv.    Statements Regarding Growth ....................................................................... 41
b.    Statements Regarding Internal Controls and GAAP ........................................... 41
c.    Statements Regarding Blockchain Capabilities .................................................. 43
d.    Statements and Omissions Regarding Executive Backgrounds ........................... 44
2.    Defendants' Rote Counter Arguments Lack Merit ............................................... 46
a.    Plaintiff's Plead False and/or Misleading Statements with the Requisite Particularity
       and the Complaint Is Hardly a Puzzle ............................................................... 46
b.    The Statements are Neither Protected Opinion Nor Puffery ............................... 48
c.    The PSLRA Safe Harbor Does Not Apply ........................................................... 51
   i.    The Statements Are Statements of Present Fact ............................................ 51
   ii.    There Is No Meaningful Cautionary Language .............................................. 53
   iii.    The Statements Were Knowingly False ...................................................... 54
3.    Plaintiff Adequately Alleges a Strong Inference of Scienter ............................... 55
a.    Legal Standard ............................................................................................... 55
b.    Plaintiff Adequately Alleges Facts Giving Rise to a Strong Inference of Scienter as to
       the Fraud Defendants ..................................................................................... 56
   i.    The Fraud Defendants Had Motive and Opportunity .................................... 56
      ◊  Growth by Acquisition/Acquisition of Revenues ....................................... 56
      ◊  Incentive Awards Tied to Stock Price and Acquisitions; Turner's Acquisition-Based
          Windfall .............................................................................................. 57
      ◊  Funding Corporate Operations ............................................................... 58
   ii.    Plaintiff Adequately Alleges Strong Circumstantial Evidence of Scienter ...................... 59
      ◊  Concrete and Personal Benefits .............................................................. 59
      ◊  The Scheme Evidences Scienter ............................................................. 60
      ◊  Actions After Being Caught ................................................................... 61
      ◊  GAAP Violations, Lack of Internal Controls, Premature Revenue Recognition, and
          Restatement ........................................................................................ 62
      ◊  The Magnitude of the Fraud ................................................................. 64
      ◊  The Core Operations Doctrine ............................................................... 64
      ◊  The Executive Terminations ................................................................. 65
      ◊  Knowledge of and Access to Contradictory Facts .................................... 65
   iii.    Pareteum and the Fraud Defendants' Counter Arguments Again Lack Merit ............ 68
      ◊  Scienter Allegations Must be Considered in Totality ................................. 68
      ◊  Plaintiff is Not Pleading "Fraud by Hindsight" ......................................... 69
      ◊  Plaintiff Does Not Engage in "Group Pleading" ....................................... 70
c.    Corporate Scienter is Adequately Alleged ........................................................ 72
4.    Plaintiff Adequately Pleads Secondary Liability Under Section 20(a) Against the
       Control Person Defendants .............................................................................. 73

C.    THE COMPLAINT ADEQUATELY ALLEGES SECTION 11, 12, AND 15 CLAIMS .................................. 74
1.    Legal Standard ............................................................................................... 74
2.    These Claims Are Not Subject to a Heightened Pleading Standard ............................... 74

ii

      3.     **Plaintiff Adequately Alleges Sections 11 and 12 Claims Against Pareteum and the Control Person Defendants for the iPass Acquisition** ..................................................76

      4.     **Plaintiff Adequately Alleges Section 11 Claims Against Defendants for the Secondary Offering** ..................................................................................................80

  a.   **Claims Against Pareteum and the Control Person Defendants**............................80

  b.   **Claims Against Squar Milner** ...........................................................................80

  c.   **Claims Against Dawson James** ........................................................................82

  d.   **Plaintiff Adequately Pleads that it Purchased Shares Pursuant or Traceable to the Secondary Offering**..............................................................................................84

  e.   **Plaintiff Adequately Pleads Loss Causation** ...................................................85

      5.     **Plaintiff Adequately Pleads a Section 15 Claim Against the Control Person Defendants** ........................................................................................................87

  D.   **THE ALTERNATIVE MOTION TO STRIKE SHOULD BE DENIED** .....................................................**87**

**IV.**    **CONCLUSION**..................................................................................................**89**

**APPENDIX**...........................................................................................................................**91**

## TABLE OF AUTHORITIES

**Cases**

*Akerman v. Arotech Corp.*,
  608 F. Supp. 2d 373 (E.D.N.Y. 2009) ...................................................................... 55, 72

*AmBase Corp. v. SDG Inc.*,
  00-1694, 2005 U.S. Dist. LEXIS 16164 (D. Conn. Aug. 3, 2005) ........................................ 45

*AQ Consulting WLL v. Branca*,
  10-7496, 2011 U.S. Dist. LEXIS 9474 (S.D.N.Y. Jan. 19, 2011) ........................................ 77

*Barilli v. Sky Solar Holdings, Ltd.*,
  17-4572, 2019 U.S. Dist. LEXIS 87929 (S.D.N.Y. May 23, 2019) ....................................... 45

*Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011) ...................................................................... 65

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................... 25, 26

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ............................................................................. 51-52

*Bielski v. Cabletron Sys.*,
  311 F.3d 11 (1st Cir. 2002) ................................................................................... 63

*Bison Capital Corp. v. ATP Oil & Gas Corp.*,
  10-0714, 2010 U.S. Dist. LEXIS 62836 (S.D.N.Y. June 24, 2010) ....................................... 25

*Brewer v. Lincoln Int. Corp.*,
  148 F. Supp. 2d 792 (W.D. Ky. 2000) ...................................................................... 45

*Burstyn v. Worldwide Xceed Gp., Inc.*,
  01-1125, 2002 U.S. Dist. LEXIS 18555 (S.D.N.Y. Sept. 30, 2002) .................................. 63, 70

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002) ................................................................................. 44

*Carlton v. Cannon*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016) ...................................................................... 52

*Carpenters Pension Tr. Fund v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ............................................................................. 25, 73

*Christine Asia Co. v. Yun Ma*,
  16-2519, 2017 U.S. App. LEXIS 24647 (2d Cir. Dec. 5, 2017) ........................................ 56

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010) ...................................................................... 74

*City of Brockton Ret. Sys. v. Shaw Group, Inc.*,
    540 F.Supp. 2d 464 (S.D.N.Y. 2008) ............................................................... 64

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    18-10320, 2020 U.S. Dist. LEXIS 55410 (S.D.N.Y. Mar. 30, 2020) ..................................... 65

*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ............................................................... 50, 52

*Crigger v. Fahnestock & Co.*,
    443 F.3d 230 (2d Cir. 2006) ...................................................................... 45

*Dale v. Rosenfeld*,
    229 F.2d 855 (2d Cir. 1956) ...................................................................... 45

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978) ...................................................................... 70

*Dobina v. Weatherford Int'l*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012) ......................................................... 59, 63-64

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
    413 F. Supp. 3d 187 (S.D.N.Y. 2019) ......................................................... 26, 42

*Employees' Ret. Sys. v. J.P. Morgan Chase & Co.*,
    804 F. Supp. 2d 141 (S.D.N.Y. 2011) ............................................................... 85

*Fisk v. SuperAnnuities*,
    927 F. Supp. 718 (S.D.N.Y. 1996) ............................................................. 77, 79

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018) ............................................................... 50

*Frater v. Hemispherx Biopharma, Inc.*,
    996 F. Supp. 2d 335 (E.D. Pa. 2014) ............................................................. 58-59

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ......................................................... 31, 43

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................... 70

*Gelles v. TDA Indus., Inc.*,
    90-5133, 1991 U.S. Dist. LEXIS 3135 (S.D.N.Y. Mar. 18, 1991) ..................................... 89

*Gen. Partner Glenn Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ...................................................................... 50

*Gotham Holdings, LP v. Health Grades, Inc.*,
    534 F. Supp. 2d 442 (S.D.N.Y. 2008) ............................................................... 78

v

*Great Rock Golf 2006, LLC v. Town of Riverhead*,
   12-3585, 2013 U.S. Dist. LEXIS 101402 (E.D.N.Y. July 18, 2013) ................................... 88

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995) ............................................................................................ 79

*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................................................................. 64

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019) ....................................................... 65, 73, 86

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ............................................................................................ 74

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004) ................................................................................... 85

*Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012) .................................................................. 89

*IBEW Local 98 Pension Fund v. Cent. Vermont Pub. Serv. Corp.*,
   11-222, 2012 U.S. Dist. LEXIS 204116 (D. Vt. Aug. 23, 2012) .......................... 48

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.*,
   369 F. App'x. 260 (2d Cir. Mar. 12, 2010) .......................................................... 71

*In Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. Dec. 20, 2012) .............................................................. 48

*In re Adelphia Communs. Corp. Sec. & Derivative Litig.*,
   03-1529, 2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 7, 2007) ...................... 48

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................ 55, 65, 67

*In re Am. Int'l Gp., Inc.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010) .......................................................... 66, 79

*In re Am. Realty Capital Props.*,
   15-40, 2016 U.S. Dist. LEXIS 196190 (S.D.N.Y. Aug. 5, 2016) ................................ Passim

*In re Ambac Fin. Gp., Inc. Secs. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) .......................................................... 43, 75

*In re Amtrust Fin. Servs., Inc. Sec. Litig.*,
   17-1545, 2019 U.S. Dist. LEXIS 153297 (S.D.N.Y. Sept. 9, 2019) ..................... 75

*In Re AOL Time Warner, Inc., Sec. & ERISA Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004) ........................................................ 52, 65, 70

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ............................................................... 50

*In re ArthroCare Corp. Secs. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010) ............................................................. 61

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ............................................... 63, 67, 69-70

*In re Authentidate Holding Corp.*,
  05-5323, 2006 U.S. Dist. LEXIS 47971 (S.D.N.Y. July 14, 2006) ..................... 84

*In re Avon Sec. Litig.*,
  19-01420, 2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019) ............ 43, 63

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ......................................................... 44, 49

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
  09-5411, 2012 U.S. Dist. LEXIS 55234 (S.D.N.Y. Apr. 12, 2012) ..................... 70

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018) ......................................................... 52, 53

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................................... 39

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) ........................................................... 54, 84

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  17-1580, 2018 U.S. Dist. LEXIS 87991 (S.D.N.Y. May 24, 2018) ..................... 48

*In re CitiGroup Inc. Bond Litig.*,
  723 F. Supp. 2d 568 (S.D.N.Y. 2010) ............................................................... 43

*In re Complete Mgmt. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001) ............................................................... 64

*In re Computer Assocs. Class Action Sec. Litig.*,
  75 F. Supp. 2d 68 (E.D.N.Y. 1999) .............................................................. 49-50

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................................................. 43

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  16-3495, 2017 U.S. Dist. LEXIS 122868 (S.D.N.Y. June 28, 2017) ................... 48

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ......................................................... 65, 73

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
 310 F. Supp. 2d 819 (S.D. Tex. 2004) ...................................................... 77

*In re eSpeed, Inc. Sec. Litig.*,
 457 F. Supp. 2d 266 (S.D.N.Y. 2006) ...................................................... 56

*In re Express Scripts Holding Co. Secs. Litig.*,
 16-3338, 2017 U.S. Dist. LEXIS 120844 (S.D.N.Y. July 31, 2017) .................................. 65

*In re Fannie Mae 2008 Sec. Litig.*,
 742 F. Supp. 2d 382 (S.D.N.Y. 2010) ...................................................... 70

*In re First Merchants Acceptance Corp. Sec. Litig.*,
 97-2715, 1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 4, 1998) ............................ 81

*In re Gentiva Sec. Litig.*,
 932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................. 42-43

*In re Genworth Fin. Sec. Litig.*,
 14-2392, 2015 U.S. Dist. LEXIS 82035 (S.D.N.Y. June 15, 2015) ................................ 51

*In re Glob. Crossing, Ltd. Sec. Litig.*,
 313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................. 84, 85

*In re Health Mgmt., Inc. Sec. Litig.*,
 970 F. Supp. 192 (E.D.N.Y. 1997) ........................................................ 81

*In re Ibis Tech. Sec. Litig.*,
 422 F. Supp. 2d 294 (D. Mass. 2005) ...................................................... 59

*In re Indep. Energy Holdings PLC Sec. Litig.*,
 154 F. Supp. 2d 741 (S.D.N.Y. 2001) ...................................................... 54

*In re Initial Pub. Offering Sec. Litig.*,
 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...................................................... 83

*In re Insys Therapeutics, Inc. Sec. Litig.*,
 17-1954, 2018 U.S. Dist. LEXIS 100000 (S.D.N.Y. June 12, 2018) ................................ 63

*In re Interpublic Sec. Litig.*,
 02-6527, 2003 U.S. Dist. LEXIS 8844 (S.D.N.Y. May 29, 2003) ................................ 57

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
 251 F. Supp. 3d 596 (S.D.N.Y. 2017) .................................................. 27, 73

*In re ITT Educ. Servs.*,
 34 F. Supp. 3d 298 (S.D.N.Y. 2014) ...................................................... 54

*In re Lehman Bros. Sec. & ERISA Litig.*,
 799 F. Supp. 2d 258 (S.D.N.Y. 2011) ................................................ 27, 44, 79

*In re Lehman Bros. Sec.*,
  131 F. Supp. 3d 241 (S.D.N.Y. 2015) ................................................................. 80

*In re Livent, Inc. Noteholders Sec. Litig.*,
  355 F. Supp. 2d 722 (S.D.N.Y. 2005) ............................................................ 76, 77

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
  939 F. Supp. 2d 360 (S.D.N.Y. 2013) ................................................................. 89

*In re Majesco Secs. Litig.*,
  05-3557, 2006 U.S. Dist. LEXIS 73563 (D.N.J. Sept. 29, 2006) ......................... 83

*In re Mannkind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011) ................................................................. 59

*In re Manulife Fin. Corp. Sec. Litig.*,
  276 F.R.D. 87 (S.D.N.Y. 2001) .......................................................................... 70

*In re MF Global Holdings Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................ 47-48

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) ................................................................. 89

*In re Mun. Mortg. & Equity, LLC*,
  876 F. Supp. 2d 616 (D. Md. 2012) .................................................................... 85

*In re Nortel Networks Corp. Sec. Litig.*,
  238 F. Supp. 2d 613 (S.D.N.Y. 2003) ............................................................ 66, 67

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................................ 54

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................................. 84

*In re Portal Software, Inc. Sec. Litig.*,
  03-5138, 2005 U.S. Dist. LEXIS 20214 (N.D. Cal. Aug. 10, 2005) ..................... 59

*In re Refco, Inc Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...................................................... 66, 75, 87

*In re Reserve Fund Sec. & Derivative Litig.*,
  732 F. Supp. 2d 310 (S.D.N.Y. 2010) ................................................................. 66

*In re Rockwell Med., Inc. Sec. Litig.*,
  16-1691, 2018 U.S. Dist. LEXIS 56897 (S.D.N.Y. Mar. 30, 2018) ..................... 65

*In re Sadia, S.A. Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009) ................................................................. 65

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ........................................................................ 63

*In re Scottish Re Gp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) ........................................................ 82

*In re Seadrill Limited Securities Litigation*,
  No. 14-9642, 2016 U.S. Dist. LEXIS 80648 (S.D.N.Y. June 20, 2016) ................... 52, 52-53

*In re Signet Jewelers Ltd. Sec. Litig.*,
  16-6728, 2018 U.S. Dist. LEXIS 199809 (S.D.N.Y. Nov. 26, 2018) .............................. 50, 63

*In re Spear & Jackson Sec. Litig.*,
  399 F. Supp. 2d 1350 (S.D. Fla. 2005) ........................................................ 61-62

*In re Sunbeam Sec. Litig.*,
  89 F. Supp. 2d 1326 (S.D. Fla. 1999) ........................................................ 62

*In re Supercom, Inc. Sec. Litig*,
  15-9650, 2018 U.S. Dist. LEXIS 175467 (S.D.N.Y. Oct. 10, 2018) .................................... 65

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ........................................................................ 57

*In re Tommy Hilfiger Sec. Litig.*,
  04-7678, 2007 U.S. Dist. LEXIS 55088 (S.D.N.Y. July 20, 2007) .................................... 25

*In re Turbodyne Techs., Inc. Sec. Litig.*,
  99-697, 2000 U.S. Dist. LEXIS 23020 (C.D. Cal. Mar. 15, 2000) .................................... 62

*In re Twinlab Corp. Sec. Litig.*,
  103 F. Supp. 2d 193 (E.D.N.Y 2000) ........................................................ 74

*In re Veeco Instruments, Inc., Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................ *Passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................ 50

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ........................................................ 27, 44

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) ........................................................ 84

*In re WorldCom, Inc. Sec. Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) ........................................................ 74

*In re WRT Energy Sec. Litig.*,
  96-3610, 2005 U.S. Dist. LEXIS 18701 (S.D.N.Y. Aug. 30, 2005) ........................ 85-86, 87

*In re Xinhua Fin. Media, Ltd. Secs. Litig.*,
07-3994, 2009 U.S. Dist. LEXIS 14838 (S.D.N.Y. Feb. 25, 2009) ...................................... 45

*Ingenito v. Bermec Corp.*,
441 F. Supp. 525 (S.D.N.Y. 1977) ...................................................................................... 77

*Jefferson Ins. Co. v. Rouhana*,
01-3014, 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 24, 2006) ...................................... 66

*Katz v. Image Innovations Holdings, Inc.*,
542 F. Supp. 2d 269 (S.D.N.Y. 2008) ................................................................................ 64

*Lasker v. N.Y. State Elec. & Gas Corp.*,
85 F.3d 55 (2d Cir. 1996) .................................................................................................. 50

*Lehman Bros. Sec. & ERISA Litig.*,
09-2017, 2011 U.S. Dist. LEXIS 82119 (S.D.N.Y. 2011) ...................................................... 71

*Lennon v. Seaman*,
63 F. Supp. 2d 428 (S.D.N.Y. 1999) .................................................................................. 87

*Levine v. AtriCure, Inc.*,
508 F. Supp. 2d 268 (S.D.N.Y. 2007) ................................................................... 74, 85, 86

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) .............................................................................................. 87

*Lynch v. Southhamptom Animal Shelter Found, Inc.*,
278 F.R.D. 55 (E.D.N.Y. 2011)..................................................................................... 88, 89

*Manavazian v. ATEC Gp.*,
160 F. Supp. 2d 468 (E.D.N.Y. 2001) ................................................................................ 49

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ............................................................................................ 64

*Menaldi v. Och-Ziff Capital Mgmt. Gp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016) ................................................................................ 73

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) .............................................................................................. 27

*Montoya v. Mamma.Com, Inc.*,
05-2315, 2006 U.S. Dist. LEXIS 13207 (S.D.N.Y. Mar. 28, 2006) .................................... 45

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
08-8781, 2011 U.S. Dist. LEXIS 46066 (S.D.N.Y. Apr. 28, 2011) .................................... 86

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
02-0767, 2003 U.S. Dist. LEXIS 11108 (S.D.N.Y. June 30, 2003) ................................. 44-45

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*,
    720 F. Supp. 2d 254 (S.D.N.Y. 2010) ...................................................................... 85

*New Orleans Emples. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...................................................................... 27, 65

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...................................................................... 49

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) ...................................................................... 36, 56, 64

*Ollila v. Babcock & Wilson Enters.*,
    17-109, 2018 U.S. Dist. LEXIS 20587 (W.D.N.C. Feb. 8, 2018) ...................................................................... 54, 70

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ...................................................................... 50, 81

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) ...................................................................... 54

*Pac. Iv. Mgmt. Co. v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010) ...................................................................... 26

*Patel v. L-3 Communs. Holdings, Inc.*,
    14-CV-6038, 2016 U.S. Dist. LEXIS 42978 (S.D.N.Y. Mar. 30, 2016) ...................................................................... 72

*Perry v. Duoyuan Printing, Inc.*,
    10-7235, 2013 U.S. Dist. LEXIS 121034 (S.D.N.Y. Aug. 22, 2013) ...................................................................... 82, 83

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int. N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015) ...................................................................... Passim

*Pollio v. MF Global, Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009) ...................................................................... 48

*Press v. Chem. Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999) ...................................................................... 55

*Reis, Inc. v. Spring11 LLC*,
    15-2836, 2016 U.S. Dist. LEXIS 131486 (S.D.N.Y. Sept. 24, 2016) ...................................................................... 89

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018) ...................................................................... 52

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ...................................................................... 26, 74, 75

*Rombach v. Chang*,
    00-0958, 2002 U.S. Dist. LEXIS 15754 (E.D.N.Y. June 7, 2002) ...................................................................... 75

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ................................................................ 64

*S.E.C. v. Cavanagh*,
445 F. 3d 105 (2d Cir. 2006) ............................................................ 78

*Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*,
05-7092, 2006 U.S. Dist. LEXIS 96035 (S.D.N.Y. May 3, 2006) ........................... 52, 53, 57

*Schwab v. E\*TRADE Fin. Corp.*,
258 F. Supp. 3d 418 (S.D.N.Y. 2017) ................................................ 65

*SEC v. Empire Dev. Gp., LLC*,
07-3896, 2008 U.S. Dist. LEXIS 43509 (S.D.N.Y. May 30, 2008) ...................... 44

*SEC v. Enters. Sols., Inc.*,
142 F. Supp. 2d 561 (S.D.N.Y. 2001) ................................................ 45

*SEC v. Espuelas*,
908 F. Supp. 2d 402 (S.D.N.Y. 2012) ................................................ 31

*SEC v. Honig*,
18-8175, 2020 U.S. Dist. LEXIS 31961 (S.D.N.Y. Feb. 25, 2020) ................ 87, 88

*SEC v. Mozilo*,
09-3994, 2010 U.S. Dist. LEXIS 98203 (C.D. Cal. Sept. 16, 2010) ................... 45

*SEC v. Ralston Purina Co.*,
346 U.S. 119 (1953) ................................................................. 77, 78

*SEC v. Telegram Grp. Inc.*,
19-9439, 2020 U.S. Dist. LEXIS 53846 (S.D.N.Y. Mar. 24, 2020) ................... 78

*SEC v. Treadway*,
11-1534, 2011 U.S. Dist. LEXIS 73950 (S.D.N.Y. July 1, 2011) ................... 88

*SEC. DataCatalyst, LLC v. Ifoverity, LLC*,
20-310, 2020 U.S. Dist. LEXIS 46990 (S.D.N.Y. May 17, 2020) ................... 77

*Shahzad v. H.J. Meyers & Co.*,
95-6196, 1997 U.S. Dist. LEXIS 1128 (S.D.N.Y. Feb. 4, 1997) ................... 88

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
348 F. Supp. 3d 313 (S.D.N.Y. 2018) ................................................ 56, 57, 58

*Shaw v. Empire Stock Transfer Inc.*,
381 F. Supp. 3d 286 (S.D.N.Y. 2019) ................................................ 89

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010) ................................................ 64

*SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010) ............................................................ 51, 54

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999) ...................................................................................... 70

*Tabor v. Bodisen Biotech, Inc.*,
  579 F. Supp. 2d 438 (S.D.N.Y. 2008) ................................................................. 48, 88

*Tanne v. Autobytel, Inc.*,
  226 F.R.D. 659 (C.D. Cal. 2005) ............................................................................. 85

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008) ............................................................................. 72-73

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................... 55, 67, 68

*U.S. Surgical Corp. Sec. Litig. v. Hirsch*,
  92-374, 1995 U.S. Dist. LEXIS 20895 (D. Conn. Apr. 12, 1995) ........................................ 88

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.*,
  2013 U.S. Dist. LEXIS 201462 (S.D.N.Y. Mar. 29, 2013) .................................................. 45

*Varghese v. China Shenghuo Pharm. Holdings*,
  672 F. Supp. 2d 596 (S.D.N.Y. 2009) ........................................................... *Passim*

*Vtech Holdings Ltd. v. PriceWaterhouseCoopers LLP*,
  348 F. Supp. 2d 255 (S.D.N.Y. 2004) ................................................................. 25-26

*Washtenaw Cty. Emples. Ret. Sys. v. Avid Tech., Inc.*,
  28 F. Supp. 3d 93 (D. Mass 2014) ........................................................................... 39

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
  723 F. App'x 20 (2d Cir. Jan. 26, 2018) ................................................................... 70

*Yung v. Lee*,
  432 F.3d 142 (2d Cir. 2005) ................................................................................... 78

*Zech Capital LLC v. Ernst & Young Hua Ming*,
  636 F. App'x 582 (2d Cir. Jan. 28, 2016) .................................................................. 70

**Statutes**

15 U.S.C. § 77k ............................................................................................... 74

15 U.S.C. § 78u-4 ...................................................................................... 26, 55

15 U.S.C. § 78u-5 ............................................................................................. 51

15 USCS § 77b ................................................................................................ 79

**Rules**

Fed. R. Evid. 404 ................................................................................................ 88

Fed. R. Civ. P. 9 ........................................................................................... *Passim*

Rule 10(b) ................................................................................................ 43, 44

Fed. R. Civ. P. 12 ................................................................................................ 25

Lead Plaintiff, through Lead Counsel, respectfully submits this omnibus memorandum in opposition to the Motions to Dismiss (Dkt. Nos. 143-1, 145, and 148-1) the Consolidated Complaint (Dkt. No. 98; the "Complaint") filed by Defendants herein.[1]

## I.   <u>INTRODUCTION</u>

Pareteum provides telecommunications software and services. In November 2015, Turner was appointed as the Company's Executive Chairman. Within months, he ousted the interim CEO and packed management with a veritable who's who of purported serial fraudsters and company destroyers, some of whom had worked with Turner at past companies that ended in financial ruin, others who had their own histories of fraud, including one who had previously purportedly "personally affected the fraudulent booking of revenues" – just like here. While Turner was (re)assembling his crew – *days* before the Class Period began – entities related to non-party Barry Honig purchased 13.2% of Pareteum's stock. Honig, the SEC-accused "primary strategist" of several "classic pump-and-dump schemes," had undisclosed ties with Pareteum executives (including Turner) and several firms that provided services in furtherance of the fraud at issue here.

As this cast of characters found its way to Pareteum, the events giving rise to this fraud action unfolded. First, as he assembled his team, Turner changed the way Pareteum reported its revenue by fabricating metrics called "Backlog" and "connections." Assuring investors that these metrics were "key indicators" of and demonstrated revenue and growth – even though they knew they were not reliable – Pareteum and the Fraud Defendants advanced a false narrative of hyper-growth, using these metrics as support. Pareteum's stock soared ***824% in just a few months***.

