# Exhibit A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PARETEUM SECURITIES LITIGATION** | **Case No. 1:19-cv-09767-AKH-GWG** |

# <u>FIRST AMENDED CONSOLIDATED COMPLAINT</u>

**TABLE OF CONTENTS**

SUMMARY OF CLAIMS……………………………………………………... 1

JURISDICTION AND VENUE…………………………………………….. 2

EXCHANGE ACT ALLEGATIONS…………………………………………. 2

I. EXCHANGE ACT PARTIES……………………………………….. 2

    A. Lead Plaintiff……………………………………………….. 2

    B. Corporate Defendant………………………………………… 3

    C. Exchange Act Defendants…………………………………… 3

II. OVERVIEW OF THE EXCHANGE ACT CASE………………...……….. 4

    A. Turner Takes Over And Fabricates Metrics for Revenue and Growth ……………………………………………………….. 4

    B. Pareteum and the Exchange Act Defendants Materially Overstate Revenue and Inflate the Backlog …………………… 5

    C. After the Truth Is Partially Revealed, Pareteum and the Exchange Act Defendants Deny Everything and Falsely Reassure Investors……………………………………………. 10

    D. Pareteum and the Exchange Act Defendants Deny Everything Again ……………………………………………………….. 13

    E. Amidst Growing Liquidity Issues, Pareteum and the Exchange Act Defendants Close a $40 Million Secondary Offering……………………………………………………… 14

    F. The Full Truth Is Revealed…………………………………… 15

III. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS BY PARETEUM AND THE EXCHANGE ACT DEFENDANTS……………………………………………….. 16

    A. Statements Regarding Reported Revenue and Realized Revenue Growth Rates…..…………………………………. 16

    B. Statements Regarding Revenue Recognition, GAAP Compliance, Internal Controls, and Financial Reporting…….. 19

        1. Statements Regarding Revenue Recognition ………………… 19

        2. Statements Regarding GAAP Compliance, Internal Controls, and Financial Reporting……………………………………. 21

        3. Statements Reassuring Investors that They Could Rely on Pareteum's Financial Reporting ……………………………… 23

    C. Statements Regarding Backlog ………………………………… 26

i

| | | | |
|---|---|---|---|
| | 1. | Statements Regarding Backlog Value……………………….. | 27 |
| | | a. Statements about Backlog Additions in September and October 2018………………………………….. | 27 |
| | | b. Statements Regarding the Backlog's Total Value…….. | 32 |
| | 2. | Statements Regarding Backlog Conversion…………………... | 33 |
| D. | STATEMENTS REGARDING THE CREDIT FACILITY……………………… | | 37 |
| E. | STATEMENTS REGARDING GROWTH…………………………………… | | 38 |

**IV. THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER….** 42

| A. | PREMATURE REVENUE RECOGNITION, THE PENDING RESTATEMENT, GAAP VIOLATIONS, LACK OF CONTROLS, AND THE MAGNITUDE OF THE PENDING RESTATEMENT……………………………………………… | 42 |
|---|---|---|
| B. | MOTIVE AND OPPORTUNITY…………………………………….. | 42 |
| C. | EXECUTIVE TERMINATIONS, PRIOR BAD ACTS, CONCEALED CONNECTIONS, AND THE SCHEME………………………………….. | 44 |
| D. | ADDITIONAL SCIENTER ALLEGATIONS REGARDING BACKLOG…………. | 49 |
| E. | ADDITIONAL SCIENTER ALLEGATIONS BASED ON THE CRITICAL NATURE OF REVENUE AND BACKLOG AND DEFENDANTS' LEVEL OF INVOLVEMENT……………………………………………………… | 52 |

**V. LOSS CAUSATION AND ECONOMIC HARM………………………….** 54

**VI. PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET….** 57

**VII. NO SAFE HARBOR………………………………………………** 58

**VIII. EXCHANGE ACT COUNTS ……...………………………………..** 60

COUNT I – Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Pareteum and the Exchange Act Defendants………. 60

COUNT II – Violations of Section 20(a) of the Exchange Act Against Turner, O'Donnell, and Bozzo …………………………………………………….. 63

**SECURITIES ACT ALLEGATIONS………………………………….…..…..** 65

**I. SECURITIES ACT PARTIES……………………………………………** 65

| A. | LEAD PLAINTIFF…………………………………………………… | 65 |
|---|---|---|
| B. | CORPORATE DEFENDANT…………………………………………… | 65 |
| C. | CONTROL PERSON DEFENDANTS………………………………….… | 65 |
| D. | UNDERWRITER AND AUDITOR DEFENDANTS………………………… | 66 |

**II. THE IPASS ACQUISITION………………………………………….** 67

**III. THE SECONDARY OFFERING…………………………………….....** 69

A.     MATERIALLY FALSE AND MISLEADING STATEMENTS BY THE CONTROL PERSON DEFENDANTS MADE IN AND/OR INCORPORATED INTO THE SECONDARY OFFERING FILINGS…………………………………………… 70

B.     MATERIALLY FALSE AND MISLEADING STATEMENTS BY DJSI MADE IN AND/OR INCORPORATED INTO THE SECONDARY OFFERING FILINGS……. 72

C.     MATERIALLY FALSE AND MISLEADING STATEMENTS BY SQUAR MILNER MADE IN AND/OR INCORPORATED INTO THE SECONDARY OFFERING FILINGS………………………………………………………………… 73

IV.     **SECURITIES ACT COUNTS**………………………………………. 75

COUNT III – Violations of Section 11 of the Securities Act Against Pareteum and the Control Person Defendants (iPass Acquisition)………………………………….. 76

COUNT IV – Violations of Section 12 of the Securities Act Against Pareteum (iPass Acquisition)………………………………………………………………. 77

COUNT V – Violations of Section 15 of The Securities Act Against the Control Person Defendants (iPass Acquisition)…………………………….………………. 78

COUNT VI – Violations of Section 11 of the Securities Act Against Pareteum, the Control Person Defendants, DJSI, and Squar Milner (Secondary Offering)………….. 78

COUNT VII – Violations of Section 15 of the Securities Act Against The Control Person Defendants (Secondary Offering)……..………………………………. 80

**CLASS ACTION ALLEGATIONS**…………………………………………… 81

**PRAYER FOR RELIEF**……………………………………………………….. 83

**JURY TRIAL DEMANDED**……………………….…………………………… 83

iii

Lead Plaintiff (defined below), through undersigned Lead Counsel, on behalf of itself and the class it seeks to represent, alleges the following based upon the investigation of Lead Counsel, which included a review of SEC filings; regulatory filings and reports; press releases and other public statements; analysts' reports and advisories; media reports; publicly available documents; and the report of an independent investigator retained by Lead Counsel. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF CLAIMS

1. This federal securities class action is brought pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of purchasers and/or acquirers of Pareteum Corporation ("Pareteum" or the "Company") securities between December 14, 2017 and October 21, 2019, inclusive (the "Class" and the "Class Period"), against Defendants (defined below) for violations of Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) and/or violations of Section 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"). In the wake of revelations that Pareteum had overstated its reported revenues (by as much as 42%), realized revenue growth rates, and contractual revenue backlog for every quarterly and yearly period encompassed by the Class Period, between June 6 and October 22, 2019, when Pareteum finally disclosed a pending restatement (the "Restatement Release"), shares of Pareteum stock collapsed, falling 90%, from $3.60 per share to just $0.37 per share, wiping out hundreds of millions of dollars of investor equity. This action seeks to recover for those wrongs.

**JURISDICTION AND VENUE**

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and under Sections 11, 12, and 15 of the Securities Act. This Court thus has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

3. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). The acts and conduct complained of herein occurred in substantial part in this District.

4. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NYSE American and the Nasdaq stock market.

**EXCHANGE ACT ALLEGATIONS**

I. **EXCHANGE ACT PARTIES**

A. **LEAD PLAINTIFF**

5. Lead Plaintiff, the Pareteum Shareholder Investor Group, is comprised of Kevin Ivkovich, Stephen Jones, Keith Moore, Nicholas Steffey, and Robert E. Whitley, Jr., who, as set forth in their attached certifications, incorporated by reference, acquired Pareteum securities at artificially inflated prices during the Class Period and were harmed when the true facts were revealed and the artificial inflation was removed from the stock price at the end of the Period.

2

## B.    CORPORATE DEFENDANT

6.     Defendant Pareteum is a Delaware corporation that maintains its principal place of business at 1185 Avenue of the Americas, 37th Floor, NY, NY. 10036. Throughout the Class Period, Pareteum's securities traded on the NYSE American under the ticker symbol "TEUM" until the market close on October 22, 2018, and then on the Nasdaq exchange under the symbol "TEUM" beginning on October 23, 2018. Pareteum is a telecommunications software services provider that targets Mobile Virtual Network Operators ("MVNO"), which provide wireless communications but do not own network infrastructure or make their own software, instead renting bandwidth from network operators and purchasing software from companies like Pareteum.

## C.    EXCHANGE ACT DEFENDANTS

7.     Defendant Robert H. "Hal" Turner ("Turner") was, during the Class Period, Executive Chairman of Pareteum's Board of Directors (at all times), its Principal Executive Officer (until May 24, 2019), and then its Chief Executive Officer ("CEO") (effective May 24, 2019).[1] Turner signed and certified the Company's Class Period 10-Qs and 10-K and made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading at that time. Turner was terminated on November 25, 2019, in the wake of the Restatement Release.

8.     Defendant Edward "Ted" O'Donnell ("O'Donnell") was Pareteum's Chief Financial Officer ("CFO") during the Class Period. O'Donnell signed and certified the Company's Class Period 10-Qs and 10-K and made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading at that time.

---

[1]     Effective May 24, 2019, the Company changed the titles of certain of its named executive officers.

3

O'Donnell was replaced as CFO in the wake of the Restatement Release, pending a review of his "status with the Company."

9. Defendant Victor Bozzo ("Bozzo") was, during the Class Period, Pareteum's CEO (until May 24, 2019), and then its Chief Commercial Officer (effective May 24, 2019). Bozzo signed the Class Period 10-K and made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading at that time.

10. Defendant Denis McCarthy ("McCarthy") was, during the Class Period, Pareteum's President (until May 24, 2019), and then its Chief Operating Officer ("COO") (effective May 24, 2019). McCarthy made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading at that time. McCarthy was terminated on October 9, 2019, twelve days before the Restatement Release. Turner, O'Donnell, Bozzo, and McCarthy are collectively referred to herein as the "Exchange Act Defendants."

## II. OVERVIEW OF THE EXCHANGE ACT CASE

### A. TURNER TAKES OVER AND FABRICATES METRICS FOR REVENUE AND GROWTH

11. Prior to November 2015, Pareteum was a declining penny stock known as Elephant Talk Communications Corporation. On November 17, 2015, Elephant Talk announced the appointment of Turner as Executive Chairman and Tim Payne (the company's then-current president) as interim CEO. While they were supposed to jointly manage, one month later, Mr. Payne was no longer interim-CEO. Instead, on October 31, 2016, as part of the "end of a successful 12-month restructuring effort," Elephant Talk rebranded as "Pareteum" and appointed Bozzo (Turner's former colleague) as CEO. On January 12, 2017, Pareteum announced the appointment

of O'Donnell as CFO. And, on February 21, 2018, Pareteum announced the appointment of McCarthy (another former Turner colleague) as SVP (and later President and COO).

12. As he assembled this new management team, Turner (along with all of the Exchange Act Defendants) changed the way Pareteum reported interim revenue by focusing analysts and investors on their self-created "36-month Contractual Revenue Backlog" (the "Backlog") metric, which they described as a "non-GAAP indicative number," a "key performance indicator [that] is directly correlated to our financial and operating results," and "*the value of new sales orders intake and the revenue **under** contract*" (emphasis added). Pareteum and the Exchange Act Defendants frequently reported the Backlog, emphasized its reliability, and represented that it was converting into "incremental monthly revenue" at or above 100%. As outlined below, throughout the Class Period, the Backlog's value was materially and artificially inflated and it was not converting to revenue at or above 100%.

**B.  PARETEUM AND THE EXCHANGE ACT DEFENDANTS MATERIALLY OVERSTATE REVENUE AND INFLATE THE BACKLOG**

13. During the Class Period, Pareteum and the Exchange Defendants falsely reported that Pareteum's reported revenues grew *729%*, from just $4.113 million in 1Q18 to $34.1 million in 2Q19, and that its Backlog grew *535%*, from $200 million in 1Q18 to $1.27 billion in 2Q19. Using as support these falsely overstated and inflated quarterly reported revenues and interim Backlog values, throughout the Class Period, Pareteum and the Exchange Act Defendants advanced a story of hyper-growth and success in signing customers to multi-year deals worth tens of millions of dollars in revenue. Based on this materially false information, the Company's stock price soared from a Class Period low of just $0.72 per share (the closing price on December 14, 2017, the first day of the Class Period, and the lowest the stock would close until the end of the

Class Period) to a trading high of $5.93 per share (on March 18, 2019) – *an 824% increase in price in just a few months*.

14.     Pareteum and the Exchange Act Defendants achieved this fraud through a classic pump-and-dump style barrage of press releases – 178 during the Class Period, over 130 in 2018 alone – in the majority of which they touted overstated revenues, fabricated or embellished customer and contracts wins, and/or an always-growing, inflated Backlog. To conceal their fraud, throughout the vast majority of the Class Period, they refused to identify the new customers and contract wins that supported their reported revenues and Backlog values. Only briefly, in a mere five press releases issued during September and October 2018, did Pareteum and the Exchange Act Defendants provide the identities of some of the new customers and contracts announced in those five press releases and their purported values. When those identities were subjected to analysis, they proved incapable of supporting the Backlog values, and, thus, the revenues, attributed to them by Pareteum and the Exchange Act Defendants.

15.     The Class Period begins with Pareteum and the Exchange Act Defendants priming the market to believe that the Company had undergone a successful "restructuring and repositioning" that "establish[ed] a strong outlook for our success in 2018 and beyond." Turner told investors that Pareteum was now focused on a "sales surge" to "deliver maximum value," and Pareteum began touting its increasing Backlog and "the magic of monthly recurring revenue." Following these statements, shares closed at $1.65 per share on December 19, 2017, from a closing price of $0.72 per share on December 14, 2017, on high volume.

16.     With the market primed, Pareteum and the Exchange Act Defendants commenced their barrage of press releases. In the first four months of 2018, they issued 58 press releases – *one every other day* – many of which announced overstated revenues, unidentified customers and

contract wins, and/or Backlog additions, often using over-the-top terminology or highlighting dramatic increases. Pareteum and the Exchange Act Defendants also represented that the Backlog metric was reliable (a "key performance indicator [that] is *directly correlated* to our financial and operating results") and that Pareteum was converting the Backlog at or above 100%, which they said would generate increasing revenues. The stock price continued to climb.

17. On May 7, 2018, Pareteum and the Exchange Act Defendants announced "record" 1Q18 results, reporting "[r]evenues of $4.113 Million, up 47% Year-Over-Year"; that the Backlog had reached $200 million following a $53 million quarter; and that Backlog revenue conversion had reached 103%. Based on these results, Pareteum raised its 2018 revenue outlook to at least 60% over 2017.

18. Having artificially quadrupled the Company's stock price in less than six months (to ~$2.50 per share), the Exchange Act Defendants used it as currency to acquire actual revenues and customers and to enrich themselves. First, on May 9, 2018, Pareteum and the Exchange Act Defendants sold 2,440,000 shares at $2.50 per share, raising $6,100,000 for "working capital and general corporate purposes." Second, on June 6, 2018, Turner increased his compensation by announcing an amendment to his employment agreement to provide for the automatic vesting of his restricted stock awards and options immediately upon the Company *entering into* an agreement to acquire another company. Then, *the next day*, June 7, 2018, Pareteum announced an agreement to acquire Artilium PLC ("Artilium") for $104.7 million in stock and cash. As a result, Turner's restricted stock awards and options instantly vested, and Pareteum acquired Artilium and its *actual* customers and revenue using its inflated stock as currency.

19. Over the next six months, from May to October 2018, Pareteum and the Exchange Act Defendants issued another 63 press releases – *one every third day* – the majority of which

7

announced overstated revenues, unidentified customer and contract wins, and/or Backlog additions, or otherwise primed the market to believe the growth narrative, the reliability of the Backlog, and that it was converting into revenue at or above 100%. On August 6, 2018, Pareteum and the Exchange Act Defendants again announced "record" 2Q18 results, reporting "revenues of $6 million, up 85% year-over-year"; that the Backlog had increased to $276 million; and that Backlog revenue conversion had reached 106%. Based on these results, Pareteum raised 2018 revenue outlook to be greater than 80% over 2017.

