UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                                   :
IN RE PARETEUM SECURITIES                                          :
LITIGATION                                                         :        Case No. 1:19-cv-09767-AKH-GWG
                                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
                                                                   X

MEMORANDUM OF LAW IN SUPPORT OF
PARETEUM CORPORATION'S MOTION TO DISMISS
THE FIRST AMENDED CONSOLIDATED COMPLAINT

**MCGUIREWOODS LLP**

1251 Avenue of the Americas
20th Floor
New York, NY 10020
Telephone: (212) 548-2100
Facsimile: (212) 548-2150

*Counsel for Defendant Pareteum Corporation*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................9

FACTS ALLEGED IN FAC..................................................................................11

    A.    The Statements Challenged by PSIG ................................................11

    B.    Allegations of Scienter ....................................................................14

ARGUMENT ........................................................................................................15

I.    The FAC DOES NOT ADEQUATELY PLEAD ANY CLAIMS UNDER THE EXCHANGE ACT ...................................................................................15

    A.    The FAC Fails to Allege Specific Reasons Why the Statements Were Knowingly False When Made ...........................................................16

        1.    The FAC Does Not Identify Particular False Statements ......................16

        2.    PSIG Has Not Shown that the Statements Were False When Made........18

            a.    The Restatement Announcement Did Not Admit That Anything About the Backlog or Connections Was False, or Anything Close to it................................................................18

            b.    The Statements About a 100% Conversion Rate Are Limited in Scope and Are Compatible with the 2018 and 2019 Reported Revenue and Growing Accounts Receivable ......20

            c.    Pareteum Experienced Revenue Growth, Even After the Restatement Announcement....................................................21

            d.    Pareteum Did Draw Credit From the Credit Facility After the Default................................................................................22

    B.    PSIG Has Not Adequately Alleged Scienter ........................................23

        1.    None of the Allegations Alone is Sufficient to Support a Strong Inference of Scienter .......................................................................23

            a.    The Motive and Opportunity Allegations...................................24

                (i).    Growth By Acquisition or Revenue Does Not Show Fraudulent Intent ....................................................24

                (ii).    Compensation Incentives are Widely Used and Do Not Suffice to Show Scienter.........................................25

                (iii).    A Motive to Fund Operations Does Not Support Scienter in This Circuit....................................................25

            b.    The Circumstantial Allegations .................................................26

                (i).    The Restatement Announcement Does Not Establish Scienter ..................................................26

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | (ii). | The Magnitude of the Anticipated Restatement Does Not Support Scienter | 28 |
| | (iii). | The Retirement of the Backlog is Not Admissible to Show Scienter | 28 |
| | (iv). | Post-Class Period Developments Do Not Evidence Scienter | 29 |
| | (v). | The Pareteum Defendants' Alleged Concealment of Relationships is not Evidence of Scienter | 29 |
| | (vi). | PSIG Has Not Shown That The Pareteum Defendants Knew  Certain Customers Were Embellished Or Fictitious Or Had Any Duty To "Verify." | 31 |
| | (vii). | The FAC Fails To Demonstrate That Pareteum Was On Notice That The Backlog Was Not Converting At 100% In 2018 | 32 |
| | (viii). | The Core Operations Doctrine Provides PSIG No Scienter Support | 34 |
| | (ix). | The Exchange Act Defendants' Senior Positions Do Not Support Scienter Or Impose Obligations To Investigate | 34 |
| 2. | The Allegations Collectively Do Not Add Up to Scienter | | 35 |
| 3. | The FAC Alleges Classic Group Scienter and Should be Dismissed On This Basis | | 36 |
| 4. | The FAC Impermissibly Alleges "Fraud by Hindsight." | | 37 |
| 5. | The Alleged Misstatements are Opinion and Puffery Protected by the PSLRA's Safe Harbor | | 38 |
| 6. | The PSLRA's Safe Harbor Protects Backlog-Related Statements | | 40 |
| 7. | The Alleged GAAP violations do not support a Section 10(b) claim | | 44 |
| C. | Because PSIG's Section 10(b) Claim Fails, So Too Does its Section 20(A) Claim | | 45 |
| II. | The FAC DOES NOT ADEQUATELY PLEAD ANY CLAIMS UNDER THE SECURITIES ACT | | 45 |
| A. | PSIG Has Failed To State A Section 11, 12, Or 15 Securities Act Claim In Connection With The iPass Registration Statement | | 45 |
| 1. | PSIG cannot state a Section 11 claim | | 47 |
| 2. | PSIG cannot state a Section 12 claim | | 49 |

**TABLE OF CONTENTS**
(continued)

|  |  | **Page** |
|---|---|---|
| | 3. PSIG cannot state a Section 15 claim | 49 |
| B. | PSIG has Failed To State A Section 11 Or 15 Securities Act Claim In Connection With The Secondary Offering | 49 |
| CONCLUSION | | 50 |

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Accuray, Inc. Sec. Litig.*,
    757 F. Supp. 2d 936 (N.D. Cal. 2010) ..............................................................33

*In re Aceto Corp. Sec. Litig.*,
    2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ....................................................26

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir.1995) ..................................................................................17

*In re Adient plc Sec. Litig.*,
    2020 WL 1644018, at *17 (S.D.N.Y. Apr. 2, 2020) ..........................................31

*Altayyar v. Etsy, Inc.*,
    242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd,* 731 F. App'x 35 (2d Cir. 2018) ...........39

*AmBase Corp. v. SDG Inc.*,
    2005 WL 1860260 (D. Conn. Aug. 3, 2005) .....................................................22

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
    2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ............................................. 40, 41

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018)................................................................32

*Barilli v. Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019)................................................................23

*In re Barrick Gold Corp. Sec. Litig.*,
    341 F. Supp. 3d 358 (S.D.N.Y. 2018)......................................................... 33, 35

*Bartesch v. Cook*,
    941 F. Supp. 2d 501 (D. Del. 2013)...................................................................28

*In re Bayou Hedge Fund Litig.*,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007), *aff'd South Cherry Street, LLC v.
    Hennessy Grp. LLC*, 573 F.3d 98 (2d Cir. 2009).............................................23

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017) .................................................................29

*In re Cisco Sys., Inc. Sec. Litig.*,
    2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ..................................................32

*City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings PLC*,
2020 WL 2834857 (S.D.N.Y. June 1, 2020) ........................................................26

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008) ......................................................... 19, 28

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) ............................................ 40, 41

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
442 F. App'x 672 (3d Cir. 2011) ..........................................................................28

*In re Complete Mgmt. Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001) ..................................................................20

*Coronel v. Quanta Capital Holdings Ltd.*,
2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .........................................................18

*Crigger v. Fahnestock & Co., Inc.*,
443 F.3d 230 (2d Cir. 2006) ................................................................................22

*Das v. Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..................................................................22

*In re Dwight's Piano Co.*,
No., 2005 WL 8161985 (S.D. Ohio Mar. 17, 2005) .............................................14

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ...................................................................... 16, 18, 28

*Ellington Mgmt. Grp., LLC v. Ameriquest Mortg. Co.*,
2009 WL 3170102 (S.D.N.Y. Sep. 29, 2009) ............................................. 16, 24

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015) ......................................32

*Fogel v. Vega*,
759 Fed. App'x 18 (2d Cir. 2018) ........................................................................31

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y.2012); reconsideration granted in part by *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645 (SDNY 2012) ..............................8

*Higginbotham v. Baxter Int'l, Inc.*,
499 F.3d 753 (7th Cir. 2007) ...............................................................................21

*In re Iconix Brand Grp., Inc.*
   2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ............................................................. 20, 21

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) ............................................................................ 26

*Ironworkers Local 580--Joint Funds v. Linn Energy, LLC,*
   29 F. Supp. 3d 400 (S.D.N.Y. 2014) ............................................................................. 14

*Janbay v. Canadian Solar, Inc.,*
   2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ................................................................. 19

*In re Keithley Instruments, Inc. Sec. Litig.*,
   268 F. Supp. 2d 887 (N.D. Ohio 2002) .......................................................................... 33

*Kinra v. Chicago Bridge & Iron Co.*,
   2018 WL 2371030 (S.D.N.Y. May 24, 2018) ................................................................. 21

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
   650 F.3d 167 (2d Cir. 2011) ...................................................................................... 39, 42

*Lipow v. Net1 UEPS Techs., Inc.,*
   131 F. Supp. 3d 144 (S.D.N.Y. 2015) ............................................................................ 27

*In re Magnum Hunter Resources Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014) ............................................................................. 19

*Malin v. XL Capital, Ltd.,*
   312 F. App'x 400 (2d Cit. 2009) .................................................................................... 28

*In re Manulife Fin. Cop. Sec. Litig.*,
   276 F.R.D. 87 (S.D.N.Y. 2001) .................................................................................. 29, 30

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) ...................................................................................... 20, 37

*McIntire v. China MediaExpress Holdings, Inc.,*
   927 F. Supp. 2d 105 (S.D.N.Y. 2013) ............................................................................ 37

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ........................................................................................... 39

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp.*,
   720 F. Supp. 2d 254 (S.D.N.Y. 2010), *on reconsideration sub nom. N.J.
   Carpenters Health Fund v. Residential Capital, LLC,* 2013 WL 1809767
   (S.D.N.Y. Apr. 30, 2013) ................................................................................................ 42

*NECA-IBEW Health & Welfare Fund v. Pitney Bowers Inc.*,
  2013 WL 1188050 (D. Conn. 2013) ................................................................10

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .............................................................. 17, 37

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019) ...............................................................20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...............................................................................31

*Pollio v. MF Glob., Ltd.*,
  608 F. Supp. 2d 564 (S.D.N.Y. 2009) ..........................................................9, 11

*Pound v. Stereotaxis, Inc.*,
  8 F. Supp. 3d 1157 (E.D. Mo. 2014) ...............................................................33

*In re PXRE Grp., Ltd., Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*,
  357 F. App'x 393 (2d Cir. 2009) ..................................................................18

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) .............................................................30

*Reilly v. U.S. Physical Therapy, Inc.*,
  2018 WL 3559089 (S.D.N.Y July 23, 2018) .......................................................28

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ..................................................8, 9, 15, 39, 40, 41, 42

*In re Seadrill Limited Securities Litigation*,
  2016 WL 3461311 (S.D.N.Y. June 20, 2016) .............................................33, 34, 35, 36

*Shemian v. Research In Motion, Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 19, 2013) ......................................................32

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) .............................................................. 20, 33

*South Cherry Street, LLC v. Henessee Grp. LLC*
  573 F.3d 98 (S.D.N.Y. 2009) .............................................................. 29, 24

*Steamfitters Local 449 Pension Plan v. Sketchers U.S.A., Inc.*,
  412 F. Supp. 3d 353 (S.D.N.Y. 2019) ..........................................................11, 32

*In re Stone & Webster, Inc., Sec. Litig.*,
  253 F. Supp. 2d 102 (D. Mass. 2003) ...............................................................33

*In re Supreme Indus. Inc. Sec. Litig.*,
  2019 WL 1436022 (N.D. Ind. Mar. 29, 2019)....................................................24

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................... 15, 16

*Union Cent. Ins. Co. v. Ally Fin., Inc.*,
  2013 WL 2154220 (S.D.N.Y. Mar. 29, 2013)...................................................23

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.*,
  2013 WL 2154381 (S.D.N.Y. Mar. 29, 2013)...................................................17

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
  723 F. App'x 20 (2d Cir. 2018).........................................................................30

*Weiss v. Mentor Graphics Corp.*,
  1999 WL 985141 (D.Ore. Oct. 6,1999) ............................................................33

## Federal Statutes

15 U.S.C. § 77k(a) .....................................................................................................39

15 U.S.C. § 78u-4(b) ..................................................................................8, 15, 16, 21

15 U.S.C. § 78u-5(i)(1) ..............................................................................................33

## Rules

Fed. R. Evid. 407 .......................................................................................................21

Defendant Pareteum Corporation ("Pareteum" or the "Company") respectfully submits this memorandum in support of its motion to dismiss the First Amended Consolidated Complaint (the "FAC") filed by Lead Plaintiff, Pareteum Shareholder Investor Group ("PSIG").

