**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PARETEUM SECURITIES LITIGATION** | **Case No. 1:19-cv-09767-AKH-GWG** |

**LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS**
**<u>TO DISMISS FIRST AMENDED CONSOLIDATED COMPLAINT</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………………………..i

TABLES OF AUTHORITIES………………………………………………………………iii

TABLE OF DEFINITIONS…………………………………………………………………x

TABLE OF DEFENDANTS AND COUNTS…………………………………………….xii

I.      PRELIMINARY STATEMENT FOR EXCHANGE ACT CLAIMS ........................... 1

II.     LEGAL STANDARD ON A RULE 12(b)(6) MOTION TO DISMISS....................... 3

III.    PLAINTIFF ADEQUATELY PLEADS SECTION 10(b) CLAIMS AGAINST
        PARETEUM AND THE EXCHANGE ACT DEFENDANTS................................... 4

  A.    THE ELEMENTS OF A SECTION 10(b) CLAIM ................................................. 4

  B.    PLAINTIFF ADEQUATELY ALLEGES A STRONG INFERENCE OF SCIENTER........................ 4

    1.   Legal Standard .................................................................................. 4

    2.   Plaintiff Adequately Alleges That the Exchange Act Defendants Had Motive and
         Opportunity to Commit Fraud .......................................................... 5

    3.   Plaintiff Adequately Alleges Circumstantial Evidence of Scienter .............................. 8

    4.   Pareteum and the Exchange Act Defendants' Remaining Scienter Arguments Fail .... 14

    5.   Corporate Scienter Is Adequately Alleged ..................................... 18

  C.    PLAINTIFF ADEQUATELY ALLEGES MATERIALLY FALSE AND MISLEADING
        STATEMENTS……………………………………………………….…… 18

    1.   Relevant Standard ............................................................................ 18

    2.   Materially False and Misleading Statements Regarding Reported Revenue and
         Realized Revenue Growth Rates, Revenue Recognition, GAAP Compliance, Internal
         Controls, and Financial Reporting.................................................. 19

    3.   False and Misleading Statements Regarding Backlog................................. 23

      a. Statements Regarding Backlog Value .................................... 23

      b. Statements Regarding Backlog Conversion.................................. 25

    4.   False and Misleading Statements Regarding the Credit Facility ................................ 28

    5.   False and Misleading Statements Regarding Growth.................................... 29

    6.   Pareteum and the Exchange Act Defendants' Argument that Certain Statements of Fact
         Constitute Inactionable Opinion Fails ........................................... 30

    7.   These Statements Are Not Puffery ................................................. 35

    8.   The PSLRA Safe Harbor Does Not Apply to Statements Regarding Backlog Value .. 36

IV.     PLAINTIFF ADEQUATELY PLEADS SECONDARY LIABILITY UNDER
        SECTION 20(a) AGAINST TURNER, O'DONNELL, AND BOZZO ..................... 39

i

V.      PLAINTIFF ADEQUATELY PLEADS SECTION 11 AND 12 CLAIMS ................ 40

  A.    THE ELEMENTS OF A CLAIM UNDER SECTIONS 11 AND 12 ........................... 41

  B.    THESE CLAIMS ARE NOT SUBJECT TO A HEIGHTENED PLEADING STANDARD .............. 42

  C.    PLAINTIFF ADEQUATELY ALLEGES SECTIONS 11 AND 12 CLAIMS IN CONNECTION WITH
        THE IPASS ACQUISITION ................................................ 43

  D.    PLAINTIFF ADEQUATELY ALLEGES SECTION 11 CLAIMS AGAINST PARETEUM, THE
        CONTROL PERSON DEFENDANTS, DJSI, AND SQUAR MILNER IN CONNECTION WITH THE
        SECONDARY OFFERING ................................................. 45

    1.  Claims Against Pareteum and the Control Person Defendants..................... 45

    2.  Claims Against Underwriter DJSI .............................................. 45

    3.  Claims Against Auditor Squar Milner ......................................... 46

    4.  Plaintiff Adequately Pleads that it Purchased Shares Pursuant or Traceable to the
        Secondary Offering ........................................................ 49

    5.  Squar Milner Cannot Establish Negative Causation.............................. 51

VI.     PLAINTIFF ADEQUATELY PLEADS SECTION 15 CLAIMS AGAINST THE
        CONTROL PERSON DEFENDANTS......................................... 52

VII.    CONCLUSION .......................................................... 53

# TABLE OF AUTHORITIES

## Cases

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................ 3, 22

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ............................................................................. 37

*Caiafa v. Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007) .............................................................. 41, 50

*Carpenters Pension Tr. Fund v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ............................................................................. 39

*Christine Asia Co. v. Yun Ma*,
   16-2519, 2017 U.S. App. LEXIS 24647 (2d Cir. Dec. 5, 2017) ............................................ 5

*City of Miami v. Quality Sys.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................................................. 31

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   18-10320, 2020 U.S. Dist. LEXIS 55410 (S.D.N.Y. Mar. 30, 2020) ........................ 16, 43, 50

*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) .................................................................38

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
   20-2031, 2020 U.S. Dist. LEXIS 140925 (S.D.N.Y. Aug. 6, 2020) ..............................*Passim*

*Crowell v. Ionics, Inc.*,
   343 F. Supp. 2d 1 (D. Mass. 2004) .....................................................................14

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
   413 F. Supp. 3d 187 (S.D.N.Y. 2019) .............................................................4, 21

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011) ...........................................................................31-32

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014) ...............................................................7-8

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ....................................................... 15, 20, 36, 39

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................. 17-18

*Gen. Partner Glenn Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ......................................................................... 31, 46

*Haw. Structural Ironworkers Pension Tr. Fund v. City Entm't Holdings, Inc.*,
 422 F. Supp. 3d 821 (S.D.N.Y. 2019) ............................................................ 16, 51

*Herman & MacLean v. Huddleston*,
 459 U.S. 375 (1983) ............................................................................................ 41-42

*Higginbotham v. Baxter Int'l, Inc.*,
 495 F.3d 753 (7th Cir. 2007) ................................................................................ 15

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
 298 F.R.D. 116 (S.D.N.Y. 2014) ......................................................................... 22

*IBEW Local 98 Pension Fund v. Cent. Vermont Pub. Serv. Corp.*,
 11-222, 2012 U.S. Dist. LEXIS 204116 (D. Vt. Aug. 23, 2012) ........................... 8

*In re Accuray, Inc. Sec. Litig.*,
 757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................................. 37

*In re Am. Int'l Gp., Inc.*,
 741 F. Supp. 2d 511 (S.D.N.Y. 2010) ................................................................... 5

*In re Am. Realty Capital Props., Inc. Litig.*,
 15-MC-40, 2015 U.S. Dist. LEXIS 151966 (S.D.N.Y. Nov. 6, 2015) ............... 40, 43, 46, 51

*In re Am. Realty Capital Props., Inc. Litig.*
 15-40, 2016 U.S. Dist. LEXIS 196190 (S.D.N.Y. Aug. 5, 2016) ............................ 47, 48, 49

*In re Ambac Fin. Gp., Inc. Secs. Litig.*,
 693 F. Supp. 2d 241 (S.D.N.Y. 2010) ................................................................. 42

*In re Amtrust Fin. Servs., Inc. Sec. Litig.*,
 17-1545, 2019 U.S. Dist. LEXIS 153297 (S.D.N.Y. Sept. 9, 2019) ................... 32, 33, 34, 42

*In re ArthroCare Corp. Secs. Litig.*,
 726 F. Supp. 2d 696 (W.D. Tex. 2010) ............................................................... 11

*In re Authentidate Holding Corp.*,
 05-5323, 2006 U.S. Dist. LEXIS 47971 (S.D.N.Y. July 14, 2006) ..................... 49

*In re Avon Sec. Litig.*,
 19-01420, 2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019) ............................ 9, 30

*In re Barrick Gold Corp. Sec. Litig.*,
 341 F. Supp. 3d 358 (S.D.N.Y. 2018) ................................................................. 38

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
 763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................. 9

*In re BioScrip, Inc. Sec. Litig.*,
 95 F. Supp. 3d 711 (S.D.N.Y. 2015) .................................................................... 49, 51

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
 17-1580, 2018 U.S. Dist. LEXIS 87991 (S.D.N.Y. May 24, 2018) ...................................... 30

*In re Complete Mgmt. Sec. Litig.*,
 153 F. Supp. 2d 314 (S.D.N.Y. 2001) ................................................................. 15

*In re Dwight's Piano Co.*,
 No. 3:04-CV-066, 2001 U.S. Dist. LEXIS 28371 (S.D. Ohio Mar. 17, 2005) ..................... 29

*In re Eletrobras Sec. Litig.*,
 245 F. Supp. 3d 450 (S.D.N.Y. 2017) ................................................................. 12

*In re First Merchants Acceptance Corp. Sec. Litig.*,
 97-2715, 1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 4, 1998) ......................................... 48

*In re Gentiva Sec. Litig.*,
 932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................. 21

*In re Genworth Fin. Sec. Litig.*,
 14-2392, 2015 U.S. Dist. LEXIS 82035 (S.D.N.Y. June 15, 2015) ...................................... 36

*In re Glob. Crossing, Ltd. Sec. Litig.*,
 313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................. 50

*In re Health Mgmt., Inc. Sec. Litig.*,
 970 F. Supp. 192 (E.D.N.Y. 1997) ................................................................. 48

*In re Iconix Brand Group, Inc.*,
 15 Civ. 4860, 2019 U.S. Dist. LEXIS 171591 (S.D.N.Y. Oct. 25, 2017) ........................... 15

*In re Initial Pub. Offering Sec. Litig.*,
 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................. 46

*In re Interpool, Inc. Sec. Litig.*,
 No. 04-321, 2005 U.S. Dist. LEXIS 18112 (D.N.J. Aug. 16, 2005) .............................. 20, 34

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
 251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................................................. 40

*In re Keithley Instruments Sec. Litig.*,
 268 F. Supp. 2d 887 (N.D. Ohio 2002) ................................................................. 37

*In re Lehman Bros. Sec. & ERISA Litig.*,
 799 F. Supp. 2d 258 (S.D.N.Y. 2011) ................................................................. 44

*In re Lehman Bros. Sec.*,
 131 F. Supp. 3d 241 (S.D.N.Y. 2015) ................................................................. 46

*In re Livent, Inc. Noteholders Sec. Litig.*,
 355 F. Supp. 2d 722 (S.D.N.Y. 2005) ................................................................. 44

*In re Lululemon Sec. Litig.,*
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................... 15

*In re Mun. Mortg. & Equity, LLC,*
   876 F. Supp. 2d 616 (D. Md. 2012) ................................................................... 50

*In re Petrobras Sec. Litig.,*
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ........................................................... 49, 51

*In re Petrobras Sec. Litig.,*
   14-cv-9662, 2016 U.S. Dist. LEXIS 21036 (S.D.N.Y. Feb. 18, 2016) ................................. 49

*In re Puda Coal Sec. Inc. Litig.,*
   11 Civ. 2598, 2013 U.S. Dist. LEXIS 142081 (S.D.N.Y. Oct. 1, 2013) ............................... 51

*In re Refco, Inc Sec. Litig.,*
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ........................................................ 5, 43, 52

*In re Scholastic Corp. Sec. Litig.,*
   252 F.3d 63 (2d Cir. 2001) ........................................................................... 15

*In re Scottish Re Gp. Sec. Litig.,*
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) ............................................................... 48

*In re Seadrill Limited Securities Litigation,*
   No. 14-9642, 2016 U.S. Dist. LEXIS 80648 (S.D.N.Y. June 20, 2016) ............................... 38

*In re Spear & Jackson Sec. Litig.,*
   399 F. Supp. 2d 1350 (S.D. Fla. 2005) .............................................................. 11

*In re Stone & Webster, Inc. Sec. Litig.,*
   253 F. Supp. 2d 102 (D. Mass. 2003) ............................................................... 37

*In re Sturm, Ruger & Co. Sec. Litig.,*
   3:09-cv-1293, 2011 U.S. Dist. LEXIS 11341 (D. Conn. Feb. 4, 2011) ............................... 38

*In re Supercom, Inc. Sec. Litig,*
   15-9650, 2018 U.S. Dist. LEXIS 175467 (S.D.N.Y. Oct. 10, 2018) .................................. 16

*In re Valeant Pharms. Int. Inc. Sec. Litig.,*
   No. 15-7658, 2017 U.S. Dist. LEXIS 66037 (D.N.J. Apr. 28, 2017) .................................. 14

*In re Veeco Instruments, Inc., Sec. Litig.,*
   235 F.R.D. 220 (S.D.N.Y. 2006) ................................................................ *Passim*

*In re Vivendi Universal, S.A. Sec. Litig.,*
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................... 17, 34

*In re Vivendi, S.A. Sec. Litig.,*
   838 F.3d 223 (2d Cir. 2016) .......................................................................... 18

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) ........................................................ 49, 51

*In re WRT Energy Sec. Litig.*,
   2005 U.S. Dist. LEXIS 18701 (S.D.N.Y. Aug. 30, 2005) ................................... 52

*Khoja v. Orexigen Therapeutics, Inc.*,
   No. 16-56069, 2018 U.S. App. LEXIS 22371 (9th Cir. Aug. 13, 2018) ............... 28

*Lehman Bros. Sec. & ERISA Litig.*,
   09-2017, 2011 U.S. Dist. LEXIS 82119 (S.D.N.Y. 2011) ................................... 17

*Levine v. AtriCure, Inc.*,
   508 F. Supp. 2d 268 (S.D.N.Y. 2007) ........................................................ *Passim*

*Manavazian v. ATEC Gp.*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) .............................................................. 36

*Menaldi v. Och-Ziff Capital Mgmt. Gp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016) .............................................................. 40

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   08-8781, 2011 U.S. Dist. LEXIS 46066 (S.D.N.Y. Apr. 28, 2011) ..................... 42

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*,
   720 F. Supp. 2d 254 (S.D.N.Y. 2010) .............................................................. 51

*New Orleans Emples. Ret. Sys. v. Celestica, Inc.*,
   455 F. App'x 10 (2d Cir. 2011) ...................................................................... 12

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ........................................................................... 35

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019) .......................................................... *Passim*

*Ollila v. Babcock & Wilson Enters.*,
   17-109, 2018 U.S. Dist. LEXIS 20587 (W.D.N.C. Feb. 8, 2018) ........................ 39

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ................................................................................ *Passim*

*Pac. Iv. Mgmt. Co. v. Mayer Brown LLP*,
   603 F.3d 144 (2d Cir. 2010) ............................................................................. 4

*Patel v. L-3 Communs. Holdings, Inc.*,
   14-CV-6038, 2016 U.S. Dist. LEXIS 42978 (S.D.N.Y. Mar. 30, 2016) ............... 18

*Perry v. Duoyuan Printing, Inc.*,
   10-7235, 2013 U.S. Dist. LEXIS 121034 (S.D.N.Y. Aug. 22, 2013) ................... 45

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
　1:16-cv-3591, 2020 U.S. Dist. LEXIS 66016 (S.D.N.Y. Apr. 14, 2020) ..................... *Passim*

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix  Int. N.V.*,
　89 F. Supp. 3d 602 (S.D.N.Y. 2015) ............................................................. *Passim*

*Pound v. Stereotaxis, Inc.*,
　8 F. Supp. 3d 1157 (E.D. Mo. 2014) .................................................................. 37

*Rodriguez v. Gigamon Inc.*,
　325 F. Supp. 3d 1041 (N.D. Cal. 2018) ............................................................. 31

*Rombach v. Chang*,
　355 F.3d 164 (2d Cir. 2004) ...................................................................... 42, 43

