KATAPAROps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

IN RE:                                          19-cv-9767 (AKH)

PARETEUM SECURITIES LITIGATION,                 Oral Argument

-------------------------------x

                                                New York, N.Y.
                                                **(via telephone)**

                                                October 29, 2020
                                                12:00 p.m.


Before:

                    HON. ALVIN K. HELLERSTEIN

                                      District Judge


                          APPEARANCES

KAHN SWICK & FOTI, LLC
        Attorneys for Lead Plaintiff the
        Pareteum Shareholder Investor Group
BY:  KIM E. MILLER
     MELISSA H. HARRIS

MCGUIREWOODS LLP
        Attorneys for Defendant Pareteum Corporation
BY:  STEPHEN G. FORESTA

BAKER & HOSTETLER LLP
        Attorneys for the Individual Defendants
BY:  DOUGLAS W. GREENE
     GENEVIEVE YORK-ERWIN

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
        Attorneys for Defendant Squar Milner LLP
BY:  PETER J. LARKIN

SCHIFF HARDIN LLP
        Attorneys for Defendant Dawson James Securities, Inc.
BY:  KAYVAN B. SADEGHI

KATAPAROps

(Via telephone)

THE COURT:  Good morning.  This is Judge Hellerstein.

THE CLERK:  Good morning, Judge.  It's Bridget. Everyone is here.

THE COURT:  OK.  So for the plaintiff Pareteum Shareholder Investor Group, we have Kim Miller and Melissa Harris.  Are they here?

MS. MILLER:  Yes, your Honor.

MS. HARRIS:  Yes, your Honor.

THE COURT:  Who will be speaking?

MS. MILLER:  Kim Miller, your Honor.

THE COURT:  For Pareteum, we have Stephen G. Foresta. Are you here, Mr. Foresta?

MR. FORESTA:  I am, your Honor.  Good morning.

THE COURT:  For the individual defendants we have Douglas Greene and Genevieve York-Erwin.

MR. GREENE:  Good morning, your Honor.  This is Doug Greene.  I'm here.  And Genevieve, are you there too?

MS. YORK-ERWIN:  Yes.  Good morning.

THE COURT:  Who will be speaking?

MR. GREENE:  Good morning, your Honor.  Doug Greene will be speaking.

THE COURT:  And for Squar Milner, I have Peter Larkin?

MR. LARKIN:  Yes, your Honor.  Good morning.

THE COURT:  Good morning.  And Dawson James

KATAPAROps

Securities, Inc., I have Kayvan Sadeghi.

MR. SADEGHI:  Yes, your Honor.  Good morning.

THE COURT:  Have I pronounced your name correctly?

MR. SADEGHI:  "Suh-DAY-hee," correct, your Honor.

THE COURT:  OK.  These are motions to dismiss by all defendants, and I think the way we'll do it is this way.  We'll deal first with the issue of whether there were false statements properly alleged, then scienter, then the Section 11 case against Dawson James Securities Inc., and finally the Section 11 case against Squar Milner.  Is that satisfactory?

MR. FORESTA:  Yes, your Honor.

MS. MILLER:  Yes, your Honor.

THE COURT:  So who wants to speak first?  It's either Mr. Foresta or Mr. Greene.

MR. FORESTA:  Your Honor, this is Stephen Foresta.  I think I'll begin and then let Mr. Greene follow up.

THE COURT:  What are you covering, Mr. Foresta?

MR. FORESTA:  I am going to cover the, as your Honor suggested, the failure on the part of plaintiffs to meet their pleading obligations, notwithstanding the fact that this is somewhat smaller pleading than we had originally, which is 220 pages and 503 paragraphs.

THE COURT:  What will you cover and what would Mr. Greene cover?

MR. FORESTA:  I am going to cover the statements

KATAPAROps

relating to backlog, your Honor. And since I believe those are the essence of what plaintiffs' amended complaint consists of and the failure to show that there is any falsity there or that they are actionable -- and frankly I have not worked out a plan with Mr. Greene as to what he would cover, other than to essentially add on to anything that I did not cover in my own presentation.

THE COURT: I warn you that you, Mr. Greene, will not duplicate any argument that Mr. Foresta makes.

MR. GREENE: Yes. Your Honor, this is --

THE COURT: Yes.

MR. GREENE: Pardon me. This is Doug Greene. Mr. Foresta will cover all the falsity allegations. I will cover anything that, without duplication, that I may wish to add, if that's OK with the Court.

THE COURT: Well, I think Mr. Foresta, then, will take care of all the allegations that the statements, the misrepresentations were not plausible misstatements, and then Mr. Greene can do scienter. Otherwise it seems to me the distinctions will be artificial. Is that satisfactory? You should have discussed this beforehand, you know.

MR. FORESTA: Yes, your Honor. And I'm sorry, you broke up when you were mentioning -- I am prepared to deal with the false statements, and I didn't hear what you said after that. Was it your intention that Mr. Greene would deal with

scienter?

THE COURT:  Yes.

MR. GREENE:  Your Honor, this is Doug Greene. Mr. Foresta and I did work out that he would take the lead in covering the entirety of their argument.  We attempted not to duplicate what they argued.  We had a slightly different way of looking at it.  I will defer to Mr. Foresta to cover the entirety of the falsity and scienter allegations.  If the Court wishes only one of us to speak to those, that would be Mr. Foresta.  If the Court wishes to hear from me on any gap filling or any of the way we attempted to slightly come at it from a different direction, I'd be happy to add.  Otherwise I will defer to Mr. Foresta.

THE COURT:  All right.  Mr. Foresta, you're up.

MR. FORESTA:  Thank you, your Honor.

The bulk of the plaintiffs' amended complaint deals with issues relating to the backlog, which was a metric that was used by Pareteum in presentations, in press releases, to show forward-looking projection for revenue.

And in addition, there are allegations of false statements relating to revenue recognition by the company, failure to comply with GAAP, and in addition failure to implement appropriate internal controls and financial reporting.  There are allegations about the credit facility and false statements relating to the credit facility.  And finally

there are allegations that the company misstated its growth prospects.

And for each one of those, there are not any sufficient allegations to meet the stringent requirements of the Federal Rules of Civil Procedure and the PSLRA.  Instead, what we have is a series of conclusory statements repeated over and over by the plaintiffs in the amended complaint that the company engaged in misconduct and misstated its financial condition, misstated the nature of the backlog, misstated the availability of credit for this facility, and misstated its ability to grow as a company.

And all of that, your Honor, is an outgrowth of two events, neither one of which establishes the requisite level of particularity necessary to get this complaint across the finish line.  And those two events are the publication of short seller reports in June of 2019, and the second one is an announcement in October of 2019 that there would be a restatement of certain financials.  Neither one of those, your Honor, the publication of the short seller event or the announcement of a restatement, provide the basis for concluding that there were false statements in materials issued by the company.  And it is simply a conclusion that the plaintiffs jumped to that there must have been misstatements in those financial reports and press releases and there must have been knowledge on the part of the company and the individuals because you have the short

KATAPAROps

seller report and you have this announcement of a restatement. And that's a leap too great for the plaintiffs to make and does not suffice, under the PSLRA, for adequate pleadings of a securities claim here.

What we have, instead, in reference to the backlog, your Honor, is zero evidence whatsoever of any falsity in the statements that were made.  And cutting through what is still not by any stretch of the imagination a short and plain statement --

THE COURT:  Listen, whoever is on the line and not speaking, mute your line.  I hear background noise.  I only want to hear Mr. Foresta.

Continue, please.

MR. FORESTA:  Thank you, your Honor.

So I was beginning to talk about the backlog, since it is a principal focus of the allegations in the amended complaint and how that was also the focus of the short seller reports.  And what the plaintiffs have done is simply taken speculation and conjecture from those short seller reports, which were issued without a doubt for the purpose of profit for the authors of that report, and they've converted that into allegations of misstatements by the company in their financials, with nothing more to support that conclusion.

On the issue of the backlog, the backlog, as the company revealed repeatedly, is an indication of a 36-month

revenue projection.  It is measured on a going-forward basis. It is an attempt to educate the public as to what the company's projections are, what their estimations are, what their expectations --

THE COURT:  Excuse me.  Someone --

THE CLERK:  Someone is using pots and pans and washing dishes.  Please mute your phone.

THE COURT:  Bridget.  Wait a minute.  That person still has not muted his or her phone.

THE LAW CLERK:  Bridget, I can look up what number that is, if you give me --

THE COURT:  I'm not going on unless there is complete mutation on all phones.

(Discussion held off the record)

THE COURT:  OK.  Go ahead, Mr. Foresta.

MR. FORESTA:  So if nothing else, this very lengthy amended complaint permits us to focus on the issue of the backlog on five press releases issued by the company, beginning in September of 2018.  And the plaintiffs have alleged that, through a combination of the short seller reports and the announcement of a restatement, there is now confirmation that these statements were false and misleading and actionable.  And as I had said before, the backlog metric used by Pareteum was an effort to educate the investing public on the prospects for the company, the expectations as for the company, on a

KATAPAROps

going-forward basis.  They are not actionable statements of fact rising to the level of a securities violation.

