UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                       :
                                       :      **<u>OPINION AND ORDER</u>**
                                       :      **<u>DENYING MOTIONS TO</u>**
IN RE PARETEUM SECURITIES LITIGATION    :      **<u>DISMISS</u>**
                                       :
                                       :      19 Civ. 9767 (AKH)
                                       :
------------------------------------------------------------ X

ALVIN K. HELLERSTEIN, U.S.D.J.:

           Defendants move to dismiss Lead Plaintiff's First Amended Consolidated

Complaint ("Complaint") against Pareteum Corporation ("Pareteum," or "Company"); Robert H.

Turner ("Turner"); Edward O'Donnell ("O'Donnell"); Victor Bozzo ("Bozzo"); Denis McCarthy

("McCarthy," and together with Turner, O'Donnell, and Bozzo, "the Individual Defendants");

Dawson James Securities Inc. ("DJSI"); and Squar Milner (together with DJSI, "Underwriter and

Auditor Defendants"). The Complaint alleges violations of the Securities Exchange Act of 1934

("Exchange Act") and the Securities Act of 1933 ("Securities Act"), on behalf of a class of

purchasers and/or acquirers of Pareteum securities between December 14, 2017 and October 21,

2019 (the "Class Period").

           With respect to the Exchange Act claims, Plaintiff alleges that Pareteum and the

Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, by

making materially false and misleading statements concerning Pareteum's (1) reported revenue

and realized revenue growth rates; (2) revenue recognition, GAAP compliance, internal controls,

and financial reporting; (3) backlog value and conversion rates; (4) access to a credit facility; and

(5) company growth. The Complaint also asserts control person claims against Turner,

O'Donnell, and Bozzo under Section 20(a) of the Exchange Act.

           With respect to the Securities Act claims, the Complaint alleges that Pareteum,

certain Individual Defendants, and the Underwriter and Auditor Defendants violated Sections 11,

1

12, and/or 15 of the Securities Act in connection with Pareteum's acquisition of iPass Inc. and a $40 million secondary offering of stocks and warrants ("Secondary Offering").  Plaintiff alleges that Defendants made various false and misleading statements in connection with these transactions and the public filings associated with the same.

The gravamen of the Complaint is that Pareteum, under the direction of the Individual Defendants, fraudulently overstated its reported revenues, realized revenue growth rates, and contractual revenue backlog.  When the fraud was revealed and Pareteum announced that it intended to issue a restatement of past financial statements, the Company's share price collapsed.  The Complaint further asserts that the Underwriter and Auditor Defendants are liable for the false financial statements incorporated into the public filings associated with the Secondary Offering.

In their motions to dismiss the Exchange Act claims, Defendants argue that the Complaint fails to show (1) that Defendants made actionably false or misleading statements; and (2) that Defendants acted with scienter.  With respect to the Securities Act claims, Pareteum and its officers seek to dismiss principally on the same grounds as their Exchange Act arguments (*i.e.*, no actionable false statements).  Squar Milner argues principally that its audit opinion is nonactionable and also makes certain standing arguments.  DJSI joins the other Defendants' briefs.

I ruled at oral argument that the Complaint adequately alleged that Pareteum, the Individual Defendants, and DJSI made materially false and misleading statements for purposes of applicable claims under the Exchange Act and the Securities Act.  Having considered and rejected the remainder of Defendants' arguments, I reserved decision on three issues: (1) whether Plaintiff sufficiently pleads scienter for the Exchange Act claims; (2) whether Plaintiff sufficiently pleads "traceability" with respect to the Section 11 claims under the Securities Act in

connection with the Secondary Offering; and (3) whether Plaintiff adequately pleads that Squar Milner made a false statement of material fact sufficient to give rise to liability under Section 11.

For the reasons that follow, the motions to dismiss are denied.

### Factual Background

The following facts are taken from the Complaint, *see* ECF No. 168, and documents incorporated by reference therein.[1]  This opinion describes only the facts relevant to the issues discussed below; the parties' familiarity with the entirety of the case is assumed.

A.  Pareteum's Early History and Creation of the Backlog Metric

Pareteum is a telecommunications software services provider targeting mobile virtual network operators ("MVNOs"), which provide wireless communications to customers, but do not themselves own network infrastructure or create their own software.  *See* Compl. ¶ 6.

Before November 2015, Pareteum was known as Elephant Talk Communications Corporation, "a declining penny stock."  *Id.* ¶ 11.  On November 17, 2015, Elephant Talk announced Turner's appointment as Executive Chairman.  *Id.*  Following a 12-month restructuring effort, on October 31, 2016, the Company rebranded itself as "Pareteum," and appointed Bozzo as CEO.  *Id.*  On January 12, 2017, Pareteum announced the appointment of O'Donnell as CFO, and on February 21, 2018, the Company announced the hiring of McCarthy as Senior Vice President and later President and COO.  *Id.*  Bozzo and McCarthy were former colleagues of Turner, the Executive Chairman.  *Id.*

At some point between November 2015 and February 2018, Turner and others in Pareteum's management changed the way the Company reported revenue by focusing analysts

---

[1] The non-conclusory allegations in the Complaint are "construed in the light most favorable to the plaintiff and assumed to be true."  *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114, 116 n.1 (2d Cir. 2012). The Court may also take judicial notice of public filings.  *See, e.g.*, *In re Morgan Stanley Info. Fund Sec. Litig*, 592 F.3d 347, 354 n.5 (2d Cir. 2010).

and investors on a "36-month Contractual Revenue Backlog" metric, which they described as a "non-GAAP indicative number," a "key performance indicator [that] is directly correlated to our financial and operating results," and "the value of new sales orders intake and the revenue under contract." *Id*. ¶ 12. As alleged, Pareteum and the Individual Defendants frequently reported the backlog, emphasized its reliability, and represented that it was converting into "incremental monthly revenue" at or above 100%. *Id.* Plaintiff alleges that the backlog's value was (1) materially and artificially inflated; and (2) not converting to revenue at or above 100%. *Id.*

During the Class Period, Pareteum and its management reported that the Company's revenues grew from $4.113 million in 1Q18 to $34.1 million in 2Q19, and that its backlog grew from $200 million in 1Q18 to $1.27 billion in 2Q19. *Id*. ¶ 13. During this same period, the Company's share price increased from a low of $0.72 per share, as of December 14, 2017, to a high of $5.93 per share, as of March 18, 2019. *Id.*

B. Pareteum's Sales Surge and Publication of Financial Reports

In December 2017, Pareteum announced to the market that the Company had undergone a successful "restructuring and repositioning" that "establish[ed] a strong outlook for . . . success in 2018 and beyond." *Id*. ¶ 15. Turner told investors that the Company was focused on a "sales surge" to "deliver maximum value," and Pareteum began touting its sales results by reference to its backlog metric. *Id.* Following these representations, Pareteum's stock price increased. *Id.*

Starting in 2018, the Company issued dozens of press releases announcing increasing revenue and sales. On May 7, 2018, Pareteum announced "record" 1Q18 results, reporting revenues of $4.113 million, "up 47% Year-Over-Year"; that the backlog had reached $200 million; and that backlog revenue conversion had reached 103%. *Id*. ¶ 17. Based on these results, Pareteum raised its 2018 revenue outlook to at least 60% over 2017. *Id.*

