# EXHIBIT C

N-6

**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**DEC 15 1988**

AT 8:30____ 4:00 P M
WILLIAM T. WALSH
CLERK

- - - - - - - - - - - - - - - - - x

ROSE CAMMER, et al.,

                Plaintiffs,

        vs.

BRUCE M. BLOOM, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - x

STATE OF NEW YORK  )
               :  ss.:
COUNTY OF NEW YORK  )

Hon. Alfred J. Lechner, Jr.

Civil Action
No. 88-2458 (AJL)

AFFIDAVIT OF
NORMAN S. POSER

REC'D IN CHAMBERS OF

DEC 15 1988

ALFRED J. LECHNER JR., U.S.D.J

NORMAN S. POSER, being duly sworn, deposes and says:

1. I have been retained by Plaintiffs' counsel in the captioned litigation to render an opinion regarding the market for Coated Sales, Inc. stock during the period from May 1987 through June 1988. For the reasons set forth below, it is my opinion that Coated Sales stock was widely traded and established and that the market in which Coated Sales stock was traded was an open, well developed, impersonal, and efficient market in which

the market price of the stock reflected the publicly disseminated information concerning the Company.

### My Qualifications And The Bases For My Opinion

2.    I am an attorney-at-law, having received my undergraduate and law degrees cum laude from Harvard University. From 1961 until 1967 I was employed by the Securities and Exchange Commission in a variety of positions, including Senior Attorney, Special Study of Securities Markets (1961-1963); Chief of the Office of Regulation (1963-1964); and Assistant Director, Division of Trading and Markets (1964-1967).

I was employed by the American Stock Exchange, Inc. for a period of twelve years (1968-1980). My positions with the American Stock Exchange included Vice President, Compliance (1968-1972); Senior Vice President, Policy Planning and Government Relations (1972-1975); and Executive Vice President, Legal and Regulatory Affairs (1975-1980).

Over the years I have performed consulting services relating to securities markets for numerous entities, including the Securities and Exchange Commission, the New York Stock Exchange, the American, Pacific and Philadelphia Stock Exchanges, and the Chicago Board Options Exchange.

2

Since 1980, I have been a Professor of Law at Brooklyn Law School in New York, teaching courses in securities regulation, corporate finance, corporations and contracts. I have taught courses in securities regulation as an Adjunct Professor at Rutgers University Graduate School of Business Administration (1973-1974) and as an Adjunct Professor of Law at New York University School of Law (1975-1980).

I am a member of the Bar of the State of New York, and of the New York County Lawyers Association (member, Committee on Securities and Exchanges, 1978-1984); the American Bar Association (member, Committee on Federal Regulation of Securities and Subcommittee on Futures and Options); the Advisory Board of Securities Regulation and Law Report, published by the Bureau of National Affairs Inc.; and the Advisory Board of the Review of Securities and Commodities Regulation, published by Standard & Poor's Corporation.

On many occasions I have lectured, written articles, and participated in seminars concerning the securities markets and securities regulation. Over the last eight years, I have been qualified as an expert witness at trials in litigations involving securities and securities markets in the federal district courts in New York, Michigan, Ohio and Virginia.

3

3. The bases for my opinion in this case include my experience and study of the workings of the various securities markets, including the American Stock Exchange, the New York Stock Exchange, and the over-the-counter market; my familiarity with the roles played by marketmakers and specialists in their respective markets; my knowledge of SEC regulation of securities and markets; and my review of a variety of information concerning Coated Sales, including its trading during the relevant period, analysts' reports concerning the company, and press releases issued by the company.

<u>Opinion</u>

4. It is generally recognized by experts who study and analyze securities markets that a stock exhibiting the following characteristics is traded on an efficient market - i.e., a market in which the price reflects the publicly available information concerning the company and its stock:

(a) the stock is admitted to trading in an impersonal and established market for the exchange of securities;

(b) the stock is regularly traded on such a market;

4

(c)    there is ready access to information concerning the price at which the stock is and has been traded; and

(d)    there is ready access to information concerning the company, for example, through filings with the SEC, press releases by the company, and/or reports by analysts who follow the Company.

My review of relevant data shows that the market for Coated Sales stock fulfills each of these criteria.

