**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE PARETEUM SECURITIES LITIGATION

Case No. 1:19-cv-09767-AKH-GWG

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND <u>APPOINTMENT OF CLASS COUNSEL</u>**

**TABLE OF CONTENTS**

**Page:**

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF FACTS ......................................................................................... 2

III.    THE PROPOSED CLASS REPRESENTATIVES .................................................. 4

IV.     ARGUMENT.............................................................................................................. 5

        A.      Plaintiffs' Claims Are Well-Suited for Class Treatment...................................... 5

        B.      The Proposed Class Satisfies the Requirements of FED. R. CIV. P. 23(a) ............... 6

                1.      The Proposed Class Is So Numerous That Joinder
                        of All Members Is Impracticable ................................................................ 6

                2.      Questions of Law or Fact Are Common to the Class ............................... 7

                3.      Plaintiffs' Claims Are Typical of the Class ............................................... 9

                4.      The Representative Parties Will Fairly and Adequately
                        Protect the Interests of the Class................................................................ 11

                5.      The Proposed Class Is Ascertainable........................................................ 13

        C.      The Proposed Class Satisfies FED. R. CIV. P. 23(b)(3)........................................ 14

                1.      Common Questions of Law and Fact Predominate ................................. 14

                2.      The Presumption of Reliance Applies ...................................................... 16

                a.      Plaintiffs Satisfy the Market Timing and Publicity Elements ................. 16

                b.      Pareteum Traded on an Efficient Market.................................................. 17

                        i.       Cammer Factor One: High Weekly Trading Volume................... 18

                        ii.      Cammer Factor Two: Analyst Coverage ..................................... 19

                        iii.     Cammer Factor Three: Market-Makers and Arbitrage ................ 20

                        iv.      Cammer Factor Four: Form S-3 Eligibility ................................. 21

                        v.       Cammer Factor Five: Cause and Effect Relationship................... 22

                        vi.      Krogman Factor One: Market Capitalization .............................. 23

                        vii.     Krogman Factor Two: Bid-Ask Spread ....................................... 24

                        viii.    Krogman Factor Three: The Float ............................................... 25

                3.      Damages Are Capable of Classwide Determination................................ 26

                4.      A Class Action Is the Superior Method for Adjudicating the Controversy
                        ................................................................................................................... 27

        D.      KSF Satisfies Fed. R. Civ. P. 23(g)........................................................................ 29

V.      CONCLUSION......................................................................................................... 30

i

<u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997).......................................................................................................... 5, 12, 14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)............................................................................................................ 5, 6, 15

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52, 59 (2d Cir. 2000)................................................................................................... 11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................................................... 5

*Billhofer v. Flamel Techs., S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) .......................................................................................... 20, 24

*Cammer v. Bloom*,
    711 F. Supp. 1264, 1286-87 (D.N.J. 1989)........................................................................ passim

*Carpenters Pension Trust Fund v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................................ 20

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003)............................................................................................... 24

*Desrocher v. Covisint Corp.*,
    14 Civ. 3878, 2016 U.S. Dist. LEXIS 25139 (S.D.N.Y. Feb. 22, 2016) ................................. 10

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) .............................................................................................. 27

*Fosbre v. Las Vegas Sands Corp.*,
    2:10-CV-765, 2015 U.S. Dist. LEXIS 77774 (D. Nev. June 15, 2015)..................................... 26

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021)............................................................................................................... 16

*Gucciardo v. Titanium Constr. Servs.*,
    16 Civ. 1113, 2017 U.S. Dist. LEXIS 109727 (S.D.N.Y. July 14, 2017) .................................. 5

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258, 276 (2014)........................................................................................................... 16

*Haw. Structural Ironworkers Pension Trust Fund, Inc. v. AMC Entm't Holdings, Inc.*,
    338 F.R.D. 205 (S.D.N.Y. 2021) ........................................................................................... 9, 11

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).................................................................................................................... 15

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) .............................................................................................. 21

*In re Am. Realty Capital Props., Inc. Litig.*,
  15-mc-40, 2017 U.S. Dist. LEXIS 142416 (S.D.N.Y. Aug. 31, 2017) ........................ 22, 24, 25

*In re Barrick Gold Secs. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ................................................................................. 18, 26

*In re Countrywide Fin. Corp. Sec. Litig.*,
  273 F.R.D. 586 (C.D. Cal. 2009) ...................................................................................... 21

*In re Deutsche Telekom AG Sec. Litig.*,
  229 F.Supp 2d 277 (S.D.N.Y. 2002)................................................................................. 15

*In re DVI Inc. Sec. Litig.*,
  249 F.R.D. 196 (E.D. Pa. 2008)........................................................................................ 20

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
  05 Civ. 10240, 2007 U.S. Dist. LEXIS 57918 (S.D.N.Y. July 27, 2007) ................................. 5

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  210 F.R.D. 476, 481 (S.D.N.Y. 2002) ................................................................................. 11

*In re Initial Pub. Offering Secs. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008)............................................................................ 17, 21

*In re JPMorgan Chase & Co. Secs. Litig.*,
  12 Civ. 03852, 2015 U.S. Dist. LEXIS 132181 (S.D.N.Y. Sept. 29, 2015) ............................. 9

*In re MF Global Holdings Ltd. Inv. Litig.*,
  310 F.R.D. 230 (S.D.N.Y. 2015) ....................................................................................... 29

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017)............................................................................................... 14

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) ......................................................................................... 7

*In re Smart Techs., Inc.*,
  295 F.R.D. 50 (S.D.N.Y. 2013) ......................................................................................... 16

*In re Veeco Instruments, Inc., Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) ......................................................................................... 6

*In re Virtus Inv. Partners, Inc.*,
  15cv1249, 2017 U.S. Dist. LEXIS 73554 (May 15, 2017)...................................................... 18

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001).............................................................................................. 12

*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ................................................................................. 6, 9, 10

*In re Winstar Communs. Sec. Litig.*,
  290 F.R.D. 437 (S.D.N.Y. 2013) ....................................................................... 19, 20, 21, 22

*In re WorldCom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ................................................................... 9, 11, 15, 26

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ................................................................................... 17, 24, 25

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014).......................................................................... 9, 19, 21, 24

*McMahan & Co. v. Wherehouse Entm't*,
  65 F.3d 1044 (2d Cir. 1995)............................................................................................... 27

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
  272 F.R.D. 160 (S.D.N.Y. 2011) ................................................................................... 26, 28

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  08-CV-5310, 2016 U.S. Dist. LEXIS 153804 (S.D.N.Y. Nov. 4, 2016).............................. 9, 27

*Pearlstein v. Blackberry Ltd.*,
  No. 13 Civ. 7060, 2021 U.S. Dist. LEXIS 14888 (S.D.N.Y. Jan. 26, 2021) .......................... 14

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)........................................................................................................ 28

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ........................................................................................ 23

*Pub. Emps. Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
  280 F.R.D. 130 (S.D.N.Y. 2012) ...................................................................................... 15

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)......................................................................................... 26, 27

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)............................................................................................. 10

*Seijas v. Republic of Arg.*,
  606 F.3d 53, 58 (2d Cir. 2010).......................................................................................... 11

