**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PARETEUM SECURITIES LITIGATION | Case No. 1:19-cv-09767-AKH-GWG |

**DECLARATION OF KIM E. MILLER IN SUPPORT OF**
**FINAL APPROVAL OF CLASS ACTION SETTLEMENT,**
**PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS, AND**
**APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND**
**<u>REIMBURSEMENT OF LITIGATION EXPENSES</u>**

## INDEX OF EXHIBITS

Exhibit A..........................................................................Resumé of Kahn Swick and Foti, LLC

Exhibit B ..............................................Transcript of Oct. 12, 2022 Preliminary Approval Hearing

1

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ............................................................................................ 4

II.   FACTUAL SUMMARY OF PLAINTIFFS' ALLEGATIONS ........................................... 6

III.  PROCEDURAL HISTORY ................................................................................................ 8

    A.  The Complaint and Motion to Dismiss ................................................................... 8

    B.  Post-Complaint Developments.............................................................................. 10

    C.  Discovery................................................................................................................ 11

    D.  Class Certification ................................................................................................. 13

    E.  First Mediation Session ......................................................................................... 13

    F.  Pareteum's Bankruptcy and the Stay of this Action.............................................. 14

    G.  Continued Discovery and Settlement Negotiations............................................... 15

    H.  The Settlement and Preliminary Approval ........................................................... 15

IV.   THE RISKS OF CONTINUING LITIGATION................................................................ 20

    A.  Standing for Section 11 Claims............................................................................. 21

    B.  Continuing Discovery............................................................................................ 22

    C.  Class Certification ................................................................................................. 23

    D.  Summary Judgment ............................................................................................... 24

    E.  Pre-Trial................................................................................................................. 25

    F.  Trial ....................................................................................................................... 25

V.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE
    SETTLEMENT CLASS AND WARRANTS FINAL APPROVAL.................................. 27

VI.   LEAD COUNSEL'S COMPLIANCE WITH THE COURT'S
    PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE
    OF THE NOTICE ........................................................................................................... 28

VII.  ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ............................ 30

VIII. LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES
    AND REIMBURSEMENT OF LITIGATION EXPENSES IS
    REASONABLE AND SHOULD BE GRANTED ............................................................ 35

    A.  The Fee Application .............................................................................................. 36

    B.  Lead Counsel's Application for Reimbursement of Expenses............................... 44

IX.   CONCLUSION ................................................................................................................ 47

I, KIM E. MILLER, hereby declare as follows:

1.    I am a partner at Kahn Swick & Foti, LLC ("KSF"), Lead Counsel for Lead Plaintiff Pareteum Shareholder Investor Group ("PSIG"), comprised of Kevin Ivkovich, Stephen Jones, Keith Moore, Nicholas Steffey, and Robert E. Whitley, Jr. ("Plaintiffs") and the Settlement Class.[1] I am an attorney admitted to practice in this Court. Unless otherwise indicated, the statements made in this Declaration are based` upon my personal knowledge.

2.    As Lead Counsel, I led the prosecution of this Action since PSIG moved for appointment as Lead Plaintiff in December 2019. I also led, on behalf of Plaintiffs and the Settlement Class, the negotiations that resulted in the Settlement discussed herein.

3.    I respectfully submit this Declaration in support of Plaintiffs' concurrently filed motions for: (1) approval of the $5.65 million all-cash Settlement between (a) Plaintiffs, Plaintiff Douglas Loskot ("Plaintiff Loskot"), and Defendants Victor Bozzo, Denis McCarthy, Edward O'Donnell, and Robert H. Turner ("Individual Defendants") and (b) Plaintiffs and Defendant Squar Milner LLP ("Squar Milner")[2] and the proposed plan for allocating the Settlement proceeds

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Amended Stipulation and Agreement of Settlement between Plaintiffs and the Individual Defendants effective October 25, 2022 (ECF No. 273) and Amended Stipulation and Agreement of Settlement between Plaintiffs and Squar Milner effective October 25, 2022 (ECF No. 274) (collectively, the "Amended Stipulations").

[2] The Individual Defendants have paid $5.25 million, and Squar Milner has paid $400,000. *See* ECF No. ECF No. 273 at ¶ 1(xx); ECF No. 274 at ¶ 1.39. In addition, the Individual Defendants have paid $100,000 toward the cost of Notice. *See* ECF No. 273 at ¶ 15. Contingent upon final approval of the Settlement, the claims in the individual action *Sabby Volatility Warrant Master Fund, Ltd. v. Pareteum Corp.*, No. 1:19-cv-10460-AKH (S.D.N.Y.) (the "*Sabby* Action"), will be dismissed pursuant to separate settlement agreements between Sabby Volatility Warrant Master Fund, Ltd. ("Plaintiff Sabby") and the Individual Defendants, and Plaintiff Sabby and Squar Milner. Plaintiffs note that the Settlement Fund does not include the separate settlement consideration for the settlements between Plaintiff Sabby and the Individual Defendants and Plaintiff Sabby and Squar Milner.

The Settlement also encompasses claims asserted by Plaintiff Loskot on behalf of a putative class in California state court. *Loskot v. Pareteum Corp.*, 20-2279 (Cal. Super. Ct., San Mateo Cty.) (the "*Loskot* Action"). The members of the putative class in the *Loskot* Action are members of the Settlement Class in this Action (excluding opt outs), and upon final approval of the Settlement, Plaintiff Loskot will dismiss the *Loskot* Action. As disclosed in the Notice, any attorneys' fees for Counsel for Loskot will be determined by a mediator, subject to appeal to this Court, with 70% of

to eligible members of the Settlement Class (the "Plan of Allocation"); and (2) Lead Counsel's application for an award of attorneys' fees of 30% of the Settlement Fund ($1,695,000) and reimbursement of reasonable litigation expenses of $422,214.12, plus accrued interest.

4. The purpose of this Declaration is to set forth the nature of the investigation, litigation, and negotiations that led to the Settlement, demonstrating why the Settlement is fair, reasonable, and adequate and should be approved by this Court, as well as why Lead Counsel's fee request and expense request (collectively, the "Fee and Expense Application") are reasonable and should be approved by the Court. A Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement (the "Settlement Memorandum") and a Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum") are being filed contemporaneously herewith.

## I.    PRELIMINARY STATEMENT

5. The proposed Settlement – which will resolve all claims against the Settling Defendants[3] for $5.65 million in cash, plus $100,000 (from Individual Defendants) towards the cost of Notice – is fair, reasonable, and in the best interests of the Settlement Class. The risks of prosecuting this litigation through the remainder of discovery, class certification, summary judgment, and trial would delay any recovery for years and, in fact, raise the strong likelihood of the Settlement Class recovering substantially less, or nothing at all in the future. These risks are exacerbated by Pareteum's bankruptcy, ongoing government investigations against some or all of

---

any such fees to be paid out of Lead Counsel's fee award in this Action, and 30% to be paid by Plaintiff Sabby. This issue is fully briefed and pending before the Mediator.

[3] The "Settling Defendants" are the Individual Defendants, Squar Milner, and the former defendants in this Action, Robert Lippert and Luis-Jimenez-Tuñon. Pareteum is not part of the Settlement because the Action is stayed against it due to the pending bankruptcy proceeding, and the Settlement does not implicate claims against Pareteum which have been timely asserted in the bankruptcy proceeding. *See In re Pareteum Corp.*, 22-10615 (Bankr. S.D.N.Y.) (the "Bankruptcy Proceeding"). Former Defendant Dawson James Securities Inc. ("DJSI") was voluntarily dismissed from this Action without prejudice on July 21, 2022. *See* ECF No. 257. On September 7, 2022, Plaintiffs and DJSI filed a Stipulation and [Proposed] Order Dismissing DJSI with prejudice. *See* ECF No. 264.

the Individual Defendants, and the rapidly dwindling insurance proceeds available to pay a judgment.

6.     The Settlement was achieved only after Plaintiffs, through Lead Counsel, extensively investigated, researched, and drafted the AC and FAC, including consultation with an economics expert and retention of a private investigator; responded to multiple motions to dismiss in two separate rounds of briefing, conducted oral argument on Defendants' second round of motions to dismiss; prepared and filed a motion for class certification supported by an expert report on market efficiency and damages; propounded various written discovery requests and reviewed the responses thereto; reviewed and analyzed approximately half a million pages of documents produced by Defendants; responded to numerous discovery requests; prepared for five fact depositions; participated in two mediation sessions, including the submission of detailed mediation briefs, and engaged in additional settlement negotiations for more a year. The Settlement resulted from good-faith, arm's length negotiations between capable and experienced counsel that took place for more than a year, with a portion of those negotiations (pertaining to the settlement with the Individual Defendants) taking place under the supervision of an experienced, respected mediator.

7.     As discussed in the Fee Memorandum, Lead Counsel's request for attorneys' fees in the amount of 30% of the Settlement Fund ($1.695 million, plus interest) is well justified given the nature, extent, and quality of legal services provided by Lead Counsel, the risks undertaken by Lead Counsel on a fully contingent basis, the magnitude and complexity of this case, and the substantial benefits conferred upon the Settlement Class. The reasonableness of the requested fee award is further supported by the fact that the fee equates to a negative multiplier of 0.47 on Lead Counsel's lodestar of $3,614,435.00 (before payment of any fee award to counsel for Loskot, 70%

5

of which will be covered by Lead Counsel and 30% of which will be covered by Plaintiff Sabby). *See infra* at ¶ 150. Moreover, in my discretion and judgment, I cut hundreds of additional attorney hours from Lead Counsel's lodestar in the interests of maximizing efficiency. *See infra* at ¶ 152.

8.      Lead Counsel also requests reimbursement of reasonable and necessary expenses incurred in connection with its prosecution and resolution of the Action in the amount of $422,214.12.[4]

9.      I respectfully submit that the Settlement, for the reasons discussed herein and in the Fee Memorandum and Settlement Memorandum, is fair, reasonable, and adequate in all respects, that the Plan of Allocation is fair, reasonable, and has a rational basis, and that the Fee and Expense Application is fair and reasonable and should be approved.

