# EXHIBIT B

MACDPARH


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE PARETEUM SECURITIES
LITIGATION,

                                        19 Civ 09767

                                        Conference
------------------------------x
                                        New York, N.Y.
                                        October 12, 2022
                                        3:00 p.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                        District Judge

                        APPEARANCES

KAHN SWICK & FOTI, LLC
      Attorney for Pareteum Shareholder Investor Group
BY:   KIM ELAINE MILLER

LOWENSTEIN SANDLER, LLP
      Attorney for Pareteum Shareholder Investor Group
BY:   MICHAEL S. ETKIN

LAX & NEVILLE, LLP
      Attorney for Sabby Volatility Warrant Master Fund, Ltd.
BY:   KOUROSH SHAFFY

WILSON ELSER MOSKOWITZ EDELMAN & DOCKET, LLP
      Attorney for Squar Milner, LLP
BY:   PETER J. LARKIN

BAKER & HOSTETLER, LLP
      Attorneys for Victor Bozzo, Denis McCarthy,
      Edward O'Donnell, Robert H. Turner and Yves Van Sante.
BY:   DOUGLAS W. GREENE
      MICHAEL SABELLA
      ERICA BARROW

DAVIS WRIGHT TREMAINE, LLP
      Attorney for Robert Lippert and Luis Jimenez-Tunon
BY:   JAMES K. GOLDFARB

MACDPARH

THE DEPUTY CLERK:  This is *In re:  Pareteum Securities Litigation.*

Counsel, please state your appearances.

MS. MILLER:  Good afternoon, your Honor.  Kim Miller for the plaintiffs -- I should say for the class plaintiffs.

THE COURT:  Introduce your colleagues.

MS. MILLER:  Your Honor, my bankruptcy colleague Micky Etkins, and this gentleman represents the Sabby plaintiff.  I forgot your name.

MR. SHAFFY:  Kourosh Shaffy.

THE COURT:  Is Sabby a settled matter?

MR. SHAFFY:  We've reached a settlement, yes.

THE COURT:  Has Sabby been approved -- or it doesn't have to be --

MR. SHAFFY:  Not yet, your Honor.

MS. MILLER:  Your Honor, if I may address that question.  The Sabby settlement is obviously not a class action subject to approval, but we settled it in tandem with this case.  And the settlement -- the payment is triggered by your approval of this case, by the final approval in this case.

THE COURT:  You made a motion, Mr. Shaffy?

MR. SHAFFY:  I believe that we filed a letter on August 17th, your Honor, just indicating that we have reached settlement and that we are awaiting preliminary approving of the class settlement.

THE COURT:  The rule that allows the parties to settle requires that all parties settle, in this instant case, in which case a judge's order is not required, but if a settlement is less than all, then a judge's approval is required.  Rule 41.  So you won't know until final approval whether there will be or will not be parties who are not settling.

So what do you do about that?  Do you make a motion asking for my approval to be heard at the same time as the final ruling, or have you thought about it?

MR. SHAFFY:  I'm not sure, your Honor.

THE COURT:  Alright.  I'll tell you this right now.  I don't take letter motions.  You have to make a motion under Rule 41 seeking approval and returning it at the same time as the class order.  You will find out the date today.

Alright.  Now we have defendants.

MS. BARROW:  Good afternoon, your Honor.  Erica Barrow of Baker & Hostetler.  We represent defendants Victor Bozzo, Denis McCarthy, Edward O'Donnell, Robert Turner and Yves Van Sante in the *Sabby* case.  With me are my colleagues Doug Green and Michael Sabella from the Hostetler firm.

THE COURT:  Okay.  Is Mr. Goldfarb here?

MR. GOLDFARB:  Good afternoon, your Honor.  James Goldfarb.  In the *Sabby* matter, I represent two individual defendants.

THE COURT:  Robert Lippert and Luis Jimenez-Tunon.

MR. GOLDFARB:  That is correct, your Honor.

THE COURT:  And is Mr. Larkin here?

MR. LARKIN:  Good afternoon, your Honor.  My name is Peter Larkin.  I'm appearing on behalf of Squar Milner.

THE COURT:  Thank you.

Ms. Miller, these next series of questions will largely be addressed to you.

MS. MILLER:  Yes, your Honor.

THE COURT:  There are two groups of plaintiffs, the *Loskot* and the *Ivkovich*.  How are they figured?

