# EXHIBIT B

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq.
Cameron Welch, Esq.
Krista L. Kulp, Esq.
1325 Avenue of the Americas – 19th Floor
New York, New York 10019
(212) 752-8000
(212) 752-8393 Facsimile

*Attorneys for Anthony M. Saccullo, in his*
*capacity as the Liquidation Trustee for the*
*TEUM Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PARETEUM CORPORATION, *et al.*,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 22-10615 (LGB)<br><br>(Jointly Administered) |
| ANTHONY M. SACCULLO, in his capacity as the Liquidation Trustee for the TEUM LIQUIDATING TRUST,<br><br>　　　　　　　Plaintiff,<br><br>　　　　　　　v.<br><br>ROBERT H. TURNER, VICTOR BOZZO, YVES VAN SANTE, EDWARD O'DONNELL, DENIS MCCARTHY, and ROBERT MUMBY,<br><br>　　　　　　　Defendants. | Adv. Pro. No. |

<u>**COMPLAINT**</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Pareteum Corporation (7538); Pareteum North America Corp. (f/k/a Elephant Talk North America Corp.) (9623); Devicescape Holdings, Inc. (2909); iPass, Inc. (4598); iPass IP LLC (2550); Pareteum Europe B.V.; Artilium Group Ltd. (f/k/a Artilium PLC); Pareteum Asia Pte. Ltd.; and Pareteum N.V. (f/k/a Artilium N.V.) (collectively the "<u>Debtors</u>") The mailing address of the Debtors, solely for the purposes of notices and communications, is c/o Saccullo Business Consulting, LLC, 27 Crimson King Drive, Bear, DE 19701.

Anthony M. Saccullo, in his capacity as the Liquidation Trustee (the "Liquidating Trustee" or "Plaintiff") for the TEUM Liquidating Trust (the "Liquidating Trust"), alleges:

**NATURE OF THE CASE**

1. This case concerns breaches of fiduciary duty and other unlawful conduct by Defendants, who were officers and directors of Pareteum Corporation[2], from December 2017 through November 2019 (the "Relevant Period"). These unlawful acts, centered around material misstatements in Pareteum's financial statements, ultimately led to Pareteum's financial ruin and the commencement of these Chapter 11 Cases (defined below). By way of example, at the direction and/or with the support of Defendants, Pareteum's public filings materially overstated revenue by approximately $12 million for fiscal year 2018 (60% of the ultimately restated value), and by approximately $30 million for the first and second quarters of 2019 (91% of the ultimately restated revenue). When these accounting irregularities were eventually disclosed, Pareteum's stock price plummeted and the Company entered an economic collapse from which it could not recover.

2. Pareteum's final chapter actually commenced in late 2015, when it undertook a restructuring effort to combat its declining business image. Defendant Robert H. Turner ("Turner") was appointed as Executive Chairman of the Board to lead the restructuring efforts. During his first year Turner rebranded the company as Pareteum, enacted a 1-to-25 reverse stock split of Pareteum's common stock, and appointed Defendant, Victor Bozzo ("Bozzo"), as Chief Executive Officer of Pareteum. In the years that followed Pareteum's financial success soared – at least on paper. By way of example, the Company's market cap expanded significantly, from less than $20 million in December 2016 to as high as $569 million in May 2019. In reality,

however, Pareteum was not nearly as successful as Turner and the other Defendants represented to the investing public.

3.      The soaring market cap and other appearances of financial success were actually derived from an illusory approach to accounting.  After joining Pareteum, Turner altered the way Pareteum reported its revenue. Pareteum began reporting a "backlog" metric, which consisted of revenue purportedly owed – but not paid – to Pareteum through its contracts to provide software and other services to its customers. During the Relevant Period, Pareteum reportedly built up a significant backlog "revenue". For instance, for the fiscal year ended December 31, 2018, Pareteum's backlog totaled $615 million. According to the Defendants, Pareteum's backlog was an important means by which investors could gauge the expected profitability and growth prospects of Pareteum, and by reporting an extremely large backlog, Defendants caused Pareteum to signal that it would soon experience significant actual growth.

4.      However, many of the customers who purportedly contributed to Pareteum's backlog during this period were either greatly exaggerated or even nonexistent. Examples of these customers include European and African companies with little to no capital or meaningful business activity, businesses with inactive websites that offered limited contact information, and businesses that were outright closed or dissolved. As such, it was unlikely that Pareteum would actually receive the revenue reflected in Pareteum's "backlog" from actual transactions with these customers.  In reality, the "backlog" was an illusion.

5.      These facts were not disclosed in Pareteum's public statements or SEC filings during the Relevant Period. Instead, Defendants caused Pareteum to issue hundreds of press releases touting its purportedly lucrative contracts with new customers and Pareteum's

---

[2] Pareteum Corporation and its debtor and their non-debtor subsidiaries and affiliates are referred to herein

artificially inflated backlog, as evidence of positive revenue growth. As a result, the price of Pareteum's stock, as well as Pareteum's market cap, increased significantly during the Relevant Period.

6.  Defendants took advantage of the artificial inflation of Pareteum's stock price in several ways for their own self-interest and to the detriment of the Company. Defendants caused Pareteum to enter into certain self-interested M&A transactions, which it did not have the actual cash to support. These acquisitions were made through stock transactions and as a result of the inflated stock price were destined to fail. These acquisitions led to a creation of an entity which could not be sustained. The acquisitions were improperly vetted, and resulted in millions of undisclosed liabilities for which Pareteum became responsible. Furthermore, the acquisitions were also self-interested, because Defendants received performance-based bonuses. For example, Turner's employment agreement was amended during the Relevant Period to provide performance-based bonuses for completing certain acquisitions.

7.  Defendants' unlawful scheme began to unravel beginning in June 2019, when two reports were published about Pareteum. On June 7, 2019, a research firm, Marcus Aurelius Value, published a report titled "*TEUM: Where Are The Customers?*" (the "Marcus Aurelius Report"). The Marcus Aurelius Report questioned the suspicious customer transactions that comprised Pareteum's abnormally large backlog. It also documented ties between certain Defendants and various prior failed stock fraud schemes, as well as connections to entities associated with Barry Honig ("Honig"), a suspected stock manipulator and the subject of Securities and Exchange Commission ("SEC") and Department of Justice investigations. Just three weeks later a second report, published on June 25, 2019, by Viceroy Research Group (the

---

collectively as "Pareteum" or the "Company".

4

"Viceroy Report"), questioned certain accounting discrepancies in Pareteum's financial statements stemming from Pareteum's apparently inflated backlog.

8. As a result of the revelations in these reports, the price of Pareteum's stock dropped precipitously and the SEC commenced an investigation into the Company.

9. On October 21, 2019, Pareteum issued a press release revealing that Pareteum's financial statements issued during the fiscal year ended December 31, 2018, and for the fiscal quarters ended March 31, 2019 and June 30, 2019, "should no longer be relied on," and consequently, would need to be restated, in part because Pareteum had "prematurely or inaccurately recognized revenue" flowing from certain customer transactions. The press release indicated that the magnitude of the restatements would be significant; for instance, Pareteum's previously reported revenue of $32.4 million for the fiscal year ended December 31, 2018 would be reduced by roughly $9 million, or 28%. Similarly, Pareteum's reported revenue of $57.1 million for the first and second fiscal quarters of 2019 would be reduced by roughly $24 million, or 42%. Ultimately, the revised 2018 10-K revealed Pareteum actually overstated its revenue by $11,970,649. The 2019 10-K reported a total of $62,049,000 in annual revenue, a stark contrast to the $57 million previously reported for just the first two quarters of 2019.

10. At the same time Pareteum came clean about its overstated financials, it implemented a significant restructuring of its senior management. On October 15, 2019, Pareteum issued a press release revealing that Defendant Denis McCarthy ("McCarthy"), who as Chief Operating Officer was responsible for, among other things, maintaining Pareteum's backlog spreadsheets, had been terminated. Pareteum further disclosed that it had retained an executive search firm to "assess[] the board of directors and key leadership positions[.]" On November 1, 2019, Defendant Edward O'Donnell ("O'Donnell") was replaced as Chief Financial Officer by

Laura A. Thomas ("Thomas"), on an interim basis. Then, on November 22, 2019, Turner was terminated from his positions as Executive Chairman of the Board and CEO.

11. As a direct consequence of Defendants' misstatements and breaches of fiduciary duties, Pareteum's financial position was substantially impaired, and Pareteum ultimately sought relief under Chapter 11 of the Bankruptcy Code. Specifically, as a result of Defendants' unlawful conduct, the Debtors: (i) incurred substantial costs addressing the various legal, financial, and regulatory actions leveled at the Debtors related to the announcement that they needed to restate their financials in both 2018 and 2019; (ii) had their stock suspended (and ultimately delisted) from trading on NASDAQ; (iii) incurred significant costs in seeking to regain NASDAQ and SEC compliance; (iv) suffered from a reduction in their ability to fund needed investment in technology and growth; and (v) faced increased capital costs because capital raises through public offerings were unavailable. All of the foregoing resulted in the Debtors' commencement of these Chapter 11 Cases.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

13. This adversary proceeding is brought pursuant to Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure and sections 544 and 550 of title 11 of United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") and/or relate to a bankruptcy case pending in the Southern District of New York. Plaintiff consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

14.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as this adversary proceeding arises under and in connection with a case under the Bankruptcy Code which is pending in this District.

15.     This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O).

## THE PARTIES

16.     Plaintiff is the Liquidating Trustee for the Liquidating Trust.

17.     Pareteum was a telecommunications "Software as a Service" or "SaaS" company, offering various products such as SIM cards, WiFi service, and a Cloud platform. One portion of Pareteum's business was its mobile bundled services line, which provided SIM cards with customizable service plan options. Pareteum's customers then purportedly resold the SIM cards to individual consumers.

18.     Turner served as the Executive Chairman of Pareteum's Board of Directors (the "Board") from November 16, 2015, and also the Chief Executive Officer ("CEO") of Pareteum from May 24, 2019, until he was terminated from both positions on November 22, 2019. He nonetheless remained a director thereafter, refusing to resign until August 2022.

19.     Bozzo served as CEO of Pareteum from November 1, 2016 until May 24, 2019. He then served as Pareteum's Chief Commercial Officer ("CCO") from May 24, 2019 until he resigned effective June 9, 2020.

20.     O'Donnell served as the Chief Financial Officer ("CFO") of Pareteum from January 9, 2017 to November 1, 2019, when he was terminated by Pareteum.

21.     McCarthy served as the Chief Operating Officer ("COO") of Pareteum from May 24, 2019 to October 9, 2019, when he was terminated. He also served as Pareteum's President

7

from October 1, 2018 to May 24, 2019, and as Pareteum's Senior Vice President of Corporate Development from February 21, 2018 to October 1, 2018.

22.     Defendant Yves van Sante ("van Sante") served as a director of Pareteum from June 1, 2014 until his resignation on October 27, 2020. He served as the Chair of Pareteum's Nominating and Corporate Governance Committee and a member of the Audit and Finance and Compensation Committees.

23.     Defendant Robert Mumby ("Mumby") served as Pareteum's Chief Revenue Officer ("CRO"), from April 2017 through June 2020.

## BACKGROUND

### A. The Chapter 11 Cases

24.     On May 15, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code [Docket No. 1][3] (the "Chapter 11 Cases").

25.     On May 16, 2022, the Debtors filed a motion for approval of bidding procedures and for a sale of substantially all of their assets. [Docket No. 13].

26.     On May 24, 2022, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").  [Docket No. 52].

27.     On June 30, 2022, the Court approved a sale of substantially all of the Debtors' assets [Docket No. 167], which closed on July 11, 2022. [Docket No. 212].

28.     On July 8, 2022, the Court approved a global settlement among the Debtors, the Committee and proposed purchaser of the Debtors' assets (the "Global Settlement"). [Docket No. 201].  Pursuant to the Global Settlement, the parties agreed to establish the Liquidating Trust as part of a chapter 11 liquidating plan, which would be funded by contributions from the

8

proposed purchasers. The Global Settlement also provided that, subject to certain carveouts, the Liquidating Trust would receive certain rights in causes of action belonging to the Debtors' estates.

29. On October 7, 2022, the Court entered an order confirming the Debtors' liquidating chapter 11 plan (the "Plan"). [Docket No. 374]. Consistent with the Global Settlement, the Plan provides for the creation of the Liquidating Trust for benefit of general unsecured creditors. (Plan, § 5.4).

30. On October 21, 2022, the Plan went effective, and the Liquidating Trust was formed (the "Effective Date"). [Docket No. 397].

31. Pursuant to the Plan, on the Effective Date, all of the Debtors' rights, title and interests in the Liquidating Trust Assets (as defined in the Plan), were transferred to Plaintiff. (Plan, § 5.2).

32. The Liquidating Trust Assets include "all Retained Causes of Action" as defined in the Plan and the Notice of Filing of Second Revised Plan Supplement to the Modified Chapter 11 Plan of Liquidation [Docket No. 372].

33. Pursuant to the Plan, Plaintiff is authorized, as the representative of the Debtors' estates, to pursue the Retained Causes of Action, including the causes of action asserted herein. (Plan, § 5.4(g)(vii)).

34. Plaintiff retains the right to enforce, sue on, settle or compromise all causes of action belonging to Plaintiff, including claims under sections 544 and 550 of the Bankruptcy Code.

---

[3] All citations to the docket refer to the jointly administered Chapter 11 Cases, *In re Pareteum Corporation, et al.* Case No. 22-10615 (LGB).

**B. Pareteum's Board of Directors**

35.     During the Relevant Period, the Board included the following individuals: Turner and van Sante, and non-parties Robert L. Lippert ("Lippert"), Luis Jimenez-Tuñon ("Jimenez-Tuñon"), and Thomas.

36.     The Board also had three committees: the Audit and Finance Committee (the "Audit Committee"), the Nominating and Corporate Governance Committee ("Governance Committee"), and the Compensation Committee (the "Compensation Committee").

37.     During the Relevant Period, the Audit Committee was comprised of the following individuals: van Sante and non-parties Jimenez-Tuñon, Lippert, and Thomas.

38.     During the Relevant Period, the Governance Committee was comprised of the following individuals: van Sante and non-parties Jimenez-Tuñon and Lippert. On November 1, 2019, Mary Beth Vitale ("Vitale") joined the Board and became a member of the Governance Committee.

39.     During the Relevant Period, the Compensation Committee was comprised of the following individuals: van Sante and non-parties Lippert and Jimenez-Tuñon. On November 1, 2019, Vitale became a member of the Compensation Committee.

**C. Defendants' Duties Owed to Pareteum**

40.     As set forth in detail below, as officers and directors of Pareteum, Defendants were obligated to comply with various duties and responsibilities pursuant to Delaware law, Pareteum's Corporate Governance Guidelines, Pareteum's Code of Conduct, and the Audit and Finance Committee Charter.

10

### a. Duties of Defendants as Directors and Officers of Pareteum

41.     By reason of their positions as officers, directors, and/or fiduciaries of Pareteum, and because of their ability to control the business and corporate affairs of Pareteum, at all relevant times, Defendants owed Pareteum and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Pareteum in a fair, just, honest, and equitable manner. Defendants were required to act in furtherance of the best interests of Pareteum and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of Pareteum owed to Pareteum and its shareholders a fiduciary duty to exercise good faith and diligence and the highest obligations of fair dealing in the administration of the affairs of Pareteum and in the use and preservation of its property and assets.

42.     Defendants, because of their positions of control and authority as directors and/or officers of Pareteum, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of Pareteum. By virtue of such duties, Defendants were required to, among other things:

- Properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of Pareteum at any given time, including making accurate statements about Pareteum's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

- Ensure Pareteum complied with its legal obligations and requirements, and disseminating honest statements to the public;

- Conduct the affairs of Pareteum in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it

11

possible to provide the highest quality performance of its business, to avoid wasting Pareteum's assets, and to maximize the value of Pareteum's stock; and

- Remain informed as to how Pareteum conducted its operations, and make reasonable inquiry regarding imprudent or unsound conditions or practices upon notification, and take steps to correct such conditions or practices.

### b. Duties Pursuant to Pareteum's Corporate Governance Guidelines and Code of Conduct

44. Pareteum held its fiduciaries to specific corporate governance principles beyond the requirements of law. In particular, Pareteum's Corporate Governance Guidelines describe the duties undertaken by the Board and the active oversight role the Board played in Pareteum's business affairs. By way of example, the Corporate Governance Guidelines state that the Board must "oversee the CEO and other senior management in the competent and ethical operation of the Company on a day-to-day basis and to assure that the long-term interests of the shareholders are being served."

45. Defendants were also bound by Pareteum's Code of Business Conduct (the "Code of Conduct"). The Code of Conduct sets forth principles to guide all directors, officers, and employees of Pareteum, who are required to know and conduct themselves in accordance with the Code of Conduct, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

12

46.     With respect to Pareteum's compliance with laws, rules, and regulations, the Code

of Conduct requires:

**LEGAL COMPLIANCE AND THE CODE**

The Company actively promotes compliance with all laws, rules and regulations in each jurisdiction in which we do business.

On top of legal compliance, the Code puts additional requirements on all of us. We place particular demands on our managers. They must, through their actions demonstrate the importance of compliance with the Code. Leading by example is critical, acting on any suspected unethical behaviour, as well as being available for employees who have ethical questions or wish to report possible violations.

Similar to breaking laws resulting in disciplinary action by society, failure to comply with the Code will result in disciplinary action by the company, including dismissal.

47.     With respect to Pareteum's corporate books, financial accounting, and public

disclosure, the Code of Conduct states:

**FINANCIAL REPORTING**

As a public company it is necessary that the Company's filings with the United States Securities and Exchange Commission are accurate and timely. The Company has appropriate internal controls and processes to ensure that accounting and financial reporting complies with applicable legislation and rulings.

The Company expects employees and officers to take this responsibility very seriously and provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

The Company's policy is to comply with all financial reporting and accounting regulations and rulings applicable to the Company if any employee or officer has concerns or complaints regarding accounting or auditing matters of the Company, then he or she is encouraged to file those concerns by one of the methods described in chapter Reporting Violations.

The integrity of the Company's financial records is critical to the operation of the Company business and is a key factor in maintaining the confidence and trust of our shareholders. We must ensure that all transactions are properly recorded, classified and summarized in accordance with the Company accounting policies. No employee may enter or remove information of the Company's books or records that intentionally hides, misleads or disguises the true nature of any financial or non financial transaction or result.

Employees involved in financial reporting shall always provide full, fair, accurate, timely and

understandable disclosure in reports and documents that the Company files with, or submits to, government agencies, tax authorities and in other public communications.

### c. Additional Duties of the Members of the Audit Committee

48. In addition, under the Audit and Finance Committee Charter, van Sante owed specific duties to Pareteum to assist the Board in overseeing the integrity of Pareteum's financial statements and Pareteum's compliance with legal and regulatory requirements. These duties include reviewing and discussing with management Pareteum's compliance with U.S. Generally Accepted Accounting Principles ("GAAP") for the full and fair disclosure of its financial report processes.

49. The Audit and Finance Committee Charter identifies the authority and responsibilities for the members of the committee, which include, among other things:

> At least annually, to obtain and review a report by the Company's independent auditors that describes (1) the accounting firm's internal quality control procedures, (2) any issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audit's carried out by the firm and any steps taken to deal with any such issues, and (3) all relationships between the firm and the Company or any of its subsidiaries; and to discuss with the independent auditors this report and any relationships or services that may impact the objectivity and independence of the auditors.

> To review and discuss with the Company's independent auditors (1) the auditors' responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process, (2) the overall audit strategy, (3) the scope and timing of the annual audit, (4) any significant risks identified during the auditors' risk assessment procedures and (5) when completed, the results, including significant findings, of the annual audit.

> To review and discuss with the Company's independent auditors (1) all critical accounting policies and practices to be used in the audit; (2) all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the auditors; and (3) other material written communications between the auditors and management.

To review with management and the Company's independent auditors: any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off balance sheet structures on the Company's financial statements.

To keep the Company's independent auditors informed of the Committee's understanding of the Company's relationships and transactions with related parties that are significant to the company; and to review and discuss with the Company's independent auditors the auditors' evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

To review with management, and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

To review and discuss with the Company's independent auditors any other matters required to be discussed by PCAOB Auditing Standards No. 1301, Communications with Audit Committees, including, without limitation, the auditors' evaluation of the quality of the company's financial reporting, information relating to significant unusual transactions and the business rationale for such transactions and the auditors' evaluation of the company's ability to continue as a going concern, and other applicable requirements of the PCAOB and the SEC.

To review and discuss with the Company's independent auditors and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the auditors on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial

15

Condition and Results of Operations" to be included in the Company's annual report on Form 10-K before the Form 10-K is filed.

To recommend to the Board that the audited financial statements and the MD&A section be included in the Company's Form 10-K and whether the Form 10-K should be filed with the SEC; and to produce the audit committee report required to be included in the Company's proxy statement.

To review and discuss with the Company's independent auditors and management the Company's quarterly financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed; and to review and discuss the Form 10-Q for filing with the SEC.

### d. Duties Under the Applicable Accounting Standards

50.     Under applicable SEC rules and regulations, Pareteum, under Defendants' guidance, was required to prepare and file financial statements in accordance with GAAP. Financial statements that are not in compliance with GAAP are presumed misleading by the SEC.

51.     The Financial Accounting Standards Board ("FASB") provides guidance in the FASB Statements of Financial Accounting Concepts (the "Concepts Statements") regarding when and how to record events in financial statements and related reports according to GAAP.

52.     Concepts Statement No. 1 provides "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions" and "[f]inancial reporting should provide information about an enterprise's financial performance during a period." FASB Concepts Statement No. 1, Objectives of Financial Reporting by Business Enterprises (2008) at 11, 13.

16

53.     Concepts Statement No. 2 provides:

- "[t]he reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user, which comes through verification, that it has that representational quality;"

- for a financial report to be complete, "nothing material is left out of the information that may be necessary to ensure that it validly represents the underlying events and conditions;" and

- "[c]onservatism is a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered."

FASB Concepts Statement No. 2, Qualitative Characteristics of Accounting Information (2008) at 18, 21, 24.

54.     In addition, FASB Accounting Standards Codification Topic 606, Revenue from Contracts with Customers ("ASC 606") requires entities to recognize revenue, only when control of the promised goods or services is transferred to customers, at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services where such transfer has been completed.

55.     ASC 606 requires entities to take the following steps to assess whether and what revenue should be recognized: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the corresponding performance obligation(s); and (5) recognize revenue when or as the entity satisfies a performance obligation by transferring control of a promised good or service to a customer.

56.     In addition to the Concepts Statements and ASC 606, SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies with respect to its

17

finances and operations. Item 303 of Regulation S-K requires that all Form 10-Qs and 10-Ks include a "Management's Discussion and Analysis of Financial Condition and Results of Operations" which must:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

57.    As set forth in detail below, Defendants completely disregarded these legal, professional, and accounting standards and obligations – and in so doing cause catastrophic harm to Pareteum.

### D. Defendants' Prior Track Record of Self-Dealing and Mismanagement

58.    Prior to joining Pareteum, Turner led a number of businesses that subsequently collapsed, in many cases amidst accusations of gross mismanagement and self-dealing.

59.    Turner had previously served as CEO of an Australian company called Davnet and during his tenure he incurred monthly expenses of $50,000. By the time he left, the company's asset position fell by $100 million.

60.    Between 2005 and 2006, Turner also served as a director at LastMile Communications, a telecommunications company based in the UK, which liquidated in 2007.

61.    He later served as CEO and Chairman of Catcher Holdings, Inc. ("Catcher Holdings") for a period of ten months.

18

62.     Turner made statements about Catcher Holdings that are alarmingly similar to some of the false and misleading statements he made about Pareteum, as described herein. During a March 23, 2007 conference call, Turner stated:

> A couple of things I'd like to speak about first of all ***I think Catcher is very much a transformational company and opportunity***. The opportunity we see that for approximately the last two years the company is very much focused on the developmental stage of the product. And now we are transforming into true production and into the revenue stages most importantly the growth stages.
>
> ***I believe that 2007 will be a break out year for us . . .***
>
> <div align="center">* * *</div>
>
> ***I think there is a significant demand for the Catcher products***. Our competition in my viewpoint is at least one generation behind, and I make that judgment based upon a significant set of phone calls that I've had over the past two weeks with a number of our VARs, a number of our manufacturers' reps, and in some cases sitting down and actually meeting face to face.

(emphasis added.)

63.     At the same period of time that Turner was CEO at Catcher Holdings, McCarthy served as Catcher Holdings' CFO. Turner left Catcher Holdings in 2007, and McCarthy left in 2008. Shortly afterward, the company collapsed.

64.     After leaving Catcher Holdings, Turner and McCarthy both took positions at Pac-West Telecomm, Inc. ("Pac-West"), where Bozzo was then employed. Turner was the CEO of Pac-West from 2008 through 2011, Bozzo served as Pac-West's Chief Sales and Marketing Officer, as well as President and General Manager of Pac-West's Emerging Technology Division from 2010 through 2011, and McCarthy served as the CFO and COO of Pac-West from 2007 through 2010. Turner, McCarthy, and Bozzo each left Pac-West in 2011 and Pac-West declared bankruptcy in 2013.  Not long after, this triumvirate took the helm at Pareteum.

<div align="center">19</div>

65.     Like the other Defendants discussed above, O'Donnell, too, left a number of failed enterprises in his wake. O'Donnell took on the role of CFO at AudioEye, Inc. ("AudioEye") in or around 2010. According to the Marcus Aurelius Report, after O'Donnell left AudioEye in November 2015, AudioEye investors sued O'Donnell for fraud.

66.     O'Donnell also served as the CFO of Radbourne Property Group from 2015 through 2016. According to the Viceroy Report, Radbourne Property Group was charged with fraud and "engaged in small-time fraud and failure to pay several liens."

67.     Perhaps most concerning about certain of Defendants' backgrounds, however, are their undisclosed affiliations with Barry Honig, an accused stock manipulator and the apparent architect of several fraudulent "pump-and-dump" schemes. In September 2018, the SEC brought charges against Honig and several other conspirators for allegedly manipulating the stock of three companies in "classic pump-and-dump schemes." On September 7, 2018, the SEC issued a press release announcing the charges, stating:

> The Securities and Exchange Commission today charged a group of 10 individuals and 10 associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock.
>
> *According to the SEC's complaint, from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes*. Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes. *Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume. According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors*.
>
> "*As alleged, Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and*

20

*undermining the integrity of our securities markets*," said Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement. "They failed to appreciate, however, the SEC's resolve to relentlessly pursue and punish participants in microcap fraud schemes."

The SEC's complaint, which was filed in federal district court in Manhattan, charges Honig [and others] with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief.

(emphasis added.)

68.     On July 10, 2019, Honig agreed to a partial consent judgment with the SEC, under the terms of which Honig would be banned from investing in and financing penny stock companies.

69.     A number of Pareteum executives, including Turner and McCarthy possessed undisclosed ties to Honig-controlled entities. For example, a Honig-controlled company was part of the group of entities that owned Catcher Holdings, where Turner and McCarthy previously served as CEO and CFO, respectively.

70.     Honig also possesses undisclosed ties to two firms that invested in Pareteum during the Relevant Period: Iroquois Capital Management, LLC ("Iroquois") and IntraCoastal Capital, LLC ("IntraCoastal"). These firms have invested in at least 34 public companies that were owned or controlled by Honig, many of which have since lost much of their value or are now entirely worthless. In December 2017, only days before the beginning of the Relevant Period, Iroquois and IntraCoastal each filed Form 13Gs with the SEC indicating that they owned approximately 3.57 million and 2.55 million shares of Pareteum stock, respectively. However, during 2018, IntraCoastal obtained additional shares and owned approximately 3.57 million shares. During the Relevant Period, Iroquois and IntraCoastal collectively came to control as

much as 13.2% of the Company's shares. Yet, both firms conveniently liquidated all their stock before the price of Pareteum's stock began to fall.

71. According to the Marcus Aurelius Report, Honig has ties to Dawson James, which acted as Pareteum's underwriter in its September 20, 2019 public offering, and Squar Milner, Pareteum's independent auditor. Both of these firms previously provided services to certain Honig-controlled entities. Right before the Relevant Period, Dawson James began issuing favorable reports on Pareteum. On December 11, 2017, Dawson James published a report lauding Pareteum's prospects as follows:

> With a new, experienced management team, growing revenues and backlog stressing recurring revenue and higher-margin contracts, an improved balance sheet and successful cost-reduction program, investors have much to like about Pareteum both near-term and over the long run. Thus, we are maintaining our BUY rating on Pareteum and 12-18 month price target of $2.10 per share.

72. Additionally, Honig's law firm, Sichenzia Ross Ference LLP, also served as Pareteum's outside counsel.

### E. Pareteum's Business Operations During the Relevant Time Period

73. Pareteum provided global cloud communications services, including voice, video, text messaging, and data services, to its customers, which include early-stage businesses, software developers, and communications service providers.

74. Until November 2015, Pareteum was known as Elephant Talk Communications Corp., a declining penny stock company with few positive business prospects.

75. In November 2015, Turner was appointed as Executive Chairman of the Board and led a significant restructuring of Pareteum, including its rebranding as Pareteum, a 1-to-25 reverse stock split, and the appointment of Bozzo as CEO in November 2016. These changes

22

helped increase Pareteum's market capitalization significantly, from less than $20 million during December 2016, to as high as $569 million during May 2019.

76.     This rapid increase is largely attributable to Pareteum's reporting of its "36 month contractual revenue backlog" in its press releases. In the SaaS industry, contractual revenue backlog is the measure of the total contract value of subscription agreements that has yet to be recognized over term. Pareteum used a 36-month term. Pareteum stated:

> Contractual revenue backlog, a Non-GAAP measure is measured on a forward looking 36-month snapshot view monthly, and, is generated by each of the Company's Managed Services, Global Mobility Cloud, and Application Exchange & Developer's Platform customers.

77.     Around January 2018, Pareteum began recognizing revenue for mobile bundled services customers using the backlog as follows: (1) a new customer signed a contract and master services agreement; (2) a purchase order was drafted by Pareteum, providing the number of SIM cards the customer intended to purchase, as well as the estimated cost for the average monthly plan they were expecting to sell to downstream customers; (3) the customer signed this purchase order which, in most cases, indicated that the full cost listed was just an estimate that would not become due until the customer actually sold the product to downstream consumers; and (4) Pareteum recognized revenue for the entire amount listed in the purchase order. Pareteum even recognized the total revenue of each purchase order irrespective of whether the SIM cards had even been shipped to the customer yet, or whether a platform had been set up by Pareteum sufficient to even allow the SIM cards to work. (*See* Order Instituting Cease-and-Desist Proceedings dated September 2, 2021, ¶ 12 annexed hereto as *Exhibit A*).

78.     Use of this "backlog" revenue recognition "methodology" caused Pareteum's reported revenues to skyrocket. In December 2017, Pareteum reported $129 million in revenue backlog. By May 2019, the revenue backlog approached $1 billion. Importantly, in press

releases, Defendants repeatedly assured the public that Pareteum would convert its revenue backlog to actual revenue received by the Company.

**F. Defendants Scheme to Inflate Pareteum's Revenue Results in the Issuance of False and Misleading Statements and Pareteum's Ultimate Demise**

### a. Overview

79. During the Relevant Period, in classic pump-and-dump fashion, Defendants made numerous public statements and caused Pareteum to issue hundreds of press releases and SEC filings, touting Pareteum's false successes. Included in these misleading statements was Pareteum's artificially inflated backlog and Pareteum's purportedly lucrative contracts with new, and often unidentified customers.

