# EXHIBIT G

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Jorian L. Rose
Email: jrose@bakerlaw.com
Michael A. Sabella
Email: msabella@bakerlaw.com
*Attorneys for Non-Debtors Robert H. Turner,*
*Edward O'Donnell, Denis McCarthy, Victor*
*Bozzo, Robert Mumby, and Yves Van Sante*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARETEUM CORPORATION, *et al.*,[1] | ) | Case No. 22-10615 (LGB) |
| | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |

### SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF MOVANTS' MOTION FOR ORDER CONFIRMING AND/OR DETERMINING THAT PROCEEDS OF CERTAIN D&O INSURANCE POLICIES ARE NOT SUBJECT TO THE AUTOMATIC STAY

Movants Robert H. Turner, Edward O'Donnell, Denis McCarthy, Victor Bozzo, Robert

Mumby, and Yves Van Sante (the "Movants"), by and through their undersigned counsel, state as

follows in further support of the Motion For Order Confirming And/Or Determining That Proceeds

Of Certain D&O Insurance Policies Are Not Subject To The Automatic Stay (the "Motion"):

---

[1] The Debtors in the Chapter 11 Cases (the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Pareteum Corporation (7538); Pareteum North America Corp. (f/k/a Elephant Talk North America Corp.) (9623); Devicescape Holdings, Inc. (2909); iPass, Inc. (4598); iPass IP LLC (2550); Pareteum Europe B.V.; Artilium Group Ltd. (f/k/a Artilium PLC); Pareteum Asia Pte. Ltd.; and Pareteum N.V. (f/k/a Artilium N.V.). The Debtors' corporate headquarters is located at 1185 Avenue of the Americas, 2nd Floor, New York, NY 10036.

# TABLES OF CONTENTS

|  |  | **Pages** |
|---|---|---|
Preliminary Statement............................................................................................1

Discussion ...........................................................................................................3

I.    The Proceeds of the ABC Policies Are Not Property of the Estate ...................................3

    (a)    The D&O Policies Provide Specific Guidelines for Coverage ...............................4

    (b)    The Priority of Payments Provision Governs Distribution of the Proceeds ............7

    (c)    The Trust's Coverage Under the ABC Policies is Remote, Speculative and Contingent................................................................................................9

    (d)    The Debtors' Pre-Petition Receipt of Insurance Proceeds for Legal Costs Does Not Support the Trustee's Position That the Insurance Proceeds Are Property of the Estate............................................................................11

II.    Cause Exists to Lift the Automatic Stay to the Extent Necessary ....................................12

Conclusion ...........................................................................................................211

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
285 B.R. 580 (Bankr. S.D.N.Y. 2002), *vacated on other grounds,* 298 B.R. 49
(S.D.N.Y. 2003) ...............................................................................................8, 13, 16

*In re Allied Digital Techs., Corp.*,
306 B.R. 505 (Bankr. D. Del. 2004) ................................................................. *passim*

*In re Beach First Nat'l Bancshares, Inc.*,
451 B.R. 406 (Bankr. D.S.C. 2011) .........................................................................18

*In re CHS Elec., Inc.*,
261 B.R. 538 (Bankr. S.D. Fla. 2001)..................................................10, 15, 17, 20

*In re CyberMedica, Inc.*,
280 B.R. 12 (Bankr. D. Mass. 2002) ...........................................................3, 4, 18

*In re Downey Fin. Corp.*,
428 B.R. 595 (Bankr. D. Del. 2010) ...............................................3, 4, 10, 12, 18

*In re Enivid, Inc.*,
364 B.R. 139 (Bankr. D. Mass. 2007) .............................................................15, 20

*In re Laminate Kingdom, LLC*,
Case No. 07-10279, 2008 WL 1766637 (Bankr. S.D. Fla. Mar. 13, 2008) ............18

*Mazzeo v. Lenhart (In re Mazzeo)*,
167 F.3d 139 (2d Cir. 1999).....................................................................................13

*In re Medex Reg'l Labs., LLC*,
314 B.R. 716 (Bankr. E.D. Tenn. 2004) ...................................................3, 4, 11

*In re MF Glob. Holdings Ltd.*,
469 B.R. 177 (Bankr. S.D.N.Y. 2012)........................................................... *passim*

*In re MF Glob. Holdings Ltd.*,
515 B.R. 193 (Bankr. S.D.N.Y. 2014).......................................................................9

*Ochs v. Lipson (In re First Central Financial Corp.)*,
238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999)......................................................... *passim*

*In re Sonnax Indus., Inc.*,
907 F.2d 1280 (2d Cir. 1990)....................................................................1, 2, 3, 12

*Spencer v. Bogdanovich (In re Bogdanovich)*,
  292 F.3d 104 (2d Cir. 2002)........................................................................................13

*In re World Health Alternatives, Inc.*,
  369 B.R. 805 (Bankr. D. Del. 2007) ...........................................................................10

**Statutes**

Bankruptcy Code Section 362 ........................................................................................20

Bankruptcy Code Section 362(d)....................................................................................12

Bankruptcy Code Section 510(b)............................................................................ *passim*

22-10615-lgb Doc 9567-4 Filed 12/07/22 Entered 12/07/22 17:33:33 Main Document

**Preliminary Statement**

1.     At the initial hearing on the Motion[1] held by the Court on November 10, 2022 (the "Initial Hearing") the Court requested additional briefing on whether: (i) the Priority of Payments provision in the Argonaut Policy (followed in form and substance by the ABC Policies) in and of itself means the Estate does not have an interest in the insurance proceeds of the policies; and (ii) even if the Court were to determine that proceeds of the ABC Policies were property of the Estate, the application of the *Sonnax Factors* (defined below) supports lifting of the automatic stay to the extent necessary to allow the policies' proceeds to be applied towards the Settlement.

