N4PDPARC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE PARETEUM SECURITIES
LITIGATION,

                                    19 Civ 09767

                                    Conference
------------------------------x
                                    New York, N.Y.
                                    April 25, 2023
                                    3:00 p.m.

Before:

            HON. ALVIN K. HELLERSTEIN,

                                    District Judge

                    APPEARANCES

KAHN SWICK & FOTI, LLC
     Attorney for Pareteum Shareholder Investor Group
BY:  KIM ELAINE MILLER

LOWENSTEIN SANDLER, LLP
     Attorney for Pareteum Shareholder Investor Group
BY:  MICHAEL S. ETKIN

LAX & NEVILLE, LLP
     Attorney for Sabby Volatility Warrant Master Fund, Ltd.
BY:  BARRY R. LAX

DAVIS, WRIGHT, TREMAINE, LLP
     Attorney for Sabby Defendants, Robert Lippert, and
     Luis Jimenez-Tunon
BY:  JAMES K. GOLDFARB

THE WEISER LAW FIRM, P.C.
     Attorney for Douglas Loskot
BY:  CHRISTOPHER L. NELSON

WILSON ELSER MOSKOWITZ EDELMAN & DOCKET, LLP
     Attorney for Squar Milner, LLP
BY:  PETER J. LARKIN
     REBECCA GELOZIN

N4PDPARC

BAKER & HOSTETLER, LLP
        Attorneys for Victor Bozzo, Denis McCarthy,
        Edward O'Donnell, Robert H. Turner and Yves Van Sante.
BY:   DOUGLAS W. GREENE
        ERICA BARROW

BAST AMRON, LLP
        Attorney for Anthony M. Saccullo, in his capacity as the
        Liquidation Trustee for the TEUM Liquidating Trust.
BY:   BRETT M. AMRON

ALSO PRESENT:   Judd Harcsar

N4PDPARC

(Case called; appearances noted)

THE COURT:  Okay.  The first thing I'd like to do is take up the objection of the liquidation trustee.

Who is that person?

MR. AMRON:  I am, your Honor.  Brad Amron on behalf of the liquidation trustee.

THE COURT:  You may be seated.

MR. AMRON:  Thank you, your Honor.

THE COURT:  So you are objecting to a change to include a side policy into the policy that is to fund the settlement.

Do I have it right?

MR. AMRON:  Slightly different, your Honor.  There is one sentence in the settlement agreement in paragraph 16 that references the side A policy --

THE COURT:  Yes.

MR. AMRON:  -- which is not a policy that is being used to fund the settlement.  It is an excess layer, the fifth excess layer in the stack of insurance.

THE COURT:  Let me get that paragraph.

MR. AMRON:  Paragraph 16.  16, on page --

THE COURT:  I know.  Paragraph 16.

MR. AMRON:  Okay.  Thank you.  It's on page 24 of the document, Judge.

THE COURT:  The agreement says, the parties agree that

other than payment of the settlement amount, notice fund, and payment of a settlement in the *Sabby* action, the remaining proceeds of the ABC policies only will be used to pay defense costs for claims, as those terms are defined in the ABC policies covered under the ABC policies.

The parties also agree that the proceeds of XL Insurance Company, policy no. BLU162674-19, called the side A policy, only will be used to pay defense expenses for claims as these terms are -- as those terms are defined in the side A policy, covered under the side A policy.

Well, I can't say I understand what's going on here, but the major objection to you is that you don't have standing. That the positions -- before they give various reasons, but the one that's most cogent to my mind is the issue should have been taken up with the trustee in bankruptcy, and that trustee in bankruptcy has held that the creditors and, therefore, the liquidation trustee, has no interest in these policies.  They are policies to protect identifications in litigations like this.

Is that a correct statement?

MR. AMRON:  Actually, your Honor, that --

THE COURT:  Ms. --

MR. AMRON:  I apologize.  I thought you were speaking to me.

THE COURT:  I'm speaking to all of you really.  I'll

start with you.  Is that a correct statement?

MR. AMRON:  Actually, Judge, the bankruptcy judge was asked to or ruled upon the issues relative to the side A policy.  The issues that were put before the bankruptcy court were whether or not the bankruptcy court would authorize a listing of an automatic stay to allow the funding of this settlement from the ABC policies.  That's it.

THE COURT:  That's because there's no interest in the --

MR. AMRON:  Actually, the bankruptcy court found that the policies and the proceeds of the policies were, in fact, property of the estate, but the judge felt that the stay should be lifted and that the settlement would be placed before the Court, this Court for approval.  But the side A policy was not included as part of that.

THE COURT:  Just a moment.

Why would the bankruptcy judge do that?  If this is property of the estate, that means that creditors here, that is, people entitled to indemnification, are placed in a better position than all other creditors of the company, and the basic rule of bankruptcy is, therefore, violated.  I can't understand what you're saying.

MR. AMRON:  What was asked of the bankruptcy court was whether or not the Court would allow a lifting of the automatic stay to allow the funding of this settlement through the ABC

N4PDPARC

policies.

THE COURT:  Okay.

MR. AMRON:  And the Court said okay.

THE COURT:  How is the side A policy different?

MR. AMRON:  The side A policy, it's not different, but it's not being used to fund this settlement, this shareholder settlement.  And that was not asked -- the issues before the bankruptcy court previously were not whether or not the stay should be lifted or can be lifted to fund the settlement with side A.  What they're asking this Court to do with that one sentence at the end of paragraph 16 is effectively modifying the terms of that insurance contract.

THE COURT:  They modify the insurance contract.  It's not denied.  The argument is that you don't have standing to complain.

Who wants to speak against Mr. Amron's position?

MR. ETKIN:  Your Honor, if I may.

THE COURT:  Sit.

MR. ETKIN:  Michael Etkin.

THE COURT:  Sit, Mr. Etkin.

MR. ETKIN:  I've served as bankruptcy counsel to the class in the bankruptcy proceeding.

What Judge Beckerman ruled, your Honor, was that while the debtor has an interest in the proceeds by virtue of the indemnification obligations that the debtor has, and that would

N4PDPARC

ordinarily be covered, and the indemnification of the directors and officers, one of the things that Judge Beckerman noted -- two very important things that Judge Beckerman noted was that, no. 1, the policy has what's called the priority of payments provision, which means that the individual insured, the directors, and officers, have a superior right to those proceeds than the company does, either by way of indemnification or through entity coverage.  So that was extremely important with respect to this.

And, in addition, under the Bankruptcy Code, your Honor, and in particular section 510(b) of the Bankruptcy Code, claims by directors and officers for indemnification with respect to securities claims like you have before you today are subordinated in terms of that hierarchy of who gets what in a bankruptcy proceeding.  Those claims are subordinated, and they're at the bottom of the ladder.  And they're not entitled to any recovery, and were never entitled to any recovery under the plan.

So while Judge Beckerman did decide that the debtor had some interest --

THE COURT:  I don't understand what you are saying so far.  The company, that is, the debtor has an obligation to its former officers and directors who are planning indemnification, and that's a priority in the way that the policy pays out.  On the other hand, if these officers, directors were to press

their claims for indemnification, they'd be lowest or very low on the list.