This fraud was effectuated through a "classic pump-and-dump" style barrage of press releases – *178 during the Class Period, and over 130 in 2018 alone* – that touted Pareteum's fake

---

[1]     Capitalized terms have the same meaning as in, and "¶_" cites are to, the Complaint; all emphasis added and citations omitted unless otherwise noted. The "Class Period" is December 14, 2017 through October 21, 2019. ¶440.

success and growth, telling investors – falsely, we now know – that (1) Pareteum's "record" revenues grew *729%* from 1Q18 to 2Q19;[2] (2) Backlog and connections grew from $200 million and 2.2 million connections in 1Q18 to $1.27 billion and 13.03 million connections in 2Q19 – increases of 535% and 592%; (3) Backlog was converting to revenue *at or above 100%*, such that Pareteum could expect every dollar of the Backlog in revenue; and (4) these metrics were reliable.

**It was all a lie.** As would be later revealed, the vast majority of the 178 press releases – Pareteum and the Fraud Defendants acknowledge that it is 101 (Dkt. No. 143-1 at 5 n.2) – and *all* of the Company's 10-Qs and 10-Ks issued during the Class Period either announced overstated revenues or fabricated or embellished customers and contracts and touted growth that did not exist. The partial truth was first revealed in June 2019, when two research reports (the Aurelius Report and the Viceroy Report) publicly revealed that Pareteum and the Fraud Defendants (1) had inflated revenues and Backlog by fabricating or embellishing customers and contracts; and (2) had not disclosed material facts about officers, directors, and investors. Shares plummeted 41%.

Rather than come clean, Pareteum and the Fraud Defendants "categorically denied" these allegations and doubled down, reassuring investors by hyping results that would later prove to be false and issuing *$40 million* of stock and warrants based on these false statements. Quietly, however, their press release machine ground to a sudden halt and they "retired" the fabricated Backlog metric – ***noting that it had "served its purpose*.**" Indeed, it had: during the Class Period, based on this fabricated and false metric, Pareteum's stock increased *824%*; Pareteum issued more than *$132 million* of falsely inflated stock as currency to acquire three other companies; Honig's associated entities cashed out, making millions; and the Fraud Defendants received millions.

---

[2]     Throughout this brief, "1Q19" refers to "the first quarter of 2019," and so on for 2Q19-4Q19; "FY18" refers to "the full year of 2018"; and "1H19" refers to the "first half of 2019."

Finally, on October 21, 2019 – despite *twice* "categorically denying" the Viceroy and Aurelius Reports and barely one month after selling $40 million worth of stock and warrants into the market – the full truth was finally revealed when Pareteum and the Fraud Defendants announced in the Restatement Release that the Company would restate, and "[i]nvestors should no longer rely upon," its financials for FY18 and 1H19 because it had "prematurely or inaccurately recognized revenue." The eventual Restatement (which *still* has not been completed) was predicted to result in a $9 million, **_28% reduction_** in the falsely reported $32.4 million of revenue for FY18 and a staggering $24 million, **_42% reduction_** in the falsely reported $57.1 million of revenue for 1H19. Following this announcement, Pareteum stock tumbled.

Defendants' misconduct destroyed hundreds of millions of dollars of investor equity. By fabricating and embellishing customers and contracts, Pareteum and the Fraud Defendants falsely inflated the fabricated Backlog and connections metrics, rendering each statement during the Class Period regarding the Backlog and its value (which grew sequentially based on prior fabricated or embellished inputs), the Backlog conversion rate, connections, and "hyper growth" false and misleading. These falsities caused the admittedly improper recognition of revenues and the artificial inflation of Pareteum's stock price. These allegations give rise to claims under Sections 10(b) and 20(a) of the Exchange Act against Pareteum and the Fraud Defendants and Sections 11, 12, and 15 against, as appropriate, Pareteum, the Control Person Defendants, Dawson James (Pareteum's exclusive placement agent), and Squar Milner (its independent auditor). In response, Defendants boldly argue that they have done nothing wrong – that, despite Pareteum's *own admitted forthcoming Restatement* of as much as 42% of its reported revenue, the Complaint does not allege a single false or misleading statement or scienter. These arguments are specious, and this Court should deny the Motions to Dismiss in their entirety.

3

## II.    RELEVANT FACTUAL BACKGROUND

### A.    RELEVANT PARTIES

Pareteum is a Delaware company with its purported principal place of business in New York City. ¶24 and n.4. The "Fraud Defendants" consist of the following current and former members of Pareteum's Board of Directors and executive management:

- Turner: Executive Chairman (during the entire Class Period), Principal Executive Officer (until 5/24/19), and then CEO; terminated after Restatement Release. ¶25.

- O'Donnell: CFO during the Class Period; replaced as CFO. ¶26.

- Bozzo: CEO (until May 24, 2019), then Chief Commercial Officer. ¶27.

- McCarthy: President (until May 24, 2019), then COO; terminated. ¶28.

- Mumby: Chief Revenue Officer during the Class Period. ¶29.

Defendants in connection with the iPass Acquisition and Secondary Offering are:

- Lippert, van Sante, and Jimenez-Tunon: directors when the Registration Statements for the iPass Acquisition and Secondary Offering were filed; signed and/or certified the FY2018 10-K.[3] ¶¶31-33.

- Dawson James: investment banker; Pareteum's exclusive placement agent/underwriter; arranged for the sale of Pareteum securities in the Secondary Offering. ¶34.

- Squar Milner: accounting firm; independent auditor for financial statements included in Pareteum's FY2018 10-K and the Secondary Offering Registration Statement. ¶35.

### B.    THE PARTIES' PRE-EXISTING TIES WITH EACH OTHER AND NON-PARTIES

#### 1.    Turner, McCarthy, Bozzo, and O'Donnell

Turner has a long history of leading failed businesses and misleading shareholders stretching as far back as 2001. *See* ¶¶47-48 (CEO of Davnet, which collapsed; LastMile liquidated year after he left). Sometime in 2007, Turner met McCarthy at a company called Catcher Holdings, where Turner served as CEO and Chairman and McCarthy served as CFO. ¶¶49, 52. When Turner

---

[3]    Turner, O'Donnell, Bozzo, Lippert, van Sante, and Jimenez-Tunon are the "Control Person Defendants."

4

and McCarthy left Catcher Holdings (after just ten and thirteen months, respectively), they left it with only $100,000, having overseen a stock price drop from $1.40 to $0.73 per share; months later, Catcher Holdings collapsed and is now a worthless penny stock. ¶¶49, 54.[4] After Catcher Holdings, Turner and McCarthy moved on to Pac-West, where they met Bozzo. ¶¶51, 55-56. Turner, McCarthy, and Bozzo all left Pac-West in 2011; it filed for bankruptcy in 2013. ¶¶51, 55.

O'Donnell likewise has a history of leading failed businesses and misleading shareholders. *See* ¶¶58-59, 61 (CFO of company that appeared to be mimicking name of respected private equity fund without connection thereto; CFO of another company charged with fraud). Most notably, less than two years before joining Pareteum, O'Donnell was sued in his capacity as former CFO of AudioEye for having "*personally affected the fraudulent booking of revenues*" to "*give the market the false notion that revenue growth was accelerating*" and to "artificially inflate AudioEye's stock price," **triggering a restatement erasing <u>92%</u> of the company's reported revenue**. ¶60.

### 2.    **Barry Honig**

Rounding out this cast of characters – indeed, tying them together – is non-party Honig. ¶65. According to the SEC, Honig is the leader of a "classic pump-and-dump" securities fraud ring and its "primary strategist, calling upon other Defendants to" engage in the scheme:

> [A] group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes…. Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price…. Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors.

---

[4]    While at Catcher Holdings, Turner made enthusiastic false statements eerily similar to those here. *See* ¶50.

5

¶65. On July 10, 2019, this Court approved a consent judgment against Honig, pursuant to which he is now banned from investing in and financing publicly traded, small cap companies. ¶65.[5]

Notably, as in this case, investigating Honig and his involvement in fraudulent companies is difficult because he and his fellow fraudsters conceal their investments. *See* ¶66 (SEC accused Honig of hiding over 90% ownership; journalist found Honig was involved with Sichenzia, Pareteum's outside counsel, in secretly funding underwriting for public offering in which he was a lead investor). Two of the "undisclosed affiliates" with which Honig purportedly has ties are Iroquois and IntraCoastal, which have allegedly invested in 34 publicly traded companies that were also owned by Honig, most of which have either declined more than 75% or are now virtually worthless. ¶68.[6] As outlined below, during the Class Period, Iroquois and IntraCoastal both invested in Pareteum (controlling 13.2% of its stock), and both conveniently cashed out before the stock price plummeted as the fraud was revealed. ¶68.

### 3.    Honig's Ties to Pareteum and Regular Accessories

Honig has undisclosed ties to Pareteum executives and directors and to several firms that provided services in furtherance of the fraud herein. While Turner and McCarthy were at Catcher Holdings (which collapsed after they left), Honig owned an interest. ¶67. And, while serving as the chair of Pareteum's Audit Committee, former Pareteum director and current interim CFO Laura Thomas served as the CFO of TowerStream, in which Honig owned a substantial stake. ¶¶62, 67.[7] Dawson James – Pareteum's exclusive placement agent that issued favorable reports touting Pareteum's Backlog and arranged for the sale of Pareteum securities in the Secondary

---

[5]    A parallel criminal investigation into Honig was also being conducted. ¶65.

[6]    Indeed, Iroquois purportedly received an SEC subpoena as part of its pump-and-dump investigation of Honig, through which the SEC sought "information to prove this group was trading as undisclosed affiliates and influencing public company CEO's to get false press releases published to drive up the price of a stock." ¶68.

[7]    In addition, a defendant in the SEC proceeding against Honig who allegedly took part in Honig's schemes also apparently appeared as a "private investor" in a Pareteum conference call. ¶67.

Offering – also acted as placement agent for several Honig-related entities and has been engaged by at least thirteen companies in which Honig and/or affiliated entities had interests (most of which have purportedly collapsed). ¶¶70, 82. Likewise, Squar Milner – Pareteum's auditor for financial statements that were incorporated into the Secondary Offering Registration Statement and covered by the Restatement Release – also audited at least one company owned by Honig. ¶71.[8]

Finally, non-party Sichenzia – Pareteum's outside counsel that assisted it in issuing tens of millions in securities in private placements – is also Honig's longtime securities law firm and has served as the securities firm for at least 22 companies in which Honig and/or John Stetson (an alleged member of Honig's pump-and-dump ring) have invested. ¶73. Notably, Sichenzia and Honig are currently being sued by MabVax Therapeutics (a company in which Honig was a large investor) for their alleged role in a pump-and-dump scheme that ultimately left that company bankrupt and involved many of the same characters as in the SEC action against Honig. ¶74. Oddly, for a publicly-traded company, *Pareteum's alleged "USA headquarters" has the identical address as Sichenzia's main office,* which Pareteum has not bothered to explain. ¶24 and n.4.

### 4. Stephen Hart

Finally, there is non-party Stephen (a/k/a Steven) Hart. In 2018, Hart either joined Pareteum as an investor relations representative *or* began working with it in that capacity – although, again oddly for a publicly-traded company, which role he actually had is unclear. ¶63. At any rate, Hart was listed as one of Pareteum's "Investor Relations Contacts" on Pareteum releases issued during 2018 and at least until March 5, 2019. ¶63. Relevant here, Hart was sentenced to prison in August 2015 for obstruction of justice and perjury following charges for "repeated violations of the federal securities laws" in connection with "two distinct trading

---

[8]     In 2017, the Public Company Accounting Oversight Board also uncovered significant deficiencies in Squar Milner's auditing, finding that it had failed to perform adequately test its client's valuation of revenue. ¶72.

schemes." ¶64. Hart was added to the list of "Prohibited Service Providers" for OTC Markets in 2019 – around the same time that he vanished from Pareteum's releases. ¶64.

* * *

Pareteum and the Fraud Defendants would have this Court believe that this assortment of characters all just happened to come together at Pareteum by pure happenstance at the same time that (1) Pareteum and the Fraud Defendants advanced, through a relentless stream of press releases, a story of hyper-growth using fabricated and false metrics; (2) the stock price increased *824%* in just a few months based on these releases; and (3) a massive overstatement of revenues led to the equally meteoric collapse of that stock price – right *after* Honig's associated entities conveniently cashed out. Pareteum and the Fraud Defendants ask too much, and their attempt to explain away these facts as "coincidences" is not plausible. In truth, Pareteum and the Fraud Defendants engaged in a meticulous, purposeful, and knowing scheme to artificially inflate Pareteum's stock.

### C.    TURNER TAKES OVER PARETEUM AND REASSEMBLES THE CREW

Prior to November 2015, Pareteum was a declining penny stock known as Elephant Talk. ¶76. That changed in November 2015, when Turner was appointed Executive Chairman and Tim Payne (its then-president) as interim CEO. ¶76. While they were supposed to *jointly* manage the Company, one month later, Mr. Payne was gone. ¶76. On October 31, 2016, Elephant Talk rebranded as "Pareteum" and appointed Bozzo (Turner's accomplice from Pac-West) as CEO. ¶77. Next, on January 12, 2017, Pareteum hired O'Donnell as CFO. ¶78. By December 2017, Honig's related entities, Iroquois and IntraCoastal, were involved, having secured millions of shares (and warrants to purchase more) in a *private* placement, giving them 13.2% of the stock. *See* ¶79. Then on February 21, 2018, Pareteum hired McCarthy (Turner's accomplice from Catcher Holdings and

8

Pac-West) as SVP and, later, President and COO. ¶80. Finally, Pareteum employed Dawson James as its placement agent; Squar Milner as its auditor; and Sichenzia as its outside counsel. ¶81.

### D.   TURNER FABRICATES NEW METRICS FOR REVENUE GROWTH

As he assembled his team, Turner changed the way Pareteum reported revenue. Specifically, throughout the Class Period, Pareteum and the Fraud Defendants focused analysts and investors on their so-called, self-created (1) "36-month Contractual Revenue Backlog" metric, which they called a "key performance indicator" that represented "the value of new sales orders intake and *the revenue under contract*" and demonstrated *current* contracts; and (2) "connections" metric, which they represented measured subscribers and was a "lead indicator" of revenue. *See* ¶¶83-85. They also emphasized the importance and reliability of these fabricated metrics, frequently reporting them and touting the growth they demonstrated. ¶¶86-87.

### E.   PARETEUM AND THE FRAUD DEFENDANTS KNOW THESE METRICS ARE UNRELIABLE

Pareteum and the Fraud Defendants were aware that these metrics were unreliable. In the March 18, 2019 FY2018 Form 10-K, they disclosed that, *throughout 2018*, Pareteum had "material weaknesses in its internal control over financial reporting, [such that its] disclosure controls and procedures were not effective." ¶¶88, 359-364. However, *despite* knowing these metrics were not reliable, Pareteum and the Fraud Defendants went out of their way to assure investors that investors could still rely on them. *See* ¶¶88-89, 359-64 ("material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results"; Squar Milner provided unqualified opinion; no changes in internal controls).[9]

---

[9]   Indeed, they affirmatively *encouraged* this reliance, causing investors to rely *more heavily* on their statements despite the material weaknesses identified. *See* ¶¶88-89, 359-64, 372 (*already* began remediation measures; "performed *additional* analysis…to *ensure* our financial statements are prepared in accordance with [GAAP]"; engaged outside advisors to "bolster our internal audit function and improve our internal control processes").

**F.      PARETEUM AND THE FRAUD DEFENDANTS ADVANCE A FALSE HYPER-GROWTH NARRATIVE USING METRICS THEY CREATED AND KNEW WERE FALSE**

Having reassembled the crew and primed investors to rely on the fabricated Backlog and connections metrics, but aware that these metrics were unreliable, Pareteum and the Fraud Defendants advanced a story of hyper-growth, using the Backlog and connections metrics as support. During this time, and based on this false information, the Company's stock price soared from a Class Period low of just $0.72 per share (on December 14, 2017) to a trading high of $5.93 per share (on March 18, 2019) – *an 824% increase in price in just a few months*. ¶90.[10]

Pareteum and the Fraud Defendants achieved this fraud through a classic pump-and-dump style barrage of false and misleading press releases that touted the Company's fake success and growth. ¶91. During the Class Period, they published *178 press releases – over 130 in 2018 alone* – the vast majority of which touted Pareteum's always-growing Backlog and connections and corresponding "rapidly growing" revenue, often based on fabricated or embellished customers and contracts. *See* ¶91 and chart. Through these releases and corresponding SEC filings, using metrics that they fabricated and knew were unreliable, Pareteum and the Fraud Defendants pushed a hyper-growth narrative of ever-growing success in signing customers to multi-year deals worth tens of millions of dollars in revenue. ¶91. *It was all a lie.*

**1.      The Scheme Begins**

Pareteum and the Fraud Defendants' scheme was primarily facilitated through material omissions. ¶92. Throughout most of the Class Period, they never disclosed the identity of their purported customers and contracts, explaining that the non-disclosure was "customary" and for "competitive reasons." ¶92. Only later in 2018, as the scheme reached its nadir, were Pareteum

---

[10]      The artificial inflation in the Company's Class Period stock price is ***visually obvious***, as the beginning and end of the Class Period bookend an otherwise meteoric rise and fall in the stock price. *See* ¶90 and graph.

and the Fraud Defendants bold enough to provide the identities of the alleged customers and contracts. ¶92. As outlined below, when those identities were subjected to analysis, they crumbled. ¶92.

The Class Period begins with Pareteum and the Fraud Defendants priming the market to believe their fraud by alleging that the Company had undergone a successful "restructuring and repositioning" that "establish[ed] a strong outlook for our success in 2018 and beyond." ¶¶93, 188. Turner told investors that Pareteum was now focused on a "sales surge" to "deliver maximum value," and the Company began touting its increasing Backlog and "the *magic* of monthly recurring revenue." ¶¶93, 188-90. Pareteum's share price started to climb. ¶94 and chart.

With the market primed, Pareteum and the Fraud Defendants commenced their barrage of press releases. In the first four months of 2018, they issued 68 press releases – ***one every other day*** – in which they repeatedly highlighted supposed (but unidentified) contract and customer wins and corresponding Backlog additions. *See* ¶¶95-102, 193-232. By way of example only:

- Pareteum claimed that, in January 2018, it added $15,200,000 to its Backlog, a 400% year-over-year increase, and Turner said that "Pareteum's performance is highlighted by the growth of our…[B]acklog…standing over $162,000,000." ¶¶95, 203-04.

- On February 28, 2018, Pareteum claimed that it secured a $10 million contract from an unidentified "established carrier," adding to the Backlog, which Bozzo called "a major milestone for continued growth," causing the stock to rise. ¶¶98, 210.

- On March 21, 2018, Pareteum claimed another supposed $10 million addition to its Backlog via a $15 million contract with an Africa-based customer, which Bozzo called a "high growth" "part of the world," again causing the stock to rise. ¶¶99, 214.

During this period, Pareteum and the Fraud Defendants also continued to represent that their fabricated metrics were reliable and that the Company was converting Backlog to revenue at or above 100% (it was not), which they said would generate increasing revenues. *See* ¶¶95-102, 193-232. Again, by way of example only:

11

- On January 8, 2018, Pareteum called the Backlog a "key performance indicator [that] is *directly correlated* to our financial and operating result." ¶¶95, 197.

- In a February 12, 2018 letter to shareholders, relying almost exclusively on the Backlog as support, Turner stated that the Company had "a very big and bright 2018 planned," with a "record high" $162 million Backlog, and "expect[ed] the pace to accelerate," again causing the stock to rise. ¶¶96-97, 206.

- On April 2, 2018, the Company announced that Squar Milner's audit opinion of its FY17 financial statements, which were included with its March 30, 2018 10-K, did *not* contain a going concern qualification, which Turner called "another milestone in our successful turnaround as…we…*convert our current revenue backlog to revenue*," which he said should provide "[c]onfidence in our business model…." ¶¶100, 225.

- On April 5, 2018, Turner claimed that the Company "remain[ed] ahead of our targeted 36-month Contractual Revenue Backlog conversion." ¶¶101, 227.

- On April 9, 2018, in a preview of its 1Q18 results, Pareteum claimed an expected 47% increase in revenue over 1Q17 – which we now know to have been false – which Turner said was "*a result of our success in converting our contract revenue backlog into connections which generates revenues.*" ¶¶101, 217.

- On April 16, 2018, in an Update Letter, Turner said the Company had "*excellent visibility into our business operations and <u>revenue recognition</u>.*" ¶¶102, 229.

Finally, on May 7, 2018, Pareteum and the Fraud Defendants announced "record" 1Q18 results – which we now know to have been false – including "[r]evenues of $4.113 Million, up 47% Year-Over-Year"; noted that the Backlog had reached $200 million following a $53 million quarter; stated that "connections, a lead indicator of revenue, increased 94%"; and *claimed that Backlog revenue conversion had reached 103%*. ¶¶104, 327-33. Turner stated that Pareteum "remains *laser focused on converting backlog to revenue*," and "[b]ased on" Backlog and connections, raised 2018 revenue outlook to *at least* 60% over 2017. ¶¶104, 327-33.

> **2.    Pareteum and the Fraud Defendants Use Artificially Inflated Stock as Currency in Two Acquisitions, Which They Then Use to Buoy Their False Metrics with Real Customers, and Turner Cashes In**

Having artificially *quadrupled* the Company's stock price in less than six months (to ~$2.50 per share), the Fraud Defendants began to cash in. ¶105. <u>First</u>, on May, 9 2018, Pareteum

and the Fraud Defendants sold 2,440,000 shares at $2.50 per share, raking in $6,100,000 for "working capital and general corporate purposes." ¶105. <u>Second</u>, barely a month later, on June 6, 2018, Turner took advantage of the artificially inflated stock price and an upcoming (but as-of-yet unannounced) acquisition to dramatically increase his compensation by amending his employment agreement to provide for the automatic vesting of his restricted stock awards and options immediately upon the Company *entering into* an agreement to acquire another company. ¶106. <u>Then</u>, *the next day*, June 7, 2018, the Company announced just such an agreement to acquire Artilium for $104.7 million in stock and cash. ¶107. As a result of this transaction, Turner appears to have acquired 1,500,000 shares of Company stock, *thereby personally profiting from Pareteum's artificially inflated stock price.* ¶108.[11] Meanwhile, Pareteum acquired Artilium (and its *actual* customers and revenue) using its falsely inflated stock as currency. ¶107.

In the meantime, over the next six months, from May to October 2018, Pareteum and the Fraud Defendants issued another 63 press releases – ***one every third day*** – in which they continued to prime the market to believe the false hyper-growth narrative, the reliability of the Backlog and connections metrics, and that these metrics were converting into actual revenue. *See* ¶¶105-21, 233-91. For example:

- On May 9 and 11, 2018, Turner claimed that Pareteum "will continue in its growth trajectory*, translating into *additional revenue….* Pareteum is in a trajectory of *relentless forward motion…TEUM is on fire."* ¶¶110, 236-37.

- On June 28, 2018, Pareteum announced $55 million in 13 new contracts, growing Backlog to $255 million, a supposed increase of 74% from 2017. ¶¶112, 244.

- On July 10, 2018, Pareteum represented that its connections metric was a "lead indicator of revenue," so much so, in fact, that it provided the confidence to increase its projected 2018 revenue outlook to 80% annual revenue growth. ¶¶112, 246.

---

[11]    Turner may have then sold 1,000,000 of these shares; Defendants have not bothered to clarify. ¶108 n.18.

13

- Turner also connected revenue recognition with Backlog and connections, representing that Pareteum's "strong" 1Q18 results were "*demonstrated by the acceleration in revenues and connections*" and *"rapid conversions of our [Backlog]."* ¶¶112, 246.

- On August 2, 2018, citing the Backlog, Turner claimed Pareteum was on a "*torrid sales pace and…On Fire with relentless forward motion*." ¶¶114, 263.

- On August 6, 2018, Turner called Pareteum a "high-growth…company," identified the Backlog and connections metrics as "[k]ey performance indicators," and again told investors that Pareteum "remains laser focused on converting backlog to revenue." ¶113. *Once again directly tying Backlog to revenue recognition*, "[b]ased on [its Backlog] of $276 million," Pareteum and the Fraud Defendants raised the Company's 2018 outlook for revenue growth to be greater than 80% over 2017. ¶¶113, 248-49.

- On September 13, 2018, in another Update Letter, Turner again connected revenue recognition to Backlog and connections, telling investors that these fabricated metrics were "lead indicators of revenue" and that, ***"to date we exceeded 100% of our plan for converting revenue and connections from backlog."*** ¶¶114, 268.

- And, on October 5, 2018, when the Company previewed its expected 3Q18 results, Pareteum and the Fraud Defendants again described the fabricated metrics as "leading indictor[s] of revenue" and its Backlog, connections, and revenues as all accelerating hand in hand as the Company "surge[d]" through 2018. ¶¶119, 273.

During the same period, Pareteum and the Fraud Defendants continued to highlight supposed contract and customer wins – but again never identified them – and massive corresponding Backlog additions. *See* ¶¶105-21, 233-91. On August 6, 2018, Pareteum and the Fraud Defendants again announced "record" 2Q18 results – which we now know to have been false – noting that revenues increased by 85% year-over-year, Backlog increased by $55 million through 13 contracts, and connections increased 225% year-over-year. ¶¶113, 343-47.

Then, on September 17 and October 2, 8, 17, and 23, 2018, Pareteum and the Fraud Defendants issued five press releases announcing $134 million in purported new contracts, in which ***they suddenly identified, <u>for the apparent first time</u>, some of the alleged customers and contracts added***. ¶¶269-70, 282-83, 284-85, 286-289. As outlined below (and in the Complaint in detail), most of the companies identified in these releases were (and remain) incapable – some

14

comically so – of generating the *$134 million* in revenues claimed by Pareteum. *Infra* §III.B.1.a.ii.[12]

In short, of the more than 100 releases issued by Pareteum and the Fraud Defendants announcing alleged customer and contract wins that amounted to hundreds of millions of dollars in supposed Backlog, which they claimed converted 100% to revenue, only *five* identified some of the alleged customers and contracts added, and virtually every single customer and contract identified in those releases, when subjected to scrutiny, crumbled. These demonstrably fabricated and embellished customers and contracts rendered the Backlog metric – and all iterations of its supposed value, which built sequentially upon each previous iteration – false and misleading.