20.     On September 17 and October 2, 8, 17, and 23, 2018, Pareteum and the Exchange Act Defendants issued five press releases announcing $134 million in purported new contracts, in which they identified, for the first time, some (but not all) of the new customers and contracts announced in those releases. As alleged below (¶¶72-85), virtually all of the companies identified in these releases were incapable of generating the *$134 million* in revenues claimed by Pareteum. For example, Pareteum's single largest historical customer generated only approximately $7.15 million of Pareteum's revenues during 1H19. Because all of the subsequent iterations of the Backlog's value that followed the September and October 2018 press releases built sequentially upon each previous iteration and thus incorporated this $134 million in fabricated and embellished customers into its reported value, all statements regarding the Backlog's value that occurred after the October 23, 2018 press release were falsely inflated.

21.     Based on such fabricated and embellished contracts and customers, on October 24, 2018, Pareteum and the Exchange Act Defendants announced that they had grown the Backlog to $500 million – a "1,150% increase year over year since 2016." On November 7, 2018, Pareteum and the Exchange Act Defendants announced "record" 3Q18 results, reporting "Revenues of $8 Million, up 129% Year-Over-Year"; that the Backlog (described as a "key performance indicator")

8

had reached $403 million; and that it was converting to revenue at 100%. Based on these results, Pareteum raised its 2018 revenue outlook to greater than 100% over 2017.

22. In the interim, on October 1, 2018, Pareteum and the Exchange Act Defendants completed the previously announced acquisition of Artilium, issuing approximately 33.4 million shares of inflated stock (then valued at $3.00 per share, or $100.2 million) to former Artilium shareholders. A month later, on November 12, 2018, Pareteum and the Exchange Act Defendants again used the inflated stock price to buy a company with actual customers and revenues, announcing an agreement to acquire iPass Inc. ("iPass") in an all-stock tender offer (the "iPass Acquisition"), in which Pareteum issued approximately 10 million shares of inflated stock (valued at approximately $30 million). Turner admitted that the iPass Acquisition was a means of increasing Pareteum's "installed Connections" and, therefore, its revenue.

23. On February 26, 2019, Pareteum and the Exchange Act Defendants again took advantage of the artificial inflation in Pareteum's stock price to secure a $50 million Credit Facility (the "Credit Facility") from Post Road Group. Shareholders would later learn that Pareteum was in default of the Credit Facility essentially from the moment it was signed.

24. On March 12, 2019, Pareteum and the Exchange Act Defendants again reported "record" 4Q18 and FY18 results, reporting year-over-year revenue growth of 139% for FY18 and 256% for 4Q18, and that the Backlog had "quadrupled" to $615 million, with a 100% conversion rate. Based on these results, they provided accelerating revenue guidance for 2019 in the range of a 225–260% increase year-over-year. Later on March 12, 2019, during an earnings call, Turner and McCarthy conditioned the market to believe that Pareteum was poised to deliver even more "dramatic revenue growth…fueled by the growth of our [Backlog] and its conversion of that backlog into billing customers," claiming that the Backlog was a reliable indicator of revenue and

9

that it was converting into "incremental monthly revenue" at "over 100% for the year." Following these statements, shares jumped from a close of $3.91 per share on March 12, 2019 to a high of $5.15 per share before closing at $4.79 per share on March 13, 2019, on trading volume of 18.58 million shares. On March 19, 2019, shares traded at a Class Period high of $5.93 per share.

25. Throughout the rest of March, April, and May 2019, Pareteum and the Exchange Act Defendants published seventeen press releases, many announcing hundreds of millions of dollars in supposed new additions to the Backlog, including the Company's "very first $100 million new [Backlog] sales month." Even a single $50 million contract would have been several orders of magnitude larger than that of Pareteum's single largest customer.

26. On May 7, 2019, Pareteum and the Exchange Act Defendants announced 1Q19 results, reporting revenue of $23 million, a 460% increase over 1Q18; that the Backlog had reached $938 million; and that it was converting to revenue at 101%. Based on these results, Pareteum raised its 2019 revenue guidance to increase 255%-285% year-over-year. During a May 7, 2019 earnings call, Turner stated that "the most important phase for Pareteum is to convert those contracts to billable revenues" and assured investors that Pareteum was converting Backlog into revenues at 101%.

27. On May 8, 2019, Pareteum and the Exchange Act Defendants used Pareteum's inflated stock to acquire Devicescape for, in part, "slightly under" $2 million in stock.

**C. AFTER THE TRUTH IS PARTIALLY REVEALED, PARETEUM AND THE EXCHANGE ACT DEFENDANTS DENY EVERYTHING AND FALSELY REASSURE INVESTORS**

28. On June 7, 2019, the Aurelius Report – the first of two highly critical independent research reports – was published.[2] It revealed, for the first time, that Pareteum and the Exchange

---

[2] Marcus Aurelius Value, *TEUM: Where Are The Customers?* (June 7, 2019), *available at* http://www.mavalue.org/research/teum-where-are-the-customers/ (last visited July 16, 2020) (the "Aurelius Report").

Act Defendants had inflated revenues and Backlog by fabricating or embellishing customers and contracts and claiming that certain customers had the ability to generate tens of millions of dollars in revenue when they did not. The Aurelius Report supported these allegations with a detailed analysis of the Backlog and the few identified customers and contracts that supported it; provided evidence and examples of "purportedly valuable customers that appear[ed] wholly incapable of paying [Pareteum] anywhere near the large contractual values that [Pareteum] ha[d] touted"; and concluded that Pareteum's "Purported $900 Million Backlog Appear[ed] *Significantly Exaggerated or Fictitious*" (italics added). The Aurelius Report also uncovered evidence that Pareteum and the Exchange Act Defendants knew about the Backlog's "exaggerated or fictitious" nature, including "embellishments involving a significant portion of the 'notable partners and customers' that [they] highlighted in a graphic at its recent analyst day, suggesting [they] struggle[d] to find enough legitimate new customers to even fill a simple slide."

29. The Aurelius Report further concluded that Pareteum was not converting Backlog to revenue at or above 100%, supporting this allegation with evidence, including (a) that the booking of phantom revenue was the same kind of fraud purportedly conducted by O'Donnell at his previous employment and (b) an analysis of Pareteum's accounts receivable, which had "grown at sequential rates far faster than revenues in each of the last four quarters," which would not have occurred had the Backlog been converting at or above 100%. The Aurelius Report predicted that, "[i]f exaggerated contractual values are now being recognized as revenue then we believe [Pareteum] will face serious accounting problems" – as it later did, as disclosed in the Restatement Release.

30. These revelations caused shares to fall almost 45%, from a close of $3.41 per share on June 6, 2019, to an intra-day low of just over $2.00 per share, on very high volume.

11

31. Shares avoided total collapse, however, and the full truth was not yet revealed to the market, as Pareteum responded to the Aurelius Report on or about Monday, June 10, 2019 in a letter to shareholders from Turner, in which he stated: "We *categorically deny* the allegations put forth. We do not intend to legitimize those reports by delving in to them. Pareteum has experienced tremendous growth, and *we continue to grow in a healthy and measurable way*" (emphasis added).[3] On June 10, shares rebounded, closing at $3.00 per share for the day.

32. On June 26, 2019, the Viceroy Report – the second independent research report – was published.[4] The Viceroy Report substantially agreed with and independently corroborated the Aurelius Report and revealed new details, including that (a) a "deeper investigation into [Pareteum's] customers show [a] much larger number [we]re insignificant, and the companies behind them appear[ed] in no way capable of fulfilling the contract values advertised by Pareteum"; and (b) "[t]wo of Pareteum's customer wins appear[ed] to be undisclosed related parties" and another was under historic investigation and charged with tax evasion fraud, information that was "easily available, leading us to believe that Pareteum was aware of the company's issues while announcing the customer win."

33. Based on an analysis of Pareteum's revenues, cash flows, and receivables, the Viceroy Report concluded that "*the majority of [Pareteum's] revenue* from sources other than Vodafone [Enabler S.L. ("Vodafone"), Pareteum's largest historical customer,] and acquired businesses iPass and Artilium *appear[ed] to be uncollectable*" (emphasis added). Viceroy determined that Pareteum's *"total revenue [wa]s overstated by 42%"* – predicting the Company's

---

[3]    Nina Zdinkak, "Pareteum Corporation (TEUM) Responds to Short Seller Aurelius Value's Accusations," available at https://www.insidermonkey.com/blog/pareteum-corporation-teum-responds-to-short-seller-aurelius-values-accusations-756474/ (last visited July 16, 2020). This letter was not filed with the SEC.

[4]    *Pareteum – The Wild West of Telecoms*, Viceroy Research Group (June 25, 2019), available at https://viceroyresearch.org/2019/06/26/pareteum-the-wild-west-of-telecoms/ (last visited July 16, 2020) (the "Viceroy Report").

own subsequent Restatement Release, which acknowledged that 1H19 revenues had been overstated by 42% (emphasis added). The Viceroy Report likewise concluded that Pareteum's Backlog metric was "not…accurate," supporting its conclusion with an analysis that demonstrated that *Pareteum "should have reported 73.10% more revenue in [1Q19]"* if the Backlog was converting at or above 100% (emphasis added). The Viceroy Report succinctly stated: "Management appears to be inflating this [Backlog] figure to hype up the share price and reassure investors."

34.     The Viceroy Report concluded that Pareteum was "terminally unprofitable" and its hyper-growth narrative was facially "suspicious," *"*completely broken[,] and *may not have ever existed at all*," urging a "fully independent investigation," especially of Turner, O'Donnell, and Pareteum's "revenue recognition practices and internal controls" (emphasis added). On June 26, 2019, in the wake of the Viceroy Report, shares of Pareteum declined another 20%.

**D.      PARETEUM AND THE EXCHANGE ACT DEFENDANTS DENY EVERYTHING AGAIN**

35.     The full truth still was not yet revealed to the market. On June 27, 2019, Pareteum responded to both Reports: "*Pareteum Corporation categorically denies all allegations put forth in the short seller reports.…* We look forward to sharing additional information about our growth and success in future earnings releases" (emphasis added). Then, in an effort to reassure investors, on July 1, 2019, Pareteum pre-announced on a "one-time basis given the compelling quarter" its 2Q19 results, representing that they would "exceed current analysts' consensus of $26.2 million for revenue." Following the June 27 and July 1, 2019 statements, the Company's stock fully recovered from the drop caused by the Viceroy Report.

36.     Meanwhile, though, Pareteum and the Exchange Act Defendants' press release machine ground to a sudden halt. In June 2019, they published just two press releases; in July

2019, just four, and only one announced a new customer, but contained no information regarding the revenue from this new customer or the Backlog. Then, on August 6, 2019, Turner announced that Pareteum and the Exchange Act Defendants would *retire and replace the Backlog* – which he represented had grown to "over $1.270 billion" – and that they no longer considered the Backlog metric to be a "key performance indicator" or "lead indicator of revenue":

> [N]ew sales order 36-month *backlog metric will now be replaced as an external metric*. **It has served its purpose** and now provides us significant internal transparency into new sales orders and their conversion into billable revenues. We can now see clearly the strength in our revenues and their expected growth, therefore *it is our reported quarterly results and the annual guidance provided, which are the strongest indicators of our expected growth and continued financial successes in the coming periods*. We will, therefore, *form[al]ly retire backlog as a key performance indicator* and no longer report it after Q3 of this year.

(Emphasis added.)

### E. AMIDST GROWING LIQUIDITY ISSUES, PARETEUM AND THE EXCHANGE ACT DEFENDANTS CLOSE A $40 MILLION SECONDARY OFFERING

37.     On August 23, 2019, Pareteum and the Exchange Act Defendants revealed that Pareteum had been in default of its February 26, 2019 $50 million Credit Facility from Post Road Group essentially *since it was signed*, admitting in a Waiver to eleven breaches, including (a) that it had not made its *first* interest payment, due March 31, 2019, a month after it executed the agreement; (b) that it had failed to provide Post Road Group with *any* of its financials, the first of which was due for the month ending February 28, 2019, two days after it executed the agreement; and (c) that it was unable to obtain and timely deliver the consents required to access the second half of the $50 million Credit Facility. On February 26, 2019, Pareteum had already drawn down the first $25 million upon signing the Credit Facility.

38.     As a condition to obtaining $2,500,000 in additional financing, Pareteum was forced to issue 750,000 shares of stock to Post Road Group. Days later, on August 23, 2019,

14

Pareteum announced that it would have to sell up to 1,311,439 additional shares to settle balances owed to vendors, again using its stock as currency. These disclosures caused the stock to fall further, from just under $3.00 per share on August 23 to just above $2.00 per share on the next trading day, August 26, 2019. Turner nonetheless claimed on August 26, 2019 that the Waiver "put[] the company on a firm footing for our ambitious growth strategies that will continue to be executed this quarter and beyond."

39. On September 20, 2019, Pareteum announced a $40 million Secondary Offering of stock and warrants (the "Secondary Offering"), which drove the stock price down further to just above $1.50 per share.

**F.** **THE FULL TRUTH IS REVEALED**

40. On October 21, 2019 – after *twice* "categorially denying" the Aurelius and Viceroy Reports and barely *one month* after selling $40 million worth of stock into the market – Pareteum and the Exchange Act Defendants revealed the full truth. On this date, Pareteum and the Exchange Act Defendants issued the Restatement Release (which is incorporated herein by reference), in which they (a) announced that Pareteum would restate its previously issued financial statements for FY18 and 1H19; (b) advised that "[i]nvestors should no longer rely upon the Company's previously released financial statements" and related releases and communications for these periods; (c) admitted that "certain revenues recognized during 2018 and 2019 should not have been recorded during that period…[and that, for] certain customer transactions, the Company may have prematurely or inaccurately recognized revenue"; and (d) estimated the revenue impact for FY18 and 1H19 to be a reduction of approximately $9 million and $24 million, respectively. These reductions represented a *28% reduction* from FY18 reported revenue of $32,435,736 and a *42% reduction* from 1H19 reported revenue of $57,188,309. Shares tumbled in after-market trading,

15

closing at $0.74 per share on October 21, and opening at $0.37 per share on October 22, 2019.

41.     When they issued the Restatement Release, Pareteum and the Exchange Act Defendants admitted that they could not even estimate when the pending Restatement would be completed, could not "predict the aggregate amount of revenue that will ultimately be restated," and noted that "the [C]ompany [could not] provide forward guidance" and expected financial results for the second half and full year 2019 "will be materially below current analysts' estimates." On November 15, 2019, Pareteum announced that it had received notice that, because it had not filed its 3Q19 10-Q, it was no longer in compliance with Nasdaq listing rules. Pareteum still has not completed the pending Restatement, has not filed results for 3Q19, 4Q19, or 1Q20, and is not in compliance with Nasdaq listing rules. Pareteum received a listing extension on July 6, 2020 and disclosed that it expects to complete the pending Restatement on or before October 30, 2020.

## III.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS BY PARETEUM AND THE EXCHANGE ACT DEFENDANTS

### A.     STATEMENTS REGARDING REPORTED REVENUE AND REALIZED REVENUE GROWTH RATES

42.     On May 7, 2018, Pareteum issued a press release announcing 1Q18 results, which stated: "Revenues of $4.113 Million, up 47% Year-Over-Year." Substantially identical figures were reported in a May 11, 2018 1Q18 10-Q, which Turner and O'Donnell signed and certified.

43.     On August 6, 2018, Pareteum issued a press release announcing 2Q18 results, which stated: "REVENUES OF $6 MILLION, UP 85% YEAR-OVER-YEAR." Substantially identical figures were reported in an August 13, 2018 2Q18 10-Q, which Turner and O'Donnell signed and certified.

44.     On November 7, 2018, Pareteum issued a press release announcing 3Q18 results, which stated: "Revenues of $8 Million, up 129% Year-Over-Year." Substantially identical figures

were reported in a November 14, 2018 3Q18 10-Q, which Turner and O'Donnell signed and certified.

45.     On March 12, 2019, Pareteum issued a press release announcing 4Q18 and FY18 results, which stated: "Total revenues increased 256% to $14.3 million" for 4Q18 and "Revenues increased 139% to $32.4 million" for FY18. Substantially identical figures were reported in a March 18, 2019 4Q18 and FY18 10-K, which was signed by Turner, O'Donnell, and Bozzo and certified by Turner and O'Donnell. During a March 12, 2019 earnings call held in connection with these results, McCarthy repeated that Pareteum "generated $14.3 million of revenue in [4Q18]."