## INTRODUCTION

Pareteum Corporation is an innovative cloud communications platform company that provides mobility, messaging, and security services, applications, and software to mobile virtual network operators and other enterprises all over the world. Pareteum's business has undergone tremendous growth over the past several years, driven in significant part by increasing demand among mobile network operators in developing markets. The Company's executives availed themselves of the free publicity available through press releases to inform the market of these exciting new contracts as they were signed, and they developed non-GAAP metrics specific to their business, such as "Three-Year Revenue Backlog" and "Connections," to help investors better understand the scope of the Company's growth opportunities.

These efforts paid off. Investors took notice of Pareteum's success, but unfortunately, so did those who would profit if the Company's stock price fell. In the summer of 2019, two notorious short sellers issued self-serving reports to drive down Pareteum's stock price. Both reports put a negative spin on public facts and accused certain Pareteum executives and Board members of fraudulently inflating announced contracts by hundreds of millions of dollars. The short-sellers' accusations wildly overstated matters, as Pareteum announced in October 2019 that it would be restating its financial reports for 2018 and parts of 2019, based on the Company's determination that certain revenues recognized during 2018 and 2019 should not have been recorded in those periods. But the Company estimated that the restatement (which has not yet been issued) would result in a total reduction in revenue of approximately $33 million—not hundreds of millions of dollars.

PSIG now bases a security fraud suit on that short-seller spin, claiming that Pareteum and co-Defendants Robert H. Turner ("Turner"), Edward O'Donnell ("O'Donnell), Victor Bozzo ("Bozzo") and Denis McCarthy ("McCarthy") (collectively, the "Individual Defendants" and with Pareteum, the "Pareteum Defendants")[1] were engaged in a massive "pump and dump" fraud in which they allegedly inflated Pareteum's connections, backlog, and revenue numbers to drive up the stock price.  These claims are fundamentally flawed for two primary reasons.

First, none of the challenged statements were materially false or misleading.  All, or nearly all, of these statements—including those related to realized revenue, backlog, and internal controls and GAAP compliance—were statements of opinion, believed to be true at the time by those who made them.  Many also were non-actionable forward-looking statements.

Second, PSIG cannot establish a "strong inference" of scienter with respect to any of the Pareteum Defendants because the alleged fraud simply does not make sense.  None of the Individual Defendants is alleged to have personally benefitted from the purported "pump and dump" scheme in any discernable way.  Indeed, not one of them is alleged to have "dumped" *any stock at all* during the class period.  The Court is required to weigh the competing inferences to be drawn from the full factual context, and here, the far more compelling inference is that the Pareteum Defendants were publicizing exciting corporate developments in real time because this was the most direct and cost-efficient way of getting publicity.  There is nothing wrong with such an approach.  To the contrary, U.S. securities laws *require* publicly traded companies to disclose important developments to investors.  Pareteum issued many press releases because it was making many deals, and when the Company later realized that it would need to revise certain historical

---

[1]   The FAC also refers to Turner, O'Donnell, Bozzo and McCarthy as the "Exchange Act Defendants" and Turner, O'Donnell and Bozzo as the "Control Person Defendants."

revenue-related metrics, it announced that development to investors in a timely fashion as well. The allegations show not fraud, but the Pareteum Defendants' earnest attempt to advance the interests of a fast-growing company and its shareholders. All of the claims in the FAC should be dismissed for these reasons, explained more fully below.

## FACTS ALLEGED IN FAC

### A.      The Statements Challenged by PSIG.

Almost every alleged misstatement or omission identified by PSIG relates to Pareteum's use of the Three-Year Revenue backlog metric in press releases and other disclosures. As alleged in the FAC, the "backlog" describes a 36-month projection of contractual revenue Pareteum expected to receive under its customer agreements. (*See* FAC ¶ 69.) It "is measured on a forward looking 36 month snapshot view monthly, and, is generated by each of the Company's Managed Services, Global Mobility Cloud, and Application Exchange & Developer's Platform customers." (Dkt. No. 143-4 at 3[2].) These customers sign "Software-as-a-Service" agreements that include "service establishment and implementation fees, . . .  as well as contractually scheduled subscribers, in some cases including subscriber usage, during the term of the agreement, and, their resulting monthly recurring revenue" (the "Fees"). (*Id.*) Thus, Pareteum's management also used the number of "connections" the Company made over a given period as an indicator of revenue, where that term represented "devices, subscribers, and their variable usage." (*See* FAC ¶ 92; Doc. 143-4 at 1.)

Although Pareteum has used the backlog metric since 2016, PSIG alleges that starting in mid-December 2017, Pareteum began issuing press releases announcing new customers and contract wins and touting the Company's "increasing [b]acklog and 'the magic of monthly

---

[2] Page cites to ECF filings are to the ECF-stamped page number in the top right hand corner.

11

recurring revenue.'" (*See, e.g.,* FAC ¶¶ 12, 15-16, 69.) These new deals increased Pareteum's backlog and connections, and similarly increased its year-over-year revenue. (*See, e.g., id.* ¶ 17.) In sum, PSIG claims that Pareteum's positive press releases and related SEC filings artificially inflated Pareteum's stock price and misled investors. (*Id.* ¶¶ 18, 163-164.)

PSIG alleges that a series of events in 2019 revealed flaws in Pareteum's revenue recognition controls.

The first of these events was Pareteum's acknowledgment in its FY2018 Form 10-K—filed on March 18, 2019, over six months before October 21, 2019—that "there existed at Pareteum 'material weaknesses in its internal control over financial reporting, [such that its] disclosure controls and procedures were not effective as of December 31, 2018.'" (*Id.* ¶¶ 59, 61-62, 64) Pareteum stated in that same filing that "[t]he material weaknesses did not result in any identified misstatements to the financial statements. . . ." (August 3, 2020 Decl. of Stephen G. Foresta, submitted herewith ("Foresta Decl."), Ex. A, FY2018 10-K at 70.)

Next, in June 2019, two websites maintained by known short sellers published articles (the "Aurelius Report" and the "Viceroy Report") questioning Pareteum's ability to convert the backlog into revenue. (FAC ¶¶ 28-34.) PSIG takes much of the content from these reports and repeats it in the FAC, sometimes inflating the articles' speculative conclusions and treating them as fact. (*Compare id.* ¶ 28 (Aurelius Report identified examples of "purportedly valuable customers that *appear[ed]* wholly incapable of paying [Pareteum]") (emphasis added), *with id.* ¶ 14 (in Section 10(b) cause of action, alleging in blanket fashion that *"the majority"* of 178 press releases identified "fabricated or embellished customer and contract wins").)

Last, PSIG alleges that Pareteum announced on October 21, 2019[3] that it "would restate its previously issued financial statements for FY18 and 1H19" because "certain revenues recognized during 2018 and 2019 should not have been recorded during that period . . . and that for certain customer transactions, the Company may have prematurely or inaccurately recognized revenue" (the "Restatement Announcement").   (*Id.* ¶¶ 1, 40.) That announcement allegedly revealed the truth to the market that *all* of Pareteum's statements regarding future contract revenue and backlog were false.  (*See id.* ¶¶ 49, 94-95.)  The Restatement Announcement disclosed that the anticipated revisions to the financial statements would result in a $9 million reduction in revenue for 2018 (a 28% decrease) and a $24 million reduction for the first half of 2019 (a 42% decrease).  (*Id.* ¶ 40.)  As a result, PSIG alleges, "shares of Pareteum tumbled in after-market trading, closing at $0.74 per share on October 21, and opening at $0.37 per share on October 22, 2019."  (*Id.*)

The FAC suggests that the Restatement Announcement revealed the falsity of the following:

- The majority of 178[4] press releases issued between December 2017 and August 2019 about Pareteum's revenues, customer and contract wins, growth, and backlog (FAC ¶¶ 14-41, 104-116);

- Six press releases issued between May 2018 and August 2019, about reported revenue and realized revenue growth rate (*id.* ¶¶ 42-51);

---

[3]  October 21, 2019 is the close of the proposed class period and the date on which PSIG asserts that Pareteum's purported fraud was fully revealed to the market.  (FAC ¶¶ 1, 40.)

[4]  The FAC does not state how many press releases were allegedly misleading, leaving that task to Defendants and this Court.  The FAC often cites to large groups of press releases issued during the class period.  (*See* FAC ¶ 14 (referencing 178 press releases); ¶ 19 (referencing 63 press releases).) As highlighted below, PSIG has failed to assert facts showing that even *one* of these press releases was false.

- A Chairman's Update Letter published on April 16, 2018, about revenue recognition procedures (*id.* ¶¶ 52);

- Six filings with the Securities and Exchange Commission, all filed between May 2018 and August 2019, about Pareteum's reported revenue, revenue recognition, realized revenue growth rate, GAAP compliance, internal controls, and financial reporting (*id.* ¶¶ 42-68);

- Two Statements by Defendant Turner and Pareteum Corporation in June 2019, about the Aurelius Report allegations (*id.* ¶¶ 31, 35, 50-51, 115-116);

- The iPass Registration Statement (*id.* ¶¶ 179-183); and

- The Secondary Offering Registration Statement (*id.* ¶¶ 184-186.)