*Rombach v. Chang*,
　00-0958, 2002 U.S. Dist. LEXIS 15754 (E.D.N.Y. June 7, 2002) ......................... 43

*Rothman v. Gregor*,
　220 F.3d 81 (2d Cir. 2000) ................................................................................. 9

*Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*,
　05-7092, 2006 U.S. Dist. LEXIS 96035 (S.D.N.Y. May 3, 2006) .............................. 6, 38, 39

*SEC v. Espuelas*,
　908 F. Supp. 2d 402 (S.D.N.Y. 2012) ................................................................ 20

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
　348 F. Supp. 3d 313 (S.D.N.Y. 2018) .................................................................. 7

*Shaw v. Empire Stock Transfer Inc.*,
　381 F. Supp. 3d 286 (S.D.N.Y. 2019) ................................................................ 53

*Skiadas v. Acer Therapeutics Inc.*,
　1:19-cv-6137, 2020 U.S. Dist. LEXIS 105814 (S.D.N.Y. June 16, 2020) ......................... 6, 27

*SLM Corp. Sec. Litig.*,
　740 F. Supp. 2d 542 (S.D.N.Y. 2010) ...................................................... 36, 38, 39

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
　531 F.3d 190 (2d Cir. 2008) .............................................................................. 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007) .......................................................................................... 4

*Varghese v. China Shenghuo Pharm. Holdings*,
　672 F. Supp. 2d 596 (S.D.N.Y. 2009) ...................................................... 9, 21, 31

*Weiss v. Mentor Graphics Corp.*,
　CV-97-1376-ST, 1999 U.S. Dist. LEXIS 17026 (D. Or. Oct. 6, 1999) ................................ 38

**Statutes**

15 U.S.C. § 77k ........................................................................................................ 41

15 U.S.C. § 78u-4 .................................................................................................... 4

**Rules**

Fed. R. Evid. 404 .................................................................................................... 88

Fed. R. Civ. P. 9 ............................................................................................... *Passim*

Rule 10(b) ...................................................................................................... 43, 44

Fed. R. Civ. P. 12 .................................................................................................. 25

**TABLE OF DEFINITIONS**

| Abbreviation | Defined Term |
|---|---|
| 424(b)(3) Prospectus | February 4, 2019 Prospectus for iPass Acquisition |
| Artilium | Artilium PLC |
| Artilium Acquisition | October 1, 2018 acquisition of Artilium by Pareteum |
| AudioEye | AudioEye, Inc. |
| Audit Opinion | March 18, 2019 audit report of Pareteum's FY18 financial statements issued by Squar Milner |
| Aurelius Report | Marcus Aurelius Value, *TEUM: Where Are The Customers?* (June 7, 2019), *available at* http://www.mavalue.org/research/teum-where-are-the-customers/ (last visited July 16, 2020) |
| Backlog | 36-month Contractual Revenue Backlog |
| Bozzo | Defendant Victor Bozzo |
| CCO | Chief Commercial Officer |
| Class Period | December 14, 2017 – October 21, 2019 |
| Control Person Defendants | Defendants Turner, O'Donnell, and Bozzo |
| Credit Facility | February 26, 2019 $50 million credit facility from Post Road Group |
| Dawson James or DJSI | Defendant Underwriter Dawson James Securities, Inc. |
| EAD Br. | Memorandum of Law in Support of the Individual Defendants' Motion to Dismiss the First Amended Consolidated Complaint (Dkt. No. 176) |
| Exchange Act | Securities Exchange Act of 1934 |
| Exchange Act Defendants | Defendants Turner, O'Donnell, Bozzo, and McCarthy |
| FAC | First Amended Consolidated Complaint (Dkt. No. 168) |
| GAAP | Generally Accepted Accounting Principles |
| Honig | Barry Honig |
| Investor Day Presentation | May 28, 2019 presentation by Pareteum at Investor Day |
| iPass | iPass Inc. |
| iPass Acquisition | February 12, 2019 acquisition of iPass by Pareteum |
| iPass Acquisition Filings | (a) Form S-4 Registration Statement on December 4, 2018, as amended on December 21, 2018, January 14, 2019, and January 15, 2019; (b) Schedule TO Tender Offer Statement on December 4, 2018, as amended and supplemented on December 10, 2018, December 21, 2018, January 4, 2019, and January 14, 2019, January 15, 2019, and February 13, 2019; and (c) Form 424(b)(3) Prospectus on February 4, 2019 |
| iPass Acquisition Registration Statement | January 15, 2019 S-4A Registration Statement |
| Joinder | Defendant Dawson James Securities, Inc.'s Notice of Joinder in Motions to Dismiss (Dkt. No. 183) |
| Lead Plaintiff | Pareteum Shareholder Investor Group |

| Long-Term Incentive Compensation Plan | Pareteum's Long-Term Incentive Compensation Plan |
|---|---|
| McCarthy | Defendant Denis McCarthy |
| Moore | Lead Plaintiff member Keith Moore |
| O'Donnell | Defendant Edward "Ted" O'Donnell |
| Pareteum or the Company | Defendant Pareteum Corporation |
| Pareteum Br. | Memorandum of Law in Support of Pareteum Corporation's Motion to Dismiss the First Amended Consolidated Complaint (Dkt. No. 181) |
| PSLRA | Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) |
| Restatement or Restatement Release | October 21, 2019 restatement release issued by Pareteum |
| Rule 9(b) | Rule 9(b) of the Federal Rules of Civil Procedure |
| Rule 10(b)(5) | 17 C.F.R. § 240.10b-5 |
| Safe Harbor | PSLRA Safe Harbor, 15 U.S.C. § 78u-5(c)(1) |
| Secondary Offering | September 20, 2019 secondary offering of stock and warrants by Pareteum |
| Secondary Offering Filings | (a) November 30, 2018 Form S-3 Amended Registration Statement; (b) December 18, 2018 Prospectus; and (c) September 20, 2019 Supplemental Prospectus |
| Section 10(b) | Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) |
| Section 11 | Section 11 of the Securities Act, 15 U.S.C. § 77k |
| Section 12 | Section 12 of the Securities Act, 15 U.S.C. § 77l(a)(2) |
| Section 15 | Section 15 of the Securities Act, 15 U.S.C. § 77o |
| Section 20(a) | Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) |
| Securities Act | Securities Act of 1933 |
| SOX | Sarbanes-Oxley Act of 2002 |
| Squar Br. | Memorandum of Law by Defendant Squar Milner LLP in Support of its Motion to Dismiss the First Amended Consolidated Complaint (Dkt. No. 178) |
| Squar Milner | Defendant Auditor Squar Milner |
| Turner | Defendant Robert H. "Hal" Turner |
| Steffey | Lead Plaintiff member Nicholas Steffey |
| Viceroy Report | *Pareteum – The Wild West of Telecoms*, Viceroy Research Group (June 25, 2019) |
| Vodafone | Vodafone Enabler S.L. |
| Topic 606 | Financial Accounting Standards Board, Accounting Standards Update No. 2014-09, *Revenue from Contracts with Customers (Topic 606)* (May 2014) |

## **TABLE OF DEFENDANTS AND COUNTS**

| Defendant: | Relationship to Company During Class Period: | Counts Asserted: |
| --- | --- | --- |
| Pareteum | The Company | Count I - Section 10(b) and Rule 10b-5 |
| | | Count III - Section 11 (iPass Acquisition) |
| | | Count IV - Section 12 (iPass Acquisition) |
| | | Count VI - Section 11 (Secondary Offering) |
| Robert H. "Hal" Turner | Executive Chairman of the Board (11/17/15 - 11/25/19)<br><br>Principal Executive Officer (11/17/15 - 5/24/19)<br><br>CEO (5/24/19 - 11/25/19) | Count I - Section 10(b) and Rule 10b-5<br><br>Count II - Section 20(a)<br><br>Count III - Section 11 (iPass Acquisition)<br><br>Count V - Section 15 (iPass Acquisition)<br><br>Count VI - Section 11 (Secondary Offering)<br><br>Count VII - Section 15 (Secondary Offering) |
| Edward "Ted" O'Donnell | CFO (1/12/17 - 11/5/19) | Count I - 10(b) and Rule 10b-5<br><br>Count II - Section 20(a)<br><br>Count III - Section 11 (iPass Acquisition)<br><br>Count V - Section 15 (iPass Acquisition)<br><br>Count VI - Section 11 (Secondary Offering)<br><br>Count VII - Section 15 (Secondary Offering) |
| Victor Bozzo | CEO (10/31/16 -5/24/19)<br><br>CCO (5/24/19 - 6/9/20) | Count I - Section 10(b) and Rule 10b-5<br><br>Count II - Section 20(a)<br><br>Count III - Section 11 (iPass Acquisition)<br><br>Count V - Section 15 (iPass Acquisition)<br><br>Count VI - Section 11 (Secondary Offering)<br><br>Count VII - Section 15 (Secondary Offering) |
| Denis McCarthy | President (2/21/18 -5/24/19)<br><br>COO (5/24/19 - 10/9/19) | Count I - Section 10(b) and Rule 10b-5 |
| Dawson James Securities | Underwriter for Secondary Offering | Count VI - Section 11 (Secondary Offering) |
| Squar Milner | Independent auditor | Count VI - Section 11 (Secondary Offering) |

Lead Plaintiff respectfully submits this omnibus memorandum in opposition to the Motions to Dismiss the First Amended Consolidated Complaint (Dkt. No. 168; the "FAC") filed by Pareteum ("Pareteum Br."), the Exchange Act Defendants ("EAD Br."), and Squar Milner ("Squar Br."), and the Joinder filed by DJSI.[1]

## I.   PRELIMINARY STATEMENT FOR EXCHANGE ACT CLAIMS

After Defendant Turner took over in November 2015 as Executive Chairman of Pareteum Corporation ("Pareteum" or "Company") and ousted its former CEO, he packed management with Defendants Bozzo, O'Donnell, and McCarthy, who – along with Turner – all either had connections to an accused serial pump-and-dump mastermind named Barry Honig or (in the case of O'Donnell) their own history of fraudulently booking revenues exactly like the fraud at issue here. Together, they invented a non-GAAP interim metric (the "Backlog") for reported revenues, populated that Backlog with fabricated and embellished customers, and then, through a classic pump-and-dump style barrage of press releases, advanced a story of hyper-growth and success in signing customers to multi-year deals worth tens of millions of dollars in revenue, using as support falsely overstated and inflated quarterly reported revenues. Pareteum's stock soared 824% in just a few months. The Exchange Act Defendants then used that inflated stock as currency to acquire other companies to prop up their ongoing fraud, increase their own incentive compensation and trigger Turner's merger compensation, allow entities associated with the pump-and-dump mastermind to make millions, and raise capital to fund operations and pay their salaries.

After the truth was partially revealed by two independent analysts, the Exchange Act Defendants categorically denied everything – *twice* – and reassured investors with false financial results, all while quietly shuttering the press release machine and retiring the fabricated Backlog.

---

[1] Capitalized terms have the same meaning as in, and "¶ _" cites are to, the FAC.

Then, on October 21, 2019, barely one month after selling $40 million worth of stock and warrants into the market in a Secondary Offering, the full truth was finally revealed when Pareteum and the Exchange Act Defendants announced in the Restatement Release that they would have to restate every major financial report they had made in FY18 and 1H19 because they had "prematurely or inaccurately recognized revenue." The eventual Restatement (which is still not complete) was anticipated to result in at least a 28% reduction in reported revenues of $32.4M for FY18 and a 42% reduction in reported revenues of $57.1M for 1H19. ¶ 117.

Having conceded causation, Pareteum and the Exchange Act Defendants challenge only the falsity and scienter elements of the Section 10(b) claims, trying to explain away the well-pleaded facts by portraying themselves as honest executives who may have gotten a little too excited about their business's supposed success. But the Restatement Release concedes material falsity for many of the alleged misstatements. And the avalanche of well-pleaded scienter allegations includes the magnitude of the pending Restatement; Pareteum and the Exchange Act Defendants' sudden pivot away from the Backlog after getting caught; that most of the Exchange Act Defendants were summarily terminated or replaced; and the fact that this appears to be part of a well-worn pattern by all the Exchange Act Defendants.

Pareteum and the Exchange Act Defendants argue that Plaintiff seeks to have this Court look beyond the four corners of the FAC, to "178 [unpled] press releases," for false statements. Yet even a cursory review of the FAC demonstrates this is not correct. Plaintiffs have adequately pleaded representative materially false and misleading statements as required in this Circuit for five categories of statements: (1) Reported Revenue and Realized Revenue Growth Rates; (2) Revenue Recognition, GAAP Compliance, Internal Controls, and Financial Reporting; (3) Backlog; (4) the Credit Facility; and (5) Growth. Pareteum and the Exchange Act Defendants next

attack the messenger, arguing that Plaintiff relies "on innuendo and conclusory assertions from two self-serving short-seller reports" and dedicating much of their brief to quibbling with the FAC's well-pleaded allegations. But such arguments are fact disputes for another day and ignore that Plaintiff's investigator independently verified many of the detailed reports' findings. ¶ 74-75, 78-80, 83.

Incredibly, Pareteum and the Exchange Act Defendants argue that Plaintiff does not allege a single false or misleading statement. Pareteum Br. at 13 n.4, 18-22; EAD Br. at 2-7. This is too much. Pareteum and the Exchange Act Defendants issued the Restatement Release, admitting that they overstated six consecutive quarters of revenues. No semantic acrobatics can change that fact. For this reason alone, Plaintiff adequately alleges false and misleading statements regarding Reported Revenue and Realized Revenue Growth, Revenue Recognition, GAAP Compliance, Internal Controls, and Financial Reporting.

Pareteum and the Exchange Act Defendants also argue that "[a]ll, or nearly all, of these statements" were statements of opinion. Pareteum Br. at 10. But the statements are largely of historical or current fact, and/or based on objective, verifiable data and are therefore actionable. And even if any of their statements did constitute opinions, *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), which allows for liability even for certain opinions honestly held, does not shield these Defendants from liability here. The Motions to Dismiss the Exchange Act claims should be denied in full.

## II.   <u>LEGAL STANDARD ON A RULE 12(b)(6) MOTION TO DISMISS</u>

To survive a Rule 12(b)(6) motion to dismiss, a complaint must simply allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence corroborating the claims." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### III.    PLAINTIFF ADEQUATELY PLEADS SECTION 10(b) CLAIMS AGAINST PARETEUM AND THE EXCHANGE ACT DEFENDANTS

#### A.    THE ELEMENTS OF A SECTION 10(b) CLAIM

To state a claim under Section 10(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Iv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010). Section 10(b) claims must also satisfy Rule 9(b) and the particularity requirements of the PSLRA, 15 U.S.C. § 78u-4(b). *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 205 (S.D.N.Y. 2019). Pareteum and the Exchange Act Defendants only challenge the particularity of the FAC's allegations and elements (1) and (2) of a Section 10(b) claim (misrepresentation or omission, and scienter), conceding the remaining elements have been met.[2]

#### B.    PLAINTIFF ADEQUATELY ALLEGES A STRONG INFERENCE OF SCIENTER

##### 1.    Legal Standard

To plead scienter, a plaintiff must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court has held that a "strong inference" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Importantly, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the

---

[2]  *See Levine v. Lawrence*, No. 03 Civ. 1694, 2005 U.S. Dist. LEXIS 11663, at *14 (E.D.N.Y. June 15, 2005) ("[F]ailure to adequately brief an argument constitutes waiver of that argument" at motion to dismiss stage) (citing *Raniola v. Bratton*, 243 F.3d 610, 613 n.1 (2d Cir. 2001)).