THE COURT:  Are they not statements of inventory?

MR. FORESTA:  Excuse me?

THE COURT:  Are they not statements of inventory?

MR. FORESTA:  They are statements of expected revenue on a 36-month going-forward basis.  It's not revenue that comes in when --

THE COURT:  Based on the inventory of the company, the contracts that it had.

MR. FORESTA:  Well, it's based on --

THE COURT:  It's not a pure projection.  It's based on something in existence.

MR. FORESTA:  It is based on something that is in existence, your Honor, insofar as there is a signed contract spanning a 36-month time period into the future.

THE COURT:  It's a measure of signed contracts.

MR. FORESTA:  It is an indication that there are signed contracts with projected revenues 36 months into the future.  Yes, your Honor.

THE COURT:  Each of those contracts, which supposedly have some kind of a dollar figure that recognizes what value will be given.

MR. FORESTA:  That's correct.  And those are the numbers --

KATAPAROps

THE COURT:  So it's not just the measure of projections.  This is a measure of actual contracts, in-house.

MR. FORESTA:  There is no question, your Honor, that it is a measure of the company entering into contracts with customers.  And in these press releases, there are absolutely references to anticipated projection --

THE COURT:  There is someone on the line who has not muted their phone.  Mute your phones.

Mr. Foresta.

MR. FORESTA:  Thank you, your Honor.

What I was saying is, in these press releases, there are references to anticipated, projected, expected revenues in the future.  But the revenue itself is not booked until the customer actually uses the services that are provided to the customer.

So it is absolutely an indication of what the company is projecting, estimating, into the future, over a 36-month time period.  It's not an announcement that, on this date, the company has brought in $30 million worth of revenue.

THE COURT:  And that, it's inventory.  The contracts are inventory.  This is a company that deals with services.  Instead of counting garments, for example, you're counting contracts for future services, as a dollar equivalent, and these are the measure of contracts.  You have them for 36 months in advance.  And that's the basis of what we're talking

about.  It's not mere projection.

MR. FORESTA:  But the revenue, your Honor, is not booked on the signing of the contract.

THE COURT:  Don't mix up revenues and contracts.

MR. FORESTA:  Oh, no, no, no.

THE COURT:  Don't mix up revenues and inventory.

MR. FORESTA:  I think it's very important --

THE COURT:  Revenue comes from sales of inventory. Inventory is what you have that will lead to future sales. There's no revenue recognition of inventory.  There's no revenue recognition on contracts in hand.  I understand the distinction.

MR. FORESTA:  And I think, your Honor, it's very important that we maintain that distinction.  And there is a clear disconnect between what the company is announcing as its backlog and what the company is recognizing as revenue.  And that's the connection that the plaintiffs have failed to make and cannot make.  They're claiming that there were misstatements in these backlog press releases, but they cannot tie it to what ultimately they claim the restatement announcement has to do, which is false or misstated revenue recognition.

THE COURT:  In paragraph 21, plaintiffs allege that on October 24, 2018, Pareteum announced that it grown the backlog to $500 million.  And on November 7, 2018, Pareteum announced

KATAPAROps

record third quarter 2018 results reporting revenues of $8 million, up 129 percent year over year.  In addition, an increase of backlog to $403 million, and backlog revenue conversion of 100 percent.

I understand what these allegations are.  There is an allegation that the contracts was a work in process where the contracts in hand were at $403.  Revenue was at $8 million. Revenue increased.  Backlog had increased.  And I don't know what "backlog revenue conversion of 100 percent" means.  But as I understand it, it would mean that the entire backlog is not falling away but is there to be realized in revenue when it comes time to recognize revenue.

So this allegation, which I just mentioned as an illustration, understands the difference between revenue recognition and contracts in hand.

MR. FORESTA:  There is no question about that, your Honor.  But what the plaintiffs would like to do is make the leap, through inference, that because the company said it would be restating its financials, restating its revenues, that it must have been misrepresenting what it said in these press releases about the backlog, because --

THE COURT:  I think as I read what the plaintiffs alleged, they've alleged that the revenues were inflated, that the backlog was inflated, both, not different.  Both.  And so there are allegations of false statements with regard to

revenue recognition and there are allegations of false statements with regard to backlog.

MR. FORESTA:  But, your Honor, the basis for the allegation that the backlog statements were false is that the company has now announced that it has to restate revenue. They're tying the revenue to, even though they're separate concepts, and they allege that, here, they're tying the revenue to the backlog.  And because the revenue is going to be --

THE COURT:  They're tying the future -- they're tying the revenue projection to the backlog, which is normal.  That's what happens all the time.  That's why a company has inventory. You're making a blurring where there is a distinction.

MR. FORESTA:  And I apologize, your Honor, and I'm not trying to do that.  I'm actually trying to draw a clear distinction between the two of them, because the basis for alleging that these five press statements contain false information is that the company has said that they have to restate revenue.  And that's a leap that is too far to make. There's no specific allegation in the amended complaint as to a false statement in any of those press releases.  The only way the plaintiffs get there is to say, it must have been false because they've now announced that they have to restate their revenue, and because these, the backlog, this metric projecting revenues into the future, was so high that it had to be wrong, otherwise the company would not be restating its revenues.  And

KATAPAROps

I submit, your Honor, that that's an inferential leap that the plaintiffs should not be entitled to make under the heightened pleading standard in this case.

THE COURT:  Is this a good time for Ms. Miller to rebut, or do you want to keep going?

MR. FORESTA:  It is, your Honor.

THE COURT:  Ms. Miller.

MS. MILLER:  Thank you, your Honor.  Just preliminarily I'd like to say that when Mr. Foresta says the bulk and the essence of the misstatements relate to the backlog, I'd just like to point out that the amended complaint, which is only 83 pages, which I think is cleaner and clearer, has five categories of misstatements.  We have a category for reported revenue and realized revenue growth rate.  And sort of my backstop as I tried to figure out how to address this with you today, your Honor, was to just start and end always with the pleading, the complaint.  So reported revenue and realized revenue growth rate, that section starts at paragraph 42 of the complaint.  And we have clear statements, starting with the May 7, 2018 press release for the first quarter of '18.  The reasons for falsity are laid out cleanly in paragraph 49. There are 16 such statements that relate to revenue.  And as --

THE COURT:  Let me cut you off, Ms. Miller.  Let me cut you off.

MS. MILLER:  Yes.

THE COURT:  So we start with paragraph 42.

MS. MILLER:  Yes.

THE COURT:  The caption there is "materially false statements."

MS. MILLER:  Yes.

THE COURT:  Just take me to, where is the allegation of false revenue recognition?

MS. MILLER:  Paragraph 42, May 7 press release, 1/2/18 results.  Here's the quote: "Revenues of 4.113 million up 47 percent year-over-year."  The reason for falsity is addressed at paragraph 49, which says that this statement was materially false and misleading when made because the restatement release confirms reported revenues and realized revenue growth figures were materially overstated by at least 28 percent in fiscal year '18 and 42 percent for the first half of '19.

And it continues.

THE COURT:  Why don't we stop there.

MS. MILLER:  Yes.

THE COURT:  It seems to me, Mr. Foresta, that that's a clear allegation focused on revenue and misstatement of revenue, and has nothing to do with allegations dealing with inflation of contract backlog.  Other allegations will deal with contract backlog.  Right, Ms. Miller?

MS. MILLER:  That's correct, your Honor.

THE COURT:  OK.  Mr. Foresta, anything more to say on

KATAPAROps

this point?

MR. FORESTA: Yes, your Honor. What they've said here is, there was a misstatement of revenue. And the reason, the substantiation for that, is nothing more than the fact that the company has announced that it's going to restate its financials. And the case law is replete with statements that say the mere fact that an issuer restates or is going to restate certain financials is not sufficient to prove that the original financials were false.

THE COURT: Then why were they restated?

MR. FORESTA: As the company announced, they had taken a different view on whether the revenue should be recognized during those time periods. There hasn't been a restatement yet.

THE COURT: Does the company recognize a difference in accounting methodology?

MR. FORESTA: They have not.

THE COURT: So a restatement, without a change in methodology, shows that the early ones should not be relied on. They're false. Now, there may be a good excuse for their being false. There may be an absence of scienter. But you can't blur the requirement of an allegation of falsity with an allegation of scienter.

I hold the complaint sufficiently alleges false statements with regard to the accounting points, that the

revenue was misstated, as alleged in the paragraphs mentioned by Ms. Miller, 42 and 49. And the allegation of inflation of backlog, where would I find that, Ms. Miller?