4

On May 9, 2018, Pareteum sold 2,440,000 shares to raise $6,100,000 for "working capital and general corporate purposes." *Id*. ¶ 18.  On June 6, 2018, Turner announced an amendment to his employment agreement to provide for automatic vesting of his restricted stock awards and options immediately upon the Company entering into an agreement to acquire another company. *Id.*  Thereafter, on June 7, 2018, Pareteum announced an agreement to acquire Artilium PLC ("Artilium") for $104.7 million in stock and cash. *Id.*

On August 6, 2018, Pareteum announced "record" 2Q18 results, reporting "revenues of $6 million, up 85% year-over-year"; an increase in the backlog to $276 million; and backlog revenue conversion of 106%. *Id*. ¶ 19.  The Company raised the 2018 revenue outlook to be greater than 80% over 2017. *Id.*

Between September and October 2018, Pareteum issued five press releases announcing $134 million in new contracts. *Id*. ¶ 20.  These press releases identified, for the first time, some of the new customers and contracts announced in those releases. *Id.*  Plaintiffs allege that "virtually all" the companies were incapable of generating the $134 million in revenue claimed by Pareteum. *Id.*

On October 24, 2018, Pareteum announced that it had increased the backlog to $500 million. *Id*. ¶ 21.  On November 7, 2018, Pareteum announced "record" 3Q18 results, reporting revenues of $8 million, "up 129% Year-Over-Year"; an increase in backlog to $403 million; and backlog revenue conversion of 100%. *Id.*  Based on these results, Pareteum raised its 2018 revenue outlook to more than 100% over 2017. *Id.*

On March 12, 2019, Pareteum announced "record" 4Q18 and FY18 results, reporting year-over-year revenue growth of 139% for FY18 and 256% for 4Q18, and that the Backlog had quadrupled to $615 million, with a 100% conversion rate. *Id*. ¶ 24.  The Company also provided revenue guidance for 2019 in the range of a 225-260% increase year-over-year. *Id.*  During an earnings call on March 24, 2019, Turner and McCarthy told investors that the

Company was poised for "dramatic revenue growth . . . fueled by the growth of our [backlog]

and its conversion of that backlog into billing customers"; that the backlog was a reliable

indicator of revenue; and that the backlog was converting into "incremental monthly revenue" at

"over 100% for the year." *Id.* Following these statements, Pareteum's shares increased from

$3.91 per share on March 12, 2019 to, $5.15 per share before closing at $4.79 per share on

March 13, 2019. *Id.*

On March 18, 2019, Pareteum released its Form 10-K for the fiscal year 2018,

and announced that, throughout 2018, the Company had experienced "material weaknesses in its

internal control over financial reporting, [such that its] disclosure controls and procedures were

not effective as of December 31, 2018." *Id*. ¶ 59. The 10-K was signed and certified by Turner,

O'Donnell, and Bozzo. *Id.* Specifically, the Company disclosed that:

> Our management, with the participation of our principal executive officer and chief
> financial officer[,]…concluded that because of material weaknesses in its internal control
> over financial reporting, as further described below, our disclosure controls and procedures
> were not effective as of December 31, 2018.
>
> ***
>
> [O]ur management has identified the following deficiencies that constitute material
> weaknesses in the Company's internal controls over financial reporting:
>
> Inadequate and ineffective management assessment of internal control over financial
> reporting, including insufficient experienced resources to complete the documentation of
> internal control assessment.
>
> Ineffective design, implementation and monitoring of information technology general
> controls pertaining to the Company's change management process.

*Id*. Immediately following these disclosures, Pareteum stated that:

> The material weakness did not result in any identified misstatements to the financial
> statements, and there were no changes to previously released financial results.
>
> * * *
> Squar Milner LLP, the Company's independent registered public accounting firm,
> expressed an unqualified opinion for the audit of our consolidated financial statements as
> of and for the year ended December 31, 2018….

*Id.* ¶ 62.

The FY18 10-K also stated that Pareteum's management had been implementing measures to remediate control deficiencies, including a review and documentation of financial reporting processes.  *Id.* ¶ 63.  The Company predicted that these actions would remediate the material weaknesses, with remediation expected to be completed prior to the end of Fiscal Year 2019.  *Id.*

The FY18 10-K also noted that the Company's accounting firm, Squar Milner, had provided an "unqualified opinion," stating that it had considered the failure in internal controls and material weaknesses in conducting its audit of Pareteum's financial statements, and concluded that such weaknesses did not affect its unqualified opinion.  *Id.* ¶ 64.  The Company also stated that there had been no changes to its internal controls that had materially affected or were reasonably likely to affect internal control over financial reporting.  *Id.* ¶ 65.  Finally, Pareteum represented in its 1Q19 Form 10-Q that the Company was performing additional analysis to remediate discovered financial reporting issues.  *Id.* ¶ 66.  Specifically, the 10-Q provided that:

> In light of the material weakness described below, we performed additional analysis and other post-closing procedures to ensure our financial statements are prepared in accordance with generally accepted accounting principles.
>
> * * *
> We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of March 31, 2019, these efforts are ongoing. We are committed to maintaining a strong internal control environment and believe that these remediation actions will represent significant improvements in our controls.

*Id.*  The 2Q19 10-Q contained substantially the same statements.  *Id.*  Pareteum's FY18 10-K was signed by Turner, O'Donnell, and Bozzo.  *Id.* ¶ 67.  The Company's 1Q19 and 2Q19 10-Qs were signed by Turner and O'Donnell.  *Id.*

On March 19, 2019, shares traded at a Class Period high of $5.93 per share. *Id.*
¶ 24.  On May 7, 2019, Pareteum announced its 1Q19 results, reporting revenue of $23 million; a
Backlog value of $938 million; and a Backlog conversion rate of 101%. *Id.* ¶ 26.  Pareteum also
raised its revenue guidance for 2019 to increase 255-285% year-over-year. *Id.*

### C.  iPass Acquisition

On November 12, 2018, the Company announced an agreement to buy iPass Inc.
("iPass") in an all-stock tender offer, in which Pareteum issued approximately 10 million shares
of its stock to the shareholders of iPass ("iPass Acquisition"). *Id.* ¶¶ 22, 178.  The tender offer
was completed, and the acquisition closed on February 12, 2019. *Id.*  ¶ 178.  In connection with
the iPass Acquisition, Pareteum filed numerous forms with the SEC, which incorporated the
Company's financial information. *See id.*  ¶¶ 179–181.