### The NASDAQ Market

5.    Coated Sales common stock is traded on the NASDAQ market ("NASDAQ"), a national securities market which lists some 5,500 issues and which has a daily trading volume of approximately 150 million shares.

6.    While the NASDAQ market is a part of the broader "over-the-counter" market, there are vitally important differences between NASDAQ and other segments of the over-the-counter market.  For example, information about the market for the shares of NASDAQ companies is more readily available than information respecting the market for non-NASDAQ over-the-counter companies.

7.    Even within NASDAQ, there is a subset of companies which are listed on the NASDAQ/National Market System (or

NASDAQ/NMS). These companies tend to be the larger NASDAQ companies, and tend to be characterized by more extensive investor and analyst interest. Information with respect to the prices at which transactions were actually executed is available for NASDAQ/NMS stocks, just as it is for stocks listed on the New York and other stock exchanges. Coated Sales was an NASDAQ/NMS stock.

8. One measure of the importance of NASDAQ/NMS stocks can be seen in the institutional interest in such stocks. In 1987, block trades (i.e. trades of 10,000 shares or more) typical of the trades effected by pension funds, mutual funds, banks and other financial institutions, constituted 42.0% of NASDAQ/NMS trading volume. Institutions were estimated to hold 32.1% of the market value of all NASDAQ/NMS common stocks.

9. NASDAQ is an acronym for National Association of Securities Dealers Automated Quotations and is a computerized quotations system operated by the National Association of Securities Dealers ("NASD"). NASDAQ was inaugurated in 1971 and within the last two decades has grown to become the second largest market in the United States, behind only the New York Stock Exchange, and the third largest equity market in the world, behind only the New York and Tokyo Exchanges. In 1987 almost 38 billion shares were traded in the NASDAQ system, or a daily

average volume of nearly 150 million shares.[1]  The total annual dollar volume of trades for 1987 was almost $500 billion. In contrast, in 1987 only 3.5 billion shares were traded on the American Stock Exchange, or an average of only 13.8 million shares per day.  The total annual dollar volume of equity trading on the American Stock Exchange in 1987 was $52.5 billion - approximately 10 per cent of the NASDAQ volume.

10.  NASDAQ lists companies headquartered in every state, the District of Columbia and Puerto Rico.  Some of the largest companies in the country are listed on NASDAQ, rather than the New York, American or one of the other regional stock exchanges, including, for example, MCI Communications Corp. (which in 1987 traded 455,372,000 shares), Intel Corporation (413,767,000 shares traded in 1987) and Apple Computer Inc. (387,746,000 shares traded in 1987)  In contrast, the most actively traded stock on the American Exchange, the Wickes Companies, traded only 114,009,000 shares in 1987, or about one-third of the number of shares of MCI that traded on the NASDAQ system.

---

[1]  This growth is outlined, and explained, by Gordon S. Macklin, former president of NASD, in an article entitled "A Primer on NASDAQ: The Market of the Future;" The NASDAQ Handbook (Probus Pub. 1987).  See Exhibit A submitted herewith.

11. Unlike the New York or American exchanges, the NASDAQ market does not have a centralized "trading-floor", and is not dependent upon a relatively small number of specialists in order to effect trades. Rather the heart of the NASDAQ system is a computer complex linked by leased telephone lines to thousands of brokers, marketmakers and financial institutions around the country.

12. The essence of the NASDAQ market is the existence of multiple marketmakers for each stock who compete among themselves in quoting prices at which they are willing to buy and sell NASDAQ securities. A "marketmaker" is a firm that is willing to purchase or sell round lots of stock of a particular company to the public at stated prices, known as "bid" and "asked" prices. A "bid" price is the price which the marketmaker is willing to pay to purchase a stock. An "asked" price is the price at which the marketmaker is willing to sell a stock.

13. On the average, in 1987 every NASDAQ listed stock had 8.0 marketmakers. The various marketmakers for any particular stock enter their bid and asked prices for the security into the NASDAQ system, and these prices are instantly displayed on the systems' computer terminals in every brokerage office and elsewhere throughout the country.

8

14. When an investor wishes to make a trade in a NASDAQ security, he may, for example, place an order with his broker to buy (or sell) the stock "at the market." If his broker is a marketmaker in that stock, the broker may fill the order at the best bid-asked price available on the system. If the broker is not a marketmaker or does not wish to fill the order at the best price, the broker will contact the marketmaker with the best price in order to complete the trade.