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
  968 F.3d 204 (2d Cir. 2020)............................................................................................... 8

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................................... passim

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015).......................................................................................... 26, 27

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
  05 Civ. 1898, 2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006) ................................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308, 313-14 (2007) .............................................................................................. 5

*UFCW Local 1776 v. Eli Lilly and Co.*,
  620 F.3d 121, 131 (2d Cir. 2010)...................................................................................... 6, 14

*United Food & Comm'l Workers Union v. Chesapeake Energy Corp.*,
  281 F.R.D. 641 (W.D. Okla. 2012)..................................................................................... 16

iv

*Vinh Nguyen v. Radient Pharms. Corp.*,
  287 F.R.D. 563 (C.D. Cal. 2012) ........................................................................ 24

*Volatility Warrant Master Fund Ltd. v. Pareteum Corp. et al.*,
  1:19cv10460 (S.D.N.Y.) ..................................................................................... 28

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ......................................................................................... 6, 7

*Wilson v. LSB Indus.*,
  15 Civ. 7614, 2018 U.S. Dist. LEXIS 138832 (S.D.N.Y. Aug. 13, 2018) ............. 14, 20, 24, 28

*Yi Xiang v. Inovalon Holdings, Inc.*,
  327 F.R.D. 510 (S.D.N.Y. 2018) .......................................................................... 2

## Statutes

15 U.S.C. §77k ................................................................................................... 8

15 U.S.C. §77l .................................................................................................... 8

## Rules

17 C.F.R. § 239.13 ............................................................................................. 22

FED. R. CIV. P. 23(a)(1) ...................................................................................... 6

FED. R. CIV. P. 23(a)(2) ...................................................................................... 7

FED. R. CIV. P. 23(b)(3) ...................................................................................... 6

FED. R. CIV. P. 23(g) .......................................................................................... 29

Lead Plaintiffs the Pareteum Shareholder Investor Group ("PSIG"), comprised of Kevin Ivkovich, Stephen Jones, Keith Moore, Nicholas Steffey, and Robert E. Whitley, Jr. (collectively, "Plaintiffs") submit this memorandum in support of their Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure, and seek an order certifying the following Class:

> All those who purchased or otherwise acquired the common stock of Pareteum Corporation during the period from December 14, 2017 through and including October 21, 2019 (the "Class Period"), excluding Defendants, officers and directors of Pareteum, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

Plaintiffs also move the Court to appoint them as Class Representatives and to appoint Kahn Swick & Foti, LLC ("KSF") as Class Counsel.

## I.    INTRODUCTION

Plaintiffs' claims are perfectly suited for class certification. Plaintiffs, a group of investors, were injured by the same course of conduct as all other Class members: material misrepresentations and omissions made by Defendants concerning Pareteum's revenue, growth, and "backlog" that maintained the price of Pareteum's stock or otherwise prevented it from falling over the course of the Class Period. As a result, Plaintiffs and Class members purchased Pareteum common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of Defendants' fraud. Trial of Plaintiffs' claims will also focus on issues and evidence common to all Class members: falsity, reliance, materiality, scienter, and loss causation (for the Exchange Act claims) and falsity and materiality (for the Securities Act claims).

Because such common issues generally predominate in securities cases, and because class adjudication is the only meaningful recourse for most investors, courts have long recognized that "class action treatment is 'particularly appropriate when plaintiffs seek redress for violations of

1

the securities laws.'" *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 519 (S.D.N.Y. 2018) (citation omitted). This case is no exception. As detailed below, the proposed Class satisfies the requirements for certification under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. It also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. Therefore, class certification should be granted.

## II.    STATEMENT OF FACTS[1]

Pareteum Corporation ("Pareteum" or the "Company") is a telecommunications services provider that targets Mobile Virtual Network Operators ("MVNOs"), which provide wireless communications but do not own network infrastructure or make their own software, instead renting bandwidth from network operators and purchasing software from companies like Pareteum. ¶ 6. Throughout the Class Period, Pareteum and certain of its former executives – defendants Victor Bozzo, Chief Executive Officer and Chief Commercial Officer, Denis McCarthy, President and Chief Operating Officer, Edward O'Donnell, Chief Financial Officer, and Robert H. Turner, Executive Chairman of the Board, Principal Executive Officer, and CEO (the "Individual Defendants") – made materially false and misleading statements and omissions regarding the Company's business, operations, and prospects.

These statements included the reporting of overstated and inflated revenues in the Company's FY18 10-K and Class Period 10-Qs that were based on an invented, non-GAAP interim metric (the "backlog"), which Pareteum and the Individual Defendants touted as a "key performance indicator," but which, in fact, consisted largely of fabricated and embellished customers. ¶¶ 45, 49, 53, 69-87. Using these falsely overstated and inflated reported revenues,

---

[1] All "¶__" citations are to the First Amended Consolidated Complaint (ECF No. 168; "FAC") unless otherwise noted.

2

Pareteum and the Individual Defendants advanced a story of hyper-growth and success in signing customers to multi-year deals allegedly worth tens of millions of dollars, added these contracts to their Backlog and falsely claimed that their Backlog was converting to revenue at or above 100%. ¶¶ 69-97. Yet as would later be revealed, many of Pareteum's customers did not have the ability to generate the touted revenue and, in fact, much of Pareteum's reported revenues were uncollectable.

The inflated revenues were incorporated by reference into registration statements filed by Pareteum in connection with its November 12, 2018 acquisition of iPass, Inc. ("iPass"). ¶¶ 179-81. They were also incorporated by reference into the registration statements for the Company's September 20, 2019 secondary offering of stocks and warrants (the "Secondary Offering"), which was underwritten by defendant Dawson James Securities Inc. ¶¶ 191, 210. Also incorporated into the Secondary Offering filings was Defendant Squar Milner LLP's March 18, 2019, audit report – which contained an unqualified opinion certifying that Pareteum's FY18 financial statements fairly presented its financial position and were prepared in accordance with GAAP. ¶¶ 147, 192-93.

As a result of this materially false information, the Company's stock price soared from a Class Period low of just $0.72 per share (the closing price on December 14, 2017, the first day of the Class Period, and the lowest the stock would close until the end of the Class Period) to a trading high of $5.93 per share (on March 18, 2019) – an 824% increase in price in just a few months. ¶ 13. And investors purchased Pareteum securities at artificially inflated prices in the open market and also acquired securities issued by Pareteum in connection with the iPass Acquisition and the Secondary Offering. ¶¶ 5, 163, 171, 196.

Defendants' misrepresentations were ultimately revealed to investors through a series of disclosures beginning on June 7, 2019 and culminating on October 21, 2019, when the Company

announced that it would be restating its previously issued financial statements for FY18 and 1H19 because it had prematurely or inaccurately recognized revenue, thereby overstating it by at least 42%. ¶¶ 28-35, 40. As Plaintiffs' expert has confirmed, all of these disclosure events resulted in statistically significant declines impacting the price of Pareteum shares. *See infra* § IV.C.2.b.v.

## III.    THE PROPOSED CLASS REPRESENTATIVES

The individuals described below are the proposed Class Representatives. Each of the proposed Class Representatives has already expended substantial time and effort in informing themselves about this case and working with counsel to vigorously prosecute this action on behalf of the Class they represent. These proposed Class Representatives have represented the Class by overseeing the litigation and communicating with appointed Lead Counsel.