## II.      FACTUAL SUMMARY OF PLAINTIFFS' ALLEGATIONS

10.      In the First Consolidated Amended Complaint (ECF No. 168; "FAC"), filed on July 20, 2020, Plaintiffs allege that Pareteum and certain of its former executives – Victor Bozzo, Chief Executive Officer and Chief Commercial Officer, Denis McCarthy, President and Chief Operating Officer, Edward O'Donnell, Chief Financial Officer, and Robert H. Turner, Executive Chairman of the Board, Principal Executive Officer, and CEO, made materially false and misleading statements and omissions regarding Pareteum's business, operations, and prospects, in violation of Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"). These statements included the reporting of overstated and inflated revenues in the Company's FY18 10-K and Class Period 10-Qs that were based on their invented "Backlog" metric, consisting largely

---

[4] Counsel for Loskot reviewed and approved the Notice prepared by Lead Counsel that was issued to the Settlement Class, including the expense cap of $425,000.  Counsel for Loskot did not inform Lead Counsel at that time that it had any reimbursable expenses.  In the course of addressing the Loskot fee issue with the mediator, after the Court-approved Notice was issued, Counsel for Loskot mentioned for the first time that it had expenses of "approximately $12,000." While Lead Counsel has received no breakdown of these expenses from Counsel for Loskot, subject to Court approval, Plaintiffs do not object to a reimbursement of reasonable expenses to Counsel for Loskot in the amount of $2,785.88 (the difference between Lead Counsel's reasonable expenses of $422,214.12 and the noticed cap).

of fabricated and embellished customers. *See* FAC at ¶¶ 45, 49, 53, 69-87.

11.     The inflated revenues were incorporated by reference into registration statements filed in connection with Pareteum's November 12, 2018, acquisition of iPass, Inc. (the "iPass Acquisition") and in connection with Pareteum's September 20, 2019, secondary offering of stocks and warrants (the "Secondary Offering"), which was underwritten by former defendant DJSI, in violation of Sections 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"). *See id.* at ¶¶ 79-81, 191, 210. Also incorporated into the Secondary Offering filings was Defendant Squar Milner's March 18, 2019, audit report which contained an unqualified opinion certifying that Pareteum's FY18 financial statements fairly presented its financial position and were prepared in accordance with GAAP. *See id.* at ¶¶ 47, 192-93.

12.     After the truth was partially revealed by two independent analysts (Aurelius Value and Viceroy Research) in June 2019, Pareteum and the Individual Defendants categorically denied everything, but they stopped issuing press releases and retired the Backlog, announcing that it had "served its purpose." *Id.* at ¶¶ 28-36. Then, on October 15, 2019, Pareteum disclosed that, on October 9, 2019, McCarthy had been terminated. *See id.* at ¶ 123.

13.     Six days later, and barely one month after the Secondary Offering, on October 21, 2019, Pareteum issued the Restatement Release in which it (a) announced that Pareteum would restate its previously issued financial statements for FY18 and 1H19; (b) advised that "[i]nvestors should no longer rely upon the Company's previously released financial statements" and related releases and communications for these periods; (c) admitted that "certain revenues recognized during 2018 and 2019 should not have been recorded during that period…[and that, for] certain customer transactions, the Company may have prematurely or inaccurately recognized revenue"; and (d) estimated the revenue impact for FY18 and 1H19 to be a reduction of approximately $9

million, or 28%, from FY18 reported revenue of $32,435,736) and $24 million, or 42%, from 1H19 reported revenue of $57,188,309. *Id.* at ¶ 40. The Restatement Release also noted Pareteum could not "predict the aggregate amount of revenue that will ultimately be restated" or "provide forward guidance" and that it expected financial results for the second half and full year 2019 "will be materially below current analysts' estimates." *Id.* at ¶ 41.

14.     Two weeks later, on November 5, 2019, Pareteum reported that O'Donnell would be replaced as CFO and that his "status with the Company [wa]s under review." *Id.* at ¶ 123. On November 15, 2019, Pareteum received notice that it was no longer in compliance with NASDAQ listing rules because it had not filed its 3Q19 10-Q. *See id.* at ¶ 41. And ten days later, on November 25, 2019, Pareteum announced Turner had been terminated as Chairman and CEO. *See id.* at ¶ 123.

15.     Plaintiffs allege that, as a result of Defendants' statements and omissions, the price of Pareteum's stock was artificially inflated, and Plaintiffs purchased shares of Pareteum stock while the share price was artificially inflated and suffered economic losses when the truth was revealed and the artificial inflation was removed. *See id.* at ¶¶ 146-50.

## III.     **PROCEDURAL HISTORY**

### A.     **The Complaint and Motion to Dismiss**

16.     The first complaint in this Action was filed on October 22, 2019, against Defendants Pareteum, Bozzo, McCarthy, and O'Donnell, alleging violations of §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. *See* ECF No. 1. Two additional complaints, alleging substantially similar claims, were filed on October 23 and 24, 2019.

17.     On January 11, 2020, the Court entered an order consolidating the three cases, appointing PSIG as Lead Plaintiff, and approving Lead Plaintiff's selection of KSF as Lead Counsel. *See* ECF No. 79.

18.     Plaintiffs began investigating the claims alleged in the initial complaint, including

by conducting a thorough review of Pareteum's annual and quarterly reports, press releases, and financial statements; by obtaining and reviewing myriad news articles and analysis reports, by consulting with an expert economist, and by hiring a private investigator and consultant to independently investigate the allegations in the Aurelius and Viceroy Reports and obtain their underlying source materials.

19.     Plaintiffs then filed an Amended Complaint (ECF No. 98; "AC") on February 26, 2020. In the AC, Plaintiffs named additional Defendants Turner, Squar Milner, DJSI, and certain other individuals,[5] and alleged additional claims under Sections 11, 12, and 15 of the Securities Act.

20.     On April 24, 2020, Squar Milner, Pareteum, and the Individual Defendants, joined by DJSI, separately moved to dismiss the AC, arguing that Plaintiffs had failed to adequately plead materially false statements or omissions and failed to allege facts sufficient to give rise to a strong inference of scienter. Squar Milner and DJSI also argued that Plaintiffs lacked standing to bring their Section 11 claims. *See* ECF Nos. 143, 144, 152.

21.     Plaintiffs filed an opposition to Defendants' motions to dismiss on June 12, 2020. *See* ECF No. 157.

22.     The Court held a telephonic status conference on June 23, 2020, after which it dismissed the AC without prejudice and instructed Plaintiffs to file an amended complaint. *See* ECF No. 162.

23.     After conducting additional research and investigation, Plaintiffs filed the FAC on July 20, 2020. *See* ECF No. 162

24.     Defendants separately moved to dismiss the FAC on August 4, 2020, arguing,

---

[5] These individuals are Robert Lippert, Jimenez-Tuñon, Rob Mumby, and Yves van Sante. They were not named in the FAC.

9

again, that Plaintiffs had not adequately pled a false or misleading statement or facts giving rise to a strong inference of scienter. Defendants Squar Milner and DJSI again also challenged Plaintiffs' standing to bring their Section 11 claims. *See* ECF Nos. 175, 177, 180, 183.

25. Plaintiffs filed an opposition to Defendants' motions to dismiss on August 28, 2020. *See* ECF No. 185. Defendants filed their reply briefs on September 3, 2020. *See* ECF Nos. 187, 188, 191.

26. The Court held oral argument on the motions to dismiss on October 29, 2020. At the conclusion of oral argument, the Court ruled that Plaintiffs had adequately alleged that Pareteum, the Individual Defendants, and DJSI made material misrepresentations, but reserved decision on scienter, traceability with respect to the Section 11 claims against Squar Milner and DJSI in connection with the Secondary Offering, and whether Plaintiffs adequately pled that Squar Milner made a false statements of material fact sufficient to give rise to liability under Section 11.

27. In an Opinion and Order dated August 11, 2021, the Court denied Defendants' motions to dismiss in full. *See* ECF No. 201.

28. Defendants separately answered the FAC on September 10, 2021. *See* ECF Nos. 202-205.

### B. Post-Complaint Developments

29. Plaintiffs continued to closely monitor developments about Pareteum's business even after filing the FAC. Many of these developments strongly supported the allegations in the FAC.

30. On November 12, 2020, Pareteum was de-listed by the NASDAQ for failing to file certain delinquent 10-Qs and 10-Ks in the wake of the Restatement Release.[6]

---

[6] *See* https://investors.pareteum.com/investors/news/press-release-details/2020/Pareteum-Provides-Update-on-Nasdaq-Delisting/default.aspx

31.     The Company issued restated financials for FY18 on December 14, 2020, with a 37% reduction of revenues (9% higher than anticipated), and issued restated financials for 1H19 on March 12, 2021, with a 47% reduction in revenues (5% higher than anticipated).[7]

32.     On September 2, 2021, Pareteum consented to an SEC order finding that it had materially overstated revenues and requiring it to pay a $500,000 civil penalty.[8]

### C.     Discovery

33.     Immediately upon denying Defendants' motions to dismiss, the Court ordered the parties to appear for a case management conference six weeks later and then entered a Case Management Plan on October 15, 2021. *See* ECF Nos. 201, 222.

34.     Pursuant to the Case Management Plan, the Parties were required to exchange all documents relating to traceability less than a month later, by November 12, 2021; Plaintiffs were required to move for class certification within six weeks, by December 1, 2021; and a discovery deadline of September 30, 2022, was set. *See* ECF No. 222. The Parties immediately commenced discovery.

35.     Pareteum and the Individual Defendants served their initial disclosures on September 29, 2021; Plaintiffs served their initial disclosures on September 30, 2021; and Squar Milner and DJSI served their initial disclosures on October 1 and October 5, 2021, respectively.

36.     Plaintiffs served their First Set of Requests for Production on DJSI and Squar Milner on September 10, 2021, and First Set of Requests for Production of Documents to Pareteum and certain Individual Defendants on September 12, 2021, to which they responded on October 18, 2021.