MS. MILLER:  So the *Loskot* case, Doug Loskot is a plaintiff in a state court action in California.  That case is essentially entirely subsumed by this class action.  There are two individual defendants named in *Loskot* that were not named in the class action, but the same insurance policies are in play.

I should point out that Squar Milner is not a named defendant in the *Loskot* action, and the Squar Milner stipulation of settlement, it's a separate settlement with the class in the S.D.N.Y. and not with Loskot.

THE COURT:  Is Loskot not settling?

MS. MILLER:  Loskot is settling as part of this case. There is no attorney representing Loskot here, but that case -- its Section 11 claims are effectively subsumed here in this case, and we seek to settle them here.  And once that

MACDPARH

settlement is approved by your Honor, then the state court judge will be requested to dismiss that action in its entirety with prejudice.

THE COURT:  Okay.  So settlement here will, in fact, be settlement of everything?

MS. MILLER:  Will resolve *Loskot*, and a settlement in this case, should your Honor approve it, would also trigger the *Sabby* individual case payout being made at the same time.

THE COURT:  Are there any other pending cases against Pareteum or the officers and directors of Pareteum or employees?

MS. MILLER:  I believe that there may still be some derivative actions pending.

MS. BARROW:  Yes, your Honor.  There are some derivative actions, but they are currently stayed.

THE COURT:  What's going to happen to them?

MS. BARROW:  Our understanding -- so if those are stayed and they'd effectively lost standing due to the bankruptcy, to the extent the trustee and the bankruptcy court are going to reinvigorate those cases, those claims, that will be litigated in the bankruptcy court.

THE COURT:  Litigated where?  The bankruptcy court?

MS. BARROW:  I can have my colleague speak a little bit about that.

THE COURT:  Okay.  Mr. Etkin.

MACDPARH

MS. BARROW:  I believe Mr. Sabella.

THE COURT:  Mr. Sabella.

MR. SABELLA:  One second, your Honor.

MS. MILLER:  Mr. Etkin can also speak to it, your Honor.

MR. SABELLA:  Your Honor, Michael Sabella for --

THE COURT:  Put the mic close to you, and speak up.

MR. SABELLA:  Your Honor, Michael Sabella.

Currently there is a confirmed Chapter 11 plan confirmed last week by Judge Beckerman in the bankruptcy court. There is an incoming liquidating trustee who will be appointed upon the effective date, which has not yet occurred at this moment because there are some preconditions to the effective date occurring, in addition to the order being signed and entered, which was entered last Friday.

If the liquidating trustee determines there are potential claims against the directors and officers, then there may be a potential litigation that could arise from those claims.  We at this point just do not know if the trustee, when he takes his role, will be proceeding on any claims at this time.

THE COURT:  My concern is that money has been held back by the insurers, who await the outcome of what happens in the derivative case.  I look upon these derivative cases as not really legitimate.  They take away from the class.  It's a

class that was suffering in -- many individuals. the reward to the company is a reward to, in effect, the stockholders who were not such at the time of this action.

So what I'm probing for is to know whether or not the insurers have held any money back for that purpose, and if they have, I would like to consider what might I do to get everything here.

MS. MILLER:  Your Honor.

MS. BARROW:  Your Honor.

MS. MILLER:  Go ahead.

MS. BARROW:  In short, the answer is no.  There has been money set aside under the side A policy for defense costs as defined under the insurance policies, and the intention is that money would be utilized to defend against government investigations and any government enforcement actions.

THE COURT:  So to that extent, the clients here are deprived of that money?

MS. BARROW:  Yes.

THE COURT:  My understanding is that the insured -- the settlement is based on the balances remaining in the insurance policies, that these are wasting policies I gather, and what's remaining is available to the plaintiffs.  But now there's a set aside that I have not been told about.

MS. BARROW:  No, your Honor.  Just to clarify, so the insurance policies for the ADC Tower, that is, for the most

part, going completely to the plaintiffs, the class plaintiffs, so that will be completely empty.

There is a separate side A policy that can only be utilized by the directors and officers, so that has been separate and will continue to stay separate. And the intention is if and when there are any government investigation costs, that will be utilized in that manner.

THE COURT: What about the derivative case?

MS. BARROW: So we have not set aside any funds for any potential claims brought by the trustee.

THE COURT: Okay.

MS. BARROW: Your Honor, it could -- the side A policy money could be utilized for defense costs for any of those claims.

THE COURT: Those claims being?

MS. BARROW: Any claims brought by the trustee. But not for settlement, your Honor.