80. It is no surprise, based upon their prior conduct, that Defendants worked together in order to improperly inflate Pareteum's revenue and are responsible for a series of improper statements regarding Pareteum's financials, financial prospects, and disclosure controls. Between December 14, 2017 and October 21, 2019, Defendants caused Pareteum to: (i) improperly recognize revenue in its financial statements concerning the customer transactions, in violation of GAAP; (ii) fail to monitor and oversee Pareteum's compliance with GAAP, the Code of Conduct, and the Audit and Finance Committee Charter; and (iii) issue false and misleading statements regarding the foregoing to conceal this misconduct from the SEC, investors, and the public.

81. As a result of Defendants' actions: (i) Pareteum was required to restate each of its financial statements issued during the 2018 fiscal year, and for the first two quarters of 2019; (ii) the SEC began an investigation and ultimately entered the cease and desist order; (iii) Pareteum was delisted from NASDAQ; (iv) Pareteum defaulted on certain obligations; and (v) ultimately, Pareteum filed for bankruptcy.

82.     Moreover, until March 18, 2019 (when Pareteum first admitted to a material weakness in its internal controls), none of Pareteum's SEC filings disclosed that Pareteum had failed to maintain adequate internal controls. Even after such material weaknesses were disclosed, Defendants encouraged greater reliance on Pareteum's financial statements by representing that Pareteum had performed a more extensive analysis than would normally be performed in connection with preparing subsequently filed financial statements.

83.     Defendants' false and misleading statements had the effect of dramatically inflating the price of Pareteum's stock during the Relevant Period. Pareteum's share price increased from $0.72 on December 14, 2017 to $5.70 on March 18, 2019 -- a nearly 800% increase.

84.     Defendants capitalized on this artificial inflation by causing Pareteum to enter into a number of ill-advised transactions. On May 9, 2018, Defendants caused Pareteum to enter into a securities purchase agreement with certain investors for approximately 2.44 million shares priced at $2.50 per share. In June 2018 and November 2018, respectively, Pareteum acquired Artilium PLC ("Artilium") and iPass, Inc. ("iPass").

85.     During this same period, Defendants caused Pareteum to significantly increase Turner's compensation. On June 6, 2018, Pareteum announced Turner's employment contract would be extended for three years, and that 100% of his restricted stock awards and options shares would become vested in the event of a merger with or acquisition of another company. Demonstrating his self-interest in consummating the mergers, Turner received approximately 1.5 million shares of stock as a result of Pareteum's acquisition of Artilium.

### b. Defendants' Misleading "Pump and Dump" Statements

86. On December 14, 2017, Defendants caused Pareteum to publish a letter from Turner to Pareteum's shareholders (the "December 14, 2017 Letter"), stating, in relevant part:

> **Pareteum Issues Shareholder Update Letter**
> *2017 Accomplishments Expected to Create Continued Growth and Market Innovations in 2018*
> *36 Month Contractual Revenue Backlog Grows to $129 Million at November 30, 2017*
>
> NEW YORK, NEW YORK, December 14, 2017 – Pareteum Corporation (NYSE American: TEUM), ("Pareteum" or the "Company"), the rapidly growing mobile Cloud Communications Platform company, announced today the issuance of a shareholder update letter from its Executive Chairman and Principal Executive Officer, Hal Turner.
>
> Dear Pareteum family, partners and shareholders,
>
> We wish to start by thanking our TEUM, partners and shareholders for all your dedication and support. While we know there are ups and downs as an employee or a shareholder of a small emerging growth company, we strongly believe in our actions over the past two years and more specifically, recently, in building a strong and valuable company for the future.
>
> These past two years, since I was appointed as Executive Chairman and Principal Executive Officer of Pareteum in November 2015, have been extremely eventful and successful. Our restructuring and repositioning in 2016 has led to solid growth in 2017, and has defined our innovation in both services and market positioning, establishing a strong outlook for our success in 2018 and beyond. We again thank you for your patience.
>
> When Marconi invented the "wireless"... radio, it changed the world and lifestyles by enabling information to be widely broadcast. Pareteum's Global Mobility Cloud now has the capability to enable virtually any type of content and information (or transaction) by moving connectivity (via wireless mobility network access) to most elements of our lives, from home to work and all forms of interaction in between, like shopping, travel, entertainment, and sports. Pareteum's Global Mobility Cloud Platform enables our Mobile Network Operator and Communication Service Provider customers to manage these data information transactions and scale their businesses affordably.
>
> Through TEUM's accretion of the current $129 million 36 Month Contractual Revenue Backlog (see definition below), our customer base increased from 4 as of year-end 2016 to currently 21 customers. This is the result of a strong TEUM effort by all our TEUMates, across all departments, including Vic Bozzo, Rob Mumby, Nick Barter, Eduardo Gimeno, Ali Davachi, Ted O'Donnell and many others that carry on every day, doing their jobs to serve our customers and create profitable growth. We have expanded into new markets and have provided new services as a result of the complete overhaul of our software and platform in order to fully support our Software as a Service business model, which we converted to in 2016.

87. On December 19, 2017, Defendants caused Pareteum to publish a PowerPoint presentation (the "December 2017 Presentation") stating that Pareteum had issued over $13 million in new revenue backlog, and emphasized, "[the Company's] [p]ath to profitability is accelerated via high margins on subscribers and the magic of monthly recurring revenue will drive sustainable returns."

26

88.     Subsequently, Pareteum's stock price increased from $0.72 per share to $1.65 per between December 14, 2017 and December 19, 2017.

89.     On January 2, 2018, Defendants caused Pareteum to issue a press release announcing expedited deployment of its services for a $3 million contract with an Indian customer (the "January 2, 2018 PR"), stating in relevant part:

> Hal Turner, Pareteum's Executive Chairman and Principal Executive Officer commented, "Service providers in India and the Indian subcontinent are seeking ways to ensure mobile access for their subscribers, to accelerate new services and innovation, and to serve their subscriber community, wherever they are in the world. Our first India located customer chose Pareteum because of our feature rich global platform and connectivity, with its developer Application Programming Interfaces (API) framework. Pareteum's selection was based on the profitable customer value derived from our cloud, its connectivity, and the ease of doing business with us. Now, with our newly supported mobile payments and Blockchain capabilities plus their expectation of future mobile services and capabilities, ranging from Artificial Intelligence (AI), Machine Learning (ML) and Internet of Things (IoT), we expect to grow with our customer in India, and everywhere they choose to do business."

90.     On January 31, 2018, Defendants caused Pareteum to issue a press release announcing that it had signed contracts scheduled to add $15.2 million to Pareteum's backlog (the "January 31, 2018 PR"). The January 31, 2018 PR stated, in relevant part:

> NEW YORK, NEW YORK, January 31, 2018 – Pareteum Corporation (NYSE American: TEUM), ("Pareteum" or the "Company"), the rapidly growing Cloud Communications Platform company, today announced that, during the month of January 2018, the Company signed contracts scheduled to add $15,200,000 to its 36-month contractual revenue backlog. The current contractual revenue backlog represents a 400% increase from a year earlier and a 10% month over month increase to the $147,000,000 36-month contractual revenue backlog announced previously on January 3, 2018.
>
> Pareteum's current cash balance is $15.6 million on January 31, 2018, reflecting having fully paid our senior secured loan, in the amount of $8.1 million, and, continuing the improved operations of the business. Increases in cash balances over prior periods are a result of net equity raised, warrant exercises and continued operational efficiencies. The improved strength of our balance sheet provides the foundation for Pareteum's focus on accelerated growth in 2018 and beyond.
>
> Contracts executed in January 2018 that have meaningfully contributed to Pareteum's accelerating growth, as measured by our 36-month contractual revenue backlog, are:
>
> • $1,000,000 contract from Social Media Provider to Enable Smartphone Services, announced January 4, 2018
> • $5,400,000 contract from Pan European Mobile Operator with African Subscribers, announced January 10, 2018
> • $3,000,000 contract from South America Data Network Provider to Add Mobility, announced January 17, 2018
> • $1,000,000 contract from Brazil Mobile Service Provider, announced January 24, 2018
> • $10,000,000 contract awarded to Pareteum Europe for MSP deployment to EMEA customer, announced January 26, 2018

27

Of note, two of the awarded contracts mentioned above are 5-year agreements, so we have included only the portion expected over the next 36 months.

Hal Turner, Executive Chairman and Principal Executive Officer at Pareteum commented, "Pareteum's performance is highlighted by the growth of our 36-month contractual revenue backlog, currently standing over $162,000,000, which represents a Compound Annual Growth Rate (CAGR), measured from the end of 2016's fourth quarter through 2017 of 400%! Removing the burden of our senior secured debt materially frees cash to be redeployed into our growth. Our ambition is to deliver a single solution for communications service providers, enterprises, and IoT customers provided from our Managed Services, Global Cloud, and IoT – Application Exchange + Developer's platforms. Pareteum's application and service solutions include AI (Artificial Intelligence, Machine Learning), Blockchain, and, our latest IP/PBX solutions. We expect these achievements to continue our march to profitability and earnings for our shareholders. We are a mission driven business. One clear Pareteum mission is to make it simple for our customers to grow and integrate the latest technologies without having to think about building them."

91. On February 12, 2018, Defendants caused Pareteum to publish a letter from Turner to Pareteum's shareholders (the "February 12, 2018 Letter"), stating:

Dear Fellow Shareholder,

The TEUM of Pareteum Corporation continues to be hard at work, globally. We have had a fast start to 2018 with excellent results in January through the collective group initiatives of:

· Rob Mumby + his key sales executives and sales support TEUM;
· Ali Davachi + his key operations, technical support and service delivery TEUM;
· Denis McCarthy + his key corporate development TEUM;
· Ted O'Donnell + his accounting and finance TEUM
· And, as always, Vic Bozzo and his indomitable leadership, especially in the sales arena, to make things happen;

I am happy to report that our executive team, with its key leadership management team, is continuing to produce results. We have a very big and bright 2018 planned. So far this year, in January alone, our TEUM signed $20.4 million of new contracts, spanning the globe, from Brazil to Africa to Europe. $15.2 million was additive to our now record high $162 million 36-month contractual revenue backlog, as two of the awarded contracts are 5-year agreements. I am extremely proud of our TEUM's accomplishments as we have accelerated the growth of our backlog from $60 million at June 30, 2017 to $162 million as of January 31, 2018. We expect the pace to accelerate during the year and that our reported results will reflect the hard work that has gone into the turnaround of our company.

We have also experienced financial improvements during January. Our balance sheet reflects materially significant positive changes, notably, with our cash balance standing at $15.6 million on January 31, 2018. This was made possible by:

· Our improved business operations resulting in nearing zero operating cash burn;

· Our NYSE American: TEUM price per share increased, which in turn, prompted voluntary exercising of warrants and cash into the company;

· We fully paid our senior secured loan, eliminating secured debt from our balance sheet and its corresponding interest and principle payments;

We are proud to be debt-free with substantial cash to operate and grow our business. We are putting these dollars to work throughout 2018 (and beyond) in a manner that we believe will yield the maximum shareholder value to TEUM through:

· Profitable Sales growth

· Product and services development, with a detailed build or buy analysis applied

Pareteum continues to win new long-term contractual business at an unprecedented pace, as evidenced by our 36-month contractual revenue backlog. We expect this pace to increase throughout the year. Yet, TEUM is never satisfied. We see many new opportunities that include our support of Blockchain technology, which is at the heart of our identity management and payment systems plans. You may register and obtain a complimentary copy of our just released Blockchain-Whitepaper; you may also be interested in recently published articles at Pareteum.com/news commenting on Pareteum and how we use Blockchain to enable secure and trusted payments. We are planning additional whitepapers throughout the year to support newly acquired product capabilities and developments. Please register here at Pareteum.com/news to receive notifications (See "Keep in Touch with Us" at the bottom of the page).

92. On February 28, 2018, Defendants caused Pareteum to issue a press release announcing a 3-year contract with Global Cloud Services, which would add over $10 million to Pareteum's backlog (the "February 28, 2018 PR"), stating in relevant part:

*Pareteum Awarded $10 Million Contract from Established Carrier to Launch a Global MVNO*

**NEW YORK, NEW YORK, February 28, 2018 – Pareteum Corporation (NYSE American: TEUM)**, ("Pareteum" or the "Company"), the rapidly growing Cloud Communications Platform company, announced today it has been awarded a 3-year contract to provide Global Cloud Services to launch a global Mobile Virtual Network Operator (MVNO) for an established Carrier. The contract is scheduled to add over $10,000,000 to Pareteum's 36 month contractual revenue backlog.

Under the terms of the agreement, the global MVNO will leverage connectivity provided by Pareteum's Global Cloud Platform to service the needs of 300,000 subscriber once fully deployed. Pareteum is providing Communications Platform as a Service (CPaaS) that support and enable subscribers, and, the connectivity for the voice, messaging, and data service bundle. Monthly fees apply to the support and usages services consumed.

Vic Bozzo, CEO of Pareteum stated, "This contract is a major milestone for continued growth. Being awarded this contract demonstrates that the technology and strategy Pareteum's turn-key solution for launching mobile network operators is being widely adopted across the globe."

93. On the heels of the announcement of the agreement with Global Cloud Services and the additional $10 million in resulting "backlog" revenue, the price of Pareteum stock increased from $2.00 per share at the close of trading on February 27, 2018, to $2.28 per share at the close of trading on February 28, 2018.

94. On March 21, 2018, Defendants caused Pareteum to issue a press release announcing a 5-year contract with an Africa-based Mobile Virtual Network Operator, which

would add yet another \$15 million to Pareteum's backlog (the "March 21, 2018 PR"), which

states in relevant part:

*Pareteum Awarded \$15 Million Service Contract Over 5 Years with Multi-Country African Mobile Virtual Network Operator*
*Expands Deeper Into Continental Africa Adding \$10 Million to 36-Month Contractual Revenue Backlog*

NEW YORK, NY – PRNewswire – March 21, 2018 – Pareteum Corporation (NYSE American: TEUM), ("Pareteum" or the "Company"), the rapidly growing Cloud Communications Platform company, announced today that it has signed a 5-year contract to provide Managed Service Platform (MSP) services to an Africa-based Mobile Virtual Network Operator (MVNO).

Pareteum's Managed Services Platform will provide a fully integrated, single source solution that will enable its newest customer to provide multi-country digital applications, data services and traditional mobile services to its end users in Africa. This MVNO will provide Digital Wallet solutions, including Blockchain technology, to provide identity management, transaction settlements and payment solutions, safely and securely. Additionally, Branded Voice and SMS airtime services are enabled via Pareteum's solution suite for private labeling.

Under the terms of the agreement, Pareteum will be paid on a monthly recurring revenue basis for platform support services based on the number of connections. Additional fees will be paid to Pareteum for other solutions, as activated, including Blockchain enablement.

Vic Bozzo, CEO of Pareteum, stated, "Pareteum's MSP Platform is a perfect fit for the contract with our newest global client. This part of the world represents high growth in connections as the digital economy takes over. We are pleased with Rob Mumby and his team as they continue to add customers to our platform."

95.     Thereafter, Pareteum's stock price increased from \$2.85 to \$3.35 per share between March 20, 2018 and March 21, 2018.

96.     On March 30, 2018, Defendants caused Pareteum to file its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 10-K"), reporting \$13.5 million revenue. Turner, O'Donnell, Bozzo, and van Sante signed the 2017 10-K. In addition, Turner and O'Donnell signed certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements, the disclosure of any material changes to Pareteum's internal controls, and the disclosure of any fraud committed by Pareteum, its officers, or its directors.

97.     Regarding revenue recognition, the 2017 10-K stated:

For the mobile solutions services the Company recognizes revenues from customers accessing our cloud-based application suite in two different service offerings, namely managed services and bundled services.

For managed services, revenues are recognized for network administration services provided to end users on behalf of Mobile Network Operators (MNO) and virtual Mobile Network Operators (MVNO's). Managed service revenues are recognized monthly based on an average number of end-users managed and calculated on a pre-determined service fee per user. For bundled services, the Company provides both network administration as well as mobile airtime management services. Revenues for bundled services are recognized monthly based on an average number of end-users managed and mobile air time and calculated based on a pre-determined service fee. Technical services that meet the criteria to be separated as a separate unit of accounting are recognized as the services are performed. Otherwise they are deferred and recognized over the contract term. Our arrangements with customers do not provide the customer with the right to take possession of the software supporting the cloud-based application service at any time.

Telecommunication revenues were recognized when delivery occurred based on a pre-determined rate and number of user minutes and number of calls that the Company has managed in a given month.

Professional services and other revenue include fees from consultation services to support the business process mapping, configuration, data migration, integration and training. Amounts that have been invoiced are recorded in accounts receivable and in net billings in excess of revenues or revenue, depending on whether the revenue recognition criteria have been met. Revenue for professional and consulting services in connection with an implementation or implantation of a new customer that is deemed not to have stand-alone value is recognized over the contractual period commencing when the subscription service is made available to the customer. Revenue from other professional services that provide added value such as new features or enhancements to the platform that are deemed to have standalone value to the customer or are sold separately from the original hosting arrangement, are deferred and revenue recognition occurs when the feature is activated.

98.     The 2017 10-K also stated that Pareteum's "disclosure controls and procedures were effective as of December 31, 2017" and that there were "no changes in [its] internal control over financial reporting . . . that have materially affected, or are reasonably likely to materially affect, [its] internal control over financial reporting."

99.     In addition to the 2017 10-K, Defendants also touted Pareteum's first quarter 2018 performance in several press releases. On April 9, 2018, Defendants caused Pareteum to announce that it expected to report at least $4.1 million in revenue for the fiscal quarter ended March 31, 2018, representing 47% growth (the "April 9, 2018 PR"), stating in relevant part:

Hal Turner, Executive Chairman and Principal Executive Officer of Pareteum, commented, "Our TEUM ended the 2017 year with a very strong fourth quarter as demonstrated by the acceleration in revenues. This momentum led to a robust first quarter of 2018 with continued year-over-year growth expected throughout the year. This momentum is a result of our success in converting our contract revenue backlog into connections which generates revenues."

100.    On April 16, 2018, Defendants caused Pareteum to publish a letter from Turner to

Pareteum's shareholders echoing the statements set forth in the April 9, 2018 PR, claiming that

"Pareteum is on to a rapid start for 2018 in all meaningful areas" (the "April 16, 2018 Letter").

The April 16, 2018 Letter also stated, in relevant part:

> We have continued to experience financial improvements during the first few months of 2018. With our Software-as-a-Service (SaaS) business model, we have excellent visibility into our business operations and revenue recognition. This enabled us to pre-announce our first quarter, ended March 31, 2018 revenue, of $4.1 million, just a week after the quarter's ended, and, which represents 47% growth for the first quarter ended March 31, 2018. This is significant because it represents a reversal of the prior year's Q1 seasonal revenue decrease, and a sequential quarter over quarter revenue increase. This reflects the increasing role our Global Cloud is playing in revenue contribution, and, its ongoing potential. It is also significant that "connections" (our term representing devices, subscribers and their variable usage), which are a lead indicator of revenue, rose to 2,220,000 as of March 31, 2018. This connections growth of 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017, gives management confidence.

101.    On May 7, 2018, Defendants caused Pareteum to issue a press release announcing

first quarter 2018 financial results, reporting revenue of $4.113 million (the "May 7, 2018 PR").

The May 7, 2018 PR also stated, in relevant part:

**Key Business Highlights for First Quarter 2018:**
- Awarded 14 contracts aggregating to $60 million in total contract value, which added $53 million to 36-month contractual revenue backlog

- Increased 36-month contractual revenue backlog from $147 million at 12/31/17 to $200 million
- Backlog revenue conversion at 103%
- Ended Q1 2018 with 2,200,000 connections, a lead indicator of revenue, increased 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017, with an additional conversion increase of 70% versus the expected in the 36-month contract backlog for connections

**Raised 2018 Outlook to At Least 60% Revenue Growth:**
Based on our 36-month contractual revenue backlog of $200 million, as of March 31, 2018, and 2,200,000 connections, we are raising our 2018 outlook. The Company now expects 2018 revenue growth of at least 60% over 2017, up from the previous provided guidance of 50%. Also, with its current cost structures, Pareteum expects positive, EBITDA, and cash from continuing operations for the full year 2018. As we convert backlog to connections, our revenue will increase and for every incremental dollar of revenue, we expect contribution to our bottom line. Our target gross margins are 70-75%.

32

102.    In addition, in the May 7, 2018 PR, Turner, stated:

"This quarter represents a record quarterly revenue milestone since we executed our turnaround and transformed the business in 2016. I am also extremely pleased and proud to report that we generated positive operating cash flow in the first quarter, a full quarter earlier than expected. First quarter revenue would have been $4.22 million, but we instituted Accounting Standard for Revenue Recognition (606) for our SaaS business model and did not recognize $107,000 of deferred revenue in the first quarter. All of our profitability metrics improved dramatically; Adjusted EBITDA, EBITDA, operating loss and cash flow from operations. Key performance indicators of connections, backlog conversion, connection values, revenue per employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. We also invested in product development and sales and marketing during the quarter, as we prepare to scale our business for expected growth and profitability. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value," said Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer.

103.    The statements in these press releases were further reinforced in the quarterly report signed by Defendants. On May 11, 2018, Defendants caused Pareteum to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 (the "1Q18 10-Q"), affirming the previously reported financial results. The 1Q18 10-Q was signed by Turner and O'Donnell, who also signed certifications pursuant to SOX attesting to the accuracy of it.

104.    Regarding controls over financial reporting, the 1Q18 10-Q stated that its "disclosure controls and procedures are effective" and that Pareteum adopted and implemented ASC 606. The 1Q18 10-Q stated, in relevant part:

*Changes in Internal Control Over Financial Reporting*

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the Company's internal controls, there have been no additional changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

33

105.     Regarding compliance with GAAP, the 1Q18 10-Q stated, in relevant part:

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three months ended March 31, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

106.     Defendants continued touting Pareteum's ability to convert its backlog into actual revenues into the second half of 2018.

107.     On June 7, 2018, Defendants caused Pareteum to issue a press release announcing the planned acquisition of Artilium, which purported would have the effect of adding over $65 million to the backlog (the "June 7, 2018 PR").

108.     On July 10, 2018, Defendants caused Pareteum to announce that it expected to report at least $5.75 million in revenue for the fiscal quarter ended June 30, 2018, representing 78% growth over the prior year period and 40% sequential growth (the "July 10, 2018 PR"). The July 10, 2018 PR also provided:

Hal Turner, Executive Chairman and Principal Executive Officer of Pareteum, commented, "Our TEUM surged into 2018 with strong first quarter results, demonstrated by the acceleration in revenues and connections. This momentum has continued into the second quarter, at an accelerating rate, because of rapid conversions of our 36 Month Contractual Revenue Backlog. We see this translating into our best quarter, ever. We anticipate continued improvement in our results and execution of our long-term strategies, aimed at open mobility and open applications, globally delivered as part of excellent customer experiences in every engagement."

34

109. On August 2, 2018, Defendants caused Pareteum to announce that its backlog had grown to \$301 million, "a 393% increase from a year earlier, when in July 2017, [its] 36 [Month Contractual Revenue Backlog] was \$61 million" (the "August 2, 2018 PR"). The August 2, 2018 PR stated:

> Hal Turner, Executive Chairman and Principal Executive Officer of Pareteum stated, "Our customers are telling us that 'telecom needs to change'. We have been listening. We are 'software', and, that is what has changed, and will even more disruptively continue to change how we receive content and communicate. Pareteum, and, its Global Software Defined Cloud, have made dramatic leaps forward in fulfilling our vision of software-driven open mobility and applications that make our customers happy. The evidence is clear in the number of new contracts being signed and the rate at which customers are subscribing to our software services. This latest triumph delivers on what we said we would do, and the results show it. We are a force to be reckoned with. Our momentum will not stop here: our vision to provide connectivity for *Any Device, Any Network, Anywhere*™, continues to disrupt the industry. **We are on a torrid sales pace and we are On Fire with relentless forward motion and passion** for customers and meeting their global service needs."

(emphasis in original).

110. By August 2018, Defendants utilized the illusion of economic growth and success they had cultivated to solicit votes and approve an incentive plan for their benefit.

111. On August 3, 2018, Turner and van Sante issued a definitive proxy statement soliciting stockholder votes in advance of Pareteum's annual meeting to be held on September 13, 2018 (the "2018 Proxy Statement"). In the 2018 Proxy Statement, Turner and van Sante solicited stockholder votes in favor of seven management proposals, including: (i) a proposal to acquire Artilium in exchange for Pareteum's common stock; (ii) a proposal to elect Turner and van Sante, among others, to new terms as directors; (iii) a proposal to approve the 2018 Long-Term Incentive Compensation Plan (the "2018 Incentive Plan"); and (iv) a proposal to approve compensation for Pareteum's named executive officers.

112. The 2018 Incentive Plan authorizes the issuance of eight million shares of Pareteum's common stock, with a 15% annual increase to the total number of reserved shares, for equity awards to Pareteum's employees and directors.

113. According to the 2018 Proxy Statement, the 2018 Incentive Plan is administered by the Board or by one or more committees appointed by the Board. It further provided that the Board may grant Performance Based Bonuses based upon performance targets set by the Board. Thus, implementation of the 2018 Incentive Plan was at the discretion of the Board.

114. The 2018 Proxy Statement solicited shareholder ratification of the 2018 Incentive Plan, which had been approved by the Board in July 2018.

115. Three days later, on August 6, 2018, Defendants caused Pareteum to announce its second quarter 2018 financial results in a press release that stated (the "August 6, 2018 PR"), in relevant part:

**Key Financial Highlights for Second Quarter 2018 Year over Year:**

- Revenues increased by 85% to $6 million
- Net Income of $1.7 million versus net loss of ($1.3 million) in the second quarter of 2017
- EBITDA improved by over $898K, or 298%, to $597,263
- Adjusted EBITDA improved by over $834K, or 180%, to $1.3 million
- Operating loss reduced by $776K, or 66%, to $397K
- Increase in total assets from $11.6 million to $33.1 million
- Cash balance of $19.2 million
- Operating cash flow adjusted for restructuring and acquisition related costs of $565 for the six months ended June 30, 2018
- Initiated reporting on dollar based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 161% in Q2 vs Q1

**Key Business Highlights for Second Quarter 2018:**

- Awarded 13 contracts aggregating to $55 million in total contract value, which added $55 million to 36-month Contractual Revenue Backlog
- Increased 36-month Contractual Revenue Backlog from $200 million at End of the first quarter of 2018 to $276 million; includes $21 million incremental from existing contracts
- Contractual Revenue Backlog conversion rate at 106%
- Ended the second quarter of 2018 with 2,713,600 Connections, an increase of 225% over the end of the second quarter of 2017 and 23% higher than the first quarter of 2018

"The quarter ended June 30, 2018, marks the achievement of materially significant milestones for Pareteum as it continues to evolve into a high-growth, software-based, enabling cloud services company. Our results include attainment of positive Net Income and positive EBITDA for the first time in Company history. Surpassing $6 million in revenues in the second quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue. Today we operate with our Global Enablement Cloud, fueled by the award winning, and, customer affirmed, software applications, solutions and application programming interfaces (APIs). It is this combination that is making our services and software the developer community's first choice for connectivity and communications. We generated positive EBITDA and Net Income, validating the efficient scalability of our business. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value," said Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer.

36

116.     These results were further reported in Pareteum's quarterly report. On August 13, 2018, Defendants caused Pareteum to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2Q18 10-Q"), affirming the previously reported financial results. The report was signed by Turner and O'Donnell, who also signed certifications pursuant to SOX attesting to the accuracy of the 2Q18 10-Q.

117.     The 2Q18 10-Q repeated its statement that Pareteum's "disclosure controls and procedures are effective" and that Pareteum adopted and implemented ASC 606.

*Changes in Internal Control Over Financial Reporting*

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the Company's internal controls, there have been no additional changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended June 30, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

118.     Regarding compliance with GAAP, the 2Q18 10-Q stated, in relevant part:

**Basis of Presentation of Interim Periods**

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three and six months ended June 30, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

119.     As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders approved the Company's acquisition of Artilium, and the 2018 Incentive Plan.

120.     A month after the 2Q18 10-Q was filed, on September 13, 2018, Pareteum filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2018 proxy statement. In particular: (i) the Artilium acquisition was approved; (ii) Turner and van Sante were reelected to terms as directors; and (iii) the 2018 Incentive Plan was ratified (the "2018 8-K").

121.    On September 17, 2018, Defendants continued their "pump and dump" press campaign by causing Pareteum to announce that it had entered into new contracts worth a total of $50 million in August 2018 (the "September 17, 2018 PR"). In the September 17, 2018 PR, Turner stated that "[c]ustomers are accelerating new revenues and substantial savings in ever increasing numbers."

122.    On October 2, 2018, Defendants caused Pareteum to announce that it had entered into new contracts yielding $15 million over three years (the "October 2, 2018 PR"). The October 2, 2018 PR stated, in relevant part:

NEW YORK, NEW YORK – PRNewswire – October 2, 2018 – Pareteum Corporation (NYSE American: TEUM), ("Pareteum" or the "Company"), today announced that it has signed new contracts with Parallax Health Sciences in the U.S., oneCentral in the Netherlands, and Naledi in South Africa totaling $15 Million over three years. New customers will use Pareteum's cloud platform as a service offering to enable voice, mobile, and device and data-monitoring for their companies. These use cases are made possible through the recently-merged Artilium and Pareteum products.

Parallax Health Sciences is Pareteum's first customer in the healthcare IT industry; it will use Pareteum's platform as a service to assist healthcare professionals in diagnosing and tracking health trends with their patients via data and SMS bundling. The technology integration will result in the establishment of Parallax Communications becoming an industry first: a globally-connected, remote patient care, mobile virtual network operator.

oneCentral is a Netherlands-based provider of telecom and cloud services; Pareteum will enable oneCentral to provide mobility bundles to its customers including voice, SMS, and data. Additionally, Pareteum will deliver its full platform as a service to Lesotho, South Africa-based Naledi Telecom, enabling it to launch as the first mobile virtual network operator there.

"Pareteum's momentum continues to grow as we close on these multimillion dollar contracts," said Vic Bozzo, chief executive officer of Pareteum. "With these new use cases, we are not only building a pipeline for our growing business, but also enabling mobile solutions for companies across industries, including the ever-important healthcare technology space."

123.    On October 5, 2018, Defendants caused Pareteum to announce that it expected to report at least $8 million in revenue for the fiscal quarter ended September 30, 2018, representing 129% growth over the prior year period and 33% sequential growth (the "October 5, 2018 PR").

38

124. The October 5, 2018 PR further stated:

Executive Chairman and Principal Executive Officer of Pareteum Hal Turner commented, "Pareteum continues to surge through 2018; with our expectation of superior financial and operating results for the third quarter. Our acceleration in revenues and connections proves it, and there's more to come. We are focused on forward momentum, and it is happening as we move into the fourth quarter. Why? Because our existing customers are buying more from us and we are signing on new ones." Turner added, "This sales performance, coupled with our daily-accelerating 36-Month Contractual Revenue Backlog conversion, provides a favorable outlook for our business, even before we complete the operational integration of our newly-acquired Artilium, which is also performing well. We are in a good place for our company."