2.     The Priority of Payments provision in this case is determinative that the Debtors do not have an interest in the insurance proceeds. Courts analyze the provision in the full context of the facts before them, looking to the terms of the contracts, the parties claiming an interest in the proceeds, and the facts giving rise to the use of the proceeds. Here, given the terms of the ABC Policies, the status of the Litigation, and the Settlement, the Estate does not have a property interest in the insurance proceeds. This is because the Priority of Payments provision compels payment in full of the claims by the Movants and the Additional Insureds under Insuring Agreement A, which includes satisfaction of the Settlement. Moreover, stay relief being granted by this Court is an express condition to the Settlement,[2] so if the Motion is not granted, the Settlement would fail and defense costs of the Movants and the Additional Insureds under Insuring Agreement A will exhaust the remainder of the ABC Policies.

---

[1] To the extent a term is not defined herein, said term shall be attributable to the terms as used in the Motion, the Objection, and/or the Reply. The D&O Policies are attached as exhibits to the Declaration of Michael A. Sabella (the "Sabella Decl.") (ECF Docket No. 412).

[2] The class action settlement agreement is subject to the condition that this Court enters "a comfort order that the insurance proceeds contemplated to fund the Settlement Amount, Notice Fund, and the settlement in the Sabby Action may be utilized for those purposes."

3.      Simply stated, the Movants have a contractual priority interest in the proceeds of the ABC Policies to resolve the claims against them through the Settlement and there is no scenario in which payment will ever be made under Insuring Agreements B and C.  Any such recovery is hypothetical, speculative, and contingent given the Priority of Payments provision.  Given these realities, the Estate does not have an interest in the insurance proceeds and the automatic stay is not applicable.

4.      Alternatively, if the Court determines that the automatic stay is applicable, cause exists to lift the automatic stay to the extent required to fund the Settlement, as an analysis of the *Sonnax Factors* shows.  If the automatic stay is lifted, it will not prejudice the Trust because the ABC Policies, and specifically the Priority of Payments provision, preclude any payments to the Trust for claims for indemnification or securities claims against it prior to payment in full of claims against the Movants and the Additional Insureds.  The proceeds will only be used to fund the Settlement or to pay the legal fees and costs of the Movants and the Additional Insureds.  If the Litigation resumes, then the anticipated legal fees and costs will quickly exhaust the balance of the ABC Policies.  In contrast, the Settlement would resolve the Litigation, which is against third parties as the Litigation is stayed as to the Debtors due to the automatic stay and no motion to lift the automatic stay to make them active participants was made.

5.      Conversely, it would harm the Movants if the automatic stay were to remain in effect and the Movants were unable to fund the Settlement with the proceeds.  They would be forced to continue to litigate their liability in the Litigation, their legal fees and expenses would quickly exhaust the remainder of the ABC Policies, and they could be exposed to personal liability for legal fees and costs and potential judgments against them.

2

6. The Trustee's argument that the Trust could be harmed because it could not seek to draw on the proceeds under Insuring Agreements B and C for claims against the Debtors ignores the plain language of the policies, which precludes such payments until payment in full under Insuring Agreement A. Equally significant is the fact that claims for indemnification or on account of violation of the federal securities laws are statutorily subordinated under Section 510(b) of the Bankruptcy Code. In other words, as a result of Section 510(b) and the confirmed Plan, indemnification claimants and securities litigation claimants received nothing and the Debtors have no exposure of "loss" to which the insurance proceeds would attach. In essence, the Trustee is attempting to assert superior rights to the insurance proceeds. But that assertion finds no support in the ABC Policies, the Bankruptcy Code or case law, and other courts have rejected it. Thus, as more fully set forth below, the balance of the harms favors the Movants and the application of the *Sonnax Factors* supports lifting of the automatic stay, to the extent applicable.

7. For these reasons set forth herein, in the Motion and in the Reply, the Movants request that the Objection be overruled and the Motion be granted.

## Discussion

### I. The Proceeds of the ABC Policies Are Not Property of the Estate

8. "Courts that have addressed whether the proceeds of a liability insurance policy are property of the estate are guided by the language and scope of the specific policies at issue." *In re MF Glob. Holdings Ltd.*, 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012) (citing *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del. 2010); *In re Medex Reg'l Labs., LLC*, 314 B.R. 716, 720 (Bankr. E.D. Tenn. 2004); *In re CyberMedica, Inc.*, 280 B.R. 12, 13 (Bankr. D. Mass. 2002)). This is because "the estate's legal or equitable interests cannot rise above that of the Debtor's pre-bankruptcy." *In re Medex Reg'l Labs., LLC*, 314 B.R. at 720; *see In re MF Glob. Holdings Ltd.*,