MR. ETKIN:  They'd be as low as shareholders, your Honor, who got nothing on this Chapter 11 plan given the deep insolvency of this company.  That's how the economics of the case played out.

But the priority that your Honor referred to and that the policy refers to is the direct coverage to the directors and officers.  That's side A coverage, where they're the direct insureds.  There's no priority with respect to their indemnification claims against the company.  So those -- just to give your Honor some perspective of what went on in the bankruptcy court, in what was a two-day evidentiary hearing, Judge Beckerman did decide that it was appropriate to allow this settlement to go forward and be funded.

I think one very important point, your Honor, to consider, and one of the several reasons why, A, the trustee has no standing, B, the trustee has no contractual right in connection with this side A policy, again, a policy that's not being used to fund this settlement --

THE COURT:  Well, he doesn't need one, because he stands in the shoes of the creditors, and the creditors are standing in the shoes of the company.  And so if the company has a right to get the proceeds of the policy, the liquidation trustee can assert that right.

MR. ETKIN:  Your Honor, they've already sued the directors and officers.  There's a pending litigation by the trustee.  The company has no -- the company has no right -- the company is not an insured under the side A policy.  That's what's very important.

THE COURT:  So that's what I was talking about at the beginning.  There's no way that the company can get the benefit of any of the proceeds of the policies.  Correct?

MR. ETKIN:  The only way they can get it is if the directors and officers ultimately make a decision, because they're covered parties under the agreement.  If they make a decision to settle somewhere down the road, that's their prerogative.  But the trustee is trying to make an argument here before you that they have some contractual right with respect to this side A policy.  That's the only policy at issue before you with respect to the objection.  And they have no right, because only the directors and officers are insured.

THE COURT:  Is that your client?

MR. AMRON:  Your Honor, we -- as the plaintiffs indicated in their papers, we are a competing plaintiff with them.  What this language tries to do is cut off our rights as a plaintiff -- we're trustee now.  This is not an indemnification issue.  I can see the side A policy does not have an indemnification provision similar to the ABC policies, but we, as representing the trustee and the creditor body in

the bankruptcy, are a claimant.

We have, as counsel indicated, asserted a litigation claim or clause against the directors and officers for breach of fiduciary duty.  To the extent there could be a settlement or a judgment, we, as a claimant, have an ability to proceed against those policies' proceeds.

And I understand counsel's argument here, but if your Honor looks at the order that Judge Beckerman entered, Judge Beckerman specifically said, with respect to the ABC policies, and that's all we're trying to accomplish here today, said in paragraph six of her order, which, your Honor, is Exhibit I -- I apologize, your Honor.  The declaration of Ms. Miller, which is at docket entry no. 288 in this case --

THE COURT:  Hold on one minute.  One minute.

Do you have a copy of Judge Beckerman's order?

MR. AMRON:  I do, your Honor.  Forgive my highlights.

LAW CLERK:  Thank you.

THE COURT:  I have the Beckerman order in front of me.

MR. AMRON:  Thank you, your Honor.

Looking at the last page of the order, paragraph six, and I'm going to summarize, because I don't have a copy in front of me, your Honor; but Judge Beckerman basically said that the policies are not to be modified.  They stand based on their language.

And what we're asking here, Judge, today is for the

same thing as to the side A policy.  And the problem with the language in paragraph 16, as indicated by counsel's reply -- excuse me, the defendant's reply to our objection where they say, well, we'd like to -- we would certainly benefit, meaning the defendants would benefit from a settlement, they use the words de minimis, but a settlement with the trustee.  But the settlement here, the shareholder settlement precludes it, which is a modification of the insurance contract.  And the insurance contract provides for the payment of loss, and --

THE COURT:  Your basic point is that the settlement agreement that was approved by Judge Beckerman was a different settlement agreement than the one before me?  Is that it?

MR. AMRON:  Sorry, your Honor.  If I may clarify, Judge Beckerman did not approve a settlement agreement.  That is for your Honor to approve, and that's what's before the Court.

THE COURT:  She allowed the policies to be used pending the settlement agreement --

MR. AMRON:  Correct.

THE COURT:  -- as set out in the version before her, which was different from this version now.

MR. AMRON:  No, your Honor.  There was a -- the issue before Judge Beckerman was whether or not the automatic stay could be lifted to allow the funding of the settlement from the ABC policies, and that relief was granted.

THE COURT:  And she didn't rule on the lifting of the stay to pay from the side A policy.

MR. AMRON:  The side A policy was not part of that relief.  That's correct.

THE COURT:  Is it because the settlement agreement was changed to --

MR. AMRON:  Not to my understanding, with respect to that language.  That was not a modification of the language.  It was not presented to Judge Beckerman, because the side A policy is not being used to fund this settlement.  So the modification --

THE COURT:  So I don't understand what your claim is then.  When Judge Beckerman lifted the stay, she lifted the stay with respect to a particular settlement agreement, and she allowed the funding of that settlement through these insurance policies.  So how can you complain to me now --

MR. AMRON:  Well, your Honor, if I may, with respect to what Judge Beckerman approved, it is the ABC policies, and the lifting of the stay to fund this settlement before the Court today.  And it's the ABC policies.

The side A policy, which is separate, was not anything that was placed before Judge Beckerman, and was not ruled on by Judge Beckerman.  And, in fact, that side A policy is not being used to fund the settlement before the Court today.  But what the language in paragraph 16 of the settlement seeks to do is

to limit the use of the side A policy to defense costs, and that is not what the language of the policy itself says.

THE COURT:  Let me -- I'm looking at Judge Beckerman's order.  The motion was to allow proceeds from the ABC policies to be used to fund the settlement.

Judge Beckerman ruled that the proceeds are property of the debtors' estates, but that the automatic stay imposed by Bankruptcy Code 362 does not bar XL Specialty Insurance Company, Westco, or Carmen Foster, collectively called the insurers, from paying, reimbursing, and/or advancing insurance proceeds under the ABC policies.  The fund is 7.6 million settlements for the following actions.

Now, you are saying that the side A agreement is not part of what she allowed?

MR. AMRON:  That is correct.

THE COURT:  So you're saying that since you have the property of the debtors' estate, that includes everything that was not specifically covered by this order of Judge Beckerman?

MR. AMRON:  No, your Honor.  That is -- my argument is different than that.

THE COURT:  Tell me again, because I'm very slow in this --

MR. AMRON:  No.  No.  There's a lot of moving parts, Judge, so I appreciate that.

Again, our argument is solely as to that one sentence,

N4PDPARC

the last sentence in paragraph 16 of the settlement, where the settlement itself seeks to narrow the scope of the side A policy, where the only -- the only thing that proceeds of the side A policy can be used for is defense costs. And the side A policy says otherwise. The side A policy specifically provides that it would cover loss, which is a defined term. And loss includes defense costs, but it also includes settlements, judgment, et cetera.

THE COURT: Let me get an explanation of why paragraph 16 is worded this way.

MS. BARROW: Your Honor, can you repeat the question?

THE COURT: Why is paragraph 16 worded in this way? It says, first, that the ABC policies --

MS. BARROW: Yes, your Honor. So during --

THE COURT: It's different than the orders in Judge Beckerman's order.