Nonetheless, based on fabricated and embellished contracts and customers like this, on October 24, 2018, Pareteum and the Fraud Defendants announced that they had grown the Backlog to $500 million – an alleged "1,150% increase year over year since 2016." ¶¶121, 275. And, on November 7, 2018, when Pareteum and the Fraud Defendants announced "record" 3Q18 results, they again described the Backlog and connections metrics as "key performance indicators," represented that the Backlog conversion rate was 100%, and raised the Company's guidance based on the Backlog to greater than 100% revenue growth for 2018 over 2017. ¶¶121, 276-78.

In the interim, Pareteum and the Fraud Defendants completed the previously announced cash and stock acquisition of Artilium, issuing approximately 33.4 million shares of inflated stock

---

[12]    For example, on October 8, 2018, Pareteum and the Fraud Defendants identified a 3-year contract with One Development (a purported Thai mobile network) that they claimed was worth $50 million alone. ¶285. To put this supposed value in perspective, Vodafone Enabler S.L., Pareteum's *single largest customer*, generated approximately 12.5%, or $7.15 million, of Pareteum's revenues during 1H19 (which we now know were overstated by as much as 42%), and the alleged $50 million One Development contract would have thus been several orders of magnitude larger than that of Pareteum's single largest customer, which had approximately *640 million* mobile customers – *ten times more customers than there are people in Thailand*. ¶285. By contrast, One Development had just seven employees, no meaningful business activity, and reported *no revenue of any kind* in 2018. ¶285. One Development was obviously incapable of generating the $50 million in revenues claimed, and the same is true for multiple contracts and customers identified in these five releases, which Pareteum claimed were worth $134 million. *Infra* §III.B.1.a.ii.

(then valued at $3.00 per share, or $100.2 million) to former Artilium shareholders. ¶117. Barely a month later, on November 12, 2018, Pareteum and the Fraud Defendants again sought to cash in on the inflated stock price by buying a company with actual customers and revenues, this time announcing an agreement to acquire iPass in an all-stock tender offer. ¶¶122-23. In connection with the iPass Acquisition, Pareteum issued another 10 million shares of inflated stock (valued at approximately $30 million) to iPass shareholders. ¶123. Turner admitted that the iPass Acquisition was a means of increasing Pareteum's connections and, therefore, its revenue. ¶125.

### 3. Honig's Associates Cash in While Pareteum and the Fraud Defendants Continue to Use Artificially Inflated Stock as Currency

On February 8 and 14, 2019, Honig-associated IntraCoastal and Iroquois reported that they had liquidated 100% of their Pareteum holdings, likely somewhere between $2.50 and $3.19 per share, representing a *272% to 347% rate of return*. ¶127 and n.19. Later in February 2019, Pareteum and the Fraud Defendants likewise took advantage of the artificial inflation in Pareteum's stock price to secure a $50 million Credit Facility from Post Road Group. ¶¶128-29.

On March 7, 2019, in another "Letter to Shareholders," Turner continued to push the false hyper-growth narrative and to represent that Pareteum was successfully converting its (embellished) Backlog. ¶¶131-32, 297-98 ("hyper-accelerate growth"; "aggressively convert our [Backlog]"). On March 12, 2019, Pareteum and the Fraud Defendants again reported supposed "record" 4Q18 and FY18 results – which we now know to have been false – purporting to have achieved year-over-year revenue growth of 139% for FY18 and 256% for 4Q18. ¶¶133, 299-303. They also represented that the Backlog had *"quadrupled"* to $615 million and that connections had increased 252% for FY18 and 59% sequentially in 4Q18. *Id.* Based on these false metrics, they forecast wildly-accelerating growth for 2019 in the range of 225 – 260% year-over-year. *Id.*

Later on March 12, 2019, during an earnings call, Turner and McCarthy conditioned the market to believe that Pareteum was poised to deliver "dramatic revenue growth" by claiming that the Backlog and connections metrics were growing and reliable indicators of revenue and that Backlog was converting to revenue *at 100%. See* ¶¶134, 303-04 ("clear path ahead for dramatic revenue growth…fueled by the growth of our…Backlog and its conversion of that backlog into billing customers") ("Our key performance indicators continue to exceed plans. Connections…have grown…. Backlog converted into live production *incremental monthly revenue*…at 97% of scheduled conversion for the fourth quarter while we're maintaining an average over 100% for the year."). Following these purported results, shares jumped 91% to a Class Period high of $5.93 per share on March 19, 2019, on massive volume. ¶136.

Throughout the rest of March, April, and May 2019, Pareteum and the Fraud Defendants published seventeen press releases announcing hundreds of millions of dollars in supposed new additions to the Backlog. *See* ¶¶314-334; *see, e.g.*, ¶¶137, 316, 319, 321 (March 28, 2019 announcement of contract with unidentified customer worth "in excess of $50 million," providing "very first $100 million new [Backlog] sales month"; April 4, 2019 announcement of "$100 million in New Sales Agreements During March"; May 15, 2019, announcement of $70 million in New Sales Agreements in April). But, again, even *a single $50 million contract* would have been several orders of magnitude larger than that of Pareteum's single largest customer. ¶137.

On May 7, 2019, Pareteum and the Fraud Defendants announced purported results for 1Q19 – which we again now know to have been false – reporting revenue of $23 million, a *460% increase* over 1Q18, and stating that the *Backlog had reached $938 million* and Connections had increased 441% for 1Q19 and 161% sequentially. ¶¶138-39, 327-330. Based on these now admittedly-false results, Pareteum and the Fraud Defendants raised 2019 full year revenue growth

17

guidance to 255% to 285% year-over-year. *Id.* During a corresponding May 7, 2019 earnings call, Turner admitted that "the most important phase for Pareteum is to convert these contracts to billable revenues" and falsely assured investors that the Company was converting Backlog and connections into revenues at *101%* and *122%*, respectively. ¶¶139, 331-32. It was not.

This scheme nonetheless had the desired effect. By repeatedly touting the rapidly growing Backlog, which would supposedly balloon to **over $1 billion**, and purported revenue growth, Pareteum and the Fraud Defendants artificially inflated the stock price, which they then used as currency to acquire companies with actual customers and revenue and gained the attention of the market. On May 8, 2019, Pareteum and the Fraud Defendants again used Pareteum's inflated stock to acquired Devicescape for, in part, "slightly under" $2 million in stock. ¶140. And, on May 29, 2019, Turner celebrated by ringing the NASDAQ bell. ¶141.

### 4. As the Truth Begins to Trickle Out, Pareteum and the Fraud Defendants Deny Everything

The celebration did not last long. Days later, on June 7, 2019, Pareteum and the Fraud Defendants got caught. On this day, the Aurelius Report – the first of two highly critical independent research reports on Pareteum – was published, revealing, for the first time, that Pareteum and the Fraud Defendants (1) were engaged in a scheme to inflate revenues and Backlog by fabricating or embellishing customers and contracts and claiming that certain customers had the ability to generate tens of millions of dollars in revenue when they did not; and (2) had concealed pre-existing ties between officers, directors, and investors. ¶142; Complaint, Ex. 1.

Importantly, the Aurelius Report supported these allegations with significant investigative reporting. Perhaps most notably, the Aurelius Report conducted a detailed analysis of the Backlog metric and the few identified customers and contracts that allegedly supported it, concluding that Pareteum's "purported $900 million Backlog appears **significantly exaggerated or fictitious**,"

18

supporting this conclusion with *significant* evidence. *See* ¶¶143-44; Complaint, Ex. 1, at 5-6. Importantly, the Aurelius Report also uncovered evidence that Pareteum and the Fraud Defendants knew about the "exaggerated or fictitious" nature of the Backlog's value, including "irregularities and embellishments involving a significant portion of the 'notable partners and customers' that [Pareteum itself knowingly] highlighted in a graphic at its recent analyst day, suggesting [Pareteum] struggles to find enough legitimate new customers to even fill a simple slide." *Id.*

The Aurelius Report further concluded that Pareteum was not, in fact, converting its Backlog to revenue at or near 100%, as Pareteum and the Fraud Defendants had stated, supporting this allegation with significant evidence, including (1) that the booking of phantom revenue was the same kind of fraud purportedly conducted by O'Donnell (Pareteum's CFO) at his former job at AudioEye and (2) an analysis of Pareteum's accounts receivable, which had "grown at sequential rates far faster than revenues in each of the last four quarters," which would not have occurred had the Backlog been converting at or above 100%. *See* ¶145; Complaint, Ex. 1, at 5-20. Finally, the Aurelius Report also disclosed that Pareteum's management had ties to previous alleged frauds and failures and that Pareteum had surrounded itself with veterans from failed stock promotions. ¶¶146-47; Complaint, Ex. 1, at 4-7.

The Aurelius Report concluded that Pareteum "is completely uninvestible" with "massive downside potential." ¶148; Complaint, Ex. 1, at 22. These revelations caused shares to fall almost 45%. ¶¶149, 156, and chart. Pareteum and the Fraud Defendants (through Turner) responded in a letter to shareholders with a ***categorical denial***. ¶150 ("We categorically deny the allegations….Pareteum has experienced tremendous growth, and we continue to grow….").

On June 26, 2019, the Viceroy Report – the second highly critical independent research report – was published. ¶151; Complaint, Ex. 2. The Viceroy Report substantially agreed with and *independently corroborated* the Aurelius Report and also revealed new details, including that:

- A deeper investigation into customers revealed that a much larger number are insignificant and in no way capable of fulfilling the contract values advertised;

- Two of Pareteum's customer wins appear to be **undisclosed related parties** and another was under historic, public investigation and charged with significant tax evasion fraud, again *evincing knowing misrepresentations*;

- Pareteum's management had a history of dishonest reporting, including O'Donnell's purported 3,000% overstatement of revenues at AudioEye; and

- Pareteum's rapid-fire announcement of supposed customer wins mirrored its equally false announcements regarding Blockchain in 2017, which were put to an abrupt halt when an SEC inquiry revealed that Pareteum had made no revenue, nor planned to do so, from Blockchain.

*See* ¶¶151-55 and n.23; Complaint, Ex. 2, at 2.

Based on an analysis of Pareteum's revenues, cash flows, and receivables, the Viceroy Report concluded that *the majority of Pareteum's revenue* from sources other than Vodafone Enabler S.L. (Pareteum's largest historical customer) and acquired businesses iPass and Artilium *appears to be uncollectable.* ¶152 and n.24; Complaint, Ex. 2, at 2. Accordingly, Viceroy determined, **"total revenue is overstated by 42%"** – predicting *the Company's own subsequent Restatement Release, which acknowledged that 1H19 revenues had been overstated by **42%**. Id.* Like the Aurelius Report, the Viceroy Report also concluded that Pareteum's fabricated Backlog metric was "not…accurate," supporting its conclusion with an analysis that demonstrated that *Pareteum "should have reported 73.10% more revenue in [1Q19]"* if its Backlog was really converting at or above the 100% rate alleged. ¶153; Complaint, Ex. 2, at 2. The Viceroy Report succinctly stated: "Management appears to be inflating this [Backlog] figure to hype up the share price and reassure investors." ¶153. Based on these facts, the Viceroy Report concluded that

20

Pareteum was "terminally unprofitable" and its hyper-growth narrative was facially "suspicious, "completely broken[,] and *may not have ever existed at all*," urging a "fully independent investigation." ¶155; Complaint, Ex. 2, at 27-36. Shares declined another 19%. ¶156 and chart.

**5.     Pareteum and the Fraud Defendants Deny Everything (Again) While They Stop Pumping the Stock and Distance Themselves from Their Own Backlog Metric**

On June 27, 2019, in a statement that appears to no longer be available on the Company's website, Pareteum and the Fraud Defendants responded to both Reports with continued "categorical denials" of "*all* allegations." *See* ¶157. Then, in an effort to restore investor confidence, on July 1, 2019, Pareteum pre-announced its 2Q19 results – which, again, we now know to have been false and overstated – representing that they would purportedly "exceed current analysts' consensus of $26.2 million for revenue." ¶158. But, quietly, and evincing scienter, Pareteum and the Fraud Defendants' press release machine ground to a sudden halt. ¶160. In June 2019, they published just two press releases; in July 2019, just four, and only one announced a new customer, but notably contained no information regarding the revenue from this purported new customer or the now infamous Backlog metric. ¶160.

*Then, further evincing scienter, on August 6, 2018, Turner announced that* **Pareteum and the Fraud Defendants would retire and replace the Backlog metric – which they had used to effectuate their fraud** *– and that they no longer considered the Backlog or connections metrics to be "key performance indicators" or "lead indicators of revenue." See* ¶161 (Backlog will be replaced; directing market to look to "reported quarterly results and the annual guidance provided [as] the strongest indicators"); *contra* ¶¶112-13 (identifying connections as "lead indicator of revenue" and Backlog and connections as "[k]ey performance indicators"). ***Notably, in so doing, Turner showed his cards, admitting that that the Backlog had "<u>served its purpose</u>."*** ¶161. Indeed,

it had: during the Class Period, and based on this fabricated and false metric, Pareteum's stock soared from a low of just $0.72 per share to a trading high of $5.93 per share – *an 824% increase* in just a few months; Pareteum and the Fraud Defendants issued *$132 million* of falsely inflated stock as currency to acquire three other companies; Honig's associated entities cashed out, making millions; and the Fraud Defendants received millions in compensation and stock awards.

### 6.     The House of Cards Begins to Fall

On August 23, 2019, Pareteum and the Fraud Defendants revealed that Pareteum had been in default of its February 2019 $50 million Credit Facility from Post Road Group essentially *since it was signed*, admitting, in a Waiver that it was forced to execute, to *eleven* breaches of the Credit Facility, including that it had not even made its *first* interest payment (barely a month after it executed the agreement) and that it had repeatedly failed to provide Post Road Group with its financials (no doubt because they would have revealed Pareteum and the Fraud Defendants' ongoing fraud). *See* ¶162.

For a Company that allegedly had a whopping (we now know, false) Backlog of $1.27 billion as of August 6, 2018 (¶161), it was surprisingly cash-strapped. As a condition to obtaining a mere $2,500,000 in additional financing, Pareteum was forced to issue 750,000 shares of stock to Post Road Group, and, days later, Pareteum announced that it would sell up to 1,311,439 additional shares to settle balances owed to vendors, again using its falsely inflated stock as currency. ¶163. These belated disclosures caused the stock to fall further. ¶164.

Turner nonetheless kept up the charade, unbelievably claiming on August 26, 2019 that the Waiver "put[] the company on a firm footing for our ambitious growth strategies." ¶165. But, on the following day, a report published on Seeking Alpha (an investor website) noted that Pareteum's accounts receivables had ballooned "an eye-catching 57% quarter-over-quarter" and had "almost

tripled" over the past six months, "from $15.4 million at year end 2018 to $45.1 million at the end of Q2," and that free cash flow for the quarter was negative $8 million – all symptoms of the falsely inflated Backlog and connections metrics that were not converting to revenue as advertised. ¶166. Presciently, the report predicted that a dilutive secondary offering was coming. ¶167.

### 7.    The Fraud Defendants Make One Last Money Grab

On September 20, 2019, the report's prophecy became reality as Pareteum announced a $40 million Secondary Offering, which drove the stock price down further. ¶169. The Secondary Offering was effectuated through the Secondary Offering Registration Statement, which included registration statements and prospectuses, with Dawson James as placement agent. ¶169.

### 8.    The Full Truth Is Finally Revealed

Finally, on October 21, 2019 – despite *twice* "categorially denying" the Aurelius and Viceroy Reports and barely *one month* after selling $40 million worth of stock into the market – Pareteum and the Fraud Defendants vindicated the Aurelius and Viceroy Reports and revealed the full truth. ¶172. On this date, Pareteum issued the Restatement Release, in which it (1) announced that it would restate its previously issued financial statements for FY18 and 1H19; (2) advised that "[i]nvestors should no longer rely upon the Company's previously released financial statements" and related releases and communications for these periods; (3) admitted that "certain revenues recognized during 2018 and 2019 should not have been recorded during that period…[and that, for] certain customer transactions, the Company may have prematurely or inaccurately recognized revenue"; and (4) estimated the revenue impact for FY18 and 1H19 to be a reduction of approximately $9 million and $24 million, respectively. ¶¶172-73. This $9,000,000 reduction in revenue for FY18 represented a ***28% reduction*** from reported revenue of $32,435,736, and the $24,000,000 reduction in revenue for 1H19 represented a ***42% reduction*** from reported revenue

23

of $57,188,309. ¶174. Following this announcement, shares of Pareteum tumbled, closing at $0.73 per share on October 21, 2019 and opening at $0.37 per share on October 22, 2019. ¶175.

### 9.    Restatement Release Fallout and Post-Class Period Developments

The fallout from the revelation of this stunning fraud was swift and decisive. In the days immediately preceding and following the Restatement Release, McCarthy, the COO who was deeply involved with the fabricated Backlog, was terminated; O'Donnell was replaced as CFO and his "status with the Company is under review"; Turner was terminated as Chairman and CEO; and the Company received a notice from the Nasdaq stating that, because it had not filed its 3Q19 10-Q, it was no longer in compliance with Nasdaq listing rules. ¶¶180-83. After stabilizing in the immediate aftermath of the Restatement Release – and without the artificial inflation created by Pareteum and the Fraud Defendants' false statements – the stock consistently traded in the $0.65 to $0.85 per share range – *exactly where it traded <u>before the Class Period began</u>*. ¶¶90, 184.

When they issued the Restatement Release, Pareteum and the Fraud Defendants admitted that they could not even estimate when the restatement would be completed, could not "predict the aggregate amount of revenue that will ultimately be restated," and noted that "the Company [could not] provide forward guidance, and expect[ed] financial results for the second half and full year 2019 will be materially below current analysts' estimates." ¶15. To date, *Pareteum still has not completed the restatement,* has not filed results for 3Q19, 4Q19, or 1Q20; and is not in compliance with Nasdaq listing rules (¶15); it has sought a stay of delisting.

## III.    LAW AND ARGUMENT

By fabricating and embellishing customers and contracts, Pareteum and the Fraud Defendants falsely inflated the fabricated Backlog and connections metrics, thereby rendering each of their statements regarding the Backlog and its value (which grew sequentially based on prior

24

fabricated or embellished inputs), the Backlog conversion rate, the connections metric, and the "hyper growth" narrative false and misleading. These falsities caused the admittedly improper recognition of revenues throughout the Class Period and collectively presented a misleading image of Pareteum's business, which caused the artificial inflation in its stock – until the truth was fully revealed in the Restatement Release.

These allegations give rise to claims under Sections 10(b) and 20(a) against Pareteum and the Fraud Defendants. What is more, these statements were repeated in the quarterly and annual reports that were in turn incorporated in the prospectuses and registration statements disseminated during the Class Period in connection with the iPass Acquisition and the Secondary Offering. These facts give rise to Section 11, 12, and 15 claims against all Defendants.

## A. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must simply allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence corroborating the claims." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Carpenters Pension Tr. Fund v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) ("a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible'"). When deciding a 12(b)(6) motion, "the complaint is liberally construed, 'accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.'" *In re Tommy Hilfiger Sec. Litig.*, 04-7678, 2007 U.S. Dist. LEXIS 55088, at *5 (S.D.N.Y. July 20, 2007).

"[T]he Court's role in deciding a motion to dismiss 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Bison Capital Corp. v. ATP Oil & Gas Corp.*, 10-0714, 2010 U.S. Dist. LEXIS 62836, at *14 (S.D.N.Y. June 24, 2010); *see also Vtech Holdings Ltd. v. PriceWaterhouseCoopers LLP*,

25

348 F. Supp. 2d 255, 261 (S.D.N.Y. 2004) ("The issue is not whether the plaintiff ultimately will prevail but whether the plaintiff is entitled to offer evidence to support its claims."). Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable…." *Twombly*, 550 U.S. at 556 (2007).

> **B.** **PLAINTIFF ADEQUATELY ALLEGES SECTION 10(B) AND 20(A) CLAIMS AGAINST PARETEUM AND THE FRAUD DEFENDANTS**

To state a claim under Section 10(b), a plaintiff must adequately allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Iv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010). In addition, 10(b) claims must satisfy Rule 9(b) and the particularity requirements of the PSLRA, 15 U.S.C. § 78u-4(b). *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 205 (S.D.N.Y. 2019). To satisfy Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id*. To satisfy the PSLRA, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

Pareteum and the Fraud Defendants only challenge elements (1) and (2) of a Section 10(b) claim (misrepresentation or omission, and scienter), as well as the particularity requirements of Rule 9(b) and the PSLRA. As such, Plaintiff only addresses those factors (though the other factors have been met). As outlined below, Plaintiff alleges with the requisite particularity that Pareteum and the Fraud Defendants made material misrepresentations and omissions with scienter, such that their Motion to Dismiss Plaintiff's Section 10(b) and (20(a) claims should be denied.

### 1.    Plaintiff Adequately Alleges False and Misleading Statements

"'The test for whether a statement is materially misleading under Section 10(b)' is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016); *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("the proper inquiry requires an examination of defendants' representations, taken together and in context"). "Thus, the matter must go to a jury unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). Importantly, "[e]ven with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation." *New Orleans Emples. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011). Here, Plaintiff adequately: (1) identifies a multitude of SEC filings, press releases, and other statements that contain false and misleading representations and/or omissions regarding the Company's (a) revenue, Backlog, connections, and growth, (b) financial and operational controls and compliance with GAAP, (c) Blockchain capabilities, and (d) executives' backgrounds; (2) specifies the date each statement was made and, where applicable, the speaker; and (3) extensively details why each statement is false or misleading. ¶¶185-384.[13]

---

[13]    Pareteum and the Fraud Defendants contest only the falsity, and *not* the materiality, of the statements alleged to be false and misleading regarding Pareteum's (a) revenue, Backlog, connections, and growth, (b) financial controls and GAAP compliance, and (c) Blockchain capabilities. Dkt. No. 143-1 at 14-16, 38-41. The only omissions that they challenge as not material are those regarding the background of Pareteum's executives. *Id.* at 21-23. Accordingly, Plaintiff only addresses the materiality of those omissions. *Infra* §III.B.1.d. Nonetheless, all of the false and misleading statements identified by Plaintiff are plainly material – indeed, the truth about them wiped out hundreds of millions of dollars of investor equity. *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 279-80 (S.D.N.Y. 2011) (fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important"

a.    **Statements Regarding Revenue, Backlog, Connections, and Growth**

Plaintiff alleges that Pareteum and the Fraud Defendants made materially false and misleading statements regarding Pareteum's false hyper-growth narrative, its fabricated Backlog and connections metrics, and its corresponding purportedly ever-growing revenue. As outlined above, through more than 100 press releases and six SEC filings, spanning a year-and-a-half, Pareteum and the Fraud Defendants told investors that the Company was achieving "record" revenues that grew from $4.113 million in 1Q18 to $34.1 million in 2Q19 – an increase of 729% – and highlighted the fabricated Backlog and connections metrics, which purportedly grew from $200 million and 2.2 million connections in 1Q18 to $1.27 billion and 13.03 million connections in 2Q19 – an increase of 535% and 592%, respectively. ¶¶188-350, 218, 343, 349. Plaintiff also alleges that these statements were false and misleading, because, among other reasons:

- It was not true that Pareteum's purported success was the result of hyper-demand, but rather Pareteum and the Fraud Defendants propped up the Company's results by manipulating Pareteum's accounting for revenues, Backlog, and connections.

- Pareteum and the Fraud Defendants materially overstated the Company's revenue by failing to properly account for and by artificially inflating its results.

- As reported by both the Viceroy and Aurelius Reports (and confirmed by Plaintiff's investigator), multiple purported customers and contracts on which Pareteum and the Fraud Defendants based many of their statements regarding revenue, Backlog, connections, and hyper-growth were either non-existent or non-operational, embellished, related parties, and/or incapable of generating the touted revenues.

- Because Backlog and connections were artificially inflated, they were not reliable indicators of revenue or financial and operating results.

- The statements were based on the Company's ability to convert the Backlog to actual revenue at or above 100%, which could not actually happen (and did not happen).

- There was no factual basis for the representations regarding revenue, Backlog, Backlog conversion, connections, growth, or numerous balance sheet line items, because, as the

---

or "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available").

Company admitted, certain revenues recognized should not have been recorded, the Company prematurely or inaccurately recognized revenues, and those errors were expected to impact revenue and numerous other balance sheet line items.

- Pareteum did not have adequate systems of internal operational or financial controls necessary to assure that its reported financial statements were true, accurate, and/or reliable, and its financial statements and reports were not prepared in accordance with GAAP, as the Company again admitted in the Restatement Release.

- There was no basis to claim that Pareteum was operating "according to plan."

¶¶187, 192, 216, 222, 245, 251, 270, 272, 280, 285, 287, 289, 296, 306, 308, 323, 326, 335-36, 342, 348, 350.

In the face of this stunning volume and array of false statements, and against the backdrop of the Restatement Release, *in which they admitted that a year-and-a half of revenues had been improperly recognized by as much as 42%,* Pareteum and the Fraud Defendants argue – almost unbelievably – that Plaintiff does not allege a single false or misleading statement. Dkt. No. 143-1 at 19. This is simply too much. There is no dispute that they admitted that the FY18 and 1H19 revenue figures were wrong – by staggering percentages. For this reason *alone*, their statements regarding revenue for these periods were actually false. *Infra* §II.B.1.a.i. But that is not all that is false. The Aurelius and Viceroy Reports, Pareteum and the Fraud Defendants' sudden pivot away from their fabricated metrics in response, and their ultimate admission that those metrics were unreliable in the Restatement Release reveal the falsity of the fabricated Backlog and connections metrics, and the entire hyper-growth story based on them. *Infra* §II.B.1.a.ii-iv.

i.      Statements Regarding Revenue

First, Plaintiff adequately alleges that Pareteum and the Fraud Defendants' statements regarding FY18 and 1H19 revenue were false. Specifically, Plaintiff alleges that they represented:

- In April and May 2018, in two press releases and a 10-Q, that 1Q18 revenue was $4.1 million, a 47% year-over-year increase (¶¶217-18, 221);

29

- In July and August 2018, in two press releases and a 10-Q, that 2Q18 revenue was $6 million, an 85% year-over-year increase (¶¶246, 248, 250);

- In October and November 2018, in two press releases and a 10-Q, that 3Q18 revenue was $8 million, a 129% year-over-year increase (¶¶273, 276, 279);

- In March 2019, in one release and a 10-K, that 4Q18 revenue was $14.3 million, a 256% year-over-year increase, and that FY18 revenue was $32.4 million, a 139% year-over-year increase (¶¶299, 305);

- In May 2019, in one press release and a 10-Q, that 1Q19 revenue was $23 million, a 460% year-over-year increase (¶¶327-28, 334); and

- In August 2019, in one press release and a 10-Q, that 2Q19 revenue was $34 million, a 469% year-over-year increase (¶¶343, 346).