46.     On May 7, 2019, Pareteum issued a press release announcing 1Q19 results, which stated: "Total revenues increased 460% to $23 million." Substantially identical figures were reported in a May 10, 2019 1Q19 10-Q, which Turner and O'Donnell signed and certified. During a May 7, 2019 earnings call, McCarthy stated that Pareteum had "achieved organic growth of 32% over the prior-quarter."

47.     On August 6, 2019, after the Aurelius and Viceroy Reports were published, Pareteum issued a press release announcing 2Q19 results, which stated: "Total revenue increased 469% to $34.1 million." Substantially identical figures were reported in an August 9, 2019 2Q19 10-Q, which was signed and certified by Turner and O'Donnell.

48.     The 1Q18, 2Q18, 3Q18, 1Q19, and 2Q19 10-Qs cited above were all signed by Turner and O'Donnell and included certifications by Turner and O'Donnell, required by Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (hereinafter, "SOX"), which included representations (a) that  each "report does not contain any untrue statement of a material fact or omit to state a material fact" and (b) that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of

17

operations and cash flows of the registrant as of, and for, the periods presented in this report." Likewise, the March 18, 2019 10-K was signed by Turner, O'Donnell, and Bozzo, and included the same SOX certifications by Turner and O'Donnell as in the 10-Qs.

49.     The statements in ¶¶42-47 made by Pareteum and all four of the Exchange Act Defendants regarding Pareteum's reported revenue and realized revenue growth figures for 1Q18, 2Q18, 3Q18, 4Q18, FY18, 1Q19, and 2Q19 were each materially false and misleading when made, and were known to be false or were recklessly disregarded, at that time. The Restatement Release confirmed that reported revenues and realized revenue growth figures were materially overstated by *at least 28%* in FY18 *and 42%* in 1H19 and, therefore, materially false when made. The Restatement Release disclosed that the Company would have to restate its "previously issued consolidated financial statements" for all such periods because "*revenues recognized during [these periods] should not have been recorded* during that period…[and that, for] certain customer transactions, the Company may have *prematurely or inaccurately recognized revenue*," such that "[i]nvestors should no longer rely upon the Company's previously released financial statements for the time periods cited above" (emphasis added). The forthcoming restatement is expected to result in a $9 million, *28% reduction* in FY18 reported revenue of $32,435,736 and a $24 million, *42% reduction* from 1H19 reported revenue of $57,188,309. Pareteum's reported revenues and realized revenue growth figures were also materially overstated because Pareteum's Backlog was inflated and not converting to revenues at or above 100%.

50.     On June 7 and 26, 2019, the Aurelius and Viceroy reports were published, stating that Pareteum's reported revenues were overstated, its Backlog was inflated, and it was not converting Backlog to revenue at or above 100%. On June 10, 2019, Turner categorically denied the Aurelius Report's allegations. On June 27, 2019, Pareteum responded to both Reports as

18

follows: "Pareteum Corporation categorically denies all allegations put forth in the short seller reports.... Everyone at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company."

51.     The categorical denials of the Aurelius and Viceroy Reports by Turner and Pareteum and the statement that "Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company" were likewise materially false and misleading when made, and were known to be false or were recklessly disregarded, at that time, as the Restatement Release confirmed that Pareteum's reported revenue and realized revenue growth figures were in fact overstated and, thus, the categorical denials were false and Pareteum could not have been "upholding the highest standards and reporting requirements of a public company."

**B.      STATEMENTS REGARDING REVENUE RECOGNITION, GAAP COMPLIANCE, INTERNAL CONTROLS, AND FINANCIAL REPORTING**

### 1.      Statements Regarding Revenue Recognition

52.     An April 16, 2018 Chairman's Update Letter, published in a press release, quoted Turner as stating: "With our Software-as-a-Service (Saas) business model, *we have excellent visibility into our* business operations and ***revenue recognition***" (emphasis added). In the 1Q18 10-Q, in a section entitled "Critical Accounting Policies and Estimates," Pareteum represented that, in accordance with GAAP, "[w]e regularly evaluate our estimates and assumptions related to revenue recognition…." The 1Q18 10-Q also represented that the Company's revenue recognition procedures complied with appropriate accounting procedures:

> On January 1, 2018, we adopted Topic 606 using the modified retrospective method applied to those contracts which were not completed as of January 1, 2018. Results for reporting periods beginning after January 1, 2018 are presented under Topic 606, while prior period amounts are not adjusted and continue to be reported in accordance with our historic accounting under Topic 605.

The 1Q18 10-Q also purported to report the Company's quarterly recognized revenue by category and to outline the timing of Pareteum's revenue recognition by category:

> *Monthly services revenues are recognized at a point in time and amounted to $3,291,882 for the period ended March 31, 2018. Installation and software development revenues are recognized over time and amounted to $820,688 for the period ended March 31, 2018.*
>
> &ast; &ast; &ast;
>
> Monthly Service Revenues
>
> The Company's performance obligations in a monthly SaaS and service offerings are simultaneously received and consumed by the customer and therefore, are *recognized over time*…. The Company typically bills its customer **at the end of each month**, *with payment to be received shortly thereafter*….
>
> Installation and Software Development Revenues
>
> *Revenue is recognized over time* if the installation and development activities create an asset that has no alternative use for which the Company is entitled to receive payment for performance completed to date. If not, then revenue is not recognized until the applicable performance obligation is satisfied.

(Emphasis added.)

53.     The 2Q18, 3Q18, 1Q19, and 2Q19 10-Qs and the FY18 10-K made substantially similar statements as in ¶52, except that they updated the amounts of revenues recognized for each relevant period and the FY18 Form 10-K included the following additional statement regarding the timing of revenue recognition:

> Topic 606…*requires entities to recognize revenue when control of the promised goods or services is transferred to customers at an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services.*
>
> &ast; &ast; &ast;
>
> Managed service revenues are *recognized monthly* based on an average number of end-users managed and calculated on a pre-determined service fee per user…. Revenues for bundled services are *recognized monthly* based on an average number of end-users managed and mobile air time and calculated based on a pre-determined service fee…. Telecommunication revenues were *recognized when delivery occurred* based on a pre-determined rate and number of user minutes and number of calls that the Company has managed in a given month.

20

(Emphasis added.)

54.     The 1Q18, 2Q18, 3Q18, 1Q19, and 2Q19 10-Qs and the FY18 10-K were signed and certified by Turner and O'Donnell and the FY18 10-K was also signed by Bozzo.

55.     The statements in ¶¶52-53 made by Pareteum, Turner, O'Donnell, and Bozzo regarding the Company's "excellent visibility into…revenue recognition," its regular evaluation of its revenue, its adoption of and compliance with the appropriate revenue recognition procedures (Topic 606), the amount of quarterly recognized revenue by category, and the timing of its revenue recognition by category were materially false and misleading when made, and were known to be false or were recklessly disregarded as such at the time that the statements were made. In truth, Pareteum did not have "excellent visibility into…revenue recognition," its revenue recognition procedures did not comply with the appropriate procedures, the amounts of its reported revenues were overstated, and the timing of its revenue recognition was incorrect, as the Company admitted in the Restatement Release that it had "prematurely or inaccurately recognized revenue"; and a "restatement" is used only when the previously issued financial statements were materially false as of the time of issuance and were based on "facts that existed at the time the financial statements were prepared."

2.     **Statements Regarding GAAP Compliance, Internal Controls, and Financial Reporting**

56.     In the 1Q18 10-Q, Pareteum represented that its "interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to…SEC[] Form 10-Q and Article 10 of SEC Regulation S-X."  Likewise, in the 1Q18 10-Q, Pareteum represented that the Company had adequate controls and procedures to ensure that its financial statements were accurate and reliable: "Based on the evaluation, *the Company's*

21

*Principal Executive Officer and Principal Accounting Officer have concluded that the Company's disclosure controls and procedures are effective….*" (emphasis added). The 2Q18 and 3Q18 10-Qs contained substantially the same statements.

57.     Turner and O'Donnell signed and certified the 1Q18, 2Q18, and 3Q18 10-Qs, thereby attesting to the accuracy and completeness of Pareteum's financial and operational results and acknowledged that they were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting. ¶48.

58.     The statements in ¶56 made by Pareteum, Turner, and O'Donnell regarding the Company's 1Q18-3Q18 GAAP compliance and internal controls were materially false and misleading when made, and were known to be false or were recklessly disregarded as such at the time, because the Company's financials did not, in fact, comply with GAAP, and it lacked sufficient internal controls to ensure that its financial statements were accurate and reliable. As admitted by Pareteum in its Restatement Release, revenues recognized during 1Q18-3Q18 should not have been recorded; Pareteum prematurely or inaccurately recognized revenues during that period by at least 28% for FY18 and 42% for 1H19; those errors were expected to impact revenue, cost of service, operating income, net loss, accounts receivable, and numerous other balance sheet line items; and investors should therefore not rely on these financial statements.

59.     Additionally, as conceded in Pareteum's March 18, 2019 FY18 10-K, throughout all of 2018, there existed at Pareteum "material weaknesses in its internal control over financial reporting,…[such that its] disclosure controls and procedures were not effective as of December 31, 2018." Specifically, the FY18 10-K disclosed:

> Our management, with the participation of our principal executive officer and chief financial officer[,]…concluded that because of material weaknesses in its internal control over financial reporting, as further described below, our disclosure controls and procedures were not effective as of December 31, 2018.

* * *

[O]ur management has identified the following deficiencies that constitute material weaknesses in the Company's internal controls over financial reporting:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.

Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

60. The statements in ¶56 were further materially false and misleading because Pareteum and the Exchange Act Defendants failed to disclose the existence of known trends, events, or uncertainties – that revenues and Backlog were overstated and inflated for *six consecutive quarters* – that Pareteum and the Exchange Act Defendants reasonably expected would have a material, unfavorable impact on net revenues or that were reasonably likely to result in the Company's liquidity decreasing in a material way. In so doing, they violated Item 303(a)(2)(ii) to Regulation S-K 17 (C.F.R. § 229.303), which requires that the Management Division and Analysis ("MD&A") section of SEC reports "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on…*revenues* or income from continuing operations," and Paragraph 3 of Item 303 Instructions, which requires that the MD&A "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

### 3. Statements Reassuring Investors that They Could Rely on Pareteum's Financial Reporting

61. In the March 18, 2019 FY18 10-K, Pareteum disclosed that, throughout 2018, there existed at Pareteum "material weaknesses in its internal control over financial reporting,…[such that its] disclosure controls and procedures were not effective as of December 31, 2018." ¶59.

23

62. Pareteum and the Exchange Act Defendants went out of their way to assure investors that, *despite* the material weaknesses that management had discovered, investors could still rely on the Company's reported financials. Immediately following the admissions in the FY18 Form 10-K, Pareteum stated:

> The material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results.
>
> * * *
>
> Squar Milner LLP, the Company's independent registered public accounting firm, expressed an unqualified opinion for the audit of our consolidated financial statements as of and for the year ended December 31, 2018….

63. The FY18 10-K also stated that Pareteum's management had *already* been "implementing and continues to implement measures designed to ensure that control deficiencies contributing to the material weakness [were] remediated" and that the "remediation actions to the Company's internal controls over financial reporting include a thorough review and documentation of all processes involved in our financial reporting…." As evidence of this, the FY18 10-K represented that their actions would foreseeably "remediate the material weakness," with the remediation foreseeably expected to "be completed prior to the end of fiscal 2019."

64. On the following page of the FY18 10-K, the Company reproduced and highlighted Squar Milner's March 18, 2019 unqualified opinion, in which Squar Milner stated that, despite the Company's failure to "maintain[] effective internal control over financial reporting as of December 31, 2018," "[t]hese material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and *this report does not affect our report dated March 18, 2019*" (emphasis added).

65. Despite reporting the prior deficiency that purported to affect 2018, but not necessarily 2019, the FY18 10-K stated: "There have been *no changes in our internal control over*

24

*financial reporting* during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting" (emphasis added).

66.     Like the 2018 10-Qs, the 1Q19 10-Q contained substantially the same statements as in ¶56, updating them as follows:

> In light of the material weakness described below, *we performed additional analysis and other post-closing procedures to ensure our financial statements are prepared in accordance with generally accepted accounting principles.*
>
> * * *
> *We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of March 31, 2019, these efforts are ongoing.*
>
> We are committed to *maintaining a strong internal control environment* and believe that these remediation actions will represent significant improvements in our controls.

(Emphasis added.) The 2Q19 10-Q contained substantially the same statements as the 1Q19 10-Q.

67.     The FY18 10-K and 1Q19 and 2Q19 10-Qs were signed and certified by Turner and O'Donnell and the FY18 10-K was also signed by Bozzo.

68.     The statements in ¶¶62-66 made by Pareteum, Turner, O'Donnell, and Bozzo regarding the Company's FY18-2Q19 GAAP compliance and internal controls, investors' ability to rely on the Company's reported financial figures *despite* the material weaknesses discovered, that the "material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results," that Squar Milner had "expressed an unqualified opinion," that they were taking "remediation steps" to address the material weaknesses,  that the remediation was expected to "be completed prior to the end of fiscal 2019," and that they were "committed to maintaining a strong internal control environment" were each materially false and misleading when made, and were known to be false or were recklessly

25

disregarded as such at the time that the statements were made. In truth, the material weaknesses did in fact result in misstatements, the remedial steps were not sufficient, and they were not completed prior to the end of fiscal 2019; as the Company admitted in the Restatement Release, it had "prematurely or inaccurately recognized revenue" during 1H19; those errors were expected to impact revenue, cost of service, operating income, net loss, accounts receivable, and numerous other balance sheet line items; investors should therefore not rely on these financial statements; and Pareteum still has not completed the pending Restatement.

C.      STATEMENTS REGARDING BACKLOG

69.      During the Class Period, Pareteum and the Exchange Act Defendants focused analysts and investors on their self-created Backlog metric as an interim metric, which Pareteum and Turner, respectively, described thusly:

> This key performance indicator is directly correlated to our financial and operating results and reflects the traction our services and solutions are gaining in the marketplace.
>
> * * *
>
> We've discussed our 36-month contractual revenue backlog, which is simply *the value of new sales orders intake and the revenue under contract* or simply called backlog and we -- as we've discussed this so which it is as a non-GAAP indicative number. We began using this metric in 2016 to provide a view of the magnitude, sales growth *and its conversion to billable revenues*.

(Emphasis added.)

70.      During the Class Period, over the course of countless press releases, Pareteum and the Exchange Act Defendants falsely and/or misleadingly reported the Backlog's growing value, emphasized its reliability as a "key performance indicator," and represented that it was converting into "incremental monthly revenue" at or above 100%. As addressed below, the Backlog value was artificially inflated, it was not converting to revenue at or above 100%, and thus was not a "key indicator of value."

26

### 1.   **Statements Regarding Backlog Value**

71.     Pareteum and the Exchange Act Defendants stated that the Backlog grew 535%, from $200 million in 1Q18 to $1.27 billion in 2Q19. For the vast majority of the Class Period, to conceal their fraud, Pareteum and the Exchange Act Defendants did not identify the new customers and contracts that underpinned the growing Backlog. However, in September and October 2018, they issued five releases announcing $134 million in new contracts in which they identified for the first time some of the alleged new customers and contracts announced in these releases. As discussed below, most of the new customers and contracts identified in these releases were incapable of generating the millions in revenues claimed, rendering the statements regarding these customers and contracts, the $134 million value that they added to the Backlog, and all future iterations of the Backlog value materially false and misleading when made.

### a.   **Statements about Backlog Additions in September and October 2018**

72.     A September 17, 2018 press release "announced the signing of contracts totaling an additional $50 Million during the last two weeks of August 2018," which brought the Backlog to "$375 million at August 31, 2018," identifying some of the new customers and contracts as ACN Europe, Wing Tel Communications, Secure Watch, and Eyethu Mobile Network. In the release, Turner stated: "Customers are *accelerating new revenue* and substantial savings in ever increasing numbers…. This is how we deliver new services creation, *enabling new revenues*…." (emphasis added).

73.     The statements made by Pareteum and Turner in the September 17, 2018 release regarding these customers and contracts, the "$50 Million" value these contracts added to the Backlog value, and their ability to "accelerat[e]" and "enable[e]" "new revenue" for Pareteum were materially false and misleading when made, and were known to be false or were recklessly

27

disregarded as such thereby, at that time, because most of the companies identified in this release were incapable of generating the $50 million in revenues claimed. Even a single $50 million contract would have been several orders of magnitude larger than that of Pareteum's single largest customer.