In addition, the FAC alleges that both the Restatement Announcement and the Aurelius and Viceroy Reports revealed the falsity of the following:

- Four press releases issued between May 2018 and May 2019, about the rate of backlog revenue conversion (*id.* ¶¶ 88-97);

- Five press releases issued between September 2018 and October 2018 and all press releases that followed, about new customers and contracts, and total backlog value (*id.* ¶¶ 72-87);

The FAC sometimes identifies the person who made the statement, but often attributes other statements to "Pareteum" or "the Company." (*See id.* ¶¶ 35, ¶ 115.)

## B. Allegations of Scienter.

In support of their allegation that the Pareteum Defendants acted with scienter, the FAC references 12 separate events or circumstances.

1. ***The Restatement Announcement.*** The FAC claims that admissions in the Restatement Announcement support an inference of scienter. (*id.* ¶ 117.)

2. ***The Magnitude of the Anticipated Restatement.*** The FAC alleges the amount of revenue expected to be impacted by the restatement supports scienter. (*id.*)

3. ***Growth by Acquisition/Acquisition of Revenues.*** The FAC alleges that Pareteum and the Exchange Act Defendants acquired companies and revenue to "prop up" the fraud. (*id.* ¶ 118.)

4. **The Incentive Awards.**  The FAC claims that equity-linked and acquisition-related incentives motivated the Exchange Act Defendants to inflate the Company's stock. (*id.* ¶ 120.)

5. **Funding Corporate Operations.**  The FAC claims that the Company's stock was inflated to fund corporate operations.  (*id.* ¶ 121.)

6. **The Retirement of the Backlog.**  The FAC alleges that Pareteum's decision to cease reporting the backlog supports an inference of scienter.  (*id.* ¶ 122.)

7. **The Termination of Certain Officers.**  The FAC alleges that the termination of certain officers supports an inference of scienter.  (*id.* ¶ 123.)

8. **The Concealment of Relationships and Prior Bad Acts.**  The FAC alleges that the Exchange Act Defendants are connected to bad actors and/or have engaged in prior bad acts.  (*id.* ¶¶ 124-133.)

9. **Fabricated or Embellished Customers.**  The FAC claims that the Pareteum Defendants knowingly or recklessly made announcements about fabricated or embellished customers that were "verifiable."  (*id.* ¶¶ 135-139.)

10. **The 100% Conversion Rate.**  The FAC alleges that the backlog did not convert at 100% and that the Exchange Act Defendants were on notice of this fact.  (*id.* ¶¶ 140-141.)

11. **The Backlog as Core Operations.**  The FAC alleges that the "importance" of the backlog to the Company's core operations creates an inference of scienter.  (*id.* ¶ 142.)

12. **The Exchange Act Defendants' Senior Positions.**  The FAC alleges that the Exchange Act Defendants' positions at Pareteum give rise to an inference of scienter.  (*id.* ¶¶ 143-145.)

## **ARGUMENT**

## I.   THE FAC DOES NOT ADEQUATELY PLEAD ANY CLAIMS UNDER THE EXCHANGE ACT

PSIG's two Exchange Act causes of action (Counts I and II) should be dismissed for several independent reasons.  First, the FAC remains a classic "puzzle pleading" containing hundreds of paragraphs with excessive block-quotes, unexplained emphases added, and blanket references to allegedly false statements, yet it does not sufficiently explain for each alleged misstatement why it was false or misleading when made in view of the information communicated in the Restatement

Announcement.  Second, the FAC does not adequately plead scienter.  And third, most of the alleged misstatements cited in the FAC are opinions that contain cautionary language and are thus protected by the PSLRA's safe harbor.  Accordingly, PSIG has failed to meet its burden of pleading a valid claim under Section 10(b) or Section 20(a) of the Exchange Act.

### A.   The FAC Fails to Allege Specific Reasons Why the Statements Were Knowingly False When Made.

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards."  *In re Gen. Elec. Co. Sec. Litig.,* 857 F. Supp. 2d 367, 383 (S.D.N.Y.2012), *reconsideration granted in part*, 856 F. Supp. 2d 645 (S.D.N.Y. 2012).  "First, the complaint must satisfy Rule 9(b), which requires that it state with particularity the circumstances constituting fraud."  *Id.* (quoting Fed. R. Civ. P. 9(b)).  "Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)."  *Id.*  A securities fraud complaint based on misstatements or material omissions must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  Here, the FAC refers to five categories of allegedly false and misleading statements: (1) statements regarding reported revenue and realized revenue growth rates; (2) statements concerning revenue recognition, GAAP compliance, internal controls, and financial reporting; (3) statements regarding the Credit Facility; (4) statements regarding backlog conversion; and (5) statements regarding growth.  However, PSIG fails to meet the heightened pleading standards as to each category.

### 1.   The FAC Does Not Identify Particular False Statements.

The FAC continues to employ the puzzle-pleading that led to the Consolidated Complaint's dismissal.  Indeed, the FAC was dismissed because it was replete with "block quotations" that

forced the Court to "search…for particular false statements." (Doc. 162 at 4.) The Court directed PSIG to file an amended complaint that "comport[s] with…the PSLRA and Rule 9(b) as applicable." *Id.* at 4. To satisfy these pleading standards, PSIG needed to "specify each statement alleged to have been misleading." *Rombach*, 355 F.3d at 172. PSIG has, once again, failed to do so. In fact, PSIG is now asking the Court to search through *the entirety* of 178 referenced press releases for particular false statements. (*See, e.g.*, FAC ¶¶ 14, 16, 19, 20, 25.)

Indeed, rather than excerpting lengthy block quotations from press releases for the Court to search through, PSIG now places an even heavier burden upon the Court by referring it to the entirety of the same press releases and asking it to perform the same "Sisyphean task." (*See* Doc. 162 at 5 ("The pleadings in the Class Complaint and the *Patel* Complaint contain the 'lengthy quotations and canned allegations,' not to mention lack of succinctness, that made the analysis in *Bahash* such a 'Sisyphean task.'").) For instance, Paragraph 14 asserts that "Pareteum and the Exchange Act Defendants achieved [the alleged] fraud through a classic pump-and-dump style barrage of press releases—178 during the Class Period, over 130 in 2018 alone—in the majority of which they touted overstated revenues, fabricated or embellished customer and contracts wins, and/or an always-growing, inflated Backlog." (FAC ¶ 14.) But PSIG only identifies five allegedly false announcements about new customers and contracts in press releases between September and October 2018, and six statements about revenue in press releases between May 2018 and August 2019. (*See* FAC ¶¶ 20, 42-47.) It is unclear which of the remaining 167 press releases (if any) contained false statements or what those false statements were. (*See* FAC ¶¶ 13-27.)

Like the block quotations in the Consolidated Complaint, the incorporation of these press releases by reference invites the Court to "determine on its own initiative how and why the [referenced press releases] were false" and fails to comport with the particularity requirements

under Rule 9(b) and the PSLRA.  (*See* Doc. 162 at 5 (quoting *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 356 (S.D.N.Y. 2015))); *Pollio v. MF Glob., Ltd.*, 608 F. Supp. 2d 564, 570 (S.D.N.Y. 2009) ("[A]lthough plaintiff's Complaint quotes verbatim from a series of press releases…, it fails to identify which portions of these statements (if any) were false or misleading. On this basis alone, [the] Complaint must be dismissed.").

### 2.   PSIG Has Not Shown that the Statements Were False When Made.

#### a.   The Restatement Announcement Did Not Admit That Anything About the Backlog or Connections Was False, or Anything Close to it.

PSIG alleges that the October 21, 2019 Restatement Announcement revealed the falsity of some subset of 178 press releases, six SEC filings, and two Registration Statements.  (*See* FAC ¶¶ 1, 40-41, 49, 55, 58, 68, 87, 94, 113, 116.)  The Restatement Announcement, PSIG asserts, showed that "*certain revenues* recognized during 2018 and 2019 should not have been recorded during that period," and that the anticipated restatement impact "for FY18 and 1H19 [was] a reduction of approximately $9 million and $24 million, respectively."  (*Id.* ¶ 40 (emphasis added).) Those "reductions represented a 28% reduction from FY18…and a 42% reduction from 1H19." (*Id.*)

PSIG identifies no statement in which Pareteum announced it was recognizing revenue that it knew should not have been recognized.  PSIG instead faults "countless" press releases addressing *future expected revenues* as quantified by the backlog and connections metrics.  (*Id.* ¶¶ 69-70.)  With the exception of the five press releases issued between September 2018 and October 2018 that specifically identify distressed or non-existent customers,[5] PSIG has offered

---

[5] PSIG claims that all press releases that followed the September and October 2018 releases "incorporated the $134 million value of the fabricated and embellished customers and contracts announced in the September and October 2018 releases" and are similarly "false and misleading" as a result.  (FAC ¶ 87.)  Under the PSLRA and Rule 9(b), PSIG is obligated to identify each

no sufficient reason why these Statements may have been false, *see Pollio*, 608 F. Supp. 2d at 569-70, and the Restatement Announcement did not reveal the falsity of the Statements.   These statements are also non-actionable expressions of opinion.  *See infra* § I.B.5.; *see also Steamfitters Local 449 Pension Plan v. Sketchers U.S.A., Inc.*, 412 F. Supp. 3d 353, 365 (S.D.N.Y. 2019) (finding that statements regarding strong backlog and forecasted revenue were "inactionable opinions.").

Even assuming PSIG can bridge the chasm between recognized revenues (which Pareteum said required revision) and expected revenues (which PSIG says were false), the purported revelation of the financial fraud ($33 million total) was orders of magnitude less than the value of contracts announced in the 178 press releases (over $500 million).  (*See* Doc. 143-6).)  And the Restatement Announcement did not reveal that *any revenue* announced in the press releases was artificially inflated—it only shows that Pareteum did not correctly recognize revenue received in 2018 and the first half of 2019.

For example, on June 7, 2018, the Company published a press release announcing that the acquisition of Artilium would add $65 million to the Company's ongoing backlog.  (*See* FAC ¶¶ 18, 118.)  Assuming Pareteum booked at least $9 million of the expected revenue as a result of this acquisition in 2018 and $24 million in the first half of 2019, the projected earnings represented *in this one statement* would account for the anticipated restatement.  Pareteum does not concede that the $65 million addition to the backlog was false, but if it were, then that one press release would account for the "full truth" purportedly revealed by the Restatement Announcement.  Put

---

statement alleged to be false.  Thus, this catch-all pleading will not suffice.  *See NECA-IBEW Health & Welfare Fund v. Pitney Bowers Inc.*, 2013 WL 1188050, at *25 (D. Conn. Mar. 23, 2013) ("While it is true that the statements in their entirety do contain substatements that reiterate those which Plaintiff has specifically identified as being fraudulent, [the statements]…do[] not satisfy the particularity requirements.").

differently, PSIG has offered no sufficient reason why—in light of the minute correction relative to total revenue—the Statements were all false.  *See Pollio,* 608 F. Supp. 2d at 570 (dismissing complaint for failure to state with particularity "in what respects the statements at issue were false").