'most plausible of competing inferences.'" *Id.* Rather, it need only be "at least as compelling" (in "equipoise") as any opposing inference. *Id.* Finally, "accept[ing] all factual allegations in the complaint as true," the Court must consider "whether ***all of the facts alleged, taken collectively***, give rise to a strong inference of scienter...." *Id.* at 322-23 (emphasis added).

Scienter is adequately pleaded by alleging either that defendants had motive and opportunity to commit fraud or that there is "circumstantial evidence of conscious misbehavior or recklessness." *Christine Asia Co. v. Yun Ma*, 16-2519, 2017 U.S. App. LEXIS 24647, at *6 (2d Cir. Dec. 5, 2017); *see also In re Am. Int'l Gp., Inc.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010) ("Plaintiffs can plead conscious misbehavior or recklessness by alleging defendants' knowledge of facts or access to information contradicting their public statements."); *In re Refco, Inc Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("[S]cienter may be found where there are 'specific allegations of various reasonably available facts, ***or 'red flags,***' that should have put the officers on notice' that the public statements were false.") (emphasis added).

## 2.     Plaintiff Adequately Alleges That the Exchange Act Defendants Had Motive and Opportunity to Commit Fraud

Plaintiff alleges Pareteum and the Exchange Act Defendants had motive to commit fraud insofar as they artificially inflated the price of Pareteum's stock by some 824% in order to: fund their acquisition of other entities; achieve options and/or stock awards pursuant to Pareteum's Long-Term Incentive Compensation Plan; and fund operations and pay their salaries. And of course, the Exchange Act Defendants' positions as "high-level corporate insiders" "gives rise to the presumption of an opportunity to commit fraud." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 36 (S.D.N.Y. 2019). Between May 2018 and May 2019, Pareteum and the Exchange Act Defendants issued more than 43 million shares (falsely) valued at more than $132 million as currency to acquire Artilium, iPass, and Devicescape to buoy their false

metrics with real revenue and prop up their ongoing scheme. ¶¶ 22, 27, 118. They even admitted that the purpose of these acquisitions was to acquire Backlog, connections, and revenue. ¶¶ 22, 118. These allegations provide persuasive evidence of motive. *See Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*, 05-7092, 2006 U.S. Dist. LEXIS 96035, at *11-12 (S.D.N.Y. May 3, 2006) ("jury could reasonably find that this motive alone--to keep the value of [company] stock high in order to use the stock to consummate corporate acquisitions--is enough…to satisfy scienter"); *Skiadas v. Acer Therapeutics Inc.,* 1:19-cv-6137, 2020 U.S. Dist. LEXIS 105814, at * 34-35 (S.D.N.Y. June 16, 2020) ("courts have found allegations of motive adequate where the company's [sic] needed to fundraise to survive").

Additional evidence of motive stems from the fact that Defendants Bozzo, O'Donnell, Turner, and McCarthy were all awarded options and/or stock during the Class Period pursuant to Pareteum's Long-Term Incentive Compensation Plan, which granted equity and equity-linked awards based on the achievement of targets, including acquisition-related activity, stock price appreciation, and relative stock price performance. ¶¶ 119-20. On June 6, 2018, Turner took advantage of the artificially inflated stock price and the not-yet-announced Artilium Acquisition to increase his compensation by amending his employment agreement to provide for the automatic vesting of his restricted stock awards and options immediately upon the Company simply entering into an agreement to acquire another company. ¶¶ 18, 119-20. Then, the next day, the Company announced the Artilium Acquisition – which it paid for using more than $100 million in artificially inflated stock, and as a result of which Turner's restricted stock awards and options instantly vested at Pareteum's artificially inflated stock price. ¶¶ 18, 120 (Turner's 2018 compensation *alone* was $5.2 million). These incentive packages and Turner's merger compensation – which were tied to the stock price – provided a motive to artificially inflate the stock price and to use that artificially

inflated stock as currency to make acquisitions to enrich the Exchange Act Defendants and thus support scienter. *See Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018) (finding motive and opportunity allegations "strong" where defendant company "depende[d] on sales of its stock to cover its operating losses").

During the Class Period, Pareteum and the Exchange Defendants used the inflated stock price to raise capital to fund operations and pay their salaries, providing still more evidence of motive. On May 9, 2018, they sold 2,440,000 shares at $2.50 per share, raking in $6,100,000 for "working capital and general corporate purposes." ¶ 18. On February 26, 2019, they entered into a $50 million Credit Facility from Post Road Group, which they then immediately defaulted on, but not before first drawing $25 million. ¶¶ 23, 37-38. Then, not long after the August 2019 "retirement" of the Backlog, Pareteum and the Exchange Act Defendants finally revealed that Pareteum had been in default of the Credit Facility essentially since it was signed, admitting to numerous breaches, several of which involved Pareteum's failure to pay interest and to provide financial information to Post Road Group, likely because it would have revealed the ongoing fraud. ¶ 37. For a company that touted a $1.27 billion Backlog, it was cash-strapped. As a condition to obtaining $2,500,000 in additional financing, Pareteum was forced to issue 750,000 shares of stock (worth ~$2.1 million) to Post Road Group, and, days later, on August 23, 2019, Pareteum announced that it would have to sell up to 1,311,439 additional shares to settle balances owed to vendors, again using its stock as currency. ¶ 38. Finally, on September 20, 2019, barely a month before the Restatement Release, Pareteum closed a $40 million Secondary Offering, again selling artificially inflated stock to raise cash. ¶¶ 39-40. These facts likewise allege a motive to inflate the Company's stock price. *See Shanawaz*, 348 F. Supp. 3d at 326 ("dependence on sales of its stock to cover…operating losses" contributed to inference of scienter); *Frater v. Hemispherx*

*Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (that company was short on cash "heighten[ed] its need for a lucrative stock sale" and contributed to scitner inference). In response to the well-pleaded allegations that Pareteum and the Exchange Defendants used the inflated stock price to raise capital to fund operations and pay their salaries, Pareteum barely lifts a finger to contest the allegations of motive, instead citing a handful of easily distinguishable cases that involve far weaker and less specific allegations of motive and/or a more tenuous connection between the alleged misstatements and the acquisition.[3]

### 3.    Plaintiff Adequately Alleges Circumstantial Evidence of Scienter

In addition to alleging motive and opportunity, Plaintiff alleges strong circumstantial evidence of scienter including: the pending Restatement of Pareteum's financials anticipated to result in a **28%** reduction in revenue for FY18 and a **42%** reduction in revenue for 1H19; the Exchange Act Defendants' connections to prior similar schemes in coordination with pump-and-dump schemer Honig and his related entities; Turner's invention of the non-GAAP compliant "Backlog" metric as part of the scheme to advance a phony story of hyper-growth; and Pareteum and the Exchange Act Defendants' forceful and categorical denials in the face of detailed reporting that customers and contracts were fabricated or embellished and could not generate tens of millions in revenue while continuing to represent the Backlog's growing value without any adjustment, despite then abandoning the Backlog metric as having "served its purpose."

The pending Restatement of financials that Pareteum and Exchange Act Defendants certified as correct just one month earlier is strong circumstantial evidence of scienter. Indeed,

---

[3] *See* Pareteum Br. at 18, citing *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) ("Plaintiffs failed to allege a connection between the [alleged fraud] and the acquisition" because "alleged misstatements began eight years before the acquisition and ended years afterward…."); *Id.*, citing *Coronel v. Quanta Capital Holdings Ltd.*, 07-CV-1405, 2009 U.S. Dist. LEXIS 6633, at *48 (S.D.N.Y. Jan. 26, 2009) (motive alleged was merely "the Company's desire to maintain an 'excellent' [financial] rating").

"accounting manipulations involving premature revenue recognition…are especially indicative of conscious misbehavior since such violations 'do not commonly occur inadvertently,' but instead 'suggest a conscious decision to improperly recognize revenue.'" *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006); *see also Okla. Firefighters*, 367 F. Supp. 3d at 38 ("suggests more than a careless mistake or trivial miscalculation"). Where "a company is forced to restate its previously issued financial statements…the mere fact that the company had to make a large correction is some evidence of scienter." *In re Veeco*, 235 F.R.D. at 232; *see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int. N.V.*, 89 F. Supp. 3d 602, 616 (S.D.N.Y. 2015) (strong inference where company restated financial results, having conceded GAAP violations regarding revenue recognition); *Varghese v. China Shenghuo Pharm. Holdings*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (scienter met where GAAP violations led to restatement); *In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (magnitude "provides some additional circumstantial evidence of scienter"); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (magnitude "renders less credible" argument that defendants did not act recklessly).[4]

The Exchange Act Defendants' concealment of their extensive past relationships and their request to strike materials about Honig from the prior complaint *on Honig's apparent behalf* (*see* Dkt. No. 143-1 at 51-53) are strong circumstantial inference of scienter. Pareteum and the other Exchange Act Defendants conducted the same kind of scheme at Pareteum as they did in previous ventures. ¶¶ 124-33. Within months of his appointment as Executive Chairman in November 2015,

---

[4] The admitted GAAP violations and lack of adequate internal controls are also indicative of scienter. *In re Avon Sec. Litig.*, 19-01420, 2019 U.S. Dist. LEXIS 200816, at *63 (S.D.N.Y. Nov. 18, 2019) ("facts…show a similarly cavalier attitude towards revenue recognition, thereby providing supplemental support for a strong inference of scienter"); *Orthofix*, 89 F. Supp. 3d at 618 ("GAAP regarding revenue recognition that were admittedly violated…are basic accounting principles" that can create inference of scienter); *id.* at 616 ("strong inference" where restatement conceded weaknesses in internal controls).

Turner ousted the interim CEO and packed management with Defendants Bozzo, O'Donnell, and McCarthy, all of whom thus became high-level corporate insiders directly involved in and responsible for Pareteum's day-to-day operations and public statements. ¶¶ 11, 117, 143-44. Just days before the Class Period began, entities affiliated with Honig purchased 13.2% of Pareteum's stock, and they sold that stock for millions in gains just before the fraud was revealed. ¶ 131. Throughout the Class Period, Pareteum regularly employed Honig's associated vendors, Defendant DJSI (Pareteum's placement agent and the underwriter for the Secondary Offering), Defendant Squar Milner (Pareteum's auditor), and Sichenzia Ross Ference Kesner LLP (Pareteum's outside counsel). ¶¶ 129-32.

Further evidencing scienter, Turner changed the way Pareteum reported its revenue by fabricating the "Backlog" metric, which Pareteum and the Exchange Act Defendants represented converted into "incremental monthly revenue" at or above 100%. ¶ 12. Using as support falsely overstated and inflated quarterly reported revenues – which they said grew *729%* during the Class Period – and interim Backlog values – which they said grew *535%*, from $200 million to $1.27 billion, during the Class Period – Pareteum and the Exchange Act Defendants advanced a story of hyper-growth and success in signing customers to multi-year deals worth tens of millions of dollars in revenue. ¶ 13.

Rather than come clean when two research reports (the Aurelius Report and Viceroy Report) publicly revealed that Pareteum and the Exchange Act Defendants had inflated revenues and Backlog by fabricating or embellishing customers and contracts and had not disclosed material facts about the Company's officers, directors, and investors (¶¶ 28-34), Pareteum and the Exchange Act Defendants doubled down, "categorically denied" these allegations – *twice* – reassuring investors that they were "dedicated to upholding the highest standards and reporting

requirements of a public company," and buoyed the stock price by pre-announcing on a "one-time basis given the compelling quarter" 2Q19 results and representing that they would "exceed current analysts' consensus of $26.2 million for revenue," all of which would later prove to be false. ¶¶ 31, 35. These denials in the face of contrary evidence further constitute strong circumstantial evidence of scienter. *See In re ArthroCare Corp. Secs. Litig.*, 726 F. Supp. 2d 696, 712, 717-18 (W.D. Tex. 2010) (finding "compelling inference of scienter" where defendants "continued to reassure investors the reports were lies, rumor-mongering, and propaganda by short sellers"); *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359 (S.D. Fla. 2005) (scienter where defendant "flatly rejected [article's allegations] as 'malicious comments' and 'misstatements, mischaracterizations, and distortions,'" because "[t]he fact that [defendant] issued a denial indicates that he was either familiar with the facts or reckless in denying the allegations without sufficient knowledge of the situation"). Making those denials worse, while they categorically denied the allegations and continued to represent the Backlog's growing value without adjustment, at the same time they shut down the Company's press release machine and "retir[ed]" the Backlog, stating that "it is our reported quarterly results and the annual guidance provided, which are the strongest indicators." ¶¶ 135-36. Around the same time, Pareteum also gave an Investor Day presentation that identified purported Pareteum customers that was replete with double counting and related and/or non-existent customers, including subsidiaries of Pareteum, which strongly suggests that the Exchange Act Defendants were aware that they did not have enough legitimate customers to fill a single slide. *See* ¶139.[5] The Exchange Act Defendants' scrubbing of their Investor Day Presentation slides also supports a compelling inference of knowledge (¶139), and Pareteum's answer to that allegation – that Plaintiff "makes no allegations about the Exchange Act

---

[5] After the Aurelius Report, Pareteum modified these slide decks. ¶ 139.

Defendants' participation in the creation of the slide" (Pareteum Br. at 31 n.7) – is belied by the fact that all Exchange Act Defendants were high-level corporate insiders directly involved in Pareteum's day-to-day operations – and, surely, its invitation-only Investor Day Presentation. ¶¶ 143-44.

Finally, McCarthy, O'Donnell, and Turner were all either terminated or replaced in the days preceding and following the Restatement Release, again evincing scienter. ¶123. *Celestica, Inc.*, 455 F. App'x at 14 n.3; *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017); *Orthofix*, 89 F. Supp. 3d at 619.

*        *        *

Considering all of Plaintiff's scienter allegations holistically, "a reasonable person would deem an inference of scienter…'at least as compelling as any opposing inference one could draw from the facts alleged.'" *Orthofix*, 89 F. Supp. 3d at 614. The only competing inference proffered by Pareteum and the Exchange Act Defendants is an effort, without supporting facts, to portray themselves as honest executives who "were publicizing exciting corporate developments in real time because this was the most direct and cost-efficient way of getting publicity." Pareteum Br. at 10. Accordingly, Pareteum and the Exchange Act Defendants would have this Court believe their Class Period statements were merely an "earnest attempt to advance the interests of a fast-growing company and its shareholders." *Id.* The magnitude of the pending Restatement – almost half of 1H19 reported revenues – undoes this innocent explanation. So too do the facts that most of the Exchange Act Defendants were fired or replaced as a result of their actions and that this sort of wrongdoing just seems to keep happening to them.

In response to Plaintiff's well-plead allegations that they knew or should have known that their statements regarding the new customers and contracts announced in the September and

October 2018 press releases were false when made, Pareteum and the Exchange Act Defendants also advance a wholly speculative counter-narrative. Specifically, Pareteum speculates that "2018 accounts receivable could rise (owing to a customer not paying on a contract that was signed before 2018) while Backlog conversion for the same year could be 100%." Pareteum Br. at 33 n.8. There is no factual basis for this speculation. The Restatement Release contradicts it, as do the facts that Pareteum's "Days Sales Outstanding" only reached 110 days (not a year or more) (¶ 96 n.6) and accounts receivables indisputably ballooned *four times* faster than Backlog. ¶¶ 95, 141.[6] Plaintiff has alleged facts indicating that Pareteum and the Exchange Act Defendants had actual knowledge of the fabricated and embellished nature of the Backlog, including that some of the officers of one of the fabricated or embellished customers allegedly perpetrated the AudioEye fraud with O'Donnell and others are connected to a Pareteum consultant. ¶ 138; *see also* ¶¶ 135-41. Likewise, the sheer magnitude of some of the embellished customers and contracts – like the $50 million Thai contract that would have been orders of magnitude larger than Pareteum's largest customer – supports a strong inference of scienter and are so obvious that Pareteum and the Exchange Act Defendants must have known. ¶84.