MS. MILLER: Your Honor, the statements regarding backlog are addressed at a section beginning at paragraph 89 of the complaint. We have about 14 statements alleged regarding the backlog in that section. Paragraphs 89 and 90 relate to backlog conversion, and paragraph --

THE COURT: The caption is "statements regarding backlog conversion".

MS. MILLER: Yes, correct. So that's the conversion of the backlog into revenue, your Honor.

THE COURT: So when you say that the company announced a conversion rate of 103 percent, I would understand that to mean that all the value stated in the contracts, plus some more, were recognized --

MS. MILLER: Yes, plus some additional subscribers, your Honor, yes.

THE COURT: That means they needed no reserves at all.

MS. MILLER: Yes, your Honor.

THE COURT: That's how I read it.

And 89 and 90 alleges that an August 6, 2018 press release announcing second quarter 2018 results stated contractual revenue backlog conversion rates at 106 percent, which, again, is a measure of realization of inventory, or

backlog.

MS. MILLER:  Yes, your Honor.  And regarding the key set of statements --

THE COURT:  What about the aggregate amount of backlog?  Where is that alleged?  91, "Backlog quadrupled to 615 million."

MS. MILLER:  Yes, your Honor.

THE COURT:  Ms. Miller, I find that these allegations are sufficient to allege false statements in revenue and in backlog.  And they're not conflated.  They are each separate.

MS. MILLER:  Thank you, your Honor.  That would bring us next to the credit facility statements, which begin at paragraph 99, with a March 7, 2019 chairman's letter quoting Turner, "We have improved our capital gain plans by the addition of a 50 million debt facility, which puts us in a position to act immediately when accretive opportunities, that further improve Pareteum, are identified."  And then the reason for falsity --

THE COURT:  Let's hear from Mr. Foresta, who made the motion.  What's your allegation with regard to the credit facility?

MR. FORESTA:  It's simply not false, your Honor.  Truth is a total defense here.  And in fact --

THE COURT:  This is the plaintiffs' plea.  We haven't gotten to the defenses.

KATAPAROps

MR. FORESTA: The plaintiff pleads in the complaint that the company, Pareteum, actually did access the credit facility. So the allegation here is that the company misstated its ability to access this credit facility, when the very allegations of the complaint show that it's false.

THE COURT: What's should I look at?

MR. FORESTA: I believe that is paragraph -- bear with me, your Honor -- paragraphs 37 and 38, your Honor.

The chairman of the company, your Honor --

THE COURT: Excuse me. Let me read it, please.

I don't read these as saying that they received credit facilities. The allegation is that Pareteum revealed that it had been in default of a February 26, 2019 credit facility, that there were 11 breaches.

MR. FORESTA: Your Honor, on March 12, 2019, in public filings, the company acknowledged that it had an obligation to obtain consent in order to access additional credit.

THE COURT: In other words, consent that the defaults would not be acted upon.

MR. FORESTA: Waivers, your Honor. And in fact the company did get waivers. And in August of --

THE COURT: Mr. Foresta, that's a matter of defense. That doesn't speak to the allegation. We're not dealing with the merits of the case, folks. We're dealing with the plausibility of the allegations. And I find the allegation

KATAPAROps

plausible.

MR. FORESTA:  And, your Honor, on this point, I would submit that the very allegations of the complaint belie, undercut, the allegation that this information was withheld.

THE COURT:  Not in the paragraphs which you mentioned. Maybe in different paragraphs which you'll give me.

I want to take this away from rhetoric and into the complaint itself.  So what allegations in the complaint show that?

MR. FORESTA:  I believe paragraph 38, your Honor, that says the company was able to access an additional $2.5 million under the credit facility, which shows that the allegation that we concealed, withheld from the investing public that we were not able to access that money is simply untrue.

THE COURT:  OK.  "Pareteum announced that it would have to sell up to 1,311,439 additional shares to settle balances owed to vendors."  That's hardly a statement that its credit facilities were in jeopardy.

MR. FORESTA:  Your Honor, if you look at paragraph 98 of the complaint, that again deals with the credit facility, and it --

THE COURT:  Wait.  Let me get to it.  "On February 26, 2019" -- this is paragraph 98 -- "Pareteum and the Exchange Act defendants took advantage of the artificial inflation in Pareteum's stock price to secure a $50 million credit facility,

which they defaulted on essentially from its execution. Despite the default, throughout the class period, Pareteum falsely stated that the entire credit facility remained available to Pareteum, that they intended to use it to fund growth."

MR. FORESTA:  So there, your Honor, is the allegation that the company falsely stated that the entire credit facility remained available.  And that's not what we see in paragraph 38, where there is a recognition and acknowledgment that the company was able to access more of the credit line.

THE COURT:  Mr. Foresta, it's a sufficient allegation, falsity with regard to the credit facility.  I so find.  Move on to the next point.

MR. FORESTA:  I believe the next category of alleged misstatements have to do with the growth of the company and allegations that the plaintiffs claim, allegations of falsity surrounding statements made by the chairman of the company about the prospects of the company, "we are on a roll," that the company is in growth mode.  All of the statements that are cited in the amended complaint are nonactionable puffery. They're opinions of the company that clearly are intended to bolster the prospects of the company and don't meet the standard for showing an actionable misstatement of fact.

THE COURT:  Ms. Miller.

MS. MILLER:  Yes, your Honor.  So the growth

statements are addressed beginning at paragraph 104 of the complaint, under a heading "statements regarding growth."  And we have about 15 or so alleged here in this section.  And just to address a couple specific examples, so at paragraph 111, there is discussion of an earnings call on May 7, 2019, where the company announced its first quarter '19 results and defendant, McCarthy, stated, "I want to reinforce Turner's comments about the remarkable transformation that Pareteum has achieved, along with this rapid growth and transformation," etc.  And then the company went on to say that they raised revenue guidance year-over-year to 255 percent to 285 percent.

The reason for falsity is addressed in paragraph 113 -- or, I'm sorry, your Honor.  Go ahead.

THE COURT:  Isn't this a duplication of your allegation of revenue inflation?

MS. MILLER:  Your Honor, the reason we have a separate category for growth is because there are a number of statements.  Again, here is another example.  Paragraph 115, referring to "a remarkable growth story," and then it goes on to backstop it with the specifics about the revenue.  And our contention is that the "remarkable growth statements" are also actionable because they dovetail with the revenue that they concede is false.

THE COURT:  The quotation is from a press release of August 6, 2019, relating to second quarter 2019 results.  The

statement that is alleged to be false is that "we are in the early innings of a remarkable growth story.  We've added numerous customers to our platform in 2019.  These customers, as well as those in our deployment pipeline, have been the drivers of our continued growth.  We're only at the beginning of our mission to connect every person and every thing."  What those last two sentences are is a projection, that looks to the future.  "Continued growth" is future.  "Remarkable growth story" is present.

MS. MILLER:  Yes, your Honor.  I agree.

THE COURT:  The first part is an allegation of falsity, which is plausible.  The second part is not.

I think, if that's the case throughout, what we need to do is not replead and not for me to call this a dismissible point, but when we come close to trial, is to make sure that we don't mix the two.

MS. MILLER:  Yes, your Honor.

THE COURT:  That part of the allegation that deals with history is an allegation of falsity, properly made.  That part of the allegation which alleges something in the future is an opinion.  However, when an opinion as to future growth is based on a known falsity that is the basis for that prediction, the prediction itself can be false.

In short, at this point of time, I will not dismiss that part of the complaint dealing with growth.  I think there

KATAPAROps

is a plausible statement of falsity.

Next point, Mr. Foresta.

MR. FORESTA:  Your Honor, I think that leads us to the nub of the problem.  Moving past any of the allege misstatements, what is completely lacking in the complaint is any sufficient allegation that the company and the individual defendants knew of these allegedly false statements.

THE COURT:  That's the issue of scienter.  I want to finish first any allegations that remain that the statements are not plausibly false.

MR. FORESTA:  I believe, your Honor --

THE COURT:  We have a bad connection.  Hello.

THE LAW CLERK:  Hi, Judge.  Yes, there is an echo on my end.

THE COURT:  Yes.  Bridget.

THE LAW CLERK:  Judge, this is Charlie.  I'm going to -- give me one second.  I think I found the problem.  One second.

Now we should be good to go.  Yes.  Good to go.

THE COURT:  Sorry, Mr. Foresta.

MR. FORESTA:  Your Honor, I was about to say that I think that we have covered all of the categories of alleged false statements in the amended complaint.

THE COURT:  Before we move on to scienter, I just need a two-minute personal break.  Can you stay on the line, or

KATAPAROps

shall we take a recess or what?

MS. MILLER:  It's fine to stay on the line with me, your Honor.  This is Ms. Miller.

THE COURT:  All right.  Stay on the line, and I'll be right back.

(Recess)

THE COURT:  OK.  I'm here.  Thank you very much.

So Mr. Foresta, are you going to argue scienter or --

MR. FORESTA:  No.  I will take that on, your Honor, and Mr. Greene, to the extent that he has anything to add on behalf of the individuals, can jump in after I'm through with my presentation.