### D.  Credit Facility

On February 26, 2019, Pareteum secured a $50 million credit facility from Post
Road Group ("Credit Facility"). *Id*. ¶ 23.  That same date, Pareteum drew down $25 million
from the facility. *Id*. ¶ 37.  On August 23, 2019, Pareteum announced that the Company had
been in default of its Credit Facility, and admitted to eleven breaches, including (a) that the
Company had failed to make its first interest payment, due March 31, 2019; (b) that the
Company failed to provide the Post Road Group with any of its financials; and (c) that the
Company was unable to obtain and timely deliver the consents required to access the remaining
funds available in the facility. *Id*. ¶ 37.  To obtain further financing and a waiver of the breaches,
Pareteum issued 750,000 shares of stock to Post Road Group. *Id*. ¶ 38.  That same month,
Pareteum announced that it was selling up to 1,311,439 additional shares to settle balances owed
to vendors. *Id.*  Following these revelations, Pareteum's stock dropped from about $3.00 per
share on August 23, 2019, to about $2.00 per share on August 26, 2019. *Id.*  On August 26,
2019, Turner stated that the waiver of the breach of the facility would "put the company on a

firm footing for our ambitious growth strategies that will continue to be executed this quarter and beyond." *Id.*

E.  Squar Milner's Audit Opinion

Squar Milner served as Pareteum's independent auditor since 2014, and specifically for Pareteum's FY17 and FY18 consolidated financial statements.  The financial statements were included in Pareteum's FY18 10-K and incorporated by reference into the Registration Statement for the Secondary Offering.  *See id.* ¶ 177.  On March 18, 2019, Squar Milner issued an audit report, which was included in Pareteum's FY18 10-K and which contained statements regarding Pareteum's FY18 revenues and financial reporting.  In that document, Squar Milner issued an unqualified opinion certifying that Pareteum's financial statements fairly presented the Company's financial position and were prepared in accordance with GAAP.  *Id.* ¶ 192.

On the basis of its audit, Squar Milner commented on deficiencies in Pareteum's internal controls, commenting specifically that "the Company has not maintained effective internal control over financial reporting as of December 31, 2018," and that, "*there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis*."  Squar Milner's "Report of Independent Registered Public Accounting Firm to the Shareholders and the Board of Directors of Pareteum Corporation," stated:

**Opinion on the Internal Control Over Financial Reporting**

We have audited Pareteum Corporation's and its subsidiaries (the Company) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. In our opinion, because of the effect of the material weaknesses described below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control —

Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 ("COSO").

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2018 and 2017 and the related consolidated statements of comprehensive loss, shareholders' equity and cash flows for the years then ended and our report dated March 18, 2019 expressed an unqualified opinion.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in internal control have been identified as material weaknesses over the Company's control environment and monitoring pursuant to the COSO framework:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment and ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and this report does not affect our report dated March 18, 2019.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material risk exists, and testing and evaluating the design and operating effectiveness of internal control based on assessed risk. Our audit also included performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statement for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipt and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

\s\ Squar Milner LLP
Los Angeles, California
March 18, 2019

Compl. ¶ 192; Squar Milner Mem. at 2–3.

That same day, Squar Milner also issued a report in connection with the firm's audit of Pareteum's consolidated financial statements for 2017 and 2018:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Pareteum Corporation and its subsidiaries (the Company) as of December 31, 2018 and 2017, the related consolidated statements of comprehensive loss, changes in stockholders' equity (deficit) and cash flows for the years then ended, and the related notes to the consolidated financial statements (collectively, the financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (Untied States) (PCAOB), the Company's internal control over financial

reporting as of December 31, 2018, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Our report dated March 18, 2019 expressed an opinion that the Company had not maintained effective internal control over financial reporting as of December 31, 2018 based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Squar Milner, LLP

We have served as the Company's auditor since 2014.

Los Angeles, California
March 18, 2019

Compl. ¶ 192; Squar Milner Mem. at 4-5.

F.   <u>Market Letter Criticisms</u>

On June 7, 2019, Marcus Aurelius Value published a report alleging that Pareteum had inflated and fabricated revenues and backlog, overstating the ability of certain customers to generate tens of millions of dollars in revenue ("Aurelius Report").  Compl. ¶ 28.

The Aurelius Report included an analysis of Pareteum's backlog and the few customers and contracts identified by Pareteum, and provided examples of customers appearing to be "wholly incapable of paying . . . anywhere near the large contractual values" that Pareteum had reported. *Id.* The Aurelius Report concluded that Pareteum's "Purported $900 Million Backlog Appear[ed] Significantly Exaggerated or Fictitious." *Id.* Aurelius also attacked Pareteum's claims of converting 100% of backlog to revenue, commenting that (a) O'Donnell (the CFO) had perpetrated a similar fraud at his previous employment; and (b) Pareteum's accounts receivable had grown faster than revenues, which would not have occurred with a conversion rate of 100%. *Id.* at 29. The report predicted that Pareteum would face "serious accounting problems," if "exaggerated contractual values are now being recognized as revenue." *Id.* Pareteum's shares fell from $3.41 per share on June 6, 2019, to an intra-day low of $2.00 per share, on high volume. *Id.* ¶ 30.

On or about June 10, 2019, Pareteum responded to the Aurelius Report by a letter to shareholders from Turner, stating that "[w]e categorically deny the allegations put forth. We do not intend to legitimize these reports by delving into them. Pareteum has experienced tremendous growth, and we continue to grow in a healthy and measurable way." *Id.* ¶ 31. Around that same time, Pareteum's share price increased to $3.00. *Id.*

On June 26, 2019, the Viceroy Research Group issued a report ("Viceroy Report") echoing, and claiming independently to corroborate, the Aurelius Report, and revealing new details, including that (a) an investigation into Pareteum's customers revealed that many were incapable of fulfilling the contract revenues announced by Pareteum; (b) two of Pareteum's customers really were related parties, and another customer had been charged with tax fraud. *Id.* ¶ 32. Viceroy posited that the Company must have been aware of these issues because such information was "easily available." *Id.*

13

After analyzing Pareteum's revenues, cash flows, and receivables, Viceroy concluded that the majority of Pareteum's revenues from sources other than Vodaphone, its largest customer, and the businesses that it had acquired, were uncollectible. *Id*. ¶ 33. Based on this analysis, Viceroy opined that Pareteum's total revenue was overstated by 42%. *Id.* Further, the report concluded that the backlog metric was inaccurate because the Company should have recorded 73.10% more revenue in 1Q19 if the backlog was converting at or above 100%. *Id.* The Viceroy Report concluded that Pareteum was "terminally unprofitable," with a suspicious growth narrative, and urged an investigation into the Company's officers and revenue recognition practices and internal controls. *Id*. ¶ 34. The next day, Pareteum's shares declined 20%. *Id.*

On June 27, 2019, Pareteum responded to both reports, stating that "Pareteum categorically denies all allegations put forth in the short seller reports . . . .  We look forward to sharing additional information about our growth and success in future earnings releases." *Id*. ¶ 35.  On July 1, 2019, the Company announced its 2Q19 results, representing that Pareteum would "exceed current analysts' consensus of $26.2 million for revenue." *Id.*  Following the June 27 and July 1, 2019 statements, Pareteum's stock recovered from the June 26 decline. *Id.*

Following the release of the short-seller reports, Pareteum's volume of press releases decreased dramatically.  Compared to dozens of reports issued over the preceding months, Pareteum released two releases in June 2019 and four in July 2019. *Id*. ¶ 36.  None of these releases contained information regarding revenue or the backlog. *Id.*

G.  Pareteum's Abandonment of Backlog as a Metric of Profitability

On August 6, 2019, Turner announced that the Company would retire and replace using the backlog as a measure of performance, which Turner represented had grown to "over $1.270 billion," and noted that the Company no longer considered the backlog to be a "key performance indicator" or "lead indicator of revenue." *Id.*  Specifically, Turner noted that:

14

[N]ew sales order 36-month backlog metric will now be replaced as an external metric. It has served its purpose and now provides us significant internal transparency into new sales orders and their conversion into billable revenues. We can now see clearly the strength in our revenues and their expected growth, therefore it is our reported quarterly results and the annual guidance provided, which are the strongest indicators of our expected growth and continued financial successes in the coming periods. We will, therefore, form[al]ly retire backlog as a key performance indicator and no longer report it after Q3 of this year.