15. Small orders (1000 shares or less for NASDAQ/NMS companies) may be completed through NASD's computerized Small Order Execution System (SOES), which automatically executes trades at the best price available. Such a trade can be completed in less than a minute.

16. A "marketmaker" in a NASDAQ stock is in many respects similar to a "specialist" on an exchange. A specialist is a firm which is responsible for making a market in a particular stock on the floor of an exchange. The specialist matches buy orders against sell orders, and when there is a temporary imbalance of orders, purchases or sells stock for its own account at quoted prices (also known as "bid" and "asked" prices).

17. When an investor decides to make a trade in an exchange listed security, he may place an order with his broker

9

to purchase or sell "at the market", in the same manner as for a NASDAQ stock. The order may be transmitted to the specialist on the trading floor who deals in that security. The specialist will match the order against an order on the other side, or if there is no corresponding order, it will fill the order from its own account at quoted prices.

18. As can be seen, the functions of marketmakers in NASDAQ and specialists in exchange listed stocks are similar - they permit the regular and continuous trading of stocks.

19. One measure of the efficiency of the various markets is known as stock liquidity. This term refers to the ease and promptness with which orders can be executed at a price that is reasonably related to the price of the immediately preceding transaction. Several studies have been performed by economists to measure the comparative liquidity of the various markets. In general, these studies have found that the liquidity of stocks traded on the NASDAQ market is comparable to the liquidity of stocks of comparable volume and investor interest traded on the New York Stock Exchange and the American Stock Exchange.

20. Coated Sales stock was included in the NASDAQ/NMS which consists of the upper echelon of companies listed on NASDAQ. NASDAQ/NMS companies tend to have more marketmakers, greater investor interest, and a larger following of analysts. These

10

companies must fulfill specific requirements for inclusion on the NASDAQ/NMS.  Many of the stocks traded on NASDAQ/NMS (including Coated Sales) also fulfill the requirements for listing on the New York or American Stock Exchanges.  Yet these companies decide to remain in the NASDAQ/NMS market rather than list with an exchange.[2]  Attached as Exhibit C herewith is a chart setting forth the requirements for listing on NASDAQ/NMS, the New York, and the American stock exchanges, and how Coated Sales compared to those criteria.

21.   From the foregoing, it is clear that NASDAQ is an established national market for the trading of securities which includes many large companies with extensive investor following.

---

[2]  For example, William G. McGowan, Chairman of MCI Communications Corp. has cited 7 reasons why MCI chose and continues to choose NASDAQ as the market for its stock, including the competitive multiple marketmaker system, high liquidity, high visibility among analysts and researchers, and ready access to information. See "Why NASDAQ?", The NASDAQ Handbook (Probus Pub. 1987) (See Exhibit B attached hereto.)

11

### Coated Sales Stock Was Widely Traded In An
### Open, Well-Developed, Established Market

22. During the class period, 19 million shares of Coated Sales common stock were outstanding, of which some 12 to 13 million shares were owned by non-insiders of the company at the start of the class period. Coated Sales stock was held by 1,200 shareholders of record. Since it is customary for brokerage firms and banks to hold the securities of many customers or trust beneficiaries in "street" or nominee name, it is likely that Coated Sales had thousands of beneficial owners during this period. Unlike the typical NYSE stock which has one specialist, or even the average NASDAQ/NMS stock which has 8.7 marketmakers, Coated Sales had 11 marketmakers, including such major brokerage houses as Merrill Lynch, Dean Witter, Prudential-Bache and A. G. Edwards. During the class period, the stock reached a high of $12 per share. Over 44 million shares of Coated Sales common stock were traded during the period May 1987 to June 1988, representing an average weekly trading volume of 750,000 shares. Moreover, the individual defendants were able to sell almost one million shares of Coated Sales stock into the market during the class period.

23. Thus, it is clear that Coated Sales stock was publicly available and was widely and regularly traded.

12

### Investors Had Ready Access To Information Concerning Coated Sales Stock Prices

24.  The bid and asked prices for transactions in Coated Sales stock on the NASDAQ market were reported in the daily financial newspapers, including the Wall Street Journal, The New York Times, and others.  Thus, any potential investor had ready access to price information on Coated Sales stock.