The Class asserts violations of Sections 10(b) and 20 of the Securities Exchange Act of 1934 ("Exchange Act") in connection with Class Period transactions in Pareteum's securities. The Class also asserts violations of sections 11, 12, and 15 of the Securities Act of 1933 ("Securities Act") in connection with the iPass Acquisition and the Secondary Offering. For both these transactions, Lead Plaintiffs propose one Class Representative who purchased or acquired the relevant securities in that transaction. The Proposed Class Representatives are:

**Lead Plaintiff Pareteum Shareholder Investor Group ("PSIG")**. PSIG is comprised of five experienced business professionals with substantial investing experience: Kevin Ivkovich, Stephen Jones, Keith Moore, Nicholas Steffey, and Robert E. Whitley, Jr.  ¶¶ 5, 171; *see also* ECF No. 23-1 (PSIG Joint Decl.) at ¶ 2. During the Class Period, PSIG purchased and/or acquired Pareteum securities at artificially inflated prices and were harmed when the true facts were revealed, and the artificial inflation was removed from the stock price at the end of the Period. *See* ¶¶ 5, 171; ECF No. 168-1 (PSIG certifications).

4

**Lead Plaintiff member Moore**: Lead Plaintiff member Moore purchased or otherwise acquired Pareteum stock issued pursuant to or traceable to the Secondary Offering Filings. *See* ¶¶ 186, 212, 215; ECF No. 168-1 at 1-7 (Moore certification).

**Lead Plaintiff member Steffey**: Lead Plaintiff member Steffey purchased or otherwise acquired Pareteum stock in the iPass Acquisition. *See* ¶¶ 183, 200, 203, 206; ECF No. 168-1 at 8-15 (Steffey certification).

## IV.    ARGUMENT

### A.    Plaintiffs' Claims Are Well-Suited for Class Treatment

The Supreme Court has repeatedly stressed the importance of the class action device in redressing the wrongs committed under federal securities laws. *See*, *e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14, 320 n.4 (2007); *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Likewise, "the Second Circuit 'has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation and has explicitly noted its preference for class certification in securities cases.'" *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 05 Civ. 10240, 2007 U.S. Dist. LEXIS 57918, at *35 (S.D.N.Y. July 27, 2007) (citation omitted); *see also Gucciardo v. Titanium Constr. Servs.*, 16 Civ. 1113, 2017 U.S. Dist. LEXIS 109727, at *7 (S.D.N.Y. July 14, 2017) ("The Second Circuit gives Rule 23 a 'liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.'").

To obtain certification, Plaintiffs must satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997). "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131

(2d Cir. 2010) (internal quotation marks omitted). In addition, Plaintiffs must satisfy one of the subsections of Rule 23(b). *Amchem*, 521 U.S. at 614. Here, Plaintiffs seek to certify a class under Rule 23(b)(3) because "the questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), that does not give the Court "license to engage in free-ranging merits inquiries at the class certification stage." *Amgen*, 568 U.S. at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

B. **The Proposed Class Satisfies the Requirements of FED. R. CIV. P. 23(a)**

1. **The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable**

To satisfy the numerosity requirement of Rule 23(a)(1), Plaintiffs must establish that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "While no minimum number of plaintiffs is required for a suit to be maintained as a class action, '[g]enerally, courts will find a class sufficiently numerous when it comprises 40 or more members.'" *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 237 (S.D.N.Y. 2006) (citation omitted). "Precise quantification of the class members is not necessary because a court may make common sense assumptions regarding numerosity." *Id.* In securities actions involving nationally-listed public companies, numerosity "may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007).

6

Here, there is no doubt that the Class far exceeds forty members. Throughout the Class Period, Pareteum was listed on the NYSE American (until October 22, 2018) and then the NASDAQ (from October 23, 2018). ¶¶ 6, 172, 217; *see also* Pareteum's Answer to the FAC (ECF No. 203; "Pareteum Answer") ¶¶ 172, 217. Pareteum reported to the SEC that it had, on average, a minimum of 42.92 million shares outstanding during the Class Period, and Pareteum traded, on average, 16.69 million shares (or 23.91% of outstanding shares) weekly. *See* Expert Report of Chad Coffman ("Coffman Report") at ¶¶ 30, 71, Declaration of Kim E. Miller in Support of Plaintiffs' Motion for Class Certification ("Miller Decl.") at Exhibit A. Therefore, the numerosity requirement is satisfied.

### 2.    Questions of Law or Fact Are Common to the Class

The commonality requirement is met where, as here, there are "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). "Even a single common question will do," *Wal-Mart*, 564 U.S. at 359, and Rule 23(a)(2) is a "low hurdle" that is "easily surmounted." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995).

As in most securities class actions, trial here will focus on numerous issues of law or fact common to the members of the class, including misrepresentations and omissions in Pareteum's SEC filings and press releases. Each Class member was injured as a result of common misrepresentations and omissions concerning Pareteum's revenues, growth, and backlog, and incurred loss when the truth was partially revealed, the Company's stock price dropped as a result of each partial disclosure, and each Class member suffered damages.

To establish liability for its Securities Act claims, the Class must prove that the registration statements and other filings for the Secondary Offering and/or iPass Acquisition contained false statements or omissions of material fact, that they purchased a registered security traceable to the registration statements at issue, and that Defendants participated in the offerings in a manner

7

sufficient to give rise to liability. 15 U.S.C. §§77k, 77l(a)(2). Thus, common questions of law and fact for the Securities Act claims include: (i) whether Defendants made materially false or misleading statements or omitted facts necessary to make their statements, in light of the circumstances under which they were made, not misleading and (ii) whether Plaintiffs purchased or acquired Pareteum securities traceable to the iPass or Secondary Offering registration statements. The Class's Exchange Act claims depend on proof of the same falsity and materiality as the Securities Act claims, as well as reliance, scienter, and transaction and loss causation. *See Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). Thus, common legal issues for the Exchange Act claims include those set forth above, as well as: (i) whether Pareteum and the Individual Defendants had actual knowledge or acted with reckless disregard for the truth when they made the misrepresentations; (ii) whether Plaintiffs relied on their misrepresentations; and (iii) whether the prices of Pareteum securities were artificially inflated during the Class Period; and (iv) whether investors suffered damages when the artificial inflation in the price of Pareteum securities was eliminated.  *See* ¶¶ 156-66; *see also* ECF No. 201 at 2 (order denying Defendants' motions to dismiss) ("The gravamen of the Complaint is that Pareteum, under the direction of the Individual Defendants, fraudulently overstated its reported revenues, realized revenue growth rates, and contractual revenue backlog. When the fraud was revealed and Pareteum announced that it intended to issue a restatement of past financial statements, the Company's share price collapsed. The Complaint further asserts that the Underwriter and Auditor Defendants are liable for the false financial statements incorporated into the public filings associated with the Secondary Offering.").