---

[7]   *See* https://investors.pareteum.com/investors/news/press-release-details/2020/Pareteum-Announces-Full-Year-2018-Restated-Financial-Results/default.aspx

[8] https://www.sec.gov/enforce/33-10975-s

37.     Plaintiffs served Pareteum and certain Individual Defendants with their Second Set of Requests for Production of Documents on September 30, 2021.

38.     On October 6, 2021, the Court held a status conference and the Parties thereafter negotiated and drafted a Rule 26(f) Report and Proposed Case Management, which they submitted on October 13, 2021.  ECF No. 219.

39.     Plaintiffs served subpoenas for documents on third parties Charles Schwab and UBS on October 13 and November 9, 2021, respectively.

40.     On November 10, 2021, Pareteum served Plaintiffs with its First Set of Requests for Production of Documents and First Set of Interrogatories.

41.     Plaintiffs propounded Requests for Admissions on all Defendants, and certain Individual Defendants propounded Requests for Admission on Plaintiffs, on December 1, 2021.

42.     Each member of Lead Plaintiff PSIG separately responded to Pareteum's Requests for Production and Interrogatories on December 10, 2021.

43.     Pareteum responded to the RFAs on January 10, 2022.

44.     Plaintiffs responded to the RFAs on January 14, 2022.

45.     Defendants produced approximately half a million pages of documents (approximately 90,000 documents) during discovery, which Plaintiffs reviewed and analyzed.

46.     Plaintiffs also received from, and produced to, DJSI (a now-dismissed defendant who is not a party to the Settlement), documents on the issue of "tracing" relating to Plaintiffs' Section 11 claims.

47.     At the time Plaintiffs and the Individual Defendants executed their Memorandum of Understanding ("MOU") on August 15, 2022, Plaintiffs had noticed the depositions of Defendants McCarthy and Bozzo, were in active discussions with defense counsel about

12

scheduling the depositions of Defendants O'Donnell and Turner, had served a former Pareteum employee with a deposition subpoena, and were actively preparing for these five depositions, which were scheduled to take place between August 16 and August 30, 2022.

48.     With the benefit of this extensive investigation and discovery, Plaintiffs and Lead Counsel have sufficient knowledge of the strengths and weaknesses of the claims asserted in this Action, having identified specific documents that corroborate those claims. This has permitted them to fully consider and evaluate the fairness of the Settlement to the Settlement Class.

### D.     Class Certification

49.     In accordance with the deadline set forth in the Case Management Plan, Plaintiffs filed a motion for class certification, appointment of class representative, and appointment of class counsel on December 1, 2021. Accompanying this motion was a detailed expert report by Chad Coffman, CFA, on market efficiency and damages methodology. *See* ECF No. 227.

50.     The Court granted Plaintiffs' motion for class certification on January 21, 2022. *See* ECF No. 234.

51.     On January 26, 2022, Pareteum requested that the Court withdraw its order so that Defendants could complete class certification discovery and submit an opposition brief. *See* ECF No. 235.

52.     The Court vacated its class certification order on January 26, 2022. *See* ECF No. 236.

### E.     First Mediation Session

53.     In an effort to resolve this matter expeditiously, Lead Counsel agreed to Defendants' request to have an early mediation while Defendants' motions to dismiss the FAC were pending.

54.     On February 25, 2021, Lead Counsel for Plaintiffs, counsel for all Defendants,

Counsel for Plaintiff Loskot, and representatives for Pareteum and the Individual Defendants' insurance carriers engaged in a full-day, virtual mediation, with David Murphy of Phillips ADR, a preeminent alternative dispute resolution firm. Counsel for Sabby also participated.

55.     In connection therewith, Plaintiffs and Defendants Pareteum and the Individual Defendants submitted to the mediator, and exchanged with each other, detailed mediation statements.

56.     No settlement was reached at the mediation and the litigation continued. Defendants were clear that in order to achieve a settlement, they would require a release of all claims asserted against them, including those in the *Loskot* and *Sabby* Actions. Nevertheless, the counsel for various Parties continued to negotiate intermittently, and at times intensively, both with and without Mr. Murphy's assistance.

### F.     Pareteum's Bankruptcy and the Stay of this Action

57.     On February 4, 2022, Pareteum filed an unopposed motion to stay further proceedings for 90 days (excluding settlement-related motion practice as to Squar Milner) to preserve its limited financial resources and the remaining D&O insurance available to the Individual Defendants, because of ongoing governmental investigations related to the subject of this litigation, as well as "the precarious financial status of Pareteum, which has been exploring a range of strategic alternatives to address ongoing liquidity constraints." ECF No. 238.

58.     The Court granted the stay on February 4, 2022. Thereafter, Plaintiffs, the Settling Defendants, and Pareteum continued to discuss settlement.

59.     On May 11, 2022, Pareteum made an unopposed request for an additional 90-day stay, which the Court stated that it would address at an upcoming status conference. *See* ECF No. 242.

60.     On May 15, 2022, Pareteum filed for bankruptcy protection.

14

61.     On May 18, 2022, Pareteum filed a Suggestion of Bankruptcy and Notice of Operation of Automatic Stay. *See* ECF No. 244. Pareteum's bankruptcy added significant complexity to the litigation as well as to the Parties' still-ongoing settlement discussions, as Pareteum was no longer involved in those discussions and there was uncertainty about whether a settlement was even possible.

62.     The Court held a status conference on June 1, 2022. Following the conference, the Court issued an Order setting a vigorous schedule for completion of discovery, including requiring additional document production to be completed by July 13, 2022, and requiring Plaintiffs to take five fact depositions by September 5, 2022. *See* ECF No. 249.

**G.     Continued Discovery and Settlement Negotiations**

63.     The Parties worked assiduously to comply with these discovery deadlines even while they continued to discuss a possible resolution.

64.     At the time Plaintiffs and the Individual Defendants reached their settlement, Plaintiffs had noticed the depositions of Defendants McCarthy and Bozzo, were in active discussions with defense counsel about scheduling the depositions of Defendants O'Donnell and Turner, had served a former Pareteum employee with a deposition subpoena, and were preparing for these five depositions, which were scheduled to take place between August 16 and August 30, 2022.[9]

**H.     The Settlement and Preliminary Approval**

65.     Following the first, unsuccessful mediation in February 2021, Plaintiffs and Squar Milner worked informally and intermittently toward a resolution.

66.     At a case management conference on October 6, 2021, Plaintiffs and Squar Milner

---

[9] Plaintiffs made extensive efforts to serve Rob Mumby, Pareteum's former Chief Revenue Officer (and a named defendant in the AC), with a deposition subpoena, but were unsuccessful. Plaintiffs also attempted to serve Stanley Stefanski, Pareteum's former Controller, with a deposition subpoena, but were likewise unsuccessful.

informed the Court of their efforts and expectation that they had reached an agreement in principle to settle.

67.    Pareteum filed for bankruptcy protection on May 18, 2022. As recounted above, this significantly complicated the Parties' ongoing settlement negotiations and there was considerable uncertainty as to whether a settlement could be achieved at all.

68.    Plaintiffs and Squar Milner executed a Stipulation of Settlement on July 14, 2022. *See* ECF No. 268. In order to avoid additional Notice costs, Plaintiffs waited to submit a motion for preliminary approval in the hopes that a broader settlement could be reached and noticed simultaneously with the Squar Milner settlement.

69.    On July 19, 2022, Plaintiffs, the Individual Defendants, the Individual Defendants' insurance carriers, Plaintiff Loskot, and Plaintiff Sabby participated in another full-day virtual mediation session overseen by Mr. Murphy. Pareteum did not participate in the negotiations. Further, at this point, DJSI had been dismissed from the Action, and, as noted above, Squar Milner had reached a settlement with Plaintiffs.

70.    The July 2022 mediation session ended without any agreement being reached. Following the unsuccessful mediation, intensive settlement discussions continued among Plaintiffs, the Individual Defendants, Plaintiff Sabby, and the Individual Defendants' insurance carriers, with Mr. Murphy's assistance. Lead Counsel participated in dozens of phone calls, zoom meetings, and email exchanges with Mr. Murphy, as did the other remaining parties, in an effort to reach a broader resolution. These negotiations were complicated by the wasting applicable insurance coverage, Pareteum's bankruptcy, other litigation against various Defendants and related entities, and ongoing governmental investigations. Discovery continued on a parallel track as the remaining Parties continued their efforts to settle.

71.     Plaintiffs, the Individual Defendants, and Plaintiff Sabby finally reached an agreement in principle to settle and memorialized their agreement in the MOU dated August 14, 2022.

72.     Plaintiffs informed the Court of the Settlement on August 17, 2022. *See* ECF No. 258.

73.     Plaintiffs, Plaintiff Loskot, and the Individual Defendants executed a Stipulation and Agreement of Settlement on September 7, 2022. *See* ECF No. 265.

74.     On September 7, 2022, Plaintiffs filed an unopposed motion for preliminary approval of the Settlement, Plan of Allocation, and proposed form and manner of Notice, for certification of the proposed Settlement Class for settlement purposes, and to schedule a Settlement Hearing. *See* ECF No. 266.

75.     The Court held a preliminary approval hearing on October 12, 2022. Aside from Counsel for Loskot, Counsel for all Settling Parties participated in the preliminary approval hearing. Counsel for Plaintiff Sabby in the individual action also attended the preliminary approval hearing.  At the hearing, the Court instructed Lead Counsel to revise the Settlement documents (*see* ECF Nos. 265, 268) to provide that attorneys' fees and expenses, if any, would be paid after an initial distribution is made to Authorized Claimants, as well as to clarify the attorneys' fee arrangement with Counsel for Loskot and provide that any attorneys' fee award for Counsel for Loskot would be determined by a mediator and be subject to appeal to the Court.

76.     The Parties subsequently amended their Stipulations of Settlement, as well as certain exhibits thereto, which they filed on December 21, 2022. *See* ECF Nos. 273, 274.

77.     On December 13, 2022, the bankruptcy court granted the motion for a Comfort Order.

17

78.     Plaintiffs informed the Court by letter dated December 16, 2022, that the Comfort Order had been entered and that the Settlement documents had been revised to address the Court's concerns. *See* ECF No. 272.

79.     On December 20, 2022, the Court granted Plaintiffs' motion for preliminary approval and entered the Preliminary Approval Order. *See* ECF No. 275.