THE COURT: Well, should the trustee be involved in the settlement?

MS. BARROW: Well, as of today, there is no trustee yet.

THE COURT: The Creditors Committee -- Mr. Sabella.

MR. SABELLA: If I may, your Honor.

There is a Creditors Committee in this case and debtor's counsel. As part of the discussions regarding the

MACDPARH

prior motion to lift stay in the bankruptcy court for defense costs, the consideration was that Creditors Committee and debtors counsel didn't want to take a position that a liquidating trustee may or may not have a claim on behalf of the debtor's bankruptcy estate against the directors and officers.

So they are at this point having a trustee be appointed relatively quickly, who is aware of potential issues and will determine if there are claims at all that could be brought against the directors and officers.  But at this point, there is no trustee currently appointed and there are no claims --

THE COURT:  I sense there's more money to be had for the settlement if the trustee settles his claims or dismisses his derivative claims.

Yes.  Ms. Miller.

MS. MILLER:  Your Honor, my understanding is that the side A is essentially available because of these government investigations, the SCC and the DOJ both investigating.  This created an enormous blockade in us being able to reach an agreement for a very long time, because of the concerns involved very specifically with the government investigations, having nothing to do with derivative actions.

THE COURT:  Your representation to me, both you, Ms. Miller and Ms. Barrow, is that nothing has been taken from

MACDPARH

the table in settlement monies because of the existence of these derivative lawsuits.

MS. BARROW:  That's right.

MS. MILLER:  That's right, your Honor.  Yes, your Honor.

THE COURT:  Ms. Barrow?

MS. BARROW:  Yes, your Honor.

THE COURT:  Okay.  Now, the papers inform me that the maximum recovery of the stockholders, of the clients, including Loskot, is 256 and a half million dollars approximately.

MS. MILLER:  That's the maximum damages that's been estimated by Chad Coffman, our economist, yes.

THE COURT:  And the proposed recovery is?

MS. MILLER:  $5,650,000.

THE COURT:  I understand that.  That's a five percent settlement?

MS. MILLER:  It's a two percent settlement, your Honor, of that figure.

THE COURT:  $5,650,000 is two percent of $256 million.

MS. MILLER:  (Nodding)

THE COURT:  Does that settlement include the *Sabby* case?

MS. MILLER:  Your Honor, it does not.  The Sabby settlement is a separate piece.  Sabby is getting $2,250,000. This was another serious impediment to getting a resolution

MACDPARH

here.  Mr. Sabby, who had more than half of the section 11 damages in the secondary offering, was very prepared to risk everything, go to trial, and get nothing.  And that is the arrangement that we worked out, which was blessed by the mediator, David Murphy.

THE COURT:  Well, tell me about the relationship. Sabby is getting a much more significant recovery than the members of the class.

MS. MILLER:  Yes, your Honor, and the reason is because we couldn't settle without getting him on board.  He was prepared to go to trial.  He was willing to lose his money. And we could not get a resolution without him, and so this is -- we went back for many months, again and again, trying and trying.  And finally -- it is quite generous what he got, but we could not have resolved this case, I can assure you, without him.

THE COURT:  What was his total maximum recovery?

MS. MILLER:  So I think --

THE COURT:  Maybe I should ask his counsel.

MS. MILLER:  Sure.

THE COURT:  Mr. Shaffy.

MR. SHAFFY:  Yes.  Actually, Barry Lax worked substantively on this with Ms. Miller, so I would defer to Ms. Miller.

THE COURT:  I can't hear you.  You're not talking into

the mic.  You're not speaking loudly.

MR. SHAFFY:  Yes.  Sorry.

So Barry Lax worked with Ms. Miller substantively on this, so I would actually defer to Ms. Miller.

THE COURT:  Well, you know what your maximum recovery is.  You know what you are hoping to get by way of a judgment.  So what was that number?

MR. SHAFFY:  I can't say at the moment, your Honor.

THE COURT:  Why can't you say?

MR. SHAFFY:  I'm not sure at the moment.  I would need to just look at my notes for a second.

THE COURT:  Look at your notes.

MR. SHAFFY:  I'm sorry, your Honor.  I don't have the number.

THE COURT:  Do you know?

MS. MILLER:  Yes, your Honor.

THE COURT:  What is it?

MS. MILLER:  So Mr. Lax indicated to me that their position was 16.5 million of Section 11 damages.  I responded to him that, based on my analysis of his shares purchased, I thought it was closer to around 13 million.