125. On October 8, 2018, Defendants caused Pareteum to announce that it had entered into a three-year contract with a new customer in Asia for over $50 million (the "October 8, 2018 PR"). The October 8, 2018 PR stated:

NEW YORK, NEW YORK – PRNewswire – October 8, 2018 – Pareteum Corporation (NYSE American: TEUM), a cloud software platform company, today announced a $50 million contract with One Development, Thailand's first mobile virtual network aggregator and enabler, and leader in the country's growing mobile virtual network operator market. Pareteum's cloud software platform will power One Development's ability to offer a turnkey solution to the over 50 companies that have obtained a mobile virtual network operator license in Thailand.

126. On October 17, 2018, Defendants caused Pareteum to announce that it had entered into agreements with four new customers for $8 million (the "October 17, 2018 PR"). The October 17, 2018 PR quoted Mumby, stating:

"Pareteum is excited to be at MVNO North America, where we look forward to meeting new customers like monogoto and Nextelle. Our customers are the reason Pareteum's momentum continues to grow," said Rob Mumby, chief revenue officer of Pareteum. "With these new use cases, we are not only building a pipeline for our growing business, but also showing potential customers the broad reach of our platform as a service, including smart metering and pet tech."

127. In October of 2018, Pareteum completed its acquisition of Artilium, a provider of enterprise software services. It completed this acquisition through a court sanctioned scheme of arrangement in the United Kingdom. The total purchase consideration paid for Artilium was $131.5 million in Pareteum stock and cash. (See Thomas Declaration, ¶ 23).

128. On October 24, 2018, Defendants caused Pareteum to announce that its backlog had increased to $500 million, in part due to Pareteum's acquisition of Artilium (the "October 24, 2018 PR").

129.    The October 24, 2018 PR stated:

NEW YORK, NEW YORK – PRNewswire – October 24, 2018 – Pareteum Corporation (Nasdaq: TEUM), a cloud software platform company, today announced that its current 36-Month Contractual Revenue Backlog (36MCRB) has grown to $500 million; this number includes the backlog incorporated with Pareteum's recent acquisition of Artilium and excludes certain monthly recurring revenue streams deriving from that acquisition for which long-term contracts are not in place.

- This milestone for Pareteum represents a 1,150% increase year over year since 2016: at year end 2016, Pareteum announced $40 million 36MCRB; at year end 2017, the company announced $147 million; and now, ten months into this year, Pareteum has reached $500 million in 36MCRB.
- During the same period, Pareteum's quarterly booked revenue increased by 260%.
- The company continues to convert backlog at greater than 100% of the contract schedules over the life of the agreement.

130.    On November 7, 2018, Defendants caused Pareteum to announce its third quarter

2018 financial results in a press release (the "November 7, 2018 PR") stating, in relevant part:

Key Financial Highlights for Third Quarter 2018 Year over Year:

- Revenues increased by 129% to $8 million
- Adjusted EBITDA improved by over $1.2 million, or 195%, to $1.8 million
- Non-GAAP Earnings Per Common Share improved to $0.01 for Q3 2018, compared to ($0.12) for Q3 2017
- Increase in total assets from $10 million to $35 million
- Cash balance of $18.9 million
- Dollar-based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 147% in the third quarter of 2018 versus the third quarter of 2017

Key Business Highlights for Third Quarter 2018:

- Awarded 19 contracts aggregating to $403 million in total contract value, which added $127 million to 36-month Contractual Revenue Backlog
- Increased 36-Month Contractual Revenue Backlog from $276 million at end of the second quarter of 2018 to $403 million; includes $72 million incremental from existing contracts
- Contractual Revenue Backlog conversion rate at 100%
- Ended the third quarter of 2018 with 2,903,000 Connections, an increase of 127% over the end of the third quarter of 2017 and 7% higher than the second quarter of 2018

"The quarter ended September 30, 2018, marks our continued evolution into a high-growth, software-based, enabling cloud services company. Surpassing $8 million in revenues in the third quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue. Our results include growth in adjusted EBITDA, which reflects the scalability of our recurring revenue SaaS business model. Subsequent to the end of the third quarter, we closed the Artilium acquisition and have been busy integrating and streamlining the businesses and eliminating redundant expenses. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value," said Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer.

131.     Notably, the November 7, 2018 PR stated that in the third quarter of 2018, Pareteum had a "***contractual revenue backlog conversion rate at 100%***", giving the false impression that the backlog was guaranteed to be converted to actual revenue received by the Company (emphasis supplied).

132.     On November 14, 2018, Defendants caused Pareteum to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018 (the "3Q18 10-Q"), affirming the previously reported financial results. The report was signed by Turner and O'Donnell who also signed certifications pursuant to SOX attesting to the accuracy of the 3Q18 10-Q.

133.     Regarding controls over financial reporting, the 3Q18 10-Q stated that Pareteum's "disclosure controls and procedures are effective" and:

> On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the Company's internal controls, there have been no additional changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended September 30, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

134.     Regarding compliance with GAAP, the 3Q18 10-Q stated:

> The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.
>
> The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three and nine months ended September 30, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

135.     Defendants continued their unlawful conduct and breaches of fiduciary duty into 2019.

136.     On February 8, 2019, IntraCoastal announced that it had liquidated all of its 3.57 million shares of Pareteum's stock as of December 31, 2018.

137.     In February of 2019, a wholly owned subsidiary of Pareteum completed its acquisition of iPass, a provider of global mobile connectivity and location and performance data.

41

That transaction was accomplished through a tender offer that provided for the shares of iPass to be exchanged for stock of Pareteum and a subsequent merger of the wholly owned subsidiary of Pareteum into iPass. The total purchase consideration paid for iPass was $30.1 million. (Thomas Declaration, ¶ 24).

138. On February 13, 2019, Defendants caused Pareteum to announce the acquisition of iPass in a stock transaction valued at approximately $30 million (the "February 13, 2019 PR"). In the February 13, 2019 PR, Turner stated:

> Mr. Robert H. Turner, Executive Chairman and Principal Executive Officer of Pareteum commented: "We're delighted to announce the completion of our acquisition of iPass. We will now accelerate as one company with combined software products and services, the expansion of addressable markets and the resulting executive and operating talent. Our integration with iPass immediately grows our installed Connections base, adding marquee brands to our portfolio of customers, and it also materially enhances our software portfolio of services, and adds global access to the world's largest Wi-Fi network."

139. The next day, on February 14, 2019, Defendants caused Pareteum to announce six new three-year contracts, "worth a total of $15 million" (the "February 14, 2019 PR"). The February 14, 2019 PR also stated: "Combined with previously announced contracts, Pareteum's 36-month contractual revenue backlog now totals $615 million."

140. That same day, on February 14, 2019, Iroquois, which previously had owned over 3.57 million shares of Pareteum's stock, announced that it had also liquidated all of its holdings as of December 31, 2018.

141. On February 15, 2019, Defendants caused Pareteum to announce twelve new agreements that added $49 million to Pareteum's backlog (the "February 15, 2019 PR"). The February 15, 2019 PR also stated:

> "Pareteum is experiencing great success with developers and enterprises for our cloud software solutions," said Rob Mumby Chief Revenue Officer. "With the addition of these new agreements, we're confident we will continue accelerating our growth as the market's first choice for cloud software communications solutions, expanding our ever growing reach, empowering businesses worldwide."
>
> Pareteum Executive Chairman and Principal Executive Officer Hal Turner commented, "We love our customers, whether they are simply buying more from us or are new customer relationships deriving value from the significant savings and new revenues we help them generate. These new January agreements reinforce how easy it is to do business with TEUM and is yet another step in our mission to connect every person and "every(thing)" through open mobility and applications everywhere."

142. Thereafter, Pareteum's stock price increased from $3.19 to $3.73 per share at between February 14, 2019 and February 15, 2019.

143. On February 20, 2019, Defendants caused Pareteum to announce six more agreements in a press release (the "February 20, 2019 PR"). The February 20, 2019 PR further stated:

> "We continue to move signed customers from our contract backlog into production and revenue generation mode, delivering immediate value," said Vic Bozzo, Chief Executive Officer of Pareteum.
>
> Pareteum Executive Chairman and Principal Executive Officer Hal Turner comments, "We are rapidly bringing our customers into service production, enabling them to realize their business plans, creating unique mobility and application software solutions. The ability to quickly accomplish all this, without heavy infrastructure or software development cost, keeps our customers coming back for more."

144.    On February 26, 2019, Defendants caused Pareteum to issue a press release (the "February 26, 2019 PR") announcing that it had entered into a credit facility with the Post Road Group (the "Post Road Facility") in order to continue to grow revenues, stating as follows:

Pareteum Executive Chairman and Principal Executive Officer Hal Turner commented, "During 2018, we showed our ability to convert our contractual revenue backlog into tangible results. This financing gives us a new currency with which to support our aggressive market consolidation through accretive acquisitions and organic growth strategy and improves leverage in the business to respect the value that management places on equity. The facility will allow us to continue on our current growth trajectory in 2019 and the future."

Michael Bogdan, Managing Partner of Post Road Group added: "We are excited to become Pareteum's capital partners during its next phase of growth and development. The strength of Pareteum's combined capabilities after its recent acquisitions creates a company with significant scale and international presence to drive further consolidation in this industry."

The credit facility was led by Post Road Group and is a milestone transaction for Pareteum's mission to connect every person and every(thing)™. The credit facility provides financing secured through Pareteum's existing recurring revenue streams from its software as a service platform, as well as its growing intellectual property portfolio. The transaction enables Pareteum to continue to demonstrate its ability to grow revenues on an organic as well as inorganic basis, globally.

Approximately $11 million of the initial draw will be used to repay the debt from Fortress Credit Corp. assumed in the iPass transaction. Remaining terms of the transaction are disclosed in Pareteum's regulatory filings.

145.    On March 5, 2019, Defendants caused Pareteum to announce that "twenty new customers have executed 3-year contracts during February 2019, valued at $30 million in the [C]ompany's expanding 36-month contractual revenue backlog" (the "March 5, 2019 PR").

146.    Just prior to announcing Pareteum's 2018 financial results, on March 7, 2019, Defendants caused Pareteum to publish a letter from Turner to Pareteum's shareholders (the "March 7, 2019 Letter"), stating:

In September 2018 I wrote a THANK YOU to you for your demonstrable support of Pareteum as you approved the Artilium acquisition. At that time, it was clear that you provided your support to us which in turn affirmed our clear mandate to hyper-accelerate growth in accretive ways, be it through our continued stellar sales growth, or, through additional successful strategic alliances which is how we began our Artilium acquisition. We certainly expect to continue our market disruption, using our software to fuel our ambitions, business plans and strategies.

***

Looking forward, we are a company with ambitious plans for continued growth and profitability. On our upcoming earnings call, scheduled for March 12, 2019, you will hear about our 2018 successes that have laid a strong foundation as we set even more challenging 2019 goals. Our growth will continue from our current customers who continue to buy more from us. We will also see many new customers enter our client rosters, and because of our iPass acquisition, we have opened completely new market segments in the enterprise sector. We fully expect to be the market leader in cloud based communications software as a service, as we execute on our business plan.

*** 

We have been updating you on our progress through our recent press releases, which we will continue to do. As we maintain our laser focus on growth, we measure ourselves by new customers joining us (36MCRB), service deployment (conversion of our 36MCRB), growth from our customer base with new product and services adoption, and clearly taking maximum advantage of our ability to make all of our services available to every customer, no matter if they were an iPass, Artilium, or Pareteum customer ...now it is a One TEUM customer base. We expect material productivity enhancement to continue as we use our own software to scale our business. We consider internal communications with our TEUMATES, and with you as shareholders, to be a cornerstone of organization effectiveness.

We are well positioned now to drive dramatic increases in our scale and become the recognized market leader through the value we create for our customers and shareholders. We expect to continue to attract long-term institutional investors who believe in our proven ability to execute our plans and scale the company. Additionally, you will have read that we have improved our capital gain plans by the addition of a $50 million debt facility, initially being used to fully repay iPass' approximately $11 million debt on better terms, and which puts us in a position to act immediately when accretive opportunities, that further improve Pareteum, are identified. We also believe that leveraging our business in this way demonstrates management's confidence in our business and equity value.

As you have heard me say many times, "we are all in sales!" We are driving hard, everyday to acquire new customers, upsell our existing customers and aggressively convert our 36MCRB.

To round out, I will sign off with a quote from the co-founder of LinkedIn, Reid Hoffman: "No matter how brilliant your mind or strategy, if you're playing a solo game, you'll always lose out to a team." Or One TEUM, if you will. We agree.

147. Shortly thereafter, on March 12, 2019, Defendants caused Pareteum to issue a press release announcing its fourth quarter and full year 2018 financial results (the "March 12, 2019 PR"). According to the March 12, 2019 PR, Pareteum's 36-month contractual revenue backlog had quadrupled to $615 million for the full year. The March 12, 2019 PR stated, in relevant part:

"2018 was a record year for Pareteum, achieving over 139% year-over-year revenue growth driven by the effectiveness of our cloud-based platform, innovative product solutions, employee talent and leading customers. In fourth quarter of 2018, we reported 256% year-over-year revenue growth, which included the first full quarter of our accretive Artilium acquisition," commented Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer. "We are extremely pleased with Pareteum's significant results in 2018 which are attributed to our TEUM's laser focus on sales expansion and operational improvements. Looking ahead to 2019, we are very excited about the tremendous opportunities for Pareteum given the strong industry dynamics; our visibility into future revenue from our 36 Month Contractual Revenue Backlog; and, the augmented talent, product, services, network expansion and productivity improvements implicit from our strategic acquisitions."

45

**FOURTH QUARTER 2018 FINANCIAL RESULTS:**

(Unless otherwise noted, all comparisons are made to the fourth quarter of 2017)

- Total revenues increased 256% to $14.3 million
- In December of 2018 our Global Software Defined Cloud (GSDC) revenue was 51% of our total revenue, with 35% in Managed Services (MSP) revenues, and Super API of 14%
- Adjusted EBITDA increased 82% to $2.34 million
- Non-GAAP EPS of $0.02 cents
- Artilium financials are fully consolidated and accretive in Pareteum's fourth quarter results
- Net Dollar-based expansion rate represented 214% growth

**FULL YEAR 2018 FINANCIAL RESULTS:**

(Unless otherwise noted, all comparisons are made to full year of 2017)

- Revenues increased 139% to $32.4 million
- Adjusted EBITDA improved 199% year-over-year to $6.4 million
- Non-GAAP EPS of $0.09 cents compared to $0.05 cents for year ending 2017
- We ended the year with a $6.1 million cash balance and no secured debt

**KEY 2018 OPERATIONAL METRICS:**

- 36-month Contractual Revenue Backlog quadrupled to $615 million for the full year 2018, up from $147 million in 2017 with a conversion rate to revenue of 100%
- Connections increased 252% to 4,609,000 for the full year 2018, and grew 59% sequentially in the fourth quarter of 2018
- Fourth quarter average annualized revenue per employee of $415,000, an improvement of 78% year-over-year

*** 

**RECENT BUSINESS HIGHLIGHTS:**

- The Company completed the acquisition of Artilium in late September bringing several strategic advantages including an increased product offering; larger addressable market in Europe; expanded our executive, operational and sales talent; and enhanced our cloud platform with key operating support systems (OSS) and the internet of things (IoT) capabilities.
- In February 2019, Pareteum completed the acquisition of iPass, delivering key strategic benefits including an intelligent Wi-Fi connectivity platform; deep relationships with marquis enterprise customers; strong process, procedures and systems; and strong talent particularly on the technology development side.
- The Company closed a $50M credit facility with Post Road Group in February 2019. An initial draw of $25M will be used to repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions.

**2019 FULL YEAR GUIDANCE:**

We expect revenue to be between $105 million and $115 million for the full year of 2019. Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.

We are expecting 2019 revenue growth in the range of 225% to 260% year-over-year, outpacing the market growth rate fivefold to be updated quarterly.

148. Again, Defendants falsely claimed in the March 12, 2019 PR that Pareteum's conversion rate for turning backlog into actual, received revenue was 100%.

149. During a conference call held the same day in connection with the results, Turner stated:

Pareteum delivered excellent results in 2018 as well as in the fourth quarter of 2018. Pareteum's prospects are now the very best, more than ever before in our history. ***There is a clear path ahead for dramatic revenue growth and this is fueled by the growth of our 36 Month Contractual Revenue Backlog and its conversion of that backlog into billing customers.*** Artilium, which we acquired in October of 2018, has performed extraordinarily well. Bart, I want to thank you and all of our new Artilium teammates for that. Artilium was accretive to earnings and revenue just as we said that it would be. Well done, Bart and team.

Since our acquisition of iPass closed just a few weeks ago, many good things have happened. We've got newly -- new high experienced teammates joining with their extremely solid business acumen, their operating muscle, and importantly, we see that our new teammates are highly energized by the significantly expanded prospects that come with their being part of Pareteum.

\* \* \*

For the remainder of 2019, we have a current robust pipeline of another 29 prospective sales transactions, and that's what's been identified just through mid-March. Pareteum's potential addition to our 36-month contractual revenue from these identified customers in our pipeline is currently $166 million.

(emphasis added.)

150. Turner then turned the discussion over to McCarthy who stated in relevant part:

We generated $14.3 million of revenue in the fourth quarter and our gross margins were 63%, in line with expectations post the Artilium acquisition.

\* \* \*

Our key performance indicators continue to exceed plans. Connections, which is our term for subscribers, devices and their connectivity usage, have grown over 4point -- to over 4.6 million at the end of the fourth quarter. 36 Month Contractual Revenue Backlog converted into live production incremental monthly revenue was at 97% of scheduled conversion for the fourth quarter while we're maintaining an average over 100% for the year.

151.    Following these statements, Pareteum's shares increased from $3.91 per share on March 12, 2019 to, $5.15 per share before closing at $4.79 per share on March 13, 2019.

152.    On March 15, 2019, Defendants caused Pareteum to announce "ten new customers have executed three-year contracts during early March 2019, valued at $17 million in the company's expanding 36-month contractual revenue backlog" (the "March 15, 2019 PR").

153.    On March 18, 2019, Defendants caused Pareteum to file its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"), affirming the financial results in the March 12, 2019 PR. Turner and O'Donnell signed certifications pursuant to SOX attesting to the accuracy of the 2018 10-K.

154.    Regarding revenue recognition, the 2018 10-K stated, in relevant part:

For managed services, revenues are recognized for network administration services provided to end users on behalf of Mobile Network Operators (MNO) and virtual Mobile Network Operators (MVNO's). Managed service revenues are recognized monthly based on an average number of end-users managed and calculated on a pre-determined service fee per user. For bundled services, the Company provides both network administration as well as mobile airtime management services. Revenues for bundled services are recognized monthly based on an average number of end-users managed and mobile air time and calculated based on a pre-determined service fee. Technical services that meet the criteria to be separated as a separate unit of accounting are recognized as the services are performed. Otherwise they are deferred and recognized over the contract term. Our arrangements with customers do not provide the customer with the right to take possession of the software supporting the cloud-based application service at any time.

Telecommunication revenues were recognized when delivery occurred based on a pre-determined rate and number of user minutes and number of calls that the Company has managed in a given month.

Professional services and other revenue include fees from consultation services to support the business process mapping, configuration, data migration, integration and training. Amounts that have been invoiced are recorded in accounts receivable and in net billings in excess of revenues or revenue, depending on whether the revenue recognition criteria have been met. Revenue for professional and consulting services in connection with an implementation or implantation of a new customer that is deemed not to have stand-alone value is recognized over the contractual period commencing when the subscription service is made available to the customer. Revenue from other professional services that provide added value such as new features or enhancements to the platform that are deemed to have standalone value to the customer or are sold separately from the original hosting arrangement, are deferred and revenue recognition occurs when the feature is activated.

The Company used revenue recognition standards for ASC 605 for the year ended December 31, 2017 and adopted the revenue recognition standards for ASC 606 beginning on January 1, 2018 using the modified retrospective transition method and applied these standards for the full year ended December 31, 2018.

155.    The 2018 10-K, however, identified certain deficiencies in Pareteum's internal controls over its financial reporting and admitted that Pareteum's internal controls were not effective, stating:

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2018 and in making this assessment used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 Framework) in accordance with the standards of the Public Company Accounting Oversight Board (United States). Based on the foregoing evaluation, our management has identified the following deficiencies that constitute material weaknesses in the Company's internal controls over financial reporting:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.

Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

The material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results. Based on these material weaknesses, the Company's management concluded that at December 31, 2018, the Company's internal control over financial reporting was not effective.

156.    The 2018 10-K included an adverse audit report by Squar Milner LLP, Pareteum's independent accounting firm, which stated:

**Opinion on the Internal Control Over Financial Reporting**
We have audited Pareteum Corporation's and its subsidiaries (the Company) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. In our opinion, because of the effect of the material weaknesses described below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 ("COSO").

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2018 and 2017 and the related consolidated statements of comprehensive loss, shareholders' equity and cash flows for the years then ended and our report dated March 18, 2019 expressed an unqualified opinion.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in internal control have been identified as material weaknesses over the Company's control environment and monitoring pursuant to the COSO framework:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment and ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and this report does not affect our report dated March 18, 2019.

157.    Despite the deficiencies in internal control over financial reporting, the 2018 10-K stated: "There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

158. The 2018 10-K further purported that Pareteum had already begun taking measures to address the identified deficiencies in Pareteum's internal controls, stating the following:

The remediation actions to the Company's internal controls over financial reporting include a thorough review and documentation of all processes involved in our financial reporting to ensure that there is segregation of duties, access security and documented review processes in place that happen at appropriate intervals throughout the year that covers all elements of the Company's financial reporting. This includes, but is not limited to, testing samples and documenting that testing has occurred with the results of the findings being reported to senior management and that they occur at appropriate intervals and continuously making improvements to our processes as necessary.

To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) will continue to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) will institute sample testing of changes made in our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhance our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors.

We believe that these actions will remediate the material weakness. The weakness will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. We expect that the remediation of this material weakness will be completed prior to the end of fiscal 2019.

159. Moreover, one of the 2018 10-K's risk disclosures concerned the Post Road Facility Pareteum had secured on February 26, 2019, with the 2018 10-K stating the following:

*We have outstanding debt secured by all of the assets of the Company, including our intellectual property, and failure by us to fulfill our obligations under the applicable loan transaction agreements may cause the repayment obligations to accelerate.*

In February 2019, we, and certain of our subsidiaries, entered into a credit agreement (the "Credit Agreement") with Post Road Administrative Finance, LLC and its affiliate Post Road Special Opportunity Fund I LLP (collectively, "Post Road"), pursuant to which Post Road will provide the Company with a secured loan of up to $50,000,000 (the "Loan") with an initial loan of $25,000,000 funded on February 26, 2019, and additional loans in increments of $5,000,000 as requested by the Company before the 18 month anniversary of the initial funding date: provided however that no additional loans shall be funded until the later of delivery of certain third party consents (the "Consents"). The Credit Agreement provides for all amounts due on February 26, 2022 and requires us to meet and maintain within specified levels and thresholds with respect to financial and operational covenants, including: requirements to maintain a minimum of $2,000,000 of unrestricted cash, certain maximum total leverage rations, a debt-to-asset ratio, maximum churn rate and adjusted EBITDA. The Credit Agreement further provides customary events of default and cure periods for certain specified events of default, and in the event of uncured default, the acceleration of the maturity date, an increase in the applicable interest rate with respect to amounts outstanding under the Loan and payment of additional fees. The Credit Agreement also provides for an increase in the interest rate upon failure to timely deliver Consents by May 31, 2019 or July 31, 2019, as applicable. There can be no assurance that we will be able to perform and timely repay the amounts outstanding under the Credit Agreement, and upon the occurrence of an event of default under the Credit Agreement, if we are not able to repay all outstanding amounts required, we would lose control over our assets, including our intellectual property, which would seriously harm our business and operations.

160. None of these issues were identified in the March 12, 2019 PR or the conference call with investors that occurred the same day.

161. After releasing the 2018 10-K, Defendants continued announcing new contracts added to the backlog. On March 28, 2019, Defendants caused Pareteum to announce it had engaged a new customer and that "[t]he initial phase of the contract is valued in excess of $50 million, which is incremental to Pareteum's 36-month contractual revenue backlog" (the "March 28, 2019 PR").

50

162. On April 4, 2019, Defendants caused Pareteum to announce that "new contracts closed during the second half of March 2019 contributed in excess of $80 million to the company's expanding 36-month contractual revenue backlog" (the "April 4, 2019 PR").

163. In April 2019, Pareteum also acquired Devicescape Holdings, Inc. ("Devicescape"), a provider of mobile location and engagement solutions. Devicescape was acquired for approximately $4 million in total purchase consideration. (*See* Thomas Declaration, ¶ 25).

164. On May 7, 2019, Defendants caused Pareteum to announce its first quarter 2019 financial results in a press release that stated (the "May 7, 2019 PR"). Once again, Defendants touted Pareteum's purported rate of converting backlog to actual income, claiming the conversion rate had now reached as high as 101%. The May 7, 2019 PR provides, in relevant part, as follows:

"We are very pleased with our strong first quarter results, delivering 460% revenue growth in Q1 2019 compared to Q1 2018. Pareteum's core business, pre-acquisitions, has grown 33% over the prior quarter," commented Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer. "We are proud of the significant business transformation we have achieved over the past few years. Pareteum is a fast-growing and profitable SaaS and communications service provider. Our software and platform solutions are unique in the market, our global TEUM is executing, we are well positioned to capture the large market opportunity, and we are committed to our mission to *connect every person and every(thing)*™."

FIRST QUARTER 2019 FINANCIAL RESULTS:
(Unless otherwise noted, all comparisons are made to the first quarter of 2018)

- Total revenues increased 460% to $23 million
- Adjusted EBITDA increased 1,723% to $5.2 million
- Non-GAAP EPS of $0.02 cents
- Artilium and iPass financials are consolidated and accretive in Pareteum's first quarter results
- Net Dollar-based expansion rate represented 144% growth
- Increase in total assets from $27.2 million at March 31, 2018 to $236.9 million at March 31, 2019
- Cash balance of $10.7 million
- 

51

- ○ KEY FIRST QUARTER OF 2019 OPERATIONAL METRICS:
- ○ 36-Month Contractual Revenue Backlog increased to $938 million for the first quarter of 2019, up from $200 million in the first quarter of 2018 with a conversion rate to revenue of 101%
- ○ Connections increased 441% to 12,012,000 for the first quarter of 2019, and grew 161% sequentially in the first quarter of 2019
- ○ First quarter average annualized revenue per employee of $390,000, an increase of 55% year over year

165. During a conference call held the same day in connection with the results, Turner stated, in relevant part:

> Now to our business at hand. Pareteum is performing extremely well. Without taking too much of Denis's thunder from his results review coming shortly. We reported a 460% Q1 2019 over Q1 2018 revenue increase, more from Denis on that shortly. However we are on target with our products delivered, those being developed, our markets served and those that we will expand to. Our customers who are onboarding now even more efficiently and our people, matching the very best resources to address every opportunity we have. In every sense, this Company has reimagined the future of communications and we're delivering on it today.
>
> Our mission of connecting every person and everything is also on track. We're on plan financially and we're well above our expectations and sales results. We're raising the quality of customer experiences everyday and we're raising our results and performance expectations with operational transparency. As a growth Company, we're expanding in a financially responsible manner.

166. With respect to Pareteum's backlog and purported conversion rate, Turner stated the following:

> To complete the 36-month contract revenue backlog topic, the most important phase for Pareteum is to convert these contracts to billable revenues. This means new sales orders placed into live production, based upon their contracted schedules for service, invoices rendered, being billed and revenues collected. Our backlog conversion metrics show this story and we're doing very well in this regard.
>
> I'd like to share a couple of details with you. From the inception of tracking the services deployed during the period of January the 1st, 2017 through March the 31st of 2019, that's a 27-month period, we converted revenues in the backlog as they were scheduled at 101%.

52

> We converted connections which is our word for subscribers at 122%. This means that taking each contract and comparing what was contractually scheduled by the customers. In both the revenue and connections, we've over retained and outperformed what had been expected. We're very pleased with this growth performance. But I must tell you we're even more pleased with what I'm about to say to you.

167. Also during the call, McCarthy stated, in relevant part:

> We have achieved organic growth of 32% over the prior-quarter from the combined Pareteum and our Artilium business . . .
>
> * * *
>
> As discussed on our year-end call, we established a new $50 million credit facility with Post Road Group and retired the more expensive debts acquired in the iPass acquisition. The facility also provides us with significant available liquidity going forward should we need it.
>
> While we currently have no plans for the additional capital to operate our business, it gives us additional security and flexibility. I want to reinforce Hal's comments about the remarkable transformation that Pareteum has achieved, along with this rapid growth and transformation, we have experienced some challenges including those related to our internal controls, primarily as a result of M&A integration.

168. During the investor call, Defendants downplayed the internal control issues identified in the 2018 10-K claiming they were "primarily as a result of 'M&A integration'."

169. On May 10, 2019, Defendants caused Pareteum to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "1Q19 10-Q"), affirming the previously reported financial results. The report was signed by Turner and O'Donnell, who also signed certifications pursuant to SOX attesting to the accuracy of the 1Q19 10-Q.

170. The 1Q19 10-Q stated that "due [to] a previously reported material weakness in our internal control over financial reporting described below, Pareteum's disclosure controls and procedures were not effective as of March 31, 2019."

171.    The 1Q19 10-Q further stated:

To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) has continued to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) instituted sample testing of changes made in our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhanced our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors. Management believes this material weakness has been remediated, as of March 31, 2019, pending further testing. .

We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of March 31, 2019, these efforts are ongoing.

We are committed to maintaining a strong internal control environment and believe that these remediation actions will represent significant improvements in our controls. However, the identified material weakness in internal control over financial reporting will not be considered remediated until controls have been designed and/or controls are in operation for a sufficient period of time for our management to conclude that the material weaknesses have been remediated. Additional remediation measures may be required, which may require additional implementation time. We will continue to assess the effectiveness of our remediation efforts in connection with our evaluations of internal control over financial reporting.

172.    Regarding compliance with GAAP, the 1Q19 10-Q stated the following:

The interim condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP,") for interim financial information and in accordance with the instructions to Securities and Exchange Commission ("SEC"), Form 10-Q and Article 8 of SEC Regulation S-X. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2018, included in our 2018 Annual Report on Form 10-K filed with the SEC on March 18, 2019, referred to as our 2018 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three months ended March 31, 2019, are not necessarily indicative of the results to be expected for future quarters or the full year. All intercompany transactions and account balances have been eliminated in consolidation. As of March 31, 2019, the Company's subsidiaries are:

173.    On May 15, 2019, Defendants caused Pareteum to announce that it had "closed more than 20 new sales transactions in April 2019, with a combined contract value of $70 million" (the "May 15, 2019 PR").

174.    On May 24, 2019, Defendants caused Pareteum to file a Form 8-K with the SEC announcing that Turner was appointed CEO, Bozzo was appointed CCO, and McCarthy was appointed COO. The sole reason provided was to "better reflect their roles and responsibilities with the Company." Surprisingly, no press release accompanied this disclosure.

175.    On June 6, 2019, Defendants issued a definitive proxy statement soliciting stockholder votes in advance of Pareteum's annual meeting to be held on July 17, 2019 (the "2019 Proxy Statement"). In the 2019 Proxy Statement, Defendants solicited stockholder votes in favor of two management proposals, including a proposal to elect Turner and van Sante to

new terms as directors. Regarding corporate governance, the 2019 Proxy Statement was substantially similar to the 2018 Proxy Statement.