469 B.R. at 193; *In re Downey Fin. Corp.*, 428 B.R. at 607. The purpose of the D&O policies is to provide coverage for directors and officers themselves, not to siphon policy proceeds away from directors and officers to provide a potential resource of funds for the debtor's creditors. In *Ochs v. Lipson (In re First Central Financial Corp.)*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999), the court explained this essential feature:

> D & O policies are obtained for the protection of individual directors and officers. Indemnification coverage does not change this fundamental purpose. There is an important distinction between the individual liability and the reimbursement portions of a D & O policy. The liability portion of the policy provides coverage directly to officers and directors, insuring the individuals from personal loss for claims that are not indemnified by the corporation. Unlike an ordinary liability insurance policy, in which a corporate purchaser obtains primary protection from lawsuits, a corporation does not enjoy direct coverage under a D & O policy. It is insured indirectly for its indemnification obligations. In essence and at its core, a D & O policy remains a safeguard of officer and director interests and not a vehicle for corporate protection.

9. With this understanding, courts address the question of whether insurance proceeds are property of the estate by analyzing several factors: the coverage provisions of the policies themselves; whether there is a priority of payments (or similar) provision; and the likelihood of coverage being sought by the debtor to make actual payment on the claims for which it seeks policy proceeds. *See In re Downey Fin. Corp.*, 428 B.R. at 604; *In re Medex Reg'l Labs., LLC*, 314 B.R. at 721; *In re CyberMedica, Inc.*, 280 B.R. at 13.

(a) **The D&O Policies Provide Specific Guidelines for Coverage**

10. There are four ABC Policies implicated by the Motion: the Argonaut Policy,[3] which is the primary policy, and three excess ABC Policies,[4] which follow the Argonaut Policy in form and substance. The Argonaut Policy and the first excess policy have been exhausted. These ABC Policies provide for various types of liability coverage for the directors and officers of the Debtors,

---

[3] *See* Sabella Decl. to Reply ¶ 2.
[4] *See* Sabella Decl. ¶¶ 3–5.

4

as well as the Debtors in certain specific instances. They are "eroding" or "wasting policies"— every dollar spent on litigation costs or otherwise results in one less dollar under the policies to cover potential claims. *See In re MF Glob. Holdings Ltd.*, 469 B.R. at 190. The key cause of erosion of the ABC Policies proceeds to date has been the defense costs of the various directors and officers of the Debtors, both pre-petition and post-petition. To date, these costs have exhausted the Argonaut Policy and the first excess policy, the XL Policy. Through this Motion, the Movants seek to use the remainder of the ABC Policies to fund the Settlement pursuant to Insuring Agreement A.

11. Insuring Agreement A, along with Insuring Agreements B and C, establish the three different levels of coverage under the contractual terms of the insurance policies:

- Insuring Agreement A: This affords specified coverage for non-indemnifiable loss: the "Insurer shall pay Loss of any Insured Person(s) arising from a Claim . . . first made during the Policy Period . . . against such Insured Person(s) for a Wrongful Act, if the Company has not indemnified the Insured Person(s) for such Loss."

- Insuring Agreement B: This affords specified company reimbursement coverage: the "Insurer shall pay Loss of the Company for Loss arising from a Claim . . . first made during the Policy Period . . . against any Insured Person(s) for a Wrongful Act, if the Company is permitted or required to indemnify the Insured Person(s) for such Loss."

- Insuring Agreement C: This affords specified company securities liability coverage: "Insurer shall pay Loss of the Company arising from a Securities Claim . . . first made during the Policy Period . . . against the Company for a Wrongful Act."

12. There are key terms in Insuring Agreement A that are pertinent to the Motion and the Court's analysis that are defined in the Argonaut Policy:

- "Claim" includes "a civil proceeding against any Insured commenced by the service of a complaint or similar pleading." *See* Sabella Decl. ¶ 2, Section II.B.2 ("Claim").[5]

- "Insured Person(s)" include, among others, the Pareteum directors, management committee members, officers, in-house general counsel, controllers, directors of investor

---

[5] The D&O Policies are attached as exhibits to the Declaration of Michael A. Sabella (the "Sabella Decl.") (ECF Docket No. 412).

relations and human resources, risk managers, and, under specified circumstances, employees. *See* Sabella Decl. ¶ 2, Section II.O ("Insured Persons"). The Movants and the Additional Insureds fall within this definition. Importantly, neither the Debtors nor the Trustee are included in the definition.

- "Loss" means "the total amount which the Insureds[6] become legally obligated to pay on account of Claims made against them for Wrongful Acts for which coverage applies, including, but not limited to damages, judgments and *settlements*." *See* Sabella Decl. ¶ 2, Section II.R ("Loss") (emphasis added).

- "Wrongful Act" is defined as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty … by an Insured Person acting in his or her capacity as such and on behalf of the Company …." *See* Sabella Decl. ¶ 2, Section II.BB.1.

13. The Litigation involves lawsuits against the Movants and the Additional Insureds in connection with their roles as directors and officers. Section V.M of the Argonaut Policy provides as follows:

> Bankruptcy or insolvency of any Insured shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights, remedies or defenses under this Policy or at law. In the event a liquidation or reorganization proceeding is commenced by or against a Company pursuant to the United States Bankruptcy Code, as amended, or any similar foreign, state or local law, *the Company and the Insured Persons hereby agree to cooperate in any efforts by the Insurer, the Company or any Insured Person(s) to obtain relief from any stay or injunction that may prohibit or delay the Insurer's payment of Loss.*

*See* Sabella Decl. ¶ 2 (emphasis added). Accordingly, the requested relief to permit the Insurers to pay Loss is expressly contemplated under the insurance policies. It is undisputed that the Litigation and Settlement create a Loss that falls within the ambit of Insuring Agreement A.