MS. BARROW: So Judge Beckerman ruled on the ABC policies, which was found to be potentially property of the estate.

THE COURT: Can you hold on a minute?

Is there any difference between the Crum & Forster Insurance policies and the North River Insurance Company policy?

MS. BARROW: Those are all ABC policies, your Honor.

So, to clarify, what was before Judge Beckerman was

the usage of the ABC policies.  Whether or not the funds from the policies could be utilized for the settlement, that's before your Honor for your approval.

Separately and apart from the ABC policies are the side A policy, and that is not being utilized for today's settlement.  However, as part of -- a material term of the settlement agreement would be that it would be reserved strictly for, quote, unquote, defense costs, as defined under the settlement agreement, in part because the clients, the individual defendants and others, needed to reserve that for potential investigation defense costs.

The side A policy only covers the directors and officers, and not per diem, so the side A policy was never a property of the estate.  And so, therefore, Judge Beckerman did not rule explicitly upon it, although at many points during the evidentiary hearing it was mentioned, and there was no objection from the trustee's counsel at that time.

And, in their papers, they explicitly say that the proceeds of the side A policy are only for the benefit of the directors and officers.  So our position is that the trustee does not have standing, A, because they're not --

THE COURT:  You're going too far.  I want to understand paragraph 16.

MS. BARROW:  Of the settlement agreement --

THE COURT:  So as I read paragraph 16, the ABC

policies are to be used to pay the settlement amount, the notice fund, the settlement in the *Sabby* action, and as to the remaining proceeds in the policy, they and nothing else will be used to pay defense costs for claims, as a fund in the ABC policy.

And then the XL Insurance Company policy, is that different from the XL Specialty Insurance policy?

MS. MILLER:  That's the side A, your Honor.

THE COURT:  Pardon?

MS. MILLER:  That's the side A policy.

THE COURT:  Yes, but I'm confused whether it's the same or different policy from the XL Specialty Insurance policy.

MR. AMRON:  It's a different XL Specialty Insurance policy, your Honor.

THE COURT:  Okay.  So the proceeds of the different XL Insurance policy, it's called the side A policy, only that will be used to pay defense expense for claims, as those are defined in the side A policy.  Which claims are those?

MS. BARRETT:  Your Honor, your question is what claims would be utilized for the side A?

THE COURT:  Yes.  I don't understand the term.  That's what I'm trying to understand, the term.

Why are certain policies only to be used to pay defense costs for claims as defined in the ABC policies, and a

N4PDPARC

different policy to pay for claims as defined in the side A policy?  Is there any difference in the coverage?

THE COURT:  There is?

MS. BARROW:  Yes.

THE COURT:  There is?

MS. BARROW:  So the ABC tower of insurance is going to be exhausted with today's class action settlement hopefully, and then the side A is not being touched as it pertains to the class action settlement.  And so the intention is to reserve that money for defense costs of the directors and officers that are covered under the side A policy.

And the trustee has an asserted claims in the bankruptcy court against our client, certain individual defendants, and he is purported --

THE COURT:  Is it true that Judge Beckerman's order does not cover the side A policy?

MS. BARROW:  Yes, your Honor.

THE COURT:  So if it doesn't cover, you don't have the comfort order that you're looking for.

MS. BARROW:  Well, we don't need it, because Pareteum is not covered under the side A.

THE COURT:  What?

MS. BARROW:  Pareteum is not covered.

THE COURT:  What was the word that you used?  What was the word you used?

MS. BARROW:  Pareteum, the debtor, or the trustee.

N4PDPARC

THE COURT:  You're saying it has no interest in the side A policy.

MS. BARROW:  Correct.  The proceeds of the side A policy are only --

THE COURT:  How can I decide that?  Isn't that a bankruptcy issue?

MS. BARROW:  I don't think it needs to be decided. It's plain on the terms, and it's never been disputed in any of the papers.  Even the trustee's papers, they say it's only for the benefit of Pareteum's directors and officers.

MS. MILLER:  Your Honor, if I could make a point about the negotiations and how we ended up here?

THE COURT:  Yes.

MS. MILLER:  Basically, what happened is as we're negotiating this settlement, I said the class needs more.  The ABC policies are not enough.  I want the side A policies.  Give me the side A.  Give me some of the side A.  Give me something, or explain why not.

And the individual defendants were very concerned, because multiple investigations, multiple government investigations were bearing down on them at that time; would not be resolved imminently; and these -- and that side A policy only insures those individual defendants, not the debtor.  And so we reached an agreement that they would have that side A money to deal with just those government investigations, and

that is the reason why the class couldn't get more of it.

THE COURT:  So the government investigations are the claims defined in the side A policy?

MS. MILLER:  The defense costs relating to the government investigations is where that money is being used from the side A policies, and that's why it's not available to the class as part of the settlement here today.

And I would also like to point out, your Honor, in the papers submitted by the individual defendants in response to the trustee, there's a case cited by Judge Marrero.  It's really very, very similar on all fours with this case.  It's the *DeAngelis v. Corzine* case, in 2015.  Effectively, a very similar situation here with the Court finding that the person -- the trustee in that case was a non-party to the settlement, had no standing, did not have a property interest in the D&O proceeds, and, therefore, would face no formal legal prejudice as a result of the final approval of the proposed settlement, because it doesn't have a legal interest in the D&O insurance proceeds.

Furthermore, Judge Marrero found --

THE COURT:  That's been your argument, but I'm troubled by the second paragraph, second numbered paragraph of Judge Beckerman's order, which says that the proceeds of the ABC policies are property of the debtors' estates.  It's that, those policies and properties that was the side A policy.

MS. MILLER:  No, your Honor.

THE COURT:  Well, I have to be given an understanding why -- and I don't know why I should be deciding that, why, when you've got the comfort order, that you cover everything --

MS. MILLER:  Because on the face of the side A policy, it only covers the directors and officers.  That's why the side A --

THE COURT:  Why didn't you get a comfort order as you were required to do to cover everything?

MS. MILLER:  Because we're not using those proceeds to settle this case.  They convinced why we didn't need to, and, therefore, there was no need for a comfort order to cover that, because it's not an issue in this settlement today.  The ABC policies are.

THE COURT:  Does that mean I should read the parties agree the proceeds of the XL Insurance policy, the side A policy will not be used to pay defense costs and settlement funds?

MS. MILLER:  Your Honor, the side A policy will be used, and is being used by the individual defendants for defense costs in connection with government investigations.

THE COURT:  Okay.  The so I see that Judge Beckerman's order stands in the way of my ruling again in your favor.  If she holds that the ABC policies are property of the debtor, by implication, unless I'm shown something different, the side A

policy is the property of the debtor.  It may be property which doesn't have much of a property interest, but it's hard for me to decide that.  I've not had any preparation on this issue. I've not lived with this issue.  It has not been discussed before me before.

So I don't know that the liquidating trustee had an obligation to come before me before.

MS. BARROW:  Your Honor, the issue about the side A was never before the bankruptcy court, because the side A is not property of the estate.

THE COURT:  Is not.

MS. BARROW:  It's not property of --

THE COURT:  I'm not getting --

MS. BARROW:  It's not property of the estate.

THE COURT:  Yes.