Plaintiff further alleges that Turner, O'Donnell, and McCarthy (three of the five Fraud Defendants) either signed and certified these false statements or were quoted repeating, expanding upon, or relying upon them. ¶¶217, 219, 248, 274, 277, 298, 300, 303, 328, 331, 344, (Turner); ¶¶221, 250, 279, 305, 334, 346 (certifications); ¶¶304, 333 (McCarthy). Finally, Plaintiff alleges that the Restatement Release confirmed these statements to be false. Specifically, in the Restatement Release, Pareteum and the Fraud Defendants disclosed that the Company would have to restate its "previously issued consolidated financial statements" for all six of these periods because "revenues recognized during [these periods] should not have been recorded during that period…[and that, for] certain customer transactions, the Company may have prematurely or inaccurately recognized revenue," such that "[i]nvestors should no longer rely upon the Company's previously released financial statements [and related releases and communications describing those statements] for the time periods cited above." ¶¶172-73. Finally, Pareteum and the Fraud Defendants expected the restatement to result in a $9 million, *__28% reduction__* in the (falsely) reported revenues for FY18 and a whopping $24 million, *__42% reduction__* in the (falsely) reported revenues for 1Q19 and 2Q19. ¶¶172-74.

In short, Plaintiff plainly alleges false and misleading statements regarding revenue. Stunningly, despite their own admissions in their Restatement Release, Pareteum and the Fraud Defendants continue to attempt to distort the truth, arguing, apparently semantically, that Plaintiff "identifies no statement in which Pareteum announced it was recognizing revenue of $9 million in 2018 and $24 million in the first half of 2019 that it knew should not have been recognized" and that "[t]he Restatement did not reveal that *any revenue* announced in the press releases was artificially inflated." Dkt. No. 143-1 at 20 (emphasis in original). But that is *precisely* what the Restatement Release said: "certain revenues recognized during 2018 and 2019 **should not have been recorded" because the Company "<u>prematurely or inaccurately recognized revenue</u>.*" ¶173. There is no getting around their own words, and their disingenuous attempts to rewrite their own Restatement Release need not long delay this Court. For this reason alone, Plaintiff adequately alleges false and misleading statements, and the Court need go no further. *See Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) (admission that company must restate financial statements means "there can be no dispute that [complaint] pleads numerous false and misleading misstatements with respect to revenue, [and] revenue related metrics"); *SEC v. Espuelas*, 908 F. Supp. 2d 402, 410 n.5 (S.D.N.Y. 2012) ("mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made"); *Varghese*, 672 F. Supp. 2d at 606 ("Misreported financial information clearly amounts to a false statement.").

ii.   Statements Regarding Backlog and Its Conversion

◊   *Statements Regarding Backlog*

Plaintiff likewise adequately alleges that Pareteum and the Fraud Defendants' statements regarding the fabricated Backlog metric – which allegedly grew 535%, from $200 million in 1Q18 to $1.27 billion in 2Q19 (¶¶218, 349) – were false and misleading. Specifically, while Pareteum and the Fraud Defendants refused to identify the Company's touted customer and contract wins

31

for the vast majority of the Class Period (¶92), in September and October 2018, Pareteum and the Fraud Defendants issued five releases announcing $134 million in new contracts in which they suddenly identified – *for the apparent first time* – some of the alleged customers and contracts added. ¶¶269-70, 282-88. And, as outlined in the Complaint, most of the customers and contracts identified in these releases were incapable of generating the millions in revenues claimed.

For example, on September 17, 2018, in a release announcing $50 million in new contracts, raising the Backlog to $375 million, Pareteum and the Fraud Defendants identified ACN Europe, Wing Tel, Secure Watch, and Eyethu Mobile as some of these new customers and contracts. ¶269. But Eyethu Mobile was non-operational: its website was and remains not functional; investigators found no indications of operations at its registered address; rather, they discovered only a dilapidated shack and crumbling structures near a rural African village; the company appears to have been launched by an unemployed man with no history in the industry ("Guys in midst of being unemployed, I started my own [MVNO[14]] company."); and its Twitter account, opened in June 2018, provided that it was supposed to launch in 2019 – but it never did. ¶¶270(b)-(d) and images. Likewise, Secure Watch and Wing Tel were facially incapable of producing the $50 million in revenue alleged. *See* ¶¶270(e)-(g) and images.

On October 2, 2018, Pareteum published a release announcing that it added $15 million in new contracts, this time identifying Parallax Health Sciences, oneCentral, and Naledi as the new customers. ¶282. But, again, Naledi was not operational: investigators found no activity or indications of operations at Naledi's address and its website was not functional; it was formed in

---

[14]     Pareteum primarily provides its telecommunications software and services to Mobile Virtual Network Operators ("MVNOs"), which are wireless communications providers that do not actually own network infrastructure, but instead rent bandwidth from large network operators, like AT&T (thus, the "virtual" in MVNO). ¶1. Similarly, rather than develop their own software, MVNOs purchase those products from companies like Pareteum. ¶1. Notably – *and well known to the Fraud Defendants* – MVNOs are very easy to form, allowing anyone with a little bit of start-up capital to start their own cellphone company; however, as a result, many start-up MVNOs inevitably fail. ¶2.

32

May 2018 with only "1000" in share capital by a Zimbabwe national who has no LinkedIn profile and no Google results; and its listed address does not return any results on Google Maps. ¶283(b). Similarly, Parallax Health Sciences was a "nearly-worthless penny-stock" with only $11,739 in revenue for 2018 and whose 10-K disclosed a "substantial doubt about the company's ability to continue as a going concern." ¶283(c). *Notably, though, two of Parallax's officers allegedly perpetrated the AudioEye fraud with O'Donnell,* **which suggests that this contract may have been fabricated by O'Donnell's past co-defendants and gives rise, in and of itself, to an overwhelming inference of scienter.** ¶283(c). Finally, oneCentral only generated $5.5 million in sales in 2018 and listed only ∋662,000 in equity and seven employees at the end of 2018 – hardly a company capable of generating $15 million in revenue for Pareteum over any period of time. ¶283(d).

The list goes on. On October 8, 2018, Pareteum announced a 3-year, **$50 million** contract with One Development, Thailand's purported "first mobile virtual network aggregator and enabler." ¶284. To put this alleged $50 million contract into perspective, Vodafone Enabler S.L. – an MVNO operating on Vodafone Spain's network and Pareteum's *single largest customer* – generated approximately 12.5%, or **$7.15 million**, of Pareteum's revenues during 1H19 (which we now know were overstated by as much as 42%). ¶285(d). In other words, the alleged $50 million One Development contract would have been several orders of magnitude larger than that of Vodafone, Pareteum's single largest customer, which had approximately *640 million* mobile customers – **ten times more customers than there are people in Thailand**. ¶285(c)-(d). By contrast, One Development was awarded its license in July 2018, had seven employees listed on LinkedIn, had no meaningful business in the four years since its incorporation, had total assets of less than $300,000.00, and *reported no revenue and a net loss in 2018*; its listed address could not be found on Google Maps; its phone number was not answered and did not direct to a voicemail

33

or recording; and its Facebook page and Twitter feeds had just 65 and 621 followers – hardly the hallmarks of an operation several orders of magnitude larger than Vodafone capable of generating $50 million in revenue. ¶285(b)-(g). Perhaps most suspicious, though, of the *five* releases on One Development's website, *three relate to its contract with Pareteum*. ¶285(e).

The same story plays out with the $19 million in alleged customers and contracts announced on October 17 and 23, 2018. *See* ¶¶286-89. Of note, one of these purported customers, Global Connect (along with another purported customer, SJ Global) again appears to be connected to an individual identified as a Pareteum consultant, *which again raises the specter, as noted in the Viceroy Report, that Pareteum and the Fraud Defendants were creating related party contracts to inflate Pareteum's purported sales wins and gives rise, in and of itself, to an overwhelming inference of scienter.* ¶289(c).[15]

In short, in the just *five* releases (out of more than 100) that actually identified the alleged customers and contracts that amounted to hundreds of millions of dollars in supposed Backlog, virtually every single customer and contract identified, when subjected to scrutiny, proved entirely – indeed, at times, comically – unable to support the $134 million in revenue that Pareteum and the Fraud Defendants claimed they would generate. These demonstrably fabricated and embellished customers and contracts render the Backlog metric false and misleading – a fact that Pareteum and the Fraud Defendants admitted when they issued the Restatement Release. And, because all future iterations of the Backlog metric incorporated the supposed value of these fabricated and embellished customers and contracts, they likewise rendered every future statement

---

[15]     In addition, on May 28, 2019, Pareteum and the Fraud Defendants gave a presentation that contained a slide identifying purported Pareteum customers that was replete with double counting and related and/or non-existent customers, including identifying four "customers" *that were actually Pareteum subsidiaries*. ¶¶322-23 and graphics. Another slide, which identified participants on a "customer panel," misleadingly identified Defendant Jimenez-Tunon – a member of the Board – as a "customer" and failed to disclose that another supposed "customer" was affiliated with Pareteum, having been appointed Chief Technology Officer and Chief Operating Officer. ¶¶324-325 and graphics. After the release of the Aurelius Report, these slides were apparently retracted and modified. ¶150 n.22.

about customer and contract wins and the Backlog value false and misleading. *See* ¶¶271-80, 290-377. Finally, the patent falsity of these customers and contracts leads to the reasonable conclusion that Pareteum and the Fraud Defendants' *prior* statements regarding customer and contract wins and Backlog – in which they refused to identify the customers and contracts – are likewise false and misleading. *See* ¶¶188-268.

Defendants admit as much. While Pareteum and the Fraud Defendants regularly identified their fabricated Backlog metric as one of the Company's two "key performance indicators" and "lead indicators of revenue" (*supra* §II.F; ¶¶85, 104, 112-14, 121, 135, 218-19, 246, 248, 268, 274, 277, 304), after being caught by the Aurelius Report, they "retired" this metric, switched gears, and admitted that it was not reliable, stating instead that "it is our reported quarterly results and the annual guidance provided, which are the strongest indicators." ¶339.

◊        *Statements Regarding Backlog Conversion*

But that is not all that was misleading about the Backlog. Plaintiff also adequately alleges that Pareteum and the Fraud Defendants' statements about the Backlog *conversion rate* were false. They repeatedly represented that they were "laser focused" on converting Backlog to revenue and that they were doing so at or above 100%. *See* ¶¶218 (103%), 219, 225, 227, 246, 248 (106%), 249, 268, 274, 276-78, 291-92, 298-99, 304, 327, 332, 339. This was simply not true.

First, if Backlog were really converting to revenues at or above 100%, then the Backlog, which had allegedly grown 535% to $1.27 billion by 2Q19 (from just $200 million in 1Q18), should have translated to proportionate increases – and hundreds of millions of dollars – in revenue during the same period. *See* ¶¶95 (Backlog was "key performance indicator [that] is *directly correlated* to our financial and operating result"); 249 ("As we convert…Backlog to Connections, *our revenue will increase* and for every incremental dollar of revenue, we expect contribution to

our bottom line."); 278 (same); 304 ("Backlog "converted into live production *incremental monthly revenue*…at…an average over 100% for the year").

But it did not. Rather, as the Restatement Release revealed, Pareteum reported $32,435,736 in revenue for FY18 (of which at least $9,000,000 was overstated) and $57,188,309 in revenue for 1H19 (of which at least $24,000,000 was overstated), resulting in *actual* revenue for FY18 of just $23,435,736 and 1H19 of just $33,188,309 – hardly the 100% or more Backlog conversion alleged. ¶174; *see also* ¶153 (Viceroy Report analysis demonstrated Pareteum *"should have reported 73.10% more revenue in [1Q19]"* if Backlog was converting at or above 100%). Likewise, throughout the Class Period, while the Backlog purportedly grew to $1.27 billion, and the Company purportedly recognized "record" revenues, it continued to report net losses. *See* ¶¶221, 279, 305 (FY18 net loss of $(12,974,650)), 334, 346, 420.

Second, if Backlog was converting at or above 100%, Pareteum's accounts receivable should have remained constant. They did not. Rather, they ballooned from just $1,954,495 in 1Q18 to $45,061,236 by 2Q19 – a *2,300% increase*. ¶¶221, 250, 279, 305, 334, 346, 419. By contrast, the Company's alleged revenues increased just 287% from FY18 to 1H19 (based on the Restatement Release corrections), and the Backlog (which we know was inflated) increased by just 535%.[16] Obviously, the Backlog was not converting as represented, and the 2,300% increase in accounts receivable proves that Pareteum and the Fraud Defendants were aware of this fact.[17]

---

[16]    *See also* ¶¶145 (analysis of accounts receivable shows it had "grown at sequential rates far faster than revenues in each of the last four quarters"); 159 (commentator noting "ballooning" accounts receivables, of which Fraud Defendants were aware); 166 (noting accounts receivables ballooned "eye-catching 57% quarter-over-quarter" and "almost tripled" over past six months, "from $15.4 million at year end 2018 to $45.1 million at the end of Q2").

[17]    In response, Pareteum and the Fraud Defendants speculate that "2018 accounts receivable could rise (owing to a customer not paying on a contract that was signed before 2018) while Backlog conversion for the same year could be 100%." Dkt. No. 143-1 at 26. Setting aside the fact that there is *no factual basis* for this speculation, the Restatement Release contradicts it, as does the fact that Pareteum's "Days Sales Outstanding" only reached 110 days (not a year or more) (¶145), and accounts receivables indisputably ballooned *four times* faster than Backlog. Pareteum and the Fraud Defendants are not entitled to an inference *in their favor* on a motion to dismiss that those events are unrelated.

◊       *Counterarguments Regarding Backlog*

In response to these damning allegations, Pareteum and the Fraud Defendants offer precious little. First, they argue that the Restatement Release and the Backlog have nothing to do with each other, because they claim the Backlog was a metric of "*future expected revenues*." Dkt. No. 143-1 at 19. First, as outlined below, Backlog was decidedly *not* a forward looking metric. *Infra* §§III.B.2.b, III.B.2.c.i; *see, e.g.,* ¶84 (Backlog was "revenue under contract," current contracts). Second, putting that false assertion aside, as outlined above, Lead Plaintiff does not rely solely on the Restatement Release as proof of the falsity of the Backlog metric; rather, the Complaint includes a bevy of other allegations supporting falsity, including the findings of the Aurelius and Viceroy Reports, independent analysts and commentators, and the findings of Plaintiff's own independent investigator (which substantially confirmed and expanded on these sources). *Supra* §§II.F, III.B.1.a.ii. Third, if the Backlog were really converting to revenues at or above 100%, then it should have translated to proportionate increases – and hundreds of millions of dollars – in revenue, but it did not. Instead, as the Backlog grew almost exponentially, reported revenue barely increased (and falsely at that), and accounts receivable grew orders of magnitude faster, proving that the Backlog was inflated and not converting as represented. Finally, Pareteum and the Fraud Defendants' contention that the Backlog and revenue have nothing to do with each other is belied by their own statements, in which they repeatedly tied Backlog to revenue, describing it as one of the "key performance indicators" and "lead indicators of revenue" – until they got caught and "retired" the Backlog metric. *Supra* §II.F; ¶¶83-84, 161.

Relatedly, Pareteum and the Fraud Defendants argue that "the purported [Restatement Release] revelation of the financial fraud ($33 million total) was orders of magnitude less than the

_____

*See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) (determination of how inventory affects revenue growth factual inquiry inappropriate at pleading stage).

value of contracts announced in the 101 press releases (over $500 million)." Dkt. No. 143-1 at 19. But that is precisely the point. If the $1.27 *billion* Backlog and its supposed 100% or more conversion rate were true, then revenue should have been much – *much* – higher than reported, not being restated *downward*, and accounts receivable should not have been the metric increasing. When the Restatement Release revealed that as much as 42% of the Company's recognized revenues were *over*stated, it proved, fully and finally, that the Backlog was a sham and that it was not converting anywhere near 100%. Stated differently, if 42% of Pareteum's revenues were overstated, and the Backlog was, as claimed, converting at or above 100% into revenue, than the Backlog likewise *had to be* overstated, which the ballooning accounts receivable suggested, the Viceroy Report first noted, and the Restatement Release finally confirmed.

Pareteum and the Fraud Defendants also argue that Plaintiff does not allege "which Backlog-related revenues did not convert at the rate claimed in the statements," arguing that perhaps a single statement – the $65 million acquisition of Artilium – might account for all of the to-be-restated revenue. Dkt. No. 143-1 at 26. But, <u>first</u>, Plaintiff specifically identifies several customers and contracts identified in five press releases that could not possibly have added the values claimed to the Backlog or converted to revenue at or above 100%. *Supra* §III.B.1.a.ii. ***<u>Despite the significant attention devoted to these fabricated and embellished customers and contracts in the Complaint, Pareteum and the Fraud Defendants do not even acknowledge them in their brief.</u>*** <u>Second</u>, no single customer or acquisition could possibly account for both the $33 million in overstated revenue *and* the hundreds of millions of dollars in *missing* revenue that Pareteum should have been realizing had the $1.27 billion Backlog truly been converting to revenue at or above 100%. <u>Third</u>, and importantly, Plaintiff does not allege that *every single customer* announced by Pareteum was fabricated or embellished, that the *value of every single*

38

*contract* was fabricated or embellished, or that *all* Backlog-related revenues did not convert at the rate claimed; rather, Plaintiff alleges that *certain customers and contracts* were fabricated or embellished, *certain revenues* were inflated, and *certain Backlog-related revenues* did not convert at the rate claimed. As a result, *every time* Pareteum and the Fraud Defendants announced the value of the Backlog or its supposed rate of conversion, or touted that the Backlog had increased as a result of a purported contract, those statements were false and misleading *because the Backlog was comprised – at least in part – of fabricated or embellished customers, contracts, and revenues.*

Plaintiff need not identify every single fabricated or embellished customer or contract. It is enough that Plaintiff alleges, as it has, that the Backlog value contained fabricated or embellished customer and contract amounts, thereby rendering every iteration of that value false and misleading. *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 498 (S.D.N.Y. 2011) (10(b) plaintiff not required to precisely quantify the amount of misstatements, so long as significance of misstatements is material); *Washtenaw Cty. Emples. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 106 (D. Mass 2014) (plaintiff not required to "allege by exactly how much the revenues were inflated…because they do not have the benefit of discovery, the [p]laintiffs are not required to plead evidence"). Indeed, "there is not much more [Plaintiff] can do right now, considering that, after almost a year since the Company announced the [R]estatement[], [it] ha[s] not yet been published, preventing [Plaintiff] from ascertaining the amount by which the revenues were previously inflated." *Avid Tech.*, 28 F. Supp. 3d at 107.

iii. <u>Statements Regarding Connections</u>

For many of the same reasons outlined above regarding the Backlog metric, Plaintiff adequately alleges that Pareteum and the Fraud Defendants' statements regarding the fabricated connections metric were likewise false and misleading. Along with the Backlog metric, Pareteum and the Fraud Defendants regularly identified their fabricated connections metric as one of the

39

Company's two "key performance indicators" and "lead indicators of revenue." *Supra* §III.B.1.a.ii; *see also* ¶¶85, 104, 112-14, 121, 135, 218-19, 246, 248, 268, 274, 277, 304. And, like with the Backlog, when they "retired" the connections metric after being caught by the Aurelius Report, they admitted that this metric was not reliable, and instead stated that "it is our reported quarterly results and the annual guidance provided, which are the strongest indicators." ¶339.

What is more, like Backlog, connections also allegedly skyrocketed during the Class Period, from 2.2 million in 1Q18 to 13.03 million in 2Q19, a 592% supposed increase. ¶¶218, 343. And, like Backlog, if as much as 42% of revenues were overstated, connections were (as claimed) converting at or above 100% into revenue, and the Backlog was overstated and not really converting into revenue at or above 100% (as Plaintiff alleges), then the connections metric – which was intimately tied to Backlog – likewise *had to be* overstated. *See* ¶¶114 ("exceeded 100% of our plan for converting revenue and connections from backlog"); 119 (Backlog, connections, and revenues accelerate together); 139 (converting Backlog and connections to revenues at 101% and 122%); 246 ("strong first quarter results, demonstrated by the acceleration in revenues *and* connections"); 274 ("acceleration in revenues *and* connections proves it").

Pareteum and the Fraud Defendants do not even attempt to defend this metric other than to argue, like they did regarding Backlog, that the connections metric "addressed future expected revenue." Dkt. No. 143-1 at 19. But they admit that the metric was used as an *ongoing* "indicator of revenue, where that term represented 'devices, subscribers, and their variable usage'" in the present – not in the future. Dkt. No. 143-1 at 3 (citing ¶85); *see also* ¶¶125 (connections base "immediately grows" upon iPass Acquisition, not in future); 217 ("connections[,] which generates revenue"); 332 ("connections[,] which is our word for subscribers"). Thus, for the same reasons that this argument was unavailing as to the Backlog, it is unavailing at to connections.

40

### iv.      Statements Regarding Growth

Finally, Plaintiff adequately alleges that Pareteum and the Fraud Defendants' statements regarding the hyper-growth narrative were likewise false and misleading. Plaintiff adequately alleges that, throughout the Class Period (and sometimes at their prior companies), Pareteum and the Fraud Defendants advanced a story of hyper-growth, causing the stock price to soar 824%. *Supra* §II.F. Plaintiff also alleges that Pareteum and the Fraud Defendants supported their growth story with reported revenues and the Backlog and connections metrics. *See, e.g.*, ¶¶101, 104, 112, 220, 249, 278. But those revenues were overstated and "inaccurately recognized" and the Backlog and connections metrics contained fabricated and embellished inputs. *Supra* §§III.B.1.a.i-iii. Accordingly, Plaintiff adequately alleges that the statements regarding Pareteum's hyper-growth narrative – which were based on these inputs – were likewise false and misleading. Finally, Plaintiff alleges that every one of the five Fraud Defendants made these growth statements.[18]

### b.      Statements Regarding Internal Controls and GAAP

Plaintiff also adequately alleges that Pareteum and the Fraud Defendants' statements regarding the Company's internal controls and GAAP compliance were false and misleading.

First, Plaintiff adequately alleges that the Company's 10-Qs and its 10-K included a statement that its revenue recognition procedures complied with appropriate accounting procedures (¶¶223, 252, 281, 307, 336, 350), when they plainly did not, as the Restatement Release admitted that Pareteum "prematurely or inaccurately recognized revenue." ¶173.

---

[18]      Turner statements: ¶¶189, 191, 194, 204, 206, 217, 219, 225, 227, 229, 236, 248 ("high-growth…company"), 263 ("On Fire"), 268, 277, 297 ("hyper-accelerate growth"), 298, 303 ("dramatic revenue growth"), 315, 321, 328, 331, 337, 339, 340, 344; McCarthy statements: ¶¶304; 333 ("rapid growth"); Bozzo statements: ¶¶193, 210, 214, 215, 230, 233, 317 ("rapidly growing"); Mumby statements: ¶¶310, 312 ("continue accelerating our growth), 315, 319, 321; Pareteum/unattributed statements: ¶¶203, 217, 220, 246, 249, 273, 274, 278, 309, 311, 329-30, 341 ("rapidly growing"); Turner and O'Donnell certifications: ¶¶221, 250, 279, 305, 334, 346.

Second, Plaintiff adequately alleges that (1) Pareteum and the Fraud Defendants repeatedly represented that Pareteum's financial statements were prepared in accordance with GAAP and that the Company had adequate controls and procedures to ensure that its financial statements were accurate and reliable (¶¶351-53, 357-58, 372, 374); (2) the Company's 10-Qs and 10-K also contained SOX certifications attesting to the accuracy and completeness of Pareteum's financial and operational results and the soundness of its internal controls (¶¶354-55, 357-58, 371, 373, 375); and (3) these statements were false and misleading because – *as explicitly conceded* in Pareteum's FY2018 Form 10K and the Restatement Release – throughout 2018, there existed at Pareteum "material weaknesses in its internal control over financial reporting, [such that its] disclosure controls and procedures were not effective as of December 31, 2018," and Pareteum "prematurely or inaccurately recognized revenue." ¶¶88, 173, 359.

Third, Plaintiff adequately alleges that, despite knowing that the Company's financial reporting was not reliable, Pareteum and the Fraud Defendants went out of their way to reassure investors that, *despite* the material weaknesses that management had discovered, investors could still rely on Pareteum's financial reporting. *Infra* §II.E. These assurances, too, were false, as again confirmed by the Restatement Release, in which Company's acknowledged that it had improperly recognized revenues and would be restating its previously-issued financials. ¶¶172-73.

These allegations are sufficient to state a 10(b) claim. "[W]here financial statements are not prepared in compliance with GAAP, they are presumed to be misleading." *DoubleLine*, 413 F. Supp. 3d at 207. Indeed, "[c]ourts often find material misstatements where[, as here,] defendants claim to be compliant with standards promulgated by themselves or regulatory agencies." *In re Gentiva Securities Litig.*, 932 F. Supp. 2d 352, 369 (E.D.N.Y. 2013), (citing *In re Bear Stearns Cos. Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 459 (S.D.N.Y. 2011) (statement

42

that defendant was "in compliance with…regulatory capital requirements" materially false)).[19]

What is more, the very fact of the impending Restatement demonstrates that the statements regarding the integrity of the Company's financial statements were false and material, since "pursuant to GAAP, previously issued financial statements should be restated only to correct *material accounting errors that existed at the time the statements were originally issued.*"[20] *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 234 (S.D.N.Y. 2006) (citing *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486-87 (S.D.N.Y. 2004) ("mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.")); *In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) (same); *comScore,* 268 F. Supp. 3d at 544 (that company must restate financials means statements regarding GAAP compliance were false and misleading).