74. As noted in the Viceroy and Aurelius Reports, Eyethu Mobile Network appears to have been non-operational. Its website was not functional, and investigators found no activity or indications of operations at its registered address; rather, they discovered only a dilapidated shack and crumbling structures near a rural African village. As noted in the Viceroy Report and confirmed by Lead Plaintiff's investigation, Eyethu appears to have been launched barely two months before its supposed contract with Pareteum by an unemployed South African with no history in the industry. Undersigned counsel's investigation has confirmed that Eyethu's website was non-operational, the company's Twitter account was opened in June 2018, and Eyethu does not appear to have ever launched, such that it could not possibly support the revenue attributed to it by Pareteum and the Exchange Act Defendants.

75. According to the Viceroy Report, Secure Watch was a small 1-2 employee operation that appears to sell security systems, operates out of a strip mall, and whose website appears to be a mere quote generator. As reported by the Viceroy Report, and confirmed through undersigned counsel's investigation, this company was founded in 2010, originally as Infiniti Security, LLC, and rebranded as Secure Watch sometime in late 2017. The company has since been rebranded again, now operating as Link Mobile, offering cellular plans and home security.

76. Likewise, Wing Tel was launched in 2017 in New York and provides cellular phone services ranging in price from $12.00 per month to $55.00 per month. In light of the fabricated or

embellished nature of Eyethu and Secure Watch, Wing Tel alone cannot support the $50 million value attributed to these companies.

77. An October 2, 2018 press release "announced that [Pareteum] has signed new contracts with Parallax Health Sciences in the U.S., oneCentral in the Netherlands, and Naledi in South Africa totaling $15 Million over three years." The release quoted Bozzo as stating: "Pareteum's momentum continues to grow as we close on *these multimillion dollar contracts*. With these new use cases, *we are* not only *building a pipeline for our growing business*, but also enabling mobile solutions for companies across industries, including the ever-important healthcare technology space" (emphasis added).

78. The statements made by Pareteum and Bozzo in the October 2, 2018 release regarding these customers and contracts, the "$15 Million" or "multi-million dollar" value that they added to the Backlog, and their ability to "build[] a pipeline for our growing business" were each materially false and misleading when made, and were known to be false or were recklessly disregarded as such thereby, at that time, because the companies identified in this release were incapable of generating the $15 million in revenues claimed. According to the Viceroy and Aurelius Reports, Naledi was not operational. Investigators found no activity or indications of operations at Naledi's registered address and its website was not functional. Lead Plaintiff's investigation confirmed that the Naledi website is not functional; that Naledi was formed in May 2018 with only "1000" in share capital by a Zimbabwe national who has no LinkedIn profile and no Google results; and that its listed address does not return any results on Google Maps (although a small building that appears identical to the one identified in the Aurelius Report does appear to exist).

79. Similarly, the Aurelius Report noted, and Lead Plaintiff's investigation confirmed, that Parallax Health Sciences is a "nearly-worthless penny-stock" with only $11,739 in revenue for the year ended December 31, 2018 and whose recent 10-K noted a "substantial doubt about the [c]ompany's ability to continue as a going concern." Notably, two of Parallax Science's officers allegedly perpetrated a similar fraud with O'Donnell at his past employment.

80. The Viceroy Report uncovered that oneCentral only generated $5.5 million in sales in 2018 and listed only nine employees on its corporate website and LinkedIn. According to the Aurelius Report, and confirmed by Lead Plaintiff's investigation, the company listed only ɔ662,000 in equity and seven employees on its balance sheet at the end of 2018.

81. An October 8, 2018 press release "announced a $50 million contract with One Development, Thailand's first mobile virtual network aggregator and enabler, and leader in the country's growing [MVNO] market." In the release, Turner was quoted as saying: "With One Development in Thailand, we are literally connecting to *a whole new world of customers….*" (emphasis added).

82. The statements made by Pareteum and Turner in the October 8, 2018 release regarding One Development, the "$50 Million" it added to the Backlog value, and its ability to allow Pareteum to service a "whole new world of customers" were each materially false and misleading when made, and were known to be false or were recklessly disregarded as such thereby, at that time, because One Development was incapable of generating the $50 million in revenues claimed by the Company.

83. According to the Viceroy and Aurelius Reports, One Development was only awarded its license in July 2018, has just seven employees listed on LinkedIn, had no meaningful business in the four years since its incorporation, and *reported no revenue in 2018*. Lead Plaintiff's

30

independent investigation confirmed that One Development's listed address, which could not be found on Google Maps, and phone number, which was not answered and did not direct to a voicemail or recording, do not support an operation capable of generating $50 million in revenue for Pareteum at the time. One Development had total assets of just 9.3 million Baht (approximately $297,790) and reported a net loss in 2018.

84. These facts negate One Development's ability to generate $50 million in revenue for Pareteum. To put this alleged $50 million contract into perspective, Vodafone – an MVNO operating on Vodafone Spain's network and Pareteum's *single largest customer* – generated approximately 12.5%, or *$7.15 million*, of Pareteum's $57.1 million of *reported* 1H19 revenues. The $50 million One Development contract would thus have been several orders of magnitude larger than that of Vodafone. As of June 20, 2019, Vodafone had approximately *640 million* mobile customers (ten times more customers than there are people in Thailand), 21 million fixed broadband customers, and 14 million TV customers, including all of the customers in Vodafone's joint ventures and associates. By contrast, One Development was awarded its license in July 2018, had seven employees listed on LinkedIn, had no meaningful business in the four years since its incorporation, had total assets of less than $300,000.00, and *reported no revenue and a net loss in 2018*; its listed address could not be found on Google Maps; its phone number was not answered and did not direct to a voicemail or recording; and its Facebook page and Twitter feeds had just 65 and 621 followers. One Development's website also only had five press releases, one of which dates to 2015; one of which appears to have announced a partnership with a cryptocurrency app for which the underlying crypt coin had lost more than 97% of its value and was valued at just $0.0044 when the Aurelius Report was published; and the other three of which relate to its contract with Pareteum and a license that was awarded to One Development.

31

85. An October 17, 2018 press release "announced agreements with four new customers valued at $8 million, including monogoto and Nextelle." Similarly, an October 23, 2018 press release "announced that [Pareteum] has signed three-year mobility as a service agreements totaling $11 million and 800,000 in connections with five new brands, including Global Connect and Moby." These statements were materially false and misleading when made, and were known to be false or were recklessly disregarded as such thereby, at that time, because the companies identified in this release were incapable of generating the $19 million in Backlog value or revenues claimed. According to the Viceroy Report, both monogoto and Nextelle maintain little online presence and appear to be small scale enterprises incapable of generating the revenues claimed by the Company. As noted in the Aurelius Report, Global Connect maintained a dubious online presence and appeared to be a small-scale enterprise. Records for "Global Connect Communications Limited" listed only £74,881 in "current asset[s]" as of April 30, 2018 and the average number of employees during the year was just two. The Viceroy Report further noted that Global Connect and another purported Pareteum customer, SJ Global, appear to be connected to an individual identified as a Pareteum consultant. The Viceroy Report further found that the link for Moby in Pareteum's press release redirected to a company called Hawaiian MVNO Mobi, Inc., and that Moby's manta.com profile lists a website that redirects to the website of an electronics wholesaler headquartered in an electronics store in Long Island City, New York.

b.    **<u>Statements Regarding the Backlog's Total Value</u>**

86. Between the fifth and final October 23, 2018 press releases that identified some new customers and contracts and the end of the Class Period, Pareteum and Turner continued to represent that the Backlog continued to grow. On October 24, 2018, Pareteum issued a press release, which stated: "Pareteum Achieves $500 Million in 36-Month Contractual Revenue

Backlog." On March 12, 2019, Pareteum issued a press release, which stated: "36-month Contractual Revenue Backlog quadrupled to $615 million for the full year 2018…." On May 7, 2019, Pareteum issued a press release, which stated: "36-Month Contractual Revenue Backlog increased to $938 million for the first quarter of 2019…." And, on August 6, 2019, during an earnings call, Turner stated: "I'm pleased to inform you that at the end of [2Q19], the 36-month revenue under contract backlog stood at over $1.270 billion."

87.     These statements by Pareteum and Turner regarding the Backlog's value that followed the September and October 2018 press releases built sequentially upon each previous iteration and incorporated the $134 million value of the fabricated and embellished customers and contracts announced in the September and October 2018 releases. For these reasons, these statements were false and misleading. Additionally, if the Backlog was, as claimed, actually converting at or above 100% into revenue, and Pareteum's revenues were admittedly overstated (by as much as 42% in 1H19,) than the Backlog likewise *had to be* overstated.

### 2. **Statements Regarding Backlog Conversion**

88.     During the Class Period, Pareteum and the Exchange Act Defendants falsely represented that the Backlog conversion rate was a "key performance indicator" and that they were converting Backlog to "incremental monthly revenue" at or above 100%.

89.     A May 7, 2018, press release announcing 1Q18 results stated: "Backlog revenue conversion at 103%." In the release, Turner was quoted as saying:

> *Key performance indicators of* connections, *backlog conversion*, connection values, revenue per employee and churn *continue to all move in the right direction* and give us confidence in our overall strategy and business execution….*Our TEUM remains laser focused on converting backlog to revenue*, servicing our clients, selling into new geographical markets and creating shareholder value.

(Emphasis added.)

33

90. An August 6, 2018 release announcing 2Q18 results stated: "Contractual Revenue Backlog conversion rate at 106%." The release continued: "*As we convert Contractual Revenue Backlog* to Connections, *our revenue will increase* and for every incremental dollar of revenue, we expect contribution to our bottom line" (emphasis added). In the release, Turner was quoted as saying: "*Surpassing $6 million in revenues* in the second quarter *demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue*…." (emphasis added). Pareteum and Turner made substantially similar statements in connection with the Company's 3Q18 results, when Pareteum again reported a 100% Backlog conversion rate.

91. A March 12, 2019 press release announcing 4Q18 and FY18 results stated: "Backlog quadrupled to $615 million for the full year 2018, up from $147 million in 2017 *with a conversion rate to revenue of 100%*" (emphasis added). During a March 12, 2019 earnings call, McCarthy stated: "*[B]acklog converted into live production incremental monthly revenue was at* 97% of scheduled conversion for [4Q18] while we're maintaining *an average over 100% for the year*" (emphasis added).

92. A May 7, 2019 press release announcing 1Q19 results stated: "Backlog increased to $938 million for the first quarter of 2019 up from $200 million in the first quarter of 2018 *with a conversion rate to revenue of 101%*" (emphasis added). During a May 7, 2019 earnings call, Turner stated:

> To complete the 36-month contract revenue backlog topic, *the most important phase for Pareteum is to convert those contracts to billable revenues*. This means new sales orders placed into live production, based upon their contracted schedules for service, invoices rendered and being billed, and revenues collected. *Our backlog conversion metrics show this story, and we're doing very well in this regard.*
>
> I'd like to share a couple of details with you. From the inception of tracking the services deployed during the period of January 1, 2017 through March 31, 2019 – that's a 27-month period – *we converted revenues in the backlog as they were scheduled at 101%.* We converted connections, which is our word for subscribers,

34

at 122%. This means that taking each contract and comparing what was contractually scheduled by the customers in both the revenue and connections, *we've over-attained and outperformed what had been expected*.

(Emphasis added.)

93.     The above statements made by Pareteum, Turner, and McCarthy regarding the reliability of Backlog conversion as a "key performance indicator" and their success in converting and ability to convert Backlog to "incremental monthly income" at or above 100% were materially false and misleading when made because it was not true that the Company was converting Backlog to revenue at or above 100% and Backlog conversion was thus not a "key performance indicator."

94.     If Backlog had been converting to "incremental monthly revenue" at or above 100%, then the Backlog – which was allegedly "*directly correlated* to [Pareteum] financial and operating results" and grew 535% during the Class Period, from just $200 million in 1Q18 to $1.27 billion by 2Q19 – should have translated to proportionate increases (and hundreds of millions of dollars) in revenue during the same period. It did not. Rather, Pareteum reported revenues of $32,435,736 for FY18 and $57,188,309 for 1H19, of which the Restatement Release revealed that at least $9,000,000 was overstated for FY18 and at least $24,000,000 was overstated for 1H19, resulting in *actual* revenues for FY18 of just $23,435,736 and 1H19 of just $33,188,309.[5] Stated differently, if, based on Pareteum's reported revenues, Pareteum and the Exchange Act Defendants reported that Backlog conversion was at or above 100%, and the reported revenues were in reality significantly overstated, as the Restatement Release confirmed, then the Backlog could not have been converting into revenue at or above 100%.

---

[5]     During the same period, Pareteum reported net losses in *all but one* of the relevant quarters:

| Net income or (loss) | 1Q18 | 2Q18 | 3Q18 | FY18 | 1Q19 | 2Q19 |
|---|---|---|---|---|---|---|
| | ($2,134,101) | $1,656,464 | $(7,020,406) | $(12,974,650) | $(5,778,515) | $(515,809) |

35

95.     Likewise, if Backlog had been converting at or above 100%, Pareteum's accounts receivable should have remained constant. They did not. Rather, they ballooned from just $1,954,495 in 1Q18 to $45,061,236 by 2Q19 – a **2,300% increase**:

| 1Q18 | 2Q18 | 3Q18 | FY18 | 1Q19 | 2Q19 |
|---|---|---|---|---|---|
| $1,954,495 | $3,852,866 | $7,200,014 | $15,361,594 | $28,644,699 | $45,061,236 |

By contrast, the Company's alleged revenues increased 287% from FY18 to 1H19 (based on the Restatement Release corrections), and Backlog increased 535%.

96.     The June 7, 2019 Aurelius Report concluded that Pareteum was not, in fact, converting its Backlog to revenue at or near 100%, supporting this conclusion with significant evidence. And the June 26, 2019 Viceroy Report's analysis demonstrated that Pareteum "should have reported 73.10% more revenue in [1Q19]" if Backlog was converting at or above 100%. On July 3, 2019, a Seeking Alpha article also highlighted the Company's "ballooning" accounts receivables and negative cash flows; noted that, "Q2 cash flows should be improved meaningfully particularly given management's statements regarding the recent iPass acquisition"; and concluded that "[c]ontract backlog seems to be overstated by a material amount" and "[a]ccounts receivable balances are ballooning, raising questions on the collectability of billings."[6] The same commentator noted on August 27, 2019 that Pareteum's accounts receivables ballooned an "eye-catching 57% quarter-over-quarter" and "almost tripled" over past six months, "from $15.4 million at year end 2018 to $45.1 million at the end of Q2"; that its free cash flow for the quarter was

---

[6]     Henrik Alex, *Pareteum's Q2 Upside Preannouncement Not Suited To Restore Investor Confidence*, SEEKING ALPHA (July 3, 2019, 9:10 AM), *available at* https://seekingalpha.com/article/4273291-pareteums-q2-upside-preannouncement-suited-restore-investor-confidence (last visited July 16, 2020). As the Aurelius Report noted, Pareteum's "own SEC filings state that 'the company typically bills its customers at the end of each month, with payment to be received shortly thereafter,'" and its "Days Sales Outstanding ha[d] reached 110 days."

36

negative $8 million; and that Pareteum's management had "actually pointed to accounts receivable to increase even further during Q3[.]"[7]

97. When they "retired" the Backlog, Pareteum and the Exchange Act Defendants admitted that Backlog conversion had not been a reliable "key performance indicator" stating instead that "it is our reported quarterly results and the annual guidance provided, which are the strongest indicators."

### D. STATEMENTS REGARDING THE CREDIT FACILITY

98. On February 26, 2019, Pareteum and the Exchange Act Defendants took advantage of the artificial inflation in Pareteum's stock price to secure a $50 million Credit Facility from Post Road Group, which they defaulted on essentially from its execution. ¶¶23, 37-38. Despite this default, throughout the Class Period, Pareteum and Turner falsely stated that the *entire* Credit Facility remained available to Pareteum and that they intended to use it to fund growth.

99. A March 7, 2019 Chairman's Letter, published in a press release, quoted Turner as stating: "[W]e have improved our capital gain plans by the addition of a $50 million debt facility,…which puts us in a position to act immediately when accretive opportunities, that further improve Pareteum, are identified."

100. The March 12, 2019 FQ18 and FY18 10-K stated:

> Post Road will provide the Company with a secured loan of up to $50,000,000 (the "Loan") with an initial loan of $25,000,000 funded on February 26, 2019, *and additional loans in increments of $5,000,000 as requested by the Company* before the 18 month anniversary of the initial funding date: provided however that no additional loans shall be funded until the later of delivery of certain third party consents (the "Consents").