> **b.    The Statements About a 100% Conversion Rate Are Limited in Scope and Are Compatible with the 2018 and 2019 Reported Revenue and Growing Accounts Receivable.**

PSIG alleges that the Pareteum Defendants "falsely represented…that they were converting backlog 'to incremental monthly revenue' at or above 100%" and that backlog conversion was a "key performance indicator."  (FAC ¶ 88.)  But PSIG has not shown that these statements were false.

First, PSIG fails to acknowledge that all four statements concerning 100% backlog conversion, only made in press releases issued between May 2018 and May 2019, exclusively apply to Q4 2017 and 2018 results.  Indeed, no representations about 100% conversion have ever been asserted with relation to contracts procured before or after Q4 2017 and 2018, according to the FAC.[6]  Nevertheless, the FAC asserts that Pareteum "frequently reported" the backlog as converting at or above 100% and relies upon internet articles speculating about what revenue would be in *2019*—not Q4 2017 and 2018—if Pareteum converted at this rate from Q3 2016 onward.  (*See, e.g.,* FAC ¶ 12 ("Pareteum and the Exchange Act Defendants frequently reported the backlog, emphasized its reliability, and represented that it was converting into 'incremental monthly revenue' at or above 100%."); ¶ 96 ("Viceroy Report's analysis demonstrated that Pareteum 'should have reported 73.10% more revenue in [1Q2019]' if Backlog was converting at

---

[6] According to the FAC, these statements were made four times: on May 7, 2018 (FAC ¶ 89 (highlighting statements that only concern Q4 2017 backlog)), August 6, 2018 (*id.* ¶ 90 (highlighting statements that concern 2018 backlog)), March 12, 2019 (*id.* ¶ 91 (same)), and May 7, 2019 (*id.* ¶ 92(same)).

or above 100%.")).)  Notably, the short-seller reports either misunderstood this key distinction or did not see fit to mention it.  The FAC repeats that error.

PSIG then compounds the error by grossly simplifying the revenue realization structure that underlies the contractual backlog.  Indeed, PSIG has alleged that "[i]f Backlog had been converting to 'incremental monthly revenue' at or above 100%, then the Backlog . . . should have translated to proportionate increases (and hundreds of millions of dollars) in revenue during the same period."  (FAC ¶ 94.)  But PSIG fails to consider (or even mention) the typical revenue realization structure for these contracts.  As Turner stated on May 7, 2019, "we expect 15% of each 36-month contract revenue backlog agreement to build in year one [of the contract].  We've set 30% in year two and 55% in year three."  (Foresta Decl., Ex. B, May 7, 2019 Earnings Call Transcript at 7.)

Next, PSIG claims that because the Restatement Announcement confirmed that reported revenues for FY2018 and 1H19 were overstated, "the Backlog could not have been converting into revenue at or above 100%."  (FAC ¶¶ 87, 94.)  This assumes—without reason—that the backlog in 2018 was the only source of revenue reflected in Pareteum's consolidated financial statements for the full year ended December 31, 2018, and the interim periods ended March 31, 2019, and June 30, 2019.  The Restatement Announcement does not attribute the overstatement to an inflated conversion rate or to any erroneous backlog metric.  At the least, these financial statements reflect revenue from contractual backlog obtained in 2016, Q1 through Q3 2017, and 2019 and PSIG has pointed to no false representations concerning that backlog's conversion rate.

### c.    Pareteum Experienced Revenue Growth, Even After the Restatement Announcement.

PSIG alleges that "Pareteum and the Exchange Act Defendants falsely portrayed Pareteum as experiencing hyper-growth" throughout the class period in Pareteum's optimistic statements

regarding its future performance projections. (*See* FAC ¶¶ 104-116.) However, these performance projections are more properly characterized as non-actionable "puffery." (*See infra* at § I.B.5.) Even if the growth projections were actionable, the portrayal was not false—Pareteum *did* experience revenue growth, even after the Restatement Announcement. Take PSIG's word for it: Pareteum's revenues "increased 287% from FY18 to 1H19 (based on the Restatement [Announcement] corrections)." (FAC ¶ 95.) "[T]ruth is an absolute defense to any action under the securities laws." *Ironworkers Local 58 –Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014). Accordingly, PSIG pled no misstatements about Pareteum's growth.

> ### d. Pareteum Did Draw Credit From the Credit Facility After the Default.

PSIG alleges that Pareteum falsely represented that credit was available to it under a Credit Facility from Post Road Group after it defaulted "essentially from its execution." (FAC ¶ 98.) This allegation fails for multiple reasons. First, one of the alleged misstatement that was made with respect to this Credit Facility, a March 12, 2019 FQ18 and FY18 10-K, conceded that Pareteum had an obligation to obtain consents to access additional credit, and cautioned that, "no additional loans [would] be funded until the later of delivery of certain third party consents." (FAC ¶ 100.) Accordingly, there was no omission concerning Pareteum's default. In any event, the defaults did not serve as a barrier to credit because the purported defaults were waived and Pareteum accessed an additional $2,500,000 in credit on August 23, 2019. (*Id.* ¶¶ 37-38.) *See In re Dwight's Piano Co.*, 2005 WL 8161985, at *14 (S.D. Ohio Mar. 17, 2005) ("Th[e] alleged misrepresentation [and omission] is that [Defendant Corporation] was operating under waiver…and…the Director Defendants failed to disclose that [Defendant Corporation] was in default…. However, neither satisfies the pleading requirements because Plaintiffs do not present evidence showing why this is a false statement.").

B.     **PSIG Has Not Adequately Alleged Scienter.**

Under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter.  15 U.S.C. § 78u-4(b)(2)(A).  Scienter is the intent "to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id*. at 314.  Like Rule 9(b), the PSLRA also requires that a complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," which compels a plaintiff to "state with particularity the specific facts in support of [a plaintiff's] belief that [defendants'] statements were false when made." *Rombach*, 355 F.3d at 172 (quotations and citations omitted).

PSIG's scienter allegations fail for multiple reasons.  First, the FAC includes twelve facts or circumstances purportedly showing scienter.  (FAC ¶¶ 117-145.)  None of these are sufficient, standing alone or considered together, to show any intent to defraud.  Additionally, and as to the Exchange Act Defendants, PSIG improperly pleads scienter on a group-wide basis.  Furthermore, allegations that future events purportedly rendered earlier statements inaccurate boil down to the oft-rejected theory of "fraud by hindsight."

1.     **None of the Allegations Alone is Sufficient to Support a Strong Inference of Scienter.**

In order to demonstrate scienter, a plaintiff can allege facts: (1) showing that the defendant had both motive and opportunity to commit fraud; or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Ellington Mgmt. Grp., LLC v. Ameriquest Mortg. Co.*, 2009 WL 3170102, at *2 (S.D.N.Y. Sep. 29, 2009).  Here, PSIG has attempted to

plead both theories of scienter, but neither attempt is successful.  None of the asserted bases for scienter meet the requirement that PSIG "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," which is the intention "to deceive, manipulate, or defraud."  *See* 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 313-14 ("To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.")

### a.      The Motive and Opportunity Allegations.

"[T]o raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [Pareteum] or its officers benefitted in some concrete and personal way from the purported fraud."  *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.*  "Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation [to] sell their own shares at a profit.  *Id.*  Here, PSIG raises no allegations unique to the Exchange Act Defendants and instead relies on generic incentives—like equity-based compensation, and the desire to sustain operations—shared by virtually every corporate officer in America.

### (i).      Growth By Acquisition or Revenue Does Not Show Fraudulent Intent.

PSIG claims that the Pareteum Defendants inflated the Company's stock value so that Pareteum could acquire companies and "actual" revenue to sustain the fraudulent scheme.  (*See* FAC ¶ 118.)  However an "allegation that [a company] had a motive to grow its profits, is . . .

24

totally insufficient to demonstrate scienter." *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, 2013 WL 2154381, at *1 (S.D.N.Y. Mar. 29, 2013).

At bottom, PSIG's real motive allegation is that Pareteum had an intent to defraud because it wanted to show revenue growth. But it is well established that this desire is not legally sufficient to plead motive to commit securities fraud. *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

### (ii). Compensation Incentives are Widely Used and Do Not Suffice to Show Scienter.

PSIG alleges that Pareteum maintained a "Long-Term Incentive Compensation Plan" that granted directors and officers equity and equity-linked awards for "acquisition-related activity, stock price appreciation, and relative stock price performance," and that this incentivized the Exchange Act Defendants to artificially inflate Pareteum's stock price. (FAC ¶ 119.) But a "desire to increase…incentive compensation by maximizing [a company's] earnings may not, as a matter of law, form the basis for Lead Plaintiffs' scienter allegations." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 273 (S.D.N.Y. 2008); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that motive cannot be predicated upon allegations that defendants inflated company's share price in order to augment their compensation).

Furthermore, many of the supposed ill-gotten incentive awards were not exercisable at all during the class period. (FAC ¶ 119.) The exercise price for almost all options was similarly *less* than the $2.54 price of Pareteum stock the day PSIG alleges Pareteum made a misstatement related to their 2018 Q1 revenue. (*See id.*) So, once again, it is not true that Pareteum and the Exchange act defendants "artificially inflate[d] the Company's stock price" to "enrich themselves." (*See id.*)

### (iii). A Motive to Fund Operations Does Not Support Scienter in This Circuit.

The third oft-rejected theory of motive scienter alleged by PSIG is that the Pareteum Defendants intended to defraud shareholders to fund corporate operations and pay salaries. (FAC

¶ 121.)  This Court and the Second Circuit have roundly rejected this theory of scienter.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 201 (rejecting theory of motive scienter because misstatements were not related to acquisition of company, and were made both before and after acquisition of company, just like here); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) ("The alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price—even if such a drop would allegedly threaten the "survival" of a company—is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit"), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009); *see, e.g., Coronel v. Quanta Capital Holdings Ltd.*, 2009 WL 174656, at *16, *26 n.14 (S.D.N.Y. Jan. 26, 2009).

### b.  The Circumstantial Allegations

PSIG's generalized circumstantial scienter theories fare no better.  Because there are no viable motive allegations, "the strength of [PSIG's] circumstantial allegations must be correspondingly greater."  *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 199 (citation omitted).  Recklessness is defined as "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *South Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (S.D.N.Y. 2009).  PSIG has not shown strong circumstantial evidence of conscious misbehavior or recklessness.