These baseless counter-narratives ignore the avalanche of detailed strong indicia of scienter discussed above. And, as Judge Rakoff very recently noted, "this alternative explanation merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage and is therefore not enough to defeat this inference of scienter." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 20-2031 (JSR) 2020 U.S. Dist. LEXIS 140925, at *31 (S.D.N.Y. Aug. 6, 2020). Plaintiffs have met their burden under *Tellabs*. *See also City of Warren*, 2020 U.S. Dist. LEXIS 140925, at *31 ("this alternative explanation merely raises a factual dispute that the Court

---

[6] In any event, courts in this Circuit have concluded that a determination of how inventory affects revenue growth is a factual inquiry inappropriate at the pleading stage. *See Okla. Firefighters*, 367 F. Supp. 3d at 31.

must resolve in plaintiff's favor at this stage and is therefore not enough to defeat this inference of scienter.").

### 4.    Pareteum and the Exchange Act Defendants' Remaining Scienter Arguments Fail

Pareteum and the Exchange Act Defendants' remaining factual defenses do nothing to overcome the well-pleaded allegations of scienter. For example, neither Pareteum nor the Exchange Act Defendants attempt to address the incriminating allegations of past wrongdoing, concealed connections, or the scheme itself. Pareteum argues that these concealed relationships were not material and were public information "available to anyone with an internet connection." Pareteum Br. at 30. But the FAC does not allege these concealed relationships as material misstatements, but rather as evidence of scienter. Their concealment supports scienter.

The argument that none of the Exchange Act Defendants "'dumped' *any stock at all* during the class period" likewise falls flat. Pareteum Br. at 10 (emphasis in original); *see also* EAD Br. at 8. Setting aside the millions in compensation and Turner's Artilium Acquisition cash-in, the obvious answer is that *they got caught* before they could dump their stock. Right after the Honig-related entities cashed out, the Aurelius and Viceroy Reports were published, after which the press release machine ground to a halt and the Backlog was "retired." "[T]he absence of stock trading profit does not establish the absence of a scheme to profit through insider trading. It only establishes the absence of a successful scheme." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 15 (D. Mass. 2004); *see also In re Valeant Pharms. Int. Inc. Sec. Litig.*, No. 15-7658, 2017 U.S. Dist. LEXIS 66037, at *34 (D.N.J. Apr. 28, 2017) ("Because it is plausible that the Exchange Act Defendants were caught before they had a chance to sell their shares, the mere fact that the Exchange Act Defendants did not sell their shares is insufficient to render Plaintiffs' allegations deficient.").

Pareteum and the Exchange Act Defendants also argue that their categorical denials of the Aurelius and Viceroy Reports and the fact that the Backlog was retired are inadmissible at trial to prove scienter under FED. R. EVID. 407. Pareteum Br. at 29. Even assuming this defense were to succeed at trial with this argument, this is a fight for another day, as allegations in a complaint need not be admissible at trial to support the denial of a motion to dismiss. *See City of Warren*, 2020 U.S. Dist. LEXIS 140925, at *20-21 ("[T]he Court is unmoved by defendants' protestations that plaintiff's allegations are based on hearsay…").[7]

In response to the well-pleaded allegations regarding the pending Restatement itself, Pareteum argues that "there is no case law supporting a conclusion that anything near a 42% reduction in reported revenue supports an inference of scienter," arguing that write-downs must exceed 75% of revenues to be relevant. Pareteum Br. at 28. But the cases it cites do not support the proposition that there is some bright line minimum percentage that must be alleged for a restatement to support an inference of scienter.[8] Rather, numerous cases have found support for an inference of scienter – combined with other factors – where the amount of the restatement was on par with, or smaller than, that at issue in this case. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ($24 million in charges undermined argument that defendants were

---

[7] Pareteum relies solely on a Seventh Circuit case, *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007), that does not stand for this proposition. There, the Seventh Circuit discounted allegations of anonymous informants with respect to its scienter analysis, reasoning "that anonymity conceals information that is essential to the sort of comparative evaluation required by *Tellabs*." *Id.* at 757. Notwithstanding the fact that the subject allegations are not predicated on anonymous informants, the Second Circuit has not considered whether Rule 407 applies at the pleading stage in securities cases, and courts in this District regularly consider allegations of remedial activity at the pleading stage. *See, e.g.*, *Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 542, 55 (S.D.N.Y. 2017) (considering "remedial measures to improve accounting and internal controls"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 583 (S.D.N.Y. 2014) (remediation of quality control processes relevant to scienter).

[8] *See Okla. Firefighters*, 367 F. Supp. 3d at 16; *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001). And in *In re Iconix Brand Group, Inc.*, the court did not, as Pareteum implies, find a lack of scienter because the magnitude of the restatement (41%) was too low; rather, the court properly held that "GAAP violations alone are not sufficient to show intent regardless of the number or magnitude of the violations." 15 Civ. 4860, 2019 U.S. Dist. LEXIS 171591, at * 35-46 (S.D.N.Y. Oct. 25, 2017). Here, conversely, the magnitude of Pareteum's Restatement is one of Plaintiff's numerous compelling indicia supporting a strong inference of scienter.

unaware of related returns and supported an inference of scienter); *Orthofix*, 89 F. Supp. 3d at 619

(net income restatements of 17% and 22% indicative of scienter).[9]

Pareteum also argues that "many of the supposed ill-gotten incentive awards were not

exercisable at all during the class period" and that the exercise price for some was "less than the

$2.54 price of Pareteum stock the day PSIG alleges Pareteum made a misstatement related to their

2018 Q1 revenue." Pareteum Br. at 25. Some of the options did indeed vest during the Class Period

(*see, e.g.,* ¶119, chart, notes (1) and (2)), and Turner specifically amended his employment

agreement to provide for the automatic vesting of his options upon the announcement of the

Artilium Acquisition, which likewise occurred during the Class Period. *Id.* at note (3); ¶120.

Finally, the exercise price of the options in relation to the Company's stock price on a random date

on which one of the Exchange Act Defendants' many false statements were made is irrelevant; the

bottom line is that, the higher the stock price, the more the options are worth.

Pareteum also argues that the core operations doctrine "has been cast into doubt." Pareteum

Br. at 34. While some courts "have 'expressed doubts as to the doctrine's continuing import,'" the

Second Circuit has held "that the doctrine can provide supplemental support for allegations of

scienter." *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.,* 422 F.

Supp. 3d 821, 852 (S.D.N.Y. 2019); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua

Water Techs. Corp.*, No. 18-10320, 2020 U.S. Dist. LEXIS 55410, at *94-96 (S.D.N.Y. Mar. 30,

2020) (adopting approach); *In re Supercom, Inc. Sec. Litig*, No. 15-9650, 2018 U.S. Dist. LEXIS

175467 (S.D.N.Y. Oct. 10, 2018) (same).

---

[9] Pareteum and the Exchange Act Defendants also argue, oddly, that their belated March 2019 disclosure of internal control weaknesses demonstrates a *lack* of scienter because they show that they were not "trying to hide anything from investors." Pareteum Br. at 27. But courts within this Circuit have held that a "failure to maintain sufficient internal controls to avoid fraud is…indicative of scienter…." *In re Veeco*, 235 F.R.D. at 232 (citing *In re Oxford Health Plans, Inc. Sec. Litig.,* 51 F.Supp.2d 290, 294 (S.D.N.Y. 1999)).

Pareteum further complains that Plaintiff improperly utilizes "group pleading." Pareteum Br. at 36-37. But the Second Circuit specifically allows a plaintiff to rely on the doctrine's "presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Lehman Bros. Sec. & ERISA Litig.*, 09-2017, 2011 U.S. Dist. LEXIS 82119, at *45 n.106 (S.D.N.Y. 2011); *In re Veeco*, 235 F.R.D. at 232-33 ("Defendants' argument that [the group pleading] doctrine is no longer good law in light of the PSLRA has been considered and rejected by this court."). And Plaintiff adequately alleges scienter as to *each* of the Exchange Act Defendants anyway. ¶¶ 7, 11-12, 18, 31-35, 42-48, 119-20, 123, 125-31 (as Executive Chairman and CEO, Turner appointed his former accomplices to his management team as the Honig-related entities invested and fabricated the Backlog metric); ¶¶ 8, 29, 48, 79, 119, 123, 127, 138 (as CFO, O'Donnell perpetrated the AudioEye fraud with officers of one of the inflated customers noted above); ¶¶ 9, 45, 48, 77, 119 (as CCO, Bozzo was quoted making false statements); ¶¶ 10, 24, 45-46, 91, 102, 110-11, 119, 123, 145 (as President and COO, McCarthy maintained the Backlog spreadsheets and analysis and was quoted making false statements).

Finally, Pareteum argues Plaintiff's allegations amount to nothing more than "fraud by hindsight." Pareteum Br. at 37. But Plaintiff cites compelling indicia to support a strong inference that the Exchange Act Defendants knew of, recklessly disregarded, or should have known of their statements' falsity at the time those statements were made. And the Second Circuit allows a plaintiff to "rel[y] on *post-class period* [developments] to confirm what a defendant should have known during the class period." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 183-84 (S.D.N.Y. May 10, 2010); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158,

181 (S.D.N.Y. 2003) (post-class period articles used to establish awareness of falsity of class period statements; opposite result would "reward [defendants] for their successful concealment").

Pareteum and the Exchange Act Defendants' arguments fail. Plaintiff has amply pleaded scienter.

### 5.      Corporate Scienter Is Adequately Alleged

Finally, "scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *Patel v. L-3 Communs. Holdings, Inc.*, 14-CV-6038, 2016 U.S. Dist. LEXIS 42978, at *46-47 (S.D.N.Y. Mar. 30, 2016). A plaintiff can allege corporate scienter without doing so with regard to a specific individual defendant, so long as "the pleaded facts [] create a strong inference that *someone* whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (emphasis added). Plaintiff alleges ample facts to support a strong inference of Pareteum's corporate scienter through the conduct of the Exchange Act Defendants.

### C.      PLAINTIFF ADEQUATELY ALLEGES MATERIALLY FALSE AND MISLEADING STATEMENTS

### 1.      Relevant Standard

"'The test for whether a statement is materially misleading under Section 10(b)' is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016). "While Rule 9(b) and the PSLRA require a plaintiff to allege fraud with particularity, they in no way dispose of the traditional rule that, at the motion to dismiss stage, the Court accepts as true the complaint's well-pleaded allegations of fact and draws all reasonable inferences in plaintiff's favor, and is prohibited from engaging in any fact finding of its own." *City of Warren*, 2020 U.S. Dist. LEXIS 140925, at *10-11.

18

Despite Defendants' puzzle pleading argument to the contrary, the FAC does not "incorporate[] by reference" 178 press releases; rather, the FAC alleges with specificity representative materially false and misleading statements regarding: (1) Reported Revenue and Realized Revenue Growth Rates (¶¶ 42-51; addressed *infra* §III.C.2); (2) Revenue Recognition, GAAP Compliance, Internal Controls, and Financial Reporting (¶¶ 52-68; addressed *infra* §III.C.2); (3) Backlog (¶¶ 69-97; addressed *infra* §III.C.3); (4) the Credit Facility (¶¶ 98-103; addressed *infra* §III.C.4); and (5) Growth (¶¶ 104-116; addressed *infra* §III.C.5).[10] These allegations satisfy Rule 9(b) and the PSLRA.

### 2. Materially False and Misleading Statements Regarding Reported Revenue and Realized Revenue Growth Rates, Revenue Recognition, GAAP Compliance, Internal Controls, and Financial Reporting

Plaintiff adequately alleges that Pareteum and the Exchange Act Defendants' statements regarding FY18 and 1H19 revenue were materially false and misleading when made. Specifically, Plaintiff alleges that they represented revenue as follows:

| Quarter: | Revenue: | Year-Over-Year Increase: |
| --- | --- | --- |
| 1Q18 (¶ 42) | $4.1 million | 47% |
| 2Q18 (¶ 43) | $6 million | 85% |
| 3Q18 (¶ 44) | $8 million | 129% |
| 4Q18 (¶ 45) | $14.3 million | 256% |
| FY18 (¶ 45) | $32.4 million | 139% |
| 1Q19 (¶ 46) | $23 million | 460% |
| 2Q19 (¶ 47) | $34 million | 469% |

Plaintiff alleges that all four Exchange Act Defendants either signed and certified these false statements or were quoted repeating them. ¶¶ 45-46, 48.

Plaintiff also adequately alleges that Pareteum, Turner, O'Donnell, and/or Bozzo: falsely represented that the Company adopted and complied with the appropriate revenue recognition

---

[10] This is what the Second Circuit contemplates. *See In re Vivendi*, 838 F. 3d at 242 n.11 (PSLRA does not confine plaintiffs to misstatement identified in their complaint, which need only contain representative misstatements).

procedures (¶¶ 52-55); falsely represented that Pareteum's financial statements were prepared in accordance with GAAP and that it had adequate controls and procedures (¶¶ 56-60); and falsely reassured investors that, despite material weaknesses that management had discovered, investors could still rely on Pareteum's financial reporting. ¶¶ 61-68.

Plaintiff further alleges that the Restatement Release confirmed these statements to be materially false when it disclosed that the Company would have to restate its financial statements for all six of these periods because "revenues recognized during [these periods] should not have been recorded during that period…[and, for] certain customer transactions, the Company may have prematurely or inaccurately recognized revenue." ¶¶ 40, 49, 55, 58, 60, 68. Pareteum and the Exchange Act Defendants estimated the Restatement to result in a $9 million, 28% reduction in the reported revenues for FY18 and a $24 million, 42% reduction in the reported revenues for 1Q19 and 2Q19. *Id.* The anticipated Restatement further demonstrates that the statements were materially false when made. *In re Interpool, Inc. Sec. Litig.*, No. 04-321, 2005 U.S. Dist. LEXIS 18112, at *15 (D.N.J. Aug. 16, 2005) (restatement occurs when company's previously-issued financial statements were materially false *as of the time of issuance* and the misstatements were based on "facts that existed at the time the financial statements were prepared"); *see also In re Veeco*, 235 F.R.D. at 234 ("previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued").

These allegations are sufficient to state a Section 10(b) claim as to the statements regarding Reported Revenue and Realized Revenue Growth. *See Fresno Cty. Emples.*, 268 F. Supp. 3d at 544 (admission that company must restate financial statements means "there can be no dispute that [complaint] pleads numerous false and misleading misstatements with respect to revenue, [and] revenue related metrics"); *SEC v. Espuelas*, 908 F. Supp. 2d 402, 410 n.5 (S.D.N.Y. 2012) ("mere

fact that financial results were restated is sufficient basis for pleading that those statements were false when made"); *Varghese*, 672 F. Supp. 2d at 606 ("Misreported financial information clearly amounts to a false statement."). So too are they sufficient to state a Section 10(b) claim as to the statements regarding revenue recognition, GAAP compliance, internal controls, and financial reporting. *DoubleLine*, 413 F. Supp. 3d at 207 ("where financial statements are not prepared in compliance with GAAP, they are presumed to be misleading"); *In re Gentiva Securities Litig.*, 932 F. Supp. 2d 352, 369 (E.D.N.Y. 2013) ("Courts often find material misstatements where [as here] defendants claim to be compliant with standards promulgated by themselves or regulatory agencies."); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 1:16-cv-3591, 2020 U.S. Dist. LEXIS 66016, at *36-37 (S.D.N.Y. Apr. 14, 2020) ("Defendants' SOX certifications are plausibly alleged to have been false or misleading" where internal controls to which they attested were alleged to have been inadequate.).