What I was saying before the break, having moved on from the alleged false statements, we really get to the nub of the problem with the plaintiffs' amended complaint, which is that they don't meet the high standard of showing that the company or the individuals knew at the time that these statements were made that they were false, that they don't plead, they don't allege facts sufficient to make out a strong inference of scienter, which is required under well-established law.

What we see instead is a series of allegations that plaintiffs would like to cobble together, to stitch an argument that the company knew these statements were false.  And they do that, as is frequently common, through allegations of motive

KATAPAROps

and opportunity, and also through circumstantial evidence. And if you look at the motive and opportunity arguments, which start at paragraph 118, you will see, your Honor, that what they're alleging are the same types of allegations, the same types of claims that are routinely rejected by courts in this circuit.

For example, the argument that defendants used Pareteum's stock to acquire companies and that they were boosting the price of the stock through these false statements as a way to acquire more, that's an argument that has been rejected by courts here.

THE COURT: Has it been rejected, Mr. Foresta, for companies as well as for individuals?

MR. FORESTA: I believe it has been rejected for both companies and individuals, your Honor. We're tied here into statements and motives of the individuals, statements made by the individuals, motives of the individuals, that boost the price of the stock. But there's an allegation in this complaint that the company, that Pareteum itself, also had the requisite scienter.

So I don't know if we can really draw the distinctions here. Mr. Greene may have something to add on the individuals that he is representing. But these allegations go to financial motivation for each of the individual defendants, whether it's through an award of stock options or stock itself, compensation

KATAPAROps

packages, all of which the plaintiffs would have this Court believe are indicia of an intent to defraud. And that's simply not enough to get the plaintiffs over the hurdle of showing sufficient scienter.

So it is obviously not uncommon for a company and for individual executives of a company to try to increase the price of stock, to try to make more money for the individuals through the compensation program. But that's not enough to meet the plaintiffs' burden of showing scienter.

What the plaintiffs would really like you to believe, your Honor, is that all of these false statements were part of a classic pump-and-dump scheme by the company and the individuals. And what they were doing was putting out hundreds of false statements and financial reports with misleading or false information in order to drive up the price of Pareteum's stock, in an effort to enrich themselves, which, in your normal pump-and-dump scheme, would then manifest itself through a sale of stock. And you don't have any of that here. There are no allegations whatsoever that any of the individuals tried to take advantage of a falsely inflated price of Pareteum stock by selling their own shares.

And in fact, if you believe the allegations of the complaint, it would be utterly and totally counterintuitive to conclude that the plaintiffs knew these were false statements; otherwise they would have dumped their stock. If, after the

KATAPAROps

short seller reports came out in June of 2019 and, as the plaintiffs claim, the defendants now suddenly realized that they had been called, you would expect a rash of stock sales by the executives at that point in time. And in fact that simply didn't happen. And I think, your Honor, that is clearly cut evidence that undercuts the argument the plaintiffs would make that the company and the individuals were aware of the false statements that had been made in advance of those short seller reports in June of 2019.

THE COURT: Ms. Miller.

MS. MILLER: Thank you, your Honor. While it's not at the heart of our scienter allegations, I would just like to point out that, as we cited in our brief at page 6 of our opposition to the collective motions to dismiss, there is a citation to the *Schottenfeld Qualified Associates* case in the Southern District of New York from 2006, where a jury could reasonably find that the motive to keep the value of company stock high, to use that stock to consummate corporate acquisitions, is enough to satisfy scienter. And we cite additional Southern District of New York case law, including a very recent case of *Skiadas v. Acer Therapeutics*.

But that's not at the heart of our scienter allegations here, your Honor. What I'd like to focus on is first of all the credit facility. That's easy. Defendants acknowledge that they were in default within two days of the

KATAPAROps

execution of the deal, so it's clear that we've sufficiently alleged, under *Tellabs*, that those statements were at least reckless.

And then you have a red flag right from the get-go that defendant O'Donnell was sued and resolved a case in 2017 involving AudioEye, same backlog metric, nonGAAP metric, same kind of fraud alleged here, booking of phantom revenue.  So that's a flag for the company prior to the class period.

THE COURT:  A settlement is not an admission.

MS. MILLER:  It's not, your Honor.  What it is is a red flag.  And the sheer magnitude of the embellished customers is another red flag.

THE COURT:  What do you mean by "red flag"?

MS. MILLER:  I mean by "a red flag" something that should have put each of the individual defendants and the company on notice that they needed to look more closely.  For example, on the --

THE COURT:  Just because there's a settlement?  Was the magnitude of the settlement such to cause red flags to wave?

MS. MILLER:  The magnitude, I think the settlement was under $10 million, your Honor.  The point of my argument on the red flag is that this very same concept of a backlog metric was used for --

THE COURT:  Was that man sued for something having to

KATAPAROps

do with Pareteum?

MS. MILLER:  Yes.  He is one of the individual defendants, your Honor.

THE COURT:  So he was sued for a misstatement, individually?

MS. MILLER:  Yes.

THE COURT:  Is that what you're saying?

MS. MILLER:  He's a 10b and a 28 defendant, your Honor.  He's also a security-backed defendant in this case.

THE COURT:  Not in this case, but in the case you're talking about.

MS. MILLER:  Yes, that's correct.

THE COURT:  He was sued for something he had done in this case.

MS. MILLER:  Oh, no.  No, I'm sorry, your Honor.  No.

THE COURT:  What was he sued for?

MS. MILLER:  He was sued for the same type of booking of phantom revenue using a backlog metric.

THE COURT:  In another case.

MS. MILLER:  Yes, that's correct.  AudioEye is the name of the case.

THE COURT:  Another company.

MS. MILLER:  Yes.

THE COURT:  And you're using that case to show motive and opportunity.

KATAPAROps

MS. MILLER:  No, your Honor.  I think that's just an indicator of a red flag that shows reckless disregard.

But the real red flag, your Honor, is the sheer magnitude of the embellished customers.  So when we saw these independent --

THE COURT:  Show me the allegation that deals with that.

MS. MILLER:  Are you talking about the allegations about the embellished customers?

THE COURT:  I want you to show where you're alleging scienter, and measure your allegations.

MS. MILLER:  The scienter section begins, your Honor, on page 42 of the complaint.  It talks about motive and opportunity, first -- I can just talk now about the motive and opportunity.

THE COURT:  There are cases that say that a motive to get the company to show better results so that they can have more stock, that's not good proof of scienter.

MS. MILLER:  So, your Honor, I gave you the names of two cases that say exactly the opposite of that point, the *Schottenfeld* case and the recent, June 16, 2020 *Skiadas* case.  In the *Skiadas* case, it was really just the company's need to fund-raise in order to survive was deemed an adequate motive.  But here we allege at paragraph --

THE COURT:  Excuse me.  Could you hold on just a

KATAPAROps

moment.

MS. MILLER:  Yes.

THE COURT:  I'm sorry.  Go ahead.

MS. MILLER:  So, your Honor, I was just pointing out paragraph 118 discusses the motive and opportunity allegation, specifically that the company issued more than 43 million shares falsely valued at more than 132 million as currency to make three acquisitions, Artilium, iPass, and Devicescape, during the class --

THE COURT:  What does the case law say about that kind of motive and opportunity, in relationship to scienter?

MS. MILLER:  So, your Honor, the *Schottenfeld* case says a jury could reasonably find that a motive like this, to keep the value of the company stock high, to use that stock to consummate corporate acquisitions, is enough to satisfy scienter.

But if you want to get to a more -- like setting aside the motive piece, there are some very concrete and specific allegations of scienter that relate to the backlog, and that section is on page 49 of the complaint, beginning at paragraph 134.  And that was the point that I began to bring up earlier regarding the sheer magnitude of the embellished customers.

The company's largest customer, Vodafone, generated about --

THE COURT:  What paragraph?

KATAPAROps

MS. MILLER:  We are looking at, let's see, I'm going to point you to a specific -- so the section begins with a heading just before paragraph 134, "additional scienter allegations regarding backlog."  And there are several paragraphs here, but if I could point you specifically to one that talks about customers, paragraph 137, your Honor.

So this section of the scienter addressing backlog is related to those press releases in September and October of 2018, where the company began to identify specific customers and tout the new contracts with these customers.  And an example is provided, a new contract.  The company, I can't pronounce it.  I'm just going to say Eyethu, but it's E-y-e-t-h-u.  And again, this is in paragraph 137.  And we allege there that that company had only recently been formed and the defendants should have been aware of that, because Eyethu tagged the company, retweeting the announcement of the contract.  And then if you look at their Twitter feed it's clear that the company was basically just born.

And then again another example --

THE COURT:  Let me stay with that.

MS. MILLER:  Yes.

THE COURT:  You refer to previous allegations regarding new customers and contracts.  And you say it was discoverable by Pareteum.  What does that mean?