*Id.*

H. <u>Secondary Offering</u>

On September 20, 2019, Pareteum closed a $40 million public offering of common stock and warrants ("Secondary Offering"). *Id.* ¶¶ 39, 184. DJSI served as underwriter for that offering. *Id.* ¶ 191. The Secondary Offering was registered for sale pursuant to a November 30, 2018 Form S-3 Amended Registration Statement, a December 18, 2018 Prospectus, and a September 20, 2019 Supplemental Prospectus (together, "Secondary Offering Filings"). *Id.* ¶ 185. The Secondary Offering was followed by a decline in the Company's share price to above $1.50 per share. *Id.* ¶ 39.

I. <u>Pareteum Announces Restatement</u>

On October 21, 2019, Pareteum issued a press release ("Restatement Announcement") disclosing the following: (a) that the Company would restate its previously issued financial statements for FY18 and 1H19; (b) that investors should "no longer rely upon the Company's previously released financial statements" and related releases and communications for these periods; (c) that "certain revenues recognized during 2018 and 2019 should not have been recorded during that period," and that for "certain customer transactions, the Company may have prematurely or inaccurately recognized revenue"; and (d) that the estimated revenue reduction for FY18 and 1H19 would be approximately $9 million and $24 million, respectively. *Id.* ¶ 40. These reductions represented a 28% reduction in reported revenue for FY18, and a 42% reduction in revenue reported in 1H19. *Id.*

On November 15, 2019, the Company announced that, due to a delay in filing its 3Q19 10-Q, it was no longer compliant with Nasdaq's listing rules; the Company later received a listing extension and disclosed that it expected to complete its financial restatement on or before October 30, 2020. *Id.* ¶ 41. The full text of the Restatement Announcement reads:

Pareteum Corporation (Nasdaq: TEUM) today announced that the Company will restate its previously issued consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019 and June 30, 2019. This decision was approved by the Company's Board of Directors upon the recommendation of the Company's Audit Committee, and after consultation with management and the Company's independent registered public accounting firm.

Investors should no longer rely upon the Company's previously released financial statements for the time periods cited above. Similarly, related press releases, earnings releases, and investor communications describing the Company's financial statements for these periods should no longer be relied upon.

The decision to restate these financial statements is based on the Company's conclusion that certain revenues recognized during 2018 and 2019 should not have been recorded during that period. For certain customer transactions, the Company may have prematurely or inaccurately recognized revenue. These restatements should not impact historical cash or cash equivalents based upon the current review. At the present time, the restatements are expected to impact Revenue, Cost of Service, Operating Income, Net Loss, Accounts Receivable and other Balance Sheet line items. While the Company's analysis is still underway, the Company currently estimates the revenue impact for the full year 2018 to be a reduction of approximately $9 million. For the first half of 2019, the Company currently estimates the revenue impact to be a reduction of approximately $24 million.

At this time, the Company has not fully completed its review and the expected financial impact of the restatement described above is preliminary and subject to change. The Company cannot predict the aggregate amount of revenue that will ultimately be restated, whether additional periods beyond those referenced above will be affected, and the final outcome or timing of the Company's filing of restated financial statements for the affected annual and quarterly periods. Until the full magnitude of these transactions is analyzed and understood, the Company cannot provide forward guidance, and expects financial results for the second half and full year 2019 will be materially below current analysts' estimates.

Pareteum has achieved a significant business transformation over the last few years, including the completion and integration of two large acquisitions, Artilium and iPass. The Company recently discovered internal control issues related to the accuracy and timing of the recognition of revenue. The Company is undertaking a financial review and is taking proactive steps to improve the oversight and controls associated with customer transactions. This restatement does not impact day-to-day operations and the Company continues to be encouraged by the positive customer interest in Pareteum's global cloud

communications platform and its other products and services. Today's announcement reiterates Pareteum's commitment to best practices and upholding the highest standards of financial reporting. The Company recognizes the seriousness of the restatement and will continue to evaluate and implement a broad range of measures and controls to ensure that Pareteum has a strong foundation of processes, procedures, systems and talent in order to capitalize on future global growth opportunities.

Pareteum cannot at this time estimate when the restatement will be completed. The Company will continue to diligently pursue completion of the restatement and intends to make its upcoming 2019 quarterly filings as soon as reasonably practical.

Following the Restatement Announcement, Pareteum's shares declined to $0.37 per share on October 22, 2019.  Compl. ¶ 40.

J.   Procedural History

In late 2019, multiple class-action lawsuits were filed against Pareteum and various Company officers and directors.  On January 10, 2020, the Court consolidated these separate actions, and appointed Pareteum Shareholder Investor Group as the lead plaintiff ("Lead Plaintiff") and Lead Plaintiff's counsel.  ECF No. 79.  Lead Plaintiff filed a complaint on February 26, 2020, asserting claims against Pareteum, several Company officers and directors, DJSI, and Squar Milner.  ECF No. 98.  Defendants moved to dismiss, and following briefings by the parties, the Court dismissed the complaint without prejudice due to the Complaint's failure to comply with Rules 8 and 9 of the Federal Rules of Civil Procedure, and the particularity requirements of the PSLRA.  ECF No. 162.  On July 17, 2020, Lead Plaintiff filed an amended complaint, ECF No. 168, and Defendants again moved to dismiss.  *See* ECF Nos. 175, 177, 180, 183.  An oral argument was held on October 29, 2020.

The Complaint asserts seven causes of action.  *See* Compl. ¶¶ 156–69, 198–215. Count I alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Pareteum and the Individual Defendants.  Count II asserts control person claims against Turner, O'Donnell, and Bozzo, under Section 20(a) of the Exchange Act. Count III asserts claims against Pareteum, Turner, O'Donnell, and Bozzo under Section 11 of the

Securities Act in connection with the iPass Acquisition.  Count IV asserts claims against

Pareteum under Section 12(a)(2) of the Securities Act; and Count V asserts control person claims

against Turner, O'Donnell, and Bozzo under Section 15 of the Securities Act.  Count VI asserts

violations of Section 11 of the Securities Act in connection with the Secondary Offering against

Pareteum, Turner, O'Donnell, Bozzo, DJSI, and Squar Milner; and Count VII asserts control

person claims against Turner, O'Donnell, and Bozzo under Section 15 of the Securities Act.

<strong>Discussion</strong>

During oral argument, I held that Plaintiff sufficiently alleged that the Defendants

made false and misleading material statements with respect to five categories of information,

sufficient to give rise to potential liability under the Exchange Act and Securities Act claims.[2]  I

reserved decision on three issues:  (1) whether Plaintiff adequately pled scienter in connection

with its Exchange Act claims; (2) whether Plaintiff adequately pled traceability as to its

Section 11 claims in connection with the Secondary Offering; and (3) whether Plaintiff showed

an actionably false or misleading statement by Squar Milner in connection with that Secondary

Offering.  I address each of these issues in turn.