25.  In addition, as a NASDAQ traded stock, investors had access through brokers to current quotations of bid and asked prices by all marketmakers in Coated Sales stock.  As shown earlier, these quotations are utilized in completing trades in NASDAQ stocks.

26.  Lastly, because Coated Sales was listed on the NASDAQ/NMS, actual prices at which Coated Sales stock was traded were promptly reported on the NASDAQ system, similar to prices of trades in any stock listed on the New York or American stock exchange.  Thus, current information concerning bid, asked, and transactional prices for the sale and purchase of Coated Sales stock was readily available to the market and to investors.  As noted earlier, economists have found the liquidity of stocks traded on the NASDAQ market equivalent to the liquidity of stocks traded on the New York or American exchanges.

13

**The Public Had Ready Access To Information
Concerning Coated Sales**

27.   Coated Sales, like all issuers listed in the NASDAQ/NMS, is required to make all filings with the SEC, including annual and quarterly reports which provide extensive information concerning the reporting company.  These filings, which are identical to the filings required of companies whose stocks are traded on a national stock exchange, provided important information to the market concerning Coated Sales.

28.   In addition, information concerning Coated Sales was available to the market through reports by a number of analysts who followed Coated Sales stock.  During the relevant period, there were at least 15 research reports concerning Coated Sales including: Paine Webber (6 reports), Market Guide Inc. (3 reports), Stephens Inc. (3 reports), Oppenheimer (2 reports), and A.G. Edwards (1 report).

29.   Many of these analyst reports were available to the public and the investment community through various computerized databases including Dow Jones and the Lexis/Nexis database.  In addition to these reports, on January 12, 1988 Oppenheimer disseminated to the investment community a report entitled "Stock for All Seasons: Our Weighted Recommended List - XXXII," which included a buy recommendation for Coated Sales.  The Oppenheimer

14

report was not only available to the public from the brokerage house, but was also disseminated to the investment community through a computer database.

30. Moreover, information regarding Coated Sales was regularly available and updated in Moody's Investor's Service and in Standard & Poor's OTC Stock Reports.

31. In addition to these sources of information, Coated Sales itself took affirmative steps to inform the investing public about its activities. During the entire period in question, Coated Sales utilized the services of Howard Bronson & Company Inc., a public relations firm in New York. From January 1987 through June 20, 1988, Coated Sales issued at least 20 press releases to the financial press, reporting various activities of the company, including its reports of sales and earnings. These press releases were issued on January 14, 1987, January 15, 1987, January 22, 1987, January 30, 1987, March 10, 1987, May 6, 1987, May 26, 1987, June 3, 1987, July 10, 1987, July 13, 1987, August 7, 1987, October 14, 1987, January 12, 1988, January 19, 1988, May 13, 1988, May 17, 1988, May 23, 1988, May 31, 1988, June 14, 1988, and June 17, 1988. These press releases were also made available to the investing public through computerized newswires and databases.

32.   Through Coated Sales' filings of SEC reports, the issuance of its annual reports and other reports to stockholders, the many financial analysts who followed the stock and issued reports during the relevant period, and through Coated Sales' own distribution of press releases concerning its business, there was a steady and readily obtainable flow of information concerning the company that was made available to the investment community and to the market.

33.   One strong indicator of the ready availability to the market of information concerning Coated Sales, and of the efficiency of the market in absorbing and reflecting such information in the price of the stock is the fact that, upon disclosure of Peat Marwick Main & Co.'s resignation as auditor for Coated Sales and the later disclosure of an overstatement of assets and earnings, the volume of trading in Coated Sales stock jumped dramatically, and the price fell significantly.

### Conclusion

34.   In my opinion, the facts described above are more than sufficient to establish that Coated Sales traded on an efficient market, since it was widely traded in an open,

16

established, well-developed and impersonal market in which the price of Coated Sales stock would reflect the publicly available information concerning the company.

_____
NORMAN S. POSER

Sworn to before this
/5th day of December 1988.

_____
Notary Public

**DEBRA McCAUGHEY**
**Notary** Public, State of New York
No. 24-4307380
**Qualified** in Kings County
**Commission** Expires Dec. 31, 1988

17