Absent Class members would have to prove identical facts and address identical legal issues if they pursued their claims individually. Under similar circumstances, courts have found Rule 23(a)(2)'s commonality requirement satisfied. *See*, *e.g.*, *In re JPMorgan Chase & Co. Secs.*

*Litig.*, 12 Civ. 03852, 2015 U.S. Dist. LEXIS 132181, at *10 (S.D.N.Y. Sept. 29, 2015) (commonality requirement met where plaintiffs alleged that "all members of the Proposed Class were injured by the same misstatements"); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014) (questions regarding whether the defendant violated the federal securities laws and made material misrepresentations to the investing public satisfy the commonality requirement); *Vivendi*, 242 F.R.D. at 84 ( (same); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003) (commonality requirement satisfied based on "misrepresentations and omissions in WorldCom's SEC filings and press releases, and in SSB's analyst reports in connection with the alleged accounting fraud"); *Haw. Structural Ironworkers Pension Trust Fund, Inc. v. AMC Entm't Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. 2021) ("Here, nearly all questions of law and fact are common to all Plaintiffs and class members claims, including whether Defendants made materially false and misleading statements or omissions in their Registration Statement or other statements made during the Class Period.").

### 3.    Plaintiffs' Claims Are Typical of the Class

In securities cases, satisfying the typicality requirement is "not demanding." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 08-CV-5310, 2016 U.S. Dist. LEXIS 153804, at *13 (S.D.N.Y. Nov. 4, 2016). "Rule 23(a)(3) is satisfied by a showing that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *Id.* (citation omitted). "In a securities class action, when plaintiffs will necessarily seek to develop facts relating to…the dissemination of allegedly false or misleading statements underlying their claims, the claims and nature of evidence are generally considered sufficient to satisfy the typicality requirement." *In re Signet Jewelers Ltd. Sec. Litig.*, 16 Civ. 6728, 2019 U.S. Dist. LEXIS 114695, at *24 (S.D.N.Y. July 10, 2019) (internal quotations and citations omitted). "When it is alleged that the same unlawful conduct was directed

9

at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Desrocher v. Covisint Corp.*, 14 Civ. 3878, 2016 U.S. Dist. LEXIS 25139, at *4 (S.D.N.Y. Feb. 22, 2016) (Hellerstein, J.) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)). Thus, where, as here, plaintiffs in a securities class action "seek to develop facts relating to the alleged accounting irregularities and the dissemination of allegedly false or misleading statements. . . , [s]uch allegations are generally considered sufficient to satisfy the typicality requirement." *Vivendi*, 242 F.R.D. at 85.

The FAC alleges that Pareteum and the Individual Defendants made material misrepresentations, and omitted material facts necessary to make the statements made therein not false or misleading, regarding Pareteum's revenues, backlog, and growth prospects, in Pareteum's financial disclosures and public statements, beginning on December 14, 2017 and continuing through October 21, 2019, when they issued the Restatement Release.  ¶¶ 13-116. The FAC alleges that these were incorporated by reference into registration statements for the iPass Acquisition and the Secondary Offering. ¶¶ 178-95. The FAC further alleges that Class members purchased their Pareteum securities at artificially inflated prices as a result of Defendants' material misrepresentations and omissions, and that when Defendants' misconduct was finally and completely revealed on October 21, 2019, the prices of Pareteum's securities plummeted. ¶¶ 40, 149, 196.

The proposed Class Representatives for the Securities Act claims (each of whom purchased or otherwise acquired Pareteum stock issued pursuant to or traceable to the Secondary Offering Filings or purchased or otherwise acquired Pareteum stock in the iPass Acquisition), the proposed Class Representatives for the Exchange Act claims (each of whom purchased or otherwise

10

acquired Pareteum securities during the Class Period) and all other Class members have been injured by this same alleged course of conduct. In fact, the proposed Class Representatives' claims are not merely similar to those of the other Class members, they are virtually identical and will be proven by common evidence. Accordingly, the typicality requirement of Rule 23(a)(3) is satisfied. *See Worldcom*, 219 F.R.D. at 280 (certifying class based on common course of conduct including "pervasive accounting fraud and the correspondingly pervasive failure of those charged with monitoring and evaluating Worldcom to review diligently the company's financial records and representations, and of those who spoke of WorldCom's financial condition to do so honestly and accurately"); *AMC Entm't*, 338 F.R.D. at 212 ("[T]he claims of the representatives and the class members arise from the same alleged misrepresentations and omissions within the Class Period and thus the representatives are typical of the class.").

Further, the fact that Class members' individual circumstances might differ based on such things as the amount of their individual damages does not affect the typicality of the Plaintiffs' claims. *See*, *e.g.*, *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010) ("[I]t is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."). Nor are Plaintiffs subject to a "unique defense" that "threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000). Plaintiffs stand in precisely the same position as absent Class members.

Accordingly, Plaintiffs meet the typicality requirement of Rule 23(a)(3).

### 4.     The Representative Parties Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is also met here. Adequacy assesses "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified,

11

experienced and able to conduct the litigation." *Baffa*, 222 F.3d at 60 (citation omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 626 (citation omitted); *see also Signet Jewelers*, 2019 U.S. Dist. LEXIS 114695, at *25 (finding no conflict of interest where "Lead Plaintiff's legal theories, if vindicated, would vindicate the interests of the Class").

Both elements of the adequacy requirement are easily satisfied here. First, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members." *Amchem*, 521 U.S. at 625-26. As demonstrated above, the typicality of the proposed Class Representatives' claims and the commonality of interest presented by the common questions of law and fact ensure the proposed Class Representatives' adequate representation of the proposed Class. *See supra* §§ IV.B.2, 3. The proposed Class Representatives described in section III, *supra*, are individuals that purchased Pareteum securities in the open market and/or in either the iPass Acquisition or the Secondary Offering. Each of these proposed Class Representatives is alleged to have been damaged by the purchase or acquisition of Pareteum securities at prices that were inflated due to a uniform set of misstatements and omissions made by Pareteum and the Individual Defendants. Defendants' identical, wrongful conduct has injured Plaintiffs, and it is in the Proposed Class Representatives' interest to vigorously prosecute this action on behalf of themselves and the Class in order to establish Defendants' liability and obtain the maximum recovery.

Second, the proposed Class Representatives have no conflicts with absent Class members. In this regard, minor or speculative conflicts "should be disregarded at the class certification stage"; only a "fundamental" conflict will affect adequacy. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted); *see also AMC Entm't*, 338

F.R.D. at 212 ("denial of class certification on the grounds of inadequacy should only occur in the most extreme instances").