80.     Pursuant to the Settlement, upon preliminary approval, the Settling Defendants paid $5.65 million in cash ($5.25 million from the Individual Defendants and $400,000 from Squar Milner) into an interest-bearing escrow account. *See* ECF No. 273 at ¶ 1(xx); ECF No. 274 at ¶ 1.39. In addition, the Individual Defendants paid $100,000 toward Notice costs. *See* ECF No. 273 at ¶ 15. In return, upon final approval, Settlement Class Members will dismiss, with prejudice, all claims that were, or could have been brought, against the Settling Defendants. *See id.* at ¶ 1(ss); ECF No. 274 at ¶ 1.32.

81.     Upon final approval of the Settlement by the Court and entry of a judgment that becomes a final judgment, and upon satisfaction of the other conditions to the Settlement, the Settlement Fund will pay for certain administrative expenses, including: (a) Notice and Administration expenses; (b) taxes assessed against the income earned on the Settlement Fund and related tax expenses; and (c) Lead Counsel's fees and litigation expenses, to the extent awarded by the Court. *See* ECF No. 273 at ¶ 10; ECF No. 274 at ¶ 5.2. The balance of the Settlement Fund (the "Net Settlement Fund") will be distributed to Settlement Class Members who submit valid Proofs of Claim and Release forms which demonstrate a recognized loss under the Plan of Allocation. *See id.* Each Authorized Claimant will receive a *pro rata* share of the Net Settlement Fund, based on their "Recognized Claim" – which depends on the number of shares acquired and the dates of their purchase and sale as compared to the alleged corrective disclosure date. *See* ECF

No. 273-2 at 11.

82.     Given the nature of this Action, Plaintiffs diligently negotiated with the Individual Defendants for payment of $100,000 toward the anticipated Notice and Claims Administration costs. Two of the primary factors affecting notice costs in securities fraud class actions are the: (1) length of the class period; and (2) number of shares traded during the class period (*i.e.*, the "trading volume"). The longer the class period, and the greater the trading volume during that class period, the greater the number of potential class members to whom individual notice must be sent in accordance with Fed. R. Civ. P. 23(e)(1) and (c)(2)(B). Here, the Settlement encompasses a Class Period that spans over 22 months, while the high trading volume throughout the Class Period generated 256.4 million potentially damaged shares.

83.     Court-appointed Claims Administrator Strategic Claims Services ("SCS"), with the approval of and under supervision of Lead Counsel, has taken considerable measures to limit the costs of providing Notice. First, SCS is engaging in an extensive campaign with brokers and nominees to provide Notice to beneficial owners via e-mail. To that end, brokers and nominees will be reimbursed the same amount for providing e-mail addresses as they will for sending beneficial owners Postcard Notices--$0.03. *See* ECF No. 275 at ¶ 8. Second, instead of printing and mailing traditional "notice packets" (consisting of copies of both the long-form Notice and Proof of Claim form) to those Settlement Class Members for whom it is unable to obtain valid e-mail addresses, the Claims Administrator instead mailed Postcard Notices, which itself results in significant savings. The Claims Administrator will submit a report outlining the implementation of Notice and the Claims Administration process with Lead Counsel's reply papers on April 18, 2023.

84.     Further, as noted above, Plaintiffs reached an agreement in principle to settle their claims against Squar Milner on June 23, 2022 (*see* ECF No. 267 at 6) and executed the Stipulation of Settlement with Squar Milner on July 14, 2022 (*see id.* at 1). Recognizing that providing Rule 23 notice of the Squar Milner settlement alone would have been cost-prohibitive, Plaintiffs postponed the preliminary approval process until after all remaining claims against all remaining Defendants could be presented to the Court and Notice could be efficiently coordinated. Thereafter, Lead Counsel reached an agreement in principle to settle the federal claims against the Individual Defendants (along with the *Loskot* Action and the *Sabby* Action) on August 15, 2022. *See id.* at 5. This strategy was successful and benefited the Settlement Class.

## IV.     THE RISKS OF CONTINUING LITIGATION

85.     Based on their experience and knowledge of the facts and applicable law, Lead Counsel KSF, a law firm that specializes in the prosecution of complex securities litigation, believes that the Settlement is in the best interest of the Settlement Class. Plaintiffs also approved the Settlement.

86.     Securities class actions are notoriously complex. *See*, *e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728, 2020 U.S. Dist. LEXIS 128998, at *11 (S.D.N.Y. July 21, 2020); *Maley v. Del Glob. Techs. Corp.*, 186 F.Supp. 2d 358, 372 (S.D.N.Y. 2002). In order to prevail on their claims, Plaintiffs would have to establish that Defendants made materially false statements or omissions, Defendants acted with scienter (for the Exchange Act claims), there was artificial inflation of Pareteum securities, and that declines in the prices of Pareteum securities were attributable to disclosures of information revealing the fraud. *See Maley*, 186 F. Supp. 2d at 372 (discussing "factual and legal hurdles" in establishing securities fraud case).

87.     The complexities confronting Plaintiffs were heightened by Pareteum filing for bankruptcy in the middle of ongoing discovery and settlement negotiations.

88.     Although Plaintiffs were able to survive the dismissal stage and believe this Action is meritorious, if the Action were to proceed, Plaintiffs would face substantial risks with respect to establishing liability and damages at each future stage of the litigation – as set forth below. If Defendants were able to prevail on any of their numerous meritorious arguments, Plaintiffs' recoverable damages would have been substantially reduced or eliminated altogether.

89.     Further, even if Plaintiffs were successful at each future stage of the litigation, proceeding through trial and possible appeals would likely take many years, significantly delaying any recovery for the Settlement Class.

90.     Moreover, proceeding with the Action would have quickly and inevitably exhausted all remaining insurance proceeds, so that even if Plaintiffs eventually triumphed at trial and appeals, the actual amount recovered would likely be zero.

91.      Given these significant risks, the $5.65 million Settlement (plus $100,000 towards the cost of Notice from the Individual Defendants) is a very good result as it provides immediate, substantial, and tangible benefits to the Settlement Class.

### A.     Standing for Section 11 Claims

92.     To establish standing for a Section 11 claim, Plaintiffs must be able to "trace their shares to an allegedly misleading registration statement." *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003). This is a demanding requirement; "traceability is strictly construed for a Section 11 claim." *In re Puda Coal Sec. Inc. Litig.*, No. 11-cv-2598, 2013 U.S Dist. LEXIS 142081, at *21 (S.D.N.Y. Oct. 1, 2013).

93.     While the Court rejected Squar Milner and DJSI's lack of standing arguments in their motions to dismiss, it did so based on the relatively low pleading standard for tracing. At oral argument on the motions to dismiss, the Court noted that it intended to address tracing at an early stage, in order to prevent Squar Milner and/or DJSI from incurring unnecessary litigation costs.

94.     Thus, there was a risk that the Court could find that Plaintiffs lacked standing to assert their Section 11 claims against Squar Milner, because of an inability to prove that they could trace their shares to the registration statements for the Secondary Offering. Indeed, this risk materialized: Plaintiffs voluntarily dismissed DJSI after conducting expedited, targeted tracing discovery pursuant to the Case Management Order, because they concluded they had no viable path to establishing tracing with respect to DJSI. Nonetheless, Plaintiffs could have amended the FAC to add Exchange Act claims against Squar Milner (although not against DJSI).

## B.     Continuing Discovery

95.     While Plaintiffs and Lead Counsel believe sufficient discovery was conducted to confirm the fairness of the Settlement, the discovery process was far from complete. Defendants had produced (and Plaintiffs had reviewed and analyzed) over half a million pages of documents, but many more relevant, responsive documents had yet to be produced. Though Lead Counsel believes the documents produced thus far strongly support Plaintiffs' claims, there is no guarantee this trend would continue, or that sufficient documents would be obtained to prove every allegation in the FAC. Additionally, Lead Counsel would have had to devote extensive time and resources to ensure meaningful review of these documents was accomplished in a thorough and timely manner.

96.     Similarly, some depositions had been scheduled, but none had taken at the time of the Settlement. Depositions in this Action, where persons with knowledge live in cities across the United States and abroad, would likely have required Lead Counsel and Defense Counsel to travel extensively, and to successfully serve subpoenas for testimony from third parties and certain former employees.

97.     In this complex matter, both sides likely would have retained multiple experts to support their respective positions, each of whom would have written at least one report, and some or all of whom may have been deposed. Expert discovery can be key to ensuring success at class

22

certification, summary judgment, and trial. If Defendants were able to retain particularly strong expert witnesses, there is a risk that Plaintiffs would not have survived future stages of the litigation.

98.     Further, discovery in complex class action cases often involves extensive motions to resolve disputes, which are often referred to a magistrate judge. Rarely is either party victorious on every discovery dispute. Even if Plaintiffs' discovery motions were largely granted, it can take months – even years – to resolve all discovery disputes and complete production of relevant, responsive documents.

99.     Completing document production, depositions, expert discovery, and discovery motions in this case would have consumed a significant amount, if not all, of Defendants' remaining insurance coverage and significantly reduced or likely eliminated the recovery available to the Settlement Class.

### C.     Class Certification

100.     While Plaintiffs believe that securities fraud actions such as this are uniquely suited to class action treatment, Plaintiffs are also aware that Defendants would have opposed class certification of a litigation class. Nevertheless, Plaintiffs believe that the Class satisfies the requirements of Fed. R. Civ. P. 23 and that they would prevail in establishing numerosity, commonality, typicality, and predominance. Further, Plaintiffs believes that they have, and would continue to, adequately and fairly protect the interests of the Class, and thus would be named as Class Representatives. Plaintiffs are also aware, however, that Defendants would very likely advance arguments against and submit an expert report challenging price impact, as well as potentially challenging market efficiency. If the Court found Defendants' arguments persuasive, it could deny certification, which would prevent recovery for absent Class Members.