The Section 11 damages are also subsumed within the 10(b) number in large part.  But, effectively -- that was the number that he was planning to go to trial, win or lose, or have it all go away in the bankruptcy.

MACDPARH

THE COURT:  Do any members of your class have Section 11 claims?

MS. MILLER:  So the answer is yes, your Honor.  So with respect to Sabby, that relates to the secondary offering only, and we do have a member of the lead plaintiff group that has those claims.  It's either Steffey or Moore.  I can't remember which one right now.  I have it right here.

THE COURT:  Don't tell me.

MS. MILLER:  But I should say, your Honor --

THE COURT:  That person is not getting any more money than the Section 10(b) claimants.

MS. MILLER:  And here's the rub.  As you know, there were issues with tracing in this case.

THE COURT:  Right.

MS. MILLER:  In fact, the defendant Dawson James is no longer in this case.  We had very intensive third-party discovery with some brokerage firms.  We were close, but we couldn't get it.  And so there was a real risk there.

Mr. Sabby is not in the same category as my client.  Mr. Sabby bought on the offering, and my client, there were some concerns about that.

THE COURT:  All right.  So I should find that because of the strength of Mr. Sabby's Section 11 claims, and because he was able to trace his shares, that a settlement of $2,250,000, or about 35, 40 percent of the maximum recovery --

MACDPARH

is that right?

MS. MILLER:  Yes, your Honor.

THE COURT:  -- is appropriate or about --

MS. MILLER:  It was a negotiation, your Honor.  It was quite intense and difficult.  As the lead --

THE COURT:  I know.  I have had in practice individual claimants, and coupled with a class action, and was able generally to do better than the class.  It's the nature of the beast.  But here it's a lot better.

MS. MILLER:  Yes, your Honor.  I understand.  I agree with you.

THE COURT:  Okay.  Now, you settled your case before taking any meaningful discovery of defendants?

MS. MILLER:  We --

THE COURT:  By meaningful discovery I mean depositions.

MS. MILLER:  There were five depositions that were to be taken within three weeks of the settle -- basically, we settled on the 17th of August.  We had three depositions set with a specific date, with two more in the pipeline to be done before September 6, when we had the next conference scheduled with your Honor.

THE COURT:  Do you think you would have done better had you taken those depositions?

MS. MILLER:  With the settlement, not by a penny, Your

MACDPARH

Honor.

THE COURT:  Why is that?

MS. MILLER:  So, I mean, this is a company that the SEC had a consent order.

THE COURT:  The company is bankrupt.  It has to do with individuals --

MS. MILLER:  Yeah.  So, I mean --

THE COURT:  In other words, you're telling me you got the maximum you could under the insurance policies --

MS. MILLER:  Right, and --

THE COURT:  -- and they lacked or were unwilling to pay the funds necessary personally to pay money into the settlement?

MS. MILLER:  Your Honor, we were unable to find any source of meaningful additional funding beyond the policies.

THE COURT:  Thank you.

MS. MILLER:  Your Honor --

THE COURT:  There was a -- I'm sorry.

MS. MILLER:  I would just like to point out that the taking of those depositions would have decreased the amount of money available in the policies.

THE COURT:  That's right, because it's a wasting policy.

MS. MILLER:  Right.

THE COURT:  I understand.

MACDPARH

The claims are not necessarily all alike because a claim that's involved in an acquisition, the iPass acquisition, and because some purchased on a secondary offering, and some purchased on a primary offering.  Should there be any distinction made among those three in terms of their recoveries?

MS. MILLER:  So the plan of allocation does treat those who purchased on either the iPass offering or the secondary slightly differently, and the plan defines those people as having purchased on the offering date at the offering price, so it's quite clear.  For that very narrow group of people, they get a ten percent bump over the 10(b).

THE COURT:  Sorry.  They get a what?

MS. MILLER:  They get a ten percent bump in the plan of allocation over the 10(b).

THE COURT:  Up or down?

MS. MILLER:  It's up, because these are people they can trace, and they don't have to prove as much as the 10(b) people do.

THE COURT:  So what you're doing is awarding the Section 11 claimants who are able to trace their shares --

MS. MILLER:  That's correct.

THE COURT:  -- ten percent better than the --

MS. MILLER:  Yes, which I believe is a small group.  Yes.

MACDPARH

THE COURT:  Is that in the settlement agreement?  I read over that.

MS. MILLER:  It is in the settlement agreement, the plan of allocation, and in the notice.