### G. **The Irregularities in the Financial Statements and Press Releases Come to Light**

176.    On June 7, 2019, Marcus Aurelius Value published the Marcus Aurelius Report. (A copy of the Marcus Aurelius Report is annexed hereto as *Exhibit B*).  The Marcus Aurelius Report stated, among other things:

TEUM's Purported $900 Million Backlog Appears Significantly Exaggerated or Fictitious.

The foundation of the Pareteum growth story is built on the company's supposedly large and fast-growing 36-month backlog, which management now says exceeds $900 million. But our investigation identified a variety of purportedly valuable customers that appear wholly incapable of paying TEUM anywhere near the large contractual values that TEUM has touted. Examples include:

- A nearly-worthless penny-stock managed by a former AudioEye executive named alongside TEUM's CFO in the fraud suit.

- African entities that show no signs of meaningful business activity.

- Contracts with crypto-companies including one that recently settled with the SEC and "agreed to return funds to harmed investors."

- Closed or dissolved businesses.

- Websites that are inactive or offer limited contact information.

- Businesses that don't answer the phones or report having minimal employees.

- European entities with tiny amounts of capital or revenue.

- Featured customers located in apartment buildings.

- Millions in loans to an entity bleeding cash.

- A purported $50 million contract with an entity in Thailand that reports having zero 2018 revenue, years of losses, and involvement with a crypto-coin that has lost 97% of its peak value.

We also found irregularities and embellishments involving a significant portion of the "notable partners and customers" that TEUM highlighted in a graphic at its recent analyst day, suggesting TEUM struggles to find enough legitimate new customers to even fill a simple slide.

TEUM's Backlog Conversion and Receivables Signal Serious Potential Accounting Problems.

The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the stock price. Bulls have taken comfort in management's assurances that TEUM's backlog has converted to revenue at over 100% of contractual rates thus far. But we find TEUM's backlog conversion rate highly problematic considering that our research has flagged so many small or defunct customers. If exaggerated contractual values are now being recognized as revenue, then we believe TEUM will face serious accounting problems. TEUM's receivables have already begun to balloon after growing at sequential rates far faster than revenues in each of the last four quarters. TEUM's small California auditor, which was specifically cited by the PCAOB for audit deficiencies related to revenue, gives us no comfort.

This is exactly why we're troubled that TEUM's receivables have grown at sequential rates far faster than revenues in each of the last four quarters. For example, revenues grew 64% to $23M in Q1 2019 from $14M in Q4 2018 but receivables ballooned 86% to $28M from $15M over the same period. This is puzzling because TEUM's own SEC filings state that "the company typically bills its customers at the end of each month, with payment to be received shortly thereafter", which we believe should naturally result in relatively minimal receivables. But TEUM's Days Sales Outstanding has reached 110 days as compared 39 days of Twilio (TWLO), a company that promoters like to compare TEUM to, suggesting that TEUM's customers may already be falling behind on their bills.

TEUM's small California auditor, Squar Milner, gives us no additional comfort. Squar has audited at least one company owned by Barry Honig, True Drinks Holdings (TRUU), an equity that is now virtually worthless. More importantly, the Public Company Accounting Oversight Board ("PCAOB") uncovered significant deficiencies in its most recent inspection of Squar in 2017. The PCAOB stated in its report that "in other words, in these audits, the auditor [Squar] issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement." The PCAOB even identified two significant deficiencies in a Squar audit specifically related to the valuation of revenue . . .

56

177. According to the Marcus Aurelius Report, one of Pareteum's purported customers was merely a shack:

> TEUM's public claims simply don't hold up to investigative scrutiny. For example, TEUM touted a contract with the South Africa based "Eyethu Mobile Network" as part of a group of deals, purportedly worth $50 million in aggregate, that TEUM says it signed in the last two weeks of August 2018. . . . Our investigators went to visit Eyethu/EMN's headquarters but discovered only a dilapidated shack and crumbling structures near a rural African village . . .
>
> Documents and detailed forensic evidence presented throughout this report shows that Eyethu is only the tip of the iceberg of small or defunct entities across the world that TEUM claims to have signed valuable contracts with

178. Moreover, the Marcus Aurelius Report detailed numerous ties between Pareteum's management, including certain of the Defendants, and various failed stock promotions and other schemes, stating the following:

> TEUM's Management Has Extensive Ties to Previous Alleged Frauds and Failures.
>
> The biographies for Turner and TEUM's COO [McCarthy] fail to disclose their leadership positions at Catcher Holdings, a now worthless stock that was owned by a group that included an entity controlled by Barry Honig, the notorious stock operator charged by the SEC last October with fraud for alleged pump and dump schemes. We see similarities between TEUM and the stock promotion at Catcher, where Turner repeatedly touted Catcher's technology and growth prospects but investors ultimately were left with nothing. TEUM's CFO was sued by investors for fraud after he allegedly "*personally affected the fraudulent booking of revenues*" as CFO of Audioeye, which later erased *92%* of reported revenues over the relevant period in a restatement. TEUM's former Audit Committee Chair, now a TEUM executive, was the CFO of TowerStream, another Honig-backed company that is now nearly worthless. TEUM's longtime investor relations representative was previously sentenced to prison in 2015 and recently disappeared from press releases after being added to a list of prohibited service providers by OTC markets
>
> * * *
>
> TEUM Has Surrounded Itself with Veterans from Failed Stock Promotions.
>
> We discovered a network of actors behind TEUM whose mere presence should send diligent investors running for hills. TEUM has paid promoters, used a placement agent, and attracted large investors that are veterans of numerous previous stock promotions Honig was an investor in, many of which have since declined to near worthlessness. We discovered that TEUM's relationship with

57

Honig's longtime securities law firm, Sichenzia Ross, is so close that the address that TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's main office. TEUM has issued tens of millions in shares, warrants, and convertible preferred securities in a series of complex private placements with the assistance of Sichenzia, who is being sued by a former client for allegedly helping create "ownership blockers" for Honig's group as part of an alleged pump and dump scheme that left that company bankrupt and unable to even validate its number of shares outstanding (Sichenzia and Honig deny the allegations)

\* \* \*

TEUM uses the same placement agent as Mabvax [Theraputics] did, a Boca Raton broker named Dawson James Securities that also now issues favorable research reports on TEUM. According to our analysis, Dawson James has been engaged by 13 different companies that have been owned by Honig, most of which have declined more than 75% from their peak value and/or are now virtually worthless.

\* \* \*

While we are unable to identify all of TEUM's private placement investors, two firms that have regularly invested alongside Honig, Iroquois Capital and IntraCoastal Capital, owned or controlled 13.2% of TEUM's outstanding shares as of March 2018, according to an SEC filing. By our count, Iroquois and/or Intracoastal have collectively invested in a total of 34 publicly traded companies that were also owned by Honig, most of which have either declined more than 75% from their peak value or are now virtually worthless. A February 2019 SEC filing reported that Iroquois Capital has already dumped their entire TEUM stake. We note that Iroquois reportedly received an SEC subpoena as part of the investigation into Honig's alleged pump and dump ring but was not named in the SEC complaint or been accused of wrongdoing.

TEUM has paid stock promoters from Red Chip companies, which has previously touted numerous now worthless companies backed by Honig. . . .

179. Upon the issuance of the Marcus Aurelius Report exposing Defendants' unlawful conduct, Pareteum's shares fell $0.83 per share, or over 24%, to close at $2.58 per share on June 7, 2019, on unusually heavy trading volume.

58

180. On June 10, 2019, Insider Monkey published Pareteum's response to the Marcus

Aurelius Report (the "June 10, 2019 Letter"):

*"Dear Fellow Pareteum Shareholders,*

*I want to take a moment to thank all of you for your support as we drive Pareteum forward.*

*In recent days our share price has been negatively impacted by a coordinated attack by short sellers. We fully understand that short selling is legal and it is an important part of the capital markets. That said, certain short sellers have used questionable tactics, including leveraging the media to misrepresent facts and make anonymous spurious claims against the company and its officers.*

*Every one of us at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company. We categorically deny the allegations put forth. We do not intend to legitimize those reports by delving in to them.*

*Pareteum has experienced tremendous growth, and we continue to grow in a healthy and measurable way. We are confident in our strategy and mission – to connect every person and every(thing)™. Today millions of people and devices around the world are connected using Pareteum's Global Cloud Communications Platform, enhancing their mobile experience. Every day more people and devices are being added to our platform.*

*We will not be distracted. We continue to focus on operating our business and generating strong financial results. We believe executing on this plan will ultimately create significant value for long term shareholders.*

*We will report our Q2 results in early August, and look forward to speaking with you then.*

*Again, I want to thank all of our shareholders for their continued support.*

(A copy of the June 10, 2019 Letter is annexed hereto as *Exhibit C*). Curiously, this response

was not posted on Pareteum's website where the other press releases and letters are easily located.

181.   On June 25, 2019, Viceroy Research Group published the Viceroy Report. (A copy

of the Viceroy Report is annexed hereto as *Exhibit D*). The Viceroy Report summarized its

findings, stating in relevant part:

> Further to recent research reports, Pareteum has a history of promotional press
> releases of customer wins. A deeper investigation into these customers show
> much larger number are insignificant, and the companies behind them appear in
> no way capable of fulfilling the contract values advertised by Pareteum.

> Two of Pareteum's customer wins appear to be undisclosed related parties tied to
> Pareteum consultant Dinesh "Danny" Patel.

> One of Pareteum's announced customer wins is a company under a historic
> investigation and charged with significant VAT evasion fraud. Information on
> this is easily available, leading us to believe that Pareteum was aware of the
> company's issues while announcing the customer win.

> Pareteum appears to be in breach of US sanctions against Iran through its
> provision of services to Iranian MVNO Amin SMC. Amin SMC appears to be
> chaired by Hamid Reza Amirinia, an individual suspected of breaching sanctions
> with an Iranian government mandate to launder money for the regime

> * * *

> Several entities on the pareteum.cloud domain are small companies or have no
> web presence whatsoever, leading us to believe that they are Pareteum customers
> who are unable to pay or have no operations.

> Pareteum's 36-month contractual backlog measurement is not an accurate
> predictor of future profits. An analysis of the company's backlog and
> management comments shows it should have reported 73.10% more revenue in
> Q1 2019 than it did. Management appears to be inflating this figure to hype up
> the share price and reassure investors.

> * * *

> Pareteum's management has a history of dishonest reporting. Notably, CFO Ted
> O'Donnell who was sued by former employer AudioEye for fabricating
> US$8.1m worth of revenue over 3 quarters which was found to have no
> supporting documentation. This was an overstatement of revenues in the period
> of more than 3,000%.

Pareteum's rapid-fire announcement of customer wins mirrors its announcements regarding cryptocurrency in 2017, which were put to an abrupt halt when a response to an SEC letter revealed TEUM had made no revenue, nor planned to do so, from cryptocurrency.

* * *

A breakdown of Pareteum's revenues, cash flows and receivables show the majority of its revenue from sources other than Vodafone and acquired businesses iPass and Artilium appears to be uncollectable. Accordingly, we believe total revenue is overstated by 42%, corroborating our findings regarding Pareteum's customers.

182.  The Viceroy Report specifically discussed the revenue figures reported in Pareteum's financial statements as follows:

Pareteum has 4 months accounts receivable sitting on its balance sheet. When combined with the drastic increase in receivable days since the end of 2017, it appears that Pareteum's new customers are not paying their bills. Despite this Pareteum's management continues to recognize this apparent uncollectable revenue from customers.

* * *

Pareteum's acquired businesses iPass and Artilium are getting paid on "typical" billing terms of 30 days, per management assertion. It is noteworthy that *this is not strictly true*:

Artilium's last publicly available financials show **77.473 receivable days** and claim that the average credit period on sales to be **87 days** as of June 30, 2018.

iPass's Q3 2018 10-Q revenue and receivables figures show **78.155 receivable days** with standard credit terms of **30 days.**

iPass' purchase price accounting allocated US$4.344m in accounts receivable to Pareteum's balance sheet.

Artilium's purchase price accounting allocated a negligible amount of accounts receivable to Pareteum's balance sheet: it appears Pareteum wrote a significant balance off. We have not accounted for this negligible balance.

According to our model Pareteum has collected only 4% of the revenue recognized from these customers in the 12 months trailing Q1 2019. While this figure is probably lower than Pretium's actual collections, it creates a Catch-22 situation where receivables from Artilium and iPass are also growing exponentially.

61

(emphasis in original).

183. Upon publication of the revelations in the Viceroy Report, Pareteum's share price fell $0.51, or over 20%, to close at $2.00 per share on June 26, 2019, on unusually heavy trading volume.

184. On June 27, 2019, Pareteum published a statement on its website (which appears to have since been removed) attempting to refute the Viceroy Report (the "June 27, 2019 Statement"), providing as follows:

> We are aware of increased trading in Pareteum Corporation stock and that certain short sellers have used questionable tactics including leveraging the media to misrepresent facts and make anonymous spurious claims against the company and its officers. Despite coordinated attacks designed only for the financial gain of these short sellers, we remain a dynamic and growing company that stands by the quality of the information reported in our most recent earnings announcements, including the guidance provided for 2019.
>
> Pareteum Corporation categorically denies all allegations put forth in the short seller reports. Without giving credence to the reports in detail, we do state the allegations that Pareteum has breached U.S. sanctions against Iran are false. While Pareteum does not publicly comment on business relationships with its customers, it is committed to compliance with all applicable laws, including U.S. sanctions against countries such as Iran. We note that certain activities in Iran have been or are authorized under OFAC General License H and/or General License D-1, and that there are longstanding U.S. policies supporting communications and Internet freedom in Iran. In view of the evolving regulatory environment in Iran, Pareteum frequently and carefully reviews its business dealings there and has engaged with the U.S. Office of Foreign Assets Control to tailor its activities and maintain strict compliance.
>
> Everyone at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company. We look forward to sharing additional information about our growth and success in future earnings releases. We invite investors and media following our activity to sign up for email alerts regarding any public statements and future earnings announcement dates by visiting our investor relations website . . . .

(A copy of the June 27, 2019 statement is annexed hereto as *Exhibit E*).

185. On July 18, 2019, Pareteum filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2019 Proxy Statement. In particular, Turner and van Sante were reelected to terms as directors.

186. On August 6, 2019, Defendants caused Pareteum to announce its second quarter 2019 financial results in a press release (the "August 6, 2019 PR"). Unlike prior earnings announcements, the August 6, 2019 PR conspicuously did not mention the highly touted revenue backlog. Instead, it reported that Pareteum's consolidated revenue was $34.1 million for this quarter.

SECOND-QUARTER 2019 FINANCIAL RESULTS YEAR-OVER-YEAR:

- Total revenue increased 469% to $34.1 million
- Income from Operations totaled $159,000
- EBITDA increased 466% to $3.4 million
- Adjusted EBITDA increased 369% to $6.1 million
- Non-GAAP EPS of $0.03 (Non-GAAP EPS of $0.05 for the 6 months ending June 30, 2019)
- Net Dollar-based expansion rate represented 151% growth
- Increase in total assets from $33.1 million at June 30, 2018 to $246.9 million at June 30, 2019

| ($000's) | Sequential Quarterly Key Metrics | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q2 2019 | | Q1 2019 | | Q4 2018 | | Q3 2018 | | Q2 2018 | |
| REVENUE | 34,148 | | 23,040 | | 14,312 | | 8,008 | | 6,003 | |
| YEAR-OVER-YEAR REVENUE GROWTH | 28,145 | 469% | 18,927 | 460% | 10,297 | 256% | 4,509 | 129% | 2,764 | 85% |
| GROSS MARGIN | 18,812 | 55% | 12,972 | 56% | 9,085 | 63% | 5,879 | 73% | 4,223 | 70% |
| ADJUSTED EBITDA | 6,081 | | 5,156 | | 2,339 | | 1,782 | | 1,297 | |
| EBITDA | 3,384 | | (2,485) | | (3,093) | | (5,851) | | 597 | |
| CONNECTIONS | 13,030 | | 12,012 | | 4,609 | | 2,903 | | 2,714 | |

KEY SECOND-QUARTER OPERATIONAL METRICS:

- Connections increased 380% to 13,030,000 for the second quarter of 2019, and grew 108.5% sequentially for the first half of 2019
- Second-quarter average annualized revenue per employee of $583,000, an increase of 55% year-over-year

187. On August 9, 2019, Defendants caused Pareteum to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q19 10-Q"), affirming the previously reported financial results. The report was signed by Turner and O'Donnell, who also signed certifications pursuant to SOX attesting to the accuracy of the report.

63

188.   Regarding efforts to remediate the previously disclosed material weakness, the 2Q19 10-Q stated, in relevant part:

To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) has continued to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) instituted monitoring controls and sample testing needs to be completed on our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhanced our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors. Management believes the Company has taken significant steps towards the remediation of the identified material weaknesses, as of June 30, 2019.

We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of June 30, 2019, these efforts are ongoing.

We are committed to maintaining a strong internal control environment and believe that these remediation actions will represent significant improvements in our controls. However, the identified material weakness in internal control over financial reporting will not be considered remediated until controls have been designed and/or controls are in operation for a sufficient period of time for our management to conclude that the material weaknesses have been remediated. Additional remediation measures may be required, which may require additional implementation time. We will continue to assess the effectiveness of our remediation efforts in connection with our evaluations of internal control over financial reporting.

189.   Around this same time, certain directors requested further information from Pareteum's auditor, Baker Tilly US, LLP (f/k/a Squar Milner LLP "Baker Tilly") and from Defendants regarding the large increase in revenue, Pareteum's cash position, forecasted cash flows, and overall financial position.

190.   At approximately the same time, it came to light that Pareteum defaulted on the Post Road Facility. On August 23, 2019, Defendants caused Pareteum to file a Form 8-K with the SEC, which included as an exhibit a "Waiver and First Amendment to Credit Agreement" in connection with the Post Road Facility (the "Waiver"). The Waiver constituted an agreement between Post Road Group and Pareteum to waive Pareteum's numerous defaults under the Post Road Facility.

191.   Pursuant to the Waiver, Pareteum was obligated to, among other things:

- Comply with the requirements set forth in the definition of "Permitted Acquisition" in connection with the consummation of the DeviceScape Acquisition as required by clause (m) of Section 9.05 of the Credit Agreement.

- Timely make interest payments owed to Administrative Agent.

64

- Timely deliver (i) financial report information for the period February 28, 2019 through June 30, 2019; and (ii) the corresponding Compliance Certificates.

192.    To obtain the Waiver and a $2.5 million loan from Post Road Group, Pareteum agreed to issue 750,000 shares of its stock to Post Road Group on August 22, 2019 and 250,000 shares on November 15, 2019, thereby diluting existing shares.

193.    On this news, Pareteum's shares fell $0.29, or nearly 11%, to close at $2.47 per share on August 23, 2019.

194.    On August 27, 2019, Seeking Alpha published a report titled, "*Pareteum – Caught in a Cash Crunch After Violating Debt Covenants*" (the "Seeking Alpha Report", a copy of which is annexed hereto as *Exhibit F*), which commented on the Post Road Facility and Pareteum's revenue – or lack thereof –stating in relevant part:

> Shares of controversial emerging *Communications Platform as a Service* ("CPaaS") provider Pareteum Corporation have remained under pressure in recent weeks after the company's Q2/2019 results on August 6 revealed two major issues:
>
> 1. Accounts receivable ballooned an eye-catching 57% quarter-over-quarter, even outpacing the 48% sequential revenue increase. Over the past six months, accounts receivable have almost tripled from $15.4 million at year end 2018 to $45.1 million at the end of Q2.
>
> 2. Free cash flow for the quarter was negative $8 million, leaving the company with just $3.4 million in unrestricted cash at the end of Q2, dangerously close to the $2 million minimum liquidity covenant defined in its up to $50 million senior secured credit facility with Post Road Group, a Connecticut-based junior private investment firm. For the first half of FY2019, Pareteum used $16.7 million in operating and investing activities.

65

195.     The Seeking Alpha Report also cautioned investors about Pareteum's financial stability, and predicted that Pareteum would likely need to implement a secondary offering at some point in the future in order to remain solvent.

196.     On September 20, 2019, Defendants caused Pareteum to announce a secondary offering of 18.8 million shares of common stock and 3.8 million units of warrants to purchase stock priced at $40 million, thereby further diluting Pareteum's stock.

197.     On this news, Pareteum's shares fell $0.17 per share, or over 9%, to close at $1.67 per share on September 20, 2019, on unusually heavy trading volume.

### H.  The Truth Emerges Leading to Multiple Parallel Investigations

198.     As reflected above, by August 2019, the truth had begun to catch up with Defendants. As a result of the investor reports, multiple parallel investigations emerged.

#### a.  The SEC Investigation

199.     In August 2019, the SEC issued a subpoena to Pareteum requesting certain information and documents regarding Pareteum's business. (*See* Declaration of Laura W. Thomas in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings [Docket No. 3] (the "Thomas Declaration"), ¶ 76).

200.     On September 2, 2021, the SEC issued a settled administrative cease-and-desist order (the "SEC Order") that found that during the Relevant Period Pareteum: (i) improperly recognized revenue based on non-binding purchase orders; (ii) made material misstatements to its auditor; and (iii) improperly recognized revenue from an unsigned purchase order and then attempted a cover-up. (*See* Ex. A).

201.    With respect to the material misstatements to Pareteum's auditors, the SEC Order

provided:

### Misstatements Made to Pareteum's Auditor

17.    Because of the improper revenue recognition practices described above, Pareteum's accounts receivable balance ballooned by the end of 2018. For many, Pareteum was still completing its obligations, such as shipping the SIM cards or setting up the platform. For others, even if some SIM cards had been shipped, the customer had not yet become operational and had not sold any SIM cards to downstream consumers, and as such did not actually owe the accounts receivable amount to Pareteum.

18.    When Pareteum's independent auditor performed its 2018 end-of-year audit testing in February 2019, it included Pareteum's accounts receivable as a main risk area. To test the validity of the accounts receivable amounts, the auditor sent out audit confirmations to many of Pareteum's customers asking the customers to sign that they agreed with Pareteum's record of how much was owed to Pareteum as of year-end 2018. These audit confirmations went out to the vast majority of the customers that accounted for the $12 million in revenue that Pareteum improperly recognized in 2018.

19.    Despite the fact that the customers did not yet owe the amounts on the audit confirmations, most of these customers did eventually sign the audit confirmations. One or more former Pareteum officers or senior accounting executives knowingly or recklessly directed Pareteum sales employees to encourage customers to sign the audit confirmations by falsely telling them that the confirmation amounts listed were just for forecasts or estimates and did not represent amounts that the customers were actually committed to paying. With these assurances, most of these customers signed the audit confirmations and returned them to Pareteum's auditor, thereby unknowingly providing false audit evidence.

202.    In addition, the SEC Order found that certain unnamed executives, but likely

include Defendants, improperly recognized revenue from an unsigned purchase order.

203.    The SEC Order alleged:

22.    In late January 2019, Pareteum and a customer were negotiating an IMSI purchase order.  A former Pareteum sales employee drafted a purchase order for 6.3 million euros and circulated an unsigned version internally to others at Pareteum for approval.

23.    Despite the fact that the 6.3 million euro purchase order had not been finalized or agreed to by the customer, at the direction of one or more former Pareteum executives, Pareteum recognized revenue for 20% of the order, or approximately $1.4 million, for January 2019.

24.    The former Pareteum sales employee ultimately finalized the purchase order with the customer in February 2019 – but for 630,000 euros, not 6.3 million.  Notwithstanding this change in the purchase order, at the direction of one or more former Pareteum executives, Pareteum continued to recognize revenue off of the unsigned draft purchase order for 6.3 million euros.  Pareteum recognized another 20% of revenue from the draft purchase order in February 2019, and another 20% in April 2019.  Ultimately, in the first and second quarter of 2019, Pareteum recognized a total of approximately $4.4 million in revenue based on this unsigned draft purchase order when the final signed purchase order was only for 630,000 euros, or approximately $750,000.

25.    Even if the 6.3 million euro purchase order had been finalized and signed, Pareteum's revenue recognition would not have been in accordance with GAAP.  At the time that this revenue was recognized, the platform for these IMSIs was not yet functional and Pareteum was still working on setting it up properly.  Further, there was no reasoning or support for recognizing 20% of this purchase order three separate times.  One or more former Pareteum executives knew, or were reckless in not knowing, that this was not proper under ASC 606 and as such was not in accordance with GAAP.

204.    After the SEC issued the subpoena to Pareteum, Defendants attempted to backdate the unsigned purchase order in order to conceal the mistake rather than admit the "mistake". Specifically, the SEC Order alleged:

26.    In August 2019, Pareteum received a subpoena from Commission staff in connection with its investigation into this conduct.  At or around this time, multiple former Pareteum executives became aware that the 6.3 million euro purchase order had never been signed, and that a 630,000-euro purchase order had been signed instead.  At first, rather than report this issue to more senior management, former Pareteum sales and accounting executives attempted to get a backdated purchase order signed retroactively to cover up the mistake.  Though these former sales and accounting employees were successfully able to get a replacement backdated purchase order signed, Pareteum ultimately identified and self-reported the existence of the backdated purchase order.

205.    The SEC Order imposed a $500,000 civil monetary fine against Pareteum, which Pareteum had been paying in installments as of the Petition Date. (*See* Thomas Declaration, ¶ 98).

### b.    The Internal Investigation

206.    The SEC subpoena prompted certain of the directors to launch an internal investigation into management, including certain of the Defendants. (*See* Thomas Declaration, ¶ 77). Shortly thereafter, a comprehensive independent investigation by special legal counsel to the Audit Committee was commenced to investigate Pareteum's revenue recognition practices and all its relevant surrounding circumstances. Pareteum engaged outside legal counsel as well as EisnerAmper LLP to assist in the Board's investigation.

207.    On October 18, 2019, the Board received a preliminary report from EisnerAmper. That preliminary report found that revenues for year-end 2018 were overstated by approximately $6.8 million, or 21%, relative to the $32.4 million revenue reported. Additionally, for the first six months of 2019, revenues were overstated by $14.5 million, or nearly 25%, relative to the $57.2 million in revenue reported. (*See* Thomas Declaration, ¶ 80).

208.    In October 2019, after Pareteum's Corporate Secretary provided the Board with a preliminary report regarding the improper recognition of revenue, McCarthy – who was responsible for maintaining Pareteum's Revenue Backlog records – was terminated effective as of October 9, 2019. (*See* Thomas Declaration, ¶ 79).

209.    As a result, Pareteum's shares fell $0.36, or over 30%, over three consecutive trading sessions to close at $0.83 per share on October 17, 2019, on unusually heavy trading volume.

210.    In addition to the termination of McCarthy, the Board immediately initiated Pareteum's process of restating its financials. (*See* Thomas Declaration, ¶ 81).

211.    On October 21, 2019, Defendants caused Pareteum to file a Form 8-K with the SEC, disclosing that financial statements in the 2018 10-K, 1Q19 10-Q and 2Q19 10-Q should no longer be relied upon and would be restated. The decision to restate the financials was based upon Pareteum's conclusion that certain revenues were recognized improperly during 2018 and 2019. (*See* Thomas Declaration, ¶ 82).The Form 8-K stated, in relevant part:

> On October 21, 2019, the board of directors of Pareteum Corporation (the "Company") determined that the Company's financial statements which were included in its annual report for the year ended December 31, 2018 and quarterly reports for the quarters ended March 31, 2019 and June 30, 2019 (collectively, the "Non-Reliance Periods") should no longer be relied upon. Similarly, related press releases, earnings releases, and investor communications describing the Company's financial statements for the Non-Reliance Periods should no longer be relied upon. The Company will restate financial statements for the Non-Reliance Periods in advance of filing the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2019.
>
> The decision to restate these financial statements is based on the Company's conclusion that certain revenues recognized during 2018 and 2019 should not have been recorded, during that period. For certain customer transactions, the company may have prematurely or inaccurately recognized revenue. These restatements should not impact historical cash or cash equivalents based upon the current review. At the present time, the restatements are expected to impact Revenue, Cost of Service, Operating Income, Net Loss, Accounts Receivable and other Balance Sheet line items. While the Company's analysis is still underway, the Company currently estimates the revenue impact for the full year 2018 to be a reduction of approximately $9 million. For the first half of 2019, the Company currently estimates the revenue impact to be a reduction of approximately $24 million.
>
> At this time, the Company has not fully completed its review and the expected financial impact of the restatement described above is preliminary and subject to change. The Company cannot predict the aggregate amount of revenue that will ultimately be restated, whether additional periods beyond those referenced above will be affected, and the final outcome or timing of the Company's filing of restated financial statements for the affected annual and quarterly periods. Until the full magnitude of these transactions is analyzed and understood, the company cannot provide forward guidance, and we expect the second half and full year 2019 will be materially below current analysts' estimates.

212.    According to the outside accountants advising the Board, these misstatements resulted from improper accounting practices, whereby Defendants directed that revenue be recognized based on non-binding purchase orders and prior to product shipment, which is not in accordance with GAAP. (*See* Thomas Declaration, ¶ 83).

213.    On October 22, 2019, Pareteum's share price fell $0.44, or nearly 60%, to close at $0.30 per share, on unusually heavy trading volume.

214.    Further, as a result of the investigation, Pareteum believed certain former senior accounting employees took steps to conceal these practices from Pareteum's auditor and Board. Pareteum, at the direction of the Board, subsequently terminated all executives and employees of

Pareteum that took part in the misreporting of Pareteum's revenue as the independent investigation progressed. (*See* Thomas Declaration, ¶ 83).

215.    On November 5, 2019, Pareteum issued a press release stating that Thomas would serve as interim CFO, effective November 15, 2019.

216.    On November 22, 2019, in connection with the terminations of all officers and employees involved with the revenue misstatements, the Board terminated Turner from his positions as Executive Chairman of the Board and CEO on November 22, 2019. (*See* Thomas Declaration, ¶ 87).

### c.  The NASDAQ Delisting

217.    On November 13, 2019, Pareteum was informed that it was no longer in compliance with NASDAQ listing rules because it had not timely filed its third quarter report, and would have to regain compliance within 60 days or be delisted from the exchange. (*See* Thomas Declaration, ¶ 86).

218.    Additionally, the misstatement of Pareteum's financial statements triggered violations under NASDAQ's listing rules. NASDAQ ultimately notified Pareteum that, to regain compliance with its listing rules, Pareteum needed to: (i) file a Quarterly Report on Form 10-Q for the period ended September 30, 2019; (ii) file its amended Annual Report on Form 10-K/A for the year ended December 31, 2018; (iii) timely file its Annual Report on Form 10-K for the year ended December 31, 2019; and (iv) timely file its Quarterly Reports on Form 10-Q for the periods ended March 31, 2020 and June 30, 2020 (collectively, the "Delinquent Filings"). (*See* Thomas Declaration, ¶ 88).

219. Pareteum was also notified that it had also violated NASDAQ listing rule 5550(a)(2) (the "Bid Price Rule"), because the bid price of its listed security had not exceeded $1 per share for a period of 30 consecutive business days. (*See* Thomas Declaration, ¶ 89).

220. Pareteum sought to regain compliance with the NASDAQ listing rules. However, progress on the audit was slow, which further delayed restatements and filings necessary to become compliant. Ultimately, these delays prevented Pareteum from meeting NASDAQ's and the SEC's requirements to become current and relisted. The public trading of the common stock on NASDAQ was suspended on November 12, 2020. The formal delisting of Pareteum's common stock from the NASDAQ became effective on February 12, 2021. (*See* Thomas Declaration, ¶ 94).