14. The other two insuring agreements implicate coverage in the event that Pareteum is required and permitted to indemnify the Insured Person(s) for claims made against them (Insuring Agreement B) or for securities claims against Pareteum itself (Insuring Agreement C).

---

[6] While "Insureds" include the Insured Persons and the Company (Pareteum), *see* Sabella Decl. ¶ 2, Section II.N, Insuring Agreement A does not incorporate "Insureds" generally into the provision and only applies to Insured Persons.

6

15.     The Priority of Payments provision deals with competing claims between Insureds under the insuring agreements.

                 (b)     **The Priority of Payments Provision Governs Distribution of the Proceeds**

16.     Even if the Lawsuit and Settlement implicated Insuring Agreements B and C, the Priority of Payments provision clearly delineates the order of coverage in favor of the directors and officers under Insuring Agreement A:

> In the event of Loss arising from one or more covered Claims for which payment is due under this Policy, the Insurer shall:  1. *first, pay all Loss covered under Insuring Agreement A. NON-INDEMNIFIABLE LOSS COVERAGE; 2. second, only after paying Loss pursuant to subparagraph (1) above*, and to the extent of any remaining amount of the Limit of Liability, pay covered Loss under Insuring Agreement B. COMPANY REIMBURSEMENT COVERAGE; 3. third, only after paying Loss pursuant to subparagraphs (1) and (2) above, and to the extent of any remaining amount of the Limit of Liability, pay covered Loss under Insuring Agreement C. COMPANY SECURITIES LIABILITY COVERAGE . . . .

*See* Sabella Decl. ¶ 2 (emphasis added).

17.     The Priority of Payments provision is fundamental and critical to the analysis here as it clearly delineates the order for which payments are to be made: Insuring Agreement A first and in full.  Indeed, it exists to specifically address the issue that the Trustee now seeks to create by ignoring the express language of the ABC Policies.  Only once "all Loss covered" is paid pursuant to Insuring Agreement A is coverage under Insuring Agreement B for indemnification claims implicated.  Importantly, payments under Insuring Agreement B can only be made "to the extent of *any remaining amount*" of the proceeds after the payments under Insuring Agreement A.  Once "Loss" is paid under Insuring Agreement B, then, and only then, is Insuring Agreement C implicated to make payment with "any remaining amount" of the proceeds under the ABC Policies.

18.     The terms are clear that coverage under Insuring Agreements A, B, and C is not treated equally for purposes of payment, but rather in a contractually determined order and only to

7

the extent there are proceeds available after payment of all Loss under each prior insuring agreement, beginning with Insuring Agreement A. The other two Insuring Agreements are subordinated to those payments. Payments made under the Argonaut Policy, and any payments made under the remaining ABC Policies are prioritized to be paid for the benefit of the Insured Persons, including the Movants and the Additional Insureds, prior to any disbursement made for the benefit of the Debtors in connection with any claim against it (to the extent such claim could ever exist). As the *Adelphia* Court noted, "bankruptcy courts should be wary of impairing the contractual rights of directors and officers even in cases where the policies provide entity coverage as well. The Court believes that if directors and officers are to serve, they need to have comfort in knowing that bankruptcy courts will be slow in depriving them of contractual rights under the D & O policies upon which they may have relied in agreeing to serve." *In re Adelphia Commc'ns Corp.,* 285 B.R. 580, 598 (Bankr. S.D.N.Y. 2002), *vacated on other grounds,* 298 B.R. 49 (S.D.N.Y. 2003).

19. The Trustee's stated position is that the Estate has an interest because of indemnification and securities claims against the Debtors. But the Trustee does not even attempt to outline how this liability could materialize, given the impact of Section 510(b) of the Bankruptcy Code and the fact that any such claims will not receive any distribution under the confirmed Plan. And, to state the obvious, the Trustee's real interest is in having proceeds available against which to recover for his claims against the Debtors' former directors and officers as highlighted by his recently filed Complaint against Movants—claims that, unlike those for which the Movants and Additional Insureds need policy proceeds, have not been valued. Moreover, the Trustee has not and cannot articulate a basis for his claims to take priority over the claims being settled. There is nothing in the ABC Policies, the Bankruptcy Code or the case law that supports such a result.

8

(c)     **The Trust's Coverage Under the ABC Policies is Remote, Speculative and Contingent**

20.     At the Initial Hearing, the Court questioned whether the Priority of Payments provision meant that the Trust does not have an interest in the proceeds of the ABC Policies. The answer is that the application of the Priority of Payments provision to the facts before the Court that results in the inescapable conclusion that the remaining proceeds of the ABC Policies are not property of the Estate. This is because any potential payments that could be made under Insuring Agreements B and C are not only remote, speculative, and contingent, but are precluded by Section 510(b) of the Bankruptcy Code and the terms of the confirmed Plan. *See In re Allied Digital Techs., Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004) ("when the liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate.").