MS. BARROW:  And I don't believe it's the trustee's argument that it is property of the estate, because that would be contrary to his position in the papers.  I believe his position is that he has rights under it for another reason.

THE COURT:  What's the other reason --

Is that right, Mr. Amron?

MR. AMRON:  If I may.  Thank you, your Honor.

The policy itself is property of the estate, but the proceeds would not be considered property of the estate.  I agree with that, because they are --

THE COURT:  So if they're not property of the estate, what interest do you have in them?

MR. AMRON:  We are, as your Honor indicated -- the capital C claims, as your Honor indicated, in paragraph 16, we as the trustee --

THE COURT:  What are the capital C claims?

MR. AMRON:  As those terms are defined in the side A policy, all right, in paragraph 16.

THE COURT:  Yes.

MR. AMRON:  We, as the liquidating trustee, are a claimant, as the plaintiffs themselves admit, and we've asserted a claim against the directors and officers, which it categorizes or is -- excuse me, is characterized as a claim under the side A policy.

What this sentence seeks to do --

THE COURT:  That means that order has to be decided not by the bankruptcy judge, but by me.

MR. AMRON:  I'm not going to indicate which Court should approve that, but --

THE COURT:  If it's not a matter of bankruptcy, if it's not a property of the estate --

MR. AMRON:  Sure.

THE COURT:  -- this is a contest in who has a better right to the proceeds of this side A policy, and if it forms its way into an attack on the settlement, then I have to decide

N4PDPARC

it.

MR. AMRON:  I appreciate it, your Honor.  What our position is, is nobody should be deciding it.  That the terms of the policy should dictate, and what they are trying to do with this one sentence is modify the terms of that insurance policy.  And the insurance policy --

THE COURT:  Can I see the side A policy?

MR. AMRON:  The side A policy is at Exhibit J to Ms. Miller's declaration at docket entry 288.

THE COURT:  What exhibit is it?

MR. AMRON:  Exhibit J.

THE COURT:  Where do I look --

MR. AMRON:  If you look, your Honor, at page 1 of 8, it's on the bottom right-hand side.  There are some endorsements, and then the policy itself.  On the bottom right, it says page 1 of 8.

THE COURT:  Yes.  I have one of two.  I'm on one of two.

MR. AMRON:  Yes.  Keep going.

THE COURT:  Page 1 of 8.  Okay.  I have page 1 of 8.

MR. AMRON:  Okay.  Under II, it says "definitions." On letter C, it says "claim."  And claim is defined as a written demand for monetary, non-monetary relief, any civil or criminal proceeding in a court of law or equity.  And then no. 3 is a formal civil, criminal, administrative, regulatory

N4PDPARC

proceeding or formal investigation.

The Trustee's claim qualifies as a capital C claim under this policy, and if you look at the insuring agreement above, under I, it says "the insurer will pay on behalf of the insured person's loss resulting from a claim," and it goes on and on and on.  But the term "loss," which is defined on page 2 of 8 under paragraph K, loss means damages, judgments, settlements, or other amounts, and defense expenses.

What this settlement and this language in paragraph 16 seeks to do is eliminate and modify this definition of loss, and the coverage under the policy by the agreement of the plaintiffs and the defendants.

THE COURT:  Let me understand, again, it means damages, judgments --

MR. AMRON:  Settlements.

THE COURT:  Or other amounts.

MR. AMRON:  Right, and defense expenses.

THE COURT:  Right, and expenses, yes, and defense expenses.

MR. AMRON:  Right.

THE COURT:  So they are asking for defense expenses.

MR. AMRON:  What they're trying to do, though, is limited.  It is only for defense expenses.  And, in fact --

THE COURT:  What more could it be for?

MR. AMRON:  It could be for settlements or judgments,

N4PDPARC

and, in fact, if you look at the defendant --

THE COURT:  So, are you prejudiced by the provision that the ABC policies will be used to pay the settlement costs and that -- well, I don't know what the -- sorry, withdrawn.

The ABC policies that are paid settlement funds, notice fund --

MR. AMRON:  Uh-huh.

THE COURT:  -- the Sabby action, and the main proceeds will be used to pay defense costs.

MR. AMRON:  Correct, your Honor.

THE COURT:  Then they say that the side A policy only will be used to pay defense costs.

MR. AMRON:  Correct, your Honor.

THE COURT:  Where are you hurt?

MR. AMRON:  Because, as the defendant in their reply to our objection indicated, they would love to settle or they would like to, but this settlement -- they would love to settle with the trustee.  Let me just be clear.  Sorry, your Honor. But this settlement that is before the Court precludes it, because of the term in paragraph 16.  But this contract --

THE COURT:  Which term?

MR. AMRON:  The last sentence of paragraph 16, which limits the use of the side A policy only to defense costs.  But the insurance policy says otherwise, and the insurance policy, according to its term -- and I can refer the Court to it --

N4PDPARC

only allows for modification by written endorsement signed by the insurance company.

THE COURT:  It is your position that if the side A policy would be used to pay the full scope of what the specialty -- the ABC policies pay, you'd be better off?

MR. AMRON:  I'm sorry, your Honor.  I didn't hear.  If you could repeat that.  I apologize.

THE COURT:  Yes.  If the side A policy would be usable for the full gambit of expenses, settlements, as well as defense claims, would you be benefited?

MR. AMRON:  That is what the policy calls for.  And we wouldn't be here --

THE COURT:  Would you be benefited?

MR. AMRON:  Yeah, potentially.  The reason is --

THE COURT:  If you were potentially benefited, Mr. Etkin, the trustee has standing.  If he can be hurt by this change, then he's got standing.

MR. ETKIN:  He's not going to be hurt, your Honor, one iota.  What he's coming in here with is a claim.  What he's leaving here with is a claim.  The argument --

THE COURT:  But they're saying that you're taking away the only potential he has to get the recovery.

MR. ETKIN:  Your Honor, he has no rights, no contractual rights, no rights to force a settlement, no rights to glom onto the insurance proceeds, unless he has a judgment,

which he doesn't have; or unless he has an agreement with the Ds&Os, which he could have but doesn't have. He's a competing claimant with a claim that's in litigation --

THE COURT: Where is it in litigation?

MR. ETKIN: Their claim is in litigation now.

THE COURT: Where?

MR. ETKIN: Our claim is settled.

THE COURT: Where is their claim in litigation?

MS. BARROW: The bankruptcy court, your Honor.

MR. AMRON: It's in the bankruptcy court.

MR. ETKIN: It's before Judge Beckerman -- they have a breach of fiduciary duties claim, and I want to be very careful, your Honor, because I want to cabin this settlement with the class which is utilizing the ABC tower, not the side A policy in which Judge Beckerman has already blessed. That's not an issue before your Honor.

The issue is the trustee coming in and taking a position that this one sentence constitutes a modification of the insurance agreement, and it doesn't. It's an understanding reached in the context of this settlement between the plaintiffs and the directors and officers.

THE COURT: Okay. I've heard enough. I hold that this issue is not for me. That the parties who are settling can arrange for their payment to be made in any way, and if there is some problem in that, it's a problem that should be

N4PDPARC

raised in the bankruptcy court with a proper remedial order addressed to the parties here.

Since this has not been done, and the objection is made through a settlement otherwise agreed to, I overrule the objection. Okay. That's the first issue.