### c.      Statements Regarding Blockchain Capabilities

Plaintiff also adequately alleges that Pareteum and the Fraud Defendants made false and misleading statements touting Pareteum's supposed Blockchain capabilities. *See* ¶¶378-80 (announcing development of "revolutionary" Blockchain support and partnership that would lead to revenue growth and profitability). These statements were again false. As Pareteum disclosed *to the SEC* just ten months later, it had "no plans to create [its] own digital currency," "no plans to

---

[19]      *See also In re Ambac Fin. Gp., Inc. Secs. Litig.*, 693 F. Supp. 2d 241, 277 (S.D.N.Y. 2010) (material misstatement where defendant falsely claimed compliance with standards); *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 580 (S.D.N.Y. 2010) (same); *In re Avon Sec. Litig.*, 19-01420, 2019 U.S. Dist. LEXIS 200816, at *51 (S.D.N.Y. Nov. 18, 2019) (where "'[p]laintiffs detail how defendants used specific accounting practices in violation of [GAAP] to prematurely recognize revenue,' they have adequately alleged…false and misleading statements"); *Varghese v. China Shenghuo Pharm. Holdings,* 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) (false statements regarding internal controls and GAAP compliance sufficient for Rule 10b-5 claim).

[20]      Under GAAP, a "restatement" is a term of art used only where a company's previously issued financial statements were materially false *as of the time of issuance* and the misstatements were based on "*facts that existed at the time the financial statements were prepared*." ¶15.

act as a verification service for digital currency," and had "not and [did] not plan in the near future to generate any revenue from [its blockchain] relationship." ¶381.

### d.    Statements and Omissions Regarding Executive Backgrounds

Finally, Plaintiff adequately alleges that (1) Pareteum and the Fraud Defendants provided information in SEC filings about their executives' backgrounds and touting their supposed credentials and accomplishments (¶383); but (2) failed to disclose that many of the same executives had preexisting relationships, histories of fraudulent and/or criminal conduct (including undisclosed connections to Honig), and/or had worked together at companies that mysteriously lost all of their shareholders' money. *Supra* §II.B; ¶¶46-75. Having chosen to provide their biographical information, Pareteum and the Fraud Defendants were obligated to be accurate and complete, and their failure to do so renders these statements materially false and misleading. "'[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic." *In re Vivendi*, 838 F.3d at 258.[21] "While a corporation 'is not required to disclose a fact merely because a reasonable investor would very much like to know' it, it has an obligation to do so when 'secret information renders prior public statements materially misleading.'" *In re Lehman Bros.*, 799 F. Supp. 2d at 282-83. Indeed, courts have repeatedly held that the omission of information about a defendant's criminal and/or regulatory violations – as was hidden here – is material. *See SEC v. Empire Dev. Gp., LLC*, 07-3896, 2008 U.S. Dist. LEXIS 43509, at *35 (S.D.N.Y. May 30, 2008) (omission of prior consent judgment arising out of fraud and misappropriation in connection with sale of stock material); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 02-0767, 2003

---

[21]    *See also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty [to disclose] is not…a defense to…liability[,] because upon choosing to speak, one must speak truthfully about material issues."); *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260, 295 (S.D.N.Y. 2010) ("Rule 10b-5 creates a statutory duty to speak the full truth when a defendant undertakes to say anything.").

U.S. Dist. LEXIS 11108, at *16 (S.D.N.Y. June 30, 2003) (denying dismissal on basis of misrepresentations about defendant's prior company's bankruptcy).[22]

In response, Pareteum and Fraud Defendants predictably argue that, because the facts they concealed were publicly available, they had no duty to disclose them. Dkt. No. 143-1 at 21-22. That is not so. Courts have repeatedly held that shareholders are not required to engage in a wild goose chase to find the complete truth. *See Dale v. Rosenfeld*, 229 F.2d 855, 858 (2d Cir. 1956) ("Availability elsewhere of truthful information cannot excuse untruths or misleading omissions in [SEC filing]."); *SEC v. Mozilo*, 09-3994, 2010 U.S. Dist. LEXIS 98203, at *29 (C.D. Cal. Sept. 16, 2010) ("[O]missions by corporate insiders are not rendered immaterial as a matter of law simply because the omitted facts were available to the public elsewhere…the 'total mix' of information does not encompass the total universe of information available in the public domain."); *Brewer v. Lincoln Int. Corp.*, 148 F. Supp. 2d 792, 802 (W.D. Ky. 2000) (rejecting argument that availability of information at issue via SEC database relieved defendants of their duty to disclose information pursuant to federal securities laws).[23]

---

[22]    *See also SEC v. Enters. Sols., Inc.*, 142 F. Supp. 2d 561, 573-74 (S.D.N.Y. 2001) (significant participation in company of individual with "extensive history of criminal and regulatory violations," "ought to have been disclosed."); *cf. Montoya v. Mamma.Com, Inc.*, 05-2313, 2006 U.S. Dist. LEXIS 13207, at *19-21 (S.D.N.Y. Mar. 28, 2006) (failure to disclose individual with criminal past who controlled company's affairs was material; executives "had a duty to monitor" *even if they were not aware individual controlled company*).

[23]    The case cited by Pareteum and the Fraud Defendants – *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) – is inapposite, as it involved a claim for common law fraud and the issue was whether the investors "should have been sufficiently alerted" to investigate. This has no bearing on whether Pareteum and the Fraud Defendants have obligations under federal law to disclose material information. The cases cited by Pareteum and the Fraud Defendants to support their argument that the information they concealed was not material are likewise distinguishable: *AmBase Corp. v. SDG Inc.,* 00-1694, 2005 U.S. Dist. LEXIS 16164, at *2-3 (D. Conn. Aug. 3, 2005), was another common law fraud case brought under state, not federal, law; *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, 11-2890, 2013 U.S. Dist. LEXIS 201462, at *9 (S.D.N.Y. Mar. 29, 2013) addressed scienter, not materiality. And, while the courts held in *In re Xinhua Fin. Media, Ltd. Secs. Litig.*, 07-3994, 2009 U.S. Dist. LEXIS 14838, at *18-23 (S.D.N.Y. Feb. 25, 2009) and *Barilli v. Sky Solar Holdings, Ltd.*, 17-4572, 2019 U.S. Dist. LEXIS 87929, at *251-53 (S.D.N.Y. May 23, 2019), that defendants' failure to discuss certain background information was immaterial, unlike here, the omissions were not about executives' prior relationships with a pump-and-dump scheme mastermind whose related entities owned a sizeable stake in the company that they cashed out before the stock tanked, nor were they about executives' prior positions at companies where securities violations and fraud were alleged to have occurred.

## 2.    Defendants' Rote Counter Arguments Lack Merit

In response to these detailed allegations of unquestionably false and misleading statements and omissions, Pareteum and the Fraud Defendants throw the proverbial spaghetti against the wall. First, they argue that Plaintiff does not plead its claims with the requisite particularity and that it is engaged in "puzzle pleading." In other words, Pareteum and the Fraud Defendants contend – despite the fact that *they* acknowledged their *own misstatements* in the Restatement Release – that they just can't figure out what statements they made were false and misleading. Next, they argue that their statements were protected opinion or inactionable puffery. Finally, they contend that their statements fall within the statutory safe harbor. These defenses lack any merit.

### a.    Plaintiff's Plead False and/or Misleading Statements with the Requisite Particularity and the Complaint Is Hardly a Puzzle

Despite the extreme detail pleaded in the Complaint, Pareteum and the Fraud Defendants argue that they simply cannot figure out what statements Plaintiff alleges to have been false and misleading. Dkt. No. 143-1 at 13-14. But the Complaint could not be clearer. Take, for example, Pareteum and the Fraud Defendants' complaint about Plaintiff's use of block quotes and emphasis. Dkt. No. 143-1 at 16-17. Putting aside that these are stylistic choices that have no bearing on whether Plaintiff's allegations are sufficient, Pareteum and the Fraud Defendants highlight Paragraphs 189 and 191 and claim that they are "unclear about what [Plaintiff] claims are misstatements." Dkt. No 143-1 at 16. But immediately preceding those paragraphs is Paragraph 187, which details the broad reasons why the statements that follow (¶¶188-350) *regarding the Company's revenue, fabricated Backlog and connections metrics, and hyper-growth narrative* are false and/or misleading. *See* ¶187(a)-(f). Plaintiff then reproduces each of the relevant statements made by Pareteum and the Fraud Defendants (in this case, during December 2017) in paragraphs 188-91, highlighting through the use of italics, bold, and underlining (in that order) the

46

relevant portions. *See* ¶188-91. Then, in paragraph 192, Plaintiff extracts and summarizes specific

portions from the preceding, highlighted statements in paragraphs 188-91 and provides *additional*

details, beyond those in paragraph 187, about why each statement is false and misleading:

> The statements made by these Defendants outlined above in ¶¶188-191 and contained in the Company's December 2017 press releases, publications, and/or filings with the SEC regarding the Company's false hyper-growth narrative, its self-created Backlog and connections metrics, and its purportedly ever-growing revenue were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the reasons outlined in ¶187 above and because, when these statements were made, there was no factual basis for the Company's representations regarding its Backlog value or that it expected "continued" and "increasing" "growth" and a "path to profitability" via "high margins" due to the "magic of monthly recurring income" and "sustainable returns" because (i) these statements were based on the Company's faulty Backlog and connections metrics, which – as subsequently revealed by the Restatement and the Aurelius and Viceroy Reports, and outlined herein in considerable detail (¶¶270, 283, 285, 287, 289) – were artificially inflated and unreliable, and (ii) these statements were based on the ability to convert the Backlog to actual revenue at or near 100%, which could not actually happen, as the Fraud Defendants knew at the time these statements were made.

¶192 (underlining added).

As outlined in the Appendix attached hereto, the same high level of detail is provided with

respect to *all* of Plaintiff's other allegations of false and misleading statements, including the

specific paragraphs of which Pareteum and the Fraud Defendants complain. Indeed, as the

allegations in the Complaint proceed chronologically, and as Pareteum and the Fraud Defendants'

fraud became bolder, the allegations become taxingly particular. *See, e.g.*, ¶¶246-51, 269-70 (*three

pages* of falsity allegations for *one* press release), 282-83; 284-85, 286-89.

Allegations such as these are more than sufficient to satisfy the PSLRA and Rule 9(b). *See,

e.g.*, *In re MF Global Holdings Secs. Litig.*, 982 F. Supp. 2d 277, 309 (S.D.N.Y. 2013) (complaint

satisfied Rule 9(b) and PSLRA where, like here, it: "separates its list of alleged misstatements into

statements made in each fiscal quarter," "lists the various alleged misstatements or omissions

during that time period and category," "[e]ach allegation contains the statement's source and, where appropriate, highlights through bold text the particular parts of the statement alleged to be inadequate," and "each subsection concludes with a paragraph containing reasons why the preceding statements were false or misleading."); *In re Adelphia Communs. Corp. Sec. & Derivative Litig.*, 03-1529, 2007 U.S. Dist. LEXIS 66911, at *7-8 (S.D.N.Y. Sept. 7, 2007) ("321 numbered paragraphs and many pages of charts" meet particularity requirement where "complaint notes every alleged misstatement, its speaker, and the relation of the banks to that speaker. Each defendant--as evidenced by their submissions to this Court--has been made acutely aware of what conduct is charged…."); *In re Veeco Instruments*, 235 F.R.D. at 227-28 (same).[24]

### b. The Statements are Neither Protected Opinion Nor Puffery

*In a footnote*, Pareteum and the Fraud Defendants argue that certain of the misrepresentations regarding Pareteum's performance – those containing the phrase 'we expect" and "similar language" – are non-actionable statements of opinion. Dkt. No. 143-1 at 35 n.9; *id.* at 40. They are wrong. "A statement of fact is objectively verifiable, but a statement of opinion is not." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 17-1580, 2018 U.S. Dist. LEXIS 87991, at *19 (S.D.N.Y. May 24, 2018). The statements by Pareteum and the Fraud Defendants regarding

---

[24]     The cases cited by Pareteum and the Fraud Defendants are not only readily distinguishable, but actually support *Plaintiff's* position, as the complaints in those cases entirely lack the detail and specificity of the Complaint here. *See In Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 Fed. App'x 32, 38 (2d Cir. Dec. 20, 2012) (Complaint "basically leav[es] the District Court to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter."); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 16-3495, 2017 U.S. Dist. LEXIS 122868, at *17 (S.D.N.Y. June 28, 2017) ("complaint fails to demonstrate with specificity how any of the statements are allegedly false…[and] employs the same conclusory formula…to cover *all* of the allegedly material misrepresentations") (emphasis in original); *IBEW Local 98 Pension Fund v. Cent. Vermont Pub. Serv. Corp.*, 11-222, 2012 U.S. Dist. LEXIS 204116, at *24-25 (D. Vt. Aug. 23, 2012) ("no ability to discern which statements Plaintiffs actually challenge as misleading" and no "'explanation of why each statement is fraudulent'"); *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 569-70 (S.D.N.Y. 2009) ("Complaint quotes verbatim from a series of press releases and other statements," but "fails to identify which portions of these statements (if any) were false or misleading" and "why"; complaint had *one paragraph* that alleged that "all of the statements…were misleading"); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452-53 (S.D.N.Y. 2008) (no allegations of which statements were false nor how).

revenues, Backlog, connections, and growth outlined above assert concrete (albeit false) data: they purport to provide the value of *actual* revenue, the *actual* value of the Backlog and by how much it had increased, the *actual* rate of Backlog conversion, and the *actual* number of connections. *Supra* §III.1.a.ii; ¶84 (Backlog represented "value of new sales orders intake and *the revenue under contract*," *current* contracts); ¶95 (Backlog was "key performance indicator…*directly correlated* to our financial and operating result"); ¶125 (connections base "immediately grows" upon iPass acquisition, not in future); ¶206 ("long-term contractual business… evidenced by [Backlog]"); ¶207 (chart denoting that Backlog includes "live and in service" contracts); ¶217 ("connections…generate[] revenue"); ¶291 (Backlog was "contractually *committed revenue*"); ¶332 ("connections…our word for subscribers").[25]

These statements are classic material misrepresentations, and not mere corporate opinion or optimism, because they are quantifiable, objectively verifiable, and were demonstrably false at the time that they were made. *Supra* §III.B.1; *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("[T]he complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true."); *In re Bank of Am.*, 757 F. Supp. at 310 ("[T]here is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.'"); *Manavazian v. ATEC Gp.*, 160 F. Supp. 2d 468, 473 (E.D.N.Y. 2001) (not puffery when company stated that it was "poised for future growth," occupied "strategic position in the technology industry," was "positioned…for dramatic revenue and earnings growth"); *In re Computer Assocs. Class Action Sec's Litig.*, 75 F. Supp. 2d 68, 71 (E.D.N.Y. 1999) (actionable where company portrayed as "booming,"

---

[25]    The statements regarding Blockchain capabilities likewise were based on concrete facts and made concrete predictions about the effect of these capabilities on revenue and profitability. *Supra* §III.B.1.c.

"experiencing and would continue to experience rapidly rising sales and profits," and "order pipeline was 'strong.'").[26]

Further, to the extent any of the alleged misrepresentations are considered statements of opinion (which they are not), they would still be actionable. Under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), an opinion is actionable if: (1) "the speaker did not hold the belief she professed," (2) "the supporting fact[s] she supplied were untrue," or (3) the opinion, "though sincerely held and otherwise true as a matter of fact," omits information "whose omission makes the statement misleading to a reasonable investor." *Gen. Partner Glenn Tongue v. Sanofi*, 816 F.3d 199, 209-210 (2d Cir. 2016) (quoting *Omnicare*, 135 S.Ct. at 1332). As outlined *supra* §III.B.1, Pareteum and the Fraud Defendants supplied untrue facts and omitted material information that made their statements misleading, and, as outlined *infra* §III.B.3, they were well aware of their falsity. Therefore, the statements, even if opinion, are actionable under *Omnicare*. Finally, any doubt must be resolved against dismissal, as whether an "opinion" is actionable "'depends on all relevant circumstances of the particular case,' and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003).

---

[26]    *See also In re Signet Jewelers Ltd. Sec. Litig.*, 16-6728, 2018 U.S. Dist. LEXIS 199809, at *34 (S.D.N.Y. Nov. 26, 2018) (statements that portfolio was "strong," "very healthy," and "robust" neither puffery nor opinion); *City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 366 (S.D.N.Y. 2012) ("optimistic statements about future growth" not puffery). The cases cited by Pareteum and the Fraud Defendants are distinguishable because they involved either vague statements, statements with only a future-looking component, or instances of classic puffery and, importantly, no allegations or findings of knowledge of their falsity. *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (statements that company would not "compromise its financial integrity," that it was "commit[ted] to create earnings opportunities," and that these "business strategies [would] lead to continued prosperity" inactionable); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758, 760 (S.D.N.Y. 2018) ("We believe we have or will have sufficient supply of formulated drugs"; "we believe that we basically made all the necessary filings"; no allegations suggesting defendants knew statements were false); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 227-28 (S.D.N.Y. 2018) (no allegations statements were made with "no reasonable basis in fact").

c.        **The PSLRA Safe Harbor Does Not Apply**

Finally, Pareteum and the Fraud Defendants contend that their statements are protected by the PSLRA's Safe Harbor, which protects from liability any "forward-looking statement" that is identified as such and accompanied by "*meaningful* cautionary statements." 15 U.S.C. § 78u-5(c)(1). The statements herein do not meet this criteria.

i.        The Statements Are Statements of Present Fact

"[W]hen an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010); *see also In re Genworth Fin. Sec. Litig.*, 14-2392, 2015 U.S. Dist. LEXIS 82035, at *5 (S.D.N.Y. June 15, 2015) (Hellerstein, J.) ("Although the statements which Defendants contend are protected by the safe harbor contain some forward-looking language, they are statements of current condition, and are therefore not protected by the safe-harbor defense."). As outlined above, the statements about revenue, Backlog, connections, and growth purported to provide the value of current, *actual* revenue, the *actual* value of the Backlog and by how much it had increased, the *actual* rate of Backlog conversion, and the *actual* number of connections. *Supra* §III.B.2.b. Because each of these statements contains representations of present or historical fact, Pareteum and the Fraud Defendants drop anchor nowhere near the Safe Harbor.

Indeed, courts have rejected the very argument they advance, finding that statements about backlog are not forward looking when, "as [the company] uses the term, 'backlog' isn't a 'projection' of earnings or a 'statement' about 'future economic performance'" but, rather, like here, is "a snapshot of ***how much work the company has under contract right now***." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008). In that situation, "[b]acklog is much like accounts receivable: It represents [a company's] contractual entitlement to perform certain

51

work, just like accounts receivable represents the company's contractual entitlement to be paid for work already performed." *Id.* Notably, in that case, the company defined "backlog" as "the dollar value of the work it has contracted to do but hasn't yet performed." *Id.* at 984. ***That is precisely what Pareteum and the Fraud Defendants told investors here.*** *Supra* §III.B.2.b; ¶¶84 (Backlog represented "value of *new sales orders intake* and ***the revenue under contract***," *current* contracts); 95 (Backlog "directly correlated" to financial and operating result); 125 (connections base "immediately grows" upon iPass Acquisition, not future); 206 ("long-term contractual business… evidenced by [Backlog]"); 207 (chart denoting Backlog includes "live and in service" contracts); 217 ("connections…generate[] revenue"); 291 ("Backlog" was "contractually ***committed revenue***").[27]

Pareteum and the Fraud Defendants' reliance on *In re Seadrill Limited Securities Litigation*, No. 14-9642, 2016 U.S. Dist. LEXIS 80648 (S.D.N.Y. June 20, 2016) and *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375-76 (S.D.N.Y. 2018) is unavailing, as the statements at issue in both cases were purely *projections* of revenue. Here, by contrast, the statements at issue are statements of present fact concerning Pareteum's current, *actual* revenues, Backlog, Backlog conversion, and connections. Moreover, both courts found that the statements contained adequate cautionary language, which – as set forth below – is not present here, and the *Seadrill* court applied the Safe Harbor because plaintiff did not "allege facts to suggest that

---

[27] *See also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1050-51 (N.D. Cal. 2018) (statements regarding "healthy product *backlog*," which provided "factual predicate for…revenue prediction," not protected because they were "facts regarding the present state"); *City of Pontiac*, 875 F. Supp. 2d at 366 ("defendants here went well beyond mere 'rosy predictions' -- they affirmatively…stated that IS&GS…had a 'solid *backlog*'"; no Safe Harbor protection); *Schottenfeld Qualified Assocs., L.P. v. Worsktream, Inc.*, 05-7092, 2006 U.S. Dist. LEXIS 96035, at *7-8 (S.D.N.Y. May 3, 2006) (statements regarding "overall growth and momentum" and "strength of [] subscription and services revenues" were "statements of present fact" not protected by Safe Harbor); *In Re AOL Time Warner, Inc., Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 221 (S.D.N.Y. 2004) (statements characterizing revenue growth as "very healthy" not forward-looking or contingent on future events; they were statements of existing financial condition); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 494 (S.D. Tex. 2016) (statements about current oil production, upon which prediction that company was "well positioned" to achieve projected yields, not forward-looking).

Defendants had actual knowledge that their statements were false"; here, Plaintiff adequately alleges knowledge of falsity. 2016 U.S. Dist. LEXIS 80648, at *27-28; 341 F. Supp. 3d at 377-78.

ii.    There Is No Meaningful Cautionary Language

Even assuming *arguendo* that the statements at issue were "forward-looking" (they are not), they would still not receive Safe Harbor protection because they were not "accompanied by *meaningful* cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Schottenfeld Qualified Assocs., L.P. v. Worsktream, Inc.*, 05-7092, 2006 U.S. Dist. LEXIS 96035, at *9 (S.D.N.Y. May 3, 2006). The language Pareteum and the Fraud Defendants cite as "meaningful cautionary statements"[28] "only refers to the most general of economic risks, such as the 'uncertainties' of conducting the issuer's business," which is insufficient to invoke Safe Harbor protection. *Id.* (citing *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 35 n.119 (S.D.N.Y. Dec. 7, 2004) ("That the statement was accompanied by cautionary language does not suffice…[because t]he language itself was generic, warning that actual results may be 'materially different' than the projections. This 'does not come close to the cautionary language needed to render reliance on the misrepresentation unreasonable'"); *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010) ("[C]autionary language is not meaningful if it is 'boilerplate,' 'general,' and 'vague.'").

---

[28]    *See* Dkt. No. 143-1 at 35-36 (identifying as sufficient to invoke the Safe Harbor: (1) "statements with respect to Pareteum's…expectations [are] based on current expectations, estimates and projections….Readers are cautioned that any such forward-looking statements are not guarantees of future performance and are subject to certain assumptions that are difficult to predict…[and] are cautioned not to place undue influence on such forward-looking statements" and (2) "[t]here can be no assurances that we reach the total revenue [B]acklog. The revenue [B]acklog assumes timing of revenue recognition that may vary from actual results."); *but see supra* §III.B.1.a.ii. (contradicting cautionary statement by telling investors that Backlog was converting to revenue at or above 100%).

iii.     The Statements Were Knowingly False

Finally, the Safe Harbor does not apply where – as here – the statement was knowingly false when made.  *In re SLM Corp., Sec. Litig.*, 740 F. Supp. 2d at 556.[29] As described above and outlined below in depth, Plaintiff adequately alleges that Pareteum and the Fraud Defendants acted with scienter and either knew the statements were false or recklessly disregarded their falsity. *Supra* §II; *infra* §III.B.3. These allegations are sufficient to refute any Safe Harbor protection. *Ollila v. Babcock & Wilson Enters.*, 17-109, 2018 U.S. Dist. LEXIS 20587, at *15-16 (W.D.N.C. Feb. 8, 2018) (allegations that defendant "failed to disclose that [company's] backlog had already been adversely affected…would likely take defendants' statement out of the safe harbor entirely, as the risks defendants warned of had already been realized."); *In re SLM Corp., Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. Sept. 24, 2010) ("Plaintiff alleges that Defendants knew the statements…were false when made, and thus neither the bespeaks caution doctrine nor the PSLRA safe harbor provision apply.").[30] In sum, because the false and misleading statements are not forward-looking, are not accompanied by meaningful cautionary statements, and were knowingly false when made, they are not protected by the Safe Harbor.

---

[29]     *See also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 736 (S.D.N.Y. 2015) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 756 (S.D.N.Y. 2001) ("No degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141-42 (S.D.N.Y. 1999) (statements based upon "beliefs" actionable because defendants were aware of undisclosed facts that undermined the accuracy of their alleged opinions or beliefs).

[30]     *See also In re Indep. Energy*, 154 F. Supp. 2d at 757 ("[P]laintiffs have pled that the forward-looking statement was made with actual knowledge of its falsity. Such allegations render the statements actionable."); *In re ITT Educ. Servs.*, 34 F. Supp. 3d 298, 306 (S.D.N.Y. 2014) ("Plaintiffs have alleged that, at the time the statement was made, it was already untrue. Plaintiffs' claim regarding this statement survives the…motion to dismiss.").

54

### 3.      **Plaintiff Adequately Alleges a Strong Inference of Scienter**

### a.      **Legal Standard**

To plead scienter, a plaintiff must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A "strong inference" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Importantly, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* Rather, it need only be "at least as compelling" (in "equipoise") as any opposing inference. *Id.* And, "[w]hen the competing inferences rest in equipoise, the 'tie…goes to the plaintiff.'" *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 373, 382 (E.D.N.Y. 2009).