(Emphasis added.)

---

[7] Henrik Alex, *Pareteum – Caught In A Cash Crunch After Violating Debt Covenants*, SEEKING ALPHA (August 27, 2019, 7:34 AM), *available at* https://seekingalpha.com/article/4288112-pareteum-caught-cash-crunch-violating-debt-covenants (last visited July 16, 2020).

37

101.    A March 12, 2019 press release stated that the Credit Facility would be used, in part, "to facilitate accelerated organic growth and potential M&A transactions."

102.    A substantially similar representation was made on May 7, 2019, when Pareteum announced its 1Q19 results. During a May 7, 2019 earnings call, McCarthy stated: "This [Credit F]acility also provides us with *significant available liquidity going forward should we need it…[and] gives us additional security and flexibility*" (emphasis added).

103.    The statements in ¶¶99-102 made by Pareteum, Turner, and McCarthy regarding the Company's ability to access the second $25,000,000 draw of the Credit Facility and the ability of those funds to help Pareteum grow and give it "security and flexibility" were materially false and misleading when made, and were known to be false or were recklessly disregarded as such at the time that the statements were made, because, when these statements were made, the Company could not, in fact, access any additional funds because it was about to or had *already* defaulted on the terms of this Credit Facility, for the following reasons: (a) Pareteum had not made its first interest payment on March 31, 2019; (b) it had failed to provide its financials, which were due beginning for the month ending February 28, 2019; and (c) it was unable to obtain and timely deliver the consents required to access the second half of the $50 million Credit Facility. ¶37.

### E.    STATEMENTS REGARDING GROWTH

104.    Throughout the Class Period, Pareteum and the Exchange Act Defendants falsely portrayed Pareteum as experiencing hyper-growth, supporting this narrative with the overstated reported revenues and realized revenue growth rates and inflated Backlog values discussed above.

105.    A December 14, 2017 press release issued on the first day of the Class Period described Pareteum as a "*rapidly growing* mobile Cloud Communication Platform company," supporting that claim by stating: "2017 Accomplishments Expected to Create *Continued Growth* and Market Innovations in 2018[.] 36 Month Contractual Revenue Backlog Grows to $129 Million

38

at November 30, 2017" (emphasis added). The release quoted Turner as saying: "Our restructuring and repositioning in 2016 has led to *solid growth* in 2017, and has defined our innovation in both services and market positioning, establishing *a strong outlook for our success in 2018 and beyond*" (emphasis added).

106.     A January 31, 2018 press release stated: "Contracts executed in January 2018 that have meaningfully contributed to Pareteum's *accelerating growth, as measured by our 36-month contractual revenue backlog*, are: [listing contracts]" (emphasis added).

107.     An April 16, 2018, Chairman Update Letter, published in a press release, quoted Turner as stating: "Backlog now sits at $200 million, *with expectations for continued, and, even accelerated growth*" (emphasis added).

108.     An August 2, 2018 press release announcing that the Backlog had reached "an astonishing $301 Million" quoted Turner as stating:

> *The evidence is clear in the number of new contracts being signed* and the rate at which customers are subscribing to our software services…. *Our momentum will not stop here*: our vision to provide connectivity for Any Device, Any Network, Anywhere^TM, continues to disrupt the industry. **We are on a torrid sales pace and we are On Fire with relentless forward motion and passion** for customers and meeting their global service needs.

(Italics added, bolding in original.)

109.     A March 7, 2019 Chairman's Letter, published in a press release, quoted Turner as saying that the Artilium Acquisition "affirmed our *clear mandate to hyper-accelerate growth* in accretive ways, be it through our continue stellar sales growth, or, through additional successful strategic alliances which is how we began our Artilium acquisition" (emphasis added). He continued:

> Looking forward, *we are a company with ambitious plans for continued growth* and profitability. On our upcoming earnings call, scheduled for March 12, 2019, *you will hear about our 2018 successes* that have laid a strong foundation as we set even

more challenging 2019 goals. *Our growth will continue* from our current customers who continue to buy more from us.

* * *

*We are well positioned now to drive dramatic increases in our scale* and become the recognized market leader through the value we create for our customers and shareholders.

(Emphasis added.)

110.    During a March 12, 2019 earnings call that followed the release of the 4Q18 and FY18 results, Turner stated: "Pareteum's prospects are now the very best, more than ever before in our history. *There is a clear path ahead for **dramatic revenue growth** and this is fueled by the growth of our [Backlog] and its conversion…*." (emphasis added). During the same call, McCarthy stated: "we are decidedly a growth company."

111.    During an earnings call on May 7, 2019, when Pareteum announced its 1Q19 results, McCarthy stated: "I want to reinforce [Turner]'s comments about the remarkable transformation that Pareteum has achieved. Along with this *rapid growth* and transformation…." (emphasis added).

112.    Finally, based on its reported revenues and growing Backlog, the Company repeatedly raised its revenue guidance when it released its results for each of 1Q18, 2Q18, 3Q18, 4Q18, FY18, and 1Q19. ¶¶17, 19, 21, 24, 26.

113.    The statements in ¶¶105-12 made by Pareteum, Turner, and McCarthy regarding Pareteum's experienced and expected growth and by Pareteum regarding revenue guidance were materially false and misleading when made, and were known to be false or were recklessly disregarded as such at the time that the statements were made, because these statements were based on the Company's reported revenues and realized revenue growth rates, which were "inaccurately recognized" and overstated throughout the Class Period by as much as 42%, and its Backlog and

40

Backlog conversion rate, which were inflated throughout the Class Period; and these statements failed to include any disclosure that they were based on such compromised inputs.

114.    On June 7 and 26, 2019, the Aurelius and Viceroy reports were published, which concluded that Pareteum's reported revenues were overstated, its Backlog was inflated, and it was not converting Backlog to revenue at or above 100%.

115.    On June 10, 2019, Turner categorically denied the Aurelius Report's allegations, stating: "Pareteum has experienced tremendous growth, and we continue to grow in a healthy and measurable way." An August 6, 2019 press release announcing 2Q19 results, which was published at the same time that Turner retired the Backlog as unreliable, quoted Turner as stating:

> *We are in the early innings of **a remarkable growth story***. We have added numerous customers to our platform in 2019, and *these customers, as well as those in our deployment pipeline, will be the drivers of our **continued growth***. *We are only at the beginning* of our mission to connect every person and every(thing)™."

(Emphasis added.)

116.    The statements in ¶115 made by Turner regarding Pareteum's experienced and expected growth were each materially false and misleading when made, and were known to be false or were recklessly disregarded, at that time, because these statements were based on the Company's reported revenues and realized revenue growth rates, which were "inaccurately recognized" and overstated throughout the Class Period by as much as 42%, and its Backlog and Backlog conversion rate, which were inflated throughout the Class Period; and these statements failed to include any disclosure that they were based on such compromised inputs.

41

## IV.   THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER

### A.   PREMATURE REVENUE RECOGNITION, THE PENDING RESTATEMENT, GAAP VIOLATIONS, LACK OF CONTROLS, AND THE MAGNITUDE OF THE ANTICIPATED RESTATEMENT

117.   As noted in Pareteum's Class Period 10-Qs and 10-K, Pareteum's management – and especially its principal executive officer (Turner) and its CFO (O'Donnell) – were "responsible for establishing and maintaining adequate internal control over financial reporting." Pareteum and the Exchange Act Defendants admitted in the Restatement Release to having violated GAAP by inaccurately recognizing revenue, and the improper revenue recognition occurred in SEC filings that were reviewed, signed, and/or certified by the Exchange Act Defendants. The pending Restatement, the significant GAAP violations, and Pareteum and the Exchange Act Defendants' admitted failure to maintain sufficient internal controls to avoid fraud each lead, independently, to a reasonable inference of scienter. The magnitude of the anticipated Restatement – a *28% reduction* in falsely reported revenue of $32.4 million for FY18 and a *42% reduction* in falsely reported revenue of $57.1 million for 1H19 – supports a strong inference of scienter.

### B.   MOTIVE AND OPPORTUNITY

118.   Growth by Acquisition/Acquisition of Revenues. Pareteum and the Exchange Act Defendants falsely inflated Pareteum's stock to use it as currency to acquire companies – and their *actual* customers, contracts, and revenues – to buoy their false metrics with real revenue and prop up their ongoing fraud, supporting a strong inference of scienter. During the Class Period, based on the false and misleading statements outlined above, Pareteum's stock increased 824% and Pareteum issued more than 43 million shares falsely valued at more than $132 million as currency to acquire Artilium, iPass, and Devicescape. Pareteum touted that the Artilium Acquisition would

add $65 million to its Backlog, and that the iPass Acquisition would increase connections and, therefore, revenue.

119.    **Incentive Awards Tied to Stock Price and Acquisitions and Turner's Acquisition-Based Windfall.** Throughout the Class Period, Pareteum had in place a Long-Term Incentive Compensation Plan, pursuant to which the Company would grant equity and equity-linked awards to officers, directors, consultants, and others upon the achievement of performance targets based upon certain operational, financial, or performance criteria, which included acquisition-related activity, stock price appreciation, and relative stock price performance. Bozzo, O'Donnell, Turner, and McCarthy were awarded options and/or stock during the Class Period pursuant to this plan. As demonstrated by the below chart derived from an analysis of Form 4s and other public filings, these incentive packages, which were tied to the Company's stock price, incentivized them to artificially inflate the Company's stock price and to use that artificially inflated stock as currency to make acquisitions in order to enrich themselves:

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| | Recipient (Title) | Date of Award | Type | Number of Securities/ Derivative Securities Acquired | Conversion/Exercise Price | Date Excercisable | Pursuant to |
| | Vic Bozzo (CEO) | 5/15/18 | Options | 500,000 | $2.37 | 2/5/2019 (1) | Long-Term Incentive Plan |
| | Edward O'Donnell (CFO) | 5/15/18 | Options | 100,000 | $2.37 | 2/5/2019 (1) | Long-Term Incentive Plan |
| | Robert Turner | 10/25/18 | Common Stock | 2,000,000(4) | | | Long-Term Incentive Plan |
| | Vic Bozzo (CEO) | 1/2/19 | Options | 150,000 | $1.72 | 1/1/2020(5) | Long-Term Incentive Plan |
| | Edward O'Donnell (CFO) | 1/2/19 | Options | 80,000 | $1.72 | 1/1/2020(5) | Long-Term Incentive Plan |
| | Denis McCarthy (President) | 1/2/19 | Options | 400,000 | $1.72 | 1/1/2020(5) | Long-Term Incentive Plan |
| | **2017 Awards with Vesting Terms Amended During the Class Period** | | | | | | |
| | Robert Turner | 11/22/16 | Option | 300,000 | $3.50 | 11/18/16 (2) | Long-Term Incentive Plan |
| | Robert Turner | 11/21/17 | Common Stock | 1,500,000 (3) | | | |

(1) One-third shall vest 2/5/19 and 2/3 shall vest in 24 equal monthly installments

(2) The options (the "Options") were issued pursuant to the Company's Amended and Restated 2008 Long-Term Incentive Compensation Plan and shall vest and become exercisable over a period of three (3) years, with 1/4 vesting immediately, and the remaining shares vesting in three equal yearly installments. On June 6, 2018, the Issuer and Reporting Person entered into an amendment to that certain employment agreement between the parties pursuant to which the vesting terms of the Options were amended to provide further that the Options shall become fully vested and exercisable on the first trading day of the calendar quarter following a "Change of Control or Triggering Event." On June 7, 2018, a "Change of Control or Triggering Event" occurred when the Issuer tendered a binding offer to merge, or acquire all or substantially all of the assets or a controlling portion (which may be less than 50%) of the equity of another company.

(3) Represents a restricted stock award (the "Restricted Stock Award") under the Pareteum Corp. 2017 Long-Term Incentive Compensation Plan, of which two-thirds shall vest on the date of grant and one-third shall vest in 12 equal monthly installments over a one year period, beginning on the one month anniversary of the date of grant. On June 6, 2018, the Issuer and Reporting Person entered into an amendment to that certain employment agreement between the parties pursuant to which the vesting terms of the Restricted Stock Award were amended to provide further that the Restricted Stock Award shall become fully vested and exercisable on the first trading day of the calendar quarter following a "Change of Control or Triggering Event." On June 7, 2018, a "Change of Control or Triggering Event" occurred when the Issuer tendered a binding offer to merge, or acquire all or substantially all of the assets or a controlling portion (which may be less than 50%) of the equity of another company.

(4) Represents a stock award of 2,000,000 shares under the 2018 Long-Term Incentive Compensation Plan (the " Stock Award"), of which half shall vest on the date of grant and the remaining half shall vest in 12 equal monthly installments over a one year period, beginning January, 2019.

(5) Option is granted pursuant to the Pareteum Corp. 2018 Long-Term Incentive Compensation Plan, of which one-third shall vest on January 1, 2020 and two-thirds shall vest in 24 equal monthly installments over a two year period thereafter (the "January Option Grant").

43

120. As of May 24, 2019, Turner beneficially owned 2,765,973 shares of the Company's stock, and in 2018 he received $5,281,843 in compensation, which included $321,255 in salary, a $600,000 bonus, $2,921,563 in bonus stock awards, and $1,439,055 in other compensation. On June 6, 2018, Turner took advantage of the artificially inflated stock price and the not-yet-announced Artilium Acquisition to increase his compensation by amending his employment agreement to provide for the automatic vesting of his restricted stock awards and options immediately upon the Company entering into an agreement to acquire another company. Then, *the next day*, the Company announced the Artilium Acquisition – which it paid for using more than $100 million in artificially inflated stock, and as a result of which Turner's restricted stock awards and options instantly vested at Pareteum's artificially inflated stock price.

121. <u>Funding Corporate Operations.</u> The Exchange Act Defendants were also motivated to inflate Pareteum stock to fund operations and pay their salaries. During the Class Period, Pareteum and the Exchange Act Defendants (a) sold 2,440,000 shares at $2.50 per share, raising $6,100,000 for "working capital and general corporate purposes"; (b) secured the $50 million Credit Facility from Post Road Group, from which they drew $25 million before defaulting; (c) issued another 750,000 shares when the Company defaulted on the Credit Facility as a condition to obtaining $2,500,000 in additional financing; (d) sold up to 1,311,439 shares of stock to settle balances owed to vendors; and (e) barely a month before the Restatement Release, closed the $40 million Secondary Offering, again selling artificially inflated stock to raise cash.

## C. EXECUTIVE TERMINATIONS, PRIOR BAD ACTS, CONCEALED CONNECTIONS, AND THE SCHEME

122. After the Aurelius and Viceroy Reports were published, the Exchange Act Defendants categorically denied everything in those Reports and assured investors that Pareteum was "fully dedicated to upholding the highest standards and reporting requirements of a public

44

company," but contradictorily shuttered the Company's press release machine and retired the Backlog. These actions, and especially their sudden pivot away from the Backlog metric when they were caught, support a strong inference of scienter.

123. On October 15, 2019, Pareteum disclosed that, on October 9, 2019, twelve days before the Restatement Release, McCarthy had been terminated. On November 5, 2019, Pareteum reported that O'Donnell would be replaced as CFO and that his "status with the Company is under review." On November 25, 2019, it announced that Turner had been terminated as Chairman and CEO. The swift and suspiciously-timed rash of senior executive terminations and replacements directly before and after the Restatement Release supports a strong inference of scienter.

124. The parties and non-parties to this matter have undisclosed preexisting relationships; undisclosed histories of fraudulent and/or criminal conduct, including undisclosed connections to Barry Honig ("Honig"), an accused serial pump and dump mastermind; and/or have worked together at companies that mysteriously lose virtually all of their shareholders' money shortly after their involvement. For example, as noted in the Viceroy Report, Turner served as CEO of Davnet, an Australian-listed company that collapsed as a result of liquidity issues; during his tenure, Davnet's "asset position fell by $100 million to not much more than $21 million," and "its cash reserves shrank by $72 million, leaving about $11 million." After Davnet, Turner served as a director of LastMile Communications, which liquidated the year after he left.

125. In early 2007, Turner met McCarthy at Catcher Holdings, Inc. ("Catcher"), where Turner served as CEO and Chairman and McCarthy served as CFO. When Turner and McCarthy left Catcher (after barely a year), they purportedly left it with only $100,000, having overseen a stock price drop from $1.40 to $0.73 per share amid going concern issues; months later, in April

45

2008, Catcher collapsed due to insufficient working capital and is now a worthless penny stock. While at Catcher, Turner made statements about Catcher similar to those at issue here.