### (i).  The Restatement Announcement Does Not Establish Scienter.

PSIG alleges that the Pareteum Defendants admitted in the Restatement Announcement that the company violated GAAP, and failed to maintain sufficient internal controls related to revenue recognition, resulting in the improper recognition of revenue in SEC filings that were

reviewed, signed, and/or certified by the Exchange Act Defendants.  (*See* FAC ¶ 117.)  However, "it is well settled that the mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter."  *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472-73 (S.D.N.Y. 2008).  "It is equally well settled" that "[a]llegations of GAAP violations" must be coupled with evidence of the "fraudulent intent" to be actionable.  *Id.* at 473.  And a defendant's "status as 'hands on' senior executive[]" does not give rise to the "necessary inference of fraudulent intent" to sustain a securities fraud claim.  *Id.*

Likewise, the Restatement Announcement's bare admission that internal control issues existed does not support an inference of scienter.  *See Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *13 (S.D.N.Y. Mar. 28, 2013) ("To the extent that Plaintiffs have alleged that the disclosure of inadequate internal controls is itself indicative of scienter, courts have consistently rejected such allegations as insufficient."); *In re Magnum Hunter Resources Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297-98 (S.D.N.Y. 2014) (concluding that admission of internal control weaknesses in a restatement did not give rise to "strong inference of scienter," despite prior admissions of internal control weakness that failed to capture the full magnitude of the issue, since it was "equally plausible that defendants were in a constant game of '[c]atch up'").

In fact, Pareteum's disclosure to investors in March 2019 that there were "material weaknesses in its internal control over financial reporting," but that at that time did not believe there were any errors in its financial results (FAC ¶¶ 58-59), shows that Pareteum "was [not] trying to hide anything from its investors."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010); *see also Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 187 (4th Cir. 2009) ("Later disclosures that timely raised questions about the reliability of financial information . . . lend weight to an inference that contemporaneous financial statements were made in good faith.").

### (ii).   The Magnitude of the Anticipated Restatement Does Not Support Scienter.

PSIG attempts to bolster its flawed "restatement as admission" scienter argument by pointing to the magnitude of the anticipated (but not yet filed) restatement.   (FAC ¶ 117.) However, there is no case law supporting a conclusion that anything near a 42% reduction in reported revenue supports an inference of scienter.   Indeed, in cases where the "magnitude" of the fraud has any role to play in the scienter analysis, financial write-downs have exceeded 75% of revenues for a given year, and plaintiffs have pled corresponding fraudulent intent.   *See Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) (alleged fraud between $50 million and $70 million); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001) (78% of revenue for year written off as bad debt).   In contrast, this Court has declined to find scienter where a company overstated its net revenues by nearly 41% and declared an impairment charge of over $400 million.   *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *11, 18 (S.D.N.Y. Oct. 25, 2017).   As above, there is no sufficient allegation of fraudulent intent as to the Pareteum Defendants when the statements were made, so this theory is entitled to no weight.

### (iii).   The Retirement of the Backlog is Not Admissible to Show Scienter.

PSIG alleges that Pareteum demonstrated scienter by issuing a denial about the Aurelius and Viceroy Reports then stopping the disclosure of the backlog metric (*See* FAC ¶ 122.) However, the FAC only alleges one such denial.   (*See* FAC ¶ 115.)   Thus, if this theory had any merit (it does not), its application would be limited to misstatements alleged after the June 10, 2019 denial of the Aurelius article.   (*Id.*)   But the theory should not be applied to any defendants for two reasons: (1) PSIG has not pled any facts with particularity showing the backlog was retired

because of the allegations in the Viceroy Report; and (2) drawing an inference of scienter from Pareteum's remedial efforts is prohibited under Fed. R. Evid. 407.

First, PSIG has not pled any facts that would refute the Pareteum Defendants' representation that the backlog was retired because it had "served its purpose" and there was no legitimate business reason to continue using it. (*See* FAC ¶ 122.) Thus, PSIG has failed to plead scienter with particularity under Rule 9(b) and the PSLRA. *See* 15 U.S.C. § 78u-4(b)(2)(A) (PSIG must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). Further, even if the backlog was retired because of the allegations raised in the Viceroy Report, this cannot give rise to an inference of scienter under Fed. R. Evid. 407. *See Higginbotham v. Baxter Int'l, Inc.*, 499 F.3d 753, 760 (7th Cir. 2007) ("[C]hanging the accounting protocols does not show that earlier ones were recognized as deficient.").

### (iv). Post-Class Period Developments Do Not Evidence Scienter.

PSIG asserts that Pareteum's replacement of its CEO, CFO and COO in the fall of 2019 shows that someone acted with scienter, although PSIG does not say who. (FAC ¶ 123.) That omission is grounds to reject this theory, because scienter must be pleaded specifically as to each defendant. *See Kinra v. Chicago Bridge & Iron Co.*, 2018 WL 2371030, at *6 (S.D.N.Y. May 24, 2018). Additionally, termination of an executive "do[es] not give rise to a cogent inference of scienter," because it says "nothing of [an individual defendant's] state of mind." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018).

### (v). The Pareteum Defendants' Alleged Concealment of Relationships is not Evidence of Scienter.

PSIG alleges that "[t]he parties and non-parties to this matter have undisclosed preexisting relationships" with businesses that failed to achieve success and "undisclosed histories of fraudulent and/or criminal conduct." (FAC ¶¶ 124-133.) Concealment of these relationships and

29

prior fraud allegedly constituted a material omission and evidences scienter. (*See id*. ¶ 133.) This argument fails for several reasons.

First, preexisting relationships and prior business ventures are not material information. *AmBase Corp. v. SDG Inc*., 2005 WL 1860260, at *24-25 (D. Conn. Aug. 3, 2005) (finding no duty to disclose insider trading charges in fraud case). Second, for proof that unspecified relationships involving some, but not all, Exchange Act Defendants were concealed, PSIG cites directly to publicly available internet reports, and relies upon other publicly available sources, "revealing" these facts. (*See* FAC ¶ 124 (citing the Viceroy report), ¶ 127 (same), ¶¶ 128-130 (referencing SEC enforcement actions).) One of those purportedly concealed facts, as cited in the internet reports, was that the law firm used by non-party Honig and Pareteum shared an office address. (Doc. 98-1 at 6.) Another allegedly concealed fact was a lawsuit naming Defendant O'Donnell. (*Id*. at 8.) In reality, each of these facts was available to anyone with an internet connection and thus nothing was "concealed." So even if this information was material, PSIG fails to allege that they could not "ferret out the reliability or truth" of the situation using the same "ordinary intelligence" demonstrated by the authors of the internet articles. *Crigger v. Fahnestock & Co., Inc*., 443 F.3d 230, 234 (2d Cir. 2006).

Moreover, "the absence of disclosures regarding facts and allegations regarding [a defendant's] past business relationships [does] not, as a matter of law, render [a company's] statements misleading." *Barilli v. Sky Solar Holdings, Ltd*., 389 F. Supp. 3d 232, 252 (S.D.N.Y. 2019). Moreover, generic claims about alleged prior bad acts are legally insufficient. *Union Cent. Ins. Co. v. Ally Fin., Inc*., 2013 WL 2154220, at *2 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' citation to a number of lawsuits and government investigations involving the RALI Defendants also provides no evidence of scienter" and dismissing Exchange Act claim).

> **(vi).   PSIG Has Not Shown That The Pareteum Defendants Knew Certain Customers Were Embellished Or Fictitious Or Had Any Duty To "Verify."**

PSIG alleges that press releases issued on September 17 and October 2, 8, 17, and 23 of 2018 announced the procurement of embellished or fabricated customers and contracts and that Pareteum and the Exchange Act Defendants either had knowledge of the falsity of these statements or recklessly disregarded the truth by failing to verify the customers.  (FAC ¶¶ 134-138.)  In support of this allegation, PSIG points to various public sources of information that it claims should have placed the Pareteum Defendants on notice of the fraud, including allegations in the Viceroy and Aurelius Reports and social media posts that revealed the recent formation at least one of the customers.  (*Id.*)

Put plainly, these conclusory allegations cannot withstand scrutiny under Rule 9(b) or the PSLRA.  *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), *aff'd sub nom. South Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009) ("[C]onclusory allegations that a defendant 'knew or [was] reckless in not knowing' the true facts will not satisfy a plaintiff's pleading requirements.").  Indeed, it is entirely plausible that the Pareteum Defendants did not know that certain customers could not or would not generate revenue.  And PSIG has proffered no facts indicating that the Defendants had actual knowledge of the customers' incapacity to generate revenue when the press releases were issued.  (*See* FAC ¶¶ 134-141.)[7]

---

[7] In its knowledge allegation, PSIG notes that Defendant O'Donnell and certain other unspecified "Pareteum consultants" had connections with individuals employed by the "embellished" customers and alleges that this "suggests that Pareteum and the Exchange Act Defendants knowingly fabricated contracts to inflate Pareteum's purported sales wins."  (FAC ¶ 138.)  But PSIG does not allege that any of the other Exchange Act Defendants maintained these connections. PSIG also points to a slide used for a May 28, 2019 investor presentation that "was replete with double counting and related and/or non-existent customers" as evidence of Pareteum and the Exchange Act Defendants' knowledge, but makes no allegations about the Exchange Act Defendants' participation in the creation of the slide.  Accordingly, neither of these facts establish

Moreover, PSIG's hypothetical allegations about what the Pareteum Defendants could have discovered had they verified the customers also fails. *See South Cherry Street, LLC*, 573 F.3d at 112 (finding plaintiff's allegation that "[defendant] 'would' have learned the truth [of the fraud] if [it] performed the 'due diligence' [that] it promised" failed to establish conscious recklessness since plaintiff did not allege any fact "that either made the falsity…of the…representations obvious or that should have alerted [defendant] that the…representations were dubious."); *see also Ellington Mgmt. Grp.*, 2009 WL 3170102, at *3 (noting that the Second Circuit, "in considering…hypothetical allegations (i.e., that violations would have been discovered had an inquiry been conducted), [has] rejected precisely this approach to pleading fraud claims."). While a duty to investigate may arise when a defendant has a duty to monitor or where confronted with "obvious signs of fraud," the Exchange Act Defendants' "ambient knowledge of various [backlog-related] anomalies as reported in the popular press" does not trigger such a duty. *Ellington Mgmt. Grp.*, LLC, 2009 WL 3170102, at *3; *see also In re Supreme Indus. Inc. Sec. Litig.*, 2019 WL 1436022, at *5 (N.D. Ind. Mar. 29, 2019) ("It isn't enough to say that defendants had access to greater detail about the composition of the backlog, or even that they knew the information was important" and dismissing securities claim concerning allegedly misleading backlog values).

### (vii).   The FAC Fails To Demonstrate That Pareteum Was On Notice That The Backlog Was Not Converting At 100% In 2018.