As to statements regarding Reported Revenues and Realized Revenue Growth pleaded in ¶¶ 42-51 and the statements regarding Revenue Recognition, GAAP Compliance, Internal Controls, and Financial Reporting (¶¶ 52-68), Pareteum and the Exchange Act Defendants argue only they are statements of opinion that are not actionable, but make no other arguments as to falsity. Pareteum Br. at 18-22; EAD Br. at 3-7.[11]

Incredibly, in its section addressing false statements regarding Backlog, Pareteum argues that Plaintiff "identifies no statement in which Pareteum announced it was recognizing revenue that it knew should not have been recognized" and that "[t]he Restatement [Release] did not reveal that any revenue announced in the press releases was artificially inflated." Pareteum Br. at 18-19.

---

[11] Paragraphs 42-51 and ¶¶ 52-68 regarding statements on Reported Revenue and Realized Growth are never cited in Pareteum's section challenging falsity. Pareteum Br. at 18-22. The Exchange Act Defendants' opinion arguments are addressed *infra* §III.C.6.

Pareteum cites nothing in support of this position. *Id.* Instead, failing to update its motion from the last round of briefing, it addresses historical statements of Reported Revenue and Realized Revenue Growth as if they are no different from "'countless' press releases addressing future expected revenues as quantified by the backlog and connections metrics." Pareteum Br. at 18. But the Restatement Release acknowledged that Pareteum "recogniz[ed] revenue that it knew should not have been recognized" (Pareteum Br. at 18), admitting: "certain revenues recognized during 2018 and 2019 should not have been recorded" because the Company "prematurely or inaccurately recognized revenue." ¶¶ 40, 49. Simply put, Pareteum admits: "the Restatement [Release]…shows that Pareteum did not correctly recognize revenue received in 2018 and the first half of 2019." Pareteum Br. at 19. There is simply no getting around Pareteum's own admissions.

Also in its section addressing false statements regarding Backlog, Pareteum seeks to explain away the pending Restatement with a hypothetical, arguing that all of the pending to-be-restated revenue might perhaps be attributable to a single statement – the press release announcing that the Artilium Acquisition would add $65 million to the *Backlog*. Pareteum Br. at 19-20. In the face of the FAC's well-pleaded allegations, this baseless hypothetical should be rejected under *Twombly*, 550 U.S. at 570; *see also City of Warren*, 2020 U.S. Dist. LEXIS 140925, at *20-21 ("[T]he Court must accept as true the complaint's well-pleaded allegations, without regard to defendants' competing accounts."); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 128 (S.D.N.Y. 2014) ("[A]t the motion to dismiss stage, the Court must view the facts in the light most favorable to the non-moving party and cannot blindly accept Defendant's hypothetical.").[12]

---

[12] It also ignores the alleged statements in which Pareteum represented its Reported Revenue and Realized Revenue Growth figures in ¶¶ 42-47. It is those statements – which reported the historical revenue that Pareteum was alleged, at the time, to have recognized  –  that would be rendered false if Pareteum had in fact prematurely or inaccurately

The FAC adequately alleges that: Pareteum reported $32,435,736 in revenues in FY18 and $57,188,309 in revenues in FH19 (¶ 42-47) and claimed that its financial reporting was adequate and complied with recognized standards (¶¶ 52, 56-66); and Pareteum admitted that it overstated those exact Reported Revenues and that those overstatements would result in 28% and 42% reductions in FY18 and 1H19 reported revenues, respectively. ¶¶ 40, 49, 55, 60, 68. For this reason alone, Plaintiff adequately alleges false and misleading statements regarding Reported Revenue and Realized Revenue Growth, Revenue Recognition, GAAP Compliance, Internal Controls, and Financial Reporting.

### 3.    False and Misleading Statements Regarding Backlog

#### a.    Statements Regarding Backlog Value

For the vast majority of the Class Period, Pareteum and the Exchange Act Defendants did not identify new customers and contracts that underpinned the growing Backlog value – which they represented grew from $200 million in 1Q18 to $1.27 billion in 2Q19. ¶ 71. However, in September and October 2018, they issued five releases announcing $134 million in new contracts in which they identified for the first time some of the alleged new customers and contracts announced in these releases. ¶71. Plaintiff adequately alleges that most of the new customers and contracts identified in these releases were incapable of generating the millions in revenues claimed, rendering the statements regarding these customers and contracts and the $134 million value that they purportedly added to the Backlog materially false and misleading. *See* ¶¶ 72-85.

For example, in an October 8, 2018 press release, Pareteum "announced a $50 million contract with One Development, Thailand's first mobile virtual network aggregator and enabler." ¶ 81. One Development was incapable of generating the $50 million in revenues claimed. ¶ 82.

---

recognized the revenue from the Artilium Acquisition, not the June 7, 2018 release announcing that Acquisition and its Backlog value.

Pareteum's single largest customer (Vodafone) generated $7.15 million of Pareteum's reported revenues during 1H19. ¶ 84. The $50 million One Development contract would have been several orders of magnitude larger than that of Vodafone, which had 640 million mobile customers – ten times more customers than there are people in Thailand. ¶ 84. One Development was licensed in July 2018, had seven employees, total assets of less than $300,000.00, and reported no revenue and a net loss in 2018. ¶¶ 83-84. The same story plays out with the $84 million in additional alleged customers and contracts announced in the other September and October 2018 press releases. ¶¶ 72-76 (September 17 release); ¶¶ 77-80 (October 2 release); ¶ 85 (October 17 and 23 releases).

Between the fifth and final October 23, 2018 press release that identified some new customers and contracts and the end of the Class Period, Pareteum and Turner continued to represent that the Backlog continued to grow, from $500 million on October 24, 2018 to $1.270 billion on August 6, 2019. ¶ 86. These statements incorporated the $134 million value of the fabricated customers and contracts announced in the September and October 2018 releases and were also materially false and misleading. ¶ 87. Pareteum and the Exchange Act Defendants admit as much. While they regularly identified the fabricated Backlog metric as one of the Company's two "key performance indicators" and "lead indicators of revenue," after being caught, they "retired" this metric and admitted that it was not reliable. ¶¶ 97, 115, 122, 133, 136, 141.

As to the Backlog value, the FAC identifies five press releases in September and October 2018 announcing Backlog additions as materially false and misleading and four specific statements that falsely represented that the Backlog continued to grow, from $500 million on October 24, 2018 to $1.270 billion, based on the incorporation of the $134 million value of the fabricated customers and contracts announced in the five September and October 2018 releases. It is those representative statements that are at issue. *Supra* n.10. In response, Pareteum appears to have failed

to update its prior brief, erroneously claiming that Plaintiff "alleges that the [Restatement Release] revealed the falsity of some subset of 178 press releases, six SEC filings, and two Registration Statements." Pareteum Br. at 18; *see also id.* at 18-19 n.5 (arguing that Plaintiff "claims that *all* press releases that followed the September and October 2018 releases" were false and misleading).

Pareteum also contends that the Restatement Release did not prove the falsity of its statements regarding Backlog value, arguing: that the Restatement Release and the Backlog have nothing to do with each other because the Backlog was a metric of "*future expected revenues*" and that "the purported [Restatement Release] revelation of the financial fraud ($33 million total) was orders of magnitude less than the [Backlog] value of contracts announced in the 178 press releases (over $500 million)." Pareteum Br. at 18-19. But Backlog was not a forward-looking metric. *Infra* §§III.C.6, III.C.8; *see, e.g.*, ¶ 69 ("revenue under contract"). And the falsity of the Backlog value is further demonstrated by Plaintiff's detailed allegations regarding the made-up customers and contracts announced in the September and October 2018 press releases (¶¶ 72-85) and that, if the Backlog was really converting to revenues at or above 100% as Pareteum claimed, and Pareteum's revenues were overstated by as much as 42% in 1H19 as the Restatement Release concedes, then the Backlog likewise had to be overstated. ¶ 87. The FAC also adequately alleges that as the Backlog grew exponentially, reported revenue barely increased, and accounts receivable grew orders of magnitude faster, suggesting that the Backlog was inflated and not converting as represented. ¶ 94-95. Pareteum has no answer for these allegations.

### b.  Statements Regarding Backlog Conversion

Plaintiff adequately alleges that Pareteum and the Exchange Act Defendants' statements regarding the Backlog conversion rate were materially false and misleading when made because it was not true that the Company was converting Backlog to revenue at or above 100% and Backlog conversion was thus not a "key performance indicator." ¶¶ 89-92. For example, if the $1.27 billion

Backlog had been converting to "incremental monthly revenue" at or above 100%, then it should have translated to proportionate increases in revenue during the same period. *See* ¶¶ 69, 90 ("As we convert…Backlog to Connections, *our revenue will increase*"); 91 (Backlog "converted into live production *incremental monthly revenue*…at…an average over 100% for the year"); 94. It did not. Rather, Pareteum reported revenues of $32,435,736 for FY18 and $57,188,309 for 1H19, of which the Restatement Release revealed that at least $9M was overstated for FY18 and at least $24M was overstated for 1H19 – hardly the 100% or more Backlog conversion Pareteum had claimed. ¶ 94.

Further, if Backlog had been converting at or above 100%, Pareteum's accounts receivable should have also remained constant. ¶ 95. They did not. Rather, they ballooned 2,300%. ¶ 95. By contrast, revenues increased 287% and Backlog increased 535%. ¶ 95; *see also* ¶ 29 (analysis of accounts receivable shows grown "far faster than revenues") and ¶ 96 (accounts receivables "almost tripled" over past six months). The FAC adequately alleges the Backlog was not converting as represented. Indeed, the Aurelius Report specifically concluded that Pareteum was not, in fact, converting its Backlog to revenue at or near 100%, and the Viceroy Report's analysis demonstrated that Pareteum "should have reported 73.10% more revenue in [1Q19]" if Backlog was converting at or above 100%. ¶96; *see also id.* (other commentators). Finally, when they "retired" the Backlog, Pareteum and the Exchange Act Defendants admitted that Backlog conversion had not been a reliable "key performance indicator." ¶ 97.

In an apparent attempt to divorce the false statements (which Pareteum (wrongly) claims only occurred in 2018) from what Pareteum (erroneously) claims to have been the only proof of falsity (mid-2019 articles analyzing 1Q19 results), Pareteum first argues that "all four statements concerning 100% backlog conversion [were] only made in press releases issued between May

2018 and May 2019" and "exclusively appl[ied] to Q4 2017 and 2018 results" and that "no representations about 100% conversion have ever been asserted with relation to contracts procured before or after Q4 2017 and 2018." Pareteum Br. at 20-21. Again, Pareteum ignores the well-pleaded allegations. The first Backlog conversion statement alleged, which Pareteum argues addresses "Q4 2017 backlog" (Pareteum Br. at 20 n.5), *actually* addresses 1Q18 Backlog conversion rates; and the last Backlog conversion statement alleged *actually* addresses 1Q19 results and Backlog conversion rates. ¶¶ 89, 92; *see also* ¶¶ 90-91 (addressing 2Q18 and 4Q18 and FY18 Backlog conversion rates). What's more, the *entirety* of 2018 falls within the Class Period. ¶ 1. At any rate, commentators noted trends suggesting the falsity of the Backlog conversion rate starting in 2018. ¶¶ 92, 96. The FAC also alleges trends in reported revenue and accounts receivables that began in 2018 (¶¶ 94-95), supporting these trends with the articles that first identified them (¶96).

Pareteum accuses Plaintiff of "grossly simplifying the revenue structure," citing a snippet from Turner from the 1Q19 earnings call that "we expect 15%" of contract revenue in year one "increasing to 30% and then 55% each successive year of the 36-month contracts." Pareteum Br. at 21. Even without the benefit of discovery, Plaintiff could counter that if Pareteum's Backlog had, in fact, been converting at or above 100%, then according to Pareteum's proffered revenue structure, it should have realized at least 15% of the $500 million in purported Backlog announced on October 24, 2018 – $75 million in revenue – in year one of those contracts; yet it didn't even come close. But *Twombly* does not require this. *See also Skiadas*, 2020 U.S. Dist. LEXIS 105814, at *26-27 ("At the motion to dismiss stage of a securities fraud action 'the court reads ambiguities' in challenged statements 'in [the plaintiff's] favor.'"); *Okla. Firefighters*, 367

F. Supp. 3d at 31 (determination of how inventory affects revenue growth factual inquiry inappropriate at pleading stage).[13]

Pareteum also argues that Plaintiff erroneously assumes "that the [B]acklog in 2018 was the only source of revenue reflected" and speculates that perhaps other, pre-Class Period contracts (from 2016 or 2017) were not converting, noting it "did not attribute the overstatement to an inflated conversion rate or to any erroneous backlog metric." Pareteum Br. at 21. This hypothetical directly contradicts the well-pleaded allegations in the FAC, which alleges that: Pareteum's "Days Sales Outstanding" only reached 110 days (not a year or more) (¶ 96 n.6), meaning that unpaid bills all accrued in the preceding 4 months, not years; and accounts receivables ballooned four times faster than Backlog. *See Okla. Firefighters*, 367 F. Supp. 3d at 31 (determination of how inventory affects revenue growth a factual inquiry inappropriate at pleading stage).

### 4.     False and Misleading Statements Regarding the Credit Facility

Plaintiff adequately alleges that: Pareteum and the Exchange Act Defendants took advantage of the artificial inflation in Pareteum's stock to secure a $50 million Credit Facility; Pareteum and Turner represented that the entire Credit Facility remained available to Pareteum to fund growth; and those statements were materially false because the Company could not access any additional funds because it was about to or had already defaulted on the Credit Facility. ¶¶ 98-103. In response, Pareteum argues that it disclosed that it could not access additional funds if it defaulted by failing to provide the requisite consents. Pareteum Br. at 22. But Pareteum did not disclose that it had already defaulted, both because it failed to deliver those consents and for the

---

[13] *See also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003, at *28 (9th Cir. Aug. 13, 2018) ("it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well pleaded complaint"). Indeed, "[i]f defendants are permitted to present their own version of the facts at the pleading stage – and district courts accept those facts as uncontroverted and true – it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Id.* at *999.

independent reason that it had failed to provide the requisite financials and to pay interest from the very beginning. ¶ 103. That failure rendered its statements false.

Pareteum also argues that its false statements are of no matter, because "the defaults did not serve as a barrier to credit because the purported defaults were waived and Pareteum accessed an additional $2,500,000 in credit on August 23, 2019." Pareteum Br. at 22. The well-pleaded FAC alleges that Pareteum was never able to access the rest of the Credit Facility and only able to access the additional $2,500,000 after paying an additional 750,000 shares of stock (worth ~$2.25 million), admitting to various breaches, and executing a waiver of its default. ¶¶ 37-38. These admissions render materially false the statements that the Credit Facility remained available to Pareteum and that they intended to use it to fund growth.[14]

### 5.    False and Misleading Statements Regarding Growth

Pareteum argues that the materially false and misleading statements regarding growth pleaded at ¶¶ 105-12 of the FAC are not actionable because Pareteum *did* experience revenue growth. Pareteum Br. at 22. This argument sidesteps the well-pleaded allegations that the portrayal of that growth by Pareteum and the Exchange Act Defendants was materially misleading because they predicated those statements upon metrics they knew at the time were overstated or inflated and failed to disclose they were based on compromised metrics. ¶¶ 113, 116. For example, an April 16, 2018 Chairman Update Letter, published in a press release, quoted Turner as stating: "Backlog now sits at $200 million, with expectations for continued, and, even accelerated growth." ¶ 107. The failure to disclose the underlying overstatement and inflation of these inputs rendered their statements regarding growth likewise misleading. *See*, *e.g.*, *Davis*, 2020 U.S. Dist. LEXIS 66016,

---

[14] Pareteum's reliance on *In re Dwight's Piano Co.* is misplaced, as the allegations that defendants therein failed to disclose the default either had "nothing to do with" the credit agreement or did not indicate when the default occurred. No. 3:04-CV-066, 2001 U.S. Dist. LEXIS 28371, at *37 (S.D. Ohio Mar. 17, 2005).

at *26-30 (where defendants made statements similar to those here about "strong demand," they were misleading because they failed to disclose information about sales practices and source and nature of growth).