MS. MILLER:  It means that the defendants, when

they're issuing these press releases and public statements to investors and the public at large and the analysts, saying we've got a great new set of customers, and they list those customers, and a basic Google search could confirm that there were problems with many of these customers, for example, that they're touting contracts that would be larger than Teum's existing largest customer, Vodafone, which just --

THE COURT:  Say that again?

MS. MILLER:  Sorry.  So the company's largest customer is Vodafone.  We talked about Vodafone in paragraph 184.  This is just an important reference to show the recklessness here, because Vodafone generated 7 million of Pareteum's reported revenue during the first half of 2019.  And then you have these press releases in September and October that are touting these new companies, like Eyethu, Secure Watch, and Wing Tel, when our investigator was easily able to Google these companies and see problems with the setup of the companies, who was involved, how much money they have.  And these are things that were tagged by the independent reports that defendants refer to as the short seller reports.

THE COURT:  Your argument is that the recklessness with which the allegations of growth and backlog were made is proof of the scienter of Pareteum and the individual defendants.

MS. MILLER:  Could you say that again, your Honor?

I'm not sure if I'm following your point about the allegation.

THE COURT:  The statement that companies of a certain size and capability were -- I think I'm having trouble formulating it, but --

MS. MILLER:  I think I have your point, your Honor, so I think I can --

THE COURT:  And maybe give it to me, your proof on my point.

MS. MILLER:  So what you're asking me is, I gave you an example of Eyethu and said that the company was only recently born.  If you look at paragraph 74 of the complaint, there is substantially more detail there, so it refers to the Viceroy and Aurelius reports, and notes that that company appears to have been nonoperational without a functioning website.  So what I was saying is, at the time we started investigating this case, one of the things that we undertook, which we note in the complaint, we had an investigator, and we also obviously have attorneys working and researching, and we just took a look at Google, at these companies, and we were able to replicate many of the findings by the Viceroy and Aurelius folks regarding these customers.

THE COURT:  Let me try and catch the point.  The consideration of income, expected income or contract size that will lead to income of companies of this nature was such that it would make it reckless for the individuals or the company to

KATAPAROps

count these as the full value in its backlog.

MS. MILLER: Yes. And I would hit on a related point that sort of emphasizes the scale of the recklessness, your Honor. And that relates to this Investor Day slide. So the company had an Investor Day conference in late May of 2019. And they issued a release that said that the management team will provide updates on the company's vision, new product offerings, etc. So this slide included notable partners and customers, but it included subsidiaries of the company, three different logo brands that are on the slide that were a single company, a customer panel that identified a board member of the company as a customer. So this just sort of suggests that nobody is minding the store, your Honor, just real recklessness as to who these customers are and what they're bringing to the table.

THE COURT: What paragraphs are those?

MS. MILLER: So the Investor Day slide is discussed at paragraphs 28 and 139.

THE COURT: These are the short sellers reports.

MS. MILLER: One of the short seller reports actually has that slide in there. And so we discuss various of the entities and people listed on that slide.

THE COURT: What is the duty of a company to pay attention to short sellers?

MS. MILLER: Your Honor, the fact of the matter is,

just because a company -- just because an outside independent researcher is short does not mean that they don't have good researchers on their team.  So when you have a detailed report --

THE COURT:  You have a motive.

MS. MILLER:  Undoubtedly, your Honor.  And we're not saying that when the first report came out from Aurelius, that caused the stock to drop, that they absolutely positively were correct and no one needed to bother to do more, everything that the short seller says is gospel.  Rather, what they did do is, they emphatically denied the veracity of, first, the first short seller report, and then, after the second one came out two weeks later, they categorically and vigorously denied everything contained in these reports again.  We argue --

THE COURT:  Let me focus on paragraph 139, which --

MS. MILLER:  Which paragraph are you on, your Honor?

THE COURT:  139.

MS. MILLER:  139.

THE COURT:  Yes.  It focuses on an Investor Day.

MS. MILLER:  Yes.

THE COURT:  Not necessarily the short sellers' reports.  And you allege that in that Investor Day, the company was engaging in double counting and giving too high a recognition of companies that had no entitlement to such recognition.  And this indicates the scienter of the company

KATAPAROps

and its individuals, at least those who were involved in this Investor Day.

MS. MILLER:  Yes, which the company said is the management team.

THE COURT:  Yes.

MS. MILLER:  So, yes, your Honor.  When they show a slide at that conference that includes subsidiaries of their own company and three logos in a single slide that are actually all the same company, that suggests recklessness at least.

THE COURT:  I think Mr. Foresta understands that point.

MR. FORESTA:  Yes, your Honor.  What they're asking you to do here, this is a classic case of fraud by hindsight. What they're asking you to do is to leap from errors, mistakes, call it what you will, and an Investor Day presentation, to knowledge, intent on the part of the company and the individuals to defraud investors when it issued public statements prior to that.  And I think, your Honor, that's just a leap that's just too broad for this Court to make.  The whole --

THE COURT:  They're not doing exactly that.  They're not talking about errors here.  Just take the sentence, "The slide also included the logos," and they say three companies, "which are actually subsidiaries of Pareteum."

MR. FORESTA:  OK.  I know we have to accept the truth

KATAPAROps

of that in the allegation.  But how does that show scienter? How does that show a strong inference of intent to deceive or defraud?  I don't believe it does, your Honor.

THE COURT:  Mr. Foresta, when you make customers of your own subsidiaries, that kind of act shows a purposefulness to inflate, because your own subsidiaries can't be customers. Everyone knows that.  And the people who are involved in the Investor Day know that.  Just looking at that sentence alone, the argument for knowledge of wrongdoing is very strong.

MR. FORESTA:  Your Honor, subsidiaries of the company are public knowledge.  If any investor was deceived, misled, believed that these were not subsidiaries of the company, they could have found that out for themselves.  The notion that this is concealed information hidden from investors in order to support allegedly fraudulent statements made by the company on the financials, I think just doesn't find any support at all, your Honor.  We're taking a very minor allegation here about an Investor Day presentation that may have had, according to the complaint, the wrong entities listed on a slide about customers, and turning that into an actionable offense under the securities law.  I'm not aware of any case that goes even remotely that close in turning a mistake into proof that the defendants intentionally misled investors and proceeded with an intent to defraud.

THE COURT:  I think the kinds of allegations in this

paragraph suggest an indifference to the fact that could be argued to be scienter.

MR. FORESTA:  In addition, your Honor, there is absolutely no connection to what they claim were misstatements made here and the restatement of financials, which is the --

THE COURT:  The restatement of financials would not touch a contract.  Backlog is not in the GAAP, the financial statement.  It's something different.

MR. FORESTA:  Well, the restatement of the financials --

THE COURT:  I will reserve decision on the issue of scienter.  Let's argue something else now.

MR. FORESTA:  Your Honor, I wanted to just briefly go back to a statement that Ms. Miller made about the credit facility and her claim that that's an easy one, because two days after the credit facility came into place they announced that they weren't able to access it.  Your Honor, that is 180 degrees apart from an allegation of scienter.  You have the company disclosing that it would need waivers and consents before it could access the remainder of the $50 million credit facility.  Clearly, there was no intent on the part of the company, or the individuals, to defraud investors, when they disclosed publicly what the situation was.

The argument about red flags and misconduct by one of the individuals, they also allege that there are relationships

or connections between the individuals and other people who are not named as defendants. That is all, your Honor, intended to paint this picture of a pump-and-dump scheme that simply finds no support in the actual facts.

THE COURT: There was no dump.

MR. FORESTA: There was no dump. There was no pump either. But certainly there was no dump. And what the plaintiffs would like to do by bringing in other people like Barry Honig and individuals who are not named as defendants is to make it appear as if the executives at Pareteum were lying in the same bed as other fraudsters, they had engaged in this kind of conduct before, they were engaging in it again at Pareteum, and that, they would like your Honor to find, is a basis for showing scienter.

THE COURT: I'm not really interested in what happened before, unless it's being urged -- and Ms. Miller said it's not -- unless it's being urged as 404 evidence, of a plan to show motive or opportunity or intent.

MS. MILLER: Your Honor --

THE COURT: Yes.

MS. MILLER: I'm sorry. I would just like to make one more point, on an additional motive. And that's the fact that defendant Turner, on June 6, 2018, increased his compensation with the announcement of the Artilium acquisition. So he amended his compensation plan, which provided for automatic

vesting of his restricted stock award, immediately upon the company acquiring another company.  On June 7 that acquisition took place.

THE COURT:  Did he sell?

MS. MILLER:  As addressed in paragraph 119, the value of his securities that became vested as a result of this is $2.3 million.

THE COURT:  Did he sell or --

MS. MILLER:  The stock vested.  He didn't sell it.

THE COURT:  He didn't sell and he didn't borrow on it.

MS. MILLER:  Right.

THE COURT:  So any increased value would be dependent on whenever he sold it.