A.  <u>Standard of Review</u>

To survive a motion to dismiss, a plaintiff must allege sufficient facts to "state a

claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While

the Court is obliged to accept as true all well-pleaded factual allegations in the complaint, and

draw reasonable inferences in the plaintiff's favor, it need not accept as true the complaint's legal

conclusions or threadbare recitations of the elements of a cause of action.  *In re AmTrust Fin.*

*Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at *10 (S.D.N.Y. Sept. 9,

---

[2]  These five categories include, (i) reported revenue and realized revenue growth rates; (ii) Revenue Recognition, GAAP Compliance, Internal Controls, and Financial Reporting; (iii) Backlog; (iv) the Credit Facility; and (v) Growth.  *See* Tr. (ECF No. 199) at 14–24.

2019) (citing *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)).  In ruling on a motion to dismiss, a

court "may consider any written instrument attached to the complaint, statements or documents

incorporated into the complaint by reference, legally required public disclosure documents filed

with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in

bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007).

       In addition, a complaint alleging fraud under the securities laws must satisfy

heightened pleading requirements under Rule 9(b) and the Private Securities Litigation Reform

Act ("PSLRA").  *Id.*  Rule 9(b) requires that "the circumstances constituting fraud . . . shall be

stated with particularity."  Fed. R. Civ. P. 9(b).  "A securities fraud complaint based on

misstatements must (1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent."  *Id*. (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

       Similarly, the PSLRA "requires that 'the complaint shall specify each statement

alleged to have been misleading, the reason or reasons why the statement is misleading, and, if

an allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed.'"  *Id*. (citing 15

U.S.C. § 78u–4(b)(1)); *In re AmTrust*, 2019 WL 4257110, at \*10.  The PSLRA also imposes

heightened scienter requirements for securities fraud actions.  *See ECA, Local 134 IBEW Joint

Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 196 (2d Cir. 2009) ("Under the

PSLRA, the complaint must . . . state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind. Therefore, [w]hile we normally draw

reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a

more stringent rule for inferences involving scienter because the PSLRA requires particular

allegations giving rise to a strong inference of scienter." (quotations and citations omitted)).

B.  Exchange Act Claims

ii)   Material Misstatements or Omissions

"To support a finding of liability, Rule 10b–5 expressly requires an actual statement, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016).  For a statement to be actionable under Section 10(b), "the statement must be false, and the statement must be material. Neither immaterial false statements nor material true statements are actionable."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

With respect to falsity, a claim for securities fraud premised on misstatements "cannot occur unless an alleged material misstatement was *false at the time it was made*."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571.   "Thus, a statement believed to be true when made, but later shown to be false is insufficient."  *In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *12 (S.D.N.Y. Apr. 2, 2020).

To establish materiality, a plaintiff must show that there was "a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 572 (citing *Basic*, 485 U.S. at 238).   Put another way, a "statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'"  *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 549 (S.D.N.Y. 2017) (quoting *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015)).   "[T]he question of whether a reasonable investor would find a particular misrepresentation or omission 'material' to an investment decision is usually a matter reserved for the trier of fact."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017).   Accordingly, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not

21

material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

    iii) <u>Opinion Statements</u>

        Statements of opinion can give rise to liability under the securities laws "in two distinct ways." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 23 (S.D.N.Y. 2016). First, liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting facts she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund.*, 575 U.S. 175, 185–86 (2015)). "[F]raud by hindsight" is not permissible; "it is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Lopez*, 173 F. Supp. 3d at 24.

        Second, "opinions, although sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194). A reasonable investor "expects not just that [the speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189. To sufficiently allege that an opinion was false or misleading because it omitted material information, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194).

        The "core inquiry is whether the omitted facts would conflict with that a reasonable investor would take from the statement itself." *Id*. This is "no small task for an

investor," and "reasonable investors understand that opinions sometimes rest on a weighing of competing facts . . . [and do] not expect that every fact known to an issuer supports its opinion statement." *Id.* (internal quotations omitted).  Thus, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (citing *Omnicare*, 575 U.S. at 190).

iv)  Scienter

To adequately plead scienter under the PSLRA, "a plaintiff must plead 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u–4(b)(2)).  For purposes of an action under Section 10(b) and Rule 10b-5, the requisite state of mind is an intent "to deceive, manipulate or defraud." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).

"In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit.  Recklessness is defined as 'at the least . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 300).  A plaintiff seeking to demonstrate scienter by showing recklessness must plead "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Ellington Mgmt. Grp., LLC v. Ameriquest Mortg. Co.*, No. 09 CIV. 0416 (JSR), 2009 WL 3170102, at *2 (S.D.N.Y. Sept. 29, 2009) (quoting *South Cherry Street, LLC v. Hennessee Group LLC, et al.*, 573 F.3d 98, 109 (2d Cir. 2009).  "In the absence of concrete allegations that senior management knew of, but actively ignored the purported violations, [e]ven an egregious failure to gather information will not establish 10b–5 liability as long as the defendants did not deliberately shut their eyes to the facts." *Ellington Mgmt. Grp., LLC*, 2009 WL 3170102, at *3 (quotations omitted).

23

The Supreme Court in *Tellabs* held that, to qualify as a "strong inference" under the PSLRA, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."   551 U.S. at 314.  This inquiry is "inherently comparative" and a court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 323-24; *see also ECA*, 553 F.3d at 198 ("In determining whether this inference can be reasonably drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively.").

In this Circuit, "scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.

To plead motive and opportunity to defraud, a plaintiff must allege that the company or its officers "benefitted in some concrete and personal way from the purported fraud."  *Id.* (citing *Novack*, 216 F.3d at 307-08).  Importantly, motives that are "common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.*; *see also Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) ("[A]s a general matter, incentive compensation can hardly be the basis on which an allegation of fraud is predicated." (quotations omitted)).

If plaintiffs cannot establish motive and opportunity, they can alternatively raise a strong inference of scienter under the "strong circumstantial evidence prong," though "the strength of the circumstantial allegations must be correspondingly greater if there is no motive." *Id.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quotations omitted)).  The Second Circuit has noted four circumstances giving rise to a strong inference of the requisite

24

scienter: "where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *Id.* (quoting *Novak*, 216 F.3d at 311).

To establish scienter with respect to a corporate defendant, a plaintiff must plead facts creating "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  In most cases, such an inference can be generated by pleading scienter as to an individual defendant occupying such a role.  *Id.*

v) <u>Control Person Liability</u>

The Exchange Act imposes liability on those who control the primary violator. *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).  Specifically, Section 20 provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t (West).

To establish a prima facie case of control person liability, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108.  "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by

contract, or otherwise.'" *First Jersey*, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b–2). The failure to allege a primary violation is fatal to a control person claim. *ATSI*, 493 F.3d at 108.

## 2. Application

In their motions to dismiss the Exchange Act claims, Pareteum and the Individual Defendants contest the material misrepresentation prong and the scienter prong. As noted above, I held during oral argument that Plaintiff sufficiently alleged material misrepresentations by the Defendants during the Class Period with respect to five categories of alleged misstatements. Accordingly, the remaining issue is whether Plaintiff adequately pleads scienter. For the reasons stated below, I find that Plaintiff has met its burden.