Furthermore, proposed Class Counsel is highly qualified. KSF has routinely served as lead counsel in securities class actions in federal courts across the country and has won substantial recoveries for classes represented by the firm in securities class actions and other complex litigation. *See* Miller Decl. Ex. B. For example, KSF served as co-class counsel in *Erica P. John Fund, Inc. v. Halliburton Co., et al.*, No. 02-cv-1152 (N.D. Tex.), a case that resulted in a $100 million settlement after two trips to the Supreme Court on class certification issues. *See id.* Most recently in the Southern District of New York, on June 22, 2018, KSF was found to have "made a substantial contribution to the class" in obtaining a $3 billion settlement from Brazil's state-controlled petrochemical company in connection with the largest corruption scandal in the history of Latin America, arising from defendants' alleged deliberate overpayments on various construction contracts in return for kickbacks. *See id.* (citing *In re Petrobras Sec. Litig.*, No. 1:14-cv-9662 (S.D.N.Y.)). KSF is also currently serving as class counsel for two securities class actions pending in this District: *In re Chicago Bridge & Iron Co. N.V. Secs. Litig.*, No. 1:17-CV-1580 (Schofield, J.) and *Pearlstein v. Blackberry Ltd.*, No. 1:13-CV-7060 (McMahon, J.). *See id.*

Finally, the record demonstrates that Plaintiffs and their counsel have zealously advanced the Class's interests. Plaintiffs researched, investigated, and filed two amended complaints, defeated Defendants' motions to dismiss (ECF No. 201), and have commenced discovery, already receiving over 775,000 pages of documents from Pareteum and meeting and conferring about the production of many more documents from all Defendants. Thus, Rule 23(a)(4) is satisfied.

### 5. The Proposed Class Is Ascertainable

In addition to the express requirements of Rule 23, the Second Circuit has recognized an implied requirement that the class be "ascertainable." *See*, *e.g.*, *Pearlstein v. Blackberry Ltd.*, No.

13 Civ. 7060, 2021 U.S. Dist. LEXIS 14888, at *15-16 (S.D.N.Y. Jan. 26, 2021) (citing *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017)). Plaintiffs have defined the class as:

> All those who purchased or otherwise acquired the common stock of Pareteum Corporation during the period from December 14, 2017 through and including October 21, 2019 (the "Class Period"), excluding Defendants, officers and directors of Pareteum, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

Its members "can be identified from the books and records maintained by [Pareteum] and his agents and, therefore, it is sufficiently ascertainable. *Wilson v. LSB Indus.*, 15 Civ. 7614, 2018 U.S. Dist. LEXIS 138832, at *23 (S.D.N.Y. Aug. 13, 2018).

### C.     The Proposed Class Satisfies FED. R. CIV. P. 23(b)(3)

This case also satisfies Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### 1.     Common Questions of Law and Fact Predominate

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (internal quotation marks omitted). "Predominance is a test readily met in certain cases alleging … securities fraud . . . ." *Amchem*, 521 U.S. at 592.

Here, all of Plaintiffs' claims "are based on the same common nucleus of facts:  Pareteum's alleged materially false and misleading statements and omissions in its financials and public filings, including those filed in connection with, and/or incorporated by reference into, the filings

14

for, the iPass Acquisition and the Secondary Offering. ¶¶ 13-116, 178-95. The facts and circumstances that underpin each of the false statements alleged are common to each of the Class members' claims. *Id.*; *see also supra* §§ IV.B.2, 3. The Class's claims also depend on proof of common legal issues. *See supra* §§ IV.B.2, 3. Because the Securities Act claims focus on the contents of the iPass Acquisition and Secondary Offering filings – with no requirement to show reliance, knowledge or causation – they are particularly well-suited for class treatment. *See Pub. Emps. Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130, 136 (S.D.N.Y. 2012) (noting the limited showing needed to establish a prima facie case under §11) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). Likewise, the Supreme Court has held that questions of whether a defendant knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, the scienter, falsity and materiality elements of a §10(b) claim) and whether the revelation(s) of the alleged fraud proximately caused that company's stock price to decline (*i.e.*, the loss causation element) are each common questions of law and fact that predominate over individualized ones. *Amgen*, 568 U.S. at 467-70. With respect to the element of reliance, the predominance requirement is usually easily met in a securities fraud class action because the plaintiffs are entitled to rely on the fraud on the market presumption of reliance. *See infra* § IV.C.2.

Accordingly, because common questions of law and fact predominate, the proposed class should be certified. *See WorldCom*, 219 F.R.D. at 293 (certifying class asserting Exchange Act §10(b) and Securities Act §11 claims where "common questions for trial include whether WorldCom's statements and public filings . . . contained material, untrue statements and omissions"); *In re Deutsche Telekom AG Sec. Litig.*, 229 F.Supp 2d 277, 282 (S.D.N.Y. 2002) (certifying class asserting Section 10(b) and 11 claims were common questions of law and fact

15

included "whether the allegedly fraudulent statements and omissions concerning Deutsche Telekom violated the securities laws").[2]

## 2.    The Presumption of Reliance Applies

The fraud-on-the-market doctrine rests on the premise that the "'market price of shares' will 'reflec[t] all publicly available information.'" *Amgen*, 568 U.S. at 461 (citing *Basic*, 485 U.S. at 246). Where shares of the defendant company trade in an efficient market, "courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities." *Id.* To invoke this presumption at the class certification stage, the only elements a plaintiff must prove are: (1) whether the alleged misrepresentations were publicly known (the so-called "publicity" requirement); (2) whether the plaintiffs traded the stock between when the misrepresentations were made and when the truth was revealed (the so-called "market timing" requirement; and (3) whether the market for the stock was efficient. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1958-59 (2021) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*").[3] Plaintiffs easily satisfy each requirement.

### a.    Plaintiffs Satisfy the Market Timing and Publicity

---

[2] To the extent there may be individualized traceability inquiries with respect to Plaintiffs' Section 11 claims arising out of the Secondary Offering, "the potential for such inquires alone does not defeat predominance." *In re Smart Techs., Inc.*, 295 F.R.D. 50, 61 (S.D.N.Y. 2013) (citing *United Food & Comm'l Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 656 (W.D. Okla. 2012) ("With respect to the impact of tracing on the predominance requirement of Rule 23(b)(3), the common question of whether the registration statement was materially misleading predominates over any secondary tracing issues that might be encountered.")).

[3] "Even though materiality is a prerequisite for invoking the *Basic* presumption, we held that it should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 282. The Supreme Court has also held that a plaintiff need not make any showing of loss causation to invoke *Basic*'s presumption at the class certification stage. *See id.* at 265.

**Elements**

Plaintiffs affirmed that they traded Pareteum stock during the Class Period, between when the misrepresentations were made and when the truth was revealed. *See* Plaintiffs' Certifications at ECF No. 168-1 at pp. 85-113; *see also* ¶¶ 5, 171, 196. Moreover, Defendants' alleged misrepresentations were public, and the majority of the offending statements were published in Form 10-Ks or 10-Qs filed with the SEC, in publicly issued Company press releases, or made public during earnings calls with analysts and investors.[4] *See* ¶¶ 42-47, 52-53, 56, 61-66, 70-72, 77, 81, 85-86, 89-92, 99-102, 105-12.

### b. Pareteum Traded on an Efficient Market

The final prerequisite for invoking the presumption of reliance is also met. Because Pareteum stock traded on the NYSE American and then the NASDAQ throughout the Class Period, the market for Pareteum stock is presumed to be efficient. *See*, *e.g.*, *In re Initial Pub. Offering Secs. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency."); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 05 Civ. 1898, 2006 U.S. Dist. LEXIS 52991, at *43 (S.D.N.Y. Aug. 1, 2006) ("If . . . a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient.").