101.     Further, even if a class is certified, Fed. R. Civ. P. 23(c) allows a court to decertify

23

a class at any time. Thus, this factor supports approval of the Settlement. *See, e.g.*, *In re Adv. Battery Techs. Sec. Litig.*, 298 F.R.D. 171, 178 (S.D.N.Y. 2014); *Bellifemine v. Sanofi- Aventis U.S. LLC*, No. 07-cv-2207, 2010 U.S. Dist. LEXIS 79679, at \*12 (S.D.N.Y. Aug. 6, 2010).

102.    Even if the Class was certified, Defendants could petition the Second Circuit for leave to appeal that decision immediately pursuant to Rule 23(f), which could result in substantial delays in the resolution of the litigation. The recent case of *In re Goldman Sachs Grp., Inc.*, No. 10-cv-3461, 2021 U.S. Dist. LEXIS 235241 (S.D.N.Y. Dec. 8, 2021), is instructive on this point. There, the district court originally granted plaintiffs' motion for class certification on September 24, 2015. *See id.* at \*25 (S.D.N.Y. Sep. 24, 2015). Thereafter, defendants appealed the district court's order to the Second Circuit twice, then to the Supreme Court, and then again to the Second Circuit – overall, taking *six years* before the class was certified. *See also In re Vivendi Universal, S.A. Sec. Litig.*, No. 11-908 (2d Cir. July 20, 2011) (denying second Rule 23(f) petition over four years after district court originally granted class certification). Thus, the danger of a protracted delay over class certification is very real.

### D.    Summary Judgment

103.    If the Court granted Plaintiffs' motion for class certification, after the completion of fact and expert discovery, Defendants would have then presented additional arguments at summary judgment in order to defeat Plaintiffs' claims. Most notably, Defendants would likely challenge the evidence regarding falsity, scienter, damages, and loss causation, the outcome of which is difficult to predict. Defendants' arguments at summary judgment would have been informed by extensive fact discovery, which could potentially undermine Plaintiffs' allegations regarding falsity, materiality, loss causation, and/or scienter.

104.    Even if Defendants' motion for summary judgment was not granted in whole, the Court could grant it in part, potentially limiting the issues Plaintiffs would be able to present to a

24

jury.

### E.      Pre-Trial

105.    Leading up to trial, the Parties likely would have raised challenges to each other's expert witnesses pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The Parties also likely would have each filed a number of motions *in limine*, asking the Court to find certain evidence inadmissible at trial. The success or failure of these motions may have significantly altered Plaintiffs' strategy at trial.

### F.      Trial

106.    Even if the Action made it past the class certification and summary judgment stages, at trial, there could be no assurance that the jury would have found in Plaintiffs' favor. Securities fraud cases require plaintiffs to demonstrate falsity, materiality, scienter and loss causation. These elements can be difficult to prove (or sometimes even difficult to explain to the average juror), and Defendants in this case likely would have raised challenges to each element. While Plaintiffs believe they would have ultimately prevailed, success is far from certain.

107.    First, Plaintiffs would have been required to prove that Defendants' statements were false or misleading. Discovery in this Action is still at a relatively nascent stage. While Plaintiffs believe that the documents produced thus far strongly support their allegations of falsity, there is no guarantee that further documents would continue this trend. Additionally, no depositions have yet been conducted. Even with strong documentary evidence, if Lead Counsel failed to elicit relevant deposition testimony regarding the falsity of Defendants' statements, it could have been fatal to Plaintiffs' case.

108.    Even if falsity had been established, Plaintiffs would have had to prove that Defendants' statements and/or conduct were material to a reasonable investor. Materiality is a subjective inquiry and is ordinarily determined by the jury. *See In re Nortel Networks Corp. Sec.*

*Litig.,* 238 F. Supp. 2d 613, 627 (S.D.N.Y. 2003) ("The determination of materiality is a mixed question of law and fact that generally should be presented to a jury."). Even if Plaintiffs believed strongly in the materiality of the statements at issue, a jury may have found in favor of Defendants.

109.    Further, Section 10(b) cases require plaintiffs to prove scienter; in other words, that defendants, at minimum, recklessly disregarded the truth about the alleged false or misleading statements. This is a notoriously difficult element to prove, as the evidence is often largely circumstantial, and may be undercut by testimony from individual defendants that they did not possess the requisite state of mind. If this Action had continued, Plaintiffs faced the very real risk that the Court or the jury could have found that Defendants did not act with scienter. While the Court held Plaintiffs adequately pled scienter at the motion to dismiss stage, there is no guarantee that a jury, upon assessing the totality of the evidence and the credibility of witnesses, would find the Defendants to have a culpable state of mind. For example, in *In re Tesla, Inc. Sec. Litig.*, No. 18-cv-04865-EMC, 2022 U.S. Dist. LEXIS 88609, at *65 (N.D. Cal. Apr. 1, 2022), despite the court granting partial summary judgment in favor of plaintiffs on falsity and scienter grounds , after a three-week trial and only a few hours of deliberations, the jury found in favor of Tesla and CEO Elon Musk.[10] Thus, after nearly four-and-a-half years of hard-fought litigation, Tesla investors will likely receive nothing.

110.    Another major risk is Plaintiffs' ability to prove loss causation and damages. To establish these elements, Plaintiffs would have to prove that the revelation of the alleged fraud proximately caused the declines in Pareteum's stock price during the Class Period and that those fraud-related causes could be parsed out from any potential non-fraud related publicly released information. Plaintiffs believe that they would have brought forth sufficient evidence to support

---

[10] *See, e.g.*, Bonnie Eslinger, *Tesla Jury Clears Musk In $12B 'Take Private' Tweet Trial*, Law360, February 3, 2023, https://www.law360.com/articles/1572558/tesla-jury-clears-musk-in-12b-take-private-tweet-trial

both the finding of loss causation and damages at summary judgment and trial. However, the questions of loss causation and damages often come down to a "battle of the experts." If Defendants' expert won the day, the Court or the jury may have found that Plaintiffs were entitled to significantly lower damages than anticipated – or none at all.

111.    Moreover, prevailing at trial would not necessarily result in a larger recovery. The jury could award a smaller per-share amount of damages, overall damages could be reduced during the post-verdict claims process, and/or the verdict could be appealed.

112.    Further, even if Plaintiffs prevailed at trial and on appeal, Defendants' insurance would have been exhausted by the continued litigation, and Plaintiffs would be unable to collect on any judgment.

113.    Given these significant risks, the $5.65 million settlement (plus $100,000 from the Individual Defendants towards Notice costs) is a solid result for the Settlement Class.

## V.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE SETTLEMENT CLASS AND WARRANTS FINAL APPROVAL

114.    While Plaintiffs adamantly believe that the Settlement Class would have prevailed on the merits at trial, Defendants are equally adamant that Plaintiffs would not have succeeded, and thus, Plaintiffs faced a significant risk that they would not have convinced a jury that Defendants made materially false and misleading statements with the requisite state of mind and that these statements caused Plaintiffs' losses.

115.    And even if Plaintiffs prevailed at trial and the inevitable post-trial proceedings and appeals, Plaintiffs likely would recover nothing, as the available insurance proceeds would be long gone, having been wasted by the continued litigation.

116.    Having considered the foregoing risks and having evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and its extensive

experience in litigating class actions under the federal securities laws, that the proposed Settlement before this Court is fair, reasonable, and adequate, and in the best interests of the Settlement Class. Plaintiffs, having been informed by Lead Counsel of the foregoing risks, as well as the strengths and weakness of the case, agrees that settlement at this time is in its best interest and the best interests of the Settlement Class.

## VI. LEAD COUNSEL'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

117. Pursuant to its Preliminary Approval Order, the Court set a Final Approval Hearing to be held on April 25, 2023, at 10:30 a.m. *See* ECF No. 275. The Preliminary Approval Order also approved the timeline set forth in the Amended Stipulations of Settlement and their attachments: (1) January 3, 2023, as the deadline for Lead Counsel to provide notice to the Settlement Class Members who could be identified with reasonable effort; (2) January 10, 2023, as the deadline for Lead Counsel to cause the Summary Notice to be published twice in nationally distributed, business focused newswires; (3) March 24, 2023, as the deadline to file papers in support of the Final Settlement, Plan of Allocation, and the application by Counsel for attorneys' fees or reimbursement of expenses (collectively, the "Applications"); (4) April 3, 2023, as the deadline for Settlement Class Members to file proof of claim forms or submit requests to be excluded from the Settlement Class or file any objections to the Settlement or any of the Applications; and (5) April 18, 2023, as the deadline to reply to any opposition to the Applications or any response to any objection(s) filed.

118. As set forth in the Declaration of Margery Craig of Strategic Claims Services ("SCS"), filed with the Court on January 19, 2023, in accordance with the Preliminary Approval Order, SCS began the process of disseminating the Postcard Notice and Notice Packet.

119.    The Postcard Notice contains, among other things, a description of the Settlement and information regarding the lawsuit and the right of Settlement Class Members to: (a) participate in the Settlement; (b) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (c) exclude themselves from the Class. The Postcard Notice also directs recipients to the Settlement Website, www.PareteumSecuritiesLitigation.com, for more complete details regarding the proposed Settlement.

120.    As of January 19, 2023, through direct mailings and mailings to brokers and nominees, SCS has mailed 3,260 copies of the Postcard Notice to potential Settlement Class Members. *See* ECF No. 278, at ¶ 7.

121.    In accordance with the Preliminary Approval Order, on January 10, 2023, SCS also caused the Summary Notice to be published in *GlobeNewswire* and *PR Newswire*. *See id.* at ¶ 9.

122.    Lead Counsel also directed SCS to establish a Settlement Website, www.PareteumSecuritiesLitigation.com, with information concerning the Settlement and access to downloadable copies of the FAC, Claim Form, Notices, Stipulations, Preliminary Approval Order, and other key filings in this Action. The Settlement Website also allows for Settlement Class Members to complete claims electronically. Additionally, SCS maintains a toll-free telephone number (1-866-274-4004), to respond to inquiries from Settlement Class Members regarding the Settlement. *See id.* at ¶¶ 10-11.

123.    As set forth above, the deadline for Settlement Class Members to request exclusion from the Settlement Class or to file an opposition to the Settlement, Plan of Allocation, and/or Fee and Expense Application is April 3, 2023.