THE COURT:  Are there any substantive issues that the claims administrator has to decide or is it all -- all the factors are laid out?

MS. MILLER:  No.  It's straight forward.  Tracing is not a big inquiry.  It's, here's the price on this date, that's it.

THE COURT:  The settlement provides that the -- of the 2 million -- of the $5,650,000, $400,000 is being attributed by Squar Milner.

MS. MILLER:  Yes, your Honor.

THE COURT:  Alright.  Tell me about that, whether it's adequate, not adequate, what were the difficulties there, why were they different from others?

MS. MILLER:  Your Honor, so I negotiated that settlement with Mr. Larkin separately.  I was quite pleased to get any recovery for the class.  I was not so fortunate with respect to Dawson James.  They are sort of similarly situated. But I managed to get some result, but that was at risk on traceability, your Honor, had we gone forward.

I'm not saying we couldn't have done it.  I'm not saying we were contemplating amending and adding 10(b) claims

MACDPARH

against them.

THE COURT:  Was there a 10(b)(5) claim against Squar Milner?

MS. MILLER:  There was not.  We were within the statute to add one.  That was something that we had contemplated.

THE COURT:  You couldn't do it?

MS. MILLER:  That was something that we did not do, but the statute hadn't run and it was something that we had considered if we didn't resolve things with them.

THE COURT:  What was the reason you didn't do it?

MS. MILLER:  We were happy to get the settlement that we got and get that piece resolved.

THE COURT:  Well, the misrepresentations all deal with the issues --

MS. MILLER:  Yes.  Effectively, yes, customers, backlogs.  It's all related.

THE COURT:  So it's hard to see how they could escape exposure if the people who are involved in that sort -- on the consumer side exposure --

MS. MILLER:  Your Honor, theoretically, we could have sought to amend, sought to add a 10(b) claim against Squar Milner, resolved the rest of the case against the company -- or against the individual defendants and tried to proceed against just Squar Milner.  I made a determination that I did not think

MACDPARH

that that made the most sense strategically for the class, but certainly it was something that we considered.

THE COURT:  When you filed these lawsuits, did you have any information that would show scienter on the part of Squar Milner?

MS. MILLER:  I did not, your Honor, so --

THE COURT:  You couldn't allege a 10(b)(5) violation.

MS. MILLER:  I could not, no, at that time.

THE COURT:  May I be given the break number?  In other words, if you don't get a certain level of approvals --

MS. MILLER:  Five.

THE COURT:  -- you don't have to do it.

MS. MILLER:  Sorry.

THE COURT:  Give me a slip of paper.

MS. MILLER:  Yes.  Would you like to see it, your Honor?  I have a copy.

THE COURT:  Pardon?  Would I like to see it?  Yes.

MS. MILLER:  So here's the number.  May I approach, your Honor?

THE COURT:  Yes.

MS. MILLER:  I have a copy of the whole agreement. Thank you.

THE COURT:  So if you can't secure that number that was given, the settlement can break up?  The cancellation.

MS. MILLER:  If more than that number opt out, and of

MACDPARH

course Sabby is excluded --

THE COURT: Right.

MS. MILLER: -- from that figure, correct, there's an opportunity for the parties to back away from the deal.

THE COURT: Okay. I think that's a reasonable number. Returning the papers to you.

MS. MILLER: Thank you, your Honor.

THE COURT: In the distributions, there tend to be a certain amount that are not cashed by the claimants. Is there a reversion or --

MS. MILLER: No, your Honor.

THE COURT: -- what's the plan?

MS. MILLER: It's not a claims-made settlement.

THE COURT: That money will be distributed on a second round?

MS. MILLER: Yes.

THE COURT: I'm looking at the agreement, and paragraph ten, there's a suggestion made that the plaintiffs' counsel's fees and expenses that are allowed will be paid ahead of the claimants. I won't approve that.

MS. MILLER: That's fine, your Honor. I actually did not think that was the case, but I'm sure you're correct. And understood.

THE COURT: Would you reword paragraph ten to reflect that the attorneys will be paid as and when the claim is --

MACDPARH

MS. MILLER:  Yes, your Honor.

THE COURT:  You get all your money on the first distribution by the way.

MS. MILLER:  Yes.

THE COURT:  Do you know what your loadstar is?

MS. MILLER:  3.5.

THE COURT:  $3.5 million?

MS. MILLER:  Yes, your Honor.

The multiplier is just under .5, at -- or 30 percent top end.