221. Thereafter, Pareteum's common stock began trading over-the-counter on the so-called "Pink Sheets". Stocks traded on Pink Sheets are often more thinly traded than stocks traded on other public exchanges, which creates significant barriers to raising necessary liquidity through access to the capital markets. (*See* Thomas Declaration, ¶ 95).

222. In June 2021, Pareteum completed the audit, restated the financials, and filed the vast majority of the Delinquent Filings. However, Pareteum's stock price had not exceeded $1 per share in the prior year. In fact, due to a material write down of goodwill and intangibles, the stock's book value was negative at the time the audit was completed. Therefore, Pareteum's stock could not be relisted on the NASDAQ exchange. (*See* Thomas Declaration, ¶ 96).

223. As a result of the delisting, Pareteum was unable to obtain cash through the public sale of securities and was forced to raise cash through the sale of preferred stock and the issuance of secured debt.

**d. The Internal Investigation Revealed Defendants' Scheme to Improperly Account for Revenue and the Myriad of Misstatements Made by Defendants.**

224. As set forth in detail below, the internal investigation revealed that despite Pareteum disclosing that it was reporting revenue in accordance with ASC 606, Pareteum recognized revenue without confirming whether the criteria of ASC 606 had been fully satisfied. Therefore, Pareteum's financial statements contained egregious errors with respect to Pareteum's actual financial performance and outlook. These errors are result of two issues relating to the Defendants' self-dealing: (1) intentional inflation of revenue; and (2) insufficient procedures in place to prevent the intentional malfeasance.

225. Pareteum did not have sufficient procedures and controls in place to provide reasonable assurance that it was recognizing revenue in accordance with ASC 606, and instead, Defendants allowed revenue to be recognized that was not in compliance with GAAP.

226. Under ASC 606, Defendants should have caused Pareteum to satisfy its performance obligations under the purchase orders prior to recognizing revenue. Specifically, Defendants should have ensured that the SIM cards had been shipped and that the platform was operational. Further, under the terms of the most recent purchase orders, the user had to activate the SIM cards before the customer was obligated to pay Pareteum. In multiple instances, Pareteum failed to meet any, let alone all, of these requirements prior to recognizing revenue. (*See* Ex. A, ¶ 13).

227. Under the leadership of Defendants, there were insufficient internal accounting controls in place to assess whether the required performance obligations had been met prior to revenue being recognized, and in practice, such checks improperly performed. As a result, Pareteum recognized the amounts listed in the purchase orders based solely on the purchase

order being signed by the customer without confirming whether these amounts were recognizable under ASC 606, which resulted in the improper recognition of millions of dollars of revenue. (*See* Ex. A, ¶ 14).

228. Defendants pressured employees to reach internal budgeted projections for revenue each month. Pareteum was only able to meet these projections by immediately recognizing revenue for the entire projected amount of a purchase order when it was signed -- despite Pareteum having not met its performance obligations under the purchase order. (*See* Ex. A, ¶ 15).

229. Recognizing the full amount of each purchase order once signed, rather than in accordance with GAAP, became standard practice for Pareteum's mobile bundled services line of business. Defendants knew, or were reckless in not knowing, that the requirements for proper revenue recognition had not been met and yet continued to authorize or accept decisions to recognize millions of dollars of revenue improperly. Revenue recognized this way accounted for millions of Pareteum's revenue each quarter starting in 2018 and continuing through the first half of 2019, even though it was not yet owed by the customers. By August 2019, Pareteum had only collected a fraction of the tens of millions in revenue it had recognized for mobile bundled services customers. (*See* Ex. A, ¶ 16).

230. As later revealed, many of the customers who purportedly contributed to its contractual revenue backlog were either significantly exaggerated or fictitious. These customers included closed or dissolved businesses, businesses with websites that are inactive or offer limited contact information, and businesses located in apartment buildings or even dilapidated shacks. Several customers were international entities that showed no signs of meaningful activity and had nominal amounts of capital or revenue.

231. For example, the Marcus Aurelius Report revealed that, in October 2018, Pareteum recognized revenue from a three-year, $50 million contract with an entity in Thailand named One Development. One Development's financial statements revealed it had zero revenue in 2018 and three consecutive years of operating losses. Its total assets were valued at approximately $298,000. Its founder appears to operate a parallel Mobile Network Virtual Operator ("MVNO") consulting business that reported $0.57 in revenue in 2018. (*See* Ex. B).

232. Also, the Marcus Aurelius Report revealed that in October 2018, Pareteum touted three new contracts with purported MVNOs in Africa worth a total of $15 million. One of the companies, Naledi Telecom, was formed in May 2018. Naledi Telecom is currently not operational and not even listed in the building directory of its registered address. Another of the three companies, Parallax Health Sciences, Inc., reported just $11,000 in revenue in 2018. (*See* Ex. B).

233. As a result, the numerous press releases and statements by Defendants on behalf of Pareteum were false and misleading to investors and the public.

234. The statements in the December 14, 2017 Letter, December 2017 Presentation, January 2, 2018 PR, January 31, 2018 PR, February 12, 2018 Letter, February 28, 2018 PR, 2017 10-K, April 9, 2018 PR, April 16, 2018 Letter, May 7, 2018 PR, 1Q18 10-Q, July 10, 2018 PR, August 2, 2018 PR, August 6, 2018 PR, 2Q18 10-Q, 2018 8-K, September 17, 2018 PR, October 2, 2018 PR, October 5, 2018 PR, October 8, 2018 PR, October 17, 2018 PR, October 24, 2018 PR, November 7, 2018 PR, 3Q18 10-Q, February 13, 2019 PR, February 13, 2019 PR, February 15, 2019 PR, February 20, 2019 PR, March 5, 2019 PR, March 7, 2019 Letter, March 12, 2019 PR, March 28, 2019, April 4, 2019, May 7, 2019 PRs, the conference call on May 7, 2019, 1Q19 10-Q, May 15, 2019 PR, June 27, 2019 Statement, and August 6, 2019 PR were materially

misleading because they failed to disclose that: (1) Pareteum was unlikely to collect revenue from certain customer transactions; (2) as a result, Pareteum had improperly recognized revenue derived from these transactions; (3) as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) as a result, Pareteum's 36-month contractual revenue backlog was not indicative of Pareteum's growth potential; (5) Pareteum was reasonably likely to restate certain financial statements; and (6) certain of Pareteum's officers and directors, including Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating the Code of Conduct.

235. The 2018 Proxy Statement was materially misleading because it failed to disclose that: (1) Pareteum was unlikely to collect revenue from certain customer transactions; (2) as a result, Pareteum had improperly recognized revenue derived from these transactions; (3) as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) as a result, Pareteum's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (5) Pareteum was reasonably likely to restate certain financial statements; (6) certain of Pareteum's officers and directors, including Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating the Code of Conduct; (7) Pareteum misrepresented the Board's actual activities with respect to financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (8) each of the non-employee directors were interested in their own grants of discretionary compensation.

236. The 2018 10-K's risk disclosures concerning the Post Road Facility and the statements during the May 7, 2019 Conference Call were materially misleading because they

failed to disclose that: (1) Pareteum had already failed to perform and timely repay the amounts due to Post Road Group; (2) Pareteum had been unable to deliver the third party consents required under its agreement with Post Road Group to receive additional loans subsequent to the initial loan of $25 million; and (3) Pareteum was already in breach of its agreement with Post Road Group by failing to timely provide financial reports to Post Road Group.

237. The 2019 Proxy Statement was materially misleading because it failed to disclose that: (1) Pareteum was unlikely to collect revenue from certain customer transactions; (2) as a result, Pareteum had improperly recognized revenue derived from these transactions; (3) as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) as a result, Pareteum's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (5) Pareteum was reasonably likely to restate certain financial statements; (6) certain of Pareteum's officers and directors, including Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct; and (7) it misrepresented the Board's actual activities with respect to financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties.

238. The statements in the 2Q19 10-Q were materially misleading because they failed to disclose that: (1) Pareteum was unlikely to collect revenue from certain customer transactions; (2) as a result, Pareteum had improperly recognized revenue derived from these transaction; (3) as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) as a result, Pareteum's 36-month contractual revenue backlog was not indicative of Pareteum's growth potential; (5) Pareteum was reasonably likely to restate certain financial statements; and (6) certain of Pareteum's officers and directors, including Turner and O'Donnell, had ties to various

failed stock promotions and schemes, as well as to entities associated with alleged stock manipulator Barry Honig, thereby violating the Code of Conduct.

239.    The internal investigation also revealed that as a result of Defendants' self-interest and breaches of fiduciary duty, Defendants failed to properly vet the Artilium and iPass acquisitions.

240.    On October 1, 2018, Pareteum completed acquisition of all of the outstanding shares of Artilium whereby each Artilium ordinary shareholder received 0.1016 new shares of the Pareteum's common stock and 1.9 pence in cash (the "Artilium Acquisition"). In connection with the Artilium Acquisition, Pareteum issued an aggregate of 37,511,447 shares of the Pareteum's common stock to Artilium shareholders and cancelled 3,200,332 shares of common stock issued by Pareteum that was held by Artilium pre-acquisition. The Artilium Acquisition caused Pareteum to assume $5 million in liabilities that were not adequately accounted for during the due diligence process for the Artilium Acquisition. (*See* Thomas Declaration, ¶ 104).

241.    On November 12, 2018, Pareteum entered into an Agreement and Plan of Merger (the "iPass Merger Agreement") by and among Pareteum, iPass, and TBR, Inc. ("TBR"), a wholly owned subsidiary of Pareteum. Pursuant to the iPass Merger Agreement, TBR commenced an exchange offer (the "iPass Offer") for all of the outstanding shares of iPass' common stock, for 1.17 shares of the Pareteum's common stock, together with cash in lieu of any fractional shares. In aggregate, Pareteum issued 9,865,412 shares of common stock to the iPass shareholders in March 2019. (*See* Thomas Declaration, ¶ 105).

242.    After the iPass merger was consummated, Pareteum discovered that there were numerous aging accounts payable that had not been recognized during the due diligence process of the iPass merger. This aged accounts payable was in addition to the known, approximately

78

$11 million loan that was owed by iPass that was paid off, in part, with proceeds of the Post Road Facility. (*See* Thomas Declaration, ¶ 106).

243. In the Summer of 2020, in an effort to reduce remaining liabilities, Pareteum hired FTI Consulting to attempt to compromise certain of the amounts owed by iPass through an out of court restructuring of iPass. That restructuring was not successful due to a lack of liquidity, which made it impossible for Pareteum to pay certain of the upfront costs/amounts necessary to compromise the accounts payable. Thus, the iPass liabilities remained on the books of iPass as of the Petition Date. (*See* Thomas Declaration, ¶ 107).

244. Based on an analysis of Pareteum's revenues, cash flows, and receivables, the Viceroy Report concluded that "***the majority of [Pareteum's] revenue*** from sources other than Vodafone [Enabler S.L. ("Vodafone"), Pareteum's largest historical customer,] and acquired businesses iPass and Artilium ***appear[ed] to be uncollectable***". (emphasis added)

245. Pareteum assumed more than $15 million in liabilities that were not adequately discovered at the time that the Artilium and iPass acquisitions closed as a result of Defendants' self-interest and desire to consummate the transactions in order to obtain certain bonuses predicated on the acquisitions. (*See* Thomas Declaration, ¶ 108).

246. As a result of these acquisitions, which had been approved and completed prior to the discovery of the improper revenue recognition in Pareteum's financial statements, Pareteum had aggregate payables of approximately $30 million in liabilities. (Thomas Declaration, ¶ 109).

**e. Numerous Lawsuits Arise in the Face of Defendants' Malfeasance and Misstatements.**

247. Pareteum was plagued by numerous putative class action and derivative lawsuits since its October 21, 2019 announcement regarding the improper recognition of revenue and the misreporting of its revenue. No less than eight putative class action and/or derivative lawsuits

(after accounting for the consolidation of such derivative actions) were commenced against Pareteum, its current and former management, and members of the Board at the times in which the revenue was misreported. These suits all center on Defendants' roles regarding the misstatements of revenue made in Pareteum's financial reports.

248.    Additionally, Pareteum was party to an additional class action lawsuit that was commenced by former shareholders of iPass who received common stock in Pareteum upon the closing of Pareteum's acquisition of iPass. This class action suit asserts that Debtors' made misleading statements regarding its financials in the tender offer by which iPass was acquired. (*See* Thomas Declaration, ¶ 101).

249.    These lawsuits put a significant and sustained drain on Pareteum and contributed substantially to commencement of these Chapter 11 Cases.

## I.    DEFENDANTS' COMPENSATION[4]

250.    Defendants received substantial compensation based upon the inflated revenues and stock prices. For example, the 2018 Proxy Statement sought approval of (i) a proposal to approve the 2018 Long-Term Incentive Compensation Plan (the "2018 Incentive Plan"); and (ii) a proposal to approve compensation for Pareteum's named executive officers. These proposals were based upon the inflated stock price and the improperly inflated revenue backlog.

### a.    Turner's Compensation

251.    According to the Restated 2019 10-K:

The Company entered into a letter of employment, effective as of November 17, 2015, with Mr. Turner, to serve as Executive Chairman of the Company. Mr. Turner is paid a base compensation of $300,000 per year. Mr. Turner receives no fees (cash or stock) for serving on our Board of Directors. Mr. Turner was granted options to purchase 2,500,000 shares that carried a 7-year exercise period after the grant date; the options vested in four equal annual installments, following the

---

[4] Pareteum's public filings do not disclose Mumby's compensation; therefore, the Trustee is still investigating.

joining date. Mr. Turner was eligible to receive a performance related bonus, depending on business performance and Group performance. Such bonus was to be based solely upon achievement of Board-approved and mutually agreed upon performance targets. For 2016 the on-target bonus percentage was set at 100% against the base salary paid in that year, capped at 200% maximum on cash payment; performance over and above 200% was paid in equity at the then-current value of the Company.

On November 18, 2016, the Company entered into a new employment agreement with Mr. Turner. The employment agreement modified and supplemented the terms of the prior employment letter between the Company and Mr. Turner by providing for the following additional terms: (i) one-time bonuses of $300,000 for achieving previously determined business and restructuring goals established by the Board and an extraordinary bonus of $300,000 for Mr. Turner's efforts on behalf of the Company during late 2015 and 2016 and to be paid as set forth in the employment agreement; (ii) a grant of 2,000,000 restricted shares of the Company's common stock; (iii) options to purchase up to 7,500,000 shares of the Company's stock, which options shall vest over a period of three (3) calendar years, with 1,875,000 shares vesting immediately, and the remaining 5,625,000 shares vesting in 3 equal installments of 1,875,000 each, on the first, second and third anniversary of the option grant with an exercise price of $0.14 per share; and (iv) other customary allowances, bonuses, reimbursements and vacation pay. The employment agreement also provided that if Mr. Turner's employment with the Company was terminated by the Company without "cause" or by Mr. Turner for "good reason" (as such terms are defined in the employment agreement) the Company would pay Mr. Turner, 12 months' salary at the rate of his salary as of such termination, together with payment of the average earned bonuses (regular and extraordinary) since November 1, 2015.

On January 2, 2018, the Compensation Committee of the Board of Directors undertook an annual review of Mr. Turner's performance and compensation and resolved to approve the following compensation changes: (i) an extraordinary bonus of $300,000 converted to shares at $.81 per share (November 17, 2017 share price) equaling 371,000 shares; (ii) a standard bonus of $300,000 for 2017 performance paid semi-monthly in 2018; (iii) an extraordinary bonus of $300,000 paid semi-monthly in 2018; (iv) payment of $79,000 converted to 97,531 shares at $.81 per share for unused vacation during 2016 and 2017; and (v) a standard equity grant of 2,000,000 that vested 25% upon grant, 25% upon the closing of a major financing or M & A event in 2018, 25% on Nov 18, 2018, and 25% on Nov 18, 2019.

252. For the fiscal year ended December 31, 2017, Turner received $2,497,529 in compensation from Pareteum. This includes $326,044 in salary, a $300,000 bonus, $1,605,965 in bonus stock awards, and $265,520 in option awards.

253. For the fiscal year ended December 31, 2018, Turner received $5,281,843 in compensation from Pareteum. This includes $321,225 in salary, a $600,000 bonus, $2,921,563 in bonus stock awards, and $1,439,055 in all other compensation.

254. For the fiscal year ended December 31, 2019, Turner received $3,778,707 in compensation from Pareteum. This includes $268,750 in salary, a $525,000 bonus, $2,750,001 in bonus stock awards, and $234,956 in all other compensation.

### b. Bozzo's Compensation

255. According to the Restated 2019 10-K:

The Company entered into an employment agreement, effective as of November 1, 2016, with Mr. Bozzo, to serve as Chief Executive Officer of the Company. Mr. Bozzo is paid a base compensation of $275,000 per year. Mr. Bozzo received a signing bonus of $50,000 and a grant of restricted common stock with the equivalent value of $10,000. Additionally, Mr. Bozzo received a restricted grant with the equivalent value of $15,000 within a reasonable time following the 6-month anniversary of the effective date and $50,000 within a reasonable amount of time following the first calendar year anniversary date, with each of these grants being subject to certain conditions set forth in the employment agreement. Additionally, Mr. Bozzo was granted options to purchase up to 3,000,000 shares of the Company's common stock, of which options to purchase 750,000 shares of common stock vested immediately, and the remaining 2,250,000 shares vest in 3 installments of 750,000 each annually on the first, second and third anniversary of the option grant. The exercise price of the options is $0.1749 per share. Mr. Bozzo also received other customary allowances, bonuses, reimbursements, and vacation pay. The employment agreement also provides that if Mr. Bozzo's employment with the Company is terminated by the Company without "cause" or by Mr. Bozzo for "good reason" the Company will pay Mr. Bozzo 12 months' salary at the rate of his salary as of such termination. Mr. Bozzo is also subject to customary non-competition, non-solicitation and confidentiality requirements during and after the term of his employment. Mr. Bozzo's employment with the Company ended on June 9, 2020.

256. For the fiscal year ended December 31, 2017, Bozzo received $743,076 in compensation from Pareteum. This includes $307,063 in salary, a $83,500 bonus, and $352,513 in bonus stock awards.

257. For the fiscal year ended December 31, 2018, Bozzo received $2,161,536 in compensation from Pareteum. This includes $293,162 in salary, a $325,000 bonus, $687,788 in bonus stock awards, $460,064 in option awards, and $395,521 in all other compensation.

258. For the fiscal year ended December 31, 2019, Bozzo received $1,216,656 in compensation from Pareteum. This includes $275,000 in salary, a $225,000 bonus, $181,689 in bonus stock awards, $498,907 in option awards, and $36,060 in all other compensation.

### c. O'Donnell's Compensation

259. According to the Restated 2019 10-K:

The Company entered into an employment agreement, effective as of January 9, 2017 with Mr. O'Donnell, to perform as Chief Financial Officer of the Company. Mr. O'Donnell is paid a base compensation of $175,000 and is entitled to an annual bonus of up to $75,000. Mr. O'Donnell was also issued a restricted stock grant of 25,000 shares and given an initial grant of 1,000,000 options, pre-reversal split stock, to purchase shares of the Company's common stock. Mr. O'Donnell is also entitled to other customary allowances, bonuses, reimbursements, and vacation pay. The employment agreement between the Company and Mr. O'Donnell is an "at will" agreement, which also provides that if Mr. O'Donnell's employment with the Company is terminated by the Company, then, subject to a mutual release, the Company will pay Mr. O'Donnell's base salary for an additional 270 days after termination in accordance with customary payroll practices. Mr. O'Donnell is also subject to customary confidentiality requirements during and after the term of his employment. Mr. O'Donnell's base rate of pay was increased to $200,000 per year, effective August 1, 2017. Mr. O'Donnell's employment with the Company ended in April 2020.

260. For the fiscal year ended December 31, 2017, O'Donnell received $432,504 in compensation from Pareteum. This includes $209,388 in salary, $2,915 in bonus stock awards, and $220,201 in option awards.

261. For the fiscal year ended December 31, 2018, O'Donnell received $437,948 in compensation from Pareteum. This includes $212,197 in salary, a $60,000 bonus, $151,397 in option awards, and $14,354 in all other compensation.

262. For the fiscal year ended December 31, 2019, O'Donnell received $525,977 in compensation from Pareteum. This includes $196,500 in salary, a $60,000 bonus, $91,465 in bonus stock awards, $147,843 in option awards, and $30,169 in all other compensation.

### d. McCarthy's Compensation

263. According to the Restated 2019 10-K:

Mr. McCarthy joined the Company as of January 1, 2018 in the capacity of SVP of Corporate Development. The Company then entered an employment agreement as of October 1, 2018, with Mr. McCarthy, to serve as President of the Company, for the purpose of expanding Mr. McCarthy's responsibilities with the Company during his continued term of employment. Mr. McCarthy was paid a base compensation of $225,000 per year. Mr. McCarthy was eligible to receive an annual bonus of up to 100% of the amount of his base salary, subject to the achievement of certain business-plan targets. Mr. McCarthy was also entitled to other customary allowances, bonuses, reimbursements for certain expenses and vacation pay. The agreement is an "at-will" agreement, and also provides that if Mr. McCarthy is terminated by the Company, then, subject to a mutual release, the Company will pay to Mr. McCarthy his base salary for an additional 12 months after termination in accordance with customary payroll practices. Mr. McCarthy is subject to the Company's customary confidentiality requirements consummate with his position during and after his term of employment.

264. For the fiscal year ended December 31, 2018, McCarthy received $354,192 in compensation from Pareteum. This includes $198,509 in salary, $138,021 in option awards, and $17,662 in all other compensation.

265. For the fiscal year ended December 31, 2019, McCarthy received $585,105 in compensation from Pareteum. This includes $168,750 in salary, a $147,029 bonus, $15,257 in option awards, and $254,069 in all other compensation.

### e. van Sante's Compensation

266. According to the Restated 2019 10-K:

Mr. van Sante is entitled to an annual directorship fee of $105,000 consisting of a $80,000 basic fee, $10,000 per committee capped at $20,000 and $5,000 as chairman for one of the committees. Mr. van Sante is also entitled to $75,000 annual additional directorship fees for other Pareteum subsidiaries. His actually

earned a cash directorship fees in 2019 amounts to $494,323, of which an amount of $11,093 related to an adjustment of overstated unpaid fees earned in 2018, furthermore, the Company decided to award Mr. van Sante with $268,030 (= €239,282) and $25,000 which were earned outside the normal board fee arrangement. During 2019 a fair market value of $237,865 in shares of common stock were issued to Mr. van Sante for shares which were earned as part of his board fee in 'lieu of cash' relating to 2016 (=$78,750), 2017 (=$74,649) and 2018 (=$43,021), additionally, a time conditioned award granted in 2017 and partially vested during 2018 resulted in the delivery of shares of common stock representing a value at grant of $18,001. For 2019, Mr. van Sante did not elect to have his directorship fees paid in shares. As per December 31, 2019, $24,741 of his cash fees remained unpaid. In January 2019, Mr. van Sante was awarded with 150,000 options for which, $127,627 was accounted for and expensed in 2019 based on a Black-Scholes option pricing model calculation, however, in December 2019 the Company revoked this grant under review of a replacement award which actually was granted in January 2020. The expenses of the evoked award will be offset against the 2020 award. For the year 2019 a cash bonus was accounted for which amounts to $25,000 and is expected to be paid in 2020.

267. For the fiscal year ended December 31, 2017, van Sante received $346,517 in compensation from Pareteum. This includes $111,197 in cash and $235,320 in non-qualified deferred compensation earnings.

268. For the fiscal year ended December 31, 2018, van Sante received $324,949 in compensation from Pareteum. This includes $129,851 in cash, $237,865 in stock awards, and $(42,767) in non-qualified deferred compensation earnings.

269. For the fiscal year ended December 31, 2019, van Sante received $709,744 in compensation from Pareteum. This includes $180,000 in cash, $214,421 in stock awards, $127,627 in option awards, and $187,647 in non-qualified deferred compensation earnings.

## J. DAMAGES TO PARETEUM

270. As a result of Defendants' improprieties, Pareteum disseminated improper, public statements concerning Pareteum's business operations, financial prospects, and compliance with federal laws and GAAP. Once revealed, these improper statements devastated Pareteum's

credibility with investors, cratering its share price, preventing it from raising capital and ultimately resulting in Pareteum seeking bankruptcy relief.

271.    As a result of Defendants' misstatements, Pareteum's stock price was seriously impaired, as set forth in the accompanying graph:



272.    Pareteum's stock was $0.72 on December 14, 2017.

273.    As a result of the misleading statements regarding Pareteum's revenue during the period December 2017 through August 2019, Pareteum's stock reached a high of $5.15 per share on March 12, 2019.

274.    After Pareteum announced it had to restate its financial statements because of the improper revenue calculation, Pareteum's stock price dropped to $0.30 per share on October 22, 2019.

275. As set forth in detail above, as a result of Defendants' actions, Pareteum's stock never recovered.

276. As a direct and proximate result of Defendants' conduct, Pareteum has been seriously harmed.

277. Such harm includes, but is not limited to:

a. the enterprise value of the Debtors, which was lost as a result of the Defendants' self-dealing and breaches of fiduciary duty;

b. the dilution of the value of Pareteum's stock as a result of the issuance of 1,000,000 shares on August 22, 2019 and November 15, 2019 to Post Road Group arising out of Pareteum's failure to satisfy its obligations under the Post Road Facility;

c. the dilution of the value of Pareteum's stock as a result of the September 20, 2019 public offering of 18.8 million shares of Company stock and 3.8 million purchase warrants;

d. the liabilities incurred by the Debtors from the Artilium and iPass acquisitions that were not accounted for during due diligence or disclosed to shareholders;

e. legal fees incurred in connection with the various lawsuits;

f. costs incurred from compensation and benefits paid to Defendants who have breached their duties to Pareteum;

g. costs incurred in connection with restating its financial statements for the periods ended December 31, 2018; March 31, 2019; and June 30, 2019;

h. cettlement with the SEC and the imposition of the fine; and

i. costs incurred as a result of the de-listing from NASDAQ and the attempts to become compliant.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**(Breach of the Duty of Loyalty Against All Defendants)**

278. Plaintiff repeats and re-alleges each of the allegations set forth above and below as if set forth herein.

279. At all relevant times hereto, there have been one or more creditors who have held and still hold, unsecured claims against the Debtors that were, and are, allowable under 11 U.S.C. § 502.

280. Each of the Defendants owes and owed to the Debtors the duty to exercise candor, good faith, and loyalty in the management and administration of the Debtors' business and affairs, particularly with respect to issues as fundamental as public disclosures.

281. Each of the Defendants violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, Defendants violated their duty of good faith by creating a culture of lawlessness within the Debtors, or consciously failing to prevent the Debtors from engaging in the unlawful acts set forth above in order to promote their own self-interest by increasing their compensation.

282. Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. They either knew, were reckless, or were grossly negligent in not knowing: (i) Pareteum was unlikely to collect revenue from certain customer transactions; (ii) Pareteum improperly recognized revenue in its financial statements from customer transactions, in violation of GAAP and other applicable standards set forth herein; (iii) Pareteum's revenues and accounts receivable were artificially inflated; (iv) consequently, Pareteum would ultimately need to restate each of its financial statements issued during the 2018 fiscal year, and for the first and second quarters of 2019; and (v) the Artilium and iPass Acquisitions would result in Pareteum being responsible for millions of dollars of undisclosed liabilities. Accordingly, the Defendants breached their duty of loyalty to Pareteum.

283. In addition, Turner and Van Sante, as directors of Pareteum, owed Pareteum the highest duty of loyalty. Turner and Van Sante breached their duty of loyalty by recklessly

permitting the unlawful activity concerning business and financial prospects. Turner and Van Sante knew or were reckless in not knowing that: (i) Pareteum was unlikely to collect revenue from certain customer transactions; (ii) Pareteum improperly recognized revenue in its financial statements from customer transactions, in violation of GAAP; (iii) Pareteum's revenues and accounts receivable were artificially inflated; (iv) consequently, Pareteum would ultimately need to restate each of its financial statements issued during the 2018 fiscal year, and for the first and second quarters of 2019; and (v) the Artilium and iPass Acquisitions would result in Pareteum being responsible for millions of dollars of undisclosed liabilities. Accordingly, these Defendants breached their duty of loyalty to Pareteum.

284. Van Sante breached his fiduciary duty of loyalty by approving the statements described herein which were made during his tenure on the Audit Committee, which he knew or was reckless in not knowing contained improper statements and omissions. Van Sante completely and utterly failed in his duty of oversight, and failed in his duty to appropriately review financial results, as required by the Audit and Finance Committee Charter in effect at the time.

285. Defendants also failed to correct and caused Pareteum to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to Pareteum for breaching their fiduciary duties

286. Defendants had actual or constructive knowledge that Pareteum issued materially false and misleading statements, and they failed to correct Pareteum's public statements and representations. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material

89

misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Pareteum's securities.

287. Defendants had actual or constructive knowledge that they had caused Pareteum to improperly engage in the unlawful schemes set forth herein and to fail to maintain internal controls. Defendants had actual knowledge that Pareteum was engaging in the unlawful schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused Pareteum to improperly engage in the unlawful schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Pareteum's securities.

288. These actions were not a good-faith exercise of prudent business judgment to protect and promote Pareteum's corporate interests.

289. As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Pareteum has sustained significant damages, including enterprise value lost, which resulted in, among other things, the Debtors having to file for bankruptcy.

290. Defendants' breaches of their duty of loyalty have therefore damaged the Debtors and their estates in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Waste of Corporate Assets against Defendants)

291. Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint as though set forth at length herein.

292. As a result of Defendants' failure to properly supervise and monitor the adequacy of Pareteum's disclosure controls and procedures and/or intentional misconduct, Defendants

have caused Pareteum to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

293. As a result of the waste of corporate assets, Defendants are liable to the Debtors and their estates in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment against Defendants)

294. Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint as though set forth at length herein.

295. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Pareteum. Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Pareteum.

296. Plaintiff seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

297. Plaintiff has no adequate remedy at law.

## FOURTH CAUSE OF ACTION
### (Abuse of Control against Defendants)

298. Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint as though set forth at length herein.

299. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Pareteum, for which they are legally responsible.

300. As a direct and proximate result of Defendants' abuse of control, Pareteum has sustained significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Debtors and their estates in an amount to be determined at trial.

301. Plaintiff has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### (Gross Mismanagement against Defendants)

302. Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint as though set forth at length herein.

303. By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Pareteum in a manner consistent with the operations of a publicly-held corporation.

304. As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Pareteum has sustained significant damages.

305. As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Debtors and their estates in an amount to be determined at trial.

306. Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays that the Court enter a judgment against Defendants:

a. On Plaintiff's First Cause of Action, in favor of Plaintiff and against all of Defendants for the amount of damages sustained by Pareteum as a result of Defendants' breaches of fiduciary duties, including compensatory, consequential, incidental and punitive damages, along with pre and post-judgment interest, costs of suit and such other relief as the Court deems just and equitable;

b.　　On Plaintiff's Second Cause of Action, in favor of Plaintiff and against all of Defendants for the amount of damages sustained by Pareteum as a result of Defendants' waste of corporate assets, including compensatory, consequential, incidental and punitive damages, along with pre and post-judgment interest, costs of suit and such other relief as the Court deems just and equitable;

c.　　On Plaintiff's Third Cause of Action, in favor of Plaintiff and against all of Defendants for restitution as a result of Defendants' unjust enrichment;

d.　　On Plaintiff's Fourth Cause of Action, in favor of Plaintiff and against all of Defendants for the amount of damages sustained by Pareteum as a result of Defendants' abuse of control, including compensatory, consequential, incidental and punitive damages, along with pre and post-judgment interest, costs of suit and such other relief as the Court deems just and equitable;

e.　　On Plaintiff's Fifth Cause of Action, in favor of Plaintiff and against all of Defendants for the amount of damages sustained by Pareteum as a result of Defendants' gross mismanagement, including compensatory, consequential, incidental and punitive damages, along with pre and post-judgment interest, costs of suit and such other relief as the Court deems just and equitable;

f.　　Awarding Plaintiff restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

g.　　Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

h.      Granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        December 5, 2022

COLE SCHOTZ P.C.