21.     If the Court were to grant the Motion, the Settlement—which is a covered "Loss" that must be paid in full first under Insuring Agreement A—will erode the remainder of the ABC Policy proceeds to resolve the Litigation against the Movants and the Additional Insureds. If the Court were to deny the Motion, then the Settlement, by its terms, will fail, and the parties to the Litigation would proceed on a brisk litigation schedule and include extensive document discovery, depositions, expert discovery, class certification, summary judgment, and a potential trial. The legal fees and costs of the Movants and the Additional Insureds would exhaust the remainder of the proceeds of the ABC Policies based on projected budgets and the historical defense costs.

22.     Because in either circumstance, payments under Insuring Agreement A will exhaust the ABC Policies, there is no possibility for payment of ABC Policy proceeds under Insuring Agreements B and C. As discussed in the Reply, Judge Glenn in *In re MF Glob. Holdings Ltd*. analyzed a similar priority of payments provision, and stated that the directors and officers

9

had a present need for coverage under the policies, and that under the priority of payments provision, their entitlement to payment was superior to any indemnification or covered claims asserted against the debtors. 469 B.R. at 193. This was because the terms of the policies provided for such coverage, which bound the debtors, and the intervening bankruptcy did not expand the debtors' contractual rights to the proceeds. *Id*.

23. The Priority of Payments provision here necessitates this same result as it is a fundamental contractual component of the insurance policies and cannot be altered by virtue of the Debtors' bankruptcy proceeding. *See In re MF Glob. Holdings Ltd.*, 515 B.R. 193, 203–04 (Bankr. S.D.N.Y. 2014) (stating that the contractual provisions of a D&O policy, including the priority of payment provisions must be "given effect" and "[t]hat provision requires that the Individual Insureds be advanced defense costs before other payments under the D & O Policies are satisfied."); *In re Downey Financial Corp.*, 428 B.R. at 607–08 (analyzing the priority of payments provision, noting that pursuant to same, the directors and officers were entitled to coverage under Coverage A while the trustee's interest was junior to Coverage A because his interests were limited to entity coverage under Coverage B, concluding that the estate did not have an interest in the proceeds, and stating that to conclude that the estate did have an interest would permit the debtor (and subsequently, the trustee) to have greater rights post-petition than the debtor had pre-petition); *In re World Health Alternatives, Inc.*, 369 B.R. 805, 811 (Bankr. D. Del. 2007) (analyzing the language and scope of the policies and holding that insurance policy proceeds were not property of the estate because the debtors had no right to the Coverage A proceeds, which insured only the debtor's officers and directors); *In re CHS Elec., Inc.*, 261 B.R. 538, 541 (Bankr. S.D. Fla. 2001) (holding that the insurance proceeds were not property of the estate where coverage

10

under the insurance policies was to be utilized for the benefit of the directors and officers of the debtor).

24.      The type of hypothetical, speculative, and contingent recovery of policy proceeds reinforces that the proceeds are not property of the estate.  *See In re Allied Digital Techs., Corp.*, 306 B.R. at 512–13 (concluding that the proceeds of the insurance policies were not property of the estate because indemnification was hypothetical or speculative and "[t]he Trustee has made no credible showing that the direct coverage of Allied Digital under Clause B(i) for securities claims has any continuing vitality"); *In re Medex,* 314 B.R. at 722–723 (holding that the absence of covered securities claims against the debtors meant that the insurance proceeds were not property of the estate); *Ochs v. Lipson (In re First Cent. Fin. Corp.)*, 238 B.R. at 18 (stating that "[i]f entity coverage is hypothetical and fails to provide some palpable benefit to the estate, it cannot be used by a trustee to lever himself into a position of first entitlement to policy proceeds.").

25.      Finally, Bankruptcy Code Section 510(b) makes clear that claims against the Debtor for violations of the federal securities laws and indemnification based upon any such violations in connection with the purchase or sale of the Debtors' stock are subordinated to the level of common stock for purposes of distribution. The Debtors' confirmed Plan provides that holders of such claims, regardless of the merits, are not entitled to any distribution. Therefore, the Debtors do not even need to look to insurance to cover claims against it because there will be no loss or economic impact on account of those claims under the Plan.

     (d)     **The Debtors' Pre-Petition Receipt of Insurance Proceeds for Legal Costs Does Not Support the Trustee's Position That the Insurance Proceeds Are Property of the Estate**

26.      The Trustee argues that pre-petition payments by the insurers to Pareteum mean that the ABC Policies' proceeds are Estate property.  The Trustee is wrong.  Defense costs were

11

paid by the insurers on behalf of the Debtors pre-petition pursuant to Insuring Agreement C (discussed above) because the Debtor was afforded coverage for defense costs in connection with securities claims. *See* Sabella Decl. ¶ 1, Section II.O ("COMPANY SECURITIES LIABILITY COVERAGE: Insurer shall pay Loss of the Company arising from a Securities Claim . . . first made during the Policy Period . . . against the Company for a Wrongful Act.").

27.     What the Trustee ignores is the fact that the Debtors' Chapter 11 filing triggered the automatic stay which precluded any further progression of the Litigation against the Debtors and therefore no further defense costs were incurred.  It also triggered and the Priority of Payments provision because from that point forward, the Debtors were not permitted or required to indemnify any Insured Person for the pre-petition claims against such Insured Person.  Thus, because the claims against the Insured Persons were then non-indemnifiable, only claims under Insuring Agreement A, whether for defense costs or otherwise, could be paid until those claims were satisfied in full.  The pre-petition payment of the Debtors defenses costs is therefore irrelevant to the issues currently before the Court.