The second issue is I'd like Ms. Miller --

MS. MILLER: Yes, your Honor.

THE COURT: -- to discuss how the order for giving notice has been satisfied.

MS. MILLER: So, your Honor, we have issued notice after the preliminary approval order was issued by your Honor on December 20th. There are two declarations from our claims administrator, Strategic Claims Solutions. They indicate that first notices were sent out to the brokerage firms, and then there were follow-up individual emails and mailings. And ultimately I'm quite pleased to -- I should also point out that there was a summary notice published in January in the Globe newswire and the PR newswire.

We had -- at the preliminary approval stage, you had some concern about how many claimants there would be, and if we could come up with a way to anticipate, you know, and maximize interest in putting in claims here for the members who are harmed. And I'm very pleased to report that there -- in the claims process, there were 1,700 valid claims that have been received, a few hundred that are in the cure process, and it

amounts to about 23 percent of the damaged shares claiming about $60 million in recognized losses.

This is a pretty great response from the class, particularly given that no class members objected and there was only one exclusion. So that is the status of the notice and the administration process. And the deadline has passed for claims to be submitted and for exclusions and opt-outs to be made.

THE COURT: I hold that the notice is adequate, that it conforms to the requirements set out at the time of the preliminary approval of settlement, and it's the -- what are the words of Rule 23, it's the --

MS. MILLER: Fair, reasonable -- oh, it comports with due process.

THE COURT: It's the best practical notice that could be achieved and was achieved as in accord with due process of law.

That means that there was one opt-out, wasn't there?

MS. MILLER: There was, your Honor. That person purchased about 9,000 shares.

THE COURT: That person has opted out, so the release provisions and the discharge provisions are not operative against that person.

MS. MILLER: Yes, your Honor.

THE COURT: I take it that the threshold -- this is a

question to Mr. Larkin.  I take it that the -- not Mr. Larkin.
This is for Mr. Greene or Ms. Barrow.

Ms. Barrow, I take it that the threshold for canceling
the insured -- canceling the settlement is not an issue, and
that the settlement will go through according to its terms, if
I could give approval.

MS. BARROW:  Yes, your Honor.

THE COURT:  Okay.

MS. MILLER:  Your Honor, if I may say, there were
about 280 million damaged shares, and only about 9,000 opted
out, so we are in great shape there.

THE COURT:  Thank you.

Ms. Barrow, could you turn your attention to paragraph
9 of the proposed settlement order, order of dismissal with
prejudice.  Should we not add to the terms of paragraph 9, in
the second sentence, after "settlement class member," the
phrase "who has not opted out?"

MS. BARROW:  Yes, your Honor.  That's fine.

THE COURT:  Okay.  So that will be done.

Would you turn to paragraph 14?  In the fourth line,
third and fourth line, it says that it may only -- oh, sorry.

MR. GOLDFARB:  Just a light blew, your Honor.

THE COURT:  What --

MR. GOLDFARB:  A light blew.

MS. MILLER:  A light blew.

THE COURT:  The Federal Government gets the best of everything.  This can happen.

All right.  Third and fourth line.  It may do so -- it may only do so after the bankruptcy court has entered a comfort order.

Well, we have a comfort order of December 13, 2022.

MS. BARROW:  Yes, your Honor.

THE COURT:  Shouldn't that be recited in the agreement.

MS. BARROW:  Yes.

MS. MILLER:  Yes, your Honor.

THE COURT:  Okay.  Probably in the whereas clause. Oh, you don't have a whereas clause.  I think you probably should break it out through a separate clause as a predicate for the claims administrator doing what a claims administrator has to do.

I'd like to hear about the plan of allocation now.  I guess it's Ms. Miller.

MS. MILLER:  Yes, your Honor.

THE COURT:  Do I need to fix this light while you're here?

MS. MILLER:  No.  We're fine.  We're fine, your Honor.

THE COURT:  Just a minute.

MS. MILLER:  Are we all okay.

MS. BARROW:  Yes.

THE COURT:  All right.  Ms. Miller.

MS. MILLER:  Okay.  So --

THE COURT:  Take off your mask.  Please.

MS. MILLER:  -- the plan --

THE COURT:  Take off your mask, please.

MS. MILLER:  Sorry.  The plan of allocation should also be approved, your Honor.  It fairly and rationally allocates the proceeds of the net settlement fund among the settlement class members based on the losses they suffered. And we did this with the assistance of our expert economist, Chad Kaufman, and we also addressed the fact that the 10(b) claims have a slight discount, which we discussed at the preliminary approval hearing.

There's a 10 percent --

THE COURT:  To recognize the greater difficulty improving --

MS. MILLER:  That's right, your Honor.  They have to prove scienter, and, therefore, that's an additional risk there.

So with respect to the section 11 claims, they get 100 percent recovery.  The 10(b) gets 90 percent recovery.  And the way that we were able to proceed with this administratively is if a person has shares traceable to the iPass acquisition, for example, their shares would have been acquired on February 12, 2019, at the tender offer price of 290.

Similarly, if a class member purchased shares of the secondary offering, they're traceable if they were purchased on 9-20-2019 at the offering price of 1.76. $1.76. So for those class members who can meet those specific requirements, they get the hundred percent. Everybody else gets the 10(b) number with the slight discount.

THE COURT: We had a motion earlier in the case attacking the standing of the Rule 11 class, because of the traceability issue.

MS. MILLER: Yes, your Honor.

THE COURT: So you were going to have discovery about that. I don't know if you did or not.

MS. MILLER: We did so at the time of the settlement. What happened is of course you sustained the complaint in full. We immediately proceeded with discovery with a priority on tracing, and we ultimately settled the claims with Squar Milner, and dismissed the claims with Dawson James. And we discussed one of the reasons why Squar Milner was more vulnerable as the auditor was because they made statements, and they had additional risk under 10(b) even though there was not a 10(b) claim made against them at the time of this settlement. But Dawson James was out of the case, because we could not demonstrate traceability.

THE COURT: Has the issue of which claimants are traceable to their shares, to a section 11 claim been resolved

yet, or was this an issue that the claims administrator has to decide?

MS. MILLER:  So in the process that I just described, in plan allocation where we address this with our expert economist, we only included class members who could clearly trace as section 11 claimants, because they purchased at the offering price on offering date, so there's some clarity there.

So there were actually $1.2 million in recognized losses of iPass purchasers.  So purchasers traceable to the iPass acquisition.  So two percent of the total recognized losses that were put in by the valid claimants.  And there were actually only a handful of secondary -- there were 14 claimants who had secondary offering claims.  It was a smaller amount. So we were able to manage that in a way that people who truly could trace, would get a slightly greater recovery.

THE COURT:  All right.  Is there any objection to the plan of allocation?

MS. MILLER:  No, your Honor.

THE COURT:  I approve the plan of allocation as fair and reasonable.

I think two more issues remain.  One is the approval of the class settlement as a whole, and the other is fixing of attorneys' fees.

MS. MILLER:  Yes, your Honor.

THE COURT:  Let me approve the settlement first, and

leave this issue for the next exploration.