Moreover, "[w]hile allegations of scienter are governed by the heightened pleading requirements of the PSLRA and Rule 9(b), 'whether a given intent existed is generally a question of fact.'" *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 456 (S.D.N.Y. 2005); *cf. Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences."). Where intent is at issue, matters are "peculiarly within the defendant's knowledge," and Rule 9(b)'s pleading standards are less stringent. *In re Alstom*, 406 F. Supp. 2d at 456. Finally, accepting Plaintiff's allegations as true and construing them in the light most favorable to Plaintiffs, the Court must consider the Complaint ***in its entirety*** to determine "whether ***all of the facts alleged, taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 323.

###### b.    Plaintiff Adequately Alleges Facts Giving Rise to a Strong Inference of Scienter as to the Fraud Defendants

In the Second Circuit, a plaintiff can plead scienter by showing either that (1) defendants had the motive and opportunity to commit fraud or (2) that there is "circumstantial evidence of conscious misbehavior or recklessness." *Christine Asia Co. v. Yun Ma*, 16-2519, 2017 U.S. App. LEXIS 24647, at *6 (2d Cir. Dec. 5, 2017).  Plaintiff adequately pleads both.

###### i.    The Fraud Defendants Had Motive and Opportunity

Where the individual defendants are "high-level corporate insiders," this "gives rise to the presumption of an opportunity to commit fraud." *Okla. Firefighters Pension & Ret. Sys.*, 367 F. Supp. 3d at 36; *see also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 281 (S.D.N.Y. 2006) (same). Here, the Fraud Defendants were indisputably all high-level corporate insiders. *Supra* §II.A. Further, as set forth below, Plaintiff adequately alleges several particularized and compelling motives for the Fraud Defendants to artificially inflate the price of Pareteum's stock, including to (1) use millions of dollars of stock as currency to acquire other companies – and their revenue; (2) use millions more to raise capital necessary to fund operations and pay their salaries; (3)  increase their incentive compensation; and (4) trigger Turner's merger compensation. Notably:

> The Court need not evaluate whether each of the various motives…constitute "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," because the question before the Court now is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."

*Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018). They do.

◊    *Growth by Acquisition/Acquisition of Revenues*

Plaintiff adequately alleges that Pareteum and the Fraud Defendants falsely inflated Pareteum's stock to use it as currency to acquire companies – and their *actual* customers, *actual* contracts, and *actual* revenues – to buoy their false metrics with real revenue and prop up their

56

ongoing fraud. As noted, during the Class Period, based on Pareteum and the Fraud Defendant's false and misleading statements, Pareteum's stock increased 824% and Pareteum issued more than *43 million* shares falsely valued at more than *$132 million* as currency to acquire Artilium, iPass, and Devicescape. *Supra* §§II.F; ¶¶107, 117, 122-23, 140. What is more, the Fraud Defendants *admitted* that the purpose of these acquisitions was to acquire Backlog, connections, and revenue.[31] These allegations provide evidence of their motives. *Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*, 05-7092, 2006 U.S. Dist. LEXIS 96035, at *11-12 (S.D.N.Y. May 3, 2006) ("jury could reasonably find that this motive alone--to keep the value of [company] stock high in order to use the stock to consummate corporate acquisitions--is enough…to satisfy scienter").[32]

◊    *Incentive Awards Tied to Stock Price and Acquisitions; Turner's Acquisition-Based Windfall*

Plaintiff also adequately alleges that, throughout the Class Period, (1) Pareteum granted equity and equity-linked awards to officers and directors based on the achievement of targets, including acquisition-related activity, stock price appreciation, and relative stock price performance; and (2) four of the five Fraud Defendants (Bozzo, O'Donnell, Turner, and McCarthy) were awarded options and/or stock during the Class Period pursuant to this plan. ¶414. These incentive packages – which were tied to the Company's stock price – provided the Fraud Defendants a motive to prop up that price and support scienter. *See Shanawaz*, 348 F. Supp. 3d at 326. Indeed, Turner's 2018 compensation *alone* was $5.2 million. ¶25.

What is more, as outlined above, on June 6, 2018, Turner took advantage of the artificially inflated stock price and the not-yet-announced Artilium Acquisition to increase his compensation

---

[31]    *See* ¶¶107, 241 (Artilium would add $65 million to Backlog); ¶122; ¶125 (iPass would increase connections and, therefore, revenue); ¶¶135, 304; ¶268; ¶300; ¶303; ¶327; ¶333; *see also* ¶152.
[32]    *See also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (finding sufficient motive not to disclose information to maintain inflated stock price); *In re Interpublic Sec. Litig.,* 02-6527, 2003 U.S. Dist. LEXIS 8844, at *32-33 (S.D.N.Y. May 29, 2003) (motive plead where "program of growth through acquisition" "relied on IPG issuing its own shares and stock-for-stock transactions").

by amending his employment agreement to provide for the automatic vesting of his restricted stock awards and options immediately upon the Company simply *entering into* an agreement to acquire another company. ¶106. Then, *the next day*, the Company announced the Artilium Acquisition – which it paid for using more than $100 million in artificially inflated stock, and as a result of which Turner appears to have acquired 1,500,000 shares of Company stock, thereby personally profiting from Pareteum's artificially inflated stock price. ¶¶107-08.[33] This, too, contributes to a strong inference of Turner's scienter.

◊   *Funding Corporate Operations*

Plaintiff also adequately alleges that the Fraud Defendants were motivated to inflate Company stock to fund operations and pay their salaries. Again, as noted above, during the Class Period, and taking advantage of the artificially inflated stock price, Pareteum and the Fraud Defendants (1) sold 2,440,000 shares at $2.50 per share, raking in $6,100,000 for "working capital and general corporate purposes" (¶105); (2) secured the $50 million Credit Facility from Post Road Group, which it then immediately defaulted on, but not before first drawing $25 million (¶¶128-30, 133, 162); (3) issued another 750,000 shares of stock when the Company defaulted on the Credit Facility as a condition to obtaining a mere $2,500,000 in additional financing (¶163); (4) sold up to 1,311,439 shares of stock to settle balances owed to vendors (¶163); and (5) barely a month before the Restatement Release, closed the $40 million Secondary Offering, again selling artificially inflated stock to raise (apparently badly needed) cash. ¶¶169, 394.

These facts sufficiently allege a motive to inflate the Company's stock price. *See Shanawaz*, 348 F. Supp. 3d at 326 ("dependence on sales of its stock to cover…operating losses" contributed to inference of scienter); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335,

---

[33]   Although unclear, Turner may have sold 1,000,000 of these shares shortly thereafter. ¶108 n.18.

350 (E.D. Pa. 2014) (that company was short on cash and could not finance clinical trial "heighten[ed] its need for a lucrative stock sale" and contributed to inference); *In re Portal Software, Inc. Sec. Litig.*, 03-5138, 2005 U.S. Dist. LEXIS 20214, at \*36-37 (N.D. Cal. Aug. 10, 2005) (that "defendants were motivated to inflate artificially [company's] stock price…and obtain much-needed operating capital" through secondary offering evidenced "palpable motive for fraud"); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2005) (same); *In re Mannkind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011) (desire to keep share price above particular level to raise capital "buttresses a finding of scienter").

ii.      Plaintiff Adequately Alleges Strong Circumstantial Evidence of Scienter

A plaintiff adequately alleges strong circumstantial evidence of scienter when it alleges that defendants (1) "benefitted in a concrete and personal way from the purported fraud," (2) "engaged in deliberately illegal behavior,"  (3) "knew facts or had access to information suggesting that their public statements were not accurate," or (4) "failed to check information they had a duty to monitor." *Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228, 241 (S.D.N.Y. 2012).

◊      *Concrete and Personal Benefits*

As set forth *supra*, Plaintiff alleges that the Fraud Defendants benefited from the fraud in concrete and personal ways: they used millions of dollars of falsely inflated stock as currency to acquire real customers and revenues; they used millions more to raise capital necessary to fund operations (and their salaries); they received incentive awards based on these acquisitions and inflated stock price; and Turner received millions based on Pareteum's inflated stock price and the acquisitions that it effectuated using that inflated stock as currency. *Supra* §III.A.3.a.i. These concrete benefits contribute to an inference of scienter.

59

◊       *The Scheme Evidences Scienter*

Plaintiff also adequately alleges that (1) some of the Fraud Defendants were accused of taking part in nearly identical frauds in the past; (2) the Fraud Defendants concealed their past relationships with each other and non-parties like Honig, an admitted pump-and-dump mastermind; (3) Honig's associated entities, Iroquois and IntraCoastal, invested in Pareteum; and (4) not coincidentally, just after they did, Pareteum and the Fraud Defendants began issuing a classic pump-and-dump style barrage of false releases. *Supra* §II. The sheer volume of these releases is telling. So too is the fact that they ended nearly contemporaneously with the publication of the Aurelius and Viceroy Reports. But that is not all.

Even after the Aurelius and Viceroy Reports were published, Pareteum and the Fraud Defendants "categorically denied" everything. However, barely a month later, they quietly discontinued use of the infamous Backlog that they had used to effectuate their fraud, noting that it had ***"<u>served its purpose</u>."*** Indeed, it had. By that time, Pareteum's stock had increased 824%; it had issued more than $132 million of inflated stock as currency to acquire three companies; Iroquois and IntraCoastal had cashed out just before the stock crashed; and the Fraud Defendants had made millions in compensation based on the inflated price. Not long after that, the other shoe fell, when Pareteum admitted it had defaulted on its Credit Facility before the ink was even dry. Nonetheless, in one last money grab, Pareteum and the Fraud Defendants (with the assistance of all other Defendants) orchestrated a $40 million Secondary Offering, in full knowledge that the representations made therein were false. Sure enough, ***one month*** after they accepted $40 million of Class members' money, Pareteum and the Fraud Defendants announced that they would have to restate ***every major financial report they had made in 2018 and 2019***.

These facts – and especially the Fraud Defendants' concealment of their extensive past relationships, their sudden pivot away from the Backlog metric when they were caught, their

60

ultimate Restatement of financials that they had certified as correct just one month earlier, and their bizarre request to strike materials about Honig from the Complaint *on Honig's apparent behalf* (Dkt. No. 143-1 at 51-53) – lead to the reasonably conceivable conclusion that the Fraud Defendants were engaged in a similar scheme once again and thus acted with scienter. *Pareteum and the Fraud Defendants do not even attempt to address these incriminating allegations*, arguing singularly that "[s]uch schemes require a defendant to actually sell – hence the 'dump' – their stock after pumping it up." Dkt. No. 143-1 at 23. Setting aside Turner's Artilium Acquisition cash-in, the obvious answer to this hollow defense, of course, is that *they got caught before they could fully, individually do so*: right after Iroquois and IntraCoastal cashed out, the Aurelius and Viceroy Reports were published, after which the press release machine ground to a halt and the Backlog was "retired." *Supra* §II.F.

◊ *Actions After Being Caught*

As outlined above, after the Aurelius and Viceroy Reports were published, the Fraud Defendants not only refused to reevaluate their fabricated metrics, but instead doubled down, categorically denying everything in those reports – ***twice*** – and assured investors that Pareteum was "fully dedicated to upholding the highest standards and reporting requirements of a public company" (¶¶150, 411), all while contradictorily (and quietly) shuttering the Company's press release machine and retiring the Backlog. *Supra* §II.F.4-II.F.7. These actions too lead to a reasonable inference of scienter. *See In re ArthroCare Corp. Secs. Litig.*, 726 F. Supp. 2d 696, 712, 717-18 (W.D. Tex. 2010) ("compelling inference of scienter" where defendants "continued to reassure investors the reports were lies, rumor-mongering, and propaganda by short sellers"); *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359 (S.D. Fla. 2005) (scienter where defendant "flatly rejected [article's allegations] as 'malicious comments' and 'misstatements, mischaracterizations, and distortions,'" because "[t]he fact that [defendant] issued a denial

61

indicates that he was either familiar with the facts or reckless in denying the allegations without sufficient knowledge of the situation."); *In re Turbodyne Techs., Inc. Sec. Litig.*, 99-00697, 2000 U.S. Dist. LEXIS 23020, at \*65-67 (C.D. Cal. Mar. 15, 2000) ("Turbodyne's immediate denial of Asensio's allegations…constitute circumstantial evidence sufficient to give rise to a strong inference that Turbodyne knew the statements were false or that it was deliberately reckless in making them."); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) ("These denials indicate that [defendants] were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial.").

◊ *GAAP Violations, Lack of Internal Controls, Premature Revenue Recognition, and Restatement*

"[A]ccounting manipulations involving premature revenue recognition…are especially indicative of conscious misbehavior since such violations 'do not commonly occur inadvertently,' but instead 'suggest a conscious decision to improperly recognize revenue.'" *In re Veeco*, 235 F.R.D. at 231-32. Where "a company is forced to restate its previously issued financial statements…the mere fact that the company had to make a large correction is some evidence of scienter.'" *Id.* at 232 (denying dismissal). Plaintiff adequately alleges that (1) Pareteum and the Fraud Defendants admitted to having violated GAAP by inaccurately recognizing revenue in substantial amounts (28% for FY18; 42% for 1H19) (¶¶173-74)[34]; and (2) the improper revenue recognition occurred in SEC filings that were reviewed, signed, and/or certified by the Fraud Defendants. *Supra* §§III.B.1.a.i, III.B.1.b.

The pending Restatement *alone* is sufficient to allege a strong inference of scienter. *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int. N.V.*, 89 F. Supp. 3d 602, 616 (S.D.N.Y. 2015) (strong inference where company restated financial results, having conceded

---

[34]     These numbers will likely turn out to higher, as the restatement has not been released, *eight months* later.

GAAP violations regarding revenue recognition); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488-89 (S.D.N.Y. 2004) ("[T]he size and nature of the restatement suggests that this was no mere error caused by the improper application of hyper-technical accounting rules -- it indicates that there were systemic accounting abuses…that resulted in a serious public misrepresentation of the company's financial condition.").[35]

So too are the significant GAAP violations sufficient to allege a strong inference of scienter. *In re Avon*, 2019 U.S. Dist. LEXIS 200816, at *63 ("facts…show a similarly cavalier attitude towards revenue recognition, thereby providing supplemental support for a strong inference of scienter with respect to [individual defendants], each of whom certified Avon's GAAP calculations"); *Orthofix*, 89 F. Supp. 3d at 618 ("GAAP regarding revenue recognition that were admittedly violated by the defendants are basic accounting principles" that, when coupled with "sufficient factual allegations," can create inference of scienter).[36]

Finally, an admitted "fail[ure] 'to maintain sufficient internal controls to avoid fraud [is] sufficiently indicative of scienter'" as well. *In re Insys Therapeutics, Inc. Sec. Litig.*, 17-1954, 2018 U.S. Dist. LEXIS 100000, at *17 (S.D.N.Y. June 12, 2018); *see also Orthofix*, 89 F. Supp. 3d at 616 ("strong inference" where restatement conceded weaknesses in internal controls); *Dobina*, 909 F. Supp. 2d at 247-48 (scienter based, in part, on discrepancies between restatement

---

[35]  *See also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ($24 million in charges undermines, at pleading stage, argument that defendants were unaware); *Varghese*, 672 F. Supp. 2d at 608 (scienter requirement met where GAAP violations led to restatement of statements); *Burstyn v. Worldwide Xceed Gp., Inc.*, 01-1125, 2002 U.S. Dist. LEXIS 18555, at *18 (S.D.N.Y. Sept. 30, 2002) ("magnitude of the adjustments raises questions about defendants' credibility, makes the press statements increasingly suspect, and by doing such, further supports a strong inference of scienter"); *In re Signet Jewelers Ltd. Sec. Litig.*, 16-6728, 2018 U.S. Dist. LEXIS 199809, at *48 (S.D.N.Y. Nov. 26, 2018) (significant write-off supported inference that management acted recklessly).

[36]  *See also Varghese*, 672 F. Supp. 2d at 608 (GAAP violations add to inference, especially where accounting violations caused significant overstatements); *Bielski v. Cabletron Sys.*, 311 F.3d 11, 39 (1st Cir. 2002) (*"'[a]ccounting shenanigans' are among the characteristic types of circumstances which may demonstrate scienter"*).

and certifications). Pareteum's "material weaknesses in its internal control" and its admissions that its controls were not effective likewise support a strong inference of scienter. ¶¶88, 359.[37]

◊       *The Magnitude of the Fraud*

The magnitude of the fraud – at least a $9 million, ***28% reduction*** in the falsely reported $32.4 million of revenue for FY18 and a staggering ***$24 million, 42% reduction*** in the falsely reported $57.1 million of revenue for 1H19 (¶¶172-73) – likewise supports a strong inference of scienter, as it "suggests more than a careless mistake or trivial miscalculation." *Okla. Firefighters Pension & Ret. Sys.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) (citing *In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) ("magnitude of the alleged fraud provides some additional circumstantial evidence of scienter")).[38]

◊       *The Core Operations Doctrine*

Under the "core operations" doctrine, "[w]here [] accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties may be imputed to the company's officers and directors who are

---

[37]       *See also Varghese*, 672 F. Supp. 2d at 608 (allegations that company "had weak internal controls and…Defendants were aware of the problems…support a strong inference of scienter"); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (admission of "material weaknesses in its internal controls…probative of scienter"). Pareteum and the Fraud Defendants argue that their March 2019 disclosure of internal control weaknesses actually demonstrates a *lack* of scienter because they show that they were not "trying to hide anything from investors." Dkt. No. 143-1 at 27. But those "disclosures" only served to make the market rely *more* heavily on their false statements (*supra* §II.E), and the cases they rely on are inapposite anyway. In *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010), unlike here, there was no basis for defendants to have known about the misrepresentations, plaintiffs alleged no motive, and as soon as an article was published about the fraud, defendants undertook an internal analysis/investigation. In *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 187 (4th Cir. 2009), defendants did not assure investors (as Pareteum and the Fraud Defendants did) that, despite the weaknesses, investors could still rely on their statements and that they were remediating them. And, in *City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F.Supp. 2d 464, 468-69 (S.D.N.Y. 2008), the accounting errors at issue involved a simple "clerical error" and a misapplication of a GAAP rule; there were no allegations of "fraudulent intent."

[38]       *See also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (magnitude of write-off "renders less credible" argument that they did not act recklessly); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (magnitude of fraud provides "additional circumstantial evidence of scienter"); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001) (magnitude of write-off "compelling evidence that defendants' theretofore rosy projections were not entirely forthright").

64

involved in the day-to-day operations of the company." *In re Veeco,* 235 F.R.D. at 233.[39] Again, Pareteum's revenue and its fabricated Backlog and connections metrics were repeatedly touted as "critical," "key," and "lead indicators" that provided "excellent visibility into [Pareteum's] business operations and revenue recognition." *Supra* §§II.F, III.B.1.a.; ¶¶6, 83-86, 119, 161, 416. Misrepresentations of Pareteum's core operations thus further support scienter.[40]

◊         *The Executive Terminations*

The rash of senior executive terminations and replacements directly before and after the Restatement Release (*supra* §II.F.9) further supports scienter. *See Celestica, Inc.*, 455 F. App'x at 14 n.3; *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017); *Orthofix* , 89 F. Supp. 3d at 619.[41]

◊         *Knowledge of and Access to Contradictory Facts*

Finally, even if *arguendo* all of these allegations did not add up to a strong inference of scienter – and they do – Plaintiff also adequately alleges that these same allegations constituted overwhelming "red flags," such that the Fraud Defendants should have known that their statements

---

[39]         *See also Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019) ("a court may infer 'that a company and its senior executives have knowledge of information concerning the core operations of a business'"); *Celestica, Inc.*, 455 Fed. App'x at 14 n.3 ("core operations…can provide supplemental support for allegations of scienter"); *Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 871 (S.D.N.Y. 2011) (courts can impute knowledge of facts to key officers relating to core operations).

[40]         Pareteum and the Fraud Defendants argue that the core operations doctrine "has been cast into doubt." Dkt. No. 143-1 at 25. While some district courts "have 'expressed doubts as to the doctrine's continuing import,'" the Second Circuit has held "that the doctrine can provide supplemental support for allegations of scienter, even if it cannot establish scienter independently." *Haw. Structural Ironworkers*, 422 F. Supp. 3d at 852; *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, No. 18-10320, 2020 U.S. Dist. LEXIS 55410, at *94-96 (S.D.N.Y. Mar. 30, 2020) (adopting approach); *In re Supercom, Inc. Sec. Litig*, No. 15-9650, 2018 U.S. Dist. LEXIS 175467 (S.D.N.Y. Oct. 10, 2018) (same); *In re Rockwell Med., Inc. Sec. Litig.*, No. 16-1691, 2018 U.S. Dist. LEXIS 56897 (S.D.N.Y. Mar. 30, 2018) (same); *Schwab v. E\*TRADE Fin. Corp.,* 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017) (same); *In re Express Scripts Holding Co. Secs. Litig.*, 16-3338, 2017 U.S. Dist. LEXIS 120844 (S.D.N.Y. July 31, 2017) (same).

[41]         *See also In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523-24, 534 (S.D.N.Y. 2009) (crediting resignations of chairman and vice chairman two weeks after fraud revealed); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 176-77 (S.D.N.Y. 2003) (inference where large loss recorded immediately following management departures); *Varghese*, 672 F. Supp. 2d at 608 (director resignation and CEO removal contributed to inference); *Alstom*, 406 F. Supp. at 505-06 (executive suspensions support inference).

were false. "[I]f a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts." *In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 323 (S.D.N.Y. 2010); *see also In re Am. Int'l Gp., Inc.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010) ("Plaintiffs can plead conscious misbehavior or recklessness by alleging defendants' knowledge of facts or access to information contradicting their public statements."); *Jefferson Ins. Co. v. Rouhana (In re Winstar Communs.)*, 01-3014, 2006 U.S. Dist. LEXIS 7618, at *21-22 (S.D.N.Y. Feb. 24, 2006) (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)) ("'An egregious refusal to see the obvious, *or to investigate the doubtful*, may in some cases give rise to an inference of recklessness.'"). "Under such circumstances, defendants knew or, more importantly, *should have known* that they were misrepresenting material facts related to the corporation." *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 631 (S.D.N.Y. 2003). What is more, "[t]he inquiry into whether corporate officers should have known of facts indicating the falsity of public statements is a fact specific one; scienter may be found where there are 'specific allegations of various reasonably available facts, *or 'red flags,*' that should have put the officers on notice' that the public statements were false." *In re Refco, Inc Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007).[42]

The Complaint is brimming with just such allegations. Most notably, Plaintiff adequately alleges that: (1) the Fraud Defendants knew that Backlog and connections, which they described as "key" and "critical" metrics, were unreliable (*supra* §§II.D-II.E); (2) many of Pareteum's supposed customers and contracts were fabricated or embellished (and some were even connected

---

[42]    "Although speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'" *In re Veeco*, 235 F.R.D. at 231. "Thus, to survive dismissal, plaintiffs must minimally allege that the defendants' conduct falls within the definition for recklessness." *Id.*

to the Fraud Defendants), all of which was verifiable (*supra* §III.B.1.(a)); (3) even if the Fraud Defendants somehow did not know about these fabricated and embellished customers and contracts *with which some of them had connections*, the Aurelius and Viceroy Reports placed them on notice (*supra* §II.F.4-II.F.7); (4) Backlog and connections were not converting to revenue at or above 100%, and accounts receivables were instead exploding (*supra* §§ II.F.6, III.B.1.(a)); (5) McCarthy maintained the Backlog spreadsheets and analysis (¶¶28, 52, 180, 415); (6) Mumby was Chief *Revenue* Officer (¶¶29, 415); (7) <u>all</u> of the Fraud Defendants were directly involved in Pareteum's day-to-day operations and had access to this information (¶¶38-40, 415); and (8) Turner, O'Donnell, Bozzo, and McCarthy signed, certified, or assisted in the preparation of the relevant SEC filings, such that they had a duty to inquire about these issues. ¶¶25-28, 250, 279, 305, 334, 346, 354, 355, 357, 371-73, 375.[43] Simply put, "[g]iven the…importance of [revenue, Backlog, and connections, the Fraud Defendants] should have been aware" of the false nature of their statements regarding these metrics. *Alstom*, 406 F. Supp. 2d at 460.

Plaintiff thus easily alleges that the Fraud Defendants were presented with sufficient "red flags," such that they had a duty to "investigate the doubtful," and thus should have known that their statements were false or misleading. These allegations, "taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 324; *see also Alstom*, 406 F. Supp. 2d at 460 (allegations of direct involvement in day-to-day operations, magnitude of fraud, and significant time during which omissions were made, could lead to "strong inference of recklessness"); *In re Nortel*, 238 F. Supp. 2d at 631 (scienter adequately plead where defendants had "ready access to facts that contradicted their public statements"); *In re Atlas Air*, 324 F. Supp. 2d at 497 (reasonable to impute knowledge to signatory of SEC filings involved in day-to-day operations of company).

---

[43]     *Alstom*, 406 F. Supp. 2d at 459 ("to sign the SEC filing documents, [officers] had a 'duty to familiarize themselves with the facts relevant to the core operations of [company]'").

iii.   Pareteum and the Fraud Defendants' Counter Arguments Again Lack Merit

In response to these detailed allegations of scienter, Pareteum and the Fraud Defendants raise precious few defenses. None need long delay the Court.