126.    After Catcher, Turner and McCarthy moved to Pac-West Telecomm, Inc. ("Pac-West"), where Turner served as CEO, McCarthy served as CFO/COO, and they met Bozzo, who served as Chief Sales and Marketing Officer and then President and General Manager. Turner, McCarthy, and Bozzo left Pac-West in 2011; it filed for bankruptcy in 2013.

127.    From October 2003 to December 2010, O'Donnell served as CFO of Carlyle Capital Group, LLC, which appeared to be mimicking The Carlyle Group without any substantive connection thereto. From July 2015 to January 2016, O'Donnell served as CFO of Radbourne Property Group, which, according to the Viceroy Report, was charged with fraud. Most notably, in November 2015, less than two years before joining Pareteum, O'Donnell was sued in his capacity as the former CFO (February 2013-June 2015) of AudioEye, Inc. ("AudioEye") after he allegedly "'*personally affected the fraudulent booking of revenues*'" to "'*give the market the false notion that revenue growth was accelerating*'" and to "'artificially inflate AudioEye's stock price,'" "***trigger[ing] a restatement erasing <u>92%</u> of the company's reported revenue over the relevant period***" (emphasis added; original emphasis removed).

128.    During the Class Period, non-party Stephen (a/k/a Steven) Hart was listed as one of Pareteum's "Investor Relations Contacts" on Pareteum press releases issued during 2018 and at least until March 5, 2019. Hart was sentenced to prison in August 2015 for obstruction of justice and perjury following charges by the SEC for "repeated violations of the federal securities laws from 2007 to 2011" in connection with "two distinct trading schemes" involving matched trading and insider trading. As of 2019, Hart was added to the list of "Prohibited Service Providers" for OTC Markets, around the same time that he vanished from Pareteum's releases.

129. According to the SEC, which brought an action against Honig in this Court in September 2018, Honig is the leader and "primary strategist" of a "long-running fraudulent" "classic pump-and-dump" securities fraud ring. On June 10, 2019, Honig entered into a consent judgment with the SEC, which was approved by Judge Ramos on July 10, 2019, pursuant to which he is now banned from investing in and financing publicly traded, small cap companies.[8]

130. Honig reportedly concealed his interests in his schemes. For example, the SEC reportedly has accused Honig of hiding over 90% ownership in a fund that was listed in SEC filings as being owned by someone else, and journalists have found that Honig was involved with Pareteum's outside counsel in secretly funding underwriting for a public offering in which he was a lead investor. Two "undisclosed affiliates" with which Honig purportedly has ties are Iroquois Capital Management, LLC ("Iroquois") and IntraCoastal Capital, LLC ("IntraCoastal"), which (according to the Aurelius Report) have invested in 34 publicly traded companies that were also owned by Honig. Iroquois also reportedly received an SEC subpoena as part of its pump-and-dump investigation of Honig, through which the SEC sought "information to prove this group was trading as undisclosed affiliates and influencing public company CEO's to get false press releases published to drive up the price of a stock."

131. In December 2017, just after the Class Period began and just as the barrage of press releases started, Honig-associated Iroquois and IntraCoastal secured millions of Pareteum shares and warrants in a private placement, giving them 13.2% of the stock. On February 8 and 14, 2019, before the stock price plummeted as the fraud was revealed, IntraCoastal and Iroquois reported

---

[8] A parallel criminal investigation into Honig and his team is also reportedly being conducted. Teri Buhl, "SEC admits Team Honig is under the criminal investigation I warned about in 2016," *available at* https://www.teribuhl.com/2019/05/22/sec-admits-team-honig-is-under-the-criminal-investigation-i-warned-about-in-2016/ (last visited July 15, 2020).

47

that they had liquidated 100% of their Pareteum holdings, likely somewhere between $2.50 and $3.19 per share, representing a likely 272%-347% rate of return.

132.    Honig also has undisclosed ties to Pareteum executives and directors and to several firms that provided services in furtherance of the fraud herein:

- While Turner and McCarthy were at Catcher, Honig owned an interest.

- Former Pareteum director and current interim CFO Laura Thomas served as the CFO of TowerStream, in which Honig owned a substantial stake.

- One of the defendants in the SEC proceeding against Honig who allegedly took part in Honig's schemes also appeared as a "private investor" in a Pareteum call in 2017.

- Dawson James Securities Inc. ("DJSI"), Pareteum's placement agent and the underwriter for the Secondary Offering, also acted as placement agent for several Honig-related entities and has been engaged by at least thirteen companies (in addition to Pareteum) in which Honig and/or affiliated entities had interests. According to the Aurelius Report, most of these companies have declined more than 75% from their peak value and/or are now virtually worthless.

- Squar Milner, Pareteum's auditor, audited at least one company owned by Honig, which (according to the Aurelius Report) is now virtually worthless as well.[9]

- Finally, non-party Sichenzia Ross Ference Kesner LLP ("Sichenzia"), Pareteum's outside counsel, is also reportedly Honig's longtime securities law firm and has served as the firm for at least 22 companies in which Honig and/or his associates have invested. Sichenzia and Honig are currently being sued by MabVax Therapeutics for their alleged role in a pump-and-dump scheme that left that company bankrupt.[10]

133.    During the Class Period, the Exchange Act Defendants concealed these past relationships and connections from investors; they regularly employed DJSI, Squar Milner, and Sichenzia, all of whom had ties to Honig. The Exchange Act Defendants also created the fabricated and embellished Backlog to support their hyper-growth narrative. Honig's associated entities,

---

[9]    In 2017, the Public Company Accounting Oversight Board found that Squar Milner had failed to perform sufficient procedures to test its client's valuation of revenue and the effectiveness of its controls.

[10]    Pareteum and Sichenzia appear to share office space: the address that Pareteum lists on its website as its "USA headquarters" is the identical address (1185 Avenue of the Americas, 37th Floor, New York, NY 10036) for Sichenzia's main office, which it represented occupies the *full floor*.

Iroquois and IntraCoastal, invested in Pareteum; just after they did, Pareteum and the Exchange Act Defendants began the barrage of false releases, which ended nearly contemporaneously with the publication of the Aurelius and Viceroy Reports. After the Aurelius and Viceroy Reports were published, Pareteum and the Exchange Act Defendants categorically denied everything. However, barely a month later, they "retired" the Backlog, noting that it had *"served its purpose."* Shortly after that, they admitted Pareteum had defaulted on its Credit Facility shortly after it was executed. Nonetheless, Pareteum and the Exchange Act Defendants orchestrated a $40 million Secondary Offering, in full knowledge that the representations made therein were false. *One month* after they accepted $40 million of Class members' money, Pareteum and the Exchange Act Defendants announced that they would have to restate *every major financial report they had made in 2018 and 2019*.

**D.    ADDITIONAL SCIENTER ALLEGATIONS REGARDING BACKLOG**

134.    The statements in ¶¶72, 77, 81, and 85 made by Pareteum and Turner regarding the new customers and contracts announced in the September 17 and October 2, 8, 17, and 23, 2018 press releases, the value that they added to the Backlog, their ability to grow Pareteum's revenues, and each subsequent statement regarding the total value of the Backlog were known to be false or were recklessly disregarded as such thereby at the time that the statements were made, for the following additional reasons.

135.    Even after the Aurelius and Viceroy Reports placed Pareteum and the Exchange Act Defendants on notice that some of the Company's customers and contracts were fabricated or embellished, rather than investigate these claims, Pareteum and the Exchange Act Defendants categorically denied them. At the same time, they quietly shut down the Company's press release machine and continued to represent the Backlog's growing value without adjusting it to take into

49

account these fabricated and embellished customers and contracts for another two months, until "retiring" the Backlog on August 6, 2019.

136. While Pareteum and the Exchange Act Defendants regularly identified the Backlog as a "key performance indicator" and "lead indicator of revenue" and repeatedly touted its growing value, after the publication of the Aurelius and Viceroy Reports, when they "retired" the Backlog, they admitted that it had not been reliable, stating that "it is our reported quarterly results and the annual guidance provided, which are the strongest indicators."

137. The information in ¶¶73-76, 78-80, and 82-85 regarding the new customers and contracts announced in the September 17, October 2, 8, 17, and 23, 2018 press releases was discoverable by Pareteum and the Exchange Act Defendants and they had a duty to inquire as to the realistic ability of these customers and contracts to add the value that they attributed to them. Indeed, some of the press releases identifying these customers even included biographies about the customers and Eyethu specifically tagged Pareteum when it retweeted Pareteum's announcement of the contract with Eyethu – a tweet that came just two months after Eyethu's public tweet acknowledging that it had only recently been formed.

138. As noted by the Aurelius report, two of Parallax Science's officers allegedly perpetrated the AudioEye fraud with O'Donnell, and Global Connect and another purported Pareteum customer, SJ Global, appear to be connected to an individual identified as a Pareteum consultant, which suggests that Pareteum and the Exchange Act Defendants knowingly fabricated contracts to inflate Pareteum's purported sales wins.

139. Additionally, on May 28, 2019, just before the Aurelius and Viceroy Reports were published, Pareteum hosted an Investor Day, during which it gave a presentation that identified purported Pareteum customers that was replete with double counting and related and/or non-

50

existent customers. For example, the slide included the logos for both Vodaphone and Lowi.es, which is simply Vodaphone's Spanish telecom business. The slide also included the logos of *bliep, Ello Mobile, SpeakUp, and United Telecome, which are actually *subsidiaries of Pareteum*. Three logos in the slide belong to one company, Belgacom, which acquired Scarlet in 2008, and then rebranded as Proximus in 2015. Likewise, according to the Viceroy Report, SOL Mobile was dissolved in 2017, years before this slide was created; Pronto Telecom (the satellite dish) did not appear to have a phone number and appears to have been run out of an apartment; Bellingham's website no longer worked, its phone number was no longer in service, its LinkedIn page listed only one employee, and it likewise appears to have been run out of an apartment; and Apeiron's website also no longer worked and its phone number was also no longer active. These fabricated and embellished "customers" strongly suggest that, despite claiming "1,000+ Live and In-Service Customers" on the slide, Pareteum and the Exchange Act Defendants struggled to find enough legitimate customers to even fill a single slide, evincing knowledge of the fabricated and exaggerated nature of their customers and contracts. Finally, the May 28, 2019 investor presentation also included a "customer panel" slide and discussion, in which Pareteum misleadingly identified Luis Jimenez-Tunon – a member of the Board – as a "customer." Notably, according to the Viceroy Report, after the release of the Aurelius Report, Pareteum apparently retracted and modified these slide decks, further supporting a strong inference of scienter.

140.    The statements in ¶¶89-92 made by Pareteum, Turner, and McCarthy regarding the reliability of Backlog conversion as a "key performance indicator" and their ability to convert Backlog to "incremental monthly revenue" at or above 100% were known to be false or were recklessly disregarded as such at the time that the statements were made, for the following additional reasons. As noted above, Pareteum and the Exchange Act Defendants were aware that

the Backlog contained fictitious or embellished customers and contracts, such that they knew that the Backlog could not possibly convert to revenue at or above 100%.

141. The failure of the 535% increase in Backlog to materialize into revenue at a proportionate pace was known to Pareteum and the Exchange Act Defendants, as they regularly reported the Company's Backlog, revenue, and accounts receivable figures and, correspondingly, they were aware that the Company's ballooning accounts receivables (which increased 2,300%) were significantly outpacing its Backlog and revenue growth, which grew 535% and 287%, respectively, during the same period. On June 7, June 26, July 3, and August 27, 2019, the Aurelius and Viceroy Reports and other market commentators placed Pareteum and the Exchange Act Defendants on notice that the Backlog did not appear to be converting to revenue at or above 100% and, instead of researching and acknowledging this fact, Pareteum and the Exchange Act Defendants categorically denied the allegations. Then, months later, they quietly retired the Backlog, admitting that it was not reliable.

**E.   ADDITIONAL SCIENTER ALLEGATIONS BASED ON THE CRITICAL NATURE OF REVENUE AND BACKLOG AND DEFENDANTS' LEVEL OF INVOLVEMENT**

142. Pareteum and the Exchange Act Defendants repeatedly described the Backlog as "critical," "key," and a "lead indicator" that provided "excellent visibility into [Pareteum's] business operations and revenue recognition." The Company's revenue and Backlog were plainly core operations of Pareteum, and misrepresentations of Pareteum's core operations support scienter. This is all the more true here, where Pareteum and the Exchange Act Defendants repeatedly asserted that, due to the material weaknesses in Pareteum's financial reporting, they had "performed *additional analysis*…to ensure our financial statements are prepared in accordance with [GAAP]," and they "categorically denied" the Aurelius and Viceroy Reports *after* those reports pointed out the basis for the pending Restatement. The core nature of these metrics, the

52

importance placed on them, the nature of their positions with the Company, and the fact that the Company and the Exchange Act Defendants continued to rely on their statements even after being confronted with evidence of their falsity likewise support a strong inference of scienter.

143. The Exchange Act Defendants were all high-level corporate insiders. Many signed and/or certified the Company's Class Period 10-Qs and 10-K. They also regularly issued releases and spoke about the Company's revenues, Backlog, and growth. Because of their positions, they had access to information about Pareteum's financial information, including its revenue and Backlog, and its financial controls and procedures and the financial reporting thereon through access to internal corporate documents, conversations, and contact with other corporate officers and employees, attendance at meetings, and reports and other information provided to them. Each of the Exchange Act Defendants, by virtue of his high-level position, directly participated in the management of the Company, was directly involved in the day-to-day operations of Pareteum at the highest levels, and was privy to confidential information concerning the Company and its business, operations, practices, financial statements, and financial condition, including the accounting misstatements alleged herein.

144. Because of the Exchange Act Defendants' positions, they possessed the power and authority to, and did, control and monitor the contents of Pareteum's SEC filings, press releases, presentations, and other public statements during the Class Period to investors, securities analysts, money and portfolio managers and institutional investors (*i.e.*, the market). They were also involved in drafting, producing, reviewing, and/or disseminating the false and/or misleading statements and information alleged herein; were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance; and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the

53

Exchange Act Defendants bears responsibility for the accuracy of the SEC filings, press releases, and other public statements detailed herein, and is primarily liable for the false and misleading statements and omissions pleaded herein.

145. Even if *arguendo* the Exchange Act Defendants were not aware of the false and misleading nature of the statements outlined above, they were aware of overwhelming "red flags," such that they had a duty to investigate the doubtful and should have known that their statements were materially false and misleading. Specifically, (a) many of Pareteum's supposed customers and contracts were fabricated or embellished (and some were even connected to the Exchange Act Defendants), all of which was verifiable; (b) even if the Exchange Act Defendants did not know about these fabricated and embellished customers and contracts with which some of them had connections, the Aurelius and Viceroy Reports placed them on notice, and they categorically denied those findings; (c) Backlog was not converting to revenue at or above 100%, and accounts receivables were instead exploding; (d) McCarthy maintained the Backlog spreadsheets and analysis; (e) *all* of the Exchange Act Defendants were directly involved in Pareteum's day-to-day operations and had access to this information; and (f) Turner, O'Donnell, Bozzo, and McCarthy signed, certified, and/or assisted in the preparation of the relevant SEC filings, such that they had a duty to inquire about these issues.

## V.    LOSS CAUSATION AND ECONOMIC HARM

146. As detailed herein, during the Class Period, Pareteum and the Exchange Act Defendants engaged in a course of conduct that artificially inflated Pareteum's stock price by misrepresenting and overstating the Company's revenue, Backlog, and growth, and, thus, the Company's financial results, thereby presenting a misleading image of Pareteum's business, financial condition and prospects. These claims caused and maintained the artificial inflation in

54

Pareteum's stock price throughout the Class Period and until the truth about the Company was fully revealed to investors. Their false and materially misleading statements caused Pareteum's shares to trade at artificially inflated levels throughout the Class Period – reaching a Class Period high of $5.93 per share in mid-March 2019.

147. On June 7, 2019, the truth was partially revealed when the Aurelius Report was published, revealing for the first time that Pareteum's reported revenues were materially overstated, its Backlog was materially inflated, and it was not converting Backlog to revenue at or above 100% (as claimed). Following the June 7 Aurelius Report, shares fell almost 45%, from a close of $3.41 per share on June 6, 2019, to an intra-day low of just over $2.00 per share, on very high volume. Shares avoided total collapse, however, and the full truth was not yet revealed to the market, because, or about Monday, June 10, 2019, Turner stated: "We categorically deny the allegations put forth. We do not intend to legitimize those reports by delving in to them. Pareteum has experienced tremendous growth, and we continue to grow in a healthy and measurable way." On June 10, shares rebounded, closing at $3.00 per share for the day.