The FAC claims that the Pareteum Defendants knew or should have known that backlog was not converting at 100% because: (1) certain customers and contracts were embellished or fabricated; (2) the 535% increase in backlog did not materialize into revenue at a proportionate

---

actual knowledge of any "fabricated or embellished" customers on the part of Pareteum or the Exchange Act Defendants other than O'Donnell.

rate; (3) Pareteum's "ballooning" accounts receivable significantly outpaced backlog and revenue growth; (4) the Aurelius and Viceroy Reports placed the Pareteum Defendants on notice that the backlog was not converting to revenue at or above 100%.  (FAC ¶¶ 140-141.)  First, PSIG has not shown that any of the Pareteum Defendants had any knowledge, or reason to know, that certain customers and contracts were embellished or fabricated.  (*See supra* § I.B.5.)  Accordingly, the Pareteum Defendants' knowledge or awareness of an inaccurate conversion rate cannot be predicated on a non-existent fact.

Because the remaining allegations, are insufficient to show falsity, they cannot show scienter.  (*See supra* § I.A.2.b.)  Facts concerning the proportionality of the backlog conversion rate to realized revenue, and the ratio of accounts receivable to converted backlog revenue,[8] are easily reconciled with a 100% conversion rate.  (*See id.*)  Thus, these facts cannot serve as notice of fraud.  As to the internet articles that attempted to report on this subject, Pareteum only represented that backlog was converting at 100% with respect to Q4 2017 and 2018 results.  By contrast, the Viceroy and Aurelius Reports speculated about what revenue would be in 2019 if backlog converted at 100% from Q3 2016 onward.  (FAC ¶¶ 12, 96.)  Since the short seller reports had no basis in fact, they could not have informed the Exchange Act Defendants of any fraud.  So the 100% conversion rate does not support an inference of fraudulent intent.

---

[8] PSIG contends that "if Backlog had been converting at or above 100%, Pareteum's accounts receivable should have remained constant."  (FAC ¶ 95.)  But PSIG fails to account for the fact that 2018 accounts receivable could rise (owing to a customer not paying on a contract that was signed before 2018) while backlog conversion for the same year could be 100% (owing to customers on deals announced in 2018 paying at least what they agreed to pay, and perhaps more, owing to specific provisions in their contract for payments on top of the announced amount). Accordingly, PSIG has not shown that the 100% conversion rate representations were false when made.

### (viii).   The Core Operations Doctrine Provides PSIG No Scienter Support.

The FAC alleges that the backlog and connections metrics were "core operations" of Pareteum and that the Company placed "importance" on them and continued to rely on them after critiques by short sellers.  (FAC ¶ 142.)  PSIG's "core operations" scienter theory "has been cast into doubt by the Second Circuit following the enactment of the PSLRA."  *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *10 (E.D.N.Y. Aug. 6, 2019).  "Where, as here, [p]laintiff's other scienter allegations . . . are not persuasive," this Court has "decline[d] to find that [p]laintiff's reliance on the core operations theory yields the cogent and compelling inference required."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 624 (S.D.N.Y. 2017); *City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings PLC*, 2020 WL 2834857, at *4 (S.D.N.Y. June 1, 2020) ("[T]he doctrine, standing alone, cannot support an inference of scienter.").  Because PSIG's other scienter allegations fall well short, its "core operations," (FAC ¶ 142), theory fails too.

### (ix).   The Exchange Act Defendants' Senior Positions Do Not Support Scienter Or Impose Obligations To Investigate.

PSIG alleges that the Exchange Act Defendants bore responsibility for the contents of the SEC filings and press releases at issue by virtue of their senior positions and that they had a duty to investigate "overwhelming red flags" suggestive of fraud.  (FAC ¶¶ 143-145.)  But a defendant's corporate position does not give rise to scienter.  *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("Plaintiff must do more than allege that the Individual Defendants had or should have knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions").

As to the Exchange Act Defendants' purported duty to investigate, PSIG's "red flag" allegations merely restate, in conclusory terms, the same inadequate scienter allegations.  (*See*

FAC ¶¶ 145.)  None of these post-facto allegations show fraudulent intent here either:

- <u>McCarthy maintained the backlog spreadsheets and analysis</u>: Since PSIG just repeats earlier scienter allegations as to McCarthy, Pareteum and the Exchange Act Defendants re-assert here the accepted principle that an individual's position does not give rise to scienter. *Lipow*, 131 F. Supp. 3d at 163.

- <u>The Exchange Act Defendants were involved in day-to-day operations</u>: A rehash of PSIG's ineffective "core operations" argument.  (*See supra* Section I.A.C.viii)

- <u>Turner, O'Donnell, and McCarthy signed SEC filings</u>: A rehash of PSIG's ineffective "corporate position" argument.  *Lipow*, 131 F. Supp. 3d at 163.

The "red flags" allegations are limited to statements involving backlog, connections, or revenues.  (FAC ¶¶ 145.)  Accordingly, this Court should disregard these scienter rationales for other alleged misstatements, inasmuch as PSIG has adequately alleged those.  As to the red flags themselves, when scrutinized, PSIG's allegations do not show that any of the Pareteum Defendants knew or should have known statements related to backlog, connections, or revenues were false—a flaw fatal to PSIG's Section 10(b) claims on these topics and one the conclusory, factually inaccurate, and legally insufficient justifications offered above do not, and cannot, cure.

## 2.    The Allegations Collectively Do Not Add Up to Scienter.

PSIG's separate inadequate scienter allegations cannot overcome the PSLRA's "strong inference" requirement in combination.  When considering whether specific scienter allegations are greater than the sum of their parts, "it does not take much to explain that zero plus zero equals zero."  *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011) (affirming dismissal of Section 10(b) claims for inadequately pleading scienter, and rejecting argument that individually insufficient grounds for scienter raised a "strong inference" of scienter when combined).  This Court has followed the same basic math in the securities context. *See City of Brockton Ret. Sys.*, 540 F. Supp. 2d at 475 ("So none of the matters cited by plaintiffs

admits an inference of fraud.  Plaintiffs argue, however, that zero plus zero plus zero plus zero plus zero adds up to something.  In this, [their] arithmetic is as faulty as Shaw Group's was."); *see also Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013) (dismissing Section 10(b) claim on similar grounds).  Indeed, this Court and the Second Circuit have faced similar laundry-lists of allegations about corporate positions and operations, financial restatements, signatures on SEC pleadings, purportedly unflattering executive histories, and incentive awards as ingredients to throw in the scienter stew.  Absent some concrete indication of a particular defendant's knowledge, though, courts send those arguments to the kitchen trashcan.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago,*, 553 F.3d at 200-01; *Malin v. XL Capital, Ltd.*, 312 F. App'x 400, 402 (2d Cir. 2009); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018); *City of Brockton Ret. Sys.*, 540 F. Supp. 2d at 475.  Accordingly, even when combined, PSIG's grounds for scienter are insufficient to raise the strong inference required to sustain its claims.

### 3. The FAC Alleges Classic Group Scienter and Should be Dismissed On This Basis.

Except for a few Individual Defendant-specific assertions,[9] most of PSIG's scienter allegations impermissibly lump everyone together.  PSIG thus relies in error on the group pleading doctrine, which "does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645

---

[9] There are scant allegations against Defendants Turner, McCarthy, O'Donnell, and Bozzo, and none of them raise a "strong inference" of scienter as to any one of these individuals.  As to O'Donnell, for example, the only specific scienter allegation is that he was replaced as CFO.  PSIG makes similar assertions about Defendants Turner and McCarthy.  But this is not enough to survive a motion to dismiss.  *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 92 (S.D.N.Y. 2017) ("Nor do [executive A's] replacement as the Group Management Committee member responsible for oversight of [defendant] and his departure . . . shortly after the dam's collapse, and [executive B's] resignation . . . nearly a year after the collapse, strongly indicate that the Individual Defendants acted with scienter").

(S.D.N.Y. 2007).  PSIG has failed to adequately plead that each Exchange Act Defendant acted with scienter when he made the allegedly false statements identified in the FAC.  This Court should thus dismiss those individuals from this case.  At the very least, this Court should make clear that the Exchange Act Defendants may be liable only for those statements they made.

### 4.    The FAC Impermissibly Alleges "Fraud by Hindsight."

PSIG asserts no non-conclusory fact during or before the alleged misstatements to show that the makers of those statements knew they were false or misleading when made.  *In re Manulife Fin. Cop. Sec. Litig.*, 276 F.R.D. 87, 99 (S.D.N.Y. 2011) (dismissing Section 10(b) claim as to certain statements because plaintiff "fail[ed] to include any explanation about why the[] statements were misleading when made").  The Second Circuit has long rejected that tactic as "fraud by hindsight."  *Id.*  (citing *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co*., Inc., 32 F.3d 697, 703 (2d Cir. 1994)).

The *In re Manulife* plaintiffs claimed that individual defendants made false and misleading statements about risk management strategies employed by Manulife in annual reports, press releases, and analyst calls, none of which came after November 2008.  *Id.*  The plaintiffs then alleged that the truth was revealed between November 2008 and March 2009.  *Id.* at 95.  Concluding that the alleged misstatements were not actionable, this Court explained that plaintiffs "fail[ed] to include any explanation about why these statements were misleading when made."  *Id.* at 99.  The only proof that the statements in question were false were the disclosures between November 2008 and March 2009—"fraud by hindsight."  *Id.*

More recently, the Second Circuit affirmed this court's dismissal of a Section 10(b) claim for pleading fraud by hindsight.  *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 723 F. App'x 20, 22 (2d Cir. 2018).  The plaintiffs in that action alleged the defendant misrepresented the adequacy of staffing in its loan service departments.  *Id.*  The Second Circuit

held that these assertions were fraud by hindsight because "Plaintiffs plead no facts demonstrating that the Company did not actually believe that it could achieve increased labor productivity with the increased loan volume at the time it made the positive statements, nor do they identify any contemporaneous facts that would have rendered such a belief unfounded."  *Id.*

PSIG offers no facts showing that the Pareteum Defendants disbelieved the Statements at the time.  In fact, PSIG almost exclusively relies on *subsequent* events (the June 2019 short seller reports and the October 2019 Restatement Announcement) to show those Statements were knowingly false when made.  (*See, e.g.*, FAC ¶ 49 ("The Restatement Release confirmed that reported revenues and realized revenue growth figures were materially overstated…").)

PSIG relies entirely on future events supposedly proving that Pareteum and the Exchange Act Defendants knew their statements were false or misleading when made.  Take paragraph 88 for example: "During the Class Period, Pareteum and the Exchange Act Defendants falsely represented that the Backlog conversion rate was a 'key performance indicator' and that they were converting Backlog to 'incremental monthly revenue' at or above 100%."  PSIG uses the Restatement Announcement and two internet reports—events that occurred over a year later—as support for their claim that Pareteum knew this statement was false when made.  (FAC ¶¶ 94, 96.) PSIG thus alleges nothing more than fraud by hindsight.