### 6. Pareteum and the Exchange Act Defendants' Argument that Certain Statements of Fact Constitute Inactionable Opinion Fails

Pareteum argues that certain of its statements regarding Backlog, GAAP compliance, and growth – those containing the phrase 'we expect" and "similar language" – are statements of opinion and are shielded from liability. *See* Pareteum Br. at 19, 38-40. The Exchange Act Defendants, on the other hand, argue that virtually every false statement alleged constitutes a protected opinion. EAD Br. at 3-7. These arguments fail because the statements are not opinions, but statements of fact.  And even if any of the statements at issue are deemed opinions, they are actionable under *Omnicare*.

"A statement of fact is objectively verifiable, but a statement of opinion is not." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 17-1580, 2018 U.S. Dist. LEXIS 87991, at *19 (S.D.N.Y. May 24, 2018). The statements regarding Reported Revenue and Realized Revenue Growth rates were based on historical GAAP metrics plainly defined and universally understood by investors and that purported to report the value of Pareteum's Reported Revenue and Realized Revenue Growth rates. ¶¶ 42-47. Courts in this District and elsewhere almost universally agree that historical, reported revenue figures and realized revenue growth rates such as these are statements of historical fact, not opinion, sufficient to state a claim for falsity with respect to improper revenue recognition. *See, e.g.*, *In re Avon*, 2019 U.S. Dist. LEXIS 200816, at *51 (where "[p]laintiffs detail how defendants used specific accounting practices in violation of [GAAP] to prematurely recognize revenue, they have adequately alleged the issuer's reported financials contain false and misleading statements") (internal quotations omitted); *Okla. Firefighters*, 367 F. Supp. 3d at 32

(statement that "revenue increased 5% YTY primarily due to strong end user demand…" statement of "historical facts," not opinion); *Varghese*, 672 F. Supp. 2d at 606 ("Misreported financial information clearly amounts to a false statement of fact.").

Pareteum's argument that its statements regarding the total value of the Backlog and its rate of conversion were also opinion fails for the same reason, as those statements purported to report the achieved Backlog value, how much that value had increased, and the realized rate of Backlog conversion into revenue. ¶¶ 72, 77, 81, 85-86; *see also* ¶ 154 (Backlog represented "value of new sales orders intake and *the revenue under contract*; Backlog includes "live and in service" contracts; Backlog was "contractually committed revenue"). These statements are thus statements of fact because they are quantifiable and objectively verifiable. They are adequately alleged to be materially false at the time that they were made. *See Rodriguez v. Gigamon*, 325 F.Supp. 3d 1041, 1055 (N.D. Cal. 2018) (statements regarding product backlog not puffery); *City of Miami v. Quality Sys.*, 865 F.3d 1130, 1137-38, 1144 (9th Cir. 2017) (defendants' statements about company's sales pipeline not opinion because "they provided a concrete description of the past and present state of the pipeline").

The Exchange Act Defendants cite to just two cases, neither of which helps them. First, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-13 (2d Cir. 2011), was overruled by *Omnicare*, which provided additional grounds for alleged statements of opinion to be actionable. *See Gen. Partner Glenn Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016) (confirming *Omnicare* "altered the standard announced by [the Second Circuit] in *Fait*," such that "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the misstatement misleading to a reasonable investor"). *Fait* also did not address historical revenues; instead, it involved credit loss reserves, the

determination of which is "not a matter of objective fact" but is "inherently subjective." 655 F.3d at 113. Indeed, as the court noted, "[t]here appears to be no single method of evaluating and setting loan loss reserves" as the methods vary among different banks, and the plaintiff in *Fait* "[did] not point to an objective standard for setting loan loss reserves." *Id.* By contrast, the FAC adequately alleges that Pareteum and the Exchange Defendants violated specific GAAP provisions regarding revenue recognition that (as outlined below) do not involve subjective judgment. ¶ 53.

The Exchange Act Defendants also rely on *In re AmTrust Financial Services, Inc. Sec. Litig.*, No. 17-CV-1545, 2019 U.S. Dist. LEXIS 153297 (S.D.N.Y. Sept. 9, 2019). EAD Br. at 3-5. But *AmTrust* was expressly limited to its facts and is inapposite here. The *AmTrust* court explained that "[d]efendants['] … motion is not based on the contention that *any* application of GAAP…results in a statement of opinion," but "[r]ather [that] the specific provisions of GAAP relevant to the particular accounting issues that AmTrust identified call for subjective judgments." 2019 U.S. Dist. LEXIS 153297, at *40 (emphasis in original). The court reasoned "[w]hether the alleged misstatements are statements of fact or opinion depends on the facts and circumstances of the seven accounting issues identified by AmTrust and addressed in its restatement." *Id.* at *41.[15] The accounting issues that the *AmTrust* defendants claimed were opinion related to recognition of warranty contract revenue, accrual of discretionary bonuses, deferred acquisition costs, capitalization of software development costs, and miscellaneous adjustments – none of which are at issue here or were governed by the revenue recognition standards at issue here. *Id.* at *41, 50, 58-59, 63-65. In *Amtrust*, plaintiffs alleged defendant's reported income was false "because of the accounting treatment applied to certain underlying metrics." *Id.* at *33; *see also id.* ("It is the accounting treatment that plaintiffs contend was erroneous and thus resulted in a false or

---

[15] No court has cited *AmTrust* (which is on appeal) for the proposition that statements of historical revenues can be opinions.

misleading number – reported income – on the financial statements."). Here, by contrast, Plaintiff alleges that the underlying data itself was false: the composition of Pareteum's reported revenue – the contracts and customers themselves – were knowingly fabricated or embellished and therefore the amount of reported revenue was false as a result. The existence and/or identity of customers and the amount of purported contracts are objectively verifiable and do not involve subjective judgment. Therefore, they are facts, not opinions. *See Amtrust*, 2019 U.S. Dist. LEXIS 153297, at *39 ("If the numbers underlying that data consist only of figures that were then presently known, fixed, or definite…then any resulting data would be a statement of fact. Likewise, if the relevant provision of GAAP or ASC topic applied to produce the data called only for the application of or evaluation under objective criteria, then the resulting data would be a statement of fact.").

The Exchange Act Defendants cite no law or accounting rule for their factual assertion that their historical reported revenue figures and realized revenue growth rates required subjective input. EAD Br. at 3-5. Instead, they obliquely refer to sections of their 2018 Form 10-K and conclude, without quoting any language, that "[n]one of this is cut and dry; all of it involves judgment calls than render reported revenue a statement of opinion rather than fact." EAD Br. at 5. A review of what the Exchange Act Defendants cite does not support this conclusion. Rather, the standard that governed Pareteum's Revenue Recognition (ASC Topic 606, "Revenue from Contracts with Customers") lays out a required framework that does not involve subjective judgment, requiring entities to: "recognize revenue *when control of the promised goods or services is transferred to customers*" (¶ 53; Topic 606 at 5); "1. Identify the contract(s) with a customer. 2. Identify the performance obligations in the contract. 3. Determine the transaction price. 4. Allocate the transaction price to the performance obligations in the contract. 5. Recognize revenue when

(or as) the entity satisfies a performance obligation" (Topic 606 at 2); and disclose "significant judgments and changes in judgments" (Topic 606 at 6).

Pursuant to these straightforward, objective requirements, Pareteum admits when it recognized revenue by category and that it recognized it based on a "pre-determined" formula. ¶ 53. Accordingly, its historical revenue statements were statements of fact, not opinion. *See also In re Interpool*, 2005 U.S. Dist. LEXIS 18112, at *15 ("[R]estatement is specifically not proper for…'better insight or improved judgment.'"). And, even if there arguably was any subjective element to this calculation (there is not), whether objective standards or subjective judgment were employed in this case is a factual issue that can only be determined after discovery and trial. *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d at 166-67, 182 (whether "opinion" statements that a company's financial results were "better than expected" and/or "very strong" were actionable "'depends on all relevant circumstances of the particular case,' and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action").

Finally, even if the historical revenue statements were statements of opinion, they remain actionable under *Omnicare* to the extent Pareteum and the Exchange Act Defendants omitted information whose omission made the statements misleading to a reasonable investor. *In re AmTrust*, 2019 U.S. Dist. LEXIS 153297, at *47; *Omnicare*, 135 S. Ct. at 1332 (opinion actionable if speaker did not hold the belief professed, supporting facts she supplied were untrue, or opinion omitted information whose omission makes the statement misleading to a reasonable investor). The Court in *Omnicare* even noted this was of specific importance regarding opinions incorporated into financial statements, because "[i]nvestors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments," and when – as in a registration statement – a speaker 'holds himself out or is understood as having special knowledge

of the matter which is not available to the plaintiff.'" *Omnicare*, 135 S.Ct. at 1330. Here, Plaintiff has alleged that the Exchange Act Defendants knew about the Backlog's "exaggerated or fictitious" nature. ¶¶ 28, 134-45. Therefore, their historical revenue statements, even if opinion, are actionable under *Omnicare*. Likewise, Pareteum and the Exchange Act Defendants' statements regarding the September and October 2018 press releases, the value that they added to the Backlog, and their ability to grow Pareteum's revenues were knowingly false when made, such that, even if they could be construed as opinions (they cannot), it does not render them inactionable. *Id.* The same is true as to Pareteum and the Exchange Act Defendants' argument that their statements regarding GAAP compliance and financial reporting and growth were opinions, as they too were premised on facts and inputs that Pareteum and the Exchange Act Defendants knew to be false – reported revenues and Backlog values and conversion rates – such that they were demonstrably false "opinions" when made and again find no relief in *AmTrust*. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("[T]he complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.").

### 7.   These Statements Are Not Puffery

Pareteum and the Exchange Act Defendants argue that certain of their statements regarding Pareteum's projected future growth and financial performance were inactionable puffery. Pareteum Br. at 22, 39, 49 (arguing that statements regarding recognition of revenue, growth statements, and projections were puffery); EAD Br. at 6 ("many of these genuine, optimistic opinions were non-actionable puffery," but not identifying specific statements). But these statements are not puffery; rather they are actionable statements grounded in historical facts and based on concrete, objectively verifiable data. *See, e.g.*, ¶ 69 (alleging that Backlog represented

the "value of new sales orders intake and the revenue under contract"); ¶ 154 (alleging that Backlog was a "key performance indicator [that] is directly correlated to our financial and operating results"); *see also Fresno Cty. Emples.*, 268 F.Supp. 3d at 548 (statements regarding projections "more than mere puffery because they were grounded in historical facts (false revenue numbers) that the [Section] 10(b) defendants allegedly knew to be false and because they were plausibly designed to mislead investors into believing that comScore's present (as well as its future) was rosier than reality"); *Manavazian v. ATEC Gp.*, 160 F. Supp. 2d 468, 473 (E.D.N.Y. 2001) (not puffery when company stated that it was "positioned…for dramatic revenue and earnings growth").

## 8.     The PSLRA Safe Harbor Does Not Apply to Statements Regarding Backlog Value

Pareteum and the Exchange Act Defendants make a narrow contention that certain statements regarding Backlog Value – excluding statements in the September and October 2018 releases regarding customers and contract underlying Backlog value – are protected by the Safe Harbor. Pareteum Br. at 40-44; EAD Br. at 6 (adopting argument). This is not so.

"[W]hen an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010); *see also City of Warren*, 2020 U.S. Dist. LEXIS 140925, at *26 (rejecting Safe Harbor where statements addressed "misrepresented present facts," not "a future that did not come to pass"); *In re Genworth Fin. Sec. Litig.*, 14-2392, 2015 U.S. Dist. LEXIS 82035, at *5 (S.D.N.Y. June 15, 2015) (Hellerstein, J.) ("Although the statements which Defendants contend are protected by the safe harbor contain some forward-looking language, they are statements of current condition, and are therefore not protected by the safe-harbor defense."). The statements about the Backlog value purported to

provide the value of the Backlog and how much it had increased. Because each of these statements contained representations of present or historical fact, they drop anchor nowhere near the Safe Harbor.

Courts have specifically rejected the argument that statements about backlog are not forward looking when, "as [the company] uses the term, 'backlog' isn't a 'projection' of earnings or a 'statement' about 'future economic performance'" but, rather, like here, is "a snapshot of *how much work the company has under contract right now*." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008) (emphasis added). In that situation, "[b]acklog is much like accounts receivable: It represents [a company's] contractual entitlement to perform certain work, just like accounts receivable represents the company's contractual entitlement to be paid for work already performed." *Id.* In *Berson*, the company defined "backlog" as "the dollar value of the work it has contracted to do but hasn't yet performed." *Id.* at 984. That is precisely what Pareteum and the Exchange Act Defendants told investors here. ¶54 (Backlog was "value of new sales orders intake and the revenue under contract; "long-term contractual business"; includes "live and in service" contracts; "commitments that we've secured from customers…."; "contractually committed revenue").

Pareteum cites a handful of out-of-circuit cases it claims "have adopted a forward-looking definition of "backlog," Pareteum Br. at 41 n.10, but these cases are not applicable here and do not support its position at all.[16] Cases in this district and elsewhere support Plaintiff's position instead.

[16] In *Pound v. Stereotaxis, Inc.*, backlog was defined not – like here – as revenue under contract – but as "outstanding orders and commitments that management 'believes will result in recognition of revenue.'" 8 F. Supp. 3d 1157, 1165 (E.D. Mo. 2014). In *In re Accuray, Inc. Sec. Litig.*, backlog "did not represent 'a contractual entitlement to perform certain work,'" but instead included contingent contracts. 757 F. Supp. 2d 936, 947 (N.D. Cal. 2010). In *In re Stone & Webster, Inc. Sec. Litig.*, the backlog claim that the court found was forward-looking was that "the statements were misleading or inadequate as predictors of [the company's] future performance." 253 F. Supp. 2d 102, 116 (D. Mass. 2003). In *In re Keithley Instruments Sec. Litig.*, plaintiffs did not contend that any of the company's statements, including regarding its "record backlog," were false, but instead argued that it was "reckless in stating its expectations

*See*, *e.g.*, *City of Pontiac Gen. Emples. Ret. Sys. v Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 366 (S.D.N.Y. 2012) (no safe harbor where defendants "stated that IS&GS…had a 'solid backlog'"); *In re Sturm, Ruger & Co. Sec. Litig.*, 3:09-cv-1293, 2011 U.S. Dist. LEXIS 11341, at *20 (D. Conn. Feb. 4, 2011) (statements about "order backlogs" not forward-looking); *In re SLM Corp*, 740 F. Supp. 2d at 555-56 (while statements regarding loan loss reserves "necessarily include forward-looking projections about future defaults," they "are not projections [if] they are directed to 'the then-present state of the Company's financial condition'"); *Schottenfeld*, 2006 U.S. Dist. LEXIS 96035, at *7-8 (statements regarding "strength of [] subscription and services revenues" were "statements of present fact").