MS. MILLER:  Well, the value was vested, so -- you're right, your Honor.  You're right.

THE COURT:  So one could argue that if there was a series of misrepresentations to inflate the stock and the party knew that, the party wouldn't take a chance of holding it, he would sell it.  So I think that's an argument against you.

MS. MILLER:  Your Honor, the last point I would like to make regarding the short seller reports is that there are cases in this district, including the *Longway Petroleum* case, in which short seller reports standing alone have been determined to be sufficient to support allegations of scienter at the pleading stage.  Of course we don't rely exclusively on

KATAPAROps

these reports.  And our big push, your Honor, on the motive is the fact --

THE COURT:  Your comment here, I think, is this, that if negative information is in a short seller's report and you're a company executive and you read the report or you should be reading the report, you should look into the allegations to see if they are true or not.

MS. MILLER:  Yes, your Honor.

THE COURT:  It's what we would call a red flag.

MS. MILLER:  Yes.  And another case as well in the Southern District of New York in 2018, *Sachsenberg v. Irsa Inversiones* case.

THE COURT:  I will take the issue of scienter under advisement.

MR. FORESTA:  Your Honor --

THE COURT:  I think we -- yes.  Who's speaking?

MR. FORESTA:  Your Honor, this is Stephen Foresta.  If I could just make one further point before we end this conference, the Court has already indicated its view on the sufficiency of the allegations of misstatements and has taken under advisement the scienter arguments.  I would just like to call your Honor's attention to the fact that, at best, the earliest misstatements that are set forth in the amended complaint took place on May 7th, 2018.  The class period goes back to December of 2017.  There is nothing in the amended

KATAPAROps

complaint to show any alleged misrepresentations that were made before May 7th of 2018.

THE COURT:  Thank you.

MS. MILLER:  Your Honor, just a quick point on that. The very first day of the class period has statements that relate to the backlog that are concerning revenue for contracts over a 36-month period as well as growth.

THE COURT:  If I find scienter with regard to an allegation that's part of the period, I think it would be reasonable to relate back to an earlier period.  It seems to me it's more like a yes-or-no question, because if there is a falsity that is known for a particular misstatement and another misstatement looks important, it's a reasonable inference to say that the scienter was earlier as well.  So I think it's more of a yes-or-no.  But I'll take this whole issue --

MR. FORESTA:  Yes.  Your Honor, I would only add to that that it is the plaintiffs' obligation to actually plead a misstatement, not to simply say there was a report about backlog in December of 2017.  That does not even purport to allege a misstatement.  It simply says there was a statement.

THE COURT:  I think it is a sufficient allegation of misstatements.  I've made that finding.  I'm taking scienter into advisement.

Is there anything that basically you would like to say with regards to individual defendants, Mr. Greene?

KATAPAROps

MR. GREENE:  No.  No thank you, your Honor.

THE COURT:  Would you think that Mr. Bozzo is in a different position than the others?

MR. GREENE:  I think, your Honor, that you need to look at the scienter of each particular person.  Each particular person and each particular statement that's attributable --

THE COURT:  You're not helping me.

MR. GREENE:  Do I think that -- I think that Mr. Bozzo is only responsible for the statements that are alleged to be attributable to him.

THE COURT:  Well, the attribution goes into the middle of the class period, does it not?

MR. GREENE:  Yes.  And Mr. Bozzo -- yes.

THE COURT:  The class period is December 2017 to October 2019.  Mr. Bozzo was the CEO until May of 2019.  So he covers the class period.

MR. GREENE:  And, your Honor, although we can't take it on in this procedural context, I do reserve the right to clarify the employment dates and the like of Mr. Bozzo and others.  I can't contest the factual allegations right now, but we will, depending on your ruling -- yes.

THE COURT:  What you're telling me, Mr. Greene, is if I find scienter on the part of Pareteum, automatically I find scienter against the individual defendants, because you're not

KATAPAROps

helping me distinguish them.

MR. GREENE:  Well, no, your Honor.  So none of the individuals -- let me address your point, then.  None of the individual defendants is alleged to have sold a single share of stock.  *Tellabs* directs your Honor to weigh the allegations of scienter, the allegations in favor and against scienter, and with respect to each individual defendant.  There is not scienter with respect to any of them.  There is not a single allegation that any of the individual defendants knew anything inconsistent with any statement that they're alleged to have made, not a single fact, not one, not one.  They are not alleged to have sold or profited personally from any of the alleged artificial inflation in the stock.  And rarely does any fraud that's motiveless, like this one bear out on the factual allegations, on the circumstantial allegations.  And even if your Honor assumes falsity, there is not any allegation that puts an inconsistent contemporaneous fact in any of the individual defendants' heads.  Not a single one.

THE COURT:  Ms. Miller.

MS. MILLER:  Your Honor, I would just say with respect to defendant Victor Bozzo, who we alleged, after he was the CEO through 5/24/19, he continued on as the chief commercial officer, he sign the 10-K.  The company has admitted it overstated by 42 percent its revenues for the first half of 2019.  We've got details regarding the backlog from the

beginning.  Those customers -- the defendants who signed these filings had a duty to have an understanding as to whether or not these customers were legitimate.

MR. GREENE:  Your Honor, they don't plead any particular item that was part of what Pareteum announced is a plan or a statement.  They don't plead any particular component of that, much less that any defendant knew that the opinion about what the revenue was, was false when made.  An allegation of falsity of financial statements needs to comply with the securities laws.  The securities laws have different elements than the accounting rules about what makes a restated financial statement false.  They have not pled any facts that tie any of the individuals to any adverse knowledge with respect to any of the planned restated financial statements, not a single fact.

THE COURT:  Ms. Miller, would you --

MS. MILLER:  Yes, your Honor.  On this point, I would just like to say that there is a devastating counterpoint regarding termination of individual defendants discussed at paragraph 123.  Just 12 days before the restatement release, the company announced --

THE COURT:  You don't know why they were terminated.

MS. MILLER:  Your Honor, we don't.  But our well-pleaded allegations indicate that O'Donnell, McCarthy, and Turner were all terminated and would be replaced.  The company said that O'Donnell was under review, after they previously

KATAPAROps

touted their talent at the company, and then they issued the release saying that they're going to have to restate six quarters.  I think under *Tellabs* you can look at that point and weigh it, and it's compelling.

THE COURT:  Does that mean that Mr. Bozzo should not be held to this complaint?

MS. MILLER:  Absolutely not, your Honor.  Again, he was a high-level executive, a CEO, and then the CCO.  He signed that 10-K filing, which addresses revenue and contracts and the backlog, and he had a duty to know that what he was signing was correct.  And the revenues were overstated by 42 percent, as the company now concedes.

MR. GREENE:  Your Honor, this is not a res ipsa loquitur -- pardon me.

THE COURT:  I have the issues.  I will take this under advisement.

MR. GREENE:  Thank you, your Honor.

THE COURT:  The next discussion will be the motion by Dawson James Securities Inc.

MR. SADEGHI:  Good afternoon, your Honor.

The only complaint that relates to Dawson James is count 6, for the Section 11 claim related to the secondary offering.  We joined in the briefing that was submitted by the company and by Squar Milner's auditor.  And so of course I'm happy to defer to Squar Milner if they would like.  On the two

primary issues that relate to Dawson James, one is the misstatement issue, which you addressed at length and I won't rehash. And the second issue is the tracing issue, which is briefed extensively in connection with Squar Milner's motion. So I'm happy to defer to them to address that first if they would like, or I can address it for your Honor.

THE COURT: What about the tracing issue?

MR. SADEGHI: Sure. On the tracing issue here, your Honor, as you know, Section 11 has a tracing requirement that the shares purchased by --

THE COURT: Yes. That's why I'm asking you to tell me about it.

MR. SADEGHI: Sure. Of course. So the allegation here is not that the plaintiffs purchased directly in the second offering. There's an allegation in paragraph 186 that lead plaintiff member Moore purchased on the same day as the secondary offering at a different price. And the plaintiffs rely on a generalized allegation that that would be traceable to the secondary offering, notwithstanding the fact that --

THE COURT: Excuse me. Do I make those evaluations on a 12(b)(6) motion, or does that come later?

MR. SADEGHI: Your Honor, I think more is required under *Twombly* to allege plausibly that the shares are traceable when the vast majority of the shares outstanding are not traceable to the secondary offering at the time of purchase.

KATAPAROps

There are two appellate courts that have addressed this issue. Both are cited in Squar Milner's reply brief. The First Circuit last year, in *In re Ariad Pharmaceuticals*, which is at 842 F.3d 744, and the Ninth Circuit, in 2013, *In Re Century Aluminum Co. Securities Litigation*. That's at 729 F.3d 1104.

THE COURT: I would say there's a better way to handle this, that in an early part of the case, the plaintiff would have to give you a schedule of exactly what shares he purchased from whom. That would enable you to make the motion based on pricing. But at this point in time it's hard to say that the allegation is not plausible.