In support of scienter, Plaintiff pleads Defendants' motive and opportunity and circumstantial evidence of intentional or reckless misconduct to satisfy the requirement of scienter. As to motive and opportunity, Plaintiff alleges that Pareteum and the Individual Defendants were motivated falsely to inflate Pareteum's stock in order to (1) use the inflated stock to purchase other companies and "buoy" false metrics; (2) enable the Individual Defendants to profit from the Company's "Long-Term Incentive Compensation Plan," which linked compensation to achievement of certain performance goals; and (3) fund corporate operations and pay salaries. *See* Compl. ¶¶ 118–21.

These allegations alone are not sufficient to give rise to a strong inference of scienter, because "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 CIV. 8846 LGS, 2014 WL 7176187, at *5 (S.D.N.Y. Dec. 16, 2014) (quoting *ECA*, 553 F.3d at 198); *see also Nguyen*, 297 F. Supp. 3d at 498 ("[A]s a general matter, incentive compensation can hardly be the basis on which an allegation of fraud is predicated." (quotations omitted)); *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 CIV. 1897HB, 2009 WL

3380621, at *12 (S.D.N.Y. Oct. 19, 2009) ("[T]he alleged motivations of a corporation to halt a drop in its stock price, raise money or preserve access to capital or lines of credit are all 'far too generalized (and generalizable) to allege the proper "concrete and personal" benefit required by the Second Circuit.'" (quoting *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009)).

Plaintiff's allegations of "strong circumstantial evidence" as proof of scienter fare better. The individual officers were the ranking officers of Parateum and responsible for the Company's optimistic estimates of backlog and revenue reported in the discussion sections of the 2018 10-K. It was they who reported a 600% increase of backlog between 1Q18 and 2Q19, from $200 million to $1.27 billion, and an even greater increase in revenue of 830%, from $4.113 million to $34.1 million, in the same time period. The Individual Defendants forecast even greater revenues in the future for, as they said, Parateum was realising more than 100% of revenue from its backlog.

At the same time, the Company's auditors advised Defendants that their internal controls over financial reporting were "inadequate and ineffective." Compl. ¶ 59. Although the auditors were not aware of "identified misstatements to the financial statements" and issued an "unqualified" opinion, the report of a clean condition did not last very long. Seven months later, on October 21, 2019, Parateum admitted that its "financial statements were not reliable," Compl. ¶ 62, and its 2018 revenues had to be reduced by $9 million, or 28%, and even more for the first half of 2019. Parateum's financial condition was even worse. It was unable to file reliable reports and was no longer compliant with Nasdaq's listing rules.

One who utters a statement knowing it is false, or indifferent to whether it is true or false, speaks with scienter. *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021) (holding that the complaint established circumstantial evidence of scienter by

27

plausibly alleging that "Individual Defendants knew that, on days when market volatility increased, Credit Suisse's hedging trades would cause a spike in the price for VIX futures contracts" but failed to adequately so disclosed in its offering documents).  The Individual Defendants, Robert H. Turner, Edward O'Donnell, Victor Bozzo, and Denis McCarthy, signed Parateum's 10-K and were responsible for its representations of revenue and Backlog.  They knew, because they were advised by the Company's auditors, that the Company's internal controls were "inadequate and ineffective" to make these representations with any degree of belief that they were accurate and reliable.  The proximity and size of the restatements, just seven months after the Individual Defendants firm and rosy representations of revenue, backlog, and realization add further strength to the strong circumstantial evidence of scienter.  *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (finding allegations of temporal proximity support an inference of scienter); *see also S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 324 (S.D.N.Y. 2019) (same).

While the magnitude of a restatement of revenue is not sufficient by itself to constitute scienter, the size of the alleged fraud "can be relevant to the scienter inquiry," provided it is "presented in tandem with other circumstantial evidence to suggest scienter."  *In re Iconix Brand Grp., Inc.*, No. 15 CIV. 4860 (PGG), 2017 WL 4898228, at *17 (S.D.N.Y. Oct. 25, 2017); *In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *15 ("[W]hen paired with allegations of knowledge or recklessness the fact of the restatement, as well as its size and relation to a defendant's 'core operations' are all some evidence of scienter.").[34]

---

[4] The same can be said of Plaintiff's "core operations" argument, which is a theory that "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 623–24 (S.D.N.Y. 2017).  Some courts have cast doubt on whether this doctrine survived the PSLRA's heightened scienter requirements, but the majority of courts in this Circuit have found that "doctrine may provide support for, but not an independent basis of, scienter." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 n.11 (S.D.N.Y. 2015) (collecting cases); *see In re Inv. Tech. Grp.*, 251

The timing of terminations and resignations, in relation to the magnitude of corrections in a restatement, also can be a strong inference of scienter, "approaching recklessness or even conscious malfeasance" as to the targeted individuals. *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) (collecting cases); *Glaser v. The9, Ltd*., 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) ("Such can be the case when independent facts indicate that the resignation was somehow tied to the alleged fraud, that the resignation somehow alerted defendants to the fraud, or that defendants' scienter was otherwise evident."); *In re Sadia, S.A. Sec. Litig.,* 643 F. Supp.2d 521, 523–24, 534 (S.D.N.Y.2009) (citing, as support for corporate scienter, the resignations of the company's chairman and vice chairman occurring less than two weeks after the company's fraud was revealed); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (finding that executive's resignations added to the overall pleading of circumstantial evidence of fraud).

Here, the terminations or replacements of Turner, McCarthy, and O'Donnell, occurring within a few weeks of the Company's announcement of a substantial restatement of its financial condition and operations, contribute to a strong inference of scienter.  Parateum's Restatement was accompanied by the termination of principal officers, the Individual Defendants.  First came McCarthy, the President and COO of Parateum, on October 9, 2019, 12 days before the Restatement Announcement.  Compl. ¶ 123.  Shortly after the Restatement Announcement, on November 5, 2019, Pareteum's CFO, O'Donnell, was removed from office and his status with the Company came "under review."  *Id.*  On November 25, 2019, Pareteum fired Turner as Chairman and CEO.  *Id.*   The motion of Turner, McCarthy, and O'Donnell to be dismissed from the complaint is denied.

---

F. Supp. 3d at 624 ("[R]ecent case law within this Circuit indicates that reliance on a 'core operations' inference may provide 'supplemental support' for establishing scienter, but is not independently sufficient.").

C.  Claims Under the Securities Act

    **1.  Legal Principles**

        i)  Overview

            "Sections 11, 12(a)(2) and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions.  Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. §§ 77k(a), 77l (a)(2)).  Section 15 imposes liability on individuals who "control[] any person liable under sections 11 or 12."  *Id.* (citing 15 U.S.C. § 77o).  Accordingly, "the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12."  *Id.*

        ii)  Sections 11, 12 and 15

            "Section 11 of the Securities Act imposes liability on issuers and other signatories of a registration statement that, upon becoming effective, 'contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011) (quoting 15 U.S.C. § 77k(a)).  To assert a claim under Section 11, a plaintiff must allege that "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *In re Morgan Stanley*, 592 F.3d at 358–59 (quotations omitted).