In addition, each of the factors identified in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) confirm that

---

[4] Defendants do not deny that these filings were made, that these press releases were issued, or that these earnings calls took place. *See* Pareteum Answer ¶¶ 42-47, 52-53, 56, 61-66, 70-72, 77, 81, 85-86, 89-92, 99-102, 105-12.

Pareteum traded in an efficient market. These factors may be considered as indicia of market efficiency. *See*, *e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 94-98 (2d Cir. 2017). Plaintiffs submit herewith the expert report of Chad Coffman, which assesses each of the direct and indirect tests identified in *Cammer* and *Krogman*, as well as two additional factors (institutional ownership and autocorrelation. *See* Coffman Report at ¶¶ 26-80.[5]  As the Coffman Report demonstrates, each of the factors tested supports a finding that Pareteum common stock traded in an efficient market during the Class Period. *See id.*

### i.    *Cammer Factor One: High Weekly Trading Volume*

The first *Cammer* factor—high weekly trading volume—suggests efficiency "because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 316 (S.D.N.Y. 2016) (quoting *Cammer*, 711 F. Supp. at 1286). "*Cammer* supposes that turnover of two percent or more of outstanding shares would justify a strong presumption of efficiency, while turnover of one percent would justify a substantial presumption." *Id.* (citing *Cammer*, 711 F. Supp. at 1286).

Pareteum stock traded regularly and actively. On average, weekly trading volume for Pareteum's common stock was 16.69 million shares, or 23.91%, during throughout the Class Period. *See* Coffman Report at ¶ 30. As this volume far exceeds the 2% threshold found sufficient in *Cammer* for a strong presumption of market efficiency, this factor weighs in favor of finding an efficient market for Pareteum stock.

---

[5] Coffman has a Master's degree from the University of Chicago, and is a Chartered Financial Analyst ("CFA") charter-holder. *See* Coffman Report at ¶ 3. Numerous courts have accepted Coffman as an expert and/or accepted his conclusions, including in the Second Circuit. *See*, *e.g.*, *In re Virtus Inv. Partners, Inc.*, 15cv1249, 2017 U.S. Dist. LEXIS 73554, at * 4, 10-12 (May 15, 2017); *In re Barrick Gold Secs. Litig.*, 314 F.R.D. 91, 104-07 (S.D.N.Y. 2016).

### ii. *Cammer* Factor Two: Analyst Coverage

Second, "*Cammer* recognizes that a stock covered by a 'significant number of analysts' is more likely to be efficient because such coverage implies that investment professionals are following the company and taking buy/sell recommendations to investors." *Strougo*, 312 F.R.D. at 316 (citing *Cammer*, 711 F. Supp. at 1286). While *Cammer* did not identify the number of analysts that would be considered "significant," the declaration submitted in that case proffered evidence that five firms issued reports during the class period. *See* Poser Declaration in *Cammer*, Miller Decl. Ex. C.

Here, Pareteum stock was actively followed by analysts from at least 18 different firms during the Class Period, who published at least 152 reports covering Pareteum. *See* Coffman Report at ¶ 36 & Ex. 4 to Coffman Report.[6] Thus, *Cammer* Factor Two strongly supports a finding of market efficiency. *See*, *e.g.*, *McIntire*, 38 F. Supp. 3d 431 (finding market efficiency even though no analysts covered the defendant corporation during the first three months of the class period, and the company was only covered by two analysts for the remainder of the class period); *In re Winstar Communs. Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (finding market efficient with three analysts).

In addition to the analyst coverage of Pareteum, there were many other sources of public information dissemination which provide further support for the efficiency of the markets for Pareteum's securities. For example, there was substantial public press regarding Pareteum. *See* Coffman Report at ¶ 38. In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost. *See id.* Further, a variety of other sources disseminated

---

[6] Further, Pareteum admits that two analyst reports - the Aurelius and Viceroy Reports – were published. *See* Pareteum Answer ¶¶ 28, 32.

information about Pareteum stocks to the investing public, including the Company's own press releases released nationally on major newswire services (¶¶ 42-47, 52, 72, 77, 81, 85-86, 89, 91-92, 99, 101, 105-09, 115),[7] which also demonstrates market efficiency. *See Winstar Commc'ns*, 290 F.R.D. at 446 (noting second *Cammer* factor favored a finding of market efficiency in part because "the company itself issued over 35 press releases and was covered by mainstream financial news services such as Bloomberg and the Wall Street Journal."); *Carpenters Pension Trust Fund v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (stating that the regular issuance of press releases, press coverage and dissemination of information through news services such as Bloomberg were factors that supported finding of market efficiency); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153-54 (S.D.N.Y. 2012) (noting the publication of over two dozen press releases and articles supported finding of efficiency); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (stating that three analysts with 80 analyst reports, together with news items and press releases, "favor[ed] a finding of market efficiency").

Moreover, on average, over 22% of Pareteum's outstanding common shares were held by institutional investors during the Class Period, and approximately 176 institutional investors held Pareteum's common shares during the Class Period. *See* Coffman Report at ¶ 76 & Ex. 12 to Coffman Report. These facts further support a finding that the market for Pareteum stock was efficient during the Class Period. *See Wilson*, 2018 U.S. Dist. LEXIS 138832, at *31 ("[W]e conclude that such a large number of institutional investors [251] supports the applicability here of the second Cammer factor.").

### iii.   Cammer Factor Three: Market-Makers and Arbitrage

---

[7] Again, Pareteum does not deny that it issued these press releases. *See* Pareteum Answer ¶¶ 42-47, 52, 72, 77, 81, 85-86, 89, 91-92, 99, 101, 105-09, 115.

Third, the existence of numerous market makers is further evidence of market efficiency because it "ensure[s] completion of the market mechanism." *Cammer*, 711 F. Supp. at 1286-87. During the Class Period, at least 91 market-makers traded Pareteum stock. *See* Coffman Report at ¶ 44. This is further evidence that Pareteum stock traded on an efficient market. *See McIntire*, 38 F. Supp. 3d at 432 (holding that average of 20 market makers, and citing cases where as few as six market makers, supported market efficiency); *Winstar Commc'ns,* 290 F.R.D. at 447 (the fact that "six large, reputable banks [] served as market makers . . . . weigh[ed] toward a finding of market efficiency"); *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (14 market makers was "indicative of efficiency").

Additionally, approximately 176 institutional investors, which typically employ in-house financial analysts, invested in Pareteum's securities during the Class Period. *See* Coffman Report at ¶ 76 & Ex. 12 to Coffman Report. Typically, the in-house analysts, or "buy-side analysts," conduct research on securities the institutions buy, enabling the institutions to act as arbitrageurs and enhance market efficiency. *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (finding that institutional investors could easily trade securities on national exchanges and "likely acted as arbitrageurs and facilitated the efficiency of the market"); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009) (stating that the "presence of large institutional investors may be similar to the presence of market-makers" who, "with more money at stake, may be more likely to inform themselves well before trading"). The multitude of institutional investors transacting in Pareteum securities is further evidence of market efficiency.