124.    As of the date of this filing, SCS has received just one valid exclusion request. One purported exclusion request was received from a putative Settlement Class Member which did not

29

comply with the requirements of the Notice, including by failing to list his relevant Class Period transactions.

125.    In addition, no objections have been received, further corroborating the reasonableness of the Settlement and Lead Counsel's fee and expense applications. Lead Counsel will address any such objections, should they arise, in its reply brief.

## VII.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

126.    Pursuant to the Court's Preliminary Approval Order and as set forth in the Notice, Settlement Class Members who wish to participate in the Settlement and be potentially eligible to receive a distribution from the Settlement Fund must provide a valid Proof of Claim to SCS postmarked or submitted on or before July 3, 2023. *See* ECF No. 275 at ¶ 23.

127.    SCS, supervised by Lead Counsel, will make all reasonable efforts to resolve any curable defects in Proof of Claim Forms to ensure that all Settlement Class Members with otherwise valid Claims are not rejected and obtain their rightful compensation from the Settlement Fund. Lead Counsel has been, and will continue to be, very involved in the claims administration process, regularly communicating with SCS and Settlement Class Members and answering their questions, and ensuring the process runs smoothly and efficiently.

128.    Plaintiffs have proposed a plan for allocating the proceeds of the Settlement among members of the Settlement Class who submit timely and valid Proofs of Claim in connection with the Settlement. The objective of the proposed Plan of Allocation is to equitably distribute the net proceeds of the Settlement to Authorized Claimants[11] based on their respective alleged economic losses as a result of the alleged violations of federal securities laws asserted in the Action, as opposed to losses caused by market-wide or industry-wide factors, or company-specific factors

---

[11] An "Authorized Claimant" is a Settlement Class Member who submits a timely and valid Proof of Claim to the Claims Administrator (in accordance with the requirements established by the Court) that is approved for payment from the Net Settlement Fund.

unrelated to the alleged fraud. Calculations under the Plan of Allocation are generally based upon the measure of damages set forth in Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC and Section 11 of the Securities Act.

129.   The Plan of Allocation was prepared in consultation with Plaintiffs' expert economics consultant. Although the Plan of Allocation is not a formal damages analysis, it reflects the informed views of Plaintiffs' economics consultants, including their review of publicly available information regarding Pareteum and a statistical analysis of the price movements of Pareteum securities during the Class Period. The Plan of Allocation is also consistent with the traditional loss calculations used in Exchange Act claims, Securities Act claims, and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Lead Counsel believes that the Plan of Allocation is reasonable and has a rational basis and should be approved.

130.   The Plan of Allocation sets forth the estimated alleged artificial inflation in the price of Pareteum common stock during the Class Period. The computation of the estimated alleged artificial inflation in the price of Pareteum common stock during the Class Period is based on certain misrepresentations alleged by Plaintiffs in the FAC and the price change of Pareteum common stock based thereon, net of market-wide and industry-wide factors, in reaction to the public announcements that allegedly corrected Defendants' material misrepresentations and omissions.

131.   Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each share of Pareteum common stock purchased or otherwise acquired during the Settlement Class Period from December 14, 2017, through October 21, 2019, inclusive, pursuant to ¶ 133 below. If the calculation of a Recognized Loss Amount for any particular share purchased or acquired during the Settlement Class Period results in a negative number, that number shall be set

to zero. For shares of Pareteum common stock acquired pursuant or traceable to the iPass Acquisition at the exchange price of $2.903 on or about February 12, 2019, an alternative Recognized Loss Amount may be calculated, pursuant to ¶ 135 below. For shares of Pareteum common stock purchased or otherwise acquired pursuant or traceable to the Secondary Offering at the offering price of $1.764 on or about September 20, 2019, an alternative Recognized Loss Amount will be calculated pursuant to ¶ 136 below. *See* ECF No. 273-2 at 12-13.

132.    The calculation of Claimants' Recognized Loss Amounts will depend upon several facts, including when the shares of Pareteum common stock were purchased or otherwise acquired during the Class Period, and in what amounts, and whether those shares were sold, and if sold, when they were sold, and for what amounts.

133.    For each share of Pareteum common stock purchased or otherwise acquired during the Settlement Class Period, and:

a. sold before June 7, 2019, the Recognized Loss Amount for each share shall be zero;

b. sold from June 7, 2019 up to and including October 21, 2019, the Recognized Loss Amount for each share is 90% of the least of: (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table 1 of the Plan of Allocation minus the amount of artificial inflation per share on the date of sale as stated in Table 1 of the Plan of Allocation below; or (ii) the purchase/acquisition price minus the sale price;

c. sold from October 22, 2019 through and including the close of market trading on January 17, 2020, the Recognized Loss Amount for each share is 90% of the least of: (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table 1 of the Plan of Allocation; (ii) the purchase/acquisition price minus the average closing price between October 22, 2019 and the date of sale as stated in Table 2 of the Plan of Allocation; or (iii) the purchase/acquisition price minus the sale price;

d. held as of the close of market trading on January 17, 2020, the Recognized Loss Amount for each share is 90% of the least of: (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table 1 of the Plan of Allocation; or (ii) the purchase/acquisition price minus $0.46, the average

32

closing price of Pareteum common stock between October 22, 2019 and January 17, 2020, as shown on the last line of Table 2 of the Plan of Allocation.

*Id.* at 13.

134.    The 10% discount for losses attributable to Section 10(b) claims is designed to reflect the increased risk Plaintiffs faced in proving liability and damages under the Exchange Act because of the requirement of proving scienter, which is not required for Securities Act claims.

135.    Alternatively, for each share of Pareteum common stock acquired pursuant or traceable to the iPass Acquisition on or about February 12, 2019, the Recognized Loss Amount shall be calculated below if it is greater than the amount calculated under ¶ 131 above:

   a.   for shares sold from February 12, 2019, through and including October 21, 2019, the Recognized Loss Amount is the difference between the acquisition price (not to exceed $2.90, the closing price of Pareteum common stock on February 12, 2019, the date of the tender offer exchange), minus the sale price;

   b.   for shares sold from October 22, 2019, through and including January 17, 2020, the Recognized Loss Amount is the difference between the acquisition price (not to exceed $2.90, the closing price of Pareteum common stock on February 12, 2019, the date of the tender offer exchange), minus the sale price (not to be less than the $0.2992 closing price on the date this lawsuit was filed on October 22, 2019);

   c.   for shares still held as of the close of market trading on January 17, 2020, the Recognized Loss Amount is $2.6008, the difference between the $2.90 tender offer exchange price and the $0.2992 closing price on the date this lawsuit was filed.

*Id.* at 13-14.

136.    Alternatively, for each share of Pareteum common stock acquired pursuant or traceable to the Secondary Offering on or about September 20, 2019, the Recognized Loss Amount shall be calculated below if it is greater than the amount as calculated under ¶ 131 above

   a.   for shares sold from September 20, 2019, through and including October 21, 2019, the Recognized Loss Amount is the difference between the acquisition price (not to exceed $1.76, the Secondary Offering price), minus the sale price;

   b.   for shares sold from October 22, 2019, through and including January 17, 2020,

33

the Recognized Loss Amount is the difference between the acquisition price (not to exceed $1.76, the Secondary Offering price), minus the sale price (not to be less than the $0.2992 closing price on the date this lawsuit was filed on October 22, 2019);

c.  for shares still held as of the close of market trading on January 17, 2020, the Recognized Loss Amount is $1.4608, the difference between the $1.76 Secondary Offering price and the $0.2992 closing price on the date this lawsuit was filed.

*Id.* at 14.

137.  Under the Plan of Allocation, Recognized Loss Amounts also take into account the PSLRA's statutory limitation on recoverable damages, whereby losses on eligible shares of Pareteum common stock cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the 90-day period subsequent to the Class Period ending on January 17, 2020 (*i.e.*, the end of the 90-day period), and losses on eligible shares of Pareteum common stock purchased or otherwise acquired during the Class Period and sold during the 90-day period subsequent to the Class Period cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the portion of the 90-day period elapsed as of the date of sale. A table showing the average 90-day look-back price for each day of the period is attached as Table 2 to the Plan of Allocation.

138.  As further explained in the Plan of Allocation, a Claimant's "Recognized Claim" will be determined by totaling the Claimant's Recognized Loss Amounts. If a Settlement Class Member has more than one purchase/acquisition or sale of Pareteum common stock during the Class Period, all purchases/acquisitions and sales shall be matched on a First In, First Out ("FIFO") basis. Class Period sales will be matched first against any holdings at the beginning of the Class Period, and then against purchases/acquisitions in chronological order, beginning with the earliest purchase/acquisition made during the Class Period. The Net Settlement Fund will be allocated on a *pro rata* basis to Authorized Claimants based on each Authorized Claimant's Recognized Claim

34

in comparison to the total Recognized Claims of all Authorized Claimants. Under the Plan of Allocation, if a Claimant's *pro rata* payment calculates to less than $20.00, no distribution will be made to that Claimant. *See* ECF No. 273-2 at 15.

139.    Pursuant to the Plan of Allocation, any remaining funds in the Net Settlement Fund after six (6) months from the date of distribution of such Net Settlement Fund, after satisfying any remaining obligations to the Claims Administrator, shall be reallocated among and distributed to Authorized Claimants who have cashed their initial distributions and who would receive at least $20 from such re-distribution. Additional re-distributions to Authorized Claimants who have cashed their prior checks and who would receive at least $10 on such additional re-distributions may occur thereafter if Lead Counsel, in consultation with the Claims Administrator, determine that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective. Thereafter, any remaining balance shall be donated to non-sectarian 501(c)(3) non-profit organization(s) to be recommended by Lead Counsel and approved by the Court. *See id.*

140.    The structure of the Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund among Authorized Claimants. Lead Counsel submits that the Plan of Allocation is fair and reasonable and should be approved together with the Settlement.

141.    In addition, in response to the dissemination of 3,260 copies of the Postcard Notice to potential Settlement Class Members and nominees, there have been no objections to date to the proposed Plan of Allocation.