THE COURT:  How much were your expenses?

MS. MILLER:  So we have a cap of 425,000, mostly for experts, consultants, bankruptcy work, but right now we're under 400,000.

THE COURT:  That will be taken up with the final approval, right?

MS. MILLER:  I'm sorry, your Honor?  That will --

THE COURT:  The settlement fees awaits the final approval.

MS. MILLER:  Yes, your Honor.  Of course.

THE COURT:  Paragraph 18 seeks to have that favored time that the attorneys -- it needs to be revised.

MS. MILLER:  Got it, your Honor.

THE COURT:  Each share of common stock on a settlement will get a little more than two cents a share.

MACDPARH

MS. MILLER:  (Nodding)

THE COURT:  How much is the average shareholder going to get?  Did you figure it out?

MS. MILLER:  So it depends on how many claims are made.  This was a stock that had a higher proportion than is typical of retail investors.  We've already had -- notice hasn't gone out but we've had many calls from investors with heart breaking losses and terrible stories about it.  But I expect that the claim rate here will be under 50 percent, but that is an estimate, again, based on my analysis and my consultation with experts.

It's very hard to guess and know.  But if 50 percent claim, that means each claimant gets more obviously, but it depends.

THE COURT:  I'm having trouble quantifying it.

MS. MILLER:  Yes.  So it could be that 20 percent claim.  If 20 percent claim, then --

THE COURT:  What is the 20 defined as, 20 percent claim?

MS. MILLER:  So of -- so the maximum damages here are maybe $279 million.  So if ten percent of that, so 27 million claim, then they would each get 20 percent recovery instead of 2 percent recovery.

THE COURT:  In terms --

MS. MILLER:  Effectively, it depends on the pricing.

MACDPARH

THE COURT:  According to your best estimates --

MS. MILLER:  Yes.

THE COURT:  -- how much in dollars would an average investor get?

MS. MILLER:  So it's -- I don't think I can answer that question accurately.  What I would say is --

THE COURT:  Are you able to provide a range?

MS. MILLER:  Let me see if this is helpful.

So 2 percent is the $5,650,000.  I expect that all claimants will get likely under -- I would estimate less than 20 percent of their money back.  It depends how many shares you purchased -- you know, some people have a hundred shares.  Some people have 30,000 shares.

THE COURT:  I'm probing because having a settlement that looks -- as little as 2 cents per share causes people to be very critical of what goes on in court with these lawsuits.

MS. MILLER:  Yes, your Honor.

THE COURT:  So I'm searching for a way to express the settlement so it may reflect the reality.

MS. MILLER:  So the reality is if 20 percent of the damaged shares claim, the average shareholder will get about 20 percent of their out-of-pocket recognized loss back, which is not a terrible number.

I will also tell you that in discussions with class members who have called over the course of the litigation, we

MACDPARH

have an unusually high number of calls that we've gotten from class members since this case was filed asking, you know, what's going on, do I have any hope of getting any money back. And we have explained to them that the company is bankrupt, and that there are strict limits. And multiple shareholders have said to us, I understand that you're doing all that you can do and I look forward to getting whatever I can get here.

I would also point out, I mean, we made the point in our papers, I absolutely understand your Honor's concern but we point to the second circuit's case in *Grinnell* that addresses your Honor's point on the low percentage.

THE COURT: I'm not concerned so much about my approval. I'm concerned about stating it in a way that shareholders will find meaningful to decide whether to opt in or opt out or to participate.

MS. MILLER: So --

THE COURT: That can be important in terms of the cancellation level.

MS. MILLER: Yes, your Honor.

So I could add some language in there that explains that, depending on the percentage of damaged shares that are claimed by claimants, it's less than a hundred percent claim, which is likely.

THE COURT: Is there reliability in the 20 percent figure?

MACDPARH

MS. MILLER:  Is there what?

THE COURT:  A reliability in experts' estimation that 20 percent of eligible claims will come forward.

MS. MILLER:  So it could easily be 10 or 50, your Honor.  I don't want to say -- I mean, I really don't think it's going to be 50.  I think it's going to be around 20, but I -- I mean, I just had a case where I thought it was going to be 80 or 90 --

THE COURT:  We don't know.

MS. MILLER:  -- and it was 30, so --

THE COURT:  We don't know.  When you put down 2 cents, it discourages people from making claims.

MS. MILLER:  I understand, your Honor.

THE COURT:  So if a person had 100 shares, they would get $2.20.