/s/ Cameron Welch
Seth Van Aalten, Esq.
Cameron Welch, Esq.
Krista L. Kulp, Esq.
1325 Avenue of the Americas – 19th Floor
New York, New York 10019
(212) 752-8000
(212) 752-8393 Facsimile

*Attorneys for Anthony M. Saccullo, in his capacity as the Liquidation Trustee for the TEUM Liquidating Trust*

94

**EXHIBIT A**

Order Instituting Cease-and-Desist Proceedings dated September 2, 2021

22-1061, Document 84, 12/05/2022, 3443117, Page97 of 151

Case 1:19-cv-07474-KH Document 284 Filed 12/05/22 Entered 12/05/22 17:12:34 Exhibit A - Order Instituting Cease-and-Desist Proceedings dated September 2    2    Pg 2 of 11

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 10975 / September 2, 2021**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 92866 / September 2, 2021**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4247 / September 2, 2021**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20522**

| | |
|---|---|
| **In the Matter of**<br><br>   **PARETEUM CORPORATION,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Pareteum Corporation ("Pareteum" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, and Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act and Section 21C of the

Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order
("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

## <u>SUMMARY</u>

1.      This case concerns accounting and disclosure fraud by Pareteum, a
telecommunications company, spanning from 2018 through mid-2019 (the "relevant time period").
During this time, Pareteum's public filings materially overstated revenue by approximately $12
million for fiscal year 2018 (60% of the ultimately restated revenue), and by approximately $30
million for the first and second quarters of 2019 (91% of the ultimately restated revenue).

2.      These misstatements resulted from improper accounting practices, whereby certain
now former executives directed that revenue be recognized based on non-binding purchase orders
and prior to product shipment, which is not in accordance with generally accepted accounting
principles ("GAAP").  Further, former senior accounting employees took steps to conceal these
practices from Pareteum's auditor.

3.      On October 21, 2019, Pareteum issued a press release announcing that Pareteum's
financial results for 2018 and the first half of 2019 required restatement, and on December 14, 2020,
Pareteum restated its financial results for 2018, reducing the full year revenue from $32.4 million to
$20.3 million.  On March 12, 2021, Pareteum reported its financial results for 2019, reporting a full
year revenue of $62.05 million, including restated quarterly financial results for the first half of
2019 – reducing its stated revenue for the first quarter of 2019 from $23.04 million to $13.07
million, and for the second quarter of 2019 from $34.2 to $16.9 million.

4.      As a result of the conduct described herein, Pareteum violated Section 17(a) of the
Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and
Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

5.      After determining that a restatement was needed, Pareteum's Audit Committee
began an independent investigation that resulted in the separation of multiple Pareteum executives –
comprising almost all of the senior management team and certain senior executives in sales and
finance positions.  Pareteum took additional remedial measures, including modifying and improving
internal accounting controls and procedures to prevent recurrence of the misconduct.  Pareteum also
provided cooperation to the Commission staff during the staff's investigation, including providing
presentations to the staff summarizing facts developed during the course of its own internal
investigation and identifying key documents.

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not
binding on any other person or entity in this or any other proceeding.

## RESPONDENT

6.      **Pareteum Corporation** is incorporated in Delaware with a principal place of business in New York, NY.  Pareteum is a telecommunications and cloud software company.  Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, and traded on the NASDAQ exchange under the symbol "TEUM."  NASDAQ delisted Pareteum's common stock on February 2, 2021 for its failure to timely file required periodic reports with the Commission.  Pareteum's common stock currently trades on the OTC Pink market as "TEUM."

## FACTS

### Background

7.      Pareteum is a telecommunications "Software as a Service" or "SaaS" company that offers various products such as SIM cards, WiFi service, and a Cloud platform.  One portion of Pareteum's business is its mobile bundled services line, which provides SIM cards with customizable service plan options.  Pareteum's customers then resell the SIM cards to consumers.

8.      FASB Accounting Standards Codification Topic 606, *Revenue From Contracts With Customers* ("ASC 606"), provides guidance for recognizing revenue for these type of sales agreements.  ASC 606 requires entities to recognize revenue only when control of the promised goods or services is transferred to customers, and at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services where such transfer has been completed.

9.      ASC 606 requires entities to take the following steps to assess whether and what revenue should be recognized:  (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the corresponding performance obligation(s); and (5) recognize revenue when or as the entity satisfies a performance obligation by transferring control of a promised good or service to a customer.

10.      Consistent with this, Pareteum disclosed in its 2018 Form 10-K that starting on January 1, 2018, Pareteum was reporting revenue in accordance with ASC 606 which, Pareteum stated, "requires entities to recognize revenue when control of the promised goods or services is transferred to customers at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services."

### Pareteum's Improper Revenue Recognition Practices Based on Non-Binding Purchase Orders

11.      Despite disclosing that ASC 606 would be followed, Pareteum recognized revenue without confirming whether the criteria of ASC 606 had been fully satisfied.  Instead, starting in or

around January 2018, Pareteum began recognizing the entire amount of a customer's initial purchase order with Pareteum, even though these purchase orders were non-binding and the product had not yet been shipped. Pareteum did not have sufficient procedures and controls in place to provide reasonable assurance that it was recognizing revenue in accordance with ASC 606, and instead, Pareteum's former accounting and finance executives allowed revenue to be recognized that was not in compliance with GAAP.

12. In practice, Pareteum's revenue recognition procedure for mobile bundled services customers during the relevant time period was as follows: (1) a new customer signed a contract and master services agreement, (2) a purchase order was drafted by Pareteum, providing the number of SIM cards the customer intended to purchase, as well as an estimated cost for the average monthly plan they were expecting to sell to downstream consumers; (3) the customer signed this purchase order, which in most cases indicated that the full cost listed was just an estimated forecasted amount that would not be due until the customer sold the product to downstream consumers; and (4) Pareteum recognized revenue for the entire amount listed in the purchase order. Pareteum recognized the total revenue of each purchase order regardless of whether the SIM cards had been shipped yet or whether a platform had been set up by Pareteum sufficient to even allow the SIM cards to work.

13. Under ASC 606, Pareteum should have satisfied its performance obligations under the purchase order prior to recognizing revenue. Specifically, Pareteum should have ensured that the SIM cards had been shipped, and that the platform had been created and was operational. Further, under the terms of most of the purchase orders, the SIM cards also had to have been sold to and activated by an end-user before the customer was obligated to pay Pareteum. In multiple instances, Pareteum failed to meet all of these requirements prior to recognizing revenue.

14. There were insufficient internal accounting controls in place at Pareteum to assess whether the required performance obligations had been met prior to revenue being recognized, and in practice, such checks were often not properly done. As a result, Pareteum recognized the amounts listed in the purchase orders based solely on the purchase order being signed by the customer without confirming whether these amounts were recognizable under ASC 606, resulting in the improper recognition of millions of dollars of revenue in contravention of ASC 606.

15. Pareteum's former leadership pressured employees to reach Pareteum's internal budgeted projections for revenue each month. Pareteum was only able to meet these projections by immediately recognizing revenue for the entire projected amount of a purchase order when it was signed – despite Pareteum having not met its performance obligations under the purchase order.

16. Recognizing the full amount of each purchase order once signed, rather than in accordance with GAAP, became standard practice for Pareteum's mobile bundled services line of business. One or more former Pareteum executives knew or were reckless in not knowing that the requirements for proper revenue recognition had not been met and yet continued to authorize or accept decisions to recognize millions of dollars of revenue improperly. Revenue recognized this way accounted for millions of Pareteum's revenue each quarter starting in 2018 and continued

through the first half of 2019, even though it was not yet owed by the customers.  By August 2019, Pareteum had only collected a fraction of the tens of millions in revenue Pareteum had recognized for mobile bundled services customers.

### Misstatements Made to Pareteum's Auditor

17.     Because of the improper revenue recognition practices described above, Pareteum's accounts receivable balance ballooned by the end of 2018.  For many, Pareteum was still completing its obligations, such as shipping the SIM cards or setting up the platform.  For others, even if some SIM cards had been shipped, the customer had not yet become operational and had not sold any SIM cards to downstream consumers, and as such did not actually owe the accounts receivable amount to Pareteum.

18.     When Pareteum's independent auditor performed its 2018 end-of-year audit testing in February 2019, it included Pareteum's accounts receivable as a main risk area.  To test the validity of the accounts receivable amounts, the auditor sent out audit confirmations to many of Pareteum's customers asking the customers to sign that they agreed with Pareteum's record of how much was owed to Pareteum as of year-end 2018.  These audit confirmations went out to the vast majority of the customers that accounted for the $12 million in revenue that Pareteum improperly recognized in 2018.

19.     Despite the fact that the customers did not yet owe the amounts on the audit confirmations, most of these customers did eventually sign the audit confirmations.  One or more former Pareteum officers or senior accounting executives knowingly or recklessly directed Pareteum sales employees to encourage customers to sign the audit confirmations by falsely telling them that the confirmation amounts listed were just for forecasts or estimates and did not represent amounts that the customers were actually committed to paying.  With these assurances, most of these customers signed the audit confirmations and returned them to Pareteum's auditor, thereby unknowingly providing false audit evidence.

### Pareteum's Improper Recognition of Revenue From an Unsigned Purchase Order, and Related Cover-up Steps

20.     In addition to the improper revenue recognition practices discussed above, Pareteum also improperly recognized millions in revenue based on an unsigned, mid-negotiation purchase order for International Mobile Subscriber Identity numbers, or IMSIs, which was never ultimately agreed to by the customer.

21.     Unlike SIM cards, IMSIs are "virtual," and do not require the shipment of any physical product – instead, Pareteum would deliver IMSIs by assigning and emailing the relevant IMSI numbers to the customer once the necessary platform had been developed and created by Pareteum.

22. In late January 2019, Pareteum and a customer were negotiating an IMSI purchase order. A former Pareteum sales employee drafted a purchase order for 6.3 million euros and circulated an unsigned version internally to others at Pareteum for approval.

23. Despite the fact that the 6.3 million euro purchase order had not been finalized or agreed to by the customer, at the direction of one or more former Pareteum executives, Pareteum recognized revenue for 20% of the order, or approximately $1.4 million, for January 2019.

24. The former Pareteum sales employee ultimately finalized the purchase order with the customer in February 2019 – but for 630,000 euros, not 6.3 million. Notwithstanding this change in the purchase order, at the direction of one or more former Pareteum executives, Pareteum continued to recognize revenue off of the unsigned draft purchase order for 6.3 million euros. Pareteum recognized another 20% of revenue from the draft purchase order in February 2019, and another 20% in April 2019. Ultimately, in the first and second quarter of 2019, Pareteum recognized a total of approximately $4.4 million in revenue based on this unsigned draft purchase order when the final signed purchase order was only for 630,000 euros, or approximately $750,000.

25. Even if the 6.3 million euro purchase order had been finalized and signed, Pareteum's revenue recognition would not have been in accordance with GAAP. At the time that this revenue was recognized, the platform for these IMSIs was not yet functional and Pareteum was still working on setting it up properly. Further, there was no reasoning or support for recognizing 20% of this purchase order three separate times. One or more former Pareteum executives knew, or were reckless in not knowing, that this was not proper under ASC 606 and as such was not in accordance with GAAP.

26. In August 2019, Pareteum received a subpoena from Commission staff in connection with its investigation into this conduct. At or around this time, multiple former Pareteum executives became aware that the 6.3 million euro purchase order had never been signed, and that a 630,000-euro purchase order had been signed instead. At first, rather than report this issue to more senior management, former Pareteum sales and accounting executives attempted to get a backdated purchase order signed retroactively to cover up the mistake. Though these former sales and accounting employees were successfully able to get a replacement backdated purchase order signed, Pareteum ultimately identified and self-reported the existence of the backdated purchase order.

**Pareteum's Restatement, Independent Investigation,
and Cooperation with Commission Staff**

27. On October 21, 2019, Pareteum publicly announced that it would be issuing financial restatements for all of 2018 and the first two quarters of 2019, and that it expected the restatements to reduce the reported revenue by $9 million for all of 2018 and $24 million for the first half of 2019. After this announcement, Pareteum's Audit Committee began an independent investigation.

22-10615-lgb  Doc 84-2  Filed 12/05/22  Entered 12/05/22 17:12:34  Exhibit A -
Order Instituting Cease-and-Desist Proceedings dated September 2    2    Pg 8 of 11

Case 1:19-cv-09767-KH   Document 84-2   Filed 12/05/23   Page 103 of 151

28. On November 5, 2019, Pareteum announced it had appointed an Interim Chief Financial Officer ("CFO"), while the former CFO's status was "under review." On November 25, 2019, Pareteum announced it had terminated and replaced the Executive Chairman and Chief Executive Officer ("CEO") of Pareteum. In addition to the CEO and CFO, in 2020, Pareteum terminated its Chief Commercial Officer and Chief Revenue Officer and replaced its Controller.

29. On December 14, 2020, Pareteum filed a restated Form 10-K for 2018, reducing the full year revenue from $32.4 million to $20.3 million. On March 12, 2021, Pareteum restated is financial results for 2019, reporting a full year revenue of $62.05 million – reducing its stated revenue for the first quarter of 2019 from $23.04 million to $13.07 million, and for the second quarter of 2019 from $34.2 to $16.9 million.

30. During the staff's investigation, after new management was installed, Pareteum and its Audit Committee voluntarily met with the staff on multiple occasions, presented detailed factual summaries of relevant information, and provided information and documents both on their own initiative and at the staff's request.

## **VIOLATIONS**

31. As a result of the conduct described above, Respondent violated Section 17(a) of the Securities Act, which prohibits fraudulent conduct in the offer or sale of a security.

32. As a result of the conduct described above, Respondent violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities.

33. As a result of the conduct described above, Respondent violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 promulgated thereunder, which require issuers of securities registered pursuant to Section 12 of the Exchange Act to file periodic and other reports with the Commission, including annual, quarterly and current reports, on the appropriate forms and within the period specified on the form that must contain any material information necessary to make the required statements made in the report not misleading.

34. As a result of the conduct described above, Respondent violated Exchange Act Section 13(b)(2)(A) which requires issuers of securities registered pursuant to Section 12 of the Exchange Act to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of assets.

35. As a result of the conduct described above, Respondent violated Exchange Act Section 13(b)(2)(B) which requires issuers of securities registered pursuant to Section 12 of the Exchange Act to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to, among other things, permit preparation of financial statements in accordance with GAAP.

**PARETEUM'S REMEDIAL EFFORTS AND COOPERATION**

36.     In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Respondent and cooperation afforded the Commission staff.

**UNDERTAKINGS**

37.     Respondent undertakes to:

a.  Cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in this Order;

b.  Use its best efforts to cause Respondent's current and former employees, officers, and directors to be interviewed by the Commission staff at such times and places as the staff requests upon reasonable notice;

c.  Use its best efforts to cause Respondent's current and former employees, officers, and directors to appear and testify truthfully and completely in such investigations, depositions, hearings or trials as may be reasonably requested by the Commission's staff;

d.  Accept service by mail or email or facsimile transmission of notices or subpoenas issued by the Commission to Respondent for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by Commission staff;

e.  Appoint its undersigned attorneys as agents to receive service of such notices and subpoenas;

f.  With respect to such notices and subpoenas, waive the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the interview or testimony reimburses the travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per diem rates; and

g.  Consent to personal jurisdiction over it in any United States District Court for purposes of enforcing any such subpoena.

In determining whether to accept Respondent's Offer, the Commission has considered these undertakings.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Pareteum's Offer.

8

Accordingly, pursuant to Section 8A of the Securities Act and 21C of the Exchange Act, it is hereby ORDERED that:

A.      Respondent Pareteum cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

B.      Respondent shall pay a civil money penalty in the amount of $500,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  Payment shall be made in the following installments:

- Due within 14 days of the entry of this Order: $75,000
- December 31, 2021: $33,333
- March 31, 2022: $33,333
- June 30, 2022: $33,334
- September 30, 2022: $81,250
- December 31, 2022: $81,250
- March 31, 2023:  $81,250
- June 30, 2023:  $81,250

Payments shall be applied first to post order interest, which accrues pursuant to 31 U.S.C. § 3717.  Prior to making the final payment set forth herein, Respondent shall contact the staff of the Commission for the amount due.  If Respondent fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Pareteum as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Scott Thompson, Co-Acting Regional Director, Division of Enforcement, Securities and Exchange Commission, Philadelphia Regional Office, 1617 John F. Kennedy Boulevard, Suite 520, Philadelphia, PA 19103.

C.       Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
 Secretary

**EXHIBIT B**

Marcus Aurelius Report



## MARCUS AURELIUS
—— VALUE ——

RESEARCH   ABOUT   CONTACT   TERMS OF SERVICE   $Q$

# TEUM: Where Are The Customers?

JUNE 7, 2019 | TEUM

 MORE

IMPORTANT – Please read this Disclaimer in its entirety before continuing to read our research opinion. The information set forth in this report does not constitute a recommendation to buy or sell any security. This report represents the opinion of the author as of the date of this report. This report contains certain "forward-looking statements," which may be identified by the use of such words as "believe," "expect," "anticipate," "should," "planned," "estimated," "potential," "outlook," "forecast," "plan" and other similar terms. All are subject to various factors, any or all of which could cause actual events to differ materially from projected events. This report is based upon information reasonably available to the author and obtained from sources the author believes to be reliable; however, such information and sources cannot be guaranteed as to their accuracy or completeness. The author makes no representation as to the accuracy or completeness of the information set forth in this report and undertakes no duty to update its contents. The author encourages all readers to do their own due diligence.

You should assume that as of the publication date of his reports and research, Aurelius and possibly any companies affiliated with him and their members, partners, employees, consultants, clients and/or investors (the "Aurelius Affiliates") have a short position in the stock (and/or options, swaps, and other derivatives related to the stock) and bonds of Pareteum. They therefore stand to rea ize significant gains in the event that the prices of either equity or debt securities of Pareteum dec ine. Aurelius and the Aurelius Affi iates intend to continue transactions in the securities of Pareteum for an indefinite period after his first report on a subject company at any time hereafter regardless of initial position and the views stated in Aurelius' research. Aure ius will not update any report or information on this website to reflect such positions or changes in such positions.

Please note that Aurelius, the author of this report, and the "Aurelius Affiliates" are not in any way associated with Aure ius Capital Management, LP, a private investment firm based in New York, and any affiliates of or funds managed by the latter company.

You should assume that all persons and entities referenced in lawsuits, government actions, or criminal indictments have denied the allegations referenced herein.

**Summary**

We are short Pareteum (NASDAQ: TEUM). We see massive downside potential and believe the stock is completely uninvestible.

TEUM's pub ic claims simply don't hold up to investigative scrutiny. For example, TEUM touted a contract with the South Africa based "Eyethu Mobile Network" as part of a group of deals, purportedly worth _$50 million_ in aggregate, that TEUM says it signed in the last two weeks of August 2018. TEUM's CEO & Chairman, Hal Turner, took to Twitter to promote Eyethu and declared that TEUM is _"bringing change to South Africans with surprisingly unlimited cheapest data bundle"_. Although Eyethu's website is not functional, Eyethu's CEO explained on Twitter in 2018; _"guys in the midst of being unemployed, I started my own mobile network operator company, EMN Telecommunications trading as Eyethu Mobile"_. **Our investigators went to visit Eyethu/EMN's headquarters but discovered only a dilapidated shack and crumbling structures near a rural African village (below).**

Documents and detailed forensic evidence presented throughout this report shows that Eyethu is only the tip of the iceberg of small or defunct entities across the world that TEUM claims to have signed valuable contracts with.

### JOIN THE LIST

Enter email...   JOIN

### COMPANY COVERAGE

MDXG (8)
HIIQ (5)
BOFI (4)
BANC (3)
PME (2)
CIA (2)
KGJI (1)
PETS (1)
EGBN (1)
AVAV (1)
ACHC (1)
VNDA (1)
INS (1)
TEUM (1)
VSLR (1)
PAYS (1)
NBIX (1)
CAN (1)
INMD (1)
BFYT (1)
GSX (1)
PEN (1)





**Key findings include:**

<u>TEUM's Management Has Extensive Ties to Previous Alleged Frauds and Failures.</u>

The biographies for Turner and TEUM's COO fail to disclose their leadership positions at Catcher Holdings, a now worthless stock that was owned by a group that included an entity controlled by Barry Honig, the notorious stock operator charged by the SEC last October with fraud for alleged pump and dump schemes. We see similarities between TEUM and the stock promotion at Catcher, where Turner repeatedly touted Catcher's technology and growth prospects but investors ultimately were left with nothing.  TEUM's CFO was sued by investors for fraud after he allegedly "*personally affected the fraudulent booking of revenues*" as CFO of Audioeye, which later erased <u>92%</u> of reported revenues over the relevant period in a restatement.  TEUM's former Audit Committee Chair, now a TEUM executive, was the CFO of TowerStream, another Honig-backed company that is now nearly worthless. TEUM's longtime investor relations representative was previously <u>sentenced to prison</u> in 2015 and recently disappeared from press releases after being added to a  ist of prohibited service providers by OTC markets.

<u>TEUM's Purported $900 Million Backlog Appears Significantly Exaggerated or Fictitious.</u>

The foundation of the Pareteum growth story is built on the company's supposedly large and fast-growing 36-month backlog, which management now says exceeds $900 million. But our investigation identified a variety of purportedly valuable customers that appear wholly incapable of paying TEUM anywhere near the large contractual values that TEUM has touted.  Examples include:

- A nearly-worthless penny-stock managed by a former AudioEye executive named alongside TEUM's CFO in the fraud suit.
- African entities that show no signs of meaningful business activity.
- Contracts with crypto-companies including one that recently settled with the SEC and "agreed to return funds to harmed investors".
- Closed or dissolved businesses.
- Websites that are inactive or offer limited contact information.
- Businesses that don't answer the phones or report having minimal employees.
- European entities with tiny amounts of capital or revenue.
- Featured customers located in apartment buildings.

- Millions in loans to an entity bleeding cash.
- A purported $50 million contract with an entity in Thailand that reports having zero 2018 revenue, years of losses, and involvement with a crypto-coin that has lost 97% of its peak value.

We also found irregularities and embellishments involving a significant portion of the "notable partners and customers" that TEUM highlighted in a graphic at its recent analyst day, suggesting TEUM struggles to find enough legitimate new customers to even fill a simple slide.

TEUM's Backlog Conversion and Receivables Signal Serious Potential Accounting Problems.

The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the stock price. Bulls have taken comfort in management's assurances that TEUM's backlog has converted to revenue at over 100% of contractual rates thus far. But we find TEUM's backlog conversion rate highly problematic considering that our research has flagged so many small or defunct customers. If exaggerated contractual values are now being recognized as revenue, then we believe TEUM will face serious accounting problems. TEUM's receivables have already begun to balloon after growing at sequential rates far faster than revenues in each of the last four quarters. TEUM's small California auditor, which was specifically cited by the PCAOB for audit deficiencies related to revenue, gives us no comfort.

TEUM Has Surrounded Itself with Veterans from Failed Stock Promotions.

We discovered a network of actors behind TEUM whose mere presence should send diligent investors running for hills. TEUM has paid promoters, used a placement agent, and attracted large investors that are veterans of numerous previous stock promotions Honig was an investor in, many of which have since declined to near worthlessness. We discovered that TEUM's relationship with Honig's longtime securities law firm, Sichenzia Ross, is so close that the address that TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's main office. TEUM has issued tens of millions in shares, warrants, and convertible preferred securities in a series of complex private placements with the assistance of Sichenzia, who is being sued by a former client for allegedly helping create "ownership blockers" for Honig's group as part of an alleged pump and dump scheme that left that company bankrupt and unable to even validate its number of shares outstanding (Sichenzia and Honig deny the allegations).

**The TEUM "Miracle"**

Pareteum's origins trace to a languishing penny stock, Elephant Talk Communications, that had declining revenues and an audit opinion that expressed doubt about its ability to operate as a going concern up until March 2018. A new management team entered in late 2015, led by CEO and Chairman Hal Turner, who quickly engineered a reverse split and a series of private placements and acquisitions to rebrand the company as Pareteum, a "Global Cloud Communications Platform". TEUM's business is built on a backend software offering that primarily targets Mobile Virtual Network Operators (MVNO), which are essentially marketing businesses that provide wireless communications to customers by renting bandwidth from large carriers ike T-Mobile or AT&T. The company's market cap has grown from $25 million in 2016 to as high as $500 million this year, while the stock has surged amidst a stream of *238 press releases* issued since the beginning of 2017 that frequently tout the company's purported capabilities in buzzword categories such as internet of things, machine learning, super API, predictive analytics, smart cities, and blockchain. Despite a relatively small sales force, reported revenues have started to grow rapidly and the company now says its backlog is approaching *$1 billion* (As compared to trailing revenues of $50 million), catching the eye of sell side analysts who now model parabolic growth.

**TEUM's Management Team Has Extensive Ties to Previous Alleged Frauds and Failures**

TEUM's biographies of Turner and Chief Operating Officer, Denis McCarthy, fail to disclose their respective roles as CEO and CFO of Catcher Holdings, a now worthless stock that was owned by a group that included an entity controlled by **_Barry Honig_, who was charged by the SEC last October with fraud for allegedly masterminding a series of pump and dump schemes**. On May 22nd, CNBC reported there is a parallel criminal investigation into Honig's alleged pump and dump ring being conducted by the U.S. Attorney's Office of San Francisco.

Catcher had declared itself "a visionary technology leader" with clients "among the world's largest private and public companies". After joining in early 2007, Turner told investors Catcher "*is a great company*" and "*will be a greater company through our execution*". But just weeks after completing an acquisition in December 2007, Turner suddenly left Catcher which quickly collapsed in April 2008 due

to "insufficiency of working capital". Turner resurfaced with McCarthy and TEUM's now-COO, Vic Bozzo, at Pac-West Telecom, but left in 2011 and that company later filed bankruptcy in 2013.

**A Group Including Alleged Pump & Dump Mastermind Barry Honig Owned Catcher Holdings**

Catcher is a visionary technology leader dedicated to producing communication oriented security & operations solutions.

GRQ Consultants, Inc. Defined Benefit Plan
c/o Barry Honig
3269 Harrington Drive
Boca Raton, FL 33496

**TEUM's CEO & CFO Repeatedly Touted Catcher's Purported Growth Prospects and Technology**

"We believe our platform is among the industry's most robust," said Hal Turner, Chairman and Chief Executive, Catcher Holdings Inc. "We anticipate the advanced features in this release will help put the company at the forefront of fast-growing and critical segments of the market including emergency response, biometric, security, mining, medical and insurance applications worldwide.

LEESBURG, VA -- (MARKET WIRE) -- 08/22/07 -- The latest and greatest technology in the war on terror -- a real-life, real-time, mobile computing unit from Catcher Holdings, Inc. (OTCBB: CTHH), created quite a buzz with the directors, writers and propmasters in Hollywood on Monday, August 13th.

Denis McCarthy, CFO of Catcher Holdings, Inc., brought two of the new mobile computing units to Michael Schrager of The Entertainment Marketing Company and Schrager immediately recognized their appeal. "The moment I saw the CATCHER(TM) 2.0, I knew every Director would want it for their military, first responder and crime solving television series. Everything about the CATCHER(TM) 2.0 is unique and high-tech -- from its ability to withstand extreme weather and

**But Investors Were Left With Nothing When Catcher Quickly Collapsed**

Item 2.05      Costs Associated with Exit or Disposal Activities

Effective April 1, 2008, Catcher Holdings, Inc. (the "Company") terminated all of its employees and ceased operations due to the insufficiency of working capital. The Company is attempting to raise funds to restart operations; however, there is no certainty that it will be successful in this regard.

Additionally, the Company has not met certain terms of a $1,000,000 note agreement wherein the note holder has a first security interest in certain of the Company's assets. The note holder has verbally agreed, from time to time, to forgo action it may take; however, there is no assurance that it will continue to do so.

We also learned that TEUM's CFO, Edward "Ted" O'Donnell, was sued by Audioeye investors for fraud after he allegedly "***personally affected the fraudulent booking of revenues***" that triggered a restatement erasing 92% of the company's reported revenue over the relevant period. The lawsuit alleged that the fraud was designed to "**give the market the false notion that revenue growth was accelerating**" and "artificially inflate AudioEye's stock price" (O'Donnell denied the allegations and the lawsuit appears to have been settled). O'Donnell resigned from AudioEye in March 2015 and joined TEUM in January 2017.

Company had only 18 employees as of March 26, 2014. This raises a strong inference that the Individual Defendants, who were senior managers of the Company, were intimately familiar with all material aspects of the Company's operations and financial reporting. Furthermore, as alleged above in ¶¶131-38, the circumstances suggest that Defendant O'Donnell, as CFO, personally affected the fraudulent booking of revenues. Accordingly, this is *not* a case where a fraud occurred at a distant subsidiary or was committed by lower-level employees who did not report directly to senior management.

truth about the lack of support for purported revenues associated with the nonmonetary license transactions was revealed. While each of these misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate AudioEye's stock price and the image of its future business prospects to give the market the false notion that revenue growth was accelerating. These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period.

While Chairing TEUM's Audit Committee, Laura Thomas was also the CFO of TowerStream, a nearly worthless equity owned by Honig. Thomas moved from the TEUM Board to an executive role at TEUM in December 2018 and resigned from TowerStream in January 2018.

TEUM's longtime investor relations representative was Stephan Hart (aka Steven or Stephen Hart) who disappeared from TEUM press releases ear ier this year after being added to the list of prohibited service providers by OTC markets. **Hart was representing TEUM even though he was *sentenced to prison*** in August 2015 for obstruction of justice and perjury following charges by the SEC for "illegal trading schemes" in December 2012.

Pareteum Investor Relations Contacts:
Ted O'Donnell
Chief Financial Officer
+1 212 984 1096
InvestorRelations@pareteum.com

Stephen Hart
Hayden IR
+1 917 658 7878

FOR IMMEDIATE RELEASE                    Friday August 9, 2019

**Former Investment Manager Employee Sentenced In Manhattan Federal Court To Four Months In Prison For Obstruction Of Justice And Perjury**

Defendant Lied During Sworn Testimony to the SEC and Impersonated His

Preet Bharara, the United States Attorney for the Southern District of New York, announced that STEVEN HART was sentenced yesterday to four months in prison in Manhattan federal court for obstruction of justice and perjury charges relating to an investigation that the U.S. Securities and Exchange Commission (the "SEC") had conducted into potential violations of the federal securities laws. Hart previously pled guilty on March 13, 2015 to a two-count criminal information. He was sentenced by U.S. District Judge Katherine Polk Failla.