## II.     Cause Exists to Lift the Automatic Stay to the Extent Necessary

28.     If the Court were to determine that the Estate has an interest in the proceeds of the ABC Policies, the Court should modify and/or lift the automatic stay to permit the proceeds of the ABC Policies to be used to fund the Settlement.  *See In re Allied Digital Techs., Corp.*, 306 B.R. at 513 ("It is not uncommon for courts to grant stay relief to allow payment of defense costs or settlement costs to directors and officers, especially when there is no evidence that direct coverage of the debtor will be necessary."); *see also In re Downey Fin. Corp.,* 428 B.R. at 611 (granting relief from stay for cause in order to permit use of D & O policy proceeds).

12

29.     The Court may grant relief from the automatic stay upon the request from the party in interest for "cause."  11 U.S.C. § 362(d).  "Cause" is determined on a case-by-case basis and is within the discretion of the court.  *See In re MF Glob. Holdings Ltd.*, 469 B.R. at 191; *In re Adelphia Commc'ns Corp.*, 285 B.R. at 593.  In determining whether "cause" exists to lift the automatic stay, courts in this district consider factors articulated by the Second Circuit in *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990) (the "*Sonnax* Factors").  Those factors are:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

(internal citation omitted).  Courts weigh the applicable factors.  *See Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002) (citing *Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 143 (2d Cir. 1999)).  The Motion implicates several of the *Sonnax* Factors, and those factors demonstrate that "cause" exists to lift the automatic stay to enable the proceeds of the ABC Policies to be used to fund the Settlement.

30.     **Relief would result in a partial or complete resolution of the issues.**  The relief requested will enable the Movants and the Additional Insureds to draw upon the ABC Policies to fund the Settlement.  This will fully resolve the Litigation allow the ABC Policies' proceeds to be applied in the manner the Debtors contractually agreed to with the Insurers.  It will also enable the Trustee to avoid any involvement seeking to address potential defense costs of the Movants and

13

Additional Insureds as addressed with the Debtors' counsel and Creditors Committee's counsel in connection with the Prior Stay Relief Motion and the subsequent *Stipulation and Order to Modify the Automatic Stay on a Limited Basis to Permit Payments of Defense Costs Under Certain Insurance Policies* (ECF Docket No. 217) and the *Amended Stipulation and Order to Modify the Automatic Stay on a Limited Basis to Permit Payments of Defense Costs Under Certain Insurance Policies* (ECF Docket No. 377).

31. **Relief will not interfere with these bankruptcy cases.** The Settlement will not hinder the liquidation of the Debtors' remaining assets or delay the distribution of funds to creditors. The Settlement will permit the Trustee and its professionals to turn their attention to other matters that are more likely to generate value for the Trust. If the Court does not grant stay relief to permit the parties to settle the Litigation, the parties will remain embroiled in expensive litigation. The proceeds will be wasted on lawyers, benefitting neither the Estate nor its creditors.

32. **The action primarily involves third parties.** The Litigation solely involves third parties to the Debtors' bankruptcy cases: the Movants, the Additional Insureds, and the plaintiffs. The Litigation against the Debtors has been stayed by virtue of the Debtors' bankruptcy filings, and they remain stayed post-confirmation of the Plan. The Plan, as discussed above, provided that any claims against the Debtors in that Litigation will receive no distribution. In contrast, the Litigation, to which the Movants are active parties, proceeded throughout the summer pursuant to Judge Hellerstein's litigation schedule, which required the parties to proceed with discovery and depositions, and contemplated expert discovery, class certification issues, summary judgment, and trial. The automatic stay relieved the Debtors from needing to participate in that process, and no motion to lift the automatic stay to bring the Debtors in as active litigants was filed. The Plan

14

relieved the Debtors from any economic exposure to the Clams. Therefore, the Litigation is focused on third parties, not the Debtors, which supports lifting the automatic stay.

33. **The Litigation and Settlement do not prejudice the interests of other creditors.** As discussed above, the Trust does not have a property interest in the proceeds of the ABC Policies. The proceeds are not a source of recovery for those creditors and therefore any use of the proceeds of the ABC Policies to fund the Settlement will not impact the unsecured creditors. The Trustee's filing of the Complaint on December 5, 2022 (22-01177-lgb, ECF Docket No. 1) does not alter this analysis because the Bankruptcy Code does not enable the Trustee to obtain any prioritization of its interest over any other party. *See In re MF Glob. Holdings Ltd.*, 469 B.R. at 196–97 (rejecting argument that trustee as a claimant against the directors and officers has a superseding right to recover insurance proceeds before all others); *In re Enivid, Inc.*, 364 B.R. 139, 157 (Bankr. D. Mass. 2007) (stating that there was no "legitimate reason why [the trustees'] claims against the directors and officers … should be elevated to a higher priority than the claims of the Shareholder Plaintiffs, which would be the effect of injunctive relief … There is simply no basis in the Bankruptcy Code or other applicable law for such an order."); *In re Allied Digital Techs., Corp.*, 306 B.R. at 513 ("Trustee is no different than any third party plaintiff suing defendants covered by a wasting policy"); *In re CHS Elec., Inc.*, 261 B.R. at 544 (noting that a trustee does not have "super-plaintiff powers" to provide it priority with claims different than another plaintiff and "the Trustee has not pointed to a case, nor are we aware of one, in which a court has protected D & O policy proceeds so as to facilitate a prioritization in favor of a trustee or debtor-in-possession to such funds."); *Ochs v. Lipson* (*In re First Cent. Fin. Corp.*), 238 B.R. at 21 ("[T]he Trustee has not pointed to a case, nor are we aware of one, in which a court has protected D & O policy

15

proceeds so as to facilitate a prioritization in favor of a trustee or debtor-in-possession to such funds."). Therefore, the Settlement does not impact the Estate.