I hold that the settlement is fair and reasonable and adequate. This is a complex case that would have raised great expense to all the parties, and would likely last some period of time more. Undoubtedly, the losing party would bring this up to the appellate courts.

It's a wise matter to try to fix risks and resolve the complexity and the expense by a settlement. So that first factor in the eight factors I have to read is satisfied.

As to the risks of establishing liability and damages, I'd like you to speak to that, Ms. Miller.

MS. MILLER: So, your Honor, we faced risks in two ways. There were risks on the merits of course. There's always a risk at trial, as the Elon Musk trial showed us. We had some risks on the section 11 claims, the ones continuing against Squar Milner, because of the traceability issue. We of course had some risk --

THE COURT: What were the main issues in misstatement?

MS. MILLER: Right. So we were going to be able to show that false statements were made. This is a restatement case. I'm very confident that I would have been able to do that. Here's the real risk. The company declared bankruptcy. The policies were wasting. Every additional minute that I spent litigating this case against the individual defendant meant less money that was ultimately going to be put into the

pot for the shareholders that I represent to recover.

THE COURT:  That's a different factor.  This factor's the risk of establishing liability and damage.  So section 11, you would have said that it's pretty easy to have shown the misstatements --

MS. MILLER:  So --

THE COURT:  -- as to --

MS. MILLER:  -- the risk aboard the section 11 claims relates to traceability issues, which would have been coming to a head very shortly in the litigation at the class stage.

THE COURT:  Well, that's -- it's either there or not.  That's not a very difficult issue.  The issue of proving scienter in a 10(b)(5) action would have been substantial.

MS. MILLER:  Yes.

THE COURT:  The question of damages, and causation of damage by the misstatements themselves always poses very substantial risk.

MS. MILLER:  The battle of the experts, your Honor.  A lot of uncertainty.

THE COURT:  So there was significant risk as to the 10(b)(5) case in establishing liability, and the damages would have presented a very difficult issue.

The third issue is the risk of maintaining class certification.  I think once I certified that class would have been stable, and I don't think there's a significant risk

there.  But that doesn't mean that there is a less expense or less complexity or less likelihood of success.

MS. MILLER:  Right.  Your Honor, and I would point out that we did make a classification motion that was supported by an expert declaration, and, in fact, you certified the class, but it was before the defendants had an opportunity to oppose, which they wanted to do.  So you opened that back up, and that's where things stood at the time of settlement.

THE COURT:  Yeah, but I think you would have had a stability of class.

MS. MILLER:  Yes.

THE COURT:  The range of reasonableness of the settlement fund, I was critical of that at the preliminary approval.  I remain somewhat critical of that.  I'm not sure, given the nature of the case, what was involved, and how it was proceeding, that recovery of about 8 percent of the scope of damage is sufficient.  However, the best way to do that is to ask the litigating parties.  It's in the plaintiffs' interest to get as much of a recovery as possible, including the lawyers, and it's in the defendants' interest to minimize that exposure.

I think I would have to say that since they think, and with the help of the mediator, they think that they had a reasonable settlement, I have to think that also.  In a sense, I have to defer to the parties in my own -- not in my own

intuitive idea -- of what was sufficient or not.  I've already talked about the proposed plan of allocation being fair and reasonable.  We're going to skip the proposed fee award for the moment.

There is a supplemental agreement which I don't quite understand.

MS. MILLER:  That would be the blow provision, your Honor, which we talked about a preliminary approval and also just now --

THE COURT:  It's academic now.

MS. MILLER:  Yes.

THE COURT:  As to defendants' ability to withstand the greater judgment, that's at issue.

MS. MILLER:  Yes.

THE COURT:  The company went into bankruptcy.  We have the individual.  It's always more difficult to get a recovery from the individual.  And the difficulty of getting recovery in any substantial amount justifies the settlement.

As to the reaction of settlement costs having only one opt out giving up the notices that were sent out shows the approval of the settlement class.  So I think that covers all the points.

Have I missed any, Ms. Miller?

MS. MILLER:  Your Honor, no.

I would only simply like to add that we had an unusual

number of calls from shareholders in this case wanting to be sure that their claims went in, and that they fully understood the process. And they were pleased to be getting something given the financial risks here with the bankruptcy and the wasting assets.

THE COURT: Is there any objection to this settlement by anybody here or by defendants?

Hearing no objection, and having found with all the factors that I'm supposed to determine that this settlement is fair, reasonable, and adequate, I so hold.

And now we get to the proposed fee award. Plaintiffs recover -- three firms I think --

MS. BARROW: So, your Honor --

THE COURT: -- make a request for a fee of $1,695,000, which was less than half of their time rates.

MS. MILLER: So to clarify, your Honor, the fee request covers lead counsel in this case, has nothing to do with Mr. Lax' individual *Sabby* case. That's separate, a separate settlement, separate individual settlement.

THE COURT: I don't need to be involved in that.

MS. MILLER: No. No. It's just his client, Mr. Sabby, gets his money when you approve the class action settlement, and not before.

THE COURT: But the mediator said something about a division between the two of you.

N4PDPARC

MS. MILLER:  So I was going to say, the other firm involved -- Mr. Nelson is here for the Loskot action, which is being settled here.  The section 11 claims relating to the iPass acquisition were subject to a case that he brought in state court in California.  They're being settled here.

THE COURT:  With a recommendation that there be a 70/30 split between your two firms.

MS. MILLER:  So Mr. Sabby, Mr. Lax's client, and the -- and lead counsel will be covering that, that whatever you determine the fee to be for counsel for Loskot in this case, but the 1.6 million in change request for the fees includes the fee that goes -- it covers 70 percent of the fee that goes to counsel for Loskot, and Mr. Sabby will cover 30 percent.

THE COURT:  It covers 70 percent of what?

MS. MILLER:  Of the fee going to counsel for Loskot.

THE COURT:  So do I have to also adjudicate the fairness of money going to Loskot?

MS. MILLER:  So the issue is what happened was -- so first we have the main fee request, which covers the only thing that -- well, there's two things.  The $1.6 million fee, which is a .47 multiplier.  We had over 3.6 million in lodestar.  I can tell you that I cut hundreds and hundreds of the firm's time for efficiency in this case.

This case was a toughy.  It required a lot of work.  I cut the hours a lot.

THE COURT:  You mean 3.6 million is net of cutting?

MS. MILLER:  So I mean there are at least 450 additional hours that I didn't include there.  So our multiplier is actually lower, but it -- anyway, our multiplier is no greater than .47.  And from the fee, whatever fee you choose to award to lead counsel, from that fee award, 70 percent of the Loskot fee to be determined by you will be paid by lead counsel, and 30 percent by Mr. Sabby.

So we had a mediator who addressed the Loskot fee.

THE COURT:  So I can rest assured that if I approve the $1,695,000 as a fee --

MS. MILLER:  Yes.

THE COURT:  -- there will be no further fee requests.

MS. MILLER:  Correct.  That will cover everything, your Honor.

THE COURT:  I think it's a reasonable fee.  I think you worked hard.  I think you worked long.  I think you recognized that there may not have been the best kind of settlement, because of the exigencies involved, and you cut appropriately.  I approve $1,695,000.

As to the expenses, you asked for $422,214.12.  The largest expense category was that of having bankruptcy counsel.