◊      *Scienter Allegations Must be Considered in Totality*

First, Pareteum and the Fraud Defendants predictably attempt to divide and conquer, arguing that any single one of Plaintiff's scienter allegations, *standing* alone, is insufficient to adequately allege scienter. Dkt. No. 143-1 at 20-27. But that is not the legal standard nor what Plaintiff alleges. Rather, the Court must consider the Complaint ***in its entirety*** to determine "whether ***all of the facts alleged, taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 324. And Plaintiff adequately alleges overwhelming collective allegations of scienter:

1.  The Fraud Defendants were high-level corporate insiders (*supra* §II.A);

2.  The Fraud Defendants had undisclosed ties with serial fraudsters and a history of similar schemes (*supra* §II.B);

3.  The Fraud Defendants had motive to artificially inflate the stock to use it as currency to acquire revenues and raise capital and trigger their incentive awards (*supra* §III.B.3.b.i);

4.  The Fraud Defendants signed, certified, or assisted in preparing (and had a duty to investigate) the Company's SEC filings containing the false statements (*supra* §III.B.3.b.ii);

5.  The Fraud Defendants were involved in Pareteum's day-to-day operations, had access to its financial information, and controlled its public statements (*supra* §III.B.3.b.ii);

6.  The Fraud Defendants admitted GAAP violations and a lack of internal controls (*supra* (*supra* §III.B.1.b);

7.  The pending restatement is staggering in size and involves premature revenue recognition relating to a core function of the business (*supra* §III.B.3.b.ii);

8.  Three of the Fraud Defendants were terminated or replaced after the Restatement Release (*supra* §II.F.9);

68

9. Backlog and connections were fabricated metrics that the Fraud Defendants knew were not reliable (*supra* §§II.D-II.E);

10. Many of Pareteum's supposed customers and contracts were fabricated or embellished and incapable of generating the massive revenues that the Fraud Defendants alleged they would be able to generate (and some were even connected to the Fraud Defendants), all of which was verifiable information (*supra* §III.B.1.a);

11. Backlog and connections were not converting to revenue at or above 100%, but instead accounts receivables were exploding and the Company was so cash-strapped that it defaulted on the Credit Facility before the ink was even dry and had to issue more stock to access just $2.5 million in liquidity (*supra* §§ II.F.6, III.B.1.a);

12. If the Fraud Defendants did not know about these fabricated and embellished customers and contracts and overstatements of Backlog, connections, and revenue, the Aurelius and Viceroy Reports placed them on notice of these "red flags" (*supra* §§II.F.4-II.F.7);

13. Instead of taking action after being placed on notice, the Fraud Defendants doubled down, categorically denying everything in those Reports (*twice*), spreading more false statements to calm the market, and issuing $40 million in new stock, all while quietly – and guiltily – halting the press release machine, retiring the Backlog, and retroactively changing slides cited by the Reports as evidence of the fraud (*supra* §§II.F.4-II.F.7).

These allegations, ***taken collectively***, as they must be, are more than sufficient to allege scienter.

◊        *Plaintiff is Not Pleading "Fraud by Hindsight"*

Pareteum and the Fraud Defendants next claim that Plaintiff's allegations amount to "fraud by hindsight" because they "assert[] no non-conclusory fact at or before the time of the Statements to show that the makers of those Statements knew they were false or misleading when made." Dkt. No. 143-1 at 30. But, as outlined in the preceding section, Plaintiff does not rely solely on the Restatement Release as proof of scienter; rather, it cites numerous, overwhelming bases to support a strong inference that the Fraud Defendants knew of, recklessly disregarded, or should have known of their statements' falsity at the time those statements were made. Indeed, standing *alone*, "the mere fact that financial results were restated is sufficient basis for pleading that those statements *were false when made*." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d at 494-96 (magnitude of restatement, that defendants signed restated statements, and red

flags "sufficient…to demonstrate that [defendants] knew, or were reckless in not knowing, that…financial results were false when issued"; strong inference arises).

What is more, the Second Circuit specifically allows a plaintiff to "rel[y] on *post-class period* [developments] to confirm what a defendant should have known during the class period." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 183-84 (S.D.N.Y. May 10, 2010); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) (post-class period articles used to establish awareness of falsity of class period statements; opposite result would "reward [defendants] for their successful concealment of their wrongdoing"). Finally, "courts 'must be cautious' in applying fraud by hindsight to dismiss a case, as its effect at this stage 'is to cut off the case as a matter of law, without further factual development.'" *Ollila*, 2018 U.S. Dist. LEXIS 20587, at \*12. For this reason, "fraud by hindsight" arguments are regularly rejected. *Id.*; *see also Burstyn*, 2002 U.S. Dist. LEXIS 18555, at \*18.[44]

◊       *Plaintiff Does Not Engage in "Group Pleading"*

Finally, Pareteum and the Fraud Defendants argue that Plaintiff improperly utilizes "group pleading." Dkt. No. 143-1 at 29-30. Not so. <u>First</u>, they are wrong on the law. Plaintiff *is* entitled to rely on the group pleading doctrine's "presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective

---

[44]     The cases cited by Pareteum and the Fraud Defendants are inapposite, as they involved a complete lack of *any* allegations of contemporaneous knowledge of falsity or reckless disregard of the truth. *See Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 723 F. App'x 20, 22 (2d Cir. Jan. 26, 2018) (plaintiffs alleged no facts "demonstrating that the Company did not actually believe" what it said "at the time it made the positive statements, nor do they identify any contemporaneous facts that would have rendered such a belief unfounded."); *Zech Capital LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582, 585 (2d Cir. Jan. 28, 2016) (no allegations that procedures were reckless and not "merely highly negligent"); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84-85 (2d Cir. 1999) ("optimism that is shown *only after the fact* to have been unwarranted does not, by itself, give rise to an inference of fraud"); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (no allegation that "defendants in fact had such perceptions or were reckless in not having them"); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 99 (S.D.N.Y. 2001) (no "explanation about why these statements were misleading when made"); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 409 (S.D.N.Y. 2010) (allegation simply that write-down should have occurred earlier); *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 09-5411, 2012 U.S. Dist. LEXIS 55234, at \*36-37 (S.D.N.Y. Apr. 12, 2012) (no allegations of contemporaneous knowledge of falsity).

work of those individuals with direct involvement in the everyday business of the company."

*Lehman Bros. Sec. & ERISA Litig.*, 09-2017, 2011 U.S. Dist. LEXIS 82119, at \*45 n.106

(S.D.N.Y. 2011); *see also Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 Fed. App'x.

260, 266 (2d Cir. Mar. 12, 2010) (remanding for consideration of liability based on group pleading

doctrine); *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. at 232-33 ("Defendants' argument

that [the group pleading] doctrine is no longer good law in light of the PSLRA has been considered

and rejected by this court."). Therefore, to the extent that Plaintiff has engaged in any group

pleading, it is entitled to do so because each of the Fraud Defendants directly participated in the

management of the Company, were directly involved in its day-to-day operations, were privy to

its confidential information, were involved in drafting, producing, reviewing, and/or disseminating

the false and/or misleading statements, controlled the content of those statements, and were

provided with copies of them or had the ability to prevent their issuance or cause them to be

corrected. *See* ¶¶43-44; *In re Veeco*, 235 F.R.D. at 232-33 (knowledge of falsity of financial

statements "can be imputed to key officers who should have known of facts…that would have led

them to the realization that the company's financial statements were false when issued.").

Second, even if *arguendo* group pleading were prohibited (it is not), Plaintiff adequately

alleges scienter as to *each* of the Fraud Defendants as well:

- Turner was Executive Chairman and CEO; assembled his former accomplices as his management team as the Honig-related entities invested; fabricated the Backlog and connections metrics; signed and certified the 10-Qs and 10-Ks; was quoted making the false statements outlined above; "categorically denied" both the Aurelius and the Viceroy Reports; took advantage of the inflated stock price to increase his compensation; received options based on that inflated price; and was terminated. ¶¶6, 14, 25, 46, 83, 93, 95, 96, 100-02, 104, 106, 108, 109, 110, 112-14, 125, 126, 129, 131, 132, 134, 137, 139, 150, 161, 165, 183, 189, 191, 194, 197, 204, 206, 219, 221, 227, 229, 233, 236, 237, 246, 248, 250, 263, 268, 274, 279, 298, 300, 303, 305, 310, 312, 313-15, 317, 319, 321, 328, 331, 332, 334, 337, 339, 340, 344-46, 349, 354, 355, 357, 358, 373, 375, 378-80, 408, 411, 414.

71

- O'Donnell was CFO; signed and certified the 10-Qs and 10-Ks; received options based on the inflated stock; and was replaced as CFO. ¶¶14, 26, 58, 181, 221, 250, 279, 305, 334, 354, 355, 357, 358, 371, 373, 375, 414, 422.

- Bozzo was CEO and CCO; signed the 10-K; was quoted making the false statements outlined above; and received options based on the stock price. ¶¶27, 98, 99, 193, 194, 198, 210, 212, 214, 215, 230, 233, 234, 305, 313, 314, 317, 414.

- McCarthy was President and COO; maintained the Backlog spreadsheets and analysis; assisted in the preparation of the SEC filings; was quoted making the false statements outlined above; received options based on the inflated stock; and was terminated. ¶¶14, 28, 52, 89, 135, 140, 180, 304, 333, 414, 415, 422.

- Mumby was Chief Revenue Officer; in charge of sales growth; and quoted making the false statements outlined above. ¶¶ 29, 137, 312, 315, 319, 321, 415.

* * *

In sum, considering all of Plaintiff's scienter allegations holistically, "a reasonable person would deem an inference of scienter…'at least as compelling as any opposing inference one could draw from the facts alleged.'" *Orthofix*, 89 F. Supp. 3d at 614.[45]

### c.    Corporate Scienter is Adequately Alleged

"[S]cienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *Patel v. L-3 Communs. Holdings, Inc.*, 14-CV-6038, 2016 U.S. Dist. LEXIS 42978, at *46-47 (S.D.N.Y. Mar. 30, 2016). A plaintiff can allege corporate scienter without doing so with regard to a specific individual defendant, so long as "the pleaded facts [] create a strong inference that *someone* whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,

---

[45]    The only "competing inference" proffered by Pareteum and the Fraud Defendants is their speculation regarding the reason for the 2,300% explosion in accounts receivables at the same time that the Backlog allegedly grew 535%. Dkt. No. 143-1 at 26. As outlined *supra* n.17, Pareteum and the Fraud Defendants are not entitled to an inference *in their favor* that is contrary to the pleaded facts (and common sense). But even if they were, this speculative explanation explains very little, and any competing inference that could be garnered from it hardly negates – much less stands "in equipoise" – with the very strong inference of scienter raised by Plaintiff's allegations. And, even if it did, "the 'tie…goes to [ ] plaintiff.'" *Akerman*, 608 F. Supp. 2d at 382.

531 F.3d 190, 195 (2d Cir. 2008).[46] Plaintiff alleges ample facts to support a strong inference of Pareteum's corporate scienter through the conduct of the Fraud Defendants.

**4.      Plaintiff Adequately Pleads Secondary Liability Under Section 20(a) Against the Control Person Defendants**

To succeed on a claim under Section 20(a), plaintiff must show: (1) a primary violation [of the Exchange Act] by the controlled person; (2) control of the primary violator; and (3) culpable participation. *Carpenters Pension Tr. Fund*, 750 F.3d at 236. As outlined above, Plaintiff has sufficiently alleged a primary violation of Section 10(b) by Pareteum (the controlled person). *Supra* §§III.B.1-3; *In re Inv. Tech. Gp.*, 251 F. Supp. 3d at 624. The Control Person Defendants do not (nor could they) dispute the second element – that they had "control" over Pareteum. Instead, they argue that Plaintiff fails to adequately plead their culpable participation in the fraud. They are wrong.[47] Plaintiff adequately alleges that (1) that Turner and O'Donnell signed and/or certified the relevant 10-Qs and 10-K (¶¶25-26); (2) Bozzo and Defendants van Sante, Jiminez-Tunon, and Lippert (as directors) signed, and Turner and O'Donnell signed and certified, the relevant 10-K (¶¶27, 305-06); (3) the false statements contained therein were known to be false or were recklessly disregarded as such (*supra* §III.B.3); (4) all of the Control Person Defendants had direct and supervisory involvement in Pareteum's day-to-day operations, knowledge of the statements, and controlled the Company, including the content and dissemination of these statements (¶¶458-59); and (5) all of the Control Person Defendants had motive. *Supra* §III.B.3.b.i; ¶414 (took part in incentive packages). Nothing more is required at this stage. *See Menaldi*, 164 F. Supp. 3d at 587 (that defendants signed relevant SEC filings and generally were responsible for

---

[46]      *See also Haw. Structural Ironworkers*, 422 F. Supp. at 854 ("corporate scienter…satisfied by…pleading scienter as to…an individual whose intent could be imputed to [company]"); *In re Eletrobras*, 245 F. Supp. 3d at 469-70 ("scienter against two key officers…necessarily alleges scienter against Eletrobras itself").

[47]      It is an open question "whether culpable participation must be pleaded with particularity, or instead, is an affirmative defense." *Menaldi v. Och-Ziff Capital Mgmt. Gp. LLC*, 164 F. Supp. 3d 568, 587 (S.D.N.Y. 2016).

content sufficient); *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (allegations that defendants "knew and/or recklessly disregarded" falsity and misleading nature of information they caused to be disseminated sufficient to state claim).

### C.   THE COMPLAINT ADEQUATELY ALLEGES SECTION 11, 12, AND 15 CLAIMS

#### 1.   Legal Standard

Section 11 of the Securities Act (15 U.S.C. § 77k) provides strict liability for any signer, director, preparing or certifying accountant, or underwriter of a registration statement that "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Section 12(a)(2) (15 U.S.C. § 77l(a)(2)) similarly affords strict liability against a seller that "offers or sells a security…by means of a prospectus…which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading."

To establish a *prima facie* claim under Sections 11 and 12, a plaintiff need only allege a "material misstatement or omission" in a registration statement. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007); *see also In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y 2000). There is no scienter requirement for a Section 11 or 12 claim. *Rombach*, 355 F.3d at 169 n.4; *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004). Thus, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Huddleston*, 459 U.S. at 382.

#### 2.   These Claims Are Not Subject to a Heightened Pleading Standard

Contrary to this law, Defendants seek to move the goal post, arguing that Plaintiff's Section 11 and 12 claims are subject to Rule 9(b)'s heightened pleading standard because they are premised

74

upon the same allegations that support their fraud claims. Dkt. No. 143-1 at 41-44; Dkt. No. 143-1 at 7-11; Dkt. No. 148-1. They are wrong. "[W]hen the same course of conduct supports *both* a claim of fraud under the Exchange Act and *a* claim under Section 11 or 12(a)(2) of the Securities Act, the latter claim must satisfy the requirements of Rule 9(b) ***unless the complaint identifies clearly an alternate basis, i.e., negligence, for the claim***." *In re Amtrust Fin. Servs., Inc. Sec. Litig.*, 17-1545, 2019 U.S. Dist. LEXIS 153297, at *31 (S.D.N.Y. Sept. 9, 2019). Even when, as here, "it is clear that plaintiffs believe [defendants] were engaged in a massive fraud[,] [t]his fact…does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence." *In re Ambac Fin. Gp., Inc.*, 693 F. Supp. 2d at 263.

Consistent with this jurisprudence, Plaintiff expressly avers that its Section 11 and 12 claims "[are] based on negligence and strict liability and do[ ] not sound in fraud." ¶¶462, 473, 485. Plaintiff also expressly asserts negligence allegations, alleging that Pareteum and the Control Person Defendants are liable under Section 11 because they "did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the iPass Registration Statement were true," and that they "acted negligently." ¶468; *see also* ¶493 (same regarding Secondary Offering); ¶495 (same regarding Dawson James).[48] Thus, "[P]laintiffs ha[s] done more than disclaim fraud; [it] ha[s] specifically pled alternate theories of fraud and negligence." *In re Refco*, 503 F. Supp. 2d at 633.[49] Indeed, Plaintiff's alternative negligence allegations are all the more appropriate in this case, as Pareteum and the Fraud Defendants "categorically denied" any fraud, such that, in the highly unlikely event those denials prove true,

---

[48]    *See also* ¶¶45 ("Each of the Control Person Defendants owed a duty…to make a reasonable and diligent investigation"); 392 ("None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements…were true"); 401 ("None of the Control Person Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements…were true.").

[49]    Defendants' heavy reliance on *Rombach*, 355 F.3d 164, is thus misplaced as, in that case, unlike here, "[p]laintiffs [did] not assert any claim of negligence…, nor [did] they specify any basis for such a claim." *Rombach v. Chang,* 00-0958, 2002 U.S. Dist. LEXIS 15754, at *10 (E.D.N.Y. June 7, 2002)).

Pareteum stockholders would only have claims in negligence to pursue. Accordingly, Plaintiff's Section 11 and 12 claims are not subject to any heightened pleading requirement.

### 3.    Plaintiff Adequately Alleges Sections 11 and 12 Claims Against Pareteum and the Control Person Defendants for the iPass Acquisition

Plaintiff alleges that (1) Pareteum was the offeror and registrant for the iPass Acquisition (¶466); (2) the iPass Registration Statement contained and incorporated materially false and misleading statements regarding 2018 revenues (*supra* §III.B.1; ¶¶385-89); (3) Plaintiff purchased or otherwise acquired Pareteum stock in the iPass Acquisition pursuant to or traceable to the iPass Registration Statement (¶476); and (4) each of the Control Person Defendants (a) was an officer and/or director at the relevant time, (b) signed the iPass Registration Statement and the FY2018 Form 10-K incorporated therein, and (c) caused the issuance of the Statement. ¶¶31-33, 305, 392, 467. Accordingly, pursuant to black letter law, Pareteum and the Control Person Defendants are strictly liable for the false and misleading statements in the iPass Registration Statement, and Plaintiff adequately pleads Section 11 and 12 claims against them. *In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 730 (S.D.N.Y. 2005) (directors "liable under Section 11(a) by means of their signature of the Registration Statement and their roles with the company").[50]

In response to this straightforward application of black letter law, Pareteum and the Control Person Defendants offer precious little. **First**, they argue that Plaintiffs have alleged no particularized scienter allegations against Lippert, van Sante, or Jiminez-Tunon. Dkt. No. 143-1 at 43 n.11. But, again, scienter is not a required element and, even if it were, Plaintiff alleges that *all*

---

[50]    Indeed, "'[t]he liability of a director who signs a registration statement does not [even] depend upon whether or not he read it or, if he did, whether or not he understood what he was reading.'" *In re Livent*, 355 F. Supp. 2d at 733.  Further, to the extent the Control Person Defendants attempt to meet their burden of proving their due diligence as an affirmative defense, Plaintiff does not need to plead their lack of due diligence, *id.* at 729, and Plaintiff nonetheless adequately alleges that they failed in that duty. ¶¶45, 392, 468.

of the Control Person Defendants signed the iPass Registration Statement and the FY2018 Form 10-K, which is sufficient to allege scienter. *Supra* §III.C.1; ¶¶305, 392, 467.

**Second**, Pareteum and the Control Person Defendants argue that the iPass Acquisition prospectus was not *really* a prospectus because the acquisition was a private offering, such that Pareteum did not *need* to issue a prospectus. Dkt. No. 143-1 at 44. But they cannot change reality in retrospect. There is no contesting the fact that Pareteum and the Control Person Defendants filed a "prospectus",[51] and Section 12 unequivocally provides liability for a *seller* that "offers or sells a security…*by means of a prospectus*." Setting aside this determinative fact, (1) whether the iPass Acquisition offering was public or private "requires a fact-specific analysis on a case by case basis" not appropriate to a motion to dismiss, and (2) Pareteum and the Control Person Defendants have the burden of establishing that it was private, *which they have not even attempted to do*. *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 310 F. Supp. 2d 819, 862, 866 (S.D. Tex. 2004) ("discovery and submission of evidence are essential before such a determination can be made"; "defendant bears the burden of proving a private-offering-exemption affirmative defense").[52]

To the contrary, although not required to do so, Plaintiff has demonstrated that the transaction is public. "[T]o be public an offer need not be open to the whole world." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 123 (1953). "Registration exemptions are construed strictly" and whether an exemption applies "turn[s] on whether the particular class of persons affected need the

---

[51]    ¶¶386, 392; *see also* Nicholson Dec., Ex. 1, excerpt of 12/3/18  Registration Statement, at intro ("Pareteum…is offering…upon the terms and subject to the conditions *set forth in this prospectus/offer*"); *id.* at Ex. 99.4 ("Enclosed for your consideration are a *prospectus/offer*"; urging shareholders to "read…the enclosed *prospectus/offer* to exchange"). The Court may consider this document as it is "incorporated by reference in the complaint" and can consider and take judicial notice of it because it is publicly filed with the SEC. *DataCatalyst, LLC v. Ifoverity*, LLC, 20-310, 2020 U.S. Dist. LEXIS 46990, at * 2 n.2 (S.D.N.Y. May 17, 2020) (Hellerstein, J.); *AQ Consulting WLL v. Branca*, 10-7496, 2011 U.S. Dist. LEXIS 9474, at * 3 (S.D.N.Y. Jan. 19, 2011) (Hellerstein, J.).
[52]    *See also Fisk v. SuperAnnuities,* 927 F. Supp. 718, 730-31 (S.D.N.Y. 1996) (denying motion to dismiss; despite offer being structured to come within private placement exemption, questions remained whether offering was actually private; burden rests with defendant to establish offering was covered by statutory exemption); *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 540 (S.D.N.Y. 1977) (questions of fact precluded summary judgment).

protection of the [Securities] Act" – *i.e.*, the knowledge of the potential investors and whether they have the information a registration would have disclosed. *SEC v. Telegram Grp. Inc.,* 19-9439, 2020 U.S. Dist. LEXIS 53846, at *23-24 (S.D.N.Y. Mar. 24, 2020); *see also S.E.C. v. Cavanagh*, 445 F. 3d 105, 115 (2d Cir. 2006) and *Ralston Purina.,* 346 U.S. at 125. Only "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'" *Id.* The iPass Acquisition in this case involved the issuance of 9,865,412 shares of Pareteum stock to the former *public* shareholders of iPass (which was itself a publicly traded company) in exchange for their iPass stock. ¶476. These *public* shareholders did not take part in the negotiations of the terms or consideration of the iPass Acquisition, and they relied on the information provided in the Registration Statement in deciding on the Acquisition. ¶476. This is not even close to the type of private transaction between sophisticated investors who can fend for themselves that the *Ralston* Court sought to exempt from Section 12 liability.[53]

**Third**, Pareteum and the Control Person Defendants argue that the alleged misrepresentations were not contained in the iPass Prospectus, but instead were in "the SEC filings incorporated into the iPass Registration Statement." Dkt. No. 143-1 at 44-45. This is incorrect.

1. Plaintiff alleges that the iPass Registration Statement contained *its own* false and misleading statements regarding Pareteum's "Historical Revenues" – the same revenues *it later admitted need to be restated*. ¶¶387-88.

---

[53] The cases cited by Pareteum and the Control Person Defendants are easily distinguishable, as they involved irrefutably *private* transactions. *Gotham Holdings, LP v. Health Grades, Inc.*, involved a sale to "*institutional investors*, not the public at large," "the transactions were *private* ones in the secondary market," and plaintiffs conceded that the prospectus did not include false statements. 534 F. Supp. 2d 442, 444-45 (S.D.N.Y. 2008). *Yung v. Lee* involved a "series of *private* subscription and letter agreements," plaintiffs acknowledged that they did not qualify as a "prospectus," and the parties agreed that they "were not offered…by means of publicly disseminated advertisements." 432 F.3d 142, 145-49 (2d Cir. 2005). Notably, *Yung* acknowledged that a separate transaction – like the iPass Acquisition – involving a prospectus that was a part of a registration statement where a parent offered to exchange its subsidiary's shares to the parent's stockholders for their holdings was a public offering. *Id.* at 144, 149.

2.  The iPass Registration Statement qualifies as a "prospectus"[54] because it (1) included a Form S-4 Registration Statement (which meets the definition of a "prospectus") *and* an actual Form 424(b)(3) Prospectus (which provides "information contained in the registration statement" and forms part of the Form S-4 Registration Statement) and (2) is by its own terms an "offer and sale of shares of Pareteum common stock." ¶¶385-90.

3.  The false and misleading statements contained within the actual, Form 424(b)(3) prospectus were incorporated by reference into the Form S-4 Registration Statement, which specifically stated that it "*incorporates by reference* important business and financial information," including the quarterly reports Plaintiff alleges to be false and misleading and "all reports and other documents subsequently filed by us…after the date of *this prospectus* and prior to the termination of this offering."[55]

4.  The Form 424(b)(3) Prospectus – which is similar in form to the Form S-4 Registration Statement, provides nearly identical information, and also incorporated the relevant quarterly reports – states that "[t]his document is a part of that registration statement."[56]

**Fourth**, Pareteum and the Control Person Defendants' argument that the incorporation by reference of SEC filings that contain false and/or misleading statements is insufficient to impose Section 12 liability is just wrong. Courts regularly allow claims to proceed based on alleged misrepresentations contained in SEC filings incorporated by reference into a registration statement. *See*, *e.g.*, *In re Lehman Bros.*, 799 F. Supp. 2d at 315-16 (financial statements incorporated into offering materials sufficient to state Exchange Act claim); *In re Am. Int. Gp*, 751 F. Supp. 2d at 539 ("The alleged material misstatements and omissions in the documents *incorporated by reference in the registration statements*…suffice to state a claim against these defendants under Section 11.").

---

[54]     *See* 15 USCS § 77b ("term 'prospectus' means any prospectus, notice, circular, advertisement, letter, *or communication*…,which offers any security for sale or confirms the sale of any security"); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995) ("the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder"); *id.* at 569 ("'prospectus'…is confined to a document that…*must include the 'information contained in the registration statement*'"); *id.* at 574 ("the term prospectus refers to a document soliciting the public to acquire securities"); *see also Fisk,* 927 F. Supp. at 730 ("document that, but for a statutory exemption, would be required to contain the information contained in a registration statement would be a Section 10 prospectus and therefore subject to Section 12(2)").

[55]     *See* Nicholson Dec., Ex. 1, excerpt of 12/3/18 Registration Statement, at 1, 122.

[56]     *See* Nicholson Dec., Ex. 2, excerpt of 2/4/19 Prospectus/Offer to Exchange, at 1, 129-30.