148. On June 26, 2019, the truth was partially revealed when the Viceroy Report was published. The Viceroy Report revealed new details and a deeper analysis of Pareteum's overstated revenues and inflated Backlog. Following the June 26 Viceroy Report, shares declined another 20%, but the full truth was not yet revealed to the market. First, on June 27, 2019, Pareteum stated: "Pareteum Corporation categorically denies all allegations put forth in the short seller reports…. Everyone at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company. We look forward to sharing additional information about our growth and success in future earnings releases." Second, on July 1, 2019, Pareteum pre-announced on a "one-time basis given the compelling quarter" its 2Q19 results, representing that they would

"exceed current analysts' consensus of $26.2 million for revenue." Then, on August 6, 2019, Pareteum announced its 2Q19 results, in connection with which it reported that "Total revenues increased 469% to $34.1 million" and that the Backlog had grown to "over $1.270 billion." Following the June 27 and July 1 statements, the Company's stock fully recovered from the drop caused by the Viceroy report:



149.     Finally, on October 22, 2019, when the Company issued the Restatement Release, the full truth was revealed, and Pareteum shares dropped to a 52-week low, tumbling 50% in after-market trading, closing at $0.74 per share on October 21, 2019 and opening at $0.37 per share on October 22, 2019.

150.     These dramatic declines eradicated the artificial inflation of Pareteum's share price and caused real economic loss to investors who purchased stock during the Class Period. As a result of their purchases of Pareteum stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic losses – *i.e.*, damages. Defendants' wrongful conduct directly and proximately caused the damages suffered by Lead Plaintiff and the Class.

151.     The timing and magnitude of Pareteum's stock price declines negates any inference that the losses suffered were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to fraudulent conduct. During the same period

in which Pareteum's share price fell as a result of the fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged. After stabilizing in the immediate aftermath of the Restatement Release, and without the artificial inflation created by the false statements outlined herein, Pareteum's stock consistently traded in the $0.65 to $0.85 per share range (until the Coronavirus pandemic) – exactly where it traded before the Class Period began:



## VI. PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET

152. At all relevant times, the market for Pareteum's common stock was an efficient market for the following reasons, among others: (a) Pareteum's stock met the requirements for listing, and was listed and actively traded on the NYSE and then the Nasdaq national market exchanges, both highly efficient and automated markets; (b) as a regulated issuer, Pareteum filed periodic public reports with the SEC and the NYSE/Nasdaq; (c) Pareteum regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press

and other media; (d) Pareteum was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s), and each of these reports was publicly available and entered the public marketplace; and (e) unexpected material news about Pareteum was reflected and incorporated into its stock price during the Class Period.

153.    As a result of the foregoing, the market for Pareteum securities promptly digested current information regarding Pareteum from all publicly available sources and reflected such information in Pareteum stock price. Under these circumstances, all purchasers of Pareteum common stock during the Class Period suffered similar injury through their purchase of Pareteum common stock at artificially inflated prices and a presumption of reliance applies.

## VII.    NO SAFE HARBOR

154.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements or omissions pleaded in this Complaint because they are not forward-looking statements; rather, they are statements of present or historical fact. Specifically, the statements outlined above regarding: (a) reported revenue and realized revenue growth percentages purported to report actual, historical revenue and actual, realized revenue growth rates; (b) Backlog purported to report the *actual* value of the Backlog and by how much it had increased; (c) Backlog conversion purported to report the actual, realized rate of Backlog conversion into revenue; and (d) hyper-growth purported to describe actual, historical growth results and ongoing growth prospects. Regarding the Backlog specifically, during the Class Period, Turner stated that the Backlog represented the "value of new sales orders intake and *the revenue under contract*"; on January 8, 2018, Pareteum stated that the Backlog was a "key performance indicator [that] is *directly correlated* to our financial and

58

operating results" (emphasis added); in a February 12, 2018 letter to shareholders, Turner stated that the Company's "long-term contractual business" was "evidenced by our [Backlog]" and linked to a presentation that denoted that Backlog includes "live and in service" contracts; and, on August 6, 2018, Turner noted that the Backlog "has also been a very useful way to help stakeholders understand…the commitments that we've secured from customers…." (emphasis added). On October 30, 2018, Pareteum's Chief Revenue Officer described the Backlog as "contractually committed revenue."

155. Further, many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent any such statements could be characterized as such, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that any statements were identified as "forward-looking statements," which they were not, the relevant Defendants are liable for those false forward-looking statements because, as outlined above, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Pareteum who knew that those statements were false when made.

## VIII.   EXCHANGE ACT COUNTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Pareteum and the Exchange Act Defendants**

156.    Lead Plaintiff repeats and realleges each and every allegation contained in ¶¶1-155 and 216-21 as if fully set forth herein.

157.    During the Class Period, Pareteum and the Exchange Act Defendants carried out a plan, scheme and course of conduct that was intended to and did: (a) deceive the investing public regarding Pareteum's business, operations, management, and the intrinsic value of its common stock; (b) enable Pareteum and the Exchange Act Defendants to artificially inflate the price of Pareteum shares; (c) enable Pareteum insiders to use millions of dollars of stock as currency to acquire revenues and to raise millions more in capital necessary to fund operations while in possession of material adverse non-public information; and (d) caused Lead Plaintiff and other members of the Class to purchase Pareteum common stock at artificially inflated prices.

158.    Pareteum and the Exchange Act Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Pareteum common stock in an effort to maintain artificially high market prices for that stock in violation of Section 10(b) and Rule 10b-5. Pareteum and the Exchange Act Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

159.    Pareteum and the Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, including the mails,

60

interstate telephone communications, and the facilities of the national securities markets, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and prospects of Pareteum as specified herein.

160. Pareteum and the Exchange Act Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Pareteum's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Pareteum and its business operations and prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Pareteum common stock during the Class Period.

161. Each of Pareteum and the Exchange Act Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Exchange Act Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Exchange Act Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Exchange Act Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each

61

of the Exchange Act Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

162. Pareteum and the Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Pareteum's operating condition and business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Pareteum and the Exchange Act Defendants' overstatements and misstatements of the Company's business, operations, and earnings throughout the Class Period, Pareteum and the Exchange Act Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

163. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Pareteum common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Pareteum's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Pareteum and the Exchange Act Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Pareteum and the Exchange Act Defendants but not disclosed in public statements by Pareteum and the Exchange Act Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Pareteum common stock during the Class Period at artificially high prices and were damaged.

164. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Pareteum was experiencing, which were not disclosed by Pareteum and the Exchange Act Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Pareteum common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

165. By virtue of the foregoing, Pareteum and the Exchange Act Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

166. As a direct and proximate result of Pareteum and the Exchange Act Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against Turner, O'Donnell, and Bozzo

167. Lead Plaintiff repeats and realleges each and every allegation contained in ¶¶1-155 and 216-21 as if fully set forth herein.

168. Turner, O'Donnell, and Bozzo acted as controlling persons of Pareteum within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power

63

to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Further, each of these Defendants themselves issued and/or were quoted in some of the press releases alleged by Plaintiff to be misleading; Turner and O'Donnell signed and/or certified the Company's Class Period 10-Qs and 10-K; Bozzo signed the Company's Class Period 10-K; and all three acted with culpable participation in the wrongdoing alleged herein.

169.    As set forth above, Pareteum and Turner, O'Donnell, and Bozzo each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Turner, O'Donnell, and Bozzo are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**SECURITIES ACT ALLEGATIONS**

170.    Lead Plaintiff repeats and realleges each and every allegation contained above in ¶¶1-4 as if fully set forth herein. With respect to the following allegations and counts, Lead Plaintiff excludes any and all allegations that could be construed as alleging of fraud or intentional misconduct and/or motive; these allegations and counts are based solely on negligence and/or strict liability and do not sound in fraud.

## I.    SECURITIES ACT PARTIES

### A.    LEAD PLAINTIFF

171.    Lead Plaintiff, the Pareteum Shareholder Investor Group, is comprised of Kevin Ivkovich, Stephen Jones, Keith Moore, Nicholas Steffey, and Robert E. Whitley, Jr., who, as set forth in their attached certifications, incorporated by reference, acquired Pareteum securities in the iPass Acquisition and in the Secondary Offering during the Class Period and have suffered damages as a result.

### B.    CORPORATE DEFENDANT

172.    Defendant Pareteum is a telecommunications software and services provider. Pareteum is a Delaware corporation that purports to maintain its principal place of business at 1185 Avenue of the Americas, 37th Floor, NY, NY. 10036. Throughout the Class Period, the Company's securities traded on the NYSE American under the ticker symbol "TEUM" until the market close on October 22, 2018, and then on the NASDAQ exchange under the ticker symbol "TEUM" beginning on October 23, 2018.

### C.    CONTROL PERSON DEFENDANTS

173.    Defendant Robert H. "Hal" Turner ("Turner") was, during the Class Period, Executive Chairman of Pareteum's Board of Directors (at all times), its Principal Executive Officer

65

(until May 24, 2019), and then its CEO (effective May 24, 2019). Turner signed and/or certified the Company's Class Period 10-Qs and 10-K. Turner was terminated on November 25, 2019, in the wake of the Restatement Release.

174. Defendant Edward "Ted" O'Donnell ("O'Donnell") was Pareteum's CFO during the Class Period. O'Donnell signed and/or certified the Company's Class Period 10-Qs and 10-K. O'Donnell was replaced as CFO in the wake of the Restatement Release.

175. Defendant Victor Bozzo ("Bozzo") was, during the Class Period, Pareteum's CEO (until May 24, 2019), and then its Chief Commercial Officer (effective May 24, 2019). Bozzo signed the Company's Class Period 10-K. Collectively, Turner, O'Donnell, and Bozzo, are referred to herein as the "Control Person Defendants."

### D. UNDERWRITER AND AUDITOR DEFENDANTS

176. Defendant Dawson James Securities Inc. ("DJSI") is a full-service investment banking firm headquartered in Boca Raton, FL. DJSI acted as Pareteum's exclusive placement agent and underwriter and arranged for the sale of Pareteum securities offered in connection with the Company's Class Period Secondary Offering.

177. Defendant Squar Milner is a certified public accounting and financial advisory firm headquartered in Orange County, California. Squar Milner served as Pareteum's independent auditor since at least 2014 and during the Class Period, and specifically for Pareteum's FY17 and FY18 consolidated financial statements, which were included in Pareteum's Class Period 10-K and incorporated by reference into the Registration Statement for the Class Period Secondary Offering.

## II.    THE IPASS ACQUISITION

178.    During the Class Period, on November 12, 2018, the Company announced that it had entered into an agreement to acquire iPass Inc. ("iPass") in a stock-based acquisition valued at approximately $30 million (the "iPass Acquisition"). Pursuant to the terms of the merger agreement, and through the iPass Acquisition Filings (defined below), Pareteum commenced a tender offer, offering 1.17 shares of Pareteum common stock in exchange for each share of iPass common stock tendered. The tender offer was effectuated and completed, and the acquisition closed, on February 12, 2019, also during the Class Period. In connection with the Acquisition, Pareteum issued 9,865,412 shares of common stock to the former public shareholders of iPass (which was a publicly traded company) in exchange for their iPass shares and 705,000 shares to iPass employees. The public shareholders of iPass did not take part in the negotiations of the terms or consideration of the iPass Acquisition, and they relied on the information provided in the iPass Acquisition Filings in deciding on the iPass Acquisition.

179.    In connection with the iPass Acquisition, Pareteum filed with the SEC (a) a Form S-4 Registration Statement on December 4, 2018, as amended on December 21, 2018, January 14, 2019, and January 15, 2019; (b) a Schedule TO Tender Offer Statement on December 4, 2018, as amended and supplemented on December 10, 2018, December 21, 2018, January 4, 2019, and January 14, 2019, January 15, 2019, and February 13, 2019; and (c) a Form 424(b)(3) Prospectus on February 4, 2019 (collectively, the "iPass Acquisition Filings."). The January 15, 2019 S-4A Registration Statement (intro) stated: "Pareteum…is offering…upon the terms and subject to the conditions set forth in this prospectus/offer." It further stated (p. 1, 122) that it "incorporates by reference important business and financial information," including "all reports and other documents subsequently filed by us…after the date of this prospectus and prior to the termination

of this offering." The February 4, 2019 Form 424(b)(3) Prospectus (p. 129-30) stated that "[t]his document is a part of that [Form S-4] registration statement."

180. In the January 15, 2019 S-4A Registration Statement (p. 115) and in the February 4, 2019 Prospectus (p. 115), Pareteum provided financial statements, entitled "Unaudited Pro Forma Condensed Combined Statement of Comprehensive Loss for the Nine Months Ended September 30, 2018," which represented that "Historical Pareteum" revenues for the nine months ended September 30, 2018, were $18,123,484, which were the same revenues reported in Pareteum's 3Q18 10-Q for the same period. In the January 15, 2019 S-4A Registration Statement (p. 129-30) and in the February 4, 2019 Prospectus (p. 129-30), Pareteum incorporated by reference the Company's 1Q18, 2Q18, and 3Q18 10-Qs and the reported revenue and realized revenue growth figures reported therein.

181. Both the statements made in the Prospectus itself and the statements incorporated by reference therein regarding Pareteum's 1Q18, 2Q18, and 3Q18 reported revenues were each materially false and misleading and/or omitted material facts necessary to make these statements not false and misleading, as the Company admitted in the Restatement Release that the reported revenues for these periods were overstated and, thus, false when made. Specifically, the Restatement Release disclosed that the Company would have to restate its "previously issued consolidated financial statements" for all three periods because "*revenues recognized during [these periods] should not have been recorded* during that period…[and that, for] certain customer transactions, the Company may have *prematurely or inaccurately recognized revenue*," such that "[i]nvestors should no longer rely upon the Company's previously released financial statements for the time periods cited above" (emphasis added). The forthcoming restatement is expected to result in *at least* a *28%* reduction in FY18 reported revenues. The iPass Acquisition Filings further

failed to provide adequate risk disclosures and did not disclose that the Company had significantly overstated revenues during the relevant period by systematically recognizing revenue it did not have.

182. Turner, O'Donnell, and Bozzo all signed the original December 4, 2018 S-4 Registration Statement and the January 15, 2019 S-4A Registration Statement. Pursuant to 15 U.S.C. § 77k(a)(1-2), they are strictly liable for the misstatements and omissions in the iPass Acquisition Filings. None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the iPass Acquisition Filings were true and without omissions of any material facts and were not misleading.

183. As outlined in the certifications attached hereto, Lead Plaintiff member Steffey received iPass shares in the iPass Acquisition and sustained damages as the value of Pareteum securities declined substantially due to Defendants' conduct and/or violations of the securities laws as alleged herein.

## III. THE SECONDARY OFFERING

184. During the Class Period, on September 20, 2019, the Company closed a $40 million direct public offering of common stock and warrants (the "Secondary Offering"). The Secondary Offering consisted of (a) 18,852,273 Common Stock Units, consisting of one share of common stock together with one Series A Purchase Warrant (to purchase one share of common stock) and one Series B Purchase Warrant (to purchase one-half share of common stock); and (b) 3,875,000 Pre-Funded Units, consisting of one pre-funded warrant to purchase one share of common stock together with one Series A Purchase Warrant and one Series B Purchase Warrant. The offering price was $1.76 per Common Stock Unit and $1.75 per Pre-Funded Unit.

185. The Secondary Offering was registered for sale pursuant to a November 30, 2018 Form S-3 Amended Registration Statement, a December 18, 2018 Prospectus, and a September 20, 2019 Supplemental Prospectus (collectively, the "Secondary Offering Filings").

186. Lead Plaintiff member Moore purchased Pareteum shares pursuant or otherwise traceable to the Secondary Offering Filings and sustained damages as the value of Pareteum securities has declined substantially due to Defendants' conduct and/or violations of the securities laws as alleged herein. Specifically: (a) on Friday, September 20, 2019, Pareteum stock opened at $1.57 per share, traded between $1.51 per share and $1.68 per share, and closed the day trading at $1.67 per share, on volume of 13.86 million shares; (b) that week, the stock traded on average daily trade volume of just 3.92 million shares, exclusive of September 20; and (c) on September 20, 2019, as outlined in the certifications attached hereto, Lead Plaintiff member Moore purchased Pareteum stock at a price of $1.62 per share, $0.15 below the Secondary Offering price and within the day's trading range.