### 5.    The Alleged Misstatements are Opinion and Puffery Protected by the PSLRA's Safe Harbor.

A sincere statement of opinion cannot form the basis for Section 10(b) liability.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (holding that an opinion is not an untrue statement of material fact even if an investor can ultimately prove it wrong).  Statements about what defendants think or believe will occur in the future are inactionable statements of opinion or belief.  *See In re Adient plc Sec. Litig.*, 2020 WL

1644018, at *17 (S.D.N.Y. Apr. 2, 2020) ("Defendants' statements about what they 'think,' 'believe,' and 'expect' to occur in the future are inactionable statements of opinion or belief").  PSIG attempts to use many statements in FAC to form the basis for liability, but these attempts all fail.  (*See e.g.* FAC ¶ 66 ("We are committed to maintaining a strong internal control environment and believe that these remediation actions will represent significant improvements in our controls."); *id.* ¶ 192 ("We conducted our audit in accordance with the standards of the PCAOB. . . .  We believe that our audit provides a reasonable basis for our opinion.")); *see also Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018) (deeming statements about internal controls to be non-actionable opinion statements under *Omnicare*).

"Puffery is defined as a 'company's statements of hope, opinion, or belief about its future performance or general market conditions.'  It is well established that puffery is 'not actionable under the securities laws.'"  *Shemian v. Research In Motion, Ltd.*, 2013 WL 1285779 at *23 (S.D.N.Y. Mar. 29, 2013) (citations omitted).  PSIG's fraud allegations rely heavily on classic puffery.  For example, PSIG premises its fraud claim upon the following non-actionable growth statements:

- "***We are on a torrid sales pace and we are On Fire with relentless forward motion and passion.***"  (FAC ¶¶ 108 (emphasis in original).)  *See In re Cisco Sys., Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (rejecting as inactionable terms such as "hitting on all cylinders," "exceeding expectations," and "on fire in terms of our growth[.]").

- "*We are well positioned now to drive dramatic increases in our scale* and become the recognized market leader through the value we create for our customers and shareholders....."  (FAC ¶ 109 (emphasis in original).)  *See In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *13 (S.D.N.Y. Aug. 19, 2015) (holding statement that a company was "well positioned to support growth" was not actionable under Section 10(b)), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).

- "*We are in the early innings of a remarkable growth story....*We are only at the beginning of our mission to connect every person and every(thing)."  (FAC ¶ 115.

(emphasis in original).)  *See Steamfitters Local 449 Pension Plan*, 412 F. Supp. 3d at 365-66 (holding inactionable statements about "our confidence in our business model worldwide"); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757-58 (S.D.N.Y. 2018) (finding that statements that the company was "confident about and prepared for what lays ahead," and was "confident in these products and our overall commercialization strategy," were inactionable puffery because "[s]uch statements do no more than place a 'positive spin on [certain] developments'").

Setting aside the optimistic nature of these statements, the fact is Pareteum *did* experience revenue growth, even after the Restatement Announcement.  The Court need not take Pareteum's word for it.  The FAC alleges that Pareteum's revenues "increased 287% from FY18 to 1H19 (based on the Restatement [Announcement] corrections)."  (FAC ¶ 95.)  PSIG has not pled misstatements in regards to Pareteum's growth.

**6.     The PSLRA's Safe Harbor Protects Backlog-Related Statements.**

Under the PSLRA's safe-harbor provision, a defendant is not liable if (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," (2) the forward-looking statement is "immaterial," or (3) "the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading."  *Slayton*, 604 F.3d at 766.  Forward-looking statements include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," "*a statement of future economic performance*, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission," and any statement of the underlying assumptions for those forward-looking statements."   15 U.S.C. § 78u-5(i)(1) (emphasis added).   "A statement that 'projects results in the future' is 'plainly forward-looking.'"  *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018) (quoting *Slayton*, 604 F.3d at 769).

Statements about backlog are forward-looking and protected. *See In re Seadrill Limited Sec. Litig.*, 2016 WL 3461311, at *9 (S.D.N.Y. June 20, 2016) (statements that are expressly designated as forward-looking statements fall under PSLRA's safe-harbor); (*compare* Dkt No. 143-4 at 3 ("Contractual revenue backlog is measured on a *forward looking* 36 month snapshot view") (emphasis added).)[10]   Indeed, by Pareteum's own definition, backlog is a forward-looking metric: "Contractual revenue backlog is measured on a forward looking 36 month snapshot view monthly, and, is generated by each of the Company's Managed Services, Global Mobility Cloud, and Application Exchange & Developer's Platform customers."   (Dkt No.. 143-4 at 3.)   The backlog projected forward-looking revenue for three years based on the terms of and services related to customer contracts.   (*Id.*)   Those contracts included recurring fees and fees based on future metrics of service establishment and implementation, and subscriber use.   (*Id.*)

It is not entirely clear which of the 178 press releases referenced in the FAC are alleged to contain misstatements related to backlog.   However, in response to past allegations, Pareteum was able to identify at least 101 Class Period press releases that contained forward-looking language. (*See* Doc. 143-6.)

For example, in each of the five press releases issued between September 2018 and October 2018, announcing a total of $134 million in new contractual backlog, accompanying cautionary language made clear (in relevant part) that "statements with respect to Pareteum's. . . expectations…are based on current expectations, estimates and projections . . . . Readers are

---

[10] Courts around the country have also adopted a forward-looking definition of "backlog."   *See Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157, 1164-65 (E.D. Mo. 2014); *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 947 (N.D. Cal. 2010); *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 116-17 (D. Mass. 2003); *In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d 887, 905 n.16 (N.D. Ohio 2002); *Weiss v. Mentor Graphics Corp.*, 1999 WL 985141, at *11 (D. Ore. Oct. 6, 1999).

cautioned that any such forward-looking statements are not guarantees of future performance and are subject to certain risks, uncertainties and assumptions that are difficult to predict." (*See* FAC ¶ 20; Foresta Decl., Ex. C, Sep. 17, 2018 Press Release, at 2-3.)  For this reason, "readers are cautioned not to place undue reliance on such forward-looking statements." (*Id.*) This language accompanied all press releases where Pareteum made statements regarding the backlog. (*See, e.g.*, Foresta Decl., Ex. C, Sep. and Oct. 2018 Press Releases.)

Moreover, this same September 17—and at least 54 others—also contained language defining the backlog for the investing public and explained how Pareteum's "multi-year Software-as-a-Service agreements include[ing] service establishment and implementation fees, guaranteed minimum monthly recurring fees, as well as contractually scheduled subscribers . . . and, their resulting monthly contractual revenue." (*Id.*)  Pareteum also told the public that "*[t]here can be no assurances that we reach the total revenue contract revenue backlog….Timing of revenue recognition…may vary from actual results.*" (*Id.* (emphasis added).)

"[U]se of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement." *In re Barrick Gold*, 341 F. Supp. 3d at 375 (quoting *Slayton*, 604 F.3d at 769).  Thus, the Statements are not "of present or historical fact." (FAC ¶ 154.)

The FAC also states—without any citation—that "many of the specific statements pleaded herein were not identified as 'forward looking statements' when made," and that, if those statements were characterized as forward-looking, "there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements." (*Id.*)  That is inaccurate, as the September

17, 2018 exemplar shows: investors knew that the contract structure of customer deals may not lead Pareteum to realize total revenue backlog, and that "timing of revenue recognition…may vary from actual results." (Foresta Decl., Ex. C, Sept. 17, 2018 Press Release, at 2.) Pareteum's SEC filings contained similar, well-identified forward-looking statements. (Foresta Decl., Ex. D, Aug. 9, 2019 Form 10-Q, at 20.)

Finally, PSIG asserts the unidentified "speaker knew that the particular forward-looking statement was false." (FAC ¶ 155.) Even if a blanket accusation of knowledge of unidentified individuals met PSIG's burden here (it does not, because of the particularity requirements of Rule 9(b) and the PSLRA), PSIG has not shown falsity for the reasons in Section I.A.

This Court has applied the PSLRA safe harbor to forward-looking statements concerning projected revenue. *See In re Seadrill*, 2016 WL 3461311, at *9. Plaintiffs in *In re Seadrill* brought Section 10(b) claims alleging that Seadrill made misstatements relating to its "solid contract backlog[11] of US$6.3 Bn" and that a particular contract added "$4.1 billion [to the] backlog." *Id.* at *4. Applying the PSLRA safe harbor to these statements, this Court explained that "[s]tatements about projected revenues from the newly signed . . . contracts . . . are forward looking statements that fall within the PSLRA's safe harbor in one or more ways." *Id.* at *9. They contained cautionary language, expressly qualified the expected revenues as just that, and identified risks related to non-realization of the backlog revenue announced. *Id.* Thus, the statements "about the backlog are therefore protected by the PSLRA safe harbor." *Id.* And protection under a separate prong of the PSLRA safe harbor was also appropriate because "[t]he statements themselves were

---

[11] "Backlog" in *In re Seadrill* represented "[f]uture expected revenues based on signed contracts," like here. 2016 WL 3461311, at *1.

objectively true in describing" the contracts "as well as the amount of backlog . . . represented." *Id.*

The same result is appropriate here.  The statements at issue contained cautionary language. The majority of them not only contained specific information about the forward-looking nature of the facts stated therein, but also included a detailed explanation of how Pareteum defined backlog, what fees and revenue were included in contracts contributing to the backlog, whether Pareteum would ever reach the total backlog, and why revenue recognition in the backlog would vary from actual results.  (*See Doc*. 143-6.)  Appropriate forward-looking language, however, accompanied all of those Statements.  For this reason, PSIG has not stated a Section 10(b) claim.

### 7.    The Alleged GAAP violations do not support a Section 10(b) claim.

PSIG cannot maintain a Section 10(b) claim based on GAAP noncompliance.  (FAC ¶¶ 52-68.)  "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim" absent "evidence of corresponding fraudulent intent." *Novak*, 216 F.3d at 309.  PSIG has not stated facts supporting fraudulent intent.  *See* Section I.A. This is particularly true for the misstatements alleged in paragraphs 42-68, which concern Pareteum's 1Q, 2Q, and 3Q 2018 10-Q filings.  PSIG has identified no facts contemporaneous with these filings demonstrating scienter.

Pareteum's identification in March 2019 of a material weakness does not trigger scienter.  *See Slayton,* 604 F.3d at 777 (finding that scienter was not sufficiently pled where the "facts [did] not support an inference that [defendant] was trying to hide anything from its investors.  Rather, they suggest[ed] that [defendant] . . . was endeavoring in good faith to ascertain and disclose" accounting issues); *see also Matrix Capital Mgmt. Fund,* 576 F.3d at 187 ("Later disclosures that timely raised questions about the reliability of financial information . . . lend weight to an inference that contemporaneous financial statements were made in good faith.").  So PSIG cannot maintain a Section 10(b) claim for Pareteum's 2018 10-K, and 1Q 2019 and 2Q 2019 10-Qs.