Pareteum and the Exchange Act Defendants' reliance on *In re Seadrill Limited Securities Litigation*, No. 14-9642, 2016 U.S. Dist. LEXIS 80648 (S.D.N.Y. June 20, 2016), and *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358 (S.D.N.Y. 2018), is unhelpful to them, as the statements at issue in both of those cases were purely projections of revenue. Here, by contrast, the statements at issue are statements of present fact concerning Pareteum's current Backlog value. Moreover, both courts found that the statements contained adequate cautionary language, which is not present here. 2016 U.S. Dist. LEXIS 80648, at *27-28; 341 F. Supp. 3d at 377-78.

Even assuming *arguendo* that the statements at issue were "forward-looking," they would still not receive Safe Harbor protection because they were not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ

---

of continued, future record growth when it had reason to know that certain aspects of its business were not operating as efficiently as they had in the past." 268 F. Supp. 2d 887, 905 (N.D. Ohio 2002) Similarly, in *Weiss v. Mentor Graphics Corp.*, the issue was not the falsity of defendant's statements about the *amount* of the backlog, but rather whether references to "strong backlog" as a predictor of future performance were forward-looking. CV-97-1376-ST, 1999 U.S. Dist. LEXIS 17026, at *29-32 (D. Or. Oct. 6, 1999). Indeed, in *Weiss*, the district court previously denied defendant's motion to dismiss, concluding that its "statements regarding backlog were not forward-looking because they were based on a confirmable, present fact -- either [it] had a strong backlog going into Q3 1996 or it did not." *Id.* at *31-32.

materially from those in the forward-looking statement." *Schottenfeld*, 2006 U.S. Dist. LEXIS 96035, at *6*. First, the language Pareteum cites as "meaningful cautionary statements" (Pareteum Br. at 41-42) "only refers to the most general of economic risks, such as the 'uncertainties' of conducting the issuer's business," which is insufficient to invoke Safe Harbor protection. *Id.* at *9 (citing *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 35 n.119 (S.D.N.Y. Dec. 7, 2004) ("warning that actual results may be 'materially different' than the projections" insufficient)). Second, "[t]he risk factors plainly did not warn investors about the relevant risk that led to the restatement: misconduct." *Fresno Cty. Emples.*, 268 F.Supp. 3d at 548. Third, Pareteum contradicted its own cautionary language about the reliability of the Backlog by expressly informing investors that Backlog was converting to revenue at or above 100%. ¶ 70. Finally, the Safe Harbor does not apply where – as here – the Backlog had already been negatively impacted or the statement was knowingly false when made. *Supra* §III.B; *Ollila v. Babcock & Wilson Enters.*, 17-109, 2018 U.S. Dist. LEXIS 20587, at *15-16 (W.D.N.C. Feb. 8, 2018) (allegations that defendant "failed to disclose that [company's] backlog had already been adversely affected…would likely take defendants' statement out of the safe harbor entirely, as the risks defendants warned of had already been realized."); *In re SLM Corp., Sec. Litig.*, 740 F. Supp. 2d at 556 ("Plaintiff alleges that Defendants knew the statements…were false when made, and thus neither the bespeaks caution doctrine nor the PSLRA safe harbor provision apply.").

## IV.   PLAINTIFF ADEQUATELY PLEADS SECONDARY LIABILITY UNDER SECTION 20(a) AGAINST TURNER, O'DONNELL, AND BOZZO

To succeed on a claim under Section 20(a), plaintiff must show: a primary violation [of the Exchange Act] by the controlled person; control of the primary violator; and culpable participation. *Carpenters Pension Tr. Fund v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). Turner, O'Donnell, and Bozzo concede the second and third elements are adequately alleged. Pareteum

Br. at 45.[17] They argue simply that Plaintiff fails to plead a primary violation of Section 10(b) by Pareteum. *Id.* As outlined above, Plaintiff has sufficiently alleged such a primary violation. *Supra* §III; *In re Inv. Tech. Grp., Inc. Sec. Litig.,* 251 F. Supp. 3d 596, 624 (S.D.N.Y. 2017).

## V.   **PLAINTIFF ADEQUATELY PLEADS SECTION 11 AND 12 CLAIMS**

In connection with the iPass Acquisition, Pareteum filed iPass Acquisition Filings that incorporated by reference the FY2018 Form 10-K and its reported revenues, and in connection with the Secondary Offering, underwritten by DJSI, Pareteum filed Secondary Offering Filings that incorporated by reference the FY 2018 Form 10-K (containing an unqualified audit opinion from Squar Milner) and 2Q19 10-Q and their reported revenues. As set forth herein, the statements in those incorporated SEC filings regarding revenue were materially false and misleading. *Infra* §§V.C, V.D.  Plaintiff need only allege a "material misstatement or omission" in a registration statement to state a claim. *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007). Plaintiff has amply done so here – against Pareteum and the Control Person Defendants for the iPass Acquisition, and against Pareteum, the Exchange Act Defendants, DJSI, and Squar Milner for the Secondary Offering.

Unable to contest their strict liability for these false statements, Defendants attempt to raise the bar, arguing that the heightened pleading standard of Rule 9(b) applies because the Securities Act claims are premised on the same allegations of fraud as Plaintiff's Exchange Act claims. Not so. Plaintiff separately and independently pleads the Exchange Act and Securities Act claims in the FAC – consistent with this Court's guidance in *In re Am. Realty Capital Props., Inc. Litig.*, 15-MC-40, 2015 U.S. Dist. LEXIS 151966, at *15 (S.D.N.Y. Nov. 6, 2015) (Hellerstein, J.).

---

[17] Plaintiff has nonetheless adequately alleged both control and culpable participation. *Infra* §III.B; ¶168; *Menaldi v. Och-Ziff Capital Mgmt. Gp. LLC*, 164 F. Supp. 3d 568, 587 (S.D.N.Y. 2016) (that defendants signed relevant SEC filings and were responsible for content sufficient).

Also unavailing is Pareteum and Squar Milner's argument that Plaintiff does not have standing to assert Section 11 claims based on the Secondary Offering. In this Circuit, "[t]he pleading requirement for [Section 11] standing is satisfied by general allegations that plaintiff purchased 'pursuant to' or traceable to [a] false registration statement." *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007). Plaintiff exceeds those allegations here.

Squar Milner also attempts to hide behind *Omnicare*, arguing that its Audit Report was merely an opinion for which it bears no liability. But Squar Milner owed a duty to independently verify and investigate the representations made in the FY2018 Form 10-K, which it failed to do, despite significant red flags. And Squar Milner is liable for the Audit Report's embedded misleading statement of *fact* that Pareteum's financial statements fairly presented its financial position. *Omnicare* cannot shield Squar Milner here.  Squar Milner's negative causation defense also fails.  To meet its heavy burden to achieve dismissal at this stage, the FAC itself must "on its face negate the factual presumption of causation." *Levine,* 508 F. Supp 2d at 274.  It does not. The Motions to Dismiss the Securities Act Claims should be denied in full.

A.     THE ELEMENTS OF A CLAIM UNDER SECTIONS 11 AND 12

Section 11 of the Securities Act (15 U.S.C. § 77k) provides strict liability for any signer, director, preparing or certifying accountant, or underwriter of a registration statement that "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Section 12(a)(2) (15 U.S.C. § 77l(a)(2)) similarly affords strict liability against a seller that "offers or sells a security…by means of a prospectus…which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." To establish a *prima facie* claim under Sections 11 and 12, a plaintiff need only allege a "material misstatement or omission" in a registration statement. *Herman & MacLean v. Huddleston*, 459

U.S. 375, 382 (1983); *Levine*, 508 F. Supp. 2d at 272. There is no scienter requirement. *Rombach*, 355 F.3d at 169 n.4.

### B.   THESE CLAIMS ARE NOT SUBJECT TO A HEIGHTENED PLEADING STANDARD

Pareteum seeks to move the goal post, arguing that Plaintiff's Section 11 and 12 claims are subject to Rule 9(b)'s heightened pleading standard because they are premised upon the same allegations that support their fraud claims. Pareteum Br. at 47-49. But "when the same course of conduct supports both a claim of fraud under the Exchange Act and a claim under Section 11 or 12(a)(2) of the Securities Act, the latter claim must satisfy the requirements of Rule 9(b) unless the complaint identifies clearly an alternate basis, *i.e.*, negligence, for the claim." *In re AmTrust*, 2019 U.S. Dist. LEXIS 153297, at *31. Even when, as here, "it is clear that plaintiffs believe [the defendants] were engaged in a massive fraud[,] [t]his fact…does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence." *In re Ambac Fin. Gp., Inc.*, 693 F. Supp. 2d 241, 263 (S.D.N.Y. 2010).

Consistent with this jurisprudence, Plaintiff separately and independently pleads the Exchange Act and Securities Act claims. *Compare* ¶¶ 5-169 (Exchange Act) to ¶¶ 170-215 (Securities Act). Plaintiff's Securities Act allegations and counts do not incorporate or rely on its prior Exchange Act Allegations (¶ 170); the Securities Act allegations aver that the Section 11 and 12 claims "[are] based solely on negligence and/or strict liability and do not sound in fraud" (¶ 170); the Securities Act allegations contain their own sections setting forth the Securities Act parties and substantive allegations (¶¶ 171-197); the Securities Act allegations and counts contain their own allegations of falsity and negligence and/or strict liability (¶¶ 180-82, 187-95, 197); and the Securities Act counts identify the specific Securities Act parties and allegations, *by paragraph*, upon which they rely. ¶¶ 198, 201, 204, 207, 213. Thus, "[Plaintiff] ha[s] done more than disclaim

fraud; [it] ha[s] specifically pled alternate theories of fraud and negligence." *In re Refco*, 503 F. Supp. 2d at 633.[18]

This Court has explicitly approved this pleading style. In *In re Am. Realty*, this Court instructed plaintiffs to fully separate its Exchange Act and Securities Act claims. 2015 U.S. Dist. LEXIS 151966, at *15 ("In re-pleading, plaintiffs should carefully delineate the separate claims, alleging what is necessary for each, and eschewing rhetoric and narrative, so that 'the complaint is organized in a way that allows the court to determine which allegations support which claim.'"). In their amended complaint, the *American Realty* plaintiffs did precisely that, separating their 1933 Act Claims and Counts from their 1934 Act Claims and Counts – just as Plaintiff did here. *See In re Am. Realty Capital Props., Inc. Litig.*, 15-MC-40 (AKH), Dkt. No. 312. Accordingly, Plaintiff's Section 11 and 12 claims are not subject to any heightened pleading requirement.

### C.  PLAINTIFF ADEQUATELY ALLEGES SECTIONS 11 AND 12 CLAIMS IN CONNECTION WITH THE iPASS ACQUISITION

Plaintiff alleges that: Pareteum was the offeror and registrant for the iPass Acquisition (¶ 178); the iPass Acquisition Filings contained and incorporated materially false and misleading statements regarding 2018 revenues (¶ 179-81); Pareteum is strictly liable as a registrant and issuer (¶¶ 182, 190); each of the Control Person Defendants was an officer and/or director at the relevant time, signed the iPass Acquisition Filings and/or the FY2018 Form 10-K incorporated therein, and/or caused the issuance of the statements, are strictly liable, and none of them made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the iPass Acquisition Filings were true, despite red flags (¶ 182). The FAC also alleges that Lead

---

[18] Pareteum's reliance on *Rombach*, 355 F.3d 164, is misplaced. In that case, "[p]laintiffs [did] not assert any claim of negligence…, nor [did] they specify any basis for such a claim." *Rombach v. Chang*, 00-0958, 2002 U.S. Dist. LEXIS 15754, at *10 (E.D.N.Y. June 7, 2002)). Likewise, *City of Omaha* involved identical theories of liability under the Securities Act and the Exchange Act; in fact, the two sets of claims were "mirror image[s]." *City of Omaha*, 2020 U.S. Dist. LEXIS 55410, at *36-37.

Plaintiff member Steffey received iPass shares in the iPass Acquisition. ¶ 183. Accordingly, Plaintiff adequately pleads Section 11 and 12 claims against Pareteum and the Control Person Defendants for the false and misleading statements in the iPass Acquisition Filings. *In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 730 (S.D.N.Y. 2005) (directors liable under Section 11(a) by means of signature of Registration Statement and roles with company).

Pareteum argues that it has no liability under Section 11 because Plaintiff "has failed to demonstrate the necessary falsity of the statements underlying its claims," again citing *In re AmTrust* for the proposition that its statements regarding Reported Revenue – which are the subject of a pending Restatement – were mere "puffery and corporate optimism." Pareteum Br. at 48-49. That is not the law. *See supra* §§III.C.6, III.C.7.

Pareteum also argues that it has no liability under Section 12 because "the FAC includes no specific statements allegedly contained in the 424(b)(3) Prospectus." Pareteum Br. at 49. But the FAC alleges that the iPass Acquisition Registration Statement was, by its own terms, a prospectus/offering statement and also incorporated "all reports and other documents subsequently filed by us…after the date of this prospectus and prior to the termination of this offering" (¶ 179); the February 4, 2019 Form 424(b)(3) Prospectus stated that "[t]his document is a part of that registration statement" (¶ 179); both the Registration Statement and the Prospectus provided financial statements that included the same revenues reported in Pareteum's 3Q18 10-Q and incorporated by reference the reported revenue and realized revenue growth figures reported in the Company's 1Q18, 2Q18, and 3Q18 10-Qs (¶ 180); and those revenue figures were materially false. ¶ 181. *See also In re Lehman Bros. & ERISA Litig.*, 799 F. Supp. 2d 258, 315-16 (S.D.N.Y. 2011) (financial statements incorporated into offering materials sufficient to state claim); *In re Am. Int.*

*Gp.*, 751 F. Supp. 2d at 539 (alleged material misstatements and omissions in documents incorporated by reference in registration statements suffice to state a claim under Section 11).

### D.   PLAINTIFF ADEQUATELY ALLEGES SECTION 11 CLAIMS AGAINST PARETEUM, THE CONTROL PERSON DEFENDANTS, DJSI, AND SQUAR MILNER IN CONNECTION WITH THE SECONDARY OFFERING

#### 1.   Claims Against Pareteum and the Control Person Defendants

Plaintiff alleges that Pareteum was the offeror and registrant for the Secondary Offering (¶ 184); the Secondary Offering Filings represented that the Company was "in fast-growth mode" and "continues to win long-term contractual business" that "would increase throughout 2019 and beyond" and incorporated the Company's FY18 10-K and 2Q19 10-Q (¶ 187); these statements and the incorporated revenue figures were materially false and misleading (¶¶ 188-89); Pareteum is strictly liable as a registrant and issuer (¶ 190); each of the Control Person Defendants was an officer and/or director at the relevant time, signed the Secondary Offering Filings and the FY2018 Form 10-K incorporated therein, and/or caused the issuance of the Filings, and none of them made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Secondary Offering Filings were true, despite red flags (¶ 190); and Lead Plaintiff member Moore purchased Pareteum shares pursuant or otherwise traceable to the Secondary Offering Filings. ¶ 186. Accordingly, for the same reasons outlined in the preceding section, Plaintiff adequately pleads Section 11 and 12 claims again Pareteum and the Control Person Defendants for the false and misleading statements and omissions in the Secondary Offering Filings.