MR. SADEGHI: I understand, your Honor, and I understand the authority in this circuit is -- the Second Circuit has not addressed this issue. I do think it's noteworthy that the two appellate courts have addressed this issue have both found this very similar, indistinguishable form of pleading to be insufficient under *Twombly*, and we think that is the right result. But I understand you appreciate the argument.

THE COURT: I will promise you this, that this issue of tracing will be advanced to a very early stage of discovery. If you're correct, you will not have to incur the major expenses of discovery, assuming I find scienter.

MR. SADEGHI: That is of course our primary concern, your Honor. We appreciate that.

KATAPAROps

THE COURT:  Right.  I think that's the way I want to handle it.  So I will not dismiss on the basis of tracing at this particular point of time, but I promise you that I will address that issue very early on.  And I think, Ms. Miller, I'm advising you that you should get ready a schedule that shows that there can be tracing.  OK?

MS. MILLER:  Yes, your Honor.

THE COURT:  Mr. Larkin, for Squar Milner.

MR. LARKIN:  Good afternoon, your Honor.  Thank you.

Having just heard what you said about tracing, it probably behooves me to move on to the next point, although I did want to note that I do believe it is worth a fresh look at the pleading requirements, since, although there isn't anything controlling on your Honor from the Second Circuit, the authority that everyone seems to have followed in the Southern District relates back to a Third Circuit case, which was decided pre *Twombly* and specifically relies upon the "prove no set of facts" criteria for a motion to dismiss that *Twombly* said should no longer be considered.  So I would urge your Honor to at least consider and hold under advisement perhaps the tracing argument, because I think there is a basis for the Court to take a fresh look at this under the *Twombly* requirement.  And the courts that have done that seem to have followed into a consideration of whether "plausible" has actually been alleged as opposed to the conclusory allegation

KATAPAROps

of just "traceable to."  And counsel for Dawson James has already mentioned the Ninth Circuit and the First Circuit. There is also a district court case in New Jersey from the Third Circuit disagreeing with the prior case.

THE COURT:  How would you show the class bought the shares that were in the secondary offering?  How would you be able to prove that?

Ms. Miller?

MS. MILLER:  I'm sorry, your Honor.  I thought you were still talking to Mr. Larkin.  I'm sorry.

THE COURT:  How would you prove tracing?

MS. MILLER:  Your Honor, we have our allegations, and we would provide documentation of when our plaintiff purchased and at what price and related documentation.

And I would disagree with Mr. Larkin's assessment --

THE COURT:  If you buy on the secondary market, even though simultaneously it was an offering, can you qualify under Section 11, Section 12?  Leave out 12.  Under Section 11.

MS. MILLER:  Under Section 11 if you buy in the secondary market, if you bought traceables or pursuant to the offering, then you're in for Section 11.  Section 12 is more stringent.  But there's no argument here regarding that standing.

THE COURT:  Suppose you were to buy on a secondary market.

KATAPAROps

MS. MILLER:  Yes.

THE COURT:  You read the prospectus saying it's a great investment and you, instead of buying on the offering, you buy in the secondary market for whatever reason.

MS. MILLER:  Right.

THE COURT:  Maybe your broker prefers that market or whatever.  Are you a Section 11 plaintiff?

MS. MILLER:  No.

THE COURT:  Only if you bought shares that were issued in the offering.

MS. MILLER:  That's right.

THE COURT:  How would you prove that?

MS. MILLER:  With your documentation and your pricing in the deposition.  It's in the paperwork, your Honor.  And it's in the pricing.

In other words, it's for discovery.

THE COURT:  In order to prove that, you would have to find out who bought in the offering and find out if that person sold immediately after the offering.  You bought your shares the same day.  Right?

MS. MILLER:  Yes.

THE COURT:  Same day of the offering.

MS. MILLER:  That's right.

THE COURT:  Yes.  So someone would have had to -- and was the offering made at the beginning of the market day?

KATAPAROps

MS. MILLER:  I don't have the time.  I know he purchased at $1.62 below the $15 offering price, and we cited case law in our brief supporting the fact that that is sufficient for alleging standing for Section 11.

THE COURT:  Why is it sufficient?

MS. MILLER:  Because you get into discovery to get the further details.  But when you have plaintiffs who purchased on the day of the secondary offering at a price below the offering price, there's a really good chance that in discovery you're going to be able to show that.  He purchased on the offering or pursuant to it.

THE COURT:  Practically speaking, without getting to the powers of the lawsuit, would you be able to trace it?

MS. MILLER:  One more time, your Honor?  Would I be able to trace if what?

THE COURT:  If your client bought on a secondary market, on the inducement of a false and fraudulent prospectus, would you have a Section 11 claim?  Could you trace back your shares to the offering?  The answer is no.

MS. MILLER:  Correct.

THE COURT:  How could you find that out before you file a lawsuit?

If I were to hold in favor of the defendant, that would mean that no class action could prevail if the shares were, under Section 11, if the shares were purchased on the

secondary market.

MS. MILLER:  That's right.

THE COURT:  We know that's not true.  So I think it would be unjust to make this ruling on the pleadings itself.

Let me ask this.  What is the Rule 11 basis that you have for alleging a Section 11 claim, without knowledge of any shares that were purchased on the offering?

MS. MILLER:  So I missed part of the question.  You're asking me, what is --

THE COURT:  Under Rule 11 you have to have good faith.

MS. MILLER:  Under Section 11, yes.

THE COURT:  Yes.  Rule 11.  Federal Rules of Civil Procedure.

MS. MILLER:  OK.  Hopefully I'm not getting sanctioned today.

THE COURT:  I'm not that tough.  I'm not looking for sanctions.  Nor ever will, I hope.  I'm just asking that you have a good-faith basis for making the allegation that the shares you bought were shares that were issued in the offering.

MS. MILLER:  Right, your Honor.  Because if we didn't, what would be the point of proceeding?

THE COURT:  Yes.

MS. MILLER:  Because we know the next thing that's going to happen is, give us the documents.

KATAPAROps

THE COURT:  What is the basis for your allegation?

MS. MILLER:  The basis for the allegation is our client purchased at $1.62 per share below the secondary offering price on the offering date.

THE COURT:  What does that mean, that you got an offering share?  What does that mean?

MS. MILLER:  In order to allege pursuant to or traceable to that offering, there are five cases cited in our brief, including four in the Southern District of New York, that say that's sufficient.  And then you get into discovery.

THE COURT:  I'll take that issue under advisement, the tracing issue under advisement as well.

OK.  Let's hear Squar Milner, the other defendant.

MR. LARKIN:  The second point would be on the statement, the only statements that are attributed to Squar Milner are statements of opinion, either in the audit of internal controls or the audit of the financial statements, I believe that the case only relates to the opinions, in connection with the audit of the financial statements.

THE COURT:  Let me ask you this first.  Do I consider the inventory at all in this case?  The inventory is the contract.  That's not part of GAAP, but it is part of the statement.  And I wonder what obligation did the accountants have for a false statement with respect to the 10-K?  Because under management's discussion there is a false statement about

some financial matter.  What is the accountant obligations?

MR. LARKIN:  The primary obligation we cited in our brief to the PCAOB rule AS 4101.  This comes within the obligation to consider subsequent events.  The primary obligation of the auditor is to design and carry out and audit the financial statements as of the statement date and then issue an opinion concerning whether they are fairly presented.  Thereafter, for the 10-K or for the offering statement, the requirements are to read it, and if there are questions within the text of what's being read that raise some questions about inconsistency with the financial statements or some other matter comes to their attention, they make inquiries of management, and the inquiries of management suffice to then proceed.  There is no other obligation in terms of the consideration of the subsequent events because the opinion is as of the financial statement date.  So there's very little requirement other than read it and, if something arises to the attention of the auditors, to ask questions of management.

THE COURT:  Now, your audit report speaks about the weakness of the internal controls of the company.

MR. LARKIN:  There are actually two.  There are two -- I'm sorry, your Honor.

THE COURT:  "Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the

KATAPAROps

documentation of internal control assessment, and ineffective design, implementation, and monitoring of information technology general controls pertaining to the company's change management process."  Those are words that don't hang together in terribly meaningful sentences except to leave the reader with a feeling that management didn't know what's going on financially.  So the question is, how do you issue an unqualified opinion as to the fairness of the company's financial statements if the controls are inadequate?

MR. LARKIN:  The way that that can occur and does occur almost every day routinely throughout financial reporting is, in planning the audit, consideration has to be given to the state of the internal controls, which the audit opinion on the financial statement indicates it has been.  And then the planning for the actual carrying out of the audit has to take that into consideration and plan around it and plan for it. There is no standard that says that weakness of an internal control prevents the ability to audit the financial statement. So it would require potentially augmentation of certain types of audit procedures, augmentation of certain types of audit steps.  There are no allegations those weren't done here. These are taken into consideration.  They're addressed in the planning and execution of the audit.  And if at the conclusion of that audit the auditors, in their professional judgment, believe that they can issue an opinion that the financial

KATAPAROps

statements are fairly presented, there is nothing about the weaknesses that prevent them from being able to do that.