Section 12(a)(2) of the Securities Act imposes similar liability "where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Morgan Stanley*, 592 F.3d at 359.  In contrast to Section 11, where liability attaches only to specific offering participants, Section 12 applies to a broader class of "statutory sellers." *Id.*  An individual is a "statutory seller" if he: "(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner." *Id.* (citing *Pinter v. Dahl*, 486 U.S. 622, 643–47 (1988) (quotations omitted)).  Thus, the prima facie elements of a Section 12(a)(2) claim are "(1) the defendant is a statutory seller; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." *Id.* (citing 15 U.S.C. § 77l(a)(2) (quotations omitted)).

The burdensome requirement of scienter, required to state a claim under Section 10(b) and Rule 10b-5 of the Exchange Act, is not applicable to a claim under Sections 11 and 12 of the Securities Act.  Issuers under section 11 are subject to virtually absolute liability. Other defendants are given a defense of due diligence, but it is they who must allege and prove the defense. *Id.*[5] As the Supreme Court noted:

> [Section 11] was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.  If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case.  Liability against the issuer of a security is virtually absolute, even for innocent misstatements. Other defendants bear the burden of demonstrating due diligence. See 15 U.S.C. § 77k(b).

---

[5] Section 11 provides due diligence defenses to non-issuer defendants.  15 U.S.C. § 77k(b).  However, "defendants bear the burden of demonstrating the applicability of each of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 n.7 (2d Cir. 2010).

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983); *see also Morgan Stanley*, 592 F.3d at 359-60 ("[U]nlike securities fraud claims pursuant to section 10(b) . . . plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation.").

"So long as a plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading—then, in a Section 11 case, the general rule [is] that an issuer's liability . . . is absolute." *Litwin*, 634 F.3d at 715–16; *see In re AmTrust*, 2019 WL 4257110, at *11 (same for Section 12(a)(2) claims).

"A plaintiff who challenges a statement of fact under the Securities Act must allege adequately that the fact was untrue at the time the statement was made or that it omitted to state a material fact necessary to make the statement made not misleading.  A plaintiff challenging a statement of opinion has a harder task.  That plaintiff must do more than simply plead that the opinion was wrong.  The plaintiff must plead facts that, if true, would be sufficient to show that: (1) the speaker did not actually hold the stated belief at the time the statement was made, or (2) the opinion did not rest on some meaningful inquiry, or standard process followed to reach such an opinion, thereby rendering it misleading to a reasonable person reading the statement fairly and in context."  *In re AmTrust*, 2019 WL 4257110, at *12.

Section 15 imposes liability on individuals or entities that control any person liable under Sections 11 or 12.  *Panther*, 681 F.3d at 114; 15 U.S.C. § 77o.  Thus, "the success of a claim under Section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12."  *Morgan Stanley*, 592 F.3d at 358.

iii) <u>Traceability</u>

"[T]o have standing to assert a section 11 claim, plaintiffs must be able to trace their shares to an allegedly misleading registration statement*." In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 206 (S.D.N.Y. 2003) (quotations omitted).  While purchasers of securities issued pursuant to a misleading registration statement "can assert a section 11 claim whether they purchase their shares directly in the public offering or in the general securities markets. . . they may only sue so long as the security was indeed issued under that registration statement and not another." *Id.*  A plaintiff bears the burden of proving that they purchased securities traceable to the offending registration statement. *Id.*

At the pleading stage, a plaintiff's general allegations that securities were purchased pursuant or traceable to a false registration statement sufficiently state a claim.  *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020) ("To establish standing under § 11 at the motion-to-dismiss stage . . . Plaintiffs need only assert that they purchased shares issued pursuant to, or traceable to the public offerings." (quotations omitted)); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015) ("[P]laintiffs' allegation that they purchased the notes pursuant to or traceable to the materially false and misleading registration statements suffices, at this stage, to establish their standing under Section 11." (quotations omitted)); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 746 (S.D.N.Y. 2015) ("[T]o establish standing under § 11 at the motion to dismiss stage, Plaintiffs need only assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'" (quoting *In re WRT Energy Sec. Litig.*, 75 F. App'x 839 (2d Cir. 2003)); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) ("[T]he pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement."); *accord. In re Authentidate Holding Corp.*, No. 05CIV5323(LTS)(DFE), 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006).  This lenient pleading standard reflects the reality that "[b]efore discovery takes place . . . it is

impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market."  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992).

### 2.  Application

At oral argument, I held that Plaintiff had adequately alleged false statements in the iPass Registration Statement pursuant to which the company was acquired and 10 million shares were issued to iPass' former owners.  I now turn to the two remaining issues with respect to the Securities Act claims: whether Plaintiff adequately pled (1) that it purchased securities traceable to the Secondary Offering; and (2) that Squar Milner made materially false statements or omissions in connection with the Secondary Offering.

### i)  Traceability of Section 11 Claims

Defendants contend that Plaintiff has failed to plead facts showing that it acquired shares of Pareteum under the Secondary Offering and, therefore, Plaintiff lacks standing to assert a Section 11 claim.  *See* Pareteum Mem. at 50; Squar Milner Mem. at 10-14.  Plaintiff counters that, at the motion to dismiss stage, Plaintiff need assert only that it purchased shares issued pursuant to or traceable to the Secondary Offering.  *See* Pl. Opp. 49-50.  Beyond that, Plaintiff alleges that Keith Moore, a member of the Plaintiff Shareholder Investment Group, purchased stock traceable to the Secondary Offering.  *Id.* at 50.

The Complaint alleges that on September 20, 2019, Pareteum closed a $40 million direct public offering of common stock and warrants.  Compl. ¶184.

The Secondary Offering consisted of (a) 18,852,273 Common Stock Units, consisting of one share of common stock together with one Series A Purchase Warrant (to purchase one share of common stock) and one Series B Purchase Warrant (to purchase one-half share of common stock); and (b) 3,875,000 Pre-Funded Units, consisting of one pre-funded warrant to purchase one share of common stock together with one Series A Purchase Warrant and one Series B Purchase Warrant. The offering price was $1.76 per Common Stock Unit and $1.75 per Pre-Funded Unit.

*Id.*

As to Moore's purchase of shares of Pareteum, the Complaint alleges:

Specifically: (a) on Friday, September 20, 2019, Pareteum stock opened at $1.57 per share, traded between $1.51 per share and $1.68 per share, and closed the day trading at $1.67 per share, on volume of 13.86 million shares; (b) that week, the stock traded on average daily trade volume of just 3.92 million shares, exclusive of September 20; and (c) on September 20, 2019, as outlined in the certifications attached hereto, Lead Plaintiff member Moore purchased Pareteum stock at a price of $1.62 per share, $0.15 below the Secondary Offering price and within the day's trading range.