#### iv. *Cammer* Factor Four: Form S-3 Eligibility

Fourth, "the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285. This element is important because "[t]he SEC permits a company to file Form S-3 when, in the SEC's judgment, the market

21

for shares in the company is reasonably efficient at processing information." *Strougo*, 312 F.R.D. at 316 (citing *Cammer*, 711 F. Supp. at 1284). Here, Pareteum was eligible to file a Form S-3 registration statement throughout the Class Period because it filed SEC reports for the previous twelve months and its average market capitalization of $234.32 million during the Class Period (*see* Coffman Report at ¶ 71 & Ex. 9 to Coffman Report) vastly exceeded the threshold requirements for S-3 registration.[8] Indeed, Pareteum filed a Form S-3 in connection with the Secondary Offering on November 30, 2018.[9] ¶ 185; *see also* Coffman Report at ¶ 47 & n.49. Thus, the fourth *Cammer* factor supports a finding of market efficiency. *See In re Am. Realty Capital Props., Inc. Litig.*, 15-mc-40, 2017 U.S. Dist. LEXIS 142416, at *37 (S.D.N.Y. Aug. 31, 2017) (Hellerstein, J.) (certifying class where, *inter alia*, it was "uncontested that [defendant] was eligible to file an S-3 registration statement at all times during the Class Period.").

### v.   *Cammer* Factor Five: Cause and Effect Relationship

Fifth, "indirect evidence of market efficiency—including that a stock trades in high volumes on a large national market and is followed by a large number of analysts—will typically be sufficient to satisfy the *Basic* presumption on class certification. In such cases there is no need to demonstrate efficiency through a direct test, such as an event study." *Strougo*, 312 F.R.D. at 322-23. Thus, because Plaintiffs can establish market efficiency indirectly via the first four *Cammer* factors and each *Krogman* factor (see below), the Court need not "consider whether

---

[8] To file a Form S-3, a company must have filed SEC reports for twelve consecutive months and possess a $75 million market capitalization level. *Winstar Communs*, 290 F.R.D. at 447 (citing 17 C.F.R. § 239.13).

[9] Pareteum does not deny that it filed this document (Pareteum Answer ¶ 185), and it is publicly available at
https://www.sec.gov/Archives/edgar/data/0001084384/000114420418062663/tv507990_s3a.htm
.

[Plaintiffs] have also satisfied *Cammer* 5 by proof of an event study." *Id*. Affirming *Strougo*, the Second Circuit agreed "that a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies." *Waggoner*, 875 F.3d at 97-99; *see also Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 n.3 (S.D.N.Y. 2018) ("As Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor[.]").

Nonetheless, Plaintiffs submit a thorough, reliable event study that unquestionably confirms a cause-and-effect relationship between the release of value-relevant company-specific information and movements in Pareteum common stock price. *See* Coffman Report at ¶¶ 49-69. "An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities." *See* Coffman Report at ¶ 50. Consistent with established industry practice, Coffman used a highly reliable regression model to isolate Company-specific abnormal returns by raw stock price movements to remove market-related and industry-related stock movements and examined whether the abnormal returns in Pareteum's common stock price were statistically significant in reaction to pre-specified material news events. *See* Coffman Report at ¶¶ 51-68.[10] His analysis determined that there was a clear cause-and-effect relationship between new material news and changes in the market price of Pareteum common stock during the Class Period. *See* Coffman Report at ¶ 69. Accordingly, the fifth *Cammer* factor is satisfied and weighs heavily in favor of class certification.

### vi. *Krogman* Factor One: Market Capitalization

Market capitalization is an indicator of market efficiency because investors have greater

---

[10] Notably, the examination performed by Coffman here was significantly more rigorous and scientific than the one submitted in *Cammer*, which addressed only anecdotal evidence of stock movement on a single news date. *See* Miller Decl. Ex. C, ¶ 33.

incentive to invest in more highly capitalized corporations, and such companies tend to be more well known and closely followed. *See Krogman*, 202 F.R.D. at 478; *Strougo*, 312 F.R.D. at 315 ("investors tend to be more interested in companies with higher market capitalizations, thus leading to more efficiency").

During the Class Period, Pareteum's average market capitalization was $234.32 million. *See* Coffman Report at ¶ 71 & Ex. 9 to Coffman Report. This ranged from the 16th to the 44th percentile of the combined NYSE and NASDAQ exchanges during the Class Period. *See* Coffman Report at ¶ 71 & Ex. 10 to the Coffman Report. Pareteum's large market capitalization provides further *indicia* of efficiency. *See Krogman*, 202 F.R.D. at 478 (finding this factor weighed slightly in favor of market efficiency when the company's market capitalization was in the top sixty percent of the sample group); *McIntire*, 38 F. Supp. 3d at 433 (holding that market capitalization of $292 to $585 million supported market efficiency).

### *vii. Krogman* **Factor Two: Bid-Ask Spread**

The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares, with a low bid-ask spread indicating a more efficient market. *See Krogman*, 202 F.R.D. at 478; *see also Strougo*, 312 F.R.D. at 316 ("[A] small bid-ask spread indicated that trading in the stock was inexpensive, suggesting efficiency."). Courts have found markets for securities efficient with bid-ask spreads ranging from 0.02% to 2.44%. *See*, *e.g.*, *Wilson*, 2018 U.S. Dist. LEXIS 138832, at *43 (0.07%) (citing *Billhofer*, 281 F.R.D. at 154, 160 (0.198%); *Am. Realty*, 2017 U.S. Dist. LEXIS 142416, at *37 (0.18%); *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 574 (C.D. Cal. 2012) (.58%); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (2.44%).

24

Even at its highest point during the Class Period, the bid-ask spread for Pareteum stock was still lower than the average bid-ask spread of other companies listed on the NYSE and NASDAQ. *See* Coffman Report at ¶¶ 73-74.

### viii.   *Krogman* Factor Three: The Float

A stock's "float" is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities. A higher float indicates greater market efficiency. *See Krogman*, 202 F.R.D. at 478; *Strougo*, 312 F.R.D. at 316-17 (finding that "[t]he percentage of shares available to the public generally bears a direct relationship to efficiency" because when insiders with private information hold large portions of the security, "the price is less likely to reflect only the total of all public information").

During the Class Period, an average of more than 91% of Pareteum's shares were in the public float. *See* Coffman Report at ¶ 75 & Ex. 12 to Coffman Report. This large public float indicates an efficient market. *See Am. Realty*, 2017 U.S. Dist. LEXIS 142416, at *37 (average float of 93% supported class certification); *McIntire*, 38 F. Supp. 3d at 433 (insider ownership of 57% to 69% of shares outstanding supported a finding of market efficiency).

Thus, each of the *Cammer* and *Krogman* factors strongly supports a finding that Pareteum common stock traded in a highly efficient market during the Class Period.[11] The *Basic* presumption of reliance is easily invoked here.

---

[11] In addition to analyzing the *Cammer* and *Krogman* factors, the Coffman Report considered two additional factors when analyzing market efficiency: institutional ownership and autocorrelation. *See* Coffman Report at ¶¶ 76-80. The Coffman Report determined that both factors further support that Pareteum's common stock traded in an efficient market during the Class Period. *See id.*

### 3. Damages Are Capable of Classwide Determination

Courts have consistently found that a plaintiff seeking class certification is not required to present a single means of calculating damages for every member of the proposed class. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015). "All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015); *see also Fosbre v. Las Vegas Sands Corp.*, 2:10-CV-765, 2015 U.S. Dist. LEXIS 77774, at *8-10 (D. Nev. June 15, 2015) (same) (collecting cases).