## VIII.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES IS REASONABLE AND SHOULD BE GRANTED

142.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead

Counsel respectfully applies for a fee award of 30% of the Settlement Amount (*i.e.*, $1,695,000, plus interest)[12] and reimbursement of reasonable litigation expenses from the Settlement Fund in the amount of $422,214.12, plus interest. The legal authorities supporting these requests are set forth in the accompanying Fee Memorandum. The primary factual bases for the requested fee award and reimbursement of litigation expenses are summarized below.

### A.    The Fee Application

143.    Lead Counsel is applying for a 30% fee award using the percentage-of-the-common-fund fee as compensation for the services it rendered on behalf of the Settlement Class.

144.    As set forth in the accompanying Fee Memorandum, given the language of the PSLRA, the Supreme Court's strong support for the percentage method, the Second Circuit's explicit approval of this method in *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), and the established practice among the courts within this Circuit, Lead Counsel submits that its fees should be awarded based on the percentage approach, with a lodestar cross-check.

145.    The factors considered by courts in this Circuit when determining the reasonableness of fee applications are: (i) time and labor expended by counsel; (ii) risks of the litigation; (iii) magnitude and complexity of the litigation; (iv) requested fee in relation to the settlement; (v) quality of representation; and (vi) public policy considerations. *See Goldberger*, 209 F.3d at 50.

146.    Based on these factors, Lead Counsel respectfully submits that the requested fee award of 30% of the Settlement Amount is fair and reasonable and should be approved.

147.    Further, as set forth below, a lodestar cross-check confirms that this fee request is reasonable, as it results in a negative lodestar multiplier of approximately 0.47.

---

[12] As disclosed in the Notice, any attorneys' fees, if any, for Counsel for Loskot will be determined by a mediator, with 70% of any such fees to be paid out of Lead Counsel's fee award in this Action, and 30% to be paid by Plaintiff Sabby. This issue is fully briefed and pending before the Mediator.

### 1.    The Favorable Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action

148.    Lead Counsel undertook time-consuming and challenging work over the course of two and a half years to prosecute the claims against Defendants and to achieve this Settlement.

149.    As detailed above, Lead Counsel:

- Conducted a lengthy investigation by reviewing and analyzing publicly available information regarding Defendants, including SEC filings, online and newspaper articles, analyst reports, press releases, stock price movements, earnings conference call transcripts, and analyst presentations;

- consulted with a damages expert to evaluate recoverable losses;

- consulted with a private investigator, who conducted an independent investigation of the allegations in the Aurelius and Viceroy Reports, and drafted the AC, adding claims and parties to the originally filed complaint;

- researched and drafted an opposition to Defendants' motions to dismiss the AC;

- conducted additional research and drafted the FAC;

- research and drafted a successful opposition to Defendants' second round of motions to dismiss;

- presented oral argument on Defendants' second round of motions to dismiss;

- consulted with experts on loss causation and market efficiency, marketing, and accounting and financial economics;

- exchanged initial disclosures;

- issued multiple sets of requests for production of documents, interrogatories, and requests for admission to Defendants, and reviewed the responses thereto;

- responded to interrogatories, requests for production, and requests for admission (separately on behalf of each of the members of PSIG and their assignees);

- issued document subpoenas to several third parties;

- reviewed and analyzed approximately half a million pages of documents produced by Defendants;

- prepared for five depositions;

- researched and drafted a motion for class certification;

- participated in two day-long mediation sessions, including the preparation of lengthy and detailed submissions to the mediator, as well as numerous follow-up sessions via telephone, email, and zoom;

37

- further negotiated with Defendants over the course of more than a year, both with and without the mediator's assistance;

- separately negotiated with, and reached an informal resolution with, Squar Milner;

- successfully negotiated for the Individual Defendants to pay an additional $100,000 towards Notice costs;

- negotiated with Defendants to document the Settlement;

- retained and worked with bankruptcy counsel to protect the interests of the Settlement Class in Pareteum's Bankruptcy Proceeding and to obtain a "Comfort Order" allowing the D&O insurance proceeds to be used to fund the Settlement;

- worked with damages consultants to prepare the Plan of Allocation; and

- oversaw Notice of the Settlement to Settlement Class Members.

150. Since the inception of the Action, Lead Counsel has dedicated over 4,700 hours to the investigation, prosecution, and resolution of the claims against Defendants, resulting in a total lodestar of $3,614,435.00. The requested fee of 30% of the Settlement Fund, or $1.695 million, yields a negative lodestar multiplier of approximately 0.47 based on Lead Counsel's lodestar—which is eminently reasonable in light of the risks undertaken by Lead Counsel and is well within—and, in fact, below – the range of lodestar multipliers approved by courts in similar complex litigation.

151. Below is a schedule that indicates the amount of time spent by each attorney at KSF who worked on this Action and the lodestar calculations based on their current billing rates. This schedule was prepared from contemporaneous daily time records regularly prepared and maintained by KSF. As the partner responsible for supervising my firm's work on this case, I reviewed these time and expense records to prepare this Declaration. The purpose of this review was to confirm both the accuracy of the time entries and expenses and the necessity for, and reasonableness of, the time and expenses committed to the litigation.

152. I reduced my firm's time by hundreds of hours, as appropriate, for efforts I deemed

38

to be less than maximally efficient. Specifically, I cut substantial time spent researching, drafting, and editing the AC, preparing for and engaging in lengthy and extensive informal negotiations, working with bankruptcy counsel, and time spent after preliminary approval was granted by the Court. In total, I cut more than 300 hours of partner and associate time. Additionally, no time spent on the application for attorneys' fees and expenses is included in Lead Counsel's lodestar.

153. Following my review and the adjustments made, I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought as stated in this Declaration are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation. In addition, based on my experience in similar litigation, the expenses are all of a type that would normally be billed to a fee-paying client in the private legal marketplace.

154. My firm's rates are set based on periodic analysis of rates used by firms performing comparable work and have been approved by courts. Different timekeepers within the same employment category (*e.g.*, partners, associates, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, year in the current position (*e.g.*, years as a partner), relevant experience, relative expertise, and the rates of similarly experienced peers at our firm or other firms.

155. As detailed in the Fee Memorandum, the hourly rates for the attorneys included in the schedule below are commensurate with the hourly rates charged by lawyers of reasonably comparable skill, experience, and reputation and have been accepted in other securities or shareholder litigation.

156.    KSF's lodestar is set forth in the following chart:

| Staff | Duration | Hourly Rate* | Lodestar |
|---|---|---|---|
| Patrick Abercrombie (S) | 139.0 | $300 | $41,700.00 |
| Alexander Burns (A) | 73.7 | $725 | $53,432.50 |
| Craig Geraci (P) | 59.3 | $895 | $53,073.50 |
| Andrew Gibson (O) | 27.0 | $725 | $19,575.00 |
| Bronwyn Gibson (S) | 76.8 | $275 | $21,120.00 |
| Melissa Harris (O) | 1092.4 | $850 | $928,540.00 |
| Lewis Kahn (P) | 31.6 | $1200 | $37,920.00 |
| Jyoti Kehl (A) | 282.1 | $500 | $141,050.00 |
| Nicolas Kravitz (A) | 169.4 | $600 | $101,640.00 |
| J Lopatka (P) | 423.7 | $895 | $379,211.50 |
| Brian Mears (A) | 265.6 | $600 | $159,360.00 |
| Kim Miller (P) | 539.5 | $1050 | $566,475.00 |
| Melinda Nicholson (P) | 199.1 | $925 | $184,167.50 |
| Michael Palestina (P) | 376.6 | $900 | $338,940.00 |
| Rhosean Scott (A) | 328.1 | $550 | $180,455.00 |
| Eda Walker (A) | 166.6 | $475 | $79,135.00 |
| Matthew Woodard (A) | 505.6 | $650 | $328,640.00 |
| **Total Duration** | 4756.1 | **Total Lodestar** | $3,614,435.00 |

(P)     Partner
(O)     Of Counsel
(A)     Associate
(S)     Support Staff
*       Travel time is billed at 50% of each attorney's hourly rate

157.    Furthermore, Lead Counsel's work will not end upon the filing of the motion for final approval. Lead Counsel's lodestar excludes this future work, including time spent preparing for the final approval hearing, as well as time spent after final approval relating to administration of the Settlement.

## 2.     The Magnitude and Complexity of the Litigation

158.    As detailed in the Fee Memorandum and discussed above, securities class action cases are known for their notorious complexity. This case is no exception, as it presented several sharply contested issues of both fact and law, and Plaintiffs faced formidable defenses to liability,

loss causation, and damages.

### 3. The Risks of Litigation Supports the Requested Fee Award

159. The financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis. This litigation was undertaken by Lead Counsel on a wholly contingent basis. In doing so, Lead Counsel faced the possibility that they would invest an enormous amount of time and money to the prosecution of this complex litigation only to secure no recovery. There have been many hard-fought lawsuits where excellent professional efforts by members of the plaintiffs' bar produced no fee to counsel, even after years of litigation—sometimes even after obtaining a successful verdict at trial.

160. The risks of contingent litigation are also highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim or a reduction in the value of a claim after a great deal of time and funds were expended on the case.

161. Lead Counsel bore the risk that no recovery would be achieved. As discussed in the Fee Memorandum and above, this litigation presented many risks and uncertainties that could have prevented any recovery whatsoever. Despite these risks, Lead Counsel continued to litigate this Action for the benefit of the Settlement Class and would have continued to litigate the case had the Parties been unable to reach the Settlement.

162. The fact that Defendants and their counsel know that leading members of the plaintiffs' bar are able and willing to go to trial, even in high-risk cases, gives rise to meaningful settlements in actions such as this.

### 4. The Requested Fee in Relation to the Settlement

163. The amount of the fee requested (30%) in relation to the Settlement Amount is fair and reasonable. As detailed in the Fee Memorandum, Courts routinely award fees of 30% or more in securities class action settlements. *See*, *e.g.*, *In re Qudian Sec. Litig.*, No. 17-cv-09741, 2021

U.S. Dist. LEXIS 109258, at *6 (S.D.N.Y. June 8, 2021) (33 1/3% of $8.5 million settlement; *Guevoura Fund Ltd. v. Sillerman*, No. 15-cv-7192, 2019 U.S. Dist. LEXIS 218116, at *56 (S.D.N.Y. Dec. 18, 2019) (33 1/3% of $7.5 million settlement).