MS. MILLER:  Right.

THE COURT:  What is the average holding?

MS. MILLER:  I don't --

THE COURT:  You said it's a lot of individuals.

MS. MILLER:  It's many retail investors.  I would say it's more than 50 percent retail investors, but I do -- I mean, there are some large holders in there.  I don't know the answer to your question sitting here right now, but there are lots of retail investors that are large holders.

THE COURT:  What did the stock sell for?

MACDPARH

MS. MILLER:  A few dollars, three bucks.

THE COURT:  Like what, three, four dollars?

MS. MILLER:  Three.

THE COURT:  During this class period?

MS. MILLER:  Yeah, it might have been -- it might have been around five at one point.

THE COURT:  If a shareholder buys at an inflated price, inflated because of misrepresentations --

MS. MILLER:  Yes.

THE COURT:  -- and then sells during the class period, the damages are mitigated?

MS. MILLER:  Well, that depends, your Honor.

So, for example, in the plan of allocation pursuant to *Dura*, if the class member purchased based on the misrepresentation and sold before the first partial disclosure, they would get nothing under *Dura*.  But if you sell after that first partial disclosure, after the artificial inflation is removed, that harm is baked in to the loss.

THE COURT:  Will you pick up that information in your proof of claim?

MS. MILLER:  That -- yes, absolutely.

THE COURT:  Show me, please.

MS. MILLER:  So the proof of claim requires a class member to put their dates of purchase and sale and prices, and so that goes right into the plan of allocation, which addresses

MACDPARH

whether it's a *Dura* loss or not.

THE COURT:  So the --

MS. MILLER:  So it has --

THE COURT:  Now, is the first partial disclosure the end date of the class?

MS. MILLER:  No.  There are four dates.  6-7-19 is the first partial disclosure when there was -- the Aurelius report came out that talks about backlogging customers.  Then there are two others, and then the final date of the class period, 10-22-19, is when they announced that they were going -- the restatement release came out.

THE COURT:  So you are saying that if a stockholder sold after June 7, he gets a full recovery?

MS. MILLER:  So --

THE COURT:  Or a balance recovery?

MS. MILLER:  So if you purchased during the class period and sell before the first partial disclosure, you're not harmed.  You get nothing.  If you sell after the first partial disclosure or hold at least 90 days or indefinitely, you're going to get something as your recognized loss.  It depends specifically -- the plan goes through your dates of every purchase, your dates of every sale, and whether or not you are still holding.

THE COURT:  You've answered all my questions.

MS. MILLER:  Your Honor, I have one small question

MACDPARH

about the notice.  I realized under the S.D.N.Y. Rule 23.1, the notice is to disclose any fee agreements.  This has no impact on the fee, because any fee would be paid out of lead counsel's share, but perhaps I should add some language into the notice, we have an agreement that the mediator, David Murphy, will determine what the *Loskot* folks, the plaintiffs in the *Loskot* case should get as a fee since their case is subsumed in this and being settled here.  But that would be paid out of our fees.

And so I could add in there that the -- and the arrangement is Sabby pays 30 percent of that and the class pays 70 percent of that fee that the mediator will determine.

THE COURT:  Actually it's both --

MS. MILLER:  Yes.  So I will add that language in there, your Honor.  I thought it was in there, and it wasn't.

THE COURT:  It probably should be made a part of the settlement agreement as well.

MS. MILLER:  Okay.  Yes, your Honor.

THE COURT:  I grant preliminary approval for the settlement.

MS. MILLER:  Thank you, your Honor.

THE COURT:  The settlement was reached after strong and zealous representation of the class by lead counsel.  It is the result of good faith, arms-length negotiations held considerably by an experienced mediator.  Given the

circumstances of the bankruptcy of Pareteum, and the difficult financial condition, and the ongoing investigations of the individual defendants, the amount of settlement is adequate.

Had this litigation proceeded, it would have been expensive, fraught with difficulties, and subject to high risk, and so the settlement is adequate in relationship to the complexity, expense, and likely duration of litigation. The trial would have been lengthy. There would be many witnesses that would be required. And since the insurance policy provided that the payments made to the insureds or the additional insureds reduced the face amount of the insurance coverage, there would be a very substantial risk of continuing the litigation would reduce the available funds for recovery.

The methods of distribution are fair. In particular, it is the Court that will appoint the neutral. I will accept the recommendation of plaintiffs' counsel. And you should provide, in an appointment, and perhaps in the agreement as well, that appeals from the ruling of the neutral come to me.