**TEUM's Purported $900 Million Backlog Appears Significantly Exaggerated or Fictitious**

After Turner took over and rebranded the company, TEUM began issuing dozens of press releases touting the growing number of new customers TEUM claims to have signed valuable contracts with. Turner has declared that "*we're on fire with relentless forward motion*" and "*highly successful in driving sales, lots and lots of contracts*". Turner has also explained the stated backlog means the "revenue value over the next 36 months, sitting there in contracts, awaiting implementation and deployment and that's based upon the customer's contractually executed schedules". The Sell Side has relied on these statements to hail TEUM's reported backlog growth as "stunning" and consensus analyst expectations now project TEUM's sales growing from $32 mil ion in 2018 to more than *$175 million* in 2020.

Doubts about the legitimacy of TEUM's claims began to surface in March, when a blog post raised questions about the validity of several customers that were named by TEUM in press releases. Our own investigation flagged a variety of customers TEUM has hyped that appear completely incapable of producing anywhere near the material amounts of revenue that TEUM has suggested or implied.

For example, in October 2018 TEUM touted a contract with Naledi Telecom, who TEUM claimed was launching as the first MVNO in Lesotho, Africa, and one of three multi-mil ion contracts purportedly totaling *$15 million* in aggregate over three years. Although Naledi's website is not functional, Lesotho corporate records we obtained show that an entity using the trade name Naledi Telecom was formed in May 2018 with less than "1000" in share capital by a Zimbabwe national. Our investigators visited Naledi's registered address but found **Naledi wasn't even listed in the building's directory and the investigators found no activity at its supposed office number** (below). The building manager told our investigators the office's tenant had moved out and our investigators were directed to a different location in the area. They didn't find Naledi at that address either, but instead the operations of a Lesotho newspaper business, where the individual who created Naledi informed them that **Naledi is not operational**, claiming it will launch at an unspecified later date.

**TEUM Hyped a Purported Multi-Million Dollar Contract With Naledi Telecom in Africa**

Pareteum will deliver its full platform as a service to Lesotho, South Africa-based Naledi Telecom, enabling it to launch as the first mobile virtual network operator there.

"Pareteum's momentum continues to grow as we close on these multimillion dollar contracts," said Vic Bozzo, chief executive officer of Pareteum. "With these new use cases, we are not only building a

**But Our Investigators Found No Operations**



Parallax Health Science was named by TEUM in the exact same press release as a multi-million contract and TEUM's "first customer in the healthcare IT industry". But Parallax is a nearly-worthless penny-stock with negligible assets that recorded a mere *$11 thousand* in revenues last year. Currently and at the time of TEUM's press release, Parallax's own SEC filings stated there is "*substantial doubt about the company's ability to operate as a going concern*". So how could Parallax possibly contribute millions in revenues for TEUM? Farcically, we learned **that Parallax's executives include O'Donnell's former associates at AudioEye, including AudioEye's former CEO who was a named defendant alongside O'Donnell in the alleged fraud.** One Central, the third company

mentioned in the same press release, at least appears to have active operations. However, a balance sheet it filed in the Netherlands reported just €662k in equity and 7 employees.

### TEUM Touted Valuable Contract With Parallax Health Sciences

*Pareteum Adds $15 Million in New Contracts*
*Platform as a Service Unleashes Multiple Use Cases*
Parallax Health Sciences is Pareteum's first customer in the healthcare IT industry; it will use Pareteum's platform as a service to assist healthcare professionals in diagnosing and tracking health trends with their patients via data and SMS bundling. The technology integration will result in the establishment of Parallax Communications becoming an industry first: a globally-connected, remote patient care, mobile virtual network operator.

### Yet Parallax Is a Nearly-Worthless Penny Stock With a Mere $11k in Revenues

**PARALLAX HEALTH SCIENCES, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the year ended | |
| --- | --- | --- |
| | December 31, 2018 | December 31, 2017 |
| Revenue | $ 11,739 | $ 94,937 |
| Cost of sales | 20,339 | 142,044 |
| Gross profit (loss) | (8,600) | (47,107) |

*Going Concern*
The Company has incurred losses since inception resulting in an accumulated deficit of $15,308,717, and a working capital deficit of $4,036,923, and further losses are anticipated. The Company's ability to continue as a going concern is dependent upon its ability to generate profitable operations in the future and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due, which may not be available at commercially reasonable terms. There can be no assurance that the Company will be able to continue to raise funds, in which case the Company may be unable to meet its obligations and the Company may cease operations. These factors, among others, raise substantial doubt about the Company's ability to continue as a going concern.

### And Parallax's CTO Allegedly Perpetrated The AudioEye Fraud With TEUM's CFO



Nathaniel T Bradley
CTO/Chief Product Ofcr
9) Parallax Health Sciences Inc

Dr Paul R Arena
President/CEO
9) Parallax Health Sciences Inc

23. Defendant Nathaniel Bradley ("Bradley") has served as the Company's President and Chief Executive Officer ("CEO") at all relevant times.

24. Defendant Edward O'Donnell ("O'Donnell") at all relevant times served as the Company's Chief Financial Officer ("CFO") until his resignation on March 29, 2015.

AudioEye, Inc. Appoints Paul Arena as Executive Chairman
Published: Jan 30, 2014 8:38 a.m. ET

TEUM claims that a Thai company named One Development purportedly signed an individual three-year **$50 million contract**, one of the largest single deals that TEUM as ever announced. But we obtained financial statements that One Development filed in Thailand which **report _no revenue_ in 2018, operating losses for each of the three years presented, and total assets of just 9.3 million BHT, translating to just a mere $298k US**. Our investigators couldn't find an office for One Development at the address listed on the company's LinkedIn page, and a person who answered One Development's phone number refused to provide an address or the founder's contact information to our investigators.  One Development's presentation materials explain that its business plan is to entice MVNOs to launch in Thailand and then sell them services.  But even though the business was founded in 2013, One Development doesn't appear to have gained much traction. Its founder has been operating a parallel MVNO consulting business, Yozzo, that reported a mere 18BHT in revenue last year (about 57 cents US). The only deal we've seen announced is a December 2018 partnership between One Development and a crypto-company named Electroneum to bring a crypto-app to MVNOs. However, the underlying coin has now lost more than 97% of its peak value.   Once again, we question how this contract could possibly contribute anywhere near $50 mil ion for TEUM?

### TEUM Touted a Purported *$50 Million* Contract With Thailand's One Development

*Pareteum Expands Customer Base in Asia with 3-year $50 Million Contract*
*Thailand's One Development Establishes We Connect*
*Makes Mobility and Content Service Solutions Widely Available*

NEW YORK, NEW YORK – PRNewswire – October 8, 2018 – Pareteum Corporation (NYSE American: TEUM), a cloud software platform company, today announced a $50 million contract with One Development, Thailand's first mobile virtual network aggregator and enabler, and leader in the country's growing mobile virtual network operator market. Pareteum's cloud software platform will power One Development's ability to offer a turnkey solution to the over 50 companies that have obtained a mobile virtual network operator license in Thailand.

### But One Development's Financial Statements Reveal Zero Revenues, Losses, and Minimal Assets

Since the crypto-boom of late 2017, TEUM has repeatedly hyped contracts tied to crypto-businesses, including a "Blockchain Technology Partnership" with Airfox, a crypto company that TEUM named in at least 8 press releases. But we learned that Airfox **settled charges with the SEC** in November 2018 related to registration violations involving its sale of "AirTokens" and "agreed to return funds to harmed investors".

**Pareteum and AirFox Expand Blockchain Technology Partnership**

Hal Turner, Executive Chairman and Principal Executive Officer at Pareteum stated, "Pareteum and AirFox form a highly complementary technology partnership. These new converged services, centered on the security offered via Blockchain and Pareteum's open source developed award winning software services for communication service providers, extend TEUM's s abilities for person to person mobile payments, that are trusted. We see new markets, faster services adoption and deeper market penetration occurring, as well as our inevitable march toward cloud based self-services, utilizing our insights gleaned from data analytics, for everything. This bodes well for our partners AirFox and for Pareteum, in fundamental revenue growth and profitability."

**SEC settles charges with AirFox, Paragon Coin over ICO registrations**

Nov. 19, 2018

The Securities and Exchange Commission said it settled charges with Carrier EQ Inc (AirFox) and Paragon Coin Inc. alleging that they sold tokens in initial coin offerings without proper registration, according to a release from the agency.

Boston-based AirFox raised about $15 million in digital assets for a token-denominated ecosystem that would let users in emerging markets earn currency in exchange for them viewing advertising, according to the SEC. By October 2017, AirFox had sold 1.06 billion tokens to about 2,500 investors according to the SEC order.

Turner told investors the Airfox Blockchain deal "bodes well" for Pareteum's "fundamental revenue growth and profitability" in a January 2018 press release (above left). But when the SEC questioned TEUM about its blockchain business in an October 2018 comment letter (below), the company admitted to the SEC that "*Airfox has not deployed any mobile-phone related services*" and "**we have not and do not plan in the near future to generate any revenue from our relationship with Airfox**". Even though we can no longer find the Blockchain whitepaper TEUM previously announced it had pub ished on its website, management continues to hype blockchain and announced in April a purported **$22 million** contract with an unnamed "Digital Currency Wi-Fi provider".

> Your blockchain-enabler platform whitepaper discusses your relationship with AirFox, a cryptocurrency provider. Please describe any agreements you have with AirFox and tell us what services AirFox provides to the company.
>
> *Response:*
>
> *We formed a partnership with AirFox originally during a time in which AirFox planned to utilize their platform to for advertising-sponsored mobile phone service. AirFox asked us to act as a referral to our customers for their service.*
>
> *Though we continue to maintain a professional relationship with AirFox and have not terminated our partnership arrangement with AirFox at this time,* ==*AirFox has not deployed any mobile-phone related services and has discontinued this portion of their business*== *for the time being.* ==*We have not and do not plan in the near future to generate any revenue from our relationship with AirFox.*==

Yes, Pareteum has some "real" customers. Elephant Talk had declining revenues and legacy contracts with a few large customers such as Vodaphone Spain. TEUM completed an October 2018 acquisition of Artillium, which added some European customers but only $11 million in trailing twelve-month revenues. Then TEUM parlayed its surging stock price to complete a February 2019 all-stock acquisition of iPass, which had contracts with various large companies but declining revenues. Yet we found TEUM still needed to use a series of embellishments and small or seemingly inactive customers just to round out a graphic included in a slide of "Notable Pareteum Partners and Customers" for its May 28th analyst day presentation (page 21). If TEUM is unable to display a simple s ide of customers without resorting to these kinds of exaggerations, how could the true backlog and customer base possibly be even close to as robust as management claims it is? Our observations on the companies circled below in red include:



- The least of the problems is the double counting and self-counting that populates this graphic. Comically, TEUM includes logos of its own subsidiaries as if they were key partners or customers. *bliep, United Telecom, Ello Mobile, and Speak Up are Artillium companies specifically named in an SEC filing made by TEUM as part of that transaction. TEUM included the logos for both Vodaphone and Lowi.es, which is simply Vodaphone's Spanish telecom business. Similarly, Belgacom is the former name and same company as Proximus, which lists scarlet as an affi iated brand in pub ic filings.
- TEUM features the logo of Sol Mobile even though documents show the company was *legally dissolved in in August 2017*. TEUM first announced the UK-based Sol Mobile as its first MVNO

customer back in December of 2016 and on the May 2017 earnings call, Turner told investors that *"names that we've announced such as Sol Mobile and Pronto which are now beginning to come online"*. It's unclear if Sol, which was founded in 2015 and registered a co-working center in Dartford, progressed much beyond a startup.



- TEUM has repeatedly touted Pronto Telecommunications as a customer and features its logo in presentations. But Pronto's founder and CEO is a real estate broker in Pittsburgh, Pronto's website contains a prominent mis-spelling, offers no contact phone number, and lists the address of an apartment building as its headquarters.



- TEUM also features the logo of UK-based Bellingham Telecommunications. Yet a balance sheet that Bellingham filed with the UK companies house in 2018 reported a mere £282k in total assets exceeded by £415k in liabilities. The address displayed on Bellingham's website matches that of a Bridgestreet rental apartment and Bel ingham's Linkedin reports only one employee. Multiple calls to the phone number on Bellingham's website went unanswered.



- TEUM also inserted the logo of a company named Apeiron into its analyst day presentation, but the company's website is no longer active. Apeiron still lists 14 employees on Linkedin and the address of a small office located in Bedford, Texas.



- The presentation lists three European companies IP Nexia, Tellink, and ACN that appear to have actual operations but financials these companies filed indicate they are relatively small. Tellink lost €239k last year on €1 million in revenue, IP Nexia lost €3 Million on dec ining revenues of €4.9 Mil ion Euro, and ACN made £57k on dec ining revenues of £4.4 mil ion.
- The presentation includes Eroski Movil, which was the MVNO business of a European supermarket chain that appears to have been an Elephant Talk customer. But Eroski announced its withdrawal from the mobile telephony business last year and stated, as translated by Google, that it will "cease to operate in the mobile telephony market and will cede its position as a service provider". Eroski's mobile website, which used the same logo that TEUM featured in its analyst day presentation, has since been deleted.

Previous TEUM investor pitchbooks have featured the logo of Exactta Communications, which says on its website that it distributes prepaid phone cards at four airports. But online searches reveal a series of customer complaints, Exactta's Facebook page has gone dormant since 2017, and its website's "Employees" webpage says it's "under construction".   Multiple calls to Exactta's US phone number listed on its website went unanswered.





In October 2018, TEUM named Global Connect as one five companies that signed contracts totaling $11 million and 800,000 connections. TEUM described Global Connect as *"a communication services internet of things company with multinational clients focused on home automated solutions"*. Yet a 2018 Balance Sheet that Global Connect filed in the UK lists only **£74k in assets**, the entity is registered to an accountant's office, and we could find only one employee on Linkedin.  A counter embedded at the bottom of the website listed less than *500 visitors*.  A second company mentioned in the same press release, WorldSim, appears to have some operations but reported only £264k in assets in its UK fi ing, indicating it is another small business.

Yonder Media Mobile, which we are told was suggested to be a customer at TEUM's analyst day, received a series of loans totaling $3.2 million from TEUM starting last year, according to SEC fi ings. Yonder's CEO received significant publicity in 2012 after Yonder's predecessor company declared bankruptcy *"taking more than $33 million worth of investors money with it  It never released a product"* (see here, here).  We found Yonder's operating report dated May 15, 2019 posted online which articulates various grandiose plans Yonder has to acquire MVNOs and complete a music app.  But, unsurprisingly, the document states the company is burning cash which was projected to dwindle to $700k at the end of May and was seeking large investments from a variety of overseas investors.

**The Amazing Story Of How This 'Insane' CEO Blew $33 Million And Never Released A Product**

TEUM Now Making Millions In Loans To Finance This CEO's Latest Venture

On November 26, 2018, the Company executed a senior secured promissory note for $500,000 from Yonder Media Mobile (an unrelated entity), with interest accruing at a simple rate of 6% per annum with a maturity date of May 26, 2020. On January 9, 2019, February 12, 2019 and February 28, 2019, the Company issued additional notes of $300,000, $200,000, and $2,000,000, respectively (the "2019 Notes"). The 2019 Notes each bear an interest rate of 12% per annum and mature 18 months following the issuance date. All principal and interest are due on the maturity date. At March 31, 2019 and December 31, 2018, the remaining outstanding principal amounts were $3,237,967 and $505,667, respectively.

**TEUM's Backlog Conversion and Receivables Signal Serious Potential Accounting Problems**

The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the company's stock price.  Is it possible that this exact kind of scheme is now occurring at TEUM?

Bulls have taken comfort in management's assurances that backlog has converted to revenue at over 100% of contractual rates thus far.  Backlog turning into actual revenue, the thinking seems to go, is a sign that TEUM's new contract wins must be high quality in nature. Conversely, we find TEUM's backlog conversion rate highly problematic considering that our research has flagged customers that are small, defunct, or seem un ikely to be able to pay TEUM anywhere near the large contractual values that TEUM has touted. If these kinds of exaggerated contracts are now being recognized as revenue, as management's commentary indicates, then we be ieve TEUM will face serious accounting problems.

This is exactly why we're troubled that TEUM's receivables have grown at sequential rates far faster than revenues in each of the last four quarters. For example, revenues grew 64% to $23M in Q1 2019 from $14M in Q4 2018 but receivables ballooned 86% to $28M from $15M over the same period. This is puzz ing because TEUM's own SEC fi ings state that *"the company typically bills its customers at the end of each month, with payment to be received shortly thereafter"*, which we believe should naturally result in relatively minimal receivables. But TEUM's Days Sales Outstanding has reached **110 days** as compared 39 days of Twilio (TWLO), a company that promoters like to compare TEUM to, suggesting that TEUM's customers may already be falling behind on their bills.

TEUM's small California auditor, Squar Milner, gives us no additional comfort.  Squar has audited at least one company owned by Barry Honig, True Drinks Holdings (TRUU), an equity that is now virtually worthless. More importantly, the Public Company Accounting Oversight Board ("PCAOB") uncovered significant deficiencies in its most recent inspection of Squar in 2017.  The PCAOB stated in its report that *"in other words, in these audits, the auditor [Squar] issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement"*.  **The PCAOB even identified two significant deficiencies in a Squar audit specifically related to the valuation of revenue**:

> Whether or not associated with a disclosed financial reporting misstatement, an auditor's failure to obtain the reasonable assurance that the auditor is required to obtain is a serious matter. It is a failure to accomplish the essential purpose of the audit, and it means that, based on the audit work performed, the audit opinion should not have been issued.[6]
>
> The audit deficiencies that reached this level of significance are described below—
>
> A.1.    Issuer A
>
> (1)    the failure, in an audit of ICFR, to perform sufficient procedures to test the design and operating effectiveness of controls over the occurrence, completeness, and valuation of revenue (AS 2201.39, .42, .44, and .B9);
>
> (2)    the failure to perform sufficient procedures to test the occurrence, completeness, and valuation of revenue, including the use of sampling with sample sizes that were too small (AS 2301.08, .13, .16, .18, and .37; AS 2315.19, .23, and .23A; AS 2810.30); and

**TEUM Has Surrounded Itself with Veterans from Failed Stock Promotions**

While Honig is not named as a TEUM investor, we uncovered a series of relationships that make it hard for us to rule out the possibility that his invisible hand could be at work.  At absolute minimum, it's clear to us that TEUM is backed by a seasoned crowd of veterans from dubious stock promotions:

- TEUM is represented by Sichenzia Ross, the securities law firm of record for at least 92 companies that Honig and/or John Stetson, an alleged member of the pump and dump ring, have invested in since 2009. Bizarrely, the relationship between TEUM and Sichenzia is so close that **the address TEUM's lists on its website as its "USA Headquarters" is actually *Sichenzia's Main Office***. A 2017 Sichenzia press release states that Sichenzia has a long-term lease for the entire 37th floor that Pareteum currently lists as its address.



- TEUM has issued tens of millions in shares, warrants, and convertible preferred securities in a series of complex private placements that Sichenzia has assisted with. We note that Sichenzia and Honig are separately being sued for fraud by a former Sichenzia client, Mabvax Therapeutics, which is now a virtually worthless penny stock that the SEC says was the scene of a Honig-led pump and dump ("Company C" in the SEC's complaint against Honig). Mabvax alleges that **Sichenzia collaborated with Honig's group to structure private placements as "ownership blockers" that <u>left Mabvax unable to validate how many shares it has outstanding</u>**. Sichenzia and Honig deny the allegations.

> 12. The impact on the Company has been staggering. In late May 2018, MabVax determined that, as a result of the emerging and still unresolved "control group" questions, it could no longer confidently determine the validity of a strikingly large number of shares issued to Investors, casting a cloud over as many as 2,628,766 shares (roughly 28% of its common stock) that were issued on Sichenzia's watch. To remove that cloud, the Company has been forced to

- TEUM uses the same placement agent as Mabvax did, a Boca Raton broker named Dawson James Securities that also now issues favorable research reports on TEUM. According to our analysis, Dawson James has been engaged by 13 different companies that have been owned by Honig, most of which have declined more than 75% from their peak value and/or are now virtually worthless.
- While we are unable to identify all of TEUM's private placement investors, two firms that have regularly invested alongside Honig, Iroquois Capital and IntraCoastal Capital, owned or controlled 13.2% of TEUM's outstanding shares as of March 2018, according to an SEC filing. By our count, Iroquois and/or Intracoastal have collectively invested in a total of 34 pub icly traded companies that were also owned by Honig, most of which have either dec ined more than 75% from their peak value or are now virtually worthless. A February 2019 SEC filing reported that **<u>Iroquois Capital has already dumped their entire TEUM stake</u>**. We note that Iroquois reportedly received an SEC subpoena as part of the investigation into Honig's alleged pump and dump ring but was not named in the SEC complaint or been accused of wrongdoing.
- TEUM has paid stock promoters from Red Chip companies, which has previously touted numerous now worthless companies backed by Honig. RedChip's founder has praised Honig and was quoted in a 2013 interview stating that "*learning from him and working with him has been incredible*".

**Just in isolation, we believe the mere presence of this collection of actors should send diligent investors running for hills.**

Case 1:19-cv-09674-K-H   Document 284-1   Filed 12/05/22   Entered 12/05/22 17:12:34   Exhibit B -
Marcus Aurelius Report    Pg 13 of 13

22-10615-lgb   Doc 276-45   Filed 12/05/22   Entered 12/05/22 17:12:34   Page 119 of 151

**In our opinion TEUM's stock is completely uninvestible and we therefore see massive downside potential.**

*All Investors Are Encouraged to Conduct Their Own Due Diligence Into These Factors*

VIEW ALL RESEARCH. MORE TEUM ITEMS

 

Copyright © 2022 Marcus Aurelius Value, All Rights Reserved.

# **EXHIBIT C**

June 10, 2019 Letter

HEDGE FUNDS - NEWS

## Pareteum Corporation (TEUM) Responds to Short Seller Aurelius Value's Accusations

Published on June 10, 2019 at 11 36 am by **NINA ZDINJAK**  in **Hedge Funds**, **News**

On Friday, June 7th, short seller, Aurelius Value, published a degrading report on **Pareteum Corporation (NASDAQ:TEUM)** with the title **"Where Are The Customers**?". In the report, among many other claims, Aurelius Value said that Pareteum has a questionable value of its 36-months backlog (reaching $900 million) on the back of its customers for which Aurelius Value suspects being capable of paying disclosed contractual values. It also questions whether the company will be able to convert 100% its backlog to revenue at the contractual rates. One example of the issue in question is Pareteum's announced contract deal with "Eyethu Mobile Network", a South Africa-headquartered company, worth around $50 million. Aurelius Value wanted to further research this company, hence it went for a visit, allegedly discovering "*a dilapidated shack and crumbling structures near a rural African village".*

Another important acquisition relates to Pareteum's management team with Aurelius Value linking them to previous breakdowns and/or frauds. More specifically, the report states that biographies for CEO Hal Turner and TEUM's COO avoid representing their head positions at Catcher Holdings, which ended up being an unprofitable stock, due to its connection with Barry Honig, an infamous stock operator who was charged with fraud by the Securities and Exchange Commission in October 2018. Aurelius Value finds **"similarities between TEUM and the stock promotion at Catcher"**, alluding that Pareteum's investors could end up with nothing as Cathcer's did.

Insider Monkey didn't verify the accuracy of Aurelius Value's report, hence in the interest of fair reporting we have reached out to Pareteum Corporation for a response to the claims, and we bring you its statement here:

*"Dear Fellow Pareteum Shareholders,*

*I want to take a moment to thank all of you for your support as we drive Pareteum forward.*

*In recent days our share price has been negatively impacted by a coordinated attack by short sellers. We fully understand that short selling is legal and it is an important part of the capital markets. That said, certain short sellers have used questionable tactics, including leveraging the media to misrepresent facts and make anonymous spurious claims against the company and its officers.*

*Every one of us at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company. We categorically deny the allegations put forth. We do not intend to legitimize those reports by delving in to them.*

*Pareteum has experienced tremendous growth, and we continue to grow in a healthy and measurable way.  We are confident in our strategy and mission – to connect every person and every(thing)™. Today millions of people and devices around the world are connected using Pareteum's Global Cloud Communications Platform, enhancing their mobile experience. Every day more people and devices are being added to our platform.*

*We will not be distracted.  We continue to focus on operating our business and generating strong financial results.  We believe executing on this plan will ultimately create significant value for long term shareholders.*

*We will report our Q2 results in early August, and look forward to speaking with you then.*

*Again, I want to thank all of our shareholders for their continued support.*

*Sincerely,*

*Hal Turner*

*Chairman and Chief Executive Officer"*

On the day the report was published (June 7th), Pareteum's stock had a closing price of $2.58, dropping by 24.34% from one day earlier when it closed at $3.41. On a year-to-date basis, its stock actually gained 68% with its price being $2.94 at the time of writing this article, and $1.75 at the beginning of the year. Among the funds tracked by Insider Monkey **Portolan Capital** held the largest position in TEUM, worth more than $6 million, at the end of March. You can see the list of hedge funds with bullish TEUM positions **here**.

Disclosure: **None.**

This article is originally published at **Insider Monkey**.

Aurelius Value On Pareteum Corporation     Daily Newsletter     Headline     NASDAQ:TEUM     Pareteum Corporation (TEUM)     Show More...

**EXHIBIT D**

Viceroy Report

(https //v ceroyresearch org/)  English

# Pareteum – The Wild West of Telecoms

AUTHOR:

V ceroy Research (https://v ceroyresearch.org/author/v ceroyresearch/)

PUBLISHED ON:

June 26, 20 9 (https://v ceroyresearch.org/20 9/06/26/pareteum the w d west of te ecoms/)

PUBLISHED IN:

Pareteum NASDAQ:TEUM (https://v ceroyresearch.org/category/pareteum nasdaqteum/)

**June 25, 2019** — Pareteum (NASDAQ TEUM) prov des serv ces to Mob e V rtua Network Operators (**MVNOs**), who se data/m nutes to users and purchase data/m nutes from te ecom network operators Recent y Pareteum has been subject to cr t c sm from other short se ers G ven the d scourse, V ceroy be eve t s prudent that we a so share our f nd ngs

REPORT DOWNLOAD L NK (HTTPS //V CEROYRESEARCH ORG/WP CONTENT/UPLOADS/2019/06/PARETEUM 26062019 PDF)

- Further to recent research reports, Pareteum has a h story of promot ona press re eases of customer w ns A deeper nvest gat on nto these customers show much arger number are ns gn f cant, and the compan es beh nd them appear n no way capab e of fu f ng the contract va ues advert sed by Pareteum
- Two of Pareteum's customer w ns appear to be und sc osed re ated part es t ed to Pareteum consu tant D nesh "Danny" Pate
- One of Pareteum's announced customer w ns s a company under a h stor c nvest gat on and charged w th s gn f cant VAT evas on fraud nformat on on th s s eas y ava ab e, ead ng us to be eve that Pareteum was aware of the company's ssues wh e announc ng the customer w n
- Pareteum appears to be n breach of US sanct ons aga nst ran through ts prov s on of serv ces to ran an MVNO Am n SMC Am n SMC appears to be cha red by Ham d Reza Am r n a, an nd v dua suspected of breach ng sanct ons w th an ran an government mandate to aunder money for the reg me
- Severa ent t es on the pareteum c oud doma n are sma compan es or have no web presence whatsoever, ead ng us to be eve that they are Pareteum customers who are unab e to pay or have no operat ons
- Pareteum's 36 month contractua back og measurement s not an accurate pred ctor of future prof ts An ana ys s of the company's back og and management comments shows t shou d have reported 73 10% more revenue n Q1 2019 than t d d Management appears to be nf at ng th s f gure to hype up the share pr ce and reassure nvestors
- Pareteum's management has a h story of d shonest report ng Notab y, CFO Ted O'Donne who was sued by former emp oyer Aud oEye for fabr cat ng US$8 1m worth of revenue over

3 quarters wh ch was found to have no support ng documentat on Th s was an overstatement of revenues n the per od of more than 3,000%

- Pareteum's rap d f re announcement of customer w ns m rrors ts announcements regard ng cryptocurrency n 2017, wh ch were put to an abrupt ha t when a response to an SEC etter revea ed TEUM had made no revenue, nor p anned to do so, from cryptocurrency

- Pareteum has made an US$3 7m oan to Yonder Med a Mob e, an ear y stage MVNO operated by ser a fa ure entrepreneur Adam K dron K dron has burned at east US$100m n h s enterpr ses, hav ng a ready cratered the Yonder brand w th a mus c stream ng serv ce wh ch co apsed n 2017

- A breakdown of Pareteum's revenues, cash f ows and rece vab es show the major ty of ts revenue from sources other than Vodafone and acqu red bus nesses Pass and Art um appears to be unco ectab e Accord ng y, we be eve tota revenue s overstated by 42%, corroborat ng our f nd ngs regard ng Pareteum's customers

We are as yet unab e to quant fy the mpact of the company's apparent breach of sanct ons aga nst ran and have not ass gned a d scount We have reported th s apparent breach to the re evant federa author t es

A token va uat on on an EV/Revenue bas s presents a 44% 76% downs de for Pareteum's share pr ce (State Current Pr ce), w th the more severe scenar o more probab e However, based on the numerous subject ve ssues h gh ghted n th s report and the dependence of the va uat on on our a ready conservat ve revenue adjustment, we cannot fu y quant fy the downs de, wh ch we be eve to be s gn f cant

(HTT S://WWW. NK D N.COM/SHAR ART C ?
W TT R.COM/ NT NT/HW T S?/WWW. AC BOOK.COM/SHAR R/SHAR R H ?
T UM++%26%2382 HUGINGHTTH/WC DOWRESHORGER ORCOWS&URB/ART S://V C ROYR S ARCH.ORG/2019/06/26/ AR T UM-
V ST-O -T COMS/TH W D-W ST-O -T COMS/) AR T UM— TH W D W ST O
T COMS&SOURC V C ROYR S ARCH)

PREVIOUS ARTICLE

NEXT ARTICLE

← V ceroy Members Commence L t gat on Aga nst M Medx and Parker H Pet t (https://v ceroyresearch.org/2019/06/17/v ceroy members commence l t gat on aga nst m medx and parker h pet t/)

Pareteum Execut ve Overv ew (https://v ceroyresearch.org/2019/06/27/pareteum execut ve overv ew/) →

**VICEROY'S COVERAGE**

ADLER GROUP ETR:ADJ (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/ADLER GROUP ETRADJ/)

AMD NASDAQ:AMD (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/AMD NASDAQAMD/)

ATHENEX NASDAQ:ATNX (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/ATHENEX NASDAQATNX/)

CAESARSTONE NASDAQ:CSTE (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/CAESARSTONE NASDAQCSTE/)

CAP TEC JSE:CP (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/CAP TEC JSECP /)

EB X NASDAQ:EB X (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/EB X NASDAQEB X/)

GRENKE AG XTRA:GLJ (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/GRENKE AG XTRAGLJ/)

HOME RE T LSE:HOME (HTTPS://VCEROYRESEARCH.ORG/CATEGORY/HOME RE T LSEHOME/)

M MEDX NASDAQ:MDXG (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/M MEDX NASDAQMDXG/)

NEP ROCKCASTLE JSE:NRP (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/NEP ROCKCASTLE JSENRP/)

NEURODERM NASDAQ:NDRM (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/NEURODERM NASDAQNDRM/)

PAGSEGURO NYSE:PAGS (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/PAGSEGURO NYSEPAGS/)

PARETEUM NASDAQ:TEUM (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/PARETEUM NASDAQTEUM/)

PRET UM TSE/NYSE:PVG (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/PRET UM TSE NYSEPVG/)

PROS EBEN ETR:PSM (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/PROS EBEN ETRPSM/)

QU NT S ASXL:Q N (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/QU NT S ASXLQ N/)

RECONNA SSANCE ENERGY AFR CA (TSXV:RECO) (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/RECONNA SSANCE ENERGY AFR CA TSXVRECO/)

SAMHALLSBYGGNADSBOLAGET STO:SBB (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/SAMHALLSBYGGNADSBOLAGET STOSBB/)

SANT XTRA:SANT (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/SANT XTRASANT/)

SORRENTO THERAPEUT CS NASDAQ:SRNE (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/SORRENTO THERAPEUT CS NASDAQSRNE/)

STE NHOFF ETR/JSE:SNH (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/STE NHOFF ETR JSESNH/)

STONECO NASDAQ:STNE (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/STONECO NASDAQSTNE/)

SYRAH RESOURCES ASX:SYR (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/SYRAH RESOURCES ASXSYR/)

TRUECALLER TRUEB:SS (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/TRUECALLER TRUEBSS/)

TYRO ASX:TYR (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/TYRO ASXTYR/)

UNCATEGOR ZED (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/UNCATEGOR ZED/)

W RECARD (HTTPS://V CEROYRESEARCH.ORG/CATEGORY/W RECARD/)

### SUBSCRIBE TO EMAIL UPDATES

Subscr be to V ceroy Research by Ema (https //feedburner goog e com/fb/a/ma ver fy?
ur =V ceroyResearch& oc=en US)

### SOME OF OUR RECENT WORK

Pareteum – The Hal Turner Options Appreciation Club
(https://viceroyresearch.org/2019/07/17/pareteum-the-hal-turner-options-appreciation-club/)

PARETEUM NASDAQ:TEUM (HTTPS://VICEROYRESEARCH.ORG/CATEGORY/PARETEUM-NASDAQTEUM/)

Pareteum – Related party share incentive schemes
(https://viceroyresearch.org/2019/07/02/pareteum-related-party-share-incentive-schemes/)

PARETEUM NASDAQ:TEUM (HTTPS://VICEROYRESEARCH.ORG/CATEGORY/PARETEUM-NASDAQTEUM/)

Pareteum – The Sound of Silence
(https://viceroyresearch.org/2019/06/28/pareteum-the-sound-of-silence/)

PARETEUM NASDAQ:TEUM (HTTPS://VICEROYRESEARCH.ORG/CATEGORY/PARETEUM-NASDAQTEUM/)

Copyr ght 2021 V ceroy Research LLC

Ma n Nav gat on

Lega

Pub  cat ons
(https://v ceroyresearch.org/pub  cat ons/)

Research (https://v ceroyresearch.org/research/)

About (https://v ceroyresearch.org/about/)

Contact (https://v ceroyresearch.org/contact/)

Terms & Cond t ons
(https://v ceroyresearch.org/wp

content/up oads/202  /0  /Terms and

Cond t ons.pdf)

Fo  ow us

 (https //tw tter com/v ceroyresearch)

(https //www   nked n com/company/v ceroy research)

## EXHIBIT E

June 27, 2019 statement

**BREAKING NEWS**   Instant updates and real-time market news.

**TEUM**
**10:32**
**06/27/19**

## Pareteum 'categorically denies' allegations in short seller report

Parateum said in a statement posted to its corporate website: "We are aware of increased trading in Pareteum Corporation stock and that certain short sellers have used questionable tactics including leveraging the media to misrepresent facts and make anonymous spurious claims against the company and its officers. Despite coordinated attacks designed only for the financial gain of these short sellers, we remain a dynamic and growing company that stands by the quality of the information reported in our most recent earnings announcements, including the guidance provided for 2019. Pareteum Corporation categorically denies all allegations put forth in the short seller reports. Without giving credence to the reports in detail, we do state the allegations that Pareteum has breached U.S. sanctions against Iran are false. While Pareteum does not publicly comment on business relationships with its customers, it is committed to compliance with all applicable laws, including U.S. sanctions against countries such as Iran. We note that certain activities in Iran have been or are authorized under OFAC General License H and/or General License D-1, and that there are longstanding U.S. policies supporting communications and Internet freedom in Iran. In view of the evolving regulatory environment in Iran, Pareteum frequently and carefully reviews its business dealings there and has engaged with the U.S. Office of Foreign Assets Control to tailor its activities and maintain strict compliance. Everyone at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company. We look forward to sharing additional information about our growth and success in future earnings releases."