34. **The interests of judicial economy and the expeditious and economical resolution of litigation.** The Settlement would resolve the Litigation and relieve the Debtors from any further involvement, including discovery and addressing Movants' further motions to this Court regarding use of the ABC Policies to cover their defense fees and costs. While the Settlement did not technically withdraw the claims against the Debtors, it is important to note that both the Pareteum Shareholder Investment Group ("PSIG"), the securities class action lead plaintiffs, and the Sabby Volatility Warrant Master Fund, Ltd. ("Sabby"), an individual opt-out plaintiff, consented to the subordination of their claims against the Estate. Such subordination is tantamount to agreeing that they will receive no distribution from the Estate and the claims against the Debtors are effectively worthless.

35. The PSIG consented to the reclassification of its claims pursuant to the *Consent Order Granting Debtors' First Omnibus Objection to Claims of Certain Equity Securities Holders* (ECF Docket No. 399), which reclassified the PSIG's claims as Class 5 – Interests under the Plan. Sabby did the same pursuant to the *Consent Order Granting Debtors' First Omnibus Objection to Claims of Certain Equity Securities Holders* (ECF Docket No. 442). Since the Plan does not provide for payment in full of unsecured creditors, there will be no distribution on account of the securities' plaintiffs' claims. To the extent there are other claimants against the Estate asserting securities claims separate and apart from the PSIG and Sabby groups, those claims are also statutorily subordinated under Section 510(b) of the Bankruptcy Code and the terms of the Plan. *See In re MF Glob. Holdings Ltd.*, 469 B.R. at 192 ("[E]ven assuming that any securities holders file proofs of claim in the bankruptcy proceedings, such claims would be subordinated to those of

16

other secured and unsecured creditors pursuant to section 510(b) of the Bankruptcy Code.") (citing *In re Adelphia Commc'ns Corp.*, 285 B.R. at 592 n.13) (stating that entity coverage for securities claims is "rarely meaningful in bankruptcy cases" because of Section 510(b)). The Litigation against the non-debtors is the only remaining piece, so lifting the automatic stay would result in a resolution of the issues between the various parties.

36.     **Impact of the stay on the parties and the balance of harms.** Courts have recognized that "[i]n essence and at its core, a D&O policy remains a safeguard of officer and director interests and not a vehicle for corporate protection." *Ochs v. Lipson (In re First Cent. Fin. Corp.)*, 238 B.R. at 16. This is the purpose of the ABC Policies, which is reinforced by the fact that the Priority of Payments provision provides that Insuring Agreement A creates a superior interest for the benefit of Insured Persons to Insuring Agreements B and C.

37.     If the automatic stay remains in effect, and the Movants are not able to utilize the insurance proceeds to satisfy the Settlement, it would frustrate the purpose of the ABC Policies themselves, undermine the contractual terms of those policies, and cause irreparable harm to the Movants and the Additional Insureds. *See, e.g.*, *Allied Digital*, 306 B.R. at 514 (stating that "[w]ithout funding, the Individual Defendants will be prevented from conducting a meaningful defense to the [] claims and may suffer substantial and irreparable harm."); *In re MF Glob. Holdings Ltd.*, 469 B.R. at 192–93 ("Lifting the automatic stay to permit [the insurer] to advance defense costs on behalf of the Individual Insureds would not severely prejudice the Debtors' estates. But failure to do so would significantly injure the Individual Insureds, whose defense costs are covered by the [insurance policies]."). In the absence of the Settlement, the Movants and Additional Insureds would be forced to continue to litigate their liability in the Litigation, and their legal fees and expenses would quickly exhaust the remainder of the ABC Policies. This could

expose them to personal liability for legal fees and expenses not able to be covered by insurance, as well as any potential judgment entered against them. It is this irreparable harm that has been recognized by courts that have granted relief from the automatic stay for parties to utilize insurance proceeds. *See e.g., In re MF Glob. Holdings Ltd.*, 469 B.R. at 196; *In re Beach First Nat'l Bancshares, Inc.,* 451 B.R. 406, 411 (Bankr. D.S.C. 2011); *In re Downey Financial Corp.*, 428 B.R. at 598; *In re Laminate Kingdom, LLC*, Case No. 07-10279, 2008 WL 1766637, at *4 (Bankr. S.D. Fla. Mar. 13, 2008); *In re CyberMedica, Inc.*, 280 B.R. at 13; *In re CHS Elec., Inc.*, 261 B.R. at 539.