MS. MILLER:  Yes, your Honor.

THE COURT:  Hearing what Mr. Etkin has said today, it proves the reasonableness of that expenditure as well.

MS. MILLER:  Thank you, your Honor.

THE COURT:  So I approve the allowance of $422,214.12.

MS. MILLER:  And so that leaves I think just the very brief Loskot issue.  So the mediator, Mr. Murphy, made a decision there, which is appealable to your Honor, and the reason we're appealing it is, first, he suggested that it should be 11 percent of --

THE COURT:  I'm not taking this on appeal.  I decide this de novo.

MS. MILLER:  Yes.  Exactly, your Honor.

So Mr. Murphy determined it should be 11 percent. There's a slight error there, because the *Loskot* case does not include the 400,000 from Squar Milner, because that case did not sue Squar Milner.  So, if anything --

THE COURT:  Loskot's got an additional expense of $2,785.88, but it's not substantiated.

MS. MILLER:  I think their expenses might be more than that, but I've never seen an accounting of what the expenses are.

THE COURT:  Any expenses --

MS. MILLER:  Right.

THE COURT:  So how can I award them?

MS. MILLER:  So I -- Mr. Nelson reviewed the notice, which had a cap, and then after we submitted it, and it was approved by your Honor and sent out, he then said, I've got

some additional expenses.  But we're within 2,700 of the cap, so I haven't seen any documentation of that.  But we have a noticed cap that's 27 higher than the expenses that you just said were reasonable, so --

THE COURT:  All right.  So I approve the $422,214.12 in expenses.  I do not approve anything additional to that.

MS. MILLER:  Okay.  Your Honor, so regarding the Loskot fee, I appealed it because, first, the mediator said that Mr. Nelson had a reasonable argument that the damages for Loskot were about 12 percent of the overall damages; but the notice itself is based on damages of 270,000 damaged shares, 290 million in damages.  This was embraced throughout the mediation, in our moving papers, our plan of allocation.  All of that was agreed to by counsel for Loskot, and now they're saying that 10(b) damages are just 91 million.

THE COURT:  What do you want me to do?

MS. MILLER:  I would like you to give them $78,000, your Honor.

THE COURT:  Without justification?

MS. MILLER:  So the reason for that is because we suggested --

THE COURT:  Without justification?

MS. MILLER:  Oh, I was just trying to tell you my reasoning, my justification.  Do you not want me to say it?

THE COURT:  You want to give it to them out of your

N4PDPARC

money?

MS. MILLER:  It's out of my money.

THE COURT:  I don't care.

MS. MILLER:  So you don't care what I do -- I mean, it's supposed to be lead counsel's discretion, which the mediator did not address.

THE COURT:  You showed me justification for $422,000.

MS. MILLER:  That's the expense, yes.  So for the Loskot fee --

THE COURT:  I approved that.

MS. MILLER:  Yes, but for the Loskot fee, we would like to give them 78,000, which is their time at half of our multiplier, because we think they should --

THE COURT:  I don't care what you do with them.

MS. MILLER:  Okay.  Thank you.

THE COURT:  Anything else we need to discuss?

Yes, sir?  It looks important.  You're stepping up to the podium.

MR. NELSON:  I believe it is important, your Honor.  My name is Christopher Nelson.  I'm lead counsel for the section 11 case pending in California, the *Loskot* case.

THE COURT:  Yes.

MR. NELSON:  Our fees in this matter were submitted to Mr. Murphy, who has handled the mediation and resolution of this case for the last two years.

THE COURT:  Who is Mr. Murphy?

MR. NELSON:  Mr. Murphy is the mediator who handled the underlying settlement, and then arbitrated the fee dispute between my firm and Ms. Miller's firm.

THE COURT:  Did he give you an award.

MR. NELSON:  He did, your Honor.  He concluded that -- and he issued a memorandum decision which was provided to your Honor, and he concluded that my firm should be awarded 11 percent of any fees awarded by your Honor to Kahn Swick. And --

THE COURT:  11 percent out of the fee given to --

MR. NELSON:  To Ms. Miller's firm, your Honor.

THE COURT:  Well, does she object to that?

MS. MILLER:  Yes.

MR. NELSON:  She does, your Honor.

THE COURT:  How much do you think you should give them?

MS. MILLER:  Your Honor, we're willing to give them 78,000, which is their lodestar at half of our multiplier. They filed a copycat case that was stayed.  The damages are about --

THE COURT:  I didn't ask for argument yet.

MS. MILLER:  Yes.

THE COURT:  Remind me -- Ms. Miller, remind me of the procedure with regard to the California lawsuit.  I knew of it.

N4PDPARC

I don't know if --

MS. MILLER:  It will be - sorry, your Honor.

THE COURT:  I don't know if it was from the beginning or from some immediate point, but I think I knew about it rather early.

MS. MILLER:  So we --

THE COURT:  I urged that it be consolidated and brought here.  It never was, but it existed.  So what was the status of it?

MS. MILLER:  So it existed.  So the cases here were filed in Federal Court.  Then Mr. Sabby filed.  Then the Loskot action was filed.  Then in the course of the settlement, we agreed to fold in the Loskot claims, which were actually alleged in this case, but they were also alleged in that case.

THE COURT:  You wouldn't be able to settle without it.

MS. MILLER:  So to get closure -- that's correct.  We could have technically settled them here, because they didn't have any additional policies or coverage, but to give complete closure, the *Loskot* case is being settled here.  And that case will be formally dismissed in state court after approval of this settlement.

THE COURT:  You want 178,000, Mr. Nelson?  Is that your number?

MR. NELSON:  Yes, it is, your Honor.

THE COURT:  Half your represented lodestar?

N4PDPARC

MR. NELSON:  Yes, your Honor.  That's correct.

THE COURT:  Including work done by other firms.

MR. NELSON:  Including work done by the Kaskel law firm, who worked in drafting and prosecuting and settling this litigation in conjunction with my law firm.

THE COURT:  I've not seen any lodestar from you.

MR. NELSON:  I beg your pardon?

THE COURT:  I've not seen any submission by you.

MR. NELSON:  Your Honor, it's my understanding our lodestar was submitted by Ms. Miller in connection with the preliminary approval and in connection with the final fee request to the Court.  Our submissions were made to the mediator pursuant to agreement amongst Ms. Miller's firm, my firm, and the mediator, who then reached the conclusion set forth at Exhibit O to her declaration.

THE COURT:  Can you, Ms. Miller, point me to the place where Mr. Nelson's lodestar is shown?

MS. MILLER:  So, your Honor, the day before the preliminary approval hearing, Mr. Nelson told me in an email that they had 300,000 in lodestar, because I thought you might ask.  You asked me about my lodestar, not his.

MR. NELSON:  It's 350, Ms. Miller.

MS. MILLER:  And then later gave me --

MR. NELSON:  It's 350.

MS. MILLER:  -- a number that's 350.  I'm not sure

that that number is --

THE COURT:  Was there justification, support?

MR. NELSON:  I have a copy of that email if your Honor would like it.

THE COURT:  I don't know.  Was that submitted to me?

MR. NELSON:  It was submitted to Ms. Miller, and it was my understanding --

MS. MILLER:  So he gave me that number.  I don't have like the detail or anything like that, but I don't dispute that his numbers --

THE COURT:  Did you submit it to me?