4.      **Plaintiff Adequately Alleges Section 11 Claims Against Defendants for the Secondary Offering**

a.      **Claims Against Pareteum and the Control Person Defendants**

Plaintiff likewise alleges that (1) Pareteum was the offeror and registrant for the Secondary Offering (¶400); (2) the Secondary Offering Registration Statement contained and incorporated the same materially false and misleading statements regarding Pareteum's 2018 revenues (*supra* §III.B.1; ¶¶396-98); (3) Plaintiff purchased or otherwise acquired Pareteum stock in the Secondary Offering pursuant to or traceable to the Secondary Offering Registration Statement (¶476); and (4) each of the Control Person Defendants (a) was an officer and/or director at the relevant time, (b) signed the Secondary Offering Registration Statement and the FY2018 Form 10-K incorporated therein, and (c) caused the issuance of the Statement. ¶¶31-33, 305, 392, 492. Accordingly, for the same reasons outlined above, Pareteum and the Control Person Defendants are strictly liable for the false and misleading statements and omissions in the Secondary Offering Registration Statement, and Plaintiff adequately pleads Section 11 and 12 claims against them. *Supra* §III.C.3.[57]

b.      **Claims Against Squar Milner**

Section 11 extends liability for misstatements in registration statements to an accountant that "prepared or certified *any part* of the registration statement" or "*any report or valuation* which is used in connection with the registration statement, with respect to the statement…which purports to have been prepared or certified by him." *In re Am. Realty Capital Props., Inc. Litig.*, 15-40, 2015 U.S. Dist. LEXIS 151966, at *16 (S.D.N.Y. Nov. 6, 2015) (Hellerstein, J.). In other words "[a]ccountants may be found liable under Section 11 for portions of registration statements that they audited." *In re Lehman Bros. Sec.*, 131 F. Supp. 3d 241, 260 (S.D.N.Y. 2015). Under

---

[57]     Although not required to do so (*supra* n.50), Plaintiff nonetheless again adequately alleges that the Control Person Defendants failed in their duty to make a reasonable and diligent investigation. ¶¶401, 468, 493.

*Omnicare*, an auditor's liability is limited to situations where (1) the auditor does not actually hold the stated opinion; (2) the opinion contains an embedded statement of fact that is misleading; or (3) the opinion omits a fact that makes the opinion misleading to an ordinary investor. *In re Am. Realty Capital.*, 2015 U.S. Dist. LEXIS 151966*, at *17; *Omnicare*, 135 S. Ct. at 1326-30.

Here, Plaintiff adequately alleges that (1) Squar Milner served as Pareteum's independent auditor (¶35); (2) Squar Milner issued an Audit Report that was included in the FY2018 Form 10-K (¶¶8, 35, 71); (3) the FY2018 Form 10-K contained statements regarding revenues and revenue recognition procedures (¶307); (4) Squar Milner concluded that, despite having found "material weaknesses" in "internal control[s] over financial reporting," these weaknesses did not affect its Audit Report, and it issued an unqualified opinion certifying that Pareteum's financial statements fairly presented its financial position and were prepared in accordance with GAAP (¶¶359, 362, 494); (5) the FY2018 10-K, its financial statements, and the Audit Report were incorporated by way of a Supplemental Prospectus into the Secondary Offering Registration Statement (¶¶394, 396); (6) as admitted in the Restatement Release, certain FY18 and 1H19 revenues were "prematurely or inaccurately recognized," which would impact numerous other balance sheet line items (¶306); (7)  Squar Milner owed a duty to independently verify and investigate these representations (¶402); and (8) it failed to do so, despite *significant* red flags and having served as Pareteum's auditor since 2014. ¶402; Dkt. No. 145 at 4. These allegations are sufficient to state a Section 11 claim against Squar Milner regarding the Secondary Offering. *See In re Am. Realty Capital Props.*, 15-40, 2016 U.S. Dist. LEXIS 196190, at *26. (S.D.N.Y. Aug. 5, 2016).[58]

---

[58]     *See also In re First Merchants Acceptance Corp. Sec. Litig.*, 97-2715, 1998 U.S. Dist. LEXIS 17760, at *32-33 (N.D. Ill. Nov. 4, 1998) (magnitude of misstatements, specific GAAP violations, and red flags together support inference that audit amounted to no audit at all or an egregious refusal to see obvious or investigate doubtful); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (GAAP violations, auditor's six-year engagement, magnitude of misrepresentations, and auditor's ignorance of red flags sufficient).

In defense, Squar Milner argues that Plaintiff alleges no fact from which it can be inferred that it did not actually hold the opinions contained within its Audit Report. Dkt. No. 145 at 12-14. But Plaintiff adequately alleges that serious red flags regarding Pareteum's failure to convert Backlog and connections to revenue and its ballooning accounts receivables existed throughout 2018 (*supra* §III.B.1.a.ii) and that the Audit Report was incorporated into the Secondary Offering Registration Statement *after* the Aurelius and Viceroy Reports, which raised additional red flags about the reliability and integrity of Pareteum's financial statements, ***less than one month*** before the Secondary Offering. ¶494. Plaintiff also adequately alleges that the Audit Report contained an embedded statement of fact that was misleading (namely, the overstated revenue numbers and that Pareteum's financial statements fairly presented its financial position and were prepared in accordance with GAAP) and omitted facts that made the Audit Report misleading (namely, that Pareteum did not have adequate controls and that its Backlog was not converting to revenue as advertised). ¶¶365-70. These allegations remove the Audit Report from *Omnicare's* protections. *In re Am. Realty Capital Props.*, 2016 U.S. Dist. LEXIS 196190, at *26 (that auditor "was privy to information that plausibly challenged the reliability of [company's] accounts and that [auditor] negligently failed to heighten its audit investigation" "[e]nough…to satisfy *Omnicare* and to require [auditor] to show by way of affirmative defense that it should not be liable because it exercised due diligence"); *In re Scottish Re Gp. Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) (auditor's familiarity with company's finances suggest its opinion was false).

### c.    Claims Against Dawson James

Finally, "[a]n underwriter may be held liable under Section 11…if 'any part of the registration statement, when such became effective, contained an untrue statement of material fact or omitted to state a material fact.'" *Perry v. Duoyuan Printing, Inc.*, 10-7235, 2013 U.S. Dist. LEXIS 121034, at *28 (S.D.N.Y. Aug. 22, 2013). As there is no scienter requirement for Section

82

11 liability (*supra* §III.C.1), a plaintiff need only allege that: (1) it purchased a registered security either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to make the statements therein not misleading. *Duoyuan Printing*, 2013 U.S. Dist. LEXIS 121034, at *28; *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 343 (S.D.N.Y. 2003) ("need not plead that [underwriter] had knowledge of the alleged omission").

Plaintiff adequately alleges that (1) Dawson James was the underwriter for the Secondary Offering (¶34) and (2) the Secondary Offering Registration Statement contained and incorporated false and misleading statements regarding Pareteum's 2018 revenues. ¶¶385-91, 396-98. That is all that is required. Further, although not required to do so,[59] Plaintiff also alleges that (3) Dawson James had a duty to make a reasonable and diligent investigation (¶¶402, 496) and (4) failed to do so, again despite *significant* red flags publicly raised by other analysts and market commentators *of which it should have been aware* in light of the fact that it provided extensive research on Pareteum and its industry and frequently commented on its revenues and growing Backlog. ¶¶402, 496. These allegations are again sufficient to state a Section 11 claim against Dawson James regarding the Secondary Offering, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. at 343; *Duoyuan Printing,* 2013 U.S. Dist. LEXIS 121034, at *28, which Dawson James essentially concedes, having not even bothered to file its own motion to dismiss.

---

[59]    *See supr*a n.50*; In re Majesco Secs. Litig.*, 05-3557, 2006 U.S. Dist. LEXIS 73563, at *16-17 (D.N.J. Sept. 29, 2006) (Section 11 due diligence inquiry "not one for a motion to dismiss" [but] is "an affirmative defense.").

### d. Plaintiff Adequately Pleads that it Purchased Shares Pursuant or Traceable to the Secondary Offering

Defendants also argue that Plaintiff does not have standing to assert Section 11 claims based on the Secondary Offering. Dkt. No. 143-1 at 45-46; Dkt. No. 145 at 7-11. "[T]o establish standing under [Section 11] at the motion to dismiss stage, Plaintiffs need *only* assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'" *In re BioScrip*, 95 F. Supp. 3d at 746. A plaintiff is specifically "*not* required to explain how their shares can be traced," *In re Authentidate Holding Corp.*, 05-5323, 2006 U.S. Dist. LEXIS 47971, at *20 (S.D.N.Y. July 14, 2006), and an "allegation that they purchased the notes 'pursuant to or traceable to the materially false and misleading' registration statements suffices, at this stage, to establish their standing under Section 11." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015).[60] Here, Plaintiff alleges just that: "Lead Plaintiff purchased Pareteum shares pursuant or otherwise traceable to the Secondary Offering Registration Statement…." ¶¶404, 489. That is all that is required as a matter of black letter law, and the Court need go no further.

Nonetheless, Plaintiff has gone further than required by law and actually demonstrated that it has standing. Specifically: (1) the $40 million Secondary Offering consisted of 18,852,273 units of stock and warrants; (2) the shares of stock and warrants were sold together at a combined price of $1.76 per unit, and the pre-funded warrants and purchase warrants were sold at a price of $1.75 per unit; (3) on September 20, 2018, Pareteum stock opened at $1.57 per share, *traded between $1.51 per share and $1.68 per share*, and closed the day trading at $1.67 per share, on volume of *13.86 million shares*; and (4) that week, the stock traded on average daily trade volume of just 3.92

---

[60]     *See also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) ("pleading requirement for Section 11 standing is satisfied by *general* allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement"); *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) ("Plaintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased 'pursuant to' or traceable to false registration statement have been held sufficient to state a claim.")

million shares, exclusive of September 20. ¶¶169-70 and n.28, 394-95. Plaintiff's certification establishes that, on September 20, 2018 – the day of the Secondary Offering, when the Company sold 18,852,273 shares into the market, resulting in trading volume *four times* higher than usual – Plaintiff member Moore purchased Pareteum stock at a price of *$1.62 per share*, just $0.15 below the Secondary Offering price and within the day's trading range. Dkt. No. 98-3 (certification). These facts are sufficient to lead to a reasonable inference that Moore's purchases were "pursuant to, or traceable to," the Secondary Offering – which Plaintiff specifically alleges. *See In re Mun. Mortg. & Equity, LLC,* 876 F. Supp. 2d 616, 658 (D. Md. 2012) (allegations that plaintiff purchased stock one day after commencement of secondary offering $0.19 below offering price adequate to present plausible claim.).[61]

### e.     Plaintiff Adequately Pleads Loss Causation

Finally, Squar Milner (alone) argues that Plaintiff has not adequately alleged loss causation. But "[l]oss causation is not an element of a claim under §11, but 'negative causation' is an affirmative defense to such a claim." *In re Am. Realty Capital Props., Inc. Litig.*, 2015 U.S. Dist. LEXIS 151966, at *17.[62] What is more, ***for section 11 claims, loss causation is presumed.*** *Levine*, 508 F. Supp. 2d at 273; *see also In re WRT Energy Sec. Litig.*, 96-3610, 2005 U.S. Dist. LEXIS 18701, at * 4 (S.D.N.Y. Aug. 30, 2005) ("any decline in value is presumed to be caused

---

[61]     The one case Pareteum and the Control Person Defendants cite is entirely inapposite. There, plaintiffs alleged that they purchased securities in *two of fifteen* separate offerings, each with its *own supplemental prospectus*. *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F. Supp. 2d 254, 264 (S.D.N.Y. 2010). Defendants argued, and the court agreed, that plaintiffs lacked standing to assert claims related to the *other thirteen* offerings. *Id.* In short, plaintiffs did not have standing to bring Section 11 claims related to securities that they *did not allege they bought*– hardly a controversial conclusion, but one that is entirely inapplicable to this case. Squar Milner argues that Moore "quickly sold these shares for a gain" and, as a result, cannot demonstrate damages. Dkt. No. 145 at 11. However, "a plaintiff has no obligation to plead damages under Section 11." *Employees' Ret. Sys. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 155 (S.D.N.Y. 2011). Therefore, this argument is wrong and premature. *See infra* §III.C.4.e, n.63-64. Further, *arguendo*, it is well-established that, under the PSLRA, a lead plaintiff does not need to have standing to sue on every cause of action that is brought on behalf of the class anyway, *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004), which is why courts often add named plaintiffs at class certification. *See Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 669 n.38 (C.D. Cal. 2005); *Glob. Crossing*, 313 F. Supp. 2d at 205.
[62]     *See also Levine*, 508 F. Supp. 2d at 272 ("[l]oss causation…is not an element of a § 11 claim").

by the misrepresentation"). As such, "the burden of disproving loss causation falls on defendants," *Levine*, 508 F. Supp. 2d at 272, and, "[b]ecause an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial" – not on a motion to dismiss. *Levine*, 508 F. Supp. 2d at 272-73; *see also In re Am. Realty*, 2015 U.S. Dist. LEXIS 151966, at *17-18 (denying dismissal; "burden will be on the defendants to prove negative causation as an affirmative defense at a later stage in the litigation").

For a defendant to achieve dismissal of a Section 11 claim at the pleading stage based on a lack of loss causation, the complaint must "on its face negate the factual presumption of causation." *Levine,* 508 F. Supp 2d at 274; *see also Haw. Structural Ironworkers*, 422 F. Supp. 3d at 854 ("absence of loss causation is an affirmative defense that only warrants dismissal if it is 'apparent from the face of the complaint.'"). That is not the case here, as (1) Pareteum's stock price dropped after the falsity of the FY2018 10-K and related financial statements, which Squar Milner certified, was revealed (¶¶90, 156, 435); (2) Plaintiff sustained damages as a result (¶404); and (3) there is nothing on the face of the Complaint that negates the factual presumption of causation.[63] "As a matter of law, an allegation that an 'investment has declined in value…is a cognizable loss for the purposes of Section 11.'" *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 08-8781, 2011 U.S. Dist. LEXIS 46066, at *22 (S.D.N.Y. Apr. 28, 2011). Accordingly, "the Court must draw the inference that Plaintiff['s] losses could have been the result of the alleged misstatements. To conclude otherwise places a burden of pleading loss causation on the [P]laintiff[], and removes

---

[63]     In response, Squar Milner argues that Plaintiff's loss is not causally connected to its Audit Report because (1) the pumping up of Pareteum's stock had nothing to do with the financial statements it audited, (2) by the time the Secondary Offering occurred, the "historical information in the 2018 financial statements was old and cold," and (3) the Aurelius and Viceroy Reports resulted in "a large volume of trading activity and downward stock-price corrections." Dkt. No. 145-1 at 14-16. But the Company's stock price declined further upon the Restatement Release. ¶¶176-78, 184. Moreover, while it is possible that, "[a]t the summary judgment stage, [Squar Milner] may have a surefire affirmative defense," that is the subject for another day. *Levine*, 508 F. Supp. 2d at 274.

the burden of establishing negative causation from [D]efendants, where it properly lies." *In re WRT Energy*, 2005 U.S. Dist. LEXIS 18701, at \*5.

### 5. Plaintiff Adequately Pleads a Section 15 Claim Against the Control Person Defendants

Finally, like Section 20(a), to state a claim for control-person liability under Section 15, plaintiff must allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re Refco*, 503 F. Supp. 2d at 637. The Control Person Defendants do not dispute control, contesting only whether there is primary liability. Dkt. No. 143-1 at 45. There is (*supra* §§III.C.3-4), and Plaintiff has therefore stated a Section 15 claim.

### D.   THE ALTERNATIVE MOTION TO STRIKE SHOULD BE DENIED

As a final, *alternative* effort, Pareteum and the Fraud Defendants seek to strike Plaintiff's allegations regarding non-parties Honig, Thomas, and Hart. Dkt. No. 143-1 at 46. But "courts should not tamper with the pleadings unless there is strong reason for so doing," *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976), especially where, as here, "the decision to strike hinges on an evidentiary question." *SEC v. Honig*, 18-8175, 2020 U.S. Dist. LEXIS 31961, at \*14 (S.D.N.Y. Feb. 25, 2020).[64] For this reason "[m]otions to strike are not favored and will not be granted unless it is clear that the allegations in question can have *no possible bearing* on the subject matter." *Lennon v. Seaman*, 63 F. Supp. 2d 428, 446 (S.D.N.Y. 1999). The Alternative Motion to Strike falls far short of this exacting standard because it is premised on the false notions that (1) allegations regarding any person who is not a defendant in the action can *never* be relevant, and (2) allegations regarding prior bad acts are *always* inadmissible propensity evidence. Dkt. No. 143-1 at 46, 49-50. Of course, neither is true.

---

[64]    *See also Lipsky*, 551 F.2d at 893 ("Evidence questions…should especially be avoided at such a preliminary stage" because "relevancy and admissibility in general require the context of an ongoing and unfolding trial").

The Complaint alleges that the Pareteum shareholders were merely the latest victims of a recurring cast of serial pump-and-dump perpetrators, most of whom appear connected through Honig. *Indeed, the fact that Pareteum and the Fraud Defendants are seeking to scrub the Complaint of references to Honig, **seemingly on Honig's behalf**, supports this.* Although Honig is not a party ***yet***, rather than impermissible propensity evidence, the SEC's allegations against him and his omnipresent involvement with Pareteum (including through former director and current interim CFO Thomas) evince Pareteum and the Fraud Defendants' *modus operandi*, motive, knowledge, plan, intent, and absence of mistake, thereby supporting scienter. *See* Fed. R. Evid. 404(b)(2) (permitting evidence of prior bad acts to show these elements); *U.S. Surgical Corp. Sec. Litig. v. Hirsch*, 92-374, 1995 U.S. Dist. LEXIS 20895, at *77 (D. Conn. Apr. 12, 1995) (prior SEC consent decree admissible to show "intent to commit securities fraud"). Indeed, in *SEC v. Honig* itself, this Court rejected a similar motion to strike, finding the movant's prior involvement with Honig provided "critical context" and "could go toward proving…intent, plan, knowledge, or absence of mistake." 2020 U.S. Dist. LEXIS 31961, at *15-16. In short, the allegations Pareteum and the Fraud Defendants seek to strike "***point to scienter rather than scandal***." *SEC v. Treadway*, 11-1534, 2011 U.S. Dist. LEXIS 73950, at *9 (S.D.N.Y. July 1, 2011).[65]

Pareteum and the Fraud Defendants' few counterarguments go nowhere. The authorities they cite do not support a different result.[66] Both Thomas' positions and Hart's conviction are

---

[65]     Likewise, Hart's conviction for *violations of the federal securities laws* – which was not a decade ago, but in 2015, three years before he was hired as Pareteum's investor relations representative – shows that he was intimately aware of the relevant securities laws and how to comply (or not) with them. ¶¶7, 63-64; *see U.S. Surgical*, 1995 U.S. Dist. LEXIS 20895, at *77 (prior SEC consent decree showed "knowledge of SEC regulations").

[66]     *Lipsky*, *Lynch*, and *Shahzad* are inapposite because Plaintiff is not relying on these facts as propensity evidence. *See Tabor*, 579 F. Supp. 2d at 454 (*Lipsky* was limited "to the use of a consent decree as collateral estoppel"); *Lynch v. Southhamptom Animal Shelter Found, Inc.*, 278 F.R.D. 55, 66 (E.D.N.Y. 2011); *Shahzad v. H.J. Meyers & Co.*, 95-6196, 1997 U.S. Dist. LEXIS 1128 (S.D.N.Y. Feb. 4, 1997). *But see Great Rock Golf 2006, LLC v. Town of Riverhead*, 12-3585, 2013 U.S. Dist. LEXIS 101402, at *26 (E.D.N.Y. July 18, 2013) (settlements and consent decrees admissible to prove "knowledge, motive, and intent").

matters of public record, so the mere mention of them cannot prejudice anyone; rather, they provide "generally admissible background information." *Lynch*, 278 F.R.D. at 66. Pareteum and the Fraud Defendants also claim that there is "no evidence" to support the connections between Honig, Iroquois and IntraCoastal, and Pareteum (Dkt. No. 143-1 at 51-52), but that is plainly wrong, as outlined *ad nauseum* above. S*upra* §II.B. And it is not as if Plaintiff divined these allegations – two independent research reports noted them. *See* Complaint, Exs. 1, 2; *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) (rejecting attempt to strike allegations based on research group's investigative report).

The question at this stage is not whether the facts presented in the Complaint "may be ruled inadmissible at an eventual trial," but whether "the matter sought to be stricken clearly can have ***no possible relation*** to the matter in controversy." *Gelles v. TDA Indus., Inc.*, 90-5133, 1991 U.S. Dist. LEXIS 3135, at *21 (S.D.N.Y. Mar. 18, 1991). This Court has held that it may strike a pleading only "when it appears *beyond peradventure that it is a sham and false and that its allegations are devoid of factual basis.*" *Reis, Inc. v. Spring11 LLC*, 15-2836, 2016 U.S. Dist. LEXIS 131486, at *7 (S.D.N.Y. Sept. 24, 2016). Pareteum and the Fraud Defendants have failed to make that showing; the allegations should stand.

## IV.    CONCLUSION

For the reasons set forth herein, the Court should deny the Motions to Dismiss and the Alternative Motion to Strike.[67]

---

[67]    If the Court is inclined to grant any part of the motions to dismiss, Plaintiff requests leave to amend to cure any pleading deficiencies. "[L]eave to amend should generally be freely give[n]." *Shaw v. Empire Stock Transfer Inc.*, 381 F. Supp. 3d 286, 293 (S.D.N.Y. 2019) (Hellerstein, J.). "Where the possibility exists that [a] defect can be cured, leave to amend should normally be granted." *Id.* In particular, "[l]eave to amend should be granted liberally in cases alleging securities fraud." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 518 (S.D.N.Y. 2009); *see also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 379 (S.D.N.Y. 2013) "[I]t is the usual practice to grant at least one chance to plead fraud with greater specificity when a complaint is dismissed under Rule 9(b).").

Dated:  June 12, 2020

Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Melinda A. Nicholson*
LEWIS S. KAHN
MELINDA A. NICHOLSON (MN-6251)
MICHAEL J. PALESTINA (admitted PHV)
MELISSA H. HARRIS (MH-3553)
1100 Poydras Street – Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: Lewis.Kahn@ksfcounsel.com
Email: Melinda.Nicholson@ksfcounsel.com
Email: Michael.Palestina@ksfcounsel.com
Email: Melissa.Harris@ksfcounsel.com

-and-

J. RYAN LOPATKA
**KAHN SWICK & FOTI, LLC**
250 Park Ave., Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: j.lopatka@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Pareteum
Shareholder Investor Group*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 12, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

CM/ECF participants. I further certify that I mailed the foregoing document and the notice of

electronic filing via U.S. first-class mail to any non-CM/ECF participants.

*/s/ Melinda A. Nicholson*
Melinda A. Nicholson

90

# APPENDIX

| Paragraph in Complaint | Reasons Why Statements are False and Misleading |
|---|---|
| ¶216 | Provides additional details why statements in ¶¶193-215 are false and misleading |
| ¶222 | Provides additional details why statements ¶¶217-221 are false and misleading |
| ¶224 | Refers to ¶¶173 and 222(c) for additional details why statement in ¶223 is false and misleading |
| ¶245 | Provides additional details why statements in ¶¶225-244 are false and misleading |
| ¶251 | Provides additional details why statements in ¶¶246-250 are false and misleading |
| ¶252 | Refers to ¶¶173 and 251(c) for additional details why statements in ¶250 are false and misleading |
| ¶270 | Refers to ¶272 and provides additional details why statements made in ¶269 are false and misleading |
| ¶272 | Provides additional details why statements in ¶¶253-271 are false and misleading |
| ¶280 | Provides additional details why statements in ¶¶273-279 are false and misleading |
| ¶281 | Refers to ¶¶173 and ¶280(c) for additional details about why statement in ¶279 is false and misleading |
| ¶283 | Refers to ¶296 and provides additional details why statements in ¶282 are false and misleading |
| ¶285 | Refers to ¶296 and provides additional details why statements in ¶284 are false and misleading |
| ¶287 | Refers to ¶296 and provides additional details why statements in ¶286 are false and misleading[1] |
| ¶289 | Refers to ¶296 and provides additional details why statements in ¶288 are false and misleading |
| ¶296 | Provides additional details why statements in ¶¶282-295 are false and misleading |
| ¶306 | Provides additional details why statements in ¶¶297-305 are false and misleading |
| ¶308 | Refers to ¶¶173 and 306(c) for additional details why statements in ¶307 are false and misleading |
| ¶323 | Refers to ¶326 and provides additional details why statements in ¶322 are false and misleading |
| ¶326 | Provides additional details why statements in ¶¶309-325 are false and misleading |
| ¶335 | Provides additional details why statements in ¶¶327-334 are false and misleading |
| ¶336 | Refers to ¶¶173 and 335(c) for additional details why statements in ¶223 are false and misleading |

---

[1]    Paragraph 287 should read "October 17, 2018 release, not "November 17, 2018 release."

92

| Paragraph in Complaint | Reasons Why Statements are False and Misleading |
|---|---|
| ¶342 | Provides additional details why statements in ¶¶337-341 are false and misleading |
| ¶348 | Provides additional details why statements in ¶¶343-347 are false and misleading |
| ¶350 | Refers to ¶¶178 and 348(c) for additional details why statements in ¶346 are false and misleading |
| ¶356 | Refers to ¶¶187 and 222 for additional details why statements in ¶¶352-355 are false and misleading |
| ¶357 | Refers to ¶¶187 and 251 for additional details why statements in 2Q:2018 are false and misleading |
| ¶358 | Refers to ¶¶187 and 280 for additional details why statements in 3Q:2018 are false and misleading[2] |
| ¶364 | Refers to ¶¶187 and 306 for additional details why statements in ¶¶359-363 are false and misleading |
| ¶371 | Refers to ¶¶187 and 306 for additional details why statements in FY2018 Form 10-K SOX Certifications are false and misleading |
| ¶373 | Refers to ¶¶187 and 355 for additional details why statements in 1Q:2019 Form 10-Q are false and misleading |
| ¶375 | Refers to ¶¶187 and 348 for additional details why statements in 2Q:19 Form 10-Q are false and misleading |
| ¶381 | Provides additional details why statements in ¶¶378-380 are false and misleading |
| ¶384 | Explains that statements in ¶383 are false and misleading because "they failed to disclose all material information outlined in [*sic*] in ¶¶46-75 above" |
| ¶388 | Refers to §§VI.A and VI.B and provides details why statements in ¶387 are false and misleading |
| ¶389 | Refers to ¶¶217-224, 246-252, 273-281, and 352-358 for additional details why statements in iPass Registration Statement are false and misleading |
| ¶397 | Refers to ¶¶297-308, 343-350, and 359-375 and provides additional details why statements in ¶396 are false and misleading |
| ¶398 | Provides additional details why statements in ¶396 are false and misleading |

---

[2]    Paragraph 358 should read "reasons outlined in ¶¶*187* and 280 above," not "¶¶*1817*."