### A. MATERIALLY FALSE AND MISLEADING STATEMENTS BY THE CONTROL PERSON DEFENDANTS MADE IN AND/OR INCORPORATED INTO THE SECONDARY OFFERING FILINGS

187. In the September 20, 2019 Supplemental Prospectus (p. S-5) Pareteum represented that the Company was "in fast-growth mode" and "continues to win long-term contractual business" that "would increase throughout 2019 and beyond." In the September 20, 2019 Supplemental Prospectus (p. S-10), Pareteum stated that its financials "should be read in conjunction with" the Company's FY18 10-K and "our financial statements and related notes thereto" and the Company's 2Q19 10-Q and "our financial statements and related notes thereto, all of which are incorporated by reference into this prospectus supplement."

188.     These statements made in the September 20, 2019 Supplemental Prospectus and those incorporated by reference therein regarding the Company's growth and Pareteum's FY18 and 2Q19 reported revenues were each materially false and misleading and/or omitted material facts necessary to make these statements not false and misleading, as the Company admitted in the Restatement Release that the reported revenues for these periods were overstated by at least *28%* in FY18 and *42%* in 1H19 and, thus, false when made. Specifically, the Restatement Release disclosed that the Company would have to restate its "previously issued consolidated financial statements" for all three periods because "revenues recognized during [these periods] should not have been recorded during that period…[and that, for] certain customer transactions, the Company may have prematurely or inaccurately recognized revenue," such that "[i]nvestors should no longer rely upon the Company's previously released financial statements for the time periods cited above."

189.     The Secondary Offering Filings, and the financial statements incorporated therein, further failed to disclose that the Company had significantly overstated revenues during the relevant period by systematically recognizing revenue it did not have. While the Company emphasized its "growth mode" and abilities "to win new long-term contractual business" that would "increase throughout 2019 and beyond," the Company failed to disclose that many of the Company's purported customers and contract wins were not currently operational and/or capable of generating the contractual revenues and that the Company lacked any meaningful internal accounting controls.

190.     As registrant and issuer of stock sold in the Secondary Offering, Pareteum is strictly liable for the misstatements and omissions in the Secondary Offering Filings. Turner, O'Donnell, and Bozzo all signed the November 30, 2018 Form S-3 Registration Statement. The Control Person

71

Defendants are liable pursuant to 15 U.S.C. § 77k(a)(1-2; 4-5). None of the Control Person Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Secondary Offering Filings were true and without omissions of any material facts and were not misleading. The Control Person Defendants should have been aware of red flags regarding Pareteum's reported revenues and realized revenue growth rates as a result of (a) their knowledge of Pareteum's business and finances, (b) the fact that Pareteum's accounts receivables ballooned from just $1,954,495 in 1Q18 to $15,361,594 in 4Q18, and (c) publicly disclosed reports by analysts and market commentators in the months immediately preceding the Secondary Offering that highlighted these issues and raised additional red flags about the reliability and integrity of Pareteum's financial statements.

### B.    MATERIALLY FALSE AND MISLEADING STATEMENTS BY DJSI MADE IN AND/OR INCORPORATED INTO THE SECONDARY OFFERING FILINGS

191.    As noted above, the Secondary Offering Filings contained statements incorporated by reference regarding Pareteum's FY18 and 2Q19 reported revenues and realized revenue growth rates that were each materially false and misleading and/or omitted material facts necessary to make these statements not false and misleading, as the Company admitted in the Restatement Release that the reported revenue and realized revenue growth figures for these periods were overstated and, thus, false when made. Pursuant to the Prospectus Supplement, DJSI, whose logo appeared on the Supplement, "may be deemed to be an underwriter within the meaning of Section 2(a)(11) of the Securities Act." DJSI, as underwriter, owed a duty to investors to independently verify and investigate the Company's representations contained in the Secondary Offering Filings and breached said duty to investigate despite red flags regarding the Company's reported revenues and revenue growth rates and the reliability of its financial statements.

**C.** **MATERIALLY FALSE AND MISLEADING STATEMENTS BY SQUAR MILNER MADE IN AND/OR INCORPORATED INTO THE SECONDARY OFFERING FILINGS**

192.    Squar Milner issued a March 18, 2019 Audit Report, which was included in Pareteum's FY18 10-K and which contained statements regarding Pareteum's FY18 revenues and financial reporting. Therein, Squar Milner issued an unqualified opinion certifying that Pareteum's financial statements fairly presented its financial position and were prepared in accordance with GAAP:

Report of Independent Registered Public Accounting Firm

To the Shareholders and the Board of Directors of Pareteum Corporation

Opinion on the Internal Control Over Financial Reporting

We have audited Pareteum Corporation's and its subsidiaries (the Company) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. *In our opinion, because of the effect of the material weaknesses described below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018*, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 ("COSO").

\* \* \*

*These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and **this report does not affect our report dated March 18, 2019.***

Basis for Opinion

\* \* \*

We conducted our audit *in accordance with the standards of the PCAOB*. . . .We believe that our audit provides a reasonable basis for our opinion.

\s\ Squar Milner LLP
Los Angeles, California
March 18, 2019

(Emphasis added.)

73

193.    The FY18 10-K, its financial statements, and the Audit Report were incorporated into the Secondary Offering Filings pursuant to the September 20, 2019 Supplemental Prospectus, which stated:

> The consolidated financial statements as of December 31, 2018…incorporated in this prospectus by reference from the Pareteum Corporation Annual Report on Form 10-K for the year ended December 31, 2018 have been audited by Squar Milner LLP, an independent registered public accounting firm, as stated in their reports thereon (which report expresses an unqualified opinion for the audit of our consolidated financial statements and a qualified opinion on the effectiveness of our internal controls over financial reporting), incorporated herein by reference, and have been incorporated in this Prospectus and Registration Statement in reliance upon such reports and upon the authority of such firm as experts in accounting and auditing.

194.    The FY18 10-K and the financial statements contained therein and incorporated into the Secondary Offering Filings by reference regarding Pareteum's FY18 reported revenues and realized revenue growth rates were each materially false and misleading and/or omitted material facts necessary to make these statements not false and misleading, as the Company admitted in the Restatement Release that the reported revenue and realized revenue growth figures for these periods were overstated and, thus, false when made.

195.    Although the Secondary Offering Prospectus was filed after the March 18, 2019 Auditor Report contained within the FY18 10-K, Squar Milner, as auditor, owed a duty to investors to independently verify and investigate the Company's representations contained in the FY18 10-K and the Secondary Offering Filings and breached said duty to investigate despite red flags regarding the Company's reported revenues and revenue growth rates and the reliability of its financial statements. Squar Milner served as the Company's auditor since 2014, and thus should have been aware of the red flags regarding Pareteum's reported revenues and realized revenue growth rates as a result of (a) its knowledge of Pareteum's business and finances, (b) the fact that Pareteum's accounts receivables ballooned from just $1,954,495 in 1Q18 to $15,361,594 in 4Q18,

74

and (c) the publicly disclosed reports by other analysts and market commentators in the months immediately preceding the Secondary Offering that highlighted these issues and raised additional red flags about the reliability and integrity of Pareteum's financial statements. Further, Squar Milner's Audit Report also contained an embedded statement of fact that was misleading, including the overstated reported revenues and revenue growth rates and that Pareteum's financial statements fairly presented its financial position and were prepared in accordance with GAAP, and omitted facts that made the Audit Report misleading, including that Pareteum did not have adequate controls.

## IV.    SECURITIES ACT COUNTS

196.    Lead Plaintiff and members of the Class purchased or otherwise acquired Pareteum stock in the iPass Acquisition and in the Secondary Offering issued pursuant to or traceable to the Secondary Offering Filings. The value of the securities sold in the iPass Acquisition and the Secondary Offering have declined substantially as a direct and proximate results of materially false and misleading statements and/or omissions therein, Lead Plaintiff and Class members have suffered substantial damage in connection with their purchase or acquisition of the securities in the iPass Acquisition and Secondary Offering. Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum securities in the iPass Acquisition and the Secondary Offering did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

197.    Each of the Control Person Defendants was an officer and/or director of Pareteum prior to and/or at the time the iPass Acquisition Filings and the Secondary Offering Filings became effective as to the iPass Acquisition and the Secondary Offering. The Control Person Defendants

at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Pareteum's business affairs. Each of the Control Person Defendants signed the iPass Acquisition Filings and the Secondary Offering Filings in their capacities as officers and/or directors of Pareteum, and caused and participated in the issuance of the iPass Acquisition Filings and the Secondary Offering Filings. As officers and/or directors of a publicly owned company, the Control Person Defendants had a duty to disseminate accurate and truthful information with respect to Pareteum's financial condition and results of operations. Because of their positions of control and authority as officers and/or directors of Pareteum, the Control Person Defendants were able to, and did, control the contents of the iPass Acquisition Filings and Secondary Offering Filings. Pareteum and the Control Person Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the iPass Acquisition Filings and the Secondary Offering Filings were true, were without omissions of any material facts, and were not misleading, and thus acted negligently.

## COUNT III

### Violations of Section 11 of the Securities Act
### Against Pareteum and the Control Person Defendants (iPass Acquisition)

198. Lead Plaintiff realleges and incorporates ¶¶1-4, 171-75, 178-83, 196-97, and 216-21 as if fully set forth herein. With respect to this Count, Lead Plaintiff excludes any and all allegations that could be construed as alleging of fraud or intentional misconduct and/or motive, as this Count is based solely on negligence and/or strict liability and does not sound in fraud.

199. Pareteum was the offeror and registrant for the iPass Acquisition. The Control Person Defendants were executive officers and/or directors of the Company responsible for the contents and dissemination of the iPass Acquisition Filings. As set forth above, the iPass Acquisition Filings were false and misleading and also incorporated by reference SEC filings that

76

contained false and misleading statements and/or omitted material facts necessary to make these statements not false and misleading.

200. Lead Plaintiff member Steffey purchased or otherwise acquired Pareteum stock in the iPass Acquisition and brings this claim against Pareteum and the Control Person Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum securities in the iPass Acquisition.

## COUNT IV

### Violations of Section 12 of the Securities Act Against Pareteum (iPass Acquisition)

201. Lead Plaintiff realleges and incorporates ¶¶1-4, 171-75, 178-83, 196-97, and 216-21 as if fully set forth herein. With respect to this Count, Lead Plaintiff excludes any and all allegations that could be construed as alleging of fraud or intentional misconduct and/or motive, as this Count is based solely on negligence and/or strict liability and does not sound in fraud.

202. Pareteum was a seller, offeror, and/or solicitor of sales of the securities issued in the iPass Acquisition and directly solicited the purchase or acquisition of securities by Lead Plaintiff by means of the iPass Acquisition Filings. As set forth above, the iPass Acquisition Filings were false and misleading and also incorporated by reference SEC filings that contained false and misleading statements and/or omitted material facts necessary to make these statements not false and misleading.

203. Lead Plaintiff member Steffey purchased or otherwise acquired Pareteum stock in the iPass Acquisition and bring this claim against Pareteum for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum securities in the iPass Acquisition.

## COUNT V

### Violations of Section 15 of The Securities Act
### Against the Control Person Defendants (iPass Acquisition)

204.    Lead Plaintiff realleges and incorporates ¶¶1-4, 171-75, 178-83, 196-97, and 216-21 as if fully set forth herein. With respect to this Count, Lead Plaintiff excludes any and all allegations that could be construed as alleging of fraud or intentional misconduct and/or motive, as this Count is based solely on negligence and/or strict liability and does not sound in fraud.

205.    At all relevant times, the Control Person Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. As set forth above, the iPass Acquisition Filings were false and misleading and also incorporated by reference SEC filings that contained false and misleading statements and/or omitted material facts necessary to make these statements not false and misleading.

206.    Lead Plaintiff member Steffey purchased or otherwise acquired Pareteum stock in the iPass Acquisition and brings this claim against Pareteum for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum securities in the iPass Acquisition. Each of the Control Person Defendants is liable jointly and severally to Lead Plaintiff and the other Class members.

## COUNT VI

### Violations of Section 11 of the Securities Act Against Pareteum,
### the Control Person Defendants, DJSI, and Squar Milner (Secondary Offering)

207.    Lead Plaintiff realleges and incorporates ¶¶1-4, 171-77, 184-97, and 216-21 as if fully set forth herein. With respect to this Count, Lead Plaintiff excludes any and all allegations that could be construed as alleging of fraud or intentional misconduct and/or motive, as this Count is based solely on negligence and/or strict liability and does not sound in fraud.

78

208. Pareteum was the offeror and registrant for the Secondary Offering. The Control Person Defendants were executive officers and/or directors of the Company responsible for the contents and dissemination of the Secondary Offering Filings. As set forth above, the Secondary Offering Filings were false and misleading and also incorporated by reference SEC filings that contained false and misleading statements and/or omitted material facts necessary to make these statements not false and misleading.

209. Squar Milner was the auditor for Pareteum's consolidated financial statements as of and for the year ended December 31, 2018, included in Pareteum's FY18 10-K and incorporated by reference into the Secondary Offering Filings. Squar Milner certified that Pareteum's materially false and misleading financial statements fairly presented the Company's financial position as of December 31, 2018 and December 31, 2017 and were prepared in accordance with GAAP, and represented that it conducted its audits or reviews in accordance with PCAOB standards. This was materially false and misleading, as revealed by the Restatement Release.

210. DJSI was the underwriter for the Secondary Offering. DJSI owed to the purchasers of securities in the Secondary Offering the duty to make a reasonable and diligent investigation of the statements contained in the Secondary Offering Filings at the time the Secondary Offering became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue or misleading. DJSI acted negligently by failing to ensure that the statements made in the Secondary Offering Filings were not false or misleading or contained omissions of material fact and is liable to Lead Plaintiff and members of the Class who purchased or otherwise acquired Pareteum securities sold pursuant or traceable to the Secondary Offering.

79

211. The Secondary Offering Filings were materially false and misleading for the reasons set forth above. The Secondary Offering Filings also incorporated by reference SEC filings that contained false and misleading statements and/or omitted material facts necessary to make these statements not false and misleading, for the reasons set forth above.

212. Lead Plaintiff member Moore purchased or otherwise acquired Pareteum stock in the Secondary Offering issued pursuant to or traceable to the Secondary Offering Filings, and bring this claim against Pareteum and the Control Person Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum securities in the Secondary Offering pursuant or traceable to the Secondary Offering Filings and the SEC filings incorporated therein by reference.

**COUNT VII**

**Violations of Section 15 of the Securities Act**
**Against the Control Person Defendants (Secondary Offering)**

213. Lead Plaintiff realleges and incorporates ¶¶1-4, 171-77, 184-97, and 216-21 as if fully set forth herein. With respect to this Count, Lead Plaintiff excludes any and all allegations that could be construed as alleging of fraud or intentional misconduct and/or motive, as this Count is based solely on negligence and/or strict liability and does not sound in fraud.

214. At all relevant times, the Control Person Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. As set forth above, the Secondary Offering Filings were false and misleading and also incorporated by reference SEC filings that contained false and misleading statements and/or omitted material facts necessary to make these statements not false and misleading,

215. Lead Plaintiff member Moore purchased or otherwise acquired Pareteum stock in the Secondary Offering issued pursuant to or traceable to the Secondary Offering Filings, and bring

80

this claim against Pareteum for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired Pareteum securities in the Secondary Offering pursuant or traceable to the Secondary Offering Filings and the SEC filings incorporated therein by reference. Each of the Control Person Defendants is liable jointly and severally to Lead Plaintiff and the other Class members.

## CLASS ACTION ALLEGATIONS

216. The allegations in this section apply to all counts in this complaint. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Pareteum between **December 14, 2017 and October 21, 2019,** inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are the Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

217. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Pareteum securities were actively traded on the NYSE American (until the market closed on October 22, 2018) and on the Nasdaq (beginning on October 23, 2018). As of August 8, 2019, there were 111,903,762 shares of Company common stock issued and outstanding. While the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Pareteum or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

218. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

219. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

220. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements made by certain Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pareteum; and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

221. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 17, 2020                    Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Melinda Nicholson*
LEWIS S. KAHN
MELINDA A. NICHOLSON (MN-6251)
MICHAEL J. PALESTINA (admitted PHV)
MELISSA H. HARRIS (MH-3553)
1100 Poydras Street – Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: Lewis.Kahn@ksfcounsel.com

Email: Melinda.Nicholson@ksfcounsel.com
Email: Michael.Palestina@ksfcounsel.com
Email: Melissa.Harris@ksfcounsel.com

-and-

KIM MILLER (KM-6996)
J. RYAN LOPATKA
250 Park Ave., 7th Fl.
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Kim.Miller@ksfcounsel.com
J.Lopatka@ksfcounsel.com

***Lead Counsel for Lead Plaintiff Pareteum
Shareholder Investor Group***