**C.**     **Because PSIG's Section 10(b) Claim Fails, So Too Does its Section 20(A) Claim**

"Liability for § 20(a) violations is derivative of liability for § 10(b) violations."  *McIntire*

*v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 121 (S.D.N.Y. 2013).  To establish a

prima facie case of liability under § 20(a), a plaintiff must show: (1) "a primary violation by the

controlled person"; (2) "control of the primary violator by the targeted defendant"; and (3) that the

"controlling person was in some meaningful sense a culpable participant in the controlled person's

fraud."  *Id.*  (internal quotation marks omitted).  The heightened pleading standards of the PSLRA

apply with respect to the third prong of a § 20(a) claim.  *Id.*  Here, PSIG has not stated a Section

10(b) claim; accordingly, the Control Person Defendants are not liable under Section 20(a).

**II.     THE FAC DOES NOT ADEQUATELY PLEAD ANY CLAIMS UNDER THE SECURITIES ACT**

The remaining causes of action in the FAC allege violations of the Securities Act in

connection with the iPass Acquisition and the Secondary Offering, but fail to meet the pleading

requirements to sustain a claim under either Section 11, Section 12 or Section 15 of the Securities

Act.

**A.     PSIG Has Failed To State A Section 11, 12, Or 15 Securities Act Claim In Connection With The iPass Registration Statement.**

PSIG alleges that the iPass Acquisition Filings[12] are false because they incorporate

financial statements in which Pareteum allegedly overstated its revenue.  The documents Pareteum

filed with the SEC in connection with this acquisition, listing historical revenues of $18,123,484,

"which were the same revenues the Company reported in Pareteum's 3Q18 10-Q," are those that

---

[12] The FAC defines the iPass Acquisition Filings as Form S-4 Registration Statement for the iPass acquisition on December 4, 2018, as amended on December 21, 2018, January 14, 2019, and January 15, 2019; (b) a Schedule TO Tender Offer Statement on December 4, 2018, as amended and supplemented on December 10, 2018, December 21, 2018, January 4, 2019, and January 14, 2019, January 15, 2019, and February 13, 2019; and (c) a Form 424(b)(3) Prospectus on February 4, 2019.  (FAC ¶ 179.)

PSIG asserts the Restatement Release demonstrates are false.  (FAC ¶¶ 180-182.)  Additionally, because the iPass Registration Statement incorporated earlier 2018 10-Q filings and investor presentations, the iPass Registration Statement allegedly contained false or misleading statements because they reported revenues that were overstated.  (*Id.* ¶ 181.)  PSIG uses the same misstatements to make out its Exchange Act and Securities Act claims.  (*Id.* ¶¶ 180-181 (claiming the 2018 10-Q filings incorporated by reference into the Registration Statement and Prospectus contained the allegedly false and misleading statement that made the basis for the Securities Act claims); *id.* ¶¶ 42-51 (relying on statements regarding and in the same filings to make out their Exchange Act claims).)

PSIG's Section 11 claim (Count III) is subject to Rule 9(b)'s heightened pleading standard under *Rombach*, 355 F.3d at 172, since it sounds in fraud, but it does not meet that standard. Because PSIG has directly linked the purported falsity of the iPass Registration Statement to Pareteum's SEC filings—the same filings that allegedly create Exchange Act liability—its Section 11 Securities Act claim meets the same fate as the Section 10(b) Exchange Act claim.  The Section 12 claim against Pareteum (Count IV) fails for the same reasons.   And without a primary violation, PSIG cannot maintain its Section 15 cause of action against the Control Person Defendants (Count V). [13]

---

[13] The Securities Act claims brought in connection with the iPass acquisition would fail under the *Iqbal/Twombly* Rule 8 notice standard as well, because PSIG has failed to plead facts sufficient to state a claim for relief in connection with the alleged misstatements made by Pareteum.  *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 174-75 (2d Cir. 2011)(citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (a pleading must contain a short statement showing the pleader's entitlement to relief); *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 185-86 (E.D.N.Y. 2017), *aff'd,* 731 F. App'x 35 (2d Cir. 2018) (where plaintiff fails to plead actionable material misstatements or omissions, Section 11, 12 and 15 claims must be dismissed under the liberal standards of Rule 8).

### 1.     PSIG cannot state a Section 11 claim.

Section 11 liability requires an allegation that a plaintiff (1) purchased a registered security; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).  "[W]hen the same course of conduct supports both a claim of fraud under the Exchange Act and a claim under Section 11 or 12(a)(2) of the Securities Act, the latter claim must satisfy the requirements of Rule 9(b) . . . . *Mere disavowal of any allegations that would make Rule 9(b) applicable will not suffice.*"  *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *11 (S.D.N.Y. Sept. 9, 2019) (emphasis added); *see also Rombach*, 355 F.3d at 172.

PSIG tries to disavow its reliance on fraud and related allegations for its Section 11 claim. (FAC ¶ 170.)  This about-face fails because "the wording and imputations of the complaint are classically associated with fraud," in that the FAC asserts "that the Registration statement was inaccurate and misleading, that it contained untrue statements of material facts, and that materially false and misleading written statements were issued."  *Rombach*, 355 F.3d at 172 (applying Rule 9(b) and PSLRA to Section 11 claim).  Further, separating out Exchange Act claims from Securities claims does not save the Securities Act claims from the heightened pleading standard. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, __F.3d__, 2020 WL 1529371, at *11 (S.D.N.Y. Mar. 30, 2020)(citing *In re Alstom S.A. Secs. Litig.*, 406 F. Supp. 2d 402, 410 (S.D.N.Y. 2005)) ("Courts in this District uniformly apply Rule 9(b) to Complaints that separate allegations in this manner, so long as the theories of liability are the same under both statutes.").  Finally, "'the gravamen of the complaint'"—consisting of hundreds of paragraphs

alleging false and misleading statements—"'is plainly fraud and no effort is made to show any other basis for the claims levied'" at the iPass Acquisition Filings. *Rombach*, 355 F.3d at 172.

The FAC asserts that "the iPass Acquisition Filings were false and misleading and also incorporated by reference SEC filings that contained false and misleading statements and/or omitted material facts necessary to make these statements not false and misleading" (FAC ¶ 199.) PSIG argues that the statements were false and misleading, because they contained revenues that were overstated. (*Id.* ¶ 181.) PSIG relies on the same conduct—the overstating of revenues in the very same SEC filings—to make out its Exchange Act claims. (*See, e.g., id.* ¶¶ 42-51.) Neither PSIG's attempt to create a separate section of the FAC in which to plead the Securities Act claim nor its inclusion of a conclusory denial of its use of fraud based language to plead this claim will save it from being reviewed according to the 9(b) pleading standard. *In re AmTrust Fin. Servs.*, 2019 WL 4257110, at *11 (disavowing allegations that make Rule 9(b) applicable is not enough); *City of Omaha Police & Fire Ret. Sys.*, F.3d, 2020 WL 1529371, at *11 (segregating Exchange Act Claims from Securities Act claims is not enough).

This Court's decision in the *AmTrust* case is highly instructive. As in this case, the plaintiff in *AmTrust* brought Exchange Act and Securities Act claims against a company in connection with its accounting treatment of revenue from customer contracts and, in particular, the recognition of revenue over the course of the contract's lifetime. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *2. The alleged misstatements related to the financial data used to produce the company's financial statements and the accounting principles applied to produce or arrive at that data, *id.* at* 12, and, as in this case, the plaintiff's claims focused on accounting issues and material weaknesses that the company addressed in a restatement. Judge Kaplan dismissed the complaint in *AmTrust*, finding, among other things, that the company was permitted to take a

positive view of its prospects and that the statements regarding the recognition of revenue was permissible "puffery and corporate optimism" that could not form the basis for Exchange Act claims. *Id.* at *28. Because PSIG attempts to use similar statements as the plaintiff in *AmTrust* to make out the same claims, the FAC should be dismissed. In short, PSIG has failed to demonstrate the necessary falsity of the statements underlying its claims

### 2.    PSIG cannot state a Section 12 claim.

The Section 12 claim asserted against Pareteum in Count IV is also premised on fraud and so subject to the same heightened standard as the Third Claim. *Rombach*, 355 F.3d at 170 (Section 12 claims premised on fraud are subject to the heightened pleading standard). It should be dismissed for the same reasons. Indeed, the FAC includes no specific statements allegedly contained in the 424(b)(3) Prospectus—only a vague allegation that "statements made in the Prospectus itself and the statements incorporated by reference therein regarding Pareteum's 1Q18, 2Q18, and 3Q18 reported revenues were each materially false and misleading and/or omitted material facts necessary to make these statements not false and misleading…" (FAC ¶ 181.) This vague allegation cannot meet the heightened 9(b) requirements. *Rombach*, 355 F.3d at 170.

### 3.    PSIG cannot state a Section 15 claim.

Because PSIG has not made out a Section 11 or 12 cause of action in connection with the iPass Acquisition, it cannot state a Section 15 claim against the Control Person Defendants. *In re Lehman Bros.*, 650 F.3d at 185-86.

### B.    PSIG has Failed To State A Section 11 Or 15 Securities Act Claim In Connection With The Secondary Offering.

PSIG similarly cannot state a Section 11 claim (Count VI) or a Section 15 claim (Count VII) related to the Secondary Offering because these claims are also subject to the same heightened pleading standard that dooms the Section 11 and Section 15 claims relating to the iPass

Acquisition, and for the same reasons.  Furthermore, PSIG has not adequately shown that it acquired any shares of Pareteum under the Secondary Offering.  While PSIG asserts it did so in Paragraph 186 of the FAC, its certifications do not clearly show any purchase of Pareteum shares under the Secondary Offering at the alleged offering price.  Without any injury from this sale, PSIG lacks standing to pursue these claims.  *See N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp.*, 720 F. Supp. 2d 254, 265-66 (S.D.N.Y. 2010), *on reconsideration sub nom. N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2013 WL 1809767 (S.D.N.Y. Apr. 30, 2013).


## CONCLUSION

For these reasons, the Court should grant Pareteum's motion to dismiss the FAC.

Dated: New York, New York
        August 3, 2020

                                                    MCGUIREWOODS LLP

                                                    */s/ Stephen G. Foresta*
                                                    Stephen G. Foresta
                                                    Jeffrey J. Chapman

                                                    McGuireWoods LLP
                                                    1251 Avenue of the Americas
                                                    20th Floor
                                                    New York, NY 10020
                                                    Telephone: (212) 548-7060
                                                    Facsimile: (212) 715-6277
                                                    Email: sforesta@mcguirewoods.com
                                                         jchapman@mcguirewoods.com
                                                    *Counsel for Defendant Pareteum*
                                                    *Corporation*

To: All counsel of record (Via ECF)