#### 2.   Claims Against Underwriter DJSI

"An underwriter may be held liable under Section 11…if 'any part of the registration statement, when such became effective, contained an untrue statement of material fact or omitted to state a material fact.'" *Perry v. Duoyuan Printing, Inc.*, 10-7235, 2013 U.S. Dist. LEXIS

121034, at *28 (S.D.N.Y. Aug. 22, 2013). A plaintiff need only allege that: it purchased a registered security either directly from the issuer or in the aftermarket following the offering; defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to make the statements therein not misleading. *Id*. Plaintiff adequately alleges that: DJSI was the underwriter for the Secondary Offering (¶¶ 176, 191) and the Secondary Offering Filing contained and incorporated false and misleading statements regarding Pareteum's 2018 revenues. ¶¶ 187-89. DJSI makes no arguments of its own regarding its liability and simply joins briefing by other Defendants. *See* Dkt. No. 183. Plaintiff's allegations are sufficient to state a Section 11 claim against DJSI regarding the Secondary Offering. *See In re Initial Pub. Offering Sec. Litig.,* 241 F. Supp. 2d 281, 343 (S.D.N.Y. 2003); *Duoyuan Printing,* 2013 U.S. Dist. LEXIS 121034, at *28.

### 3.     Claims Against Auditor Squar Milner

Section 11 extends liability for misstatements in registration statements to an accountant that "prepared or certified any part of the registration statement" or "any report or valuation which is used in connection with the registration statement, with respect to the statement…which purports to have been prepared or certified by him." *In re Am. Realty*, 2015 U.S. Dist. LEXIS 151966, at *16; *see also In re Lehman Bros. Sec.*, 131 F. Supp. 3d 241, 260 (S.D.N.Y. 2015) (accountants liable for portions of registration statements they audited). Under *Omnicare*, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi*, 816 F.3d at 209 (citing *Omnicare*, 135 S. Ct. at 1332); *see also In re Am. Realty*, 2015 U.S. Dist. LEXIS 151966, at *17.

46

Here, Plaintiff adequately alleges that: Squar Milner served as Pareteum's independent auditor since 2014 (¶¶ 177, 195); Squar Milner issued an Audit Report that was included in the FY2018 Form 10-K (¶ 192); Squar Milner concluded therein that, despite having found "material weaknesses" in "internal control[s] over financial reporting," these weaknesses did not affect its Audit Report, and it issued an unqualified opinion certifying that Pareteum's financial statements fairly presented its financial position and were prepared in accordance with GAAP (¶ 192); the FY18 10-K, its financial statements, and the Audit Report were incorporated into the Secondary Offering Filings (¶ 193); those statements were false (¶ 194); and Squar Milner owed a duty to independently verify and investigate these representations, which it failed to do, despite significant red flags. ¶ 195. These allegations state a Section 11 claim against Squar Milner. *In re Am. Realty*, 15-40, 2016 U.S. Dist. LEXIS 196190, at *26 (S.D.N.Y. Aug. 5, 2016).

Squar Milner argues that Plaintiff alleges no fact from which it can be inferred that it did not actually hold the opinions contained within its Audit Report. Squar Br. at 16. But Plaintiff adequately alleges that Squar Milner served as Pareteum's auditor since 2014, should have been aware of the red flags regarding Pareteum's reported revenues and realized revenue growth rates as a result of its knowledge of Pareteum's business and finances and the fact that Pareteum's accounts receivables ballooned 7,860% from 1Q18 to 4Q18 (all periods that it audited in the March 18, 2019 Report), and breached its duty to independently verify and investigate the FY18 10-K financials despite these significant red flags. ¶ 195. In short, if two independent analysts were able to discover the fraud just a few weeks later, Squar Milner, having served as Pareteum's auditor for more than four years, should have done so during its comprehensive audit of the Company's FY18 financial statements. The Audit Report was also incorporated into the Secondary Offering Filings *after* the Aurelius and Viceroy Reports, which raised additional red flags about the reliability of

Pareteum's financial statements, ***less than one month*** before the Secondary Offering. ¶ 195. This removes the Audit Report from *Omnicare's* protections. 135 S. Ct. at 1330 ("Investors do not, and are right not to, expect opinions contained in [financial] statements to reflect baseless, off-the-cuff judgments," and when – "as in a registration statement – a speaker 'holds himself out or is understood as having special knowledge of the matter which is not available to the plaintiff.'"); *see also In re Am. Realty Capital Props.*, 2016 U.S. Dist. LEXIS 196190, at *26 (that auditor "was privy to information that plausibly challenged the reliability of [company's] accounts and that [auditor] negligently failed to heighten its audit investigation" "[e]nough…to satisfy *Omnicare* and to require [auditor] to show by way of affirmative defense that it should not be liable because it exercised due diligence"); *In re Scottish Re Gp. Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) (auditor's familiarity with company's finances suggest its opinion was false); *In re First Merchants Acceptance Corp. Sec. Litig.*, 97-2715, 1998 U.S. Dist. LEXIS 17760, at *32-33 (N.D. Ill. Nov. 4, 1998) (magnitude of misstatements, GAAP violations, and red flags together support inference that audit amounted to no audit at all or an egregious refusal to see obvious or investigate doubtful); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (GAAP violations, auditor's six-year engagement, magnitude of misrepresentations, and auditor's ignorance of red flags sufficient).

Plaintiff also adequately alleges that the Audit Report contained an embedded statement of fact that was misleading (namely, the overstated revenue numbers and that Pareteum's financial statements fairly presented its financial position and were prepared in accordance with GAAP) and omitted facts that made the Audit Report misleading (namely, that Pareteum did not have adequate controls). ¶ 195. Squar Milner argues merely that Pareteum's financial statements were its responsibility, not Squar Milner's. Squar Br. at 17. This argument was rejected by Judge Rakoff

in *In re Petrobras Sec. Litig.*, 14-cv-9662, 2016 U.S. Dist. LEXIS 21036, at *15 (S.D.N.Y. Feb. 18, 2016). Judge Rakoff reasoned, "PwC's audit opinions that 'the accompanying consolidated [financial] statement[s]…present fairly, in all material respects, the financial position of [Petrobras]' rested on the underlying facts contained in the financial statements"; therefore, "the financial statements were embedded in PwC's audit opinions." *Id.* at *14-15. Squar Milner's argument should be similarly rejected. Finally, this Court previously rejected a substantially similar argument in *In re Am. Realty Capital Props.*, 2016 U.S. Dist. LEXIS 196190, at *26 (rejecting accountant's argument "that its opinion that [company's] financial statements fairly reported [its] financial conditions and results of operations did not constitute a certification of the truthfulness of each and every component of those statements").

### 4.    Plaintiff Adequately Pleads that it Purchased Shares Pursuant or Traceable to the Secondary Offering

Pareteum and Squar Milner argue that Plaintiff does not have standing to assert Section 11 claims based on the Secondary Offering. Pareteum Br. at 50; Squar Br. at 10-15. "[T]o establish standing under [Section 11] at the motion to dismiss stage, Plaintiffs need *only* assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 746 (S.D.N.Y. 2015) (emphasis added). A plaintiff is "*not* required to explain how their shares can be traced," *In re Authentidate Holding Corp.*, 05-5323, 2006 U.S. Dist. LEXIS 47971, at *20 (S.D.N.Y. July 14, 2006) (emphasis added), and an "allegation that they purchased the notes 'pursuant to or traceable to the materially false and misleading' registration statements suffices, at this stage, to establish their standing under Section 11." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015).[19] Nonetheless, Plaintiff has gone

---

[19] *See also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 326, 373 (S.D.N.Y. 2011) ("pleading requirement for Section 11 standing is satisfied by *general* allegations that plaintiff purchased pursuant to or traceable to [a] false

further than required by the law in this Circuit. The FAC alleges that on September 20, 2019 – the day of the Secondary Offering, when the Company sold 18,852,273 shares into the market, resulting in trading volume four times higher than usual – Lead Plaintiff member Moore purchased Pareteum stock at a price of $1.62 per share, $0.15 below the Secondary Offering price and within the day's trading range. ¶¶ 184, 186. These facts are sufficient to lead to a reasonable inference that Moore's purchases were "pursuant to" the Secondary Offering. *See In re Mun. Mortg. & Equity, LLC,* 876 F. Supp. 2d 616, 658 (D. Md. 2012) (allegations that plaintiff purchased stock one day after commencement of secondary offering $0.19 below offering price adequate to present plausible claim); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d at 407  ("The pleading requirement for Section 11 standing is satisfied by 'general allegations that plaintiff purchased 'pursuant to' or traceable to [a] false registration statement.'").

Squar Milner argues that *Twombly* and *Iqbal*, in effect, abrogated prior cases holding that general tracing allegation are sufficient for a Section 11 claim at the motion to dismiss stage. Squar Br. at 13-15. Thus, it argues that to survive dismissal Plaintiff must "allege facts…giving rise to a plausible inference that the plaintiffs' shares were issued as part of the subject offering, and overcoming the obvious alternative explanation that plaintiffs purchased from the pool of previously issued shares." *Id.* at 14-15. Squar Milner is wrong. As to the law, it is telling that it cites only three out-of-Circuit cases for this proposition. *See* Squar Br. at 15. The Second Circuit has not adopted this approach, and numerous cases in this Circuit after *Twombly* and *Iqbal* have held that allegations that a plaintiff purchased a security "pursuant to or traceable to" a false or misleading registration statement suffice at this stage. *See City of Omaha*, 2020 U.S. Dist. LEXIS

---

registration statement") (emphasis added); *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) ("Plaintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased 'pursuant to' or traceable to false registration statement have been held sufficient to state a claim.").

55410, at *38; *In re BioScrip*, 95 F. Supp. 3d at 746; *In re Petrobras*, 116 F. Supp. 3d at 384; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 373. As to the facts, Squar Milner argues that it is more plausible that Lead Plaintiff member Moore purchased some of the Company's already circulating stock. Squar Br. at 13. This argument ignores the requirements of *Twombly*; Plaintiff's well-pleaded allegation – that on a day when Pareteum issued 18 million shares into the market and 13.86 million shares actively traded, Lead Plaintiff Moore purchased one of the Secondary Offering shares – is plausible and sufficient at this stage.[20]

### 5.   Squar Milner Cannot Establish Negative Causation

"Loss causation is not an element of a claim under §11, but 'negative causation' is an affirmative defense to such a claim." *In re Am. Realty*, 2015 U.S. Dist. LEXIS 151966, at *17; Squar Br. at 10. As such, the "burden will be on the defendants to prove negative causation as an affirmative defense at a later stage in the litigation." *In re Am. Realty*, 2015 U.S. Dist. LEXIS 151966, at *17-18 (denying dismissal). For a defendant to achieve dismissal of a Section 11 claim at the pleading stage based on a lack of loss causation, the complaint must "on its face negate the factual presumption of causation." *Levine*, 508 F. Supp 2d at 274; *see also Haw. Structural Ironworkers*, 422 F. Supp. 3d at 854 ("absence of loss causation is an affirmative defense that only warrants dismissal if it is 'apparent from the face of the complaint.'").

Squar Milner argues that it has met this heavy burden because, it contends, it is "*implausible*" that Plaintiff's loss is causally connected to its Audit Report because the pumping

---

[20] Squar Milner's heavy reliance on *In re Puda Coal Sec. Inc. Litig.* is misplaced, as that decision was rendered on summary judgment – after discovery. 11 Civ. 2598, 2013 U.S. Dist. LEXIS 142081, at *6 (S.D.N.Y. Oct. 1, 2013). And the single case Pareteum cites is likewise inapposite. In *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F. Supp. 2d 254, 264 (S.D.N.Y. 2010), plaintiffs alleged that they purchased securities in two of fifteen separate offerings, each with its own supplemental prospectus. Defendants argued, and the court agreed, that plaintiffs lacked standing to assert claims related to the other thirteen offerings. *Id.* In short, plaintiffs did not have standing to bring Section 11 claims related to securities that they did not allege they bought – hardly a controversial conclusion, but one that is inapplicable to this case.

up of Pareteum's stock had nothing to do with the financial statements it audited, by the time the Secondary Offering occurred, the "historical information in the 2018 financial statements was old and cold," and "intervening events occurred that shifted the market" and drove down Pareteum's stock price. Squar Br. at 19-20. But Pareteum's stock price dropped further upon the Restatement Release, which revealed the falsity of the FY2018 10-K and related financial statements, which Squar Milner certified. ¶¶ 149, 186, 192-95; *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 08-8781, 2011 U.S. Dist. LEXIS 46066, at *22 (S.D.N.Y. Apr. 28, 2011) ("As a matter of law, an allegation that an 'investment has declined in value…is a cognizable loss for the purposes of Section 11.'"). Further, "implausible" is not the standard; rather, the FAC itself must "negate the factual presumption of causation." While it is not impossible that, "[a]t the summary judgment stage, [Squar Milner] may have a surefire affirmative defense," that is the subject for another day. *Levine*, 508 F. Supp. 2d at 274; *see also In re WRT Energy Sec. Litig.*, 2005 U.S. Dist. LEXIS 18701, at *5 (S.D.N.Y. Aug. 30, 2005) ("[T]he Court must draw the inference that Plaintiff['s] losses could have been the result of the alleged misstatements. To conclude otherwise places a burden of pleading loss causation on the [P]laintiff[], and removes the burden of establishing negative causation from [D]efendants, where it properly lies.").

## VI.   PLAINTIFF ADEQUATELY PLEADS SECTION 15 CLAIMS AGAINST THE CONTROL PERSON DEFENDANTS

To state a claim for control-person liability under Section 15, plaintiff must allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re Refco*, 503 F. Supp. 2d at 637. The Control Person Defendants do not dispute control, arguing only that Plaintiff's claims for primary liability fail. Pareteum Br. at 49-50. There is primary liability (*supra* §V), and Plaintiff has therefore stated Section 15 claims.

## VII.   <u>CONCLUSION</u>

For the reasons set forth herein, the Court should deny the Motions to Dismiss.[21]


Dated: August 27, 2020                                Respectfully submitted,

                                                                   **KAHN SWICK & FOTI, LLC**

                                                                   <u>/s/ Melissa Harris</u>
                                                                   LEWIS S. KAHN
                                                                   MELINDA A. NICHOLSON (MN-6251)
                                                                   MICHAEL J. PALESTINA (admitted PHV)
                                                                   MELISSA H. HARRIS (MH-3553)
                                                                   1100 Poydras Street – Suite 3200
                                                                   New Orleans, Louisiana 70163
                                                                   Telephone: (504) 455-1400
                                                                   Facsimile: (504) 455-1498
                                                                   Email: Lewis.Kahn@ksfcounsel.com
                                                                   Email: Melinda.Nicholson@ksfcounsel.com
                                                                   Email: Michael.Palestina@ksfcounsel.com
                                                                   Email: Melissa.Harris@ksfcounsel.com

                                                                   -and-

                                                                   KIM MILLER (KM-6996)
                                                                   J. RYAN LOPATKA
                                                                   250 Park Ave., 7th Fl.
                                                                   New York, NY 10177
                                                                   Telephone: (212) 696-3730
                                                                   Facsimile: (504) 455-1498
                                                                   Kim.Miller@ksfcounsel.com
                                                                   J.Lopatka@ksfcounsel.com

                                                                   ***Lead Counsel for Lead Plaintiff Pareteum***
                                                                   ***Shareholder Investor Group***

---

[21] If the Court is inclined to grant any part of the Motions to Dismiss, Plaintiff respectfully requests leave to amend to cure any pleading deficiencies. "[L]eave to amend should generally be freely give[n]." *Shaw v. Empire Stock Transfer Inc.*, 381 F. Supp. 3d 286, 293 (S.D.N.Y. 2019) (Hellerstein, J.). "Where the possibility exists that [a] defect can be cured, leave to amend should normally be granted." *Id.*

<u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that on August 27, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing via U.S. first-class mail to any non-CM/ECF participants.

                             */s/ Melissa Harris*         
                             Melissa Harris