THE COURT:  If you know a weakness in internal controls and you see in management discussion comments on a 36-month backlog, which eventually works its way into revenue recognition as part of the optimism expressed about the company, do you have an obligation as an accountant to place questions about that?

MR. LARKIN:  Only to the extent that it would call into question accuracy of the financial statements that are the subject of the opinion.  So if this subsequent knowledge or series of events after the statement date of the financials, which here was December 31st, the fact that as things come to your attention, either through reading the management discussion in the 10-K or subsequently in reading documentation associated with the secondary offering, it would require you to consider it as a subsequent event that may or could have an impact on the fairness of the financial statements or the previously issued opinion.  But they don't require any obligation to go forward into what is being said about the subsequent period.  They only have to be considered to the extent that they will impact upon the fairness of the financial statements upon which the opinion was issued.

THE COURT:  Ms. Miller, how do you get past *Omnicare*? You have this claim "false and fraudulent."

KATAPAROps

MS. MILLER:  Right.

THE COURT:  So it's a question.

MS. MILLER:  So you've got that embedded, the facts that are false, your Honor.

THE COURT:  Let me put the question this way.  You are claiming that an opinion of an accounting firm qualifies as a false statement, which means that you have to prove that the accountant knew that it was false?

MS. MILLER:  No.

THE COURT:  Or failed to come forward with facts telling it was false, or was indifferent to the facts?  Isn't that what you have to prove?

MS. MILLER:  So the statements by Squar Milner omit facts that render it misleading to an ordinary investor under *Omnicare*.  There are embedded facts here that are wrong because of these internal control shortcomings and material weaknesses.  And in fact the complaint alleges that two independent analysts were able to discover the fraud shortly after Squar Milner issued its audit report.  And so the idea that they can just allow the secondary offering to incorporate these statements without them being responsible for those reissued statements at a time when all of the defendants, including Squar Milner, were on notice of these independent short seller reports, we sufficiently alleged, under Section 11, that there is a materially false and misleading statement by Squar Milner for

which they are liable.  They can come forward with defenses later but not at this stage.

THE COURT:  Take me through the allegations.

MS. MILLER:  Paragraph 192 is under a heading for "materially false and misleading statements by Squar Milner made and/or incorporated into the secondary offering filings," and there you can see, on page 73 of the complaint, paragraph 192, which discusses the material weaknesses.

THE COURT:  That's what I just read.

MS. MILLER:  Right.  Exactly, your Honor.

Then you go on to paragraph 193.  That addresses the 10-K and the audit report language.  And then paragraph 195 talks about the breach of Squar Milner's duty to investigate despite the red flags regarding the revenues and revenue growth rate.  And that's sufficient under Section 11.

THE COURT:  Let me read 195.

You say they breached their duty to investigate despite red flags regarding the company's reported revenues and revenue growth rate.  Now, what were the red flags?

MS. MILLER:  Well, the red flags are fundamentally addressed in the independent short seller reports, that ultimately led to the announced restatement shortly after this secondary offering was issued for $40 million.  These were red flags that allowed Aurelius and Viceroy to put together detailed allegations, including a 42 percent overstatement of

KATAPAROps

revenue for the first half of 2019, and despite all of the disparagement of short selling, ultimately, when they came out with the restatement release, what percent did they say was at minimum overstated, for the first half of 2019?  42 percent. It's exactly same thing.

THE COURT:  It's hard for me to think that an accountant, once he's finished his audit, will change what he has to do because of a short sellers report.

MS. MILLER:  Your Honor, I would respectfully submit that that's exactly what *Omnicare* requires.  When you have that embedded statement, they absolutely have a duty under Section 11.

They spoke, in the supplemental prospectus on the secondary offering.  What they said --

THE COURT:  What case has said that?

MS. MILLER:  *Omnicare*.

THE COURT:  Yes.  *Omnicare* was not dealing with short sellers.

This is the focus on red flags.  What is it that tells me that the company knew its opinion was wrong or should have known it was not strong enough, or was indifferent to the facts?  the only red flag you're talking about is the short sellers report.

MS. MILLER:  No, your Honor.  In paragraph 195 we talked about additional red flags.  In that paragraph we say

that Squar Milner served as the company's auditor since 2014, and the following thing should have made them aware of red flags regarding the company's reported revenues and realized revenue growth to be false. And that includes knowledge of the company's business and finances, the fact that the accounts receivable ballooned, the publicly disclosed reports that I mentioned, and finally, as I mentioned with respect --

THE COURT: Go ahead.

MS. MILLER: Finally, the last sentence there in that paragraph, talking about an embedded statement of fact, goes back to *Omnicare*. I mean, there's an embedded statement of fact in there. The September supplemental prospectus was issued that incorporated by reference this audit report. And Squar Milner had a duty to know that, if that language was going to go out there again to the public, they had a duty to investigate and know that it wasn't false. And they were reckless.

THE COURT: I'm sorry. I'm missing this. The report is on the 10-K. What was the date of that report?

MS. MILLER: March 18. Oh, I'm sorry. The secondary prospectus. Oh, yes. March 18, 2019. That's when the auditor report was issued within the 10-K.

THE COURT: And what happened after that besides the short sellers?

MS. MILLER: The accounts receivable ballooned, your

KATAPAROps

Honor.  It continued to balloon.

THE COURT:  Now, you said there was some other report that was issued by the company that relied on the March 18, 2019 opinion.

MS. MILLER:  That's the supplemental prospectus for the secondary offering.

THE COURT:  What's the date of that?

MS. MILLER:  9/20/19.

THE COURT:  What did it do that gives you an argument of culpability on the part of Squar Milner?

MS. MILLER:  All we have to allege, your Honor, is that they had a duty to investigate and did not do so and instead allowed their false statements, their audit report, to be incorporated by reference, and used in that secondary offering to raise $40 million, just a month before the restatement release was issued.

THE COURT:  Why did they have a duty to investigate it further?

MS. MILLER:  Because their report was being used to facilitate the offering, to enable the offering.  They raised $40 million in part because they incorporate by reference this audit report.

THE COURT:  Yes.  But what gives rise to a duty to investigate?

MS. MILLER:  The fact that their words were being used

KATAPAROps

again, incorporated by reference, in the offering.  So they spoke again, Squar Milner spoke again, in the secondary offering.

THE COURT:  What is the obligation, if a supplementary prospectus uses a report issued earlier?  Does the accountant have to recertify it?

MS. MILLER:  No, your Honor.

THE COURT:  Does something comes to our attention that changes our opinion?

MS. MILLER:  No, your Honor.

THE COURT:  What does the accountant have to do?

MS. MILLER:  What the accountant has to do is have no reason to disbelieve its statements.  And you can be sure, Squar Milner is a small company, this is an important client. There is no doubt that conversations were had after the short seller reports came out.  And they knew that the report was being used to facilitate the secondary offering.  And any cursory look would have demonstrated that that audit report was not accurate.

THE COURT:  I can tell you this.  I'm left with a strong opinion that Squar Milner was not up to the job.  But I am not able to make the additional leap that that satisfies *Omnicare*.  I'm going to take this under advisement as well. But I want to tell you that I have that difficulty.

MS. MILLER:  Your Honor, if I may just make one final

KATAPAROps

point, I would say that the main defendant, the company and individual defendants, could not have used Squar Milner's audit report again without Squar Milner's consent.  And so, again, if their words are being used to facilitate the offering, of course they have an obligation.  It's their words, and they were on notice, to have reason to be concerned that the words were not accurate.

THE COURT:  Mr. Larkin, first of all, do you agree that Squar Milner had to give consent to the use of its opinion in the September 20, 2019 supplementary prospectus?

MR. LARKIN:  In this particular offering no, because what they were incorporating was a previously filed 10-K, as opposed to it being financial statements that previously were not filed.  Then there might be a consent requirement.  But, here, there was not a consent requirement.

THE COURT:  So what you're saying is that an issuer had to incorporate a prior financial statement and opinion of an accountant without asking the permission of the accountant.

MR. LARKIN:  They don't have to get the consent. They're supposed to advise them.  And then the accountant, once advised, has to follow the steps under AS 4101, I mentioned previously, which are, read the prospectus and ask management any questions they have after having read it.  That's their only obligation.

THE COURT:  That's under, what's the citation?

KATAPAROps

MR. LARKIN:  It's PCAOB rule.  We cite it in our brief.  It's PCAOB rule AS 4101, and specifically it's in subparagraph 10.

THE COURT:  I'll take that issue under advisement as well.

So the only thing I ruled on today is that there are sufficient allegations of false statements.  All other issues are taken under advisement.

Thank you very much for a really fine presentation from both sides.

COUNSEL:  Thank you, your Honor.

(Adjourned)