*Id.*

Defendants argue that it is more likely that Moore bought his shares from the pool of Pareteum's issued and outstanding shares: 114,099,071 shares. *See, e.g.*, Squar Milner Mem. at 13. But this is not so. The average daily volume of Parateum shares was 3,920,000 shares before the offering. In contrast, the volume on September 20, 2019, was 13,860,000 shares. A buyer on September 20, 2019 was more likely to purchase Parateum shares from the Secondary Offering than from outstanding shares pre-existing the offering. The price paid by Moore, $1.62 per share, was close to the issue price, $1.57 per share, and well within the trading range that day, $1.51 to $1.68 per share. Pre-existing shareholders who wished to sell their shares likely would have sold before the offering, to mitigate the price dilution of the secondary offering.

At this stage, Plaintiff's allegations that Moore purchased Pareteum shares "pursuant or otherwise traceable to" the Secondary Offering are plausible and sufficient. *See In re Authentidate Holding Corp.*, 2006 WL 2034644, at *7 ("[G]eneral allegations that plaintiff purchased pursuant to or traceable to false registration statement have been held sufficient to state a claim, [however] plaintiffs must at the very least identify named class members who do have standing to bring such claims." (internal citations and quotations omitted)). *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 384 ("[T]he pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement. At this stage, plaintiffs are not required to explain *how* their shares can be traced." (emphasis in original) (quotations omitted)); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 746 ("[T]o establish standing under § 11 at the motion to dismiss stage, Plaintiffs

need only assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'" (quoting *Perry v. Duoyuan Printing, Inc.*, No. 10 CIV. 7235 GBD, 2013 WL 4505199, at \*10 (S.D.N.Y. Aug. 22, 2013)).[6]  This aspect of defendants' motion is denied.

    ii) <u>Plaintiffs' Claims Against Squar Milner</u>

        Section 11(a)(4) of the Securities Act, 15 U.S.C. § 77k, provides for liability against accountants "in case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ."  Section 11 provides:

    a) Persons possessing cause of action; persons liable

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—

    . . .

    (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

. . . .

---

[6] Defendants cite out-of-circuit authority for the proposition that more specific pleading is required with respect to traceability.  *See In re Ariad Pharms. Sec. Litig.*, 842 F.3d 744, 755-6 (1st Cir. 2019); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013).  These authorities are not binding on this Court, and in any event, I and others in this district reject such a burdensome pleading standard.  *See, e.g., In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 384; *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 746; *Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at \*9-10; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011); *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003).  This more lenient approach makes sense because "modern market conditions" make tracing particularly difficult in "a world in which the 'shares' purchased by a stockholder might be merely electronic entries in a brokerage firms' books."  *Perry*, 2013 WL 4505199, at \*9-10.  Finally, Plaintiff does more than state in conclusory terms that its purchases were traceable to the Secondary Offering.  As discussed above, the Complaint also sets forth additional facts supporting the plausibility of such an inference.

15 U.S.C. § 77k.  But an accountant's opinion that a company has fairly stated its reports of financial condition and results of operations is not itself actionable, for an opinion is not a statement of fact or a warranty of correctness.  *Omnicare*, 575 U.S. 175, 183–87.  More has to be shown: that the accountant does not honestly hold the belief expressed, or that the opinion contains an embedded statement of a materially false fact, or if the opinion omits a fact that makes the opinion misleading to an ordinary investor.  *Id.*; *Tongue*, 816 F.3d at 210.

Squar Milner issued its last fairness opinion on March 18, 2019, in connection with Parateum's 10-K for 2018.  It allowed its opinion to apply also to the registration statement for the iPass acquisition and associated tender of shares, and the Secondary offering effective September 20, 2019 of approximately 19 million shares effective September 20, 2019.  Plaintiff contends that it should not have done so without adding an appropriate qualification or reservation as to the continuing fairness and reliability of Parateum's financial reporting.  Failure to express such a qualification or reservation caused Squar Milner's opinion to contain an embedded falsehood, and to omit to state facts necessary to make its opinion misleading to an ordinary investor.  As Plaintiff's allegation states:

> Squar Milner, as auditor, owed a duty to investors to independently verify and investigate the Company's representations in the FY18 10-K and the Secondary Offering Filings and breached said duty to investigate red flags regarding the Company's reported revenues and revenue growth rates and the reliability of its financial statements.

Compl. ¶ 195.

Squar Milner's fairness opinion noted that "the Company has not maintained effective control over financial reporting as of December 31, 2018," "that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis," and that there was "insufficient experienced resources to complete the documentation of internal control assessment."  Compl. ¶ 192.  Although the "material weaknesses" did not "affect [Squar Milner's] report dated March 18,

2019," it should have been the subject of additional inquiry for the September 20, 2019 Secondary offering. *Id.* Squar Milner should not have left, unchallenged, the assertions of accelerating growth in that offering: revenues increasing 800%, from $4.113 million in the first quarter of 2018, to $34.1 million in the second quarter of 2019; and Backlog increasing 635%, from $200 million to $1.27 billion, in the same time period.

       An accountant may not allow a previous opinion to be used in connection with a later securities offering unless intervening material events are disclosed. *See* Public Company Accounting Oversight Board Auditing Standard 4101, *Responsibilities Regarding Filings Under Federal Securities Statutes* (events occurring subsequent to the auditor's report, if they "have a material effect on the audited financial statements included therein[,] . . . should be disclosed in order to keep those statements from being misleading"). That means that Squar Milner had to ascertain if intervening facts or events made its prior audit opinion no longer reliable.

       Parateum's 10-K for 2018 disclosed extraordinary growth in revenues—139% for the entire year, and 256% for the fourth quarter—and even more extraordinary growth in backlog—$615 million, a 400 % increase, with a 100% conversion rate into revenues. This growth accelerated between the first quarter of 2018 to the second quarter of 2019, as described above. But if internal controls remained weak, how reliable were these figures? Plaintiff alleges that Squar Milner had the duty to disclose if Parateum's internal controls had improved to assess if this continuing growth was accurate and reliable and that, without such disclosure, misleading information was embedded and further information was necessary to make these figures not misleading. At the pleading stage, these allegations are sufficient.

       Other events in the same period of time should have caused concern to Squar Milner. Market letters of short-sellers described how Parateum's Backlog was dangerously concentrated and of questionable reliability, raising "red flags" as to the continuing reliability of

Parateum's revenue and growth.   Compl. ¶ 196.  The decision of the management in August 2019 to abandon reliance on backlog as an important metric of profitability and growth also should have raised concern and prompted additional inquiry.  Squar Milner failed to react.  More than two months later, on October 21, 2019, Parateum confessed to the unreliability of its financial condition and results of operations and issued its restatement, correcting its false and misleading financial statements.  *See In re Am. Realty Capital Properties, Inc. Litig.*, No. 15 MC 40 (AKH), 2016 WL 11110435, at *1 (S.D.N.Y. Aug. 5, 2016).  Squar Milner's motion to dismiss is denied

### Conclusion

For the foregoing reasons, and those discussed at oral argument, I hold as follows:

1.   Defendants' motions to dismiss are denied.

2.   Defendants shall file an answer to the operative Complaint within 30 days of this order.

3.   The parties shall appear for a case management conference on September 30, 2021, at 4:00 p.m., in Courtroom 14D, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007.

4.   The Clerk shall terminate the open motions (ECF Nos. 175, 177, 180, 183).


SO ORDERED.

Dated:        August 11, 2021                        _____/s/_____
             New York, New York                        ALVIN K. HELLERSTEIN
                                                       United States District Judge