After resolving the common liability issues, all that will remain is the mechanical task of computing individual Class members' damages based on a common methodology. While the amount of individual damages will invariably be different from one Class member to another depending on the day each Class member purchased Pareteum stock and at what price, it is well-established that damages under Section 10(b) can be computed in the same way, common to all Class members, using readily available pricing information in accordance with widely-used and generally-accepted methodologies and the PSLRA. *See*, *e.g., In re Barrick Gold Secs. Litig.*, 314 F.R.D. 91, 105-06; *see also* Coffman Report ¶¶ 81-84. Tabulation of damages will not undermine the predominance of common issues. *See Roach*, 778 F.3d at 402, 405 (holding that individualized damages determination alone cannot defeat predominance).

And Section 11 damages are even more straightforward, because they are calculated using a computation set forth in the Securities Act. *See In re WorldCom Inc. Sec. Litig.*, 02 Civ. 3288, 2005 U.S. Dist. LEXIS 3143, at *4 (S.D.N.Y. Mar. 3, 2005) (citing 15 U.S.C. § 77k(e)); *see also N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 167 (S.D.N.Y. 2011) (The "'plain language of section 11(e) prescribes the method of calculating damages . . . and the statutory scheme requires courts to apply the prescribed formula in every section 11 case.'")

26

(quoting *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995)), *aff'd sub nom. N.J. Carpenters Health Fund v. Rali Series 2006-QO1*, 477 F. App'x 809 (2d Cir. 2012); Coffman Report at ¶¶ 85-88.  Tabulation of damages will not undermine the predominance of common issues. *See*, *e.g.*, *Sykes*, 780 F.3d at 88 ("All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability'") (citations omitted); *see also Roach.*, 778 F.3d at 402, 405 (holding that individualized damages determination alone cannot defeat predominance).

### 4.    A Class Action Is the Superior Method for Adjudicating the Controversy

Securities fraud actions "easily satisfy the superiority requirement of Rule 23." *N.J. Carpenters Health Fund*, 2016 U.S. Dist. LEXIS 153804, at *34-35. Rule 23(b)(3) sets forth the following factors to be considered when assessing "superiority": (A) the class members' interest in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. FED. R. CIV. P. 23(b)(3). Each of these factors weighs strongly in favor of class certification.

The class members' interests in individually controlling the prosecution of separate actions is minimal because the trouble and expense of individual actions, when weighed against the individual recoveries potentially obtainable, would be prohibitive. There are currently no individual opt-out actions pending but, even if there were, they would not preclude a finding of superiority: if the mere fact that some class members opt out precludes a superiority determination, "'few class actions would ever reach the trial room.'" *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 143 (S.D.N.Y. 2014) (quoting *N.J. Carpenters Health Fund. v.*

27

*Residential Capital, LLC*, 08 CV 8781, 2013 U.S. Dist. LEXIS 180913, at \*25 (S.D.N.Y. Dec. 27, 2013)).

Here, class certification will promote judicial efficiency by permitting common claims and issues to be resolved once with a binding effect on all parties. By contrast, if Plaintiffs and each of the Class members were forced to bring separate individual actions, each would be required to prove the same wrongdoing by Defendants to establish liability, resulting in unnecessary judicial inefficiencies and potentially inconsistent judgments. More importantly, class certification is the only way to afford relief to those whose claims are too small to justify individual lawsuits. *See*, *e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class actions allow plaintiffs to pool claims that would otherwise be uneconomical to litigate individually). As a result, a class action is not only the superior method of adjudication, but also perhaps the only feasible way to litigate the claims alleged in this action. *See Wilson*, 2018 U.S. Dist. LEXIS 138832, at \*50-51 (where class would likely consist of thousands of members widely dispersed geographically, and "many individual class members' claims may be too small to be worth litigating on an individualized basis," the superiority requirement of Rule 23(b)(3) is met). And because individual Class members are most likely located in geographically dispersed areas, Pareteum and its related entities are located in this District, Pareteum's stock was traded on the NYSE American and the NASDAQ, the related *Sabby* action is pending in this Court[12] and is coordinating discovery efforts with the instant action (ECF No. 222), and many of the acts and practices complained of occurred in substantial part in this District, the Southern District of New York is a desirable forum for this class action.

---

[12] *Volatility Warrant Master Fund Ltd. v. Pareteum Corp. et al.*, 1:19cv10460 (S.D.N.Y.) (Hellerstein, J.).

Finally, Lead Plaintiffs do not foresee any management difficulties that will preclude this action from being maintained as a class action. Indeed, the parties have undertaken two rounds of motion to dismiss briefing and have begun discovery in an efficient manner – further indicating that proceeding as a class action is the most efficient manner to litigate the Class's claims. *See In re MF Global Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015) (superiority requirement met because "no difficulties [had] aris[en] from the management of the Proposed Class" while it "engaged in significant discovery and resolved a motion to dismiss"). Consistent with the requirements of Rule 23(b)(3), the certification of this action as a class action would not only be superior to other available methods for fairly and efficiently adjudicating the controversy, but appears to be the sole method for fairly and efficiently litigating the claims of the thousands of members of the proposed Class.

### D.      KSF Satisfies Fed. R. Civ. P. 23(g)

FED. R. CIV. P. 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class. These considerations all weigh in favor of appointing KSF as Class Counsel.

KSF has the experience, knowledge, and resources to represent the Class. *See* Miller Decl. Ex. B. KSF has devoted substantial time and resources to investigating the legal and factual bases for the claims in this action, drafting the Consolidated Amended Complaint and the FAC, defeating Defendants' motions to dismiss, and pursuing discovery. KSF has dedicated a team of experienced attorneys prosecuting this action and will commit the necessary resources to achieve a successful recovery for investors.

## V.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order:(1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing PSIG as Class Representatives; (3) appointing KSF as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

DATED: December 1, 2021                             Respectfully submitted,

                                                    **KAHN SWICK & FOTI, LLC**

                                                    */s/ Kim E. Miller*
                                                    Kim E. Miller (KM-6996)
                                                    J. Ryan Lopatka (admitted *pro hac vice*)
                                                    250 Park Ave., 7th Floor
                                                    New York, NY 10177
                                                    Telephone: (212) 696-3730
                                                    Facsimile: (504) 455-1498
                                                    Kim.Miller@ksfcounsel.com
                                                    J.Lopatka@ksfcounsel.com

                                                    -and-

                                                    Melissa H. Harris (MH-3553)
                                                    1100 Poydras Street, Suite 3200
                                                    New Orleans, LA 70163
                                                    Phone: (504) 455-1400
                                                    Facsimile: (504) 455-1498
                                                    melissa.harris@ksfcounsel.com

                                                    *Lead Counsel for Lead Plaintiff Pareteum*
                                                    *Shareholder Investor Group*

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2021, I filed the foregoing upon all counsel of record by using the CM/ECF system. The CM/ECF system will provide service of such filing(s) via Notice of Electronic Filing (NEF).

                                                    */s/ Kim E. Miller*
                                                    Kim E. Miller