### 5. The Parties Were Represented by Experienced, High-Caliber Counsel

164. The expertise and experience of counsel is an important factor in setting a fair fee. The attorneys at KSF are experienced and skilled securities class action litigators and have successful track records in securities cases throughout the country. *See* Ex. A (KSF Firm Resumé).

165. The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants are represented by very experienced and highly-qualified attorneys from Baker & Hostetler LLP (for Defendants Bozzo, McCarthy, O'Donnell, and Turner) and Wilson Elser Moskowitz Edelman & Dicker LLP (for Defendant Squar Milner) – preeminent law firms that have defended numerous securities cases resulting in favorable decisions for defendants. In the face of this formidable opposition, and considering the circumstances, Plaintiffs and Lead Counsel developed, litigated, and successfully negotiated an excellent recovery in this Action for the Settlement Class.

### 6. The Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases

166. Courts have repeatedly held that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations. *See*, *e.g.*, *City of Providence v. Aéropostale*, No. 11-cv-7132, 2014 U.S. Dist. LEXIS 64517, at *50 (S.D.N.Y. May 9, 2014).

167. The SEC, a vital but understaffed government agency, does not have the budget or the resources to ensure complete enforcement of the securities laws. If this important policy is to be carried out, the courts should award fees that will adequately compensate plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of the

situation.

### 7.   The Support of Plaintiffs and Reaction of the Class Support the Fee Request

168.    Each of the members of Lead Plaintiff PSIG were consulted about, and approved, Lead Counsel's Fee and Expense Application. Under the retainer agreements by and among Lead Counsel and PSIG, Lead Counsel agreed to litigate the Action on an entirely contingent basis, meaning that Lead Counsel would not be compensated at all, or reimbursed for any expenses it incurred on behalf of the Settlement Class, unless it obtained a recovery for the Settlement Class. Plaintiffs' support of the 30% fee request adds further support to the reasonableness of Lead Counsel's fee request.

169.    Plaintiffs actively monitored the litigation and consulted with Lead Counsel over the course of this Action, as well as throughout the settlement negotiations. Lead Counsel acted under the supervision of, and negotiated within the settlement authority granted by, Plaintiffs. Plaintiffs' support of the requested attorneys' fee award should be given considerable weight. In the post-PSLRA era, the support of court-appointed class representatives is a significant consideration in determining a fair fee. *See In re Veeco Instruments Sec. Litig.*, No. 05-md-01695, 2007 U.S. Dist. LEXIS 85554, at *25-26 (S.D.N.Y. Nov. 7, 2007) ("[A] fee request which has been approved and endorsed by a properly-appointed lead plaintiff is presumptively reasonable….") (internal quotation marks omitted).

170.    To date, following the dissemination of 3,260 copies of the Postcard Notice, each of which informed potential Settlement Class Members of Lead Counsel's intent to seek a fee of up to 30% of the Settlement Fund, there has been no objection to the amount of attorneys' fees and expenses set forth in the Notice.

### 8. A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee Award

171. Lead Counsel has expended over 4,700 hours in the investigation, prosecution, and resolution of the claims against Defendants, for a lodestar of $3,614,435.00, resulting in a negative multiplier of approximately 0.47 (before any payment to Counsel for Loskot).

172. As set forth in the Fee Memorandum, a negative lodestar multiplier is a strong indication of the reasonableness of Lead Counsel's requested 30% fee.

173. Indeed, where there is a negative lodestar multiplier, courts regularly award fees of 30% or higher. *See*, *e.g.*, *Sillerman*, 2019 U.S. Dist. LEXIS 218116, at *56-57; *City of Providence v. Aéropostale*, No. 11-cv-7132, 2014 U.S. Dist. LEXIS 64517, at *38-39 (S.D.N.Y. May 9, 2014).

174. As noted *supra*, Lead Counsel cut hundreds of hours from its lodestar in the interests of maximizing efficiency.

175. Moreover, Lead Counsel's lodestar multiplier is calculated before any award to Counsel for Loskot is deducted. As 70% of any such fees will come directly out of Lead Counsel's fee award, any fee to Counsel for Loskot will further reduce Lead Counsel's lodestar.

### B. Lead Counsel's Application for Reimbursement of Expenses

176. Lead Counsel seeks reimbursement from the Settlement Fund of $422,214.12 for expenses reasonably and actually incurred by Lead Counsel in connection with their commencement, prosecution and resolution of the claims asserted in the Action. These expenses are detailed in ¶ 180 below.

177. Lead Counsel's expenses were reasonable and necessary to the prosecution and resolution of this Action and are the type of expenses that counsel typically incur in complex litigation, and for which counsel are typically reimbursed when the litigation gives rise to a common fund.

178. From the beginning of the case, Lead Counsel was aware that it might not recover

44

any of its expenses, or at least would not recover anything until the Action was successfully resolved. It also understood that, even assuming the case was ultimately successful, reimbursement would not compensate for the lost use of the funds advanced to prosecute this Action. Thus, Lead Counsel was motivated to, and did, take significant steps to avoid unnecessary expenditures and minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

179. Lead Counsel's expenses are reflected on the books and records maintained respectively by KSF, which are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred in this Action. These expense items are billed separately by Lead Counsel, and such charges are not duplicated in their billing rates.

180. The expense schedule below identifies the specific categories of expenses, *e.g.*, court fees, fees for experts and consultants, discovery hosting, on-line legal and factual research, travel costs, reproduction costs, messenger and courier costs, and overnight mail costs incurred by Lead Counsel.

| Category: | Total: |
|---|---|
| Experts | $63,828.75 |
| Investigators and Consultants | $39,441.15 |
| Bankruptcy Counsel | $275,000.00 |
| Mediator | $14,360.49 |
| Electronic Discovery Platform | $12,625.00 |
| Computerized Legal Research/Analyst Reports | $5,011.32 |
| Copies ($0.25/page) and Supplies | $4,927.67 |
| Court Costs/Filing Fees/Transcripts | $2,901.98 |
| Travel/Meals/Lodging | $2,534.17 |
| Messengers/Couriers/Overnight Delivery | $1,583.59 |
| **Total KSF Expenses:** | **$422,214.12** |

181. The work of Plaintiffs' bankruptcy counsel, Mickey Etkin of Lowenstein Sandler LLP ("Lowenstein"), represents Lead Counsel's greatest litigation expense. Mr. Etkin and his team

at Lowenstein, who have particular expertise in the interplay between securities class actions and bankruptcy, were retained shortly after Pareteum filed for bankruptcy protection, when it became clear that Lead Counsel needed assistance navigating the complexities of Pareteum's Bankruptcy Proceeding and its effect on this litigation, including, but not limited to, critical issues such as discovery and competing claims to insurance proceeds. Asset sales by Pareteum in the Bankruptcy Proceeding had to be monitored, document preservation had to be insured, and the disposition of relevant insurance proceeds had to be addressed – all requiring bankruptcy counsel to file objections and appear at hearings under the direction of Lead Counsel.  Proofs of claim also had to be filed in the Bankruptcy Proceeding on behalf of the Settlement Class in order to preserve their rights against Pareteum.  Bankruptcy counsel also was charged with reviewing and responding to Pareteum's disclosure statement and plan of liquidation filed in the Bankruptcy Proceeding. In addition, Lead Counsel consulted with bankruptcy counsel with respect to bankruptcy-related issues during the course of negotiations and mediation leading to the Settlement.  This all culminated in the Parties' efforts to obtain a "Comfort Order" from the bankruptcy court so that the automatic stay could be lifted and the proceeds of the D&O insurance policies could be used to fund the Settlement. The bankruptcy court issued the Comfort Order on December 13, 2022, thereby allowing the Settlement to proceed.

182.   An additional relatively large expense was for Plaintiffs' damages and loss causation expert, Chad Coffman, CFA, of Global Economic Group, with whom Lead Counsel worked closely throughout the case. First, Lead Counsel consulted with Mr. Coffman when pleading loss causation and damages. Then, in connection with Plaintiffs' motion for class certification, Mr. Coffman submitted a 36-page report on market efficiency and damages, with numerous exhibits and appendices. *See* ECF No. 227-1. In addition, Lead Counsel consulted with

Mr. Coffman regarding the reasonableness of the Settlement and development of the Plan of Allocation.

183.    Plaintiffs also hired a private investigation firm to conduct an independent investigation into the allegations set forth in the Viceroy and Aurelius Reports, and a consulting firm to obtain the source materials and underlying data for the Viceroy Report, which were crucial for researching and drafting the two amended complaints.

184.    The expenses detailed above and the other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. Moreover, all of the expenses incurred by Lead Counsel were necessary to the successful prosecution and resolution of the claims against the Defendants.

185.    The expenses of Lead Counsel are also reasonable compared to expenses reimbursed in similar cases, as discussed in the Fee Memorandum.

186.    The expenses requested by Lead Counsel have been approved by Plaintiffs.

187.    No objections to the expense provision of the Notice have been received to date.

188.    In view of the complex nature of the Action, the expenses incurred by Lead Counsel were reasonable and necessary to pursue the interests of the Settlement Class. Accordingly, Lead Counsel respectfully submit that the costs and expenses it incurred should be reimbursed from the Settlement Fund.

## IX.    CONCLUSION

189.    For the reasons set forth above and in the accompanying motions, Settlement Memorandum, and Fee Memorandum, I respectfully submit that: (a) the Settlement is fair, reasonable, and adequate and should be granted final approval; (b) the Plan of Allocation represents a fair and equitable method for allocating and distributing the Net Settlement Fund among eligible Settlement Class Members and should be approved; and (c) the Fee and Expense

47

Application should be granted.

I declare under penalty of perjury of the laws of the United States of America and the State of Connecticut that the foregoing is true and correct.

Executed this 24th day of March, 2023 at Greenwich, Connecticut.

*/s/ Kim E. Miller*
Kim E. Miller