MS. MILLER: Yes, your Honor.

THE COURT: Fill in the dates that you want for your notice, and provide -- work out the date of hearing with my office, and I'll sign the order.

MS. MILLER: Your Honor, one slight quirk there. On November 10th, there's a hearing scheduled in the bankruptcy court where we anticipate a comfort order will be entered that

MACDPARH

will allow the insurance --

THE COURT:  Thank you for reminding me.

MS. MILLER:  Yes.

THE COURT:  Are we binding the insurance companies?

MS. MILLER:  Say it again, your Honor?

THE COURT:  Are we binding the insurance carriers? This should be of paramount interest to the defendants.

MS. MILLER:  I'm not sure I understand your question.

THE COURT:  Well, the money is coming from the insurance.

MS. MILLER:  That's correct.  All the money is coming from the insurance carriers.

THE COURT:  So how sure are you of obtaining this comfort order?  I'm not familiar with it but --

MR. ETKINS:  May I, your Honor --

THE COURT:  Yes.

MR. ETKINS:  -- address that?

The only condition for the funding by the carriers is obtaining the comfort order from the bankruptcy court.  I've been involved in a lot of these cases where there's the intersection between bankruptcy and insurance litigation, and insurance carriers insist, in basically every case I've been involved in, where there's a Chapter 11 pending, that they get a comfort order from the bankruptcy court that the stay, the automatic stay is not applicable and that they are free to fund

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MACDPARH

in connection with the settlement or in connection with the -- paying defense costs.

THE COURT:  How risky is that?

MR. ETKINS:  Normally, your Honor, that is not a risky thing at all.  Frankly, I never quite fully understood why the carriers insist on that based upon the language of the policies, which gives a priority to individual defendants with respect to the policy proceeds, but they've just historically insisted on it.

So I've been involved in a lot of cases where comfort orders are routinely entered by the bankruptcy court.  That's not to say --

THE COURT:  What happens if you don't get a comfort order?

MR. ETKINS:  I'm sorry?

THE COURT:  What happens if you don't get a comfort order?

MR. ETKINS:  As I understand it, and I can defer to my colleagues at Baker & Hostetler, because it's their motion in the bankruptcy court because their clients are the insureds, but, as I understand it, the comfort order is a condition to the settlement.

THE COURT:  Does it say so?

MS. MILLER:  Yes, your Honor.

THE COURT:  Okay.  That's another ground for

MACDPARH

cancellation in other words?

MS. MILLER:  Yes, your Honor.

THE COURT:  Is that expressed in the notice?

MS. MILLER:  Yes, your Honor.  Yes.

THE COURT:  Alright.  Then we're -- one more question. What happens to the settlement class if there is no settlement?

MS. MILLER:  It reverts back to the position prior to the agreement, and we would immediately go into depositions. And the policies would be wasted within a couple months I assume.

THE COURT:  Okay.  I've given my order, and -- I'm sorry.  Just a minute.

Anything more?

MS. MILLER:  Your Honor, I would just -- how would you like to address this -- you had initially said that I should reach out to chambers to schedule a date.  Would you like me to do that or get back after we hopefully have the comfort order?

THE COURT:  Why don't you get the comfort order first.

MS. MILLER:  Okay.  So --

THE COURT:  That condition will be removed when you do?

MS. MILLER:  Yes.  Yes, your Honor.

THE COURT:  You'll be scheduling this sometime in September then?

MS. MILLER:  The final approval order is set to be 124

MACDPARH

days after preliminary approval or -- the latter of preliminary approval or the comfort order.  So it would be end of March most likely, to give time for notice and for people to --

THE COURT:  Why do you need 120 days after the comfort order?  Is that statutory?

MS. MILLER:  It's not, but less than 90 is problematic for due process under the case law in the Second Circuit and elsewhere.  I've done as tight as 90.  This proposal says 124, but we could do it -- we could do it -- it could be as short as 90 days, but less than that -- it takes a while with the nominees getting out the notices, et cetera.

THE COURT:  Okay.  You've provided it.

Anything else?

MS. MILLER:  No, your Honor.

THE COURT:  Do the defendants have any comments?

MS. BARROW:  No, your Honor.

MR. GOLDFARB:  No, your Honor.

MR. SABELLA:  No, your Honor.

THE COURT:  Okay.  We are in recess.

MS. MILLER:  Thank you, your Honor.

THE COURT:  Thank you.

(Adjourned)