## EXHIBIT F

*"Pareteum – Caught in a Cash Crunch After Violating Debt Covenants"*
(the "<u>Seeking Alpha Report</u>")

12/1/22, 1:59 PM ~~Case 1:19-cv-09767-ASJ~~ ~~Pareteum~Caught In A Cash Crunch~~ ~~Document 284~Violating Debt Covenants~~ ~~Filed 04/03/23~~ ~~Page 131~~ ~~Seeking Alpha~~

Seeking Alpha Report    Pg 2 of 22

 Seeking Alpha<sup>α</sup>



Short Ideas    Tech

# Pareteum - Caught In A Cash Crunch After Violating Debt Covenants

Aug. 27, 2019 7:34 AM ET | **Pareteum Corporation (TEUM)** | 160 Comments | 9 Likes

 **Henrik Alex**
14.41K Followers

## Summary

Briefly discussing key issues from the company's Q2/2019 earnings report with accounts receivable ballooning even further and ongoing large cash outflows.

Company failed to comply with certain debt covenants and post-closing obligations under its credit facility with Post Road Group.

Lender has severely tightened the reins on Pareteum, now requiring management to report on an at least weekly basis.

Company will have to issue another 800,000 shares to Post Road Group in exchange for the required waiver and amendment and an incremental $2.5 million draw under the credit facility.

Personally, I do not expect the company to achieve covenant compliance going forward and accordingly investors might have to prepare for a notice of default and a subsequent, large equity offering to repay the amounts currently outstanding under the credit facility.

**Note:** *I have previously covered Pareteum (NASDAQ:OTC:TEUM), so investors should view this as an update to my earlier articles on the company.*

Shares of controversial emerging *Communications Platform as a Service ("CPaaS")* provider Pareteum Corporation have remained under pressure in recent weeks after the company's Q2/2019 results on August 6 revealed two major issues:

Case 1:19-cv-09767-AKH   Document 284   Filed 04/03/23   Page 132 of 151

Seeking Alpha Report    Pg 3 of 22

1. Accounts receivable ballooned an eye-catching 57% quarter-over-quarter, even outpacing the 48% sequential revenue increase. Over the past six months, accounts receivable have almost tripled from $15.4 million at year end 2018 to $45.1 million at the end of Q2.

2. Free cash flow for the quarter was negative $8 million, leaving the company with just $3.4 million in unrestricted cash at the end of Q2, dangerously close to the $2 million minimum liquidity covenant defined in its up to $50 million senior secured credit facility with Post Road Group, a Connecticut-based junior private investment firm. For the first half of FY2019, Pareteum used $16.7 million in operating and investing activities.



On the conference call, management actually pointed to accounts receivable to increase even further during Q3 with collections starting to come through in Q4.

After an initial rally to the $4 level in after hours, shares sold off the following day and experienced further pressure in subsequent sessions. Last Friday, the stock finished at $2.75, its lowest level since two professional shortseller reports hit in June.

After the close of Friday's regular session, the company filed a "*waiver and first amendment*" to its credit facility with Post Road Group after incurring "*breaches of certain obligations and covenants*" under the credit agreement.

In fact, the list of failures looks quite impressive:

*Source: Company's SEC-filing, Annex A*

I was particularly perplexed by the stated failure "*to timely make the interest payment owed to the Administrative Agent for the Interest Period that ended on or about March 31, 2019*" given that the company still had sufficient liquidity at that time. In addition, the company failed to timely deliver certain financial reporting information and corresponding compliance certificates for basically each month since the closing of the original credit agreement in February.

Moreover, Pareteum did not obtain required "*consents and acknowledgements*" from two undisclosed counterparties with regards to the required remittance of payments to a certain Pareteum Europe account with Capital One Financial.

The covenant breaches prevented Pareteum from drawing further under its credit facility, requiring the company to negotiate an expensive waiver and amendment with the lender.

In exchange for the waiver and amendment and an incremental $2.5 million draw under the facility, Pareteum will have to issue 800,000 new shares to Post Road Group. Moreover, the lender has been tightening the reins on the company quite heavily (*emphasis added by author*):

*The Credit Parties shall cooperate with further due diligence and information requests made by the Administrative Agent and any advisors retained by the Administrative Agent, including without limitation, by **causing the senior management of the Borrower to: (I) participate in telephone conferences or in-person meetings on at least a weekly basis** with Administrative Agent and such advisors to discuss and analyze the most recent financial statements and related forecasts and other items reasonably requested by the Administrative Agent and such advisors during each such meeting and **(II) deliver to the Administrative Agent and such advisors all backup and supporting documentation that the Administrative Agent and/or such advisors' request in order to analyze and verify the accuracy and completeness of the reporting, related supporting information and calculation of financial covenants prepared by Borrower in accordance with the Credit Agreement** (...)*

In addition, Pareteum's deadline to obtain the above discussed *"consents and acknowledgements"* from the two undisclosed counterparties has been extended until October 31.

Clearly, Post Road Group has been alarmed by the company's failure to comply with a number of covenants and post-closing obligations and also started to scrutinize the company's financials given the new requirement for management to report to the administrative agent on an "*at least weekly basis*".

## Bottom Line:

As of this point, it seems that the skeptics have been right on Pareteum as the company is obviously experiencing a cash crunch with the lender only reluctantly providing additional liquidity to keep the company afloat for now.

Should Pareteum again fail to comply with the covenants and obligations under the amended credit agreement, Post Road Group might very well chose to issue a notice of default, requiring the company to repay the almost $28 million currently outstanding under the facility within short notice.

Case 1:19-cv-09767-AKH Document 284-2 Filed 04/03/23 Page 135 of 151

At this point, the company might still be able to sell additional equity but given the requirement to raise at least $35-$40 million to repay the credit facility including considerable exit fees and bridge the gap to anticipated cash collections in Q4 would likely cause the stock to tumble well below the $2 mark, particularly if investors require Pareteum to issue warrant sweeteners or even enter into a toxic financing transaction.

Frankly speaking, things are really starting to look ugly for Pareteum. The company has been in breach of debt covenants basically right from the closing date of the credit agreement with Post Road Group in February and seems now caught in a severe cash crunch.

Personally, I do neither expect the company to return to covenant compliance in due time nor the accounts receivable issue starting to resolve itself by next quarter. Accordingly, investors might have to prepare for a large, secondary offering in the not too distant future.

Should the company not start to collect on its accounts receivable in due time, Pareteum will likely lose its ability to access the capital markets with bankruptcy being the ultimate outcome in this case.

Given the recent, negative developments and the company's increasingly uncertain outlook, investors should continue to avoid the shares or sell existing positions. Even a short position might still yield decent returns should things play out as expected by me. Unfortunately, the shares are hard to borrow at this point.

This article was written by



**Henrik Alex**
14.41K Followers

I am mostly a trader engaging in both long and short bets intraday and occasionally over the short- to medium term. My historical focus has been mostly on tech stocks but over the past couple of years I have

Show More

---

**Disclosure:** I/we have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.

Case 1:19-cv-09767-AKH Document 284-4 Filed 04/03/23 Page 136 of 151

# Comments (160)

Sort by    Newest ▾    ⋮



**nickatyme**                                              09 Oct. 2019, 2:11 PM    ⋮

Comments (2.3K)  |  + Follow

ROFLMAO, Appears the next thing is to blame it all on recession.
www.pareteum.com/...

Pareteum is a collection of misfit failing firms and a collection of people who lack a shred of Integriy. The sort of garbage barge a guy buying Tandem might own.

Dreamweavers

↪ Reply        👍 Like (1)



**nickatyme**                                              20 Sep. 2019, 4:21 PM    ⋮

Comments (2.3K)  |  + Follow

I have this troubling thought that keeps bouncing around in my head. It has to do with Hal demanding his 2M shares be immediately vested & making them available to be loaned out to be shorted and then delaying an offering they knew they needed to do until months after the stock value had reached $5 and announced it after the stock price dropped below $2.

Everyone knows a CEO's first responsibility is to enhance shareholder value. Those two decisions seem to fly in the face of his responsibilities and are completely opposite of what one would have expected from a CEO.

You don't defend your company share value by loaning your shares to short sellers or waiting months until the market value of shares has eroded precipitously to do a secondary you've known for 6 month or more you needed to do.

Whose side is this guy Turner on anyway?

Just a thought and opinion sorry for the rant.

↪ Reply        👍 Like (2)

Case 1:19-cv-09767-ALC Document 284-1 Filed 04/03/23 Page 137 of 151



**liegh aulper**

20 Sep. 2019, 5:07 PM

 Premium

Comments (1.7K)  |  + Follow

Actually could be the first time I ever agreed with you, but you make an unfounded (?) assumption if you think he loaned them out, or do you actually know a fact, for the first time

➥ Reply      👍 Like



**nickatyme**

20 Sep. 2019, 5:26 PM

Comments (2.3K)  |  + Follow

I suggest you go read filings and decide for yourself.

➥ Reply      👍 Like



**liegh aulper**

20 Sep. 2019, 11:26 PM

 Premium

Comments (1.7K)  |  + Follow

I have, and I see no basis for your statement.
will reconsider if you can post additional info

➥ Reply      👍 Like

**See More Replies**



**nickatyme**

20 Sep. 2019, 9:36 AM

Comments (2.3K)  |  + Follow

One has to question the business acumen of the people behind Pareteum. Ultimately they do the offering at 1.76 . They knew in December they were going to need cash, they had a $5 stock in April but no they borrowed from Post Road at exorbitant rates rather than do the offering. Now they're peddling 47M new shares, if the warrants ever get exercised which I doubt they will. And do this thru Dawson James, no concern about the caliber of folks that participate here.LOL

➥ Reply      👍 Like (3)

Case 1:19-cv-09767-AKH Document 284-1 Filed 04/03/23 Page 138 of 151

 **Henrik Alex**                          20 Sep. 2019, 9:40 AM  ⋮

 Contributor   Premium   Marketplace

Comments (38.89K)  |  + Follow

*Author's Reply* I think it is pretty telling that NONE of the investment banks praising the company all day had the guts to shop this offering to their clients.

Instead Pareteum ended up with Tier 3 firm Dawson James and a ton of warrant sweeteners.

You need to deduct the warrant value from the offering price to arrive at the real price paid per common stock which is likely closer to $1.25.

⇨ Reply      👍 Like (2)

---

 **nickatyme**                          20 Sep. 2019, 10:14 AM  ⋮

Comments (2.3K)  |  + Follow

I'm still sorting the language out regarding the PREFUNDING 3,875,000.

I'm betting Iroquois Capital Management, LLC &
INTRACOASTAL CAPITAL, LLC got the PREFUNDED offering. Those two seem to be the go to players for Dawson James.

⇨ Reply      👍 Like

---

 **Henrik Alex**                          20 Sep. 2019, 10:31 AM  ⋮

 Contributor   Premium   Marketplace

Comments (38.89K)  |  + Follow

*Author's Reply* Prefunded warrants will only be allocated to investors that already owned a sizeable stake in TEUM.

⇨ Reply      👍 Like

Case 1:19-cv-09767-AKH Document 284 Filed 04/03/23 Page 139 of 151



## Henrik Alex

 20 Sep. 2019, 9:16 AM ⋮

Comments (38.89K)  |  + Follow

*Author's Reply* Company has filed the prospectus with the SEC. Net proceeds will only be $37.5 million and I have some doubts about the $30 million number being sufficient for repayment of the Post Road debt given outsized exit fees agreed to in the recent amendment.

 Reply     👍 Like (2)

## Henrik Alex

 20 Sep. 2019, 8:35 AM ⋮

Comments (38.89K)  |  + Follow

*Author's Reply* As suspected, company raises $40 million in equity to repay the Post Road credit facility and cover ongoing operating cash outflows.

$30 million seems rather low given the large amount of exit fees that would be due in conjunction with the Post Road facility repayment.

 Reply     👍 Like (2)



## Growtheport

20 Sep. 2019, 9:00 AM ⋮

Comments (2.85K)  |  + Follow

Well done on this one Henrik. 18% of the current float is short. They are very happy today.

Shame on TEUM management. More shareholder dilution and they could have done this when the PPS was well above $3.

 Reply     👍 Like



### Shareholders Unite

20 Sep. 2019, 9:13 AM    ⋮

**Marketplace Contributor**    **Premium**

Comments (11.44K)   |   + Follow

Yes, kudo's to Alex. Although we got out with a profit months ago, our "benefit of the doubt attitude" seems to have been unwarranted now. Still find it hard to imagine how they can end up in so much trouble with big legitimate customers willing to testify in public to the quality of the platform.

⇨ Reply      👍 Like



### Henrik Alex

20 Sep. 2019, 9:14 AM    ⋮

**Contributor**   **Premium**   **Marketplace**

Comments (38.89K)   |   + Follow

*Author's Reply* They should have never taken out this credit facility as they knew from the very beginning that they would not be able to comply with the covenants.

Instead, they should have used their elevated share price to raise tons of cash at $4+

⇨ Reply      👍 Like (2)

**See More Replies**



### Bud Capital

06 Sep. 2019, 4:31 AM    ⋮

Comments (20)   |   + Follow

Henrik first article you have ever written that I am inclined to agree with. Good stuff

⇨ Reply      👍 Like



### Henrik Alex

06 Sep. 2019, 6:11 AM    ⋮

**Contributor**   **Premium**   **Marketplace**

Comments (38.89K)   |   + Follow

*Author's Reply* Not sure if I should take this as a compliment...

⇨ Reply      👍 Like (1)

 **liegh aulper**                                              06 Sep. 2019, 11:46 AM  ⋮

**Premium**

Comments (1.7K)  |  + Follow

I'm sure he didn't mean to hurt your feelings, intentionally

↪ Reply      👍 Like

---

 **nickatyme**                                              06 Sep. 2019, 12:55 PM  ⋮

Comments (2.3K)  |  + Follow

*@Henrik Alex* Consider the source, the folks holding deep underwater positions resent your articles being accurate. They're bitter ,angry, unable to accept personal responsibility for their losses.

Intelligent, experienced, knowledgeable investors appreciate your work. Its been pretty damn accurate, consistently.

Its easier to criticize you than accept that they should have considered the material, The envy and jealousy is obvious. None so blind as those who refuse to see,

↪ Reply      👍 Like

---

 **bdelbono3030**                                          04 Sep. 2019, 7:33 PM  ⋮

Comments (1)  |  + Follow

It's about to get worse. Looks like a law office out of the Bay Area is gearing up for lawsuit. Counsel has called TEUM "uninvestible", but it's too soon to know where this is going. I dumped my shares as soon as I got wind on that news.

↪ Reply      👍 Like

Case 1:19-cv-09767-AKH  Document 284  Filed 04/03/23  Page 142 of 151

### Kagami427

Comments (1.89K)  |  + Follow

04 Sep. 2019, 4:22 PM

I honestly think you're reading a bit too uch into this probablybecause the seed has already been planted in y our head by those short sellers. Last time I checked management stated they were 100% in compliance of all debt covenants so this obviously news to me and should be news to everyone.

It doesn't really make a whole lot of sense. They didn't necessarily even need the Post Road Group loan.

Why can't they issue convertible debt and then buy it back eventually?

Obviously things are going great for the company right now... not sure how we can deny that (you saying the skeptics were right because TEUM apparently didn't pay back 25M dollars they borrowed/paid for by issuing shares. The shares being issued bothered me more than anything. Multiple times now. I don't understand why they can't go to a normal bank. They have a substantial market cap and a real operating business. Regardless of what the future holds for the company, why wouldn't they be able to get a loan from some other bank where it doesn't cost an arm and a leg? Are they THAT well known for not paying things back nobody will touch them? I don't knoow. It's not like these loans are huge and the majority of analysts remain largely bullish on TEUM going forward... including myself, for the time being at least.

Why do they have to pay someone just to lend them a couple million? They've had to pay and dilute shares with millions o dollars worth of shares GIVEN to the lender now every single time they've needed to borrow any money. They lenders have made millions $ just on the free shares. The problems pretty much remain a lack of 100% transparency and the fact I really don't understand how the last time they mentioned it they were not even close to not be ing able to pay back the tiny amount of debt they borrowed. I really don't understand why they can't pay it. And if it's a DSO issue, post road should have already known this right? And not actually expected payment immediately cause that's not how it works.

So somehow they 'breached a cov' with Post Road. I just don't get it. How is it even possible? Why would they borrow the money in the first place if they can't pay it back? But... I know they can pay it back. They have 45M in accounts receivable right there. They simply need to wait for collections to start coming in. But why is Post Road so freaking anal about everything, they really don't trust these guys that much? I just don't get it!

↳ Reply    👍 Like

Case 1:19-cv-09767-AKH Document 284-4 Filed 04/03/21 Page 143 of 155



**Koppie**
Comments (153)  |  + Follow

04 Sep. 2019, 4:03 PM

teum is doing very bad!!! long idex, todays presentation by alf poor is massive!!!!

➥ Reply     👍 Like

**Henrik Alex**

`Contributor` `Premium` `Marketplace`

Comments (38.89K)  |  + Follow

04 Sep. 2019, 4:21 PM

*Author's Reply* Did Alf introduce a 36-month-backlog figure?

➥ Reply     👍 Like

**Kagami427**
Comments (1.89K)  |  + Follow

04 Sep. 2019, 4:22 PM

lol IDEX hahaha. Now... idex is a scam trust me

➥ Reply     👍 Like

**keko5647**
Comments (460)  |  + Follow

04 Sep. 2019, 3:50 PM

Hi,
For pleasure I take shares at 1,73$.
it's a little position just for the stress.
Antony

➥ Reply     👍 Like

12/1/22, 1:59 PM · Case 1:19-cv-09767-AKH · Pareteum Caught In Cash Crunch After Violating Debt Covenants · Seeking Alpha · Document 284 · Entered · Filed 04/03/23 · Page 144 of 151

Seeking Alpha Report    Pg 15 of 22

**keko5647**                                                    05 Sep. 2019, 11:54 AM ⋮

Comments (460)  |  + Follow

Hi,

It was a very good idea.

In the fact, today I double my position.

Probably the share has be oversold.

I put a global sell order at 2,26 $.

Some years ago, Alan had speak about the irrational exuberance of the markets. I thing it has been the case for Pareteum.

My mail has not the scope to push anybody to buy or sell the share.

Antony

↳ Reply      👍 Like

---

**keko5647**                                                    06 Sep. 2019, 8:28 AM ⋮

Comments (460)  |  + Follow

I change my order and give a new sell target at 2,55 $.

↳ Reply      👍 Like

---



**Me XMan**                                                     04 Sep. 2019, 1:02 PM ⋮

Comments (11.57K)  |  + Follow

This is not looking good here.

↳ Reply      👍 Like

---



**Henrik Alex**                                                 04 Sep. 2019, 1:06 PM ⋮

`Contributor`  `Premium`  `Marketplace`

Comments (38.89K)  |  + Follow

***Author's Reply*** Perhaps management wasn't available for the weekly report to Post Road...

↳ Reply      👍 Like (1)

Case 1:19-cv-09767-AKH  Document 284-1  Filed 04/03/23  Page 145 of 151



**Me XMan**                                        04 Sep. 2019, 1:10 PM  ⋮

Comments (11.57K)  |  + Follow

*@Henrik Alex* You think they're con?

↪ Reply        👍 Like

---

**Henrik Alex**                                    04 Sep. 2019, 1:17 PM  ⋮

`Contributor`  `Premium`  `Marketplace`

Comments (38.89K)  |  + Follow

*Author's Reply* Yes.

↪ Reply        👍 Like (1)

---

**Henrik Alex**                                    04 Sep. 2019, 10:21 AM  ⋮

`Contributor`  `Premium`  `Marketplace`

Comments (38.89K)  |  + Follow

*Author's Reply* Stock about to break 2019 lows this morning - very weak in an otherwise strong market.

↪ Reply        👍 Like (1)

---

**guiriduro**                                      04 Sep. 2019, 10:45 AM  ⋮

Comments (128)  |  + Follow

Turner also deleted his Twitter account, probably not helping long's anxiety.

↪ Reply        👍 Like (1)

---

**Henrik Alex**                                    04 Sep. 2019, 11:38 AM  ⋮

`Contributor`  `Premium`  `Marketplace`

Comments (38.89K)  |  + Follow

*Author's Reply* I see. Thanks for providing this information.

↪ Reply        👍 Like

**cellardweller55**                                                     01 Sep. 2019, 10:31 AM  ⋮

Comments (16)  |  + Follow

Pareteum broke none of the 3 most important covenents.

☆Revenue

☆Ebita

☆customer acquisitions

They had to pay a late fee and Post Road decided to protect themselves with some shares.

Not bad at $3.15/share. Less than 1 % of outstanding.

The only thing Pareteum did, was grow too fast.

A problem I'll live with...for at least the next 2 qt.'s.

If Oppenheimer and Post Road believe in Pareteum's future...that's good enough for me right now.

⤷ Reply        👍 Like (2)

---

**Henrik Alex**                                                     01 Sep. 2019, 12:59 PM  ⋮



Comments (38.89K)  |  + Follow

*Author's Reply* Post Road, clearly, has some doubts. Otherwise they wouldn't have forced management to report to them on an "at least weekly basis".

⤷ Reply        👍 Like (6)

---

**MovingSphere**                                                     02 Sep. 2019, 11:11 AM  ⋮

Comments (199)  |  + Follow

☆Revenue -> doubtful if Pareteum cannot collect

☆Ebita -> doubtful if bad debt expenses are understated

☆customer acquisitions -> doubtful if customers don't pay

In my opinion, of course.

⤷ Reply        👍 Like (2)

Case 1:19-cv-09767-AKH Document 284-1 Filed 04/03/23 Page 147 of 151



**cellardweller55**

02 Sep. 2019, 2:03 PM

Comments (16)  |  + Follow

So what's changed, now that Post Road is keeping and eye on "their" investment.

Makes me feel better as a investor.

Every week, let them check all day for all I care.

Months of slander and nothing...absolutely nothing has come of it.

Common sense should tell you...

nothing will.

↪ Reply       👍 Like (2)

**See More Replies**



**nickatyme**

31 Aug. 2019, 2:02 PM

Comments (2.3K)  |  + Follow

Realizing how easy it is for so many to be swept up in the tsunami of pumping I thought this should be shared just to clarify a few comments made my Pareteum mgmt. earlier this year. Namely announcements of BIG NEW DEALS .

Citrix, GoogleFi, M1, Tata all touted as big NEW DEALS. well truth is they're not new or big deals. Truth is they all came to Pareteum via the acquisition of iPASS, yes the same iPASS that was reversed and in the process of delisting when acquired. All of these relationships were in effect years before iPASS was about to go under, you figure out how much value they had.

iPass Partners with Tata Communications
Connectivity, Global Wi-Fi, Network Wednesday, June 29, 2016

Mar 8, 2016, 08:54am
The Experiment Is Over: Google Opens Its Project Fi Wireless Service To All, via iPASS

iPass to Bring the Power of Unlimited Global Wi-Fi to Its Mobile Worker Community With Citrix CubeFree
Wednesday, May 27, 2015

Newsroom
M1 Limited to offer global Wi-Fi data roaming services from iPass
Tuesday, April 9, 2013

These "NEW DEALS" have all been in effect since 2013,2015,2016. All belonged to iPASS which was one foot in the grave when Turner scooped them up, lawsuits and all.

 Reply      👍 Like (3)

**Segurax**

01 Sep. 2019, 8:43 AM

Premium

Comments (127)  |  + Follow

So, the contracts a real? I thought they were made up ?

↪ Reply      👍 Like (1)

Case 1:19-cv-09767-AKH Document 284-1 Filed 04/03/23 Page 149 of 151



**Henrik Alex**                                    01 Sep. 2019, 1:02 PM   ⋮

Contributor   Premium   Marketplace

Comments (38.89K)  |  + Follow

> *Author's Reply* Don't think that IPass and Artilium faked customer contracts like Pareteum obviously did. But the problem with legacy IPass customers is well known: Razor thin margins.

↪ Reply        👍 Like (4)

---



**keko5647**                                       31 Aug. 2019, 9:26 AM   ⋮

Comments (460)  |  + Follow

Hi,
My order at 1,99 $ is still running.
May be or not , I will be a shareholder soon.

↪ Reply        👍 Like

---



**nickatyme**                                      30 Aug. 2019, 8:56 PM   ⋮

Comments (2.3K)  |  + Follow

And now the ambulance chasers, flashalert.me/...

Someone just threw gasoline on the garbage barge and lit it up

↪ Reply        👍 Like

---



**Koppie**                                         29 Aug. 2019, 7:09 AM   ⋮

Comments (153)  |  + Follow

that idex article mentioned only bus revs in china, atricle is not that bad. Asean (MEG) isnt in that calculation, neither gtb deal. thanks for your warnings.

↪ Reply        👍 Like

Case 1:19-cv-09767-ALC Document 284 Filed 04/03/23 Page 150 of 151

Seeking Alpha Report    Pg 21 of 22



**Koppie**    28 Aug. 2019, 1:09 PM

Comments (153)  |  + Follow

sold teum for idex at $1,50, insider chaiman Wu bought 1,7 million Shares for $3. also blackrock has 2,7 million shares. q3 bus revs will come as confirmed. massive eps for this and next year.

→ Reply    👍 Like

**Segurax**    28 Aug. 2019, 1:18 PM

Premium

Comments (127)  |  + Follow

Yep, they beat TEUM any day. You actually down more in two days then with TEUM

.

→ Reply    👍 Like

**Henrik Alex**    28 Aug. 2019, 1:23 PM

Contributor  Premium  Marketplace

Comments (38.89K)  |  + Follow

*Author's Reply* I would bet he fell victim to this painfully weak article on IDEX:

seekingalpha.com/...

He will have to learn the hard way again, I guess.

→ Reply    👍 Like (2)

**Segurax**    28 Aug. 2019, 12:11 PM

Premium

Comments (127)  |  + Follow

They confirmed again today that they will be cashflow positive end of year! And also explained how the AR works! Yeez, even Telstra , Australia's biggest joined. Don't tell me , all lies again?
Maybe I should keep my cheap shares anyway!

→ Reply    👍 Like (4)

Case 1:19-cv-09767-AKH Document 284-1 Filed 04/03/23 Page 151 of 151 - Seeking Alpha

**BigMoneyMatt**                                    28 Aug. 2019, 1:12 PM  ⋮

Comments (175)  |  + Follow

Yep yep! Good outlook

↪ Reply        👍 Like

---

**Henrik Alex**                                    28 Aug. 2019, 1:15 PM  ⋮

Contributor  Premium  Marketplace

Comments (38.89K)  |  + Follow

***Author's Reply*** What else should they say? "No, we actually lied on the Q2 conference call"? Come on.

↪ Reply        👍 Like (4)

---

**Segurax**                                        28 Aug. 2019, 1:21 PM  ⋮

Premium

Comments (127)  |  + Follow

Yes, they should tell shareholders they lied and the Telstra contract is fake. I do some DD and find out if Telstra is fake via my Australian connection!

↪ Reply        👍 Like (2)

**See More Replies**

---

 **WYCO Researcher**                                 28 Aug. 2019, 6:26 AM  ⋮

Contributor  Premium

Comments (7.47K)  |  + Follow

They are "toast"

↪ Reply        👍 Like (2)

---

Disagree with this article? Submit your own. To report a factual error in this article, click here. Your feedback matters to us!