38. In contrast, the Trustee would not be harmed by the use of the proceeds to fund the Settlement because the ABC Policies will be exhausted either by funding the Settlement or, if the Settlement fails as a result of the Motion being denied, then by the legal fees and expenses of the Movants' and Additional Insureds' legal counsel in defending against the Litigation. If the Litigation ultimately results in judgment(s) against the Movants and Additional Insureds, and the proceeds of the ABC Policies are exhausted through the defense costs of the Litigation and any subsequent appeals, then the Movants and Additional Insureds could also be exposed to significant personal liability. While either scenario would obviously greatly harm the Movants and Additional Insureds, the Trust would not even receive a benefit because in neither scenario would it receive ABC Policy proceeds, by operation of the Priority of Payments provision.

39. Additionally, the Trustee's potential claims under Insuring Agreements B and C are speculative, contingent, and unlikely. As to the potential indemnification claims under Insuring Agreement B, the likelihood of such claims ever being paid or satisfied are functionally non-existent. The reasons are two-fold. First, the Settlement resolves any claims for indemnification that could be made by the Movants as a result of the Litigation because it resolves

18

the Litigation.  As previously noted, the Debtors filed an objection to one of those claims (ECF Docket No. 337), and it is likely other similar objections from the Trustee will follow.  Second, the Trustee cannot and is not required to make payment on any such indemnification claims because those claims are statutorily subordinated under Section 510(b) and not entitled to any distribution under the Plan.

40.     With regards to Insuring Agreement C, which is the third coverage in line, after payment in full under Insuring Agreements A and B, the securities claims against the Debtors are subordinated under Section 510(b) of the Bankruptcy Code, the stipulations with the plaintiffs to the Litigation, and the terms of the Plan, as discussed above.  Since the Plan does not provide for payment in full of unsecured creditors, there will never be any distributions made from the estate on account of the Class 5 claims and the Plan does not provide for any such distribution.

41.     Finally, the Trustee argued in the Objection that the use of the proceeds to fund the Settlement would deprive the Trustee of the ability to use the proceeds to satisfy the claims of the general unsecured creditors.  To state the obvious, the Trustee cannot simply claim entitlement to money from D&O insurance as a potential plaintiff.  Instead, the Argonaut Policy, like all D&O policies, requires a "Claim".  The Trustee's filing of the Complaint on December 5, 2022 (22-01177-lgb, ECF Docket No. 1) is a transparent effort to attempt to manufacture an interest against the proceeds.  The Movants note that the Complaint only identifies them and no other potential defendant.

42.     The Trustee views the proceeds as a source of recovery for the Trust on account of the Complaint.  That is the Trustee's real goal here.  And, of course, the Complaint does not enable the Trustee to have superior rights to the insurance proceeds or to forestall the Settlement because of the Complaint.  This is a conclusion reached by several courts faced with similar arguments.

19

*See In re Enivid, Inc.*, 364 B.R. at 157 (rejecting trustees' request for a preliminary injunction to prevent distribution of insurance proceeds to fund a settlement so as to permit the trustees time to prevail on their own claims against the directors and officers because the trustees did not provide "a legitimate reason why their claims against the directors and officers … should be elevated to a higher priority than the claims of the Shareholder Plaintiffs, which would be the effect of injunctive relief … There is simply no basis in the Bankruptcy Code or other applicable law for such an order."); *In re CHS Elec., Inc.*, 261 B.R. at 544 ("Unfortunately, [the trustee] could not cite to, and this Court is unaware of, any Bankruptcy Code provision or case law that would give a bankruptcy trustee any different status than a non-bankruptcy plaintiff with an unliquidated claim against third-parties which may be covered by insurance proceeds about to be used to settle or satisfy a judgment entered in favor of other plaintiffs."); *Ochs v. Lipson* (*In re First Cent. Fin. Corp.*), 238 B.R. at 21 ("[T]he Trustee has not pointed to a case, nor are we aware of one, in which a court has protected D & O policy proceeds so as to facilitate a prioritization in favor of a trustee or debtor-in-possession to such funds.").

43. The Trustee cannot jump ahead in priority with his Complaint against the Movants or for potential claims under Insuring Agreements B and C. The Trustee has no basis to receive any distribution from the proceeds of the insurance policies. In any event, if the Motion is denied, the Litigation will resume and the legal fees and expenses of the Movants will continue to exhaust the ABC Policies under Insuring Agreement A. This is why the balance of the harms clearly favors the Movants, who have a real and immediate need for use of the insurance proceeds to fund the Settlement and resolve the Litigation, proceeds in which they hold a priority interest.

44.    Accordingly, the Movants submit that to the extent that the Court determines that the automatic stay is applicable, the analysis of the *Sonnax Factors* weighs heavily in favor of lifting the automatic stay.

## Conclusion

45.    For the reasons set forth herein, the Motion, and the Reply, the Movants request that the Objection be overruled, and the entry of an order pursuant to Section 362 of the Bankruptcy Code that the automatic stay is not applicable, or should be modified to the extent necessary so that the proceeds of the ABC Policies can be used towards settlement of the Litigation.

Dated:    December 7, 2022          BAKER & HOSTETLER LLP
          New York, New York

                                    By: */s/ Jorian L. Rose*
                                    Jorian L. Rose
                                    Michael A. Sabella
                                    45 Rockefeller Plaza
                                    New York, New York 10111
                                    212-589-1400
                                    jrose@bakerlaw.com
                                    msabella@bakerlaw.com

                                    *Attorneys for Movants*

21