MS. MILLER:  No.

THE COURT:  I don't understand how your work contributed to the result.

MR. NELSON:  Certainly.  May I respond, your Honor?

THE COURT:  Yes.

MR. NELSON:  Thank you.

So in 2018, the Supreme Court decided *Cyan v. Beaver County*, and the Supreme Court concluded that section 11 cases can be brought in parallel in federal or in state court.  My client, Mr. Loskot, elected to bring a case in tate court in California, because -- well, for a number of reasons, but the most basic of them are that there is generally accepted to be a lower pleading standard in state court.  We believed that there was a more attractive jury pool for the plaintiffs.

THE COURT:  You don't need much in the way of pleading in a section 11 case.

MR. NELSON:  Certainly not in pleading, your Honor, but to prove it up we would need a more favorable jury pool that we believe we could have received here in Federal Court in the Southern District.

THE COURT:  That's completely speculative.

MR. NELSON:  It certainly is, your Honor.  What is not speculative, however, is that the PSLRA does not apply to the section 11 claims brought in state court, and the discovery stay does not apply to claims brought in state court.

Mr. Loskot chose to present his claims in a state court in California, because that is his home state, and he wanted to be in state court, as is his right.  We filed the case.  We immediately served discovery.  We received responses. We fully briefed the various motions to dismiss of the company and the individual defendants.

We stayed our case in December of 2020 at the request of the mediator, and at the request of defendants.  And it was our understanding that Ms. Miller wanted us to stay our case, as well as the defendant, so that we did not run down the insurance policy at that time, and so as to maximize the potential of money recoverable for the class.

We participated in each of the mediations.  We participated in the settlement process.  And everything we have

N4PDPARC

heard until it came time to reach an agreement with Ms. Miller's firm was that we had done the class a great service by bringing our case and holding off on prosecuting our case when we --

THE COURT:  I don't see what service you brought other than not increased fees.

MR. NELSON:  It's --

THE COURT:  I mean, I decided the motions here.

MR. NELSON:  You certainly did, your Honor.

THE COURT:  I decided on the briefs submitted by Ms. Miller and the defendants.

MR. NELSON:  Yes, your Honor.

THE COURT:  So you didn't contribute to that.

MR. NELSON:  We did not, your Honor, but we brought additional pressure to bear on the company, and I don't believe that counsel for defendants would dispute that that lead to this settlement here.

THE COURT:  What additional pressure?

MR. NELSON:  Pardon, your Honor?

THE COURT:  What additional pressure?

MR. NELSON:  The additional pressure comes from a case that would be co-litigated and brought to bear against the company.

THE COURT:  If I decided ahead of that California case, there'd be nothing for it to decide.

N4PDPARC

MR. NELSON:  If the Court had decided to dismiss the action, your Honor?

THE COURT:  That, yes, and anything else, any rulings I make would be at least highly persuasive in the California court.

MR. NELSON:  They would be extremely, highly persuasive, your Honor.

THE COURT:  I don't know what you did to contribute to the result.

MR. NELSON:  We litigated the case.

THE COURT:  All I'm saying is it seems to me parasitical activity.  There's a lawsuit here, so we'll file it there.

MR. NELSON:  Your Honor, it is a lawsuit duly brought that we are allowed to bring, because my client, he wanted to bring it in state court.

THE COURT:  I know your client had a right to bring it in state court, and if your client had been first or more aggressive or the like, then litigation could have gone on in state court.  But it's a federal action.  It was brought here. I litigated here, and I don't see how you contributed to the result.  If you don't contribute to the result, you don't get a piece the action.

MR. NELSON:  Your Honor, I am somewhat at a loss as to how to respond to that.

N4PDPARC

THE COURT:  There is no response.

MR. NELSON:  No, your Honor.  We brought the case, and we were litigating the case actively.  The defendants asked us to stay it so that we would not diminish the insurance policies.  Ms. Miller's firm asked us to stay our case, so we would not diminish the insurance policies, and we did so.

THE COURT:  Why don't you and Ms. Miller have a little chat for 15 minutes, and see if you can resolve your differences.

MR. NELSON:  Thank you, your Honor.

MS. MILLER:  Thanks, your Honor.

THE COURT:  I guess you'll all have to wait.

You can chat in the jury room.  There.

(Recess taken)

THE COURT:  We are ready to go back on the record.

MR. NELSON:  We were unable to reach a resolution, your Honor.

THE COURT:  You can have your seats again.

Okay.  Go ahead.

MR. NELSON:  We were unable to reach a resolution, your Honor.  Ms. Miller offered us 78,000, which does not seem fair to us.

THE COURT:  That's what she offered before.

MR. NELSON:  68,000 before.  78,000 today, your Honor.

MS. MILLER:  Your Honor --

THE COURT:  Why don't you even it to $100,000?

MS. MILLER:  Your Honor, I would just say one thing. We not only litigated the case, but we funded it.  If this case was lost, we would have been out of pocket 430,000.

THE COURT:  Ms. Miller, I know.  I know.  I know.

MS. MILLER:  Yes.  Okay.

THE COURT:  You want 100?

MR. NELSON:  We can do 100, your Honor.  Thank you.

THE COURT:  One hundred.

MS. MILLER:  Thank you, your Honor.

THE COURT:  Okay.  Settlement is approved, and the recognition of the $1,695,000 awarded to Ms. Miller's firm. $100,000 of that will be given to Mr. Nelson's firm.

I have a couple of nits on the --

MS. MILLER:  Your Honor, if I could clarify, the payment of that fee will be 70 percent from lead counsel's fee and 30 percent from Mr. Sabby.

THE COURT:  Yes?

MR. LAX:  Yes, your Honor.

THE COURT:  So ordered.

MS. BARROW:  Your Honor, Erica Barrow.

THE COURT:  Can I ask you, Ms. Miller, to give me a more embracive order for fees than I have here?

MS. MILLER:  Yes.

THE COURT:  Okay.  So what do we have left to do?  Are

you going to give me a revised order for dismissal?  Are you going to give me a revised order for allocation for attorneys' fees?

MS. MILLER:  Yes, your Honor.

THE COURT:  Is there anything else I need to do today?

MS. BARROW:  Your Honor, would you like -- just on a housekeeping matter, would you like us to email chambers the revised draft of the dismissal order?

THE COURT:  Would I like what?

MS. BARROW:  Us to email chambers with the revised version of the dismissal order?

THE COURT:  No.  There's too many pages for us to copy.  Deliver it.

MS. BARROW:  Okay.

THE COURT:  All right?

MS. BARROW:  (Nodding head)

MS. MILLER:  Thank you, your Honor.

THE COURT:  You can give us it in Word, but give us a hard copy as well.

MS. BARROW:  Yes, your Honor.

THE COURT:  Okay.  I think we're finished.

MS. MILLER:  Yes, your Honor.

THE COURT:  Thank you all.

MR. LAX:  Your Honor, thank you.

MR. ETKIN:  Thank you, your Honor.

N4PDPARC

MS. BARROW:  Thank you, your Honor.

MR. GREENE:  Thank you, your Honor.

(Adjourned)